**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FIRST GUARANTY MORTGAGE<br><br>CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-10584<br><br>(Jointly Administered) |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL
ORDERS: (I) AUTHORIZING USE OF CASH MANAGEMENT PROCEDURES, BANK ACCOUNTS,
AND CERTAIN PAYMENT METHODS; (II) PROHIBITING SETOFFS AND
FREEZING OF BANK ACCOUNTS; (III) MODIFYING REQUIREMENTS OF
SECTION 345(b) OF THE BANKRUPTCY CODE; AND (IV) FOR RELATED RELIEF**

First Guaranty Mortgage Corporation ("FGMC"), and the above-referenced affiliated

debtors and debtors-in-possession (the "Debtors") under chapter 11 of title 11 of the United States

Code, §§ 101 *et seq.* (the "Bankruptcy Code"),[2] in these chapter 11 cases (the "Chapter 11 Cases"),

by and through the undersigned counsel of record, hereby file this motion (the "Motion"), pursuant

to §§ 105(a), 345, and 363 of the Bankruptcy Code; Rules 6003 and 6004(h) of the Bankruptcy

Rules; and Local Rules 2015-2(a) and 9013-1, for entry of an interim order (substantially in the

form attached hereto as **Exhibit A**, the "Interim Order") and a final order (substantially in the form

attached hereto as **Exhibit B**, the "Final Order") (i) authorizing the Debtors to continue to use (as

such capitalized terms are defined below) their existing Cash Management System, Bank

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number are: First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621). The location of the corporate headquarters and the service address for First Guaranty Mortgage Corporation is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

[2] All references to "§" or "section" herein are to sections of the Bankruptcy Code. All references to "Bankruptcy Rules" are to provisions of the Federal Rules of Bankruptcy Procedure. All references to "Local Rules" are to provisions of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Delaware (the "Court").

Accounts, and certain Credit and Electronic Payment Methods; (ii) authorizing the Debtors to open or close Bank Accounts or establish new or different Credit and Electronic Payment Methods, all in the ordinary course of business; (iii) prohibiting applicable banks from offsetting against or freezing any of the Debtors' deposit accounts; (iv) modifying the requirements of § 345(b) of the Bankruptcy Code; (v) scheduling a final hearing; and (vi) granting related relief.

## PRELIMINARY STATEMENT

1.      The relief sought in this Motion is critical to ensure that the Debtors continue to have reliable and ready access to cash receipts so they can pay for the ordinary and necessary expenses of their businesses and to avoid harm to parties who have entrusted funds to the Debtors. Without this relief, the Debtors would suffer immediate and irreparable harm because they would not be able to access cash receipts in order to fund business operations, thereby harming their businesses and depleting value from their estates to the detriment of creditors.  Granting this Motion, as well as other Motions, is necessary to ensure that the Debtors can pay their ordinary course operating expenses, and, ultimately, provide the Debtors with an opportunity to administer their business as a going concern.

2.      In support of this Motion, the Debtors rely upon and refer this Court to the Declaration of Aaron Samples (the "Samples Declaration" or the "First Day Declaration").

3.      As discussed in the First Day Declaration, market conditions, taken together with various other factors as more fully described in the First Day Declaration, resulted in a liquidity crisis for the Debtors, thereby precipitating the filing of these Chapter 11 Cases.

4.      For these reasons, and as more fully explained below, the Debtors request that this Court grant the relief requested herein.

# I.    JURISDICTION AND VENUE

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors confirm their consent pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with the Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The predicates for the relief requested are §§ 105, 345, and 363 of the Bankruptcy Code, Rules 6003 and 6004(h) of the Bankruptcy Rules, and Rules 2015-2(a) and (b) 9013-1(m) of the Local Rules.

# II.    STATEMENT OF FACTS

## A.    The Chapter 11 Cases

7.      On June 30, 2022 (the "Petition Date"), the Debtors commenced their Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court.

8.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to §§ 1007(a) and 1108 of the Bankruptcy Code.  To

date, no trustee, examiner, or statutory committee has been appointed in these cases by the United States Trustee (the "U.S. Trustee").

9.     A description of the Debtors' capital and corporate structures, businesses, and the events leading to commencement of these Chapter 11 Cases, as well as the facts and circumstances supporting this Motion, are set forth in the Declaration.

**B.     The Debtors' Cash Management System, Bank Accounts, and Credit and Electronic Payment Methods**

10.     Prior to the commencement of these Chapter 11 Cases, and in the ordinary course of their businesses, the Debtors maintained centralized cash management and monitoring procedures (the "Cash Management System") to efficiently collect, monitor, transfer, and disburse funds generated by the Debtors' business operations.

11.     The Cash Management System allows the Debtors to operate their business efficiently and meet their needs given their industry-specific needs as originators and sellers of collateralized residential mortgage loans.  During the fiscal year that ended December 31, 2021, the Debtors sold mortgage loans totaling $10.613 billion in unpaid principal balance, comprised of (i) $2.165 billion of Fannie Mae conventional conforming loans, (ii) $2.63 billion of Freddie Mac conventional conforming loans, (iii) $3.986 billion of Ginnie Mae loans, and (iv) $1.832 billion of other loans.[3]

---

[3] As used in this Motion, "Fannie Mae" refers to the Federal National Mortgage Association, and "Freddie Mac" means the Federal Home Loan Mortgage Corporation.  Fannie Mae and Freddie Mac are government-sponsored entities that buy and securitize mortgage loans originated by mortgage lenders.  This enables the mortgage lenders access to liquidity that is, in turn, supported by demand for residential mortgage backed securities ("RMBS").

As used in this Motion, "Ginnie Mae" refers to the Government National Mortgage Association, a federal corporation within the U.S. Department of Housing and Urban Development ("HUD").  Ginnie Mae guarantees investors the timely payment of principal and interest on

**Sources of Cash Receipts and the Flow of Funds**

12.     To assist the Court in understanding the Debtors' need to maintain their existing Cash Management System, a diagram reflecting the manner in which the Debtors have received funds and made disbursements is attached as **Exhibit C** (the "Cash Flow Diagram").  As reflected in the Cash Flow Diagram, which is intended to be representative of the manner in which funds have flowed into and out of the Debtors, the Debtors borrow funds from warehouse lenders[4] to use in the origination and purchase of residential mortgage loans.  The Debtors' warehouse lenders (the "Warehouse Lenders") are Customers Bank, Flagstar Bank, Texas Capital Bank, and J.V.B. Financial Group LLC (three of which also function as Repo Lenders).[5]

13.     For the Repo Lenders, the Debtors are short-term loan sellers and the Repo Lenders are loan buyers.  The Debtors (as sellers) seek a source of funding for use in purchasing or originating and closing, as applicable, mortgage loans, and the Repo Lenders (as buyers) are willing to provide such funds to the Debtors for use in the purchase or closing of mortgage loans upon the terms contained in the relevant master repurchase agreement.  To accomplish this goal, from time to time the parties hereto may enter into transactions in which the Debtors agree to transfer to a Repo Lender (as buyer) certain mortgage loans and the related assets against the

---

residential mortgage backed securities that, in turn, are backed by federally insured or guaranteed loans.

[4] Warehouse Lenders provide credit facilities to loan originators to pay for a mortgage that a borrower uses to purchase property.  These loans are typically very short – from origination of the residential mortgage loan until such time as it is sold on the secondary market.  As used by the Debtors in this Motion, "Warehouse Lenders" includes entities that purchase mortgages pursuant to master repurchase agreements (each a "Repo Lender" and collectively "Repo Lenders").

[5] As used in this Motion, the "Repo Lenders" are (i) Customers Bank, (ii) Texas Capital Bank, National Association, and (iii) J.V.B. Financial Group, LLC, as successor by merger to C&Co./PrinceRidge LLC (each a "Prepetition Repo Buyer" and, collectively, the "Prepetition Repo Buyers") and refers to a short-term lender to the Debtors with respect to certain purchased loans.

transfer of funds by the Repo Lender (as buyer), with a simultaneous agreement by the Repo Lender (as buyer) to transfer to Debtors (as seller) such mortgage loans and the related assets at a date certain against the transfer of funds by the Debtors (as seller).

14.    Funds from the sale of loans are used to, among other things, repay the Warehouse Lenders and fund the Debtors' business operations.

15.    At the same time, the Debtors are party to certain agreements with the Warehouse Lenders (the "Warehouse Agreements") under which the Warehouse Lenders advance and will finance the purchase of loans.  Loans that will be sold to or guaranteed by a governmental agency (such as Fannie Mae, Freddie Mac, or Ginnie Mae) (the "Agency Loans") are financed at 100%. With respect to jumbo mortgage loans, Warehouse Lenders will finance between 95% and 99% of the loan, and with respect to non-qualified loans (*i.e.* also referred to as non-conforming), Warehouse Lenders will finance between 90% and 95% of the loan.

16.    The Debtors also borrow funds from Repo Lenders, such as J.V.B. Financial LLC, to purchase loans that meet certain eligibility criteria.  Deutsche Bank, in its capacity as a trustee, determines whether any specific loan meets the requisite eligibility criteria.  If Deutsche Bank determines a specific loan meets the eligibility criteria, then Deutsche Bank will provide funds to the Debtors which, in turn, are sent to borrowers for immediate disbursement.  The overall flow of funds is similar to the manner in which funds are disbursed by the Warehouse Lenders in that Repo Lenders send funds to the Debtors from an account over which Deutsche Bank is custodian, and then the Debtors send funds to the appropriate party.

17.    Once originated or purchased, the Debtors then sell, on a permanent basis, the loans they originate or purchase to a number of parties including Fannie Mae, Freddie Mac, Ginnie Mae, and other private parties referred to as "Loan Purchasers" in the Cash Flow Diagram.

LEGALDOCS\22255787.v10

18.     In addition to loan origination and purchasing, the Debtors have also engaged in hedging activities in an effort to reduce risk due to volatility in pricing for loans that are originated and sold in fluctuating market conditions.  This has been necessary because there is a gap in time between the date a customer or borrower receives an interest rate lock at the time a mortgage loan commitment is issued and the date of settlement of the loan.  As set forth in the Declaration, margin calls in the weeks leading up to the Petition Date had an adverse impact on the Debtors' cash position.  The Debtors do not expect to be engaged in hedging activities post-petition.

19.     Funds remaining with the Debtors for business operations are then used for disbursements to vendors, for payroll, and to loan servicers or subservicers (collectively, the "Servicers"), including for fees or expenses (such as appraisals and the like, as needed).

20.     As events in the Chapter 11 Cases progress, the manner in which the Debtors receive funds may change.

**The Bank Accounts**

21.     The Cash Management System is comprised of thirty-nine (39) bank accounts (the "Bank Accounts") maintained at seven (7) different financial institutions (the "Banks" and each individually a "Bank").  The Banks include Customers Bank; Flagstar Bank; Texas Capital Bank; Wells Fargo, N.A.; Deutsche Bank; Bank of America, N.A.; and Signature Bank.  Texas Capital Bank; Wells Fargo, N.A.; Bank of America, N.A.; and Signature Bank are designated as authorized depositories by the Office of the United States Trustee for Region 3 (the "UST"), pursuant to the UST's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "Guidelines").  Customers Bank, Flagstar Bank, and Deutsche Bank are not designated as authorized depositories per the Guidelines.

LEGALDOCS\22255787.v10

22.     The Bank Accounts are identified and described on a schedule (the "Bank Account Chart") attached as **Exhibit D** (the "Bank Accounts" or each individually a "Bank Account"). The Bank Account Chart contains key pieces of information about each of the Debtors' Bank accounts, including (a) the manner in which they are titled based on recent bank statements, which reflects the status of any specific Bank Account if used to hold funds for other parties; (b) last four digits for each account number; (c) the account type (*e.g.*, warehouse, checking, etc.); (d) the applicable Bank; (e) whether the accounts are subject to draft agreements (such as to fund customer property taxes) and the name of the drafting party; (f) recent balances; and (g) a short description of the purpose and use for each account.  The three Bank Accounts at the bottom of the Bank Account Chart were established shortly before the Petition Date and include two accounts established for the benefit of the Debtors with account names of "Computershare Inc aaf KCC Client Funds" and naming "First Guaranty Mortgage Company" as the beneficiary (the "FBO Accounts").  The Debtors may open additional accounts immediately after the Petition Date to the extent needed.

23.     The Bank Accounts can be grouped into several categories as indicated in the Bank Account Chart.  These include (a) warehouse lending accounts (the "Warehouse Account"), where receipts from loan sales are deposited and from which the Debtors' participation in the loans is drafted; (b) operating accounts of the Debtors (the "Operating Accounts"), where disbursements are made for, among other things, ordinary business expenses; (c) custodial or restricted accounts (the "Custodial Accounts"), which hold funds over which the Debtors or a Servicer act as custodian

for other parties, such as HUD or borrower escrows; and (d) pledged accounts (the "Pledged Accounts"), serving as collateral for Warehouse Lenders.[6]

24.     Certain of the Bank Accounts on the Bank Account Chart occasionally have in excess of $250,000.00 in the account depending on the timing of receipts and disbursements.  The Bank Account Chart indicates recent balances shortly before the Petition Date.

## Disbursement Processes

25.     The Debtors use funds from the Bank Accounts to pay, among other things, the following items: (i) wages and employee benefits; (ii) amounts owed to contract counterparties and vendors; (iii) insurance premiums; (iv) taxes and fees; and (v) general operating costs.

26.     As part of the Cash Management System, all disbursements are approved through the Debtors' standard procedures under which ultimate approval authority for disbursements is currently vested in the Debtor's Chief Executive Officer (the "CEO"), who also has check-writing authority.  All disbursements over $20,000.00 require direct, rather than delegated, approval of the CEO.  Using internal reports, including aged accounts payable summaries, the Controller or CEO directs the Debtors' financial accountants regarding which invoices to pay, in what amounts, and when to make such payments.  The financial accountants then have the ability to select approved invoices for specific vendors that a Debtor intends to pay, and then batches of checks are run on a specific date based on the directives.

27.     The Debtors' non-payroll disbursements are primarily, but not exclusively, made through a weekly check run.  Subordinate employees requesting disbursements are required to get the appropriate level of approval prior to review and approval by the CEO of all disbursements.

---

[6] This Motion seeks authority for the Debtors to continue to engage in their usual and customary practices of disbursements with respect to funds for which the Debtors serve as a custodian or conduit.  This relief is set forth in paragraph 9 of the Interim Order.

Checks are typically printed each Friday on check stock that the Debtors have and can edit as necessary.[7]

28.    The Debtors have filed a separate motion requesting permission to pay outstanding payroll and benefits for employees (the "Payroll Motion").  The Payroll Motion provides a detailed description of the timing and manner of relevant disbursements.  Suffice to say for this Motion, payroll is managed by the Debtors' human resources department with payroll disbursements made electronically to all employees every other Friday (twenty-six (26) times per year) and certain commission payments disbursed twice monthly (twenty-four (24) times per year).

29.    The Bank Accounts are monitored daily for cash balances and placed in appropriate categories to show the Debtor's daily cash position.  The Bank Accounts are reconciled monthly by a financial accountant and reviewed by the Controller.  A financial accountant or the Controller maintains a spreadsheet to reconcile the general ledger to the Bank Accounts each month. Discrepancies are investigated by a financial accountant.  It is critical that the Debtors monitor their cash balance carefully because the Debtors, particularly in the days leading up to the commencement of these cases, have operated on very narrow daily cash margins, meaning that a delayed receivable or unexpected disbursement could quickly disrupt business operations due to an inability to pay for critical supplies or services.

30.    While the majority of disbursements are made by checks, the Debtors occasionally use credit or debit cards  (collectively, the "Credit Cards") in the ordinary course of their business for certain vendor payments, and certain parties draft payments (as indicated in the Bank Account

---

[7] Because the Debtors' can easily edit their name on their check stock, they are not seeking permission to forgo indicating their status as debtors-in-possession on post-petition checks.

Chart).  The Credit Cards are issued by American Express and Texas Capital Bank (Visa).[8]  There are seven (7) American Express cards with total monthly disbursements of approximately $40,000.00 to $45,000.00.  There is one (1) Visa card with five (5) employees having an extension with respect to such card and able to incur charges.  Monthly charges for the Visa card total approximately $40,000.00.  This motion requests authority to continue to use Credit Cards post-petition on an interim and then final basis, with monthly caps during the interim period equal to $45,000.00 for the American Express card and $40,000.00 for the Visa card.

31.     The Debtors also use electronic funds transfers and automatic clearing house transactions (collectively, "Electronic Transfers" and together with the Credit Cards, the "Credit and Electronic Payment Methods") in the ordinary course of their businesses.  Electronic Transfers are utilized in the funding and settlement process of residential mortgage loans.

32.     As set forth in the First Day Declaration, the Debtors believe that their business operations and cash management capabilities would be negatively affected if they are required to modify their Cash Management System, close their Bank Accounts, and cease using Credit and Electronic Payment Methods.  Opening new bank accounts and making disbursements solely by check would lead to delayed cash receipts and delayed disbursements—and the Debtors do not have sufficient cash reserves to maintain operations without a reliable and ready stream of cash receipts.  Lastly, their business would further be negatively affected—and residential borrowers and investors would be harmed—if the Debtors are not able to maintain their ordinary and customary practices with respect to Custodial Accounts.

---

[8] The Credit Cards have the names of authorized users on the physical cards, but the bill is issued to the Debtors, and the Debtors are the party responsible for all charges.

### III.   RELIEF REQUESTED

33.   By this Motion, the Debtors first seek entry of the Interim Order followed by scheduling of the Final Hearing and then entry of an order granting this Motion on a final basis.

34.   Pursuant to the Interim Order, the Debtors request that the Court (i) authorize continued use of the Cash Management System, Bank Accounts, and certain Credit and Electronic Payment Methods; (ii) authorize the Debtors to open or close Bank Accounts or establish new or different Credit and Electronic Payment Methods, all in the ordinary course of business; (iii) prohibit the Banks from offsetting against or freezing any of the Debtor's deposit accounts; (iv) modify the requirements of § 345(b) of the Bankruptcy Code; (v) waive any applicable stay and enter the Interim Order on an emergency or expedited basis; and (vi) for related relief.

### IV.   BASIS FOR RELIEF

#### A.   This Court Should Authorize the Debtors to Maintain Existing Bank Accounts

35.   The UST Guidelines require debtors-in-possession to, among other things, close all existing bank accounts and open new debtor-in-possession bank accounts; open a new set of books and records as of the commencement of a case; and make all disbursements of estate funds by check with a notation representing the reason for the disbursement. These requirements are intended to provide a clear line of demarcation between prepetition and post-petition transactions and operations, and to prevent a debtor's inadvertent payment of prepetition claims.

36.   The Debtors seek a waiver of the UST Guidelines' requirement for the closure of the Bank Accounts and opening of new post-petition bank accounts at depositories authorized by the UST. Maintenance of the Bank Accounts, Credit and Electronic Payment Methods, and the Cash Management System will greatly facilitate the Debtors' operations in chapter 11.  The continued maintenance of the Bank Accounts, in particular, is of paramount importance because

LEGALDOCS\22255787.v10

the accounts are used to collect revenues and effectuate payments to employees and vendors, as well as to investors, taxing authorities, and borrower hazard insurance companies.  Given the Debtors' narrow daily cash margins, strict enforcement of the UST Guidelines, including the requirement to close and open new accounts, would cause a severe disruption in the Debtors' activities and would impair the Debtors' ability to operate under chapter 11 if receivables are delayed and critical vendors cannot be paid in a timely manner as a result.

37.     Moreover, requiring the Debtors to close all Bank Accounts and reestablish entirely new accounts—and to otherwise disrupt the Cash Management System to comply with the UST Guidelines—would require considerable time and expense to the Debtors' estates, while affording limited benefits.  The commencement of the Chapter 11 Cases will already place a strain on the Debtors' relationships with their employees, customers, and vendors, all of whom are important to the Debtors' continued operations.  Requiring the Debtors to replace all of their Bank Accounts by opening entirely new accounts and to change all payment information with their business partners would not only cause delay, confusion, and disruption in the Debtors' operations, but would also jeopardize the Debtors' relationships with these parties.  Permitting the Debtors to continue using the Bank Accounts and the existing Cash Management Procedures is, therefore, essential to a smooth and orderly transition of the Debtors into chapter 11 and to avoid disruption of their businesses and operations.

38.     To guard against improper transfers resulting from the post-petition honoring of prepetition checks, the Debtors will promptly notify the Banks not to honor checks drawn on the Bank Accounts before the Petition Date, except upon limited Court-approved exceptions, such as with respect to borrower-related disbursements (for example, for property taxes and hazard insurance) from Operating Accounts (including any FBO Account) and Custodial Accounts or

disbursements to loan investors as to which the Debtors are merely conduits or custodians.  Subject to a prohibition against honoring prepetition checks or offsets without specific authorization from this Court, the Debtors request that they be authorized to maintain and continue the use of their Bank Accounts in the same manner and with the same account numbers, styles, and purposes as those employed prepetition.

39.     Moreover, no parties-in-interest will be harmed by the continued use of the Bank Accounts because the Debtors have implemented appropriate mechanisms to ensure that the Debtors will not make unauthorized payments on account of prepetition obligations. In addition, parties-in-interest and the U.S. Trustee can adequately monitor the flow of funds into and out of the Bank Accounts through the required monthly operating reports or such other reporting as may be required or ordered in these cases. In light of such protective measures and the disclosure obligations, the Debtors submit that the relief requested herein is in the best interests of the estates and creditors, and that compliance with the UST Guidelines would be unnecessary and inefficient.

40.     The Debtors further request that this Court authorize and direct the Banks to receive, process, honor, and pay any and all checks, electronic fund transfer, credit card, ACH payments, wires and other payment instructions, as well as drafts payable through, drawn, or directed on, such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto, irrespective of whether such checks, drafts, electronic fund transfers, credit card, or ACH payments are dated prior or subsequent to the Petition Date. With respect to the use of Credit Cards on an interim basis, the Debtors' request is limited to a monthly caps of $45,000.00 for the Debtors' American Express card and $40,000.00 for the Debtors' Visa card.

41.     In light of these common realities, Courts in this and other districts have noted that

an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in relevant part*, 997 F.2d 1039 (3d Cir. 1993); *see also Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1114 (5th Cir. 1995) (finding cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets"). Indeed, the United States Court of Appeals for the Third Circuit has concluded that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets").

42.     As a result, the Debtors request authority to continue to use their Cash Management System pursuant to §§ 105(a) and 363 of the Bankruptcy Code.  More specifically, § 363(c)(1) of the Bankruptcy Code authorizes the debtor-in-possession to "use property of the estate in the ordinary course of business without notice or a hearing," 11 U.S.C. § 363(c)(1), and § 105(a) empowers this Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title," 11 U.S.C. § 105(a).  The purpose of these sections is to provide a debtor-in-possession with the flexibility to engage in the ordinary transactions required to operate its business without undue oversight by creditors or a court.  *See Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992); *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007).  Thus many courts have held that § 363(c) grants debtors authority to continue the routine transactions that are necessitated by their cash management system.  *See Amdura Nat'l Distrib.*

LEGALDOCS\22255787.v10

*Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996); *Charter Co. v. Prudential Ins. Co. of Am. (In re Charter Co.)*, 778 F.2d 617, 621 (11th Cir. 1985).

43.     As discussed above, the Debtors' Cash Management System was established and used consistently by the Debtors in the ordinary course of business prior to the Petition Date.  Thus, continuing the use of the Cash Management System maintains the ordinary course of the Debtors' business rather than requiring radical alteration that could be expensive, burdensome, and disruptive at a time when the Debtors' businesses are fragile due to the transition into chapter 11.

44.     Moreover, the Cash Management System provides the Debtors with appropriate tools to manage their funds – and businesses – during this case while also ensuring controls are in place to prevent assets from being used without adequate disclosure and permission.  Indeed, as discussed above, the Cash Management System is not only predicated on the use of preexisting Bank Accounts and payment methods, but it also is premised on existing policies and procedures for when and how disbursements are authorized and made.  Said another way, the Cash Management System already provides the type of controls necessary for chapter 11 while also being fully compatible with the transparency and disclosure that chapter 11 requires.

45.     Accordingly, consistent with these provisions, the continued use of a banking and cash management system employed in the ordinary course of a debtor's prepetition business has been approved in a number of other cases in this District.  *See, e.g., In re Clover Techs. Grp., LLC*, No. 19-12680 (KBO) (Bankr. D. Del. Jan. 21, 2020) (authorizing the debtors to continue using their prepetition cash management system); *In re Bumble Bee Parent, Inc.*, Case No. 19-12502 (LSS) (Bankr. D. Del. Dec. 18, 2019), ECF No. 152 (authorizing the debtors' continued use of existing bank accounts); *In re Anna Holdings, Inc.*, No. 19-12551 (CSS) (Bankr. D. Del. Dec. 3, 2019) (same); *In re Destination Maternity Corporation, et al.*, No. 19-12256 (BLS) (Bankr. D.

Del. Nov. 12, 2019) (same); *In re Dura Auto. Sys., LLC*, Case No. 19-12378 (KBO) (Bankr. D. Del. Nov. 19, 2019), ECF No. 335 (same); *In re Forever 21, Inc.*, Case No. 19-12122 (KG) (Bankr. D. Del. Oct. 28, 2019), ECF No. 334 (same); *In re Furie Operating Alaska, LLC*, No. 19-11781 (LSS) (Bankr. D. Del. Sept. 27, 2019) (same); *In re Blackhawk Mining LLC, et al.*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 8, 2019) (same); *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (KG) (Bankr. D. Del. July 5, 2019), ECF No. 243 (same); *In re Mattress Firm, Inc.*, Case No. 18-12241 (CSS) (Bankr. D. Del. Nov. 7, 2018), ECF No. 758 (same).[9]

46.     Even if any aspects of the Cash Management System and related relief would be considered outside of the ordinary course, the Court may approve it pursuant to § 363(b) of the Bankruptcy Code, which authorizes the Court to do so after notice and an opportunity for hearing. Relatedly, the Court has authority under § 105(a) of the Bankruptcy Code to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Moreover, the relief requested is not in direct contravention of any specifically enumerated restriction or prohibition elsewhere in the Bankruptcy Code and is necessary to avoid harm to the Debtors, their creditors, and borrowers and others who have entrusted funds to the Debtors.

47.     Accordingly, the Debtors respectfully request that this Court allow them to maintain the Bank Accounts, maintain the Cash Management Procedures, and continue using their Credit Card and Electronic Payment Methods in the ordinary course as was done before the Petition Date and authorize and direct the Banks to process transactions in regard to the Bank Accounts. To the extent necessary, the Debtors request that the Court waive compliance with the UST Guidelines

---

[9] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

**B.      This Court Should Prohibit the Banks From Attempting to Setoff Against or Freeze the Debtors' Cash**

48.      Subject to § 553 of the Bankruptcy Code, the Banks should be prohibited from offsetting, affecting, freezing, or otherwise impeding the Debtors' use of any funds deposited in the Bank Accounts on account of, or by reason of, any claim (as defined in § 101(5) of the Bankruptcy Code) that the Banks may have against either of the Debtors or any non-debtor affiliate that arose before the Petition Date, absent further order of this Court.  Given the Debtors' narrow daily cash margins, setoffs or freezing the Debtors' funds would have serious adverse consequences to business operations and could harm borrowers who will then have unfunded mortgage loans.  Consequently, on an interim basis, the Court should prohibit the Banks from offsetting, affecting, freezing, or otherwise impeding the Debtors' use of funds deposited in the Bank Accounts.  *See, e.g., In re Gorham Paper and Tissue, LLC*, No. 20-12814 (Bankr. D. Del. Nov. 6, 2020) (interim order prohibiting bank from "offsetting, affecting, freezing, or otherwise impeding the Debtors' use of any funds deposited in the Bank Accounts on account of, or by reason of, any claim, as defined in § 101(5)) of any such Bank against the Debtors . . . absent further order of the Court.").

**C.      This Court Should Grant a Limited Modification of § 345(b) of the Bankruptcy Code on an Interim Basis for 45 Days**

49.      Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," § 345(b) requires the debtor to obtain from the entity with which the money is deposited a bond in

favor of the United States and secured by the undertaking of an adequate corporate surety, unless the Court for cause orders otherwise. 11 U.S.C. § 345(b).

50.     Local Rule 2015-2(b) authorizes this Court to grant interim relief from § 345(a) and (b) until a hearing on the merits of the Debtors' request to waive the investment requirements. Specifically, the Local Rule provides:

> Except as provided in Local Rule 4001-3, no waiver of the investment requirements of 11 U.S.C. § 345 shall be granted by the Court without notice and an opportunity for hearing in accordance with these Local Rules. However, if a motion for such a waiver is filed on the first day of a chapter 11 case in which there are more than 200 creditors, or otherwise with cause shown, the Court may grant an interim waiver until a hearing on the debtor's motion can be held.

Local Rule 2015-2(b). Here, interim relief is warranted because the Debtors have over 200 creditors between them, and the Debtors operate a carefully managed cash management system.

51.     Although Customers Bank, Flagstar Bank, and Deutsche Bank are not authorized depositories, the Debtors believe that the standards of § 345 are met because these banks are highly rated subject to supervision by federal banking regulators.  Accordingly, the Debtors believe that any funds that are deposited with these banks are secure, and thus, in compliance with § 345(a) of the Bankruptcy Code.

52.     Strict compliance with the requirements of § 345(b) would be inconsistent with § 345(a), which permits a debtor-in-possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money."  11 U.S.C. § 345(a).  Thus, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended § 345(b) to provide that its strict investment requirements may be waived or modified if the Court so orders "for cause."  11 U.S.C. § 345(b), amended by 140 Cong. Rec. H10752-01, 1994 WL 545773 (1994).

53.     Review of the factors analyzed by courts to determine whether "cause" exists to waive the requirements demonstrates that there is justification to extend the Debtors' time to comply with, or seek a waiver of, the requirements in § 345(b).  To elaborate, courts consider the "totality of circumstances" in determining whether "cause" exists, with particular regard to the following factors: (a) the sophistication of the debtor's operations; (b) the size of the debtor's operations; (c) the amount of investments involved; (d) the reasonableness of the debtor's request for relief from § 345(b) requirements in light of the overall circumstances of the case; (e) bank ratings of the financial institutions where debtor in possession funds are held; (f) the complexity of the case; (g) the safeguards in place within the debtor's organization of insuring the safety of the funds; (h) the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions; (i) the benefit to the debtor; and (j) the harm, if any, to the estate.  *In re Serv. Merch. Co.*, 240 B.R. 894, 895 (Bankr. M.D. Tenn. 1999).

54.     Here "Cause" exists to waive the requirements of § 345(b) on an interim basis for forty-five (45) days in these chapter 11 cases because Customers Bank, Flagstar Bank, and Deutsche Bank are highly rated, reputable, and well-capitalized institutions that are subject to supervision by national banking regulators.

55.     Moreover, the process of satisfying the requirements of § 345(b) would lead to needless inconvenience and inefficiencies in the management of the Debtors' operations, and a bond secured by the undertaking of a corporate surety would be unnecessary.  This extension, if granted, shall be without prejudice to the Debtors' rights to seek additional extensions on an interim or final basis in the future.

## V.   <u>REQUEST FOR INTERIM AND FINAL HEARING</u>

56.     As set forth, the Debtors request that the Court hold a hearing and enter the Interim

Order on an emergency or expedited basis and schedule a hearing and grant this Motion on a final

basis.

## VI.   **COMPLIANCE WITH BANKRUPTCY RULE 6003 AND WAIVER**
## **BANKRUPTCY RULES 6004(a) AND (h)**

57.     Lastly, the Debtors request that the Court determine that the relief requested in this

Motion complies with Rule 6003 of the Bankruptcy Rules and that waiver of Rules 6004(a) and

(h) of the Bankruptcy Rules is appropriate.

58.     Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and irreparable
> harm, the court shall not, within 21 days after the filing of the petition, grant relief
> regarding the following: . . (b) a motion to use, sell, lease, or otherwise incur an
> obligation regarding property of the estate, including a motion to pay all or part of
> a claim that arose before the filing of the petition, but not a motion under Rule 4001.

59.     The Third Circuit Court of Appeals has interpreted language similar to that used in

Rule 6003 of the Bankruptcy Rules in the context of preliminary injunctions.  In that context,

irreparable harm has been interpreted as a continuing harm that cannot be adequately redressed by

final relief on the merits and for which money damages cannot provide adequate compensation.

*See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 Fed. Appx. 907, 910 (3d Cir. 2007) (*citing*

*Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)).  Further, the harm must be shown to be actual

and imminent, not speculative or unsubstantiated.  *See, e.g., Acierno v. New Castle County*, 40

F.3d 645, 653-55 (3d Cir. 1994).

60.     As described in this Motion and the Declaration, the Debtors have complex

business operations that require reliable and ready access to cash receipts without interruption.

Requiring the Debtors to discontinue use of the Cash Management System, switch Bank Accounts,

and otherwise alter payment systems would lead to significant disruption (without real benefit). The Debtors would, at least for a time, be unable to track cash receipts or disbursements—and, further, could enter a period without adequate liquidity to maintain business operations from disruptions in electronic collections arising from the sale of loans.

61.     As a result, the Debtors respectfully submit that they have satisfied the "immediate and irreparable harm" standard of Rule 6003 of the Bankruptcy Rules and seek authority to continue to maintain their banking and cash management practices in the ordinary course of business.

62.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the Debtors submit that granting this Motion is essential to prevent irreparable damage to the Debtors' operations, going-concern values, and their efforts to pursue a sale or restructuring of the businesses.

63.     Accordingly, the relief requested herein is appropriate under the circumstances and under Rules 6003 and 6004(h) of the Bankruptcy Rules.

64.     Finally, should the Court be inclined to grant the Motion, the Debtors also seek a waiver of the notice requirements under Bankruptcy Rule 6004(a).

## VII.     NOTICE

65.     The Debtors will provide notice of this motion to: (i) the Office of the United States Trustee for the District of Delaware, (ii) all alleged secured creditors, (iii) the thirty (30) largest general unsecured creditors appearing on the list filed in accordance with Rule 1007(d) (on a consolidated basis), (iv) the Banks, and (v) any parties requesting special notice.  As this motion

LEGALDOCS\22255787.v10

is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).

## VIII.    CONCLUSION

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief requested herein; and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated: June 30, 2022                    **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Mary F. Caloway (DE Bar No. 3059)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
           tcairns@pszjlaw.com
           mcaloway@pszjlaw.com

-and -

**DENTONS US LLP**

Samuel R. Maizel
Tania M. Moyron
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Email:  samuel.maizel@dentons.com
           tania.moyron@dentons.com

*Proposed Counsel for Debtors and Debtors in Possession*