## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FIRST GUARANTY MORTGAGE CORPORATION, *et al.*,[1] | Case No. 22-10584 |
| Debtors. | (Jointly Administered) |

### MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) PAY EMPLOYEE OBLIGATIONS AND (B) CONTINUE EMPLOYEE BENEFIT PROGRAMS, AND (II) GRANTING RELATED RELIEF

First Guaranty Mortgage Corporation, ("FGMC"), and the above-referenced affiliated debtors and debtors in possession (the "Debtors")[2] under chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code"),[3] in these chapter 11 cases (the "Chapter 11 Cases"), by and through the undersigned counsel of record, hereby move (the "Motion"), pursuant to §§ 105(a), 363(b), 507(a)(4), and 507(a)(5), Bankruptcy Rules 2015-2(a) and (b), 6003, and 6004, and Local Rule 9013-1(m), for entry of an interim order (substantially in the form attached hereto as **Exhibit A**, the "Interim Order") and a final order pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f) (substantially in the form attached hereto as **Exhibit B**, the "Final Order") (i) authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, commissions, other compensation, and reimbursable expenses, and (b) continue employee benefits programs in

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are:  First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621).  The location of the corporate headquarters and the service address for First Guaranty Mortgage Corporation is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the First Day Declaration (defined *infra*).

[3] All references to "§" or "section" herein are to sections of the Bankruptcy Code.  All references to "Bankruptcy Rules" are to provisions of the Federal Rules of Bankruptcy Procedure.  All references to "Local Rules" are to provisions of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Delaware (the "Court").

the ordinary course of business, including payment of certain prepetition obligations related thereto (together, the "Employee Compensation & Benefits"), (ii) scheduling a final hearing, and (iii) granting related relief.  In further support of the Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The relief sought in this Motion is critical for the Debtors to continue to operate their business and retain the morale and services of their employees (the "Employees," of which current Employees are referred to as "Current Employees" and former employees as "Former Employees"), who are, in turn, necessary for the Debtors' ability to evaluate their restructuring options, accommodate their customers, and maximize and preserve value for all stakeholders.  In support of this Motion, the Debtors rely upon and refer this Court to the *Declaration of Aaron Samples in Support of Chapter 11 Petitions and First Day Pleadings* (the "Samples Declaration" or the "First Day Declaration").  For these reasons, and as more fully explained below, the Debtors request that this Court grant the relief requested herein.

### I.      JURISDICTION, VENUE AND STATUTORY BASIS FOR RELIEF

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012.

3.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

4.      The Debtors confirm their consent pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f) to the entry of a final order by the Court in connection with the Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

US_ACTIVE\121825757\V-6

5.     Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The predicates for the relief requested are §§ 105, 345, and 363, Bankruptcy Rules 6003 and 6004(h), and Local Rules 2015-2(a) and (b) and 9013-1(m).

## II.     STATEMENT OF FACTS

### A.     General Background

7.     On the date hereof (the "Petition Date"), the Debtors each commenced voluntary cases for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to §§ 1107(a) and1108.  No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

8.     Prior to the Petition Date, FGMC was a full service, non-bank mortgage lender, offering a full suite of residential mortgage options tailored to borrowers' different financial situations.  It was one of the leading independent mortgage companies in the United States that originated residential mortgages through a national platform.  As described in more detail in the First Day Declaration, FGMC's business included the origination, purchase, service, sale and/or securitization of residential real estate mortgage loans.  However, just prior to the Petition Date, as a result of an extreme and unanticipated liquidity crisis and resultant inability to obtain additional capital, FGMC ceased all of its mortgage loan origination activity and separated nearly 80% of its workforce.  The Debtors commenced these Chapter 11 Cases to evaluate their restructuring options, accommodate their customers, and maximize and preserve value for all stakeholders.

9.      Additional information regarding the Debtors, including their business and the events leading to the commencement of these Chapter 11 Cases, is set forth in the First Day Declaration.

**B.      The Debtors' Work Force and Their Compensation Structure**

10.      As of the Petition Date, the Debtors have approximately 134 Current Employees.[4] Prior to the Petition Date, on June 24, 2022, approximately 471 Former Employees were separated from employment as discussed in the First Day Declaration.

11.      The majority of the Current Employees are paid a base amount of salary ("Base Pay") as their primary form of compensation.

12.      Prior to June 24, 2022, the Debtors' workforce included approximately 292 Employees paid, in whole or in part, on a commission basis tied to the value of closed loans (which Employees are called the "Commission Employees" and each a "Commission Employee," and the commissions they earned are referred to collectively as the "Commissions" and individually as a "Commission"). Commission Employees are or were primarily sales-staff or "originators," and received compensation pursuant to one of three types of pay frameworks: (1) Base Pay and Commission ("Base Pay Plus Commission"); (2) Base Pay recovered against Commissions earned; and (3) only Commissions, with no Base Pay.

13.      Currently, the Debtors employ approximately eight Commission Employees, all of whom are paid on a Base Pay Plus Commission basis. The Debtors retained these Commission Employees because they hold licenses in critical jurisdictions and thus can provide services that will assist in the preservation and closing of existing, but not yet closed, loans and in turn, to the smooth transition into and through chapter 11.

---

[4] Employees are further divided in "exempt" or "non-exempt," with exempt Employees not eligible for overtime under applicable law, and non-exempt Employees being eligible for overtime under applicable law.

14.     The Debtors' practice has been to pay certain Commissions to Commission Employees that are terminated without cause, in the event that the Commission(s) were attributable to the Employees' work and become payable after termination.

### 1.     Payroll Schedules

15.     Traditionally, and with limited exception noted below, Employees receive wages and salaries, including Base Pay and Commissions, (the "Wages") according to the following, applicable schedules:

- Twice monthly, generally on every other Friday (26 pay cycles a year), the Debtors pay Employees Base Pay (which is paid to non-Commission Employees in the amount of (a) current Wages for exempt Employees and (b) Wages one week in arrears for non-exempt Employees).

- On the 15th of every month,[5] the Debtors pay Employee Commissions for (i) certain "Direct to Consumer Retail, Wholesale and Correspondent" business channels related to the prior month (i.e., July 15th would be a date payable for June commissions) and (ii) after recovering applicable Base Pay, for "Distributed Retail" channels for loans that were funded between the 16th and last calendar day of the prior month (e.g. June 16 to June 30).

- At the end of every month, the Debtors pay Employee Commissions, after subtracting applicable Base Pay, for "Distributed Retail" channels for loans that were funded from the 1st-15th calendar days of the same month.

### 2.     The Debtors' Latest Payrolls

16.     The Debtors' latest payrolls for (i) Commissions for "Direct to Consumer Retail, Wholesale and Correspondent" channels was June 15,  2022, (ii) Base Pay was Friday, June 24, 2022 (the "June 24 Payroll"), and (iii) Commissions for Distributed Retail channels was June 28, 2022.[6]

---

[5] Or closest business day, if the 15th is not a business day.

[6] In the June 24, 2022 Payroll, the Debtors paid terminated Employees current for time-worked, regardless of whether the Employee would have been paid in arrears if they had remained.  The Debtors' Employees, including the June 24 terminated Employees are located in different states and largely work from home.

17.    On June 24, 2022, the Debtors conducted a large reduction in force ("RIF").  On that date, the Debtors also paid terminated Employees paid time off ("PTO") in accordance with company policy.  The Debtors also paid terminated Employees severance benefits.

### 3.    Outstanding Amounts to Employees and the Upcoming Payrolls

18.    The Debtors estimate that Current Employees are owed, in the aggregate, approximately $504,000 and Former Employees approximately $1,450,000 on account of accrued Wages including unpaid wages, salaries, Commissions, paid leave, and other regular compensation earned before the Petition Date (collectively, the "Unpaid Employee Wages").    Unpaid Reimbursable Expenses (defined below) are not included in these figures and are addressed separately below.  In addition, the above amounts may fluctuate depending on contingencies such as loan closings.[7]

19.    The Debtors seek authority to pay Unpaid Employee Wages, which include prepetition Commissions (after applicable recovery of Base Pay) as they come due (e.g., on July 15, 2022) (i) to each Current Employee to the extent owed (although no insider will receive more than the amount available under the § 507(a)(4) statutory cap absent further order of the Court, which is currently $15,150.00 per employee) and (ii) to Former Employees (notably those who were separated on June 24, 2022), up to each individual's available amount up to the § 507(a)(4) cap.

20.    Postpetition, the Debtors' average monthly gross payroll for their Current Employees is expected to be approximately $1.3 million.  This payroll is expected to consist primarily of Wages that are not Commission-related, because a majority of their Commission Employees were a part of the June 24, 2022 RIF.

---

[7] Unpaid Commissions earned for prepetition work will be paid no earlier than July 15, 2022.

21.     The next scheduled payrolls for the Debtors are (a) July 8, 2022 for Base Pay (under which current Employees will be owed pre- and postpetition Wages), and (b) July 15, 2022 and July 29, 2022 for Commission pay (depending on the applicable origination channel).  In the July 8, 2022 payroll, the Debtors seek authority to pay Former Employees (subject to availability under that Former Employee's individual § 507(a)(4) cap balance) amounts that had been reconciled or adjusted as owed from any underpayment from the June 24 Payroll, including recently submitted expenses, uncalculated overtime, etc. (with these amounts as the "Adjustments").

22.      The Debtors have sufficient cash to pay Wages for these payrolls for Current Employees, and also to make payments requested in this Motion to Former Employees (up to the limit of the § 507(a)(4) cap), which, as noted, total approximately $1,450,000 in the aggregate.

23.     By this Motion, the Debtors seek authority, but not direction, to (i) pay their Current Employees Unpaid Employee Wages (which arose prepetition) in the ordinary course of business consistent with past practice and (ii) to pay Former Employees any Unpaid Employee Wages up to the § 507(a)(4) cap, including through (a) Adjustments in the July 8, 2022 payroll and (b) ordinary course Commission payments made postpetition (but no earlier than July 15, 2022, and up to the § 507(a)(4) cap).

**4.      Payroll Costs**

24.     The Debtors use support payroll processing, payroll tax calculations and filings, and other payroll-related services (all such costs, collectively, the "Payroll Costs") through vendor Ultimate Kronos Group (the "Payroll Vendor").  The Payroll Vendor invoices the Debtors quarterly, and the next invoice will be billed and payable in July 2022 for services provided for the second quarter of 2022.  The Debtors seek authority to honor prepetition amounts of Payroll

Costs, including amounts owed to the Payroll Vendor (which is estimated at $85,000) to ensure continued payroll services during the Chapter 11 Cases.

## C.   **The Monthly Bonus Structure**

25.     The Debtors operate a monthly Bonus Plan (the "Bonus Plan") for certain non-insider Employees.  Payments under the Bonus Plan are an integral part of the qualifying Employees' pay, and are amounts these Employees depend on.  As such, the Debtors and these Employees consider amounts under the Bonus Plan as a critical portion of Employee compensation.

26.     Employees earn amounts under the Bonus Plan during a calendar month or quarter based on performance, which amounts are then paid on the 15th calendar day of the subsequent month or quarter.  Specific treatment under the Bonus Plan is based upon employment category, with plans for account managers, Wholesale closers and funders, Consumer Direct retail closers and funders, Consumer Direct loan processors, operational managers, and Distributed Retail, Correspondent, Wholesale, and non-QM underwriters, in addition to other underwriters.  The Debtors estimate that on July 15, 2022, a total of approximately $1,600,000 will be due and payable under the Bonus Plan[8] (representing approximately $1,400,000 to Former Employees and $200,000 to Current Employees), for an average amount of $12,598 per Employee with respect to amounts earned prepetition.  Going forward, approximately 45 Current Employees are eligible under the Bonus Plan, which the Debtors seek to pay postpetition.

27.     The Debtors seek authority to (a) pay Current Employees in the ordinary course all Bonus Plan amounts, no matter when earned (subject to the caveat that no prepetition amount will

---

[8]  By way of comparison, the Debtors paid a total of $1,500,000 under the Bonus Plan on June 15, 2022.

be paid pursuant to the Interim Order in excess of the § 507(a)(4) cap; although the Final Order seeks payments of all amounts), and to (b) pay Former Employees' Bonus Plan amounts that will not exceed the § 507(a)(4) cap for any individual Employee.[9]  For the avoidance of doubt, the relief sought with respect to the Bonus Plan does not include the payment of any obligation to an "insider" (as that term is defined in § 101(31)).

**D.**    **Contractors**

28.    The Debtors have utilized independent contractors ("Contractors") in their business, including Wheeler Staffing Partners Inc. ("Wheeler") for staffing and recruiting needs. The Debtors currently owe Wheeler approximately $13,100 for prepetition services from one individual's services payable in late July 2022.  Given the uncertainty that the Debtors face with the Chapter 11 Cases, the Debtors believe they may need to utilize Wheeler or other Contractors during the Chapter 11 Cases.  Through this Motion, the Debtors seek to pay Wheeler the prepetition amount owed (in the ordinary course), and to retain and pay Contractors in the ordinary course postpetition.

**E.**    **Deductions and Other Employee Benefit Programs**

29.    In addition to Wages and/or Commissions, Employees receive other forms of compensation, including health benefits, paid time off, and reimbursement of certain business expenses (collectively, the "Employee Benefit Programs").  The Employee Benefit Programs include, but are not limited to: (a) PTO; (b) expense reimbursement for certain employment-related

---

[9] Certain loan origination Employees were also entitled to payment of sign-on bonuses, which amounts are not payable unless the Employee was actively employed with the Debtors.  All of these Employees have been terminated before the Petition Date.  The Debtors made all sign-on bonus payments to employees that were due while the employees were actively employed.  The Debtors do not seek authority at this time (and may or may not in the future) to pay sign-on bonus amounts postpetition for terminated employees.

activities; (c) 401(k) retirement savings plan; (d) a healthcare program, including dental and vision coverage; and (v) workers' compensation insurance. Some of these programs are funded by Employees through payroll deductions and/or through employer contributions, as described below.

### 1. Deductions and Withholding

30.    Certain of these Employee Benefit Programs are funded by the Employees themselves through payroll deductions or a combination payroll deductions and contributions from the Debtors (the "Deductions"). For instance, the Debtors are required by law to withhold from the Employees' wages amounts related to, among other things, national, regional, and local income tax (the "Employee Payroll Taxes") for remittance to the appropriate taxing authorities. The Employee Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority when the Employees' payroll checks are disbursed.

31.    As of the Petition Date, the Debtors estimate that the aggregate amount of accrued, but unpaid, Deductions by Current Employees for Base Pay[10] is approximately $95,000. The Debtors seek authority to continue deducting and remitting amounts to the appropriate third parties in a manner consistent with historical practice for any unpaid Deductions that relate to the period prior to the Petition Date and to continue the Deductions in the ordinary course of the Debtors' business, consistent with past practices.

### 2. Business Expense Reimbursements

32.    The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on the Debtors' behalf.[11] Such expenses typically include, but are not limited to, business-related travel expenses (including mileage), conference

---

[10] Given the contingencies involved with Commission pay (notably, loan closings), the Debtors are unable at this time to provide an accurate estimate for Deductions for Commission Pay.

[11] Expenses may include company related obligations incurred by employees on credit cards.

fees, and other items (the "Reimbursement Obligations").  Expense reports detailing the Reimbursement Obligations are submitted for reimbursement by the Employees and generally must be supported by copies of receipts.  Expenses are paid with payroll.

33.     Though expenses are processed daily, the expenses incurred by Employees on behalf of the Debtors throughout the year vary because there may be delay between when an Employee incurs an expense and submits the corresponding expense report for processing. Therefore, it is difficult for the Debtors to determine the exact amount of Reimbursement Obligations that are due and owing for any particular time period.  However, with that caveat, the Debtors estimate that, as of the Petition Date, the Debtors owe at least $80,000 of Reimbursement Obligations to all Employees (current and former), and also believe that few, if any, Employees are owed for expenses related to work engaged in prior to 180 days before the Petition Date or are be owed expenses earned within 180 days of the Petition Date in excess of amounts available under the applicable § 507(a)(4) cap.  The Debtors seek authority to pay (a) remaining Employees in the ordinary course all Reimbursement Obligations amounts, no matter when earned, and to continue to pay these amounts in the ordinary course of the Debtors' business, and (b) Former Employees' Reimbursement Obligations amounts that will not exceed the § 507(a)(4) cap for any individual employee (provided that the Debtors reserve the right to seek authority to pay amounts above the § 507(a)(4) cap (to the extent it applies) at a future date).

**3.      PTO**

34.     The Debtors provide eligible Employees with PTO.  The ability to receive payments for unused PTO depends on whether the Employee is Exempt or Non-exempt.

35.     Non-exempt Employees accrue PTO each pay-cycle and are entitled to receive a payout of accrued, but unused, PTO in their final pay-check upon separation.   In the June 24

Payroll, the Debtors paid PTO to eligible non-exempt Employees who were separated under the June 24, 2022 RIF.[12]

36.     In contrast, exempt Employees do not receive payment for unused PTO.  Exempt Employees have no set limit for PTO and do not accrue PTO.  The Debtors do not track PTO balances for exempt Employees as there is no need since exempt Employees do not receive payout of PTO upon termination.

37.     As of the Petition Date, the Debtors have approximately $120,000 on their books for accrued PTO for their Current Employees.

38.     The Debtors believe that the continuation of PTO policy for their current Employees is essential to maintaining Employee wellness and morale during the Chapter 11 Cases.  Further, the policies are broad-based programs upon which all Current Employees have come to depend, and the continuation of those programs will not create any material cash flow obligations beyond the Debtors' normal payroll obligations.  Moreover, disruptions or changes to these policies could have a direct impact on Employee commitment, morale and retention, to the detriment of the Debtors.

39.     The Debtors therefore seek authority to honor their existing PTO policies to the extent it would permit Current and any other hired and continuing Employees to use their prepetition accrued leave in the ordinary course of business, and going forward.  The Debtors are not, by this Motion, seeking permission to cash out any accrued and unused PTO of *continuing* Employees, but do seek the authority, in the Debtors' discretion, to pay Nonexempt Employees

---

[12] To the Debtors' knowledge, all Employees separated prior to June 24, 2022 also received all owed PTO, Wages, severance and any other amounts owing.

for unused PTO, as permitted per policy, that accrued within the 180 days prior to the Petition Date as well as for postpetition earned PTO.

### 4.    Health Plans

40.    The Debtors offer all Employees who are full-time and their eligible dependents (collectively, the "Dependents") the option of medical, dental, and vision insurance.  The Debtors' Health Plans are fully insured, and there is no estate liability apart from payment of premiums and related administrative costs.

41.    For medical insurance, including prescription drug coverage, the Debtors offer coverage (the "Medical Plan") through Cigna (the "Health Provider").  The costs of the Medical Plan are borne in part by the Debtors and in part by Employees.  The Debtors have generally borne[13] approximately 45% to 73% of the costs of the Medical Plan for eligible Employees, and the Employees bear the remainder of the costs, based on dependent elections.  If an Employee elects insurance coverage for dependents, the monthly cost for the premiums is deducted from payroll on a bi-weekly basis.  The Debtors seek to continue the Medical Plan postpetition.

42.    For dental insurance, the Debtors also offer coverage through the Health Provider (the "Dental Plan").  The costs of the Dental Plan are borne in part by the Debtors and in part by Employees.  The Debtors bear approximately 41% to 70% of the costs of the Dental Plan for eligible Employees, and the Employees bear the remainder of the costs, based on dependent elections.  If an Employee elects insurance coverage for dependents, the monthly cost for the premiums is deducted from payroll on a bi-weekly basis.

---

[13] Costs in this section are based on data pre-existing the June 24, 2022 RIF, and adjusted numbers for the current workforce are not yet known.

43.     For vision insurance, the Debtors offer coverage through the Health Provider (the "Vision Plan," and, together with the Medical Plan and Dental Plan, the "Health Plans"). The costs of the Vision Plan are borne in part by the Debtors and in part by Employees. The Debtors bear approximately 50% of the costs of the Vision Plan for eligible Employees, and the Employees bear approximately 50%.  If an Employee elects insurance coverage, the monthly cost for the premiums is deducted from payroll on a bi-weekly basis.

44.     In total, the Debtors' aggregate prepetition monthly cost for premiums under the Health Plan was approximately $550,000.  Due to the June 24, 2022 RIF, however, the Debtors expect this amount to decline materially during the Chapter 11 Cases.

45.     The Debtors also offer their Employees the benefit of maintaining a respective health-savings account through HSA Bank (affiliated with Cigna) and a flexible savings account through TaxSaver (the "HSA & FSA Benefits").  The HSA & FSA Benefits are funded entirely by the individual Employee participant, although administrative expenses related to administration are paid by the Debtors. The Debtors seek authority to pay amounts necessary to maintain their Health Plans (including the HSA & FSA Benefits) by paying the Health Provider, HSA Bank and TaxSaver prepetition amounts, and to pay these amounts in the ordinary course of its business postpetition.

46.     Furthermore, and for similar reasons, the Debtors seek to continue to perform any obligations under § 4980B of the Internal Revenue Code to administer Continuation Health Coverage ("COBRA") (*see* 26 U.S.C. § 4980B) in respect to eligible Former Employees.  The Debtors utilize the vendor BenefitFirst to administer COBRA.  The Debtors believe that any prepetition costs related to COBRA coverage benefits are *de minimis* (BenefitFirst invoices the Debtors monthly for approximately $4,200 per month, and the next invoice will be sent in July,

2022). The Debtors also employ New York Life to assist with Family and Medical Leave and ADA administration, which has a cost of approximately $1,400 per month.  In addition, the Debtors employ a vendor to assist with FSA administration at a cost of approximately $1,000 per month.  In order to maintain Employee morale and ensure the orderly administration of the estate, the Debtors request authority to pay in their discretion any of these prepetition costs and continue to pay postpetition in the ordinary course.

### 5.    Employee Life Insurance and Workers' Compensation

47.    The Debtors' Employees and their families depend on insurance provided by the Debtors as a fundamental aspect of compensation.  Any disruption or perceived disruption regarding insurance benefits or coverage would damage morale and may cause Current Employees to seek employment elsewhere.  The Debtors offers eligible Employees premium based group life insurance ("Life Insurance"), accidental death and dismemberment insurance ("AD&D"), disability and other similar insurance through New York Life, which coverage will be transferred to Unum on and will become effective as of July 1, 2022.  The amount of monthly premiums for Life Insurance and AD&D total approximately $25,000, less voluntary employee deductions.[14] The Debtors do not believe any amount is owed for prepetition coverage under the Life Insurance and AD&D programs.

48.    The Debtors also provide workers' compensation insurance through Chubb (the "Workers' Compensation Insurance").  The amount of the annual premium is approximately $75,000,  which the Debtors believe has been paid in full and no amount is due and outstanding. The Debtors must continue the claim assessment, determination, adjudication, and payment

---

[14] Life Insurance is portable at time of termination, however, otherwise, the insurance benefits described in this sub-section end at an Employee's termination.

process related to the Workers' Compensation Insurance without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.  To the best of Debtors' knowledge, there are no open claims as of the Petition Date against the Workers' Compensation Insurance. Because the Debtors are statutorily and/or contractually obligated to maintain their Workers' Compensation Insurance, their inability to do so may result in adverse legal consequences that disrupt these Chapter 11 Cases.  Thus, the Debtors seek authority, but not direction, to (a) maintain their Workers' Compensation Insurance in the ordinary course of business on a postpetition basis and (b) modify the automatic stay solely to allow Employees to assert claims against the Workers' Compensation Insurance.

49.     In summary, the Debtors believe that they are current on all and claims obligations and seek to maintain these programs postpetition during the Chapter 11 Cases.  To the extent amounts are owed, however, the Debtors seek authority, in their discretion, to pay any accrued and unpaid prepetition premiums and related charges and to continue the above benefits postpetition and to deliver the Employees' portion of any accrued and unpaid prepetition premiums to the corresponding administrators in connection with the payment of the Wages and withholding obligations.

**6.      The 401(k) Plan**

50.     The Debtors offer eligible Employees the opportunity to participate in a defined 401(k) contribution plan through Principal (as recordkeeper) which allows for voluntary employee pre-tax deferrals (the "401(k) Plan").  Employees participating in this program may contribute up to the federal statutory cap per year, and the Debtors deduct the employee pre-tax deferrals from Employee paychecks for each pay-cycle.  The Debtors' 401(k) Plan includes a match by the

16

Debtors of up to 3.5%. Failure to timely forward the Employees' 401(k) Plan deductions may be a violation of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), resulting in potential personal liability for the Debtors' officers for such deducted amounts. Maintaining the 401(k) Plan as a part of the Employee Benefit Programs is critical to maintaining employee morale.

51.     The Debtors seek authority to transfer Employee contributions in connection with the payment of Wages and withholding obligations described above. Administration fees for the 401(k) Plan are paid by Employee Participants. The Debtors do not believe any 401(k) Plan payments will cause the total payments made for prepetition Employee obligations to exceed the statutory limit for priority claims of $15,150; however, if that is not the case, the Debtors believe that standard administration costs related to these retirement benefits are *de minimis*, and the Debtors request authority to pay in their discretion any such prepetition costs to maintain employee morale and ensure the orderly administration of the estates.[15]

### III.     RELIEF REQUESTED

52.     By this Motion, the Debtors first seek entry of the Interim Order followed by scheduling of the Final Hearing and then entry of an order granting this Motion on a final basis.

53.     Pursuant to the Interim Order, the Debtors request that the Court: (a) authorize the Debtors to pay and continue to administer postpetition the Employee Compensation & Benefits, including (i) to pay, in the ordinary course as amounts arise postpetition, (ii) to pay, in the ordinary course, Current and Former Employees up to the § 507(a)(4) cap, and (iii) to pay identified third

---

[15] In addition to standard administration costs, these retirement programs are subject to audits. Currently, an audit is occurring. The Debtors believe the current audit may be subject to the automatic stay. Given the Debtors' limited human and financial resources, the existing audit may need to be suspended or modified.

parties, including the Health Provider and Payroll Vendor, any amounts owed; (b) waive any applicable stay and enter the Interim Order on an emergency or expedited basis; and (c) grant related relief.

54.     Pursuant to the Final Order, the Debtors request that the Court:  (a) authorize the Debtors to pay and continue to administer postpetition the Employee Compensation & Benefits, including (i) to pay, in the ordinary course as amounts arise postpetition, (ii) to pay, in the ordinary course Former Employees up to the § 507(a)(4) cap, Current Employees (other than insiders) all prepetition amounts that may be due regardless of the § 507(a)(4) cap, and (iii) pay identified third parties including the Health Provider and Payroll Vendor any amounts owed; (b) waive any applicable stay and enter the Interim Order on an emergency or expedited basis; and (c) grant related relief.

## IV.    BASIS FOR RELIEF

55.     Sections 105(a) and 363(b)(1) and (c)(1) of the Bankruptcy Code and the "necessity of payment" doctrine provide statutory support for the requested relief.  Further, payments of the majority of the amounts of Employee Compensation & Benefits will be required both (a) to confirm a plan (requiring payment of all administrative expenses) and (b) to comply with applicable, non-bankruptcy law in the operation of the Debtors' business.

### A.    Certain of the Employee Compensation & Benefits Are Entitled to Priority Treatment

56.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation & Benefits owed to the Employees to priority treatment.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including sick leave pay earned by an individual, and (b) contributions

18

to an employee benefit plan).  Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees, and should not materially affect recoveries for general unsecured creditors.  Indeed, payment of the Employee Compensation & Benefits at this time enhances value for the benefit of all interested parties.

57.     The Debtors note that the majority of Employee Compensation & Benefits and related taxes that the Debtors request authority to pay and/or honor are amounts entitled to priority in payment under §§ 507(a)(4), (5), and (8)(D).  If the aggregate prepetition Wages, Employee Benefits, and PTO that accrued within the 180 days prior to the Petition Date exceeds the sum of $15,150 allowable as a priority claim under §§ 507(a), (a) if the Employee is a Former Employee, the Debtors are not seeking authority to pay this amount, and (b), if the Employee is a Current Employee, the Debtors are not requesting *interim authority*, by this Motion, to pay any such excess amounts.  Thus, *on an interim basis*, the Debtors request authority to pay or honor all *prepetition* amounts of Employee Compensation & Benefits in the ordinary course of business, but only up to the $15,150 priority cap for each Employee.  However, the Debtors seek authority in the Final Order to pay Current Employees (other than insiders) prepetition amounts above this cap.

**B.     Payment of Certain Employee Compensation & Benefits Is Required by Law**

58.     The Debtors seek authority to pay the applicable Deductions to the appropriate third-parties.  These amounts principally represent wages that governments, Employees, or judicial authorities have designated for deduction from the Employees' paychecks.  Indeed, certain Deductions are not property of the Debtors' estates, because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf.  *See* 11 U.S.C. § 541(b)(1), (d); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages

created a trust relationship between the debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Because the Deductions may not be property of the Debtors' estates, the Debtors request authorization to transmit the Deductions on account of the Employees to the proper parties in the ordinary course of business. Failure to remit such Deductions could subject the Debtors to disputes or collection efforts from governmental authorities or third-parties that may not respect the automatic stay.

**C.    Payment of the Employee Compensation & Benefits is Proper Pursuant to § 363(b) of the Bankruptcy Code and the "Doctrine of Necessity"**

**1.    Section 363 and the Debtors' Ordinary Course of Business**

59.    Section 363(c)(1) of the Bankruptcy Code expressly grants the Debtors the authority to "enter into transactions . . . in the ordinary course of business" and "use property of the estates in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1). Therefore, the Debtors believe they are permitted to pay all postpetition amounts due pursuant to the Employee Compensation & Benefits, as such actions are in the ordinary course of the Debtors' business.  Out of an abundance of caution, however, the Debtors seek entry of an order granting the relief requested herein to provide certainty and avoid any disruptions to their business operations.

60.    In addition, the Court may grant authority to pay amounts arising prepetition pursuant to §§ 363(b) and 105(a).  Section 363 provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under § 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions."  *See, e.g., In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (requiring that the debtor show a "sound business

20

purpose" to justify its actions under § 363) (internal citations omitted); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

**2.    Section 105(a) and the Necessity of Payment Doctrine**

61.    The Court may also authorize payment of prepetition claims in appropriate circumstances under § 105(a), which codifies the inherent equitable powers of a bankruptcy court and empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Specifically, the Court may use its power under § 105(a) to authorize the payment and continuation of the Employee Compensation & Benefits under the "necessity of payment" rule (also referred to as the "doctrine of necessity").

62.    The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Ry. Co.*, 657 F.2d 570 (3d Cir. 1981).  The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor.  *Id.* at 581 (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment").  Moreover, in 2017, the U.S. Supreme Court, in *Czyzewski v. Jevic Holding Corp.*, recognized that courts "approve[] interim distributions that violate ordinary priority rules," generally when there are "significant Code-related objectives

21

that the priority-violating distributions serve," including "***payment of employees' prepetition***

***wages***." 137 S. Ct. 973, 985 (2017) (emphasis added).

63.     This is because the necessity of payment doctrine is designed to foster a debtor's

rehabilitation, which courts have recognized is "the paramount policy and goal of chapter 11." *In*

*re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Just for Feet,*

*Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade

vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re*

*Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-

possession of pre-petition claims outside of a confirmed plan of reorganization is generally

prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy

courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the

debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124

B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of

toolmakers as "necessary to avert a serious threat to the Chapter 11 process").

**3.      The Need for Approval of Payment of the Employee Compensation & Benefits**

64.     The Debtors' request for authority to make payments of the Employee

Compensation & Benefits as set forth herein is warranted.  The majority of the Employees rely

exclusively on the Employee Compensation & Benefits to satisfy their daily living expenses and

to provide security and assurance for themselves and their families regarding reacting to and

planning for major life-events.  Consequently, the Employees will be exposed to significant

financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee

Compensation & Benefits.  Additionally, continuing ordinary course benefits will help maintain

Employee morale, and avoid Employee flight that could jeopardize the Debtors' ongoing business

efforts and endanger creditor recoveries.

65.     Moreover, Current Employees provide the Debtors with services necessary to conduct the Debtors' business through the current Chapter 11 Cases, and the Debtors believe that absent the payment of the Employee Compensation & Benefits, the Debtors may experience turnover and instability at this critical time in their chapter 11 efforts.  The Current Employees are vital and the Debtors will face extreme difficulty in replacing them.  Enterprise/going-concern value may be materially impaired to the detriment of all stakeholders in such a scenario.  The Debtors therefore believe that paying and honoring their Employee Compensation & Benefits is a necessary and critical element of the Debtors' efforts to preserve value during the operation of their business during this case.

## V.     COMPLIANCE WITH BANKRUPTCY RULE 6003 AND WAIVER BANKRUPTCY RULES 6004(A) AND (H)

66.     Lastly, the Debtors request that the Court determine that the relief requested in this Motion complies with Bankruptcy Rule 6003 and that waiver of Bankruptcy Rules 6004(a) and (h) is appropriate.

67.     Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding the following: . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001

68.     The Third Circuit Court of Appeals has interpreted language similar to that used in Bankruptcy Rule 6003 in the context of preliminary injunctions.  In that context, irreparable harm has been interpreted as a continuing harm that cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.  *See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 Fed. Appx. 907, 910 (3d Cir. 2007) (*citing Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)).  Further, the harm must be shown to be actual and

23

imminent, not speculative or unsubstantiated.  *See, e.g., Acierno v. New Castle County*, 40 F.3d 645, 653-55 (3d Cir. 1994).

69.     As described in this Motion and the Declarations, the Debtors respectfully submit that the relief requested herein is necessary and appropriate to ensure a smooth transition into chapter 11, to preserve essential Employee morale to continue operating in the ordinary course, to maintain existing relationships with the Debtors' Employees during the turbulent early stages of these bankruptcy cases, and to preserve and maximize value for the benefit of the Debtors' creditors.  As set forth herein, the relief requested in this Motion is essential to those objectives.

70.     As a result, the Debtors respectfully submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and seek authority to pay and honor the Employee Compensation & Benefits as proposed herein.

71.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the Debtors submit that granting this Motion is essential to prevent irreparable damage to the Debtors' operations, going-concern values, and their efforts to pursue a sale or restructuring of the businesses.

72.     Accordingly, the relief requested herein is appropriate under the circumstances and under Bankruptcy Rules 6003 and 6004(h).

73.     Finally, should the Court be inclined to grant the Motion, the Debtors also seek a waiver of the notice requirements under Bankruptcy Rule 6004(a).

US_ACTIVE\121825757\V-6

## VI.    <u>NOTICE</u>

74.    The Debtors will serve this Motion, the First Day Declaration, and the Notice of Hearing on:  (i) the Office of the United States Trustee for the District of Delaware; (ii) all alleged secured creditors; (iii) the thirty largest general unsecured creditors appearing on the list filed in accordance with Bankruptcy Rule 1007(d); (iv) all Employees; and (v) any parties requesting special notice.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

No previous motion for the relief sought herein has been made to this or any other court.

## VII.    <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief requested herein; and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

US_ACTIVE\121825757\V-6

Dated: June 30, 2022             **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Mary F. Caloway (DE Bar No. 3059)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
       tcairns@pszjlaw.com
       mcaloway@pszjlaw.com

-and -

**DENTONS US LLP**

Samuel R. Maizel
Tania M. Moyron
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Email:   samuel.maizel@dentons.com
       tania.moyron@dentons.com

*Proposed Counsel for Debtors and Debtors in Possession*

26