**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FIRST GUARANTY MORTGAGE<br>CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-10584 (CTG)<br><br>(Jointly Administered) |

**DECLARATION OF AARON SAMPLES IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Aaron Samples, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.     I am the Chief Executive Officer of First Guaranty Mortgage Corporation ("FGMC") which is the sole Member of Maverick II Holdings, LLC ("Maverick", together with FGMC, the "Debtors"). I am familiar with the Debtors' business, financial affairs, and day-to-day operations.

2.     On the date hereof (the "Petition Date"), the Debtors each commenced a case (together, the "Chapter 11 Cases") by filing a petition for relief under chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

3.     I submit this Declaration to provide an overview of the Debtors' business and the Chapter 11 Cases and support for the Debtors' "first day" applications and motions (collectively, the "First Day Pleadings"). I am over the age of 18, competent to testify, and authorized to submit this Declaration on behalf of the Debtors.

4.     Except as otherwise noted, I have personal knowledge of the matters set forth herein. All facts set forth in the Declaration are based on my personal knowledge, my discussions

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621).  The Debtors' mailing address is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

with other members of the Debtors' senior management, my review of relevant documents, and/or my opinion based on my experience and knowledge of the Debtors' operations and financial condition.  In making the Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing the Declaration.  If I were called to testify as a witness in this matter, I could and would testify competently to the facts set forth herein.

5.      The Declaration is divided into two parts.  Part I provides background information about, among other things, the Debtors' business operations, their workforce, their corporate and capital structures, and the events leading up to the filing of these Chapter 11 Cases.  Part II provides an overview of the relief sought by the First Day Pleadings, as well as additional evidence in support thereof.

## PART I

## BACKGROUND

### I.    Overview of the Debtors' Business

6.      Prior to the Petition Date, the Debtors operated as a full service, non-bank mortgage lender offering a full suite of residential mortgage loan options tailored to borrowers' different financial situations.  The Debtors were one of the leading independent mortgage companies in the United States that originated residential mortgages through a national platform.  As described in more detail below, the Debtors' business included the origination, purchase, service, sale, and/or securitization of residential real estate mortgage loans.  However, due to unforeseen historically adverse market conditions for the mortgage lending industry, including unanticipated market volatility, the Debtors have experienced significant operating losses and cash flow challenges.  As a result of these challenges, they were forced to cease all of their origination activity and terminate the employment of nearly eighty percent (80%) of their workforce just prior to the Petition Date.

7.      FGMC's corporate headquarters are located in Plano, Texas.  The Debtors have regional offices in Texas, Virginia, Utah, Hawaii, Maryland, Missouri, Nevada, New Jersey, and

North Carolina.  FGMC is licensed to operate in all fifty states and the District of Columbia and is a national Ginnie Mae[2] and Fannie Mae[3] direct lender and approved Freddie Mac seller and servicer, with licenses and/or approvals from the Federal Housing Administration ("FHA"), the United States Department of Veterans Affairs ("VA"), Ginnie Mae, and the United States Department of Agriculture.  As an originator and seller of collateralized residential mortgage loans, during the fiscal year that ended December 31, 2021, the Debtors originated mortgage loans totaling $10.613 billion, comprised of (i) $2.165 billion of Fannie Mae conventional conforming loans, (ii) $2.63 billion of Freddie Mac conventional conforming loans, (iii) $3.986 billion of Ginnie Mae loans, and (iv) $1.832 billion of other loans.

8.      There are three main components, or channels, to the Debtors' mortgage loan business:  (a) wholesale loan originations; (b) retail loan originations; and (c) correspondent lending.

a.  <u>Wholesale Loan Originations</u>.  The Debtors' wholesale loan origination channel produced Ginnie Mae, Fannie Mae, Freddie Mac, and Non-Agency loans but was focused primarily on non-qualified mortgage ("Non-QM") loans to consumer borrowers who do not meet the attributes, typically based on the traditional income verification, required for a "qualified mortgage" under federal lending regulations.  The Debtors offered Non-QM loans for borrowers based on alternative credit methods such as "bank statements" and 1099-only income.  In the wholesale mortgage loan business, the

---

[2] As used in this Declaration, "Ginnie Mae" refers to the Government National Mortgage Association, a federal corporation within the United States Department of Housing and Urban Development ("HUD").  Ginnie Mae guarantees investors the timely payment of principal and interest on residential mortgage backed securities that, in turn, are backed by federally-insured or guaranteed loans.

[3] As used in this Declaration, "Fannie Mae" refers to the Federal National Mortgage Association, and "Freddie Mac" means the Federal Home Loan Mortgage Corporation (Ginnie Mae, Fannie Mae and Freddie Mac collectively referred to as the "Agencies" and individually, each an "Agency").  Fannie Mae and Freddie Mac are Government-Sponsored Enterprises ("GSEs") that buy and securitize mortgage loans originated by mortgage lenders.  This enables the mortgage lenders access to liquidity that is, in turn, supported by demand for residential mortgage backed securities ("RMBS").

Debtors worked with an independent network of mortgage brokers to identify borrowers eligible for a residential mortgage loan.

b. Retail Loan Originations.  Through a centralized call center located in Plano, Texas, and a series of branch offices in various locations, the Debtors also originated residential mortgage loans directly to retail customers. Potential borrowers could call and ascertain whether they were eligible for a mortgage loan.  The Debtors' loan officers also called potential customers, realtors and builders.  The Debtors' employees handled the approval and underwriting process, obtained all required documentation, and ensured compliance with all regulatory requirements through the loan closing.

c. Correspondent Lending.  Through its correspondent lending channel, FGMC purchased mortgage loans originated and closed by other lenders. The correspondent lenders are typically unable to sell the loans on the secondary market themselves; the Debtors purchased the correspondent loans, which included Fannie Mae, Freddie Mac, Ginnie Mae, Non-Agency, and Non-QM loans, and sold them themselves.

9.      Once a wholesale, retail or correspondent loan is originated or purchased, the Debtors had the option to sell them to one of a number of parties including Fannie Mae, Freddie Mac, Ginnie Mae, and other private parties.  Until recently, in the ordinary course of business, the Debtors' wholesale and retail mortgage loan channels were replenished with additional new loan origination on a daily basis.  But, as noted above, on June 24, 2022, the Debtors ceased all new origination activity, and are now focused on funding and closing the committed mortgages remaining in the Debtors' pipeline.

10.     In addition to loan origination and purchasing, the Debtors have also engaged in hedging activities in an effort to reduce risk due to volatility in pricing for loans that are originated and sold in fluctuating market conditions.  This has been necessary because there is a gap in time between the date a customer or borrower receives an interest rate lock at the time a mortgage loan

commitment is issued and the date of settlement of the loan, and the Debtors are expected to support the value of the trade by posting margin (*i.e.*, cash or other eligible collateral) to the hedge counterparty.  The Debtors were subject to margin calls from hedge counterparties in the weeks leading up to the Petition Date, adversely affecting the Debtors' cash position.

11.    Though not a core part of the business, the Debtors also own loan servicing rights, which they fulfill through a sub-servicer.

12.    As of June 1, 2022, the Debtors employed approximately 600 full-time employees, of which approximately 292 were paid (either in whole or in part) on a commission basis for loans closed.  On June 24, 2022, as a result of its inability to procure additional financing to ease its liquidity crisis as well as the cessation of new loan origination activity, FGMC reduced its workforce by separating the employment of approximately 471 employees, including approximately 284 employees paid (at least in part) on a commission basis.  On June 24, 2022, the Debtors sent the separated employees notices of planned employee separation pursuant to the Worker Adjustment and Retraining Notification Act (the "WARN Act").

## II.    The Debtors' Organizational Structure

13.    FGMC, a Virginia corporation, owns 100% of the equity interests in Maverick, a Delaware LLC, and is Maverick's sole Member.

14.    Maverick is a non-operating holding company.  Maverick owns 50% of the equity interests of FirstLine Holdings, LLC ("FirstLine").  The party owning the other 50% interest in FirstLine is a non-affiliated entity.  FirstLine owns 100% of the equity interests of non-debtor FirstLine Title, LLC.

## III.    The Debtors' Debt Structure

### A.    Warehouse Agreements

15.    As is customary in the mortgage industry, the Debtors borrow funds from warehouse lenders to use in the origination and purchase of residential mortgage loans.  Warehouse lenders provide lines of credit to loan originators for use to fund mortgage loans that consumer borrowers use to purchase residential real property.  The Debtors' warehouse lenders (the

"Warehouse Lenders") are Customers Bank; Flagstar Bank, FSB; Texas Capital Bank, National Association; and J.V.B. Financial Group LLC, as successor by merger to C&C/PrinceRidge LLC. The agreements with the Warehouse Lenders (the "Warehouse Agreements") are structured either as repurchase facilities or secured loan facilities, as set forth below:

    a.   Second Amended and Restated Master Repurchase Agreement, dated as of October 9, 2019, by and between FGMC and Customers Bank (the "Customers Repo Facility");

    b.   Mortgage Warehouse Agreement, dated as of August 14, 2020 (as amended, restated, supplemented or otherwise modified from time to time), by and between FGMC and Texas Capital Bank, National Association (the "TCB Repo Facility"); and

    c.   Master Repurchase Agreement, dated as of October 25, 2012 (as amended, restated, supplemented or otherwise modified from time to time), by and between FGMC and J.V.B Financial Group, LLC, as successor by merger to C&Co./PrinceRidge LLC (the "J.V.B. Repo Facility", collectively with the Customers Repo Facility and the TCB Repo Facility, the "Prepetition Repo Facilities").

    d.   Amended and Restated Loan Agreement, dated as of July 17, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Customers Loan Agreement"), by and between FGMC and Customers Bank; and

    e.   Mortgage Warehouse Loan and Security Agreement, dated as of June 30, 2017 (the "Flagstar Loan Agreement", together with the Customers Loan Agreement, the "Prepetition Loan Facilities") by and between FGMC and Flagstar Bank, FSB.

    16.    Pursuant to the terms of the Prepetition Repo Facilities, the Debtors sold newly originated mortgage loans to repo counterparties to finance the origination of such mortgage loans,

and typically repurchase such mortgage loans from the related Warehouse Lender after origination, with the proceeds from sales of such loans to Fannie Mae, Freddie Mac, Ginnie Mae, or other secondary market participants.  The Debtors generally obtain advances of less than 100% of the principal balance of such mortgage loans from the related Prepetition Repo Buyer, which requires the Debtors to use working capital to fund the remaining equity portion of the principal balance of the mortgage loans, which is often referred to as the "haircut."

17.    Under the terms of the Prepetition Loan Facilities, the applicable Warehouse Lender will advance funds to the Debtors to finance the origination and purchase of loans.  The amounts advanced are secured by mortgage loans, cash, and related collateral.  The Debtors' obligations to Customers Bank are further secured by a cash reserve account and related collateral. Further, a portion of the Debtors' obligations to Customers Bank, not to exceed $25 Million, is subject to a full recourse guarantee pursuant to that certain Guaranty and Suretyship Agreement, dated as of September 30, 2020 (as amended, restated, supplemented or otherwise modified from time to time), by LVS II Offshore, L.P., in favor of Customers Bank.

18.    Typically, loans that will be sold to or guaranteed by a quasi-governmental entity (such as Fannie Mae, Freddie Mac, or Ginnie Mae) (the "Agency Loans") are financed at 100%. With respect to non-Agency Loans and Non-QM Loans, Warehouse Lenders will finance between 90% and 95% of the original principal amount of the loan, which requires the Debtors to use working capital to fund the remaining portion of the principal balance of the mortgage loans.

19.    As of the Petition Date, the Debtors estimate that they collectively owe the Warehouse Lenders approximately $418 million.

**B.    Bridge Loans**

20.    Pursuant to that certain Second Amended and Restated Secured Promissory Note, dated as of June 29, 2022, executed by FGMC, as borrower, and in favor of B2 FIE XI LLC, as lender ("Prepetition Bridge Lender") (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Bridge Loan Agreement"), the Prepetition Bridge Lender extended certain loans and other financial accommodations to the Debtors (the "Prepetition Bridge

Loans"). The Prepetition Bridge Lender is an indirect subsidiary of a private investment firm managed by Pacific Investment Management Company LLC ("PIMCO"). B2FIE I LLC, an affiliate of the LVS II SPE XXXIV LLC, the Cash Flow DIP Lender (described below), owns 100% of the equity interests of FGMC.

21.    As of the Petition Date, the total outstanding amount due under the Prepetition Bridge Loan Agreement is approximately $18.4 million (the "Prepetition Bridge Loan Agreement Amount"), $7.3 million of which was used to finance the Prepetition Bridge Loans.

22.    Pursuant to the Prepetition Bridge Loan Agreement, the Debtors granted Prepetition Bridge Lender (a) a fully perfected, junior security interest in and lien on substantially all of its encumbered assets, and (b) a fully perfected, senior security interest in and lien on substantially all of its unencumbered assets, subject to no other liens (the "Prepetition Bridge Loan Liens"), including all proceeds thereof, whether then owned and existing or thereafter acquired or arising (the "Prepetition Bridge Loan Collateral").

### B.    Unsecured Debt

23.    As of the Petition Date, the Debtors estimate they owe approximately $37 million of unsecured indebtedness, including trade debt and payables, amounts owed to former and current employees, and a $25 million fully-drawn line of credit with Customers Bank.

### IV.    Events Leading to the Commencement of the Chapter 11 Cases

### A.    Mortgage Industry

24.    Continued concerns about the availability and cost of credit, the United States mortgage market, including uncertainty with respect to Government-Sponsored Enterprises ("GSE") (Fannie Mae and Freddie Mac are GSEs) under the current and/or future administrations, some real estate markets in the United States, economic conditions in the United States and Europe and the systemic impact of inflation or deflation, energy costs, geopolitical issues (including the potential for increased tensions between the United States and Russia resulting from the current situation involving Russia's invasion of Ukraine), political gridlock in United States federal budget matters including full or partial government shutdowns, trade wars, the COVID-19 outbreak (and

any future outbreaks of coronavirus or similar disease) and potential military actions or threats have contributed to increased market volatility and diminished expectations for the United States economy.  After many years of historically low inflation and interest rates for mortgage loans due in major part to the United States Federal Reserve lowering interest rates to near zero as a result of the COVID-19 pandemic, mortgage rates in the United States are experiencing steep increases as a result of the Federal Reserve's inflation-curbing strategy.  For instance, mortgage rates have increased from an average of 3.2% in January 2022 to 5.27% in May 2022.  As a result, the refinance boom that reached its peak in 2020 and 2021 is now largely over.

25.    Limited housing stock is also contributing to a reduction in demand for purchase money mortgages as home values have continued to appreciate at near record levels despite the recent rise in mortgage loan interest rates.  Accordingly, mortgage companies are currently under more financial and operational stress than any time in decades, in my experience.

26.    The residential mortgage industry is also one of the most highly regulated industries in the United States.  The creation of the federal Consumer Financial Protection Bureau ("CFPB") under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and the additional authorities and responsibilities granted to it to administer and enforce various federal consumer protection statutes, including new requirements related to determining a borrower's ability to repay the loan and new servicing rules, as well as the increasing sophistication and coordination of various state banking and financial institution regulators, has led to unprecedented oversight and scrutiny of the residential mortgage industry, significantly increasing the legal, regulatory, and operational risks of operating a mortgage origination company.

**B.    Debtors' Liquidity Crisis**

27.    The Debtors' business has been directly and severely impacted by the series of macroeconomic challenges described above.  In 2021, intense competition for mortgage originations, in part due to the collapse of the refinancing market, resulted in a sharp decline in the Debtors' performance.  The Debtors' margins on the sale of loans also declined dramatically.

28.     Unfortunately, these trends have continued into 2022.  For the four months ending April 30, 2022, the Debtors generated a $23.3 million after-tax net loss. This was, in part, a result of lower origination volumes.  In the first four months of 2022, the Debtors originated $1.7 billion in mortgages, an annual originations pace of only $5 to $6 billion.  Moreover, gain on sale margins continued to be very weak.   In an effort to increase profitability, in the first four months of 2022, FGMC expanded its retail residential mortgage loan origination platform, increasing origination volumes in its most profitable business line.   However, this expansion came at considerable additional expense in the form of additional labor costs, primarily salary and benefits.

29.     The combination of continued losses and volatile daily margin calls on hedge positions has led to drastic reductions in the Debtors' unrestricted cash creating a liquidity crisis. By mid-June 2022, as liquidity continued to decline, Debtors' management concluded that they could no longer continue operations without a significant injection of new liquidity, as one or two days of significant margin calls could leave the Debtors without any cash.   Despite their best efforts, the Debtors were unable to obtain additional equity capital or financing.  As a result, the Debtors determined that, in order to protect part of the current "pipeline" (loans not yet funded), they needed to suspend all new loan applications, suspend all correspondent lending, cease all hedging payments and significantly reduce their workforce.  The Debtors further determined that filing these Chapter 11 Cases was the best way to preserve operational ability to help customers purchase and refinance their homes.

## V.     The Debtors' Objectives in the Chapter 11 Cases

30.     The Debtors commenced these Chapter 11 Cases to evaluate their restructuring options, accommodate their customers, and maximize and preserve value for all stakeholders.

# PART II
# FIRST-DAY PLEADINGS

## I.    Administrative Motions

### A.    Joint Administration Motion

31.    The Debtors request entry of an order directing joint administration of their Chapter 11 Cases, for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure providing for the Court to maintain one file and one docket for all of the Debtors' Chapter 11 Cases under the lead case, *In re First Guaranty Mortgage Corporation, et al.*

32.    The two Debtor entities are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code.  Accordingly, joint administration of these Chapter 11 Cases will allow for the efficient administration of the Debtors' interrelated Chapter 11 Cases, will yield significant cost savings, and will not prejudice the substantive rights of any party in interest.

33.    I believe that entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") and all parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

### B.    Creditor Matrix Motion

34.    In the Creditor Matrix Motion, the Debtors seek an order (a) authorizing the Debtors to (i) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (ii) file a consolidated list of the Debtors' thirty largest unsecured creditors in lieu of filing lists for each Debtor, and (iii) redact certain personally identifiable information for the Debtors' individual creditors and interest holders; and (b) granting related relief.

35.    Although I understand that a list of creditors usually is filed on a debtor-by-debtor basis, in some cases involving more than one debtor, the debtors may file a consolidated creditor matrix "in the interest of justice."  Requiring the Debtors to segregate and convert their

computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings.

36.     Similarly, I submit that it is appropriate for the Debtors to file a single list of their thirty largest general unsecured creditors on a consolidated basis.  Because the list of creditors that hold the 20 largest unsecured claims against each Debtor (the "Top 20 List") of the Debtors could overlap, and certain Debtors may have fewer than thirty (30) significant unsecured creditors, the Debtors submit that filing separate Top 20 Lists for each Debtor would be of limited utility.  In addition, the exercise of compiling separate Top 20 Lists for each individual Debtor could consume an excessive amount of the Debtors' limited time and resources.  Further, I believe that a single, consolidated list of the Debtors' thirty largest unsecured, non-insider creditors will aid the U.S. Trustee in its efforts to communicate with these creditors.

37.     Additionally, I believe that it is appropriate to authorize the Debtors to redact from any paper filed or to be filed with the Court in these Chapter 11 Cases the home addresses of individual creditors—including the Debtors' current and former employees—because such information could be used, among other things, to perpetrate identity theft or to locate survivors of domestic violence, harassment, or stalking.

38.     The Debtors propose to provide an unredacted version of the Creditor Matrix (and any other applicable filings) to the U.S. Trustee, counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases, any party in interest upon reasonable and legitimate request, and the Court.

39.     Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Creditor Matrix Motion.

### C.     The 156(c) Application

40.     In the 156(c) Application, the Debtors seek entry of an order appointing Kurtzman Carson Consultants LLC ("KCC") as their Claims and Noticing Agent in the Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Chapter 11 Cases.  It is my understanding

that the Debtors' selection of KCC to act as the Claims and Noticing Agent has satisfied this Court's protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtors, with the assistance of their advisors, have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, I submit, based on input from the Debtors' advisors regarding all engagement proposals obtained and reviewed, that KCC's rates are competitive and reasonable given KCC's quality of services and expertise.  Although the Debtors have not yet filed their schedules of assets and liabilities, it is anticipated that there could be thousands of entities to be noticed.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, I believe that the appointment of a claims and noticing agent is required by Rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, and is otherwise in the best interests of both the Debtors' estates and their creditors.

## II.      Operational Motions Requesting Immediate Relief

### A.      Cash Management Motion

41.      By the Cash Management Motion, the Debtors request interim and final (i) authority to continue using their existing cash management system (the "Cash Management System") including the continued use of their existing bank accounts, business forms, and credit card programs, and payment of all fees related thereto; (ii) authority to implement changes to their Cash Management System in the ordinary course of business, including opening new or closing existing bank accounts; (iii) authority to continue intercompany transactions; and (iv) a waiver of the requirements of section 345(b) of the Bankruptcy Code, if applicable.

42.      Maintaining the Debtors' Cash Management System in its current state is crucial to the Debtors' continued operations, given the volume of transactions processed through the Cash Management System each day.  Any disruption to the Cash Management System would unnecessarily and significantly disrupt the Debtors' operations and impede the successful administration of their Chapter 11 Cases.

43.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in these Chapter 11 Cases with minimal disruption, thereby benefiting all parties in interest.  Accordingly, for the reasons set forth herein and in the Cash Management Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

**B.      Wages and Benefits Motion**

44.     By the Wages and Benefits Motion, the Debtors seek entry of interim and final orders granting them the authority, in their discretion, to (a) pay certain prepetition employee wages, salaries, commissions, other compensation, and reimbursable expenses, and (b) continue certain employee benefits programs in the ordinary course of business, including payment of certain related prepetition obligations (collectively, the "Employee Compensation & Benefits"). On June 24, 2022, the Debtors conducted a large reduction in force ("RIF").  On that day, the Debtors also paid terminated employees paid time off in accordance with company policy.  The Debtors also paid terminated employees severance benefits.  Notwithstanding such payments, as of the Petition Date, certain amounts to current and former employees with respect to prepetition service are or may become due and owing, including unpaid wages, salaries, commissions, paid leave, other regular compensation, and reimbursable expenses.

45.     The majority of the Debtors' employees rely exclusively on the Employee Compensation & Benefits to satisfy their daily living expenses and to provide security and assurance for themselves and their families regarding reacting to and planning for major life-events.  Consequently, employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation & Benefits. Additionally, continuing ordinary course benefits will help maintain employee morale, and avoid employee flight that could jeopardize the Debtors' ongoing business efforts and endanger creditor recoveries.  Moreover, current employees provide the Debtors with services necessary to conduct the Debtors' business through the current Chapter 11 Cases, and I believe that absent the payment

of the Employee Compensation & Benefits, the Debtors may experience turnover and instability at this critical time in their chapter 11 efforts.

46.     Accordingly, for the reasons set forth herein and expanded on in the Wage and Benefits Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Wage and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

        **C.**      **Insurance and Surety Bonds Motion**

47.     The Debtors request the entry of an order authorizing, but not directing, the Debtors to continue and, to the extent necessary, revise, extend, renew, supplement, or change the Debtors' pre-petition insurance programs and surety bonds, or enter into new policies or surety bonds, if necessary, in the ordinary course of business and pay prepetition obligations in respect thereof.

48.     In the ordinary course of business, the Debtors have maintained, and continue to maintain, a number of insurance programs and surety bonds through several different carriers. Continuation of these insurance programs and surety bonds is essential for preserving the value of the Debtors' assets.

49.     Accordingly, for the reasons set forth herein and expanded on in the Insurance and Surety Bond Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance and Surety Bond Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

        **D.**      **Utilities Motion**

50.     By the Utilities Motion, the Debtors seek entry of interim and final orders: (i) approving the Debtors' proposed form of adequate assurance of payment to the Utility Companies (as defined below); (ii) establishing procedures for resolving objections by Utility Companies relating to the adequacy of the proposed adequate assurance provided by the Debtors; (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or

discriminating against, the Debtors on the basis of the commencement of these Chapter 11 Cases and/or any outstanding prepetition debts; and (iv) granting related relief, all as more fully set forth in the Motion.

51.     In the ordinary course of business, the Debtors obtain various essential utility services (collectively, the "Utility Services"), including electricity, water, and network/internet, from a number of utility companies (collectively, the "Utility Companies"). The Debtors rely on the Utility Companies to provide Utility Services in all their locations other than (a) their leased executive suites where no separate utilities are procured, and (b) one location that closed several months ago and has since remained unoccupied. In locations with Utility Services, the Debtors rely on the Utility Companies to provide necessary support to their employees, vendors, and customers. Accordingly, I believe preserving the Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations, and even a brief alteration or discontinuation of service would likely cause severe disruption to the Debtors' business.

52.     The Debtors have proposed to provide Utility Companies with Adequate Assurance of payment for Utility Services and customary procedures for resolving any disputes. I understand such procedures are routinely approved in this district and would request the Court approve the Utilities Motion to ensure the Debtors maintain uninterrupted Utility Services.

### E.     Critical Vendors Motion

53.     By the Critical Vendors Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to pay, in their reasonable business judgment, claims of vendors critical to their business (the "Critical Vendors"). The Debtors rely on the Critical Vendors to assist with their business, and each of the Critical Vendors is vital to the Debtors' business. The cooperation of the Critical Vendors is essential to the Debtors' ability to preserve the value of their estates and pursue their goals in the Chapter 11 Cases. Accordingly, I submit that the relief requested in the Critical Vendors Motion should be approved.

### F.     Cash Flow DIP Motion

54.     The Debtors require operating liquidity utilized for payment of general operating expenses such as payroll, vendors and other day-to-day expenses.  By the Cash Flow DIP Motion, the Debtors seek, among other things, authorization and approval to obtain Cash Flow DIP Financing (as defined therein) under a super-priority senior credit facility.  The Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Cash Flow DIP Motion is not granted.  The Debtors are entering chapter 11 with minimal cash on hand, and thus access to Cash Flow DIP Financing and the use of cash collateral is critical to ensure the Debtors' smooth entry into chapter 11.  The commencement of these Chapter 11 Cases will place increased demands on the Debtors' liquidity due to, among other things, the costs of administering the Chapter 11 Cases.  The relief requested is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors are denied the proposed interim and final borrowings, including, among other things, frustrating the Debtors' ability to successfully navigate the Chapter 11 Cases.  The Cash Flow DIP Financing has been market tested and evaluated by the Debtors and their professionals, and it will provide sufficient liquidity to fund the Chapter 11 Cases.  The Debtors negotiated the DIP Financing, the use of cash collateral, and the adequate protection proposed in the DIP Motion in good faith and at arms' length, and I submit that the terms of the DIP Facility are reasonable and the best that could be obtained under the facts and circumstances of these Chapter 11 Cases.

55.     Accordingly, for the reasons set forth herein and expanded on in the Cash Flow DIP Motion, on behalf of the Debtors, I respectfully submit that the relief requested therein is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

**G.     DIP Repo Motion**

56.     By the DIP Repo Motion, the Debtors seek, among other things, to obtain critical funding enabling the Debtors to fund loans to be originated to borrowers intending to close on their home purchase within the next 60-90 days.  Prior to the Petition Date, the Debtors had access to

warehouse lines with multiple liquidity providers.  They used these lines to fund loans in their pipeline.  As a result of the filing of these Chapter 11 Cases, the Debtors can no longer access their prepetition warehouse lines to fund new loans.  As such, the DIP Repo Facility is necessary in order to prevent the harm that would result if those borrowers were unable to complete the purchase of or refinance their homes because we failed to fund their acquisition loans.

57.    Further, prior to the Petition Date, in the ordinary course of business, FGMC entered into forward transactions for the purchase or sale of mortgage-backed and other securities, including pursuant to "when-issued," "to-be-announced," "dollar roll" and other transactions with various regulated broker dealers pursuant to the terms of various Master Securities Forward Transaction Agreements (the "Prepetition MSFTAs").  FGMC used the Prepetition MSFTAs to hedge certain risks inherent in its financing operations.  The counterparties to the Debtors' Prepetition MSFTAs include, but are not limited to BMO Capital Markets Corp., Goldman Sachs LLC, Mizuho Securities USA LLC, Morgan Stanley & Co. LLC, South Street Securities LLC, and Wells Fargo Securities LLC.  Such hedging arrangements are customary in the mortgage origination industry and afford mortgage originators and borrowers more advantageous borrowing rates and terms.

58.    Accordingly, for the reasons set forth herein and expanded upon in the DIP Repo Motion, on behalf of the Debtors, I respectfully submit that the relief requested therein is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

## CONCLUSION

59.    I have reviewed each of the First Day Pleadings.  All of the facts set forth in the First Day Pleadings are true and correct to the best of my knowledge and belief based upon (a) my personal knowledge of the Debtors' operations and finances, (b) information learned from my review of relevant documents, (c) information supplied to me by other members of the Debtors' management team and the Debtors' advisors, and/or (d) my opinion based upon my knowledge and experience or information I have reviewed concerning the Debtors' operations and financial condition.  Accordingly, the Debtors respectfully request that the relief requested in each of the First Day Pleadings be granted because such relief is a critical element in stabilizing and facilitating the Debtors' operations during the pendency of the Chapter 11 Cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: June 30, 2022

Aaron Samples
Chief Executive Officer
First Guaranty Mortgage Corporation