**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br>FIRST GUARANTY MORTGAGE<br>CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-10584 (CTG)<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO ENTER INTO REPURCHASE
AGREEMENT FACILITIES; (II) AUTHORIZING THE DEBTORS TO SELL
AND REPURCHASE MORTGAGE LOANS IN THE ORDINARY COURSE OF
BUSINESS; (III) GRANTING LIENS AND PROVIDING SUPER-PRIORITY
ADMINISTRATIVE EXPENSE STATUS; (IV) MODIFYING THE
AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING WITH
RESPECT TO THE RELIEF
REQUESTED HEREIN; AND (VI) GRANTING RELATED RELIEF**

First Guaranty Mortgage Corporation, ("FGMC"), and the above-referenced affiliated

debtors and debtors in possession (the "Debtors")[2] under chapter 11 of title 11 of the United States

Code, §§ 101 *et seq.* (the "Bankruptcy Code"), in these chapter 11 cases (the "Chapter 11 Cases"),

by and through the undersigned counsel of record, hereby move (the "Cash Flow DIP Motion"),

pursuant to §§ 105(a), 361, 362, 363, 364, 503, 507, 546, 548, 555, 556, 559, 560, and 561,

Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1, 4001-1, 4001-2 and 9013-

1, for entry of an interim order (substantially in the form attached hereto as **Exhibit A**, the "Interim

DIP Repo Order") and a final order (the "Final DIP Repo Order", and together with the Interim

Order, the "DIP Repo Orders") (i) authorizing the Debtors to obtain debtor-in-possession

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number are: First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621). The location of the corporate headquarters and the service address for First Guaranty Mortgage Corporation is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the DIP Repo Documents (defined herein).

warehouse financing on the terms set forth herein (the "<u>DIP Repo Facility</u>"), (ii) authorizing the Debtors to sell and repurchase certain mortgage loans and related assets in the ordinary course of business and perform all such other and further acts as may be required in connection with the DIP Repo Documents (defined below), (iii) granting liens and providing super-priority administrative expense status, (iv) modifying the automatic stay, (v) scheduling a final hearing with respect to the relief requested herein (the "<u>Final Hearing</u>"); and (vi) granting related relief.

In further support of this Motion, the Debtors submit and rely on the *Declaration of Aaron Samples, Chief Executive Officer of First Guaranty Mortgage Corporation In Support of Chapter 11 Petitions and First Day Pleadings* (the "<u>Samples Declaration</u>" or the "<u>First Day Declaration</u>"), and (ii) the *Declaration of Tanya Meerovich in Support of Debtors' Motions for Debtor-in-Possession Financing* (the "<u>Meerovich Declaration</u>"), each of which has been filed contemporaneously herewith and is incorporated by reference herein.

In further support of this Motion, the Debtors, by and through their proposed undersigned counsel, respectfully represent:

**<u>PRELIMINARY STATEMENT</u>**

By this Motion the Debtors request authority to enter into the DIP Repo Facility, which will enable the Debtors to support its customers (residential home loan borrowers) in the purchase or refinance of their homes.  The relief sought here is necessary in order to ensure that borrowers are not left at closing tables without the funds necessary to close on their loans.

The residential mortgage market as a whole has faced serious macroeconomic challenges over the past few months, including increased concerns about the availability and cost of credit, the end of the refinance boom, the systemic impact of inflation and geopolitical issues, and the reduced demand for purchase money mortgages.

2

Further, the residential mortgage market remains one of the most highly regulated markets in the United States.  The creation of the federal Consumer Financial Protection Bureau under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and the additional authorities and responsibilities granted to it to administer and enforce various federal consumer protection statutes, including new requirements related to determining a borrower's ability to repay the loan and new servicing rules, as well as the increasing sophistication and coordination of various state banking and financial institution regulators, has led to unprecedented oversight and scrutiny of the residential mortgage industry.  This additional oversight has led to significant increases the legal, regulatory and operational risks of operating a mortgage origination company.

The above market conditions, taken together with various other factors as more fully described in the First Day Declaration, resulted in a liquidity crisis for the Debtors, thereby precipitating the filing of these Chapter 11 Cases.  Nevertheless, the Debtors have extended commitments to customers whereby the Debtors have agreed to provide financing for newly originated residential mortgage loans and the Debtors customers are relying on that funding to be available at closing.  The Debtors anticipate funding several million dollars in loans that are scheduled to close within the next few days.  Accordingly, the relief sought in this Motion is critical for the Debtors and their borrowers.

In the ordinary course of business, the Debtors use warehouse facilities to fund mortgage loan originations and purchases.  A warehouse facility is structured as a "safe harbor" repurchase agreement under which a seller sell a mortgage loan to a buyer, with the buyer agreeing to sell the mortgage loan back to the seller on a certain date in the future.  This arrangement, which is typical in the mortgage industry, is how FGMC actually funds the mortgage loans it originates on behalf of underlying borrowers.  FGMC buys the mortgage loans back when it is prepared to permanently

3

sell it to one or more loan buyers.  Without the benefit of the relief sought in this Motion, FGMC will not be able to provide the funding necessary for its borrowers to close the purchase of their homes.

When FGMC agrees to provide a mortgage loan to a borrower, it issues an interest rate lock commitment to the borrower.  To protect against potential interest rate exposure on the mortgage loan before it is permanently sold, the Debtors enter into an interest rate hedge agreement.  They do so pursuant to a standard form of agreement referred to as a Mortgage Security Forward Transfer Agreement ("MSFTA").

By this Motion, the Debtors request, among other things, authority to enter into the DIP Repo Facility pursuant to (i) a Master Repurchase Agreement, a copy of which is attached hereto as **Exhibit B** (the "DIP Repo Facility Agreement") among FGMC, as seller, Barclays Bank PLC, as administrative agent (in such capacity, the "DIP Repo Agent") and buyer, and the other buyers from time to time party thereto (collectively with the DIP Repo Agent acting on behalf of such buyers, the "DIP Repo Facility Purchasers"), and the related Pricing Side Letter (a copy of which is being filed under seal) and (ii) all other documents related thereto, including the "Program Documents" (as defined in the DIP Repo Facility Agreement) (collectively with the DIP Repo Facility Agreement, and the Pricing Side Letter, the "DIP Repo Facility Documents"), which provide for a maximum committed amount of up to $125,000,000.

The Debtors also request authority to enter into and perform, as necessary, under certain MSFTAs (the "DIP MSFTAs") between FGMC and the counterparties thereto (the "DIP MSFTA Counterparties"), pursuant to which, from time to time, FGMC and the DIP MSFTA Counterparties will enter into forward transactions for the purchase or sale of mortgage-backed and other asset-backed securities and such other securities as the parties thereto may determine.

4

Lastly, the Debtors request authority to enter into certain netting agreements related to the foregoing (the "DIP Netting Agreement" and together with the DIP Repo Facility Agreement, DIP MSFTAs and all other related documentation, the "DIP Repo Documents").  Pursuant to the DIP Netting Agreement, FGMC shall grant to the DIP Repo Agent netting and setoff rights with respect to obligations of FGMC arising under the DIP Repo Facility Agreement, the DIP MSFTAs, and any other DIP Repo Documents.

The Debtors, with the assistance of their financial advisor, FTI Consulting, conducted a comprehensive marketing process designed to obtain the most favorable terms for their debtor-in-possession warehouse financing needs.  The Debtors negotiated the DIP Repo Facility with the DIP Repo Parties[3] in good faith and at arm's length, and believe that the terms of the DIP Repo Facility are competitive and the best that could be obtained under the circumstances.  Further, the DIP Repo Facility has been market tested and represents the best offer available to the Debtors.

The DIP Repo Facility contemplates that the financing available thereunder will not be available for general working capital and operational expenses.  The Debtors have arranged for financing to recover such expenses through a separate debtor-in-possession financing motion (the "Cash Flow DIP Motion" and the facility, the "Cash Flow DIP Facility").  However, the Debtors contemplate that a portion of the DIP Repo Facility proceeds will be used to refinance a portion of the Prepetition Bridge Loans funded by the Prepetition Bridge Lender (each as defined below).

For these reasons, and as more fully set forth below, the Debtors request that the Court grant the relief requested herein.

---

[3] For purposes herein, the "DIP Repo Parties" means (a) the DIP Repo Facility Parties, (b) the DIP MSFTA Counterparties, and (c) the DIP Netting Parties, in each case, in their respective capacities as such.

## JURISDICTION AND VENUE

1.        The United States Bankruptcy Court for the District of Delaware (the "Court") has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing*

*Order of Reference from the United States District Court for the District of Delaware*, dated

February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1(f) of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this

motion to the extent that it is later determined that the Court, absent consent of the parties, cannot

enter final orders or judgments in connection herewith consistent with Article III of the United

States Constitution.

2.        Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.        The statutory bases for the relief requested herein are sections 105(a), 361, 362,

363, 364, 503, 507, 546, 548, 555, 556, 559, 560, and 561, of chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code"), 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"),

Bankruptcy Rules 2002, 4001, 6004, and 9014, and 9013-1, and Local Rules 2002-1, 4001-1,

4001-2 and 9013-1.

## RELIEF REQUESTED

4.        By this Motion, the Debtors request: (i) entry of the Interim DIP Repo Order, and

(ii) following the Final Hearing, entry of the Final DIP Repo Order.  For the reasons set forth

herein, and in reliance on the evidence set forth in the First Day Declaration and the Meerovich

Declaration, the relief sought herein should be authorized and the Cash Flow DIP Motion granted.

## BACKGROUND

5.      On the date hereof (the "Petition Date"), the Debtors each commenced voluntary cases for relief under chapter 11 of the Bankruptcy Code.  The Debtors have requested that their cases be jointly administered.

6.      The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      No creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee (the "United States Trustee").  No trustee or examiner has been appointed in the Chapter 11 Cases No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

8.      FGMC originates, purchases, services, sells and/or securitizes residential real estate mortgage loans.  Specifically, FGMC's mortgage services include: (i) retail, including direct to consumer, distributed, and hybrid structures; (ii) wholesale, focused on non-qualified mortgage and non-agency production; and (iii) correspondent, focused on non-delegated non-qualified mortgage and non-agency production.  Its 2021 funding's comprised 36,044 units totaling $10.25 billion in unpaid principal balance.

9.      FGMC is a Virginia corporation and its affiliated debtor Maverick II Holdings, LLC is a Delaware LLC.  Founded in 1987, headquartered in Plano, Texas, and licensed in 49 states plus the District of Columbia, FGMC is a full service, non-bank mortgage lender.

10.     FGMC is a National Ginnie Mae, Fannie Mae direct lender and Freddie Mac Seller and Servicer, with licenses and/or approvals from the Federal Housing Authority, Veterans Affairs, Ginnie Mae, and the United States Department of Agriculture.  As of December 2021, FGMC employed 725 full-time employees, 37% of which were sales related.

US_ACTIVE\121802446\V-6
DOCS_DE:239660.1 28311/001

11.     FGMC maintains centralized call centers in Plano, Texas, as well as regional offices in Maryland, Missouri, Nevada, New Jersey, and North Carolina.

12.     Prior to the Petition Date, the Debtors received bridge financing (the "Prepetition Bridge Loans") and financed the origination of mortgage loans with loan proceeds advanced by B2 FIE XI LLC[4] (in such capacity, the "Prepetition Bridge Lender") pursuant to the terms of that certain Second Amended and Restated Secured Promissory Note, dated June 29, 2022 (the "Prepetition Bridge Loan Agreement", and the mortgage loans financed thereunder, the "Bridge Financed Loans").  As of the Petition Date, the total outstanding amount due under the Prepetition Bridge Loan Agreement is $18,350,771 (the "Prepetition Bridge Loan Agreement Amount"), $7,260,148 of which was used to finance the Bridge Financed Loans.

13.     Additional factual background of the Debtors, including with regard to their organizational structure, is set forth in the First Day Declaration.

**A.     Summary of Terms of DIP Repo Facility[5]**

14.     In accordance with Bankruptcy Rules 4001(b)–(d) and Local Rule 4001-2(a), the below chart summarizes the significant terms of the Orders and DIP Repo Documents.

| SUMMARY OF MATERIAL TERMS OF DIP REPO FACILITY | | |
|---|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | First Guaranty Mortgage Corporation | Master Repurchase Agreement at p. 1 |

---

[4] B2 FIE XI LLC is the proposed lender under the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Providing Super-Priority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; (VI) Scheduling an Interim Hearing to Approve the Proposed Interim Order and a Final Hearing with Respect to the Relief Requested Herein; and (VII) Granting Related Relief* (the "Cash Flow DIP Motion") filed contemporaneously herewith.

[5] This summary is qualified in its entirety by reference to the applicable provisions of the DIP Repo Note. To the extent there exists any inconsistency between this summary and the provisions of the DIP Repo Note or the Orders, the provisions of the DIP Repo Note or the Orders, as applicable, shall control.

| SUMMARY OF MATERIAL TERMS OF DIP REPO FACILITY | | |
|---|---|---|
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Maverick II Holdings, LLC Pimco Bravo Fund II, L.P. | Master Repurchase Agreement at p. 11 |
| **DIP Repo Parties** Bankruptcy Rule 4001(c)(1)(B) | Barclays Bank PLC [or an affiliate thereof] | Master Repurchase Agreement at p. 27 |
| **DIP Repo Facility** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(i)(B | $125,000,000 | Pricing Side Letter |
| **Borrowing Limits** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(i)(A), (a)(iii) | Non-qualified mortgage and Jumbo sublimit of $25,000,000 | Pricing Side Letter |
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B) | Agency: 1-month SOFR + 3.000% •Agency interest rate shall be reduced to 1-month SOFR + 2.850% upon the advance rate being 90% Non-qualified mortgage: 1-month SOFR + 3.000% Jumbo: 1-month SOFR + 3.000% | Pricing Side Letter |
| **Expenses and Fees** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B), (M) | (i)   Up Front Fee: 50 bps on total facility size, to be paid upon entry of the Interim DIP Repo Order; and (ii)   Unused Line Fee: 50 bps on unused committed amounts. | Pricing Side Letter |
| **Maturity Date** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(ii); Local Rule 4001-2(a)(i)(B), (M), (a)(ii | the earlier of (i) emergence from Chapter 11 and (ii) 150 days from the closing date. | Master Repurchase Agreement at p. 13 |
| **Collateral and Priority** Bankruptcy Rule | The DIP Repo Agent shall take: first priority liens and security interests in (i) pursuant to Section 364(c)(2) of the Bankruptcy Code, the Purchased | Master Repurchase |

9

| SUMMARY OF MATERIAL TERMS OF DIP REPO FACILITY | | |
|---|---|---|
| 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Assets (as defined in the DIP Repo Facility Agreement) (collectively, the "DIP Repo Facility Backup Collateral"); and<br><br>(ii) on behalf of itself and the other DIP Repo Parties, the DIP Netting Parties, and any agents or custodians under the DIP Repo Documents, and the DIP MSFTA Counterparties, super-priority administrative claim pursuant to sections 507(b), 364(c)(2), 364(c)(3) and 364(e) of the Bankruptcy Code.<br><br>The DIP MSFTA Counterparties shall take:<br><br>first-priority liens and security interests, pursuant to section 364(c)(2) of the Bankruptcy Code, to secure FGMC's obligations under the DIP MSFTAs in, and right of setoff against, all Forward Collateral (as defined in the DIP MSFTAs) and all securities, money and other property, then or thereafter delivered by or on behalf of FGMC under such DIP MSFTA to or for the benefit of the DIP MSFTA Counterparties in connection with such DIP MSFTA or any Transaction (as defined in the DIP MSFTAs), or then or thereafter held or carried by or on behalf of FGMC in connection with the DIP MSFTA or any Transaction (as defined in the DIP MSFTAs) and, in each case, all proceeds of any of the foregoing (collectively, the "DIP MSFTA Collateral")<br><br>The DIP Agent shall also take, pursuant to the DIP Netting Agreement, first-priority liens and security interests, pursuant to section 364(c)(2) of the Bankruptcy Code, for the benefit of itself and the other DIP Netting Parties, in each case, to secure FGMC's obligations under the DIP Netting Agreement, as applicable, in: [6]<br><br>(i)    each Deposit Account, Securities Account or other trust or custodial account maintained or required to be maintained under or in connection with any DIP Repo Document;<br><br>(ii)    all property (including Security Entitlements) now or hereafter credited to or held in any such account or otherwise held, or carried by or through, or subject to the control of any DIP Netting Party or agent thereof in connection with | Agreement at p. 32 |

---

[6] Capitalized terms used but not defined in items (i) – (v) of this subsection shall have the meanings set forth in the DIP Netting Agreement.

US_ACTIVE\121802446\V-6
DOCS_DE:239660.1 28311/001

| SUMMARY OF MATERIAL TERMS OF DIP REPO FACILITY | | |
|---|---|---|
| | a DIP Repo Document whether fully paid or otherwise; | |
| | (iii) all rights under the DIP Repo Documents, including, without limitation, all rights of FGMC in any obligations of any DIP Netting and all rights of FGMC in or to any transaction (including Clearing Transactions), confirmations and agreements under the DIP Repo Documents; | |
| | (iv) all Accounts, Chattel Paper, Commodity Accounts, Commodity Contracts, Documents, General Intangibles, Instruments, Investment Property, Letter-of-Credit Rights and Securities held under or constituting collateral or security under or pursuant to any DIP Repo Documents; and | |
| | All proceeds of the foregoing ((i) – (iv) collectively, the "DIP Netting Collateral," and, together with the DIP Repo Facility Backup Collateral, and the DIP MSFTA Collateral, the "DIP Repo Collateral"). | |
| **Covenants** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(H), (M) | (i) Minimum liquidity of FGMC on the DIP Closing Date (as defined in the Interim DIP Repo Order) of $20 million, which amount shall be calculated based on  unrestricted cash on deposit in an unencumbered account (the "Unrestricted Account") and amounts immediately available for borrowing under the Cash Flow DIP without restriction or subject to the discretion of the Cash Flow DIP Lender (as defined in the Cash Flow DIP Orders) and (ii) have minimum liquidity of not less than $[__] at any point thereafter[7], which shall be calculated based on unrestricted Cash on deposit in the Unrestricted Account and amounts immediately available for borrowing under the Cash Flow DIP without restriction or subject to the discretion of the Cash Flow DIP Lender; | Master Repurchase Agreement at p. 42 |
| | (ii) Compliance with Borrowing Base (as such term is defined in the DIP Repo Documents) ; and | |
| | (iii) Daily mark-to-market. | |

---

[7] This amount remains subject to credit approval.

US_ACTIVE\121802446\V-6
DOCS_DE:239660.1 28311/001

| SUMMARY OF MATERIAL TERMS OF DIP REPO FACILITY | | |
|---|---|---|
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(S) | (i)   A conversion to a liquidation or Chapter 7, appointment of a trustee or Examiner, loss of Debtor Exclusivity;<br><br>(ii)  Cross default/termination of Cash Flow DIP Facility or the filing of a chapter 11 plan that does not contemplate a full repayment in cash of the DIP Repo Facility;<br><br>(iii) Loss of GSE issuer or servicer status and loss or termination of any contract/license material to origination/sale/delivery of mortgage loans; and<br><br>(iv)  Other usual and customary events of default. | Master Repurchase Agreement at p. 55 |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | (i)   Entry of an Interim DIP Repo Order within 4 business days of the Petition Date and a Final DIP Repo Order within 35 days of the Petition Date. | Interim Repo DIP Order ¶20 |
| **Carve-Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(i)(F), (M) | The terms of the Carve-Out is provided in the Cash Flow DIP Motion. No new Carve-Out is being provided under the DIP Repo Facility. | Interim Cash Flow DIP Order at ¶ 9 |
| **Prepayments**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(I) | Voluntary prepayments permitted without penalty or premium.<br><br>Mandatory prepayments, including disposition of Collateral, when Borrowing Base not in compliance. | |
| **Conditions to Closing of DIP Repo Facility**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E) | (i)   Entry of Interim DIP Repo Order satisfactory to DIP Repo Agent;<br><br>(ii)  Cash Flow DIP Facility of at least $22 million;<br><br>(iii) Entry of order approving Cash Flow DIP Facility satisfactory to DIP Repo Agent;<br><br>(iv)  Minimum liquidity of FGMC on the DIP Closing Date (as defined in the Interim DIP Repo Order) of $20 million, which amount shall be calculated based on unrestricted cash on deposit in an unencumbered account (the "<u>Unrestricted Account</u>") and amounts immediately available for borrowing under the Cash Flow DIP without restriction or subject to the discretion of the Cash Flow DIP Lender (as defined in the Cash Flow | Master Repurchase Agreement at p. 34 |

| SUMMARY OF MATERIAL TERMS OF DIP REPO FACILITY | | |
|---|---|---|
| | DIP Orders) and (ii) have minimum liquidity of not less than $[ ] at any point thereafter[8], which shall be calculated based on unrestricted Cash on deposit in the Unrestricted Account and amounts immediately available for borrowing under the Cash Flow DIP without restriction or subject to the discretion of the Cash Flow DIP Lender; and | |
| | (v)    Maintenance of Agency and regulatory status. | |
| **Parties with an Interest in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(i) | N/A | |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) | N/A | |
| **Determination Regarding Prepetition Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) | N/A | |
| **Effect of Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii), (vii), (viii) | N/A | |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv); | The automatic stay imposed under section 362(a) of the Bankruptcy Code is modified as necessary to effectuate all of the terms and provisions of the Orders, including, without limitation, to: (a) permit the Debtors to grant the applicable lien(s); (b) permit the Debtors to perform such | Interim Repo DIP Order ¶ 33 |

---

[8] This amount g remains subject to credit approval.

| SUMMARY OF MATERIAL TERMS OF DIP REPO FACILITY | | |
|---|---|---|
| Local Rule 4001-2(a)(i)(S) | acts as the DIP Repo Parties may request, in their reasonable discretion, to assure the perfection and priority of the liens granted herein; (c) permit the DIP Repo Parties, to file, in their sole discretion deems necessary or advisable, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the applicable liens; (d) permit the Debtors to incur and discharge all liabilities and obligations to the DIP Repo Parties under the DIP Repo Documents and the Orders; (e) authorize the Debtors to pay, and the DIP Repo Parties to retain and apply, payments made in accordance with the terms of the DIP Repo Orders and the DIP Repo Documents; and (f) permit the Debtors and DIP Repo Parties to take any other actions necessary and appropriate to implement the terms of the Orders and the DIP Repo Documents, including, without limitation, the implementation of applicable reserves. | |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall indemnify and hold the DIP Repo Parties and their respective officers, directors, employees, counsel and agents (including all professionals) (each, an "Indemnified Party") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all reasonable fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case arising out of, relating to, or by reason of any investigation, litigation or proceeding arising out of or relating to the DIP Repo Facility, the DIP Repo Documents, the DIP Repo Facility Agreement, or any obligation or act taken or omitted by such Indemnified Party related or attendant thereto; provided that no Indemnified Party will be indemnified for any cost, expense or liability to the extent the same is found in a final nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. | Interim Repo DIP Order ¶ 18 |
| **Section 506(c) Waiver and Section 552(b) Waiver** | Debtors have agreed to waive claims against DIP Repo Parties for surcharge of expenses pursuant to section 506(c) of the Bankruptcy Code and to waive claims | |

| SUMMARY OF MATERIAL TERMS OF DIP REPO FACILITY | | |
|---|---|---|
| Bankruptcy Rule 4001(c)(1)(B)(x) | under section 552(b)(1) of the Bankruptcy Code based upon the "balance of the equities". | |
| **Any Provision That Limits the Court's Power to Enter Future Orders**<br><br>Local Rule 4001-(a)(i)(C) | N/A | |
| **Any Provision that Provides for the Funding of Non-Debtor Affiliates**<br><br>Local Rule 4001-(a)(i)(D) | N/A | |
| **Any Provision that Provides for Postpetition Liens on Unencumbered Assets**<br><br>Local Rule 4001-(a)(i)(G) | Pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a perfected first priority lien. | Interim Repo DIP Order ¶ 8, 10 |
| **In Jointly Administered Cases, any Provision Governing Joint Liability of the Debtors**<br><br>Local Rule 4001-(a)(i)(J) | The Debtors shall be joint and several obligors. | Interim Repo DIP Order ¶ B |
| **Any Provision that Requires the Debtor to Pay an Agent or Lender's Expenses and Attorneys' Fees with no Notice or** | N/A | |

15

| SUMMARY OF MATERIAL TERMS OF DIP REPO FACILITY | | |
|---|---|---|
| **Review by the UST and Committee**<br><br>Local Rule 4001-(a)(i)(K) | | |
| **Any Provision that Prohibits the Use of Estate Funds to Investigate Liens and Claims of Prepetition Lenders**<br><br>Local Rule 4001-(a)(i)(L) | N/A | |
| **Any Provisions granting Cross-Collateralization**<br><br>Local Rule 4001-2(a)(i)(N) | N/A | |
| **Any Provisions Deeming Prepetition Debt to be Postpetition Debt**<br><br>Local Rule 4001-(a)(i)(O) | N/A | |
| **Any Provisions Priming Secured Liens Without Consent of Lienholder**<br><br>Local Rule 4001-(a)(i)(P) | N/A | |
| **Any Provisions Binding the Estate to Validity, Perfection or Amount of Secured Debt** | N/A | |

US_ACTIVE\121802446\V-6
DOCS_DE:239660.1 28311/001

| SUMMARY OF MATERIAL TERMS OF DIP REPO FACILITY | | |
|---|---|---|
| Local Rule 4001-2(a)(i)(Q) | | |
| **Provisions that Immediately Approve All Terms and Conditions of the Underlying Loan Agreement**<br><br>Local Rule 4001-2(a)(i)(R) | N/A | |
| **Provisions Limiting What Parties in Interest May Raise at Emergency Hearings**<br><br>Local Rule 4001-2(a)(i)(T) | N/A | |
| **Provisions that Grant Liens on Avoidance Actions**<br><br>Local Rule 4001-2(a)(i)(U) | N/A | |
| **Provisions that Immediately Waive the Debtor's Rights under Section 506(c)**<br><br>Local Rule 4001-2(a)(i)(V) | No costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Case at any time shall be charged against the DIP Repo Parties, or any of their claims, or the DIP Repo Parties' Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the DIP Repo Parties, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders. | To be inserted in Final Repo DIP Order |
| **Provisions that Affect the Court's Power to Consider the Equities of the Case under Section 552(b)(1)** | The DIP Repo Parties shall be entitled to all of the rights and benefits of section 552 of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Repo Parties with respect to proceeds, product, offspring or profits of any of the Collateral. | To be inserted in Final Repo DIP Order |

US_ACTIVE\121802446\V-6
DOCS_DE:239660.1 28311/001

| SUMMARY OF MATERIAL TERMS OF DIP REPO FACILITY | | |
|---|---|---|
| Local Rule 4001-2(a)(i)(W) | | |
| **Provisions that Immediately Shield the Lender from the Equitable Doctrine of Marshalling** Local Rule 4001-2(a)(i)(X) | The DIP Repo Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of their Collateral, and proceeds shall be received and applied pursuant to the Orders and the DIP Repo Documents notwithstanding any other agreement or provision to the contrary. | To be inserted in Final Repo DIP Order |
| **Budget** Local Rule 4001-2(a)(iii) | N/A | |

### B.      The Debtors Need for Postpetition Financing

15.      As explained above, the Debtors have an immediate and critical need to obtain the DIP Repo Facility.  The Debtors' businesses depend on the uninterrupted flow of liquidity in order to fund mortgage originations for customers.  Without immediate access to the DIP Repo Facility, the Debtors will be unable fund loans to be originated to borrowers intending to close on their home purchase within the next several weeks.  The DIP Repo Facility is necessary in order to prevent the harm that would result if those borrowers were unable to complete the purchase or refinance of their homes.

### C.      The Debtors' Efforts to Obtain Postpetition Financing

16.      As further detailed in the First Day Declaration, the Debtors have been impacted by the series of macroeconomic challenges, including a steep rise in interest rates.  The combination of continued losses related to the Debtor's lower origination volumes, and volatile daily margin calls on hedge positions has led to drastic reductions in the Debtors' unrestricted cash and initiated a liquidity crisis.  As further detailed in the Meerovich Declaration, the Debtors and

18

their professionals have worked collaboratively to secure debtor in possession financing. The Debtors and their professionals approached multiple potential sources of debtor-in-possession financing, including commercial banks and other financial institutions. No party offered potential financing on terms more favorable than the DIP Repo Facility.

17.     Given the unique and extensive nature of the Debtors' capital requirements, in the absence of the availability of the DIP Repo Facility, the Debtors, their estates, borrowers and creditors would likely sustain serious and irreparable harm.

## RELIEF REQUESTED SHOULD BE GRANTED

**D.     Entry into the DIP Repo Facility is an Exercise of the Debtors' Sound Business Judgment**

18.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, among other things, an exercise of "sound and reasonable business judgment"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business

judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

19.    Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-514 (Bankr. D. Utah. Oct. 8, 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

20.    In determining whether the Debtors have exercised sound business judgment in entering into the DIP Repo Facility, the Court should consider the economic terms of the financing under the totality of circumstances. *See* Hr'g Tr. at 734-35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as they once were previously); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard" bargains to acquire funds for its reorganization). Moreover, the Court may appropriately take into consideration noneconomic benefits to the Debtors offered

under the proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the

Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

21.    The Debtors' decision to enter into the DIP Repo Facility is an exercise of their

sound business judgment.  The DIP Repo Facility is the best financing option available under

present circumstances and the Debtors have satisfied the legal requirements to incur the obligations

under the DIP Repo Facility on the terms and conditions set forth in the DIP Repo Documents.

The Debtors believe that the DIP Repo Documents contain terms that are fair, reasonable, and in

the best interest of the Debtors and their estates.  Accordingly, the Debtors respectfully submit that

they should be authorized to enter into the DIP Repo Documents and to obtain access to the DIP

Repo Facility.

### E.    Debtors Should Be Authorized to Grant Liens and Superpriority Claims

22.    The Debtors propose to obtain financing under the DIP Repo Facility by providing

security interests and liens as set forth in the DIP Repo Documents and described above.  The

Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which

authorizes a debtor to incur secured or superpriority debt under certain circumstances.

Specifically, section 364(c) of the Bankruptcy Code provides that:

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

23.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (finding that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon a showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (finding that superpriority administrative expenses should be authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (finding that credit was unavailable absent a senior priming lien because the debtor had made unsuccessful contact with other financial institutions in the relevant geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that the fact that two national banks refused to grant

unsecured loans was sufficient to support the conclusion that the requirements of section 364 were met); *In re Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and finding that debtor made reasonable efforts to satisfy the requirements of section 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

24.     Courts have articulated a three-part test to determine whether a debtor is entitled to enter into financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (i.e., by allowing an administrative claim);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*, 115 B.R. at 37–40; *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

25.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

26.     As described above and in the First Day Declaration, the Debtors are unable to obtain credit without the protections afforded by section 364(c) of the Bankruptcy Code.  Thus,

23

the Debtors determined that the DIP Repo Facility provides the best opportunity available to the fund the Debtors' existing locked loan commitments to borrowers.  Therefore, approving superpriority claims with respect to the Collateral in favor of the DIP Repo Parties, as necessary, is reasonable and appropriate.

**F.**    **The Debtors Should Be Authorized to Pay Fees Required by the DIP Repo Documents to the Extent that the DIP Repo Facility is Consummated**

27.    In addition to reimbursement obligations, as specified under the DIP Repo Documents, the Debtors have agreed, subject to Court approval, to pay certain fees and other payments to the DIP Repo Parties.  The fees and other obligations under the DIP Repo Documents were negotiated in good faith and at arm's length and represent the most favorable terms to the Debtors on which the DIP Repo Parties would agree to make the DIP Repo Facility available.  The Debtors considered the fees when determining in their sound business judgment whether entry into the DIP Repo Facility constituted the best path forward for the Debtors, and the Debtors determined that paying these fees in order to obtain the financing under the DIP Repo Facility is in the best interests of the Debtors' estates.  Accordingly, the Court should authorize the Debtors to pay the fees under the DIP Repo Facility.

**G.**    **The DIP Repo Parties Should Be Deemed A Good Faith Parties under Section 364(e)**

28.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency

24

of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

29.     As explained in the Meerovich Declaration, the DIP Repo Documents are the result of (i) the Debtors' reasonable judgment that the DIP Repo Parties provided the best [(and only)] postpetition financing alternative available under the circumstances and (b) extended arms' length, good-faith negotiations between the Debtors and the DIP Repo Parties.  Under the circumstances, the terms and conditions of the DIP Repo Documents are fair and reasonable, and the proceeds of the DIP Repo Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the Orders and the DIP Repo Documents.  Accordingly, the Court should find that the DIP Repo Parties are a "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Repo Parties are entitled to all of the protections afforded by that section.

### H.     Modification of Automatic Stay is Warranted

30.     The relief requested herein contemplates a modification and vacation of the automatic stay to permit the Debtors to, among other things, (a) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; and (b) implement the terms of the Orders, including payment of all amounts referred to in the DIP Repo Documents.

31.     Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances.  Accordingly, the Debtors request that the Court modify the automatic stay solely to the extent contemplated by the DIP Repo Facility Agreement and the Orders.

I.      **The DIP Repo Facility Should be Approved Under Section 363(b) and (c) of the Bankruptcy Code**

32.      Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  If "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted).  Indeed, courts in this District consistently have declined to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions are attributable to any "rational business purpose." *Integrated*, 147 B.R. at 656 (quoting *CRTF Corp. v. Federated Dep't Stores*, 683 F. Supp. 422, 436 (S.D.N.Y. 1988)).

33.      As articulated above and in the Meerovich Declaration and the First Day Declaration, there is a sound and compelling basis for the Debtors to enter into the DIP Repo Documents and the transactions contemplated thereunder.  The DIP Repo Facility will make available substantial financing to fund committed loans.

34.      Without access to the DIP Repo Facility, the Debtors will not be able to satisfy obligations to customers with locked loans.  As a result, those customers would be left at closing tables without the funds necessary to close on the purchase or refinance of their homes.  Further, the DIP Repo Facility is necessary in order to fund the Debtors' operations.  The Debtors entry into the DIP Repo Facility, therefore, is both necessary in order for the Debtors to provide necessary funding to customers, and critical to the success of the Chapter 11 Cases.  The Debtors submit ample business justification exists for them to enter into the DIP Repo Documents and the

transactions contemplated thereby. Furthermore, and out of an abundance of caution, the Debtors submit that the repurchase transactions and the sale of receivables pursuant to the DIP Repo Facility constitutes transactions in the ordinary course of the Debtors' business and are subject to section 363(c) of the Bankruptcy Code (providing that a debtor may enter into ordinary course transactions without notice or a hearing).

**J.     Transactions Under the DIP Repo Facility Satisfy Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear**

35.     Bankruptcy Code section 363(f) permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable non-bankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. 11 U.S.C. § 363(f). Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale. *See Scherer v. Fed. Nat'l Mortg. Ass'n (In re Terrace Chalet Apts., Ltd.)*, 159 B.R. 821, 825 (N.D. Ill. 1993) (sale extinguishes liens under section 363(f) as long as one of the five specified exceptions applies).

36.     Entry into the DIP Repo Facility is appropriate under section 363(f) of the Bankruptcy Code. The only known liens or interests in the mortgages that are proposed to be repurchased and sold in connection with the implementation of the DIP Repo Facility are the liens held by the Prepetition Bridge Lender pursuant to the Prepetition Bridge Loan Agreement, who has consented to the transactions. With respect to mortgages originated after the DIP Repo Facility is implemented, no party other than the DIP Repo Purchaser will have liens or interests in such mortgages. Furthermore, notice will be provided to any other party that the Debtors become aware

27

of that may hold a lien, claim, encumbrance, or other interest in the transferred assets. But for the free and clear transfer of the transferred assets under section 363(f) of the Bankruptcy Code, the DIP Repo Purchaser would not have entered into the DIP Repo Facility on the same terms, which would adversely impact the Debtors' effort to maximize the value of their estates. Thus, the Debtor may sell the assets transferred pursuant to the DIP Repo Facility free and clear of all liens in accordance with Bankruptcy Code section 363(f)(2) and (f)(5).

**K.      The DIP Repo Purchaser Should Be Entitled to the Protections of Bankruptcy Code Section 363(m)**

37.      Bankruptcy Code section 363(m) provides in relevant part that the reversal or modification on appeal of an authorization under section 363(b) of a sale or lease of property does not affect the validity of a sale or lease under such authorization to a purchaser who bought or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m). "Although the Bankruptcy Code does not define the meaning of 'good-faith purchaser,' most courts have adopted a traditional equitable definition: 'one who purchases the assets for value, in good faith and without notice of adverse claims.'" *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (citation omitted).

38.      The United States Court of Appeals for the Third Circuit has held that: "'The requirement that a purchaser act in good faith . . . speaks to the integrity of [purchaser's] conduct in the course of the sale proceedings.'" *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (citation omitted). Typically, the misconduct that would deny a purchaser's good faith status involves "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 56 (7th Cir. 1983) (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d

1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor to section 363(m)). As supported by the Meerovich Declaration, the Debtors submit that the transactions contemplated by the DIP Repo Facility are arm's-length transactions entitled to the protections of Bankruptcy Code section 363(m), negotiated by unrelated parties with their own sophisticated legal, financial, technical, and tax advisors.

**L.      The DIP Repo Facility Constitutes a "Safe Harbor" Agreement Entitled to the Protections of the Safe Harbor Provisions of the Bankruptcy Code**

39.      As discussed herein, the Debtors finance their operations through various arrangements that, while highly complex, are customary in the mortgage origination industry. Such arrangements are structured to afford lenders maximum protections in foreclosure and insolvency proceedings of their borrowers.  In particular, it is essential to such lenders that such arrangements be structured to obtain the benefit of the so-called "safe harbor" provisions of the Bankruptcy Code and other so-called "bankruptcy remote" vehicles.  These protections ultimately benefit borrowers and their customers by facilitating access to the capital markets and lowering costs to both borrowers and customers.

40.      As described in the First Day Declaration and in the Interim DIP Repo Order, prior to the Petition Date, FGMC financed its mortgage origination operations via certain repurchase agreements pursuant to which it sold to buyer counterparties various mortgage obligations that FGMC originated or purchased from their joint ventures, and pursuant to which it was obligated to repurchase such mortgage obligations in the future.  As provided previously, these financing arrangements are customary in the mortgage origination industry and afford mortgage originators and borrowers more advantageous borrowing rates and terms as compared to other potential financing structures (such as secured lending facilities).  The Debtors propose in this Motion and the Interim DIP Repo Order to continue such financing activities pursuant to new and/or amended

and restated master repurchase agreements entered into pursuant to the Interim DIP Repo Order that are substantially similar to the Prepetition Repo Facilities.

41.    It is customary in the mortgage origination industry to structure arrangements such as the DIP Repo Facility so that they in fact qualify as "repurchase agreements" and "securities contracts" as defined in the Bankruptcy Code, entitled to the protections of the so-called "safe harbor" provisions of the Bankruptcy Code.  The Bankruptcy Code definition of "repurchase agreement" includes the requirement that the agreement provide for the transfer of mortgage assets in return for the transfer of funds, with a simultaneous agreement by the transferee to transfer the mortgage assets back to the transferor against the transfer of funds.  *See* 11 U.S.C. § 101(47). Similarly, the Bankruptcy Code definition of "securities contract" includes the requirement that the agreement provide for the purchase, sale, or loan of a mortgage loan. *See* 11 U.S.C. § 747(7)(a)(i).

42.    Here, the DIP Repo Facility provides for the transfer, purchase or sale of mortgage loans (or interests therein) against the transfer of funds by the DIP Repo Facility Purchaser, with a simultaneous agreement by such DIP Repo Facility Purchaser to transfer the mortgage loans (or interests therein) back to FGMC against the transfer of funds.  Therefore, the DIP Repo Facility satisfies both the transfer requirements and the qualifying asset requirements and is a "repurchase agreement" within the meaning of section 101(47) of the Bankruptcy Code and a "securities contract" within the meaning of section 741(7) of the Bankruptcy Code. *See, e.g., Calyon New York Branch v. American Home Mortgage Corp. (In re American Home Mortgage, Inc.)*, 379 B.R. 503, 519-20 (Bankr. D. Del. 2008) (a contract providing for the sale and repurchase of mortgage loans constitutes a "repurchase agreement" and a "securities contract" and is subject to the safe harbors under the Bankruptcy Code); *Wells Fargo Bank N.A. v. HomeBanc, et al. (In re Homebanc*

*Mortgage Corp.*), 2013 WL 211180, at *10 (Bankr. D. Del. 2013) (same); *Sher v. TMST Hedging Strategies, Inc. (In re TMST, Inc.)*, 518 B.R. 329 (Bankr. D. Md. 2014) (same).

43.    In order to avail itself of the safe harbors under the Bankruptcy Code, a party to a repurchase agreement or securities contract must qualify as a protected counterparty.  Here each of the DIP Repo Facility Parties is a (x) "financial institution" within the meaning of section 101(22) of the Bankruptcy Code because it is a commercial bank, (y) "financial participant" within the meaning of section 101(22A) of the Bankruptcy Code because it had one or more safe harbor agreements with a borrower in excess of the amounts set forth in Bankruptcy Code 101(22A), and/or (z) "repo participant" within the meaning of section 101(46) of the Bankruptcy Code.

44.    The DIP Repo Facility and the DIP Repo Facility Parties therefore are entitled to the protections of the safe harbors of the Bankruptcy Code as provided for in sections 362(b)(6), 362(b)(7), 362(o), 546, 548, 555 and 559 of the Bankruptcy Code.

 *(2) The DIP MSFTAs Constitute Forward Agreements," "Swap Agreements," and "Master Netting Agreements" Under the Bankruptcy Code*

45.    Prior to the Petition Date, in the ordinary course of business, FGMC entered into forward transactions for the purchase or sale of mortgage-backed and other securities, including pursuant to "when-issued," "to-be-announced," "dollar roll" and other transactions with various regulated broker dealers pursuant to the terms of various Master Securities Forward Transaction Agreements (the "Prepetition MSFTAs").  FGMC used the Prepetition MSFTAs to hedged certain of its financing operations.  The counterparties to the Debtors' Prepetition MSFTAs include, but are not limited to BMO Capital Markets Corp., Goldman Sachs LLC, Mizuho Securities USA LLC, Morgan Stanley & Co. LLC, South Street Securities LLC, and Wells Fargo Securities LLC. As stated in the First Day Declaration, such hedging arrangements are customary in the mortgage origination industry and afford mortgage originators and borrowers more advantageous borrowing

rates and terms.  The Debtors propose in this Motion and the Interim DIP Repo Order to continue such hedging activities post-petition.

46.    It is customary in the mortgage origination industry to structure such arrangements so that they in fact qualify as "forward agreements," "swap agreements," and "master netting agreements" as defined in the Bankruptcy Code that are in turn entitled to the protections of the "safe harbor" provisions of the Bankruptcy Code.  Each DIP MSFTA is a (x) "forward contract" within the meaning of section 101(25) of the Bankruptcy Code, a "swap agreement" within the meaning of section 101(53B) of the Bankruptcy Code, and a "securities contract" within the meaning of section 741(7) of the Bankruptcy Code, in each case because the DIP MSFTA provides for the purchase or sale of mortgage loans or other securities on a delayed delivery basis and (y) "master netting agreement" within the meaning of section 101(38A) of the Bankruptcy Code because it provides for netting and setoff of the parties' rights and obligations thereunder.  In addition, each DIP MSFTA Counterparty is a "master netting agreement participant" within the meaning of Section 101(38B) of the Bankruptcy Code because it will be a party to an outstanding master netting agreement.

47.    The DIP MSFTAs and DIP MSFTA Counterparties therefore are entitled to the protections of the safe harbors of the Bankruptcy Code as provided for in sections 362(b)(6), 362(b)(17), 362(b)(27), 362(o), 546, 548, 556, 560 and 561 of the Bankruptcy Code.

(3)    *Each DIP Netting Agreement Constitutes a "Master Netting Agreement" Under the Bankruptcy Code*

48.    Prior to the Petition Date, certain Debtors entered into a certain margin, setoff and netting agreement to allow the Debtors and counterparties to the Prepetition Repo Facilities and the Prepetition MSFTAs (the "Prepetition Netting Counterparties") to net, setoff and margin their obligations to one another under the Prepetition Netting Agreements.  As stated in the First Day

Declaration, such netting arrangements are customary in the mortgage origination industry and afford mortgage originators and borrowers more advantageous borrowing rates and terms. The Debtors propose in this Motion and the Interim DIP Repo Order to enter into a substantially similar agreement post-petition.

49.     It is customary in the mortgage origination industry to structure such arrangements so that they in fact qualify as "master netting agreements" as defined in the Bankruptcy Code that are in turn entitled to the "safe harbor" provisions of the Bankruptcy Code. Each Netting Agreement is a "master netting agreement" within the meaning of section 101(38A) of the Bankruptcy Code because it provides for the exercise of rights, including rights of netting, setoff, liquidation, termination, acceleration, or close out, under or in connection with securities contracts, forward contracts, repurchase agreements, and/or swap agreements. Moreover, each DIP Netting Counterparty is a "master netting agreement participant" because it was a party to an outstanding master netting agreement with a borrower.

50.     The DIP Netting Agreement and the DIP Netting Counterparties therefore are entitled to the protections of the safe harbors of the Bankruptcy Code as provided for in sections 362(b)(27), 362(o), 546, 548, and 561 of the Bankruptcy Code.

### M.     The Debtors Require Immediate Access to the DIP Repo Facility

51.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), 4001(c)(2). In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions. *See In re Ames Dep't Stores*, 115 B.R. at 36.

33

52.     The Debtors' businesses depend on the uninterrupted flow of liquidity in order to fund mortgage originations.  The Debtors and their customers would suffer immediate and irreparable harm if the authority to borrow under the DIP Repo Facility is not granted on an interim basis promptly after the Petition Date.

## RESERVATION OF RIGHTS

53.     Except as may be provided in the Orders entered by the Court approving the DIP Repo Facility, nothing contained herein is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors or any liens against the Debtors' property, (b) an agreement or obligation to pay any claims, (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (d) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (e) an approval, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code, (f) a limitation on the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to the Orders once entered.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Orders is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.  Nothing contained in the Orders will be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

## WAIVER OF ANY APPLICABLE STAY

54.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek

in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable, as the exigent nature of the relief sought herein justifies immediate relief.

## REQUEST FOR FINAL HEARING

55.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for consideration of entry of the Final DIP Repo Order.

56.     The Debtors request that they be authorized to serve a copy of the signed Interim DIP Repo Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## NOTICE

57.     The Debtors will provide notice of this motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) counsel to the DIP Repo Purchaser, (f) counsel to the Cash Flow DIP Lender; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b).

## NO PRIOR REQUEST

58.     No prior request for the relief sought in this motion has been made to this or any other court.

## CONCLUSION

WHEREFORE the Debtors respectfully request entry of the Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

35

Dated: June 30, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Tel:     (302) 652-4100
Fax:     (302) 652-4400
Email:  ljones@pszjlaw.com
            tcairns@pszjlaw.com

-and-

Samuel R. Maizel (*Pro Hac Vice* pending)
Tania M. Moyron (*Pro Hac Vice* pending)
**DENTONS US LLP**
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Email:  samuel.maizel@dentons.com
            tania.moyron@dentons.com

Lauren Macksoud (*Pro Hac Vice* Pending)
Claude D. Montgomery (*Pro Hac Vice* Pending)
**DENTONS US LLP**
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 632-8390
Email: lauren.macksoud@dentons.com
            claude.montgomery@dentons.com

David F. Cook (DE Bar No. 6352)
**DENTONS US LLP**
1900 K Street, NW
Washington, DC 20006
Telephone:  (202) 496-7500
Email:  david.f.cook@dentons.com

*Proposed Counsel for Debtors and Debtors in Possession*