# EXHIBIT B

**MASTER REPURCHASE AGREEMENT**

**Between**

**BARCLAYS BANK PLC, as Purchaser and Agent**

**and**

**FIRST GUARANTY MORTGAGE CORPORATION, as Seller**

**Dated as of [_____], 2022**

# TABLE OF CONTENTS

1.   APPLICABILITY ...................................................................................1
2.   DEFINITIONS AND INTERPRETATION ...........................................1
3.   THE TRANSACTIONS .........................................................................24
4.   [RESERVED]. ........................................................................................27
5.   TAKEOUT COMMITMENTS ...............................................................27
6.   PAYMENT AND TRANSFER ...............................................................28
7.   MARGIN MAINTENANCE ...................................................................28
8.   TAXES; TAX TREATMENT ..................................................................29
9.   BENCHMARK REPLACEMENT .........................................................32
10.  SECURITY INTEREST; PURCHASER'S APPOINTMENT AS
     ATTORNEY-IN-FACT ...........................................................................33
11.  CONDITIONS PRECEDENT ................................................................34
12.  RELEASE OF PURCHASED ASSETS ..................................................38
13.  RELIANCE .............................................................................................38
14.  REPRESENTATIONS AND WARRANTIES .........................................38
15.  COVENANTS OF SELLER ....................................................................42
16.  REPURCHASE OF PURCHASED ASSETS .........................................50
17.  SERVICING OF THE MORTGAGE LOANS; SERVICER
     TERMINATION .....................................................................................51
18.  EVENTS OF DEFAULT .........................................................................54
19.  REMEDIES .............................................................................................56
20.  DELAY NOT WAIVER; REMEDIES ARE CUMULATIVE ...................59
21.  USE OF EMPLOYEE PLAN ASSETS .................................................59
22.  INDEMNITY ...........................................................................................59
23.  WAIVER OF REDEMPTION AND DEFICIENCY RIGHTS .................60
24.  REIMBURSEMENT; SET-OFF ..............................................................60
25.  FURTHER ASSURANCES .....................................................................62
26.  ENTIRE AGREEMENT; PRODUCT OF NEGOTIATION ...................62
27.  TERMINATION .....................................................................................62
28.  REHYPOTHECATION; ASSIGNMENT ..............................................62
29.  AMENDMENTS, ETC. ...........................................................................64
30.  SEVERABILITY .....................................................................................64
31.  BINDING EFFECT; GOVERNING LAW ..............................................64
32.  WAIVER OF JURY TRIAL; CONSENT TO JURISDICTION AND
     VENUE; SERVICE OF PROCESS ........................................................64
33.  SINGLE AGREEMENT ..........................................................................65
34.  INTENT ..................................................................................................65
35.  NOTICES AND OTHER COMMUNICATIONS ...................................66
36.  CONFIDENTIALITY .............................................................................67
37.  DUE DILIGENCE ..................................................................................68
38.  USA PATRIOT ACT; SANCTIONS AND ANTI-TERRORISM .............69
39.  EXECUTION IN COUNTERPARTS ......................................................70
40.  CONTRACTUAL RECOGNITION OF BAIL-IN...................................70
41.  CONTRACTUAL RECOGNITION OF UK STAY IN RESOLUTION .................70

**42.     NOTICE REGARDING CLIENT MONEY RULES.....................................................71**

SCHEDULES AND EXHIBITS

| | |
|---|---|
| EXHIBIT A-1 | MONTHLY CERTIFICATION |
| EXHIBIT A-2 | QUARTERLY CERTIFICATION |
| EXHIBIT B-1 | REPRESENTATIONS AND WARRANTIES WITH RESPECT TO MORTGAGE LOANS |
| EXHIBIT B-2 | REPRESENTATIONS AND WARRANTIES WITH RESPECT TO NON-QM MORTGAGE LOANS |
| EXHIBIT C | TRANSACTION REPRESENTATIONS |
| EXHIBIT D | FORM OF GOODBYE LETTER |
| EXHIBIT E | FORM OF WAREHOUSE LENDER'S RELEASE |
| EXHIBIT F | LIST OF DISAPPROVED MEMBERS OF THE MORTGAGE BACKED SECURITIES DIVISION OF THE FIXED INCOME CLEARING CORPORATION |
| EXHIBIT G | FORM OF ESCROW INSTRUCTION LETTER |
| EXHIBIT H | FORM OF SELLER MORTGAGE LOAN SCHEDULE |

# MASTER REPURCHASE AGREEMENT

Dated as of [_____], 2022.

**BETWEEN:**

BARCLAYS BANK PLC, in its capacity as purchaser (together with its permitted successors and assigns in such capacity hereunder, "Barclays" or a "Purchaser") and agent pursuant hereto (together with its permitted successors and assigns in such capacity hereunder, "Agent"),

and

FIRST GUARANTY MORTGAGE CORPORATION, in its capacity as a seller (together with its permitted successors and assigns in such capacity hereunder, "Seller").

## 1.    APPLICABILITY

Purchaser may from time to time, upon the terms and conditions set forth herein, agree to enter into transactions on a committed basis with respect to the Committed Amount and an uncommitted basis with respect to the Uncommitted Amount, in which Seller sells to Purchaser Eligible Mortgage Loans, on a servicing-released basis, and, if applicable, Takeout MBS, against the transfer of funds by Purchaser, with a simultaneous agreement by Purchaser to transfer to Seller such Purchased Assets on a date certain not later than one year following such transfer, against the transfer of funds by Seller; provided, that the Aggregate MRA Purchase Price shall not exceed, as of any date of determination, the lesser of (a) the Maximum Aggregate Purchase Price (less the Aggregate EPF Purchase Price) and (b) the aggregate Asset Base of all Purchased Assets and all Eligible Mortgage Loans proposed to be sold in such Transaction. Each such transaction shall be referred to herein as a "Transaction," and shall be governed by this Agreement.  This Agreement sets forth the procedures to be used in connection with periodic requests for Purchaser to enter into Transactions with Seller.  Seller hereby acknowledges that Purchaser is under no obligation to enter into, any Transaction pursuant to this Agreement with respect to the Uncommitted Amount. Seller acknowledges that during the term of this Agreement, Agent may undertake to join any of Sheffield Receivables Corporation, Barclays CCP Funding LLC, Salisbury Receivables Company LLC, Barclays Bank Delaware, any other asset-backed commercial paper conduit administered by Agent or any Affiliate of the Agent as additional purchasers under this Agreement, and Seller hereby consents to the joinder of such additional purchasers.

## 2.    DEFINITIONS AND INTERPRETATION

(a)    Defined Terms.

"30+ Day Delinquent Mortgage Loan" means any Mortgage Loan that, as of any determination date, using the MBA Methodology, is thirty (30) or more days delinquent (inclusive of any grace period).

"<u>Accepted Servicing Practices</u>" means with respect to any Mortgage Loan, those accepted, customary and prudent mortgage servicing practices (including collection procedures) of prudent mortgage banking institutions that service mortgage loans of the same type as the Mortgage Loans in the jurisdiction where the related Mortgaged Property is located, and which are in accordance with the requirements of each Agency Program, applicable law, FHA regulations and VA regulations, if applicable, and the requirements of any private mortgage insurer so that the FHA insurance, VA guarantee or any other applicable insurance or guarantee in respect of any Mortgage Loan is not voided or reduced.

"<u>Accrual Period</u>" means, with respect to each Monthly Payment Date for any Transaction, the immediately prior calendar month beginning with the first calendar day of such month to and including the last calendar day of such month; <u>provided that</u> with respect to the first Monthly Payment Date of a Transaction following the related Purchase Date, the Accrual Period shall commence on the related Purchase Date and provided further that the last Accrual Period shall end on the Termination Date.

"<u>Additional Eligible Loan Criteria</u>" has the meaning assigned thereto in the Pricing Side Letter.

"<u>Adjustable Rate Mortgage Loan</u>" means a Mortgage Loan that provides for the adjustment of the Mortgage Interest Rate payable in respect thereto.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control" means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "controlling," "controlled by" and "under common control with" have meanings correlative to the meaning of "control."

"<u>Agency</u>" means Freddie Mac, Fannie Mae or Ginnie Mae, as applicable.

"<u>Agency Guide</u>" means the Freddie Mac Guide, the Fannie Mae Guide, or the Ginnie Mae Guide, as applicable.

"<u>Agency Mortgage Loan</u>" means a Fannie Mae Mortgage Loan, Freddie Mac Mortgage Loan, or Ginnie Mae Mortgage Loan, as applicable.

"<u>Agency Program</u>" means the Freddie Mac Program, the Fannie Mae Program, or the Ginnie Mae Program, as applicable.

"<u>Agent</u>" has the meaning set forth in the preamble.

"<u>Aggregate EPF Purchase Price</u>" means as of any date of determination, an amount equal to the aggregate Outstanding Purchase Price (as defined in the Mortgage Loan Participation Purchase and Sale Agreement) for all Participation Certificates (as defined in the Mortgage Loan Participation Purchase and Sale Agreement) then owned by Purchaser under the Mortgage Loan Participation Purchase and Sale Agreement.

"Aggregate MRA Purchase Price" means as of any date of determination, an amount equal to the aggregate Outstanding Purchase Price for all Purchased Mortgage Loans and Takeout MBS, as applicable, then subject to Transactions under this Agreement.

"Agreement" means this Master Repurchase Agreement (including all exhibits, schedules and other addenda thereto), as it may be amended, further supplemented or otherwise modified from time to time.

"ALTA" means the American Land Title Association.

"Alternative Rate" means a per annum rate based on an index that is a commercially reasonable substitute for the then-current Benchmark, as determined by Purchaser.

"Applicable Agency" means Ginnie Mae, Fannie Mae, or Freddie Mac, as applicable.

"Applicable Margin" has the meaning assigned thereto in the Pricing Side Letter.

"Approvals" means with respect to Seller, the approvals obtained from the Applicable Agency or HUD in designation of Seller as a Ginnie Mae-approved issuer, an FHA-approved mortgagee, a VA-approved lender, a Fannie Mae-approved lender or a Freddie Mac-approved Seller/Servicer, as applicable, in good standing.

"Asset Base" has the meaning assigned thereto in the Pricing Side Letter.

"Assignment of Mortgage" means, with respect to any Mortgage, an assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the assignment of the Mortgage to Purchaser.

"ATR Rules":  means the "ability to repay" rules specified in the federal Truth-in-Lending Act as amended pursuant to rulemaking authority provided under the federal Dodd-Frank Act which require lenders to make a reasonable, good-faith determination that a Mortgagor has an ability to repay the loan as determined by the following eight (8) underwriting factors, or as otherwise required pursuant to such rules: (i) current or reasonably expected income or assets (other than the value of the property that secures the loan) that the Mortgagor will rely on to repay the loan, (ii) current employment status (if the originator relies on employment income when assessing the Mortgagor's ability to repay), (iii) monthly mortgage payment for the loan, (iv) monthly payment on any simultaneous loans secured by the same property, (v) monthly payments for property taxes and required insurance, and certain other costs related to the property such as homeowners association fees or ground rent, (vi) debts, alimony, and child-support obligations, (vii) monthly debt-to-income ratio or residual income, calculated using the total of all of the mortgage and nonmortgage obligations listed above, as a ratio of gross monthly income and (viii) credit history.

"Bail-In Action" means the exercise by the Bank of England (or any successor resolution authority) of any write-down or conversion power existing from time to time (including, without limitation, any power to amend or alter the maturity of eligible liabilities of an institution under resolution or amend the amount of interest payable under such eligible liabilities or the date on

which interest becomes payable, including by suspending payment for a temporary period and together with any power to terminate and value transactions) under, and exercised in compliance with, any laws, regulations, rules or requirements in effect in the United Kingdom relating to the transposition of the European Banking Recovery and Resolution Directive as amended from time to time, including but not limited to, the Banking Act 2009 as amended from time to time, and the instruments, rules and standards created thereunder, pursuant to which Purchaser's obligations (or those of Purchaser's affiliates) can be reduced (including to zero), canceled or converted into shares, other securities, or other obligations of Purchaser or any other person.

"Bank" means (i) [Deutsche Bank National Trust Company] and its successors and permitted assigns or (ii) such other bank as may be mutually acceptable to the Seller and the Purchaser.

"Bankruptcy Code" means 11 U.S.C. Section 101 *et seq.*, as amended from time to time.

"Barclays Agreement" means any agreement (including, without limitation, the Program Documents and the EPF Program Documents, if applicable) in any amount entered into between Seller or any of its Affiliates and Purchaser or any of its Affiliates.

"Benchmark" means, initially, Term SOFR; provided that if a Benchmark Transition Event has occurred with respect to Term SOFR or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior Benchmark pursuant to Section 9.

"Benchmark Replacement" means the sum of:

   (1)  the alternate benchmark rate that has been selected by Agent giving due consideration to

      (a)  any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body at such time or

      (b)  any evolving or then-prevailing market convention for determining a rate of interest for Dollar-denominated syndicated or bilateral credit facilities; and

   (2)  the Benchmark Replacement Adjustment,

provided that, if at any time, the Benchmark Replacement as so determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and any other Program Documents.

"Benchmark Replacement Adjustment" means, for each applicable Accrual Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by Purchaser giving due

consideration to the factors set forth in clauses (1)(a) and (1)(b) in the definition of Benchmark Replacement.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Accrual Period," timing and frequency of determining rates and making payments of interest, timing of seller requests for repurchase, the applicability and length of lookback periods and other technical, administrative or operational matters) that the Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Agent in a manner substantially consistent with market practice (or, if the Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Agent decides is reasonably necessary in connection with the administration of this Agreement).

"Benchmark Replacement Date" means the date on which a Benchmark Replacement becomes effective pursuant to Section 9.

"Benchmark Transition Event" means, with respect to any then-current Benchmark, the occurrence of a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark, the regulatory supervisor for the administrator of such Benchmark, the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark, a resolution authority with jurisdiction over the administrator for such Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark, announcing or stating that (a) such administrator has ceased or will cease on a specified date to provide all applicable tenors of such Benchmark, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any applicable tenor of such Benchmark, (b) all applicable tenors of such Benchmark are or will no longer be representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored or that such Benchmark is or will not be in compliance or aligned with the International Organization of Securities Commissions Principals for Financial Benchmarks, (c) Agent determines in its sole discretion that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining such Benchmark, or (d) Agent determines in its sole discretion that the adoption of any Change in Law or in the interpretation or application thereof shall make it unlawful for Purchaser to accrue Price Differential based on such Benchmark.

"Business Day" means (A) any day other than (i) a Saturday or Sunday, (ii) a day upon which the New York Stock Exchange or the Federal Reserve Bank of New York is closed, or (iii) with respect to any day on which the parties hereto have obligations to the Custodian or on which the Custodian has obligations to any party hereto, a day upon which the Custodian's offices are closed, and (B) with respect to any calculation of Term SOFR, a U.S. Government Securities Business Day.

"Cases" means the cases under chapter 11 of the Bankruptcy Code commenced by Seller and its affiliated debtors-in-possession in the United States Bankruptcy Court for the District of

Delaware and jointly administered as *In re First Guaranty Mortgage Corporation*, et al., Case No. 22-10584.

"Cash Equivalents" has the meaning assigned thereto in the Pricing Side Letter.

"Certification" has the meaning assigned thereto in the Custodial and Disbursement Agreement.

"Change in Control" means (a) any transaction or event as a result of which an entity owned or controlled or managed by Pacific Investment Management Company, LLC ceases to own, directly or indirectly, beneficially or of record, 100% of the stock of Seller, (b) the sale, transfer, or other disposition of all or substantially all of Seller's or any Guarantor's assets (excluding any such action taken in connection with any securitization transaction or routine sales of Mortgage Loans), or (c) the consummation of a merger or consolidation of Seller with or into another entity or any other corporate reorganization, if more than 50% of the combined voting power of the continuing or surviving entity's equity outstanding immediately after such merger, consolidation or such other reorganization is owned by persons who were not equityholders of the Seller immediately prior to such merger, consolidation or other reorganization.

"Change in Law" means (a) the adoption of any Requirement of Law, rule or regulation after the date of this Agreement, (b) any change in any Requirement of Law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by Purchaser (or any Affiliate thereof) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"Closing Protection Letter" means, with respect to any Wet-Ink Mortgage Loan that becomes subject to a Transaction, a letter of indemnification from a title company approved by Purchaser, in its sole discretion, in any jurisdiction where insured closing letters are permitted under applicable law and regulation, addressed to Seller, which is fully assignable to Purchaser, with coverage that is customarily acceptable to Persons engaged in the origination of mortgage loans, identifying the Settlement Agent covered thereby, which may be in the form of a blanket letter.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collection Account" means the following account established by the Seller in accordance with Section 17(e) for the benefit of the Purchaser, Account Number: [_____], ABA: # [_____].

"Collection Account Control Agreement" means that certain Collection Account Control Agreement, dated as of [_____], 2022, by and among the Purchaser, the Seller and Bank, in form and substance acceptable to the Purchaser to be entered into with respect to the Collection Account, as the same may be amended, modified or supplemented from time to time.

"Committed Amount" has the meaning assigned thereto in the Pricing Side Letter.

"Contract" means an agreement between an Originator and any Obligor, pursuant to or under which such Obligor shall be obligated to pay for merchandise, insurance or services from time to time.

"Corporate Advances" shall mean advances made by the Servicer in connection with the foreclosure or servicing of a Mortgage Loan, other than, for the avoidance of doubt, servicing advances made on account of delinquent principal and interest payments.

"Corporate DIP Facility" shall have the meaning assigned thereto in the Pricing Side Letter.

"Custodial and Disbursement Agreement" means that certain Custodial and Disbursement Agreement, dated as of [_____], 2022, among Seller, Purchaser, Disbursement Agent and Custodian, entered into in connection with this Agreement and the Mortgage Loan Participation Purchase and Sale Agreement, as the same may be amended, modified or supplemented from time to time.

"Custodian" means Deutsche Bank National Trust Company, and its successors and permitted assigns.

"Default" means any event that, with the giving of notice or the passage of time or both, would constitute an Event of Default.

"Default Rate" has the meaning assigned thereto in the Pricing Side Letter.

"Disbursement Account" has the meaning assigned thereto in the Custodial and Disbursement Agreement.

"Disbursement Agent" means Deutsche Bank National Trust Company and its successors and permitted assigns, or such other entity as mutually agreed upon by Agent and Seller.

"Dollars" or "$" means, unless otherwise expressly stated, lawful money of the United States of America.

"Dry Mortgage Loan" means any Eligible Mortgage Loan other than a Wet-Ink Mortgage Loan.

"Due Date" means the day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

"E-Sign" means the federal Electronic Signatures in Global and National Commerce Act, as amended from time to time.

"Economic and Trade Sanctions and Anti-Terrorism Laws" means any applicable laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering, or bribery, all as amended, supplemented or replaced from time to time.

"Effective Date" means [_____], 2022.

"Electronic Tracking Agreement" means the electronic tracking agreement in form and substance acceptable to Purchaser and Seller, dated as of [_____], 2022 among Purchaser, Seller, MERSCORP Holdings, Inc. and MERS, entered into in connection with this Agreement and the Mortgage Loan Participation Purchase and Sale Agreement, as the same may be amended, modified or supplemented from time to time.

"Electronic Transmission" means the delivery of information in an electronic format reasonably acceptable to the applicable recipient thereof.  An Electronic Transmission shall be considered written notice for all purposes hereof (except when a request or notice by its terms requires execution).

"Eligible Asset" means any Eligible Mortgage Loan, Takeout MBS or Takeout Commitment.

"Eligible Mortgage Loan" means a Mortgage Loan that (i) satisfies each of the representations and warranties in Exhibit B-1 and with respect to a Non-QM Mortgage Loan, satisfies each of the additional representations and warranties in Exhibit B-2 to this Agreement in all material respects, (ii) other than a Non-QM Mortgage Loan, was, if such Mortgage Loan is (a) an Agency Mortgage Loan, at origination, in Strict Compliance with the eligibility requirements of the Ginnie Mae Program, Fannie Mae Program, or Freddie Mac Program, as applicable, or (b) a Jumbo Mortgage Loan, underwritten and originated in accordance with Seller's applicable underwriting guidelines, (iii) with respect to all Mortgage Loans other than Wet-Ink Mortgage Loans, contains all required documents in the Mortgage File without exceptions unless otherwise waived by Purchaser or permitted pursuant to the terms of this Agreement or the Custodial and Disbursement Agreement, and (iv) satisfies the applicable Additional Eligible Loan Criteria.

"EPF Gestation Custodial Account Control Agreement" means that certain Gestation Custodial Account Control Agreement, dated on or about the date hereof, among Seller, Purchaser and Bank entered into in connection with the Mortgage Loan Participation Purchase and Sale Agreement, as the same shall be amended, supplemented or otherwise modified from time to time.

"EPF Pricing Side Letter" means that certain Pricing Side Letter, dated on or about the date hereof, between Seller and Purchaser entered into in connection with the Mortgage Loan Participation Purchase and Sale Agreement, as the same shall be amended, supplemented or otherwise modified from time to time.

"EPF Program Documents" means the Mortgage Loan Participation Purchase and Sale Agreement, the EPF Pricing Side Letter, the EPF Gestation Custodial Account Control Agreement and all other agreements, documents and instruments entered into by Seller on the one hand, and Purchaser or one of its Affiliates (or Custodian on its behalf) and/or Agent or one of its Affiliates on the other, in connection herewith or therewith with respect to the transactions contemplated hereunder or thereunder and all amendments, restatements, modifications or supplements thereto.

"ERISA" means, with respect to any Person, the Employee Retirement Income Security Act of 1974, as amended from time to time and any successor thereto, and the regulations promulgated and rulings issued thereunder.

"Escrow Instruction Letter" means the Escrow Instruction Letter from Seller to the Settlement Agent, in the form provided by Seller, which shall include instructions to the Settlement Agent substantially in the form of Exhibit G hereto, as the same may be modified, supplemented and in effect from time to time.

"Escrow Payments" means, with respect to a Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water charges, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges and other payments as may be required to be escrowed by the Mortgagor with the Mortgagee pursuant to the terms of the Mortgage or any other document.

"Event of Default" has the meaning assigned thereto in Section 18 hereof.

"Event of Insolvency" means, with respect to any Person,

      (i)     the filing of a voluntary petition (or the consent by such Person to the filing of any such petition against it), commencing, or authorizing the commencement of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, dissolution or similar law relating to the protection of creditors, or suffering any such petition or proceeding to be commenced by another; or such Person shall consent or seek to the appointment of or taking possession by a custodian, receiver, conservator, trustee, liquidator, sequestrator or similar official of such Person, or for any substantial part of its Property, or any general assignment for the benefit of creditors;

      (ii)     a proceeding shall have been instituted against such Person under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution, moratorium, delinquency or liquidation law of any jurisdiction, whether now or subsequently in effect, or a custodian, receiver, conservator, liquidator, trustee, sequestrator or similar official for such Person or such Person's Property (as a debtor or creditor protection procedure) is appointed by any Governmental Authority having the jurisdiction to do so or takes possession of such Property and any such proceeding is not dismissed within thirty (30) days of filing;

      (iii)     other than with respect to Seller and Maverick Guarantor, that such Person or any Affiliate shall become insolvent;

      (iv)     that such Person shall (a) admit in writing its inability to pay or discharge its debts or obligations generally as they become due or mature, (b) admit in writing its inability to, or intention not to, perform any of its material obligations, or (c) generally fail to pay any of its debts or obligations as they become due or mature;

      (v)     any Governmental Authority shall have seized or appropriated, or assumed custody or control of, all or any substantial part of the Property of such Person, or shall have taken any action to displace the management of such Person; or

      (vi)     the audited annual financial statements of such Person or the notes thereto or other opinions or conclusions stated therein shall be qualified or limited by reference to

the status of such Person as a "going concern" or a reference of similar import or shall indicate that such Person has a negative net worth or is insolvent; or

(vii)    if such Person or any Affiliate is a corporation, such Person or any Affiliate or any of their Subsidiaries, shall take any corporate action in furtherance of, or the action of which would result in any of the foregoing actions.

Notwithstanding the foregoing, the filing of the Cases shall not be considered an "Event of Insolvency" hereunder with respect to the Seller, the Guarantors, or any other named debtor or debtor-in-possession in the Cases.

"Fannie Mae" means the Federal National Mortgage Association or any successor thereto.

"Fannie Mae Guide" means the Fannie Mae MBS Selling and Servicing Guide, as such Guide may hereafter from time to time be amended.

"Fannie Mae Mortgage Loan" means a mortgage loan that is in Strict Compliance on the related Purchase Date with the eligibility requirements specified for the applicable Fannie Mae Program described in the Fannie Mae Guide.

"Fannie Mae Program" means the Fannie Mae Guaranteed Mortgage-Backed Securities Programs, as described in the Fannie Mae Guide.

"Fannie Mae Security" means an ownership interest in a pool of Fannie Mae Mortgage Loans, evidenced by a book-entry account in a depository institution having book-entry accounts at the Federal Reserve Bank of New York, issued and guaranteed, with respect to timely payment of interest and ultimate payment of principal, by Fannie Mae and backed by a pool of Fannie Mae Mortgage Loans, in substantially the principal amount and with substantially the other terms as specified with respect to such Fannie Mae Security in the related Takeout Commitment, if any.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCA" means the United Kingdom Financial Conduct Authority.

"FHA" means the Federal Housing Administration, an agency within HUD, or any successor thereto, and including the Federal Housing Commissioner and the Secretary of Housing and Urban Development where appropriate under the FHA regulations.

"Final Order" means that certain *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 507, 546, 548, 555, 556, 559, 560, and 561 (I) Authorizing Debtors to Enter into Repurchase Agreement Facilities and Related Documents; (II) Authorizing Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business; (III) Granting Liens and Providing Super-Priority Administrative Expense Status; (IV) Modifying the Automatic Stay; and*

*(V) Granting Related Relief*, expected to be entered by the United States Bankruptcy Court for the District of Delaware in the Cases.

"Floor" has the meaning assigned thereto in the Pricing Side Letter.

"Foreign Purchaser" has the meaning assigned thereto in Section 8(d).

"Freddie Mac" means the Federal Home Loan Mortgage Corporation, and its successors in interest.

"Freddie Mac Guide" means the Freddie Mac Sellers' and Servicers' Guide, as such Guide may hereafter from time to time be amended.

"Freddie Mac Mortgage Loan" means a mortgage loan that is in Strict Compliance on the related Purchase Date with the eligibility requirements specified for the applicable Freddie Mac Program described in the Freddie Mac Guide.

"Freddie Mac Program" means the Freddie Mac Home Mortgage Guarantor Program or the Freddie Mac FHA/VA Home Mortgage Guarantor Program, as described in the Freddie Mac Guide.

"Freddie Mac Security" means a modified pass-through mortgage-backed participation certificate, evidenced by a book-entry account in a depository institution having book-entry accounts at the Federal Reserve Bank of New York, issued and guaranteed, with respect to timely payment of interest and ultimate payment of principal, by Freddie Mac and backed by a pool of Freddie Mac Mortgage Loans, in substantially the principal amount and with substantially the other terms as specified with respect to such Freddie Mac Security in the related Takeout Commitment, if any.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States of America.

"Ginnie Mae" means the Government National Mortgage Association and its successors in interest, a wholly-owned corporate instrumentality of the government of the United States of America.

"Ginnie Mae Guide" means the Ginnie Mae Mortgage-Backed Securities Guide, as such Guide may hereafter from time to time be amended.

"Ginnie Mae Mortgage Loan" means a mortgage loan that is in Strict Compliance on the related Purchase Date with the eligibility requirements specified for the applicable Ginnie Mae Program in the applicable Ginnie Mae Guide, and such mortgage loan has not been purchased out of a Ginnie Mae Security.

"Ginnie Mae Program" means the Ginnie Mae Mortgage-Backed Securities Programs, as described in the Ginnie Mae Guide.

"Ginnie Mae Security" means a modified pass-through mortgage-backed certificate guaranteed by Ginnie Mae, evidenced by a book-entry account in a depository institution having book-entry accounts at the Federal Reserve Bank of New York and backed by a pool of Ginnie Mae Mortgage Loans, in substantially the principal amount and with substantially the other terms as specified with respect to such Ginnie Mae Security in the related Takeout Commitment.

"Governmental Authority" means any nation or government, any state or other political subdivision, agency or instrumentality thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any court or arbitrator having jurisdiction over Seller, Guarantors, any of their respective Subsidiaries, or any of their respective Property.

["Guarantors" means the PIMCO Guarantor and the Maverick Guarantor.]

"Hedge Instrument" means any interest rate cap agreement, interest rate floor agreement, interest rate swap agreement or other interest rate hedging agreement entered into by Seller with a counterparty reasonably acceptable to Agent, in each case with respect to the Mortgage Loans.

"High Cost Mortgage Loan" means a Mortgage Loan that is (a) subject to, covered by or in violation of the provisions of the Homeownership and Equity Protection Act of 1994, as amended, (b) a "high cost," "covered," "threshold," "abusive," "predatory" or "high risk" mortgage loan under any federal, state or local law, or any similarly classified loan using different terminology under any law imposing heightened regulation, scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees, or any other state or other regulation providing assignee liability to holders of such mortgage loans, (c) subject to or in violation of any such or comparable federal, state or local statutes or regulations, or (d) a "High Cost Loan" or "Covered Loan," as applicable, as such terms are defined in the current version of the Standard & Poor's LEVELS® Glossary Revised, Appendix E.

"HUD" means the Department of Housing and Urban Development, or any federal agency or official thereof which may from time to time succeed to the functions thereof with regard to FHA mortgage insurance.  The term "HUD," for purposes of this Agreement, is also deemed to include subdivisions thereof such as the FHA and Ginnie Mae.

"IBA" means the ICE Benchmark Administration.

"Income" means, with respect to any Purchased Asset at any time, any principal and/or interest thereon and all dividends, sale proceeds and all other proceeds as defined in Section 9-102(a)(64) of the Uniform Commercial Code and all other collections and distributions thereon (including, without limitation, any proceeds received in respect of mortgage insurance) but excluding any Escrow Payments and any and all fees, reimbursements and income entitled to be retained by a Servicer pursuant to the related Servicing Agreement.

"Incremental Purchase Price" has the meaning assigned thereto in Section 3(l) hereof.

"Incremental Purchase Price Request" has the meaning assigned thereto in Section 3(l) hereof.

"Indebtedness" has the meaning assigned thereto in the Pricing Side Letter.

"Indemnified Party" has the meaning assigned thereto in Section 22(a).

"Initial Purchase Price" has the meaning assigned thereto in the Pricing Side Letter.

"Interim Order" means that certain *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 507, 546, 548, 555, 556, 559, 560, and 561 (I) Authorizing Debtors to Enter into Repurchase Agreement Facilities and Related Documents; (II) Authorizing Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business; (III) Granting Liens and Providing Super-Priority Administrative Expense Status; (IV) Modifying the Automatic Stay; (V) Scheduling an Interim Hearing to Approve the Proposed Interim Order and a Final Hearing with Respect to the Relief Requested Herein; and (VI) Granting Related Relief*, expected to be entered by the United States Bankruptcy Court for the District of Delaware in the Cases.

"Investment Company Act" means the Investment Company Act of 1940, as amended, including all rules and regulations promulgated thereunder.

"Jumbo Mortgage Loan" means a first lien Mortgage Loan that exceeds the applicable conforming loan balance limits established by the Agencies which (i) conforms with all requirements of Seller's applicable underwriting guidelines, which are subject to Purchaser's approval in its sole discretion, as the same may be amended, supplemented or otherwise modified from time to time and (ii) has the benefit of the safe harbor from liability under the ATR Rules or a rebuttable presumption for such liability.

"Lien" means any mortgage, deed of trust, lien, claim, pledge, charge, security interest or similar encumbrance.

"Margin Call" has the meaning assigned thereto in Section 7(b) hereof.

"Margin Deficit" has the meaning assigned thereto in Section 7(b) hereof.

"Market Value" means, with respect to any Transaction and as of any date of determination, (i) the value ascribed to a Purchased Asset or a Mortgage Loan by Agent in its sole good faith discretion using methodology and parameters customarily used by Agent, and (ii) zero, with respect to any Mortgage Loan that is a Purchased Asset but is not an Eligible Mortgage Loan.

"Master Netting Agreement" means that certain Global Netting and Security Agreement, dated as of the date hereof, among Purchaser, Seller and certain Affiliates and Subsidiaries of Purchaser, entered into in connection with this Agreement and the Mortgage Loan Participation Purchase and Sale Agreement, as the same shall be amended, supplemented or otherwise modified from time to time.

"Material Adverse Change" means, with respect to a Person, any material adverse change in the business, condition (financial or otherwise), operations, performance, Property or prospects of such Person including the insolvency of such Person or its Parent Company (unless such material adverse change directly arises from the filing of the Cases), if applicable.

"Material Adverse Effect" means (a) a Material Adverse Change with respect to Seller or Guarantors, as applicable, or any of Seller's or any Guarantor's Affiliates; (b) a material impairment of the ability of Seller, Guarantors or any of their respective Affiliates that is a party to any Program Document to perform under any Program Document to which it is a party; (c) a material adverse effect upon the legality, validity, binding effect or enforceability of any Program Document against Seller or Guarantors, as applicable, or any of their respective Affiliates that is a party to any Program Document; (d) a material adverse effect on the Market Value of the Purchased Assets; or (e) a material adverse effect on the Approvals of Seller, except in each case which directly arises from the filing of the Cases.

"Maturity Date" has the meaning assigned thereto in the Pricing Side Letter.

"Maverick Guarantee" means that certain Guarantee of Maverick II Holdings LLC, dated as of the date hereof, in favor of Purchaser with respect to the Obligations of the Seller under the Program Documents, dated as of the date hereof, as the same may be amended, supplemented or otherwise modified from time to time.

"Maverick Guarantor" means Maverick II Holdings LLC.

"Maximum Aggregate Purchase Price" has the meaning assigned thereto in the Pricing Side Letter.

"MBA Methodology" means a method of calculating delinquency of a Mortgage Loan based upon the Mortgage Banker Association method, under which method a Mortgage Loan is considered delinquent if the Monthly Payment related to such Mortgage Loan has not been received by the end of the day immediately preceding the loan's next Due Date.

"MERS" means Mortgage Electronic Registration Systems, Inc., a Delaware corporation, or any successor in interest thereto.

"MERS Designated Mortgage Loan" means any Mortgage Loan as to which the related Mortgage or Assignment of Mortgage, has been recorded in the name of MERS, as agent for the holder from time to time of the Mortgage Note.

"MIN" means the mortgage identification number of Mortgage Loans registered with MERS on the MERS System.

"Modified Loan" means an Eligible Mortgage Loan that (a) is insured by FHA or guaranteed by the VA, (b) (1) was purchased out of a Ginnie Mae Security or from a third-party whole loan investor solely as a result of modifications to such Eligible Mortgage Loan, or (2) was purchased out of a Ginnie Mae Security or from a third-party whole loan investor as a result of delinquent mortgage payments, but, without any loan modifications, subsequently became reperforming and (c) is a Ginnie Mae Mortgage Loan.

"Minimum Transfer Amount": $250,000, provided that if an Event of Default has occurred, the Minimum Transfer Amount shall be zero.

"Monthly Payment" means the scheduled monthly payment of principal and interest on a Mortgage Loan as adjusted in accordance with changes in the Mortgage Interest Rate pursuant to the provisions of the Mortgage Note for an Adjustable Rate Mortgage Loan.

"Monthly Payment Date" means the tenth (10th) day of each calendar month beginning with [July] 2022; provided that if such day is not a Business Day, the next succeeding Business Day.

"Mortgage" means a mortgage, deed of trust, or other security instrument, securing a Mortgage Note.

"Mortgage File" has the meaning assigned thereto in the Custodial and Disbursement Agreement.

"Mortgage Interest Rate" means, with respect to each Mortgage Loan, the annual rate at which interest accrues on such Mortgage Loan from time to time in accordance with the provisions of the related Mortgage Note.

"Mortgage Loan" means an Agency Mortgage Loan, a Modified Loan, a Jumbo Mortgage Loan, a Non-QM Mortgage Loan, or a Second Lien Mortgage Loan.

"Mortgage Loan Participation Purchase and Sale Agreement" means that certain Mortgage Loan Participation Purchase and Sale Agreement, dated on or about the date hereof, between Purchaser and Seller, as the same may be amended, modified or supplemented from time to time.

"Mortgage Note" means a promissory note or other evidence of indebtedness of the obligor thereunder, evidencing a Mortgage Loan, and secured by the related Mortgage.

"Mortgaged Property" means the real property (or leasehold estate, if applicable) securing repayment of the debt evidenced by a Mortgage Note.

"Mortgagee" means the record holder of a Mortgage Note secured by a Mortgage.

"Mortgagor" means the obligor or obligors on a Mortgage Note, including any person who has assumed or guaranteed the obligations of the obligor thereunder.

"MSFTA" means that certain Master Securities Forward Transaction Agreement, dated as of the date hereof, by and between Barclays Capital Inc. and Seller, as the same shall be amended, supplemented or otherwise modified from time to time.

"Negative Amortization" means the portion of interest accrued at the Mortgage Interest Rate in any month which exceeds the Monthly Payment on the related Mortgage Loan for such month and which, pursuant to the terms of the Mortgage Note, is added to the principal balance of such Mortgage Loan.

"Non-QM Mortgage Loan" means either (a) a Mortgage Loan which does not have the benefit of the safe harbor from liability under the ATR Rules or a rebuttable presumption for such liability or (b) a Mortgage Loan secured by a one-to four-family residential investor property,

which in either case was underwritten and originated in accordance with underwriting guidelines reasonably acceptable to Purchaser.

"Non-Utilization Fee" has the meaning assigned thereto in the Pricing Side Letter.

"Obligations" means (a) all amounts due and payable by Seller to Purchaser in connection with a Transaction hereunder, together with interest thereon (including interest which would be payable as post-petition interest in connection with the Cases or any other bankruptcy or similar proceeding) and other obligations and liabilities of Seller to Purchaser arising under, or in connection with, the Program Documents or directly related to the Purchased Assets, whether now existing or hereafter arising; (b) any and all sums paid by Purchaser or on behalf of Purchaser pursuant to the Program Documents in order to preserve any Purchased Asset or its interest therein; (c) in the event of any proceeding for the collection or enforcement of any of Seller's indebtedness, obligations or liabilities referred to in clause (a), the reasonable expenses of retaking, holding, collecting, preparing for sale, selling or otherwise disposing of or realizing on any Purchased Asset, or of any exercise by Purchaser of its rights under the Program Documents, including without limitation, reasonable attorneys' fees and disbursements and court costs; (d) all of Seller's indemnity obligations to Purchaser pursuant to the Program Documents; and (e) any and all amounts paid by or on behalf of the Purchaser to any subservicer before or after a default hereunder.

 "Obligor" means a Person obligated to make payments pursuant to a Contract; provided that in the event that any payments in respect of a Contract are made by any other Person, such other Person shall also be deemed to be an Obligor.

"OFAC" means the Office of Foreign Assets Control of the United States Department of Treasury.

"OFSI" means the Office of Financial Sanctions Implementation of the United Kingdom's HM Treasury.

"Origination Date" has the meaning assigned thereto in the Pricing Side Letter.

"Originator" means Seller or any other third party originator as mutually agreed upon by Agent and Seller.

"Other Agreement" means any (A) warehouse, credit, repurchase, line of credit, financing or hedging agreements or other similar agreement relating to any Indebtedness in an amount greater than $2,500,000 between Seller or any of its Affiliates or Subsidiaries, on the one hand, and any Person, on the other hand, or (B) Barclays Agreement.

"Other Taxes" has the meaning assigned thereto in Section 8(b).

"Outstanding Purchase Price" means, for any Purchased Asset, as of any date of determination, the Initial Purchase Price thereof, as reduced by any amount thereof repaid to the Purchaser pursuant to the terms of the Agreement and as increased by any Incremental Purchase Price related to such Purchased Asset.

"Parent Company" means a corporation or other entity owning at least 50% of the outstanding shares of voting stock of Seller.

"Participant Register" has the meaning assigned thereto in Section 28(b).

"Person" means any legal person, including any individual, corporation, partnership, association, joint stock company, trust, limited liability company, unincorporated organization, governmental entity or other entity of similar nature.

"PIMCO Guarantee" means that certain Guarantee of LVS II Holdings, LP, dated as of the date hereof, in favor of Purchaser with respect to the Obligations of the Seller under the Program Documents, dated as of the date hereof, as the same may be amended, supplemented or otherwise modified from time to time.

"PIMCO Guarantor" means Pimco Bravo Fund II, L.P.

"Price Differential" means, with respect to any Purchased Mortgage Loan or Transaction as of any date of determination, an amount equal to the sum, for all days elapsed during the related Accrual Period, of the product of (A) the Pricing Rate (or during the occurrence and continuation of an Event of Default, by daily application of the Default Rate) and (B) the Outstanding Purchase Price for such Purchased Mortgage Loan or Transaction in respect of such day and (C) 1/360.

"Price Differential Determination Date" means, with respect to any Monthly Payment Date, the second (2nd) Business Day preceding such date.

"Pricing Rate" means, as of any date of determination an amount equal to the sum of (i) the greater of (a) the Benchmark and (b) the Floor plus (ii) the Applicable Margin.

"Pricing Side Letter" means that certain Pricing Side Letter, dated as of [_____], 2022, between Seller and Purchaser, entered into in connection with this Agreement, as the same may be amended, modified or supplemented from time to time.

"Principal Balance" means the unpaid principal balance of a Mortgage Loan.

"Program Documents" means this Agreement, the Pricing Side Letter, the PIMCO Guaranty, the Maverick Guaranty, the Custodial and Disbursement Agreement, the Servicer Side Letter, the Collection Account Control Agreement, any assignment of Hedge Instrument, the Electronic Tracking Agreement, the Master Netting Agreement, the EPF Program Documents, the MSFTA, and any intercreditor agreement and all other agreements, documents and instruments entered into by Seller on the one hand, and Purchaser or one of its Affiliates (or Custodian on its behalf) and/or Agent or one of its Affiliates on the other, in connection herewith or therewith with respect to the Transactions contemplated hereunder or thereunder and all amendments, restatements, modifications or supplements thereto.

"Property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Purchase Date" means, with respect to each Transaction, the date on which Purchased Mortgage Loans and the related Purchased Assets including Takeout MBS, as applicable, are sold by Seller to the Purchaser or its designee hereunder, [provided that the Purchase Date for any Modified Loan shall occur on the fifteenth (15th) day of a month (or if such day is not a Business Day, on the next Business Day.]

"Purchase Price Percentage" has the meaning assigned thereto in the Pricing Side Letter.

"Purchased Assets" means with respect to each Purchased Mortgage Loan, whether now existing or hereafter acquired:  (i) the Mortgage Loans, (ii) the related Servicing Rights, (iii) Seller's rights under any related Hedge Instruments to the extent related to the Mortgage Loans, (iv) all mortgage guarantees and insurance relating to such individual Mortgage Loans (issued by governmental agencies or otherwise) or the related Mortgaged Property and any mortgage insurance certificate or other document evidencing such mortgage guarantees or insurance and all claims and payments related to such Mortgage Loans, (v) all guarantees or other support for such Mortgage Loans, (vi) all rights to Income and the rights to enforce such payments arising from such Mortgage Loans and any other contract rights, payments, rights to payment (including payments of interest or finance charges) with respect thereto, (vii) all Takeout MBS, Takeout Commitments and Trade Assignments (including the rights to receive the related purchase price related therefor) related to the Purchased Mortgage Loans, (viii) the Collection Account and all amounts on deposit therein, (ix) to the extent related to the Purchased Mortgage Loans, all "accounts," "deposit accounts," "securities accounts," "chattel paper," "commercial tort claims," "commodity accounts," "documents," "general intangibles," "instruments," "investment property," and "securities accounts," relating to the foregoing as each of those terms is defined in the Uniform Commercial Code and all cash and Cash Equivalents and all products and proceeds relating to or constituting any or all of the foregoing, (x) any purchase agreements or other agreements or contracts relating to or constituting any or all of the foregoing, (xi) any other collateral pledged or otherwise relating to any or all of the foregoing, together with all files, material documents, instruments, surveys (if available), certificates, correspondence, appraisals, computer records, computer storage media, accounting records and other books and records relating to the foregoing, and (xii) any and all replacements, substitutions, distributions on, or proceeds with respect to, any of the foregoing.

"Purchased Mortgage Loan" means a Mortgage Loan sold by Seller to Purchaser in a Transaction hereunder and not yet repurchased by Seller.

"Purchaser" has the meaning set forth in the preamble hereof.

"Purchaser's Wire Instructions" has the meaning set forth in the Pricing Side Letter.

"Records" means all instruments, agreements and other books, records, and reports and data generated by other media for the storage of information maintained by Seller or any other person or entity with respect to a Purchased Asset.  Records shall include, without limitation, the Mortgage Notes, any Mortgages, the Mortgage Files, the Servicing Files, and any other instruments necessary to document or service a Purchased Mortgage Loan, including, without limitation, the complete payment and modification history of each Purchased Mortgage Loan.

"Relevant Governmental Body" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"Repurchase Date" means, with respect to any Transaction involving Eligible Mortgage Loans, the earlier of (a) the Termination Date, or (b) the second (2nd) Business Day following Seller's written notice to Purchaser requesting a repurchase of such Transaction pursuant to Section 16 hereof.

"Repurchase Price" means the price at which Purchased Assets are to be transferred from Purchaser or its designee to Seller upon termination of a Transaction, which will be determined in each case as the sum of: (i) the Outstanding Purchase Price, (ii) the Price Differential accrued and unpaid thereon, and (iii) any accrued and unpaid fees or expenses or indemnity amounts and any other outstanding amounts owing under the Program Documents from Seller to Purchaser.

"Request for Release of Documents" means the Request for Release of Documents set forth as Exhibit [C-1] to the Custodial and Disbursement Agreement.

"Requirement of Law" means as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Responsible Officer" means (i) as to any Person, the chief executive officer or, with respect to financial matters, the chief financial officer of such Person and (ii) as to Seller, President, Treasurer, Senior Managing Counsel or any other executive managing member.

"Restricted Mortgage Loan" means (i) a "Growing Equity Loan," "Manufactured Home Loan," "Graduated Payment Loan," "Buydown Loan," "Project Loan," "Construction Loan" or "HECM Loan," each as defined in the applicable Agency Guide, (ii) a 30+ Day Delinquent Mortgage Loan, (iii) a Mortgage Loan for which the related Escrow Payments have not been made by the next succeeding Due Date, or (iv) a High Cost Mortgage Loan.

"Sanctions Lists" has the meaning ascribed to it in Section 38(a).

"SEC" has the meaning ascribed thereto in Section 36.

"Second Lien Mortgage Loan" means an Agency Mortgage Loan that is secured by a second lien on the related Mortgaged Property.

"Section 404 Notice" means the notice required pursuant to Section 404 of the Helping Families Save Their Homes Act of 2009 (P.L. 111-22), which amends 15 U.S.C. Section 1641 *et seq.*, to be delivered by a creditor that is an owner or an assignee of a Mortgage Loan to the related Mortgagor within thirty (30) days after the date on which such Mortgage Loan is sold or assigned to such creditor.

"Secured Promissory Note" has the meaning assigned thereto in Section 10(a).

"Security" means a Ginnie Mae Security, a Fannie Mae Security or a Freddie Mac Security, as applicable.

"Seller" has the meaning set forth in the preamble hereof.

"Seller Mortgage Loan Schedule" means the list of Purchased Mortgage Loans proposed to be purchased by Purchaser, in the form of Exhibit H hereto, that will be delivered in an Excel spreadsheet format by Seller to Purchaser and Custodian and attached by the Custodian to the related Certification.

"Servicer" means Rushmore Loan Management Services LLC or any servicer approved by Agent in its sole discretion, which may be Seller.

"Servicer Side Letter" means, if Mortgage Loans are serviced by a third party servicer or sub-servicer pursuant to a Servicing Agreement, the side letter agreement related to such Servicing Agreement among the Seller, the Servicer and the Purchaser, which is mutually agreed upon by the parties hereto.

"Servicer Termination Event" means each of the following events:

a.  Change of Servicer without consent of the Agent;

b.  Failure of Servicer (i) to service the Mortgage Loans in accordance with the Servicer Side Letter or (ii) in any material respect to service the Mortgage Loans in accordance with the related servicing agreement; or

c.  An Event of Insolvency with respect to Servicer.

"Servicing Agreement" means, if Mortgage Loans are serviced by a third party servicer, the servicing agreement between such servicer and Seller.

"Servicing File" means with respect to each Mortgage Loan, the file retained by Seller or its designee consisting of all documents that a prudent originator and servicer would include (including copies of the Mortgage File), all documents necessary to document and service the Mortgage Loans and any and all documents required to be delivered in connection with any transfer of servicing pursuant to the Program Documents.

"Servicing Records" means with respect to a Mortgage Loan, the related servicing records, including but not limited to any and all servicing agreements, files, documents, records, data bases, computer tapes, copies of computer tapes, proof of insurance coverage, insurance policies, appraisals, other closing documentation, payment history records, and any other records relating to or evidencing the servicing of such Mortgage Loan.

"Servicing Rights" means contractual, possessory or other rights of Seller or any other Person to administer or service a Mortgage Loan or to possess the Servicing File.

"Servicing Term" has the meaning assigned thereto in Section 17(b).

"Settlement Agent" means, with respect to any Transaction the subject of which is a Wet-Ink Mortgage Loan, the entity approved by Agent, in its sole good-faith discretion, which may be a title company, escrow company or attorney in accordance with local law and practice in the jurisdiction where the related Wet-Ink Mortgage Loan is being originated.

"SOFR" means, with respect to any day, the secured overnight financing rate published for such day by the SOFR Administrator on the SOFR Administrator's website, currently at http://www.newyorkfed.org, or any successor source identified by the SOFR Administrator from time to time.

"SOFR Administrator" means the Federal Reserve Bank of New York, as administrator of SOFR (or a successor administrator).

"Strict Compliance" means compliance of Seller and the Mortgage Loans with the requirements of the Agency Guide as amended by any agreements between Seller or a Takeout Investor, on the one hand, and the Applicable Agency, on the other hand, sufficient to enable Seller to issue and to service and Ginnie Mae to guarantee or Fannie Mae or Freddie Mac to issue and guarantee a Security; provided, that until copies of any such agreements between Seller and the Applicable Agency have been provided to Agent by Seller and agreed to by Agent, such agreements shall be deemed, as between Seller and Purchaser, not to amend the requirements of the Agency Guide.

"Structuring Fee" has the meaning assigned thereto in the Pricing Side Letter.

"Subsidiary" means, (a) with respect to Seller, any corporation, partnership or other entity of which is at least 51% owned by Seller or one or more Subsidiaries of Seller or (b) with respect to any other Person, any corporation, partnership or other entity of which at least a majority of the securities or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other persons performing similar functions of such corporation, partnership or other entity (irrespective of whether or not at the time securities or other ownership interests of any other class or classes of such corporation, partnership or other entity shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person and/or one or more Subsidiaries of such Person.

"Takeout Commitment" means (i) a fully executed trade confirmation from the related Takeout Investor to Seller confirming the details of a forward trade between the Takeout Investor and Seller with respect to one or more Purchased Assets, which trade confirmation shall be enforceable and in full force and effect, and shall be validly and effectively assigned to Purchaser pursuant to a Trade Assignment, and relate to pools of Mortgage Loans that satisfy the "good delivery standards" of the Securities Industry and Financial Markets Association as set forth in the Securities Industry and Financial Markets Association Uniform Practices Manual, as amended from time to time or (ii) a commitment (a) to swap one or more identified Purchased Mortgage Loans with a Takeout Investor that is an Agency for a Security and (b) to sell the related Security or Takeout MBS to a Takeout Investor.

"<u>Takeout Investor</u>" means (x) for non-Jumbo Mortgage Loans, (i) Barclays Capital Inc., or any successor thereto, (ii) any member of the Mortgage Backed Securities Division of the Fixed Income Clearing Corporation unless any such member is listed in Exhibit F (as may be amended from time to time by the Agent in its reasonable discretion) or (iii) any other Person approved by Agent in its sole discretion, and (y) for Jumbo Mortgage Loans, either (i) Barclays Bank PLC or (ii) any other Person approved by Agent in its sole discretion.

"<u>Takeout MBS</u>" means to the extent any Purchased Mortgage Loans are pooled into Securities, and such Securities do not settle on the date they are issued, partial interests in such Securities backed by such Purchased Mortgage Loans.

"<u>Taxes</u>" has the meaning assigned thereto in Section 8(a).

"<u>Term SOFR</u>" means, with respect to any date of determination, the forward-looking term rate based on SOFR, for a corresponding tenor of one month, as of two (2) Business Days prior to the first day of the corresponding Accrual Period containing such date of determination, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any such date Term SOFR has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to Term SOFR has not occurred, then Term SOFR will be the Term SOFR as published by the Term SOFR Administrator on the first preceding Business Day for which such Term SOFR was published by the Term SOFR Administrator so long as such first preceding Business Day is not more than three (3) Business Days prior to such determination date.

"<u>Term SOFR Administrator</u>" means CME Group Benchmark Administration Limited (or any successor administrator of a forward-looking term rate based on SOFR rate approved by Purchaser in its sole discretion).

"<u>Termination Date</u>" means the earliest to occur of (i) the Maturity Date, and (ii) the termination of the Mortgage Loan Participation Purchase and Sale Agreement, and at the option of Purchaser, the occurrence and continuation of an Event of Default under this Agreement after the expiration of any applicable grace period.

"<u>Trade Assignment</u>" means an assignment to Purchaser of a forward trade between the Takeout Investor and Seller with respect to one or more Purchased Mortgage Loans, together with the related trade confirmation from the Takeout Investor to Seller that has been fully executed, is enforceable and is in full force and effect and confirms the details of such forward trade.

"<u>Transaction</u>" has the meaning assigned thereto in Section 1 hereof.

"<u>Transaction Fee</u>" has the meaning assigned thereto in the Pricing Side Letter.

"<u>Transaction Representations</u>" means the representations and warranties set forth in <u>Exhibit C</u> which are deemed to be made by Seller to Purchaser in accordance with <u>Section **Error! Reference source not found.**</u> hereof.

"UETA" means the Official Text of the Uniform Electronic Transactions Act as approved by the National Conference of Commissioners on Uniform State Laws at its Annual Conference on July 29, 1999.

"Uncommitted Amount" has the meaning assigned thereto in the Pricing Side Letter.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interest in any Purchased Assets or the continuation, renewal or enforcement thereof is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the U.S. Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"VA" means the United States Department of Veterans Affairs.

"Warehouse Lender" means any lender providing financing to Seller for the purpose of warehousing, originating or purchasing a Mortgage Loan, which lender has a security interest in such Mortgage Loan to be purchased by Purchaser.

"Warehouse Lender's Release" means a letter, in the form of Exhibit E, from a Warehouse Lender to Purchaser, unconditionally releasing all of Warehouse Lender's right, title and interest in certain Mortgage Loans identified therein upon payment to the Warehouse Lender.

"Wet-Ink Mortgage Loan" means a Mortgage Loan that Seller is selling to Purchaser simultaneously with the origination thereof that is funded in part, either directly or indirectly, with the Initial Purchase Price paid by Purchaser hereunder and for which the Custodian shall not have received a complete Mortgage File.

"Wet-Ink Mortgage Loan Document Receipt Date" means for any Wet-Ink Mortgage Loan, the date that the Custodian executes an original trust receipt without exceptions.

(b)     Interpretation.

Headings are for convenience only and do not affect interpretation. The following rules of this subsection (b) apply unless the context requires otherwise. The singular includes the plural and conversely. A gender includes all genders. Where a word or phrase is defined, its other grammatical forms have a corresponding meaning. A reference to a subsection, Section, Annex or Exhibit is, unless otherwise specified, a reference to a section of, or annex or exhibit to, this Agreement. A reference to a party to this Agreement or another agreement or document includes the party's successors and permitted substitutes or assigns. A reference to an agreement or document is to the agreement or document as amended, modified, novated, supplemented or replaced, except to the extent prohibited by any Program Document. A reference to legislation or

to a provision of legislation includes any modification or re-enactment of it, a legislative provision substituted for it and a regulation or statutory instrument issued under it.  A reference to writing includes a facsimile transmission and any means of reproducing words in a tangible and permanently visible form.  A reference to conduct includes, without limitation, an omission, statement or undertaking, whether or not in writing.  An Event of Default exists until it has been waived in writing by Purchaser or has been timely cured. The words "hereof," "herein," "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement. The term "including" is not limiting and means "including without limitation." In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding," and the word "through" means "to and including." This Agreement may use several different limitations, tests or measurements to regulate the same or similar matters. All such limitations, tests and measurements are cumulative and shall each be performed in accordance with their terms. Unless the context otherwise clearly requires, all accounting terms not expressly defined herein shall be construed, and all financial computations required under this Agreement shall be made, in accordance with GAAP, consistently applied. References herein to "fiscal year" and "fiscal quarter" refer to such fiscal periods of Seller. An Event of Default shall be deemed to be not continuing once waived by the Purchaser or the Agent.

Except where otherwise provided in this Agreement, any determination, consent, approval, statement or certificate made or confirmed in writing with notice to Seller by Purchaser or an authorized officer of Purchaser as required by this Agreement shall be made in good faith and is conclusive in the absence of manifest error. A reference to an agreement includes a security interest, guarantee, agreement or legally enforceable arrangement whether or not in writing related to such agreement.

A reference to a document includes an agreement in writing or a certificate, notice, instrument or document, or any information recorded in electronic form.  Where Seller is required to provide any document to Purchaser under the terms of this Agreement, the relevant document shall be provided in writing or printed form unless Purchaser requests otherwise.

This Agreement is the result of negotiations among, and has been reviewed by counsel to, Purchaser and Seller, and is the product of all parties.  In the interpretation of this Agreement, no rule of construction shall apply to disadvantage one party on the ground that such party proposed or was involved in the preparation of any particular provision of this Agreement or this Agreement itself.  Except where otherwise expressly stated, Purchaser may give or withhold, or give conditionally, approvals and consents and may form opinions and make determinations in its absolute sole discretion.  Except as specifically required herein, any requirement of good faith, discretion or judgment by Purchaser or Agent shall not be construed to require Purchaser or Agent to request or await receipt of information or documentation not immediately available from or with respect to Seller, any other Person or the Purchased Assets themselves.

## 3.    **THE TRANSACTIONS**

(a)    It is acknowledged and agreed that, notwithstanding any other provision of this Agreement to the contrary, the facility provided under this Agreement is (i) a committed facility with respect to the Committed Amount and (ii) an uncommitted facility with respect to the

Uncommitted Amount, and Purchaser shall have no obligation to enter into any Transactions hereunder with respect to the Uncommitted Amount. All purchases of Mortgage Loans hereunder shall be first deemed committed up to the Committed Amount and then the remainder, if any, shall be deemed uncommitted up the Uncommitted Amount.

(b)     Subject to the terms and conditions of the Program Documents, Purchaser may enter into Transactions provided, that the Aggregate MRA Purchase Price shall not exceed, as of any date of determination, the lesser of (i) the Maximum Aggregate Purchase Price (less the Aggregate EPF Purchase Price) and (ii) the aggregate Asset Base of all Purchased Assets and all Eligible Mortgage Loans proposed to be sold in such Transaction.

(c)     Unless otherwise agreed, Seller shall request that Purchaser enter into a Transaction with respect to any Eligible Mortgage Loan by delivering to the indicated required parties (each, a "Required Recipient") the required delivery items (each, a "Required Delivery Item") set forth in the table below by the corresponding required delivery time (the "Required Delivery Time"), and such Transaction shall occur no later than the corresponding required purchase time (the "Required Purchase Time"):

| Purchased Asset Type | Required Delivery Items | Required Delivery Time | Required Recipient | Required Purchase Time |
|---|---|---|---|---|
| Eligible Mortgage Loans | Seller Mortgage Loan Schedule | No later than 5:00 p.m. (New York City time) on the Business Day prior to the requested Purchase Date | Purchaser, Custodian, and Disbursement Agent | No later than 5:00 p.m. (New York City time) on the requested Purchase Date |

By submitting a Seller Mortgage Loan Schedule, Seller hereby agrees that it shall be deemed to have made all of the Transaction Representations as of the related Purchase Date.

(d)     With respect to each Wet-Ink Mortgage Loan, in accordance with the Custodial and Disbursement Agreement, Seller shall cause the related Settlement Agent to deliver, or shall promptly deliver upon receipt from Settlement Agent, to the Custodian the remaining documents in the Mortgage File.

(e)     Upon Seller's request to enter into a Transaction pursuant to Section 3(c) and assuming all conditions precedent set forth in this Section 3 and in Sections 11(a) and (b) have been met, and provided no Default or Event of Default shall have occurred and be continuing, on the requested Purchase Date, Purchaser shall in the case of a Transaction with respect to the Committed Amount and may, in its sole discretion, in the case of a Transaction with respect to the Uncommitted Amount, purchase the Eligible Mortgage Loans included in the related Seller Mortgage Loan Schedule by transferring the Initial Purchase Price (net of any related Structuring Fee or any other unpaid fees and expense then due and payable by Seller to Purchaser pursuant to this Agreement) in accordance with the following wire instructions or as otherwise provided:

Receiving Bank:
ABA#:
Account Name:
Account Number:
Attention:

Seller hereby acknowledges and agrees that the Initial Purchase Price for any Eligible Mortgage Loan includes a mutually negotiated premium allocable to the portion of the Purchased Assets that constitutes the related Servicing Rights.

(f)     On the related Price Differential Determination Date, Agent shall calculate the Price Differential for each outstanding Transaction payable on the Monthly Payment Date utilizing the Pricing Rate.  Not less than two (2) Business Days prior to each Monthly Payment Date, Agent shall provide Seller with an invoice for the amount of the Price Differential due and payable with respect to all outstanding Transactions, setting forth the calculations thereof in reasonable detail and all accrued fees and expenses then due and owing to Purchaser.  On the earliest of (1) the Monthly Payment Date or (2) the Termination Date, Seller shall pay to Purchaser the Price Differential then due and payable for (x) all outstanding Transactions and (y) Purchased Assets for which Purchaser has received the related Outstanding Purchase Price pursuant to Section 3(g) during the prior calendar month.

(g)     With respect to a Transaction, upon the earliest of (1) the Repurchase Date and (2) the Termination Date, Seller shall pay to Purchaser the related Outstanding Purchase Price together with any other Obligations then due and payable, and shall repurchase all Purchased Assets then subject to such Transaction.  The Repurchase Price shall be transferred directly to Purchaser, and Purchaser shall transfer to Seller the related Purchased Assets.

(h)     If Agent determines in its sole discretion that any Change in Law or any change in accounting rules regarding capital requirements has the effect of reducing the rate of return on Purchaser's capital or on the capital of any Affiliate of Purchaser, to the extent assigned to an Affiliate in accordance with the terms of this Agreement, under this Agreement as a consequence of such Change in Law or change in accounting rules, then from time to time Seller will compensate Purchaser or Purchaser's Affiliate, as applicable, for such reduced rate of return suffered as a consequence of such Change in Law or change in accounting rules on terms similar to those imposed by Purchaser. Further, if due to the introduction of, any change in, or the compliance by Purchaser with (i) any eurocurrency reserve requirement, or (ii) the interpretation of any law, regulation or any guideline or request from any central bank or other Governmental Authority whether or not having the force of law, there shall be an increase in the cost to Purchaser or any Affiliate of Purchaser in engaging in the present or any future Transactions, then Seller shall either terminate this Agreement or, from time to time and upon demand by Purchaser, compensate Purchaser or Purchaser's Affiliate for such increased costs, and such amounts shall be deemed a part of the Obligations hereunder. Purchaser shall provide Seller with notice as to any such Change in Law, change in accounting rules or change in compliance promptly following Purchaser's receipt of actual knowledge thereof. Notwithstanding anything to the contrary in this Agreement, Seller shall only be obligated to compensate Purchaser therefor if Purchaser requests payment therefor within three hundred and sixty (360) days of incurring such costs and makes request for compensation from other similarly situated counterparties.

(i)    [Reserved]

(j)    [Reserved]

(k)    If the adoption of or any change in any Requirements of Law or in the interpretation or application thereof after the Effective Date shall make it unlawful, as determined by Agent in its sole discretion, for Purchaser to effect or continue Transactions as contemplated by this Agreement, (i) any commitment of Purchaser hereunder to enter into new Transactions shall be terminated, (ii) the Pricing Rate shall be converted automatically to the Alternative Rate on the last day of the then current Accrual Period or within such earlier period as may be required by Requirements of Law, and (iii) if required by such adoption or change, the Maturity Date shall be deemed to have occurred.

(l)    To the extent that the Asset Base for any Purchased Mortgage Loan is greater than the Outstanding Purchase Price for such Purchased Mortgage Loan, Seller may request (an "Incremental Purchase Price Request") that Purchaser transfer an additional purchase price amount less than or equal to the positive difference between the Asset Base and the Outstanding Purchase Price for such Purchased Mortgage Loan (each such additional purchase price amount, an "Incremental Purchase Price"). Each Incremental Purchase Price Request and Purchaser's transfer of the applicable Incremental Purchase Price shall constitute a Transaction under this Agreement and will be subject to all conditions precedent and other terms required to be satisfied prior to execution of each such Transaction under this Agreement. In connection with each Incremental Purchase Price Request, Seller may direct Purchaser to transfer the applicable Incremental Purchase Price in full or in part to reduce the Exposure that is a positive number under the other Relevant Master Agreements identified under the Master Netting Agreement; provided however that pursuant to Section 4.2 and Section 4.3 of the Master Netting Agreement, Barclays in its capacity as the Designated Barclays Entity under the Master Netting Agreement shall have the right to require Seller to transfer all or a portion of the Incremental Purchase Price to reduce the Exposure that is a positive under the other Relevant Master Agreements identified under the Master Netting Agreement, to zero.

**4.    [RESERVED].**

**5.    TAKEOUT COMMITMENTS**

With respect to each Purchased Mortgage Loan subject to a Takeout Commitment, Seller shall instruct the related Takeout Investor to remit directly to Purchaser or the Bank in accordance with the terms of the Custodial and Disbursement Agreement no later than 4:00 p.m. (New York City time) on a Business Day an amount equal to the Repurchase Price for such Purchased Mortgage Loan in accordance with the Purchaser's Wire Instructions.  Simultaneously with or prior to such payment, Seller shall deliver to Purchaser via facsimile or electronic mail a payoff file in mutually agreeable form (the "Payoff File") and shall indicate on such Payoff File the Mortgage Loan identification numbers which identified the applicable eligible Mortgage Loans when it was purchased by Purchaser hereunder.  Upon receipt by Purchaser of payment of the Repurchase Price in respect of such Purchased Mortgage Loan, Purchaser shall release and remit to Seller any amount in excess of the Repurchase Price (other than the related Price Differential) on such Business Day; provided, that both immediately before and after giving effect to such

release and remittance, (i) there is no Default or Event of Default under this Agreement or any other Program Document and (ii) there is no Margin Deficit.

With respect to Takeout MBS, Seller shall inform Purchaser immediately when any Securities backed by Purchased Mortgage Loans become Takeout MBS and shall provide the related CUSIP number(s) on the related issuance date.  Simultaneously upon the transfer of the Takeout MBS to the Purchaser, (i) the Seller shall be construed to have transferred the Repurchase Price to the Purchaser for the related pooled Purchased Mortgage Loans backing such Takeout MBS; (ii) the Seller and Purchaser shall have entered into a new Transaction with respect such Takeout MBS; and (iii) the Purchaser shall be construed to have transferred the Initial Purchase Price for the related Takeout MBS to the Seller.  The Takeout MBS will be delivered to the securities account of the securities intermediary, at which time they will be subject to this Agreement.  The Seller shall arrange for the sale of the Takeout MBS to a Takeout Investor, the proceeds of such sale to be credited to the account of the paying agent to satisfy the Repurchase Price with respect to the Takeout MBS.

## 6.    PAYMENT AND TRANSFER

(a)    Unless otherwise agreed by Seller and Purchaser or as otherwise provided herein or in any other Program Document, all transfers of funds hereunder shall be in Dollars in immediately available funds.  Seller shall remit (or, if applicable, shall cause to be remitted) directly to Purchaser all payments required to be made by it to Purchaser hereunder or under any other Program Document in accordance with wire instructions provided by Purchaser.  Any payments received by Purchaser after 5:00 p.m. (New York City time) shall be applied on the next succeeding Business Day.

(b)    Following Seller's receipt of the Closing Protection Letter and Seller's distribution of the Escrow Instruction Letter to the Settlement Agent, the Disbursement Agent will aggregate and disburse funds directly to the loan closing with respect to Wet-Ink Mortgage Loans that are subject to a Transaction hereunder.

## 7.    MARGIN MAINTENANCE

(a)    Agent shall have the right to determine the Market Value of any Purchased Asset on a daily basis in its sole discretion, including the right to determine that the Market Value with respect to one or more of the Purchased Assets may be zero.  After making that determination, Agent may determine the Asset Base of any Purchased Asset on such day.

(b)    If, as of any date of determination, the Agent determines that the aggregate Asset Base of all Purchased Assets and all Eligible Mortgage Loans proposed to be sold in such Transaction is less than the aggregate Outstanding Purchase Price of all Purchased Assets for all such Transactions (a "Margin Deficit") and such Margin Deficit exceeds the Minimum Transfer Amount, then Agent may, by notice to the Seller (as such notice is more particularly set forth below, a "Margin Call"), require Seller to transfer to Purchaser or its designee cash to cure the Margin Deficit.  If the Agent delivers a Margin Call to the Seller on or prior to 11:00 a.m. (New York City time) on any Business Day, then the Seller shall transfer cash to Purchaser or its designee by no later than 5:00 p.m. (New York City time) on the same Business Day.  In the event Agent

delivers a Margin Call to Seller after 11:00 a.m. (New York City time) on any Business Day, Seller shall be required to transfer cash no later than 12:00 noon (New York City time) on the next succeeding Business Day.

(c)     Any cash transferred to Purchaser or its designee in satisfaction of a Margin Call or pursuant to Section 17(f)(ii) herein shall reduce the Outstanding Purchase Price of the related Transactions.

(d)     The failure of Purchaser, on any one or more occasions, to exercise its rights hereunder, shall not change or alter the terms and conditions of this Agreement or limit the right of the Purchaser to do so at a later date.  Seller and Purchaser each agree that a failure or delay by a Purchaser to exercise its rights hereunder shall not limit or waive Purchaser's rights under this Agreement or otherwise existing by law or in any way create additional rights for Seller.

## 8.     **TAXES; TAX TREATMENT**

(a)     All payments made by Seller and each Guarantor under any Program Document shall be made free and clear of, and without deduction or withholding for or on account of, any present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities (including penalties, interest and additions to tax) with respect thereto imposed by any Governmental Authority therewith or thereon, excluding (i) income taxes, branch profits taxes, franchise taxes or any other tax imposed on net income by the United States, a state or a foreign jurisdiction under the laws of which Purchaser is organized or of its applicable lending office, or a state or foreign jurisdiction with respect to which Purchaser has a present or former connection (other than any connection arising from executing, delivering, being party to, engaging in any transaction pursuant to, performing its obligations under, receiving payments under, receiving or perfecting a security interest under or enforcing any Program Document, or selling or assigning any Purchased Asset or Program Document), or any political subdivision thereof, (ii) U.S. federal withholding taxes imposed on amounts payable to or for the account of Purchaser with respect to an applicable interest in a Transaction pursuant to a law in effect on the date on which Purchaser enters into a Transaction or such Purchaser changes its lending office, except in each case to the extent that, pursuant to this Section 8, amounts with respect to such taxes were payable either to Purchaser's assignor immediately  before such Purchaser became a party hereto or to such Purchaser immediately before it changed its lending office, and (iii) any withholding taxes imposed under FATCA (collectively, such non-excluded taxes are hereinafter called "Taxes"), all of which shall be paid by Seller or such Guarantor for its own account not later than the date when due.  If Seller or any Guarantor is required by law or regulation to deduct or withhold any Taxes from or in respect of any amount payable hereunder, it shall: (a) make such deduction or withholding, (b) pay the amount so deducted or withheld to the appropriate Governmental Authority not later than the date when due, (c) deliver to the Purchaser, promptly, original tax receipts and other evidence satisfactory to the Purchaser of the payment when due of the full amount of such Taxes; and (d) except as otherwise expressly provided in Section 8(d) below, pay to the Purchaser such additional amounts (including all Taxes imposed by any Governmental Authority on such additional amounts) as may be necessary so that the Purchaser receives, free and clear of all Taxes, a net amount equal to the amount it would have received under this Agreement, as if no such deduction or withholding had been made.

(b)      In addition, Seller and Guarantors agree to pay to the relevant Governmental Authority in accordance with applicable law any current or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies (including, without limitation, mortgage recording taxes, transfer taxes and similar fees) imposed by any taxing authority that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, any Program Document except such taxes imposed with respect to an assignment as a result of a present or former connection between Purchaser and the jurisdiction imposing such taxes (other than connections arising from Purchaser having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Program Document, or sold or assigned any Purchased Asset or Program Document) ("Other Taxes").

(c)      Seller and Guarantors agree to indemnify Purchaser for the full amount of Taxes (including additional amounts with respect thereto) and Other Taxes, and the full amount of Taxes of any kind imposed by any jurisdiction on amounts payable under this Section 8, and any liability (including penalties, interest and expenses arising thereon or with respect thereto) arising therefrom or with respect thereto, provided, that the Purchaser shall have provided Seller and Guarantors with evidence, reasonably satisfactory to the Seller and Guarantors, of payment of Taxes or Other Taxes, as the case may be.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 8 (including by the payment of additional amounts pursuant to this Section 8), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 8 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (c) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (c), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (c) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.

(d)      Any Purchaser that is either (i) not incorporated under the laws of the United States, any State thereof, or the District of Columbia or (ii) not otherwise treated as a "United States person" under the Code (a "Foreign Purchaser") shall, to the extent it is legally entitled to do so, provide Seller and Agent with original properly completed and duly executed copies of United States Internal Revenue Service ("IRS") Forms W-8BEN-E or W-8ECI or any successor form prescribed by the IRS (or IRS Form W-8IMY, with IRS Form W-8BEN-E or W-8ECI attached), certifying that such Person is (1) entitled to benefits under an income tax treaty to which the United States is a party which eliminates or reduces United States withholding tax under Sections 1441 through 1442 of the Code on payments to it, (2) entitled to the benefits of the exemption for portfolio interest under Section 881(c) of the Code or (3) otherwise fully exempt or entitled to relief from United States withholding tax under Sections 1441 through 1442 of the Code on

payments to it, or certifying that the income receivable pursuant to this Agreement is effectively connected with the conduct of a trade or business in the United States, in any case, on or prior to the date upon which each such Foreign Purchaser becomes a Purchaser.  Each Foreign Purchaser will resubmit the appropriate form eliminating or reducing withholding tax on payments to it on the earliest of (A) the third anniversary of the prior submission, or (B) on or before the expiration of thirty (30) days after there is a "change in circumstances" with respect to such Person as defined in Treas. Reg. Section 1.1441-1(e)(4)(ii)(D).  For any period with respect to which the Foreign Purchaser has failed to provide Seller and Guarantors with the appropriate form or other relevant document as expressly required under this Section 8(d) (unless such failure is due to a change in treaty, law, or regulation occurring subsequent to the date on which a form originally was required to be provided under the first sentence of this Section 8(d) or except to the extent that, pursuant to this Section 8, amounts payable with respect to such taxes were payable to Purchaser's assignor immediately before Purchaser became a party hereto) such Person shall not be entitled to "gross-up" of Taxes under Section 8(a) or indemnification under Section 8(c) with respect to Taxes imposed by the United States which are imposed because of such failure; provided, however, that should a Foreign Purchaser, which is otherwise exempt from, or eligible for relief from, a withholding tax, become subject to Taxes because of its failure to deliver a form required hereunder, Seller or Guarantors, as applicable, shall, at no cost or expense to Seller or Guarantors, take such steps as such Foreign Purchaser shall reasonably request to assist such Foreign Purchaser to recover such Taxes.  Upon the execution of this Agreement, each Purchaser that is a "United States person" within the meaning of the Code shall deliver to Seller and Guarantors a duly executed copy of Internal Revenue Service Form W-9 or such other documentation or information prescribed by applicable laws or reasonably requested by Seller or Guarantors as will enable Seller or Guarantors, as applicable, to determine whether or not Purchaser is subject to backup withholding or information reporting requirements.  Unless Seller or each Guarantor has received such forms or other documents or information as expressly required by this Section 8(d) to establish Purchaser's exception from backup withholding tax, Seller or such Guarantor, as applicable, shall not be required to pay additional sums or indemnify Purchaser for any backup amount withheld.

(e)     If a payment made to Purchaser under any Program Document would be subject to United States federal withholding tax imposed by FATCA if Agent or Purchaser were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), Purchaser shall deliver to Seller and Guarantors at the time or times prescribed by law and at such time or times reasonably requested by Seller or Guarantors such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Seller or Guarantors as may be necessary for Seller and Guarantors to comply with its obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)     Without prejudice to the survival of any other agreement of the Seller or Guarantors hereunder, the agreements and obligations of the Seller and Guarantors contained in this Section 8 shall survive the termination of this Agreement.  Nothing contained in this Section 8 shall require Purchaser to make available any of its tax returns or other information that it deems to be confidential or proprietary.

(g)     Each party to this Agreement acknowledges that it is its intent solely for purposes of U.S. federal and relevant state and local income and franchise taxes to treat each Transaction as indebtedness of the Seller that is secured by the Purchased Assets and that the Purchased Assets are owned by Seller in the absence of an Event of Default by the Seller.  All parties to this Agreement agree to such treatment and agree to take no action inconsistent with this treatment, unless required by law.

## 9.    **BENCHMARK REPLACEMENT**

(a)     Upon the occurrence of a Benchmark Transition Event, the Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder and under any Program Document in respect of any Benchmark setting at or after 5:00 p.m. on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided by the Agent to the Purchaser and the Seller without any amendment to, or further action or consent of any other party to, this Agreement or any other Program Document, so long as the Agent has not received, by such time, written notice of objection to such Benchmark Replacement from the Purchaser [or the Seller]. At any time that the administrator of the then-current Benchmark has permanently or indefinitely ceased to provide such Benchmark or such Benchmark has been announced by the regulatory supervisor for the administrator of such Benchmark pursuant to public statement or publication of information to be no longer representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored, the Seller may revoke any request for a Transaction to be made or continued that would bear interest by reference to such then-current Benchmark until the Seller's receipt of notice from the Agent that a Benchmark Replacement has replaced such Benchmark.

(b)     In connection with the implementation and administration of a Benchmark Replacement, the Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Program Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(c)     The Agent will promptly notify the Seller and the Purchaser of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes.

(d)     Any determination, decision or election that may be made by the Agent or Purchaser pursuant to this Section 9, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 9.

10. **SECURITY INTEREST; PURCHASER'S APPOINTMENT AS ATTORNEY-IN-FACT**

(a)     Seller and Purchaser intend that (other than for tax and accounting purposes) the Transactions hereunder be sales to Purchaser of the Purchased Assets and not loans from Purchaser to Seller secured by the Purchased Assets.  However, in order to preserve Purchaser's rights under this Agreement in the event that a court or other forum recharacterizes the Transactions hereunder as other than sales, and as security for Seller's performance of all of its Obligations, Seller hereby grants to Agent for benefit of Purchaser a first priority security interest in the Purchased Assets. Seller acknowledges and agrees that its rights with respect to the Purchased Assets are and shall continue to be at all times junior and subordinate to the rights of Purchaser hereunder.

(b)     Seller hereby irrevocably constitutes and appoints Agent for benefit of Purchaser and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Seller and in the name of Seller, the name of Purchaser or in its own name for benefit of Purchaser, from time to time in Agent's discretion, to file such financing statement or statements relating to the Purchased Assets as Agent at its option may deem appropriate, and if an Event of Default shall have occurred and be continuing, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be reasonably necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, Seller hereby gives Agent for benefit of Purchaser the power and right, on behalf of Seller, without assent by, but with notice to, Seller, to do the following if an Event of Default shall have occurred and be continuing and Agent for benefit of Purchaser has elected to exercise its remedies pursuant to Section 19 hereof:

(i)     in the name of Seller, in the name of Purchaser, or in its own name for the benefit of Purchaser, or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due with respect to any Purchased Assets and to file any claim or to take any other action or initiate and maintain any appropriate proceeding in any appropriate court of law or equity or otherwise deemed appropriate by Agent for the purpose of collecting any and all such moneys due with respect to any Purchased Assets whenever payable;

(ii)    to pay or discharge taxes and Liens levied or placed on or threatened against the Purchased Assets;

(iii)   (A) to direct any party liable for any payment under any Purchased Assets to make payment of any and all moneys due or to become due thereunder directly to Agent, Purchaser or as Agent shall direct, (B) in the name of Seller, in the name of Purchaser or in its own name, or otherwise as appropriate, to directly send or cause the applicable servicer to send "hello" letters, "goodbye" letters in the form of Exhibit D, and Section 404 Notices; (C) to ask or demand for, collect, receive payment of and receipt for any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Purchased Assets; (D) to sign and endorse any invoices, assignments, verifications, notices and other documents in connection with any Purchased Assets; (E) to commence and prosecute any suits, actions or proceedings at law or in equity in any court

of competent jurisdiction to collect the Purchased Assets or any proceeds thereof and to enforce any other right in respect of any Purchased Assets; (F) to defend any suit, action or proceeding brought against Seller with respect to any Purchased Assets; (G) to settle, compromise or adjust any suit, action or proceeding described in clause (F) above and, in connection therewith, to give such discharges or releases as Purchaser may deem appropriate; and (H) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any Purchased Assets as fully and completely as though Purchaser was the absolute owner thereof for all purposes, and to do, at Agent's option and Seller's expense, at any time, and from time to time, all acts and things which Agent deems necessary to protect, preserve or realize upon the Purchased Assets and Purchaser's Liens thereon and to effect the intent of this Agreement, all as fully and effectively as Seller might do.

Seller hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.  This power of attorney is a power coupled with an interest and shall be irrevocable.

Seller also authorizes Purchaser, from time to time if an Event of Default shall have occurred and be continuing, to execute any endorsements, assignments or other instruments of conveyance or transfer with respect to the Purchased Assets in connection with any sale provided for in Section 19 hereof.

The powers conferred on Purchaser hereunder are solely to protect Purchaser's interests in the Purchased Assets and shall not impose any duty upon it to exercise any such powers.  Purchaser shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither Purchaser nor any of its officers, directors, employees or agents shall be responsible to Seller for any act or failure to act hereunder.

## 11.    **CONDITIONS PRECEDENT**

(a)    As conditions precedent to the effectiveness of this Agreement, Purchaser shall have received on or before the Effective Date the following, in form and substance satisfactory to Purchaser and duly executed by each party thereto (as applicable):

(i)    Each of the Program Documents duly executed and delivered by the parties thereto and being in full force and effect, free of any modification, breach or waiver;

(ii)    Certificates of an officer of Seller and each Guarantor attaching certified copies of Seller's and each Guarantor's consents or charter, bylaws and corporate resolutions, as applicable, approving the Program Documents and Transactions thereunder (either specifically or by general resolution), and all documents evidencing other necessary corporate action or governmental approvals as may be required in connection with the Program Documents;

(iii)    Certified copies of good standing certificates from the jurisdiction of organization of Seller and each Guarantor, dated as of no earlier than the date which is ten (10) Business Days prior to the Effective Date;

(iv)     An incumbency certificate of the secretary of Seller and each Guarantor certifying the names, true signatures and titles of Seller's and each Guarantor's respective representatives who are duly authorized to request Transactions hereunder and to execute the Program Documents and the other documents to be delivered thereunder;

(v)     An opinion of Seller's counsel or a court order addressing such matters as Purchaser may reasonably request (including, without limitation, with respect to Purchaser's perfected security interest in the Purchased Assets, a non-contravention, enforceability and corporate opinion with respect to Seller, an opinion with respect to the inapplicability of the Investment Company Act to Seller and Guarantors, an opinion that this Agreement constitutes a "repurchase agreement", a "securities contract" and a "master netting agreement" within the meaning of the Bankruptcy Code and an opinion that no Transaction constitutes an avoidable transfer under Sections 546(e), 546(f), and 546(j) of the Bankruptcy Code, each in form and substance acceptable to Purchaser);

(vi)     Seller shall have paid to Purchaser and Purchaser shall have received all accrued and unpaid fees and expenses owed to Purchaser in accordance with the Program Documents, including without limitation, the Structuring Fee, any Non-Utilization Fee, and any Transaction Fees then due and owing pursuant to Section 2 of the Pricing Side Letter, in immediately available funds, and without deduction, set-off or counterclaim;

(vii)     A copy of the insurance policies required by Section 15(q) of this Agreement;

(viii)     Duly completed and filed Uniform Commercial Code financing statements acceptable to Purchaser and covering the Purchased Assets on Form UCC1;

(ix)     Purchaser or Agent shall have completed the due diligence review pursuant to Section 37, and such review shall be satisfactory to Purchaser and Agent in their sole discretion;

(x)     Seller shall have provided evidence, satisfactory to Purchaser and Agent, that Servicer's Approvals are in good standing; and

(xi)     Any other documents reasonably requested by Purchaser or Agent.

(b)     As conditions precedent to each Transaction pursuant to this Agreement (including the initial Transaction), each of the following conditions precedent must have been satisfied:

(i)     Purchaser or its designee shall have received on or before the Purchase Date with respect to Eligible Mortgage Loans that are to be the subject of such Transaction (unless otherwise specified in this Agreement) the following, in form and substance satisfactory to Purchaser and (if applicable) duly executed:

(A)     Seller shall have paid to Purchaser and Purchaser shall have received all accrued and unpaid fees and expenses owed to Purchaser that have been invoiced in accordance with the Program Documents, including without limitation the Structuring Fee, any Non-

Utilization Fee, and any Transaction Fees in immediately available funds, and without deduction, set-off or counterclaim;

(B)     The Seller Mortgage Loan Schedule with respect to such Purchased Assets, delivered pursuant to Section 3(c);

(C)     Such certificates, customary opinions of counsel or other documents as Purchaser may reasonably request, provided that such opinions of counsel shall not be required routinely in connection with each Transaction but shall only be required from time to time as deemed necessary by Purchaser in its commercially reasonable judgment;

(D)     Purchaser shall have received the Structuring Fee and the Transaction Fees in respect of such Transaction then due and owing pursuant to Section 2 of the Pricing Side Letter, in immediately available funds, and without deduction, set-off or counterclaim;

(E)     With respect to Mortgage Loans that are not Wet-Ink Mortgage Loans, an original trust receipt executed by the Custodian without exceptions and with respect to Wet-Ink Mortgage Loans, an original trust receipt executed by the Wet-Ink Mortgage Loan Document Receipt Date by the Custodian without exceptions;

(F)     Such other certifications of Custodian as are required under [Sections 2 and 4 of the Custodial and Disbursement Agreement];

(G)     With respect to any table-funded Wet-Ink Mortgage Loan that is the subject of such Transaction, (x) a copy of the Escrow Instruction Letter in the form attached as Exhibit G hereto, signed by the Settlement Agent and (y) a copy of the Closing Protection Letter from each title company in form and substance acceptable to Purchaser in its sole discretion; and

(H)     A duly executed Warehouse Lender's Release from any Warehouse Lender (including any party that has a precautionary security interest in a Mortgage Loan) having a security interest in any Mortgage Loans subject to such Transaction, substantially in the form of Exhibit E, addressed to Purchaser, releasing any and all of its right, title and interest in, to and under such Mortgage Loan (including, without limitation, any security interest that such secured party or secured party's agent may have by virtue of its possession, custody or control thereof) and, to the extent applicable, has filed Uniform Commercial Code termination statements in respect of any Uniform Commercial Code filings made in respect of such Mortgage Loan, and each such Warehouse Lender's Release and Uniform Commercial Code termination statement has been

delivered to Purchaser prior to such Transaction and to the Custodian as part of the Mortgage File.

(ii)     No Default or Event of Default shall have occurred and be continuing;

(iii)     Purchaser shall not have determined that the introduction of or a change in any Requirement of Law or in the interpretation or administration of any requirement of law applicable to Purchaser has made it unlawful, and no Governmental Authority shall have asserted that it is unlawful, for Purchaser to enter into Transactions;

(iv)     Both immediately prior to the related Transaction and also after giving effect thereto and to the intended use thereof, all representations and warranties in the Program Documents shall be true and correct on the date of such Transaction (with the same force and effect as if made on such date) and Seller is in compliance with the terms and conditions of the Program Documents, other than as may be expressly waived by the Purchaser;

(v)     The then Aggregate MRA Purchase Price when added to the Initial Purchase Price for the requested Transaction, shall not exceed, as of any date of determination, the lesser of (a) the Maximum Aggregate Purchase Price (less the Aggregate EPF Purchase Price) and (b) the aggregate Asset Base of all Purchased Assets and all Eligible Mortgage Loans proposed to be sold in such Transaction;

(vi)     [Reserved];

(vii)     Satisfaction of any conditions precedent to the initial Transaction as set forth in clause (a) of this Section 11 that were not satisfied prior to such initial Purchase Date;

(viii)     Purchaser shall have determined that all actions necessary to establish or maintain Purchaser's perfected security interest in the Purchased Assets have been taken;

(ix)     Purchaser or its designee shall have received any other documents reasonably requested by Purchaser;

(x)     There is no Margin Deficit at the time immediately prior to entering into a new Transaction (other than a Margin Deficit that will be cured contemporaneous with such Transaction in accordance with the provisions of Section 7 hereof); and

(xi)     None of the following shall have occurred and/or be continuing:

(A)     an event or events shall have occurred in the good faith determination of Purchaser resulting in the effective absence of a "repo market" or comparable "lending market" for financing debt obligations secured by mortgage loans or securities or an event or events shall have occurred resulting in Purchaser not being able to finance Eligible Mortgage Loans through the "repo market" or "lending market" with traditional counterparties at rates which

would have been reasonable prior to the occurrence of such event or events; or

(B)     an event or events shall have occurred resulting in the effective absence of a "securities market" for securities backed by mortgage loans or an event or events shall have occurred resulting in Purchaser not being able to sell securities backed by mortgage loans at prices which would have been reasonable prior to such event or events; or

(C)     there shall have occurred a material adverse change in the financial condition of Purchaser which affects (or can reasonably be expected to affect) materially and adversely the ability of Purchaser to fund its obligations under this Agreement.

## 12.    **RELEASE OF PURCHASED ASSETS**

Upon timely payment in full of the Repurchase Price and all other Obligations (if any) then owing with respect to a Purchased Asset pursuant to Section 3(g) hereof, unless a Margin Deficit or an Event of Default shall have occurred and be continuing: (a) Purchaser shall automatically and without any further action terminate any security interest that Purchaser may have in such Purchased Asset, (b) the Purchaser shall automatically and without further action sell and release to the Seller or the applicable Takeout Investor, as the case may be, such Purchased Asset, and (c) with respect to such Purchased Asset, Purchaser shall or shall direct Custodian to release such Purchased Asset to Seller or the applicable Takeout Investor, as the case may be.  Except as set forth in Section 17(f)(ii) and Section 16, Seller shall give at least two (2) Business Days prior written notice to Purchaser if such repurchase shall occur on any date other than the Repurchase Date.

If such a Margin Deficit is applicable, Purchaser shall notify Seller of the amount thereof and Seller may thereupon satisfy the Margin Call in the manner specified in Section 7.

## 13.    **RELIANCE**

With respect to any Transaction, Purchaser may conclusively rely upon, and shall incur no liability to Seller in acting upon, any request or other communication that Purchaser reasonably believes to have been given or made by a person authorized to enter into a Transaction on Seller's behalf.

## 14.    **REPRESENTATIONS AND WARRANTIES**

Seller hereby represents and warrants to Purchaser and Agent, and shall on and as of the Purchase Date for any Transaction and on and as of each date thereafter through and including the related Repurchase Date be deemed to represent and warrant to Purchaser and Agent that:

(a)     Due Organization, Qualification, Power, Authority and Due Authorization.  Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and it has qualified to do business in each jurisdiction in which it is legally required to do so.  Seller has the power and authority under its certificate of incorporation, bylaws and

applicable law to enter into this Agreement and the Program Documents and to perform all acts contemplated hereby and thereby or in connection herewith and therewith; this Agreement and the Program Documents and the transactions contemplated hereby and thereby have been duly authorized by all necessary action and do not require any additional approvals or consents or other action by, or any notice to or filing with, any Person other than any that have heretofore been obtained, given or made.

(b)    Noncontravention.  The consummation of the transactions contemplated by this Agreement and Program Documents are in the ordinary course of business of Seller and will not conflict with, result in the breach of or violate any provision of the charter or by-laws of Seller or result in the breach of any provision of, or conflict with or constitute a default under or result in the acceleration of any obligation under, any agreement, indenture, loan or credit agreement or other instrument to which Seller, the Purchased Assets or any of Seller's Property is or may be subject to, or result in the violation of any law, rule, regulation, order, judgment or decree to which Seller, the Purchased Assets or Seller's Property is subject.  Without limiting the generality of the foregoing, the consummation of the Transactions will not violate any policy, regulation or guideline of the FHA or VA or result in the voiding or reduction of the FHA insurance, VA guarantee or any other insurance or guarantee in respect of any Mortgage Loan, and such FHA insurance or VA guarantee is in full force and effect or shall be in full force and effect as required by the applicable Agency Guide.

(c)    Legal Proceeding.  Other than the Cases, there is no action, suit, proceeding, inquiry or investigation, at law or in equity, or before or by any court, public board or body pending or, to the knowledge of a Responsible Officer of the Seller, threatened against or affecting Seller (or, to Seller's knowledge, any basis therefor) wherein an unfavorable decision is a reasonable possibility and wherein an unfavorable decision, ruling or finding would adversely affect the validity of the Purchased Assets or the validity or enforceability of this Agreement, the Program Documents or any agreement or instrument to which Seller is a party and which is used or contemplated for use in the consummation of the Transactions contemplated hereby or would be reasonably likely to materially and adversely affect Seller's ability to carry out its obligations hereunder.

(d)    Valid and Binding Obligations.  This Agreement, the Program Documents and every other document to be executed by Seller in connection with this Agreement is and will be legal, valid, binding and subsisting obligations of Seller, enforceable in accordance with their respective terms, except that (A) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally, including, without limitation, the Cases, and (B) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(e)    Financial Statements.  The financial statements of Seller and each Guarantor, copies of which have been furnished to Purchaser, (i) are, as of the dates and for the periods referred to therein, complete and correct in all material respects, (ii) present fairly the financial condition and results of operations of Seller and such Guarantor as of the dates and for the periods indicated and (iii) have been prepared in accordance with GAAP consistently applied, except as noted therein (subject as to interim statements to normal year-end adjustments).  Since the date of the most recent financial statements, there has been no Material Adverse Change with respect to Seller or any

Guarantor, unless such Material Adverse Change directly arises from the filing of the Cases. Except as disclosed in such financial statements or pursuant to Section 15(i) hereof, neither Seller nor any Guarantor is subject to any contingent liabilities or commitments that, individually or in the aggregate, have a material possibility of causing a Material Adverse Change with respect to Seller or such Guarantor, unless such Material Adverse Change directly arises from the filing of the Cases.

(f)     Accuracy of Information.  Neither this Agreement nor any representations and warranties or information relating to Seller that Seller has delivered or caused to be delivered to Purchaser, including, but not limited to, all documents related to this Agreement, the Program Documents or Seller's financial statements, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements made therein or herein in light of the circumstances under which they were made, not misleading.  Since the furnishing of such documents or information, there has been no change, nor any development or event involving a prospective change that would render any of such documents or information untrue or misleading in any material respect.

(g)     No Consents.  No consent, license, approval or authorization from, or registration, filing or declaration with, any regulatory body, administrative agency or other governmental instrumentality, nor any consent, approval, waiver or notification of any creditor, lessor or other non-governmental Person, is required in connection with the execution, delivery and performance by Seller or its Parent Company, if any, of this Agreement or any other Program Document, other than any that have heretofore been obtained, given or made.

(h)     Compliance With Law, Etc.  No practice, procedure or policy employed by Seller in the conduct of its businesses violates any law, regulation, judgment, agreement, regulatory consent, order or decree applicable to it which, if enforced, would be reasonably likely to result in a Material Adverse Effect.

(i)     [Reserved]

(j)     Fraudulent Conveyance.  The amount of consideration being received by Seller in respect of each Transaction, taken as a whole, constitutes reasonably equivalent value and fair consideration for the related Purchased Assets.  Seller is not transferring any Purchased Assets with any intent to hinder, delay or defraud any of its creditors.  The Agreement and the Program Documents, any other document contemplated hereby or thereby and each Transaction has not been entered into fraudulently by Seller hereunder, or with the intent to hinder, delay or defraud any creditor or Purchaser.

(k)     Investment Company Act Compliance.  Neither Seller nor any Guarantor is required to be registered as an "investment company" as defined under the Investment Company Act nor is an entity "controlled by" an entity required to be registered as an "investment company" as defined under the Investment Company Act. [Seller (i) is not required to register under the Investment Company Act based upon the exemption provided by Section [_] of the Investment Company Act (although other exemptions or exclusions may be applicable), and (ii) is not a "covered fund" within the meaning of the final regulations issued December 10, 2013,

implementing Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, commonly known as the "Volcker Rule."]

(l)     Taxes.  Seller has timely filed all federal and state tax returns that are required to be filed by it and has paid all taxes, including any assessments received by it, to the extent that such taxes have become due (other than for taxes that are being contested in good faith and for which it has established adequate reserves or as otherwise does not have a reasonable likelihood of resulting in a Material Adverse Effect).  Any taxes, fees and other governmental charges payable by Seller in connection with a Transaction and the execution and delivery of the Program Documents have been paid.

(m)     Additional Representations.  With respect to each Purchased Asset to be sold hereunder by Seller to Purchaser, Seller hereby makes all of the applicable representations and warranties set forth in Exhibit B-1 and with respect to Non-QM Mortgage Loans, the additional representations and warranties set forth in Exhibit B-2 as of the date the related Mortgage File is delivered to Purchaser or the Custodian with respect to the Purchased Assets and continuously while such Purchased Asset is subject to a Transaction.  Further, as of each Purchase Date, Seller shall be deemed to have represented and warranted in like manner that Seller has no knowledge that any such representation or warranty may have ceased to be true in a material respect as of such date, except as otherwise stated in a written notice to the Purchaser, any such exception to identify the applicable representation or warranty and specify in reasonable detail the related knowledge of Seller.

(n)     No Broker.  Seller has not dealt with any broker, investment banker, agent, or other person, except for Purchaser, who may be entitled to any commission or compensation in connection with the sale of Purchased Assets pursuant to this Agreement; provided, that if Seller has dealt with any broker, investment banker, agent, or other person, except for Purchaser, who may be entitled to any commission or compensation in connection with the sale of Purchased Assets pursuant to this Agreement, such commission or compensation shall have been paid in full by Seller.

(o)     [Reserved]

(p)     [Reserved]

(q)     Custodian.  The Custodian is an eligible custodian under each Agency Guide and each Agency Program, and is not an Affiliate of Seller.

(r)     No Adverse Actions.  No Agency, nor HUD, FHA or VA, has revoked any Approval or otherwise terminated Seller as an Agency approved issuer or servicer.

(s)     [Reserved].

(t)     Affiliated Parties.  Except for the Guarantors, Seller is not an Affiliate of the Custodian, Disbursement Agent, Settlement Agent or any other party to a Program Document hereunder.

(u)    <u>Chief Executive Office/Jurisdiction of Organization</u>.    On the Effective Date, Seller's chief executive office is located at 5800 Tennyson Parkway, Suite 450, Plano, Texas 75024 and its chief place of business is located at the same address.  On the Effective Date, Seller is a corporation organized under the laws of Virginia. Seller is not organized under any jurisdiction other than Virginia, and Seller's organizational identification number is 03055761.

(v)    <u>Notices to Servicer</u>.  As of the Effective Date, Seller has notified the applicable Servicer in writing identifying each Purchased Loan that is serviced under the related servicing agreement or subservicing agreement and is subject to the terms and provisions of this Agreement.

The representations and warranties set forth in this Agreement shall survive transfer of the Purchased Assets to Purchaser and shall continue for so long as the Purchased Assets are subject to this Agreement.

## 15.    <u>COVENANTS OF SELLER</u>

Seller hereby covenants and agrees with Purchaser and Agent as follows:

(a)    <u>Defense of Title</u>.  Seller warrants and will defend the right, title and interest of Purchaser in and to all Purchased Assets against all adverse claims and demands.

(b)    <u>No Amendment or Compromise</u>.  None of Seller or those acting on Seller's behalf shall amend, modify, or waive any term or condition of, or settle or compromise any claim in respect of, any item of the Purchased Assets, any related rights or any of the Program Documents without the prior written consent of Purchaser, except if such amendment or modification does not (i) affect the amount or timing of any payment of principal or interest payable with respect to a Purchased Asset, extend its scheduled maturity date, modify its interest rate, or constitute a cancellation or discharge of its outstanding principal balance or (ii) materially and adversely affect the security afforded by the real property, furnishings, fixtures, or equipment securing the Purchased Asset.  Notwithstanding the foregoing, the Seller may amend, modify or waive any term or condition of the individual Mortgage Loans in accordance with Accepted Servicing Practices and the Agency Guides; provided, that Seller shall promptly notify Purchaser of any amendment, modification or waiver that causes any Purchased Mortgage Loan to cease to be an Eligible Mortgage Loan.

(c)    <u>No Assignment; No Liens</u>.  Except as permitted herein, Seller shall not sell, assign, transfer or otherwise dispose of, or grant any option with respect to, or pledge, hypothecate or grant a security interest in, or Lien on or otherwise encumber (except pursuant to the Program Documents) any of the Purchased Assets or any interest therein, <u>provided</u> that this Section 15(c) shall not prevent any of the following: any contribution, sale, assignment, transfer or conveyance of Purchased Assets in accordance with the Program Documents and any forward purchase commitment or other type of take out commitment for the Purchased Assets (without vesting rights in the related purchasers as against Purchaser).

(d)    <u>No Economic Interest</u>.  Except to the extent of the PIMCO Guarantor's second lien, neither Seller nor any Affiliate thereof will acquire any economic interest in or obligation with respect to any Purchased Mortgage Loan except for record title to the Mortgage relating to such

Purchased Mortgage Loan and the right and obligation to repurchase the Mortgage Loan hereunder and the right to receive amounts pursuant to Section 17.

(e)    <u>Preservation of Purchased Assets</u>.  Seller shall take all actions necessary or, in the opinion of Purchaser, desirable, to preserve the Purchased Assets so that they remain subject to a first priority perfected security interest hereunder and deliver evidence that such actions have been taken, including, without limitation, duly completed and filed Uniform Commercial Code financing statements on Form UCC1. Without limiting the foregoing, Seller will comply with all applicable laws, rules, regulations and other laws of any Governmental Authority applicable to Seller relating to the Purchased Assets and cause the Purchased Assets to comply with all applicable laws, rules, regulations and other laws of any such Governmental Authority.  Seller will not allow any default to occur for which Seller is responsible under any Purchased Assets or any Program Documents and Seller shall fully perform or cause to be performed when due all of its obligations under any Purchased Assets or the Program Documents.

(f)    <u>Maintenance of Papers, Records and Files</u>.

(i)    Seller shall maintain all Records relating to the Purchased Assets not in the possession of Custodian or released in accordance with the Custodial and Disbursement Agreement in good and complete condition in accordance with industry practices and preserve them against loss.  Seller shall collect and maintain or cause to be collected and maintained all such Records in accordance with industry custom and practice, and all such Records shall be in Purchaser's or Custodian's possession unless Purchaser otherwise approves in writing or in accordance with the Custodial and Disbursement Agreement. Seller will not cause or authorize any such papers, records or files that are an original or an only copy to leave Custodian's possession, except for individual items removed in connection with servicing a specific Mortgage Loan, in which event Seller will obtain or cause to be obtained a receipt from the Custodian for any such paper, record or file, or as otherwise permitted under the Custodial and Disbursement Agreement.

(ii)    For so long as Purchaser has an interest in or Lien on any Purchased Asset, Seller will hold or cause to be held all related Records for the sole benefit of Purchaser.

(iii)    Upon reasonable advance notice from Custodian or Purchaser, Seller shall (x) make any and all such Records available to Custodian or Agent for examination, either by its own officers or employees, or by agents or contractors, or both, and make copies of all or any portion thereof, (y) permit Agent or its authorized agents to discuss the affairs, finances and accounts of Seller with its chief operating officer and chief financial officer and to discuss the affairs, finances and accounts of Seller with its independent certified public accountants.

(g)    <u>Financial Statements and Other Information; Financial Covenants</u>.

(i)    Seller shall keep or cause to be kept in reasonable detail books and records setting forth an account of its assets and business and, as applicable, shall clearly reflect therein the transfer of Purchased Assets to Purchaser.  Seller or Guarantors, as applicable, shall furnish or cause to be furnished to Purchaser the following:

(A)     Financial Statements.

(1)     As soon as is practicable, but in any event within ninety (90) days after the end of each fiscal year of Seller and each Guarantor, (A) either (1) the consolidated audited balance sheets of Seller and each Guarantor and their respective consolidated Subsidiaries, which will be in conformity with GAAP, and the related consolidated audited statements of income and changes in equity showing the financial condition of Seller and Guarantors, respectively, and their respective consolidated Subsidiaries as of the close of such fiscal year and the results of operations during such year, and consolidated audited statements of cash flows, as of the close of such fiscal year, setting forth, in each case, in comparative form the corresponding figures for the preceding year, each consolidated financial statement to carry the unqualified report of an independent public accountant reasonably acceptable to Purchaser and Agent and to be accompanied by a letter of management in form and substance acceptable to Purchaser and Agent or (2) Form 10-Ks filed by Seller and each Guarantor with the SEC and (B) if not included in such Form 10-K, an opinion (subject to no qualification, exception or explanatory paragraph as to going concern or other adverse matters, including material limitations on scope of audit) of independent certified public accountants of recognized national standing, which unqualified opinion shall state that said consolidated financial statements fairly present the consolidated financial position and results of operations of Seller or Guarantors, as applicable, and their respective consolidated Subsidiaries as at the end of, and for, such fiscal year and that such financial statements were prepared in accordance with GAAP applied consistently throughout the periods reflected therein; provided, however, that each of the foregoing will be deemed to have been furnished to the extent that such items have been filed timely with the SEC;

(2)     As soon as is practicable, but in any event within forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year of Seller and each Guarantor, consolidated unaudited balance sheets and consolidated statements of income and changes in equity and unaudited statement of cash flows, all to be in a form acceptable to Purchaser and Agent, showing the financial condition and results of operations of Seller and Guarantors, respectively, and their respective consolidated Subsidiaries, each on a consolidated basis as of the end of each such quarter and for the then elapsed portion of the fiscal year, setting forth, in each case, in comparative form the corresponding figures for the corresponding periods of the preceding fiscal year, certified by a financial officer of Seller or Guarantors, as applicable, (acceptable to Purchaser and Agent) as presenting fairly the financial position and results of operations of Seller and Guarantors, respectively, and their respective consolidated Subsidiaries and as having been prepared in accordance with GAAP consistently applied, in each case, subject to normal year-end audit adjustments;

(3)     As soon as is practicable, but in any event within forty-five (45) days after the end of each of the first two months of a fiscal quarter, consolidated unaudited balance sheets and consolidated statements of income and

changes in equity and unaudited statement of cash flows, all to be in a form acceptable to Purchaser and Agent, showing the financial condition and results of operations of Seller or Guarantors, as applicable, and their respective consolidated Subsidiaries on a consolidated basis as of the end of each such month and for the then elapsed portion of the fiscal year, setting forth, in each case, in comparative form the corresponding figures for the corresponding month of the preceding fiscal year, certified by a financial officer of Seller or Guarantors, as applicable, (acceptable to Purchaser and Agent) as presenting fairly the financial position and results of operations of Seller or Guarantors, as applicable, and their respective consolidated Subsidiaries and as having been prepared in accordance with GAAP consistently applied, in each case, subject to normal year-end audit adjustments;

(4)     Promptly upon receipt thereof, a copy of each other report submitted to Seller and Guarantors by their independent public accountants in connection with any annual, interim or special audit of Seller or Guarantors, as applicable;

(5)     Promptly upon becoming available, copies of all financial statements, reports, notices and proxy statements sent by each of their respective Parent Company, Seller or Guarantors or any of Seller's or each Guarantor's consolidated Subsidiaries in a general mailing to their respective stockholders and of all reports and other material (including copies of all registration statements under the Securities Act of 1933, as amended) filed by any of them with any securities exchange or with the SEC or any governmental authority succeeding to any or all of the functions of the SEC;

(6)     Promptly upon becoming available, copies of any press releases issued by any Seller and copies of any annual and quarterly financial reports that any Seller or Guarantors may be required to file with the SEC or any federal banking agency, or any report which a Seller may be required to file with the SEC or any federal banking agency containing such financial statements, and other information concerning any Seller's or Guarantor's business and affairs as is required to be included in such reports in accordance with the rules and regulations of the SEC or such federal banking agency as may be promulgated from time to time;

(7)     Such supplements to the aforementioned documents and such other information regarding the operations, business, affairs and financial condition of their respective Parent Company, Seller, Guarantors or any of Seller's or Guarantors' respective consolidated Subsidiaries as Purchaser may request.

(B)     [Reserved].

(C)     Other Information.  Upon the request of Purchaser, such other information or reports as Purchaser may from time to time reasonably request.

(ii)     Seller shall at all times comply with the financial covenants set forth in Section 3 of the Pricing Side Letter.

(iii)    Certifications.  Seller shall execute and deliver a certification substantially in the form of Exhibit A attached hereto within (x) forty-five (45) days after the end of each of the first two calendar months of each fiscal quarter, within (y) forty five (45) days after the end of the first three fiscal quarters of each fiscal year of Seller, and (z) ninety (90) days after the end of each fiscal year of Seller.  Each certification to be executed and delivered       hereunder       shall       be       sent       via       electronic       mail       to USResiFinancing@barclayscapital.com,  CoreRMBSBanking@barclayscapital.com  and CreditSecuritizedP1@barclayscapital.com or such other email address as the Agent may furnish to the Seller from time to time by written notice.

(h)     Agency Reporting.  Seller shall comply with the applicable reporting requirements of each Agency Guide and HUD.

(i)     Notice of Material Events.  Seller shall promptly inform Purchaser and Agent in writing     (via     electronic     mail     to     USResiFinancing@barclayscapital.com     and CoreRMBSBanking@barclayscapital.com or such other email address as the Agent may furnish to the Seller from time to time by written notice) of any of the following:

(i)     any Default or Event of Default by Seller or any other Person (other than Purchaser or Purchaser's Affiliates) of any material obligation under any Program Document, or the occurrence or existence of any event or circumstance that Seller reasonably expects will with the passage of time become a Default or Event of Default by Seller or any other Person;

(ii)    any material adverse change in the insurance coverage of Seller as required to be maintained pursuant to Section 15(q) hereof, or any other Person pursuant to any Program Document, with copy of evidence of same attached;

(iii)   to the extent Seller is not prohibited by a Governmental Authority or a statute or rule applicable to Seller from disclosing, the commencement of, or any determination in, any material dispute, litigation, investigation, proceeding, sanctions or suspension between Seller or its Parent Company, on the one hand, and any Governmental Authority or any other Person, on the other (other than any investigation or proceeding conducted in the ordinary course of business by a state licensing authority);

(iv)   any material change in accounting policies or financial reporting practices of Seller which could reasonably be expected to have a Material Adverse Effect;

(v)    any event, circumstance or condition that has resulted, or has a reasonable likelihood of resulting in either a Material Adverse Change or a Material Adverse Effect with respect to Seller;

(vi)   [any material modifications to the Seller's underwriting or acquisition guidelines; provided that with respect to Agency Mortgage Loans, a quarterly update will constitute sufficient notice;]

(vii)    [Reserved];

(viii)    to the extent Seller is not prohibited by a Governmental Authority or a statute or rule applicable to Seller from disclosing and within one (1) Business Day of a Responsible Officer of Seller having notice or knowledge thereof, any penalties, sanctions or charges levied, or threatened in writing to be levied, against Seller or any change, or threatened in writing change, in Approval status, or actions taken, or threatened to be taken, against Seller by or disputes between Seller and any Applicable Agency, or any supervisory or regulatory Governmental Authority (including, but not limited to HUD, FHA and VA) supervising or regulating the origination or servicing of mortgage loans by, or the issuer status of, Seller;

(ix)    any consolidation or merger of Seller, any Change in Control of Seller, or any sale of all or substantially all of Seller's Property; or

(x)    upon a Responsible Officer of Seller becoming aware of any termination or threatened termination by an Agency of the Custodian as an eligible custodian.

(j)    <u>Maintenance of Approvals</u>.  Seller shall take all necessary actions to obtain its Approvals and maintain such Approvals once obtained at all times during the term of this Agreement.  If, for any reason, Seller ceases to maintain any such Approval obtained after the date of this Agreement, Seller shall so notify Purchaser and Agent within one (1) Business Day of a Responsible Officer's notice or knowledge thereof.

(k)    <u>Maintenance of Licenses</u>.  Seller shall (i) maintain all licenses, permits or other approvals necessary for Seller to conduct its business and to perform its obligations under the Program Documents, (ii) remain in good standing under, and comply in all material respects with, all laws of each state in which it conducts business or any Mortgaged Property related to a Purchased Mortgage Loan is located, and (iii) conduct its business strictly in accordance with applicable law in effect in all jurisdictions where Seller conducts material mortgage related business, except in the case of clauses (i) and (ii) of this Section 15(k) as would not be reasonably likely to have a Material Adverse Effect.

(l)    <u>Taxes, Etc</u>.  Seller shall pay and discharge or cause to be paid and discharged, when due all taxes, assessments and governmental charges or levies imposed upon it or upon its income and profits or upon any of its Property, real, personal or mixed (including without limitation, the Purchased Assets) or upon any part thereof, as well as any other lawful claims which, if unpaid, might become a Lien upon such properties or any part thereof, except for any such taxes, assessments and governmental charges, levies or claims as are appropriately contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves are provided or as otherwise does not have a reasonable likelihood of resulting in a Material Adverse Effect. Seller shall file on a timely basis all material federal, and state and local tax and information returns, reports and any other information statements or schedules required to be filed by or in respect of it.

(m)    <u>Nature of Business</u>.  Seller shall not make any material change in the nature of its business as carried on at the date hereof other than engaging in lines of business as may be customary for originators or servicers of residential mortgage loans.

(n)    <u>Limitation on Distributions</u>.  Seller shall have the right to pay dividends so long as such dividend distribution does not result in any breach of the financial covenants set forth in Section 3 of the Pricing Side Letter.  Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, Seller shall not make any payment of any dividends or make distributions on account of, or set apart assets for a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of, any capital stock, senior or subordinate debt of Seller or other equity interests, respectively, thereof, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or Property or in obligations of Seller.

(o)    <u>Use of Custodian</u>.  Without the prior written consent of Purchaser, Seller shall use no third party custodian as document custodian other than the Custodian for the Mortgage File relating to the Purchased Mortgage Loans.

(p)    <u>Merger of Seller</u>.  Without Agent's prior written consent, Seller shall not, at any time, directly or indirectly (i) liquidate or dissolve or enter into any consolidation or merger wherein Seller is not the surviving entity or be subject to a Change in Control or sell all or substantially all of its Property (other than in connection with an asset-based financing or other secondary market transaction related to the Seller's assets in the ordinary course of the Seller's business); (ii) form or enter into any partnership, joint venture, syndicate or other combination which would have a Material Adverse Effect with respect to Seller; or (iii) make any Material Adverse Change with respect to Seller.

(q)    <u>Insurance</u>.  Seller shall obtain and maintain insurance with responsible companies in such amounts and against such risks as are customarily carried by business entities engaged in similar businesses similarly situated, including without limitation, the insurance required to be obtained and maintained by each Agency pursuant to the Agency Guides, and will furnish to Purchaser promptly following request full information as to all such insurance, and provide within fifteen (15) days after receipt of such request the certificates or other documents evidencing renewal of each such policy.  Seller shall continue to maintain coverage, for itself and its Subsidiaries, that encompasses employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, Property (other than money and securities), and computer fraud in an aggregate amount of at least such amount as is required by each Agency.

(r)    <u>Affiliate Transaction</u>.  Seller shall not, at any time, directly or indirectly, sell, lease or otherwise transfer any Property or assets to, or otherwise acquire any Property or assets from, or otherwise engage in any transactions with, any of its Affiliates unless the terms thereof are no less favorable to Seller, than those that could be obtained at the time of such transaction in an arm's length transaction with a Person who is not such an Affiliate.  For the avoidance of doubt, the existence of the Corporate DIP Facility shall not constitute a violation of this provision.

(s)    <u>Change of Fiscal Year</u>.  Seller shall not, at any time, directly or indirectly, except upon ninety (90) days' prior written notice to Purchaser, change the date on which its fiscal year begins from its current fiscal year beginning date.

(t)    <u>Transfer of Servicing Rights, Servicing Files and Servicing</u>.  With respect to the Servicing Rights of each Purchased Mortgage Loan, Seller shall transfer such Servicing Rights to Purchaser or its designee on the related Purchase Date.  With respect to the Servicing Files and the physical and contractual servicing of each Purchased Mortgage Loan to the extent in the possession of Seller, Seller shall deliver such Servicing Files and the physical and contractual servicing to Purchaser or its designee upon the expiration of the Servicing Term unless such Servicing Term is renewed by Purchaser pursuant to Section 17.  Seller's transfer of the Servicing Rights, Servicing Files and the physical and contractual servicing under this Section shall be in accordance with customary standards in the industry including the transfer of the gross amount of all escrows held for the related Mortgagors (without reduction for unreimbursed advances or "negative escrows").

(u)    <u>Audit and Approval Maintenance</u>.  Seller shall (i) at all times maintain copies of relevant portions of all final written Agency audits, examinations, evaluations, monitoring reviews and reports of its origination and servicing operations (including those prepared on a contract basis for any such agency) in which there are material adverse findings, including without limitation notices of defaults, notices of termination of approved status, notices of imposition of supervisory agreements or interim servicing agreements, and notices of probation, suspension, or non-renewal, and all necessary approvals from each Agency, (ii) upon Agent's request, promptly provide Agent with copies of such audits, examinations, evaluations, monitoring reviews and reports promptly upon receipt from any Agency or agent of any Agency except to the extent disclosure is prohibited by applicable law, any Governmental Authority or such Agency, [and (iii) take all actions necessary to maintain its respective Approvals obtained after the date hereof.]

(v)    <u>MERS</u>.  The Seller is a member of MERS in good standing and current in the payment of all fees and assessments imposed by MERS, and has complied with all rules and procedures of MERS.  In connection with the assignment of any Purchased Mortgage Loan registered on the MERS System, the Seller agrees that it will, at the Seller's own cost and expense, promptly cause the MERS System to indicate that such Mortgage Loan has been transferred to the Purchaser in accordance with the terms of this Agreement by including in MERS' computer files (a) the code in the field which identifies the specific owner of the Mortgage Loans and (b) the code in the field "Pool Field" which identifies the series in which such Mortgage Loans were sold.  The Seller further agrees that it will not alter codes referenced in this paragraph with respect to any Mortgage Loan at any time that such Mortgage Loan is subject to this Agreement, and the Seller shall retain its membership in MERS at all times during the term of this Agreement.

(w)    <u>Fees and Expenses</u>.  Seller shall timely pay to Purchaser all reasonable fees and actual out of pocket expenses, including any due and owing portion of the Non-Utilization Fee and any Transaction Fees if and as required, under the Pricing Side Letter; provided that Purchaser may, in its sole discretion, net any Non-Utilization Fee and any Transaction Fees from the proceeds of any Initial Purchase Price paid by Purchaser to Seller to the extent such amounts were not otherwise received by Purchaser.

(x)    <u>Agency Status</u>.  Once the Seller or any of its subservicers has obtained any status with an Agency mortgage loan pool for which Seller is issuer or servicer, Seller shall not take or omit (or permit any subservicer or Servicer to take or omit) any act, except in the case of the Seller, the filing of the Cases, that (i) would result in the suspension or loss of any of such status, or (ii) after which Seller or any such relevant subservicer or Servicer would no longer be in good standing with respect to such status, or (iii) after which Seller or any such relevant Servicer or subservicer would no longer satisfy all applicable Agency net worth requirements, if both (x) all of the material effects of such act or omission shall not have been cured by Seller or waived by the applicable Agency before termination of such status and (y) the termination of such status could reasonably be expected to have a Material Adverse Effect.

(y)    <u>Further Documents</u>.  Seller shall, upon request of Purchaser or Agent, promptly execute and deliver to Purchaser or Agent all such other and further documents and instruments of transfer, conveyance and assignment, and shall take such other action as Purchaser or Agent may reasonably require to more effectively transfer, convey, assign to and vest in Purchaser and to put Purchaser in possession of the Property to be transferred, conveyed, assigned and delivered hereunder and otherwise to carry out more effectively the intent of the provisions under this Agreement.

(z)    <u>Due Diligence</u>.  Seller will permit Purchaser, Agent or their respective agents or designees to perform due diligence reviews on the Mortgage Loans subject to each Transaction hereunder within thirty (30) days following the related Purchase Date.  Seller shall cooperate in all respects with such diligence and shall provide Purchaser, Agent or their respective agents or designees with all loan files and other information (including, without limitation, Seller's quality control procedures and results) reasonably requested by Purchaser, Agent or their respective agents or designees and shall bear all costs and expenses associated with such due diligence.

(aa)    <u>Event of Insolvency</u>. Except for the Cases, neither Seller nor any Guarantor nor any of their respective Affiliates or consolidated Subsidiaries, shall take any corporate action in furtherance of, or any action which would result in any an Event of Insolvency.

(bb)    <u>Notices to Servicer</u>. On and after the Effective Date, Seller shall notify each applicable Servicer in writing identifying each Purchased Loan that is serviced under the related Servicing Agreement or subservicing agreement and becomes subject to the terms and provisions of this Agreement.

## 16.    <u>REPURCHASE OF PURCHASED ASSETS</u>

Upon discovery by Seller of a breach of any of the representations and warranties set forth on <u>Exhibit B-1</u> or <u>Exhibit B-2</u>, as applicable, to this Agreement, Seller shall give prompt written notice thereof to Purchaser.  Upon any such discovery by Purchaser, Purchaser will notify Seller. It is understood and agreed that the representations and warranties set forth in <u>Exhibit B-1</u> or <u>Exhibit B-2</u> to this Agreement, as applicable, with respect to the Purchased Assets shall survive delivery of the respective Mortgage Files to the Purchaser or Custodian with respect to the Purchased Assets and shall inure to the benefit of Purchaser.  The fact that Purchaser has conducted or has failed to conduct any partial or complete due diligence investigation in connection with its purchase of any Purchased Asset shall not affect Purchaser's right to demand repurchase or any

other remedy as provided under this Agreement.  Seller shall, within five (5) Business Days of the earlier of Seller's discovery or receipt of notice by a Responsible Officer of Seller with respect to any Purchased Asset of (i) any breach of a representation or warranty contained in <u>Exhibit B-1</u> or <u>Exhibit B-2</u> of this Agreement or (ii) any failure to deliver any of the items required to be delivered as part of the Mortgage File within the time period required for delivery pursuant to the Custodial and Disbursement Agreement, promptly cure such breach or delivery failure in all material respects.  If within five (5) Business Days after the earlier of Seller's discovery of such breach or delivery failure or receipt of notice thereof that such breach or delivery failure has not been remedied by Seller, Seller shall promptly upon receipt of written instructions from Purchaser, at Purchaser's option, repurchase such Purchased Asset at a purchase price equal to the Repurchase Price with respect to such Purchased Asset by wire transfer to the account designated by Purchaser.

## 17.    <u>SERVICING OF THE MORTGAGE LOANS; SERVICER TERMINATION</u>

(a)    <u>Subservicing</u>.

(i)    Upon payment of the Initial Purchase Price, Purchaser shall own the Servicing Rights related to the Purchased Mortgage Loans including the Mortgage File related to such Purchased Mortgage Loans.  Seller and Purchaser each agrees and acknowledges that the Mortgage Loans sold hereunder shall be sold to Purchaser on a servicing released basis, and that Purchaser is engaging and hereby does engage Seller to provide servicing of each such Mortgage Loan for the benefit of Purchaser; provided that with respect to one or more Purchased Mortgage Loans, a Servicer other than the Seller may subservice the Mortgage Loans for the benefit of Purchaser.

(ii)    So long as a Purchased Mortgage Loan is outstanding, Seller shall neither assign, encumber or pledge its obligation to subservice such Mortgage Loans in whole or in part, nor delegate its rights or duties under this Agreement (to other than a subservicer) without the prior written consent of Purchaser, the granting of which consent shall be in the sole discretion of Purchaser. Seller hereby acknowledges and agrees that (i) Purchaser is entering into this Agreement in reliance upon Seller's representations as to the adequacy of its financial standing, servicing facilities, personnel, records, procedures, reputation and integrity, and the continuance thereof; and (ii) Seller's engagement hereunder to provide mortgage servicing for the benefit of Purchaser is intended by the parties to be a "personal service contract" and Seller is hereunder intended by the parties to be an "independent contractor".

(iii)    Seller shall service (or cause Servicer to subservice) and administer the Mortgage Loans it is servicing on behalf of Purchaser in accordance with Accepted Servicing Practices.  Servicer shall have no right to modify or alter the terms of any such Mortgage Loan or consent to the modification or alteration of the terms of any such Mortgage Loan except in Strict Compliance with the related Agency Program.  Servicer shall at all times maintain accurate and complete records of its servicing of the Mortgage Loans it is servicing on behalf of Purchaser, and Agent may, at any time during Servicer's business hours on reasonable notice, examine and make copies of such Servicing Records. Seller agrees that Purchaser is the 100% beneficial owner of all Servicing Records relating to the Mortgage Loans.  Seller covenants to hold or cause to be held such Servicing Records

for the benefit of Purchaser and to safeguard such Servicing Records and to deliver them promptly to Agent or its designee (including the Custodian) at Agent's request or otherwise as required by operation of this Section 17.

(b)    Servicing Term.  Seller has sold the Servicing Rights related to the Purchased Assets to the Purchaser hereunder.  Notwithstanding the foregoing, Seller shall cause Servicer to service such Mortgage Loans on behalf of Purchaser from the related Purchase Date until the next Monthly Payment Date, which term may be extended in writing by Agent, in its sole reasonable discretion, until the next following Monthly Payment Date (each, a "Servicing Term")[1]. Notwithstanding the forgoing, Purchaser and/or Agent shall have the right to instruct Seller to terminate Servicer at any time following the occurrence of a Servicer Termination Event. Seller shall hold or cause Servicer to hold all Escrow Payments collected with respect to the Mortgage Loans it or a Servicer is servicing on behalf of Purchaser in segregated accounts for the sole benefit of the related Mortgagor and shall apply the same for the purposes for which such funds were collected.  If Seller should discover that, for any reason whatsoever, it or the Servicer has failed to fully perform its servicing obligations in any material respect with respect to the Mortgage Loans it is servicing or Servicer is servicing on behalf of Purchaser, Seller shall promptly notify Purchaser and Agent.

(c)    Servicing Reports.  On a monthly basis, on the 10th day of the month, or if such day is not a Business Day, the following Business Day, Seller shall furnish to Purchaser reports in form and scope satisfactory to Purchaser, setting forth (i) data regarding the performance of the individual Purchased Mortgage Loans, (ii) a summary report of all Mortgage Loans serviced by the Seller and originated pursuant to an Agency Guide, HUD and/or FHA or VA guidelines (on a portfolio basis), in each case, for the immediately preceding month, including, without limitation, all collections, delinquencies, defaults, defects, claim rates, losses and recoveries, and (iii) any other information reasonably requested by Purchaser or Agent or Verification Agent.

(d)    Backup Servicer.  If an Event of Default has occurred, the Agent, in its sole discretion, may appoint a backup servicer.  In such event, Seller shall commence monthly delivery to such backup servicer of the servicing information required to be delivered to Purchaser pursuant to Section 17(d) hereof and any other information reasonably requested by backup servicer, all in a format that is reasonably acceptable to such backup servicer.  Purchaser shall pay all costs and expenses of such backup servicer, including, but not limited to all fees of such backup servicer in connection with the processing of such information and the maintenance of a servicing file with respect to the Purchased Mortgage Loans.  Seller shall cooperate fully with such backup servicer in the event of a transfer of servicing hereunder and will provide such backup servicer with all documents and information necessary for such backup servicer to assume the servicing of the Purchased Mortgage Loans.

(e)    Collection Account.  Prior to the initial Purchase Date, Seller shall establish and maintain the Collection Account with the Bank in the Agent's name for the sole and exclusive

---

[1] The following will be hard-coded in the invoice: Extension of Master Repurchase Agreement Servicing Term: This email shall serve as notice that, pursuant to Section 17(b) of the Master Repurchase Agreement, Barclays is hereby extending the Servicing Term for an additional period commencing as of the date of this email until the next following Monthly Payment Date.

benefit of the Purchaser. Such account shall be subject to the Collection Account Control Agreement (unless an order entered in the Cases obviates the need for such Collection Account Control Agreement). Servicer shall deposit or credit to the Collection Account all amounts collected on account of the Mortgage Loans within two (2) Business Days of receipt, and remit such collections in accordance with Section 17(f) hereof. Following the occurrence and during the continuance of an Event of Default, such amounts shall be deposited or credited irrespective of any right of setoff or counterclaim arising in favor of Seller (or any third party claiming through it) under any other agreement or arrangement. Amounts on deposit in the Collection Account shall be distributed as provided in Section 17(f).

(f)    Income Payments.

(i)    Where a particular term of a Transaction extends over the date on which Income is paid in respect of any Purchased Asset subject to that Transaction, (i) Seller shall deposit or cause to be deposited such Income into the Collection Account no later than two (2) Business Days after receipt thereof by Seller; it being agreed that Seller shall not be deemed to have received Income if the Servicer has received such Income on behalf of Seller but not remitted such Income to Seller, and (ii) such Income shall be the Property of Purchaser subject to subsections 17(f)(ii) and (iii) below. The Collection Account shall be subject to the terms and conditions of the Collection Account Control Agreement.

(ii)    Except as otherwise provided in Section 17(f)(iv), on the Monthly Payment Date, Seller shall release amounts from the Collection Account and apply those amounts to (A) to pay outstanding Price Differential due and payable in respect of Purchased Assets then subject to a Transaction, including Purchased Assets for which Purchaser has received the related Outstanding Purchase Price pursuant to Section 3(g) during the prior calendar month, (B) to reduce the Outstanding Purchase Price for all outstanding Transactions, (C) to pay all other Obligations then due and payable to Purchaser and (D) to pay to Seller any remaining amounts.

(iii)    Notwithstanding anything herein or in the Collection Account Control Agreement to the contrary, amounts shall not be released to Seller to the extent that such action would result in the creation of a Margin Deficit (unless prior thereto or simultaneously therewith Seller cures such Margin Deficit in accordance with Section 7), or if an Event of Default is then continuing. Further, if an uncured Margin Deficit exists as of such Monthly Payment Date, Purchaser shall cause the Bank to disburse the Income related to the Transaction for which the Margin Deficit exists to Purchaser (up to the amount of such Margin Deficit), which amounts shall be applied by Purchaser to reduce the related Repurchase Price.

(iv)    If a successor servicer takes delivery of such Mortgage Loans either under the circumstances set forth in Section 17(i) or otherwise, all amounts deposited in the Collection Account shall be paid to Purchaser promptly upon such delivery.

(g)    [Reserved].

(h)    [Reserved].

(i)    <u>Servicer Termination</u>.  Purchaser, in its sole discretion, may terminate Seller's or any Servicer's rights and obligations as servicer or subservicer, as applicable, of the affected Mortgage Loans that it is servicing or subservicing, as applicable, on behalf of Purchaser and require Seller or Servicer, as applicable, to deliver the related Servicing Records to Purchaser or its designee upon the occurrence of (i) an Event of Default or (ii) upon the expiration of the Servicing Term as set forth in Section 17(b) by delivering written notice to Seller and Servicer requiring such termination.  Such termination shall be effective upon Seller's or such Servicer's receipt of such written notice; provided, that Seller's and such Servicer's servicing rights shall be terminated immediately upon the occurrence a Servicer Termination Event, regardless of whether notice of such event shall have been given to or by Purchaser, Seller or such Servicer.  Upon any such termination, all authority and power of Seller or Servicer respecting its rights to subservice and duties under this Agreement relating thereto, shall pass to and be vested in the successor servicer appointed by Purchaser and Purchaser is hereby authorized and empowered to transfer such rights to subservice the Mortgage Loans for such price and on such terms and conditions as Purchaser shall reasonably determine.  Seller shall, and shall cause such Servicer to, promptly take such actions and furnish to Purchaser such documents that Purchaser deems necessary or appropriate to enable Purchaser to enforce such Mortgage Loans and shall, and shall cause such Servicer to, perform all acts and take all actions so that the Mortgage Loans and all files and documents relating to such Mortgage Loans held by Seller or Servicer, together with all escrow amounts relating to such Mortgage Loans, are delivered to successor servicer, including but not limited to preparing, executing and delivering to the successor servicer any and all documents and other instruments, placing in the successor servicer's possession all Servicing Records pertaining to such Mortgage Loans and doing or causing to be done, all at Seller's sole expense.  To the extent that the approval of the Applicable Agency is required for any such sale or transfer, Seller shall fully cooperate with Purchaser to obtain such approval.  All amounts paid by any purchaser of such rights to service or subservice the Mortgage Loans shall be the property of Purchaser.  The subservicing rights required to be delivered to successor servicer in accordance with this Section 17(i) shall be delivered free of any servicing rights in favor of Seller or any third party (other than Purchaser) and free of any title, interest, lien, encumbrance or claim of any kind of Seller other than record title to the Mortgages relating to the Mortgage Loans and the right and obligation to repurchase the Mortgage Loans hereunder.  No exercise by Purchaser of its rights under this Section 17(i) shall relieve Seller of responsibility or liability for any breach of this Agreement.

(j)    <u>Conflict</u>s.    For the avoidance of doubt, if a Servicer Side Letter conflicts with any provision set forth in this Section 17, the applicable Servicer Side Letter shall control with respect to such provision.

## 18.    <u>EVENTS OF DEFAULT</u>

With respect to any Transactions covered by or related to this Agreement, the occurrence of any of the following events shall constitute an "<u>Event of Default</u>":

(a)    Seller fails to transfer the Purchased Assets to the Purchaser on the applicable Purchase Date (provided the Purchaser has tendered the related Initial Purchase Price);

(b)    Seller either fails to repurchase the Purchased Assets on the applicable Repurchase Date or fails to perform its obligations under Section 7 or the last sentence of Section 16;

(c)     Seller shall fail to (i) remit to Purchaser when due any payment required to be made under the terms of this Agreement, any of the other Program Documents or any other contracts or agreements delivered in connection herewith or therewith, or (ii) perform, observe or comply with any material term, condition, covenant or agreement contained in this Agreement or any of the other Program Documents (other than the other "Events of Default" set forth in this Section 18) or any other contracts or agreements delivered in connection herewith or therewith, and such failure in clause (ii) above is not cured within the time period expressly provided for therein, or, if no such cure period is provided, within three (3) Business Days of the earlier of (x) a Responsible Officer of Seller's receipt of written notice from Purchaser or Custodian of such breach or (y) the date on which a Responsible Officer of Seller obtains notice or knowledge of the facts giving rise to such breach;

(d)     Any representation or warranty made by Seller (or any of Seller's officers) in the Program Documents or in any other document delivered in connection therewith, or in any other contract or agreement, shall have been incorrect or untrue in any material respect when made or repeated or deemed by the terms thereof to have been made or repeated and, if curable, is not cured or corrected within three (3) Business Days of notice or knowledge by a Responsible Officer of Seller (other than the representations or warranties in Section 14(m), Exhibit B-1 or Exhibit B-2 which shall be considered solely for the purpose of determining whether the related Purchased Asset is an Eligible Mortgage Loan, unless (i) Seller shall have made any such representation or warranty with the knowledge that it was materially false or misleading at the time made or repeated or deemed to have been made or repeated, or (ii) any such representation or warranty shall have been determined by Purchaser in its sole discretion to be materially false or misleading on a regular basis);

(e)     Seller, any of its Subsidiaries, or any Guarantor, as applicable, shall be in default (x) under any Other Agreement, or (y) under any Barclays Agreement, in either case, beyond any applicable cure period, unless such default directly arises from the filing of the Cases;

(f)     Any Event of Insolvency of the Seller or any Guarantor or any of their respective Affiliates (unless such Event of Insolvency directly arises from the filing of the Cases);

(g)     Any final judgment or order for the payment of money in excess of $500,000 in the aggregate (to the extent that it is, in the reasonable determination of Purchaser, uninsured and provided that any insurance or other credit posted in connection with an appeal shall not be deemed insurance for these purposes) shall be rendered against Seller, any of its Subsidiaries, or any Guarantor by one or more courts, administrative tribunals or other bodies having jurisdiction over them and the same shall not be discharged (or provisions shall not be made for such discharge) satisfied, paid or bonded, or a stay of execution thereof shall not be procured, within sixty (60) days from the date of entry thereof and Seller, any of its Subsidiaries, or any Guarantor, as applicable, shall not, within said period of sixty (60) days, or such longer period during which execution of the same shall have been stayed or bonded, appeal therefrom and cause the execution thereof to be stayed during such appeal;

(h)     Any Governmental Authority or any person, agency or entity acting or purporting to act under governmental authority (i) shall have taken any action to condemn, seize or appropriate, or to assume custody or control of, all or any substantial part of the Property of Seller,

any of its Subsidiaries, or any Guarantor, or shall have taken any action to displace the management of Seller, any of its Subsidiaries, or any Guarantor or to curtail its authority in the conduct of the business of Seller, any of its Subsidiaries, or any Guarantor, or (ii) takes any action in the nature of enforcement to remove, limit or restrict the approval of Seller, any of its Subsidiaries, or any Guarantor as an issuer, purchaser or a seller/servicer of Mortgage Loans or securities backed thereby;

(i)      Seller shall fail to comply with any of the financial covenants set forth in Section 3 of the Pricing Side Letter;

(j)      Any Material Adverse Effect shall have occurred (other than a Material Adverse Effect arising from a Material Adverse Change in Seller's prospects);

(k)      This Agreement shall for any reason cease to create a valid first priority security interest or ownership interest upon transfer in any material portion of the Purchased Assets or purported to be covered hereby;

(l)      A Change in Control of Seller or any Guarantor shall have occurred that has not been approved by Agent;

(m)      Purchaser shall reasonably request, specifying the reasons for such request, reasonable information, and/or written responses to such requests, regarding the financial well-being of Seller, and such reasonable information and/or responses shall not have been provided within ten (10) Business Days of such request or such longer time frame as Barclays provides in its sole discretion;

(n)      A material event of default shall have occurred and be continuing beyond the expiration of any applicable cure periods under any of the Program Documents or the EPF Program Documents, as applicable, unless such default directly arises from the filing of the Cases;

(o)      The Seller ceases to be a member of MERS in good standing and has not been reinstated within fifteen (15) calendar days following receipt of notice or knowledge thereof;

(p)      The occurrence of a Servicer Termination Event; or

(q)      The failure of the Seller, any Guarantor, and any of their respective affiliated debtors and debtors-in-possession to comply with "Chapter 11 Milestones" set forth in Paragraph [20] of the Interim Order or Final Order, as applicable, or the occurrence of any of the events of default set forth in Paragraph [21] of the Interim Order or Final Order, as applicable, in each case, if such failure is not cured or corrected within 1 Business Day thereof.

## 19.   **REMEDIES**

Upon the occurrence of (i) an Event of Default (other than that referred to in Section 18(f)), the Purchaser, at its option, shall have the right to exercise any or all of the following rights and remedies and (ii) an Event of Default referred to in Section 18(f), the following rights and remedies shall immediately and automatically take effect without any further action by any Person (an Event

of Default exists until it has been waived in writing (which may be via electronic mail) by Purchaser).

(a)     (i)     The Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled).  Seller's Obligations hereunder, to repurchase all Purchased Assets at the Repurchase Price therefor on the Repurchase Date in such Transactions shall thereupon become immediately due and payable; all Income paid after such exercise or deemed exercise shall be remitted to and retained by Purchaser and applied to the aggregate Repurchase Prices and any other amounts owing by Seller hereunder; Seller shall immediately deliver to Purchaser or its designee any and all original papers, records and files relating to the Purchased Assets subject to such Transaction then in its possession and/or control; and all right, title and interest in and entitlement to such Purchased Assets and Servicing Rights thereon shall become property of Purchaser.

(ii)     Purchaser may (A) sell, on or following the Business Day following the date on which the Repurchase Price becomes due and payable pursuant to Section 19(a)(i) without notice or demand of any kind, at a public or private sale and at such price or prices as Purchaser may reasonably deem satisfactory, any or all or portions of the Purchased Assets on a servicing-released or servicing-retained basis, as Purchaser may determine in its sole discretion and/or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Assets, to give Seller credit for such Purchased Assets (including credit for the Servicing Rights in respect of sales on a servicing-retained basis) in an amount equal to the Market Value of the Purchased Assets against the aggregate unpaid Repurchase Price and any other amounts owing by Seller hereunder.  Seller shall remain liable to Purchaser for any amounts that remain owing to Purchaser following a sale and/or credit under the preceding sentence.  The proceeds of any disposition of Purchased Assets shall be applied <u>first</u> to the reasonable costs and expenses including but not limited to legal fees incurred by Purchaser in connection with or as a result of an Event of Default; <u>second</u> to costs of cover and/or related hedging transactions; <u>third</u> to the aggregate Repurchase Prices; and <u>fourth</u> to all other Obligations.

(iii)     The parties recognize that it may not be possible to purchase or sell all of the Purchased Assets on a particular Business Day, or in a transaction with the same purchaser, or in the same manner because the market for such Purchased Assets may not be liquid.  In view of these characteristics of the Purchased Assets, the parties agree that liquidation of a Transaction or the underlying Purchased Assets does not require a public purchase or sale and that a good faith private purchase or sale shall be deemed to have been made in a commercially reasonable manner.  Accordingly, Purchaser may elect the time and manner of liquidating any Purchased Asset and nothing contained herein shall obligate Purchaser to liquidate any Purchased Asset upon the occurrence of an Event of Default or to liquidate all Purchased Assets in the same manner or on the same Business Day or shall constitute a waiver of any right or remedy of Purchaser.  Notwithstanding the foregoing, the parties to this Agreement agree that the Transactions have been entered into in consideration of and in reliance upon the fact that all Transactions hereunder constitute a

single business and contractual obligation and that each Transaction has been entered into in consideration of the other Transactions.

(iv)    The Purchaser may terminate the Agreement.

(b)    Seller hereby acknowledges, admits and agrees that Seller's Obligations under this Agreement are recourse obligations of Seller. Purchaser may set off cash, the proceeds of the liquidation of the Purchased Assets and all other sums or obligations owed by Purchaser to Seller or against all of Seller's Obligations to Purchaser, or Seller's obligations to Purchaser under any other agreement between the parties, or otherwise, whether or not such obligations are then due, without prejudice to Purchaser's right to recover any deficiency. Purchaser shall have the right to obtain physical possession of the Records and all other files of Seller relating to the Purchased Assets and all documents relating to the Purchased Assets which are then or may thereafter come into the possession of Seller or any third party acting for Seller and Seller shall deliver to Purchaser such assignments as Purchaser shall request.

(c)    Purchaser shall have the right to direct all Persons servicing the Purchased Assets to take such action with respect to the Purchased Assets as Purchaser determines appropriate, including, without limitation, using its rights under a power of attorney granted pursuant to Section 10(b) hereof.

(d)    Purchaser shall, without regard to the adequacy of the security for the Obligations, be entitled to the appointment of a receiver by any court having jurisdiction, without notice, to take possession of and protect, collect, manage, liquidate, and sell the Purchased Assets or any portion thereof, collect the payments due with respect to the Purchased Assets or any portion thereof, and do anything that Purchaser is authorized hereunder to do.  Seller shall pay all costs and expenses incurred by Purchaser in connection with the appointment and activities of such receiver, and such shall be deemed part of the Obligations hereunder.

(e)    Purchaser may, at its option, enter into one or more hedging transactions covering all or a portion of the Purchased Assets, and Seller shall be responsible for all damages, judgments, costs and expenses of any kind which may be imposed on, incurred by or asserted against Purchaser relating to or arising out of such hedging transactions; including without limitation any losses resulting from such hedging transactions, and such shall be deemed part of the Obligations hereunder.

(f)    In addition to all the rights and remedies specifically provided herein, Purchaser shall have all other rights and remedies provided by applicable federal, state, foreign and local laws, whether existing at law, in equity or by statute, including, without limitation, all rights and remedies available to a purchaser/secured party under the Uniform Commercial Code.

Except as otherwise expressly provided in this Agreement, Purchaser shall have the right to exercise any of its rights and/or remedies without presentment, demand, protest or further notice of any kind, other than as expressly set forth herein, all of which are hereby expressly waived by Seller.

Purchaser may enforce its rights and remedies hereunder without prior judicial process or hearing, and Seller hereby expressly waives, to the extent permitted by law, any right Seller might

otherwise have to require Purchaser to enforce its rights by judicial process.  Seller also waives, to the extent permitted by law, any defense Seller might otherwise have to the Obligations, or any guaranty thereof, arising from use of nonjudicial process, enforcement and sale of all or any portion of the Purchased Assets or from any other election of remedies.  Seller recognizes that nonjudicial remedies are consistent with the usages of the trade, are responsive to commercial necessity and are the result of a bargain at arm's length.

Seller shall cause all sums received by it with respect to the Purchased Assets to be deposited promptly upon receipt thereof but in no event later than two (2) Business Days thereafter.  Seller shall be liable to Purchaser for the amount of all losses, costs and/or expenses (plus interest thereon at a rate equal to the Default Rate) that Purchaser may sustain or incur in connection with hedging transactions relating to the Purchased Assets, conduit advances and payments for mortgage insurance.

## 20.    **DELAY NOT WAIVER; REMEDIES ARE CUMULATIVE**

No failure on the part of Purchaser to exercise, and no delay by Purchaser in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by Purchaser of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All rights and remedies of Purchaser provided for herein are cumulative and in addition to any and all other rights and remedies provided by law, the Program Documents and the other instruments and agreements contemplated hereby and thereby, and are not conditional or contingent on any attempt by Purchaser to exercise any of its rights under any other related document.  Purchaser may exercise at any time after the occurrence of an Event of Default one or more remedies permitted hereunder, as it so desires, and may thereafter at any time and from time to time exercise any other remedy or remedies permitted hereunder.

## 21.    **USE OF EMPLOYEE PLAN ASSETS**

No assets of an employee benefit plan subject to any provision of ERISA shall be used by either party hereto in a Transaction.

## 22.    **INDEMNITY**

(a)    Except as set forth in Sections 3(g) and 3(i), Seller agrees to indemnify and hold harmless Purchaser, Agent and their Affiliates and their respective officers, directors, employees, agents and advisors (each, an "Indemnified Party") from and against (and will reimburse each Indemnified Party as the same is incurred within thirty (30) days following receipt of an invoice therefor) any and all claims, damages, losses, liabilities, taxes, increased costs and all other expenses including out-of-pocket expenses (including, without limitation, reasonable fees and expenses of outside counsel and audit and due diligence fees) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including without limitation, in connection with) (i) any investigation, litigation or other proceeding (whether or not such Indemnified Party is a party thereto) relating to, resulting from or arising out of any of the Program Documents and all other documents related thereto, any breach by Seller of any representation or warranty or covenant in this Agreement or any other Program

Document, and all actions taken pursuant thereto, (ii) the Transactions, the actual or proposed use of the proceeds of the Transactions, this Agreement or any of the transactions contemplated hereby, including, without limitation, any acquisition or proposed acquisition, or any indemnity payable under the Servicing Agreement or other servicing arrangement, (iii) the actual or alleged presence of hazardous materials on any Property or any environmental action relating in any way to any Property, (iv) the actual or alleged violation of any federal, state, municipal or local predatory lending laws, or (v) the reduction of the Principal Balance due to a cram down or similar action authorized by any bankruptcy proceeding or other case arising out of or relating to any petition under the Bankruptcy Code, including, without limitation, the Cases, in each case, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted directly from such Indemnified Party's gross negligence or willful misconduct or is the result of a claim made by Seller against the Indemnified Party, and Seller is ultimately the successful party in any resulting litigation or arbitration. Seller hereby agrees not to assert any claim against Purchaser or any of its Affiliates, or any of their respective officers, directors, employees, attorneys and agents, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Program Documents, the actual or proposed use of the proceeds of the Transactions, this Agreement or any of the transactions contemplated thereby. THE FOREGOING INDEMNITY AND AGREEMENT NOT TO ASSERT CLAIMS EXPRESSLY APPLIES, WITHOUT LIMITATION, TO THE NEGLIGENCE (BUT NOT GROSS NEGLIGENCE OR WILLFUL MISCONDUCT) OF THE INDEMNIFIED PARTIES.

(b)　　If Seller fails to pay when due any costs, expenses or other amounts payable by it under this Agreement, including, without limitation, reasonable fees and expenses of counsel and indemnities, such amount may be paid on behalf of Seller by Purchaser, in its sole discretion and Seller shall remain liable for any such payments by Purchaser and such amounts shall be deemed part of the Obligations hereunder. No such payment by Purchaser shall be deemed a waiver of any of Purchaser's rights under the Program Documents.

(c)　　Without prejudice to the survival of any other agreement of Seller hereunder, the covenants and obligations of Seller contained in this Section 22 shall survive the payment in full of the Repurchase Price and all other amounts payable hereunder and delivery of the Purchased Assets by Purchaser against full payment therefor.

## 23.　**WAIVER OF REDEMPTION AND DEFICIENCY RIGHTS**

Seller hereby expressly waives, to the fullest extent permitted by law, every statute of limitation on a deficiency judgment, any reduction in the proceeds of any Purchased Assets as a result of restrictions upon Purchaser or Custodian contained in the Program Documents or any other instrument delivered in connection therewith, and any right that they may have to direct the order in which any of the Purchased Assets shall be disposed of in the event of any disposition pursuant hereto.

## 24.　**REIMBURSEMENT; SET-OFF**

(a)　　Seller agrees to pay within fifteen (15) Business Days of request therefor all reasonable out-of-pocket costs and expenses of Purchaser in connection with the initial and

subsequent negotiation, modification, renewal and amendment of the Program Documents (including, without limitation, (A) all collateral review and UCC search and filing fees and expenses and (B) the reasonable fees and expenses of outside counsel for Purchaser with respect to advising Purchaser as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under this Agreement and any other Program Document, with respect to negotiations with Seller or with other creditors of Seller arising out of any Default or any events or circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto). Seller agrees to pay within fifteen (15) Business Days of request therefor, with interest at the Default Rate to the extent that an Event of Default has occurred, all costs and expenses, including without limitation, reasonable attorneys' fees and disbursements (and fees and disbursements of Purchaser's outside counsel) expended or incurred by Purchaser and/or Custodian in connection with the modification, renewal, amendment and enforcement (including any waivers) of the Program Documents (regardless of whether a Transaction is entered into hereunder), the taking of any action, including legal action, required or permitted to be taken by Purchaser (without duplication to Purchaser) and/or Custodian pursuant thereto or by refinancing or restructuring in the nature of a "workout." Further, Seller agrees to pay, with interest at the Default Rate to the extent that an Event of Default has occurred, all costs and expenses, including without limitation, reasonable attorneys' fees and disbursements (and fees and disbursements of Purchaser's outside counsel) expended or incurred by Purchaser in connection with (a) the rendering of legal advice as to Purchaser's rights, remedies and obligations under any of the Program Documents, (b) the collection of any sum which becomes due to Purchaser under any Program Document, (c) any proceeding for declaratory relief, any counterclaim to any proceeding, or any appeal, or (d) the protection, preservation or enforcement of any rights of Purchaser. For the purposes of this Section 24(a), attorneys' fees shall include, without limitation, fees incurred in connection with the following: (1) discovery; (2) any motion, proceeding or other activity of any kind in connection with a bankruptcy proceeding or case arising out of or relating to any petition under the Bankruptcy Code, as the same shall be in effect from time to time, or any similar law; (3) garnishment, levy, and debtor and third party examinations; and (4) post-judgment motions and proceedings of any kind, including without limitation any activity taken to collect or enforce any judgment. Any and all of the foregoing amounts referred to in this Section 24(a) shall be deemed a part of the Obligations hereunder. Without prejudice to the survival of any other agreement of Seller hereunder, the covenants and obligations of Seller contained in this Section 24(a) shall survive the payment in full of the Repurchase Price and all other amounts payable hereunder and delivery of the Purchased Assets by Purchaser against full payment therefor.

(b)      In addition to any rights and remedies of Purchaser hereunder and at law, Purchaser and its Affiliates shall have the right, upon providing prior written notice (provided that failure to provide such notice shall not restrict Purchaser's right to set-off), upon any amount becoming due and payable (whether at the stated maturity, by acceleration or otherwise) by Seller hereunder or under any other agreement (including, without limitation, the Mortgage Loan Participation Purchase and Sale Agreement) entered into between Seller or any of its Affiliates on the one hand, and Purchaser or any of its Affiliates on the other hand, to set-off and appropriate and apply against such amount any and all Property and deposits (general or special, time or demand, provisional or final), in any currency, or any other credits, indebtedness or claims, in any currency, or any other collateral (in the case of collateral not in the form of cash or such other marketable or negotiable

form, by selling such collateral in a recognized market therefor or as otherwise permitted by law or as may be in accordance with custom, usage or trade practice), in each case, whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Purchaser or any Affiliate thereof to or for the credit or the account of Seller or any of its Affiliates.  Purchaser may also set-off cash and all other sums or obligations owed by Purchaser or its Affiliates to Seller or its Affiliates (whether under this Agreement or under any other agreement between the parties (including, without limitation, the Mortgage Loan Participation Purchase and Sale Agreement) or between Seller or any of its Affiliates, on the one hand, and Purchaser or any of its Affiliates, on the other) against all of Seller's obligations to Purchaser or its Affiliates (whether under this Agreement or under any other agreement (including, without limitation, the Mortgage Loan Participation Purchase and Sale Agreement) between the parties or between Seller or any of its Affiliates, on the one hand, and Purchaser or any of its Affiliates, on the other), whether or not such obligations are then due.  The exercise of any such right of set-off shall be without prejudice to Purchaser's or its Affiliate's right to recover any deficiency.  Purchaser agrees to promptly notify Seller after any such set-off and application made by Purchaser; provided that the failure to give such notice shall not affect the validity of such set-off and application.

## 25.    <u>FURTHER ASSURANCES</u>

Seller agrees to do such further acts and things and to execute and deliver to Purchaser such additional assignments, acknowledgments, agreements, powers and instruments as are reasonably required by Purchaser to carry into effect the intent and purposes of this Agreement, to perfect the interests of Purchaser in the Purchased Assets or to better assure and confirm unto Purchaser its rights, powers and remedies hereunder.

## 26.    <u>ENTIRE AGREEMENT; PRODUCT OF NEGOTIATION</u>

This Agreement supersedes and integrates all previous negotiations, contracts, agreements and understandings between the parties relating to a sale and repurchase of Purchased Assets, and it, together with the other Program Documents, and the other documents delivered pursuant hereto or thereto, contains the entire final agreement of the parties.  No prior negotiation, agreement, understanding or prior contract shall have any validity hereafter.

## 27.    <u>TERMINATION</u>

This Agreement shall remain in effect until the Termination Date.  However, no such termination shall affect Seller's outstanding obligations to Purchaser at the time of such termination.  Seller's obligations to indemnify Purchaser pursuant to this Agreement and the other Program Documents shall survive the termination hereof.

## 28.    <u>REHYPOTHECATION; ASSIGNMENT</u>

(a)    Purchaser may, in its sole election, and without the consent of the Seller engage in repurchase transactions with the Purchased Assets or otherwise pledge, hypothecate, assign, transfer or otherwise convey the Purchased Assets with a counterparty of Purchaser's choice, in all cases subject to Purchaser's obligation to reconvey the Purchased Assets (and not substitutes therefor) on the Repurchase Date, all at no cost to the Seller.  In the event Purchaser engages in a repurchase transaction with any of the Purchased Assets or otherwise pledges or hypothecates any

of the Purchased Assets, Purchaser shall have the right to assign to Purchaser's counterparty any of the applicable representations or warranties in Exhibit B-1 or Exhibit B-2 to this Agreement and the remedies for breach thereof, as they relate to the Purchased Assets that are subject to such repurchase transaction.

(b)    The Program Documents and the Seller's rights and obligations thereunder are not assignable by Seller without the prior written consent of Purchaser. Any Person into which Seller may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which Seller shall be a party, or any Person succeeding to the business of Seller, shall be the successor of Seller hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding. Without any requirement for consent of the Seller and at no cost or expense to the Seller, each of Purchaser and Agent may, in its sole election, assign or participate all or a portion of its rights and obligations under this Agreement and the Program Documents with a counterparty of Purchaser's or Agent's choice. Purchaser or Agent shall maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Purchased Assets or other obligations under the Program Documents (the "Participant Register"); provided that Purchaser shall have no obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, advances, purchases, letters of credit or its other obligations under any Program Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, advance, purchase, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and the Purchaser or Agent shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. The Seller agrees that, for any such permitted assignment, Seller will cooperate with the prompt execution and delivery of documents reasonably necessary for such assignment process to the extent that Seller incurs no cost or expense that is not paid by the Purchaser or Agent, as applicable. Upon such assignment, (a) such assignee shall be a party hereto and to each Program Document to the extent of the percentage or portion set forth in the Participant Register, and shall succeed to the applicable rights and obligations of Purchaser or Agent hereunder, and (b) Purchaser or Agent shall, to the extent that such rights and obligations have been so assigned by it to either (i) an Affiliate of Purchaser or Agent which assumes the obligations of Purchaser or Agent hereunder or (ii) to another Person which assumes the obligations of Purchaser or Agent hereunder, be released from their obligations hereunder accruing thereafter and under the Program Documents.

(c)    Purchaser and Agent may distribute to any prospective assignee, participant or pledgee any document or other information delivered to Purchaser by Seller subject to the confidentiality restrictions contained in Section 36 hereof; accordingly, such prospective assignee, participant or pledgee shall be required to agree to confidentiality provisions similar to those set forth in Section 36.

29.    **AMENDMENTS, ETC.**

No amendment or waiver of any provision of this Agreement nor any consent to any failure to comply herewith or therewith shall in any event be effective unless the same shall be in writing and signed by Seller, Purchaser and Agent, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

30.    **SEVERABILITY**

If any provision of any Program Document is declared invalid by any court of competent jurisdiction, such invalidity shall not affect any other provision of the Program Documents, and each Program Document shall be enforced to the fullest extent permitted by law.

31.    **BINDING EFFECT; GOVERNING LAW**

This Agreement shall be binding and inure to the benefit of the parties hereto and their respective successors and assigns. THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF (EXCEPT FOR SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

32.    **WAIVER OF JURY TRIAL; CONSENT TO JURISDICTION AND VENUE; SERVICE OF PROCESS**

EACH OF SELLER, PURCHASER AND AGENT HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE PROGRAM DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  SELLER HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS, ON BEHALF OF ITSELF AND ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF ANY COURT OF THE STATE OF NEW YORK, OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE PROGRAM DOCUMENTS IN ANY ACTION OR PROCEEDING.  SELLER HEREBY SUBMITS TO, AND WAIVES ANY OBJECTION IT MAY HAVE TO, NON-EXCLUSIVE PERSONAL JURISDICTION AND VENUE IN THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, WITH RESPECT TO ANY DISPUTES ARISING OUT OF OR RELATING TO THE PROGRAM DOCUMENTS.  SELLER HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF A SUMMONS AND COMPLAINT AND OTHER PROCESS IN ANY ACTION, CLAIM OR PROCEEDING BROUGHT BY ANOTHER PARTY IN CONNECTION WITH THIS AGREEMENT OR THE OTHER PROGRAM DOCUMENTS, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THEREUNDER, OR THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS, ON BEHALF OF ITSELF OR ITS PROPERTY, IN THE MANNER SPECIFIED IN THIS SECTION 32 AND TO SUCH PARTY'S ADDRESS SPECIFIED IN SECTION 34 OR SUCH OTHER ADDRESS AS SUCH

PARTY SHALL HAVE PROVIDED IN WRITING TO THE OTHER PARTIES HERETO. NOTHING IN THIS SECTION 32 SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO (I) SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW, OR (II) BRING ANY ACTION OR PROCEEDING AGAINST ANY OTHER PARTY OR ITS PROPERTIES IN THE COURTS OF ANY OTHER JURISDICTIONS.

## 33.    **SINGLE AGREEMENT**

Seller, Purchaser and Agent acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other.  Accordingly, Seller, Purchaser and Agent each agree (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, and (ii) that payments, deliveries and other transfers made by any of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transaction hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 34.    **INTENT**

Seller, Purchaser and Agent recognize that each of the Transactions and this Agreement is a "repurchase agreement" as that term is defined in Section 101 of the Bankruptcy Code, and a "securities contract" as that term is defined in Section 741 of the Bankruptcy Code, or a "qualified financial contract" as that term is defined in the Federal Deposit Insurance Act, as applicable, and a "master netting agreement" as that term is defined in Section 101 of the Bankruptcy Code.

It is understood that Purchaser's right to liquidate the Purchased Assets and terminate and accelerate the Transactions and this Agreement or to exercise any other remedies pursuant to Section 18 hereof is a contractual right to liquidate, terminate and accelerate the Transactions under a repurchase agreement, a securities contract, a master netting agreement, and a qualified financial contract as described in Sections 559, 555 and 561 of the Bankruptcy Code and Section 1821(e)(8)(A)(i) of the Federal Deposit Insurance Act, as applicable, and a contractual right to offset under a master netting agreement and across contracts, as described in Section 561 of the Bankruptcy Code. It is understood that Purchaser's right to accelerate the Repurchase Date with respect to the Purchased Assets and any Transaction hereunder pursuant to Section 19 hereof is a contractual right to liquidate, terminate and accelerate the Transactions under a repurchase agreement, a securities contract, a master netting agreement, and a qualified financial contract as described in Sections 559, 555 and 561 of the Bankruptcy Code and Section 1821(e)(8)(A)(i) of the Federal Deposit Insurance Act, as applicable.

The parties hereby intend that any provisions hereof or in any other document, agreement or instrument that is related in any way to the servicing of the individual Mortgage Loans shall be deemed "related to" this Agreement within the meaning of Sections 101(38A)(A) and 101(47)(A)(v) of the Bankruptcy Code and part of the "contract" as such term is used in Section 741 of the Bankruptcy Code.

Seller, Purchaser and Agent agree that this Agreement is intended to create mutuality of obligations among the parties, and as such, the Agreement constitutes a contract which (i) is between all of the parties and (ii) places each party in the same right and capacity.

## 35.    NOTICES AND OTHER COMMUNICATIONS

Except as provided herein, all notices required or permitted by this Agreement shall be in writing (including without limitation by Electronic Transmission, email or facsimile) and shall be effective and deemed delivered only when received by the party to which it is sent; provided that notices of Events of Default and exercise of remedies or under Sections 6 or 19 shall be sent via overnight mail and by Electronic Transmission.  Any such notice shall be sent to a party at the address, electronic mail or facsimile transmission number set forth below:

if to Seller:          First Guaranty Mortgage Corporation
                       5800 Tennyson Parkway, Suite 450
                       Plano, TX 75024
                       Attention: General Counsel
                       Telephone: 469-592-7239
                       E-mail: generalcounsel@fgmc.com

if to Purchaser:       Barclays Bank PLC
                       745 Seventh Avenue, 2nd Floor
                       New York, New York 10019
                       Attention: US Residential Financing
                       Telephone:  (212) 412-7990
                       E-mail: USResiFinancing@barclays.com

                       Barclays Bank PLC
                       745 Seventh Avenue, 5th Floor
                       New York, New York 10019
                       Attention:  RMBS Banking
                       Telephone:  (212) 528-7482
                       E-mail: CoreRMBSBanking@barclayscapital.com

                       With copies to:

                       Barclays Bank PLC – Operations US
                       400 Jefferson Park
                       Whippany, New Jersey 07981
                       Attention: Whole Loan Operations
                       Telephone: (201) 499-4456
                       E-Mail: WholeLoanOperati@barclayscapital.com

if to Agent:           Barclays Bank PLC
                       745 Seventh Avenue, 2nd Floor
                       New York, New York 10019
                       Attention: US Residential Financing

Telephone:  (212) 412-7990
E-mail: USResiFinancing@barclays.com

Barclays Bank PLC
745 Seventh Avenue, 5th Floor
New York, New York 10019
Attention:  RMBS Banking
Telephone:  (212) 528-7482
E-mail: CoreRMBSBanking@barclayscapital.com

With copies to:

Barclays Bank PLC – Operations US
400 Jefferson Park
Whippany, New Jersey 07981
Attention: Whole Loan Operations
Telephone: (201) 499-4456
E-Mail: WholeLoanOperati@barclayscapital.com

or to such other address, e-mail address or facsimile number as either party may notify to the others in writing from time to time.

36.    **CONFIDENTIALITY**

      Seller, Purchaser and Agent each hereby acknowledge and agree that all written or computer-readable information provided by one party to the other in connection with the Program Documents or the Transactions contemplated thereby, including without limitation, Seller's Mortgagor information in the possession of Purchaser shall be kept confidential and shall not be divulged to any party except for a prospective assignee, participant or pledgee pursuant to Section 28 or otherwise without the prior written consent of such other party except for (i) disclosure to Seller's or Purchaser's respective officers, directors, employees, consultants, representatives, direct and indirect parent companies, attorneys, auditors, taxing authorities, equity holders, investors, agents or accountants, provided that such attorneys or accountants likewise agree to be bound by this covenant of confidentiality, or are otherwise subject to confidentiality restrictions or (ii) with prior (if feasible) written notice to Purchaser, disclosure required by law, rule, regulation or order of a court or other regulatory body or (iii) with prior (if feasible) written notice to Purchaser, disclosure to any approved hedge counterparty to the extent necessary to obtain any Hedge Instrument hereunder, (iv) as required by final order of the court entered in the Cases, or (v) with prior (if feasible) written notice to Purchaser, any disclosures or filing required under Securities and Exchange Commission ("SEC") or state securities' laws; provided that in the case of clause (iv), Seller shall not file or disclose the Pricing Side Letter.  Notwithstanding anything herein to the contrary, except as reasonably necessary to comply with applicable securities laws, each party (and each employee, representative, or other agent of each party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure.  For this purpose, tax treatment and tax structure shall not include (i) the identity of any existing or future party (or any Affiliate of such party) to

this Agreement or (ii) any specific pricing information or other commercial terms, including the amount of any fees, expenses, rates or payments arising in connection with the transactions contemplated by this Agreement.

Notwithstanding anything in this Agreement to the contrary, Seller, Purchaser and Agent shall comply with all applicable local, state and federal laws, including, without limitation, all privacy and data protection law, rules and regulations that are applicable to the Purchased Assets and any applicable terms of this Agreement, including information relating to any Mortgage Loan that is not purchased hereunder and information relating to any other Mortgage Loans of Seller that is delivered to Purchaser or Agent by another lender under an intercreditor agreement or other agreement (the "Confidential Information"). Seller, Purchaser and Agent understand that the Confidential Information may contain "nonpublic personal information", as that term is defined in Section 509(4) of the Gramm-Leach-Bliley Act (the "GLB Act"), and each agrees to maintain such nonpublic personal information that it receives hereunder in accordance with the GLB Act and other applicable federal and state privacy laws. Seller, Purchaser and Agent shall each implement such physical and other security measures as shall be necessary to (a) ensure the security and confidentiality of the "nonpublic personal information" of the "customers" and "consumers" (as those terms are defined in the GLB Act) of such party or any Affiliate of such party which that party holds, (b) protect against any threats or hazards to the security and integrity of such nonpublic personal information, and (c) protect against any unauthorized access to or use of such nonpublic personal information. Seller, Purchaser and Agent each shall, to the extent practicable and permitted by law, rule, regulation, judicial process, and governmental and regulatory authority, notify the other promptly following discovery of any breach or compromise of the security, confidentiality, or integrity of nonpublic personal information of the customers and consumers of the non-notifying party or any Affiliate of the non-notifying party by personal delivery, or by overnight courier with confirmation of receipt of the applicable requesting individual. The provisions of this Section 36 shall survive termination of this Agreement.

37. **DUE DILIGENCE**

Purchaser, Agent or any of their respective agents, representatives or permitted assigns shall have the right, upon reasonable prior notice and during normal business hours, to conduct inspection and perform continuing due diligence reviews of (x) Seller and its Affiliates, directors, officers, employees and significant shareholders, including, without limitation, their respective financial condition and performance of its obligations under the Program Documents, and (y) the Servicing File and the Purchased Assets. Seller agrees promptly to provide Purchaser, Agent and their respective agents with access to, copies of and extracts from any and all documents, records, agreements, instruments or information (including, without limitation, any of the foregoing in computer data banks and computer software systems) relating to Seller's respective business, operations, servicing, financial condition, performance of their obligations under the Program Documents, the documents contained in the Servicing Files or the Purchased Assets or assets proposed to be sold hereunder in the possession, or under the control, of Seller. In addition, Seller shall also make available to Purchaser and/or Agent, upon reasonable prior notice and during normal business hours, a knowledgeable financial or accounting officer of Seller for the purpose of answering questions respecting the Purchased Assets. Without limiting the generality of the foregoing, Seller acknowledges that Purchaser shall enter into transactions with Seller based solely upon the information provided by Seller to Purchaser and/or Agent and the representations,

warranties and covenants contained herein, and that Purchaser and/or Agent, at its option, shall have the right at any time to conduct itself or through its agents, or require Seller to conduct quality reviews and underwriting compliance reviews of the individual Mortgage Loans at the expense of Seller.  Any such diligence conducted by Purchaser and/or Agent shall not reduce or limit the Seller's representations, warranties and covenants set forth herein.  Seller agrees to reimburse Purchaser and/or Agent for all reasonable out-of-pocket due diligence costs and expenses incurred pursuant to this Section 37.

## 38.     __USA PATRIOT ACT; SANCTIONS AND ANTI-TERRORISM__

Each of Purchaser and Agent hereby notifies the Seller that pursuant to the requirements of the USA PATRIOT Improvement and Reauthorization Act, Title III of Pub. L. 109-177 (signed into law March 9, 2009) (the "Act"), it is required to obtain, verify, and record information that identifies the Seller, which information includes the name and address of the Seller and other information that will allow each of Purchaser and Agent, as applicable, to identify the Seller in accordance with the Act. Seller hereby represents and warrants to each of Purchaser and Agent, and shall on and as of the Purchase Date for any Transaction and on and as of each date thereafter through and including the related Repurchase Date be deemed to represent and warrant to each of Purchaser and Agent that:

(a)    (i) Neither the Seller, nor the Parent Company nor, to the Seller's actual knowledge, any director, officer, or employee of the Seller or any of its subsidiaries, or to the Seller's actual knowledge, any Originator of a Purchased Asset is named on the list of Specifically Designated Nationals maintained by OFAC or any similar sanctions list issued by OFAC, OFSI, or any other Governmental Authority (collectively, the "Sanctions Lists") or is located, organized, or resident in a country or territory that is, or whose government is, the target of sanctions imposed by OFAC, OFSI, or any other Governmental Authority; (ii) no Person or Persons on the Sanctions Lists owns, whether individually or in the aggregate, directly or indirectly, a ten percent or greater interest in, or otherwise controls, the Seller, the Parent Company or any Originator; and (iii) to the knowledge of the Seller, neither the Purchaser nor Agent is precluded by any Economic and Trade Sanctions and Anti-Terrorism Laws from entering into this Agreement or any transactions pursuant to this Agreement with the Seller due to the ownership or control by any person or entity of stocks, shares, bonds, debentures, notes, drafts or other securities or obligations of the Seller.

(b)    (i) Seller will not conduct business with or engage in any transaction with any Obligor that the Seller knows, after reasonable diligence or after being notified by an Originator of a Purchased Asset, (x) is named on any of the Sanctions Lists or is located, organized, or resident in a country or territory that is, or whose government currently is, the target of sanctions imposed by OFAC or any other Governmental Authority; (y) is owned ten percent or more, directly or indirectly, or otherwise controlled, by a Person named on any Sanctions List; (ii) if the Seller obtains actual knowledge, after reasonable due diligence, that any Obligor is named on any of the Sanctions Lists or that any Person or Persons on the Sanctions Lists owns, whether individually or in the aggregate, directly or indirectly, a ten percent or greater interest in, or otherwise controls, the Obligor, the Seller, or any Originator, as applicable, Seller will give prompt written notice to the Purchaser and Agent of such fact or facts; and (iii) the Seller will (x) comply at all times with the requirements of the Economic and Trade Sanctions and Anti-Terrorism Laws applicable to any transactions, dealings or other actions relating to this Agreement and (y) will, upon the Purchaser's

or Agent's reasonable request from time to time during the term of this Agreement, deliver a certification confirming its compliance with the covenants set forth in this Section 38.

## 39.   EXECUTION IN COUNTERPARTS

This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing and delivering one or more counterparts.  The parties intend that faxed signatures and electronically imaged signatures such as .pdf files shall constitute original signatures and are binding on all parties.  The original documents shall be promptly delivered, if requested.  The parties agree that this Agreement, any addendum, exhibit or amendment hereto or any other document necessary for the consummation of the transactions contemplated by this Agreement may be accepted, executed or agreed to through the use of an electronic signature in accordance with E-Sign, UETA and any applicable state law.  Any document accepted, executed or agreed to in conformity with such laws will be binding on all parties hereto to the same extent as if it were physically executed and each party hereby consents to the use of any secure third party electronic signature capture service with appropriate document access tracking, electronic signature tracking and document retention as may be reasonably chosen by a signatory hereto, including but not limited to DocuSign.

## 40.   CONTRACTUAL RECOGNITION OF BAIL-IN

Seller acknowledges and agrees that notwithstanding any other term of this Agreement or any other agreement, arrangement or understanding with Purchaser, any of Purchaser's liabilities, as the Bank of England (or any successor resolution authority) may determine, arising under or in connection with this Agreement may be subject to Bail-In Action and Seller accepts to be bound by the effect of:

(a)     any Bail-In Action in relation to such liability, including (without limitation):

(i)     a reduction, in full or in part, of any amount due in respect of any such liability;

(ii)     a conversion of all, or part of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, Seller; and

(iii)     a cancellation of any such liability; and

(b)     a variation of any term of this Agreement to the extent necessary to give effect to Bail-In Action in relation to any such liability.

## 41.   CONTRACTUAL RECOGNITION OF UK STAY IN RESOLUTION

Where a resolution measure is taken in relation to any BRRD undertaking or any member of the same group as that BRRD undertaking and that BRRD undertaking or any member of the same group as that BRRD undertaking is a party to this Agreement (any such party to this Agreement being an "Affected Party"), each other party to this Agreement agrees that it shall only be entitled to exercise any termination right under this Agreement against the Affected Party to

the extent that it would be entitled to do so under the Special Resolution Regime if this Agreement were governed by the laws of any part of the United Kingdom.

For the purpose of this Section 41, "resolution measure" means a 'crisis prevention measure', 'crisis management measure' or 'recognised third-country resolution action', each with the meaning given in the "PRA Rulebook: CRR Firms and Non-Authorised Persons: Stay in Resolution Instrument 2015", as may be amended from time to time (the "PRA Contractual Stay Rules"), provided, however, that 'crisis prevention measure' shall be interpreted in the manner outlined in Rule 2.3 of the PRA Contractual Stay Rules; "BRRD undertaking", "group", "Special Resolution Regime" and "termination right" have the respective meanings given in the PRA Contractual Stay Rules.

## 42.   **NOTICE REGARDING CLIENT MONEY RULES.**

Purchaser, as a CRD credit institution (as such term is defined in the rules of the FCA), holds all money received and held by it hereunder as banker and not as trustee.  Accordingly, money that is received and held by Purchaser from you will not be held in accordance with the provisions of the FCA's Client Asset Sourcebook relating to client money (the "Client Money Rules") and will not be subject to the statutory trust provided for under the Client Money Rules.

In particular, Purchaser shall not segregate money received by it from you from Purchaser money and Purchaser shall not be liable to account to you for any profits made by Purchaser use as banker of such cash and upon failure of Purchaser, the client money distribution rules within the Client Asset Sourcebook (the "Client Money Distribution Rules") will not apply to these sums and so you will not be entitled to share in any distribution under the Client Money Distribution Rules.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Seller, Agent and Purchaser have caused their names to be signed to this Master Repurchase Agreement by their respective officers thereunto duly authorized as of the date first above written.

**FIRST GUARANTY MORTGAGE CORPORATION**, as Seller

By:_____
Name:
Title:

**BARCLAYS BANK PLC**, as Purchaser and Agent

By:_____
Name:
Title:

**EXHIBIT A-1**

**MONTHLY CERTIFICATION**

I, _____, _____ of First Guaranty Mortgage Corporation (the "Seller"), in accordance with that certain Master Repurchase Agreement (as the same may be amended, supplemented, or otherwise modified from time to time, the "Agreement"), dated as of [_____], 2022, by and between Barclays Bank PLC and Seller do hereby certify that:

(i)      To the best of my knowledge, no Default or Event of Default has occurred and is continuing;

(ii)     Attached hereto as Schedule One is a schedule of each financial covenant that the Seller is subject to under any agreement (other than the Agreement), and a calculation which demonstrates compliance with each such financial covenant; and

(iii)    The Seller has complied with each of the covenants set forth in Section 3 of the Pricing Side Letter, as evidenced by the worksheet attached hereto as Schedule Two.

[Signature Page Follows]

Capitalized terms used but not defined herein have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, I have signed this certificate.

Date: _____, 20[    ]

<div style="margin-left: 40%;">

FIRST GUARANTY MORTGAGE
CORPORATION

By:_____
Name:
Title:

</div>

**EXHIBIT A-2**

**QUARTERLY CERTIFICATION**

I, _____, _____ of First Guaranty Mortgage Corporation (the "Seller"), in accordance with that certain Master Repurchase Agreement (as the same may be amended, supplemented, or otherwise modified from time to time, the "Agreement"), dated as of [_____], 2022, by and between Barclays Bank PLC and Seller do hereby certify that:

      (i)      To the best of my knowledge, no Default or Event of Default has occurred and is continuing;

      (ii)      Attached hereto as Schedule One is a schedule of each financial covenant that the Seller is subject to under any agreement (other than the Agreement), and a calculation which demonstrates compliance with each such financial covenant; and

      (iii)     The Seller has complied with each of the covenants set forth in Section 3 of the Pricing Side Letter, as evidenced by the worksheet attached hereto as Schedule Two.

[Signature Page Follows]

A-2 - 1

Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, I have signed this certificate.

Date: _____, 20[    ]

FIRST GUARANTY MORTGAGE
CORPORATION

By:_____
Name:
Title:

A-2 - 2

SCHEDULE ONE TO EXHIBIT A

OTHER FINANCIAL COVENANTS

2" = "1" "065037.0000230 EMF_US 81093815v3" ""

SCHEDULE TWO TO EXHIBIT A

FINANCIAL COVENANTS WORKSHEET

2" = "1" "065037.0000230 EMF_US 81093815v3" ""

**EXHIBIT B-1**

**REPRESENTATIONS AND WARRANTIES
WITH RESPECT TO MORTGAGE LOANS**

Capitalized terms used but not defined in this Exhibit B-1 have the meanings assigned to such terms in the Master Repurchase Agreement dated as of [_____], 2022 (as the same may be amended, supplemented, or otherwise modified from time to time, the "Agreement"), by and between Barclays Bank PLC, ("Purchaser" or "Agent") and First Guaranty Mortgage Corporation ("Seller"). Seller hereby represents and warrants to the Purchaser and Agent that, for each Mortgage Loan as of the related Purchase Date and the related Repurchase Date and on each date that such Mortgage Loan is subject to a Transaction:

(a)    All information provided to Purchaser by Seller, including without limitation the information set forth in the Seller Mortgage Loan Schedule, with respect to the Mortgage Loan is true and correct in all material respects;

(b)    Such Mortgage Loan is an Eligible Mortgage Loan;

(c)    Such Mortgage Loan was owned solely by Seller on the related Purchase Date, is not subject to any lien, claim or encumbrance, including, without limitation, any such interest pursuant to a loan or credit agreement for warehousing mortgage loans, and was originated, underwritten and serviced in either (A) Strict Compliance (with respect to Agency Mortgage Loans), or (B) compliance with Seller's applicable underwriting guidelines (with respect to Jumbo Mortgage Loans) and with all applicable law and regulations, including without limitation the Federal Truth-in-Lending Act, the Real Estate Settlement Procedures Act, regulations issued pursuant to any of the aforesaid, and any and all rules, requirements, guidelines and announcements of each Agency, and, as applicable, the FHA, HUD and VA, as the same may be amended from time to time.

(d)    The improvements on the land securing such Mortgage Loan are and will be kept insured at all times by responsible insurance companies reasonably acceptable to Purchaser and the Applicable Agency against fire and extended coverage hazards under policies, binders or certificates of insurance with a standard mortgagee clause in favor of Seller and its assigns, providing that such policy may not be canceled without prior notice to Seller. Any proceeds of such insurance shall be held in trust for the benefit of Purchaser. The scope and amount of such insurance shall satisfy the rules, requirements, guidelines and announcements of the Applicable Agency (except with respect to Non-QM Mortgage Loans), and shall in all cases be at least equal to the lesser of (A) the principal amount of such Mortgage Loan or (B) the maximum amount permitted by applicable law, and shall not be subject to reduction below such amount through the operation of a coinsurance, reduced rate contribution or similar clause;

(e)    Each Mortgage is a valid first lien, or in the case of a Second Lien Mortgage Loan, second lien, on the Mortgaged Property and is covered by an attorney's opinion of title acceptable to the Applicable Agency (except with respect to Non-QM Mortgage Loans) or by a policy of title insurance on a standard ALTA or similar lender's form in favor of Seller and its assigns, subject only to exceptions permitted by the applicable Agency Program (except with respect to Non-QM

Mortgage Loans). Seller shall hold for the benefit of Purchaser such policy of title insurance, and, upon request of Purchaser, shall immediately deliver such policy to Purchaser or to the Custodian on behalf of Purchaser;

(f)      Such Mortgage Loan is either (i) insured by the FHA under the National Housing Act, guaranteed by the VA under the Servicemen's Readjustment Act of 1944 or (ii) with respect to Fannie Mae Mortgage Loans and Freddie Mac Mortgage Loans, is otherwise eligible to be insured or guaranteed in accordance with the requirements of the applicable Agency Program (except with respect to Non-QM Mortgage Loans) and, in either case, such Mortgage Loan is not subject to any defect that would prevent recovery in full or in part against the FHA, VA or other insurer or Guarantor, as the case may be;

(g)      A MIN has been assigned by MERS and such MIN is accurately provided on the Seller Mortgage Loan Schedule. Either the Mortgage is in favor of MERS or an Assignment of Mortgage to MERS has been duly and properly recorded;

(h)      Seller has not received any notice of liens or legal actions with respect to such Mortgage Loan and no such notices have been electronically posted by MERS;

(i)      Except with respect to Non-QM Mortgage Loans and Jumbo Mortgage Loans, each Mortgage Loan is eligible for sale to the Applicable Agency and fully complies with all of the terms and conditions, including any covenants, representations and warranties, in the applicable Agency Guide and eligible for securitization by and/or sale to Fannie Mae, Freddie Mac or eligible for inclusion in a Ginnie Mae MBS pool;

(j)      There are no restrictions, contractual or governmental, which would impair the ability of Seller from servicing the Mortgage Loans;

(k)      Such Mortgage Loan will not result in Negative Amortization;

(l)      The Mortgagor is one or more natural persons and/or trustees for an Illinois land trust or a trustee under a "living trust" and such "living trust" is in compliance with Applicable Agency guidelines (except with respect to Non-QM Mortgage Loans) for such trusts;

(m)      Such Mortgage Loan is not a High Cost Mortgage Loan;

(n)      No predatory, abusive or deceptive lending practices, including but not limited to, the extension of credit to a Mortgagor without regard for the Mortgagor's ability to repay the Mortgage Loan and the extension of credit to a Mortgagor which has no tangible net benefit to the Mortgagor, were employed in connection with the origination of the Mortgage Loan. Such Mortgage Loan is in compliance with the anti-predatory lending eligibility for purchase requirements of the Fannie Mae Guide;

(o)      [reserved]

(p)      If such Mortgage Loan was pledged to another warehouse, credit, repurchase or other financing facility immediately prior to the related Purchase Date, then (i) such pledge has

been released immediately prior to, or concurrently with, the related Purchase Date hereunder and (ii) Purchaser has received a Warehouse Lender's Release in respect of such Mortgage Loan;

(q)     Such Mortgage Loan has not been released from the possession of the Custodian under Section 5 of the Custodial and Disbursement Agreement to Seller or its bailee for a period in excess of fifteen (15) calendar days (or if such fifteenth day is not a Business Day, the next succeeding Business Day) or such earlier time period as indicated on the related Request for Release of Documents;

(r)     Seller has not sold, assigned, transferred, pledged or hypothecated any interest in any individual Mortgage Loan subject to a Transaction to any person other than any sale, assignment, transfer, pledge or hypothecation that is released in conjunction with the sale to Purchaser hereunder, and upon delivery of a Purchased Asset to Purchaser, Purchaser will be the sole owner thereof (other than for tax and accounting purposes), free and clear of any lien, claim or encumbrance other than those arising under this Agreement.;

(s)     Such Mortgage Loan has not been manually underwritten;

(t)     Such Mortgage Loan is a MERS Designated Mortgage Loan;

(u)     Seller has submitted the original Mortgage in respect of each Mortgage Loan for recordation in the appropriate public recording office in the applicable jurisdictions wherein such recordation is necessary to perfect the lien thereof as against creditors of the Seller.

(v)     With respect to each Mortgage Loan that is a Wet-Ink Mortgage Loan, the Settlement Agent has been instructed in writing by Seller to hold the related Mortgage File as agent and bailee for Purchaser or Agent and to promptly forward such Mortgage File in accordance with the provisions of the Custodial and Disbursement Agreement and the Escrow Instruction Letter (if applicable);

(w)     No Mortgage Loan shall be a Mortgage Loan of a loan type deemed an unacceptable risk for any reason at the Purchaser's discretion;

(x)     Each Mortgage Loan has been fully disbursed and is secured by a first lien, or in the case of a Second Lien Mortgage Loan, a second lien, on an underlying property as a "closed-end" Mortgage Loan with no further disbursements required by any party;

(y)     [reserved]

(z)     The Mortgage Loan is not secured by property located in (a) a state where the Seller is not licensed as a lender/mortgage banker or (b) a state that the Purchaser determines to be unacceptable and has provided Seller advance notice of such;

(aa)     The Mortgage Loan has not been converted to an ownership interest in real property through foreclosure or deed-in-lieu of foreclosure;

(bb)     The Mortgage Loan relates to Mortgaged Property that consists of (i) a detached single family dwelling, (ii) a two-to-four family dwelling, (iii) a one-family dwelling unit in a

Freddie Mac eligible condominium project, (iv) a townhouse, or (v) a detached single family dwelling in a planned unit development none of which is a cooperative or commercial property; and is not related to Mortgaged Property that consists of (a) mixed use properties, (b) log homes, (c) earthen homes, (d) underground homes, (e) mobile homes or manufactured housing units (whether or not secured by real property), (f) any dwelling situated on more than ten acres of property or (g) any dwelling situated on a leasehold estate; and

(cc)    Such Mortgage Loan is not a Restricted Mortgage Loan.

(dd)    In connection with the assignment of any Mortgage Loan registered on the MERS system, the Seller agrees that it will, at the Seller's own cost and expense, promptly cause the MERS system to indicate that such Mortgage Loan has been transferred to the Purchaser in accordance with the terms of this Agreement by including in MERS' computer files (a) the code in the field which identifies the specific owner of the Mortgage Loans and (b) the code in the field "Pool Field" which identifies the series in which such Mortgage Loans were sold.  The Seller further agrees that it will not alter codes referenced in this paragraph with respect to any Mortgage Loan at any time that such Mortgage Loan is subject to this Agreement, and the Seller shall retain its membership in MERS at all times during the term of this Agreement.

**EXHIBIT B-2**
**ADDITIONAL REPRESENTATIONS AND WARRANTIES**
**WITH RESPECT TO NON-QM MORTGAGE LOANS**

Capitalized terms used but not defined in this Exhibit B-2 have the meanings assigned to such terms in the Master Repurchase Agreement, dated as of [_____], 2022 (as the same may be amended, supplemented, or otherwise modified from time to time, the Agreement"), by and between Barclays Bank PLC, ("Purchaser" or "Agent") and First Guaranty Mortgage Corporation ("Seller").  Seller makes the following representations and warranties to Purchaser with respect to all Non-QM Loans owned by the Seller, as of the initial purchase date for such Non-QM Loans, subject to any exceptions agreed to by the Purchaser.

(a)     Payments Current. No payment required under a Non-QM Mortgage Loan is more than 30 days contractually delinquent (using the MBA methodology). The first monthly payment shall be made, or shall have been made, with respect to the Non-QM Mortgage Loan on its due date or within the grace period, all in accordance with the terms of the related Mortgage Note.

(b)     Doing Business. All parties which have had any interest in the Non-QM Mortgage

(c)     Loan, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (i) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (ii) either (A) organized under the laws of such state, (B) qualified to do business in such state, (C) a federal savings and loan association, a savings bank or a national bank having a principal office in such state, or (D) not doing business in such state.

(d)     No Mechanics' Liens. There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under the law could give rise to such liens) affecting the Mortgaged Property which are or may be liens prior to, or equal or coordinate with, the lien of the Mortgage.

(e)     Origination; Payment Terms. Principal and/or interest payments on the Non-QM Mortgage Loan commenced no more than 60 days after funds were disbursed in connection with the Non-QM Loan. With respect to adjustable-rate Non-QM Loans, the mortgage interest rate is adjusted on each interest rate adjustment date to equal to the applicable index plus the gross margin (rounded up or down to the nearest 0.125%) as set forth in the Mortgage Note, subject to the mortgage interest rate cap as set forth in the Mortgage Note. The Mortgage Note is payable on a monthly basis in equal monthly installments of principal and/or interest, which installments of interest with respect to adjustable rate Non-QM Mortgage Loans are subject to change on the interest rate adjustment date due to adjustments to the mortgage interest rate on each interest rate adjustment date as set forth in the Mortgage Note, with interest calculated and payable in arrears, sufficient to amortize the Non-QM Mortgage Loan fully by the stated maturity date, over an original term of not more than 30 years from commencement of amortization. The

B - 5

due date of the first payment under the Mortgage Note is no more than 60 days from the date of the Mortgage Note.

(f)     <u>Occupancy of the Mortgaged Property</u>. As of the date of origination of the Non-QM Loan, other than Investor Mortgage Loans, the Mortgaged Property is lawfully occupied under applicable law. All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities. Seller has not received notification from any Governmental Authority that the Mortgaged Property is in material non-compliance with such laws or regulations, is being used, operated or occupied unlawfully or has failed to have or obtain such inspection, licenses or certificates, as the case may be. Seller has not received notice of any violation or failure to conform with any such law, ordinance, regulation, standard, license or certificate. With respect to any Non-QM Mortgage Loan originated with an "owner-occupied" Mortgaged Property and as the mortgagor's primary residence, the mortgagor represented at the time of origination of the Non-QM Mortgage Loan that the mortgagor would occupy the Mortgaged Property as the mortgagor's primary residence.

(g)     <u>No Additional Collateral</u>. The Mortgage Note is not and has not been secured by any collateral except the lien of the corresponding Mortgage and the security interest of any applicable security agreement or chattel mortgage referred to in paragraph **Error! Reference source not found.** of Schedule **Error! Reference source not found.** above.

(h)     <u>No Buydown Provisions; No Graduated Payments or Contingent Interests</u>. Except as approved by Purchaser in its sole discretion, the Non-QM Mortgage Loan does not contain provisions pursuant to which monthly payments are paid or partially paid with funds deposited in any separate account established by the Seller, the mortgagor, or anyone on behalf of the mortgagor, or paid by any source other than the mortgagor nor does it contain any other similar provisions which may constitute a "buydown" provision. The Non-QM Mortgage Loan is not a graduated payment Non-QM Mortgage Loan and the Non-QM Mortgage Loan does not have a shared appreciation or other contingent interest feature.

(i)     <u>Consolidation of Future Advances</u>. Any future advances made to the mortgagor prior to the Purchase Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term. The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first lien priority, or in the case of a Second Lien Mortgage Loan, second lien priority, by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to Purchaser. The consolidated principal amount does not exceed the original principal amount of the Non-QM Loan.

(j)     <u>Interest Rate Adjustments</u>. All mortgage interest rate adjustments have been made in strict compliance with state and federal law and the terms of the related Mortgage Note. Any interest required to be paid pursuant to state, federal and local law has been properly paid and credited.

(k)     <u>Construction or Rehabilitation of Mortgaged Property</u>. Other than with respect to a HUD 203k rehabilitation Non-QM Loan, a HUD 203h disaster Non-QM Mortgage Loan or an investor loan, no Non-QM Mortgage Loan was made in connection with the construction or rehabilitation of a Mortgaged Property or facilitating the trade-in or exchange of a Mortgaged Property.

(l)     <u>Capitalization of Interest</u>. The Mortgage Note does not by its terms provide for the capitalization or forbearance of interest.

(m)     <u>No Equity Participation</u>. No document relating to the Non-QM Mortgage Loan provides for any contingent or additional interest in the form of participation in the cash flow of the Mortgaged Property or a sharing in the appreciation of the value of the Mortgaged Property. The indebtedness evidenced by the Mortgage Note is not convertible to an ownership interest in the Mortgaged Property or the mortgagor the Seller has not financed and does not own, directly or indirectly, any equity of any form in the Mortgaged Property or the mortgagor.

(n)     <u>Primary Mortgage Guaranty Insurance</u>. For each Non-QM Mortgage Loan that is insured by a policy of primary mortgage guaranty insurance or is required to be insured by a policy of primary mortgage guaranty insurance, the policy of primary mortgage guaranty insurance is in the amount required, is issued by an approved insurer, if applicable, all provisions of such primary mortgage guaranty insurance have been and are being complied with, such policy is in full force and effect, and all premiums due thereunder have been paid. There are no defenses, counterclaims, or rights of setoff affecting the Non-QM Mortgage Loans or affecting the validity or enforceability of any private mortgage insurance applicable to the Non-QM Mortgage Loans.

(o)     <u>Qualified Mortgage</u>. With respect to those Non-QM Mortgage Loans originated on and after January 10, 2014 (or such later date as set forth in the relevant regulations) and for which an exemption from the ATR Rules is not available, prior to the origination of each Non-QM Mortgage Loan, the originator made a reasonable and good faith determination that the mortgagor had a reasonable ability to repay the loan according to its terms, in accordance with, at a minimum, the eight underwriting factors set forth in 12 CFR 1026.43(c).

(p)     <u>TRID Compliance</u>. With respect to each Non-QM Mortgage Loan where the mortgagor's loan application for the Non-QM Mortgage Loan was taken on or after October 3, 2015, other than Investor Mortgage Loans and Mortgage Loans originated by a U.S. Department of Treasury Community Development Financial Institutions Fund-certified originator, such Non-QM Mortgage Loan was originated in compliance with the TILA-RESPA Integrated Disclosure Rule.

(q)     <u>Ability to Repay Exemption</u>. Each Non-QM Mortgage Loan that was not originated in accordance with the ATR Rules is exempt from the ATR Rules because either (a) such Mortgage Loan is a Mortgage Loan where the proceeds of such loan are primarily used for a non-consumer, business, commercial, or agricultural purpose as provided for in Sections 1026.3(a) and 1026.43(a) of Regulation Z of the Truth in Lending Act or (b) the originator was designated by the U.S. Department of the Treasury as a Community Development Financial Institution at the time the Mortgage Loan was originated; and such exemption will remain in place for each Mortgage Loan even when the Mortgage Loan is sold, assigned, or otherwise transferred by the originator.

(r)     Each Non-QM Mortgage Loan was originated in compliance with statutory, regulatory, and originator underwriting standards in effect at the time of origination. Each such Non-QM Loan, to the extent applicable, was underwritten at the fully indexed rate, based upon the mortgagor's ability to repay the Mortgage Loan according to its terms, and relied on documented income and complies with all existing supervisory guidance governing the underwriting of residential mortgages, including the Interagency Guidance on Non-Traditional Mortgage Product Risks effective on October 5, 2006, and the Interagency Statement on Subprime Mortgage Lending effective on July 10, 2007, and such other additional regulations or guidance applicable to insured depository institutions at the time of the Mortgage Loan's origination.

**EXHIBIT C**

**TRANSACTION REPRESENTATIONS**

Reference is made to the Master Repurchase Agreement, dated as of [_____], 2022 (the "Repurchase Agreement"), by and between Barclays Bank PLC ("Purchaser" and "Agent") and First Guaranty Mortgage Corporation ("Seller"). Capitalized terms used but not otherwise defined herein have the meaning given them in the Repurchase Agreement.

Seller hereby represents and warrants to each of Purchaser and Agent, as of the related Purchase Date, that:

(1)    the Eligible Mortgage Loans have the characteristics on the electronic file or computer tape or disc delivered by Seller to Purchaser.

(2)    no Default or Event of Default has occurred and is continuing on the related Purchase Date (or to the extent existing, shall be cured after giving effect to the Transaction to be effected on such Purchase Date) and no Default or Event of Default will occur after giving effect to the Transaction to be effected on such Purchase Date as a result of such Transaction;

(3)    each of the representations and warranties made by the Seller in or pursuant to the Program Documents is true and correct in all material respects on and as of such date as if made on and as of the date hereof (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date);

(4)    each of the representations and warranties made by Seller in or pursuant to the Program Documents is true and correct in all material respects on and as of such Purchase Date as if made on and as of such Purchase Date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date);

(5)    Seller has all requisite Approvals; and

(6)    the Seller has satisfied all applicable conditions precedent in Sections 11(a) and (b) of the Repurchase Agreement and all other requirements of the Program Documents.

The Seller further represents and warrants that (1)(a) with respect to the Eligible Mortgage Loans subject to the requested Transaction that are not Wet-Ink Mortgage Loans, the documents constituting the Mortgage Files (as defined in the Custodial and Disbursement Agreement) and (b) with respect to Eligible Mortgage Loans that are Wet-Ink Mortgage Loans, the Transaction Notice and the Seller Mortgage Loan Schedule, in each case as more specifically identified on the Seller Mortgage Loan Schedule delivered to the Purchaser and the Custodian (the "Receipted Assets"), have been or are hereby submitted to Custodian and such required documents are to be held by the Custodian for the Purchaser, (2) all other documents related to such Receipted Assets (including, but not limited to, mortgages, insurance policies, loan applications and appraisals) have been or will be created and held by Seller for Purchaser, (3) all documents related to such Receipted Assets withdrawn from Custodian shall be held by Seller for Purchaser, and (4)

C - 1

upon Purchaser's wiring of the Initial Purchase Price pursuant to Section 3(b) of the Repurchase Agreement, Purchaser will have purchased the Receipted Assets from the Seller.

**EXHIBIT D**

**FORM OF GOODBYE LETTER**

«Primary_Borrower»                                    [_____] [__], 20[  ]
«Mailing_address_line_1»
«Mail_city», «Mail_state» «Mail_zip»


RE:    Transfer of Mortgage Loan Servicing
       Mortgage Loan «Account_number»

Dear Customer:

First Guaranty Mortgage Corporation is the present servicer of your mortgage loan.  Effective [Date]  the servicing of your mortgage will be transferred to _____.  This transfer does not affect the terms and conditions of your mortgage, other than those directly related to servicing.  Because of the change in servicer, we are required to provide you with this disclosure.


First Guaranty Mortgage Corporation cannot accept any payments received after [Date].  Effective [Date], all payments are to be made to _____.  Any payments received by First Guaranty Mortgage Corporation after [Date]   will be forwarded to _____. _____ will be contacting you shortly with payment instructions.  Please make future payments to:

                         _____
                         Attn: _____
                         [Address]


If you currently make payments by an automatic checking or savings account deduction, that service will discontinue effective with the transfer date.  After the servicing transfer, you may request this service from _____.

In [Date], you will receive a statement from First Guaranty Mortgage Corporation reflecting the amount, if any, of the interest and taxes paid on your behalf in 20[  ].  A similar statement will be sent _____ for the period beginning [Date] through year-end.  Both statements must be added together for income tax purposes.

If you have any questions concerning your account through [Date], you should continue to contact First Guaranty Mortgage Corporation, at <Seller's Phone Number>, <HOURS OF OPERATION>.  Questions after the transfer date should be directed to _____Customer Service Department at 1-800-_____, Monday – Friday, 7 a.m. – 7 p.m. EST.

Sincerely,

Loan Servicing Department
First Guaranty Mortgage Corporation

## NOTICE OF ASSIGNMENT, SALE OR TRANSFER

## OF SERVICING RIGHTS

You are hereby notified that the servicing of your mortgage loan, that is the right to collect payments from you, is being assigned, sold or transferred.

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than the terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you a notice at least 15 days before the effective date, or at closing.  Your new servicer must also send you this notice no later than 15 days after this effective date.

This notification is a requirement of Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605).  You should also be aware of the following information, which is set out in more detail in Section 6 of RESPA (12 U.S.C. 2605).

During the 60 day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed upon you.

Section 6 of RESPA (12 U.S.C. 2605) gives you certain consumer rights.  If you send a **"qualified written request"** to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgement within 20 Business Days of receipt of your request. A **"qualified written request"** is written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number and your reasons for the request.  If you want to send a **"qualified written request"** regarding the servicing of your loan, it must be sent to this address:

_____

[Address]

No later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute.  During this 60 Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.  However, **this does not prevent the servicer from initiating foreclosure** if proper grounds exist under the mortgage documents.

A Business Day is any day excluding legal public holidays (State or federal), Saturday and Sunday.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals, in circumstances where servicers are shown to have violated the requirements of that Section.  You should seek legal advice if you believe your rights have been violated.

MIRANDA DISCLOSURE – For your protection, please be advised that we are attempting to collect a debt and any information obtained will be used for that purpose.  Calls will be monitored and recorded for quality assurance purposes.  If you do not wish for your call to be recorded please notify the customer service associate when calling.

BANKRUPTCY INSTRUCTION – Attention to any customer in Bankruptcy or who has received a bankruptcy discharge of this debt.  Please be advised that this letter constitutes neither a demand for payment of the captioned debt nor a notice of personal liability to any recipient hereof who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code. However, it may be a notice of possible enforcement of our lien against the collateral property, which has not been discharged in your bankruptcy.

**EXHIBIT E**

**FORM OF WAREHOUSE LENDER'S RELEASE**

(Date)

Barclays Bank PLC – Legal Department
745 Seventh Avenue, 20th Floor
New York, New York 10019
Attention: General Counsel

Barclays Capital – Operations
US-400 Jefferson Park
Whippany, New Jersey 07981
Attention: Matt Lederman
Telephone: (201) 499-4456
Email: WholeLoanOperati@barclayscapital.com

First Guaranty Mortgage Corporation
5800 Tennyson Parkway, Suite 450
Plano, TX 75024
Attention: General Counsel
Email: generalcounsel@fgmc.com

     Re:    Certain Mortgage Loans Identified on Schedule A hereto and owned by First Guaranty Mortgage Corporation

     Capitalized terms used herein but not defined herein have the meanings ascribed to such terms in the Master Repurchase Agreement, dated as of [_____], 2022 (as the same may be amended, supplemented, or otherwise modified from time to time, the "Repurchase Agreement"), between Barclays Bank PLC and First Guaranty Mortgage Corporation.

     The undersigned hereby releases all right, interest, lien or claim of any kind with respect to the Mortgage Loans described in the attached Schedule A, such release to be effective automatically without any further action by any party upon receipt in the account identified below in immediately available funds of $_____, representing a loan count of _____, in accordance with the following wire instructions:

          [                ]

          Very truly yours,

          [WAREHOUSE LENDER]

          By: _____

Name:
Title:


[SCHEDULE A TO EXHIBIT E – LIST OF MORTGAGE LOANS TO BE RELEASED]

**EXHIBIT F**

LIST OF DISAPPROVED MEMBERS OF THE MORTGAGE BACKED SECURITIES
DIVISION OF THE FIXED INCOME CLEARING CORPORATION

[NONE]

**EXHIBIT G**

**FORM OF ESCROW INSTRUCTION LETTER
TO BE PROVIDED BY SELLER BEFORE CLOSING**

The escrow instruction letter (the "Escrow Instruction Letter") shall also include the following instruction to the Settlement Agent (the "Escrow Agent"):

Barclays Bank PLC (the "Purchaser"), has agreed to provide funds ("Escrow Funds") to First Guaranty Mortgage Corporation to finance certain mortgage loans (the "Mortgage Loans") for which you are acting as Escrow Agent.  [Deutsche Bank National Trust Company], in its capacity as funds disbursement agent (the "Disbursement Agent"), will disburse such funds on behalf of Purchaser.

You hereby agree that (a) you shall receive such Escrow Funds from Purchaser to be disbursed by the Disbursement Agent in connection with this Escrow Instruction Letter, (b) you will hold such Escrow Funds in trust, without deduction, set-off or counterclaim for the sole and exclusive benefit of Purchaser until such Escrow Funds are fully disbursed on behalf of Purchaser in accordance with the instructions set forth herein, and (c) you will disburse such Escrow Funds on the date specified for closing (the "Closing Date") only after you have followed this Escrow Instruction Letter's requirements with respect to the Mortgage Loans.  In the event that the Escrow Funds cannot be disbursed on the Closing Date in accordance with the Escrow Instruction Letter, you agree to promptly remit the Escrow Funds to the Disbursement Agent by re-routing via wire transfer the Escrow Funds in immediately available funds, without deduction, set-off or counterclaim, back to the account specified in Disbursement Agent's incoming wire transfer.

You further agree that, upon disbursement of the Escrow Funds, you will hold the Mortgage File as specified in the Escrow Instruction Letter in escrow as agent and bailee for Purchaser, and will forward the Mortgage File and original Escrow Instruction Letter in connection with such Mortgage Loans by overnight courier (y) to the Disbursement Agent within three (3) Business Days following the date of origination.

You agree that all fees, charges and expenses regarding your services to be performed pursuant to this Escrow Instruction Letter are to be paid by Seller or its borrowers, and Purchaser shall have no liability with respect thereto.

You represent, warrant and covenant that you are not an affiliate of or otherwise controlled by Seller, and that you are acting as an independent contractor and not as an agent of Seller.

The provisions of this Escrow Instruction Letter may not be modified, amended or altered, except by written instrument, executed by the parties hereto and Purchaser.  You understand that Purchaser shall act in reliance upon the provisions set forth in this Escrow Instruction Letter, and that Purchaser is an intended third party beneficiary hereof.

Whether or not an Escrow Instruction Letter executed by you is received by the Disbursement Agent, your acceptance of the Escrow Funds shall be deemed to constitute your acceptance of this Escrow Instruction Letter.

FIRST GUARANTY MORTGAGE CORPORATION,
as Seller

By:_____
Name:
Title:

[ESCROW AGENT/SETTLEMENT AGENT SIGNATURE BLOCK]

**EXHIBIT H**

**FORM OF SELLER MORTGAGE LOAN SCHEDULE**

**[TO BE PROVIDED BY BARCLAYS]**

099900.13145 EMF_US 90535424v14