**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>FIRST GUARANTY MORTGAGE<br>CORPORATION, *et al.*,[1]<br><br>            Debtors. | Chapter 11<br><br>Case No. 22-10584 (CTG)<br><br>(Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION OPERATIONAL CASH FLOW FINANCING;
(II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL;
(III) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS; (IV) GRANTING ADEQUATE
PROTECTION; (V) MODIFYING THE AUTOMATIC STAY;
(VI) SCHEDULING A FINAL HEARING; AND
(VII) GRANTING RELATED RELIEF**

First Guaranty Mortgage Corporation ("FGMC") and Maverick II Holdings, LLC

("Maverick"), the above-referenced affiliated debtors and debtors in possession (together, the

"Debtors")[2] under chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy

Code"), in these chapter 11 cases (the "Chapter 11 Cases"), by and through the undersigned

counsel of record, hereby move (the "Motion"), pursuant to sections 105(a), 361, 362, 363(c)(2),

364(c)(1), 364(c)(2), 364(c)(3) and 364(e), 507 and 552, Rules 2002, 4001, 6003(b), 6004(a),

6004(h), and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

Rules 2002-1, 4001-1, 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"),

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621). The Debtors' mailing address is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Cash Flow DIP Documents (defined herein).

for entry of an interim order (substantially in the form attached hereto as **Exhibit A**, the "Interim Cash Flow DIP Order") and a final order (the "Final Cash Flow DIP Order", and together with the Interim Cash Flow DIP Order, the "Cash Flow DIP Orders") (i) authorizing the Debtors to obtain debtor-in-possession operational cash flow financing on the terms set forth herein, (ii) authorizing the Debtors to use cash collateral, (iii) granting liens and providing super-priority administrative expense status, (iv) granting adequate protection, (v) modifying the automatic stay, (vi) scheduling an interim hearing to approve the proposed Interim Order and a final hearing with respect to the relief requested herein (the "Final Hearing"); and (vii) granting related relief.

In further support of this Motion, the Debtors submit and rely on (i) the *Declaration of Aaron Samples, Chief Executive Officer of First Guaranty Mortgage Corporation In Support of Chapter 11 Petitions and First Day Pleadings* sworn to the date hereof (the "Samples Declaration" or the "First Day Declaration"), and (ii) the Declaration of Tanya Meerovich in support of this Motion (the "Meerovich Declaration"), each of which has been filed contemporaneously herewith and is incorporated by reference herein.

In further support of this Motion, the Debtors, by and through their proposed undersigned counsel, respectfully represent:

## PRELIMINARY STATEMENT

1.      The Debtors seek authority to enter into the Cash Flow DIP Facility (as defined below) provided by LVS II SPE XXXIV LLC, including any permitted assignees and successors (the "Cash Flow DIP Lender").[3]  The relief sought in this Motion is critical for the Debtors to obtain the necessary liquidity to pay their ordinary course operating costs and administrative expenses, maintain the enterprise value of their business, and, ultimately, provide the Debtors with an opportunity to reorganize.

2.      The Debtors request authority to, among other things, obtain the liquidity necessary to fund their operations, including the payment of vendors, employee payroll, facilities rent,

---

[3] The Cash Flow DIP Lender is an indirect subsidiary of a private investment managed by Pacific Investment Management Company LLC.  B2 FIE IV LLC, an affiliate of the DIP Lender, owns 100% of the equity interests of FGMC.

professional fees, and other necessary expenses.  The Cash Flow DIP Facility will provide the Debtors with up to $22 million in new money borrowing capacity (of which, $11 million will be available on an interim basis) to ensure the Debtors will have sufficient liquidity, affording all parties in interest with confidence that the Debtors will have ample funds available to honor all post-petition obligations.  Further, the Cash Flow DIP Facility will include additional amounts necessary to fund any shortfalls in the Debtors' existing pipeline of mortgage loans -- the Mortgage Loan Funding Amounts (as defined below), plus transaction costs and related expenses associated with a potential sale of the Debtors' loans to a third party to come -- the Pipeline Sale Transaction Funding Amounts (as defined below).  As part of the Cash Flow DIP Facility and in consideration of the new money advances contemplated thereunder, the Debtors also seek authority, subject to entry of the Final Cash Flow DIP Order, to roll-up certain Prepetition Bridge Loan Obligations (as defined below) owed to an affiliate of the Cash Flow DIP Lender (as defined below).  In sum, the Debtors request authority to, among other things, (i) borrow under the Cash Flow DIP Facility, (ii) grant the Cash Flow DIP Lender certain liens and superpriority claims to secure the obligations under the Cash Flow DIP Facility, (iii) use cash collateral, and (iv) provide adequate protection to the Prepetition Lenders (as defined below).

3.     For the reasons stated below and in the above-referenced declarations, the Debtors request that this Court grant the relief requested herein.

**JURISDICTION AND VENUE**

4.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory bases for the relief requested herein are sections 105(a), 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3) and 364(e), 507 and 552 the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003(b), 6004(a), 6004(h), and 9014, and 9013-1, and Local Rules 2002-1, 4001-1, 4001-2 and 9013-1.

## **RELIEF REQUESTED**

7.      By this Motion, the Debtors seek entry of the Cash Flow DIP Orders:

(a)      ***DIP Facility***: authorizing each of FGMC and Maverick, each in its capacity as a joint and several borrower and Debtor in the Chapter 11 Cases (each a "Borrower" and "Debtor" in the Chapter 11 Cases and together the "Borrowers" or the "Debtors") to obtain postpetition financing under a senior secured, super priority term loan facility (the "Cash Flow DIP Facility"), which includes (i) $22 million (of which $11 million will be available on an interim basis) plus (ii) the Mortgage Loan Funding Amounts, plus (iii) the Pipeline Sale Transaction Funding Amounts that will be available as set forth in, and subject to the terms and conditions of that certain term sheet by and between the Debtors and the Cash Flow DIP Lender, substantially in the form attached hereto as **<u>Exhibit B</u>** (the "Cash Flow DIP Term Sheet" which shall be followed by a Secured Superpriority Debtor-In-Possession Term Loan Agreement, the "Cash Flow DIP Credit Agreement", and the resulting new money loans, the "New Money DIP Loans" and related loan documentation (including the Cash Flow DIP Credit Agreement and the Cash Flow DIP Orders, the "Cash Flow DIP Documents"); and (iv) subject to entry of the Final Cash Flow DIP Order, a roll up facility consisting of the Prepetition Bridge Loan Obligations (as defined below) that are remaining after the Prepetition B2 FIE Financed Loan Obligations (as defined below) are refinanced by the DIP Repo Facility (such remaining Prepetition Bridge Loan Obligations, the "Roll-Up Obligations"), which Roll-Up Obligations shall be converted into a portion of the outstanding Cash Flow DIP Obligations.

(b)      ***DIP Documents***: authorizing the Debtors to borrow under the Cash Flow DIP Credit Agreement and enter into any and all agreements, documents, instruments and amendments delivered or executed in connection therewith;

(c)      ***Security and Priority***: authorizing the Debtors to grant, subject and subordinate to any Permitted Liens (as defined in the Cash Flow DIP Documents) and the Carve Out (as defined in the Cash Flow DIP Documents), senior liens and superpriority administrative expense status to the Cash Flow DIP Lender to secure the Cash Flow DIP Obligations (as defined in the Cash Flow DIP Documents), including continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the Cash Flow DIP Collateral (as defined in the Cash Flow DIP Documents);

(d)      *Adequate Protection*: approving of the form and manner of adequate protection as set forth herein and in the Cash Flow DIP Order;

(e)      *Automatic Stay*: vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code and any other applicable stay (including Bankruptcy Rule 6004) to the extent necessary to implement and effectuate the terms and provisions of the Cash Flow DIP Documents;

(f)      *Final Hearing*: scheduling the Final Hearing to consider the relief requested herein; and

(g)      *Other Relief*: granting related relief.

## BACKGROUND

8.      On the date hereof (the "<u>Petition Date</u>"), the Debtors each commenced voluntary cases for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in the chapter 11 cases.

9.      Prior to the Petition Date, FGMC was a full service, non-bank mortgage lender, offering a full suite of residential mortgage options tailored to borrowers' different financial situations.  It was one of the leading independent mortgage companies in the United States that originated residential mortgages through a national platform.  As described in more detail in the First Day Declaration, FGMC's business included the origination, purchase, service, sale and/or securitization of residential real estate mortgage loans.  However, just prior to the Petition Date, as a result of an extreme and unanticipated liquidity crisis and resultant inability to obtain additional capital, FGMC ceased all of its mortgage loan origination activity and separated nearly 80% of its workforce.  The Debtors commenced these Chapter 11 Cases to evaluate their options, accommodate their customers, and maximize and preserve value for all stakeholders.

10.      Additional information regarding the Debtors, including their business and the events leading to the commencement of these Chapter 11 Cases, is set forth in the First Day Declaration.

A.      **Summary of Terms of DIP Financing**[4]

11.     In accordance with Bankruptcy Rules 4001(b)–(d) and Local Rule 4001-2(a), the below chart summarizes the significant terms of the proposed Cash Flow DIP Orders and Cash Flow DIP Documents.

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Borrowers** Bankruptcy Rule 4001(c)(1)(B) | First Guaranty Mortgage Corporation | Cash Flow DIP Term Sheet at p. 1 |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Maverick II Holdings, LLC and each other direct and indirect subsidiary of FGMC that becomes a Debtor. | Cash Flow DIP Term Sheet at p. 1 |
| **DIP Lender** Bankruptcy Rule 4001(c)(1)(B) | LVS II SPE XXXIV LLC, including any permitted assignees and successors[5] | Cash Flow DIP Term Sheet at p. 1 |
| **DIP Facility** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(i)(B | The Cash Flow DIP Lender's commitment shall consist of (a) a senior secured, superpriority multi-draw term loan facility, in the aggregate amount not to exceed the sum of (i) $22,000,000 (the "Operating Amount") plus (ii) the Mortgage Loan Funding Amounts, plus (iii) the Pipeline Sale Transaction Funding Amounts, plus (iv) subject to entry of the Final Cash Flow DIP Order, a roll up facility consisting of the Prepetition Bridge Loan Obligations that are remaining after the Prepetition B2 FIE Financed Loan Obligations are refinanced by the DIP Repo Facility (*i.e.*, the Roll-Up Obligations), which Roll-Up Obligations shall be converted into a portion of the outstanding Cash Flow DIP Obligations. "Mortgage Loan Funding Amounts" shall mean amounts required to fund (i) the amount (not to exceed $16,000,000 in the aggregate) which comprises the excess, if any, of (A) the original principal balance of | Cash Flow DIP Term Sheet at p. 1, 2 |

---

[4] This summary is qualified in its entirety by reference to the applicable provisions of the Cash Flow DIP Credit Agreement. To the extent there exists any inconsistency between this summary and the provisions of the Cash Flow DIP Credit Agreement or the Cash Flow DIP Orders, the provisions of the Cash Flow DIP Credit Agreement or the Cash Flow DIP Orders, as applicable, shall control.

[5] The Cash Flow DIP Lender is an indirect subsidiary of a private investment managed by Pacific Investment Management Company LLC.  B2 FIE IV LLC, an affiliate of the DIP Lender, owns 100% of the equity interests of FGMC.

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | each mortgage loan originated by the Borrower (not to exceed $125 million in the aggregate) and sold to the Repo DIP Facility (as defined below) minus (B) the amount of funding provided by the Repo DIP Lender in respect of such originated loan, plus (ii) any mark to market losses incurred in connection with the Repo DIP Facility in an amount not to exceed $3,600,000 in the aggregate, plus (iii) all professional fees incurred in connection with the Repo DIP Facility in an amount not to exceed $600,000 in the aggregate, plus (iv) non-utilization fees and interest or pricing fees incurred under the Repo DIP Facility in amount not to exceed $200,000, in each case, solely to the extent not satisfied first from the proceeds of DIP Repo Collateral.<br><br>"Pipeline Sale Transaction Funding Amounts" shall mean amounts required to fund (i) a work fee in an amount acceptable to the Cash Flow DIP Lender in its sole discretion, with respect to a pipeline purchase facility transaction approved by the Cash Flow DIP Lender and consistent with the Approved Budget (the "Pipeline Sale") and (ii) any mark to market losses incurred in connection with the Pipeline Sale in an amount not to exceed $3,600,000.<br><br>Up to $11,000,000 out of the Operating Amount, plus access to the Mortgage Loan Funding Amounts and the Pipeline Sale Transaction Funding Amounts, during the interim period shall be made available to the DIP Borrower on an interim basis (subject to disbursement in accordance with the Approved DIP Budget (as defined below)) upon the date that the conditions precedent to the "Effective Date" under the Cash Flow DIP Facility have been satisfied, including entry of the Interim Cash Flow DIP Order.<br><br>The remainder of the Cash Flow DIP Facility shall be made available to the DIP Borrower (subject to disbursement in accordance with the Approved DIP Budget) following the entry of the Final Cash Flow DIP Order and subject to the satisfaction of the conditions precedent to such borrowings | |
| **Borrowing Limits**<br>Bankruptcy Rule | As set forth above. | *Id.* |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| 4001(c)(1)(B); Local Rule 4001-2(i)(A), (a)(iii) | | |
| **Budget** Bankruptcy Rule 4001(c)(1)(B) | Approved Budget is appended to the Interim Cash Flow DIP Order. | Interim Cash Flow DIP Order at Exhibit B |
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B) | Applicable Rate: 11% per annum  Default Interest Rate: Applicable Rate + 2.00% per annum  Interest calculated on the basis of 360-day year and payable in kind monthly in arrears. | Cash Flow DIP Term Sheet at p. 3 |
| **Expenses and Fees** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B), (M) | Upon entry of the Interim Cash Flow DIP Order and the Final Cash Flow DIP Order, as applicable, the Cash Flow DIP Lender shall receive, for the ratable benefit of the Cash Flow DIP Lender, a non-refundable closing fee ("DIP Closing Fees") in the amount of 2.00% of the new money made available under the Cash Flow DIP Facility authorized by such order, which such DIP Closing Fee shall be payable in kind, which first payment shall be earned in full and payable in cash upon the closing date of the Cash Flow DIP Facility (the "Cash Flow DIP Closing Date"). No DIP Closing Fees shall be payable with respect to any Roll-Up Obligations. | Cash Flow DIP Term Sheet at p. 4 |
| **Maturity Date** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(ii); Local Rule 4001-2(a)(i)(B), (M), (a)(ii | The termination date (the "Termination Date") of the Cash Flow DIP Facility means the earliest to occur of:  (a)    150 days after the Petition Date (the "Maturity Date");  (b)    35 days after the Petition Date if a final order approving the Cash Flow DIP Facility is not entered, unless extended by the Borrowers and the Cash Flow DIP Lender (the "Final Cash Flow DIP Order Deadline");  (c)    The effective date of an acceptable plan;  (d)    The date of consummation of the sale of all or substantially all of the assets of the Debtors; and | Cash Flow DIP Term Sheet at p. 4 |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | (e)   The date of termination of the Commitments (including acceleration thereof). Upon the Termination Date, the Cash Flow DIP Lender is entitled to immediate payment of any and all amounts owing under the Cash Flow DIP Documents. | |
| **Security and Priority** Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Subject in each case to the Carve-Out, all obligations owing by the Debtors to the Cash Flow DIP Lender under the Cash Flow DIP Facility shall at all times be secured by liens granted: (a)   to the Cash Flow DIP Lender, superpriority claims pursuant to sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code, against the Debtors to secure the Cash Flow DIP Obligations on a joint and several basis, which shall be junior in all respects to the DIP Repo Superpriority Claims (as defined below) against the Debtors; (b)   to the Cash Flow DIP Lender, liens, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, to secure the Cash Flow DIP Obligations, on the Cash Flow DIP Collateral (as defined below), including (i) a first-priority lien on the Debtors' unencumbered property, (ii) a first-priority priming lien on Prepetition Bridge Loan Collateral (as defined below), and (iii) junior liens on the DIP Repo Facility Backup Collateral and the Prepetition Loan Collateral (as both terms are defined below) other than Prepetition Bridge Loan Collateral (the "Cash Flow DIP Liens"); *provided* that, for the avoidance of doubt, the Cash Flow DIP Liens shall attach to the DIP Repo Facility Backup Collateral only to the extent that (i) the Transactions (as defined DIP Repo Facility Agreement) are recharacterized as other than sales or (ii) the Purchased Assets are repurchased by the Debtors; and (c)   to the DIP Repo Guarantor, subject to satisfaction of the DIP Repo Guarantee Lien Condition (as defined below), junior liens - and security interests, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, on the Cash Flow DIP Collateral and pari passu with the Cash Flow DIP Liens, to secure amounts actually advanced by the DIP Repo Guarantor under the DIP Repo Guarantee made by it | Interim Cash Flow DIP Order at ¶ 5, Recital O |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | |
|---|---|
| | for the benefit of the DIP Repo Facility Purchasers ("<u>DIP Repo Guarantee Liens</u>").

All liens authorized and granted pursuant to the Interim Cash Flow DIP Order or the Final Cash Flow DIP Order, as applicable, in each case, entered by the Bankruptcy Court approving the Cash Flow DIP Facility shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection. The Cash Flow DIP Lender shall be permitted, but not required, to make any filings, deliver any notices or take any other acts as may be desirable under state law or other law in order to reflect the perfection and priority of the Cash Flow DIP Lender's claims described herein.

As referenced herein, "<u>DIP Repo Superpriority Claims</u>" means the first-priority liens and security interests granted to the DIP Repo Parties and secured by the DIP Repo Facility Backup Collateral, as such terms are defined in the DIP Repo Motion.[6]

Subject to approval pursuant to the Interim DIP Repo Order, a portion of the proceeds of the DIP Repo Facility will be used to purchase the mortgage loans financed by the Prepetition Bridge Loans (as defined in the Interim DIP Repo Order, the "<u>B2 FIE Financed Loans</u>") and repay the portion of the Prepetition Bridge Loans Obligations used to finance the B2 FIE Financed Loans (as defined in the Interim DIP Repo Order, the "<u>Prepetition B2 FIE Financed Loan Obligations</u>").

Notwithstanding anything to the contrary in the Interim Cash Flow DIP Order or any other order of the Court or any other document, in no event shall the Cash Flow DIP Facility be paid down (by mandatory or voluntary prepayment) while any portion of the DIP Repo Obligations (as defined in the Interim DIP Repo Order) remain outstanding; *provided*, for the | |

---

[6] The "<u>DIP Repo Motion</u>" refers to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Enter into Repurchase Agreement Facilities; (II) Authorizing the Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business; (III) Granting Liens and Providing Super-Priority Administrative Expense Status; (IV) Modifying the Automatic Stay; (V) Scheduling an Interim Hearing to Approve the Proposed interim Order and a Final Hearing with Respect to the Relief Requested Herein; and (VI) Granting Related Relief*, filed contemporaneously herewith.

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | avoidance of doubt, that nothing in this sentence prohibits the repayment of the Prepetition B2 FIE Financed Loan Obligations. | |
| **Covenants** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(H), (M) | Usual and customary for facilities of this type, as further set forth in the Cash Flow DIP Documents. | Cash Flow DIP Term Sheet at p. 13, 14 |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(S) | Usual and customary for facilities of this type, as further set forth in the Cash Flow DIP Documents. | Cash Flow DIP Term Sheet at p. 16-18 |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi) | Failure to satisfy any of the following milestones (each, a "***Milestone***") by the date specified for such Milestone shall constitute an immediate event of default under the Cash Flow DIP Facility:<br><br>(a)    within four (4) business days after the Petition Date, the Interim DIP Order shall have been entered;<br><br>(b)    Within 30 days of the Petition Date, filing of a plan and disclosure statement in forms acceptable to the Cash Flow DIP Lender;<br><br>(c)    Within 60 days of the Petition Date, sale of all or substantially all of the Debtors' MSR portfolio and receipt of all proceeds from servicing released sales, which sales shall be acceptable to the Cash Flow DIP Lender;<br><br>(d)    Within 90 days of the Petition Date, sale of all or substantially all of FGMC's pipeline of loans, which sales shall be acceptable to the Cash Flow DIP Lender;<br><br>(e)    Within 90 days of the Petition Date, sale of all or substantially all of the repurchased loans and haircut unfunded loans as of the Petition Date, which sales shall be acceptable to the Cash Flow DIP Lender;<br><br>(f)    Within 90 days of the Petition Date, substantial cessation of all loan operations; | Cash Flow DIP Term Sheet at p. 7-8 |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | (g)      Within 35 days of the Petition Date, entry of the Final Cash Flow DIP Order in a form acceptable to the Cash Flow DIP Lender;<br><br>(h)      Within 50 days of the Petition Date, court approval of a disclosure statement, which order shall be in a form acceptable to the Cash Flow DIP Lender;<br><br>(i)      Within 110 days of the Petition Date, entry of a confirmation order, confirming a plan acceptable to the Cash Flow DIP Lender;<br><br>(j)      Within 120 days of the Petition Date, substantial plan consummation and occurrence of the effective date of such Acceptable Plan shall have occurred. | |
| **Carve-Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(i)(F), (M) | The "Carve-Out" means the sum of:<br><br>(a)      all fees required to be paid to the Clerk of this Court and to U.S. Trustee under section 1930(a) of title 28 of the United States Code and 31 U.S.C. § 3717 (collectively, the "Clerk and UST Fees");<br><br>(b)      to the extent allowed by the Court (regardless of whether the order allowing such fees is entered before or after the Carve-Out Trigger Notice), accrued and unpaid fees and expenses (the "Allowed Professional Fees"), in an aggregate amount on a line item basis not exceeding the budged amounts for such Allowed Professional Fees reflected in the Approved DIP Budget, incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the date of delivery by the Cash Flow DIP Lender of a Carve-Out Trigger Notice (as defined below) (collectively, the "Pre-Termination Amount"). For purposes of the Carve-Out, Allowed Professional Fees shall exclude (a) any restructuring, sale, success or similar fee of any Professional Person and (b) fees and expenses of any third party professionals employed by any individual member of the Creditors' Committee (if any)"); | Interim Cash Flow DIP Order at ¶ 9 |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY |
|---|

|  | (c)    any accrued and unpaid postpetition fee and expense claims, without regard to when such fees and expenses accrued, related to the appointment of the Chief Restructuring Officer and the Operations Consultant, in each case, in accordance with the Approved DIP Budget, including any interim or final approval as set forth in any order of the Court approving the appointment of any Chief Restructuring Officer and the Operations Consultant or, if applicable, any procedures approved by the Court relating to the compensation of the Chief Restructuring Officer and the Operations Consultant; *provided, however,* that any Court-approved bonus, transaction, success fees, completion fees, substantial contribution fees, or any other fees of similar import shall be paid solely from the net proceeds of the Court approved transaction giving rise to such award;

(d)    in the event of a conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, allowed fees and expenses incurred by a trustee and any professional retained by such trustee, in an aggregate amount not to exceed $25,000; <u>provided, however</u>, no portion of the Carve-Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Debtors owing to the Cash Flow DIP Lender or the Prepetition Bridge Lender or any of its affiliates, or (ii) liens or security interests in the collateral securing such indebtedness, including challenges to the perfection, priority or validity of the liens granted in favor of the Cash Flow DIP Lender or the Prepetition Bridge Lender or any of its affiliates with respect thereto;

(e)    Allowed Professional Fees of Professional Persons incurred on and after the first business day following delivery by the Cash Flow DIP Lender of the Carve-Out Trigger Notice, subject to an aggregate cap of $200,000 (collectively, the "<u>Post Trigger Notice Carve-Out Fee Cap</u>").

Upon the occurrence and during the continuance of any Cash Flow DIP Event of Default (as defined |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | below), the Cash Flow DIP Lender may deliver a written notice invoking the Post Trigger Notice Carve-Out Fee Cap (the "Carve-Out Trigger Notice") to the Debtors, the Debtors' lead restructuring counsel, the U.S. Trustee, and the lead counsel for the Creditors' Committee (if any). Promptly following the entry of the Interim Cash Flow DIP Order, the Debtors shall establish a segregated account, which shall not be subject to control of the Cash Flow DIP Lender (the "Carve-Out Account"), but which shall be funded by the Cash Flow DIP or available funds at FGMC in accordance with the Approved DIP Budget and in no event from any Excluded Asset. Amounts funded into the Carve-Out Account in accordance with clause (e) below shall be held in trust to pay the Carve-Out. | |
| **Prepayments** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(I) | Voluntary prepayments: the Debtors may, upon at least one business days' notice, prepay in full or in part, the Cash Flow DIP Facility, without premium or penalty; provided, however, each such partial prepayment shall be in a minimum amount to be agreed. Once repaid, Cash Flow DIP Loans may not be re-borrowed. Mandatory prepayments: Subject to the Cash Flow DIP Orders, usual and customary for facilities of this type and acceptable to the Cash Flow DIP Lender, including, in an amount equal to (a) 100% of net insurance and condemnation proceeds (excluding business interruption insurance proceeds), (b) 100% of net cash proceeds from the issuance of post-petition indebtedness not permitted by the Cash Flow DIP Documents and (c) 100% of the net cash proceeds of any asset sales (other than DIP Repo Facility Backup Collateral) (without any reinvestment rights or de minimis dollar carveouts). At the election of the Cash Flow DIP Lender in its sole discretion, all or a portion of such mandatory prepayments may be declined and available to the Debtors to be used in accordance with the Approved DIP Budget. Subject to the Carve-Out, all optional prepayments and mandatory prepayments (within one business day of receipt thereof) shall be applied as follows: first, to | Cash Flow DIP Term Sheet at p. 12-13 |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | pay accrued and unpaid interest on, and expenses in respect of, the obligations under the Cash Flow DIP Facility, to the extent then due and payable; and second, to repay any principal amounts or other obligations which have been advanced and are outstanding under the Cash Flow DIP Facility. | |
| **Conditions to Closing of DIP Facility** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E) | Usual and customary for facilities of this type, as further set forth in the Cash Flow DIP Documents. | Cash Flow DIP Term Sheet at p. 14-16 |
| **Parties with an Interest in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(i) | Prepetition Lenders consisting of B2 FIE XI LLC, Flagstar Bank, FSB, and Customers Bank | Interim Cash Flow DIP Order at fn 4 |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) | As adequate protection for, and equal in amount to, any diminution in the value of the interests of the Prepetition Lenders in the collateral described in the Prepetition Loan Facilities (the "Prepetition Loan Collateral"), each Prepetition Lender will receive, subject in each case to the Carve-Out, the following as adequate protection: (a)      a superpriority administrative expense claim against each of the Debtors solely to the extent of any diminution in value of such Prepetition Lender's Prepetition Loan Collateral, which shall be senior to all other administrative expense or other claims, but subject and subordinate to (i) the Cash Flow DIP Superpriority Claims, (ii) the DIP Repo Superpriority Claims, and (iii) the Carve-Out. (b)      a replacement security interest and lien on the same property of the Debtors on which a perfected, first-priority security interest and lien was held before the Petition Date pursuant to such Prepetition Lender's Prepetition Loan Documents, subordinate only to (i) Liens permitted to be senior under such Prepetition Lender's Prepetition Loan Documents, (ii) the Cash | Interim Cash Flow DIP Order at ¶ 15 |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | Flow DIP Liens, (iii) the DIP Repo Guarantee Liens, and (iv) the Carve-Out. | |
| **Determination Regarding Prepetition Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) | Debtors to stipulate as to the validity, perfection and priority of the claims and liens of the Prepetition Bridge Lender. | Interim Cash Flow DIP Order at Recital F |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of the Final Cash Flow DIP Order, the Debtors would provide a lien on proceeds of avoidance actions in favor of the Cash Flow DIP Lender. | Interim Cash Flow DIP Order at ¶ 5(a)(ii) |
| **Effect of Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii), (vii), (viii) | The findings set forth in the Cash Flow DIP Orders and the Debtors' Stipulations shall be binding upon the Debtors, the Creditors' Committee and all other parties in interest in the Chapter 11 Cases and in any successor cases in all circumstances, subject to a "Chapter 11 Challenge Period" that means (i) with respect to parties-in-interest other than the Creditors' Committee, seventy-five (75) calendar days after entry of the Final Cash Flow DIP Order, and (ii) with respect to the Creditors' Committee, sixty (60) calendar days after the appointment of the Creditors' Committee. If a Creditors' Committee is appointed, the Creditors' Committee shall be subject to a budget not to exceed $30,000 in connection with the investigation and prosecution of any challenge; *provided*, that any fees, expenses or costs incurred by the Creditors' Committee in excess of the Investigation Budget shall not constitute an allowable administrative expense claim, including for purposes of section 1129(a)(9)(A) of the Bankruptcy Code. | Interim Cash Flow DIP Order at Recital F and ¶ 23, 24 |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv); Local Rule 4001-2(a)(i)(S) | The automatic stay imposed under section 362(a) of the Bankruptcy Code is modified as necessary to effectuate all of the terms and provisions of the Cash Flow DIP Orders, including, without limitation, to: (a) permit the Debtors to grant the applicable lien(s); (b) permit the Debtors to perform such acts as the Cash Flow DIP Lender may request, in its reasonable discretion, to assure the perfection and priority of the liens granted herein; (c) permit the Cash Flow DIP | Interim Cash Flow DIP Order at ¶ 16(c), 21 |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | Lender, to file, in its sole discretion as it deems necessary or advisable, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the applicable liens; (d) permit the Debtors to incur all liabilities and obligations to the Cash Flow DIP Lender under the Cash Flow DIP Documents and the Cash Flow DIP Orders; (e) authorize the Debtors to pay, and the Cash Flow DIP Lender to retain and apply, payments made in accordance with the terms of the Cash Flow DIP Orders and the Cash Flow DIP Documents; and (f) permit the Debtors and Cash Flow DIP Lender to take any other actions necessary and appropriate to implement the terms of the Cash Flow DIP Orders and the Cash Flow DIP Documents, including, without limitation, the implementation of applicable reserves. | |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | Each Borrower and Guarantor shall indemnify the Cash Flow DIP Lender and its affiliates and their respective advisors, investment managers, employees, officers, directors, agents, subagents, and representatives in relation to the Cash Flow DIP Documents and the Cash Flow DIP Orders, except to the extent arising solely out of fraud or willful misconduct of the Cash Flow DIP Lender. | Cash Flow DIP Term Sheet at p. 18, 19 |
| **Section 506(c) Waiver and Section 552(b) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to entry of the Final Cash Flow DIP Order, the Debtors have agreed to waive claims against Cash Flow DIP Lender for surcharge of expenses pursuant to section 506(c) of the Bankruptcy Code and to waive claims under section 552(b)(1) of the Bankruptcy Code based upon the "balance of the equities". | Interim Cash Flow DIP Order at Recital L and M |
| **Any Provision That Limits the Court's Power to Enter Future Orders** Local Rule 4001-(a)(i)(C) | N/A | |
| **Any Provision that Provides for the** | N/A | |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Funding of Non-Debtor Affiliates**<br><br>Local Rule 4001-(a)(i)(D) | | |
| **Any Provision that Provides for Postpetition Liens on Unencumbered Assets**<br><br>Local Rule 4001-(a)(i)(G) | The Cash Flow DIP Collateral includes a first-priority lien on the Debtors' unencumbered property. | Interim Cash Flow DIP Order at ¶ 5 |
| **In Jointly Administered Cases, any Provision Governing Joint Liability of the Debtors**<br><br>Local Rule 4001-(a)(i)(J) | Both Debtors are liable under the Cash Flow DIP Facility. | Cash Flow DIP Term Sheet at p. 1 |
| **Any Provision that Requires the Debtor to Pay an Agent or Lender's Expenses and Attorneys' Fees with no Notice or Review by the UST and Committee**<br><br>Local Rule 4001-(a)(i)(K) | N/A | |
| **Any Provision that Prohibits the Use of Estate Funds to Investigate Liens and Claims of Prepetition Lenders** | No portion of the Carve-Out, any cash collateral, any other Cash Flow DIP Collateral, or any proceeds of the Cash Flow DIP Facility shall be used for the payment of professional fees, disbursements, costs or expenses incurred by any person, including, without limitation, the Debtors, the Creditors' Committee, any trustee or other estate representative appointed in the Cases or any Successor Case, or any other party, for any of the | Interim Cash Flow DIP Order at ¶ 12 |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| Local Rule 4001-(a)(i)(L) | following actions or activities without the written consent of the Cash Flow DIP Lender: (a) to seek authorization to obtain liens or security interests on any asset of the Debtors that are senior to, or on a parity with, the Cash Flow DIP Liens, the Cash Flow DIP Collateral, or the Cash Flow DIP Superpriority Claims; (b) to seek authorization to obtain claims against the Debtors or their property that are senior to, or *pari passu* with, the liens and claims identified in the preceding sub-clause (a); or (c) except as expressly set forth herein, directly or indirectly prepare, assert, join, commence, support, or prosecute any action for any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination, or any other relief against, or adverse to the interests of, the Cash Flow DIP Lender and any of its representatives with respect to any transaction, occurrence, omission, action, or other matter, including, without limitation, (i) any Avoidance Action, (ii) any "lender liability" claims and causes of action, (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Cash Flow DIP Liens, the Cash Flow DIP Superpriority Claims, or the Cash Flow DIP Obligations, (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid, or subordinate, in whole or in part, any of the obligations identified in the preceding clause (iii), (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to the parties hereunder or under any of the documents referred to herein, including claims, proceedings, or actions that might prevent, hinder or delay any of such parties' assertions, enforcement, realizations or remedies on or against their collateral and rights herein or (vi) objecting to, contesting with, or interfering with, in any way, such parties' enforcement or realization upon any of their collateral or rights, once a Cash Flow DIP Event of Default has occurred; *provided* that the Debtors shall be permitted to challenge the validity of any alleged Cash Flow DIP Event of Default. | |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Any Provisions Granting Cross-Collateralization**<br><br>Local Rule 4001-2(a)(i)(N) | N/A | |
| **Any Provisions Deeming Prepetition Debt to be Postpetition Debt**<br><br>Local Rule 4001-(a)(i)(O) | The portion of the Prepetition Bridge Obligations related to mortgage loans financed by the Bridge Lender shall be refinanced by the Repo DIP facility to be provided by Barclays Bank PLC (the "Repo DIP Facility"). Upon entry of the Final Cash Flow DIP Order, certain of the obligations under the Prepetition Bridge Loan Agreement (as defined below) shall be rolled-up and converted into a portion of the outstanding Cash Flow DIP Obligations under the Cash Flow DIP Facility, immediately junior in priority to the Cash Flow DIP Facility (the "Roll-Up Obligations"). | Interim Cash Flow DIP Order at p. 2, Recital O |
| **Any Provisions Priming Secured Liens Without Consent of Lienholder**<br><br>Local Rule 4001-(a)(i)(P) | N/A | |
| **Any Provisions Binding the Estate to Validity, Perfection or Amount of Secured Debt**<br><br>Local Rule 4001-2(a)(i)(Q) | The findings set forth in the Cash Flow DIP Orders and the Debtors' Stipulations shall be binding upon the Debtors, the Creditors' Committee and all other parties in interest in the Chapter 11 Cases and in any successor cases in all circumstances, subject to the Chapter 11 Challenge Period. | Interim Cash Flow DIP Order at Recital F and ¶ 23, 24 |
| **Provisions that Immediately Approve All Terms and Conditions of the Underlying Loan Agreement** | The Motion seeks authorization and approval of the Cash Flow DIP Documents. | Interim Cash Flow DIP Order at ¶ 1 |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| Local Rule 4001-2(a)(i)(R) | | |
| **Provisions Limiting What Parties in Interest May Raise at Emergency Hearings** <br><br> Local Rule 4001-2(a)(i)(T) | N/A | |
| **Provisions that Grant Liens on Avoidance Actions** <br><br> Local Rule 4001-2(a)(i)(U) | Addressed above. | |
| **Provisions that Immediately Waive the Debtor's Rights under Section 506(c)** <br><br> Local Rule 4001-2(a)(i)(V) | Surcharge waiver subject to entry of Final Cash Flow DIP Order. | Interim Cash Flow DIP Order at Recital L |
| **Provisions that Affect the Court's Power to Consider the Equities of the Case under Section 552(b)(1)** <br><br> Local Rule 4001-2(a)(i)(W) | Equities of the case waiver subject to entry of Final Cash Flow DIP Order. | Interim Cash Flow DIP Order at Recital L |
| **Provisions that Immediately Shield the Lender from the Equitable Doctrine of Marshalling** <br><br> Local Rule 4001-2(a)(i)(X) | Marshaling waiver subject to entry of Final Cash Flow DIP Order. | Interim Cash Flow DIP Order at Recital M |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Budget**<br><br>Local Rule 4001-2(a)(iii) | The Debtors believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget. | Interim Cash Flow DIP Order at Exhibit B |

### B.    The Debtors' Prepetition Indebtedness

### i    The Prepetition Repo Facilities

12.    As is customary in the industry, the Debtors finance their mortgage loan origination platforms through asset-backed secured lending facilities.  Certain of the Debtors' secured lending facilities are structured as master repurchase agreements.  The Debtors, through FGMC, have three (3) active master repurchase facilities with the following financial institutions: (i) Customers Bank, (ii) Texas Capital Bank, National Association, and (iii) J.V.B.  Financial Group, LLC, as successor by merger to C&Co./PrinceRidge LLC (each a "Prepetition Repo Buyer" and, collectively, the "Prepetition Repo Buyers"), pursuant to the following agreements:

(a)    Second Amended and Restated Master Repurchase Agreement, dated as of October 9, 2019 (as amended, restated, supplemented or otherwise modified from time to time), by and between FGMC and Customers Bank;

(b)    Mortgage Warehouse Agreement, dated as of August 14, 2020 (as amended, restated, supplemented or otherwise modified from time to time), by and between FGMC and Texas Capital Bank, National Association; and

(c)    Master Repurchase Agreement, dated as of October 25, 2012 (as amended, restated, supplemented or otherwise modified from time to time), by and between FGMC and J.V.B Financial Group, LLC, as successor by merger to C&Co./PrinceRidge LLC (each a "Prepetition Repo Facility" and, collectively, the "Prepetition Repo Facilities").

13.    Pursuant to the terms of the related Prepetition Repo Facilities, the Debtors sell newly originated mortgage loans to the related counterparty to finance the origination of such mortgage loans, and typically repurchase such mortgage loans from the related Prepetition Repo Buyer within a certain time period following origination.  The Debtors generally obtain advances of less than 100% of the principal balance of such mortgage loans from the related Prepetition

Repo Buyer, which requires the Debtors to use working capital to fund the remaining equity portion of the principal balance of the mortgage loans, which is often referred to as the haircut.

### ii    Other Prepetition Warehouse Financing Facilities

14.    Certain of the Debtors' warehouse financing facilities are structured as secured loan agreements.  The Debtors, through FGMC, have two (2) active secured loan warehouse facilities with the following financial institutions: (i) Customers Bank, and (ii) Flagstar Bank, FSB (each a "Prepetition Lender" and, collectively, with the Prepetition Bridge Lender (as defined below), the "Prepetition Lenders"), pursuant to the following agreements:

(a)    Amended and Restated Loan Agreement, dated as of July 17, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Customers Loan Agreement"), by and between FGMC and Customers Bank; and

(b)    Mortgage Warehouse Loan and Security Agreement, dated as of June 30, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Flagstar Loan Agreement", together with the Customers Loan Agreement, each a "Prepetition Loan Facility" and, collectively with the Prepetition Bridge Loans, the "Prepetition Loan Facilities"), by and between FGMC and Flagstar Bank, FSB.

15.    Pursuant to the terms of these Prepetition Loan Facilities, the Debtors pledge mortgage loans, cash, and related collateral to secure advances to finance the originations of such mortgage loans.  The Debtors obtain advances of less than 100% of the principal balance of the mortgage loans under the Prepetition Loan Facilities, which requires the Debtors to use working capital to fund the remaining portion of the principal balance of the mortgage loans.

16.    In addition, a portion of FGMC's obligations under the Customers Loan Agreement, not to exceed $25 Million, is subject to a full recourse guarantee pursuant to that certain Guaranty and Suretyship Agreement, dated as of September 30, 2020 (as amended, restated, supplemented or otherwise modified from time to time), by LVS II Offshore, L.P., in favor of Customers Bank.

### iii.    Prepetition Bridge Financing

17.    Pursuant to that certain Second Amended and Restated Secured Promissory Note, executed by FGMC, as borrower, and in favor of B2 FIE XI LLC, as lender, ("Prepetition Bridge Lender") (as amended, restated, supplemented or otherwise modified from time to time, the

"<u>Prepetition Bridge Loan Agreement</u>"), extended certain loans and other financial accommodations to the Debtors (the "<u>Prepetition Bridge Loans</u>").  The Prepetition Bridge Lender is an affiliate of the Cash Flow DIP Lender.

18.     The Prepetition Bridge Lender is owed on account of the Prepetition Bridge Loans the principal amount of $18,350,771 (such obligations, together with all interest, fees, reimbursement obligations, indemnification obligations and all other "Obligations" under and as defined in the Prepetition Bridge Loan Agreement, the "<u>Prepetition Bridge Loan Obligations</u>").

19.     Pursuant to the Prepetition Bridge Loan Agreement, the Debtors pledged to the Prepetition Bridge Lender a senior secured lien on substantially all of its personal property assets (the "<u>Prepetition Bridge Loan Liens</u>"), including all proceeds thereof, whether then owned and existing or thereafter acquired or arising (the "<u>Prepetition Bridge Loan Collateral</u>").

20.     The Debtors seek to roll-up a portion of the Prepetition Bridge Loan Obligations into the Cash Flow DIP Facility.  The remaining Bridge Loan Obligations will be refinanced as requested by the DIP Repo Motion.

**C.     The Debtors Need for Postpetition Financing**

21.     An immediate and critical need exists to obtain the Cash Flow DIP Facility and to use cash collateral in order to permit, among other things, the continued operation of the Debtors' businesses in the ordinary course, to administer and preserve the value of their estates, to satisfy administrative expenses, and to satisfy other working capital and operational needs.  The Debtors also have an existing pipeline of mortgage loans that requires funding in order for the Debtors to satisfy their obligations to prospective borrowers.

22.     The Cash Flow DIP Facility will provide the Debtors with up to $22 million in new money borrowing capacity (of which, $11 million will be available on an interim basis) to ensure the Debtors will have sufficient liquidity for operations and other administrative obligations. Further, the Cash Flow DIP Facility will include additional amounts necessary to fund any shortfalls in the Debtors' existing pipeline of mortgage loans -- the Mortgage Loan Funding Amounts, plus transaction costs and related expenses associated with a potential sale of the

Debtors' loans to a third party to come -- the Pipeline Sale Transaction Funding Amounts.  As part of the Cash Flow DIP Facility and in consideration of the new money advances contemplated thereunder, the Debtors also seek authority, subject to entry of the Final Cash Flow DIP Order, to roll-up certain Prepetition Bridge Loan Obligations (as defined below) owed to an affiliate of the Cash Flow DIP Lender (as defined below).

23.     In the absence of the availability of the Cash Flow DIP Facility in accordance with the terms of the Cash Flow DIP Documents, the continued operation of the Debtors' business would not be possible.  The access of the Debtors to sufficient working capital and liquidity through the Cash Flow DIP Facility and the use of cash collateral is necessary and vital to avoid serious and irreparable harm to the Debtors and to achieve an orderly wind down of the Debtors' businesses.

**D.      The Debtors' Efforts to Obtain Postpetition Financing**

24.     As further detailed in the declarations in support of the Motion, the Debtors have been impacted by the series of macroeconomic challenges, including a steep rise in interest rates. The combination of continued losses related to the Debtor's lower origination volumes, and volatile daily margin calls on hedge positions has led to drastic reductions in the Debtors' unrestricted cash and initiated a liquidity crisis.  The Debtors and their professionals have worked collaboratively to secure debtor in possession financing.  The Debtors and their professionals approached multiple potential sources of debtor-in-possession financing, including commercial banks and other financial institutions.  No party offered potential financing on terms more favorable than the Cash Flow DIP Facility.

25.     Given the unique and extensive nature of the Debtors' capital requirements, in the absence of the availability of the Cash Flow DIP Facility, the Debtors' continued operations would not be possible and serious and irreparable harm to the Debtors, their estate, and their creditors would occur.  Thus, the ability of the Debtors to preserve and maintain the value of their assets and maximize the return for creditors requires the availability of capital from the Cash Flow DIP Facility.

## **RELIEF REQUESTED SHOULD BE GRANTED**

A.    **Entry into the Cash Flow DIP Facility is an Exercise of the Debtors' Sound Business Judgment**

26.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, among other things, an exercise of "sound and reasonable business judgment"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

27.    Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-514 (Bankr. D. Utah. Oct. 8, 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy]

Code").  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc*., No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

28.     In determining whether the Debtors have exercised sound business judgment in entering into the Cash Flow DIP Facility, the Court should consider the economic terms of the financing under the totality of circumstances.  *See* Hr'g Tr. at 734-35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as they once were previously); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).  Moreover, the Court may appropriately take into consideration noneconomic benefits to the Debtors offered under the proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

29.     The Debtors' decision to enter into the Cash Flow DIP Facility is an exercise of their sound business judgment.  The Cash Flow DIP Facility is the best financing option available under present circumstances and the Debtors have satisfied the legal requirements to incur the obligations under the Cash Flow DIP Facility on the terms and conditions set forth in the Cash

Flow DIP Documents. The Debtors believe that the Cash Flow DIP Documents contain terms that are fair, reasonable, and in the best interest of the Debtors and their estates. Accordingly, the Debtors respectfully submit that they should be authorized to enter into the Cash Flow DIP Documents and to obtain access to the Cash Flow DIP Facility.

**B.      Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

30.      The Debtors propose to obtain financing under the Cash Flow DIP Facility by providing security interests and liens as set forth in the Cash Flow DIP Documents and described above. The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to incur secured or superpriority debt under certain circumstances. Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

31.      To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (finding that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon a showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584

(S.D.N.Y. 2001) (finding that superpriority administrative expenses should be authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (finding that credit was unavailable absent a senior priming lien because the debtor had made unsuccessful contact with other financial institutions in the relevant geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that the fact that two national banks refused to grant unsecured loans was sufficient to support the conclusion that the requirements of section 364 were met); *In re Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and finding that debtor made reasonable efforts to satisfy the requirements of section 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

32.     Courts have articulated a three-part test to determine whether a debtor is entitled to enter into financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (i.e., by allowing an administrative claim);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*, 115 B.R. at 37–40; *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

33.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the

Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

34.    As described above and in the declarations in support of the Motion, the Debtors are unable to obtain credit without the protections afforded by section 364(c) of the Bankruptcy Code.  Thus, the Debtors determined that the Cash Flow DIP Facility, to the extent that such financing is necessary, provides the best opportunity available to the Debtors under the circumstances to fund the Chapter 11 Cases.  Therefore, approving superpriority claims and liens on property of the Debtors' estates in favor of the Cash Flow DIP Lender, as necessary, is reasonable and appropriate.

###    C.    Debtors Should Be Authorized to Use Cash Collateral

35.    For the reasons set forth herein and as described in the declarations in support of the Motion, the Debtors require the use of Cash Collateral of the Prepetition Lenders and the Prepetition Repo Buyers in accordance with the Budget for working capital for general corporate purposes and to fund the Chapter 11 Cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease
> in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

36.    Further, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  Section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (*en banc*).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as

granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

37.     Here, the Debtors have agreed to provide the Prepetition Lenders with adequate protection in the form of postpetition liens and superpriority claims as set forth above, which the Debtors believe is sufficient to cover any potential diminution in value.  The Cash Flow DIP Facility and use of cash collateral are necessary to allow the Debtors to continue the operation of their businesses and execute an orderly wind down of their businesses, which will preserve and maximize the value of the Debtors and their estates for the benefit of all stakeholders, including the Prepetition Lenders.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

**D.     The Carve-Out is Appropriate**

38.     The Carve-Out shall be senior to all liens and claims securing the Cash Flow DIP Facility, the adequate protection liens and claims and all other forms of adequate protections, liens, or claims securing the Cash Flow DIP Obligations or the other secured obligations.

39.     Without the Carve-Out, the Debtors' estates may be deprived of possible rights and powers if the services for which professionals may be compensated is restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of these cases by ensuring that assets remain

for the payment of U.S. Trustee fees and professional fees, notwithstanding the grant of superpriority claims and replacement liens as part of the proposed adequate protection.

      **E.**      **The Roll-Up is Appropriate**

      40.      The proposed Interim Cash Flow DIP Order includes the approval of the Roll-Up DIP Loan, which has the effect of refinancing certain of the Prepetition Bridge Obligations. The Roll-Up DIP Loan is fair, equitable, and in the best interest of the Debtors' estates; further, the Debtors' acceptance of the Roll-Up DIP Loan is a sound exercise of the Debtors' business judgment.

      41.      Courts in this district have regularly approved roll-ups made pursuant to debtor-in-possession financing, including on an interim basis, in recognition of the fact that such terms are often needed for chapter 11 debtors to secure favorable postpetition financing. *See, e.g., In re True Religion Apparel, Inc.*, No. 20-10941 (CSS) (Bankr. D. Del. Apr. 15, 2020) [D.I. 78] (authorizing a DIP facility comprising (among other things) $1,700,000 in new money to be provided following the entry of an interim DIP order, $6,700,000 of new money to be provided following the entry of the final DIP order and a rollup of approximately $45 million in prepetition obligations pursuant to interim order); *In re APC Automotive Techs. Intermediate Hldgs., LLC*, Case No. 20- 11466 (CSS) (Bankr. D. Del. June 4, 2020) (authorizing a full roll-up of approximately $90 million of an asset-based lending (ABL) facility upon entry of an interim order); *In re Blackhawk Mining LLC*, Case No. 19-11595 (LSS) (Bankr. D. Del. Aug. 13, 2019) (authorizing an approximately $240 million DIP that included a roll-up of $70 million in prepetition term loan debt and up to $82 million of prepetition ABL debt pursuant to interim order); *In re ATD Corp.*, Case No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing an approximately $1.23 billion DIP which included a full roll-up of the prepetition ABL outstanding principal of $639 million pursuant to interim order); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) [Bank. D. Del. Apr. 16, 2018) [D.I. 177] (authorizing the roll-up of prepetition loans provided by an insider of the debtor on an interim basis, applying the business judgment standard); *In re Bon-Ton Stores, Inc.*, Case

No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to interim order).

42.     The Roll-Up DIP Loan is appropriate in these Chapter 11 Cases for several reasons. First, the Cash Flow DIP Lender provided the Prepetition Bridge Financing as a bridge loan to cover operational costs of the Debtors while the Debtors searched for alternative financing.  The Debtors were not able to procure alternative financing and, as such, the Debtors and the Cash Flow DIP Lender agreed to the terms of the Cash Flow DIP Facility.  The Cash Flow DIP Lender would not otherwise extend credit to the Debtors without the roll up provisions included in the Cash Flow DIP Documents.  Accordingly, the Roll-Up DIP Loan is an appropriate exercise of the Debtors' business judgment and should be approved.

**F.      The Debtors Should Be Authorized to Pay Fees Required by the Cash Flow DIP Documents to the Extent that the Cash Flow DIP Facility is Consummated**

43.     As specified under the Cash Flow DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees and other obligations to the Cash Flow DIP Lender.  The fees and other obligations under the Cash Flow DIP Documents were negotiated in good faith and at arm's length and represent the most favorable terms to the Debtors on which the Cash Flow DIP Lender would agree to make the Cash Flow DIP Facility available.  The Debtors considered the fees when determining in their sound business judgment whether entry into the Cash Flow DIP Facility constituted the best path forward for the Debtors, and the Debtors determined that paying these fees in order to obtain the financing under the Cash Flow DIP Facility is in the best interests of the Debtors' estates.  Accordingly, the Court should authorize the Debtors to pay the fees under the Cash Flow DIP Facility.

**G.      The Cash Flow DIP Lender Should Be Deemed A Good Faith Lender Under Section 364(e)**

44.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

45.     Here, and as explained in the declarations in support of the Motion, the Cash Flow DIP Documents are the result of (i) the Debtors' reasonable judgment that the Cash Flow DIP Lender provided the best (and only) postpetition financing available under the circumstances and (b) extended arms' length, good-faith negotiations between the Debtors and the Cash Flow DIP Lender.  Under the circumstances, the terms and conditions of the Cash Flow DIP Documents are fair and reasonable, and the proceeds of the Cash Flow DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the Cash Flow DIP Orders and the Cash Flow DIP Documents and in accordance with the Budget (subject to the permitted variances).  Accordingly, the Court should find that the Cash Flow DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and that the Cash Flow DIP Lender thus is entitled to all of the protections afforded by that section.

### H.    Modification of Automatic Stay is Warranted

46.     The relief requested herein contemplates a modification and vacation of the automatic stay to permit the Debtors to, among other things, (a) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; and (b) implement the terms of the Cash Flow DIP Orders, including payment of all amounts referred to in the Cash Flow DIP Documents.

Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances. Accordingly, the Debtors request that the Court modify the automatic stay solely to the extent contemplated by the Cash Flow DIP Credit Agreement and the Cash Flow DIP Orders.

## I.    Interim Approval Should Be Granted

47.    Bankruptcy Rules 4001(b)(2) and (c)(2) each provide that, with respect to motions for authorization to use cash collateral, and motions for authority to obtain credit, respectively:

> The court may commence a final hearing on a motion . . . no earlier than 14 days after service of the motion.  If the motion so requests, the court may conduct a [preliminary] hearing before such 14-day period expires, but the court may authorize . . . [relief] only . . . necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

48.     Similarly, to the extent the Debtors are seeking authority to use, sell, or otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003(b) provides that the Court may only grant immediate relief to the extent it is necessary to avoid immediate and irreparable harm.

49.    Generally, courts find "immediate and irreparable harm" exists where loss of the business threatens ability to reorganize.  *See Ames*, 115 B.R. at 36 n.2.  Granting the relief requested on an interim basis is left to the Court's discretion as informed by the facts of the case. In examining requests for interim relief, courts apply the same business judgment standard applicable to other business decisions, and a debtor should be entitled to borrow those amounts that it believes prudent in the operation of its business.  *See In re Trans World Airlines, Inc.*, 163 B.R. at 974; *Ames*, 115 B.R. at 40.  After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. *Ames*, 115 B.R. at 36.

50.    The Debtors seek expedited approval of the relief requested, in light of the immediate and irreparable harm that the Debtors' estates will incur unless they obtain the financing and use of cash collateral necessary to sustain their businesses.  Absent sufficient funds, the

Debtors' businesses and assets will quickly erode to the detriment of the Debtors' estates and creditors. For the reasons set forth above, the Debtors submit that immediate access to Cash Flow DIP Facility is necessary to preserve the value of the Debtors' estates for the benefit of their creditors and other parties in interest.

## RESERVATION OF RIGHTS

51.     Except as may be provided in the Cash Flow DIP Orders entered by the Court approving the Cash Flow DIP Facility, nothing contained herein is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors or any liens against the Debtors' property, (b) an agreement or obligation to pay any claims, (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (d) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (e) an approval, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code, (f) a limitation on the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to the Cash Flow DIP Orders once entered. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Cash Flow DIP Orders is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently. Nothing contained in the Cash Flow DIP Orders will be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

## WAIVER OF ANY APPLICABLE STAY

52.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the 14-day

stay imposed by Bankruptcy Rule 6004(h), to the extent applicable, as the exigent nature of the relief sought herein justifies immediate relief.

### REQUEST FOR FINAL HEARING

53.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for consideration of entry of the Final Cash Flow DIP Order.

54.     The Debtors request that they be authorized to serve a copy of the signed Interim Cash Flow DIP Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

### NOTICE

55.     The Debtors will provide notice of this motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (d) counsel to the Cash Flow DIP Lender, and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b).

### NO PRIOR REQUEST

56.     No prior request for the relief sought in this motion has been made to this or any other court.

### CONCLUSION

WHEREFORE the Debtors respectfully request entry of the Cash Flow DIP Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: June 30, 2022                    **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Tel:     (302) 652-4100
Fax:    (302) 652-4400
Email: ljones@pszjlaw.com
            tcairns@pszjlaw.com

-and-

Samuel R. Maizel (*Pro Hac Vice* pending)
Tania M. Moyron (*Pro Hac Vice* pending)
**DENTONS US LLP**
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Email: samuel.maizel@dentons.com
            tania.moyron@dentons.com

Lauren Macksoud (*Pro Hac Vice* Pending)
Claude D. Montgomery (*Pro Hac Vice* Pending)
**DENTONS US LLP**
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 632-8390
Email: lauren.macksoud@dentons.com
            claude.montgomery@dentons.com

David F. Cook (DE Bar No. 6352)
**DENTONS US LLP**
1900 K Street, NW
Washington, DC 20006
Telephone:  (202) 496-7500
Email:  david.f.cook@dentons.com

*Proposed Counsel for Debtors and Debtors in Possession*

# **EXHIBIT A**

**Interim Cash Flow DIP Order**

**EXHIBIT B**

**Cash Flow DIP Term Sheet**