**HIGHLY CONFIDENTIAL – NOT TO BE DISTRIBUTED**
Confidential Settlement Communication, Not For Distribution or Discovery
Pursuant to Federal Rule of Evidence 408

*[The following is intended to summarize certain basic terms of the proposed Cash Flow DIP Facility and related accommodations. It is not intended as a definitive list of all of the Cash Flow DIP Lender's requirements or conditions in connection with the proposed arrangements. This indicative non-binding term sheet does not constitute a commitment to provide the proposed Cash Flow DIP Facility or other accommodations on these or any other terms or a binding obligation of any sort. These summary indicative terms and conditions are confidential and should be treated as such and should not be discussed with any other party, except for the DIP Borrower and its advisors.]*

**Summary of Cash Flow DIP Financing Terms**

| | |
|---|---|
| Borrower: | First Guaranty Mortgage Corporation ("**FGMC**" or the "**DIP Borrower**"). |
| Guarantors: | Each direct and indirect subsidiary of FGMC, including any such subsidiary filing petitions for relief under the Bankruptcy Code (together with FGMC, collectively, the "**Debtors**"), as debtors and debtors-in-possession under the Bankruptcy Code in the Cases shall guaranty repayment of the Cash Flow DIP Facility (defined below). |
| Venue | The Debtors will file the Cases in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The date of the filing of the Cases will be referred to as the "**Petition Date**." |
| Cash Flow DIP Lender: | LVS II SPE XXXIV LLC (including any permitted assignees and successors, the "**Cash Flow DIP Lender**") |
| Cash Flow DIP Facility/Availability: | The Cash Flow DIP Lender's commitment shall consist of (a) a senior secured, superpriority multi-draw term loan facility, in the aggregate amount not to exceed the sum of (i) $22,000,000 (the "**Operating Amount**") plus (ii) the Mortgage Loan Funding Amounts (as defined below), plus (iii) the Pipeline Sale Transaction Funding Amounts (as defined below) and (b) subject to entry of the Final Cash Flow DIP Order (as defined below), a roll up facility consisting of the Roll-Up Obligations (defined below), which would be made available as debtor-in-possession financing (the "**Cash Flow DIP Facility**" and the loans made thereunder, the "**Cash Flow DIP Loans**") to be provided by the Cash Flow DIP Lender to the DIP Borrower, as debtor-in-possession, in the Cases. |

| | |
|---|---|
| | "Mortgage Loan Funding Amounts" shall mean amounts required to fund (i) the amount (not to exceed $16,000,000 in the aggregate) which comprises the excess, if any, of (A) the original principal balance of each mortgage loan originated by the Borrower (not to exceed $125 million in the aggregate) and sold to the Repo DIP Facility minus (B) the amount of funding provided by the Repo DIP Lender in respect of such originated loan, plus (ii) any mark to market losses incurred in connection with the Repo DIP Facility in an amount not to exceed $3,600,000 in the aggregate, plus (iii) all professional fees incurred in connection with the Repo DIP Facility in an amount not to exceed $600,000 in the aggregate, plus (iv) non-utilization fees and interest or pricing fees incurred under the Repo DIP Facility in amount not to exceed $200,000, in each case, solely to the extent not satisfied first from the proceeds of DIP Repo Collateral.<br><br>"Pipeline Sale Transaction Funding Amounts" shall mean amounts required to fund (i) a work fee, in an amount acceptable to the Cash Flow DIP Lender in its sole discretion, with respect to a pipeline purchase facility transaction approved by the Cash Flow DIP Lender and consistent with the Approved Budget (the "*Pipeline Sale*") and (ii) any mark to market losses incurred in connection with the Pipeline Sale in an amount not to exceed $3,600,000.<br><br>Up to $11,000,000 out of the Operating Amount, plus access to the Mortgage Loan Funding Amounts and the Pipeline Sale Transaction Funding Amounts, during the interim period shall be made available to the DIP Borrower on an interim basis (subject to disbursement in accordance with the Approved DIP Budget (as defined below)) upon the date that the conditions precedent to the "Effective Date" under the Cash Flow DIP Facility have been satisfied, including entry of the Interim Cash Flow DIP Order.<br><br>The remainder of the Cash Flow DIP Facility shall be made available to the DIP Borrower (subject to disbursement in accordance with the Approved DIP Budget) following the entry of the Final Cash Flow DIP Order and subject to the satisfaction of the conditions precedent to such borrowings. |
| Purposes: | The Cash Flow DIP Facility shall be available for the following purposes, in each case in accordance with the terms of the then-Approved DIP Budget:<br><br>(a) to fund the Debtors' working capital requirements, operating expenses, and other line items in accordance with the terms of the Approved DIP Budget (subject to agreed variances) |

2

| | |
|---|---|
| | including the reasonable fees and expenses of the Debtors' professionals; |
| | (b) [reserved]; |
| | (c) following the entry of the Final Cash Flow DIP Order, to fund the Roll-Up Obligations (as defined below) following payment of the Cash Flow DIP Obligations (as defined in the Cash Flow DIP Motion); |
| | (d) to pay fees and expenses of the Cash Flow DIP Lender related to the Cash Flow DIP Facility and the Cases, including, without limitation, reasonable out of pocket fees of attorneys and other professional advisors of the Cash Flow DIP Lender, including, without limitation, Greenberg Traurig, LLP, and any financial advisor that may be retained by the Cash Flow DIP Lender. |
| | No proceeds of the Cash Flow DIP Facility shall be transferred to, or used by, any entity other than the DIP Borrower, except as permitted under the Approved DIP Budget, and the Interim Cash Flow DIP Order or Final Cash Flow DIP Order, as applicable. No portion of the Cash Flow DIP Facility or the Carve-Out (as defined below) shall be used to assert any claim, cause of action or objection against the Cash Flow DIP Lender or any its affiliates or any of their respective employees, officers, directors, advisors, investment managers, agents and subagents, including, without limitation, to challenge any claim or lien of the Bridge Lender or the priority, validity or enforceability of the Prepetition Bridge Loan Documents, and/or challenging any prepetition payment or transfer to the Bridge Lender or its affiliates. |
| | No proceeds of the Cash Flow DIP Facility consisting of Mortgage Loan Funding Amounts shall be used for any purpose other than (a) funding mortgage loan closings and (b) fees, guarantees, professional fees, interest and hedging fees, hedging losses and expenses incurred, in each case, pursuant to the Repo DIP Facility. |
| | No proceeds of the Cash Flow DIP Facility consisting of Pipeline Sale Transaction Funding Amounts shall be used for any purpose other than to fund the Pipeline Sale. |
| <u>Roll-Up</u> | The portion of the Prepetition Bridge Obligations related to mortgage loans financed by the Bridge Lender shall be refinanced by the Repo DIP facility to be provided by Barclays Bank PLC (the "***Repo DIP Facility***"). Upon entry of the Final Cash Flow DIP Order, all of the Prepetition Bridge Obligations remaining after such refinancing shall be rolled-up and converted into a portion of the |

3

| | |
|---|---|
| | outstanding Cash Flow DIP Obligations under the Cash Flow DIP Facility (the "**Roll-Up Obligations**"). |
| Prepetition Loan Documents: | (a) that certain Amended and Restated Loan Agreement dated as of July 17, 2019, between FGMC and Customers Bancorp, Inc. ("**Customers**") (as the same may have been amended, restated, supplemented, or otherwise modified from time to time before the date hereof); <br><br> (b) that certain Mortgage Warehousing Loan and Security Agreement dated as of June 30, 2017, between FGMC and Flagstar Bank, FSB ("**Flagstar**") (as the same may have been amended, restated, supplemented, or otherwise modified from time to time before the date hereof); and <br><br> (c) that certain Second Amended and Restated Secured Promissory Note dated as of June 29, 2022, between FGMC and B2 FIE XI LLC ("**Bridge Lender**"; and together with Customers, and Flagstar, each, a "**Prepetition Lender**" and, collectively, the "**Prepetition Lenders**") (as the same may have been amended, restated, supplemented, or otherwise modified from time to time before the date hereof). <br><br> (each of the foregoing, together with the other agreements, documents, notes and instruments entered into in connection with the same, the "**Prepetition Loan Documents**"). The Collateral (as defined in the Prepetition Loan Documents) subject to the liens of the Prepetition Lenders shall be referred to herein as the "**Prepetition Loan Collateral**." |
| Interest Rate: | The Cash Flow DIP Obligations shall bear interest at the rate of 11.0% per annum (plus an additional 2.0% per annum upon the occurrence and during the continuance of an event of default). Interest shall be payable in kind monthly in arrears and on the Termination Date. |
| Fees: | Upon entry of the Interim Cash Flow DIP Order and the Final Cash Flow DIP Order, as applicable, the Cash Flow DIP Lender shall receive, for the ratable benefit of each Cash Flow DIP Lender, a non-refundable closing fee ("**DIP Closing Fees**") in the amount of 2.00% of the new money made available under the Cash Flow DIP Facility authorized by such order, which such DIP Closing Fee shall be payable in kind, which first payment shall be earned in full and payable in cash upon the closing date of the Cash Flow DIP Facility |

4

| | |
|---|---|
| | (the "***Cash Flow DIP Closing Date***").  No DIP Closing Fees shall be payable with respect to any Roll-Up Obligations. |
| Maturity: | The termination date (the "***Termination Date***") of the Cash Flow DIP Facility means the earliest to occur of:<br><br>(a)     150 days after the Petition Date (the "***Maturity Date***").<br>(b)     35 days after the Petition Date if a final order approving the Cash Flow DIP Loan is not entered, unless extended by the DIP Borrower and the Cash Flow DIP Lender (the "***Final Cash Flow DIP Order Deadline***").<br>(c)     The effective date of an acceptable plan;.<br>(d)     The date of consummation of the sale of all or substantially all of the assets of the Debtors.<br>(e)     The date of termination of the Commitments (including as a remedy from an event of default).<br><br>Upon the Termination Date, the Cash Flow DIP Lender is entitled to immediate payment of any and all amounts owing under the Cash Flow DIP Documents. |
| DIP Budget; Reporting: | The Debtors have prepared and delivered a cash flow forecast, in form and substance acceptable to, and consented to by, the Cash Flow DIP Lender (attached hereto as <u>Exhibit A</u>, the "***Initial DIP Budget***"), setting forth all line-item and cumulative receipts and operating disbursements on a weekly basis for the period beginning as of the week of the Closing Date through and including the thirteenth (13th) week after such week.  The Initial DIP Budget shall be deemed the "***Approved DIP Budget***" for all purposes of the Cash Flow DIP Documents until superseded by any Updated DIP Budget (as defined below) that subsequently is consented to by the Cash Flow DIP Lender.<br><br>On or before 5:00 p.m. New York City time on Thursday of each week, the Debtors shall deliver (a) a supplement to the Initial DIP Budget (or the previously supplemented Approved DIP Budget, as the case may be), covering the subsequent 13-week period that commences with the week immediately following the date of delivery of the supplemental budget (and which, for the avoidance of doubt, cannot modify previous weeks), consistent with the form and level of detail set forth in the Initial DIP Budget and otherwise in form and substance reasonably acceptable to, and consented to by, the Cash Flow DIP Lender in its discretion (each such supplemental budget, an "***Updated DIP Budget***"), (b) an actual |

5

consolidated cash flow of the Debtors for the week preceding the first week of such Updated DIP Budget, showing line item variances between actual results and projected results (if applicable) for such week from the most recent Approved DIP Budget delivered pursuant to clause (a), in each case in a form reasonably acceptable to the Cash Flow DIP Lender which (I) shall be prepared on a consolidated basis for the Debtors, approved and certified by the Chief Restructuring Officer of the Debtors, as being accurate in all material respects (or in the case of the projections, as being projections believed to be reasonable at the time furnished, prepared in good faith based on assumptions believed to be reasonable at the time furnished), and (II) shall (A) show, in the case of clause (a), projected cash receipts and projected cash disbursements, (B) include for such period, in the case of clauses (a) and (b), a summary of collections, disbursements, outstanding checks and interest payments, (C) in the case of clause (b), include a line item variance report setting forth (x) actual results against anticipated results under the Approved DIP Budget for the week in regard to which such accompanying cash flow forecast is being delivered, reported in the aggregate (highlighting key line items) as of the end of such period, (y) variances in dollar amounts and percentages, and (z) a written explanation for all line item variances of greater than 10% for the applicable week, and (D) such other information as the Cash Flow DIP Lender may reasonably request (such items described in this clause (b), the "*Variance Report*").

Upon (and subject to) the approval of any such Updated DIP Budget by the Cash Flow DIP Lender in its sole discretion, such Updated DIP Budget shall constitute the then-approved Approved DIP Budget. To the extent that a proposed Updated DIP Budget is not approved by the Cash Flow DIP Lender, the Initial Budget or last approved Updated DIP Budget shall remain in full force and effect.

As of the Friday after the second calendar week ending after the Petition Date and on each Friday thereafter (each a "Testing Date" and, as to the first three Testing Dates, the period between the Petition Date to the Testing Date and, as to subsequent Testing Dates, the four weeks prior to the Testing Date, a "Testing Period"), the Debtors shall not permit (i) the amount of receipts in any line item during such Testing Period to be less than 90% of the amount of receipts for such line item as set forth in the Approved DIP Budget for such Testing Period or (ii) the amount of disbursements (for the avoidance of doubt, excluding professional fees, which must be no more than 100% of the amount set forth in the Approved DIP Budget for such Testing Period) in any line item during such Testing Period to be greater than 110% of the amount of

6

| | |
|---|---|
| | disbursements for such line item as set forth in the Approved DIP Budget for such Testing Period; provided, however, that for purposes of testing the relevant line items in the Approved DIP Budget are the following: "Asset Sales/Recoveries" and "Total Operating Disbursements" (calculated without giving effect to "Professional Fees"), and "Professional Fees" (the "**Budget Compliance Covenant**"). <br><br> The Debtors shall (i) require their attorneys and advisors to have a weekly call with advisors and attorneys of the DIP Lender, at a time to be mutually agreed, (ii) require senior management (including Aaron Samples, Thomas Ramm, and Darien Oien), the Chief Restructuring Officer (as defined below), and the Operations Consultant (defined below) to have calls with the DIP Lender each Monday, Wednesday, and Friday of each week (and more frequently if an Event of Default has occurred and is continuing), (iii) upon the request of the Cash Flow DIP Lender, from time to time conduct Cash Flow DIP Lender presentations by senior management (including Aaron Samples, Thomas Ramm, and Darien Oien), the Chief Restructuring Officer, and the Operations Consultant regarding any plans, sale, and the marketing process and the other business and affairs of the Debtors, and (iv) allow the Cash Flow DIP Lender to have direct access to senior management (including Aaron Samples, Thomas Ramm, and Darien Oien), the Chief Restructuring Officer, and the Operations Consultant from time to time in its discretion to discuss the plan, sale, and the marketing process and the other business and affairs of the Debtors. |
| <u>Chief Restructuring Officer and Operations Consultant:</u> | (a) The board of directors of FGMC (the "**Board**") and each Debtor shall be required to appoint and retain a representative of FTI Consulting (which person shall be acceptable to the Cash Flow DIP Lender (Tanya Meerovich of FTI Consulting is acknowledged as acceptable for this role) and employed on terms and conditions acceptable to the Cash Flow DIP Lender), as a "chief restructuring officer" of each Debtor to handle, subject to the approval and supervision of the Board, all matters related to the Debtors' finances (including disbursements), budgetary matters, restructuring matters, plan matters, sale matters and the chapter 11 cases generally (the "**Chief Restructuring Officer**").  The Chief Restructuring Officer shall not be replaced or removed or have its duties changed, in each case, without the prior written consent of Cash Flow DIP Lender. The Chief Restructuring Officer shall use such other representatives of FTI Consulting to assist in performing the duties delegated to the Chief Restructuring Officer and such representatives shall be retained as temporary employees of the Debtors.  The Chief Restructuring Officer shall (i) be at all times retained by the Debtors, (ii) prepare each Approved DIP Budget and variance |

7

| | |
|---|---|
| | reports and any other projections and cash flow forecasts of the Debtors, (iii) assist the Debtors in all aspects of their financial affairs, budgeting and reporting requirements under the Cash Flow DIP Facility and (iv) perform any such actions or other actions as are typically performed determined by a chief restructuring officer. The Chief Restructuring Officer shall report to the Board.<br><br>(b) The Board and each Debtor shall be required to appoint and retain an operations consultant (who shall be acceptable to Cash Flow DIP Lender) on terms and conditions acceptable to the Cash Flow DIP Lender in its sole discretion), as an "operations consultant" of each Debtor to consult on matters related to the Debtors' ongoing operations during the Cases (the "***Operations Consultant***").  The Operations Consultant shall not be permitted to be replaced or removed or have its duties changed, in each case, without the prior consent of Cash Flow DIP Lender.  The Operations Consultant shall (i) be at all times retained by the Debtors and (ii) consult with the Debtors in all aspects of their operations.  The Operations Consultant shall report to the Chief Restructuring Officer. |
| <u>Milestones</u>: | Failure to satisfy any of the following milestones (each, a "***Milestone***") by the date specified for such Milestone shall constitute an immediate event of default under the Cash Flow DIP Facility:<br><br>(a)     Within 4 business days after the Petition Date, the entry of the Interim Cash Flow DIP Order;<br>(b)     Within 30 days of the Petition Date, filing of a plan and disclosure statement in forms acceptable to the Cash Flow DIP Lender;<br>(c)     Within 60 days of the Petition Date, sale of all or substantially all of the Debtors' MSR portfolio and receipt of all proceeds from servicing released sales, which sales shall be acceptable to the Cash Flow DIP Lender;<br>(d)     Within 90 days of the Petition Date, sale of all or substantially all of FGMC's pipeline of loans, which sales shall be acceptable to the Cash Flow DIP Lender;<br>(e)     Within 90 days of the Petition Date, sale of all or substantially all of the repurchased loans and haircut unfunded loans as of the Petition Date, which sales shall be acceptable to the Cash Flow DIP Lender;<br>(f)     Within 90 days of the Petition Date, substantial cessation of all loan operations;<br>(g)     Within 35 days of the Petition Date, entry of the Final Cash Flow DIP Order in a form acceptable to the Cash Flow DIP Lender; |

| | |
|---|---|
| | (h)    Within 50 days of the Petition Date, court approval of a disclosure statement, which order shall be in a form acceptable to the Cash Flow DIP Lender;<br>(i)    Within 110 days of the Petition Date, entry of a confirmation order, confirming a plan acceptable to the Cash Flow DIP Lender;<br>(j)    Within 120 days of the Petition Date, substantial plan consummation and occurrence of the plan's effective date. |
| Security and Priority: | As set forth in the Interim Cash Flow DIP Order |
| Carve-Out: | The "*Carve-Out*" means the sum of:<br><br>(a) all unpaid fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code;<br><br>(b) to the extent allowed by the Bankruptcy Court (regardless of whether the order allowing such fees is entered before or after the Carve-Out Notice is received) and in an aggregate amount on a line item basis not exceeding the budgeted amounts for such unpaid professional fees and disbursements as reflected in the Approved DIP Budget, (i) as of the date of delivery of the Carve-Out Notice (as defined below), all accrued and unpaid fees and expenses incurred by persons or firms retained by (A) the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "*Debtors' Professionals*"), or (B) any statutory unsecured creditors' committee appointed in the Cases pursuant to section 1103 of the Bankruptcy Code (the "*Committee*" and its professionals retained as set forth herein, the "*Committee's Professionals*" and with the Debtors' Professionals, the "*Professionals*") and (ii) after the delivery of a Carve-Out Notice, all unpaid fees and expenses incurred by the Professionals in an aggregate amount not to exceed $200,000;<br><br>(c) any accrued and unpaid postpetition fee and expense claims, without regard to when such fees and expenses accrued, related to the appointment of the Chief Restructuring Officer and the Operations Consultant, in each case, in accordance with the Approved DIP Budget, including any interim or final approval as set forth in any order of the Court approving the appointment of any Chief Restructuring Officer and the Operations Consultant or, if applicable, any procedures approved by the Court relating |

9

to the compensation of the Chief Restructuring Officer and the Operations Consultant; provided, however, that any Court-approved bonus, transaction, success fees, completion fees, substantial contribution fees, or any other fees of similar import shall be paid solely from the net proceeds of the Court approved transaction giving rise to such award;

(d) in the event of a conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, allowed fees and expenses incurred by a trustee and any professional retained by such trustee, in an aggregate amount not to exceed $25,000; provided, however, no portion of the Carve-Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Debtors owing to the Cash Flow DIP Lender or the Bridge Lender or any of its affiliates, or (ii) liens or security interests in the collateral securing such indebtedness, including challenges to the perfection, priority or validity of the liens granted in favor of the Cash Flow DIP Lender or the Bridge Lender or any of its affiliates with respect thereto.

The Carve-Out and the Cash Flow DIP Loans may not be used to investigate or challenge the validity, perfection, priority, extent, or enforceability of the Cash Flow DIP Facility, or the liens or security interests securing the Cash Flow DIP Facility, or assert any claims against the lenders or agents under the Prepetition Loan Documents; provided that any Committee's Professional may incur up to $30,000 to investigate the liens and claims under the Prepetition Loan Documents or any other challenges to the Debtors' stipulations in favor of the Bridge Lenders.

Any funding of the Carve-Out shall constitute advances under the Cash Flow DIP Facility secured by the Cash Flow DIP Collateral and shall be otherwise entitled to the protections granted under the Interim Cash Flow DIP Order, the Final Cash Flow DIP Order, the Bankruptcy Code and applicable law. The Carve-Out shall not reduce the amounts payable to the Cash Flow DIP Lender under the Cash Flow DIP Facility. All amounts owed to Debtors' Professionals and the Committee's Professionals under the Carve-Out must be allowed by order of the Bankruptcy Court. Nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clause (b). The Debtors shall be authorized to fund a

10

| | |
|---|---|
| | reserve equal to the Carve-Out on a weekly basis consistent with the Approved Budget. |
| | For purposes of the foregoing, "**Carve-Out Notice**" shall mean a written notice delivered by the Cash Flow DIP Lender to the Debtors and their counsel, the Office of the United States Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuance of an Event of Default. |
| <u>Adequate Protection:</u> | As adequate protection for, and equal in amount to, any diminution in the value of the interests of the Prepetition Lenders in the Prepetition Loan Collateral, each Prepetition Lender will receive, subject in each case to the Carve-Out, the following as adequate protection: <br><br>(a) a superpriority administrative expense claim against each of the Debtors solely to the extent of any diminution in value of such Prepetition Lender's Prepetition Loan Collateral, which shall be senior to all other administrative expense or other claims, but subject and subordinate to (i) the Cash Flow DIP Superpriority Claims, (ii) the DIP Repo Superpriority Claims, and (iii) the Carve-Out. <br><br>(b) a replacement security interest and lien on the same property of the Debtors on which a perfected, first-priority security interest and lien was held before the Petition Date pursuant to such Prepetition Lender's Prepetition Loan Documents, subordinate only to (i) Liens permitted to be senior under such Prepetition Lender's Prepetition Loan Documents, (ii) the Cash Flow DIP Liens, (iii) the DIP Repo Guarantee Liens, and (iv) the Carve-Out. |
| <u>Releases and Stipulations</u> | Subject to the right of other parties in interest with standing, the Debtors shall (i) stipulate to the amount, validity, enforceability, perfection and unavoidability of the prepetition obligations and the liens of the Bridge Lender upon the Prepetition Bridge Loan Collateral, (ii) acknowledge that no affirmative claims exist with respect to the Bridge Lender, B2 FIE IV LLC, LVS II Offshore, L.P., LVS II Holdings, LP, and Bravo II Guarantor I LLC, and each of their respective affiliates, advisors, investment managers, employees, officers, directors, agents, subagents, and representatives, in each case, with respect to any matters, and (iii) release and waive any such claims, including affirmative causes of action and objections to claims, with respect to the Bridge Lender, B2 FIE IV LLC, LVS II Offshore, L.P., LVS II Holdings, LP, and Bravo II Guarantor I LLC, and each of their respective affiliates, advisors, investment managers, employees, officers, |

11

|   |   |
|---|---|
|   | directors, agents, subagents, and representatives, in each case. The Final Cash Flow DIP Order shall also prohibit the assertion of claims under section 506(c) of the Bankruptcy Code against the Cash Flow DIP Lender and provide that the Cash Flow DIP Lender and its counsel, advisors and consultants shall be entitled to the benefit a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code.<br><br>Pursuant to section 363(k) of the Bankruptcy Code, the Cash Flow DIP Lender shall have the exclusive right to credit bid the Cash Flow DIP Obligations with respect to any bulk or piecemeal sale of all or any portion of the Cash Flow DIP Collateral. |
| <u>Remedies:</u> | Upon the occurrence of an Event of Default, the Cash Flow DIP Lender shall have customary remedies, including, without limitation: (i) delivering a notice of an Event of Default; (ii) charging the default rate of interest on the Cash Flow DIP Facility and other outstanding obligations; (iii) terminating all commitments under the Cash Flow DIP Facility; and (iv) exercising, upon five (5) business days' prior written notice to the Debtors, their rights to realize on any or all Cash Flow DIP Collateral without the necessity of obtaining any further relief or order from the Bankruptcy Court. Upon five (5) business days' written notice from the Cash Flow DIP Lender, in its sole and absolute discretion, following an Event of Default, the automatic stay of section 362 of the Bankruptcy Code shall be terminated without further order of the Bankruptcy Court, without the need for filing any motion for relief from the automatic stay or any other pleading, for the limited purpose of permitting the Cash Flow DIP Lender to do any of the following: (i) foreclose on the Collateral; (ii) accelerate all loans and other outstanding obligations under the Cash Flow DIP Facility; and (iii) declare the principal of and accrued interest, premiums, fees and expenses constituting the obligations under the Cash Flow DIP Facility to be due and payable. Section 362 relief from the stay in favor of the Cash Flow DIP Lender shall be embodied in any order approving the Cash Flow DIP Facility and the use of cash collateral.<br><br>The Bankruptcy Court shall retain exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Cash Flow DIP Documents, the Interim Cash Flow DIP Order, the Final Cash Flow DIP Order and with respect to the Cash Flow DIP Collateral. The only issue as to which the Debtors may seek Bankruptcy Court intervention at any hearing seeking to delay or prevent the Cash Flow DIP Lender from exercising remedies |

12

| | |
|---|---|
| | shall be whether an Event of Default has, in fact, occurred and is continuing. |
| Mandatory Prepayments: | Subject to the Cash Flow DIP Orders, usual and customary for facilities of this type and acceptable to the Cash Flow DIP Lender, including, in an amount equal to (a) 100% of net insurance and condemnation proceeds (excluding business interruption insurance proceeds), (b) 100% of net cash proceeds from the issuance of post-petition indebtedness not permitted by the Cash Flow DIP Documents and (c) 100% of the net cash proceeds of any asset sales (other than DIP Repo Collateral) (without any reinvestment rights or de minimis dollar carveouts).  At the election of the Cash Flow DIP Lender in its sole discretion, all or a portion of such mandatory prepayments may be declined and available to the Debtors to be used in accordance with the Approved DIP Budget.<br><br>Subject to the Carve-Out, all optional prepayments and mandatory prepayments (within one business day of receipt thereof) shall be applied as follows: first, to pay accrued and unpaid interest on, and expenses in respect of, the obligations under the Cash Flow DIP Facility, to the extent then due and payable; and second, to repay any principal amounts or other obligations which have been advanced and are outstanding under the Cash Flow DIP Facility. |
| Optional Prepayments: | The Debtors may, upon at least one business days' notice, prepay in full or in part, the Cash Flow DIP Facility, without premium or penalty; provided, however, each such partial prepayment shall be in a minimum amount to be agreed.  Once repaid, Cash Flow DIP Loans may not be re-borrowed. |
| Representations and Warranties: | Usual and customary for facilities of this nature and others to be reasonably specified by the Cash Flow DIP Lender. |
| Affirmative and Negative Covenants: | Usual and customary for facilities of this type and acceptable to the Cash Flow DIP Lender, and to include covenants that: (i) no leases or executory contracts may be assumed or rejected without the prior written consent of the Cash Flow DIP Lender in its reasonable discretion, and (ii) advance copies of all material pleadings and/or filings in the Cases to be made by the Debtors shall be provided to the Cash Flow DIP Lender prior to filing.  Additional covenants include, without limitation:<br><br>    (a) due organization and authorization, enforceability, financial condition, no material adverse changes; |

13

|  | (b) perfection and priority of liens securing the Cash Flow DIP Facility, amount of prepetition debt, amount and nature of existing debt, and effectiveness of borrowing orders; |
|---|---|
|  | (c) prohibitions against the Debtors using any cash or the proceeds of any Cash Flow DIP Loans in a manner or for a purpose other than in accordance with the Cash Flow DIP Facility and Approved DIP Budget, subject to the Budget Compliance Covenant; |
|  | (d) continued retention of the Chief Restructuring Officer, the Operations Consultant, Darien Oien, Thomas Ramm; |
|  | (e) timely delivery of the Approved DIP Budget and variance reports; |
|  | (f) delivery of monthly financial statements, reports, accountants' letters, projections, officers' certificates; |
|  | (g) delivery of reporting and other information reasonably requested by the Cash Flow DIP Lender (including information required to be delivered pursuant to the Cases and such other reporting as set forth herein); |
|  | (h) provision of regular updates as determined by the Cash Flow DIP Lender in its sole discretion, as to prospective purchasers' receipt of marketing materials, and the receipt by the Debtors of indications of interest and other documentation from potential purchasers thereon; |
|  | (i) maintenance of existence; |
|  | (j) maintenance of properties, notices of default, litigation and other material events; |
|  | (k) payment of taxes; compliance with laws, receipt of governmental approvals, environmental compliance, licenses and certifications; |
|  | (l) maintenance of books and records; |
|  | (m) naming of the Cash Flow DIP Lender as additional insureds on all insurance policies; and |
|  | (n) compliance with the Budget Compliance Covenant. |

14

| | |
|---|---|
| | Unless waived by the Cash Flow DIP Lender, breach of any of the foregoing shall be an Event of Default. |
| <u>Conditions Precedent to the Cash Flow DIP Facility:</u> | The Cash Flow DIP Documents will contain the following conditions precedent to the Cash Flow DIP Facility:<br><br>(a) The form and substance of the first day orders shall be reasonably satisfactory to the Cash Flow DIP Lender.<br><br>(b) The preparation, authorization and execution of the agreements with respect to the Cash Flow DIP Facility and the Repo DIP Facility (which shall include refinancing of mortgage loans funded by Bridge Lender before the Petition Date), in form and substance reasonably satisfactory to the Cash Flow DIP Lender.<br><br>(c) No later than four business days after the Petition Date, the Bankruptcy Court shall have entered the Interim Cash Flow DIP Order, in form and substance reasonably satisfactory to the Cash Flow DIP Lender.<br><br>(d) All premiums, fees and documented out of pocket fees and expenses (including reasonable and documented fees and expenses of counsel and financial advisors) required to be paid to the Cash Flow DIP Lender on or before the Cash Flow DIP Closing Date for which invoices have been presented shall have been paid.<br><br>(e) [reserved].<br><br>(f) [reserved].<br><br>(g) The Cash Flow DIP Lender shall have a valid and perfected lien on and security interest in the Cash Flow DIP Collateral with the priority described herein.<br><br>(h) No default or event of default shall exist under the Cash Flow DIP Documents.<br><br>(i) The representations and warranties of the Debtors under the Cash Flow DIP Documents shall be true and correct in all material respects after giving effect to such funding.<br><br>(j) The Debtors shall have established a cash management system for the Cases reasonably satisfactory to the Cash Flow DIP Lender. |

15

|  |  |
|---|---|
|  | (k) The retention by the Debtors of the Chief Restructuring Officer on the Petition Date and the Operations Consultant who shall have been retained prior to the Petition Date.<br><br>(l) The Cash Flow DIP Lender shall have received a certificate from the Debtors' insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to the Cash Flow DIP Documents is in full force and effect and that the Cash Flow DIP Lender has been named as additional insured and/or lenders loss payee thereunder to the extent required under the Cash Flow DIP Documents. |
| <u>Conditions Precedent to Each Borrowing:</u> | In advance of the Closing Date and any Initial Borrowing or Subsequent Borrowing, the following conditions precedent shall have been satisfied:<br><br>(a) No default or event of default shall exist under the Cash Flow DIP Documents.<br><br>(b) The making of a Cash Flow DIP Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.<br><br>(c) The Cash Flow DIP Lender shall have received a borrowing notice, substantially in the form as attached to the Cash Flow DIP Term Loan Agreement.<br><br>(d) The Cash Flow DIP Orders (and in the case of Interim Cash Flow DIP Order only) shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any manner adverse in any material respect to the Cash Flow DIP Lender without the consent of the Cash Flow DIP Lender. |
| <u>Events of Default:</u> | Usual and customary for facilities of this nature and others to be reasonably specified by the Cash Flow DIP Lender, including, without limitation:<br><br>(a) failure to make any payment of principal, interest or fees when due;<br><br>(b) representations and warranties that were materially incorrect when made;<br><br>(c) failure to observe or perform certain covenants; |

16

|  | (d) failure to observe or perform any other covenant, condition, or agreement in the Cash Flow DIP Documents, subject to a cure period; |
|---|---|
|  | (e) failure to satisfy or stay execution of judgments above $50,000; |
|  | (f) default in other agreements relating to postpetition indebtedness (including the Repo DIP Facility Documents); |
|  | (g) any material provision of any Cash Flow DIP Document shall cease to be in full force and effect, or cease to create a valid and perfected lien; |
|  | (h) certain events involving ERISA; |
|  | (i) a change in control; |
|  | (j) dismissal of the Cases (other than in connection with a transfer of venue of the Cases, so long as there remains a pending proceeding in the Bankruptcy Court under the Bankruptcy Code with respect to each Debtor) or conversion of the Cases into cases under chapter 7 of the Bankruptcy Code; |
|  | (k) a trustee, receiver or examiner shall have been appointed in one or more of the Cases; |
|  | (l) granting of relief from any stay of proceeding (including the automatic stay) so as to allow a third-party to proceed against any material asset of the Debtors, except as the Cash Flow DIP Lender may reasonably approve; |
|  | (m) entry of an order granting any superpriority claim which is senior to or pari passu with the Cash Flow DIP Lender's claims under the Cash Flow DIP Facility without the prior consent of the Cash Flow DIP Lender or as otherwise provided in the Cash Flow DIP Orders (other than as described under the caption "Priority" above); |
|  | (n) entry of an order staying, reversing, vacating or otherwise modifying, without the prior written consent of the Cash Flow DIP Lender, the Cash Flow DIP Facility, the Interim Cash Flow DIP Order or the Final Cash Flow DIP Order, other than in connection with a transfer of venue of the |

ACTIVE 65520449v10

DOCS_DE:239668.1 28311/001

| | |
|---|---|
| | Cases, and such order is not stayed or reversed within two business days after entry thereof; |
| | (o) Payment of, or granting adequate protection with respect to, prepetition debt (other than as contemplated by the Cash Flow DIP Orders) in a manner that requires cash expenditures in excess of $50,000 either (i) not contemplated by the Approved DIP Budget or (ii) would have a material adverse effect on the Cash Flow DIP Collateral (as reasonably determined by the Cash Flow DIP Lender), in each case, unless otherwise agreed by the Cash Flow DIP Lender; |
| | (p) cessation of liens or superpriority claims granted with respect to the Cash Flow DIP Collateral to be valid, perfected and enforceable in all respects with the priority described herein; |
| | (q) failure to satisfy any Milestone; |
| | (r) (i) the removal or attempted removal by the Debtors, or replacement or attempted replacement by the Debtors of the Chief Restructuring Officer as an officer of any Debtor, (ii) the dissolution or attempted dissolution of the position of the Chief Restructuring Officer as an officer of any Debtor, or the change or derogation or attempted change or derogation of the duties thereof, or (iii) the hindering or other circumvention or attempted hindering or other circumvention of the duties of the Chief Restructuring Officer; |
| | (s) (i) absent the consent of the Cash Flow DIP Lender, the removal or attempted removal by the Debtors, or replacement or attempted replacement by the Debtors of the Operations Consultant to the Debtors, or (ii) the hindering or other circumvention or attempted hindering or other circumvention of the duties of the Operations Consultant; |
| | (t) appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of any of the Debtors; |
| | (u) obtaining additional financing or granting liens not permitted under the Cash Flow DIP Facility (unless the Cash Flow DIP Facility is indefeasibly paid in full in cash) or using cash collateral without the consent of Cash Flow DIP Lender or seeking to reduce, set-off or subordinate Cash |

18

|  | Flow DIP Obligations or related liens; |
|---|---|
|  | (v) the entry of an order granting automatic stay relief to a third party allowing them to foreclose on any asset worth more than $50,000; and |
|  | (w) a Debtor or any subsidiary becomes adverse in any lawsuit to the Cash Flow DIP Lender. |
|  | Unless waived by the Cash Flow DIP Lender, breach of any of the foregoing shall be an Event of Default. |
| Expense Reimbursement: | Each Debtor shall jointly and severally be obligated to pay all reasonable and documented out-of-pocket costs and expenses of the Cash Flow DIP Lender, including all reasonable and documented counsel to the Cash Flow DIP Lender in connection with (i) the discussion, negotiation, preparation, execution and delivery of any documents in connection with the Cash Flow DIP Facility, including the Cash Flow DIP Documents and the funding of all Cash Flow DIP Loans, the administration of the Cash Flow DIP Facility and any amendment, modification or waiver of any provision of the Cash Flow DIP Documents, (ii) the interpretation, enforcement or protection of any of its rights and remedies under the Cash Flow DIP Documents or (iii) the Cases. |
| Indemnification | Each Borrower and Guarantor shall indemnify the Cash Flow DIP Lender and its affiliates and their respective advisors, investment managers, employees, officers, directors, agents, subagents, and representatives in relation to the Cash Flow DIP Documents and the Cash Flow DIP Orders, except to the extent arising solely out of fraud or willful misconduct of the Cash Flow DIP Lender. |
| Governing Law and Submission to Jurisdiction: | This Cash Flow DIP Documents will be governed by the Bankruptcy Code, and the laws of the State of New York. |

19