# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>FIRST GUARANTY MORTGAGE CORPORATION, *et al.*,[1]<br>Debtors. | Chapter 11<br><br>Case No. 22-10584 (CTG)<br><br>(Jointly Administered) |

## DECLARATION OF TANYA MEEROVICH IN SUPPORT OF DEBTORS' MOTIONS FOR DEBTOR-IN-POSSESSION FINANCING

I, Tanya Meerovich, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am a Senior Managing Director of FTI Consulting ("FTI"), financial advisor to the First Guaranty Mortgage Corporation ("FGMC") and its affiliated debtor Maverick Holdings, LLC ("Maverick", together with FGMC, the "Debtors"). I was appointed chief restructuring officer ("CRO") of the Debtors on the Petition Date (defined below).

2. I am authorized to execute this declaration (the "Declaration"). Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein, and if called upon to testify, I would testify competently to all of the facts set forth herein.

3. I submit this Declaration in support of the (i) *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Providing Super-Priority Administrative Expense Status; (IV) Granting Adequate Protection; (V)*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction in which it operates, are: First Guaranty Mortgage Corporation (9575) (Virginia); and Maverick II Holdings, LLC (5621) (Delaware). The location of the corporate headquarters and the service address for First Guaranty Mortgage Corporation is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

*Modifying the Automatic Stay; (VI) Scheduling an Interim Hearing to Approve the Proposed Interim Order and a Final Hearing with Respect to the Relief Requested Herein; and (VII) Granting Related Relief* (the "Cash Flow DIP Motion", the underlying lending facility, the "Cash Flow DIP Facility", and the corresponding proposed financing, the "Cash Flow DIP Financing"); and (ii) *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Enter Into Repurchase Agreement Facilities and Related Documents; (II) Authorizing Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business; (III) Granting Liens and Providing Super-Priority Administrative Expense Status; (IV) Modifying the Automatic Stay; (V) Scheduling an Interim Hearing to Approve the Proposed Interim Order and a Final Hearing with respect to the Relief Requested Herein; (VI) Granting Related Relief* (the "DIP Repo Motion", the underlying facility, the "DIP Repo Facility", and the corresponding proposed financing, the "DIP Repo Financing").[2] The DIP Motions were filed contemporaneously herewith.

4. For the reasons set forth below, I believe the relief requested in the DIP Motions is necessary to ensure that the Debtors possess critical liquidity and working capital to fund their Chapter 11 Cases, so they can achieve their objectives in chapter 11. As such, I believe that the relief requested in the DIP Motions is in the best interests of the Debtors' stakeholders and estates.

## QUALIFICATION

5. FTI is a publicly traded, global business advisory firm with more than 7,000 employees across 88 locations around the world. FTI is dedicated to helping organizations manage change, mitigate risk and resolve disputes: financial, legal, operational, political and regulatory, reputational and transactional.

---

[2] The Cash Flow DIP Motion and the DIP Repo Motion together shall be referred to as the "DIP Motions"; the Cash Flow DIP Facility and the DIP Repo Facility together shall be referred to as the "DIP Facilities."

6. With more than 1,700 professionals in 64 offices across 17 countries, FTI's Corporate Finance & Restructuring segment is one of the leading restructuring advisors in the world. FTI focuses on the strategic, operational, financial, transactional and capital needs of clients to deliver a wide range of services centered around three core offerings: Turnaround, Restructuring and Bankruptcy, Business Transformation and Transactions. FTI also couples industry experts with seasoned operators and restructuring professionals, to provide outside-the-box, yet practical solutions in complex situations. FTI's clients include corporations, boards of directors, investors, private equity sponsors, banks, lenders and other financing sources and creditor groups, as well as other parties-in-interest.

7. I have over fifteen years of experience leading complex transformations and advising on in- and out-of-court restructurings for companies across industries, with expertise in the financial services, real estate, non-for-profit, insurance, healthcare, education, energy, manufacturing, infrastructure, print, entertainment and retail industries. I graduated from Roosevelt University with a Bachelor's degree in business management and finance. I am a Chartered Financial Analyst, a Certified Insolvency and Restructuring Advisor and a Certified Turnaround Professional. My recent engagements in the financial services industry include, among others: AG Mortgage Investment Trust Inc, Impac Mortgage, MFA Financial, Ocwen Financial, Residential Capital, Credit-Based Asset Servicing and Securitization, Progrexion, JH Capital, Litton Loan Servicing, Ditech Corporation, Walter Investments and Stearns Lending. Prior to joining FTI, I was in the Financial Services Advisory group of RSM Cayman Islands, where I was involved in a number of high-profile and complex cross-border insolvency engagements in the financial services sector.

**FTI'S RETENTION**

8. In June 2022, the Debtors engaged FTI to serve as financial advisor to the Debtors. My team members and I have been working closely with the Debtors to provide certain financial advisory and consulting services to the Debtors in connection with their assessment and management of liquidity, sizing of potential financing requirements, and evaluation of strategic alternatives, including review of associated financial and operating information, assistance with operational readiness and due diligence support in connection with such strategic alternatives.

**BACKGROUND**

9. On June 30, 2022 (the "Petition Date"), the Debtors each commenced a case (together, the "Chapter 11 Cases") by filing a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

10. Additional background related to the Debtors is contained in the previously filed *Declaration of Aaron Samples In Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration").

**I.    The Debtors' Need for Financing**

11. The Debtors require operating liquidity utilized for payment of general operating expenses such as payroll, vendors and other day-to-day expenses. Separately, as a mortgage company that originates residential mortgages, the Debtors finance their mortgage origination business through "warehouse lending facilities" structured as repurchase agreements and warehouse loans.

12. The Debtors are in need of immediate access to capital, including existing unrestricted cash. FTI, together with the Debtors' other advisors, undertook a detailed analysis of

the Debtors' operations and funding needs. The Debtors determined, in consultation with FTI and their other advisors, that they would require both access to additional operating capital, and postpetition warehouse lending facilities, in order to allow the Debtors to operate in chapter 11 as a going concern as they work with their advisors and key stakeholders to achieve their restructuring goals.

**II.     The Debtors' Proposed Postpetition Financings**

13.     FTI worked collaboratively with management to secure the Cash Flow DIP Facility and the DIP Repo Facility, which will allow the Debtors to gain access to capital in excess of $175 million to fund loans already in the pipeline, the Debtors equity in funded loans, fees, and expenses associated with the DIP Repo Facility, ongoing operations and bankruptcy expenses, and a potential sale of their pipeline. For the Cash Flow DIP Facility, management provided views on the cash needs and cushion necessary to operate the company as a going concern. For the DIP Repo Facility, management leveraged their knowledge and expertise in the mortgage origination industry to guide the negotiation with potential postpetition warehouse lenders around key terms including advance rates, interest rates, and fees.

14.     Below, I provide a brief overview of the two DIP Motions, and further below I describe the marketing and negotiation process to ensure the best possible terms.

15.     By the Cash Flow DIP Motion the Debtors seek, among other things, authorization and approval to obtain Cash Flow DIP Financing under a super-priority senior credit facility. The Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Cash Flow DIP Motion is not granted. The Debtors are entering chapter 11 with minimal cash on hand, and thus access to Cash Flow DIP Financing and the use of cash collateral is critical to ensure the Debtors' smooth entry into chapter 11. The commencement of these Chapter 11 Cases will place

increased demands on the Debtors' liquidity due to, among other things, the costs of administering the Chapter 11 Cases. The relief requested is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors are denied the proposed interim and final borrowings, including, among other things, frustrating the Debtors' ability to successfully navigate the Chapter 11 Cases. The Cash Flow DIP Facility has been market tested and evaluated by the Debtors and their professionals, and it will provide sufficient liquidity to fund the Chapter 11 Cases. The Debtors negotiated the Cash Flow DIP Financing, the use of cash collateral, and the adequate protection proposed in the Cash Flow DIP Motion in good faith and at arms' length, and I submit that the terms of the Cash Flow DIP Facility are reasonable and the best that could be obtained under the facts and circumstances of these Chapter 11 Cases.

16. By the DIP Repo Motion, the Debtors seek, among other things, to obtain critical funding enabling the Debtors to fund loans to be originated to borrowers intending to close on their home purchase or refinancing within the next 60-90 days. Prior to the Petition Date, the Debtors had access to warehouse lines with several banks. It used these lines to fund loans in its pipeline. As a result of the filing of these Chapter 11 Cases, the Debtors can no longer access its prepetition warehouse lines to fund new loans. As such, the DIP Repo Facility is necessary in order to prevent the harm that would result if those borrowers were unable to complete the purchase or refinance of their homes.

17. Further, prior to the Petition Date, in the ordinary course of business, FGMC entered into forward transactions for the purchase or sale of mortgage-backed and other securities, including pursuant to "when-issued," "to-be-announced," "dollar roll" and other transactions with various regulated broker dealers pursuant to the terms of various Master Securities Forward Transaction Agreements (the "Prepetition MSFTAs"). FGMC used the Prepetition MSFTAs to

hedge certain of its financing operations. The counterparties to the Debtors' Prepetition MSFTAs include, but are not limited to BMO Capital Markets Corp., Goldman Sachs LLC, Mizuho Securities USA LLC, Morgan Stanley & Co. LLC, South Street Securities LLC, and Wells Fargo Securities LLC. As stated in the First Day Declaration, such hedging arrangements are customary in the mortgage origination industry and afford mortgage originators and borrowers more advantageous borrowing rates and terms. The Debtors propose to continue such hedging activities postpetition in the DIP Repo Motion and the corresponding interim order.

18. Shortly prior to the Petition Date, B2 FIE XI LLC financed certain mortgages in favor of the Debtors. Under the DIP Repo Facility, Barclays (defined below) will be buying those mortgage loans and refinancing the relevant portion of the applicable secured note.

## THE CASH FLOW DIP FACILITY

### I.    The Cash Flow DIP Facility is the Best Cash Flow Financing Available

19. Before the commencement of these Chapter 11 Cases, FTI, at the request of the Debtors, and in connection with its search for DIP Repo financing as more fully explained below, approached multiple potential sources of debtor-in-possession financing as possible alternatives to the Cash Flow DIP Facility. Based on my experience, I solicited potential sources of alternative financing that, in my judgment, might be interested in, and have a reasonable likelihood of pursuing, a debtor-in-possession financing under the specific circumstances of these Chapter 11 Cases. I contacted commercial banks and financial institutions that, in my judgment, would provide the greatest chance of finding alternative financing while also protecting against potentially damaging leaks of information and harm to the Debtors' reputation in the market.

20. At the conclusion of this search process, I determined based on my experience that none of the parties that were approached would provide financing on terms more favorable than

those reflected in the Cash Flow DIP Facility. Based on my experience, and my involvement in the process of seeking alternatives to the Cash Flow DIP Facility, it is my opinion that there currently is no viable alternative to the Cash Flow DIP Facility that will allow the Debtors to pursue a value-maximizing restructuring.

## II.    The Terms of the Cash Flow DIP Facility are Fair and Reasonable

21.    Based on my experience with debtor-in-possession financing transactions, as well as my involvement in the negotiation of the Cash Flow DIP Facility and pursuit of alternative financing proposals, the Cash Flow DIP Facility is the best and only reasonable financing option currently available to the Debtors under the circumstances. The proposed Cash Flow DIP Facility will provide the Debtors with access to crucial liquidity at the outset of these Chapter 11 Cases needed to avoid immediate and irreparable harm to their businesses, and will allow the Debtors to maximize value by continuing operations.

22.    In addition to providing the Debtors with incremental liquidity, the Cash Flow DIP Facility will provide the Debtors with access to the use of cash collateral. Such liquidity is anticipated to allow the Debtors to fund their day-to-day operations during these Chapter 11 Cases, thereby preserving the value of the Debtors' estates for the benefit of all stakeholders.

23.    In sum, it is my professional opinion that the terms of the Cash Flow DIP Facility, taken as a whole, are reasonable under the circumstances and were the product of good faith, arm's-length negotiations, and that the Cash Flow DIP Facility will benefit all stakeholders in these Chapter 11 Cases by providing the Debtors with the necessary liquidity to fund operations, avoiding immediate harm to the Debtors' business that would occur if immediate financing were not available. For all of the reasons included in this Declaration, I believe it is appropriate for the

Court to approve the Cash Flow DIP Facility and the use of cash collateral as contemplated by the Cash Flow DIP Motion.

## THE DIP REPO FACILITY

**I.    The DIP Repo Facility is the Best DIP Repo Financing Available**

24.     I was actively involved in the Debtors' analysis of their funding needs and financing options, including with respect to the DIP Repo Facility.  Based on my involvement, I believe the Debtors and FTI were able to conduct a competitive and successful process leading to favorable terms for the DIP Repo Facility, and the DIP Repo Facility should be approved as part of the Debtors' postpetition financing program.

25.     Between June 14th, 2022 and June 27th, 2022, FTI reached out to twenty-nine (29) parties, including banks, financial institutions, and other mortgage originators, on behalf of the Debtors in order to explore solutions to funding the Debtors' unfunded loan pipeline either through a financing facility or a sale or a transfer to another mortgage originator.  Of those twenty-nine (29) parties, eight (8) signed non-disclosure agreements.  After exchanging information with the potential lenders and engaging in preliminary discussions, the Debtors received a total of four (4) term sheet proposals and one oral proposal.  The Debtors engaged in arms-length negotiations with each of these parties regarding the key terms such as advance rates, interest rates, covenants, and fees.

26.     At the conclusion of this search process, I determined based on my experience that the proposal provided by Barclays Bank PLC ("Barclays") would provide financing on the most favorable basis.  Barclays was able to move the quickest, was the most flexible, and provided the most favorable terms under the given circumstances.

27. The obligations under the DIP Repo Facility will be guaranteed by Pimco Bravo Fund II, L.P. ("PIMCO Guarantor") and Maverick II Holdings LLC ("Maverick Guarantor") for the duration of the facility. Based on my involvement in these negotiations, a guaranty on the facility was a requirement and a material inducement for providing postpetition warehouse financing in all such proposals that the Debtors received. Absent such guaranty, the postpetition warehouse financing may not be provided or the proposed advance rates would have been significantly lower, which in turn would have increased the Debtors' funding needs under the Cash Flow DIP Facility on a dollar-for-dollar basis.

## II.     The Terms of the DIP Repo Facility are Fair and Reasonable

28. Based on my experience with debtor-in-possession financing transactions, as well as my involvement in the negotiation of the DIP Repo Facility and pursuit of alternative financing proposals, the DIP Repo Facility is the best warehouse financing option currently available to the Debtors under the circumstances. The proposed DIP Repo Facility will allow the Debtors to obtain critical funding enabling the Debtors to fund loans to be originated to borrowers intending to close on their home purchase or refinance within the next 60-90 days, that it would not otherwise have. This relief is necessary in order to prevent the harm that would result if those borrowers were unable to complete the purchase or refinance of their homes.

29. In sum, it is my professional opinion that the terms of the DIP Repo Facility, taken as a whole, are reasonable under the circumstances and were the product of good faith, arm's-length negotiations, and that the DIP Repo Facility will benefit all stakeholders in these Chapter 11 Cases by providing the Debtors with the necessary funding to fund loans to be originated to borrowers intending to close on their home purchase or refinance within the next 60-90 days, thereby avoiding immediate harm to the Debtors' business that would occur if such immediate

financing were not available. For all of the reasons included in this Declaration, I believe it is appropriate for the Court to approve the DIP Repo Facility as contemplated by the DIP Repo Motion.

## **NEED FOR INTERIM RELIEF**

30. In my opinion, the Debtors require immediate access to the DIP Facilities, and the relief sought in the DIP Motions, to avoid irreparable harm pending the final hearing on these matters. Without immediate access to funds made available under the DIP Motions, the Debtors could face a value-destructive interruption to their businesses and lack the liquidity to conduct a reorganization on a going-concern basis.

## **CONCLUSION**

31. I have reviewed each of the DIP Motions. All of the facts set forth in the DIP Motions are true and correct to the best of my knowledge and belief based upon (a) my personal knowledge of the Debtors' operations and finances, (b) information learned from my review of relevant documents, (c) information supplied to me by other members of the Debtors' management team and the Debtors' advisors, and/or (d) my opinion based upon my knowledge and experience or information I have reviewed concerning the Debtors' operations and financial condition. Accordingly, the Debtors respectfully request that the relief requested in each of the DIP Motions be granted because such relief is a critical element in stabilizing and facilitating the Debtors' operations during the pendency of the Chapter 11 Cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: June 30, 2022                                    */s/ Tanya Meerovich*
                                                        Tanya Meerovich
                                                        Senior Managing Director
                                                        FTI Consulting