**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
-----------------------------------------------------------X
                                    :    Chapter 11
In re:                              :
                                    :    Case No. 22-10584 (CTG)
FIRST GUARANTY MORTGAGE             :
CORPORATION, et al.¹                :
                                    :
              Debtors.              :    Joint Administration Requested
                                    :
-----------------------------------------------------------X
```

**CUSTOMERS BANK OMNIBUS OBJECTION AND EMERGENCY MOTION TO
CONTINUE DEBTORS': (I) CASH MANAGEMENT MOTION;
(II) CASH FLOW DEBTOR IN POSSESSION MOTION; AND
(III) REPURCHASE AGREEMENT MOTION**

Customers Bank, by and through its undersigned counsel, hereby respectfully submits this objection and emergency motion to continue certain of the first day motions filed by debtors Maverick II Holdings, LLC ("Maverick") and First Guaranty Mortgage Corporation ("FGMC" and, together with Maverick, the "Debtors"), specifically: (i) Motion of the Debtors for Entry of Interim and Final Orders: (I) Authorizing Use of Cash Management Procedures, Bank Accounts, and Certain Payment Methods; (II) Prohibiting Setoffs and Freezing of Bank Accounts; (III) Modifying Requirements of Section 345(b) of the Bankruptcy Code; and (IV) for Related Relief [Dkt. 5] (the "Cash Management Motion"); (ii) Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying the Automatic

---

¹ The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621). The Debtors' mailing address is 5400 Tennyson Parkway, Suite 450, Plano, TX 75024.

Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief [Dkt. 22] (the "Cash Flow DIP Motion"); and (iii) Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Enter into Repurchase Agreement Facilities; (II) Authorizing the Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business; (III) Granting Liens and Providing Superpriority Administrative Expense Status; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing with Respect to the Relief Requested Herein; and (VI) Granting Related Relief [Dkt. 20] (the "DIP Repo Motion" and, together with the Cash Management Motion and the Cash Flow DIP Motion, the "Objectionable First Day Motions"), and respectfully sets forth and represents as follows:

## BACKGROUND

### FGMC's Relationship with Customers Bank

1.       Customers Bank and FGMC are party to two financing arrangements. First, pursuant to that certain Amended and Restated Loan Agreement, dated as of July 17, 2019 (as amended, restated, supplemented, or modified from time to time, the "Loan Agreement"), Customers Bank has made available to FGMC a revolving credit facility in order to provide working capital. FGMC's obligations under the Loan Agreement are secured by the following collateral:  a first-priority security interest in all of FGMC's rights, title and interest in, to and under the Pledged Ginnie Mae Servicing Receivables (as defined in the Loan Agreement), all deposit accounts maintained in FGMC's name with Customers Bank (excluding any deposit accounts maintained by FGMC at Customers Bank where escrow funds belonging to borrowers are held for the payment, on behalf such borrowers, of real property taxes, insurance and similar escrow items), including but not limited to the Non-Interest Bearing Accounts (as defined in the Loan Agreement), the Purchased Assets (as defined in the Repurchase Agreement) and the

Mortgage Loans (as defined in the Repurchase Agreement), after taking into account the effect, if any, of the Transactions (as defined in the Repurchase Agreement) upon such Purchased Assets and Mortgage Loans. In particular, pursuant to the First Amendment to the Loan Agreement, FGMC agreed to deposit $6,000,000 in a deposit Working Capital Account (as defined below) to secure the Obligations under the Loan Agreement (as defined in the Loan Agreement).

2.      Second, pursuant to a Second Amended and Restated Master Repurchase Agreement, dated as of October 9, 2019 (as amended, restated, supplemented or modified from time to time, the "Repurchase Agreement"), Customers Bank agreed to provide funding to FGMC in order to facilitate FGMC's purchase or closing of mortgages in exchange for the transfer to Customers Bank of the Mortgage Loans and related assets, with a simultaneous agreement by Customers Bank to transfer such Mortgage Loans and related assets on a date certain. The collateral under the Repurchase Agreement consists of the following (capitalized terms are defined in the Repurchase Agreement):

(i)     all Mortgage Loans, including the related Note and Mortgage;

(ii)    all mortgage files and Records related to the Mortgage Loans;

(iii)   all Servicing Rights and Servicing Records relating to the Mortgage Loans and any other collateral pledged or otherwise relating to such Mortgage Loans, all mortgage guaranties and insurance (issued by an Agency or otherwise) and any mortgage insurance certificate or other document evidencing such mortgage guaranties or insurance relating to any Mortgage Loan;

(iv)    any Take-out Commitments to the extent relating to the Mortgage Loans;

(v)     any Hedge Agreements to the extent relating to the Mortgage Loans;

(vi)    all of Seller's rights as the owner of the Mortgage Loans under any agreements or contracts relating to, constituting, or otherwise governing, any or all of the foregoing to the extent they relate to the Mortgage Loans including the right to receive principal and interest payments with respect to the Mortgage Loans and the right to enforce such payments and all insurance policies and insurance proceeds relating to any Mortgage Loan or the related Mortgaged Property, including, but not limited to, any payments or proceeds under any related primary insurance or hazard insurance;

3

(vii)    any Property relating to any Mortgage Loan or the related Mortgaged Property;

(viii)    any REO Property and the related Mortgage and grant deed delivered to Buyer (whether or not recorded) related to a Transaction hereunder;

(ix)    all Mortgage-backed Securities (i) that are backed in whole or in part by any Mortgage Loan, (ii) identified for purchase on any purchase commitment or otherwise identified for sale or pledge to Buyer, (iii) with respect to which Buyer or a third party acting on Buyer's behalf has been identified as the nominal or beneficial owner of such Mortgage-backed Security; or (iv) which have been delivered to or have otherwise come into the possession, custody or control of Buyer or a third party acting on Buyer's behalf, together with all cash and non-cash distributions in respect of the foregoing (collectively the "Related Securities" and each a "Related Security");

(x)    all deposit accounts maintained in Seller's name with Buyer;

(xi)    any deposit accounts or any share thereof, maintained in Seller's name with any institution, related to any of the foregoing collateral or proceeds thereof, including proceeds of any Take-out Commitments;

(xii)    the Purchase Documents (to the extent such Purchase Documents and Seller's rights thereunder relate to the Mortgage Loans);

(xiii)    all Income relating to the Mortgage Loans;

(xiv)    all closing protection letters relating to the Mortgage Loans;

(xv)    any other assets or contract rights, accounts, deposit accounts (including any interest of Seller in escrow accounts), payments, rights to payment (including payments of interest or finance charges), "chattel paper", "investment property" and general intangibles to the extent that any of the foregoing relates to any Mortgage Loan;

(xvi)    any and all replacements, substitutions, distributions on or proceeds of any and all of the foregoing; and

(xvii)    any other Property, rights, title or interests as are specified on a Purchase Request and/or Trust Receipt.

In particular, Section 7(k) of the Repurchase Agreement requires that FGMC maintain with Customers Bank an account with a minimum balance equal to $1,125,000.

3.    FGMC has the following deposit accounts with Customers Bank (collectively, the "Deposit Accounts"):

a.    Warehouse Lending account no. x2029 (the "Maintenance Account);

b.    203K Master account no. x2442 (the "203k Account");

    c.   PIMCO Extra Deposit account no. x6097 (as also described above, the "Working Capital Account"); and

    d.   Custodial account no. x2019 (the "Custodial Account").

4.    The 203k Account currently has no funds in it.  Amounts held in the Custodial Account are held for Ginnie Mae to make principal and interest payments on Ginnie Mae securities.

5.    In order to secure FGMC's obligations under the Repurchase Agreement, Customers Bank and certain other warehouse providers entered into an Amended and Restated Joint Securities Account Control Agreement dated as of August 11, 2017 (as amended, restated, supplemented or modified from time to time, the "JSACA"), with Deutsche Bank National Trust Company ("Securities Intermediary").  Pursuant to the JSACA, the Securities Intermediary agreed to establish certain joint accounts (the "JSACA Accounts") in the name of FGMC and for the benefit of Customers Bank and the other warehouse providers, as their interests may appear. The JSACA expressly provides that FGMC shall not have any right to direct the disposition of securities or funds in the joint securities accounts without the approval of the warehouse providers. The JSACA Accounts currently contain either cash or securities issued or guaranteed by Fannie Mae, Freddie Mac or Ginnie Mae with a value of approximately $136,000,000.

**The Objectionable First Day Motions**

6.    On June 30, 2022 (the "Petition Date") at 6:27 a.m., the Debtors filed voluntary Chapter 11 petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  Continuing throughout the day and well into the afternoon, the Debtors filed a variety of motions, including the Objectionable First Day Motions.

7.    Pursuant to the Cash Management Motion, the Debtors are requesting authority to, among other things, maintain the bank accounts that they maintained prior to the Petition Date,

4811-3051-6055\4

and to prohibit applicable banks from offsetting against or freezing any of the Debtors' deposit accounts. Cash Management Motion at 2.

8.      Pursuant to the Cash Flow DIP Motion, the Debtors are requesting authority to, among other things, use the cash collateral of the prepetition warehouse providers, including Customers Bank's cash collateral. *Id.* at 30. While the Debtors propose to grant prepetition lenders adequate protection in form of superpriority administrative expense claims and replacement liens, such claims and liens are junior to those of the DIP Repo and Cash Flow Financing and proposed carve-out. *Id.* at 15-16.

9.      Pursuant to the DIP Repo Motion, the Debtors are requesting authority to, among other things, obtain certain debtor-in-possession warehouse financing. DIP Repo Motion at 1-2. Like the Cash Flow Financing requested in the Cash Flow DIP Motion, the Debtors are proposing that the DIP Repo Financing be given superpriority ahead of all other creditors, including prepetition secured creditors. *Id.* at 9-11.

10.     The Debtors filed Cash Management Motion at 7:39 a.m., the DIP Repo Motion at 3:04 p.m., and the Cash Flow DIP Motion at 3:29 p.m. on the Petition.

11.     The Debtors requested a hearing on all its first day motions, including the Objectionable First Day Motions, for July 1, 2022 at 10:00 a.m., that is, less than 20 hours after some of their motions were filed.

## THE OBJECTION

### A.    The Objectionable First Day Motions Should Be Continued To Provide Reasonable Notice to Creditors

12.     Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") provides that "the court shall not, within 21 days after the filing of the petition, issue an order granting . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the

estate" unless "necessary to avoid immediate and irreparable harm[.]" FED. R. BANKR. P. 6003.

The Advisory Committee note for Bankruptcy 6003 explains the purpose of the rule as follows:

> There can be a flurry of activity during the first days of a bankruptcy case. This activity frequently takes place prior to the formation of a creditors' committee, and it also can include substantial amounts of materials for the court and parties in interest to review and evaluate. This rule is intended to alleviate some of the time pressures present at the start of a case so that full and close consideration can be given to matters that may have a fundamental impact on the case.

FED. R. BANKR. P. 6003 advisory committee's note. The Debtors' requests to obtain postpetition financing in the Cash Flow DIP Motion and DIP Repo Motion are both covered by this rule.

13.     Rather than providing the Court and all interested parties with sufficient time to fully and closely consider the extraordinary relief being sought in the Cash Flow DIP Motion and DIP Repo Motion, the Debtors requested the Hearing for less than 20 hours after some of the motions were even filed. The Objectionable First Day Motions and the relief they seek for the Debtors involve a complicated set of secured claims in numerous and distinct pieces of collateral, and affected parties, such as Customers Bank, have not been afforded due notice and opportunity to respond. Due process requires having an opportunity to present one's objection. *See Mullane Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Accordingly, Customers Bank respectfully requests that this Court continue the Hearing to permit Customers Bank and all affected parties sufficient time to respond to the relief being requested and to comply with Bankruptcy Rule 6003.

14.     Furthermore, the Debtors have not demonstrated that immediate or irreparable harm will result as required by Bankruptcy Rule 6003. Indeed, the authorization the Debtors request in the Objectionable First Day Motions is not an immediate necessity. The Debtors' interim DIP budget shows that no funding needs are imminent, especially with respect to Customers Bank's collateral. *See* Proposed Interim Cash Flow DIP Order, Exhibit B.

15.    Instead, the use of Customers Bank's cash collateral, for example, can be determined in the near future; not less than 20 hours after Debtors filed these pleadings. To expect Customers Bank, other creditors and the Court to be adequately prepared to contest the non-consensual use of cash collateral at the Hearing in less than 20 hours would simply be unjust and unreasonable, especially when such use is not immediately required. In sum, Customers Bank respectfully requests the Court be mindful of the expedited timeline in this matter and the lack of actual urgency by denying the Cash Management Motion, Cash Flow DIP Motion and DIP Repo Motion with respect to Customers Bank for lack of proper notice and due process or, in the alternative, continue the Hearing to a later date.

**B.    The Cash Management Motion Should Be Denied to the Extent it Restricts Customers Bank's Bankruptcy Code § 559 Rights**

16.    Bankruptcy Code § 559 protects repo participants, such as Customers Bank, by providing, in relevant part, as follows:

> The exercise of a contractual right of a repo participant or financial participant to cause the liquidation, termination, or acceleration of a repurchase agreement because of a condition of the kind specified in section 365(e)(1) of this title *shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court* or administrative agency in any proceeding under this title[.]

11 U.S.C. § 559 (emphasis added).

17.    This provision has been construed as "giv[ing] parties to a repurchase agreement a safe harbor from the automatic bankruptcy stay, which normally prevents creditors from collecting, recovering, or offsetting debts without court approval." *In re HomeBanc Mortg. Corp.*, 945 F.3d 801, 811 (3d Cir. 2019). Essentially, section 559 "permits a non-defaulting party to liquidate collateral, according to the terms of the relevant repurchase agreement, without seeking court approval." *Id.* Bankruptcy Code § 559 was enacted to "preserve market liquidity by providing a 'safe harbor' for non-defaulting repo participants 'to terminate, liquidate or accelerate

8

. . . repurchase agreements with the bankrupt or insolvent party.'" *Calyon N.Y. Branch v. Am. Home Mortg. Corp. (In re Am. Home Mortg., Inc.)*, 379 B.R. 503, 516 (Bankr. D. Del. 2008) (quoting H.R. REP. 109-21, pt. 1, at 133 (2005)).

18.    The Repurchase Agreement is unquestionably a repurchase agreement for purposes of being entitled to the safe harbor protections of Bankruptcy Code § 559. *See* Declaration of Aaron Samples in Support of Chapter 11 Petitions and First Day Pleadings [Dkt. 19] at ¶¶ 15-16. Notwithstanding that fact, as part of the Cash Management Motion, the Debtors have requested that this Court circumscribe Customers Bank's repo participant rights by requesting that all banks be barred from offsetting against or freezing any of the Debtors' deposit accounts. As detailed above, the Debtor holds a number of accounts with Customers Bank, including accounts set up precisely for purposes of exercising repo rights under the Repurchase Agreement.

19.    In particular, the Maintenance Account was established pursuant to the Repurchase Agreement as security for such agreement and thus entitled to the protections of section 559. The Working Capital Account serves as collateral for the Loan Agreement and was never intended to be a source of working capital for FGMC.  But the Working Capital Account is also collateral for the Repurchase Agreement, see clause (x) of paragraph 2 above, and thus also entitled to the protections of section 559. The JSACA Accounts are funded with proceeds of the Mortgage Loans sold under the Repurchase Agreement and thus entitled to the protections of section 559.  Indeed, the JSACA is clear – FGMC shall have no control over such accounts.

20.    Ultimately, Customers Bank urges this Court to deny the Cash Management Motion to the extent it seeks to circumvent the statutory and contractual rights of Customers Bank.

**C.    The Cash Flow DIP Motion and DIP Repo Motion Should Be Denied to the Extent They Seek Authority to Use Customers Bank's Collateral Without Adequate Protection and Impair Customers Bank's Collateral**

21.    As the Debtors concede in the Cash Flow DIP Motion, in order to use cash collateral, Bankruptcy Code § 363(c)(2) requires either that the entity with an interest in such collateral consent or that the court authorize such use, subject to providing adequate protection pursuant to section 363(e). *See* 11 U.S.C. § 363(c)(2) & (e); Cash Flow DIP Motion at 30. Similarly, Bankruptcy Code § 364(d)(1) provides that postpetition financing may be secured by a senior lien only where "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). "A debtor has the burden to establish that the holder of the lien to be subordinated has adequate protection." *Resolution Trust Corp. v. Swedeland Dev. Grp. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994).

22.    Adequate protection of a secured creditor's interest in property is intended "to preserve the secured creditor's position as it existed at the time of the filing." *In re Melson*, 44 B.R. 454, 456–57 (Bankr. D. Del. 1984); *Swedeland Dev. Grp.*, 16 F.3d at 564 ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy." (quotation and citation omitted)). Ultimately, "the purpose of adequate protection is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use by the debtor." *Delaware Tr. Co. v. Wilmington Tr., N.A. (In re Energy Future Holdings Corp.)*, 546 B.R. 566, 581 (Bankr. D. Del. 2016) (quotation and citation omitted).

23.    The Bankruptcy Code does not explicitly define the term adequate protection. *Swedeland Dev. Grp.*, 16 F.3d at 564. Bankruptcy Code § 361 offers three non-exclusive means of providing adequate protection: (1) periodic cash payments from the debtor to the secured

10

creditor; (2) the tender of an additional or replacement lien on other property of the debtor; and (3) a "catch all" provision permitting such other means of relief as will result in the realization by the secured creditor of the "indubitable equivalent" of his interest in property. 11 U.S.C. § 361. Exactly what constitutes adequate protection must be determined on a case-by-case basis. *Swedeland Dev. Grp.*, 16 F.3d at 564.

24.     The Debtors have not met their burden of demonstrating that Customers Bank will be adequately protected notwithstanding the use of its cash collateral and the priming of its liens pursuant to the Cash Flow DIP Financing and Repo DIP Financing. Indeed, the DIP Repo Motion does not even address providing adequate protection even though it proposes the imposition of priming liens. *See* DIP Repo Motion at 13. The Cash Flow DIP Motion, meanwhile, proposes both to prime Customers Bank's prepetition liens and to use Customers' Bank's cash collateral. As adequate protection, the Debtors propose that prepetition lenders, such as Customers Bank, be granted administrative expense claims and replacement liens that will be behind the DIP Financing, DIP Repo Loan, and the carve-out, among other things. This is not the indubitable equivalent of cash which is in the sole possession and control of Customers Bank.  Thus, their form of purported adequate protection will not protect Customers Bank for the diminution in value of its collateral, including the cash in the Deposit Accounts.

25.     On a practical level, it does not appear that the Debtors actually need to use Customers' Bank's cash collateral. Indeed, a significant portion of both the Cash Flow DIP Financing and DIP Repo Financing is set to be used to roll-up the prepetition bridge financing, placing it ahead of other prepetition lenders, such as Customers Bank. That is, much of the funding will not be used for operating expenses. A review of the proposed budget, annexed to the proposed Interim Cash Flow DIP Order as Exhibit B, reveals that the operating expenses are not actually

particularly significant and the proposed Cash Flow DIP Financing more than covers those operating expenses without turning to cash collateral.

26.     Ultimately, the Debtors have failed to demonstrate that Customers Bank's collateral is adequately protected to permit the priming of Customers' Bank's liens or the use of its cash collateral. As such, the Cash Flow DIP Motion and the DIP Repo Motion should be denied.

**D.     In the Alternative, the Court Should Carve Customers Bank Out of Any Relief Granted with Response to the Objectionable First Day Motions**

27.     As an alternative to denying the Objectionable First Day Motions or an outright continuance of such motions, Customers Bank proposes being carved out of any orders granting such motions. As set forth above, Customers Bank does not believe that its cash collateral is necessary for the Debtors' day-to-day operations. Moreover, Bankruptcy Code § 559 severely limits any relief that the Debtors' have requested with respect to Customers Bank's collateral. As such, carving Customers Bank out would not ultimately prejudice the relief sought by the Debtors.

28.     Customers Bank proposes language substantially the same as follows in order to carve Customers Bank out of any relief being granted:

> Notwithstanding anything in this order to the contrary, the relief sought by the Debtors in this order shall not apply (i) to any deposit accounts located at Customers Bank or Flagstar Bank, (ii) to the accounts held by Deutsche Bank pursuant to the Amended and Restated Joint Securities Account Control Agreement dated as of August 11, 2017 (as amended, restated, supplemented or modified from time to time, the "JSACA") by and among Deutsche Bank National Trust Company ("Securities Intermediary"), Customers Bank, Flagstar Bank and Texas Capital Bank, or (iii) to any of the collateral for the Prepetition Loan Facilities or the Customers Repo Facility, including cash collateral and proceeds of collateral. Notwithstanding anything in this order to the contrary, no liens being granted in connection with this order or any other interim first-day order shall attach to the collateral of Flagstar Bank or Customer Bank. Nothing in this paragraph shall affect the right of the Debtors, Customers Bank or Flagstar Bank to seek additional relief, including, without limitation, in the final first day orders.

12

29.     Counsel to Customers Bank and counsel to Flagstar have shared the foregoing language with Debtors' counsel, but as of the writing of this Objection, the parties have not reached an agreement.

*[Remainer of this Page Intentionally Left Blank]*

## <u>CONCLUSION</u>

**WHEREFORE,** for the reasons set forth above, Customers Bank respectfully requests that the Court continue the Hearing, or, in the alternative (A) (i) deny the Cash Management Motion to the extent is seeks to restrict accounts otherwise entitled to safe harbor protections; (ii) deny the Cash Flow DIP Motion to the extent it seeks to prime Customers Bank's lien or use its cash collateral; (iii) deny the DIP Repo Motion to the extent it seeks to prime Customers Bank's liens; or (B) insert certain language as set forth above in any order granting such motions that would carve Customers Bank out of such relief; and granting such other, further, and different relief as the Court deems just and proper.

Dated: July 1, 2022

By: */s/ Eric Lopez Schnabel*
Eric Lopez Schnabel, Esq.
Alessandra Glorioso, Esq.
DORSEY & WHITNEY (DELAWARE) LLP
300 Delaware Avenue
Suite 1010
Wilmington, DE  19801
Telephone: (302) 425-7171
E-mail: schnabel.eric@dorsey.com
        glorioso.alessandra@dorsey.com

 -and-

Thomas O. Kelly III, Esq.
DORSEY & WHITNEY LLP
50 South Sixth Street
Suite 1500
Minneapolis, MN 55402-1498
Telephone: (612) 492-6029
E-mail: kelly.tom@dorsey.com

*Counsel to Customers Bank*

4811-3051-6055\4