**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FIRST GUARANTY MORTGAGE CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-10584 (CTG)<br><br>(Jointly Administered) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION OPERATIONAL CASH FLOW FINANCING;
(II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL;
(III) GRANTING LIENS AND PROVIDING SUPER-PRIORITY
ADMINISTRATIVE EXPENSE STATUS; (IV) GRANTING ADEQUATE
PROTECTION; (V) SCHEDULING A FINAL HEARING; (VI) MODIFYING
THE AUTOMATIC STAY; AND (VII) GRANTING RELATED RELIEF**

Upon the motion, dated June 30, 2022 (the "Cash Flow DIP Motion"), of First Guaranty Mortgage Corporation ("FGMC") and Maverick II Holdings, LLC ("Maverick"), the debtors and debtors in possession (together, the "Debtors") in the above-captioned chapter 11 cases (the "Cases"), seeking entry of an order (this "Interim Cash Flow DIP Order") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506, 507 and 552 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 4001-1, 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), *inter alia*:

(i)     authorizing, pursuant to sections 105(a), 363(b), 364(c), and 364(d) of the Bankruptcy Code, the Debtors to execute, deliver, perform under and enter into transactions under:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621).  The Debtors' mailing address is 5400 Tennyson Parkway, Suite 450, Plano, TX 75024.

(a)      that certain Senior Secured Superpriority Debtor-in-Possession Term Loan and Security Agreement, to be dated on or about the DIP Closing Date,[2] the form of which is attached as Exhibit A to this Interim Cash Flow DIP Order (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "Cash Flow DIP Credit Agreement," and all obligations or liabilities with respect to the Cash Flow DIP Credit Agreement, the "Cash Flow DIP Obligations") among (i) FGMC, as borrower, (ii) Maverick, as "Holdings" (and a guarantor) and (iii) LVS II SPE XXXIV LLC, as lender (the "Cash Flow DIP Lender") which shall consist of (a) a senior secured, superpriority multi-draw term loan facility, in the aggregate amount not to exceed $22,000,000 (the "Operating Amount") plus access to the Mortgage Loan Funding Amounts and the Pipeline Sale Transaction Funding Amounts (each as defined in the Cash Flow DIP Credit Agreement) (the "Cash Flow DIP Facility") and, (b) subject to entry of the Final Cash Flow DIP Order (as defined below), a roll up facility consisting of the Prepetition Bridge Loan Obligations (as defined below) that are remaining after the Prepetition B2 FIE Financed Loan Obligations (as defined below) are refinanced by the DIP Repo Facility (such remaining Prepetition Bridge Loan Obligations, the "Roll-Up Obligations"), which Roll-Up Obligations shall be converted into a portion of the outstanding Cash Flow DIP Obligations; and

(b)      all other documents related thereto, including a custodial agreement related to the loan files for the B2 FIE Financed Loans (as defined below), (collectively with the Cash Flow DIP Credit Agreement, the "Cash Flow DIP Documents").

(ii)      granting, subject to the Carve-Out (as defined below) the priorities identified herein:

(a)      to the Cash Flow DIP Lender, superpriority claims pursuant to sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code, against the Debtors to secure the Cash Flow DIP Obligations on a joint and several basis, which shall be junior in all respects to the DIP Repo Superpriority Claim (as defined below);

(b)      to the Cash Flow DIP Lender, the Cash Flow DIP Liens (as defined below), pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, to secure the Cash Flow DIP Obligations, on the Cash Flow DIP Collateral (as defined below), including (i) a first-priority lien on the Debtors' unencumbered property, (ii) a first-priority priming lien on Prepetition Bridge Loan Collateral (as defined below), and (iii) junior liens on the DIP Repo Facility Backup Collateral and the Prepetition Loan Collateral (as

---

[2] For purposes herein, the "DIP Closing Date" means the date on which the Cash Flow DIP Facility is entered into and becomes effective, which shall occur on the date that this Interim Cash Flow DIP Order is entered or as soon as practicable thereafter.

both terms are defined below) other than Prepetition Bridge Loan Collateral; and

(c)     to the DIP Repo Guarantor, subject to satisfaction of the DIP Repo Guarantee Lien Condition (as defined below), first-priority priming liens and security interests, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, on the Cash Flow DIP Collateral and *pari passu* with the Cash Flow DIP Liens, to secure amounts actually advanced by the DIP Repo Guarantor under the DIP Repo Guarantee made by it for the benefit of the DIP Repo Facility Purchasers;[3]

(iii)   authorizing the Debtors, pursuant to sections 361, 362 and 363 of the Bankruptcy Code:

(a)     to use the Prepetition Loan Collateral (as defined below) (including cash collateral, which for the avoidance of doubt shall not include the DIP Repo Facility Backup Collateral or any other Excluded Asset (as both terms are defined below)); and

(b)     to provide adequate protection, subject to the Carve-Out and the priorities identified herein, to the Prepetition Lenders.

(iv)    upon entry of an Order approving Cash Flow DIP Facility on a final basis (the "Final Cash Flow DIP Order"), authorizing the Debtors to waive:

(a)     any Debtors' right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(b)     the "equities of the case" exception pursuant to section 552(b) of the Bankruptcy Code; and

(c)     the equitable doctrine of marshaling or similar doctrines;

---

[3] For purposes herein:

  a.  The "DIP Repo Facility" has the meaning ascribed to it in the [DIP Motion] (the "DIP Repo Motion").

  b.  The "DIP Repo Agent" has the meaning ascribed to it in the DIP Repo Motion.

  c.  The "DIP Repo Parties" has the meaning ascribed to it in the DIP Repo Motion.

  d.  The "DIP Repo Facility Purchasers" means the buyers from time to time under the DIP Repo Facility, together with the DIP Repo Agent acting on their behalf.

  e.  "DIP Repo Superpriority Claims" means the "DIP Superpriority Claims," as defined in the Interim DIP Repo Order.

  f.  The "DIP Repo Guarantee" means that certain Limited Recourse Guarantee, to be dated on or about the DIP Closing Date, attached as Exhibit C to the Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof), by and among the DIP Repo Agent and [Bravo Fund II, L.P.], as guarantor (the "DIP Repo Guarantor"), pursuant to which the DIP Repo Guarantor has agreed to provide a limited guaranty of FGMC's obligations under the DIP Repo Facility.

  g.  The "Prepetition Lenders" means B2 FIE XI LLC, Flagstar Bank, FSB ("Flagstar"), and Customers Bank ("Customers").

  h.  The "Prepetition Repo Facility Purchasers" has the meaning ascribed to it in the DIP Repo Motion.

(v)     authorizing the Debtors to use the proceeds of the Cash Flow DIP Facility, in accordance with this Interim Cash Flow DIP Order and the Cash Flow DIP Documents;

(vi)    modifying the automatic stay to the extent set forth herein and in the Cash Flow DIP Documents; and

(vii)   scheduling a final hearing (the "<u>Final Hearing</u>") to consider final approval of the Cash Flow DIP Documents as set forth in the Motion.

The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") having considered the Cash Flow DIP Motion, the exhibits attached thereto, the declarations in support of the Cash Flow DIP Motion, the Cash Flow DIP Documents; and the Interim Hearing having been held by this Court on July 1, 2022; and pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, notice of the Cash Flow DIP Motion and the relief sought at the Interim Hearing having been given by the Debtors; this Court having considered the Cash Flow DIP Motion and all pleadings related thereto, including the record made by the Debtors at the Interim Hearing; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE PLEADINGS AND THE RECORD, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

A.      <u>Petition Date</u>. On June 30, 2022 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

B.      <u>Joint Administration</u>.    The Court entered an order approving the joint administration of the Cases.

---

[4] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

DOCS_DE:239711.1 28311/001

C.    <u>Debtors in Possession</u>.    The Debtors have continued in the management and operation of their businesses and properties as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

D.    <u>Jurisdiction and Venue</u>.    This Court has core jurisdiction over the Cases, the Cash Flow DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.    Venue for the Cases and proceedings on the Cash Flow DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.    The Court may enter a final order consistent with Article III of the United States Constitution.    The predicates for the relief sought herein are sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, 9013 and 9014, and Local Rules 2002-1, 4001-1, 4001-2 and 9013-1.

E.    <u>Committee Formation</u>.    As of the date hereof, the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") has not appointed an official committee of unsecured creditors in the Cases pursuant to section 1102 of the Bankruptcy Code (a "<u>Creditors' Committee</u>").

F.    <u>Debtors' Stipulations</u>.    After consultation with their attorneys and financial advisors, the Debtors, subject to the limitations thereon contained in Paragraph [23] of this Interim Cash Flow DIP Order, on their behalf and on behalf of their estates, admit, acknowledge, agree, and stipulate as follows:

(a)    *Prepetition Bridge Loans*. Pursuant to that certain Second Amended and Restated Secured Promissory Note, dated as of June 29, 2022, executed by FGMC, as borrower, and in favor of B2 FIE XI LLC, as lender, ("<u>Prepetition Bridge Lender</u>") (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Prepetition Bridge Loan Agreement</u>"), extended certain loans and other financial accommodations to the Debtors (the "<u>Prepetition Bridge Loans</u>").    The Prepetition Bridge Loan Agreement and any other agreements and documents executed or delivered in connection therewith or pursuant thereto, each as may be amended, restated, supplemented or otherwise modified from time to time are collectively referred to herein

as the "<u>Prepetition Bridge Loan Documents</u>."

(b)    *Prepetition Bridge Loan Obligations.* As of the Petition Date:

(i)    The Prepetition Bridge Lender is owed on account of the Prepetition Bridge Loans the principal amount of $18,350,771 (such obligations, together with all interest, fees, reimbursement obligations, indemnification obligations and all other "Obligations" under and as defined in the Prepetition Bridge Loan Agreement, the "<u>Prepetition Bridge Loan Obligations</u>").

(ii)    The Debtors are absolutely and unconditionally obligated to the Prepetition Bridge Lender in respect of the Prepetition Bridge Loan Obligations under the Prepetition Bridge Loan Agreement.

(c)    *Prepetition Bridge Loan Liens and Prepetition Bridge Loan Collateral.* As more fully set forth in the Prepetition Bridge Loan Documents:

(i)    Pursuant to the Prepetition Bridge Loan Agreement, the Debtors pledged to the Prepetition Bridge Lender a senior secured lien on substantially all of its personal property assets (the "<u>Prepetition Bridge Loan Liens</u>"), including all proceeds thereof, whether then owned and existing or thereafter acquired or arising (the "<u>Prepetition Bridge Loan Collateral</u>").[5]

(d)    *Validity, Perfection and Priority of Prepetition Bridge Loan Liens and Prepetition Bridge Loan Obligations.*  The Debtors acknowledge and agree that as of the Petition Date: (a) the Prepetition Bridge Loan Liens on the Prepetition Bridge Loan Collateral are (i) valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Bridge Lenders for fair consideration and reasonably equivalent value and (ii) senior in priority over any and all other liens on the Prepetition Bridge Loan Collateral other than any other liens that are valid, properly perfected (before the Petition Date or in accordance with section 546 of the Bankruptcy Code), non-avoidable, and senior in priority as a matter of law ("<u>Prepetition Prior Liens</u>");[6]  (b) the Prepetition Bridge Loan Obligations constitute legal, valid, binding and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the Prepetition Bridge Loan Documents; (c) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Bridge Loan Liens or Prepetition Bridge Loan Obligations exist, and no portion of the Prepetition Bridge Loan Liens or Prepetition Bridge Loan

---

[5] For purposes of this Order, the "<u>Prepetition Loan Collateral</u>" shall mean the following: (i) the Prepetition Bridge Loan Collateral; (ii) the collateral granted to Flagstar pursuant to that certain Mortgage Warehousing Loan and Security Agreement dated as of June 30, 2017, between FGMC, as borrower, and Flagstar, and any other agreements and documents executed or delivered in connection therewith or pursuant thereto; and (iii) the collateral granted to Customers pursuant to that certain Amended and Restated Loan Agreement dated as of July 17, 2019, between FGMC, as borrower, and Customers, and any other agreements and documents executed or delivered in connection therewith or pursuant thereto.

[6] Nothing herein shall constitute a finding or ruling by this Court that any asserted Prepetition Prior Lien is valid, senior, enforceable, prior, perfected or non-avoidable.

DOCS_DE:239711.1 28311/001

Obligations (or any payment made in respect of any thereof) is subject to any challenge or defense, including, without limitation, avoidance, disallowance, disgorgement, recharacterization or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or other applicable law; (d) any payments made on account of the Prepetition Bridge Loan Obligations before the Petition Date were (1) payments out of the Prepetition Bridge Loan Collateral and/or (2) made in the ordinary course of business and in exchange for reasonably equivalent value and did not diminish any property otherwise available for distribution to unsecured creditors; and (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or actions for recovery or disgorgement, against the Prepetition Bridge Lender, or any of its Related Parties (as defined below), arising out of, based upon or related to their respective obligations under the Prepetition Bridge Loan Documents.  For the avoidance of doubt, the Debtors acknowledge and agree that as of the Petition Date, the Prepetition Bridge Lenders have perfected, first-priority (subject only to applicable Prepetition Prior Liens) liens on the Prepetition Bridge Loan Collateral

(e)     *Release of Claims.*  The Debtors shall be deemed to have forever waived, discharged and released each of the Prepetition Bridge Lender and each of their respective Related Parties[7] (collectively, the "Prepetition Bridge Lender Releasees") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights and other rights of disgorgement or recovery against any and all of the Prepetition Bridge Lender Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Prepetition Bridge Loan Liens, the Prepetition Bridge Loan Obligations, the Prepetition Bridge Loan Documents or the debtor-creditor relationship between any of the Prepetition Bridge Lender, on the one hand, and the Debtors, on the other hand, including, without limitation, (a) any recharacterization, subordination, avoidance, disallowance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, municipal law or foreign law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition Bridge Loan Obligations or any payments or other transfers made on account of the Prepetition Bridge Loan Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition Bridge Loan Liens securing the Prepetition Bridge Loan Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition Bridge Lender Releasees.

(f)     *Cash Collateral.*  All of the Debtors' cash, including any cash in deposit accounts of the Debtor, wherever located, and any proceeds of the sale of the Prepetition Bridge Loan Collateral (including, without limitation, any proceeds from the Bankruptcy Sale (as defined below)) constitutes Cash Collateral of the Prepetition Bridge Lender.

---

[7] For purposes of this Order, "Related Party" means, with respect to any specified person (as defined in the Bankruptcy Code), such person's affiliates (as defined in the Bankruptcy Code) and the respective directors, officers, employees, agents, investment managers, subagents, representatives, and advisors (including attorneys, accountants and experts) of such person and such person's affiliates.  For the avoidance of doubt, the affiliates of the Prepetition Bridge Lender and Cash Flow DIP Lender include Pacific Investment Management Company LLC, B2 FIE IV LLC, LVS II Offshore, L.P., LVS II Holdings, LP, and Bravo II Guarantor I LLC.

G.      <u>Findings Regarding Corporate Authority</u>.  The Debtors have all requisite corporate power and authority to execute and deliver the Cash Flow DIP Documents to which they are parties to and to perform their obligations thereunder.

H.      <u>Adequate Notice of Interim Hearing</u>.  On June 30, 2022 the Debtors filed the Cash Flow DIP Motion with this Court, pursuant to Bankruptcy Rules 2002, 4001, 9013 and 9014, and represent that they provided notice of the Cash Flow DIP Motion and the Interim Hearing to the following parties and/or their respective counsel as follows: (i) the U.S. Trustee, (ii) the Debtors' [twenty (20)] largest unsecured creditors on a consolidated basis (excluding insiders), (iii) counsel to the Prepetition Bridge Lender, (iv) respective counsel for each of the Prepetition Repo Facility Purchasers, (v) counsel to Flagstar, (vi) counsel to Customers, (vii) counsel to the Cash Flow DIP Lender, (viii) counsel to the DIP Repo Lender, and (ix) any other party entitled to notice pursuant to Local Rule 9013-1(m).  The notice given by the Debtors of the Cash Flow DIP Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rules 2002, 4001(b), (c) and (d) and 9013 and the applicable Local Rules.

I.      <u>Findings Regarding Postpetition Financing</u>.

(a)      *Good Cause*.  Good and sufficient cause has been shown for the entry of this Interim Cash Flow DIP Order.

(b)      *Necessity of Cash Flow DIP Facility*.  An immediate and critical need exists to obtain the Cash Flow DIP Facility and to use cash collateral in order to permit, among other things, the continued operation of the Debtors' businesses in the ordinary course, to administer and preserve the value of their estates, to maintain business relationships and to satisfy other working capital and operational needs.  In the absence of the availability of funds in accordance with the extensions of credit under the Cash Flow DIP Documents and this Interim Cash Flow DIP Order,

DOCS_DE:239711.1 28311/001

the continued operation of the Debtors' business would not be possible. The access of the Debtors to sufficient working capital and liquidity through the Cash Flow DIP Facility and the use of cash collateral is necessary and vital to avoid serious and irreparable harm to the Debtors and to achieve a successful reorganization. Consummation of the transactions contemplated by the Cash Flow DIP Documents and this Interim Cash Flow DIP Order is therefore in the best interests of the Debtors' estates.

(c)      *No Financing Available on More Favorable Terms*. Given their financial condition and capital structure, and despite their diligent efforts, the Debtors are unable to reasonably obtain from other sources sufficient postpetition liquidity, and the Cash Flow DIP Facility is the only such operational financing facility available at this time. The Debtors have also been unable to obtain secured credit from other sources (i) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (ii) secured only by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (iii) secured solely by a junior lien on property of the Debtors and their estates that is already subject to a lien. A loan facility in the amount provided by the Cash Flow DIP Documents is not otherwise available to the Debtors without granting the Cash Flow DIP Lender superpriority claims and superpriority priming liens and security interests, pursuant to sections 364(c)(1), (2), (3), and 364(d) of the Bankruptcy Code, as provided in this Interim Cash Flow DIP Order and the Cash Flow DIP Documents. After considering the advantages and disadvantages of the proposed Cash Flow DIP Facility, the Debtors have concluded, in the exercise of their prudent business judgment, that moving forward with the proposed Cash Flow DIP Facility is the best financing alternative reasonably available. The Cash Flow DIP Facility will permit the Debtors to operate their businesses in the ordinary course. Additionally, the extensions of credit under the Cash Flow DIP

9

Facility are fair and reasonable and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

(d)     *Willingness to Provide Liquidity*.    The Cash Flow DIP Lender has indicated a willingness to engage in the transactions contemplated by the Cash Flow DIP Documents and this Interim Cash Flow DIP Order in reliance on, among other things, (i) approval by the Court of the terms and conditions of the Cash Flow DIP Documents with respect to the Cash Flow DIP Obligations, and (ii) entry of findings of the Court that (A) the Cash Flow DIP Facility and the other financial accommodations pursuant to the Cash Flow DIP Documents are essential to the Debtors' estates and are being extended in good faith, and (B) the Cash Flow DIP Superpriority Claims and the Cash Flow DIP Liens (each as defined below) will have the protections provided for in section 364(e) of the Bankruptcy Code.

(e)     *Good Faith*.    The Cash Flow DIP Documents have been negotiated in good faith and at arm's length among the Debtors, the Cash Flow DIP Lender, and their respective representatives.  All of the Cash Flow DIP Obligations arising under, in respect of, or in connection with the Cash Flow DIP Facility and Cash Flow DIP Documents shall be deemed to have been extended by the Cash Flow DIP Lender in accordance with the Cash Flow DIP Documents and in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall therefore be entitled to the full protection of section 364(e) of the Bankruptcy Code and the terms, conditions, benefits and privileges of this Interim Cash Flow DIP Order regardless of whether this Interim Cash Flow DIP Order is subsequently reversed, vacated, modified or otherwise no longer in full force and effect or the Cases are subsequently converted or dismissed, unless the occurrence of the

10

Cash Flow DIP Obligations pursuant to this Interim Cash Flow DIP Order is stayed pending appeal.

J.      <u>Adequate Protection</u>.  The Prepetition Lenders are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, and subject to paragraph 23 of this Interim Cash Flow DIP Order, to adequate protection of their interests in the Prepetition Loan Collateral for, and equal in amount to, any diminution in the value of the Prepetition Lenders' interests in the Prepetition Loan Collateral pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code. As adequate protection, the Prepetition Lenders shall be granted, as set forth herein, and subject to paragraph 23 of this Interim Cash Flow DIP Order, superpriority administrative claims and adequate protection liens for, and in an amount equal to, any Diminution in Value (as defined below) of the Prepetition Lenders' interests in the Prepetition Loan Collateral, but subject and subordinate to (i) the Cash Flow DIP Superpriority Claims, (ii) the DIP Repo Superpriority Claims, and (iii) the Carve-Out (collectively, the "<u>Forms of Adequate Protection</u>"). Based on the Cash Flow DIP Motion and on the record presented to the Court, the Forms of Adequate Protection are fair and reasonable and reflect the Debtors' prudent exercise of business judgment.

K.      <u>Consideration</u>.  The Debtors will receive and have received fair consideration and reasonably equivalent value in exchange for access to the Cash Flow DIP Facility and all other financial accommodations provided under the Cash Flow DIP Facility, the Cash Flow DIP Documents, and this Interim Cash Flow DIP Order.  The terms of the Cash Flow DIP Facility pursuant to the Cash Flow DIP Documents and the use of the Cash Flow DIP Collateral (including the cash collateral) pursuant to this Interim Cash Flow DIP Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment and constitute reasonably equivalent value and fair consideration.

L.      Sections 506(c) and 552(b) of the Bankruptcy Code.  The Cash Flow DIP Lender

and Prepetition Lenders each shall be entitled to all of the rights and benefits of section 552(b) of

the Bankruptcy Code.  Because of the agreement of the Cash Flow DIP Lender and Prepetition

Lenders, as the case may be, to subordinate the Cash Flow DIP Liens, the Cash Flow DIP

Superpriority Claims, the Adequate Protection Liens and the 507(b) Claims (each as defined

below) to the payment of certain administrative expenses of the Debtors' estates pursuant to the

Carve-Out, the Cash Flow DIP Lender and the Prepetition Lenders are each entitled to a waiver of

any "equities of the case" claims under section 552(b) of the Bankruptcy Code subject to entry of

the Final Cash Flow DIP Order such that the "equities of the case" exception under section 552(b)

of the Bankruptcy Code shall not apply to the Cash Flow DIP Lender or the Prepetition Lenders

with respect to proceeds, products, offspring or profits of any of the Cash Flow DIP Collateral (as

defined below) and/or Prepetition Loan Collateral, as applicable.  Similarly, upon entry of the Final

Cash Flow DIP Order, each of the Cash Flow DIP Lender and Prepetition Lenders are entitled to

a waiver of section 506(c) of the Bankruptcy Code.

M.      No Marshaling/Application of Proceeds.  Subject to and upon entry of the Final

Cash Flow DIP Order, neither the Cash Flow DIP Lender nor the Prepetition Bridge Lender shall

be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to

any obligations, liens or collateral acknowledged or approved pursuant to this Interim Cash Flow

DIP Order or the Final Cash Flow DIP Order.

N.      Immediate Entry.  The Debtors have requested immediate entry of this Interim Cash

Flow DIP Order pursuant to Bankruptcy Rule 4001(b)(2) and Local Bankruptcy Rule 4001-2.

Absent the granting of the relief set forth in this Interim Cash Flow DIP Order, the Debtors will be

immediately and irreparably harmed.  Entry of this Interim Cash Flow DIP Order is in the best

interests of the Debtors and their estates and creditors because it will, among other things, allow the Debtors to continue to operate in the ordinary course of their businesses and thereby maximize the value of their estates.

O.    <u>DIP Repo Facility</u>. On the Petition Date, the Debtors also filed the DIP Repo Motion, seeking, among other things, the entry of an Order granting the relief requested therein on an interim basis (the "<u>Interim DIP Repo Order</u>").  Subject to approval pursuant to the Interim DIP Repo Order, a portion of the proceeds of the DIP Repo Facility will be used to purchase the mortgage loans financed by the Prepetition Bridge Loans (as defined in the Interim DIP Repo Order, the "<u>B2 FIE Financed Loans</u>") and repay the portion of the Prepetition Bridge Loans Obligations used to finance the B2 FIE Financed Loans (as defined in the Interim DIP Repo Order, the "<u>Prepetition B2 FIE Financed Loan Obligations</u>").  Notwithstanding anything to the contrary in this Interim Cash Flow DIP Order or any other order of the Court or any other document, in no event shall the Cash Flow DIP Facility be paid down (by mandatory or voluntary prepayment) while any portion of the DIP Repo Obligations (as defined in the Interim DIP Repo Order) remain outstanding; *provided*, for the avoidance of doubt, that nothing in this sentence prohibits the repayment of the Prepetition B2 FIE Financed Loan Obligations.

Based upon the foregoing findings and conclusions, the Cash Flow DIP Motion and the record before the Court with respect to the Cash Flow DIP Motion, and good and sufficient cause appearing therefore, **IT IS HEREBY ORDERED** that:

1.    <u>Motion Granted/Interim Financing Approved</u>.  The Cash Flow DIP Motion is granted on an interim basis as set forth in this Interim Cash Flow DIP Order.  The Debtors are hereby authorized to enter into the Cash Flow DIP Documents.  All objections to the Cash Flow

DIP Motion and to this Interim Cash Flow DIP Order to the extent not withdrawn, waived, settled or resolved are hereby denied and overruled on the merits.

2.    <u>Effectiveness</u>.  Subject to the terms hereof, this Interim Cash Flow DIP Order shall become immediately effective and enforceable *nunc pro tunc* to the Petition Date, upon the date this Interim Cash Flow DIP Order is signed by the Court and entered on the docket in the Cases (the "<u>Interim Cash Flow DIP Order Entry Date</u>"), and there shall be no stay of execution or effectiveness of this Interim Cash Flow DIP Order.

3.    <u>Authorization of the Cash Flow DIP Facility</u>

(a)    Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors are immediately authorized and empowered to (i) enter into and perform their obligations under the Cash Flow DIP Credit Agreement, (ii) execute and deliver all other Cash Flow DIP Documents required or advisable to effect the Cash Flow DIP Facility, and (iii) take all actions which may be necessary or advisable for the performance by the Debtors under the Cash Flow DIP Documents. The Debtors are hereby authorized on an interim basis to borrow up to the aggregate principal amount of $11,000,000 out of the Operating Amount, plus access to the Mortgage Loan Funding Amounts and the Pipeline Sale Transaction Funding Amounts, all of which shall be used by the Debtors as permitted by the Cash Flow DIP Documents, including, without limitation, subject to the Approved Budget (as defined below).

(b)    In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized and empowered to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all related fees and expenses, that the

14

Cash Flow DIP Lender may reasonably determine is required or necessary for the Debtors' performance of their obligations under the Cash Flow DIP Facility, including, without limitation:

> (i)       the execution, delivery, and performance of the Cash Flow DIP Documents, including, without limitation, the Cash Flow DIP Credit Agreement and any security and pledge agreements contemplated thereby;

> (ii)      the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the Cash Flow DIP Documents, in each case in such form as the Debtors and other required parties may agree;

> (iii)     the non-refundable payment or reimbursement of the reasonable and documented fees, costs and expenses referred to in the Cash Flow DIP Documents, including the fees and expenses of the Cash Flow DIP Lender, and costs and expenses payable under the Cash Flow DIP Documents; and

> (iv)     the performance of all other acts required under or in connection with the Cash Flow DIP Documents.

4.       <u>Cash Flow DIP Obligations</u>.  Upon execution of the Cash Flow DIP Documents, the Cash Flow DIP Documents and Cash Flow DIP Obligations shall constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each person or entity party to the Cash Flow DIP Documents (a "<u>Cash Flow DIP Party</u>") in accordance with the terms thereof and the terms of this Interim Cash Flow DIP Order, and any of their successors and assigns, including any trustee appointed in the Cases or in any case under chapter 7 of the Bankruptcy Code upon conversion of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").  No obligation, payment, transfer or grant of security hereunder or under the Cash Flow DIP Documents shall be stayed, restrained, voidable, avoidable

or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, 547, or 550 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance (whether equitable or otherwise), impairment or any other challenges under the Bankruptcy Code or any other applicable foreign or domestic law or regulation by any person or entity; provided, however, that the grant of adequate protection claims and liens shall be subject to paragraph 23 of this Interim Cash Flow DIP Order.

5.     <u>Security for the Cash Flow DIP Obligations</u>.

(a)     Effective immediately upon entry of this Interim Cash Flow DIP Order, the Court hereby grants the following valid, binding, enforceable, non-avoidable, automatically and properly perfected postpetition senior priming security interests and liens (collectively, the "<u>Cash Flow DIP Liens</u>") to the Cash Flow DIP Lender, in each case to secure the Debtors' obligations under the Cash Flow DIP Documents: a lien and security interest, pursuant to section 364(c) and section 364(d) of the Bankruptcy Code, upon all property identified in (i), (ii) and (iii) below and subject to the relevant priorities described below and in the Interim DIP Repo Order (in each case, other than Excluded Assets (as defined below)) (collectively, the "<u>Cash Flow DIP Collateral</u>").  The Cash Flow DIP Liens on the Cash Flow DIP Collateral shall be senior in all respects to the security interests in, and liens on, the Cash Flow DIP Collateral and subject only to (A) the Carve-Out, (B) valid, perfected and non-avoidable liens (other than liens of the Prepetition Bridge Loan Lender, which shall be primed) on Cash Flow DIP Collateral that are in existence on the Petition Date, solely to the extent such liens are senior in priority to the Cash Flow DIP Liens on Cash Flow DIP

Collateral, (C) valid and non-avoidable liens on Cash Flow DIP Collateral that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code solely to the extent such liens are senior in priority to the Cash Flow DIP Liens on Cash Flow DIP Collateral, and (D) as to the DIP Repo Facility Backup Collateral (as defined below) only, the lien of the DIP Repo Agent in such collateral.

(i)     Priming Lien on Prepetition Bridge Loan Collateral.  Pursuant to section 364(d) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, a valid, binding, continuing, enforceable, fully perfected, senior priming lien on, and security interest in, the Prepetition Bridge Loan Collateral.

(ii)     Senior Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, a valid, binding, continuing, enforceable, fully perfected, first priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property in which any of the Debtors has an interest, whether existing on or after the Petition Date or thereafter acquired, that is not subject to a valid, perfected, non-avoidable and enforceable lien or security interest in existence on or as of the Petition Date (collectively, the "Unencumbered Property"), including, without limitation, (i) any cash of the Debtors, (subject to the limitations on the Carve-Out Account set forth herein) and any investment of such cash (*provided* that such cash shall not include any cash that constitutes DIP Repo Collateral), inventory, accounts receivable, other rights to payment whether arising before or on the Petition Date, including without limitation the warehouse related cash accounts at FGMC, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other

17

intellectual property, equity interests, and any claims and causes of the Debtors; (ii) any commercial tort claims and causes of action of any of the Debtors and any claims or causes of action against any directors or officers of the Debtors as well as any proceeds of, or property recovered in connection with, any successful claims and causes of action against any directors or officers of the Debtors; (iii) upon entry of the Final Cash Flow DIP Order, proceeds of the Debtors' claims and causes of action arising under chapter 5 of the Bankruptcy Code (collectively, the "Avoidance Actions"); and (iv) the proceeds of all of the foregoing; *provided* that the Unencumbered Property shall exclude the Excluded Assets, to the extent set forth in the definition thereof; and

(iii)    Junior Liens on Prepetition Loan Collateral and DIP Repo Backup Collateral.    Pursuant to section 364(c)(3) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, a valid, binding, continuing, enforceable, fully perfected, junior lien on, and security interest in (a) the Prepetition Loan Collateral (other than the Prepetition Bridge Loan Collateral), which security interests and liens in favor of the Cash Flow DIP Lender shall be immediately junior to the Prepetition Lenders and (b) the DIP Repo Facility Backup Collateral,[8] which security interests and liens in favor of the Cash Flow DIP Lender shall be immediately junior to the DIP Repo Lender; *provided* that, for the avoidance of doubt, the Cash Flow DIP Liens shall attach to the DIP Repo Facility Backup Collateral only to the extent that (i) the Transactions (as defined DIP Repo Facility Agreement) are recharacterized as other than sales or (ii) the Purchased Assets are repurchased by the Debtors.

---

[8] As set forth in the Interim DIP Repo Order, the term "DIP Repo Facility Backup Collateral" means the Purchased Assets (as defined in the DIP Repo Facility Agreement).

(b)      The Cash Flow DIP Liens shall be effective immediately upon the Interim Cash Flow DIP Order Entry Date.

(c)      The Cash Flow DIP Liens are granted on the Cash Flow DIP Collateral *nunc pro tunc* to the Petition Date without the necessity of the execution by the Debtors (or recordation or other filing or notice) of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control by the applicable agents or Cash Flow DIP Lender.  As set forth below in Paragraph 20 of this Interim Cash Flow DIP Order, the Cash Flow DIP Lender may, but shall not be obligated to, execute, record, file, or notice such security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents with respect to the Cash Flow DIP Liens, or possess or control the Cash Flow DIP Collateral, and the automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to implement the foregoing.

6.      <u>Cash Flow DIP Superpriority Claims</u>.  On account of the Cash Flow DIP Obligations, the Cash Flow DIP Lender is hereby granted superpriority administrative expense claims (the "<u>Cash Flow DIP Superpriority Claims</u>") pursuant to sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code against each of the Debtors.   The Cash Flow DIP Superpriority Claims shall be senior to all other administrative expense or other claims, including those arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 546(d), and 726 of the Bankruptcy Code.  Notwithstanding the foregoing, the Cash Flow DIP Superpriority Claims shall be subject and subordinate in all respects to the Carve-Out and the DIP Repo Superpriority Claims and, pending entry of the Final Cash Flow DIP Order, shall not be payable from the proceeds of Avoidance Actions.

7.      <u>Security for the DIP Repo Guarantor</u>.

(a) In order to provide credit support on behalf of the Debtors and to induce the DIP Repo Parties to extend credit under the DIP Repo Facility, the DIP Repo Guarantor agreed to guarantee the obligations of FGMC under the DIP Repo Facility up to the DIP Repo Guarantee Limit.  The provision of the DIP Repo Guarantee was a material inducement to the DIP Repo Agent and the DIP Repo Facility Purchasers extending postpetition warehouse financing to the Debtors pursuant to the DIP Repo Facility.  Additionally, absent the provision of the DIP Repo Guarantee, the DIP Repo Facility Purchasers would have provided a lower advance rate under the DIP Repo Facility, which in turn would have increased the funding need of the Debtors under the Cash Flow DIP Facility on a dollar-for-dollar basis.

(b) Effective immediately upon entry of this Interim Cash Flow DIP Order, the Court hereby grants the following valid, binding, enforceable, non-avoidable, automatically and properly perfected postpetition security interests and liens (collectively, the "DIP Repo Guarantee Liens") to the DIP Repo Guarantor, to secure amounts actually advanced by the DIP Repo Guarantor under the DIP Repo Guarantee for the benefit of the DIP Repo Facility Purchasers: a contingent first-priority lien and security interest, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, on the Cash Flow DIP Collateral, which shall arise only upon the full and indefeasible payment and satisfaction of the obligations under the DIP Repo Facility (the "DIP Repo Guarantee Lien Condition"). The DIP Repo Guarantee Liens shall be *pari passu* with the Cash Flow DIP Liens.

(c) The DIP Repo Guarantee Liens are granted on the Cash Flow DIP Collateral *nunc pro tunc* to the Petition Date without the necessity of the execution by the Debtors (or recordation or other filing or notice) of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control by the applicable agents or any other Cash Flow DIP Party.  As set forth below in Paragraph 20 of this

Interim Cash Flow DIP Order, the DIP Repo Guarantor may, but shall not be obligated to, execute, record, file, or notice such security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents with respect to the DIP Repo Guarantee Liens, or possess or control the Cash Flow DIP Collateral, and the automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to implement the foregoing.

8.    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Interim Cash Flow DIP Order or the Cash Flow DIP Documents, the Cash Flow DIP Collateral shall not include (i) any leasehold interest of a Debtor to the extent the granting of liens on such interest would, after giving effect to the Bankruptcy Code or this Interim Cash Flow DIP Order, nonetheless result in the abandonment, invalidation or unenforceability of any right, title or interest under any lease governing such leasehold interest or a breach or termination of such lease pursuant to its terms, (ii) any escrow, fiduciary, or trust account (including funds held in such accounts unless and until released or distributed to the Debtors), (iii) the Debtors' intellectual property that constitutes "intent to use" trademarks, to the extent the assignment of the creation or a lien thereon would violate applicable non-bankruptcy law unless such violation is excused or permitted under applicable bankruptcy law, (iv) any amount in excess of 65% of the voting equity interest in any non-U.S. subsidiary of a Debtor, (v) the Carve-Out Account (as defined below) (including funds held in the Carve-Out Account), and (vi) the proceeds of any of the assets identified in the foregoing clauses (i) and (vi) until released or distributed to the Debtors, (the assets described in the foregoing clauses (i) through (vi), subject to the foregoing proviso, the "<u>Excluded Assets</u>").

9.    <u>Carve-Out</u>.

(a)     As used in this Interim Cash Flow DIP Order, the "Carve-Out" shall be comprised of the following components:

(i)     <u>Clerk and U.S. Trustee Fees</u>.  All fees required to be paid to the Clerk of this Court and to U.S. Trustee under section 1930(a) of title 28 of the United States Code and 31 U.S.C. § 3717 (collectively, the "<u>Clerk and UST Fees</u>").

(ii)    <u>Allowed Professional Fees Incurred Prior to a Carve-Out Trigger Notice</u>.  To the extent allowed by the Court (regardless of whether the order allowing such fees is entered before or after the Carve-Out Trigger Notice), accrued and unpaid fees and expenses (the "<u>Allowed Professional Fees</u>"), in an aggregate amount on a line item basis not exceeding the budged amounts for such Allowed Professional Fees reflected in the Approved DIP Budget, incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Creditors' Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the date of delivery by the Cash Flow DIP Lender of a Carve-Out Trigger Notice (as defined below) (collectively, the "<u>Pre-Termination Amount</u>").  For purposes of the Carve-Out, Allowed Professional Fees shall exclude (a) any restructuring, sale, success or similar fee of any Professional Person and (b) fees and expenses of any third party professionals employed by any individual member of the Creditors' Committee (if any).

(iii)   any accrued and unpaid postpetition fee and expense claims, without regard to when such fees and expenses accrued, related to the appointment of the Chief Restructuring Officer and the Operations Consultant, in each case, in accordance with the Approved DIP Budget, including any interim or final approval as set forth in any order of the Court approving the appointment of any Chief Restructuring Officer and the Operations Consultant or, if applicable, any procedures approved by the Court relating to the compensation of the Chief Restructuring Officer and the Operations Consultant; *provided*, *however*, that any Court-approved bonus, transaction, success fees, completion fees, substantial contribution fees, or any other fees of similar import shall be paid solely from the net proceeds of the Court approved transaction giving rise to such award;

(iv)    <u>Chapter 7 Trustee</u>.  In the event of a conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, allowed fees and expenses incurred by a trustee and any professional retained by such trustee, in an aggregate amount not to exceed $25,000; <u>provided</u>, <u>however</u>, no portion of the Carve-Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Debtors owing to the Cash Flow DIP Lender or the Prepetition Bridge Lender or any of its affiliates, or (ii) liens or security interests in the collateral securing such indebtedness, including challenges to the perfection,

22

priority or validity of the liens granted in favor of the Cash Flow DIP Lender or the Prepetition Bridge Lender or any of its affiliates with respect thereto;

(v)     Allowed Professional Fees Incurred After a Carve-Out Trigger Notice. Allowed Professional Fees of Professional Persons incurred on and after the first business day following delivery by the Cash Flow DIP Lender of the Carve-Out Trigger Notice, subject to an aggregate cap of $200,000 (collectively, the "Post Trigger Notice Carve-Out Fee Cap").

(b)     Carve-Out Trigger Notice. Upon the occurrence and during the continuance of any Cash Flow DIP Event of Default (as defined below), the Cash Flow DIP Lender may deliver a written notice invoking the Post Trigger Notice Carve-Out Fee Cap (the "Carve-Out Trigger Notice") to the Debtors, the Debtors' lead restructuring counsel, the U.S. Trustee, and the lead counsel for the Creditors' Committee (if any). The Carve-Out Trigger Notice may be delivered by email (or any other means permitted under the Cash Flow DIP Documents).

(c)     Delivery of Fee Statements. For purposes of determining the Pre-Termination Amount, no later than five (5) business days after the delivery of a Carve-Out Trigger Notice, each Professional Person shall deliver a statement (each, a "Fee Statement") to the Debtors setting forth a good-faith estimate of the amount of fees and expenses incurred and unpaid prior to the date of the Carve-Out Trigger Notice.

(d)     Carve-Out Account. Promptly following the entry of this Interim Cash Flow DIP Order, the Debtors shall establish a segregated account, which shall not be subject to control of the Cash Flow DIP Lender (the "Carve-Out Account"), but which shall be funded by the Cash Flow DIP or available funds at FGMC in accordance with the Approved DIP Budget and in no event from any Excluded Asset. Amounts funded into the Carve-Out Account in accordance with clause (e) below shall be held in trust to pay the Carve-Out. Following delivery of a Carve-Out Trigger Notice, all Allowed Professional Fees of Professional Persons shall be paid to the applicable Professional Person first from the Carve-Out Account in accordance with the order or orders of

23

the Court allowing such Allowed Professional Fees.  Notwithstanding anything to the contrary in

this or any other Court order, the Carve-Out Account and the amounts on deposit in the Carve-Out

Account shall be available and used only to satisfy obligations of Professional Persons benefitting

from the Carve-Out.  The failure of the Carve-Out Account to satisfy Professional Fees in full shall

not affect the priority of the Carve-Out.  The Cash Flow DIP Collateral shall include the Debtors'

reversionary interest in funds held in the Carve-Out Account, if any, after all Allowed Professional

Fees that are subject to the Carve-Out have been paid in full pursuant to a final order not subject

to appeal.

(e)  <u>Carve-Out Funding After a Carve-Out Trigger Notice</u>.  The following provisions

with respect to the Carve-Out Account shall apply only upon delivery of a Carve-Out Trigger

Notice:

    (i)  On the date of the Carve-Out Trigger Notice, the Carve-Out Trigger Notice shall be deemed to constitute a demand to the Debtors to utilize all cash on hand at FGMC or from the Cash Flow DIP and in no event from any Excluded Asset (the "<u>Cash On Hand</u>") as of such date to fund the Carve-Out Account in an amount equal to (A) the unpaid Clerk and UST Fees, (B) the Chapter 7 Trustee Fee Cap, (C) the Pre-Termination Amount (determined based upon the Fee Statements submitted to the Debtors in accordance with clause (c) above), (D) the Post Trigger Notice Carve-Out Fee Cap, (collectively, the "<u>Aggregate Unfunded Amount</u>") to be held in trust to pay all amounts included in the Carve-Out.

    (ii)  On or after the date of a Carve-Out Trigger Notice, no Cash Flow DIP Party, including the Cash Flow DIP Lender, shall foreclose on or sweep cash of the Debtors (including cash received as a result of the sale or other disposition of any assets and cash provided pursuant to the Cash Flow DIP Facility) until the Carve-Out Account has been fully funded with the Aggregate Unfunded Amount.

    (iii)  All funds in the Carve-Out Account shall be used first to pay the obligations set forth in the definition of the Carve-Out set forth above until paid in full. All payments and reimbursements made from the Carve-Out Account shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

(f)  <u>Payment of Compensation</u>.  Following delivery of a Carve-Out Trigger Notice, the

Debtors shall be permitted to pay fees and expenses allowed and payable by order of the Court

(that has not been vacated or stayed, unless the stay has been vacated) under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable from the Carve-Out Account.

10.      Fees and Expenses.   The Debtors are authorized and directed to pay any and all reasonable and documented fees and expenses described in this Paragraph no later than ten (10) days after receipt (via electronic mail) by (i) the Debtors, (ii) counsel for the Debtors, (iii) the U.S. Trustee, and (iv) counsel for the Creditors' Committee (if any) (collectively, the "Fee Notice Parties"), of an invoice (which need not contain any itemized details as to the relevant fees and expenses), in connection with the Cases, whether incurred before, on or after the Petition Date and whether or not the transactions contemplated hereby are consummated.   The Debtors shall indefeasibly pay or reimburse the Cash Flow DIP Lender for its respective reasonable and documented fees and out-of-pocket costs, expenses and charges, including, but not limited to, the reasonable and documented fees, costs, and expenses of Greenberg Traurig, LLP, as counsel to the Cash Flow DIP Lender, and any other advisors or professionals retained by the Cash Flow DIP Lender. For the avoidance of doubt, no recipient of the fees, costs and expenses of the Cash Flow DIP Lender shall be required to file with respect thereto any interim or final fee application with the Court.   Such fees and expenses shall not be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever.   All fees, costs and expenses payable under the Cash Flow DIP Documents to the Cash Flow DIP Lender shall be included and constitute part of the Cash Flow DIP Obligations and be secured by the Cash Flow DIP Liens.   For the avoidance of doubt, the Debtors shall be responsible to pay, subject to the procedures outlined in this Paragraph, all reasonable and documented fees and expenses incurred by the Cash Flow DIP Lender in connection with any action taken in the Cases, including, but not limited to, acting as a plan sponsor pursuant to any chapter 11 plan for the Debtors.   Further, the upfront fee payable by

25

the Debtors pursuant to section 3.04(b) of the Cash Flow DIP Credit Agreement, which is deemed fully earned and nonrefundable on the Interim Cash Flow DIP Order Entry Date, shall be payable pursuant to the terms of the Cash Flow DIP Documents.

11.     <u>No Direct Obligation to Pay Professional Fees</u>.  The Cash Flow DIP Lender shall not be responsible for payment or reimbursement of any fees or disbursement of any Professional Person, or the Clerk and UST Fees, incurred in connection with these Cases, any Successor Cases or otherwise.  Nothing in this Interim Cash Flow DIP Order or otherwise shall be construed: (a) to obligate the Cash Flow DIP Lender in any way to pay compensation to, or reimburse the expenses of, any Professional Person, or the Clerk and UST Fees, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; (b) as consent to the allowance of any fees and expenses of Professional Persons; or (c) to affect the rights of the Cash Flow DIP Lender, or any other party in interest, to object to the allowance and payment of such fees and expenses.

12.     <u>Restrictions on Use of Proceeds of Cash Flow DIP Facility</u>.  No portion of the Carve-Out, any cash collateral, any other Cash Flow DIP Collateral, or any proceeds of the Cash Flow DIP Facility shall be used for the payment of professional fees, disbursements, costs or expenses incurred by any person, including, without limitation, the Debtors, the Creditors' Committee, any trustee or other estate representative appointed in the Cases or any Successor Case, or any other party, for any of the following actions or activities without the written consent of the Cash Flow DIP Lender: (a) to seek authorization to obtain liens or security interests on any asset of the Debtors that are senior to, or on a parity with, the Cash Flow DIP Liens, the Cash Flow DIP Collateral, or the Cash Flow DIP Superpriority Claims; (b) to seek authorization to obtain claims against the Debtors or their property that are senior to, or *pari passu* with, the liens and claims

26

identified in the preceding sub-clause (a); or (c) except as expressly set forth herein, directly or indirectly prepare, assert, join, commence, support, or prosecute any action for any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination, or any other relief against, or adverse to the interests of, the Cash Flow DIP Lender and any of its representatives with respect to any transaction, occurrence, omission, action, or other matter, including, without limitation, (i) any Avoidance Action, (ii) any "lender liability" claims and causes of action, (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Cash Flow DIP Liens, the Cash Flow DIP Superpriority Claims, or the Cash Flow DIP Obligations, (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid, or subordinate, in whole or in part, any of the obligations identified in the preceding clause (iii), (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to the parties hereunder or under any of the documents referred to herein, including claims, proceedings, or actions that might prevent, hinder or delay any of such parties' assertions, enforcement, realizations or remedies on or against their collateral and rights herein or (vi) objecting to, contesting with, or interfering with, in any way, such parties' enforcement or realization upon any of their collateral or rights, once a Cash Flow DIP Event of Default has occurred; *provided* that the Debtors shall be permitted to challenge the validity of any alleged Cash Flow DIP Event of Default.

13.    <u>Limitation of Liability</u>.  The Cash Flow DIP Lender shall have no liability to any third party relating to the Cash Flow DIP Documents and the Debtors' use of the liquidity provided thereunder and shall not, by virtue of entering into the transactions contemplated by the Cash Flow DIP Facility or otherwise complying with the Cash Flow DIP Documents or this Interim Cash

27

Flow DIP Order, be deemed to be in control of the operations of the Debtors, or to owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.  The Debtors shall, and are hereby authorized to, indemnify and hold harmless the Cash Flow DIP Lender and its affiliates and representatives from and against all losses, liabilities, claims, damages, penalties, actions, judgments, suits, expenses or disbursements of any nature whatsoever arising out of or relating to the Cash Flow DIP Documents or this Interim Cash Flow DIP Order, including the syndication of any obligations thereunder, and the Debtors' use of the liquidity provided thereunder; *provided*, *however*, that the foregoing indemnity shall not apply to any actions of any indemnified parties determined in a final non-appealable judgment to constitute fraud, gross negligence, or willful misconduct.  This indemnification shall survive and continue for the benefit of all such persons or entities.

14.     <u>No Obligation to Extend Credit</u>.   The Cash Flow DIP Lender shall have no obligation to make any loan or advance under the Cash Flow DIP Documents, unless all of the conditions precedent in the Cash Flow DIP Credit Agreement have been satisfied in full or waived by the Cash Flow DIP Lender in its sole discretion.

15.     <u>Adequate Protection of the Prepetition Lenders</u>.  Subject to the Carve-Out in all respects, to the extent there is a postpetition diminution in value of the Prepetition Loan Collateral (including cash collateral), resulting from the use, sale, or lease by the Debtors of the Prepetition Loan Collateral (including cash collateral), the granting of the Cash Flow DIP Superpriority Claims, the granting of the Cash Flow DIP Liens and to the Carve-Out, and the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code (collectively, the "<u>Diminution in Value</u>"), the Prepetition Lenders are hereby granted, subject to the terms and

conditions set forth below, and subject to paragraph 23 of this Interim Cash Flow DIP Order, the following Forms of Adequate Protection:

(a)    <u>Adequate Protection Liens</u>.  Pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Prepetition Lenders are hereby granted a perfected, first-priority security interest and lien on (the "<u>Adequate Protection Liens</u>") the same property of the Debtors on which the Prepetition Lenders had a perfected, first-priority security interest and lien prior to the Petition Date, whether arising prepetition or postpetition, which liens and security interests shall be subordinate only to (i) Liens permitted to be senior under such Prepetition Lender's loan documents, (ii) the Cash Flow DIP Liens, (iii) the DIP Repo Guarantee Liens, and (iv) the Carve-Out.

(b)    <u>Prepetition Lenders Superpriority Claim</u>.  Pursuant to sections 361 and 364(c)(1) of the Bankruptcy Code, the Prepetition Lenders are hereby granted a superpriority administrative expense claim (the "<u>Prepetition Lenders Superpriority Claim</u>") against each of the Debtors solely to the extent of any Diminution in Value of the Prepetition Loan Collateral, as provided for in section 507(b) of the Bankruptcy Code, which administrative expense claim in the Cases or any Successor Cases shall be senior to all other administrative expense or other claims, including those arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code; *provided* that such Prepetition Lenders Superpriority Claim shall be subject and subordinate to (i) the Cash Flow DIP Superpriority Claims, (ii) the DIP Repo Superpriority Claims, and (iii) the Carve-Out.  Notwithstanding the foregoing, the Prepetition Lenders Superpriority Claim shall not be payable from the proceeds of Avoidance Actions, pending entry of the Final Cash Flow DIP Order.

(c)    <u>Reporting</u>.  As additional adequate protection, the Debtors shall prepare and deliver to the Prepetition Lenders any documents provided to the Cash Flow DIP Lender and/or the DIP Repo Agent for reporting purposes under the Cash Flow DIP Facility and/or the DIP Repo Facility.

(d)    <u>Sufficiency of Adequate Protection</u>.  The Prepetition Lenders are adequately protected by the Forms of Adequate Protection set forth herein and through the Cash Flow DIP Facility.  The Cash Flow DIP Facility is necessary to allow the Debtors to continue the operation of their businesses, maintain their value as a going concern and achieve a successful reorganization, which will preserve and maximize the value of the Debtors and their estates for the benefit of the Debtors and all their stakeholders, including the Prepetition Lenders.  The grant of the Cash Flow DIP Liens accordingly will not cause a diminution in the value of the Prepetition Lenders' interest in the Prepetition Loan Collateral.  The grant of the DIP Repo Guarantee Liens benefits the Prepetition Lenders because absent provision of the DIP Repo Guarantee, the advance rates under the DIP Repo Facility would have been lower, which would have necessitated commensurately higher borrowings under the Cash Flow DIP Facility. Accordingly, the DIP Repo Guarantee Liens are contingent priming liens (contingent upon funding actual amounts under the DIP Repo Guarantee and the full and indefeasible payment and satisfaction of the obligations of the Debtors under the DIP Repo Facility) instead of actual priming liens in respect of additional borrowings under the Cash Flow DIP Facility.  Additionally, the Forms of Adequate Protection are consistent with the Bankruptcy Code.  The Court therefore finds that the foregoing adequate protection is reasonable and sufficient to protect the interests of the Prepetition Lenders.

16.    <u>Events of Default</u>.

(a)    Unless further extended or waived by written agreement among the Debtors and the Cash Flow DIP Lender, the occurrence of any of the following events shall constitute an event

30

of default (each a "Cash Flow DIP Event of Default"): (i) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Cash Flow DIP Order or any Final Cash Flow DIP Order; (ii) the consent of the Debtors to the standing of any party, including the Creditors' Committee, to pursue any claim or cause of action against any of the Released Parties (as defined below) that belongs to the Debtors or their estates, including, without limitation, any Challenge (as defined below); (iii) commencement of a Challenge (as defined below) by any party, including the Debtors or the Creditors' Committee; and (iv) an "Event of Default" as defined under the Cash Flow DIP Documents shall have occurred and is continuing, unless waived pursuant to the Cash Flow DIP Documents.

(b)     Upon the occurrence and during the continuation of a Cash Flow DIP Event of Default, the Cash Flow DIP Lender may (i) deliver a notice of Cash Flow DIP Event of Default; (ii) declare the principal of and accrued interest, fees, expenses and other amounts under the Cash Flow DIP Documents to be due and payable; (iii) place an administrative hold on any deposit account or securities account that constitutes Cash Flow DIP Collateral, including the Controlled Account (as defined in the Cash Flow DIP Documents), subject to funding of the Carve-Out Account; and (iv) upon five (5) business days' written notice to the Debtors, any official committee, and the U.S. Trustee (the "Cash Flow DIP Forbearance Period"), exercise all other rights and remedies available to the Cash Flow DIP Lender; *provided*, *however*, that, with respect to any Cash Flow DIP Event of Default for the failure to pay all obligations under the Cash Flow DIP Documents in full in cash by the maturity date as set forth in the Cash Flow DIP Credit Agreement (the "Cash Flow DIP Maturity Date"), the Cash Flow DIP Lender may exercise all rights and remedies immediately upon the occurrence of said default.

DOCS_DE:239711.1 28311/001

(c)      Notwithstanding anything herein to the contrary, (i) if a Cash Flow DIP Event of Default exists at the end of the Cash Flow DIP Forbearance Period, then the Cash Flow DIP Lender shall be permitted to immediately exercise all of its other rights and remedies under the Cash Flow DIP Documents and (ii) the Cash Flow DIP Lender shall not be required to permit any funding or other financial accommodation under the Cash Flow DIP Documents during the Cash Flow DIP Forbearance Period unless and until the foregoing conditions shall have been satisfied during such period.  The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary, without the need for any further order of the Court, to permit the Cash Flow DIP Lender to exercise all rights and remedies under the Cash Flow DIP Documents and under this Interim Cash Flow DIP Order, in accordance with the terms of this Interim Cash Flow DIP Order.

17.      <u>Amendments, Consents, Waivers and Modifications</u>.  The Debtors and the Cash Flow DIP Lender are authorized, subject to the Cash Flow DIP Documents, to implement, in accordance with the terms of the respective Cash Flow DIP Documents, any amendments, waivers, consents or other modifications to or under the Cash Flow DIP Documents without the need for further notice and hearing or any order of this Court; *provided*, *however*, that, without the consent of this Court after notice and a hearing, no such amendments, consents, waivers or modifications shall (i) shorten the maturity date as set forth in the Cash Flow DIP Credit Agreement, (ii) increase the commitments thereunder or the rate of interest payable under the Cash Flow DIP Documents (other than imposition of the default rate) or (iii) amend the "Events of Default" or covenants in the Cash Flow DIP Documents to be materially more restrictive to the Debtors than those set forth in the form of Cash Flow DIP Credit Agreement as of the Interim Cash Flow DIP Order Entry Date.

32

18.     <u>Rights of Access and Information</u>.   Without limiting the rights of access and information afforded the Cash Flow DIP Parties under the Cash Flow DIP Documents, the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the Cash Flow DIP Lender reasonable access to: (a) the Debtors' premises, (b) knowledgeable officers of the Debtors, (c) the Debtors' books and records, and (d) the Debtors' properties and other collateral of any Debtor against whom such parties are granted Cash Flow DIP Liens under this Interim Cash Flow DIP Order, and the Debtors shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.

19.     <u>DIP Budget</u>.

(a)     Attached hereto as <u>Exhibit B</u> is an initial cash flow forecast (the "<u>Initial DIP Budget</u>") setting forth all line-item and cumulative receipts and operating disbursements on a weekly basis for the period beginning as of the week of the Closing Date through and including the thirteenth (13th) week after such week.  The Initial DIP Budget shall be deemed the "<u>Approved DIP Budget</u>" for all purposes of the Cash Flow DIP Documents until superseded by any Updated DIP Budget (as defined below) that subsequently is consented to by the Cash Flow DIP Lender

(b)     On or before 5:00 p.m. New York City time on Thursday of each week, the Debtors shall deliver (a) a supplement to the Initial DIP Budget (or the previously supplemented Approved DIP Budget, as the case may be), covering the subsequent 13-week period that commences with the week immediately following the date of delivery of the supplemental budget (and which, for the avoidance of doubt, cannot modify previous weeks), consistent with the form and level of detail set forth in the Initial DIP Budget and otherwise in form and substance reasonably acceptable to, and consented to by, the Cash Flow DIP Lender in its discretion (each such supplemental budget, an "<u>Updated DIP Budget</u>"), (b) an actual consolidated cash flow of the Debtors for the week

33

preceding the first week of such Updated DIP Budget, showing line item variances between actual results and projected results (if applicable) for such week from the most recent Approved DIP Budget delivered pursuant to clause (a), in each case in a form reasonably acceptable to the Cash Flow DIP Lender which (I) shall be prepared on a consolidated basis for the Debtors, approved and certified by the Chief Restructuring Officer of the Debtors, as being accurate in all material respects (or in the case of the projections, as being projections believed to be reasonable at the time furnished, prepared in good faith based on assumptions believed to be reasonable at the time furnished), and (II) shall (A) show, in the case of clause (a), projected cash receipts and projected cash disbursements, (B) include for such period, in the case of clauses (a) and (b), a summary of collections, disbursements, outstanding checks and interest payments, (C) in the case of clause (b), include a line item variance report setting forth (x) actual results against anticipated results under the Approved DIP Budget for the week in regard to which such accompanying cash flow forecast is being delivered, reported in the aggregate (highlighting key line items) as of the end of such period, (y) variances in dollar amounts and percentages, and (z) a written explanation for all line item variances of greater than 10% for the applicable week, and (D) such other information as the Cash Flow DIP Lender may reasonably request (such items described in this clause (b), the "Variance Report").

(c)    Upon (and subject to) the approval of any such Updated DIP Budget by the Cash Flow DIP Lender in its sole discretion, such Updated DIP Budget shall constitute the then-approved Approved DIP Budget.

(d)    As of the Friday after the second calendar week ending after the Petition Date and on each Friday thereafter (each a "Testing Date" and, as to the first three Testing Dates, the period between the Petition Date to the Testing Date and, as to subsequent Testing Dates, the four weeks

34

prior to the Testing Date, a "Testing Period"), the Debtors shall not permit (i) the amount of receipts in any line item during such Testing Period to be less than 90% of the amount of receipts for such line item as set forth in the Approved DIP Budget for such Testing Period or (ii) the amount of disbursements (for the avoidance of doubt, excluding disbursements under any of the "Debtor Professional Fees," "Committee Professional Fees," or "Lender Professional Fees" line items, each of which must be no more than 100% of the amount set forth in the Approved DIP Budget for such line item during the relevant Testing Period; provided, however, that any surplus during a Testing Period in any such line item can be carried forward to later Testing Periods for such line item) in any line item during such Testing Period to be greater than 110% of the amount of disbursements for such line item as set forth in the Approved DIP Budget for such Testing Period; provided, however, that for purposes of testing the relevant line items in the Approved DIP Budget are the following: "Asset Sales/Recoveries," "Total Operating Disbursements," "Debtor Professional Fees," "Committee Professional Fees," and "Lender Professional Fees."

20.     Automatic Perfection of Cash Flow DIP Liens and DIP Repo Guarantee Liens.

(a)     This Interim Cash Flow DIP Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the Cash Flow DIP Liens and DIP Repo Guarantee Liens without the necessity of filing or recording financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, taking possession of or control over any assets or taking any other action to validate or perfect (in accordance with applicable non-bankruptcy law) the Cash Flow DIP Liens or DIP Repo Guarantee Liens or to entitle the Cash Flow DIP Lender or DIP Repo Guarantor to its respective priorities granted herein.

(b)     Notwithstanding the foregoing, each of the Cash Flow DIP Lender and DIP Repo Guarantor is hereby authorized, but not required, to file or record financing statements, trademark

filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over (including pursuant to a deposit account control agreement) or take any other action in order to validate and perfect the liens and security interests granted to the Cash Flow DIP Lender or DIP Repo Guarantor hereunder.  Whether or not the Cash Flow DIP Lender or DIP Repo Guarantor chooses to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be and hereby are deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, whether in these Cases or any Successor Case.  The Debtors shall, if requested, execute and deliver to the Cash Flow DIP Lender or DIP Repo Guarantor, as applicable, all such agreements, financing statements, instruments and other documents as the Cash Flow DIP Lender or DIP Repo Guarantor may reasonably request to more fully evidence, confirm, validate, perfect, preserve and enforce the Cash Flow DIP Liens or DIP Repo Guarantee Liens, as applicable.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(c)    The Debtors are authorized to execute and deliver promptly upon demand by the Cash Flow DIP Lender or DIP Repo Guarantor all such financing statements, mortgages, notices and other documents as the Cash Flow DIP Lender or DIP Repo Guarantor may reasonably request. The Debtors are authorized to, and shall, execute and deliver to the Cash Flow DIP Lender or DIP Repo Guarantor such agreements, financing statements, mortgages, instruments and other documents as the Cash Flow DIP Lender or DIP Repo Guarantor may reasonably request to evidence, confirm, validate or perfect the Cash Flow DIP Liens or DIP Repo Guarantee Liens, and the failure by the Debtors to execute or deliver any documentation relating to the Cash Flow DIP

36

Liens or DIP Repo Guarantee Liens shall in no way affect the validity, enforceability, non-avoidability, perfection, or priority of such liens.

(d)     In lieu of obtaining such documentation or instruments, a certified copy of the Interim Cash Flow DIP Order may be filed by the Cash Flow DIP Lender and DIP Repo Guarantor with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Interim Cash Flow DIP Order for filing and recording.

21.     <u>Automatic Stay Modified</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary, without the need for any further order of the Court, to permit the Cash Flow DIP Lender to exercise all rights and remedies under this Interim Cash Flow DIP Order or the Cash Flow DIP Documents.

22.     <u>Proofs of Claim</u>.  The Cash Flow DIP Lender shall not be required to file proofs of claim in the Cases, and the Debtors' stipulations in this Interim Cash Flow DIP Order or the Final Cash Flow DIP Order shall be deemed to constitute a timely filed proof of claim.  Any order entered by the Court in connection with the establishment of a bar date for any claim (including, without limitation, administrative claims) in the Cases or any Successor Cases shall not apply to the Cash Flow DIP Lender.

23.     <u>Challenge Period/Investigation Budget</u>.

(a)     Notwithstanding any other provisions of this Interim Cash Flow DIP Order, the Creditors' Committee and any other party-in-interest (other than the Debtors) are permitted to investigate and commence, prior to the expiration of the Chapter 11 Challenge Period,[9] an

---

[9] For purposes of this Order, "<u>Chapter 11 Challenge Period</u>" means (i) with respect to parties-in-interest other than the Creditors' Committee, seventy-five (75) calendar days after entry of the Final Cash Flow DIP Order, and (ii) with respect to the Creditors' Committee, sixty (60) calendar days after the appointment of the Creditors' Committee.

adversary proceeding or contested matter, as required by the applicable Bankruptcy Rules, to seek to obtain standing to, and if standing is obtained, to do any of the following: (each, a "<u>Challenge</u>") (i) challenge the Debtors' Stipulations contained herein, or any other stipulations or findings contained in this Interim Cash Flow DIP Order or any Final Cash Flow DIP Order with respect to the Cash Flow DIP Liens or Cash Flow DIP Obligations, or the Prepetition Loan Liens or Prepetition Loan Obligations, including, without limitation, any challenge to the validity, priority, perfection, or enforceability thereof, including, without limitation, whether in nature of a setoff, counterclaim, or defense; (ii) assert any claim or cause of action, including a Released Claim (as defined below) against the Released Parties (as defined below); *provided*, that if a Creditors' Committee is appointed, the Creditors' Committee shall be subject to the Investigation Budget (as defined below) in accordance with Paragraph 23(b).  If any of the Cases are converted to a case under chapter 7 of the Bankruptcy Code prior to the latest date by which the Chapter 11 Challenge Period would end pursuant to this Paragraph, then any chapter 7 trustee appointed in such converted case shall have a maximum of twenty (20) calendar days (the "<u>Chapter 7 Challenge Period</u>" and, together with the Chapter 11 Challenge Period, the "<u>Challenge Period</u>") after the date that the Case is converted to bring any such Challenge.  Except to the extent asserted in a Challenge filed during the Challenge Period, the expiration of such Challenge Period (to the extent not otherwise waived or barred), shall mean that (i) any and all Challenges or potential challenges shall be deemed to be forever waived and barred; (ii) all of the agreements, waivers, releases, affirmations, acknowledgements and stipulations contained in this Interim Cash Flow DIP Order and any Final Cash Flow DIP Order shall be irrevocably and forever binding on the Debtors, the Creditors' Committee and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, including any chapter 7 trustee, without further action by any party or the Court and

all such parties shall be deemed to have absolutely and unconditionally released, waived, and

forever discharged and acquitted the Cash Flow DIP Lender, the Prepetition Bridge Lender, and

each of their respective Related Parties (the "Released Parties") from any and all obligations and

liabilities to the Debtors (and their successors and assigns) and from any and all claims,

counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action

(collectively, the  "Released Claims") of any kind, nature or description, whether known or

unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon

contract or tort or under any state or federal law or otherwise, including, without limitation, any

claims for recharacterization, subordination, or substantive consolidation, arising out of or relating

to (as applicable) the Cash Flow DIP Facility or the Prepetition Loan Obligations, the obligations

owing and the financial obligations made thereunder, the negotiation thereof and of the deal

reflected thereby, and the obligations and financial obligations made thereunder, in each case that

any of the Debtors at any time had, now have or may have, or that their successors or assigns

hereafter can or may have against any of the Released Parties for or by reason of any act, omission,

matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Cash

Flow DIP Order, whether such Released Claims are matured or unmatured or known or unknown;

and (iii) all of the Cash Flow DIP Obligations and/or Prepetition Loan Obligations, as the case

may be, shall be deemed allowed on a final basis and the Cash Flow DIP Liens and/or Prepetition

Loan Liens shall be deemed to constitute valid, binding and enforceable encumbrances, and not

subject to avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

Notwithstanding anything to the contrary herein: (x) if any Challenge is timely commenced, the

stipulations contained in this Interim Cash Flow DIP Order or any Final Cash Flow DIP Order

shall nonetheless remain binding on all other parties-in-interest and preclusive except to the extent

that such stipulations are expressly and successfully challenged in such Challenge; and (y) the Released Parties reserve all of their rights to contest on any grounds any Challenge.  Nothing in this Interim Cash Flow DIP Order vests or confers on any person, including, without limitation, the Creditors' Committee or any other statutory committee that may be appointed in these Cases, standing or authority to directly or indirectly support or pursue any cause of action, claim, defense, or other right belonging to the Debtors or their estates.

(b)    <u>Investigation Budget</u>.  If a Creditors' Committee is appointed, the Creditors' Committee shall be subject to a budget not to exceed $30,000 in connection with the investigation and prosecution of any Challenge (the "<u>Investigation Budget</u>").

24.    <u>No Third Party Rights</u>. Except as explicitly provided for herein (including the release of Released Claims against the Released Parties), this Interim Cash Flow DIP Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary.

25.    <u>Prohibition on Additional Liens</u>.  Except as expressly provided in the Cash Flow DIP Documents, this Interim Cash Flow DIP Order, or the DIP Repo Order, the Debtors shall be enjoined and prohibited from, at any time during the Cases until such time as the Cash Flow DIP Obligations have been indefeasibly paid in full in cash, granting liens on or security interests in the Cash Flow DIP Collateral, the Prepetition Loan Collateral, or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are senior to or *pari passu* with the Cash Flow DIP Liens other than the Carve-Out, unless and until all Cash Flow DIP Obligations are indefeasibly paid in full in cash.

26.    <u>No Waiver</u>.  This Interim Cash Flow DIP Order shall not be construed in any way as a waiver or relinquishment of any rights that the Cash Flow DIP Lender may have to bring or

be heard on any matter brought before the Court.  Similarly, the failure of the Cash Flow DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Cash Flow DIP Order, the Cash Flow DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Cash Flow DIP Lender.

27.    <u>Discharge Waiver</u>. The Debtors expressly stipulate, and the Court finds and adjudicates, that none of the obligations, liens or superpriority claims granted or approved by this Interim Cash Flow DIP Order shall be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations, as applicable, have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization; provided, however, that the grant of adequate protection claims and liens shall be subject to paragraph 23 of this Interim Cash Flow DIP Order.

28.    <u>Interim Cash Flow DIP Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the Cash Flow DIP Documents and this Interim Cash Flow DIP Order, the provisions of this Interim Cash Flow DIP Order shall govern and control solely to the extent of the inconsistency.

29.    <u>Survival</u>. The provisions of this Interim Cash Flow DIP Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in the Cases; (b) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Case; or (d) pursuant to which the Court abstains from hearing the Cases or any Successor Case.  The terms and provisions of this Interim Cash Flow DIP Order, including the claims, liens, security interests and other protections granted pursuant to this Interim Cash Flow DIP Order, notwithstanding the entry of

41

any such order, shall continue in the Cases, in any Successor Case, or following dismissal of any of the Cases or any Successor Case, and shall maintain their priority as provided in this Interim Cash Flow DIP Order until all obligations related thereto have been paid in full.

30.    Preservation of Rights Under this Interim Cash Flow DIP Order.

(a)    Without in any way limiting the preceding Paragraph, if an order dismissing the Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, the Debtors shall request that such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the liens and superpriority claims granted pursuant to this Interim Cash Flow DIP Order shall continue in full force and effect, shall maintain their priority as provided in this Interim Cash Flow DIP Order and shall, notwithstanding such dismissal, remain binding on all parties in interest until all obligations pertaining thereto shall have been indefeasibly paid in full in cash (with interest) and the related commitments shall have been terminated in accordance with their terms and (ii) the Court shall retain non-exclusive jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such claims and obligations.

(b)    If any or all of the provisions of this Interim Cash Flow DIP Order are hereafter reversed, stayed, modified or vacated, such reversal, stay, modification or vacation shall not affect (i) the validity and enforceability of any obligations incurred prior to the actual receipt by the affected parties of written notice of the effective date of such reversal, stay, modification or vacation and (ii) the validity and enforceability of the liens and superpriority claims authorized or created hereby, unless this Interim Order is stayed pending appeal.  Notwithstanding any such reversal, stay, modification or vacation, the obligations incurred by the Debtors hereunder and under the applicable documents, prior to the actual receipt of written notice of the effective date of such reversal, stay, modification or vacation, shall be governed in all respects by the original

provisions of this Interim Cash Flow DIP Order, and the parties shall be entitled to all the rights, remedies, privileges and benefits of sections 363(m) and 364(e) of the Bankruptcy Code, this Interim Cash Flow DIP Order and pursuant to the applicable documents.

31.    Rights Under Sections 363(k) and 1129(b). Unless otherwise ordered by the Court for cause, the Cash Flow DIP Lender shall have the right to credit-bid the full amount of the Cash Flow DIP Obligations in any sale or disposition of the Cash Flow DIP Collateral as provided for in section 363(k) of the Bankruptcy Code, in accordance with the terms of the Cash Flow DIP Documents, without the need for further Court order authorizing the same and whether such sale is effectuated through section 363(k) and/or section 1129(b) of the Bankruptcy Code or otherwise because, among other things, the denial of such rights would result in the Cash Flow DIP Obligations not receiving the indubitable equivalent of their claims.

32.    No Consent. No action, inaction or acquiescence by the Cash Flow DIP Lender, including funding the Debtors' ongoing operations under this Interim Cash Flow DIP Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the Cash Flow DIP Lender to a charge against the Cash Flow DIP Collateral pursuant to sections 506(c), 552(b) or 105(a) of the Bankruptcy Code.

33.    Binding Effect; Successors and Assigns. The Cash Flow DIP Documents and the provisions of this Interim Cash Flow DIP Order, including all findings herein, shall be binding upon all parties in interest in the Cases, including, without limitation, the Cash Flow DIP Lender, the Creditors' Committee or any trustee or examiner appointed in these Cases, and the Debtors, and their respective successors and assigns (including any trustee or fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estate of the Debtors) whether in these Cases, in any Successor Cases, or upon any dismissal of any such

chapter 11 or chapter 7 case, and shall inure to the benefit of the Cash Flow DIP Lender and the Debtors and their respective successors and assigns.

34.     <u>No Duty to Monitor Compliance</u>.  The Cash Flow DIP Lender shall not (i) have any obligation with respect to any Debtor's use of cash collateral or the use of proceeds of the Cash Flow DIP Facility; (ii) be obligated to ensure or monitor any Debtor's compliance with any financial covenants, formula, or other terms and conditions of the Cash Flow DIP Documents; or (iii) be obligated to pay any expenses incurred or authorized to be incurred pursuant to the Cash Flow DIP Documents.

35.     <u>Final Hearing</u>.  The Final Hearing is scheduled for July 28, 2022, at 10:00 a.m. (prevailing Eastern Time) before this Court.  Any objections by creditors or other parties-in-interest to any provisions of this Interim Cash Flow DIP Order shall be deemed waived unless timely filed and served in accordance with this Paragraph.  The Debtors shall promptly serve a notice of entry of this Interim Cash Flow DIP Order and the Final Hearing, together with a copy of this Interim Cash Flow DIP Order, by first class mail, postage prepaid, or overnight mail upon the Notice Parties.  The notice of the entry of this Interim Cash Flow DIP Order and the Final Hearing shall state that objections to the entry of the Final Order shall be filed with this Court by no later than July 21, 2022 p.m. (prevailing Eastern Time) on 4:00 p.m. (prevailing Eastern Time), 2022 (the "<u>Objection Deadline</u>"), with copies to: (i) proposed counsel for the Debtors; (ii) counsel for the Cash Flow DIP Lender Greenberg Traurig, LLP (Attn: Nancy Peterman (PetermanN@gtlaw.com), John D. Elrod (ElrodJ@gtlaw.com), Joseph Davis (DavisJ@gtlaw.com), and Danny Duerdoth (duerdothD@gtlaw.com), (iii) the Office of the United States Trustee for the District of Delaware, Attn: Benjamin Hackman; and (v) counsel to the Committee, if any.

44

36.    <u>Fannie Mae and Freddie Mac Rights</u>.

(a)    Notwithstanding anything to the contrary contained in the Cash Flow DIP Documents or this Interim Order, no lien, security interest granted pursuant to the Cash Flow DIP Documents or this Interim Order (including the Cash Flow DIP Liens or any adequate protection lien) shall attach to, modify, include or otherwise affect, and no administrative expense claim shall prime or encumber: (a) any mortgage loan presently owned by the Federal National Mortgage Association (together with any successor thereto, "<u>Fannie Mae</u>"; and such mortgage loans the "<u>Fannie Mae Loans</u>"), (b) any servicing rights with respect to the Fannie Mae Loans (the "<u>Fannie Mae Servicing Rights</u>"), (c) the Fannie Mae Lender Contract (as defined below) or any rights of the Debtors, or obligations of Fannie Mae, under the Fannie Mae Lender Contract (d) any mortgage loan presently owned, or subsequently acquired, by the Federal Home Loan Mortgage Corporation (together with any successor thereto, "<u>Freddie Mac</u>"; and such mortgage loans the "<u>Freddie Mac Loans</u>"), (e) any servicing rights with respect to the Freddie Mac Loans (the "<u>Freddie Mac Servicing Rights</u>"), or (f) the Freddie Mac Agreements (as defined below) or any rights of the Debtors, or obligations of Freddie Mac, under the Freddie Mac Agreements. Each of the Cash Flow DIP Facility Parties and the Prepetition Lenders stipulates that it has no claim as a secured creditor against Fannie Mae or Freddie Mac in connection with the Cash Flow DIP Facility.

(b)    Furthermore, none of the principal, interest, and funds for the payment of property taxes and insurance premiums, mortgage premiums, condominium fees, or any other amounts collected by any Debtor or any subservicer in connection with its performance of its servicing obligations under the Fannie Mae Lender Contract or the Freddie Mac Agreements are property of the Debtors' estates under section 541 of the Bankruptcy Code. Fannie Mae and Freddie Mac reserve all rights in and under all of their respective agreements with the Debtors, including,

respectively, the Fannie Mae Lender Contract and the Freddie Mac Agreements, none of which are impaired by the Cash Flow DIP Documents or this Interim Order.

(c)     If, notwithstanding the foregoing, any party hereafter asserts that the Cash Flow DIP Liens or Cash Flow DIP Collateral, or adequate protection collateral include any Fannie Mae Servicing Rights, the Fannie Mae Lender Contract or any rights of the Debtors, or obligations of Fannie Mae under the Fannie Mae Lender Contract, any and all security interests therein shall be subject and subordinate to all rights of Fannie Mae under the Mortgage Selling and Servicing Contract, the Fannie Mae Selling Guide, the Fannie Mae Servicing Guide and all supplemental servicing instructions or directives provided by Fannie Mae, all applicable master agreements, recourse agreements, repurchase agreements, indemnification agreements, loss-sharing agreements, and any other agreements between Fannie Mae and the Debtors, and all as amended, restated or supplemented from time to time (collectively, the "Fannie Mae Lender Contract"), which rights include, among other rights, the right of Fannie Mae to terminate servicing or the Fannie Mae Lender Contract with or without cause and the right to sell, or have transferred, the Fannie Mae Servicing Rights. Fannie Mae reserves all of its rights under the Fannie Mae Lender Contract, including all of its rights under the Fannie Mae Servicing Guide.

(d)     If, notwithstanding the foregoing, any party hereafter asserts that the Cash Flow DIP Liens or Cash Flow DIP Collateral, or adequate protection collateral include any Freddie Mac Servicing Rights, any Freddie Mac Agreement, or any rights of the Debtors, or obligations of Freddie Mac under any Freddie Mac Agreement, any and all security interests therein shall be subject and subordinate to all rights of Freddie Mac under the Freddie Mac Single-Family Seller/Servicer Guide, Freddie Mac Single-Family/Servicer Guide Plus Additional Provisions, all applicable master agreements, master commitments, purchase agreements, pricing identifiers,

46

supplements, addendums, bulletins, directives, terms of business and any other agreements between Freddie Mac and the Debtors, and all as amended, restated or supplemented from time to time (collectively, the "Freddie Mac Agreements"), which rights include, among other rights, the right of Freddie Mac to terminate the Servicing Contract (as defined in Freddie Mac Agreements) with or without cause and the right to sell, or have transferred, the Freddie Mac Servicing Rights. Freddie Mac reserves all of its rights under all Freddie Mac Agreements.

(e)     If there is any conflict between the terms of the Fannie Mae Lender Contract and those of the Cash Flow DIP Documents, the terms of the Fannie Mae Lender Contract will control.  If there is any conflict between the terms of any Freddie Mac Agreements and those of the Cash Flow DIP Documents, the terms of the applicable Freddie Mac Agreements will control.

37.     Flagstar/Customers.  Notwithstanding anything in this Cash Flow DIP Interim Order and the Cash Flow DIP Documents to the contrary, the relief sought by the Debtors in this order shall not apply (i) to any deposit accounts located at Customers Bank, Flagstar Bank, or Texas Capital Bank, National Association ("TCB"); (ii) to the accounts held by Deutsche Bank pursuant to the Amended and Restated Joint Securities Account Control Agreement dated as of August 11, 2017 (as amended, restated, supplemented or modified from time to time, the "JSACA") by and among Deutsche Bank National Trust Company ("Securities Intermediary"), Customers Bank, Flagstar Bank and Texas Capital Bank, or (iii) to any of the collateral for the Prepetition Loan Facilities, the Customers Repo Facility, or the Prepetition Repo Facility of J.V.B. Financial Group, LLC, as successor by merger to C&Co./PrinceRidge LLC ("J.V.B") including cash collateral and proceeds of collateral; provided, however, that the Cash Flow DIP Liens (x) shall attach to such accounts and collateral on a junior basis to the extent of surplus proceeds from the disposition of the collateral, if any, (y) shall be and remain junior and subordinate in all respects

DOCS_DE:239711.1 28311/001

to the security interests of Flagstar Bank, Customers Bank, or J.V.B. in the collateral of Flagstar Bank, Customers Bank, or J.V.B and (z) such Cash Flow DIP Liens (a) shall not in any respect limit the rights of Flagstar Bank, Customers Bank, J.V.B. to exercise their rights and remedies with respect to their respective collateral, (b) shall be automatically released (as to the collateral of Flagstar Bank, Customers Bank, or J.V.B. but not as to the surplus proceeds from the disposition of such collateral remaining after Flagstar Bank, Customers Bank, or J.V.B respectively, has been indefeasibly paid in full on all obligations of the Debtor) without further action upon any disposition of such collateral or application of such collateral to the obligations of the Debtor to Flagstar Bank, Customers Bank, or J.V.B, (c) shall not give rise to any notice or other rights, under the Uniform Commercial Code or otherwise, in connection with any disposition or application of such collateral, and (e) shall not grant the Cash Flow DIP Lender any rights of enforcement with respect to such collateral until Customers Bank, Flagstar Bank, or J.V.B, as applicable, has received irrevocable payment in full of all of the Debtor's outstanding obligations to it.  Nothing in this paragraph shall affect the right of the Debtors, Customers Bank, Flagstar Bank, TCB, or the Cash Flow DIP Lender to seek additional relief, including, without limitation, in the final first day orders. For the avoidance of doubt, the Debtors shall be permitted to use the Bank Account at Texas Capital Bank ending in the last four digits of 7572 for the purpose of payroll-related disbursements solely from proceeds of the Cash Flow DIP Loan.

38.    Retention of Jurisdiction. This Court has and shall retain jurisdiction to enforce this Interim Cash Flow DIP Order according to its terms to the fullest extent permitted by law.

**Dated: July 1st, 2022**
**Wilmington, Delaware**

**CRAIG T. GOLDBLATT**
**UNITED STATES BANKRUPTCY JUDGE**