**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FIRST GUARANTY MORTGAGE<br>CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-10584 (CTG)<br><br>(Jointly Administered) |

**MOTION OF DEBTORS FOR ENTRY OF ORDER (I) APPROVING KEY EMPLOYEE
INCENTIVE PROGRAM, (II) KEY RETENTION EMPLOYEE PROGRAM AND
(III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors"), in these chapter

11 cases (the "Chapter 11 Cases"), by and through the undersigned counsel of record, hereby move

(the "Motion"), pursuant to §§ 363(b), 503(c), 1107(a), and 1108 under chapter 11 of title 11 of

the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code"),[2] and Bankruptcy Rule 6004, and

Local Rule 9013-1(m), for a final order pursuant to Bankruptcy Rule 7008 and Local Rule 9013-

1(f) (substantially in the form attached hereto as **Exhibit A**, the "Order"): (a) approving the

Debtors' proposed key employee incentive plan for certain employees (respectively, the "KEIP,"

a copy of which is attached as **Exhibit 1 to the Order**, and the eligible employees as the "KEIP

Participants");[3] (b) approving the Debtors' proposed key employee retention plan for certain

employees (the "KERP," a copy of which is attached hereto as **Exhibit 2 to the Order**, and the

eligible employees as the "KERP Participants,") (respectively, the KEIP and KERP are the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621). The location of the corporate headquarters and the service address for First Guaranty Mortgage Corporation is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

[2] All references to "§" or "section" herein are to sections of the Bankruptcy Code. All references to "Bankruptcy Rules" are to provisions of the Federal Rules of Bankruptcy Procedure. All references to "Local Rules" are to provisions of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Delaware (the "Court").

[3] To protect the privacy of the KERP Participants and KEIP Participants, the names of the KERP and KEIP Participants, as well as their positions within the Company, are being filed under seal, but will be provided to the Court, the Office of the United States Trustee for the District of Delaware, and counsel to the official committee appointed in the Chapter 11 Cases of unsecured creditors.

"Programs"); and (c) granting related relief. In further support of the Motion, the Debtors respectfully state as follows:

## I.    PRELIMINARY STATEMENT

1.    On June 30, 2022 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2.    Six days prior to the Petition Date, the Debtors conducted a large reduction in work force (the "RIF"). On the same day, the Debtors paid their separated employees unpaid base wages then owed and all accrued paid time off ("PTO") to the extent owed.[4]

3.    The employees that remain, approximately 20% of the Debtors' pre-petition workforce (the "Current Employees"), are key to the Debtors' business and success in these Chapter 11 Cases, including the Debtors' efforts to close out the pipeline and conduct all required sales and post-closing activities to maximize value for all constituents. These same employees may also provide a foundation for the Debtors' ability to emerge from Chapter 11 as a scaled-down version of the prepetition entity and to continue originating and servicing customers, if the Debtors pursue this option as part of their Chapter 11 Cases. The Debtors face numerous challenges in achieving success on an expedited timeline and subject to a stringent budget, including (i) stabilizing their business (including funding, closing, and selling loans originated prepetition), (ii) liquidating assets, and (iii) limiting liability and claims. The Current Employees' continued focus, energy and efforts are critical to the Debtors' ability to overcome these challenges and maximize creditor recoveries in these Chapter 11 Cases.

4.    Similar to prepetition practice, the Debtors have sought to treat Employees with the care and respect they deserve. As part of first day relief requested, the Debtors sought and obtained authority to pay non-insider Employees prepetition amounts owed to them (up to the § 507(a)(4)

---

[4] The following week, but also prepetition, the Debtors paid separated employees severance in accordance with an informal company practice. To the extent such employees were owed commissions, which were not then due, the Debtors sought and received authority to pay such commissions up to each employee's available balance under the statutory priority claim cap of § 507(a)(4). Notwithstanding these efforts, at least three class action WARN suits have been filed, *see infra*, and the Debtors believe neither action has merit and are prepared to defend against them vigorously.

cap pending final approval for Current Employees), and for authority to maintain prepetition employee programs postpetition. While payment (and the prospect of future payment) of prepetition obligations and the maintenance of prepetition benefit programs (e.g. 401(k), health care) were helpful in addressing Current Employees' initial stated concerns, as evidenced by growing attrition, those efforts alone are not enough to incentivize and/or retain Current Employees. In fact, the Debtors' efforts to retain and incentivize Current Employees are especially challenged here, given that the Debtors will need to conduct additional postpetition reductions in force.

5.      In light of these factors, the Debtors, with their advisors, have developed the Programs, which are designed to retain the services of the KERP Participants and to incentivize the KEIP Participants, as the Debtors continue to operate, evaluate their restructuring options, accommodate their customers, and maximize and preserve value for all stakeholders, and formulate a plan of reorganization and exit strategy. Without this relief, KERP and KEIP Participants will not be properly incentivized to achieve the Debtors' objectives, which will imperil the success of these Chapter 11 Cases. For the avoidance of doubt, the proposed Programs seek to supplement compensation and benefits approved on an interim basis under the First Day wage motion and to replace any expectations Current Employees may have to an existing payment for severance, whether provided by the terms of contract or under the Debtors' informal prepetition practice.

6.      In support of this Motion, the Debtors rely upon and refer this Court to the *Declaration of Dewey Imhoff* (the "Imhoff Declaration"), and the *Declaration of Tanya Meerovich* (the "Meerovich Declaration"), along with the *Declaration of Aaron Samples in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 19] (the "First Day Declaration"). For these reasons, and as more fully explained below, the Debtors respectfully request that this Court grant the relief requested herein.

3

## II.    JURISDICTION, VENUE AND STATUTORY BASIS FOR RELIEF

7.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012.

8.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

9.    The Debtors confirm their consent pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f) to the entry of a final order by the Court in connection with the Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.    Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

11.    The statutory and legal predicates for the relief requested herein are §§ 363(b), 503(c), 1107(a), and 1108, and Bankruptcy Rule 6004.

## III.    STATEMENT OF FACTS

### A.    General Background

12.    Prior to the Petition Date, the Debtors operated as a full service, non-bank mortgage lender, offering a full suite of residential mortgage options tailored to borrowers' different financial situations.    As described in more detail in the First Day Declaration, the business included the origination, purchase, service, sale and/or securitization of residential real estate mortgage loans.

13.    On the Petition Date, the Debtors commenced the Chapter 11 Cases, which are being jointly administered under the above-captioned case.    The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to §§ 1107(a) and 1108.

14.    The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, is set forth in the First Day Declaration and fully incorporated herein by reference.

4

15.     On July 14, 2022, the Office of the United States Trustee (the "UST") appointed an official committee of unsecured creditors (the "Committee").

**B.     The Workforce**

16.     A week prior to the Petition Date, the Debtors employed approximately 600 employees.  Of that group, approximately 300 employees worked primarily as sales-staff or originators and were paid, in whole or in part, on a commission basis tied to the funded amount of closed loans (the "Commission Employees").

17.     In the days leading up to the Petition Date, as a result of an unanticipated liquidity crisis, the Debtors ceased all of its mortgage loan origination activity and implemented the RIF on June 24, 2022.  The RIF eliminated the majority of Commission Employees and a substantial number of non-Commission Employees.

18.     Of the remaining Current Employees, 124 will be eligible for the Programs.  All of these individuals are key to the Debtors' operations and restructuring effort.  This group is divided into proposed KERP and proposed KEIP Participants as follows:

- (i) the proposed KERP Participants, approximately 118 non-insider Current Employees, (a) who are paid a regular salary, (b) of whom, some, but not all, may earn accrued paid time off ("PTO") payable upon termination (which, as of the date of this filing, has an estimated aggregate value of $100,000 for Current Employees), and (c) who, upon termination without cause, may seek or otherwise expect payment under an informal, pre-petition company practice equal to one-week's pay for every year worked ("Severance"); and

- (ii) the proposed KEIP Participants, six upper level executives, arguably "insiders" (a) who are paid a regular salary, and (b) who could earn incentive bonuses under a prepetition incentive plan, (c) who have unlimited PTO, and (d) who, upon termination, earn severance (as set forth under their respective employment arrangement).

5

19.     The Current Employees were not part of the June 24, 2022 RIF and are essential for the success of these Chapter 11 Cases.  In addition to ensuring compliance with the new Chapter 11 reporting requirements, many will be focused on critical operational matters, including closing and funding of mortgage loans, post-closing activity which includes required loan insuring, remediation of data errors, loan delivery to investors, selling of the loans, and support with the Agencies (as defined in the First Day Declaration) and investors throughout the process. Further, certain of the Current Employees are necessary for the Debtors to have the capacity to answer customer questions and manage the sale of funded loans, servicing, and other assets. Other Current Employees are necessary to ensure that the technology infrastructure keeps critical systems running to perform post-closing activity, provide help desk support, and maintain the same level of cyber security through the process, as well as data storage. Further, the Current Employees are necessary because (i) branch sites will need to be secured and closed out, equipment retrieved and liquidated, and (ii) a remediation team will be required to ensure that any potential issues or missing documents can be resolved or recovered so that assets can be sold. Certain of the Current Employees are also critical to ensuring regulatory compliance throughout the process. Finally, in the event the Debtors reorganize as a scaled down operation, they will require a base team of employees to ensure the required licenses are retained and to continue originating and servicing mortgage loan customers.

20.     The Debtors are acutely concerned with attrition, which concerns are well founded. Since the Petition Date, at least eight employees have resigned. The Debtors have also had at least ten separate conversations with employees who are considering resigning (or know of other employees who are considering resigning) and other companies who are considering hiring Current Employees. Thus, the proposed Programs were developed to reduce if not halt the untimely outflow of non-insider talent and to incentivize senior management to perform at the highest level all with the goal of enhancing creditor recoveries and success in these Chapter 11 Cases.

C.    **The Debtors' Goals and Tasks in their Chapter 11 Cases**

21.    The Debtors commenced the Chapter 11 Cases to evaluate their restructuring options, accommodate their customers, and maximize and preserve value for all stakeholders.  The Debtors intend to file and confirm a plan of reorganization or liquidation under § 1129 (a "Plan") in the third or fourth quarter of this year.  However, before the Debtors can confirm a Plan, they must administer their existing assets and business in an efficient manner under challenging circumstances.

D.    **The Pipeline**

22.    The Debtors largely stopped originating new mortgage loans after the RIF. However, on the Petition Date there was a prepetition pipeline of unfunded purchase money and refinance loans, including those for which customer rate lock commitments already had been made (the "Pipeline").  In the ordinary course of their business, the Debtors move loans "downstream" in the Pipeline by (i) funding the loans (and obtaining and maintaining capital in order to do so) and then (ii) selling these loans to investors, including government agencies, financial institutions and other qualified entities.  These unfunded loans are being funded through loan sales under a postpetition warehouse liquidity facility structured as a master repurchase agreement.  It is imperative that the Debtors have the staff and related resources to complete the funding of these loans, and the sale of such loans to investors, as the failure to do so would (i) prevent consumer borrowers from funding their home purchases or refinancing their current mortgages, and (ii) prevent the sale of these loans to satisfy obligations owed to postpetition liquidity providers.

E.    **The Wage Motion and Cash Flow DIP Motion**

23.    As a part of their first-day relief, the Debtors filed their Wage Motion[5] and Cash Flow DIP Motion.[6]  The Wage Motion sought approval to authorize the Debtors to pay Current

---

[5] *Motion to Pay Employee Wages Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief* [Docket No. 9] (the "Wage Motion").
[6] *Motion to Approve Debtor In Possession Financing*, [Docket No. 22] (the "Cash Flow DIP Motion").

Employees in the ordinary course and make certain payments to Current Employees and separated employees on account of prepetition obligations. On July 1, 2022, the Court entered an interim order approving the Wage Motion and setting a final hearing for July 28, 2022. Docket No. 64.

24.    Through their Cash Flow DIP Motion, the Debtors obtained interim approval of the Cash Flow DIP Facility from the Cash Flow DIP Lender (as both these terms are defined in Docket No. 22), with a final hearing set for July 28, 2022. The Cash Flow DIP Facility is subject to an "Approved DIP Budget" (as defined in Docket No. 22), which allocates funds for "Operating Disbursements." The Debtors and the Cash Flow DIP Lender have agreed that the amounts sought in this Motion are permitted Operating Disbursements under the current Approved DIP Budget. Further, the Cash Flow DIP Facility is subject to "Milestones" (and each a "Milestone") (as defined in Docket No. 22). *See* Docket No. 22 (Cash Flow DIP Term Sheet) at 7-8. The failure to achieve a Milestone is an immediate event of default under the Cash Flow DIP Facility. *Id.*

25.    The Approved DIP Budget also includes a line-item for "Asset Sales/Recoveries" contemplating the sale of various of the Debtors' assets (the "Balance Sheet Assets") that the Debtors intend to sell in the ordinary course and/or through § 363 sales during their Chapter 11 Cases (the "Balance Sheet Asset Sales"). The Debtors will undertake the Balance Sheet Sales because, in consultation with stakeholders, they have determined that the Balance Sheet Assets have value, but are not needed by the Debtors after reorganization.

F.    **The WARN Suits**

26.    In response to the RIF, at least three separate class action complaints were filed under the WARN Act, two prepetition (in the Eastern District of Texas and Nevada) and the third, a postpetition adversary proceeding. *See Jackson v. First Guaranty Mortgage Corporation*, Case No. 22-cv-00545 (E.D. Tex.); *Wolter v. First Guaranty Mortgage Corporation*, Case No. 2:22-cv-01030 (D. Nev.); *Buckley v. First Guaranty Mortgage Corporation*, Adv. Case No. 22-10584 (Bankr. D. Del.). The Debtors aver, and are prepared to demonstrate, that to the extent any suit is permitted to proceed, it has no merit and that no WARN damages are owed to former employees.

8

G.    **Future Separations**

27.    The Debtors have determined that they may need to undergo additional RIFs during the Chapter 11 Cases, one of which is contemplated on or around August 15, 2022 (the "August RIF"), and another in mid-September, 2022 (the "September RIF"). These potential RIFs are tied to the scaling down of the Debtors' business (and thus need for certain employees) and the movement of loans through and out of the Pipeline.

28.    The Programs are designed to mitigate both harm to the estates and to the Current Employees by compensating the KERP Participants for remaining employed by the Debtors during the wind-down of the Pipeline and completion of the Balance Sheet Asset Sales, and incentivizing the KEIP Participants to meet the Debtors' goals and maintain the progress of these Chapter 11 Cases, including confirmation of a Plan.

H.    **The Development of the KEIP and KERP**

29.    As explained in this Motion, the Debtors determined that there is an acute need to incentivize and retain their key employees for the success of their Chapter 11 Cases. The Debtors enlisted the services of FTI Consulting, Inc. ("FTI"), to support the development of the KEIP and the KERP. FTI has significant experience in designing executive and employee incentive, retention, and severance plans for companies in Chapter 11 and has access to extensive industry compensation data. The Debtors, their legal counsel, and FTI reviewed the Debtors' employment requirements during these Chapter 11 Cases, and the attendant necessary features of incentive and retention plans. FTI assisted the Debtors in designing the KEIP and KERP, keeping in mind the Debtors' goals of maximizing value, enhancing the Debtors' financial condition, and ensuring effective management throughout these Chapter 11 Cases. The KEIP and KERP were designed to promote appropriate and reasonable incentives and to retain non-insider personnel essential to the success of these Chapter 11 Cases.

30.    FTI also worked closely with the Debtors to ensure that the KEIP and KERP were competitive within the industry, and that the incentives set for the executives participating in the KEIP were appropriate. The Debtors and FTI reviewed market comparisons within a bankruptcy

9

context and historical compensation levels.  With regard to the market comparisons within the bankruptcy context, FTI reviewed several incentive-based and retention-based programs that have been approved for other large companies going through chapter 11 in recent years (respectively, the "Comparable KEIPs" and "Comparable KERPs").  The Comparable KEIPs and Comparable KERPs were selected based on their respective recency and size as described more in the Imhoff Declaration.

31.     Accordingly, the Debtors and FTI developed the Programs to be comparable to plans similar in design and scope that have been recently approved by bankruptcy courts. FTI and the Debtors used this market research in preparing proposals for the KEIP and KERP, which underwent several rounds of revisions before being submitted for consideration to the Debtors' board of directors (the "Board of Directors").  The Board of Directors reviewed the proposed Programs, asked questions and provided comments requiring revisions before approving the Programs.

32.     The Debtors also consulted with and addressed questions from the Cash Flow DIP Lender.  The Cash Flow DIP Lender supports the Programs and agrees to payments thereunder. The Debtors will engage with and provide reasonable information about the Programs to the UST and the Committee in an effort to obtain their consent or at least eliminate or minimize any objection.

**I.    The KEIP**

**1.    The KEIP Participants and their Value**

33.     The KEIP Participants are six (6) members of the Debtors' senior leadership team, consisting of the Debtors' (i) Chief Executive Officer, (ii) Chief Operating Officer, (iii) Chief Information Officer, (iv) Chief Legal Officer and General Counsel, (v) Executive Vice President – Capital Markets, and (vi) Executive Vice President – Chief Compliance Officer.  This team is responsible for executing the Debtors' operating and strategic plans, including maintaining the Debtors' business operations with the reduced staff, overseeing and addressing issues during these

10

Chapter 11 Cases, and maintaining employee morale and a positive culture among the Debtors' employees during these Chapter 11 Cases. Further, the KEIP Participants would also be responsible for managing any sale and marketing process or a corporate reorganization/merger/spinoff, if the Debtors elected to pursue such a process. The KEIP Participants are vital to the on-going stability, continuity, and strength of the Debtors during these Chapter 11 Cases.

34.    This challenge is compounded by the nature of the Debtors' business, which is built on trust, reputation and communication that the KEIP Participants have earned from counterparties. Vendors, partners and customers may be cautious to continue to do business with the Debtors in the face of a challenging market and press coverage. The KEIP Participants have offset such fears through outreach and open communication with their employees and the marketplace.

**2.    Terms of the KEIP**

35.    Under the proposed KEIP, there are five tranches of independent bonuses (the "KEIP Bonuses," and with payments of these bonuses as the "KEIP Bonus Payments"). As described below, the KEIP Bonuses for any individual tranche may (i) not be earned at all, or, (ii) if earned, may fluctuate between a low, threshold amount (together, the "Threshold Amounts," and each, respectively, a "Threshold Amount,") and a high, target amount (the "Target Amounts," and each, respectively a "Target Amount").

36.    The below chart[7] provides the total amount of Threshold and Target Amounts as compared to base salary of the KEIP Participants. In summary, the total Threshold Amounts are $1,166,300 and the total Target Amounts are $1,555,000, and an illustrative chart (numbers in $000s) is presented below:

---

[7] A list of the KEIP Participants, their salaries, and a summary and breakdown of their potential awards is attached as **Exhibit B** to the Imhoff Declaration.

11



| Name | Base Salary | Threshold | Target |
|------|-------------|-----------|--------|
| ███ – CEO | ███ | ███ | ███ |
| ███ – COO | ███ | ███ | ███ |
| ███ - CIO | ███ | ███ | ███ |
| ███ – CLO & GC | ███ | | ███ |
| ███ – EVP, Cap. M | ███ | ███ | ███ |
| ███ – EVP, COO | ███ | ███ | ███ |
| **Total** | **$2,352.1** | **$ 1,166.3** | **$1,555.0** |

37.    As to the tranches, ***first,*** a KEIP Participant will earn (i) a Threshold Amount if, by September 14, 2022, the Pipeline is orderly, timely and compliantly resolved, and will earn a Target Amount if the same is accomplished by August 31, 2022 (with this bonus as the "<u>Pipeline Resolution Bonus</u>").  The Pipeline Resolution Bonus is weighted at the Threshold and Target Amount levels as 40% of the KEIP Bonuses.  The range of the payout for the Pipeline Bonus is $466,500 at the Threshold Award level to $622,000 at the Target Award level.

38.    ***Second***, a KEIP Participant will earn (i) a Threshold Amount if, by October 7, 2022, all or substantially all of the funded and closed loans in the Pipeline are liquidated, and (ii) will earn a Target Amount if the same is accomplished by September 30, 2022 (with this bonus as the "<u>Pipeline Sale Bonus</u>").  The Pipeline Sale Bonus is weighted at the Threshold and Target Amount levels as 15% of the KEIP Bonuses.  The range of the payout for the Pipeline Sale Bonus is $174,900 at the Threshold Award level to $233,300 at the Target Award level.

39.    ***Third,*** a KEIP Participant will earn (i) a Threshold Amount if all or substantially all of the Balance Sheet Assets (excluding HUD claims and counter-party receivables) have been liquidated by October 14, 2022, and (ii) a Target Amount if the same is accomplished by September 30, 2022 (with this bonus as the "<u>Balance Sheet Asset Bonus</u>").  The Balance Sheet Asset Bonus is weighted at the Threshold and Target Amount levels as 15% of the KEIP Bonuses.

12

The range of the payout for the Balances Sheet Asset Bonus is $174,900 at the Threshold Award level to $233,300 at the Target Award level.

40.    *Fourth*, a KEIP Participant will earn (i) a Threshold Amount if the Operating Disbursements (excluding professional fees) are at a level of 110% of the budgeted amount in the Approved DIP Budget, and (ii) a Target Amount if the Operating Disbursements (excluding professional fees) are met without an adverse variance in the Approved DIP Budget (with this bonus as the "DIP Budget Bonus"). The DIP Budget Bonus is weighted at the Threshold and Target Amount levels as 15% of the KEIP Bonuses. The range of the payout for the DIP Budget Bonus is $174,900 at the Threshold Award level to $233,300 at the Target Award level.

41.    *Fifth*, a KEIP Participant will earn (i) a Threshold Amount if a Plan is confirmed by November 30, 2022, and (ii) a Target Amount if a Plan is confirmed by November 15, 2022 (this bonus is the "Plan Bonus"). The Plan Bonus is weighted at the Threshold and Target Amount levels as 15% of the KEIP Bonuses. The range of the payout for the Plan Bonus is $174,900 at the Threshold Award level to $233,300 at the Target Award level.

42.    These five categories of KEIP Bonuses are independent. Of course, they all bear relation towards the success of the Debtors' Chapter 11 Cases. For instance, if the Pipeline Resolution Bonus is not met, it is less likely that the DIP Budget is met, which, in turn, makes it is much less likely that the Debtors can confirm a Plan.

43.    The KEIP Program supersedes and obviates any severance obligation that might become due and owing to a KEIP Participant. If a KEIP Participant is terminated for "cause,"[8] or voluntarily ends his or her employment, he or she will not receive any future KEIP Bonus Payment, and any KEIP Bonus Payments already made must be returned to the Debtors. Neither the (i) termination of the employment of a KEIP Participant without cause nor (ii) death or disability shall affect any right of a KEIP Participant to a KEIP Bonus, and KEIP Bonuses will be earned upon

---

[8] For purposes of the KEIP and KERP, "cause" means (i) failure to materially perform the duties for which they are employed, (ii) willful violation of a material policy of the Debtors, (iii) commission of any act or acts of fraud, embezzlement, dishonesty, or other willful misconduct, (iv) material breach of any of their obligations under any written agreement or covenant with the Debtors, or (v) an act of dishonesty resulting or intended to result, directly or indirectly, in their gain for personal enrichment at the expense of the Debtors.

13

the occurrence of any triggering event(s), regardless of whether the event(s) occurred after (i) termination without cause or (ii) death or disability.

44.     KEIP Bonus Payments will be made on a rolling basis, coinciding with timing of the applicable trigger event(s) and condition(s) (with payments to be made as reasonably practicable after such occurrences) and circumstances of the Chapter 11 Cases.

45.     To receive and retain their KEIP Bonus Payments, all KEIP Participants will be required to execute one or more releases of any claim for severance or for any other claim, including under any existing bonus program.

46.     The Cash Flow DIP Lender supports the KEIP.

## J.     The KERP

### 1.     The KERP Participants and their Value

47.     The KERP Participants serve crucial roles in and are an integral part of the Debtors' business.  The KERP Participants were not a part of the prepetition RIF, because the Debtors determined their services were necessary to the success of the Debtors' Chapter 11 Cases (and the RIF has minimized redundancies for the business).

48.     The KERP Participants are not responsible for setting company policy and generally do not attend senior management meetings or participate in meetings of the Debtors' Board of Directors or any of its committees.  In fact, many of the KERP Participants' duties are limited to implementing tasks within a particular division or department.  The KERP Participants' respective scopes of authority are limited.  As such, their titles reflect their relative position below upper management and functions within the organization and do not reflect any real insider status or responsibility. *See infra.*

## 2.    The Terms of the KERP

49.    Under the proposed KERP, each KERP Participant[9] will receive a monetary award (the "KERP Award") through one or more payment(s) (the "KERP Payments" and each a "KERP Payment"), which amount depends on the KERP Participant's assigned tier (a "KERP Tier") and a salary formula.  There are four KERP Tiers ("Tiers 1-4"), which are based on length of stay.

50.    A KERP Award is based upon a calculation that equals the higher amount of (i) the sum of any accrued potential Severance that may have been payable under the Company's informal, prepetition practice and an amount equal to unpaid accrued PTO or (ii) a percentage (a "KERP Percentage") of that KERP Participant's annual base salary, depending on the KERP Tier that the KERP Participant is placed (the "KERP Percentage Award").

51.    For the avoidance of doubt, in addition to the KERP Award, KERP Participants who remain through the Debtors' designated date of separation and who execute required waivers and releases will also receive payment in full of all accrued and unpaid PTO.  However, all separate Severance benefits that may have otherwise existed are being terminated and will not be payable upon a KERP Participant's separation from employment.  Moreover, if the KERP Participant voluntarily leaves employment prior to the Debtors' designated date of separation, or such KERP Participant is terminated for cause, that KERP Participant will forfeit the entire KERP Award and any PTO earned in relation to work performed prior to 180 days before the Petition Date (*i.e.*, January 1, 2022) or earned within that 180 day period in excess of any available balance under the priority cap under § 507(a)(4) will be treated as a general unsecured claim.

52.    KERP Participants in the first and second KERP Tiers will be entitled to receive two KERP Payments: one payment, representing 35% of their KERP Award, if they are employed after the September RIF (the "KERP Retention Payment") and another payment, representing 65% of their KERP Award, to be earned upon the earlier date of  (i) confirmation of a Plan, (ii) the conversion of these Chapter 11 Cases to chapter 7 of the Bankruptcy Code, (iii) termination of

---

[9] A list of the KERP Participants, their titles, their KERP Tier, their salary, their KERP Percentage, their possible KERP Percentage Award  their proposed KERP Award, their accrued Severance and PTO, and their KERP award is attached as **Exhibit A** to the Imhoff Declaration.

15

their employment without cause, or (iv) death or disability (the "<u>KERP Final Payment</u>").  KERP Participants in KERP Tiers three and four will receive one KERP Payment, payable upon the earlier date (i) the conversion of these Chapter 11 Cases to chapter 7 of the Bankruptcy Code, (ii) termination of their employment without cause, or (iii) death or disability.

53.     KERP Participants in "Tier 1" (with an estimated ▮▮ participants and an average salary of ▮▮▮▮) will be assigned a KERP Percentage of ▮▮ of their salaries.  The high-side estimated KERP Payments to Tier 1 (if all KERP Participants agree to the program, remain in compliance and remain employed voluntarily) total $217,300.

54.     KERP Participants in "Tier 2" (with an estimated ▮ participants and an average salary of ▮▮▮) will be assigned a KERP Percentage of ▮ of their salaries.  The high-side estimated KERP Payments to Tier 2 (if all KERP Participants agree to the program, remain in compliance and remain employed voluntarily) total $578,200.

55.     KERP Participants in "Tier 3" (with an estimated ▮ participants and an average salary of ▮▮▮) will be assigned a KERP Percentage of ▮▮ of their salaries.  The high-side estimated KERP Payments to Tier 3 (if all KERP Participants agree to the program, remain in compliance and remain employed voluntarily) total $220,400.  The Debtors intend to terminate the employment of these Tier 3 employees in the September RIF.

56.     KERP Participants in "Tier 4" (with an estimated ▮ participants and an average salary of ▮▮▮) will be assigned a KERP Percentage of ▮▮ of their salaries.  The high-side estimated KERP Payments to Tier 4 (if all KERP Participants agree to the program, remain in compliance and remain employed voluntarily) total $402,400.  The Debtors intend to terminate the employment of these Tier 4 employees in the August RIF.

57.     If every KERP Participant remains eligible until their requested termination date or to Plan confirmation, total payments under the KERP formula will be approximately $1,418,300 (the "<u>KERP Formula Maximum</u>").  The KERP Formula Maximum, however, shall be reduced dollar for dollar based upon attrition due to termination for cause or resignation or an KERP Participant's failure to timely execute a release.

58.     In addition to the KERP Formula Maximum, the KERP Program provides a discretionary pool of $150,000 (the "KERP Discretionary Pool").   Amounts paid from the KERP Discretionary Pool are referred to as the "KERP Pool Payments" and each a "KERP Pool Payment").   The Debtors seek authority to make KERP Pool Payments at the discretion of the Debtors' management, without creditor input or Court approval, to active KERP Participants.

59.     In order to receive any KERP Payment, a KERP Participant will be required to sign one or more releases (collectively, the "KERP Release"), which KERP Release will release any and all claims that the KERP Participant has or may acquire against the Debtors related to their employment or termination of employment, whether arising pre or postpetition, and including any WARN liability or any claim to severance.   KERP Payments will be in lieu of any compensation that is due or owing, *except* for accrued, ordinary course salary, commissions, production bonuses and, subject to the terms described herein, PTO.

60.     The Cash Flow DIP Lender supports the KERP.

## IV.     RELIEF REQUESTED

61.     By this Motion, pursuant to §§ 105(a), 363(b) and 503(b) and (c)(3) and Bankruptcy Rule 6004, the Debtors request the entry of the Proposed Order, attached hereto as Exhibit A, (i) approving the KEIP, and granting the Debtors discretion to effectuate the KEIP and (ii) approving the KERP, and granting the Debtors discretion to effectuate the KERP.

## V.     BASIS FOR RELIEF

A.     **The KEIP Should be Approved**

1.     **Implementation of the KEIP Is Warranted Under § 363(b)(1) as an Appropriate Exercise of the Debtors' Business Judgment.**

62.     "The [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate," 11 U.S.C. § 363(b)(1), as long as the debtor can "show that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153

(D. Del. 1999); *see also Culp v. Stanziale (In re Culp)*, 550 B.R. 683, 697 (D. Del. 2015).  Where there is a reasonable basis for a debtor's business decisions, courts generally do not contradict the proposed course of conduct.  *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

63.     The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment.  *See In re Global Home Prods., LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) (citing *In re U.S. Airways, Inc.*, 329 B.R. 793, 795 (Bankr. E.D. Va. 2005)).  The KEIP is an incentive plan for six key senior executives that is designed to motivate them to achieve the best possible outcome (and to maintain the necessary flexibility to determine a final path and achieve this outcome) in these Chapter 11 Cases.  Consequently, the KEIP is not prohibited under the inapplicable § 503(c)(1) (concerning solely retentive programs) or § (c)(2) (concerning severance programs), but, rather, is permitted under § 503(c)(3).  *See, e.g., In re Alpha Natural Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) ("On its face, § 503(c)(1) does not apply to a KEIP because the payments thereunder are incentive and not purely retentive."); *In re Nobex Corp.*, 2006 Bankr. LEXIS 417, at *8 (Bankr. D. Del. Jan. 19, 2006) ("The sale-related incentive pay to [senior management] is not governed by §§ 503(c)(1) or 503(c)(2) of the Bankruptcy Code.").

64.     Therefore, the implementation of the proposed KEIP – a classic incentive plan, but tailored for the unique circumstances of the Chapter 11 Cases – is a sound exercise of the Debtors' business judgment and, as such, should be approved under § 363(b) of the Bankruptcy Code.  The KEIP Participants are essential to the Debtors' operations and their services are necessary to maximize the value of these Debtors' estates.  The KEIP establishes goals for the KEIP Participants that, if achieved, will have a meaningful impact on the Debtors' restructuring efforts.  The payment levels under the KEIP are reasonable in light of the size of the Debtors' estates and the amounts that comparable companies have provided as incentives to their senior leadership in other chapter 11 cases.  As a result, the Debtors, in their sound business judgment believe that the

US_ACTIVE\121844564\V-17

implementation of the KEIP is well justified under the circumstances and will benefit the Debtors' estates and their creditor constituencies; and therefore the Court should approve the KEIP.

> **2.    Approval of the Proposed KEIP Is Justified by the Facts and Circumstances of these Chapter 11 Cases and Therefore Satisfies § 503(c)(3).**

65.    Section 503(c)(3) prohibits transfers or obligations outside the ordinary course of business "not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition." 11. U.S.C. § 503(c)(3).  This Court and the majority of other courts have found that this standard is no different from the business judgment standard under § 363(b).  *See Global Home Prods.*, 369 B.R. at 783-84; *In re Nobex Corp.*, 2006 Bankr. LEXIS 417 (Bankr. D. Del. Jan. 19, 2006) (court concluded that § 503(c)(3) was a reiteration of the standard under § 363 under which courts had previously authorized transfers outside the ordinary course of business based on the business judgment of the debtor); *see also In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) (collecting cases); 4 *Collier on Bankruptcy* ¶ 503.17[4] (16th ed. 2012).  Given the presumption of good faith for a debtor, courts presume that "an incentive plan established postpetition by a debtor-in-possession for the benefit of senior management is in the ordinary course of the Debtors' business." *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 798 (Bankr. D. Del. 2007).

> **a.    The *Dana* Factors.**

66.    Courts assessing a debtor's business judgment relating to an incentive program under § 503(c)(3) look at six factors (the "*Dana* Factors"):  (a) whether a reasonable relationship existed between the proposed plan and the desired results; (b) whether the cost of the plan was reasonable in light of the overall facts of the case; (c) whether the scope of the plan was fair and reasonable; (d) whether the plan was consistent with industry standards; (e) whether the debtor had put forth sufficient due diligence efforts in formulating the plan; and (f) whether the debtor received sufficient independent counsel in performing any due diligence and formulating the plan.

US_ACTIVE\121844564\V-17

*In re Dana Corp.*, 358 B.R. at 576-77, applied in *In re Global Home Products, LLC*, 369 B.R. at 786.

### b.   The KEIP satisfies each of the *Dana* Factors.

67.   *Factor (a): The KEIP is Structured to Achieve the Desired Performance and is an Incentive Plan.* [10]   The KEIP incentivizes the Debtors' senior management team to achieve value-driving financial targets.  As discussed at length above, to earn both Threshold and Target Amounts, performance will require substantial outperformance from KEIP Participants.  Though the Debtors have not yet determined a final reorganization strategy, they will not emerge from these Chapter 11 Cases with the same business model and scale as they have now.  The process of scaling down and pivoting their business on-the-fly – necessitated by the sudden turn in the mortgage market and  punctuated by the June 24, 2022 RIF – is an immense challenge.  Unexpected and exigent circumstances landed the Debtors in Chapter 11 (a changed market, depleted employee pool, pressure from various constituents).  With this backdrop, the prerequisites of achieving the goals in the KEIP -- (i) funding and clearing the Pipeline, (ii) efficiently, liquidating the Balance Sheet Assets at a good value, (iii) meeting the DIP Budget, and (iv) expediently confirming a Plan—are not faits accomplis and are proper goals to motivate the KEIP Participants.  *See In re Residential Capital, LLC*, 478 B.R. 154, 171–73 (Bankr. S.D.N.Y. 2012) (distinguished between KEIPs which merely paid insiders based on any occurrence of a sale or plan (as retentive), and those that tied compensation to set, non-fait-accompli sale amounts and/or which were tied to meeting budgets, including DIP Budgets (as incentivizing)); *United Mine Workers of Am. 1974 Pension Plan & Tr. v. Alpha Nat. Res., Inc.*, 553 B.R. 556 (E.D. Va. 2016) ("Notably, the [participants] can earn a

---

[10] The KEIP was not designed to retain the KEIP Participants, although a prerequisite to receiving a payment under the KEIP is that the KEIP Participant must be employed at the time of the payment unless such employee's employment was terminated without cause. *See, e.g., In re Global Home Prods., LLC*, 369 B.R. at 786 ("The fact, as Debtors pointed out, that all compensation has a retention element does not reduce the Court's conviction that Debtors' primary goal [is] to create value by motivating performance.  All companies seek to retain employees they value by fairly compensating them.").

20

'target' level payout for confirmation of a Chapter 11 plan or a sale of substantially all of the Debtors' assets. However, this payout is only earned if the sale or confirmation takes place prior to June 30, 2016."); *In re Borders Group, Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011) ("As further evidence that the KEIP is primarily incentivizing, the size of the KEIP award is dependent on how quickly the Debtors emerge from bankruptcy. As the time spent in chapter 11 increases, KEIP bonus opportunities decrease. Thus, in addition to meeting the incentives of total Sale Proceeds (and budget goals for the Entity KEIP Participants), payments are also keyed to meeting fairly aggressive time-based goals."). The conditions to earn the KEIP Bonuses are not only essential for success in these Chapter 11 Cases, they also require substantial outperformance and dedication by the KEIP Participants.

68.    *Factors (b) and (c): The Costs and Scope of the KEIP Are Reasonable.* The KEIP concerns a narrow scope of employees – six out of an approximate total of 124 employees, and is targeted towards those with the most macro-influence over the Debtors' business and responsibility for achievement of Chapter 11 goals. As to cost, notably here, the Cash Flow DIP Lender agrees that the KEIP is reasonable under the Debtors' business judgment and has explicitly agreed for its collateral and money, the DIP funds, to be used to pay for the KEIP. The Cash Flow DIP Lender has no incentive to rubber-stamp the spending of its cash and its approval speaks volumes to the cost and necessity for the program. *See In re Glob. Home Products, LLC*, 369 B.R. 778, 787 (Bankr. D. Del. 2007 (approving KEIP where KEIP was "part of Debtors' budget which the DIP lenders, whose money is at risk and whose financial acumen is apparent, approved. . .").

69.    The KEIP will cost a total of approximately $1.166 million at a Threshold Award level and up to $1.555 million at Target Award levels—in each case assuming the requisite performance is actually achieved.   As set forth in the Imhoff Declaration, the KEIP's proposed cost is a reasonable, market-based approach that is consistent with award opportunities approved in comparable chapter 11 cases. Also as set forth in the Imhoff Declaration, KEIP Participants' total direct compensation will remain below compensation opportunities at certain peer firms, as

21

KEIP Participants will not receive outsized awards versus market peers even at maximum performance.

70.    ***Factors (d), (e), and (f): The Debtors Developed the KEIP with Independent Advice and Oversight and were Diligent in this Development.*** The Debtors actively sought input from their advisors during the KEIP development process. This process included FTI's specific compensation-related expertise and the oversight and approval of the Board (the Debtors' CEO is also a member of the Board of Directors, however he was excluded from any voting or formal debate concerning the KEIP). The Debtors, with the assistance of FTI and their other restructuring advisors, performed considerable diligence on their Current Employees' existing compensation levels (both with and without some form of incentive-based compensation) and market comparables vis-à-vis the Debtors' resources and Chapter 11 goals.

71.    Additionally, Courts in this district have approved similar incentive plans. *See In re MobiTV*, Case No. 21-10457 (LSS) (Docket No. 178) (Bankr. D. Del. Apr. 14, 2021) (approving KEIP designed to incentive goal that (i) the business' services remained online through the duration of these cases, and (ii) that the services are successfully transitioned to another party); *In re Claire Stores*, Case No. 18-10584 (MFW) (Docket No. 499) (Bankr. D. Del. June 13, 2018) (KEIP approved tied to achievement of EBITDA levels in face of severe business pressure under unforeseen, changed business landscape from loss of Toys-R-Us as business partner); *In re Real Industry, Inc.*, Case No. 17-12464 (KJC) (Bankr. D. Del., Jan. 17, 2018) (Docket No. 349) (approving KEIP tied to DIP Budget and EBITDA adherence); *Pacific Sunwear of California, Inc., et al.,* Case No. 16-10822 (LSS) (Bank. D. Del. May 12, 2016) (plan confirmation and compliance with DIP covenants metrics); *New Gulf Resources, LLC*, et al., Case No. 15-12566 (BLS) (Bankr. D. Del. Jan. 19, 2016); *In re Hipcricket, Inc.*, Case No. 15-10104 (LSS) (Bankr. D. Del. Mar. 18, 2015) (plan confirmation performance goals); *In re Longview Power, LLC*, et al. Case No. 13-12211 (BLS) (Bank. D. Del. Dec. 18, 2013) (KEIP with chapter 11 confirmation and power capacity operation milestones).

US_ACTIVE\121844564\V-17

72.    Accordingly, the Debtors respectfully submit that the *Dana* Factors and § 503(c)(3) are satisfied.

## B.    The KERP Should be Approved

73.    The KERP should be approved under the business judgement rule as applied under the statutory authority cited above for approval of the KEIP. *See* 11 U.S.C. §§ 105(a) and 503(b). The KERP is different than the KEIP in that the employees who would benefit from it are not insiders of the Debtors and as such may receive time-based retention bonuses and severance. 11 U.S.C. § 503(c).

### 1.    Because the KERP does not Include Insiders, it is not Subject to §§ 503(c)(1) and (2) of the Bankruptcy Code

74.    The KERP is not subject to the restrictions set forth in §§ 503(c)(1) and (2) of the Bankruptcy Code because the KERP is not applicable to any "insiders" (as such term is defined by § 101(31)).  Generally, the Bankruptcy Code defines an "insider" to include, among other things, "an officer of the debtor" and a "person in control of the debtor." 11 U.S.C. § 101(31). Courts have also concluded that an employee may be an "insider" if that employee has "*at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiedly dictate corporate policy and the disposition of corporate assets.*" *In re Velo Holdings, Inc.*, 472 B.R. 201, 208 (Bankr. S.D.N.Y. 2012) (citation omitted) (emphasis added).

75.    Although certain of the KERP Participants hold titles such as "senior vice president," "vice president," "assistant vice president," "officer,"[11] "manager" or "director," they do not take part in the strategic management or decide "critical financial decisions" of the Debtors, and thus are not "insiders" within the meaning of the Bankruptcy Code. *See In re Foothills Texas, Inc.*, 408 B.R. 573, 579 (Bankr. D. Del. 2009) (holding that the "mere title of a person does not end the inquiry" of whether they are an insider) (cited by *In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) ("[T]itles such as 'vice president' are not determinative [as

---

[11] Only one employee, the Debtors' chief people officer, holds this title, whose role concerns human resources and who does not make corporate decisions.

to insider status]. For example, in *In re NMI Systems, Inc.*, 179 B.R. 357, 370 (Bankr. D.D.C. 1995), the court found that a vice president was not an insider because [et. al. he was not] 'in the inner circle making the company's critical financial decisions.'"). The KERP Participants' respective scopes of authority are limited and their titles reflect only their relative position below upper management and functions within the organization and not any real insider status or responsibility. As a consequence, the KERP Participants are not "insiders" as defined in the Bankruptcy Code, and, accordingly, the Debtors maintain that §§ 503(c)(1) and 503(c)(2) do not apply to the KERP.

76.    Because the KERP does not include insiders, the applicable standard for evaluating the appropriateness of the KERP is provided by § 503(c)(3). As stated above, § 503(c)(3) permits payments to a debtor's employees outside the ordinary course of business if those payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). As discussed above, courts have generally held that this standard is no different from the business judgment standard applied by courts in determining whether to authorize the use, sale or lease of property outside the ordinary course of business under § 363(b). Accordingly, the KERP should be approved as a valid exercise of the Debtors' business judgment pursuant to § 363(b).

**2.    The KERP Satisfies the *Dana* Factors**

77.    Also, the KERP satisfies each of the *Dana* Factors. The Debtors incorporate their analysis of the *Dana* Factors above as to the KERP, and add the following. As to the first and third *Dana* Factors, the KERP was designed to motivate the KERP Participants for their significant efforts in these Chapter 11 Cases and to ensure that they continue to focus their full effort and attention on the Debtors' day-to-day operations as the Debtors clear their Pipeline, sell the Balance Sheet Assets and steady and position themselves for an exit from these Chapter 11 Cases. The KERP provides a fair amount of a retention premium given the uncertainty created by the Chapter 11 Cases, the Debtors' past downsizing and the announced and upcoming August and September RIFs. Further, this amount is justified given the high attrition risk that the Debtors are facing. *See In re Glob. Aviation Holdings Inc.*, 478 B.R. at 151 ("no showing of a bona fide job offer or any

24

other evidence of an intent to leave is required to pay a bonus to non-insiders [under a KERP]") (finding KERP reasonable under business judgment where Debtors concluded that "at least one" KERP employee would, without the KERP, leave). Finally, the KERP Release provides a material benefit to the Debtors, notably resolving any potential postpetition WARN claim.

78.    As to the remaining *Dana* Factors, as stated above and as described further in the Imhoff Declaration, with regard to the KEIP, the KERP was designed by the Debtors with the assistance of FTI, which (a) priced the KERP based on comparisons with similar retention plans of other comparable companies; (b) designed the KERP to be within industry standards; (c) performed due diligence for purposes of designing and implementing the KERP; and (d) provided independent counsel in performing due diligence and formulating the KERP.

79.    The KERP is similar to retention plans routinely approved in other courts and in this district. *See In re MobiTV*, Case No. 21-10457 (LSS) (Docket No. 499) (approving KERP for all non-insider employees after debtor had reduced its workforce pre-petition and was pursuing a liquidation); *In re Oneweb Global Limited, et. al.*, Case No. 20-22437 (RDD) (Docket No. 235) (Bankr. S.D.N.Y. May 29, 2020) (debtors executed prepetition RIF of 90% of workforce, and Court approved (i) KERP for 47 remaining employee totaling $3 million (40% of salary paid in quarterly installments); *In re Mervyn's Holdings, LLC*, No. 08-11586 (KG) (Bankr. D. Del. Oct. 30, 2008) [Docket No. 794] (approving retention plan for 93 non-insider employees contemplating payments of approximately $1.3 million).

80.    Accordingly, the Debtors respectfully submit that the KERP is justified by the facts and circumstances of these Chapter 11 Cases, is a sound exercise of business judgment, and that implementation of the KERP is in the best interests of the Debtors, their estates, creditors and all other stakeholders. For the reasons discussed above, the Debtors' KERP should be approved.

C.    **The KEIP and KERP may be Approved under § 105**

81.    Bankruptcy courts may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Courts use their § 105(a) powers to authorize payments essential to the operation of the debtor's business and maximizing

25

the value of the estate. *Just for Feet, Inc.*, 242 B.R. 821, 824-26 (D. Del. 1999) (debtors may make payments that are essential to the continued operation of the business while in chapter 11); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payments to employees on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit ... payment of creditors in full or at least proportionately"). Here, approval of KEIP and KERP is an appropriate use of the Court's § 105(a) powers because the programs are necessary to the continued operation of the Debtors' business and to the maximization of the value of the Debtors' chapter 11 estates for all stakeholders.

D.    **The KEIP and KERP Payments are Warranted under § 503(b)(1) as Actual, Necessary Costs and Expenses of Preserving the Debtors' Chapter 11 Estates**

82.    Section 503(b) of the Bankruptcy Code states in pertinent part that "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including – (1)(A) the actual necessary costs and expenses of preserving the estate including – (i) wages, salaries, and commissions for services rendered after commencement of the case. . . ." 11 U.S.C. § 503(b); *see also In re APF Co.*, 270 B.R. 567, 570-71 (Bankr. D. Del. 2001) (postpetition employee bonus is an administrative expense claim under section 503(b)(1)(A)). As discussed above, the KEIP and KERP are appropriately designed to maximize the value of these estates and are appropriately categorized as wages earned after the Petition Date.

## VI.    NOTICE

83.    Notice of this Motion will be provided to the following parties, or, in lieu thereof, their counsel, if known: (i) the UST; (ii) counsel to the Committee; (iii) counsel to the Debtors' DIP Lenders; and (iv) those persons who have requested notice pursuant to Bankruptcy Rule 2002. A copy of the Motion is also available on the Debtors' case website at https://www.kccllc.net/FGMC. The Debtors submit that no other or further notice need be provided.

26

84.     No previous motion for the relief sought herein has been made to this or any other court.

## VII.   <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief requested herein; and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

27

Dated: July 19, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Mary F. Caloway (DE Bar No. 3059)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
        tcairns@pszjlaw.com
        mcaloway@pszjlaw.com

-and -

**DENTONS US LLP**

Samuel R. Maizel
Tania M. Moyron
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Email:   samuel.maizel@dentons.com
        tania.moyron@dentons.com

*Proposed Counsel for Debtors and Debtors in Possession*