## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FIRST GUARANTY MORTGAGE CORPORATION, *et al.*,[1] | Case No. 22-10584 (CTG) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF TANYA MEEROVICH IN SUPPORT OF DEBTORS' MOTION OF DEBTORS FOR ENTRY OF ORDER (I) APPROVING KEY EMPLOYEE INCENTIVE PROGRAM, (II) KEY RETENTION EMPLOYEE PROGRAM AND (III) GRANTING RELATED RELIEF

I, Tanya Meerovich, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

### BASIS FOR TESTIMONY AND QUALIFICATIONS

1.     I am a Senior Managing Director of FTI Consulting ("FTI").  I was appointed chief restructuring officer ("CRO") of First Guaranty Mortgage Corporation ("FGMC") and its affiliated debtor Maverick Holdings, LLC ("Maverick", together with FGMC, the "Debtors")  on June 30, 2022.

2.     I am authorized to execute this declaration (the "Declaration").  I am familiar with the Debtors' books and records, day-to-day operations, business, and financial condition.  Except as otherwise indicated, the facts set forth herein are based upon (a) my personal knowledge of and familiarity with the Debtors' operations and finances, (b) information learned from my review of the relevant documents and information supplied to me by other members of the Debtors'

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction in which it operates, are:  First Guaranty Mortgage Corporation (9575) (Virginia); and Maverick II Holdings, LLC (5621) (Delaware).  The location of the corporate headquarters and the service address for First Guaranty Mortgage Corporation is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

management, the Debtors' professionals, and employees of the Debtors working under my supervision, and (c) my opinions based upon experience, knowledge, and information concerning the Debtors and the industry in which the Debtors operate.    I am over the age of 18 and am authorized to submit this declaration on behalf of the Debtors.

3.    I make this declaration in support of the *Debtors' Motion for an Order (I) Approving Key Employee Incentive Plan (II) Approving Key Employee Retention Plan for Non-Insider Employees* (the "Motion") filed concurrently herewith.  Capitalized terms used buy not defined herein shall have the meanings ascribed to them in the Motion.  Except as may otherwise be noted, I could and would testify to the following based upon my personal knowledge.

4.    I am familiar with the need for, the terms and background and development of the Debtors' proposed Key Employee Incentive Plan (the "KEIP") and the Debtors' Key Employee Retention Plan (the "KERP") as described in the Motion.

5.    FTI is a publicly traded, global business advisory firm with more than 7,000 employees across 88 locations around the world.  FTI is dedicated to helping organizations manage change, mitigate risk and resolve disputes: financial, legal, operational, political and regulatory, reputational and transactional.

6.    With more than 1,700 professionals in 64 offices across 17 countries, FTI's Corporate Finance & Restructuring segment is one of the leading restructuring advisors in the world.  FTI focuses on the strategic, operational, financial, transactional, and capital needs of clients to deliver a wide range of services centered around three core offerings: Turnaround, Restructuring and Business Transformation and Transactions.   FTI also couples industry experts with seasoned operators and restructuring professionals, to provide outside-the-box, yet practical solutions in complex situations.  FTI's clients include corporations, boards of directors, investors, private equity sponsors, banks, lenders and other financing sources and creditor groups, as well as other parties-in-interest.

7.    I have over fifteen years of experience leading complex transformations and advising on in- and out-of-court restructurings for companies across industries, with expertise in

the financial services, real estate, non-for-profit, insurance, healthcare, education, energy, manufacturing, infrastructure, print, entertainment and retail industries.  I graduated from Roosevelt University with a Bachelor's degree in business management and finance.  I am a Chartered Financial Analyst, a Certified Insolvency and Restructuring Advisor and a Certified Turnaround Professional.  My recent engagements in the financial services industry include, among others: AG Mortgage Investment Trust Inc, Impac Mortgage, MFA Financial, Ocwen Financial, Residential Capital, Credit-Based Asset Servicing and Securitization, Progrexion, JH Capital, Litton Loan Servicing, Ditech Corporation, Walter Investments and Stearns Lending.  Prior to joining FTI, I was in the Financial Services Advisory group of RSM Cayman Islands, where I was involved in a number of high-profile and complex cross-border insolvency engagements in the financial services sector.

### TESTIMONY CONCERNING THE DEBTORS AND THE KEIP AND KERP

**A.** **General Background**

8.     Prior to the Petition Date, the Debtors operated as a full service, non-bank mortgage lender, offering a full suite of residential mortgage options tailored to borrowers' different financial situations.  As described in more detail in the First Day Declaration, the business included the origination, purchase, service, sale and/or securitization of residential real estate mortgage loans.

9.     On the Petition Date, the Debtors commenced the Chapter 11 Cases, which are being jointly administered under the above-captioned case.  The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to §§ 1107(a) and 1108.

10.     The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, is set forth in the First Day Declaration and fully incorporated herein by reference.

11.     One July 14, 2022, the Office of the United States Trustee (the "UST") appointed an official committee of unsecured creditors (the "Committee").

B.     **The Workforce**

12.     A week prior to the Petition Date, the Debtors employed approximately 600 employees.    Of that group, approximately 300 employees worked primarily as sales-staff or originators and were paid, in whole or in part, on a commission basis tied to the funded amount of closed loans (the "Commission Employees").

13.     In the days leading up to the Petition Date, as a result of an unanticipated liquidity crisis, the Debtors ceased all of its mortgage loan origination activity and implemented the RIF on June 24, 2022.   The RIF eliminated the majority of Commission Employees and a substantial amount of non-Commission Employees.

14.     Of the remaining Current Employees, 124 will be eligible for the Programs. All of these individuals are key to the Debtors' operations and restructuring effort.   This group is divided into proposed KERP and proposed KEIP Participants as follows:

- (i) the proposed KERP Participants, approximately 118 non-insider Current Employees, (a) who are paid a regular salary and (b) of whom, some, but not all, may earn accrued paid time off ("PTO") payable upon termination (which, as of the date of this Declaration, has an estimated aggregate value of $100,000 for Current Employees) and, (c) who, upon termination without cause, may seek or otherwise expect payment under an informal, pre-petition company practice equal to one-week's pay for every year worked ("Severance"); and

- (ii) the proposed KEIP Participants, six upper level executives, arguably "insiders" (a) who are paid a regular salary, and (b) who could earn incentive bonuses under a prepetition incentive plan and, (c) who have unlimited PTO, and (d) who, upon termination, earn severance (as set forth under their respective employment arrangement).

15.     The Current Employees were not part of the June 24, 2022 RIF and are essential for the success of these Chapter 11 Cases.   In addition to ensuring compliance with the new Chapter 11 reporting requirements, many will be focused on critical operational matters including closing and

funding of mortgage loans, post-closing activity which includes required loan insuring, remediation of data errors, loan delivery to investors, selling of the loans and support with the Agencies (as defined in the First Day Declaration) and investors throughout the process. Further, certain of the Current Employees are necessary for the Debtors to have the capacity to answer customer questions and manage the sale of funded loans, servicing and other assets. Other Current Employees are necessary to ensure that the technology infrastructure keeps critical systems running to perform post-closing activity, provide help desk support and maintain the same level of cyber security through the process, as well as data storage.  Further, the Current Employees are necessary because (i) branch sites will need to be secured and closed out, equipment retrieved and liquidated. A remediation team will be required to ensure that any potential issues or missing documents can be resolved or recovered so that assets can be sold.  Certain of the Current Employees are also critical to ensuring regulatory compliance throughout the process. Finally, in the event the Debtors reorganize as a scaled down operation, they will require a base team of employees to ensure the required licenses are retained and to continue originating and servicing mortgage loan customers.

16.    The Debtors are acutely concerned with attrition, which concerns are well founded. Since the Petition Date, at least eight employees have resigned.  The Debtors have also had at least ten separate conversations with employees who are considering resigning (or know of other employees who are considering resigning) and other companies who are considering hiring the Current Employees.   Thus, the proposed Programs were developed to reduce if not halt the untimely outflow of non-insider talent and to incentivize senior management to perform at the highest level all with the goal of enhancing creditor recoveries and success in these Chapter 11 Cases.

C.    **The Debtors' Goals and Tasks in their Chapter 11 Cases**

17.    The Debtors commenced the Chapter 11 Cases to evaluate their restructuring options, accommodate their customers, and maximize and preserve value for all stakeholders.  The Debtors intend to file and confirm a plan of reorganization or liquidation under § 1129 (a "Plan") in the third or fourth quarter of this year.  However, before the Debtors can confirm a Plan, they

must administer their existing assets and business in an efficient manner under challenging circumstances.

**D.      The Pipeline**

18.     The Debtors largely stopped originating new mortgage loans after the RIF. However, on the Petition Date, there was a prepetition pipeline of unfunded purchase money and refinance loans, including those for which customer rate lock commitments already had been made (the "Pipeline").  In the ordinary course of their business, the Debtors move loans "downstream" in the Pipeline by (i) funding the loans (and obtaining and maintaining capital in order to do so) and then (ii) selling these loans to investors, including government agencies, financial institutions and other qualified entities.  These unfunded loans are being funded through loan sales under a postpetition warehouse liquidity facility structured as a master repurchase agreement.  It is imperative that the Debtors have the staff and related resources to complete the funding of these loans, and the sale of such loans to investors, as the failure to do so would (i) prevent consumer borrowers from funding their home purchases or re-financing their current mortgages, and (ii) prevent the sale of these loans to satisfy obligations owed to postpetition liquidity providers.

**E.      The Wage Motion and Cash Flow DIP Motion**

19.     As a part of their first-day relief, the Debtors filed their Wage Motion[2] and Cash Flow DIP Motion.[3]  The Wage Motion sought approval to authorize the Debtors to pay Current Employees in the ordinary course and make certain payments to Current Employees and separated employees on account of prepetition obligations.  On July 1, 2022, the Court entered an interim order approving the Wage Motion and setting a final hearing for July 28, 2022.  Docket No. 64.

20.     Through their Cash Flow DIP Motion, the Debtors obtained interim approval of the Cash Flow DIP Facility from the Cash Flow DIP Lender (as both these terms are defined in Docket

---

[2] *Motion to Pay Employee Wages Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief* [Docket No. 9] (the "Wage Motion").
[3] *Motion to Approve Debtor In Possession Financing*, [Docket No. 22] (the "Cash Flow DIP Motion").

No. 22), with a final hearing set for July 28, 2022. The Cash Flow DIP Facility is subject to an "Approved DIP Budget" (as defined in Docket No. 22), which allocates funds for "Operating Disbursements." The Debtors and the Cash Flow DIP Lender have agreed that the amounts sought in this Motion are permitted Operating Disbursements under the current Approved DIP Budget.

21.     The Approved DIP Budget also includes a line-item for "Asset Sales/Recoveries" contemplating the sale of various of the Debtors' assets (the "Balance Sheet Assets") that the Debtors intend to sell in the ordinary course and/or through § 363 sales during their Chapter 11 Cases (the "Balance Sheet Asset Sales"). The Debtors will undertake the Balance Sheet Sales because, in consultation with stakeholders, they have determined that the Balance Sheet Assets have value, but are not needed by the Debtors after reorganization.

**F.     Future Separations**

22.     The Debtors have determined that they may need to undergo additional RIFs during the Chapter 11 Cases, one of which is contemplated on or around August 15, 2022 (the "August RIF"), and another in mid-September, 2022 (the "September RIF"). These potential RIFs are tied to the scaling down of the Debtors' business (and thus need for certain employees) and the movement of loans through and out of the Pipeline.

23.     The Programs are designed to mitigate both harm to the estates and to the Current Employees by compensating the KERP Participants for remaining employed by the Debtors during the wind-down of the Pipeline and completion of the Balance Sheet Asset Sales, and incentivizing the KEIP Participants to meet the Debtors' goals and maintain the progress of these Chapter 11 Cases, including confirmation of a Plan.

**G.     The Development of the KEIP and KERP**

24.     As explained in this Motion, the Debtors determined that there is an acute need to incentivize and retain their key employees for the success of their Chapter 11 Cases. The Debtors enlisted the services of FTI, to support the development of the KEIP and the KERP. FTI has significant experience in designing executive and employee incentive, retention, and severance plans for companies in chapter 11 and has access to extensive industry compensation data. The

Debtors, their legal counsel, and FTI reviewed the Debtors' employment requirements during these Chapter 11 Cases, and the attendant necessary features of incentive and retention plans. FTI assisted the Debtors in designing the KEIP and KERP, keeping in mind the Debtors' goals of maximizing value, enhancing the Debtors' financial condition, and ensuring effective management throughout these Chapter 11 Cases. The KEIP and KERP were designed to promote appropriate and reasonable incentives and to retain non-insider personnel essential to the success of these Chapter 11 Cases.

25.    The KEIP and KERP were carefully calibrated and underwent several rounds of revisions before being submitted for consideration to the Debtors' board of directors (the "Board of Directors"). The Board of Directors reviewed the proposed plans, asked questions and provided comments requiring revisions before approving the plans. [4]

26.    The Debtors also consulted with and addressed questions from the Cash Flow DIP Lender. The Cash Flow DIP Lender supports the Programs and agrees to the payments thereunder. The Debtors will engage with and provide reasonable information about the Programs to the UST and the Committee in an effort to obtain their consent or at least eliminate or minimize any objection.

## H.    The KEIP

### 1.    Terms of the KEIP

12.    Under the proposed KEIP, there are five tranches of independent bonuses (the "KEIP Bonuses," and with payments of these bonuses as the "KEIP Bonus Payments"). As described below, the KEIP Bonuses for any individual tranche may (i) not be earned at all, or, (ii) if earned, may fluctuate between a low, threshold amount (together, the "Threshold Amounts," and each, respectively, a "Threshold Amount,") and a high, target amount (the "Target Amounts," and each, respectively a "Target Amount").

---

[4] The KEIP Participants who holds seats on the Board of Directors (the Chief Executive Officer) was recused from participating in the formal consideration and voting on the KEIP.

13.     The below chart provides the total amount of Threshold and Target Amounts as compared to base salary of the KEIP Participants.  In summary, the total Threshold Amounts are $1,166,300 and the total Target Amounts are $1,555,000, and an illustrative chart (numbers in $000s) is presented below:

| Name | Base Salary | Threshold | Target |
| --- | --- | --- | --- |
| ███ – CEO | ███ | ███ | ███ |
| ███. – COO | ███ | ██ | ██ |
| ███ – CIO | ███ | ███ | ███ |
| ███ – CLO & GC | ███ | ██ | ██ |
| ███ – EVP, Cap. M | ███ | ██ | ██ |
| ███ – EVP, COO | ███ | ███ | ██ |
| **Total** | **$2,352.1** | **$1,166.3** | **$1,555.0** |

14.     As to the tranches, *first,* a KEIP Participant will earn (i) a Threshold Amount if, by September 14, 2022, the Pipeline is orderly, timely and compliantly resolved, and will earn a Target Amount if the same is accomplished by August 31, 2022 (with this bonus as the "Pipeline Resolution Bonus").  The Pipeline Resolution Bonus is weighted at the Threshold and Target Amount levels as 40% of the KEIP Bonuses.  The range of the payout for the Pipeline Bonus is $466,500 at the Threshold Award level to $622,000 at the Target Award level.

15.     *Second*, a KEIP Participant will earn (i) a Threshold Amount if, by October 7, 2022, all or substantially all of the funded and closed loans in the Pipeline are liquidated, and (ii) will earn a Target Amount if the same is accomplished by September 30, 2022 (with this bonus as the "Pipeline Sale Bonus").  The Pipeline Sale Bonus is weighted at the Threshold and Target Amount levels as 15% of the KEIP Bonuses.  The range of the payout for the Pipeline Sale Bonus is $174,900 at the Threshold Award level to $233,300 at the Target Award level.

16.     *Third,* a KEIP Participant will earn (i) a Threshold Amount if all or substantially all of the Balance Sheet Assets (excluding HUD claims and counter-party receivables) have been liquidated by October 14, 2022, and (ii) a Target Amount if the same is accomplished by September 30, 2022 (with this bonus as the "Balance Sheet Asset Bonus"). The Balance Sheet Asset Bonus is weighted at the Threshold and Target Amount levels as 15% of the KEIP Bonuses. The range of the payout for the Balances Sheet Asset Bonus is $174,900 at the Threshold Award level to $233,300 at the Target Award level.

17.     *Fourth*, a KEIP Participant will earn (i) a Threshold Amount if the Operating Disbursements (excluding professional fees) are at a level of 110% of the budgeted amount in the Approved DIP Budget, and (ii) a Target Amount if the Operating Disbursements (excluding professional fees) are met without an adverse variance in the Approved DIP Budget (with this bonus as the "DIP Budget Bonus"). The DIP Budget Bonus is weighted at the Threshold and Target Amount levels as 15% of the KEIP Bonuses. The range of the payout for the DIP Budget Bonus is $174,900 at the Threshold Award level to $233,300 at the Target Award level.

18.     *Fifth*, a KEIP Participant will earn (i) a Threshold Amount if a Plan is confirmed by November 30, 2022, and (ii) a Target Amount if a Plan is confirmed by November 15, 2022 (this bonus is the "Plan Bonus"). The Plan Bonus is weighted at the Threshold and Target Amount levels as 15% of the KEIP Bonuses. The range of the payout for the Plan Bonus is $174,900 at the Threshold Award level to $233,300 at the Target Award level.

19.     These five categories of KEIP Bonuses are independent. Of course, they all bear relation towards the success of the Debtors' Chapter 11 Cases. For instance, if the Pipeline Bonus is not met, it is more likely that the DIP Budget is not met, which, in turn, makes it much less likely that the Debtors can confirm a Plan.

20.     The KEIP Program supersedes and obviates any severance obligation that might become due and owing to a KEIP Participant.  If a KEIP Participant is terminated for "cause,"[5] or voluntarily ends his or her employment, he or she will not receive any future KEIP Bonus Payment, and any KEIP Bonus Payments already made must be returned to the Debtors.  Neither the (i) termination of the employment of a KEIP Participant without cause nor (ii) death or disability shall affect any right of a KEIP Participant to a KEIP Bonus, and KEIP Bonuses will be earned upon the occurrence of any triggering event(s), regardless of whether the event(s) occurred after (i) termination without cause or (ii) death or disability.

21.     KEIP Bonus Payments will be made on a rolling basis, coinciding with timing of the applicable trigger event(s) and condition(s) (with payments to be made as reasonably practicable after such occurrences) and circumstances of the Chapter 11 Cases.

22.     To receive and retain their KEIP Payments, all KEIP Participants will be required to execute one or more releases of any claim for severance or for any other claim, including under any existing bonus program.

23.     The Cash Flow DIP Lender supports the KEIP.

## I.     The KERP

### 1.     The KERP Participants and their Value

27.     The KERP Participants serve crucial roles in and are an integral part of the Debtors' business. The KERP Participants were not a part of the prepetition RIF, because the Debtors determined their services were necessary to the success of the Debtors' Chapter 11 Cases (and the RIF has minimized redundancies for the business).

---

[5] For purposes of the KEIP and KERP, "cause" means (i) failure to materially perform the duties for which they are employed, (ii) willful violation of a material policy of the Debtors, (iii) commission of any act or acts of fraud, embezzlement, dishonesty, or other willful misconduct, (iv) material breach of any of their obligations under any written agreement or covenant with the Debtors, or (v) an act of dishonesty resulting or intended to result, directly or indirectly, in their gain for personal enrichment at the expense of the Debtors.

28.     The KERP Participants are not responsible for setting company policy and generally do not attend senior management meetings or participate in meetings of the Debtors' Board of Directors or any of its committees.  In fact, many of the KERP Participants' duties are limited to implementing tasks within a particular division or department.  The KERP Participants' respective scopes of authority are limited.  As such, their titles reflect their relative position below upper management and functions within the organization and do not reflect any real insider status or responsibility.  *See infra.*

### 2.      The Terms of the KERP

29.     Under the proposed KERP, each KERP Participant[6] will receive a monetary award (the "KERP Award") through one or more payment(s) (the "KERP Payments" and each a "KERP Payment"), which amount depends on the KERP Participant's assigned tier (a "KERP Tier") and a salary formula.  There are four KERP Tiers ("Tiers 1-4"), which are based on length of stay.

30.     A KERP Award is based upon a calculation that equals the higher amount of (i) the sum of any accrued potential Severance that may have been payable under the Company's informal, prepetition practice and an amount equal to unpaid accrued PTO or (ii) a percentage (a "KERP Percentage") of that KERP Participant's annual base salary, depending on the KERP Tier that the KERP Participant is placed (the "KERP Percentage Award").

31.     For the avoidance of doubt, in addition to the KERP Award, KERP Participants who remain through the Debtors' designated date of separation and who execute required waivers and releases will also receive payment in full of all accrued and unpaid PTO.  However, all separate Severance benefits that may have otherwise existed are being terminated and will not be payable upon a KERP Participant's separation from employment.  Moreover, if the KERP Participant voluntarily leaves employment prior to the Debtors' designated date of separation, or such KERP Participant is terminated for cause, that KERP Participant will forfeit the entire KERP Award and

---

[6] A list of the KERP Participants, their titles, their KERP Tier, their salary, their KERP Percentage, their possible KERP Percentage Award  their proposed KERP Award is attached as **Exhibit A** to the Imhoff Declaration.

any PTO earned in relation to work performed prior to 180 days before the Petition Date (i.e., January 1, 2022) or earned within that 180 day period in excess of any available balance under the priority cap under § 507(a)(4) will be treated as a general unsecured claim.

32.    KERP Participants in "Tier 1" (with an estimated ███ participants and an average salary of ██████) will be assigned a KERP Percentage of ███ of their salaries. The high-side estimated KERP Payments to Tier 1 (if all KERP Participants agree to the program, remain in compliance and remain employed voluntarily) are $217,300.

33.    KERP Participants in "Tier 2" (with an estimated █ participants and an average salary of ██████) will be assigned a KERP Percentage of ███ of their salaries. The high-side estimated KERP Payments to Tier 2 (if all KERP Participants agree to the program, remain in compliance and remain employed voluntarily) are $578,200.

34.    KERP Participants in "Tier 3" (with an estimated █ participants and an average salary of █████) will be assigned a KERP Percentage of ███ of their salaries. The high-side estimated KERP Payments to Tier 3 (if all KERP Participants agree to the program, remain in compliance and remain employed voluntarily) are $220,400. The Debtors intend to terminate the employment of these Tier 3 employees in the September RIF.

35.    KERP Participants in "Tier 4" (with an estimated █ participants and an average salary of ██████) will be assigned a KERP Percentage of ███ of their salaries. The high-side estimated KERP Payments to Tier 4 (if all KERP Participants agree to the program, remain in compliance and remain employed voluntarily) are $402,400. The Debtors intend to terminate the employment of these Tier 4 employees in the August RIF.

36.    If every KERP Participant remains eligible until their requested termination date or to Plan confirmation, total payments under the KERP formula will be approximately $1,418,300 (the "KERP Formula Maximum"). The KERP Formula Maximum, however, shall be reduced dollar for dollar based upon attrition due to termination for cause or resignation or a KERP Participant's failure to timely execute a release.

37.    In addition to the KERP Formula Maximum, the KERP Program provides a discretionary pool of $150,000 (the "KERP Discretionary Pool"). Amounts paid from the KERP Discretionary Pool are referred to as the "KERP Pool Payments" and each a "KERP Pool Payment"). The Debtors seek authority to make KERP Pool Payments at the discretion of the Debtors' management, without creditor input or Court approval, to active KERP Participants.

38.    In order to receive any KERP Payment, a KERP Participant will be required to sign one or more releases (collectively, the "KERP Release"), which KERP Release will release any and all claims that the KERP Participant has or may acquire against the Debtors related to their employment or termination of employment, whether arising pre or postpetition, and including any WARN liability or any claim to severance. KERP Payments will be in lieu of any compensation that is due or owing, *except* for accrued, ordinary course salary, commissions, production bonuses and, subject to the terms described herein, PTO.

39.    The Cash Flow DIP Lender supports the KERP.

A.    **The KEIP and KERP Should be Approved**

39.    The KERP was designed to motivate the KERP Participants for their significant efforts in these Chapter 11 Cases and to ensure that they continue to focus their full effort and attention on the Debtors' day-to-day operations as the Debtors clear their Pipeline, sell the Balance Sheet Assets and position themselves for an exit from these Chapter 11 Cases. The KERP provides a fair amount of a retention premium given the uncertainty created by the Chapter 11 Cases, the Debtors' past downsizing, and the announced and upcoming August and September RIFs. Further, the amount of the KERP is justified given the high attrition risk that the Debtors are facing. Finally, the KERP Release provides a material benefit to the Debtors, notably resolving any potential postpetition WARN claim.

40.    The KEIP incentivizes the Debtors' senior management team to achieve value-driving financial targets. As discussed at length above, to earn both Threshold and Target Amounts, performance will require substantial outperformance from KEIP Participants. Though the Debtors have not yet determined a final reorganization strategy, they will not emerge from these

Chapter 11 Cases with the same business model and scale as they have now. The process of scaling down and pivoting their business on-the-fly – necessitated by the sudden turn in the mortgage market and punctuated by the June 24, 2022 RIF – is an immense challenge. Unexpected and exigent circumstances landed the Debtors in Chapter 11 (a changed market, depleted employee pool, pressure from various constituents). With this backdrop, the prerequisites of achieving the goals in the KEIP – (i) funding and clearing the Pipeline, (ii) efficiently liquidating the Balance Sheet Assets at a good value, (iii) meeting the DIP Budget, and (iv) expediently confirming a Plan – are not faits accomplis and are proper goals to motivate the KEIP Participants. The conditions to earn the KEIP Bonuses are not only essential for success in these Chapter 11 Cases, they also require substantial outperformance and dedication by the KEIP Participants.

41.    The Debtors, with their advisors and stakeholders in this case, have developed the Programs, which are appropriately designed to retain the services of the KERP Participants and incentivize the KEIP Participants as the Debtors' continue to operate while winding-down and liquidating certain aspects of their business and formulating a restructuring plan. Without this relief, KERP Participants will leave, and KEIP Participants will not be properly incentivized, which will imperil the success of these Chapter 11 Cases.

42.    Accordingly, I have determined that implementing the KEIP and KERP is essential to effectively and efficiently accomplish the Debtors' goals in these Chapter 11 Cases and to maximize creditor recoveries.  I agree with the determination of the Board of Directors' approval of the KEIP and KERP.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 19, 2022

/s/ Tanya Meerovich
Tanya Meerovich
Senior Managing Director
FTI Consulting