## **Exhibit B**

(Statement)

*ACTIVE 66486132v1*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>FIRST GUARANTY MORTGAGE CORPORATION, *et al.*,[1]<br>Debtors. | Chapter 11<br><br>Case No. 22-10584 (CTG)<br><br>(Jointly Administered)<br><br>**Ref. Docket Nos. 22, 67, and 199** |

## STATEMENT OF B2 FIE XI LLC AND LVS II SPE XXXIV LLC
## IN SUPPORT OF THE CASH FLOW DIP MOTION

B2 FIE XI LLC (the "Prepetition Bridge Lender") and LVS II SPE XXXIV LLC (the "Cash Flow DIP Lender") submit this Statement ("Statement") in support of *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Providing Superpriority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* [Docket No. 22] (the Cash Flow DIP Motion")[2] filed by First Guaranty Mortgage Corporation ("FGMC") and Maverick II Holdings, LLC ("Maverick"), the above-referenced affiliated debtors and debtors in possession (together, the "Debtors"), and in response to the objection [Docket No. 199] ("Objection") filed by the Official Committee of Unsecured Creditors ("Committee"). In support of the Statement, the Prepetition Bridge Lender and the Cash Flow DIP Lender represent as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621). The Debtors' mailing address is 5400 Tennyson Parkway, Suite 450, Plano, TX 75024.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Cash Flow DIP Motion.

ACTIVE 66486158v5

**I.     THE DEBTORS HAVE ESTABLISHED THE NEED FOR THE
CASH FLOW DIP FACILITY AND HAVE NO OTHER ALTERNATIVES**

1.     Given market volatility and rising interest rates, the Debtors filed these cases quickly and with little warning.  Despite having little time to conduct diligence and facing uncertainty as to the Debtors' business, the Prepetition Bridge Lender funded more than $18 million in bridge loans and the Cash Flow DIP Lender committed to more than $42 million in postpetition financing.  This new money financing package (i) allowed, on a prepetition basis, payment of employee wages and salaries and for those employees who were terminated prepetition, payment of severance and accrued, unused paid time off, (ii) continues to allow the Debtors to pay amounts due to employees on a postpetition basis; (iii) allowed, and continues to allow, the Debtors to fund mortgage loans to consumers, including consumers who were expecting mortgages for the purchase of homes, (iv) provided the Debtors a soft landing in chapter 11, (v) preserves the Debtors' optionality to maintain and potentially sell a business platform, and (vi) gives the Debtors runway to operate while in chapter 11.  Without this financing, the Debtors would have been forced to shut down operations, leaving high and dry the consumers who were relying on committed mortgages to purchase homes, as well as employees who rely on a paycheck and benefits from the Debtors.

2.     In short, an immediate and emergency liquidation would destroy the Debtors' value and create exponentially larger claims against the Debtors.  Given that neither the Debtors nor the Committee has proposed a viable alternative to the Cash Flow DIP Facility, if the proposed financing is not approved, it appears that a value-destroying liquidation is likely.

3.     The Committee argues that these cases are run for the sole benefit of the Prepetition Bridge Lender and the Cash Flow DIP Lender.  That of course ignores the benefits to the Debtors, their estates and creditors that result from a financed path, as well as the harm that results from an

uncertain path with no financing. It also ignores the fact that the Prepetition Bridge Lender and the Cash Flow DIP Lender are the only parties that have stepped up to fund the Debtors, both immediately before and after the commencement of these cases.

4.   Indeed, just weeks before the Petition Date the Debtors were effectively out of cash and approached the Prepetition Bridge Lender for a loan. Among other things, the Debtors' warehouse lenders and repo counterparties were no longer willing to finance the Debtors; and after trying to find other financing sources or a buyer for the pipeline of consumer loans, the Debtors had no other alternatives. The Prepetition Bridge Lender agreed to provide more than $18 million in bridge loans in the weeks prior to the Petition Date on the terms negotiated. The bridge loans included more than $7 million to fund mortgage loans after the warehouse lenders and repo counterparties stopped financing those loans.

5.   The Cash Flow DIP Lender then committed to provide postpetition financing of up to more than $42 million of new money to, among other things, fund the costs of these cases (pursuant to a budget prepared by the Debtors, the Debtors' Chief Restructuring Officer and the Debtors' other professionals), as well as a portion of the mortgages in the Debtors' pipeline. In addition, the DIP Repo Guarantor agreed to guarantee the $125 million Repo DIP Facility, without which the Debtors could not fund the mortgages in their pipeline.

6.   The Prepetition Bridge Lender, the Cash Flow DIP Lender, and the DIP Repo Guarantor have, therefore, collectively committed to provide more than $60 million in new money financing and to guarantee an additional $125 million in repo purchases. This financing does not seek to prime the liens of the prepetition warehouse lenders and repo counterparties – which were collectively owed more than $400 million as of the Petition Date – or the rights of government-sponsored enterprises that have purchased the Debtors' mortgages and related assets. Given the

junior position on encumbered assets, as well as the Debtors' limited unencumbered assets, the Prepetition Bridge Lender and Cash Flow DIP Lender face material risk that the Prepetition Bridge Loan and Cash Flow DIP Facility will not be paid in full.

7.      Finally, the Committee spends much of its Objection attacking the Cash Flow DIP Lender's relationships to other parties allegedly involved in these cases and mischaracterizes those relationships. To clarify the record, the Cash Flow DIP Lender is an affiliate of the Prepetition Bridge Lender, the DIP Repo Guarantor and B2 FIE IV LLC ("B2 FIE IV"), which owns all of the equity in FGMC. Each of B2 FIE IV, the Cash Flow DIP Lender, and the Prepetition Bridge Lender, are directly or indirectly owned by PIMCO BRAVO Fund II, L.P. ("Bravo II"), which is a pooled investment fund. Pacific Investment Management Company, LLC is the investment manager for each of Bravo II, the Cash Flow DIP Lender, the Prepetition Bridge Lender, and B2 FIE IV and is not the owner of FGMC, as alleged by the Committee.

**A. The Cash Flow DIP Facility Contains Customary, Market Terms.**

8.      In the Committee's Objection, the Committee takes issue with terms of the Cash Flow DIP Facility. Without any justification or support, the Committee argues that the Prepetition Bridge Lender and/or Cash Flow DIP Lender should not (i) obtain liens on unencumbered assets, including avoidance actions, (ii) obtain a waiver of the Debtors' ability to seek collateral surcharges under section 506(c) of the Bankruptcy Code, (iii) obtain a waiver of the marshaling doctrine, or (iv) receive a waiver of the equities of the case exception under section 552 of the Bankruptcy Code. Although in some cases lenders may agree to the concessions requested by the Committee, the concessions are not warranted here.

9. First, all the terms of the Cash Flow DIP Financing – including terms noted above – are part of a package deal. It is inappropriate for the Committee to ask the Court to strike provisions that the Committee does not like, while retaining the benefits the financing provides.

10. Second, the Committee's position that a DIP lender is not entitled to liens on unencumbered assets is contrary to the structure of the Bankruptcy Code. Under section 364, liens on unencumbered assets may be granted if unsecured credit cannot be obtained, but priming liens may only be granted if credit cannot be obtained without them. *See* 11 U.S.C. § 364(d)(1)(A). Thus, unencumbered assets should be the first category of assets used to secure DIP financing. Proceeds of avoidance actions and litigation claims are no exception, despite the Committee's incorrect assertion that a grant of liens in such proceeds and claims is "[c]ontrary to the prevailing case law." *See* Objection ¶ 44. The proceeds of avoidance actions are property of the estate that can be pledged to secure DIP financing. Courts routinely approve the grant of such liens.[3] Moreover, this aspect of the Cash Flow DIP Facility does not somehow "shield" the Prepetition Bridge Lender and the Cash Flow DIP Lender. *See id.* ¶ 45. All parties, including the Committee, retain the right to bring a Challenge. The fact that avoidance actions and other tort claims would secure the new money Cash Flow DIP Facility does not shield the Prepetition Bridge Lender and Cash Flow DIP Lender from the consequences of a successful Challenge. Regardless of such a Challenge, the Cash Flow DIP Lender's new money loan should not lose the benefit of collateral that the Debtors are permitted to pledge.

---

[3] *See, e.g.*, *In re TECT Aerospace Grp. Holdings*, Case No. 21-10670 (KBO) (May 13, 2021) [Docket No. 174] (approving liens on proceeds of avoidance actions); *In re Muji U.S.A. Limited*, Case No. 20-11805 (MFW) (Aug. 11, 2020) [Docket No. 105] (same); *In re GNC Holdings, Inc.*, Case No. 20-11662 (KBO) (July 21, 2020) [Docket No. 502] (same); *In re AAC Holdings Inc.*, Case No. 20-11648 (JTD) (July 15, 2020) [Docket No. 159] (same); *In re Quorum Health Corp.*, Case No. 20-10766 (KBO) (May 6, 2020) [Docket No. 286] (same).

11. Third, the 506(c), 552(b), and marshalling waivers are customary and appropriate. The Cash Flow DIP Lender has agreed to the Carve-Out, which makes all professional fees incurred pursuant to the budget through an event of default, plus other customary amounts, senior to the Prepetition Bridge Loans and the Cash Flow DIP Facility. The Cash Flow DIP Lender has agreed to a budget prepared by the Debtors, the Debtors' Chief Restructuring Officer and the Debtors' other professionals, which budget pays the administrative costs of these cases. The 506(c) and 552(b) waivers ensure that the lenders will not have further surcharge forced on them, particularly where the lenders have provided material value for the estates.

12. Finally, the Cash Flow DIP Facility provides the only funding available to keep the cases running, pay administrative claims, pay employees, allow consumers access to the mortgages that they were expecting, and maintain the option to sell an operating business. Indeed, the Committee does not offer a viable alternative for the Debtors to fund these cases. In making the arguments noted above, the Committee seems to suggest that the Cash Flow DIP Lender should be forced to provide what would effectively amount to an unsecured loan so that unencumbered assets can be preserved solely for unsecured creditors. Said differently, the Committee wants to have its cake and eat it too. It seeks to reap the benefits of the Prepetition Bridge Loans and Cash Flow DIP Facility (including a substantially reduced claims pool relative to the claims pool that would exist without the Prepetition Bridge Loans and the Cash Flow DIP Facility) without the burdens (collateral) that go along with financings of this type.

13. Ultimately, while the Cash Flow DIP Lender has accommodated various creditors and other stakeholders (as noted below), and has been willing to take the risk that the Cash Flow DIP Facility may not be paid in full, it is unwilling to provide tens of millions of dollars in financing just so unsecured creditors – who are not providing any financing to support these cases

– can obtain the full value of unencumbered assets. Rather than a case in which a DIP lender should forgo collateral or collateral protections, this is a case in which the Cash Flow DIP Lender should be entitled to all unencumbered collateral and other collateral protections. Indeed, the Cash Flow DIP Lender is funding the administrative costs of these cases and is not obligated to guaranty a recovery to the prepetition unsecured creditors.

### B. Committee's Additional Objections Are Without Merit.

14. The Committee also raises objections to other aspects of the Cash Flow DIP Facility. As noted above, the Committee cannot cherry-pick provisions of the Cash Flow DIP Facility that it does not like. The Court should evaluate the terms of the financing as a whole. Nevertheless, the Cash Flow DIP Lender addresses certain of these issues below, including certain proposed changes to the order approving the Cash Flow DIP Facility on a final basis (the "Proposed Final Cash Flow DIP Order").

#### 1. The Roll Up

15. As noted above, the Prepetition Bridge Lender provided the Prepetition Bridge Loans within weeks prior to the Petition Date. These loans allowed the Debtors, which were facing the prospect of a shut-down, to continue operating while preparing for the filing of these cases on an orderly basis. Under the circumstances, a roll-up of the remaining portion of the Prepetition Bridge Loans is appropriate. Indeed, Courts routinely approve similar relief.[4]

---

[4] *See, e.g.*, *In re JAB Energy Solutions II,* LLC, Case No. 21-11226 (CTG) (Bankr. D. Del. Oct. 26, 2021) [Docket No. 92] (permitting roll-up of prepetition debt); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Nov. 5, 2019) [Docket No. 397] (sane); *In re Charming Charlie LLC*, No. 19-11534 (CSS) (Bankr. D. Del. Aug. 14, 2019) [Docket No. 253] (same); In *re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 13, 2019) [Docket No. 185] (same) *In re Remington Outdoor Co., Inc.*, Case No. 18-10684 (BLS) (Bankr. D. Del. Apr. 16, 2018) [Docket No. 177] (same); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. March 12, 2018) [Docket No. 352] (same).

ACTIVE 66486158v5

### 2. Stipulations and Releases

16.     The Committee takes issue with provisions related to the stipulations and releases in favor of the Prepetition Bridge Lender, the Cash Flow DIP Lender, and their Related Parties. The Committee will have ample time (60 days after appointment, which is a typical challenge period) to investigate, and, if it chooses, to seek standing to pursue, any and all claims that it believes the Debtors' estates have against the Released Parties. This is sufficient to protect the Committee with respect to any causes of action that it believes exist.

### 3. Other Objections Addressed by Proposed Final Cash Flow DIP Order

17.     The Cash Flow DIP Lender has worked tirelessly to accommodate the requests of the Debtors, as well as four different prepetition warehouse lenders and counterparties (each with separate counsel) and three different government-sponsored enterprises (each with separate counsel), on the Proposed Final Cash Flow DIP Order. In addition, the Debtors requested that the Cash Flow DIP Lender make changes to address certain of the objections raised by the Committee, which are summarized below.

   a. <u>Standing Motion and Challenge Period</u>:  In its Objection the Committee suggests that filing a standing motion should toll the Chapter 11 Challenge Period until 14 days after the Court rules on the motion. *See* Objection ¶ 71. The Cash Flow DIP Lender believes that paragraph 23(a) of the Proposed Final Cash Flow DIP Order already protects the Committee in this regard. Nonetheless, Paragraph 23(a) of the Proposed Final Cash Flow DIP Order clarifies that if the Committee or another party-in-interest files a standing motion and the Court grants the motion, the Chapter 11 Challenge Period for the party filing the standing motion will be extended until 14 days after the Court grants the standing motion.

8

b. <u>Milestones</u>.  The Debtors requested that the Cash Flow DIP Lender extend (i) the deadline for filing a plan and disclosure statement from July 29, 2022 to and including August 22, 2022 and (ii) the corresponding deadline for approval of the disclosure statement.  The Cash Flow DIP Lender has agreed to modify these deadlines, which is reflected in paragraph 16(a) of the Proposed Final Cash Flow DIP Order.  The Debtors indicated that they do not need any of the other milestones adjusted.

c. <u>Events of Default and Remedies</u>.  The Committee takes issue with the default and remedy provisions related to the Cash Flow DIP Facility.  Objection ¶ 75.  First, the proposed final order (and the interim order) provide for a five (5) business day forbearance period before the Cash Flow DIP Lender is authorized to exercise rights and remedies following an Event of Default.  *See* Proposed Final Cash Flow DIP Order  ¶ 16(b).  This is consistent with the Local Rules[5] and provides the Debtors and the Committee sufficient time to seek an emergency hearing if they so choose.  The Committee also states that the order should be clear that the Debtors and the Committee can contest the occurrence of an Event of Default.  Objection ¶ 75.  While the Cash Flow DIP Lender believes this is implicit in the forbearance period, Paragraph 16(b) of the order clarifies that during the Cash Flow DIP Forbearance Period, the Debtor and the Committee would have the right to seek a hearing for purposes of seeking a determination of whether a Cash Flow DIP Event of Default has occurred.

---

[5] *See* Del. Bankr. L. R. 4001-2(i)(S) (requiring DIP financing motion to expressly note if the forbearance period is less than five days).

d. <u>Investigation Budget</u>.  Paragraph 23(b) of the order increases the Investigation Budget from $30,000 to $100,000.

## II.  CONCLUSION

At the end of the day, the Debtors appear to have only two options for these cases: (1) a financed path that preserves value, minimizes claims, pays budgeted administrative costs (including payroll), and allows consumers access to mortgage loans on which they are relying; or (2) an uncertain path with no committed financing, likely resulting in a conversion to chapter 7 and an increased claims pool, no operating business, unpaid administrative creditors, and consumers without mortgage loans.  Neither the Debtors not the Committee have identified a viable alternative.  Thus, from the perspective of the Prepetition Bridge Lender and the Cash Flow DIP Lender, the choice in these cases is clear and the Cash Flow DIP Facility should be approved.

*[Remainder of page intentionally left blank.]*

Dated: August 1, 2022						GREENBERG TRAURIG, LLP

*/s/ Dennis A. Meloro*
Dennis A. Meloro (DE Bar No. 4435)
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Email: melorod@gtlaw.com

-and-

Nancy A. Peterman (admitted *pro hac vice*)
Eric J. Howe (admitted *pro hac vice*)
Danny Duerdoth
77 West Wacker Dr., Suite 3100
Chicago, Illinois 60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
Email:	petermann@gtlaw.com
	howee@gtlaw.com
	duerdothd@gtlaw.com

-and-

John D. Elrod (admitted *pro hac vice*)
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
Telephone: (678) 553-2100
Facsimile: (678) 553-2212
Email: elrodj@gtlaw.com

Counsel for LVS II SPE XXXIV LLC, as Cash Flow DIP Lender, and B2 FIE XI LLC as Prepetition Bridge Lender

ACTIVE 66486158v5