**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br>FIRST GUARANTY MORTGAGE<br>CORPORATION, *et al.*,[1]<br>Debtors. | Chapter 11<br><br>Case No. 22-10584 (CTG)<br><br>(Jointly Administered) |

### SUPPLEMENTAL DECLARATION OF TANYA MEEROVICH IN SUPPORT OF DEBTORS' MOTIONS FOR DEBTOR-IN-POSSESSION REPO AND CASH FLOW FINANCING

I, Tanya Meerovich, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am a Senior Managing Director of FTI Consulting ("FTI"), prepetition consultants to First Guaranty Mortgage Corporation ("FGMC") and its affiliated debtor Maverick Holdings, LLC ("Maverick", together with FGMC, the "Debtors"). I was appointed chief restructuring officer ("CRO") of the Debtors on the Petition Date (defined below).

2. I am authorized to execute this declaration (the "Supplemental Declaration"). Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein, and if called upon to testify, I would testify competently to all of the facts set forth herein.

3. I submit this Supplemental Declaration in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Enter Into Repurchase Agreement Facilities and Related Documents; (II) Authorizing Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business; (III) Granting Liens and Providing Super-Priority*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction in which it operates, are: First Guaranty Mortgage Corporation (9575) (Virginia); and Maverick II Holdings, LLC (5621) (Delaware). The location of the corporate headquarters and the service address for First Guaranty Mortgage Corporation is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

*Administrative Expense Status; (IV) Modifying the Automatic Stay; (V) Scheduling an Interim Hearing to Approve the Proposed Interim Order and a Final Hearing with respect to the Relief Requested Herein; (VI) Granting Related Relief* (the "<u>DIP Repo Motion</u>", the underlying facility, the "<u>DIP Repo Facility</u>", and the corresponding proposed financing, the "<u>DIP Repo Financing</u>") and .*Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* (the "<u>DIP Cash Flow Motion</u>").[2] The DIP Repo Motion was filed on June 30, 2022 [ECF Docket No. 20] and the Court's Interim Order approving the DIP Repo Facility was entered on July 1, 2022 [ECF Docket No. 66]. The DIP Cash Flow Motion was filed on June 30, 2022 [ECF Docket No. 20] and the Court's Interim Order approving the DIP Cash Flow Facility was entered on July 1, 2022 [ECF Docket No. 67]. My initial *Declaration of Tanya Meerovich in Support of Debtors' Motions for Debtor-In-Possession Financing* was filed on June 30, 2022 [ECF Docket No. 27] (the "<u>Meerovich First Day Declaration</u>").[3]

4. For the reasons set forth in the Meerovich First Day Declaration and as further set forth below, I believe the relief requested in the DIP Motions is necessary to ensure that the Debtors possess critical liquidity and working capital to fund their Chapter 11 Cases, so they can achieve their objectives in chapter 11. As such, I believe that the relief requested in the DIP Motions is in the best interests of the Debtors' stakeholders and estates.

---

[2] The Cash Flow DIP Motion and the DIP Repo Motion together shall be referred to as the "<u>DIP Motions</u>"; the Cash Flow DIP Facility and the DIP Repo Facility together shall be referred to as the "<u>DIP Facilities</u>."

[3] All terms not defined herein shall have the meaning ascribed to them in the DIP Motions.

5.      Additional background related to the Debtors is contained in the previously filed *Declaration of Aaron Samples In Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration").

## I.    The Debtors' Financing Supports the Debtors' Value Preservation Efforts

6.      Upon the Debtors' prepetition retention of FTI, our initial task was to review the Debtors' liquidity situation and identify areas where the Debtors could reduce cash burn consistent with the goal of maximizing the value of the Debtors' business. Based upon my prior experience in this industry, it was readily apparent that the Debtors' liquidity was rapidly eroding as a result of (a) a rapid change in circumstances affecting the mortgage industry overall, *i.e.*, generally rising short and longer term interest rates adversely affecting demand for a dwindling supply of housing stock and (b) margin calls resulting from interest rate volatility. Given that the Debtors' principal source of liquidity is the sale of loans to warehouse providers and investors as part of mortgage backed securities, plus remittances from "in the money" interest rate hedges, any macro-economic issues adversely affecting mortgage loan demand or mortgage loan sale pricing had a corresponding adverse effect on the Debtors' prepetition liquidity.

7.      Early during our engagement, members of the FTI team and I advised the Debtors to take the steps we identified to reduce cash burn and simultaneously maintain the business as a going concern as the best possible and most likely path to preserve the Debtors' platform for a possible sale or third party equity investment. Given the nature of the Debtors' consolidated balance sheet, our collective experience led FTI to conclude that preserving the platform was the only viable means of preserving or enhancing the estates' value.

8.      As described in the Debtors' First Day Declaration, the Debtors' consolidated balance sheet consists primarily of loans pledged or sold to warehouse lenders through mortgage

repurchase agreements and secured loan financing facilities. The Debtors' pipeline consisted of loans for which commitments have been made, but which were not yet funded by warehouse lenders or sold to investors.

9. The key to preserving value was to preserve the optionality of doing business with Freddie Mac, Fannie Mae and Ginnie Mae, plus preserving the Debtors' valuable fifty (50) state licenses to issue mortgages. The prospect of preserving the Debtors' entire portfolio of state licenses would disappear if customers to whom the Debtors made late-stage rate commitments were left without funding to close their mortgages. Any such customers could also lose their deposits for home purchases, and, in this volatile housing market, lose their opportunity for required or desired new housing or the opportunity to address their household liquidity needs through mortgage refinancing or home equity loans. Based upon our experience, we were certain that breaking consumer commitments would create regulatory issues and potential claims and imperil the Debtors' state mortgage licenses and correspondingly their ability to do business and to maintain issuer and servicer status with Ginnie Mae, Fannie Mae and Freddie Mac who are involved in guarantying, buying, or investing in mortgage loans or securitized mortgage loan pools.

10. Attached hereto as Exhibit A is a timeline showing key events and actions taken by the Debtors and FTI following our engagement through the Petition Date, including the Debtors' management of the unclosed loan pipeline and the cash burn. To manage those competing considerations, the Debtors stopped buying loans from correspondent lenders, increased pricing across all channels, and implemented a program of shifting loan commitments to other mortgage providers to which the Debtors' employees and contractors transferred in connection with the Debtors' reduction in force. Prior to the Petition Date, the Debtors facilitated and encouraged such

transfers, contrary to normal industry practice. As a result, the Debtors successfully reduced the loans in the pipeline from approximately $720 million as of June 9, 2022, to approximately $188 million remaining in the pipeline at the time of filing through a combination of (a) transfers to other mortgage originators, (b) halting the funding of correspondent loans and acceptance of loan applications, (c) funding of the loans deemed necessary under the prepetition warehouse lenders and Prepetition Bridge Lender, and (d) completion of adverse actions in the ordinary course.

11. Attached hereto as Exhibit B is a chart prepared by FTI showing the Debtors' pipeline of unfunded loans as of June 9, June 27, the Petition Date, and July 27, 2022. Also attached hereto as Exhibit C is a chart showing the changes in pipeline loan balances from June 27, 2022, to July 27, 2022, resulting from actions of FTI and the Debtors' management. During the period of FTI's involvement, the Debtors did not sell any loans to the Prepetition Bridge Lender and sold virtually no loans to any of its affiliates.[4]

12. The Debtors publicly announced the above steps on June 24, 2022, the same day that the major reduction in force was implemented and 470 employees and contractors were terminated. *See* Exhibit A. Of those employees, approximately 300 were mortgage originators.

13. Prior to the Petition Date, the Debtors hedged their entire portfolio in the normal course of business. By hedging the entire portfolio, the Debtors' net exposure in the aggregate was intended to be zero. However, shortly before the Petition Date, all of the Debtors' hedges were terminated concurrently with, or immediately following, the reduction in force implemented to reduce cash burn. If the Debtors had not concurrently reduced the population of the loans in the

---

[4] During the year 2021 during with the Debtors sold approximately $244.5 million in unpaid balance loans to B2 FIE IV LLC, an affiliate of the Prepetition Bridge Loan Provider.

pipeline through various actions, the Debtors' unhedged interest rate exposure would have been substantial.

14. From the outset, FTI understood that the Debtors' equity sponsor could not provide longer term economic support for the Debtors. As a result, FTI initially focused its efforts on engaging with a prepetition potential investor, whose CEO quickly rescinded its prior proposal as a "waste of time". . *See* Exhibit A. From June 14, 2022, up until the Petition Date, FTI contacted approximately 30 other parties including mortgage originators, financial institutions, and banks that might be potentially interested in a pipeline or DIP transaction and conducted the pipeline and DIP marketing processes simultaneously. Twenty-one of the institutions solicited by FTI at my instruction were mortgage companies. Only three of the contacted mortgage companies submitted written expressions of interest to buy some or all of the Debtors' prepetition pipeline. All third party proposals required the payment of substantial non-refundable fees relative to the expected size of the pipeline. Under each proposal, there was a material difference in value depending on the available agency execution pricing and a requirement for shortfall funding for pipeline loans. The Debtors also faced significant time constraints in trying to implement any of the pipeline sale transactions out of court given the nature of the Debtors' accelerating liquidity constraints.

15. The market response of the mortgage companies forced FTI to focus its efforts on warehouse DIP financing. All eight of the institutions that FTI approached as potential DIP warehouse funders were regional, national, or global financial institutions with substantial exposure and experience in the U.S. mortgage backed securitization ("MBS") space. Five of those institutions executed NDAs and participated in one or more diligence calls.

16. Three financial institutions provided confidential warehouse DIP terms, orally or in writing. Each financial institution proposed advance rates that differed materially based upon

6

agency (Ginnie Mae, Fannie Mae and Freddie Mac) qualifications.  The DIP Repo Facility proposed by Barclays had several favorable aspects, including: (a) speed of implementation; (b) flexibility as to the size of the proposed pipeline and aggregate financial need; and (c) competitive upfront fees, available line fees, interest rates and commitment limitations.

17.    After considering the financial institutions' responses, consistent with the advice given by FTI, the Debtors' second step in managing interest rate exposure and preserving the value of the platform was to agree to the Barclays Master Repurchase Agreement, a copy of which is found at D.I. 20-2 (the "Barclays MRA"), and the corresponding MSFTAs[5] mandated as part of the DIP Repo Facility.  As a result, all loans funded on a post-petition basis under the DIP Repo Facility are interest rate hedged at the time of loan funding, greatly reducing the estates' exposure to interest rate risks.

18.    The value of the Debtors' loans is largely a function of the 10-year treasury rate and its resulting impact on the 15 and 30-year mortgage loan market. Despite the generally rising interest rate trends, since the Petition Date, the mortgage rate movements have generally favored the Debtors, reflecting favorably on the steps taken to preserve the platform and its related value. Attached hereto as Exhibit D is a chart based on publicly disclosed data that is published on a daily basis by Optimal Blue, a division of Black Knight, showing the movement of interest rates for 30-year mortgage loans and 15-year conforming loans of the types offered by the Debtors.  This chart demonstrates that between the Petition Date and July 29, 2022, the Debtors' efforts have been value-enhancing.  The positive result was made possible only by the combination of the Barclays MRA and the Debtors' ability to fund the advance shortfall through the Cash Flow DIP Facility.

---

[5] "MSFTA" means Multi-Bank Securities Forward Transfer Agreement, which is a form of interest rate hedging agreement used in mortgage loan repurchase agreements.

19. In my judgment, the Barclays MRA would not be possible without the Cash Flow DIP Facility and correspondingly, the Cash Flow DIP Facility would not be possible without the Barclays' MRA. Both facilities are needed to protect customers, preserve the Debtors' platform, and the possibility of recovering going concern value for the Debtors' estates and their creditors.

## II. Response to the Committee DIP Borrowing Objection

20. I understand the Official Committee of Unsecure Creditors (the "Committee") and its advisors have suggested this Court not approve the DIP Repo Facility because (a) it is too expensive and above market, (b) certain fees are not capable of calculation, and (c) the preservation of the prepetition pipeline and the smooth execution of loan sales in the marketplace that would be the subject of purchases under the DIP Repo Facility do not benefit the estates. *See* Committee Objection, *passim*.

21. I also understand the Committee and its advisors have suggested this Court not approve the Cash Flow DIP Facility, because (a) the Cash Flow DIP Facility is an insider transaction created and undertaken solely for the benefit of affiliates of PIMCO and provides no value to the Debtors' estates, (b) the interest rate is excessive and above market, (c) the Cash Flow DIP Facility Fees are above market, (d) the Rollup of the Prepetition Bridge Lender Loan is inappropriate under the circumstances of these cases, and (e) the Repo DIP Guaranty should not become a postpetition secured estate obligation. *See* Committee Objection, *passim*.

### A. DIP Repo Facility

22. FTI worked collaboratively with management to secure the DIP Repo Facility and the Cash Flow DIP Facility, the combination of which have allowed, and will continue to allow, the Debtors to gain access to capital necessary to fund loans already in the pipeline and ongoing operations and bankruptcy expenses, preserve the Debtors' equity, if any, in funded loans and

allow the Debtors to effectuate a potential sale of their pipeline and any other estate assets. For the Cash Flow DIP Facility, FTI worked with the Debtors' management team regarding the cash needs and cushion necessary to operate the Debtors as a going concern. For the DIP Repo Facility, FTI, in concert with the Debtors' management, leveraged their knowledge and expertise in the mortgage origination industry to guide the negotiation with potential postpetition warehouse lenders around key terms, including advance rates, interest rates, and fees.

23. As described above at ¶¶13-15, FTI market tested both the concept and the terms of the DIP Repo Facility and found the Barclays MRA to be favorable to the Debtors in the aggregate, including an ability to execute timely. The advance rates designated in the Pricing Side Letter are reasonable, and proposed interest rates are both arms-length and less than the rates proposed in other chapter 11 mortgage repo facilities. The existence of additional collateral support in the form of a sponsor-related guaranty is customary and the implicit cost of such a facility to the Debtors' estates in the event the DIP Repo Guaranty is called upon by Barclays and charged to the Debtors' estates is comparable to the five-point guaranty utilized in the Stearns chapter 11 case.[6]

24. Prior to the Petition Date, the Debtors only received one other market expression of interest to take the entire remaining pipeline that Barclays agreed to purchase subject to the Barclays MRA. Such competing offer was subject to diligence and an unconditional upfront fee of $6 million, plus reimbursement of expenses. The other expressions of interest received from two other mortgage companies either contemplated taking over a significant portion, but not the entirety, of the remaining pipeline or that a postpetition warehouse facility would be in place to

---

[6] See e.g., *In re Stearns Holdings, LLC*, United States Bankruptcy Court for the Southern District of New York, Case No. 19-12226. [ECF Docket No. 90.] A comparable 5 point guaranty in these cases would be $6.25 million guaranty carrying interest at 10% and a [2% fee].

9

fund the loans before being purchased. Under these constructs, a postpetition warehouse facility would be required to fund the pipeline.

25. The term "customary fees and expenses" as used by the Debtors and the Court in the Interim DIP Order ¶17 and challenged by the Committee, *see* Objection at ¶66, are financed through the Barclays MRA as a deduction from loan purchase advance proceeds and include customary items such as (i) documentary and stamp recording taxes, *see* Barclays MRA, §8(b) [D.I. 20-2 at 35] and (ii) escrow service fee charges, *see* Barclays MRA at Exhibit G-1 [D.I. 20-2 at 101] or as part of the Repurchase Price charged by Barclays to the Debtors upon repurchase. *See* Definition, "Repurchase Price", Barclays MRA [D.I. 20-2 at 24].

26. Although the Court has seen and reviewed the Pricing Side Letter which is subject to a Motion to Seal [D.I. 40], I understand the Committee has asserted that it has not been given an opportunity to review the Pricing Side Letter. *See* Objection at ¶¶52, 67. However, it is my understanding that although the Committee has not yet executed an agreed confidentiality agreement sufficient to protect Barclays' interest in its confidential commercial terms, its professionals have agreed to review it under a professional eyes only limitation. As a result. the Committee professionals have been, given an unredacted copy of the Pricing Side Letter.

27. I understand the Committee has challenged the Minimum Liquidity requirements of the Repo DIP Facility, on the grounds that: "Neither the DIP Cash Flow Budget nor the Repo DIP Motion provide any detail as to where this minimum liquidity will come from, what account will serve as the Unrestricted Account, and how the Debtors will account for such cash throughout these cases." *See* Committee Objection at ¶68. The source of liquidity will be cash on the balance sheet and unrestricted access to the account in which the Cash Flow DIP Facility proceeds are

10

deposited, subject to the Final Cash Flow DIP Order, and access to future advances subject to the terms of the Cash Flow DIP Facility.

28. The Debtors have made material progress in these cases justifying entry of the Final DIP Repo Order proposed by the Debtors. They have taken necessary and appropriate steps that have enabled them to move optimally and (i) reduce the pipeline not subject to the Barclays MRA, through its skilled traders and finance team, (ii) provide "best execution" and assisted in the sale and securitization of pooled mortgage loans through MBS subject to the Prepetition Warehouse Facilities thereby reducing or eliminating deficiency claims, (iii) hedge against interest rate movements in the pipeline loans as they become funded under the DIP Repo Facility, (iv) take advantage of favorable interest rate movements for loans not yet closed as of the Petition Date, (v) engage in constructive dialogue with Freddie Mac, Fannie Mae and Ginne Mae and state regulators in an effort to secure "best execution" for loans subject to pre and postpetition repurchase obligations, MBS securitizations and collateral sales, and (vi) engage in constructive dialogue with the Cash Flow DIP Lender and Repo DIP Guarantor to preserve optionality for a plan of reorganization as against a plan of liquidation, all while preserving balance sheet assets and the potential upside value of the platform. These efforts have protected mortgage loan customers, minimized job losses and preserved the opportunity to generate going concern value to benefit creditors.

29. The DIP Repo Facility, including the Barclays MRA and the Repo DIP Guaranty, are a necessary package to enable the Debtors to move forward. If the Committee were to succeed in its Objection, in my judgment, the Debtors would have to convert the chapter 11 cases to chapter 7 liquidation cases.

B. **The Cash Flow DIP Facility**

11

30.     FTI and its team unequivocally recommended the Debtors negotiate access to the Cash Flow DIP Facility, after testing the market, in order to provide liquidity to stabilize operations, fund imminently closing consumer loans, minimize job losses, and maximize the opportunity to generate a recovery for creditors.

31.     A critical point supporting FTI's recommendations to management and the Board was FTI's finding that no solicited financial institution was interested in providing a cash flow DIP.  The solicited parties expressed concerns to FTI including, but not limited to: (a) uncertainty and lack of clarity on whether there will be a going-concern emerging from the bankruptcy, (b) uncertainty around agency approvals and FGMC's ability to continue pooling and securitizing agency loans, (c) uncertainty around potential surviving legacy reps and warranties and other contingent liabilities post-emergence and (d) lack of assets not already pledged to a prepetition warehouse or working capital lender.

**III.    Overall the Terms of the DIP Facilities Are Fair and Reasonable.**

32.     Based on my experience, and that of the other FTI team members with debtor-in-possession financing transactions, as well as my involvement in the negotiation of the DIP Repo Facility and Cash Flow DIP Facility and pursuit of alternative financing proposals, the DIP Repo Facility and the Cash Flow DIP Facility are the best available components of a reasonable financing package available to the Debtors under the circumstances.  Since the Petition Date, no financial institution or individual qualified investor has approached FTI or the Debtors to replace either DIP Facility.  Further, the Committee has not proposed any specific alternative sources or market comparisons warranting risking loss of the DIP Facilities and the value of the Debtors' platform.

33. As part of my duties to give the Debtors sound advice on the reasonableness of the terms proposed by the Cash Flow DIP Lender, FTI conducted a review of publicly available operating DIP terms in the market for facilities of comparable size. That review concluded that the Cash Flow DIP Facility, the Cash Flow DIP's roll-up, interest rate, and fees are reasonable and appropriate. At my direction, FTI compared four debtors in the financial sector and nine additional names with comparable DIP term loan sizes that have filed for chapter 11 in Delaware or the Southern District of New York since January 2021, a period of rising short and long term interest rates. Attached hereto as Exhibit E is a summary of that study.

34. Importantly, absent the DIP Facilities, the unsecured claims pool (i.e., consumer and regulatory claims against the Debtors, employee claims and counterparty claims) would mushroom and eviscerate most of the value in these estates.

35. In sum, it is and was my business judgment that the terms of the Cash Flow DIP Facility, and the Repo DIP Facility taken as a whole, are reasonable under the circumstances and were the product of good faith, commercial and arm's-length negotiations. The DIP Facilities offer the Debtors and their estates the necessary liquidity to fund operations, avoid immediate harm to the Debtors' business that would occur without such financing, and preserve reorganization opportunities for a buyer or equity sponsor under a plan. For all of the reasons included in this Declaration, I believe it is appropriate for the Court to approve the Cash Flow DIP Facility and the use of cash collateral as contemplated by the Cash Flow DIP Motion.

**A.     The DIP Repo Facility is the Best DIP Repo Financing Available.**

36. I was actively involved in the Debtors' analysis of their funding needs and financing options, including with respect to the DIP Repo Facility. Based on my personal involvement, I believe the Debtors and FTI were able to conduct a competitive and successful process leading to

13

favorable terms for the DIP Repo Facility, and the DIP Repo Facility should be approved as part of the Debtors' postpetition financing program.

37. At the conclusion of the search process, I determined based on my experience that the Barclays proposal would provide financing on the most favorable basis. Barclays was able to move the quickest, was the most flexible, and provided the most favorable terms under the given circumstances.

38. The obligations under the DIP Repo Facility are guaranteed by PIMCO Bravo Fund II, L.P. ("PIMCO Guarantor") and Maverick II Holdings LLC ("Maverick Guarantor") for the duration of the facility. Based on my involvement in these negotiations, a guaranty on the facility was a requirement and a material inducement for providing postpetition warehouse financing in all such proposals that the Debtors received. Absent such guaranty, the postpetition warehouse financing may not be provided or the proposed advance rates would have been significantly lower, which in turn would have increased the Debtors' funding needs under the Cash Flow DIP Facility ¶[31-32], on a dollar-for-dollar basis.

**B.    The Terms of the Cash Flow DIP Facility Are Inherently Fair.**

39. As shown above at ¶¶32-33, FTI has concluded that the Cash Flow DIP Terms are the same or better than market, in other words comparable. Based on my experience with debtor-in-possession financing transactions, as well as my involvement in the negotiation of the Cash Flow DIP Facility, the pursuit of alternative financing proposals, the Cash Flow DIP Facility has allowed the Debtors to obtain critical funding for operations and the necessary funding in excess of Barclays' Repo DIP Facility advance rates for the Debtors' pipeline. After the Petition Date, this relief is necessary in order to prevent the harm that would result if those borrowers were unable to complete the purchase or refinance of their homes.

40. Although the Cash Flow DIP Facility requires a release of claims against the Cash Flow DIP Lender and its affiliates, from the outset such a release has been subject to a negotiated 60-day challenge period for the Committee to review any potential prepetition lien perfection issues or avoidance claims. This is standard or market feature of related party DIP financing.

41. In sum, it is my business judgment that the terms of the Cash Flow DIP Facility, taken as a whole, are reasonable under the circumstances and the only market terms available. My personal involvement and that of the FTI team members assured management and the directors that the terms are the product of good faith, arm's-length negotiations between representatives of the Debtors, including counsel, FTI team members and management, and the representatives of the Cash Flow DIP Lender consisted of its counsel and individuals who had no prior connection to the Debtors activities. The terms of the Cash Flow DIP Facility were approved by all directors, including the independent director and the CEO. It is my judgment that the Cash Flow DIP Facility will benefit all stakeholders in these Chapter 11 Cases. For all of the reasons included in this Declaration, I also believe it is appropriate for the Court to approve the Cash Flow DIP Facility as contemplated by the Cash Flow DIP Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: August 1, 2022                              */s/ Tanya Meerovich*
                                                                                  Tanya Meerovich
                                                                                  Chief Restructuring Officer

### Exhibit A: Timeline of Key Dates, Events, and Activities

| | Prepetition | | | | | | | | | | | | | | | | | | | | | | | | Postpetition | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sun 6/5 | Mon 6/6 | Tue 6/7 | Wed 6/8 | Thu 6/9 | Fri 6/10 | Sat 6/11 | Sun 6/12 | Mon 6/13 | Tue 6/14 | Wed 6/15 | Thu 6/16 | Fri 6/17 | Sat 6/18 | Sun 6/19 | Mon 6/20 | Tue 6/21 | Wed 6/22 | Thu 6/23 | Fri 6/24 | Sat 6/25 | Sun 6/26 | Mon 6/27 | Tue 6/28 | Wed 6/29 | | Thu 6/30 | Fri 7/1 |

Timeline activities:
- FTI's retention (6/5)
- Expense reduction and management (6/6 onward)
- Business sale discussion with an interested party (6/6–6/9)
- $5M Prepetition Bridge Loan draw (6/9); $7M draw (6/22); $6.4M draw (6/28)
- Evaluation of strategic alternatives and negotiations with Cash Flow DIP Lender (6/8 onward)
- Slowed down funding of correspondent loans and increased pricing for all channels (6/8–6/21)
- DIP marketing process (6/13–6/22); Three Indications of interest for repo DIP received (6/22–6/25)
- Pipeline sale marketing process (6/13–6/27); Three indications of interest received (6/27–6/29)
- Last date of margin call payment (6/16)
- Approximately $5M of margin calls from hedge counterparties (6/16–6/17)
- Initial conversations with Agencies (6/17)
- Initial conversations with Prepetition Warehouse/Repo Lenders (6/14–6/17)
- RIF implemented; loan applications/correspondent channel stopped (6/17)
- Default notices from hedge counterparties; lost access to prepetition warehouse lines for funding of wet loans (6/17–6/27)
- Loans funded by Prepetition Bridge Lender (6/27–6/29)
- Board approval and resolution for bankruptcy filing (6/29)
- Petition Date (6/30)
- First Day relief (including Repo DIP and Cash Flow DIP) approved on an interim basis (7/1)

**Exhibit B: Unclosed Pipeline Summary**

*($ in Millions)*

|  | Loan Count | | | | Gross Dollars | | | |
|---|---|---|---|---|---|---|---|---|
| **Opening of Business Day as of:** | 6/9/2022[1] | 6/27/2022[2] | 6/30/2022[3] | 7/27/2022[4] | 6/9/2022[1] | 6/27/2022[2] | 6/30/2022[3] | 7/27/2022[4] |
| Consumer/Wholesale | 880 | 808 | 697 | 84 | $243 | $217 | $188 | $20 |
| Correspondent | 1,330 | 1,148 | - | - | 477 | 408 | - | - |
| **Total Unclosed Pipeline** | **2,210** | **1,956** | **697** | **84** | **$720** | **$626** | **$188** | **$20** |

(1): Includes loan applications that were submitted through 6/8/22 (some of which had not yet been locked)

(2): Includes loan applications that were submitted through 6/24/22 (some of which had not yet been locked); excludes loans with expired locks and loans pre-emptively removed due to anticipated adverse actions

(3): Includes loan applications that were submitted through 6/24/22 (some of which had not yet been locked); excludes correspondent loans, loans with expired locks, and loans pre-emptively removed due to anticipated adverse actions

(4): Excludes correspondent loans, loans with expired locks, and loans pre-emptively removed due to anticipated adverse actions

## Exhibit C: Consumer/Wholesale Unclosed Pipeline Resolution Progress and Outcomes as of 7/27/22

($ in Millions)

| | 6/27/2022 Unclosed Pipeline[1] | Less: Loans Funded by Pre-pet. WH Lenders[2] | Less: Loans Funded by B2 FIE XI LLC[3] | Less: Loans Funded by Barclays (7/26)[4] | Less: Adverse Loans as of 7/26/2022[5] | Less: Anticipated Adv. Loans Exc. from 7/27 Unclosed[6] | Add/Less: Changes to Gross Dollars | 7/27/2022 Unclosed Pipeline |
|---|---|---|---|---|---|---|---|---|
| Loan Count | 911 | (51) | (29) | (178) | (520) | (49) | - | 84 |
| Gross Dollars | $ 260 | $ (13) | $ (7) | $ (45) | $ (155) | $ (19) | $ (0) | $ 20 |

Note: Includes distributed retail, consumer direct, and wholesale channels only and excludes correspondent channel

(1): Adjusted to gross up for inclusion of loans that were pre-emptively removed from the 6/27 unclosed pipeline due to anticipated adverse actions (where actual adverse actions were completed by 7/26/22).

(2): Represents the gross loan amounts and not the advanced amounts; includes 32 TCB-funded loans ($7.4 mm gross) that have since been sold and removed from the closed loan pipeline.

(3): Represents loans funded prepetition by B2 FIE XI LLC. The loans were subsequently refinanced by the Barclays DIP on 7/28/22.

(4): Represents the gross loan amounts and not the advanced amounts; actual advance amount for Barclays DIP-funded loans is $37.4 mm as of 7/26/22.

(5): Represents adverse actions completed from 6/27 through 7/26, including loans pre-emptively excluded from the 6/27 unclosed pipeline data due to anticipated adverse actions.

(6): Represents loans in the 6/27 unclosed pipeline that have been pre-emptively removed from the 7/27 unclosed pipeline due to anticipated adverse actions (actual adverse actions not yet completed).

**Exhibit D: Historical Mortgage Rates from June 27, 2022, through July 29, 2022**



Source: Optimal Blue (a division of Black Knight), accessed on August 1, 2022. (https://www2.optimalblue.com/obmmi/)

**Exhibit E: Cash Flow DIP Study**

| # | Company Name | Sector | Venue | Petition Date | DIP Size Roll-Up ($ mm) | DIP Size New Money ($ mm) | DIP Size Total ($ mm) | Roll-Up % | Interest Rate (PIK) | Interest Rate (Cash) | Commitment / Closing Fee | OID | Unused Fee | Exit Fee | Other Fees[12] | Total Fees | Maturity (Months) | Annualized Fees (%) | Annualized Fees ($ mm) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | GWG Holdings[1] | Financials | TXSB | 20 Apr 2022 | $ - | $ 75.0 | $ 75.0 | - | | 10.0% | 2.0% | | 0.5% | 1.0% | - | 3.5% | 8.5 | 4.2% | $ 3.2 |
| 2 | Alpha Holding, S.A. de C.V.[2] | Financials | DE | 01 Aug 2021 | - | 45.0 | 45.0 | - | 10.0% | 10.0% | 2.0% | | | 2.0% | - | 4.0% | 6.0 | 8.0% | 3.6 |
| 3 | Renovate America, Inc.[3] | Financials | DE | 21 Dec 2020 | 6.0 | 44.0 | 50.0 | 12.0% | | 7.0% | 0.4% | | | | - | 0.4% | 3.0 | 1.4% | 0.7 |
| 4 | Stearns Holdings, LLC | Financials | SDNY | 09 Jul 2019 | - | 35.0 | 35.0 | - | | 10.0% | 2.0% | | 1.0% | | - | 3.0% | 6.0 | 4.0% | 1.4 |
| 5 | Stimwave Technologies Inc.[4] | Healthcare | DE | 15 Jun 2022 | - | 40.0 | 40.0 | - | 10.0% | | 4.5% | | | | - | 4.5% | 4.0 | 13.5% | 5.4 |
| 6 | MD Helicopters Inc.[5] | Industrials | DE | 30 Mar 2022 | - | 60.0 | 60.0 | - | | 8.5% | | | | 5.0% | 8.0% | 13.0% | 5.0 | 31.2% | 18.7 |
| 7 | Gulf Coast Health Care LLC | Healthcare | DE | 14 Oct 2021 | - | 25.0 | 25.0 | - | | L + 12.0% | 1.0% | | 0.5% | | - | 1.5% | 8.2 | 1.5% | 0.4 |
| 8 | Hospitality Investors Trust | Real Estate | DE | 19 May 2021 | - | 65.0 | 65.0 | - | | 15.0% | | | | | 0.1% | 0.1% | 6.0 | 0.1% | 0.1 |
| 9 | Automotores Gildemeister[6] | Consumer | SDNY | 12 Apr 2021 | - | 26.5 | 26.5 | - | 11.8% | | | | 5.0% | | - | 5.0% | 2.2 | 27.7% | 7.3 |
| 10 | CarbonLite Holdings LLC (CA Debtors)[7] | Materials | DE | 08 Mar 2021 | 45.5 | 20.0 | 65.5 | 69.5% | 11.0% | 11.0% | | 3.0% | | | 0.0% | 3.0% | 4.0 | 9.1% | 5.9 |
| 11 | CarbonLite Holdings LLC (PA Debtors)[8] | Materials | DE | 08 Mar 2021 | 50.0 | 25.0 | 75.0 | 66.7% | 12.0% | 12.0% | 1.0% | | | | - | 1.0% | 6.0 | 2.0% | 1.5 |
| 12 | Alamo Drafthouse Cinema[9] | Comms Svcs. | DE | 03 Mar 2021 | 40.0 | 20.0 | 60.0 | 66.7% | 9.3% | | 2.0% | | | | 0.1% | 2.1% | 4.0 | 6.3% | 3.8 |
| 13 | Knotel, Inc.[10] | Real Estate | DE | 31 Jan 2021 | 20.4 | 20.4 | 40.8 | 50.0% | | 12.0% | | 1.5% | | | - | 1.5% | 3.0 | 6.0% | 2.4 |
| | Min. | | | | $ - | $ 20.0 | $ 25.0 | - | 9.3% | 7.0% | 0.4% | 1.5% | 0.5% | 1.0% | - | 0.1% | 2.2 | 0.1% | $ 0.1 |
| | Mean | | | | 12.5 | 38.5 | 51.0 | 20.4% | 10.7% | 10.8% | 1.9% | 3.2% | 0.7% | 2.7% | 0.6% | 3.3% | 5.1 | 8.8% | 4.2 |
| | Median | | | | - | 35.0 | 50.0 | - | 10.5% | 10.5% | 2.0% | 3.0% | 0.5% | 2.0% | - | 3.0% | 5.0 | 6.0% | 3.2 |
| | Max. | | | | 50.0 | 75.0 | 75.0 | 69.5% | 12.0% | 15.0% | 4.5% | 5.0% | 1.0% | 5.0% | 8.0% | 13.0% | 8.5 | 31.2% | 18.7 |
| | **FGMC (Cash Flow DIP Interim Order)[11]** | Financials | DE | 30 Jun 2022 | $ 11.1 | $ 42.4 | $ 53.5 | 20.7% | 11.0% | N/A | 1.6% | N/A | N/A | N/A | N/A | 1.6% | 5.0 | 3.8% | $ 2.0 |
| | *Percentile Rank* | | | | 69.6% | 63.3% | 52.9% | 68.5% | 60.0% | N/A | 36.9% | N/A | N/A | N/A | N/A | 34.5% | 50.0% | 32.5% | 38.0% |
| | 25th Percentile | | | | $ - | $ 25.0 | $ 40.0 | - | 10.0% | 10.0% | 1.0% | 2.3% | 0.5% | 1.5% | - | 1.5% | 4.0 | 2.0% | $ 1.4 |
| | 50th Percentile | | | | - | 35.0 | 50.0 | - | 10.5% | 10.5% | 2.0% | 3.0% | 0.5% | 2.0% | - | 3.0% | 5.0 | 6.0% | 3.2 |
| | 75th Percentile | | | | 20.4 | 45.0 | 65.0 | 50.0% | 11.6% | 12.0% | 2.0% | 4.0% | 0.8% | 3.5% | 0.0% | 4.0% | 6.0 | 9.1% | 5.4 |

Source: Reorg Research Credit Cloud DIP database, docket filings applicable to the final DIP orders for the respective comparable companies and the interim DIP order for the Debtors

Note: The population of comparable companies includes four companies in the financials sector and nine additional companies that had comparable DIP term loans ($25 million to $75 million in size) on a final DIP order basis that filed for Chapter 11 in Delaware or Southern District of New York since January 2021.

(1) GWG Holdings' DIP assumed to include $10 million of discretionary overadvance; fees are assumed to be applicable to the full DIP amount including discretionary overadvance; excludes $18.3 million alternate stalking horse fee, which would be paid with proceeds from any 363 sale transaction

(2) Alpha Holding's DIP includes a 10% PIK toggle whereby the Debtors can elect to pay in cash or in kind

(3) Renovate America's DIP includes a $175K origination fee, which is shown as a percentage under Commitment / Closing Fee

(4) Stimwave Technologies' commitment fee represents the sum of 3% commitment fee and 1.5% facility fee

(5) MD Helicopters' DIP contemplates administrative agent fees which are not disclosed

(6) Automotores' DIP contemplates agent fees which are not disclosed

(7) CarbonLite (CA Debtors) DIP contemplates 11% PIK on roll-up amounts and 11% cash interest on new money

(8) CarbonLite (PA Debtors) DIP contemplates 3% commitment fee on new money portion only

(9) Alamo Drafthouse's PIK interest rate represents the weighted average on roll-up (6.5%) and new money (15.0%) amounts

(10) Knotel DIP contemplates 3% OID on new money portion only

(11) FGMC's roll-up amount of $11.1 million is based on $18,350,711 prepetition bridge loan amount minus $7,260,148 originally funded by B2 FIE XI LLC that were refinanced under the Barclays facility on 7/28/22; FGMC's illustrative $42.4 million is based on the sum of $22 million operating amount plus $20.4 million of mortgage loan funding amount (comprising $16 million in haircut on original loan funding amounts, $3.6 million MTM losses, $0.6 million professional fees for warehouse DIP, and $0.2 million non-utilization fees/interest/pricing fees); new money amount excludes any pipeline sale transaction funding amounts related to any potential sale of the pipeline which would be approved at the discretion of the Cash Flow DIP Lender; commitment fee reflects 2% on the $42.4 million new money portion.

(12) Other fees include agent fees and backstop fee