## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FIRST GUARANTY MORTGAGE CORPORATION, *et al.*,[1] | Case No. 22-10584 (CTG) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF ORDER (I) AUTHORIZING
(A) PRIVATE SALE AND (B) TRANSFER OF CERTAIN SERVICING
RIGHTS AND OBLIGATIONS TO BSI FINANCIAL SERVICES FREE
AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND
INTERESTS; (II) APPROVING THE TERMS OF THE PURCHASE AND
SALE AGREEMENT; (III) APPROVING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS;
AND (IV) GRANTING RELATED RELIEF**

First Guaranty Mortgage Corporation ("FGMC") and Maverick II Holdings, LLC

("Maverick"), the above-referenced affiliated debtors and debtors in possession (together, the

"Debtors"),[2] respectfully state the following in support of this motion (the "Motion"):

### RELIEF REQUESTED

1.      Pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, §§

101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9013, and 9014 of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 9013-1 of the Local

Rules of Bankruptcy Practice and Procedure (the "Local Rules") of the United States Bankruptcy

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number in the jurisdiction in which it operates, are: First Guaranty Mortgage Corporation (9575) (Virginia); and Maverick II Holdings, LLC (5621) (Delaware). The location of the corporate headquarters and the service address for First Guaranty Mortgage Corporation is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Sale Agreement (defined herein).

Court for the District of Delaware (the "Court"), the Debtors seek entry of an order (substantially in the form attached hereto as **Exhibit A**, the "Sale Order")[3]: (i) authorizing the (a) private sale and (b) transfer (the "Sale") of certain mortgage servicing rights and obligations to Servis One, Inc. d/b/a BSI Financial Services ("BSI" or the "Buyer"), such Sale being free and clear of liens, claims, encumbrances, and interests (except as otherwise set forth in this Motion); (ii) approving the terms of the Purchase and Sale Agreement (the "Sale Agreement", attached hereto as **Exhibit B**)[4]; (iii) approving the assumption and assignment of certain executory contracts (as hereinafter defined); and (iv) granting further relief.

2.      In further support of this Motion, the Debtors reference and rely on (i) the *Declaration of Aaron Samples, Chief Executive Officer of First Guaranty Mortgage Corporation In Support of Chapter 11 Petitions and First Day Pleadings* sworn to on June 30, 2022 (the "Samples Declaration" or the "First Day Declaration") [Dkt. 19], and (ii) the Declaration of Tanya Meerovich in support of this Motion (the "Meerovich Declaration"), which has been filed contemporaneously herewith and are incorporated by reference herein.  In addition, the Debtors have filed concurrently herewith *Debtors' Emergency Motion for an Order (I) Approving a Settlement Agreement with Federal Home Loan Mortgage Corporation Pursuant to Federal Rules of Bankruptcy Procedures 9019; (II) Authorizing the Sale of Certain Mortgage Loans; and (III) Granting Related Relief*, whereby FGMC and Freddie Mac (as defined herein) have resolved certain prepetition obligations and accounts between themselves, pursuant to a settlement agreement (the "Freddie Mac Settlement Agreement").

---

[3] To the extent that the terms of any agreement regarding the Sale require modification of the proposed Sale Order, the Debtors will provide notice of the modified proposed Sale Order to this Court and interested parties in advance of the hearing on the Sale (the "Sale Hearing").

[4] The Sale Agreement is in its substantially final form.  To the extent any material terms are changed, the Debtors will file the final form of the Sale Agreement in advance of the Sale Hearing.

2

3.     As more fully described below, the Debtors assert that they own mortgage servicing rights created at the time the Debtors originated mortgage loans.[5]   These rights include a contractual right to perform the servicing of such mortgage loans, all rights to receive all servicing fees and ancillary income of such mortgage loans, and the rights to collect, hold, and disburse all collections and monthly payments with respect to such mortgage loans, the right to receive interest income on such amounts, and all rights, powers and privileges incident to any of the foregoing (such rights, collectively, the "MSRs").

4.     With respect to parties other than Freddie Mac, the Debtors, in the past, entered into sale and purchase agreements to sell the MSRs related to mortgage loans to be sold at future dates to investors acquiring such loans in the ordinary course.

5.     By this Motion, the Debtors request authorization to sell and otherwise transfer: (i) in bulk, MSRs or SCRs that the Debtors own and hold, as applicable, related to certain mortgage loans previously sold to Ginnie Mae (as defined herein), Fannie Mae (as defined herein), Freddie Mac, or currently owned by the Debtors, and their related income streams, and (ii) on a "flow" basis, MSRs or SCRs, as applicable, related to certain mortgage loans which the Debtors have not yet pledged to Ginnie Mae, or sold to Fannie Mae, or Freddie Mac.  The Sale of the MSRs or SCRs, as applicable, must occur within a short time frame to satisfy certain performance requirements under investor agreements to purchase such mortgage loans, and to sell and transfer

---

[5] Notwithstanding anything to the contrary herein, with respect to Freddie Mac, all references to "Mortgage Servicing Rights," "MSRs" and "servicing rights" (to the extent such characterizations or representations in the Motion are even applicable to Freddie Mac Loans (defined below) or with respect to servicing performed by FGMC on behalf of Freddie Mac), shall mean "Servicing Contract Rights" or "SCRs" (as defined in the Freddie Mac Single-Family Seller/Servicer Guide, the "Freddie Mac Guide" (available at www.guide.freddiemac.com)).  SCRs can be held and transferred (subject to Freddie Mac's consent), but Freddie Mac asserts that such rights cannot be owned by any Seller/Servicer (as defined in the Freddie Mac Guide).  The scope of any such SCRs and FGMC's and any other transferee servicer's rights and obligations under any related Servicing Contract is subject to, and set forth in, the Freddie Mac Agreements (defined below).

the MSRs or SCRs, as applicable, at prices the Debtors believe maximize the Sale value of these MSRs or SCRs, as applicable, to their estates.

6.      After extensive marketing, the Debtors submit that (i) the purchase price or the consideration to be provided for the Sale, is fair and reasonable and will maximize value to the estates, (ii) the Sale eliminates the expense and execution uncertainty associated with a broadly noticed auction sale and transfer process, and (iii) the Sale will enable the Debtors to meet certain deadlines and requirements imposed by the Agencies (as defined below).  Thus, the Debtors hereby request that the Court grant the Motion.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory bases for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9013, and 9014 and Local Rules 2002-1 and 9013-1.

## BACKGROUND

### A.      General Background

10.      On June 30, 2022 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases are

4

being jointly administered pursuant to Rule 1005(b) of the Federal Rules of Bankruptcy Procedure. Each Debtor is continuing to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.     On July 15, 2022, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee") for the Chapter 11 Cases.  No trustee or examiner has been appointed.

### B.     General Overview of Debtors' Mortgage Loan Origination Business

12.     As set forth in the First Day Declaration, prior to the Petition Date, FGMC was a full-service, non-bank mortgage lender and mortgage servicer, offering a full suite of residential mortgage loan options tailored to borrowers' different financial situations and servicing, through a third-party subservicer, certain mortgage loans owned by third parties.  It was one of the leading independent mortgage companies in the United States, originating residential mortgages through a national platform.  As described in more detail in the First Day Declaration, FGMC's business included the origination, purchase, service, sale, and securitization of residential mortgage loans.

### C.     Debtors' Prepetition Financing Facilities

13.     As is customary in the mortgage lending industry, the Debtors borrow funds from warehouse lenders to use in the origination and purchase of residential mortgage loans entered into with consumer borrowers who use the proceeds to purchase or refinance existing loans secured by residential real property.  The Debtors' prepetition warehouse lenders (the "Warehouse Lenders") are Customers Bank; Flagstar Bank, FSB; Texas Capital Bank, National Association; and J.V.B. Financial Group LLC, as successor by merger with C&C/PrinceRidge LLC.  The agreements with the Warehouse Lenders (the "Warehouse Agreements") are structured either as repurchase facilities or secured loan facilities, as set forth below.

14.     Certain of the Debtors' liquidity facilities for funding their mortgage loans to consumers were structured as master repurchase agreements.  Prior to the Petition Date, the Debtors, through FGMC, had three (3) active master repurchase facilities with the following financial institutions: (i) Customers Bank, (ii) TCB, and (iii) J.V.B. (each a "Prepetition Repo Buyer" and, collectively, the "Prepetition Repo Buyers"), pursuant to the following agreements:

(a)     Second Amended and Restated Master Repurchase Agreement, dated as of October 9, 2019 (as amended, restated, supplemented or otherwise modified from time to time), by and between FGMC and Customers Bank;

(b)     Mortgage Warehouse Agreement, dated as of August 14, 2020 (as amended, restated, supplemented or otherwise modified from time to time), by and between FGMC and TCB; and

(c)     Master Repurchase Agreement, dated as of October 25, 2012 (as amended, restated, supplemented or otherwise modified from time to time), by and between FGMC and J.V.B (each a "Prepetition Repo Facility" and, collectively, the "Prepetition Repo Facilities").

15.     Pursuant to the terms of the related Prepetition Repo Facilities, the Debtors sold newly originated mortgage loans to these Prepetition Repo Buyers to finance the origination of such mortgage loans, and typically repurchased such mortgage loans from the related Prepetition Repo Buyer within a certain agreed upon time period following origination.

16.     Certain of the Debtors' financing facilities were structured as secured, or partially secured, loan facilities.  The Debtors, through FGMC, had two (2) active secured loan facilities with the following financial institutions:  (i) Customers Bank, and (ii) Flagstar Bank, FSB (each a "Prepetition Lender" and, collectively, with the Prepetition Bridge Lender (as defined below), the "Prepetition Lenders"), pursuant to the following agreements:

(a)     Amended and Restated Loan Agreement, dated as of July 17, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Customers Loan Agreement"), by and between FGMC and Customers Bank; and

(b)     Mortgage Warehouse Loan and Security Agreement, dated as of June 30, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the

"Flagstar Loan Agreement", together with the Customers Loan Agreement, each a "Prepetition Loan Facility" and, collectively with the Prepetition Bridge Loans, the "Prepetition Loan Facilities"), by and between FGMC and Flagstar Bank, FSB.

17.     Pursuant to the terms of these Prepetition Loan Facilities (and, collectively with the Prepetition Repo Facilities, the "Prepetition Financing Facilities"), the Debtors pledged or sold to their Prepetition Lenders and Prepetition Repo Buyers mortgage loans, cash, and related collateral to secure advances to finance the origination of such mortgage loans.

18.     Pursuant to that certain Second Amended and Restated Secured Promissory Note, executed by FGMC, as borrower, and in favor of B2 FIE XI LLC, as lender ("Prepetition Bridge Lender") (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Bridge Loan Agreement"), the Prepetition Bridge Lender funded certain residential mortgage loans and made other financial accommodations to the Debtors on June 28 and June 29, 2022 (such extensions of credit by the Prepetition Bridge Lender, the "Prepetition Bridge Loans").

19.     The Prepetition Bridge Lender was owed the principal amount of $18,350,771 (such obligations, together with all interest, fees, reimbursement obligations, indemnification obligations, and all other "Obligations" under and as defined in the Prepetition Bridge Loan Agreement, the "Prepetition Bridge Loan Obligations") on account of the Prepetition Bridge Loans.

20.     Pursuant to the Prepetition Bridge Loan Agreement, the Debtors granted to the Prepetition Bridge Lender security interests in and liens on substantially all of its personal property, including all proceeds thereof, whether then owned and existing or thereafter acquired or arising. A portion of the Prepetition Bridge Loan Obligations have been refinanced under the Barclays DIP Repo Facility (defined below) with the remaining portion rolled up into the Cash Flow DIP Loan (defined below).

### D.    Postpetition DIP Financing Facilities

21.    Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* [Dkt. 22] (the "Cash Flow DIP Loan"), the Debtors obtained final approval of funding from LVS II SPE XXXIV LLC which provides the Debtors access to, among other things, $22 million in new money financing available under the Cash Flow DIP Loan for operational purposes.[6]

22.    In addition, pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Enter Into Repurchase Agreement Facilities; (II) Authorizing the Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business; (III) Granting Liens and Providing Super-Priority Administrative Expense Status; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing with Respect to the Relief Requested Herein; and (VI) Granting Related Relief* [Dkt. 20] (the "DIP Repo Motion"), the Debtors also obtained final approval of a post-petition warehouse facility from Barclays Bank PLC with a maximum committed amount of $125 million to fund residential mortgage loans (the "Barclays DIP Repo Facility").[7]

---

[6] *See Final Order (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Providing Super-Priority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Granting Related Relief* [Dkt. 292].

[7] *See Final Order Pursuant TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 507, 546, 548,555, 556, 559, 560 And 561 (I) Authorizing the Debtors to Enter Into Repurchase Agreement Facilities And Related Documents; (II) Authorizing Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business; (III) Granting Liens and Providing Super-Priority Administrative Expense Status; (IV) Modifying the Automatic Stay; And (V) Granting Related Relief* [Dkt. 288].

8

### E.    The Debtors' Mortgage Loan Business and Agency Relationships

23.    FGMC is licensed to operate in all fifty states and the District of Columbia and is a Ginnie Mae[8] approved issuer, Fannie Mae[9] direct lender and Freddie Mac approved seller and servicer, with licenses and/or approvals from the Federal Housing Administration ("FHA"), the United States Department of Veterans Affairs ("VA"), Ginnie Mae, and the United States Department of Agriculture.  As an originator and seller of collateralized residential mortgage loans, during the fiscal year that ended December 31, 2021, the Debtors originated mortgage loans totaling $10.613 billion, comprised of (i) $2.165 billion of Fannie Mae conventional conforming loans, (ii) $2.63 billion of Freddie Mac conventional conforming loans, (iii) $3.986 billion of Ginnie Mae loans, and (iv) $1.832 billion of other loans.

24.    There were three main components, or channels, to the Debtors' mortgage loan business:  (a) wholesale loan originations; (b) retail loan originations; and (c) correspondent lending.

(a)    Wholesale Loan Originations.  The Debtors' wholesale loan origination channel produced Ginnie Mae, Fannie Mae, Freddie Mac, and Non-Agency loans but was focused primarily on non-qualified mortgage ("Non-QM") loans to consumer borrowers who do not meet the attributes, typically based on the traditional income verification, required for a "qualified mortgage" under federal lending regulations. The Debtors offered Non-QM loans for borrowers based on alternative credit methods such as "bank statements" and 1099-only income.  In the wholesale mortgage loan business, the Debtors worked with an independent network of mortgage brokers to identify borrowers eligible for a residential mortgage loan.

---

[8] As used in this Motion, "Ginnie Mae" refers to the Government National Mortgage Association, a federal corporation within the United States Department of Housing and Urban Development ("HUD").  Ginnie Mae guarantees investors the timely payment of principal and interest on residential mortgage-backed securities that, in turn, are backed by federally-insured or guaranteed loans.

[9] As used in this Motion, "Fannie Mae" refers to the Federal National Mortgage Association, and "Freddie Mac" means the Federal Home Loan Mortgage Corporation (Ginnie Mae, Fannie Mae and Freddie Mac collectively referred to as the "Agencies" and individually, each an "Agency").  Fannie Mae and Freddie Mac are Government-Sponsored Enterprises ("GSEs") that buy and securitize mortgage loans originated by mortgage lenders.  This enables the mortgage lenders access to liquidity that is, in turn, supported by demand for residential mortgage-backed securities ("RMBS").

(b)     <u>Retail Loan Originations</u>.  Through a centralized call center located in Plano, Texas, and a series of branch offices in various locations, the Debtors also originated residential mortgage loans directly to retail customers.  Potential borrowers could call and ascertain whether they were eligible for a mortgage loan.  The Debtors' loan officers also called potential customers, realtors and builders.  The Debtors' employees handled the approval and underwriting process, obtained all required documentation, and ensured compliance with all regulatory requirements through the loan closing.

(c)     <u>Correspondent Lending</u>.  Through its correspondent lending channel, FGMC purchased mortgage loans originated and closed by other lenders.  The correspondent lenders are typically unable to sell the loans on the secondary market themselves; the Debtors purchased the correspondent loans, which included Fannie Mae, Freddie Mac, Ginnie Mae, Non-Agency, and Non-QM loans, and sold them themselves.

25.     Once a wholesale, retail or correspondent loan is originated or purchased, the Debtors had the option to sell them to one of a number of parties (or their designees), including the Agencies and other private parties.  Until recently, in the ordinary course of business, the Debtors' wholesale, retail and correspondent mortgage loan channels were replenished with additional new loan origination on a daily basis.  However, on June 24, 2022, the Debtors ceased taking loan applications and funding correspondent loans, and are now focused on funding and closing the committed mortgages remaining in the Debtors' unclosed pipeline.

**F.     The Sale of Servicing Rights, Including MSRs**

26.     In connection with the Debtors' mortgage loan origination business, the Debtors retain certain servicing rights created at the time of origination, including the right to service such mortgage loans, all rights to receive servicing fees and ancillary income of such mortgage loans, the right or obligation to collect, hold, and disburse all monies collected and/or escrowed, such as monthly payments with respect to such mortgage loans, the right to receive interest income on such amounts, and all rights, powers and privileges incident to any of the foregoing.

DOCS_DE:240263.1

27.     Prepetition, the Debtors established subservicing relationships with Rushmore Loan Management Services, BSI, and Specialized Loan Servicing LLC to subservice the related mortgage loans in which the Debtors perform servicing on account of such loans.

28.     FGMC, in the ordinary course of its business, then sold mortgage loans to Freddie Mac and were subject to the express terms of the Freddie Mac Agreements (defined and described below).  In addition, FGMC, in the ordinary course of its business, sold mortgage loans to the other Agencies, which loans were also subject to applicable Agency Agreements.

29.     Thus, as part of the Debtors' ongoing business operations, they have in the past entered into (i) certain bulk MSR or SCR purchase and sale agreements to sell and transfer MSRs or SCRs, as applicable, related to mortgage loans which have been previously sold to the GSEs and Ginnie Mae (or their designees), and (ii) certain "flow" purchase and sale agreements in which the Debtors have agreed to sell and transfer the MSRs or SCRs, as applicable, related to certain mortgage loans to be sold to the GSEs and Ginnie Mae (or their designees) at a future date in the ordinary course.  In connection with such purchase and sale agreements or Transfer of Servicing Agreements (with respect to Freddie Mac and as defined in the Freddie Ma Guide), and subject to any required consents by the Agencies, the parties had determined not only a servicing transfer date on which the related MSRs or SCRs, as applicable, will actually transfer from the Debtors to the related successor servicer, but also the name of the designated successor servicer.

30.     Postpetition, the Debtors retain the right and/or obligation to service mortgage loans originated pursuant to, and subject to the (i) related Pre-Petition Financing Facilities, (ii) Barclays DIP Repo Facility, and (iii) the Prepetition Bridge Loans, which have not yet been designated to a successor servicer.  By this Motion, the Debtors are seeking authorization to expeditiously sell and transfer the MSRs or SCRs, as applicable:  (i) which have been originated pursuant to the related

Prepetition Financing Facilities or the Prepetition Bridge Loan Agreement, and (ii) which have been, or will be originated pursuant to the Barclays DIP Repo Facility, by way of a private sale to the Buyer.

31.    In connection with such purchase and sale agreements, or any Transfer of Servicing Agreement (with respect to Freddie Mac), each Agency asserts approval rights over the respective sale and transfer agreements, and related successor servicers.  The Debtors and the Buyer, each respectively, acknowledge that the proposed servicing transfer is subject to the Agencies' respective consent.

32.    Ginnie Mae has advised that the Debtors must identify a successor servicer to which it intends to transfer the MSRs related to the Ginnie Mae loans, approved by Ginnie Mae in its sole discretion, **on or before August 15, 2022**.  It should be noted that **no later than September 1, 2022**, the Debtors must deliver to the Buyer certain mortgage files and other information for purposes of completing certain due diligence requirements pursuant to the Sale Agreement. In order to meet these deadlines, the Debtors identified the Buyer as successor servicer to Ginnie Mae.  In addition, to assure a smooth and seamless transfer of the data and records necessary to service the loans, and to accommodate the approval process of the transfer of the MSRs or SCRs,

DOCS_DE:240263.1

as applicable, by the other Agencies, the Sale Agreement has set **September 15, 2022** as the "Sale Date"[10] and **November 1, 2022** as the "Transfer Date".[11]

### G.    The Agreements with the Agencies

33.    During the period between the Sale Date and the Transfer Date, FGMC, as interim servicer or in the case of Freddie Mac, as Servicer, pursuant the Sale Agreement and the Interim Servicing Agreement (as defined in the Sale Agreement), shall, or shall cause its subservicer to, service the mortgage loans in accordance with (i) accepted practices with, and requirements of, the respective Agencies, (ii) the Sale Agreement and (iii) the Interim Servicing Agreement (as defined in the Sale Agreement).

34.    Regarding the respective Agencies, FGMC has entered into and has certain obligation under various agreements with such Agencies.  For example, with respect to any mortgage loans FGMC sold to, or serviced on behalf of, Freddie Mac (collectively, the "Freddie Mac Loans"), FGMC agreed to be bound by the Freddie Mac Guide, the Freddie Mac Single-Family/Servicer Guide Plus Additional Provisions, certain applicable Master Agreements (as defined in the Freddie Mac Guide), Purchase Contracts, as define in the Freddie Mac Guide),

---

[10] On or prior to the Sale Date, FGMC must deliver a preliminary trial balance containing the unpaid principal balances and other information relating to the loans, among other information.  FGMC must also have received documentation that the Agencies have approved the servicing transfer by the Sale Date before the Buyer is obligated to pay the "Purchase Price" as defined in the Sale Agreement.  Subject to any Agency related requirements, FGMC shall transfer all legal and beneficial right, title and interest in and to the MSRs or SCRs, where applicable, on the Sale Date.  In addition, FGMC will represent as of the Sale Date that it has the sole right and authority to sell and transfer the MSRs and/or the SCRs, as applicable, subject to Agency consent, and that the MSRs or SCRs, as applicable, are sold and transferred free and clear of all liens, claims, encumbrances and interests.  Notwithstanding the foregoing, with respect to Freddie Mac, any Sale of SCRs is subject to all requirements under the Freddie Mac Agreements and Freddie Mac shall release liens, claims, encumbrances and interests arising out of, or related to, the SCRs only to the extent that they have been specifically satisfied pursuant to the Freddie Mac Settlement Agreement, for which the Debtors sought this Court's approval on August 15, 2022.

[11] The Transfer Date shall be the effective "reporting date" for all Ginnie Mae loans.  The "Holdback Amount(s)" shall be calculated from the Transfer Date, in two installments, the first being an amount equal to 10% of the Purchase Price due 90 days from the Transfer Date, and the second amount equal to 10% of the purchase price due 180 days from the Transfer Date, both holdbacks subject to the satisfaction of certain documentation, representation and indemnification requirements under the Sale Agreement.

DOCS_DE:240263.1

Pricing Identifier Terms (as defined in the Freddie Mac Guide), supplements, addendums, Bulletins (as defined in the Freddie Mac Guide), directives, terms of business and any other agreements between the Debtors and Freddie Mac, as amended, restated or supplemented from time to time (collectively, the "Freddie Mac Agreements").[12]

35.    During the period between the Sale Date and the Transfer Date, FGMC, as Servicer, will also abide by the Freddie Mac Agreements in servicing, or causing its subservicer to service, the related mortgage loans.    During this period, FGMC will also abide by other Agency agreements.

36.    As set forth below, the Debtors intend to assume and assign certain of these agreements and the Debtors' obligations related thereto (collectively, the "Executory Contracts") to the Buyer, pursuant to § 365 of the Bankruptcy Code.[13]    The assumption and assignment of the Executory Contracts are integral to the Sale of any related SCRs, as applicable, to the Buyer. Accordingly, the Debtors seek this Court's approval of the assumption and assignment of the Executory Contracts.

---

[12] The Freddie Mac Agreements require, among other things, that any sales of mortgage loans by FGMC to Freddie Mac be true, absolute and unconditional sales, whether sold with or without recourse, with Freddie Mac having a first priority lien on the Mortgaged Premises (as defined in the Freddie Mac Guide) and the Mortgaged Premises required to be free and clear of all prior liens and encumbrances and no rights or conditions existing that could give rise to such liens except as specifically permitted by the Freddie Mac Guide.  *See, e.g.*, Freddie Mac Guide §§ 1201.3 and 4201.2.

[13] The Executory Contracts to be assumed by the Debtors and assigned to BSI pursuant to any Sale Order approving the transaction will include FGMC's Service Contract (as defined by the Freddie Mac Guide) with Freddie Mac.

If the Debtors' obligations under the Freddie Mac Settlement Agreement are satisfied, Freddie Mac acknowledges and accepts that any cure obligation that would otherwise have been owing by FGMC to Freddie Mac in connection with any assumption and assignment of the Servicing Contract to BSI are compromised and satisfied.  Freddie Mac reserves its rights to assert any ad all claims that it has against FGMC (whether or not such claims are specified in the Freddie Mac Settlement Agreement) if the Freddie Mac Settlement Agreement is not approved by the Bankruptcy Court.

## MATERIAL TERMS OF THE SALE AGREEMENT

37.    The following chart summarizes the key terms and conditions of the Sale

Agreement:[14]

| Provision | Summary Description |
|---|---|
| **Parties** | <u>Seller</u>:  FGMC<br><u>Buyer</u>:  BSI Financial Services (non-insider)<br>*See* Sale Agreement, Preliminary Statement. |
| **Purchase Price**[15] | The Estimated Gross Purchase Price of $4.8m: Determined as of anticipated Sale Date (GNMA - 2.02 x net servicing fee x UPB and FNMA/FHLMC – 2.43 x net servicing fee x UPB) to be paid in installments, as follows:<br>• 80% payable on the Closing Date;<br>• 10% payable on the 90 day anniversary of the Transfer Date; and<br>• 10% payable on the 180 day anniversary of the Transfer Date.<br><br>*See* Sale Agreement § 2.02. |
| **Conditions Precedent** | The closing is subject to the following major conditions occurring (collectively, the "<u>Conditions Precedent</u>"):<br>• the Seller must obtain approval from the Court to consummate the Sale;<br>• the Court must find that cause exists to waive the 14-day stay period under Bankruptcy Rule 6004(h) or such 14-day period shall have expired; and<br>• the Buyer must be acceptable to any related Agency.<br><br>*See* Sale Agreement §§ 2.03 (i) – (xiii). |
| **Closing Date** | Closing shall occur as soon as possible after all Conditions Precedent have been satisfied or waived, as applicable, on or prior to the Sale Date of September 15, 2022.<br>*See* Sale Agreement §§1.01, and 2.03. |

---

[14] This summary, including any references to the Sale Agreement contained herein (the "Summary"), are provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between the Summary and the Sale Agreement, the Sale Agreement shall govern in all respects.  Capitalized terms used in the Summary shall have the meanings ascribed to them in the Sale Agreement.  All references to sections in the Summary shall refer to sections of the Sale Agreement.

[15] The figure of $4.8 million is subject to adjustment based on servicing advances, fees and expenses and other holdback considerations, as applicable.

DOCS_DE:240263.1

38.     In the Debtors' business judgment, the Sale is fair, reasonable, and the best available option to maximize value for the Debtors and all stakeholders.

## **RELIEF REQUESTED SHOULD BE GRANTED**

### A.     **The Court Should Approve the Private Sale**

39.     For the reasons explained below, and throughout this Motion, the Debtors submit that the approval of a private sale of the Debtors' servicing rights and obligations, including the MSRs and the SCRs, as applicable, to the Buyer, pursuant to the terms of the Sale Agreement, is the best course of action under the circumstances to maximize the value of the MSRs or SCRs, as applicable, for the Debtors' estates.

40.     Section 363(b)(1) of the Bankruptcy Code provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Thus, subject to court approval, the Bankruptcy Code permits a debtor to enter into a transaction outside the ordinary course of business as long as there are "sound business justifications" that support such action. *Committee of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983); *see also In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (*citing In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986) and concluding that the Third Circuit follows the "sound business purpose" rather than the only in "emergencies" rule and requires a "good faith" finding).

41.     In order to ascertain the existence of a sound business purpose for any sale out of the ordinary course of business, this Court must find "some articulated business justification" for the proposed action. *Delaware & Hudson Ry. Co.*, 124 B.R. at 175-76; *see also In re Lionel Corp.*, 722 F.2d at 1070; *Titusville Country Club v. PennBank* (*In re Titusville Country Club*), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 19 (Bankr. E.D. Pa. 1987); *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005)

16

(stating that "[o]vercoming the presumptions of the business judgement rule on the merits is a near-Herculean task").

42.    Generally, courts have applied four (4) factors in determining whether a sale of a debtor's assets should be approved:  (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided.  *See Lionel,* 722 F.2d at 1071-72 (setting forth the "sound business justifications" requirement); *Abbotts Dairies,* 788 F.2d at 145-57 (interpreted by courts as implicitly adopting the articulated business justification test and adding the "good faith" requirement); *Delaware & Hudson Ry.,* 124 B.R. at 176 ("Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith.").

43.    This fundamental analysis does not change if the proposed sale is private, rather than public.  *See, e.g.*, *In re Ancor Exploration Co.,* 30 B.R. 802, 808 (Bankr. N.D. Okla. 1983) ("[T]he bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b).").  The bankruptcy court "has ample discretion to administer the estate, including the authority to conduct public or private sales of estate property."); *In re WPRV-TV, Inc.,* 143 B.R. 315, 319 (D.P.R. 1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992); *accord*, *In re Canyon Partnership*, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985).  Thus, a court-approved auction process is not required as long as the four factor test is met.  *See, e.g.*, *In re Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 49-50 (Bankr. S.D.N.Y. 2016) ("[E]ven asset sales are not conditioned on such a requirement [of a formal

auction], which does not appear in the Bankruptcy Code or the Bankruptcy Rules."). Here, the proposed private sale of the MSRs to the Buyer meets all of these requirements and should be approved.

### (i) There Is a Sound Business Reason to Proceed with the Private Sale

44.     The Debtors determined that consummating the Sale of the MSRs or SCRs, as applicable, on a private basis is appropriate in light of the facts and circumstances of the Chapter 11 Cases, and in the best interest of their estates and stakeholders. The Buyer has a pre-existing relationship with the Debtors as both a servicer and a subservicer of loans originated or purchased by the Debtors.[16]  As a result, the Buyer's systems and processes are in place to transfer any necessary data underlying the mortgage loans between the Debtors and the Buyer.

45.     A sale of MSRs and a transfer of SCRs, as applicable, to the Buyer would eliminate the need for a public auction, avoiding a process that is unlikely to yield more value for the Debtors' estates than the transaction for which the Debtors seek approval in this Motion. As set forth in the Meerovich Declaration, twenty four (24) parties with substantial servicing capabilities were contacted. In fact, the bidding process that was undertaken was more robust than the process that the Debtors would have implemented in the ordinary course of their business prepetition. *See* Meerovich Declaration at ¶ 16. Although there was interest expressed in purchasing the MSRs by several of the parties contacted, the Buyer submitted the only bid, which was reviewed by the Debtors' senior management and advisors. *See* Meerovich Declaration at ¶ 17. In light of the extensive bidding process that was undertaken, the Debtors believe that the Sale offers the best opportunity to maximize the value of the MSRs.

---

[16] FGMC and Buyer are parties to a certain joint marketing services agreement dated as of March 4, 2021, pursuant to which FGMC and Buyer agreed to terms of jointly marketing FGMC's loan products to borrowers of mortgage loans as to which the Buyer would own the servicing rights thereto.

18

46.     As a result of the Buyer's existing relationship with the Debtors, and understanding of the MSRs and/or SCRs, as applicable, and the Buyer's willingness to provide significant consideration, the Debtors believe that their estates and creditors will benefit from the approval of the Sale Agreement without the need to incur added costs associated with a public auction and sale process, at which the Debtors are not guaranteed the commitment of the Buyer to adhere to the Sale Agreement at all, much less at the price to be provided through the Sale Agreement.

47.     The Debtors believe that the proposed transaction will likely close expeditiously.

**(ii) The Price That Is Being Offered Is Fair and Reasonable**

48.     The Purchase Price represents a fair and reasonable price for the purchased assets under the Sale Agreement.  *See e.g., In re Pursuit Cap. Mgmt.*, LLC, 874 F.3d 124, 128 (3d Cir. 2017) (trustee provided testimony that the offer represented a "fair and reasonable price").  In light of the transparent bidding process undertaken by the Debtors and their professionals that led to the Sale Agreement recommended for the Court's approval, as described in the Meerovich Declaration, the Debtors believe that the Buyer's offer is the highest and best offer under the circumstances. *See* Meerovich Declaration at ¶¶ 18-19.

**(iii) The Transaction Is Proposed in Good Faith**

49.     Moreover, the Debtors believe that the transaction has been proposed in good faith. The terms of the transaction are the product of extensive, intense arms-length negotiations with the Buyer.  The Buyer is not an affiliate of any of the Debtors.  The Buyer has no common officers or directors with any of the Debtors.  Furthermore, this transaction is proposed for the sole purpose of maximizing the return on the estates' assets and minimizing future administrative expenses.

(iv) Adequate Notice Has Been Provided

50.     With respect to the notice required in connection with a private sale, Bankruptcy Rule 2002(c)(1) states, in pertinent part, that, . . . the notice of a proposed use, sale or lease of

property . . . shall include . . . the terms and conditions of any private sale and the deadline for filing objections.  The notice of a proposed use, sale or lease of property, including real estate, is sufficient if it generally describes the property.  The Debtors have provided adequate notice of the proposed transaction to parties-in-interest.  *See* Fed.R.Bankr.P. 2002(c)(1) (notice must contain "the terms and conditions of any private sale and the time fixed for filing objections."); *see also, Delaware & Hudson Ry.*, 124 B.R. at 180 (the disclosures necessary in such a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement).

51.    It is respectfully submitted that, in the Debtors' informed business judgment, there is very little, if anything, to be gained by conducting a formal auction of the Debtors' servicing rights and obligations, and there is a great deal to lose.  Even if there were other entities willing and able to overbid the Buyer, which the Debtors believe to be unlikely, the delay, uncertainty and added administrative expenses attendant to the auction process would be unfavorable to the Debtors, their estates and creditors.  For these reasons, the Debtors request that the Court not require the Debtors to conduct a public sale or to establish bidding procedures contrary to the Sale Agreement and the Debtors' business judgment, but instead approve the proposed transaction.

**B.    The Sale Is Appropriate Pursuant to Bankruptcy Rule 6004(f)**

52.    Bankruptcy Rule 6004(f) authorizes a debtor to sell property outside of the ordinary course of business by private sale or public auction.  The proposed consideration represents a fair and reasonable value under the circumstances.  As previously noted, a court-approved auction process is not required to prove it so under the Bankruptcy Code, Bankruptcy Rules, or Local Rules.  *See, e.g.*, *In re The Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 49-50 (Bankr. S.D.N.Y. 2016).  The Sale was subject to an extensive negotiation process and resulted in a purchase price that is fair and reasonable under the circumstances.  Additionally, courts have held that a debtor

20

has broad discretion to determine the manner in which its assets are sold. *See In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y 1998) (noting that a trustee has ample authority to conduct a sale of estate property through private sale).

53.     In an exercise of their sound business judgment, the Debtors have determined that consummating the Sale on a private basis is appropriate in light of the facts and circumstances of these Chapter 11 Cases and is in the best interest of their estates and all parties in interest. The Debtors, therefore, submit that the Sale should be approved.

### C.     The Sale Is Proposed in Good Faith Within the Meaning of 11 U.S.C. §363(m)

54.     As discussed above, the Sale Agreement was negotiated at arms-length and in good faith after other proposals were considered. The Buyer is not affiliated with any of the Debtors or their representatives. Accordingly, this Court should find that Buyer has acted in good faith within the meaning of section 363(m) of the Bankruptcy Code. *See generally*, *Marin v. Coated Sales, Inc.* (*In re Coated Sales, Inc.*), No. 89 Civ. 3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that to show lack of good faith, a party must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); *see also generally In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings" (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978))).

### D.     The Sale Should Be Free and Clear of Any Liens, Claims, Encumbrances and Interests

55.     In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see In re Elliot*, 94 B.R. 343, 354 (E.D. Pa. 1988) (sale "free and clear" may be approved provided the requirements of at least one subsection are met).

56.     Freddie Mac does not waive any liens, claims, encumbrances or interests that it may have arising from the Freddie Mac Agreements against FGMC or the proposed transferee, except to the extent that any such liens, claims, encumbrances or interests have otherwise been expressly satisfied by virtue of an approved Freddie Mac Settlement Agreement.

57.     The Debtors expect that they will be able to satisfy at least one of the subsections of Section 363(f).  Nevertheless, the Debtors will seek to obtain the consent of the primary parties in interest to the Sale Agreement.  Accordingly, the Debtors request that the transfer be approved "free and clear", with any liens, claims, encumbrances and interests to attach to proceeds of the sale.

### E.     Assumption and Assignment of Executory Contracts Should Be Approved

58.     To facilitate and effect the Sale to the Buyer, the Debtors seek authority to assume and assign the Executory Contracts to the Buyer.

59.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Bankruptcy Court, provided that the defaults under such contracts are cured and adequate assurance of future performance is provided.  A debtor's decision to assume or reject an executory contract or

22

unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See In re Old Carco LLC*, 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009) ("Moreover, the business judgment standard as applied to a bankrupt's decision to reject an executory contract because of perceived business advantage requires that the decision be accepted by courts unless it is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankruptcy retained business discretion.") (internal quotations omitted).

60.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid") (citations omitted).

61.     The Debtors believe that they can and will demonstrate that all requirements for assumption and/or assignment of the Executory Contracts will be satisfied at the Sale Hearing. Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that assuming and assigning to the Buyer the Executory Contracts would be in the best interests of their estates.

**F.      Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate**

62.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that "an order authorizing the trustee to assign an executory contract . . . is stayed until the expiration of 14 days after entry of the order, unless otherwise stayed." The Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) are waived.

63.      The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."  10 COLLIER ON BANKRUPTCY ¶ 6004.11 (16th rev. ed. 2022). Regarding Bankruptcy Rule 6006(f) the Advisory Committee Notes that "the court may, in its discretion order that Rule 6006(d) is not applicable so that the executory contract  . . . may be assigned immediately."

64.      To maximize the value received under the Sale Agreement and meet the deadlines imposed by Ginnie Mae and the other Agencies, the Debtors seek to close the Sale as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## **RESERVATION OF RIGHTS**

65.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, other than the Executory Contracts, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## **NOTICE**

66.     The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) counsel to the Committee; (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) counsel to the Cash Flow DIP Lender and the Repo DIP Lender; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b).

## **NO PRIOR REQUEST**

67.     No prior request for the relief sought in this Motion has been made to this or any other court.

## <u>CONCLUSION</u>

WHEREFORE the Debtors respectfully request entry of the Sale Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

*[Signature page to follow]*

DOCS_DE:240263.1

Dated: August 15, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Mary F. Caloway*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Tel:    (302) 652-4100
Fax:    (302) 652-4400
Email: ljones@pszjlaw.com
         tcairns@pszjlaw.com

-and-

Samuel R. Maizel (*Pro Hac Vice*)
Tania M. Moyron (*Pro Hac Vice*)
**DENTONS US LLP**
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Email: samuel.maizel@dentons.com
         tania.moyron@dentons.com

Lynn P. Harrison III (*Pro Hac Vice pending*)
Lauren Macksoud (*Pro Hac Vice*)
Claude Montgomery (*Pro Hac Vice*)
**DENTONS US LLP**
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 632-8390
Email: lynn.harrisoniii@dentons.com
         lauren.macksoud@dentons.com
         claude.montgomery@dentons.com

*Counsel for Debtors and Debtors in Possession*

27