IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FIRST GUARANTY MORTGAGE<br>CORPORATION, *et al.*, [1]<br><br>                Debtors. | Chapter 11<br><br>Case No. 22-10584 (CTG) |

## COMBINED DISCLOSURE STATEMENT AND
## CHAPTER 11 PLAN OF FIRST GUARANTY MORTGAGE
## <u>CORPORATION AND DEBTOR AFFILIATE</u>

**DENTONS US LLP**
Samuel R. Maizel (*Pro Hac Vice*)
Tania M. Moyron (*Pro Hac Vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Email: samuel.maizel@dentons.com
tania.moyron@dentons.com

-and-

**DENTONS US LLP**
David F. Cook (DE Bar No. 6352)
1900 K Street, NW
Washington, DC 20006
Telephone: (202) 496-7301
Email: david.f.cook@dentons.com

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com

*Counsel for Debtors and Debtors in Possession*

Dated: September 6, 2022

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621). The Debtors' mailing address is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

# TABLE OF CONTENTS

                                                                                        Page

SECTION 1 INTRODUCTION ................................................................................ 1

SECTION 2 SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS
      AND INTERESTS UNDER PLAN AND IMPORTANT SOLICITATION AND
      CONFIRMATION DATES AND DEADLINES ................................................ 2

    2.1    Summary of Classification and Treatment of Claims and Interests ...................... 2

    2.2    Important Dates and Deadlines ............................................................. 7

SECTION 3 DEFINED TERMS ............................................................................. 8

SECTION 4 BACKGROUND ................................................................................ 23

    4.1    General Background ........................................................................ 23

    4.2    Events Leading to Chapter 11 Filing .................................................... 26

SECTION 5 THE CHAPTER 11 CASES .................................................................. 28

    5.1    First Day Motions and Other Early Developments in the Chapter 11 Cases........ 28

    5.2    DIP Financing and Related Matters ..................................................... 29

    5.3    Debtors' Retention of Professionals and Personnel ................................... 30

    5.4    Formation of the Committee; Retention of Professionals ............................. 30

    5.5    Debtors' Schedules and Statement of Financial Affairs .............................. 31

    5.6    Claims Bar Dates ......................................................................... 31

    5.7    KEIP and KERP Motion ................................................................. 31

    5.8    Ordinary Course Professionals .......................................................... 31

    5.9    Section 559 and Stay Relief Motions.................................................... 31

SECTION 6 CONFIRMATION AND VOTING PROCEDURES ..................................... 32

    6.1    Confirmation Hearing ..................................................................... 32

    6.2    Procedures for Objections ................................................................ 33

    6.3    Requirements for Confirmation ......................................................... 33

6.4    Classification of Claims and Interests ..................................................... 34

6.5    Impaired Claims or Interests ................................................................... 35

6.6    Confirmation Without Necessary Acceptances; Cramdown ................................ 36

6.7    Feasibility .............................................................................................. 37

6.8    Best Interests Test and Liquidation Analysis ............................................ 37

6.9    Eligibility to Vote on the Combined Plan and Disclosure Statement ................... 38

6.10   Solicitation Package / Release Opt-Out Election Form ......................................... 38

6.11   Voting Procedures, Voting Deadline, and Deadline to Submit the Release Opt-Out Election ................................................................................... 39

6.12   Acceptance of the Combined Plan and Disclosure Statement .............................. 40

SECTION 7  CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER DISCLOSURES ......................................................................................... 40

7.1    Certain Risk Factors to be Considered .................................................... 40

7.2    Certain U.S. Federal Income Tax Consequences ...................................... 43

7.3    Releases, Exculpations, and Injunctions .................................................. 48

7.4    Alternatives to the Combined Plan and Disclosure Statement ............................ 48

SECTION 8 UNCLASSIFIED CLAIMS ....................................................................... 49

8.1    Unclassified Claims ................................................................................. 49

8.2    Administrative Claims .............................................................................. 49

8.3    Professional Fees .................................................................................... 50

8.4    DIP Loan Claims ..................................................................................... 50

8.5    Priority Tax Claims .................................................................................. 51

SECTION 9 CLASSIFICATION OF CLAIMS AND INTERESTS ............................................ 51

9.1    Summary of Classification ....................................................................... 51

9.2    Special Provision Governing Unimpaired Claims ................................................ 52

9.3    Vacant and Abstaining Classes ................................................................ 52

SECTION 10 TREATMENT OF CLAIMS AND INTERESTS ................................................. 52

    10.1    Class 1—Priority Non-Tax Claims ................................................................ 52

    10.2    Class 2—Other Secured Claims .................................................................... 53

    10.3    Class 3—Secured Prepetition Facility Claims .............................................. 53

    10.4    Class 4— Loan Settlement Claims ................................................................ 55

    10.5    Class 5—Prepetition LVS II Offshore Guaranty Claim ............................... 56

    10.6    Class 6—General Unsecured Claims ............................................................ 56

    10.7    Class 7—Interests ......................................................................................... 56

SECTION 11 DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS ........................... 56

    11.1    Distribution Dates ......................................................................................... 57

    11.2    Subsequent Distributions .............................................................................. 57

    11.3    Distribution Record Date .............................................................................. 57

    11.4    Manner of Cash Payments Under the Plan or Liquidating Trust Agreement ....... 57

    11.5    Time Bar to Cash Payments by Check .......................................................... 57

    11.6    Liquidating Trust Assets Account ................................................................ 58

SECTION 12 PROCEDURES FOR RESOLVING DISPUTED CLAIMS ............................... 58

    12.1    No Distributions Pending Allowance ........................................................... 58

    12.2    Resolution of Disputed Claims ..................................................................... 58

    12.3    Objection Deadline ....................................................................................... 58

    12.4    Estimation of Claims ..................................................................................... 58

    12.5    Disallowance of Claims ................................................................................ 59

    12.6    Adjustment to Claims Register Without Objection ...................................... 59

    12.7    Reserve Provisions for Disputed Claims ...................................................... 59

    12.8    Rounding ....................................................................................................... 60

    12.9    No Cash Payments of Less Than $100 on Account of Allowed Claims .............. 60

12.10    Delivery of Distributions and Unclaimed Property ......................................... 60

12.11    Books and Records ........................................................................................... 61

SECTION 13 TREATMENT OF EXECUTORY CONTRACTS   AND UNEXPIRED
LEASES .................................................................................................................. 61

13.1    Rejection / Assumption ..................................................................................... 61

13.2    Rejection Claims ............................................................................................... 61

13.3    Insurance Policies ............................................................................................. 62

SECTION 14 MEANS FOR IMPLEMENTATION OF THE PLAN ......................................... 62

14.1    General Settlement of Claims and Interests...................................................... 62

14.2    Committee Settlement ....................................................................................... 62

14.3    Wind-Down........................................................................................................ 63

14.4    Dissolution of Debtors………………………………………………………….63

14.5    Disposition of Mortgage Loans ....................................................................... 65

14.6    Litigation ........................................................................................................... 66

14.7    Dissolution of the Committee ........................................................................... 66

SECTION 15 EFFECT OF CONFIRMATION ....................................................................... 67

15.1    Binding Effect of the Plan................................................................................. 67

15.2    Vesting of Property of Debtors on the Effective Date ..................................... 67

15.3    Property Free and Clear .................................................................................... 67

SECTION 16 EXCULPATIONS, INJUNCTIONS, AND RELEASES .................................... 67

16.1    Exculpation ....................................................................................................... 67

16.2    Releases.............................................................................................................. 68

16.3    Injunction .......................................................................................................... 69

16.4    Post-Confirmation Liability of Liquidating Trustee ........................................ 70

16.5    Preservation of Rights of Action....................................................................... 70

16.6    No Discharge ..................................................................................................... 72

SECTION 17 CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................................. 72

    17.1    Conditions to Confirmation of the Plan ................................................ 72

    17.2    Conditions to the Effective Date .......................................................... 72

    17.3    Waiver of Conditions Precedent .......................................................... 73

SECTION 18 RETENTION OF JURISDICTION ................................................... 73

SECTION 19 MISCELLANEOUS PROVISIONS .................................................. 74

    19.1    Revocation of the Combined Plan and Disclosure Statement .............. 74

    19.2    Severability of Plan Provisions ........................................................... 74

    19.3    Exhibits ............................................................................................... 75

    19.4    Notices ................................................................................................ 75

    19.5    Reservation of Rights .......................................................................... 75

    19.6    Defects, Omissions and Amendments .................................................. 76

    19.7    Filing of Additional Documents .......................................................... 76

    19.8    Successors and Assigns ........................................................................ 76

    19.9    Setoffs and Recoupments .................................................................... 76

    19.10   Tax Exemption .................................................................................... 77

    19.11   Securities Exemption ........................................................................... 77

    19.12   Implementation ................................................................................... 77

    19.13   Record Date ......................................................................................... 77

    19.14   Certain Actions ................................................................................... 77

    19.15   Substantial Consummation .................................................................. 78

    19.16   Waiver of Fourteen-Day Stay .............................................................. 78

    19.17   Governing Law .................................................................................... 78

    19.18   Entire Agreement ................................................................................ 78

SECTION 20 RECOMMENDATION ..................................................................... 78

EXHIBIT A:  LIQUIDATION ANALYSIS

## DISCLAIMERS

**EACH HOLDER OF A CLAIM AGAINST THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE.  IF YOU ARE ENTITLED TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.  <u>THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT</u>.**

**THE COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD EVALUATE THE COMBINED PLAN AND DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

**THE COMBINED PLAN AND DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE TRUE AND ACCURATE, THEY ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTORY PROVISIONS. THE TERMS OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT. CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, AND THE APPLICABLE**

STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND THE DEBTORS DISCLAIM ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT.  THE DELIVERY OF THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTORS' CONTROL. ACCORDINGLY, THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS.  SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT.  THE DEBTORS DO NOT INTEND TO UPDATE OR REVISE THEIR FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND THEIR ADVISORS.  ALTHOUGH THE DEBTORS AND THEIR ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE DEBTORS AND THEIR ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

IN CONNECTION WITH THE DEBTORS' SOLICITATION OF ACCEPTANCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT PURSUANT TO SECTION 1126(b) OF THE BANKRUPTCY CODE, THE DEBTORS ARE FURNISHING A SOLICITATION PACKAGE, CONSISTING OF THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE EXHIBITS HERETO, CONFIRMATION NOTICE, AND A BALLOT OR RELEASE OPT-OUT ELECTION FORM, AS APPLICABLE, TO EACH RECORD HOLDER OF CLAIMS ELIGIBLE TO VOTE OR ITS COUNSEL.  THE COMBINED PLAN AND DISCLOSURE STATEMENT IS TO BE USED BY EACH SUCH

**ELIGIBLE HOLDER SOLELY IN CONNECTION WITH ITS EVALUATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT; USE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED.  NOTHING STATED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY.  THE COMBINED PLAN AND DISCLOSURE STATEMENT MAY NOT BE REPRODUCED OR PROVIDED TO ANYONE OTHER THAN ADVISORS TO THE RECIPIENT WITHOUT THE PRIOR WRITTEN CONSENT OF THE DEBTORS.**

# SECTION 1
# INTRODUCTION

First Guaranty Mortgage Corporation ("FGMC") and Maverick II Holdings, LLC ("Maverick" and together with FGMC, the "Debtors"), the debtors and debtors-in-possession in the above-captioned chapter 11 cases, hereby propose the following combined disclosure statement and plan pursuant to sections 1121(a) and 1125(b) of title 11 of the United States Code (the disclosure statement portion hereof, the "Disclosure Statement" and the chapter 11 plan portion hereof, the "Plan," as may be modified and/or amended from time to time, and collectively, the "Combined Plan and Disclosure Statement").  Capitalized terms used in the Combined Plan and Disclosure Statement and not otherwise defined have the meanings ascribed to such terms in Section 3.

Pursuant to the Plan, the Debtors will liquidate their remaining assets, wind down their affairs, and be dissolved through a Liquidating Trust.  After payment of senior claims as provided in the Plan, any Residual Value in the Liquidating Trust will be distributed to the holder of the Cash Flow DIP Claims, until paid in full, and thereafter, to the holders of general unsecured claims.

The Debtors will distribute the Combined Plan and Disclosure Statement to all holders of Claims and Interests in accordance with section 1125(b) of the Bankruptcy Code; Rules 2002, 3016, and 3017 of the Federal Rules of Bankruptcy Procedure; and the Bankruptcy Court's order conditionally approving the Combined Plan and Disclosure Statement [Docket No. [•]] (the "Conditional Approval and Procedures Order").  The Combined Plan and Disclosure Statement and the exhibits hereto include a discussion of:  (i) the nature and history of the Debtors' business and liabilities; (ii) events during the Chapter 11 Cases; (iii) the requirements for confirmation of the Plan and procedures for voting to accept or reject the Plan; (iv) additional factors and disclosures to be considered, including risk factors and certain U.S. federal income tax consequences of the Plan; and (v) the terms of the Plan, including the treatment of holders of Claims and Interests under the Plan.  The Disclosure Statement was prepared with the intent to provide "adequate information" (as defined in the Bankruptcy Code) to enable holders of Claims against and Interests in the Debtors to make informed judgments about the Plan.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Section 19.1 of the Combined Plan and Disclosure Statement, subject to the Cash Flow DIP Lender's consent, the Debtors expressly reserve the right to alter, amend, or modify the Combined Plan and Disclosure Statement, including the Plan Supplement, one or more times, before substantial consummation thereof.

***Please read the Combined Plan and Disclosure Statement, the exhibits, other supporting materials, and any appropriate ballot carefully and follow the instructions set forth below and on the appropriate ballot to vote on the Combined Plan and Disclosure Statement.  The Debtors believe that the Combined Plan and Disclosure Statement provides the best method of maximizing the recoveries for the holders of Claims and Interests against the Debtors.  Therefore, the Debtors recommend that all creditors who are entitled to vote should vote in favor of the Combined Plan and Disclosure Statement.***

Unless otherwise specified, all section or exhibit references in the Combined Plan and Disclosure Statement are to the respective section in, or exhibit to, the Combined Plan and Disclosure Statement, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection, or clause contained herein.  The headings in the Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; and (c) unless otherwise noted above, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

## SECTION 2
## SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER PLAN AND IMPORTANT SOLICITATION AND CONFIRMATION DATES AND DEADLINES

2.1    <u>Summary of Classification and Treatment of Claims and Interests</u>.

All Claims against or Interests in the Debtors, other than Administrative Claims, DIP Repo Loan Claims, Cash Flow DIP Claims and Priority Tax Claims, are classified for purposes of voting and distributions under the Combined Plan and Disclosure Statement.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor, and each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The classifications of Claims and Interests shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable.  The Plan does not contemplate substantive consolidation of the Debtors.

A summary of the classification of these Claims and Interests, the proposed treatment of each Class of Claims or Interests, and the voting status of each Class of Claims or Interests follows.

| Class | Treatment | Status |
|---|---|---|
| Unclassified: Administrative Claims, estimated to total approx. $[•]<br><br>**Estimated Recovery: 100%** | Except to the extent that a holder of an Allowed Administrative Claim agrees to less favorable treatment, each holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the holder of such Claim and the Debtors or the Liquidating Trustee, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law. | Unclassified—not entitled to vote |
| Unclassified: DIP Repo Loan Claims, estimated to total approx. $53,655,159<br><br>**Estimated Recovery: 100%** | Unless otherwise agreed by the Debtors and the DIP Repo Parties, the holders of the DIP Repo Claims shall be paid in full, in Cash: (a) through sales of purchased loans and (b) by guarantor(s) of the DIP Repo Claims purchasing the DIP Repo Facility Purchasers' interests in purchased loans. | Unclassified—not entitled to vote |

| Class | Treatment | Status |
|-------|-----------|--------|
| Unclassified: Cash Flow DIP Claims, estimated to total approx. $35,048,628 <br><br>**Estimated Recovery: 10% to 35%** | Subject to the terms of the Committee Settlement, the Cash Flow DIP Lender shall receive 100% of the proceeds recovered by the Liquidating Trust, until the Cash Flow DIP Claims have been paid in full, in Cash. | Unclassified—not entitled to vote |
| Unclassified: Priority Tax Claims, estimated to total approx. $500,000 to $800,000 <br><br>**Estimated Recovery: 100%** | Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall be paid the full unpaid amount of such Allowed Priority Tax Claim as follows: (a) Cash equal to the unpaid portion of the Allowed Priority Tax Claim on the later of the Effective Date or thirty (30) days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (b) such other treatment as to which the holder of an Allowed Priority Tax Claim and the Debtors shall have agreed upon in writing. | Unclassified—not entitled to vote |
| Class 1: Priority Non-Tax Claims, estimated to total approx. $1,534,196 <br><br>**Estimated Recovery: 100%** | The Debtors or the Liquidating Trustee, as applicable, shall pay the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law). The Entity holding a Priority Non-Tax Claim will be paid in Cash in full in respect of such Allowed Claim without interest from the Petition Date; provided, however, that such Entity may be treated on such less favorable terms as may be | Unimpaired—deemed to accept the Plan |

| Class | Treatment | Status |
|---|---|---|
|  | agreed to in writing by such Entity. |  |
| Class 2: Other Secured Claims, estimated to total approx. $8,969<br><br>**Estimated Recovery: 100%** | Except to the extent previously paid in full, at the option of the Debtors or the Liquidating Trustee, subject to agreement by the Cash Flow DIP Lender, one of the following treatments shall be provided in full satisfaction and release of such Allowed Other Secured Claim: (i) the holder of such Claim shall retain its Lien on its collateral until such collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such holder; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, the holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim; (iii) the collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor; or (iv) treatment on such other terms as agreed between the Creditor, the Debtors or the Liquidating Trustee, as applicable, and the Cash Flow DIP Lender. | Unimpaired—deemed to accept the Plan |

| Class | Treatment | Status |
|---|---|---|
| Class 3: Secured Prepetition Facility Claims, estimated to total approx. $557,617,115<br><br>**Estimated Recovery: 90% to 95%** | The holders of Secured Prepetition Facility Claims shall receive the following treatment: (i) delivery of the mortgage loans and other collateral purchased or securing their respective Claims or the net proceeds of the liquidation of such mortgage loans and other collateral, or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Secured Prepetition Facility Claim. For the avoidance of doubt, any unsecured deficiency Claims of holders of Secured Prepetition Facility Claims shall be treated as General Unsecured Claims. | Impaired – entitled to vote |
| Class 4: Loan Settlement Claims, estimated to total approx. TBD<br><br>**Estimated Recovery: TBD** | Each holder of a Loan Settlement Claim shall receive an Allowed Claim in amount of the cash in their possession and turnover to the Debtors any cash beyond such amount in accordance with any settlement agreement reached between such holder and the Debtors and approved by the entry of an Order pursuant to Rule 9019. | Impaired – entitled to vote |
| Class 5: Prepetition LVS II Offshore Guaranty Claim, estimated to total approx. $25,000,000<br><br>**Estimated Recovery: 0%** | The holder of the Prepetition LVS II Offshore Guaranty Claim shall receive a Pro Rata share of the Liquidating Trust Interests in exchange for its Allowed Claims following the payment or reserve for Administrative Claims, DIP Loan Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims, except as otherwise provided by the terms of the Committee Settlement. | Impaired – entitled to vote |
| Class 6: General Unsecured Claims, estimated to total approx. | Each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata share of the Liquidating Trust Interests in exchange for their Allowed | Impaired – entitled to vote |

| Class | Treatment | Status |
|---|---|---|
| $51,700,781<br><br>**Estimated Recovery: Recovery Anticipated Pursuant to Section 14.** | Claims following the payment or reserve for all Administrative Claims, DIP Repo Claims, Cash Flow DIP Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Prepetition Facility Claims, and Other Secured Claims, except as otherwise provided by the terms of the Committee Settlement. | |
| Class 7: Interests<br><br>**Estimated Recovery: 0%** | There shall be no Distribution on account of Interests. Upon the Effective Date, all Interests will be deemed cancelled and will cease to exist. | Impaired – deemed to reject the Plan |

2.2    Important Dates and Deadlines

| Event | Proposed Date |
|---|---|
| Voting Record Date | September 20, 2022 |
| Solicitation Commences | September 23, 2022 |
| Deadline for Creditors to File Rule 3018 Motions | September 30, 2022 |
| Deadline for Debtors to Respond to Rule 3018 Motions | October 7, 2022 |
| Deadline to file Plan Supplement | October 14, 2022 |
| Voting Deadline | October 18, 2022 |
| Combined Plan and Disclosure Statement Objection Deadline | October 21, 2022 |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined Plan and Disclosure Statement | October 25, 2022 |
| Deadline to File Voting Tabulation Affidavit | October 25, 2022 |
| Confirmation Hearing | October 28, 2022 |

## SECTION 3
## DEFINED TERMS

As used in the Combined Plan and Disclosure Statement, capitalized terms not otherwise defined have the meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

"Administrative Claim" means a Claim for an expense of administration of the Chapter 11 Cases arising under sections 503(b), 507(b), 503(b)(9) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates; (b) the value of any goods received by the Debtors within 20 days before the Petition Date to the extent that goods were sold to the Debtors in the ordinary course of the Debtors' business; (c) Professional Fee Claims; (d) all fees and charges assessed against the Estates under 28 U.S.C. §§ 1911-1930; (e) all obligations designated as Allowed Administrative Claims pursuant to an order of the Bankruptcy Court; (f) administrative claims that were timely filed prior to the Administrative Expense Bar Date; and (g) any Tax Claims incurred by the Debtors after the Petition Date or relating to a tax year or period which occurs after the Petition Date.

"Administrative Expense Bar Date" means the applicable last date, at 5:00 p.m. Eastern time, set by the Bankruptcy Court for a Claimant to file a request for payment of any Administrative Claim (excluding Professional Fee Claims) arising on or after the Petition Date, through and including the Effective Date.  The Administrative Expense Bar Date shall be sixty (60) days after the Effective Date.

"Allowed" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtors on the Schedules as other than disputed, contingent, or unliquidated and, as to which, the Debtors, the Liquidating Trustee or other party in interest has not filed an objection on or before the Claims Objection Deadline; (b) a Claim that is set forth in a timely filed Proof of Claim as to which no objection has been filed and which is not otherwise a Disputed Claim; (c) a Claim that has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtors prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Liquidating Trustee on or after the Effective Date; (iii) in any stipulation of amount and nature of any Administrative Claim, Priority Non-Tax Claim, or Priority Tax Claim executed by (y) the Debtors and approved by the Bankruptcy Court, or (z) the Liquidating Trustee; or (iv) in any contract, instrument, indenture or other agreement entered into or assumed by the Debtors in connection with and in accordance with the Plan; (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been timely filed by the Claimant before the applicable rejection Bar Date for such claim or has otherwise been deemed timely filed under applicable law; or (f) a Claim that is allowed pursuant to the terms of the Plan.  For the purpose of determining distributions pursuant to the Plan, allowance under subsections (a) and (b) only is applicable once any of the following occur (1) before the Claims Objection Deadline, the Debtors or the Liquidating Trustee, as applicable, determine not to object to the Claim, (2) the Claims Objection Deadline passes without an objection being filed, or (3) after the Debtors or Liquidating

Trustee timely objects to the Claim, the Claim is allowed as provided in subparagraphs (c), (d) or (e) above.

"<u>Allowed Claim</u>" or "<u>Allowed … Claim</u>" means a Claim that has been Allowed.

"<u>Avoidance Actions</u>" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtors, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

"<u>Ballots</u>" mean the ballots upon which the holders of Impaired Claims shall indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions.

"<u>Bankruptcy Code</u>" means title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in sections 101 *et seq.* of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075.

"<u>Bar Date</u>" means, as applicable, the General Claims Bar Date, the Administrative Expense Bar Date, or any other applicable deadline to file Claims referenced in the Plan.

"<u>Bar Date Order</u>" means the Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Setting a Bar Date for the Filing of Proofs of Claim By Governmental Units, (III) Setting a Bar Date for the Filing of Requests for Allowance of Administrative Expense Claims, (IV) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (V) Approving the Form of and Manner for Filing Proofs of Claim, (VI) Approving Notice of Bar Dates, and (VII) Granting Related Relief [Docket No. 382], which established the General Claims Bar Date and certain other deadlines and procedures.

"<u>Beneficiaries</u>" means holders of Allowed Claims entitled to receive Distributions from the Liquidating Trust under the Plan, whether or not such Claims were Allowed on the Effective Date.  For the avoidance of doubt, the Cash Flow DIP Lender is a Beneficiary solely to the extent provided in the Committee Settlement.

"<u>Bidding Procedures Order</u>" means the *Order: (A) Approving Bidding Procedures for Equity Acquisition or One or More Sales or the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief* implementing procedures to solicit and, if applicable, select bids from interested parties to purchase some or all of the Debtors' assets under section 363 of the Bankruptcy Code.

"Business Day" means any day, other than a Saturday, Sunday or legal holiday as defined in Bankruptcy Rule 9006(a).

"Cash" means cash and cash equivalents, including, but not limited to, bank deposits, wire transfers, checks, and readily marketable securities, instruments, and legal tender of the United States of America or instrumentalities thereof.

"Cash Flow DIP Agreement" means that certain Senior Secured Superpriority Debtor-in-Possession Term Loan and Security Agreement, dated July 1, 2022, among FGMC, as borrower, Maverick, as "Holdings" (and a guarantor), and LVS II SPE XXXIV LLC, as lender, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Cash Flow DIP Claim(s)" means the Secured Claim(s) held by the Cash Flow DIP Lender pursuant to the Cash Flow DIP Documents.

"Cash Flow DIP Documents" means the Final Cash Flow DIP Order, the Cash Flow DIP Agreement, and other agreements and other documents entered into, or delivered, on connection with the Cash Flow DIP Facility.

" Cash Flow DIP Facility" means the financing facility pursuant to the Final Cash Flow DIP Order and the Cash Flow DIP Agreement.

"Cash Flow DIP Lender" means LVS II SPE XXXIV LLC, as lender under the Cash Flow DIP Agreement.

"Causes of Action" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims, including, without limitation, all claims and any avoidance, preference, recovery, subordination or other actions of the Debtors and Estates (unless the context expressly states that such Causes of Action belong to another Entity) against Creditors, insiders, and/or any other Entities under the Bankruptcy Code, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the Effective Date. For the avoidance of doubt, Causes of Action does not include claims, challenges or other matters barred or otherwise released in the Final DIP Orders.

"Chapter 11 Cases" means the Chapter 11 cases commenced when the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on the Petition Date (each a "Chapter 11 Case") and with the following lead case number: 22-10584 (CTG).

"Claim" means a claim (as defined in section 101(5) of the Bankruptcy Code) against the Debtors, including, but not limited to: (a) any right to payment from the Debtors whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from the

Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Claimant" means the holder of a Claim.

"Claims Agent" means Kurtzman Carson Consultants LLC, which was appointed as the Debtors' claims, noticing, and balloting agent.

"Claims Objection Deadline" means, with respect to all Claims other than Professional Fee Claims, (a) 180 days after the Effective Date, or (b) such other period as may be fixed by an order of the Bankruptcy Court for objecting to Claims upon request of the Liquidating Trustee.

"Class" means a category of holders of Claims or Interests, as set forth in Section 9 of the Plan.

"Committee" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases on July 14, 2022.[2]

"Committee Settlement" means the settlement reached between the Debtors, the Committee and the Cash Flow DIP Lender, as set forth in the Final Cash Flow DIP Order and described in Section 14.2.

"Confirmation" means the entry of the Confirmation Order, subject to all conditions specified in Section 6 hereof having been (a) satisfied or (b) waived pursuant to Section 6.

"Confirmation Date" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Hearing" means the hearing at which the Bankruptcy Court will consider final approval of the disclosures contained in the Disclosure Statement and confirmation of the Plan.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"Consummation" or "Consummate" means the occurrence of the Effective Date.

"Contingent Claim" means any Claim for which a Proof of Claim has been filed with the Bankruptcy Court but was not filed in a sum certain and which Claim has not been estimated, fixed, or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date, or a Claim that has accrued but nonetheless remains dependent on the occurrence of a future event that may never occur.

---

[2] The five members of the Committee are (1) South Street Securities, (2) Daiwa Capital Markets America, Inc., (3) Maxwell Lending Solutions, Inc., (4) Sourcepoint, Inc, and (5) Lori Buckley.

"Creditor" means any holder of a Claim against any Debtor as specified in section 101(10) of the Bankruptcy Code.

"Debt" means liability on a Claim.

"Debtors" means First Guaranty Mortgage Corporation and Maverick II Holdings, LLC, debtors and debtors-in-possession in the Chapter 11 Cases.

"Debtor/Estate Release" has the meaning set forth in Section 16.2(a)(i) hereof.

"Debtor/Estate Releasors" has the meaning set forth in Section 16.2(a)(i) hereof.

"DIP Facilities" means the Cash Flow DIP Facility and the DIP Repo Facility.

"DIP Lenders" means the Cash Flow DIP Lender and the DIP Repo Parties.

"DIP Loan Claim(s)" means the DIP Repo Claims, the Cash Flow DIP Claims, and the DIP Repo Guarantee Claims.

"DIP Repo Agent" means Barclays Bank PLC, as administrative agent under the DIP Repo Facility Agreement.

"DIP Repo Claim(s)" means the Secured Claim(s) held by the DIP Repo Parties under the Final DIP Repo Order and the DIP Repo Facilities Agreement.

"DIP Repo Facility" means the financing facility pursuant to the Final DIP Repo Order and the DIP Repo Facilities Agreement.

"DIP Repo Facility Agreement" means that certain Master Repurchase Agreement, dated July 1, 2022, among FGMC, as seller, and the DIP Repo Parties, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"DIP Repo Facility Purchasers" means the buyers from time to time party to the DIP Repo Facility Agreement.

"DIP Repo Guarantee" means that certain Limited Recourse Guarantee, dated on or about July 1, 2022 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof), by and among the DIP Repo Agent and the DIP Repo Guarantor, pursuant to which the DIP Repo Guarantor has agreed to provide a limited guaranty of FGMC's obligations under the DIP Repo Facility.

"DIP Repo Guarantee Claims" means any outstanding Claims and obligations of the DIP Repo Guarantor against the Debtors arising from the DIP Repo Guarantee or the Final Cash Flow DIP Order.

"DIP Repo Guarantor" means Bravo Fund II, L.P., as guarantor under the DIP Repo Guarantee.

"DIP Repo Parties" means the DIP Repo Agent and the DIP Repo Facility Purchasers.

"DIP Repo Purchased Assets" has the meaning ascribed to the term "Purchased Assets" in the DIP Repo Facility Agreement.

"Disallowed Claim" means (i) a Claim, or any portion thereof, that has been disallowed by a Final Order or by other agreement of a Claimant; (ii) a Claim that has been listed in the Schedules at zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, a Final Order, or other applicable law; or (iii) a Claim that has not been listed in the Schedules and as to which no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, a Final Order, or other applicable law.

"Disputed" means, with respect to any Claim or Interest, any Claim or Interest: (a) listed on the Schedules as unliquidated, disputed, or contingent and as to which no Proof of Claim has been filed; or (b) as to which the Debtors, the Liquidating Trustee, or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or is otherwise disputed by the Debtors or the Liquidating Trustee, as applicable, in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

"Disputed Claim" means: (i) any Claim or portion of a Claim as to which an objection to the allowance thereof has been interposed as of any deadline fixed under the Plan or by order of the Bankruptcy Court, which objection has not been withdrawn or determined by Final Order; (ii) any Claim scheduled by the Debtors in the Schedules as disputed, contingent, or unliquidated and as to which no Proof of Claim has been timely filed; or (iii) a Claim that is not listed in the Schedules and as to which no Proof of Claim has been timely filed. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the objection.

"Disputed Claim Reserve" has the meaning set forth in Section 12.7 hereof.

"Distribution Agent" means the Debtors and/or the Liquidating Trustee, or the designees or agents of the foregoing.

"Distribution Dates" means collectively the Initial Distribution Date, any Subsequent Distribution(s) Date, and the date of the Final Distribution.

"Distribution Record Date" means the close of business on the Business Day immediately preceding the Effective Date.

"Distributions" means the distributions of Cash to be made in accordance with the Plan and the Liquidating Trust Agreement, as applicable.

"Effective Date" means the date selected by the Debtors, subject to the Cash Flow DIP Lender's consent, which is a Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect, and (b) all conditions specified in Section 6 hereof have been satisfied, unless waived by the Debtors and the Cash Flow DIP Lender. Within five (5) business days after the Effective Date, notice of the Effective Date shall be filed with the Bankruptcy Court by the Debtors or the Liquidating Trustee, as applicable.

"Entity" means an entity as defined in section 101(15) of the Bankruptcy Code.

"Estates" means the estates of the Debtors in the Chapter 11 Cases created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

"Exculpated Parties" means collectively (a) the Debtors, (b) the Debtors' respective officers, managers, and employees, (c) members of the Committee (solely in their capacities as Committee members), and (d) Bankruptcy Court-approved Estate professionals, provided, however that none of the parties shall be entitled to exculpation unless and solely to the extent they are found by a court of competent jurisdiction to have acted in their capacities as fiduciaries of the Estates.

"Fannie Mae" means the Federal National Mortgage Association.

"Final Cash Flow DIP Order" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Providing Super-Priority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Granting Related Relief* [Docket No. 292].

"Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

"Final DIP Orders" means the Final Cash Flow DIP Order, together with the Final DIP Repo Order.

"Final DIP Repo Order" means the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 507, 546, 548, 555, 556, 559, 560 and 561 (I) Authorizing the Debtors to Enter Into Repurchase Agreement Facilities and Related Documents; (II) Authorizing Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business; (III) Granting Liens and Providing Superpriority Administrative Expense Status; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 288].

"Final Distribution" means the last payment to holders of Allowed Claims in accordance with the provisions of the Plan.

"Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction: (i) that has not been reversed, stayed, modified, or amended; (ii) as to which the time to or the right to appeal or seek reconsideration, review, rehearing, or certiorari has expired or been waived (without regard to whether the time to seek relief from a judgment under Bankruptcy Rule 9024 has expired); and (iii) as to which no appeal or petition for reconsideration, review, rehearing, or certiorari is pending.

"Flagstar" means Flagstar Bank, FSB.

"Freddie Mac" means the Federal Home Loan Mortgage Corporation.

"General Claims Bar Date" means October 14, 2022, at 5:00 p.m. prevailing Eastern Time, which is the general deadline set pursuant to the Bar Date Order for filing proofs of claim for any Claims against the Debtors that arose prior to the Petition Date.

"General Unsecured Claim" means any unsecured Claim against the Debtors or Estates that is not a Secured Claim, a DIP Loan Claim, an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, or a Loan Settlement Claim.  For avoidance of doubt, General Unsecured Claims include all Prepetition Facility Deficiency Claims.

"Ginnie Mae" means the Government National Mortgage Association.

"Governmental Unit" means the United States; State; Commonwealth, District, Territory, municipality, foreign state, department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under Chapter 11), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

"Impaired" means with respect to a Claim or Class of Claims, a Claim or Class of Claims that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"Indemnified Parties" has the meaning set forth in Section 16.4 hereof.

"Initial Distribution Date" means the Effective Date, or as soon as practicable thereafter when the initial distribution of Cash shall be made to the holders of Allowed Claims, as determined by the Debtors or the Liquidating Trustee, as applicable.

"Insider" means an insider of the Debtors, as defined in section 101(31) of the Bankruptcy Code.

"Insurance Policies" means all insurance policies maintained by the Debtors as of the Petition Date, including but not limited to director and officer insurance policies.

"Interest" means any equity interest in the Debtors, including, but not limited to, all issued, unissued, authorized, or outstanding shares or stock, whether vested or non-vested, together with any warrants, options, or contract rights to purchase or acquire such interests at any time.

"Interim Cash Flow DIP Order" means *the Interim Order (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Scheduling a Final Hearing; (VI) Modifying the Automatic Stay; and (VII) Granting Related Relief* [Docket No. 67].

"Interim Fee Order" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 268], entered by the Bankruptcy Court in the Chapter 11 Cases.

"J.V.B." means J.V.B. Financial Group, LLC, as successor by merger to C&Co./PrinceRidge LLC.

"<u>Lien</u>" means any charge against or interest in property (including, but not limited to, any mortgage, lien, pledge, charge, security interest, encumbrance, or other security device of any kind) to secure payment of a debt or performance of an obligation.

"<u>Liquidating Trust</u>" means the grantor trust to be created upon the Effective Date for the benefit of the Beneficiaries pursuant to Section 14.4 hereof.

"<u>Liquidating Trust Agreement</u>" means the agreement, substantially in the form included in the Plan Supplement governing the Liquidating Trust, as it may be subsequently modified from time to time.

"<u>Liquidating Trust Assets</u>" means the assets held in the Liquidating Trust comprised of (i) the Plan Contribution Amount; (ii) all Causes of Action the Debtors hold or may hold against any Entity as of the Effective Date (after giving effect to the releases set forth in the Plan, including the Debtor/Estate Release); (iii) all Claims and rights of the Debtors under any Insurance Policies; (iv) any and all other non-Cash assets, interests, rights, claims and defenses of the Debtors or Estates, including, without limitation, all rights under any order of the Bankruptcy Court; and (v) any and all proceeds of any of the foregoing.  For the avoidance of doubt, (a) assets subject to any Sale Transaction and (b) Cash in excess of the Plan Contribution Amount shall not be Liquidating Trust Assets.

"<u>Liquidating Trust Assets Account</u>" means an interest-bearing bank account or money-market account to be established and held in trust by the Liquidating Trustee on or after the Effective Date for the purpose of holding the Liquidating Trust Assets to be distributed pursuant to the Plan and any interest, dividends, or other income earned upon the investment of the Liquidating Trust Assets.  The Liquidating Trust Assets Account will be initially funded by the Debtors or Liquidating Trustee, as applicable, on or immediately after the Effective Date with the Plan Contribution Amount.

"<u>Liquidating Trust Interests</u>" means the non-transferable beneficial interests in the Liquidating Trust, record of which will be maintained by the Liquidating Trustee in accordance with the Liquidating Trust Agreement and Section 11 hereof.

"<u>Liquidating Trustee</u>" means the Person selected by the Cash Flow DIP Lender, acceptable to the Debtors, to act as trustee of the Liquidating Trust in accordance with the terms of the Plan, the Confirmation Order, and the Liquidating Trust Agreement, or such successor appointed as the trustee in accordance with the Liquidating Trust Agreement.

"<u>Liquidation Proceeds</u>" means any Cash or other consideration paid to or realized by the Debtors or the Liquidating Trustee, as applicable, upon the collection, sale, transfer, assignment, or other disposition of the Liquidating Trust Assets.

"<u>Litigation</u>" means the interest of the Estates, the Debtors, or the Liquidating Trust, as applicable, in any and all claims, rights, and Causes of Action that have been or may be commenced by the Debtors or the Liquidating Trust, as applicable, except to the extent concerning any Released Parties.  Litigation includes, without limitation not otherwise stated herein, any action: (i) to avoid and recover any transfers of property determined to be preferential, fraudulent, or avoidable pursuant to sections 544, 545, 547, 548, 549(a), and 550 of the Bankruptcy Code; (ii)

for the turnover of property to the Debtors or the Liquidating Trust, as applicable; (iii) for the recovery of property or payment of money that belongs to or can be asserted by the Debtors or the Liquidating Trust, as applicable; (iv) for compensation for damages incurred by the Debtors; and (iv) equitable subordination actions against Creditors.

"Litigation Recovery" means any Cash or other property received by the Debtors or the Liquidating Trust, as applicable, from all or any portion of the Litigation, including, but not limited to, awards of damages, attorneys' fees and expenses, interest, and punitive damages, whether recovered by way of settlement, execution on judgment, or otherwise. If any Litigation is pursued on a contingent-fee basis, the Litigation Recovery will be net of any contingent fee paid to legal counsel.

"Loan Settlement Claims" means any and all unsecured Claims of any purchasers, subservicers and other third parties in the possession of certain cash, including "holdback" or other amounts, owed to the Debtors with respect to purchase and sale agreements and loan subservicing agreements, respectively.

"LVS II Offshore Guarantor" means LVS II Offshore, L.P. solely in its capacity as guarantor under the LVS II Offshore Guaranty.

"LVS II Offshore Guaranty" means that certain Guaranty and Suretyship Agreement dated September 30, 2020, providing for the guarantee of prompt payment and performance of obligations arising from the Prepetition Customers Loan Agreement.

"Mortgage Loans" shall have the meaning provided in Section 14.5.

"Ordinary Course Professional Order" means the *Order (I) Authorizing Employment and Payment of Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 281].

"Person" means any individual, corporation, limited liability company, general partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, Governmental Unit, or other Entity.

"Petition Date" means June 30, 2022, the date on which the Debtors filed their respective voluntary petitions for relief commencing the Chapter 11 Cases.

"Plan Contribution Amount" means the amount of the Debtors' Cash, up to $250,000, required to effectuate the administration of the Plan and the Liquidating Trust, provided however, that to the extent the Liquidating Trust holds any Plan Contribution Amount in excess of the amounts necessary to satisfy the payments and expenses provided herein and after the full administration of the Plan by the Liquidating Trustee, any such remaining Plan Contribution Amount shall be distributed to the Cash Flow DIP Lender in accordance with the treatment provided in Section 9 of the Plan solely to the extent that the Cash Flow DIP Claim has not been fully satisfied pursuant to the Plan. In determining the excess Plan Contribution Amount, the Liquidating Trust shall exclude consideration therefrom any undistributed portion of the Estates' Share derived pursuant to the Committee Settlement.

"Plan Documents" means the Plan, the Disclosure Statement, the Plan Supplement, the Liquidating Trust Agreement, any plan support letters, or other documents or pleadings filed by the Debtors relating to the Plan.

"Plan Objection Deadline" means the deadline established by the Bankruptcy Court for filing and serving objections to Confirmation of the Plan.

"Plan Supplement" means the pleading or pleadings identified in the Plan or Disclosure Statement for filing with the Bankruptcy Court not later than seven (7) calendar days prior to the Plan Objection Deadline, which shall include certain exhibits and schedules to the Plan, as well as documents, agreements, and instruments evidencing and effectuating the Plan.

"Prepetition Bridge Lender" means B2 FIE XI LLC and any successor thereto, in its capacity as lender under the Prepetition Bridge Loan Agreement.

"Prepetition Bridge Loan Agreement" means that certain Second Amended and Restated Secured Promissory Note, dated as of June 29, 2022, executed by FGMC, as borrower, and in favor of the Prepetition Bridge Lender, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Bridge Loan Claims" means any outstanding Claims and obligations under the Prepetition Bridge Loan Agreement and any other documents and agreements executed and delivered in connection with the Prepetition Bridge Loan Agreement. The Prepetition Bridge Loan Claims shall not include (a) any amounts refinanced with the proceeds of the DIP Repo Facility or (b) any amounts "rolled up" into the Cash Flow DIP Facility.

"Prepetition Customers Loan Agreement" means that certain Amended and Restated Loan Agreement, dated as of July 17, 2019, by and between FGMC and Customers Bank, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Customers Loan Obligation Deficiency Claims" means any outstanding deficiency Claims and obligations under the Prepetition Customers Loan Agreement and all other documents and agreements executed and delivered in connection with the Prepetition Customers Loan Agreement.

"Prepetition Customers Loan Obligation Claims" means any outstanding Secured Claims and obligations under the Prepetition Customers Loan Agreement and all other documents and agreements executed and delivered in connection with the Prepetition Customers Loan Agreement.

"Prepetition Customers Repo Agreement" means that certain Second Amended and Restated Master Repurchase Agreement, dated as of October 9, 2019, by and between FGMC and Customers Bank, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Customers Repo Facility Deficiency Claims" means any outstanding deficiency Claims and obligations under the Prepetition Customers Repo Agreement and all other documents and agreements executed and delivered in connection with the Prepetition Customers Repo Agreement.

"Prepetition Customers Repo Facility Secured Claims" means any outstanding Secured Claims and obligations under the Prepetition Customers Repo Agreement and all other documents and agreements executed and delivered in connection with the Prepetition Customers Repo Agreement.

"Prepetition Facility Deficiency Claims" means the Prepetition Customers Loan Obligation Deficiency Claims, the Prepetition Customers Repo Facility Deficiency Claims, Prepetition Flagstar Warehouse Facility Deficiency Claims, Prepetition J.V.B. Repo Facility Deficiency Claims and the Prepetition TCB Repo Facility Deficiency Claims.

"Prepetition Flagstar Loan Agreement" means that certain Mortgage Warehouse Loan and Security Agreement, dated as of June 30, 2017, by and between FGMC and Flagstar, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Flagstar Warehouse Facility Deficiency Claims" means any outstanding deficiency Claims and obligations under the Prepetition Flagstar Loan Agreement and all other documents and agreements executed and delivered in connection with the Prepetition Flagstar Loan Agreement.

"Prepetition Flagstar Warehouse Facility Secured Claims" means any outstanding Secured Claims and obligations under the Prepetition Flagstar Loan Agreement and all other documents and agreements executed and delivered in connection with the Prepetition Flagstar Loan Agreement.

"Prepetition J.V.B. Repo Agreement" means that certain Master Repurchase Agreement, dated as of October 25, 2012, by and between FGMC and J.V.B., as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition J.V.B. Repo Facility Deficiency Claims" means any outstanding deficiency Claims and obligations under the Prepetition J.V.B Repo Agreement and all other documents and agreements executed and delivered in connection with the Prepetition J.V.B. Repo Agreement.

"Prepetition J.V.B. Repo Facility Secured Claims" means any outstanding Secured Claims and obligations under the Prepetition J.V.B. Repo Agreement and all other documents and agreements executed and delivered in connection with the Prepetition J.V.B. Repo Agreement.

"Prepetition Loan Agreements" means the Prepetition Customers Loan Agreement and the Prepetition Flagstar Loan Agreement.

"Prepetition LVS II Guaranty Claims" means any outstanding Claims and obligations against the Debtors arising from the LVS II Offshore Guaranty.

"Prepetition Repo Agreements" means the Prepetition Customers Repo Agreement, the Prepetition TCB Repo Agreement, and the Prepetition J.V.B. Repo Agreement.

"Prepetition Repo Facility Claims" means the Prepetition Customers Repo Facility Claims, the Prepetition J.V.B. Repo Facility Claims, and the Prepetition TCB Repo Facility Claims.

"<u>Prepetition Repo Lenders</u>" means Customers Bank, Texas Capital Bank, National Association, and J.V.B.

"<u>Prepetition TCB Repo Agreement</u>" means that certain Mortgage Warehouse Agreement, dated as of August 14, 2020, by and between FGMC and Texas Capital Bank, National Association, as amended, restated, supplemented or otherwise modified from time to time.

"<u>Prepetition TCB Repo Facility Deficiency Claims</u>" means any outstanding deficiency Claims and obligations under the Prepetition TCB Repo Agreement and all other documents and agreements executed and delivered in connection with the Prepetition TCB Repo Agreement.

"<u>Prepetition TCB Repo Facility Secured Claims</u>" means any outstanding Secured Claims and obligations under the Prepetition TCB Repo Agreement and all other documents and agreements executed and delivered in connection with the Prepetition TCB Repo Agreement.

"<u>Prepetition Warehouse Lenders</u>" means Customers Bank, solely in its capacity as a lender pursuant to the Prepetition Customers Loan Agreement and Flagstar, solely in its capacity as a lender under the Prepetition Flagstar Loan Agreement.

"<u>Priority Claim</u>" means a Priority Non-Tax Claim or a Priority Tax Claim.

"<u>Priority Non-Tax Claim</u>" means any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under section 507(a) of the Bankruptcy Code.

"<u>Priority Tax Claim</u>" means a Claim of a Governmental Unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"<u>Pro Rata</u>" means proportionately so that, with respect to a Claim, the ratio of: (a) (i) the amount of property distributed on account of a particular Claim to (ii) the Allowed amount of the Claim, is the same as the ratio of (b) (i) the amount of property distributed on account of all Allowed Claims in the Class or Classes entitled to share in the applicable distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

"<u>Professional</u>" means an Entity:  (a) employed pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"<u>Professional Fee Claim</u>" means those fees and expenses claimed by Professionals pursuant to sections 330, 331, or 503 of the Bankruptcy Code, and accrued and unpaid as of the Effective Date.

"<u>Professional Fee Reserve</u>" means a reserve fund established by the Debtors or the Liquidating Trustee, as applicable, on or as soon as practicable after the Effective Date, to pay any accrued and unpaid (a) Professional Fee Claims incurred by a Professional and which have not yet been approved by the Bankruptcy Court; (b) fees or expenses incurred by an entity or person retained under the Ordinary Court Professional Order; and (c) Professional Fee Claims approved

by the Bankruptcy Court. The amounts deposited into the Professional Fee Reserve shall be free and clear of all liens, claims and encumbrances of any Persons or Entities except to the extent that any excess amounts remain in the Professional Fee Reserve after payment of all Allowed Professional Fee Claims, such excess amounts to be distributed to the Cash Flow DIP Lender in accordance with the Plan.

"Proof of Claim" means a proof of claim filed pursuant to section 501 of the Bankruptcy Code or any order of the Bankruptcy Court, together with supporting documents.

"Rejection Bar Date" means the last date for any Entity whose claims arise out of the Bankruptcy Court approved rejection of an executory contract or unexpired lease to file a proof of claim for damages related to such rejection. The Rejection Bar Date for such Claims will be, (i) with respect to executory contracts and unexpired leases rejected pursuant to a Bankruptcy Court order other than the Confirmation Order, the date provided by an order approving the rejection, and, (ii) with respect to executory contracts and unexpired leases rejected pursuant to the Confirmation Order, the date that is thirty (30) days after the Effective Date.

"Related Persons" means, subject to any exclusions expressly set forth in the Plan, with respect to a specific Person, said Person's successors and assigns, and as applicable, its current and former shareholders, affiliates, subsidiaries, employees, agents, investment managers, subagents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, and consultants. For the avoidance of doubt, the affiliates of the Prepetition Bridge Lender and Cash Flow DIP Lender include Pacific Investment Management Company LLC, B2 FIE IV LLC, LVS II Offshore, L.P., LVS II Holdings, LP, Bravo II Guarantor I LLC, and Bravo Fund II, L.P.

"Release Opt-Out Election Form" means a form for holders of Claims to opt out of being a Releasing Party in connection with the Third Party Release.

"Released Parties" means, collectively, (a) the Debtors, (b) the DIP Lenders, (c) the Prepetition Bridge Lender, (d) the Committee, and (e) each of such Entities' Related Persons.

"Releasing Parties" means, individually and collectively: (i) each holder of a Claim or Interest that: (a) votes to accept the Plan; (b) is conclusively deemed to have accepted the Plan or is otherwise being paid in full under the Plan; (c) abstains from voting on the Plan and does not opt out of the Third Party Release; (d) votes to reject the Plan and does not opt out of the Third Party Release; or (e) is conclusively deemed to have rejected the Plan and does not opt out of the Third Party Release; (ii) the Committee and each of its members in such capacity; and (iii) with respect to each of the foregoing Entities in clauses (i) and (ii), such Entities' or Persons' successors, assigns, transferees, and such Entities' or Persons' officers and directors, agents, members, financial and other advisors, attorneys, employees, partners, affiliates, and representatives (in each case in their capacity as such), and any and all other entities who may purport to assert any cause of action, by, through, for, or because of such Entities or Persons.

"Repo DIP Claim(s)" means the Secured Claim(s) held by the DIP Repo Parties pursuant to the Final DIP Repo Order and the DIP Repo Facility Agreement.

"Residual Value" means the net proceeds of Liquidating Trust Assets remaining, if any, after (i) the full and indefeasible payment of the Plan Contribution Amount, Allowed Other Secured Claims, Allowed Administrative Claims (including the DIP Loan Claims), Allowed Priority Tax Claims, and Allowed Priority-Non Tax Claims; and (ii) the establishment of appropriate reserves for any Disputed Claims (related only to the categories of Claims set forth in clause (i) of this definition) and costs or expenses either incurred or expected to be incurred by the Liquidating Trust in connection with the Plan.

"Sale Transaction" means a sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, the procedures established under the terms of the Bidding Procedures Order, and an order of the Bankruptcy Court approving such sale.

"Schedules" means the schedules of assets and liabilities as the Bankruptcy Court required the Debtors to file pursuant to section 521 of the Bankruptcy Code, the Official Bankruptcy Forms, and the Bankruptcy Rules, as they may be amended and supplemented from time to time, and the Debtors' statements of financial affairs filed with the Bankruptcy Court, as the Bankruptcy Court required the Debtors to file pursuant to section 521 of the Bankruptcy Code, the Official Bankruptcy Forms, and the Bankruptcy Rules, as they may be amended and supplemented from time to time [Docket Nos. 365, 366].

"Secured Claim" means any Claim that is secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of such Lien or right of setoff as determined under sections 506(a) or 1129(b) of the Bankruptcy Code, as applicable.

"Secured Prepetition Customers Loan Obligation Claims" means the Prepetition Customers Loan Obligation Claims solely to the extent secured by the Debtors' prepetition deposit accounts at Customers Bank.

"Secured Prepetition Facility Claims" means the Prepetition Repo Facility Claims and the Secured Prepetition Warehouse Facility Claims.

"Secured Prepetition Warehouse Facility Claims" means the Secured Prepetition Customers Loan Obligation Claims and the Secured Prepetition Flagstar Warehouse Facility Claims.

"Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

"Subsequent Distribution Date" means any date after the Initial Distribution Date upon which the Liquidating Trust makes a distribution to any holders of Allowed Administrative, Secured, Priority, or General Unsecured Claims.

"Tax" means any tax, charge, fee, levy, impost, or other assessment by any federal, state, local, or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, *ad valorem*, estimated, severance, stamp, occupation, and withholding tax.

"Tax" shall include any interest or additions attributable to, imposed on, or with respect to such assessments.

"Tax Claim" means all or that portion of an Allowed Claim held by a Governmental Unit for a Tax assessed or assessable against the Debtors.

"Third Party Release" has the meaning set forth in Section 16.2(c) hereof.

"Unimpaired Claim" means an unimpaired Claim within the meaning of section 1124 of the Bankruptcy Code.

"U.S. Trustee" means the Office of the United States Trustee for the District of Delaware.

"Voting Classes" mean Classes 3, 4, 5 and 6.

"Voting Deadline" means [•], 2022 at 4:00 p.m. (prevailing Eastern Time).

"Voting Instructions" means the instructions for voting on the Plan contained on the Ballots.

"Voting Record Date" means the date as of which the identity of holders of Claims is set by the Bankruptcy Court for purposes of determining the Entities entitled to receive and vote on the Plan.

## SECTION 4
## BACKGROUND

4.1    General Background.

(a)    Debtors' Prepetition Business and Operations.

Prior to the Petition Date, FGMC operated as a full service, non-bank mortgage lender offering a full suite of residential mortgage loan options tailored to borrowers' different financial situations.  FGMC was one of the leading independent mortgage companies in the United States that originated residential mortgages through a national platform.  As described further below, FGMC's business included the origination, purchase, service, sale, and/or securitization of residential real estate mortgage loans.  However, due to unforeseen historically adverse market conditions for the mortgage lending industry, including unanticipated market volatility, FGMC has experienced significant operating losses and cash flow challenges.  As a result of these challenges, FGMC was forced to cease all of its origination activity and terminate the employment of nearly eighty percent (80%) of its workforce just prior to the Petition Date.

There were three main components, or channels, to FGMC's mortgage loan business:  (a) wholesale loan originations; (b) retail loan originations; and (c) correspondent lending.  Specifically:

> Wholesale Loan Originations.  FGMC's wholesale loan origination channel produced Ginnie Mae, Fannie Mae, Freddie Mac, and Non-Agency loans but was

focused primarily on non-qualified mortgage ("Non-QM") loans to consumer borrowers who do not meet the attributes, typically based on the traditional income verification, required for a "qualified mortgage" under federal lending regulations. FGMC offered Non-QM loans for borrowers based on alternative credit methods such as "bank statements" and 1099-only income. In the wholesale mortgage loan business, FGMC worked with an independent network of mortgage brokers to identify borrowers eligible for a residential mortgage loan.

Retail Loan Originations. Through a centralized call center located in Plano, Texas, and a series of branch offices in various locations, FGMC also originated residential mortgage loans directly to retail customers. Potential borrowers could call and ascertain whether they were eligible for a mortgage loan. FGMC's loan officers also called potential customers, realtors and builders. FGMC's employees handled the approval and underwriting process, obtained all required documentation, and ensured compliance with all regulatory requirements through the loan closing.

Correspondent Lending. Through its correspondent lending channel, FGMC purchased mortgage loans originated and closed by other lenders. The correspondent lenders are typically unable to sell the loans on the secondary market themselves; as such, FGMC purchased the correspondent loans, which included Fannie Mae, Freddie Mac, Ginnie Mae, Non-Agency, and Non-QM loans, and sold them itself.

Once a wholesale, retail or correspondent loan was originated or purchased, FGMC had the option to sell them to a number of parties or agencies, including Fannie Mae, Freddie Mac, Ginnie Mae. Prior to the Petition Date, in the ordinary course of business, FGMC's wholesale and retail mortgage loan channels were replenished with additional new loan origination on a daily basis. On June 24, 2022, FGMC ceased most new origination activity.

In addition to loan origination and purchasing, prepetition, FGMC also engaged in hedging activities in an effort to reduce risk due to volatility in pricing for loans that are originated and sold in fluctuating market conditions. This was necessary because there is a gap in time between the date a customer or borrower receives an interest rate lock at the time a mortgage loan commitment is issued and the date of settlement of the loan, and FGMC is expected to support the value of the trade by posting margin (*i.e.*, cash or other eligible collateral) to the hedge counterparty. FGMC was subject to margin calls from hedge counterparties in the weeks leading up to the Petition Date, adversely affecting its cash position.

Though not a core part of the business, FGMC also owns loan servicing rights, which it fulfills through a sub-servicer.

As of June 1, 2022, FGMC employed approximately 600 full-time employees, of which approximately 292 were paid (either in whole or in part) on a commission basis for loans closed. On June 24, 2022, as a result of its inability to procure additional financing to ease its liquidity crisis as well as the cessation of new loan origination activity, FGMC reduced its workforce by terminating the employment of approximately 471 employees, including approximately 284 employees paid (at least in part) on a commission basis. On June 24, 2022, FGMC sent the

separated employees notices of planned employee separation pursuant to the Worker Adjustment and Retraining Notification Act ("WARN").

Maverick is a non-operating holding company with no employees.

    (b)    Corporate Organizational Structure.

FGMC is a Virginia corporation and, as Maverick's sole Member, owns 100% of the equity interests in Maverick, a Delaware LLC.

Maverick owns 50% of the equity interests of FirstLine Holdings, LLC ("FirstLine"). The party owning the other 50% interest in FirstLine is a non-affiliated entity. FirstLine, as the sole Member, owns 100% of the equity interests of non-debtor FirstLine Title, LLC.

    (c)    Debtors' Debt Structure.

    (i)    Prepetition Repo Facilities.

Pursuant to the terms of the Prepetition Repo Agreements, the Debtors sold newly originated mortgage loans to repo counterparties to finance the origination of such mortgage loans, and typically repurchased such mortgage loans from the related Prepetition Repo Lender after origination, with the proceeds from sales of such loans to direct investors, including Fannie Mae, Freddie Mac, Ginnie Mae, or through the issuance of mortgage backed securities ("MBS"), indirectly to investors, including Fannie Mae, Freddie Mac, Ginnie Mae and other secondary market participants. Prior to the issuance of MBS, the Debtors generally obtained advances of less than 100% of the unpaid principal balance ("UPB") of such mortgage loans from the Prepetition Repo Lenders which required the Debtors to use working capital to fund the remaining equity portion of the UPB which is often referred to as the "haircut".

    (ii)    Prepetition Loan Agreements.

Under the terms of the Prepetition Loan Agreements, the applicable Prepetition Loan Agreement lender will advance funds to the Debtors to finance working capital necessary for business of the origination and/or purchase of mortgage loans from correspondent mortgage lenders. The amounts advanced pursuant to the Prepetition Loan Agreements were wholly or partially secured by mortgage loans, deposit accounts, and related collateral. The Debtors' obligations to Customers Bank under the Customers Bank Loan Agreement are further secured by the Customers Bank Guaranty.

    (iii)    Agency Loans.

Typically, loans that will be sold to, invested in or guaranteed by an entity such as Fannie Mae, Freddie Mac, or Ginnie Mae (collectively, the "Agency Loans") are financed at 100%. With respect to non-Agency Loans and Non-QM Loans, Warehouse Lenders will finance between 90% and 95% of the original principal amount of the loan, which requires the Debtors to use working capital to fund the remaining portion of the principal balance of the mortgage loans.

As of the Petition Date, the Debtors estimated that they collectively owed the Prepetition Repo Lenders, and the Prepetition Warehouse Lenders approximately $418 million.

(iv)    Bridge Loans.

Pursuant to the Prepetition Bridge Loan Agreement, executed by FGMC, as borrower, and in favor of the Prepetition Bridge Lender, as lender, the Prepetition Bridge Lender extended certain loans and other financial accommodations to the Debtors (the "Prepetition Bridge Loans"). The Prepetition Bridge Lender is an indirect subsidiary of a private investment firm managed by Pacific Investment Management Company LLC. B2FIE IV LLC, an affiliate of the Cash Flow DIP Lender (described below), owns 100% of the equity interests of FGMC.

As of the Petition Date, the total outstanding amount due under the Prepetition Bridge Loan Agreement is approximately $18.4 million, $7.3 million of which was used to finance the Prepetition Bridge Loans.

Pursuant to the Prepetition Bridge Loan Agreement, the Debtors granted the Prepetition Bridge Lender (a) a fully perfected, junior security interest in and lien on substantially all of its encumbered assets, and (b) a fully perfected, senior security interest in and lien on substantially all of its unencumbered assets, including all proceeds thereof, whether then owned and existing or thereafter acquired or arising.

The Prepetition Bridge Loan Claims do not include (a) any amounts refinanced with the proceeds of the DIP Repo Facility or (b) any amounts "rolled up" into the Cash Flow DIP Facility. As of the Effective Date, there will not be any unpaid Prepetition Bridge Loan Claims.

(v)    Unsecured Debt.

As of the Petition Date, the Debtors estimate they owe approximately $78 million of unsecured indebtedness, including trade debt and payables, amounts owed to former and current employees, and a $25 million fully-drawn line of credit with Customers Bank.

4.2    Events Leading to Chapter 11 Filing.

(a)    Mortgage Industry.

As of the Petition Date, the mortgage industry had seen an increase in market volatility as a result of the following issues: concerns about the availability and cost of credit, uncertainty with respect to Government-Sponsored Enterprises (including Fannie Mae and Freddie Mac) under the current and/or future administrations, volatility in certain United States real estate markets, worsening economic conditions in the United States and Europe, the systemic impact of inflation or deflation, rising energy costs, geopolitical issues (including the potential for increased tensions between the United States and Russia resulting from the current situation involving Russia's invasion of Ukraine), political gridlock in United States relating to federal budget matters (including full or partial government shutdowns), trade wars, the COVID-19 outbreak (and any future outbreaks of coronavirus or similar diseases) and potential military actions or threats. After many years of historically low inflation and interest rates for mortgage loans due in major part to the United States Federal Reserve lowering interest rates to near zero as a result of the COVID-19

pandemic, mortgage rates in the United States experienced steep increases as a result of the Federal Reserve's inflation-curbing strategy. For instance, mortgage rates increased from an average of 3.2% in January 2022 to 5.27% in May 2022. As a result, the refinance boom that reached its peak in 2020 and 2021 is now largely over.

Limited housing stock contributed to a reduction in demand for purchase money mortgages as home values continued to appreciate at near record levels despite the recent rise in mortgage loan interest rates.

The residential mortgage industry is also one of the most highly regulated industries in the United States. The creation of the federal Consumer Financial Protection Bureau under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and the additional authorities and responsibilities granted to it to administer and enforce various federal consumer protection statutes, including new requirements related to determining a borrower's ability to repay the loan and new servicing rules, as well as the increasing sophistication and coordination of various state banking and financial institution regulators, has led to unprecedented oversight and scrutiny of the residential mortgage industry, significantly increasing the legal, regulatory, and operational risks of operating a mortgage origination company.

(b)     Debtors' Liquidity Crisis.

The Debtors' business had been directly and severely impacted by the series of macroeconomic challenges described above. In 2021, intense competition for mortgage originations, in part due to the collapse of the refinancing market, resulted in a sharp decline in the Debtors' performance. The Debtors' margins on the sale of loans also declined dramatically.

Unfortunately, these trends continued into 2022. For the four months ending April 30, 2022, the Debtors generated a $23.3 million after-tax net loss. This was, in part, a result of lower origination volumes. In the first four months of 2022, the Debtors originated $1.7 billion in mortgages, an annual originations pace of only $5 to $6 billion. Moreover, gain on sale margins continued to be very weak. In an effort to increase profitability, in the first four months of 2022, FGMC expanded its retail residential mortgage loan origination platform, increasing origination volumes in its most profitable business line. However, this expansion came at considerable additional expense in the form of additional labor costs, primarily salary and benefits.

The combination of continued losses and volatile daily margin calls on hedge positions has led to drastic reductions in the Debtors' unrestricted cash creating a liquidity crisis. By mid-June 2022, as liquidity continued to decline, Debtors' management concluded that they could no longer continue operations without a significant injection of new liquidity, as one or two days of significant margin calls could leave the Debtors without any cash. Despite their best efforts, the Debtors were unable to obtain additional equity capital. As a result, the Debtors determined that, in order to protect part of the current "pipeline" (loans not yet funded), they needed to suspend all new loan applications, suspend all correspondent lending, cease all hedging payments and significantly reduce their workforce. The Debtors further determined that filing these Chapter 11 Cases was the best way to preserve operational ability to enable customers to close on loans already in the pipeline.

## SECTION 5
## THE CHAPTER 11 CASES

The following is a brief description of certain material events that have occurred during the Chapter 11 Cases.

5.1     <u>First Day Motions and Other Early Developments in the Chapter 11 Cases</u>.

The Debtors filed a number of motions after the Petition Date to, among other things, help stabilize operations and establish procedures for the Chapter 11 Cases:

(i)     joint administration motion [Docket No. 2] and order thereon [Docket No. 56];

(ii)     applications to appoint Kurtzman Carson Consultants LLC as the Debtors' claims and noticing agent [Docket No. 4] and order thereon [Docket No. 58] and as the Debtors' administrative advisor [Docket No. 94] and order thereon [Docket No. 229];

(iii)     motion for authorization to use certain cash management procedures, bank accounts, and certain payment methods, and to modify requirements imposed by section 345(b) of the Bankruptcy Code [Docket No. 5], interim order thereon [Docket No. 61] and final order thereon [Docket No. 273];

(iv)     motion for authorization to continue insurance programs and prepetition surety bonds and pay obligations arising thereunder [Docket No. 6] and order thereon [Docket No. 206];

(v)     motion to provide procedures to deal with utility providers [Docket No. 8] and order thereon [Docket No. 205];

(vi)     motion to pay certain prepetition employee wages, salaries, commissions, other compensation, and reimbursable expenses, and to continue certain employee benefits programs [Docket No. 9] and interim order thereon [Docket No. 64] and a final order with regard to Current Employees and continued order with regard to Former Employees thereon [Docket No. 288]; and

(vii)     motion for authorization to pay prepetition claims (which the Debtors estimate will not exceed $800,000 in total) of certain vendors and service providers critical to their businesses including vendors that are key to maintaining the Debtors' existing computer and operating systems, documenting and closing loans, and selling loans into the secondary market [Docket No. 7] and interim order thereon [Docket No. 65] and final order thereon [Docket No. 272].

5.2    <u>DIP Financing and Related Matters</u>.

a.    <u>DIP Repo Motion</u>

On June 30, 2022, the Debtors filed the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Enter into Repurchase Agreement Facilities; (II) Authorizing the Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business; (III) Granting Liens and Providing Superpriority Administrative Expense Status; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing with Respect to the Relief Requested Herein; and (VI) Granting Related Relief* [Docket No. 20] (the "<u>DIP Repo Motion</u>"). The DIP Repo Motion sought, among other things, to obtain critical funding enabling the Debtors to fund loans to be originated to borrowers intending to close on their home purchase within 60-90 days. Prior to the Petition Date, the Debtors had access to warehouse lines with the Prepetition Repo Lenders. They used these lines to fund loans in their pipeline. As a result of the filing of the Chapter 11 Cases, the Debtors could no longer access the Prepetition Repo Agreements to fund new loans. As such, the DIP Repo Facility (providing for a maximum committed amount of up to $125 million) was necessary in order to prevent the harm that would result if those borrowers were unable to complete the purchase or refinance of their homes because the Debtors failed to fund their mortgage loans. The DIP Repo Motion contemplated that the DIP Repo Agent would be granted first priority liens in the "Purchased Assets" (as defined in the DIP Repo Facility Agreement) under section 364(c)(2) of the Bankruptcy Code and superpriority administrative claims.

Further, prior to the Petition Date, in the ordinary course of business, FGMC entered into forward transactions for the purchase or sale of mortgage-backed and other securities, including pursuant to "when-issued," "to-be-announced," "dollar roll" and other transactions with various regulated broker dealers pursuant to the terms of various Master Securities Forward Transaction Agreements (the "<u>MSFTAs</u>"). FGMC used the prepetition MSFTAs to hedge certain risks inherent in its financing operations. The counterparties to the Debtors' prepetition MSFTAs include BMO Capital Markets Corp., Goldman Sachs LLC, Mizuho Securities USA LLC, Morgan Stanley & Co. LLC, South Street Securities LLC, and Wells Fargo Securities LLC. Such hedging arrangements are customary in the mortgage origination industry and afford mortgage originators and borrowers more advantageous borrowing rates and terms. By the DIP Repo Motion, the Debtors requested authority to enter into and perform as necessary under certain MSFTAs (the "<u>DIP MSFTAs</u>") between FGMC and the counterparties thereto, pursuant to which, from time to time, FGMC and the applicable counterparties will enter into forward transactions for the purchase or sale of mortgage-backed and other asset-backed securities and such other securities as the parties thereto may determine. By the DIP Repo Motion, the DIP MSFTA counterparties will be provided first priority liens pursuant to section 364(c)(2) of the Bankruptcy Code to secure FGMC's obligations under the DIP MSFTAs, and all "Forward Collateral" (as defined in the DIP MSFTAs), among other collateral.

Additionally, prior to the Petition Date, FGMC entered into a margin, setoff and netting agreement to allow FGMC and counterparties to the Prepetition Repo Agreements and prepetition MSFTs to net, setoff and margin their obligations to one another under certain prepetition netting agreements. Such netting arrangements are customary in the mortgage origination industry and afford mortgage originators and borrowers more advantageous borrowing

rates and terms.  The Debtors propose to enter into a substantially similar agreement postpetition.  By the DIP Repo Motion, the DIP Repo Agent will be provided with first-priority liens, pursuant to section 364(c)(2) of the Bankruptcy Code, to secure FGMC's obligations under the DIP Repo Facility Agreement, in, among other collateral, deposit, securities or other trust accounts maintained in connection with the DIP Repo Documents.

On July 1, 2022, the Bankruptcy Court entered an order granting the DIP Repo Motion, subject to the terms set forth in the order, on an interim basis [Docket No. 66].  The Bankruptcy Court entered the Final DIP Repo Order on August 4, 2022 [Docket No. 288].

b.    Cash Flow DIP Motion

On June 30, 2022, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* [Docket No. 22] (the "Cash Flow DIP Motion").  The Debtors require operating liquidity utilized for payment of general operating expenses such as payroll, facilities rent, vendors and other day-to-day expenses.  By the Cash Flow DIP Motion, the Debtors sought, among other things, authorization and approval of the Cash Flow DIP Facility from the Cash Flow DIP Lender (including any permitted assignee or successor), with up to $22 million in new money borrowing capacity.  The Debtors entered these Chapter 11 Cases with minimal cash on hand, and thus access to the Cash Flow DIP Facility and the use of cash collateral was critical to ensure the Debtors' smooth entry into chapter 11.  The Cash Flow DIP Facility was market tested and evaluated by the Debtors and their professionals, and includes the roll-up of certain obligations under the Prepetition Bridge Loans. On July 1, 2022, the Bankruptcy Court entered the Interim Cash Flow DIP Order and on August 4, 2022, the Bankruptcy Court entered the Final Cash Flow DIP Order.

5.3    Debtors' Retention of Professionals and Personnel.

The Debtors filed applications or motions, as applicable, to employ certain professionals, including (i) Dentons US, LLP and Pachulski Stang Ziehl & Jones LLP as bankruptcy co-counsel in the Chapter 11 Cases (approved by the Bankruptcy Court pursuant to orders entered on August 2, 2022 [Docket Nos. 267 and 277]; and (ii) FTI Consulting, Inc., a restructuring advisory firm, to provide Tanya Meerovich as the Debtors' Chief Restructuring Officer and additional personnel as of the Petition Date (approved by the Bankruptcy Court pursuant to an order entered on August 10, 2022 [Docket No. 311]).

5.4    Formation of the Committee; Retention of Professionals.

On or about July 14, 2022, the U.S. Trustee formed the Committee, comprised of (i) South Street Securities, (ii) Daiwa Capital Markets America Inc., (iii) Maxwell Lending Solutions, Inc., (iv) Sourcepoint, Inc., and (v) Lori Buckley, as WARN Act plaintiff [Docket No. 132].  The Committee proposes Thompson Coburn Hahn & to retain Hessen LLP as bankruptcy counsel and Blank Rome LLP as Delaware counsel to the Committee, Berkeley Research Group, LLC as its financial advisor

-30-

5.5     Debtors' Schedules and Statement of Financial Affairs.

Upon the Debtors' motion, pursuant to an order entered on July 28, 2022 [Docket No. 227], the Bankruptcy Court extended the Debtors' time to file the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs until August 29, 2022.  On August 29, 2022, the Debtors filed their respective Schedules and Statements of Financial Affairs [Docket Nos. 365, 366].

5.6     Claims Bar Dates.

Upon the Debtors' motion [Docket No. 324], on August 31, 2022, the Bankruptcy Court entered an order [Docket No. 382] setting October 14, 2022 as the general claims bar date for the filing of proofs of claim; December 27, 2022 as the claims bar date for governmental units; and October 14, 2022 as the bar date for administrative claims arising on or prior to September 30, 2022.

5.7     KEIP and KERP Motion.  On July 20, 2022, the Debtors filed the *Motion of Debtors for Entry of Order (I) Approving Key Employee Incentive Program, (II) Key Retention Employee Program and (III) Granting Related Relief* [Docket No. 163 (redacted)], under seal, seeking approval of the Debtors' proposed key employee incentive plan (covering six members of the Debtors' senior leadership team) and retention plan (for certain non-insider employees).  The Committee objected to the Debtors' motion [Docket No. 248].  The Bankruptcy Court entered an order approving the KERP on the terms set forth therein [Docket No. 290].  The Bankruptcy Court separately entered an order approving the KEIP on the terms set forth therein [Docket No. 322].

5.8     Ordinary Course Professionals.  On July 14, 2022, the Debtors filed a motion [Docket No. 135] seeking entry of an order establishing the orderly and regular process for: (i) the retention of professionals including accountants, attorneys and other professionals on an "as needed" basis without the submission of separate, formal retention applications; and (ii) for the allowance and payment of compensation and reimbursement of expenses for such ordinary course professionals.  On August 2, 2022, the Bankruptcy Court entered the Ordinary Course Professionals Order [Docket No. 281].

5.9     Section 559 and Stay Relief Motions.  On July 21, 2022, Customers Bank filed a *Motion Seeking Confirmation of Applicability of 11 U.S.C. § 559 or, in the Alternative, Granting Relief from the Automatic Stay and Related Relief* [Docket No. 184].  On August 2, 2022, the Bankruptcy Court entered the *Order Confirming Applicability of 11 U.S.C. § 559 and, in the Alternative, Granting Relief from the Automatic Stay and Related Relief* [Docket. No. 271].  On August 5, 2022, Flagstar Bank filed the *Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [Docket No. 298].  On August 11, 2022, the Bankruptcy Court entered the *Order Granting Flagstar Bank, FSB's Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [Docket No. 317].  The Debtors did not oppose either motion, but the entered orders reflected language negotiated by the Debtors.     5.10:  BSI Sale Motion.  On August 15, 2022, the Debtors filed *the Debtors' Motion for Entry of Order (I) Authorizing (A) Private Sale and (B) Transfer of Certain Servicing Rights and Obligations to BSI Financial Services Free and Clear of Liens, Claims, Encumbrances, and Interests; (II) Approving the Terms of the Purchase and Sale Agreement: (III) Approving the Assumption and Assignment of Certain Executory*

*Contracts; and (IV) Granting Related Relief* [Docket No. 328] (the "BSI Sale Motion"). Fannie Mae filed a limited objection and reservation of rights with respect to the BSI Sale Motion [Docket No. 370]. Customers Bank filed a limited opposition and reservation of rights with respect to the BSI Sale Motion [Docket No. 372]. Freddie Mac filed a limited objection and reservation of rights with respect to the BSI Sale Motion [Docket No. 374]. Thereafter, the Debtors filed a certification of counsel with respect to the BSI Sale Motion, attaching a revised form of order reflecting terms resolving the issues raised by Fannie Mae, Customers Bank, and Freddie Mac in their respective pleadings [Docket No. 389]. On September 1, 2022, the Bankruptcy Court entered an Order approving the BSI Sale Motion on such terms [Docket No. 390].

5.11.  Freddie Mac Settlement Motion.  On August 17, 2022, the Debtors filed the *Debtors' Motion for an Order (I) Approving a Settlement Agreement with the Federal Home Loan Mortgage Corporation Pursuant to Fed. R. Bankr. P. 9019, (II) Authorizing the Sale of Certain Mortgage Loans, and (III) Granting Related Relief* [Docket No. 341] (the "Freddie Mac Settlement Motion"). Separately, on August 17, 2022, the Debtors filed the Debtors' Motion for Entry of Order Approving Stipulation Between Debtors and Freddie Mac for the Provision of Adequate Protection and Adequate Assurances Relating to the Servicing of Freddie Mac's Loans [Docket No. 343] (the "Freddie Mac Stipulation Motion"). The Committee filed a reservation of rights with respect to the Freddie Mac Settlement Motion and the Freddie Mac Stipulation Motion [Docket No. 377]. On August 31, 2022, the Bankruptcy Court entered Orders approving the Freddie Mac Settlement Motion [Docket No. 386] and the Freddie Mac Stipulation Motion [Docket No. 387].

5.12.  Fannie Mae Settlement Motion.  On September 1, 2022, the Debtors filed the Debtors' Motion for an Order (I) Approving a Settlement Agreement with the Federal National Mortgage Association Pursuant to Fed. R. Bankr. P. 9019, (II) Authorizing the Sale of Certain Mortgage Loans, and (III) Granting Related Relief [Docket No. 394] (the "Fannie Mae Settlement Motion"). Separately, on September 1, 2022, the Debtors filed the Debtors' Motion for Entry of Order Approving Stipulation Between Debtors and Fannie Mae for the Provision of Adequate Protection and Adequate Assurances Relating to the Servicing of Fannie Mae's Loans [Docket No. 393] (the "Fannie Mae Stipulation Motion"). To date, no objections to either the Fannie Mae Settlement Motion or the Fannie Mae Stipulation Motion have been filed. The Bankruptcy Court will convene a hearing to consider the Fannie Mae Settlement Motion and the Fannie Mae Stipulation Motion on September 8, 2022 at 10:00 a.m. (ET) [Docket No. 396]. The deadline to submit an objection to the Fannie Mae Settlement Motion and/or the Fannie Mae Stipulation Motion is at such hearing [Docket No. 396].

5.13  Stipulations. The Debtors have filed multiple motions for approval of settlements or stipulations with Freddie Mac. These matters remain pending before the Bankruptcy Court.
**CONFIRMATION AND VOTING PROCEDURES**

6.1  Confirmation Hearing.

On [•], 2022, the Bankruptcy Court entered the Conditional Approval and Procedures Order. The Confirmation Hearing has been scheduled for **[•], 2022, at [•] (prevailing Eastern Time)** to consider (a) final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the

Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

6.2    Procedures for Objections.

Any objection to final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Combined Plan and Disclosure Statement must be made in writing and filed with the Bankruptcy Court by no later than **[•], 2022, at 4:00 p.m. (prevailing Eastern Time)** and be served in accordance with the local rules of the Bankruptcy Court on the following parties: (i) the Debtors c/o FTI Consulting, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036, Attn: Tanya Meerovich (tanya.meerovich@fticonsulting.com); (ii) counsel for the Debtors, (1) Dentons US LLP, 601 S. Figueroa St., Suite 2500, Los Angeles, CA 90018, Attn: Samuel R. Maizel (samuel.maizel@dentons.com) and Tania Moyron (tania.moyron@dentons.com), and (2) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899-8705 (Courier 19801), Attn: Laura Davis Jones (ljones@pszjlaw.com); (iii) counsel for the Official Committee of Unsecured Creditors, (1) Thompson Coburn Hahn & Hessen LLP, 488 Madison Ave., New York, NY 10022, Attn: Mark S. Indelicato (mindelicato@thompsoncoburn.com) and Mark T. Power (mpower@thompsoncoburn.com), and (2) Bank Rome LLP, 1201 Market Street, Suite 800, Wilmington, DE 19801, Attn: Regina Stango Kelbon (regina.kelbon@blankrome.com), Victoria A. Guilfoyle (tori.guilfoyle@blankrome.com), and Lawrence R. Thomas III (lorenzo.thomas@blankrome.com); and (iv) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Benjamin Hackman (benjamin.a.hackman@usdoj.gov). **Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.**

6.3    Requirements for Confirmation.

The Bankruptcy Court will confirm the Combined Plan and Disclosure Statement only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among the requirements for confirmation in the Chapter 11 Cases is that the Combined Plan and Disclosure Statement be: (i) accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Combined Plan and Disclosure Statement "does not discriminate unfairly" against, and is "fair and equitable" with respect to, such Class; and (ii) feasible. The Bankruptcy Court must also find that:

    a.    the Combined Plan and Disclosure Statement has classified Claims and Interests in a permissible manner;

    b.    the Combined Plan and Disclosure Statement complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

    c.    the Combined Plan and Disclosure Statement has been proposed in good faith.

The Debtors believe that the Combined Plan and Disclosure Statement complies, or will comply, with all such requirements.

6.4    Classification of Claims and Interests.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Combined Plan and Disclosure Statement divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).

Section 1122 of the Bankruptcy Code requires the Combined Plan and Disclosure Statement to place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such class. The Combined Plan and Disclosure Statement creates separate Classes to deal respectively with Priority Non-Tax Claims, various Secured Claims, General Unsecured Claims, and Interests. The Debtors believe that the Combined Plan and Disclosure Statement's classifications place substantially similar Claims or Interests in the same Class and, thus, meet the requirements of section 1122 of the Bankruptcy Code.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Combined Plan and Disclosure Statement complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Combined Plan and Disclosure Statement if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Combined Plan and Disclosure Statement.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Combined Plan and Disclosure Statement only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Combined Plan and Disclosure Statement has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Combined Plan and Disclosure Statement to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Combined Plan and Disclosure Statement, to make such permissible modifications to the Combined Plan and Disclosure Statement as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Combined Plan and Disclosure Statement.

Case 22-10584-CTG    Doc 405    Filed 09/06/22    Page 45 of 90

**EXCEPT AS SET FORTH IN THE COMBINED PLAN AND DISCLOSURE STATEMENT, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE COMBINED PLAN AND DISCLOSURE STATEMENT'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Combined Plan and Disclosure Statement to holders of Allowed Claims reflects an appropriate resolution of their Allowed Claims taking into account the differing nature and priority of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Combined Plan and Disclosure Statement. Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Combined Plan and Disclosure Statement, or do not vote to accept the Combined Plan and Disclosure Statement, but who will be bound by the provisions of the Combined Plan and Disclosure Statement if it is confirmed by the Bankruptcy Court.

6.5    Impaired Claims or Interests.

Pursuant to section 1126 of the Bankruptcy Code, only the holders of Claims in Classes Impaired by the Combined Plan and Disclosure Statement and receiving a payment or Distribution under the Combined Plan and Disclosure Statement may vote to accept or reject the Combined Plan and Disclosure Statement. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be Impaired if the Combined Plan and Disclosure Statement alters the legal, equitable, or contractual rights of the holders of such Claims or Interests treated in such Class. The holders of Claims not Impaired by the Combined Plan and Disclosure Statement are deemed to accept the Combined Plan and Disclosure Statement and do not have the right to vote on the Combined Plan and Disclosure Statement. The holders of Claims or Interests in any Class which will not receive any payment or Distribution or retain any property pursuant to the Combined Plan and Disclosure Statement are deemed to reject the Combined Plan and Disclosure Statement and do not have the right to vote. Finally, the holders of Claims or Interests whose Claims or Interests are not classified

-35-

under the Combined Plan and Disclosure Statement are not entitled to vote on the Combined Plan and Disclosure Statement.

Under the Combined Plan and Disclosure Statement, holders of Claims in the Voting Classes -- Class 3 (Secured Prepetition Facility Claims), Class 4 (Loan Settlement Claims), Class 5 (Prepetition Customers Bank Guaranty Claim) and Class 6 (General Unsecured Claims) -- are Impaired and are entitled to vote to accept or reject the Combined Plan and Disclosure Statement. Holders of Claims in Class 1 (Priority Non-Tax Claims) and Class 2 (Other Secured Claims) are Unimpaired and, therefore, not entitled to vote on the Combined Plan and Disclosure Statement and are deemed to accept the Combined Plan and Disclosure Statement. Holders of Interests in Class 7 are Impaired and will not receive any payment or Distribution or retain any property pursuant to the Combined Plan and Disclosure Statement and, therefore, are deemed to reject the Combined Plan and Disclosure Statement and do not have the right to vote.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN THE VOTING CLASSES.**

6.6    Confirmation Without Necessary Acceptances; Cramdown.

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because holders of Interests in Class 7 are deemed to reject the Combined Plan and Disclosure Statement, the Debtors will seek confirmation of the Combined Plan and Disclosure Statement from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in the Impaired Classes is entitled to receive any property under the Combined Plan and Disclosure Statement.

The concept of "unfair discrimination" is not defined in the Bankruptcy Code, but case law suggests it exists when a difference in a plan's treatment of two classes of equal priority results in a materially lower percentage recovery for the non-accepting class. The Debtors do not believe that the Plan unfairly discriminates against any Class of Claims.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

a.    Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its

allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

b.    Unsecured Creditors.  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

c.    Interests.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Combined Plan and Disclosure Statement satisfy the absolute priority rule, where required.

6.7    Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Combined Plan and Disclosure Statement).  Based on the Debtors' analysis, the Liquidating Trustee will have sufficient assets to accomplish its tasks under the Combined Plan and Disclosure Statement.  Therefore, the Debtors believe that the liquidation pursuant to the Combined Plan and Disclosure Statement will meet the feasibility requirements of the Bankruptcy Code.

6.8    Best Interests Test and Liquidation Analysis.

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the

costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

The Debtors, with the assistance of their advisors, have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by holders of Claims if the Chapter 11 Cases were converted to cases under chapter 7 (the "Liquidation Analysis"), which is attached hereto as **Exhibit A**.

Based upon the Debtors' current projections, holders of Allowed Administrative Claims, Priority Claims and Other Secured Claims will be paid in full under the Plan, while holders of Allowed General Unsecured Claims will receive a projected distribution to be determined based on various assumptions. *See* **Exhibit A** (Liquidation Analysis Supplement) attached hereto.

Based upon **Exhibit A** (Liquidation Analysis Supplement) attached hereto, the Debtors believe that creditors will receive at least as much or more under the Plan than they would receive if the Chapter 11 Cases were converted to Chapter 7 cases.

6.9    Eligibility to Vote on the Combined Plan and Disclosure Statement.

Unless otherwise ordered by the Bankruptcy Court, only holders of Allowed Claims in the Voting Classes may vote on the Combined Plan and Disclosure Statement. Further, subject to the tabulation procedures that were approved by the Conditional Approval and Procedures Order, in order to vote on the Combined Plan and Disclosure Statement, you must hold an Allowed Claim in the Voting Classes, or be the holder of a Claim that has been temporarily Allowed for voting purposes only pursuant to the approved tabulation procedures or under Bankruptcy Rule 3018(a).

6.10    Solicitation Package / Release Opt-Out Election Form.

All holders of Allowed Claims in the Voting Classes will receive a solicitation package (the "Solicitation Package"). The Solicitation Packages will contain: (i) the Combined Plan and Disclosure Statement; (ii) the Conditional Approval and Procedures Order; (iii) notice of the Confirmation Hearing; (iv) a form of Ballot, including voting instructions and a pre-addressed return envelope; (v) a Release Opt-Out Election Form; and (vi) such other materials as the Bankruptcy Court may direct or approve or that the Debtors deem appropriate.

All other Creditors and parties in interest not entitled to vote on the Combined Plan and Disclosure Statement will receive only a copy of the notice of Confirmation Hearing and a Release Opt-Out Election Form.

Copies of the Combined Plan and Disclosure Statement shall be available on the Claims and Balloting Agent's website at https://www.kccllc.net/fgmc. Any creditor or party-in-interest can request a hard copy of the Combined Plan and Disclosure Statement be sent to them by regular mail by calling the Claims and Balloting Agent at (888) 647-1742 (U.S. & Canada) during regular business hours.

**IN ADDITION TO OTHER PARTIES WHO WILL BE CONSIDERED RELEASING PARTIES, ANY HOLDER OF A CLAIM OR INTEREST THAT DOES NOT AFFIRMATIVELY OPT-OUT OF THE THIRD PARTY RELEASE CONTAINED IN SECTION 16 HEREOF BY TIMELY AND PROPERLY COMPLETING AND RETURNING A RELEASE OPT-OUT ELECTION FORM WILL BE CONSIDERED A RELEASING PARTY IN RELATION TO THE THIRD PARTY RELEASE UNDER THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

6.11    <u>Voting Procedures, Voting Deadline, and Deadline to Submit the Release Opt-Out Election</u>.

The Voting Record Date for determining which holders of Claims in the Voting Classes may vote on the Combined Plan and Disclosure Statement is [•], 2022.

In order for your Ballot to count, you must (1) complete, date, and properly execute the Ballot and (2) properly deliver the Ballot to the Claims and Balloting Agent by either (a) mailing the Ballot to the Claims and Balloting Agent at the following address: FGMC Ballot Processing c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; and/or (b) uploading the Ballot on the Claims and Balloting Agent's online balloting platform at https://www.kccllc.net/fgmc. Instructions for casting a Ballot will be available on the Claims and Balloting Agent's website.

Ballots must be submitted electronically, or the Claims and Balloting Agent must actually receive physical, original Ballots by mail or overnight delivery, on or before the Voting Deadline, which is **[•], 2022 at 4:00 p.m. (prevailing Eastern Time)**. Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, you may not change your vote once a Ballot is submitted electronically or the Claims and Balloting Agent receives your original paper Ballot. Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, any Ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Combined Plan and Disclosure Statement.

In order to be effective, Release Opt-Out Election Form for holders of Claims or Interests entitled to opt out of being a Releasing Party in connection with the Third Party Release contained in Section 16.2(b) must be received by the Claims and Balloting Agent by the Voting Deadline. Each Release Opt-Out Election Form must be properly delivered to the Claims and Balloting Agent by either (a) mailing the Release Opt-Out Election Form to the Claims and Balloting Agent at the following address: FGMC Ballot Processing c/o KCC, N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (b) uploading the Release Opt-Out Election Form on the Claims and Balloting Agent's online opt-out portal at https://www.kccllc.net/fgmc.

**IF YOU ARE ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL OR UPLOAD THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT AND YOU DID NOT RECEIVE A BALLOT, YOU**

**RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT OR PROCEDURES FOR VOTING ON THE COMBINED PLAN AND DISCLOSURE STATEMENT, PLEASE CONTACT THE CLAIMS AND BALLOTING AGENT BY (I) TELEPHONE AT (888) 647-174 (U.S./CANADA) OR (II) EMAIL AT FGMCinfo@kccllc.com.    THE CLAIMS AND BALLOTING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

      6.12    <u>Acceptance of the Combined Plan and Disclosure Statement</u>.

If you are a holder of a Claim in one of the Voting Classes, your acceptance of the Combined Plan and Disclosure Statement is important. In order for the Combined Plan and Disclosure Statement to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Combined Plan and Disclosure Statement. At least one Impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Combined Plan and Disclosure Statement. The Debtors urge that you vote to accept the Combined Plan and Disclosure Statement.

**SECTION 7**
**CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER DISCLOSURES**

      7.1    <u>Certain Risk Factors to be Considered</u>.

THE COMBINED PLAN AND DISCLOSURE STATEMENT AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT AND ITS IMPLEMENTATION.

      (a)    <u>The Combined Plan and Disclosure Statement May Not Be Accepted</u>.

The Debtors can make no assurances that the requisite acceptances of the Combined Plan and Disclosure Statement will be received, and the Debtors may need to obtain acceptances of an alternative plan for the Debtors, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any alternative arrangement or plan would be similar to or as favorable to creditors as those proposed in the Combined Plan and Disclosure Statement.

(b)      The Combined Plan and Disclosure Statement May Not Be Confirmed.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Combined Plan and Disclosure Statement.  Even if the Bankruptcy Court determined that the Combined Plan and Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Combined Plan and Disclosure Statement if it finds that any of the statutory requirements for confirmation had not been met.  As is described in greater detail in Section 6.3, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan.  While, as more fully set forth Section 6, the Debtors believe that the Combined Plan and Disclosure Statement complies with or will comply with all such requirements, there can be no guarantee that the Bankruptcy Court will agree.

Moreover, there can be no assurance that modifications to the Combined Plan and Disclosure Statement will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.  If the Combined Plan and Disclosure Statement is not confirmed, it is unclear what distributions holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of liquidation.  If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case it is likely that the holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Combined Plan and Disclosure Statement.

(c)      Distributions to Holders of Allowed Claims Under the Combined Plan and Disclosure Statement May be Inconsistent with Projections.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution.  There can be no assurance that the estimated Claim amounts set forth in the Combined Plan and Disclosure Statement are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

(d)      Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  As is described in greater detail in Section 6.4, the Debtors believe that the classification of Claims and Interests under the Combined Plan and Disclosure Statement complies with the requirements set forth in the Bankruptcy Code.  Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion.

To the extent that the Bankruptcy Court finds that a different classification is required for the Combined Plan and Disclosure Statement to be confirmed, the Debtors would seek to (i) modify the Combined Plan and Disclosure Statement to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Combined Plan and Disclosure Statement, by changing the composition of such Class and the vote required for approval of the Combined Plan and Disclosure Statement. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Combined Plan and Disclosure Statement based upon such reclassification. Except to the extent that modification of classification in the Combined Plan and Disclosure Statement requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Combined Plan and Disclosure Statement by any holder of Claims pursuant to this solicitation will constitute a consent to the Combined Plan and Disclosure Statement's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Combined Plan and Disclosure Statement only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Combined Plan and Disclosure Statement provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Combined Plan and Disclosure Statement complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Combined Plan and Disclosure Statement does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Combined Plan and Disclosure Statement. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Combined Plan and Disclosure Statement and could increase the risk that the Combined Plan and Disclosure Statement will not be consummated.

(e)      Failure to Consummate the Combined Plan and Disclosure Statement.

Although the Debtors believe that the Effective Date will occur and may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

(f)      The Releases May Not Be Approved.

There can be no assurance that the releases, as provided in Sections 16.2 and 16.3, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan that differs from the Combined Plan and Disclosure Statement or the Plan not being confirmed.

(g)      Reductions to Estimated Creditor Recoveries.

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of distributions to creditors in such Class to be reduced substantially. The amount of cash realized from the monetization of the Debtors' remaining assets could be less than anticipated, which could cause the amount of distributions to creditors to be reduced substantially.

7.2    Certain U.S. Federal Income Tax Consequences.

The following discussion is a summary of certain material U.S. federal income tax consequences of the Combined Plan and Disclosure Statement to the Debtors and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of Claims. The following summary does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote on the Combined Plan and Disclosure Statement. This summary is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Combined Plan and Disclosure Statement and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders of Claims in light of their individual circumstances, nor does the discussion deal with tax issues with respect to holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies; banks or other financial institutions; brokers, dealers, or traders in securities; real estate investment trusts; governmental authorities or agencies; tax-exempt organizations; retirement plans; individual retirement or other tax-deferred accounts; certain expatriates or former long-term residents of the United States; small business investment companies; regulated investment companies; S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes and their owners; persons whose functional currency is not the U.S. dollar; persons who use a mark-to-market method of accounting; persons required to report income on an applicable financial statement; persons holding Claims or Interests as part of a straddle, hedge, constructive sale, conversion transaction, or other integrated transaction; and persons who are not U.S. holders (as defined below)). Furthermore, this discussion assumes that a holder of a Claim holds such claim as a "capital asset" within the meaning of Section 1221 of the Internal Revenue Code (generally property held for investment). This discussion does not address any U.S. federal non-income (including estate or gift), state, local, or foreign taxation, alternative minimum tax, or the Medicare tax on certain net investment income.

If a partnership (or other entity or arrangement classified as a partnership for U.S. federal income tax purposes) is a holder of Claims or Interests, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership. A holder of a Claim or Interest that is a partnership and the partners in such

partnership should consult their tax advisors with regard to the U.S. federal income tax consequences of the Combined Plan and Disclosure Statement.

**THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

(a)    Tax Consequences for U.S. Holders of Certain Claims.

Generally, a holder of a Claim should in most, but not all, circumstances recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its Claim and such holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a holder's Claim. The tax basis of a holder in a Claim will generally be equal to the holder's cost therefor. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim for more than one year.

A creditor who receives Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such creditor realizes an overall gain or loss as a result of surrendering its Claim. A creditor who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such creditor realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

Under the Plan, the holders of certain Claims, including General Unsecured Claims in Class 6, will likely receive only a partial distribution of their Allowed Claims. Whether the applicable holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the holder and its Claims. Creditors should consult their own tax advisors.

(b)    Tax Consequences in Relation to Liquidating Trust.

As of the Effective Date, the Liquidating Trust will be established for the benefit of the holders of certain Allowed Claims. The tax consequences of the Plan in relation to the Liquidating Trust and the Beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law.

Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to the Liquidating Trust's claims reserves) among holders of Claims will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its assets (valued at their tax book value) to the holders of the beneficial interests in the Liquidating Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining trust assets.

The tax book value of the trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Uncertainties with regard to federal income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee may (a) elect to treat any trust assets allocable to, or retained on account of, Disputed Claims (the "Trust Claims Reserve") as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Trust Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the trust assets in such reserves, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtor. All parties (including, without limitation, the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) will be required to report for tax purposes consistently with the foregoing.

The Liquidating Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994.28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan and Liquidating Trust Agreement, and in conformity with Revenue Procedure 94-45, *supra*, all parties (including the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) are required to treat for federal income tax purposes, the Liquidating Trust as a grantor trust of which the holders of the applicable Allowed Claims are the owners and grantors. While the

following discussion assumes that the Liquidating Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust.  If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and the Beneficiaries thereof could materially vary from those discussed herein.

In general, each creditor who is a Beneficiary of the Liquidating Trust will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Beneficiary in satisfaction of its applicable Allowed Claim, and (ii) such Beneficiary's adjusted tax basis in such Claim.  The "amount realized" by a Beneficiary will equal the sum of cash and the aggregate fair market value of the property received by such party pursuant to the Plan (such as a Beneficiary's undivided beneficial interest in the assets transferred to the Liquidating Trust).  Where gain or loss is recognized by a Beneficiary in respect of its Allowed Claim, the character of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the party, whether the Claim constituted a capital asset in the hands of the party and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the party had previously claimed a bad debt deduction in respect of the Claim.

After the Effective Date, any amount that a creditor receives as a distribution from the Liquidating Trust in respect of its beneficial interest in the Liquidating Trust should not be included, for federal income tax purposes, in the party's amount realized in respect of its Allowed Claim, but should be separately treated as a distribution received in respect of such party's beneficial interest in the Liquidating Trust.

In general, a Beneficiary's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Liquidating Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the Beneficiary's holding period in such assets will begin the day following the Effective Date.  Distributions to any Beneficiary will be allocated first to the original principal portion of the Beneficiary's Allowed Claim as determined for federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim.  However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

For all federal income tax purposes, all parties (including the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) will treat the transfer of assets to the Liquidating Trust, in accordance with the terms of the Plan and Liquidating Trust Agreement, as a transfer of those assets directly to the holders of the applicable Allowed Claims followed by the transfer of such assets by such holders to the Liquidating Trust.  Consistent therewith, all parties will treat the Liquidating Trust as a grantor trust of which such holders are to be owners and grantors.  Thus, such holders (and any subsequent holders of interests in the Liquidating Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Liquidating Trust for all federal income tax purposes.  Accordingly, each holder of a beneficial interest in the Liquidating Trust will be required to report on its federal income tax return(s) the holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust.

The Liquidating Trust's taxable income will be allocated to the holders of beneficial interests in the Liquidating Trust in accordance with each such holder's pro rata share. The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The federal income tax reporting obligation of a holder of a beneficial interest in the Liquidating Trust is not dependent upon the Liquidating Trust distributing any cash or other proceeds. Therefore, a holder of a beneficial interest in the Liquidating Trust may incur a federal income tax liability regardless of the fact that the Liquidating Trust has not made, or will not make, any concurrent or subsequent distributions to the holder. If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the Liquidating Trust it holds, the holder may be allowed a subsequent or offsetting loss.

The Liquidating Trustee will file with the IRS returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Liquidating Trust will also send to each holder of a beneficial interest in the Liquidating Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Plan and the transactions contemplated thereunder.

(c)      Information Reporting and Withholding.

In connection with the Combined Plan and Disclosure Statement, the Debtors will comply with all applicable withholding and information reporting requirements imposed by U.S. federal, state, local, and foreign taxing authorities, and all Distributions under the Combined Plan and Disclosure Statement will be subject to those withholding and information reporting requirements. Holders of Claims may be required to provide certain tax information as a condition to receiving Distributions pursuant to the Combined Plan and Disclosure Statement.

In general, information reporting requirements may apply to Distributions pursuant to the Combined Plan and Disclosure Statement. Additionally, under the backup withholding rules, a holder may be subject to backup withholding with respect to Distributions made pursuant to the Combined Plan and Disclosure Statement, unless a U.S. holder provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establish an exemption from backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against a U.S. holder's U.S. federal income tax liability, if any, hand may entitle a U.S. holder to a refund, provided the required information is timely furnished to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions,

certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Combined Plan and Disclosure Statement would be subject to these regulations and require disclosure on the holder's tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE COMPLEX.   THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

      7.3      Releases, Exculpations, and Injunctions.

This Combined Plan and Disclosure Statement contains certain releases, exculpations, and injunction language.   Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Plan will affect any Claim, interest, right, or action with regard to the Debtor and certain third parties.

**THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

      7.4      Alternatives to the Combined Plan and Disclosure Statement.

If the requisite acceptances are not received or the Combined Plan and Disclosure Statement is not confirmed and consummated, the theoretical alternatives to the Combined Plan and Disclosure Statement would be (a) formulation of an alternative chapter 11 plan, (b) conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (c) dismissal of the Chapter 11 Cases.  As discussed below, the Debtors do not believe that any of these alternatives, even if viable, would afford holders of Claims or Interests a greater recovery than what is provided by the Combined Plan and Disclosure Statement.

If the Combined Plan and Disclosure Statement is not confirmed, then the Debtors or any other party in interest could attempt to formulate a different plan.  The additional costs, including, among other amounts, additional professional fees, all of which would constitute Administrative Claims (subject to allowance thereof), however, may be so significant that one or more parties in interest could request that the Chapter 11 Cases be converted to chapter 7.  At this time, the Debtors do not believe that there are viable alternative plans available to the Debtors.

If the Combined Plan and Disclosure Statement is not confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate and distribute the Debtors' remaining assets in accordance with the priorities established by the Bankruptcy Code.  As discussed above and

indicated in the Liquidation Analysis, the Debtors believe that the Combined Plan and Disclosure Statement provides a better outcome for holders of Claims than a chapter 7 liquidation would provide.

If the Combined Plan and Disclosure Statement is not confirmed, the Chapter 11 Cases also could be dismissed. Among other effects, dismissal would result in the termination of the automatic stay, thus permitting creditors to assert state-law rights and remedies against the Debtors and their assets, likely to the detriment of other creditors. While it is impossible to predict precisely what would happen in the event the Chapter 11 Cases are dismissed, it is unlikely that dismissal would result in a ratable distribution of the Debtors' assets among creditors as provided in the Combined Plan and Disclosure Statement. Thus, the vast majority of creditors could expect to receive less in the dismissal scenario than they would receive under the Combined Plan and Disclosure Statement.

## SECTION 8
## UNCLASSIFIED CLAIMS

8.1    <u>Unclassified Claims</u>.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Loan Claims, and Priority Tax Claims have not been classified for purposes of voting or receiving Distributions. Rather, all such Claims are treated separately as unclassified Claims as set forth in this Section, and the holders thereof are not entitled to vote on the Combined Plan and Disclosure Statement.

8.2    <u>Administrative Claims</u>.

(a)    Except to the extent that a holder of an Allowed Administrative Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive from Available Cash, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the holder of such Claim and the Debtors or the Liquidating Trustee, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law.

(b)    Holders of Administrative Claims (including, without limitation, Professionals requesting compensation or reimbursement of such expenses pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code) that do not file such requests by the applicable deadline provided for herein may be subject to objection for untimeliness and may be prohibited by order of the Bankruptcy Court from asserting such claims against the Debtors, the Estates, the Liquidating Trust, or their successors or assigns, or their property. Any objection to

Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

(c)     All fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date.

8.3    Professional Fees.

(a)     Professionals requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code or required to file fee applications by order of the Bankruptcy Court for services rendered prior to the Effective Date must file and serve pursuant to the notice provisions of the Interim Fee Order, an application for final allowance of compensation and reimbursement of expenses no later than forty five (45) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court. For avoidance of doubt, the Liquidating Trustee is not authorized under the Plan to object to applications for final allowance of compensation and reimbursement of expenses.

(b)     On the Effective Date, or as soon as practicable thereafter, the Liquidating Trustee shall establish an appropriate Professional Fee Reserve based upon estimates of anticipated fees provided by Professionals for services rendered and expenses incurred prior to the Effective Date, including estimated fees for services rendered, and actual and necessary costs incurred, in connection with the filing, service and prosecution of any applications for allowance of Professional Fees pending on the Effective Date or filed and/or served after the Effective Date. The Liquidating Trustee shall supplement the Professional Fee Reserve if the amount originally established is insufficient to pay Allowed Professional Fee Claims.

(c)     Upon approval of the fee applications by the Bankruptcy Court, the Liquidating Trustee shall pay Professionals from the Professional Fee Reserve all of their respective Allowed Professional Fee Claims.

8.4    DIP Loan Claims.

(a)     DIP Repo Claims.

On or before the Effective Date, unless otherwise agreed by the Debtors and the DIP Repo Parties, the holders of the DIP Repo Claims shall be paid in full, in Cash: (a) through sales of purchased loans, and (b) by the DIP Repo Guarantor purchasing the DIP Repo Facility Purchasers' interests in purchased loans pursuant to the terms of the DIP Repo Guarantee.

(b)     Cash Flow DIP Claims.

On or before the Effective Date, the Cash Flow DIP Lender is entitled to payment in full, in Cash provided that, subject to the terms of the Committee Settlement, the Cash Flow DIP Lender and, if applicable, the DIP Repo Guarantor, shall receive 100% of the net proceeds recovered by the Liquidating Trust, until the Cash Flow DIP Claims and the DIP Repo Guarantee Claims (if any), have been paid in full, in Cash.

8.5     Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall be paid the full unpaid amount of such Allowed Priority Tax Claim as follows: (a) Cash equal to the unpaid portion of the Allowed Priority Tax Claim on the later of the Effective Date or thirty (30) days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (b) such other treatment as to which the holder of an Allowed Priority Tax Claim and the Debtors shall have agreed upon in writing.

## SECTION 9
## CLASSIFICATION OF CLAIMS AND INTERESTS

9.1     Summary of Classification.

The provisions of this Section 9 govern Claims against and Interests in the Debtors.  Any Class that is vacant will be treated in accordance with Section 9.3.

The following table designates the Classes of Claims against, and Interests in, the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Combined Plan and Disclosure Statement in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Combined Plan and Disclosure Statement.  A Claim or portion thereof is classified in a particular Class only to the extent that such Claim or portion thereof qualifies within the description of such Class and is classified in a different Class to the extent that the portion of such Claim qualifies within the description of such different Class.

| Class | Designation | | Treatment | Entitled to Vote |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | | Unimpaired | No (presumed to accept) |
| 3 | Secured Prepetition Facility Claims | | | |
| | A. | Prepetition J.V.B. Repo Facility Secured Claims | Impaired | Yes |
| | B. | Prepetition TCB Repo Facility Secured Claims | Impaired | Yes |
| | C. | Prepetition Customers Repo Facility Secured Claims | Impaired | Yes |
| | D. | Prepetition Flagstar Warehouse Facility Secured Claims | Impaired | Yes |

| Class | Designation | Treatment | Entitled to Vote |
|:---:|---|:---:|:---:|
| | E.    Prepetition Customers Loan Obligation Claims | Impaired | Yes |
| 4 | Loan Settlement Claims | Impaired | Yes |
| 5 | Prepetition LVS II Offshore Guaranty Claims | Impaired | Yes |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Interests | Impaired | No (presumed to reject) |

9.2     Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Combined Plan and Disclosure Statement, nothing under the Combined Plan and Disclosure Statement shall affect the rights of the Debtors or the Liquidating Trustee, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

9.3     Vacant and Abstaining Classes.

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Combined Plan and Disclosure Statement for purposes of voting to accept or reject the Combined Plan and Disclosure Statement and for purposes of determining acceptance or rejection of the Combined Plan and Disclosure Statement by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## SECTION 10
## TREATMENT OF CLAIMS AND INTERESTS

10.1     Class 1—Priority Non-Tax Claims.

(a)     Classification.  Class 1 consists of all Priority Non-Tax Claims.

(b)     Treatment.  The Debtors or the Liquidating Trustee, as applicable, shall pay the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law).  The Entity holding a Priority Non-Tax Claim will be paid in Cash in full in respect of such Allowed Claim without interest from the Petition Date; provided, however, that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity.

(c)     Impairment and Voting. Class 1 is Unimpaired. Holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

10.2     Class 2—Other Secured Claims.

(a)     Classification. Class 2 consists of Other Secured Claims.

(b)     Classification. Class 2 consists of all Other Secured Claims. For purposes of distributions under the Plan, each holder of an Other Secured Claim in Class 2 is considered to be in its own separate subclass within Class 2 (*i.e.*, Class 2A, Class 2B, *etc.*), and each such subclass is deemed to be a separate Class for purposes of the Plan.

(c)     Treatment. Except to the extent previously paid in full, to the extent any Other Secured Claims exist, at the option of the Debtors or the Liquidating Trustee, as applicable, one of the following treatments shall be provided: (i) the holder of such Claim shall retain its Lien on its collateral until such collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such holder in full satisfaction and release of such Allowed Other Secured Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the holder of such Claim and the Debtors or the Liquidating Trustee, as applicable, the holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim in full satisfaction and release of such Other Secured Claim; or (iii) the collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor, in full satisfaction, release, and discharge of such Other Secured Claim.

(d)     Impairment and Voting. Class 2 is Unimpaired. Holders of Other Secured Claims are conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

10.3     Class 3—Secured Prepetition Facility Claims.

10.3.1  Class 3A—Prepetition J.V.B. Repo Facility Secured Claim.

(a)     Classification. Class 3A consists of the Prepetition J.V.B. Repo Facility Secured Claim.

(b)     Treatment. The holder of the Prepetition J.V.B. Repo Facility Secured Claims shall receive the following treatment on account of such Claim: (i) delivery of the Mortgage Loans and other collateral purchased or securing the Claim or the net proceeds of the liquidation of such mortgage loans and other collateral; or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Prepetition J.V.B. Repo Facility Secured Claim. Provisions regarding the process for transferring or otherwise monetizing the Mortgage Loans underlying the Prepetition J.V.B. Repo Facility Secured Claims and returning to

the Debtors any amounts collected in excess of any repurchase amounts and expenses are set forth below in Section 14.5.

(c)     Impairment and Voting.   Class 3A is Impaired, and the holder thereof is entitled to vote on the Plan.

10.3.2  Class 3B— Prepetition TCB Repo Facility Secured Claim.

(a)     Classification.   Class 3B consists of the Prepetition TCB Repo Facility Secured Claim.

(b)     Treatment.  The holder of the Prepetition TCB Repo Facility Secured Claim shall receive the following treatment on account of such Claim: (i) delivery of the Mortgage Loans and other collateral purchased or securing the Claim or the net proceeds of the liquidation of such mortgage loans and other collateral, or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Prepetition TCB Repo Facility Secured Claim.  Provisions regarding the process for transferring or otherwise monetizing the mortgage loans underlying the Prepetition TCB Repo Facility Secured Claim and returning to the Debtors any amounts collected in excess of any repurchase amounts and expenses are set forth below in Section 14.5.

(c)     Impairment and Voting.   Class 3B is Impaired and the holder thereof is entitled to vote on the Plan.

10.3.3  Class 3C— Prepetition Customers Repo Facility Secured Claim.

(a)     Classification.   Class 3C consists of the Prepetition Customers Repo Facility Secured Claim.

(b)     Treatment.  The holder of the Prepetition Customers Repo Facility Secured Claim shall receive the following treatment on account of such Claim: (i) delivery of the mortgage loans and other collateral purchased or securing the Claim or the net proceeds of the liquidation of such mortgage loans and other collateral, or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Prepetition Customers Repo Facility Secured Claim.  Provisions regarding the process for transferring or otherwise monetizing the mortgage loans underlying the Prepetition Customers Repo Facility Secured Claim and returning to the Debtors any amounts collected in excess of any repurchase amounts and expenses are set forth below in Section 14.5.

(c)     Impairment and Voting.   Class 3C is Impaired and the holder thereof is entitled to vote on the Plan.

10.3.4  Class 3D— Prepetition Flagstar Warehouse Facility Secured Claim

(a)     Classification.   Class 3D consists of the Prepetition Flagstar Warehouse Facility Secured Claim.

(b)    Treatment.  The holder of the Prepetition Flagstar Warehouse Facility Secured Claim shall receive the following treatment on account of such Claim: (i) delivery of the mortgage loans and other collateral purchased or securing the Claim or the net proceeds of the liquidation of such mortgage loans and other collateral, or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Prepetition Flagstar Warehouse Facility Secured Claim.  Provisions regarding the process for transferring or otherwise monetizing the mortgage loans underlying the Prepetition Flagstar Warehouse Facility Secured Claims and returning to the Debtors any amounts collected in excess of the amount of the Allowed Prepetition Flagstar Warehouse Facility Secured Claim are set forth below in Section 14.5.

(c)    Impairment and Voting.  Class 3D is Impaired and the holder thereof is entitled to vote on the Plan.

10.3.5  Class 3E— Prepetition Customers Loan Obligation Secured Claim.

(a)    Classification.  Class 3E consists of the Prepetition Customers Loan Obligation Secured Claim.

(b)    Treatment.  The holder of the Prepetition Customers Loan Obligation Secured Claim shall receive the following treatment on account of such Claim: (i) delivery of the collateral securing the Claim or the net proceeds of the liquidation of such collateral, or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Prepetition Customers Loan Obligation Secured Claim.  Provisions regarding the process for transferring or otherwise monetizing the collateral underlying the Prepetition Customers Loan Obligation Secured Claim are set forth below in Section 14.5.

(c)    Impairment and Voting.  Class 3E is Impaired and the holder thereof is entitled to vote on the Plan.

10.4    Class 4— Loan Settlement Claims.

(a)    Classification.  Class 4 consists of Loan Settlement Claims.  The Loan Settlement Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtors, the Estates, and pursuant to the Plan, the Liquidating Trustee, which subordination claims, rights, and grounds are fully enforceable prior to, on, and after the Effective Date.

(b)    Treatment. Each holder of a Loan Settlement Claim shall (i) receive an Allowed Claim in the amount of the cash in their possession, and (ii) (a) retain an amount of the cash in their possession and (b) turnover to the Debtors any cash beyond such amount in accordance with any settlement agreement reached between such holder and the Debtors and approved by the entry of an Order pursuant to Rule 9019.

(c)    Impairment and Voting.  Class 4 is Impaired, and the holders of Class 4 Claims are entitled to vote on the Plan.

10.5    Class 5—Prepetition LVS II Offshore Guaranty Claim.

(a)    Classification.  Class 5 consists of the Prepetition LVS II Offshore Guaranty Claim.

(b)    Treatment.  The holder of the Prepetition LVS II Offshore Guaranty Claim shall receive a Pro Rata share of the Liquidating Trust Interests in exchange for its Allowed Claims following the payment or reserve for Administrative Claims, DIP Loan Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims, except as otherwise provided by the terms of the Committee Settlement.

(c)    Impairment and Voting.  Class 5 is Impaired, and the holder thereof is entitled to vote on the Plan.

10.6    Class 6—General Unsecured Claims.

(a)    Classification.  Class 6 consists of all General Unsecured Claims other than the unsecured claims described in Classes 4 and 5.  For avoidance of doubt, Class 6 includes all Prepetition Facility Deficiency Claims.  Class 6 Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtors, the Estates, and pursuant to the Plan, the Liquidating Trustee (as applicable), which subordination claims, rights, and grounds are fully enforceable prior to, on, and after the Effective Date.

(b)    Treatment.  Each holder of an Allowed General Unsecured Claim in Class 6 shall receive a Pro Rata share of the Liquidating Trust Interests in exchange for their Allowed Claims following the payment or reserve for the Plan Contribution Amount, Administrative Claims, DIP Loan Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims, except as otherwise provided by the terms of the Committee Settlement.

(c)    Impairment and Voting.  Class 6 is Impaired, and the holders of Class 6 Claims are entitled to vote on the Plan.

10.7    Class 7—Interests.

(a)    Classification.  Class 7 consists of all Interests.

(b)    Treatment.  There shall be no Distribution on account of Class 7 Interests. Upon the Effective Date, all Interests will be deemed cancelled and will cease to exist; provided, however, for purposes of convenience, the Debtors and the Cash Flow DIP Lender may agree that Interests in Maverick shall continue to be held by FGMC as of the Effective Date.

(c)    Impairment and Voting.  Holders of Interests are deemed to have rejected the Plan, and are not entitled to vote.

## SECTION 11
## DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS

11.1    Distribution Dates.

The Debtors or the Liquidating Trustee, as applicable, shall make Distributions to holders of Claims, and with respect to General Unsecured Claims, may, in their discretion, make a full or partial Pro Rata Distribution to the holders of General Unsecured Claims on the Initial Distribution Date or a Subsequent Distribution Date.

11.2    Subsequent Distributions.

Any Distribution not made on the Initial Distribution Date or a Subsequent Distribution Date because the Claim relating to such Distribution had not been Allowed on that Distribution Date shall be held by the Distribution Agent on any Subsequent Distribution Date after such Claim is Allowed.  No interest shall accrue or be paid on the unpaid amount of any Distribution.

11.3    Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date.  The Distribution Agent shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date.  In making any Distribution with respect to any Claim, the Distribution Agent shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that is known to the Distribution Agent as of the Distribution Record Date.

11.4    Manner of Cash Payments Under the Plan or Liquidating Trust Agreement.

Cash payments made pursuant to the Plan or Liquidating Trust Agreement shall be in United States dollars by checks drawn on a domestic bank selected by the Distribution Agent, or by wire transfer from a domestic bank, at the option of the Distribution Agent.

11.5    Time Bar to Cash Payments by Check.

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof.  Requests for the reissuance of any check that becomes null and void pursuant to this Section shall be made directly to the Distribution Agent by the holder of the Allowed Claim to which the check was originally issued. Any Claim in respect of such voided check shall be made in writing on or before the later of six months from the Effective Date or 90 days after the date of issuance thereof.  After that date, all Claims in respect of voided checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become the property of the Liquidating Trust, as unclaimed property in accordance with section 347(b) of the Bankruptcy Code.

11.6    Liquidating Trust Assets Account.

Unless otherwise provided in the Confirmation Order, the Liquidating Trust Assets Account shall be invested by the Liquidating Trustee in a manner consistent with the objectives of section 345(a) of the Bankruptcy Code and in its reasonable and prudent exercise of discretion. The Liquidating Trustee shall have no obligation or liability to Beneficiaries in connection with such investments in the event of any unforeseeable insolvency of any financial institution where such funds are held.

## SECTION 12
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

12.1    No Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, the Debtors and the Liquidating Trustee, as applicable, shall not distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed.  Nothing contained herein, however, shall be construed to prohibit or require payment or Distribution on account of any undisputed portion of a Claim.

12.2    Resolution of Disputed Claims.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, subject to the Liquidating Trust Agreement, the Liquidating Trustee shall have the right to make, file, prosecute, settle, withdraw, or resolve objections to Claims.

The costs of pursuing the objections to Claims shall be borne by the Liquidating Trust. From and after the Confirmation Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to the extent, the Liquidating Trustee elects to withdraw any such objection or the Liquidating Trustee and the Claimant elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim or Disputed Interest without approval of the Bankruptcy Court.

12.3    Objection Deadline.

All objections to Claims shall be filed and served upon the Claimant not later than the Claims Objection Deadline, as such may be extended by order of the Bankruptcy Court.

12.4    Estimation of Claims.

At any time, (a) prior to the Effective Date, the Debtors, and (b) after the Effective Date, the Liquidating Trustee may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trust have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during Litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall

constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Claim, the Debtors or the Liquidating Trust, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdraw, or resolved by any mechanism of the Bankruptcy Court.

12.5    Disallowance of Claims.

Except as otherwise agreed or ordered by the Bankruptcy Court, any and all proofs of claim filed after the Bar Date shall not be treated as an Allowed Claim for purposes of Distribution without any further notice or action, and holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed.

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or Entities that are transferees of transfers avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, provided that such Cause of Action is retained by the Liquidating Trust shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action the Debtors hold or may hold against any Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estates by that Entity have been turned over or paid to the Debtors or the Liquidating Trust.

12.6    Adjustment to Claims Register Without Objection.

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register at the direction of the Debtors or the Liquidating Trustee, as applicable, without an objection filed and without further notice to or action, order, or approval of the Bankruptcy Court.

12.7    Reserve Provisions for Disputed Claims.

On or by each Distribution Date, the Debtors or the Liquidating Trustee, as applicable, shall reserve Cash required for distribution on Disputed Claims as if such Claims were Allowed as filed with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Debtors or the Liquidating Trustee (the "Disputed Claim Reserve").

The property in the Disputed Claim Reserve shall be held in trust for the benefit of the holders of Disputed Claims that are ultimately determined to be Allowed.  Each Disputed Claim Reserve shall be closed and extinguished when all Distributions and other dispositions of Cash of other property required to be made hereunder will have been made in accordance with the terms of the Plan.

12.8    Rounding.

Whenever any payment of a fraction of a cent would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest cent.

12.9    No Cash Payments of Less Than $100 on Account of Allowed Claims.

Notwithstanding anything herein to the contrary, except with respect to Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims and Other Secured Claims, if a Distribution to be made to a holder of an Allowed Claim on the Initial Distribution Date or any Subsequent Distribution Date would be $100 or less in the aggregate, no such Distribution will be made to that holder unless a request therefor is made in writing to the Distribution Agent.  If such request is made, such Cash shall be held for such holder until the earlier of (i) the next time an interim distribution is made to the holders of Allowed Claims (unless the distribution would still be less than $100, in which case this Section shall again apply), or (ii) the date on which Final Distributions are made to the holders of Allowed Claims.

12.10    Delivery of Distributions and Unclaimed Property.

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made at (a) the address of each Claimant as set forth in the Schedules, unless superseded by the address set forth on proof(s) of claim filed by such Claimant, or (b) the last known address of such Claimant if no proof of claim is filed or the Debtors or the Liquidating Trustee have been notified in writing of a change of address.  If any Distribution is returned as undeliverable, the Distribution Agent may, in its discretion, make reasonable efforts to determine the current address of the holder of the Claim with respect to which the Distribution was made, but no Distribution to any such holder shall be made unless and until the Distribution Agent has determined the then-current address of such holder, at which time the Distribution to such holder shall be made without interest.  Amounts in respect of any undeliverable Distributions shall be returned to, and held in trust by, the Distribution Agent, until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code.  The Distribution Agent shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; *provided, however*, that its discretion may not be exercised in a manner inconsistent with any express requirements of the Plan or, if applicable, the Liquidating Trust Agreement.  On or about the time that the Final Distribution is made, the Distribution Agent may make a charitable donation with undistributed funds if, in its reasonable judgment, the cost of calculating and making the Final Distribution of the remaining funds is excessive in relation to the benefits to the holders of Claims that would otherwise be entitled to such Distributions, and such charitable donation is provided to an entity not otherwise related to the Debtors or the Liquidating Trustee.

Except with respect to property not distributed because it is being held in a Disputed Reserve, Distributions that are not claimed by the later of the expiration of six (6) months from the Effective Date or (90) days after the date of a Distribution shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in the Liquidating Trust, and the Claims with respect to which those Distributions are made shall be automatically cancelled.  After the expiration of that period, the claim of any Entity to those Distributions shall

be cancelled.  Nothing contained in the Plan shall require the Debtors or the Liquidating Trust to attempt to locate any holder of an Allowed Claim.  All funds or other property that vest or revest in the Liquidating Trust pursuant to this Section shall be distributed to the other holders of Allowed Claims in accordance with the provisions of the Plan or the Liquidating Trust Agreement, as applicable.

12.11   <u>Books and Records</u>.

The Debtors shall transfer dominion and control over all of their books and records, in whatever form, manner or media, to the Liquidating Trustee on or as soon as reasonably practicable after the Effective Date.

### SECTION 13
### TREATMENT OF EXECUTORY CONTRACTS
### AND UNEXPIRED LEASES

13.1   <u>Rejection / Assumption</u>.

Except with respect to (i) executory contracts or unexpired leases that were previously assumed or rejected by order of the Bankruptcy Court, (ii) executory contracts or unexpired leases that are the subject of a pending motion to assume or reject, pursuant to section 365 of the Bankruptcy Code, or (iii) executory contracts or unexpired leases that are scheduled by the Debtors and the Cash Flow DIP Lender to be assumed as of the Effective Date, as set forth in the Plan Supplement, on the Effective Date, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed <u>rejected</u> pursuant to section 365 of the Bankruptcy Code; *provided, however,* that nothing in this Section shall cause the rejection, breach, or termination of any contract of insurance benefiting the Debtors and the Estates, the Debtors' officers, managers and directors and/or the Liquidating Trust.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions and rejections, as applicable, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  Nothing in this Section shall be construed as an acknowledgement that a particular contract or agreement is executory or is properly characterized as a lease.

The non-Debtor parties to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property that is the subject of such executory contracts and leases, and neither the Debtors nor the Liquidating Trust shall bear any liability for costs associated with such matters.

13.2   <u>Rejection Claims</u>.

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Confirmation of the Plan, if any, must be filed with the Claims Agent within thirty (30) days after the earlier of the Effective Date or an order of the Bankruptcy Court approving such rejection.  Any Claim arising from the rejection of an executory contract or unexpired lease pursuant to Confirmation of the Plan that is not filed within such times will be subject to objection.  All such Claims for which Proofs of Claim are timely and properly filed and ultimately Allowed will be treated as General Unsecured Claims.

13.3    Insurance Policies.

Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations of the Insurance Policies.  To the extent one or more of the Insurance Policies provide potential coverage related to one or more Causes of Action the Debtors hold or may hold against any Entity, the Debtors shall, to the extent permissible under each Insurance Policy, assign all of their rights thereunder with respect to such Causes of Action to the Liquidating Trust.  All net proceeds (including, for the avoidance of doubt, net of any deductibles or retentions) of Insurance Policies received by the Liquidating Trust shall be treated as proceeds of such Causes of Action for all purposes under the Plan.  The Debtors shall take no action to or otherwise impair the Insurance Policies.  Nothing herein shall diminish or impair the enforceability of the Insurance Policies and related agreements that may cover Claims and Causes of Action against the Debtors or any other Entity.

## SECTION 14
## MEANS FOR IMPLEMENTATION OF THE PLAN

14.1    General Settlement of Claims and Interests. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and the Estates. All Plan Distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

14.2    Committee Settlement.  Pursuant to the terms of the Committee Settlement: (a) the net proceeds from the recoveries, if any, on account of (A) Avoidance Actions and (B) the first $7.5 million of the Debtors' commercial tort claims (collectively, "Unencumbered Claims") shall be split (i) 50% to the Debtors' estates (the "Estate's Share"), and (ii) 50% to the Cash Flow DIP Lender, the Prepetition Bridge Lender, and/or the other released parties under the Final Cash Flow DIP Order; (b) (i) the Estate's Share shall not be part of the collateral pool securing the loans granted by the Interim Cash Flow DIP Order, Final Cash Flow DIP Order, Interim Repo DIP Order, or Final Repo DIP Order, and (ii) the Released Parties and the DIP Repo Parties shall not be entitled to share in any distribution of the Estate's Share on account of their secured, superpriority, administrative, or unsecured claims (including subrogation claims) they may have against the Debtors' Estates; provided, however, that Flagstar shall be entitled to participate in distributions from the Estate's Share to the extent of any allowed unsecured claims (including deficiency claims); (c) the Debtors shall consult with the Committee and the Cash Flow DIP Lender prior to pursuing, settling and/or releasing any Unencumbered Claims; provided, however, that in the event the Committee or the Cash Flow DIP Lender do not agree with the Debtors as to such actions, the Committee and the Cash Flow DIP Lender retain the right to seek appropriate relief from the Bankruptcy Court; and (d) the aggregate amount in the "Committee Professional Fees" line item

in the Approved DIP Budget (as defined in the Final Cash Flow DIP Order) shall be $1,500,000 for the case, which shall be inclusive of the Investigation Budget (as defined in the Final Cash Flow DIP Order). For purposes of the terms of the Committee Settlement, to the extent of any inconsistency between the terms of the Final Cash Flow DIP Order and this Plan, the terms of the Final Cash Flow DIP Order shall control; provided, however, for the avoidance of doubt, holders of General Unsecured Claims shall not be entitled to a recovery from the Estate's Share until the Plan Contribution Amount has been repaid in full in Cash from the Liquidating Trust Assets.Wind-Down. Residual Value in the Liquidating Trust will be distributed to the holder of the Cash Flow DIP Claims and the holder of the DIP Repo Guarantee Claims (if any), until such claims are paid in full, and thereafter, to the holders of General Unsecured Claims, subject in all respects to the terms of the Committee Settlement.

(a)     Dissolution of Debtors. From and after the Effective Date, the Debtors shall be dissolved, without any further action required on the part of the Debtors or the Debtors' members, managers, officers, directors, interest holders, and/or any other parties; provided, however, the Liquidating Trustee in his or her discretion shall be authorized to take any and all actions necessary or desirable in relation to dissolution of the Debtors. On the Effective Date, the employment, retention, appointment and authority of all managers, officers, directors, employees and professionals of the Debtors shall be deemed to terminate.

(b)     Appointment of the Liquidating Trustee. The identity of the Liquidating Trustee will be disclosed in the Plan Supplement. From and after the Effective Date, professionals may be retained by the Liquidating Trustee as set forth in the Liquidating Trust Agreement, without further need for documentation or Bankruptcy Court approval. All fees and expenses incurred by the professionals retained by the Liquidating Trustee following the Effective Date shall be paid by the Liquidating Trust from the Liquidating Trust Assets (after payment in full of all Allowed Administrative Claims) in accordance with the Liquidating Trust Agreement.

(c)     The Liquidating Trust. On the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of, inter alia, (i) administering the Liquidating Trust Assets, (ii) prosecuting and/or resolving all Disputed Claims, (iii) investigating and pursuing any Causes of Action the Debtors hold or may hold against any Entity, and (iv) making all Distributions to the Beneficiaries provided for under the Plan. The Liquidating Trust is intended to qualify as a liquidating trust pursuant to Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of the trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidating Trustee shall, in an orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, and make timely Distributions to the Beneficiaries, and not unduly prolong the duration of the Liquidating Trust. Neither the Liquidating Trust nor the Liquidating Trustee shall be or shall be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.

(d)     Liquidating Trust Assets. On the Effective Date, the Liquidating Trust Assets shall vest automatically in the Liquidating Trust. The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief. The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be made for the benefit and on behalf of the Beneficiaries. The assets comprising the Liquidating Trust Assets will be treated for tax

purposes as being transferred by the Debtors to the Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the Beneficiaries to the Liquidating Trust in exchange for the beneficial interests in the Liquidating Trust.  The Beneficiaries shall be treated as the grantors and owners of the Liquidating Trust.  Upon the transfer of the Liquidating Trust Assets, the Liquidating Trust shall succeed to all of the Debtors' rights, title and interest in the Liquidating Trust Assets, and the Debtors will have no further interest in or with respect to the Liquidating Trust Assets.

Except to the extent definitive guidance from the IRS or a court of competent jurisdiction (including the issuance of applicable Treasury Regulations or the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one) indicates that such valuation is not necessary to maintain the treatment of the Liquidating Trust as a liquidating trust for purposes of the Internal Revenue Code and applicable Treasury Regulations, as soon as possible after the Effective Date, the Liquidating Trustee shall make a good-faith valuation of the Liquidating Trust Assets.  The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trust, the Beneficiaries) for all federal income tax purposes.

(e)      Rights and Powers of the Liquidating Trustee.  The Liquidating Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules to act on behalf of the Liquidating Trust. Without limiting the foregoing, the Liquidating Trustee will have the right to, among other things, (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement; (2) liquidate the Liquidating Trust Assets; (3) investigate, prosecute, settle, abandon or compromise any Causes of Action the Debtors hold or may hold against any Entity; (4) make all Distributions in accordance with the Plan and the Liquidating Trust Agreement; (5) administer the Liquidating Trust and pursue viable Causes of Action in accordance with the Plan and the Liquidating Trust Agreement; (6) establish and administer any necessary reserves for Disputed Claims that may be required; (7) object to the Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (8) assert or waive any attorney-client privilege on behalf of the Debtors and Estates with regard to acts or events during time periods prior to the Petition Date; and (9) employ and compensate professionals and other agents, including, without limitation, existing Professionals employed by the Debtors or the Committee in accordance with the Liquidating Trust Agreement or the Plan, *provided, however*, that any such compensation shall be made only out of the Liquidating Trust Assets, to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

(f)      Fees and Expenses of the Liquidating Trust.  Subject to payment in full of all Allowed Administrative Claims, and except as otherwise ordered by the Bankruptcy Court, expenses incurred by the Liquidating Trust on or after the Effective Date shall be paid in accordance with the Liquidating Trust Agreement without further order of the Bankruptcy Court.

(g)     Transfer of Beneficial Interests in the Liquidating Trust.  Liquidating Trust Interests shall not be transferable except upon death of the interest holder or by operation of law. The Liquidating Trust shall not have any obligation to recognize any transfer of Claims or Interests occurring after the Distribution Record Date.

(h)     Available Cash; Provision of the Plan Contribution Amount.

Available Cash shall be used to fund distributions to Creditors (including holders of Allowed Administrative Claims, Priority Tax Claim, and Priority Non-Tax Claims) or other payments to be made pursuant to or otherwise consistent with the Plan and the Confirmation Order. Notwithstanding any other provision of the Plan or the Liquidating Trust Agreement, Available Cash will be used in the first instance by the Liquidating Trustee to pay or reserve for all unpaid Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims (including any Disputed Claims until such Claims are resolved), prior to use of the Available Cash for purposes of the Liquidating Trust.  Subject to the restrictions set forth herein, the Plan Contribution Amount (to the extent remaining after payment of or reserve for all Allowed Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims) and the proceeds of any other Liquidating Trust Assets will be used by the Liquidating Trustee to pay for the expenses of the Liquidating Trust in accordance with the Liquidating Trust Agreement.

On or as soon as practicable following the Effective Date, the Liquidating Trust Assets Account shall be opened by the Liquidating Trustee and funded with the Plan Contribution Amount, which money shall constitute Liquidating Trust Assets.  Thereafter, from time to time, upon receipt of any Liquidation Proceeds or any Litigation Recovery, the Liquidating Trustee shall deposit such funds into the Liquidating Trust Assets Account, and they shall become part of the Liquidating Trust Assets for funding distributions to Creditors and paying the expenses of the Liquidating Trust.

14.5    Disposition of Mortgage Loans.   The following provisions shall govern the disposition of the mortgage loans and related assets, including mortgage servicing rights constituting purchased assets or collateral (the "Mortgage Loans") underlying the Prepetition Repo Facility Claims and Prepetition Warehouse Facility Claims: The Mortgage Loans shall be sold or otherwise disposed of in a manner that maximizes the returns and minimizes the costs to the Debtors and Estates, including, without limitation:

i       With respect to any Mortgage Loans relating to the Prepetition Repo Agreements or Prepetition Warehouse Agreements, whose value is equal to or less than the Prepetition Repo Facility Claims or the Prepetition Warehouse Facility Claims, as applicable, the Prepetition Repo Lender or the Prepetition Warehouse Lender (y) shall sell all such loans (with the Debtors agreeing to relief from the automatic stay if necessary) or (z) may request the Debtors' assistance in selling such loans, provided that an agreement is reached by and between such Prepetition Repo Lender or Prepetition Warehouse Lender and the Debtors to compensate the Debtors for such assistance, with the terms and  conditions of such agreement in a form acceptable to the Cash Flow DIP Lender.

ii        With respect to any Mortgage Loans relating to the Prepetition Repo Agreements or Prepetition Warehouse Agreements, whose value <u>exceeds</u> the Prepetition Repo Facility Claims or the Prepetition Warehouse Facility Claims, as applicable, the Debtors, with the agreement of the Prepetition Repo Lender or the Prepetition Warehouse Lender, as applicable, and the Cash Flow DIP Lender, shall retain a broker to liquidate all such loans.

iii       With respect any Prepetition Repo Agreement not terminated immediately upon the Petition Date, or previously rejected by the Debtors pursuant to section 365(a) of the Bankruptcy Code, upon entry of the Confirmation Order such agreements shall be deemed cancelled, terminated and rejected as of the Petition Date.

14.6   <u>Litigation</u>.

Except as otherwise provided herein (including the Debtor/Estate Release), all Litigation is retained, vested in the Liquidating Trust, and preserved pursuant to section 1123(b) of the Bankruptcy Code. From and after the Effective Date, all Litigation will be prosecuted or settled by the Liquidating Trustee. To the extent any Litigation is already pending on the Effective Date, the Liquidating Trustee will continue the prosecution of such Litigation and shall be substituted as plaintiff, defendant, or in any other capacity for the Debtors or the Estates pursuant to the Plan and the Confirmation Order on the Effective Date, without need for any further motion practice or notice in any case, action, or matter.

14.7   <u>Dissolution of the Committee</u>.

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Cases, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date. Nothing in the Plan shall prohibit or limit the ability of the Debtors' or Committee's Professionals to represent the Liquidating Trustee or to be compensated or reimbursed per the Plan and/or the Liquidating Trust Agreement in connection with such representation.

14.8   <u>Sale Transaction(s)</u>. The Debtors and, to the extent applicable, the Liquidating Trustee, are authorized and directed to implement the terms of any Sale Transaction.

## SECTION 15
## EFFECT OF CONFIRMATION

15.1    Binding Effect of the Plan.

The provisions of the confirmed Plan shall bind the Debtors, the Liquidating Trust, the Liquidating Trustee, any Entity acquiring property under the Plan, any Beneficiary, and any Creditor or Interest holder, whether or not such Creditor or Interest holder has filed a Proof of Claim or Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or the Interest of such Interest holder is impaired under the Plan, and whether or not such Creditor or Interest holder has accepted or rejected the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to the Plan.  The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, or Governmental Unit or parish in which any instrument related to under the Plan or related to any transaction contemplated under the Plan is to be recorded with respect to any taxes of the kind specified in section 1146(a) of the Bankruptcy Code.

15.2    Vesting of Property of Debtors on the Effective Date.

Upon the Effective Date, title to all property (including, without limitation, all Causes of Action) of the Estates shall vest in the Liquidating Trust and shall be retained by the Liquidating Trust for the purposes contemplated under the Plan pursuant to the Liquidating Trust Agreement.

15.3    Property Free and Clear.

Except as otherwise provided in the Plan or the Confirmation Order, all property that shall vest in the Liquidating Trust shall be free and clear of all Claims, Interests, Liens, charges, or other encumbrances of Creditors or Interest holders, other than as set forth herein, in the Liquidating Trust Agreement, and in relevant documents, agreements, and instruments contained in the Plan Supplement.  Following the Effective Date, the Liquidating Trustee may transfer and dispose of any such property free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or the Confirmation Order.

## SECTION 16
## EXCULPATIONS, INJUNCTIONS, AND RELEASES

16.1    Exculpation.

The Exculpated Parties will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken between the Petition Date and Effective Date in connection with or related to the Chapter 11 Cases, the sale or other disposition of the Debtors' assets or the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan; *provided, however*, that this limitation will not affect or modify the obligations created under the Plan, or the rights of any holder of an Allowed Claim to enforce its rights under the Plan, and shall not release any action (or inaction) constituting willful misconduct, fraud, bad faith, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction); *provided that* any Exculpated Party shall be entitled to

reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan, and such reasonable reliance shall form a defense to any such claim, Cause of Action, or liability.  Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of section 1125(e) of the Bankruptcy Code.

      16.2   <u>Releases</u>.

      (a)   <u>Debtor Releases</u>.

**Notwithstanding anything in the Combined Plan and Disclosure Statement to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after and subject to the occurrence of the Effective Date, the Debtors and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action, by, through, for, or because of the foregoing entities (collectively, the "<u>Debtor/Estate Releasors</u>"), shall release (the "<u>Debtor/Estate Release</u>") each Released Party, and each Released Party is deemed released by the Debtor/Estate Releasors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor/Estate Releasors, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor/Estate Releasors would have been legally entitled to assert in its own right, or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Debtors' liquidation, the Chapter 11 Cases, the purchase, sale, transfer of any security, asset, right, or interest of the Debtors and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party (including pursuant to the Prepetition Bridge Loan Agreement or the Cash Flow DIP Documents), the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of, or solicitation of votes on, the Combined Plan and Disclosure Statement or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, actual fraud, bad faith, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction) but in all respects such Released Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; provided, that the foregoing Debtor/Estate Release shall not operate to waive or release any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan; and further provided that nothing herein shall act as a discharge of the Debtor.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, of the Debtor/Estate Release, which includes by reference each of the related provisions and**

definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor/Estate Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) in the best interests of the Debtors and all holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Debtor/Estate Releasors asserting any Claim or Cause of Action released pursuant to the Debtor/Estate Release.

        (b)      **Third Party Release**.

Notwithstanding anything in the Plan to the contrary, on and after and subject to the occurrence of the Effective Date, each of the Releasing Parties shall release (the "**Third Party Release**") each Released Party, and each of the Debtors, the Estates, and the Released Parties shall be deemed released from, any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of any of the Debtors or the Estates, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Debtors' liquidation, the Chapter 11 Cases, the purchase, sale, transfer of any security, asset, right, or interest of the Debtors and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Combined Plan and Disclosure Statement, the business or contractual arrangements between the Debtor and any Released Party (including pursuant to the Prepetition Bridge Loan Agreement or the Cash Flow DIP Documents), the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of, or solicitation of votes on, the Combined Plan and Disclosure Statement or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, actual fraud, bad faith, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction) but in all respects such Released Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Combined Plan and Disclosure Statement. Notwithstanding anything to the contrary in the foregoing, the Third Party Release shall not release any obligations of any party under the Combined Plan and Disclosure Statement or any other document, instrument, or agreement executed to implement the Combined Plan and Disclosure Statement.

    16.3    **Injunction**.

In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtors, the Liquidating Trust, or

the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, the Estates, the Liquidating Trust, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtors, the Estates, the Liquidating Trust, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; (c) creating, perfecting, or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Estates, the Liquidating Trust, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; and (d) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest.  Nothing contained in this Section shall prohibit the holder of a timely filed Proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtors or the Liquidating Trust under the Plan.

16.4    Post-Confirmation Liability of Liquidating Trustee.

The Liquidating Trustee, together with its consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and the professionals engaged by the foregoing (collectively, the "Indemnified Parties") shall not be liable for any and all liabilities, losses, damages, claims, Causes of Action, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, to the holders of Claims or Interests for any action or inaction taken in good faith in connection with the performance or discharge of their duties under the Plan, except the Indemnified Parties will be liable for actions or inactions that constitute willful misconduct, fraud, bad faith, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction).  However, any act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute willful misconduct, fraud, bad faith, or gross negligence.  In addition, the Liquidating Trust and the Estates shall, to the fullest extent permitted by the laws of the State of Delaware, indemnify and hold harmless the Indemnified Parties from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidating Trust and the Estates or the implementation or administration of the Plan if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interest of the Liquidating Trust and the Estates.  To the extent the Liquidating Trust indemnifies and holds harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Liquidating Trustee in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be paid as Liquidating Trust Expenses.  All rights of the Persons exculpated and indemnified pursuant hereto shall survive confirmation of the Plan.

16.5    Preservation of Rights of Action.

(a)    Vesting of Causes of Action.

Except as otherwise provided in the Plan or Confirmation Order, including any Cause of Action that is expressly waived, relinquished, exculpated, released, settled, or compromised under the Plan or Confirmation Order (including, without limitation, pursuant to the Debtor/Estate Release), in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors hold or may hold against any Entity shall vest upon the Effective Date in the Liquidating Trust, subject to the terms of the Committee Settlement as to proceeds recovered.

Except as otherwise provided in the Plan, Confirmation Order or the Committee Settlement, after the Effective Date, the Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Causes of Action the Estates hold or may hold against any Entity, in accordance with the terms of the Plan and the Liquidating Trust Agreement, as applicable, and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases.

Subject to the terms of the Committee Settlement, Causes of Action and recoveries therefrom shall remain the sole property of the Liquidating Trust, and holders of Claims shall have no direct right or interest in to any such Causes of Action or recoveries.

(b)    Preservation of All Causes of Action Not Expressly Settled or Released.

Unless a Cause of Action against a holder of a Claim or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan (including, without limitation, pursuant to the Debtor/Estate Release) and/or or any Final Order (including the Confirmation Order), the Debtors and the Liquidating Trustee expressly reserve such retained Cause of Action for later adjudication by the Debtors or the Liquidating Trustee, as applicable (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere, or of which the Debtors may be presently unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time, or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan, or Confirmation Order, except where such Causes of Action have been released or otherwise resolved by a Final Order (including the Confirmation Order).  In addition, subject to the terms of the Committee Settlement, the Debtors and Liquidating Trustee expressly reserve the right to pursue or adopt claims alleged in any lawsuit in which a Debtor is a defendant or interested party against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to which the Debtors have incurred an obligation (whether on account of services, the purchase or sale of goods, or otherwise), or that has received services from the Debtors or a transfer of money or property of the Debtors, or that has received services from the Debtors or a transfer or money or property of the Debtors, or that has transacted business with the Debtors, or that has leased property from the Debtors, should assume and is hereby advised that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a proof

of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors or Liquidating Trustee have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors or Liquidating Trustee have objected to any such Entity's scheduled Claim; (v) any such Entity's scheduled Claim has been identified by the Debtors or Liquidating Trustee as disputed, contingent, or unliquidated; or (vi) the Debtors have identified any potential claim or Cause of Action against such Entity herein.

16.6    No Discharge.

Nothing contained in the Combined Plan and Disclosure Statement shall be deemed to constitute a discharge of the Debtors under section 1141(d)(3) of the Bankruptcy Code.

## SECTION 17
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

17.1    Conditions to Confirmation of the Plan.

Confirmation of the Combined Plan and Disclosure Statement is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtors, subject to the Cash Flow DIP Lender's consent: (i) the Bankruptcy Court shall have approved a disclosure statement to the Plan, which may be this Combined Plan and Disclosure Statement, in form and substance acceptable to the Debtors and the Cash Flow DIP Lender, (ii) the Debtors shall have determined that there will be sufficient Cash on the Effective Date to pay (or with respect to Disputed Claims to reserve for as required pursuant to the Plan) Allowed Administrative Claims, Non-Tax Priority Claims, and Priority Tax Claims in full (or in such lesser amount as may be agreed to by the Claimant), (iii) the Confirmation Order to be presented to the Bankruptcy Court at the Confirmation Hearing shall be acceptable to the Debtors and the Cash Flow DIP Lender in form and substance, and (iv) the final version of the schedules, documents, and exhibits contained in the Plan Supplement, and all other schedules, documents, supplements and exhibits to the Combined Plan and Disclosure Statement, shall be in form and substance acceptable to the Debtors and the Cash Flow DIP Lender.

17.2    Conditions to the Effective Date.

The occurrence of the Effective Date is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtors, subject to the consent of the Cash Flow DIP Lender: (i) a Confirmation Order in form and substance acceptable to the Debtors and the Cash Flow DIP Lender shall have been entered by the Bankruptcy Court and become a Final Order which is not subject to any stay of effectiveness; (ii) the Liquidating Trust shall have been created pursuant to the terms of the Plan, the Liquidating Trustee shall have been appointed by order of the Bankruptcy Court (which may be the Confirmation Order), and the Liquidating Trust Agreement shall have been executed by the Liquidating Trustee; (iii) the Plan Contribution Amount shall have been fully funded and released to the Liquidating Trustee upon the Effective Date; (iv) the Debtors shall not be in default under the Cash Flow DIP Documents (or, to the extent that the Debtors have been or are in default on the proposed Effective Date, such default shall have been waived by the Cash Flow DIP Lender

or cured in a manner consistent with the Cash Flow DIP Documents, as applicable; (v) in the case of one or more Sale Transactions, (a) each such Sale Transaction shall have closed and (b) all post-closing obligations of the Debtors related to each such Sale Transaction, including pursuant to any transition services, interim management, or similar agreements shall have terminated, unless the express terms of such Sale Transaction permit such obligations to be performed after the occurrence of the Effective Date; and (vi) all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto.

      17.3   <u>Waiver of Conditions Precedent</u>.

      To the fullest extent permitted by law, the conditions to the Effective Date set forth in Section 17.2 may be waived or modified in whole or in part at any time in writing by the Debtors, subject to the Cash Flow DIP Lender's consent, without leave from or an order of the Court.

## SECTION 18
## RETENTION OF JURISDICTION

      From and after the Confirmation Date, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including, but not limited to, for the following purposes:

      (a)   To hear and determine any and all objections to the allowance of a Claim, proceedings to estimate a Claim for any purpose, actions to equitably subordinate a Claim, proceedings seeking approval of any necessary claims reconciliation protocols, or any controversy as to the classification of a Claim in a particular Class under the Plan;

      (b)   To administer the Plan, the Liquidating Trust, the Trust Assets and the proceeds thereof;

      (c)   To estimate or liquidate any Disputed Claims;

      (d)   To hear and determine any and all adversary proceedings, contested matters or applications pending on the Effective Date or otherwise relating to, arising from, or in connection with the Litigation; provided, however, that the Liquidating Trustee shall reserve the right to commence actions in all appropriate jurisdictions;

      (e)   To hear and determine any and all motions and/or objections to fix, estimate, allow and/or disallow any Claims arising therefrom;

      (f)   To hear and determine any and all applications by Professionals for an award of Professional Fees;

      (g)   To enable the Liquidating Trustee to commence and prosecute any Litigation which may be brought after the Effective Date;

      (h)   To interpret and/or enforce the provisions of the Plan and the injunction provided for in the Plan and to determine any and all disputes arising under or regarding interpretation of the Plan or any agreement, document, or instrument contemplated by the Plan;

(i)      To enter and implement such orders as may be appropriate in the event Confirmation is for any reason stayed, reversed, revoked, modified, or vacated;

(j)      To modify any provision of the Plan to the extent permitted by the Bankruptcy Code and to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(k)      To enter such orders as may be necessary or appropriate in furtherance of Confirmation and the successful implementation of the Plan and to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code;

(l)      To enter any orders as required by Rule 23 of the Federal Rules of Civil Procedure, to the extent made applicable to any adversary proceeding pursuant or contested matter pursuant to Bankruptcy Rules 7023 and 9014(c), as applicable;

(m)      To enforce all orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

(n)      To enforce, and hear and determine all disputes involving, the injunction, release, and exculpation provisions provided in Section 16; and

(o)      To close the Chapter 11 Cases when administration of the Liquidating Trust and the Chapter 11 Cases has been completed.

## SECTION 19
## MISCELLANEOUS PROVISIONS

19.1    <u>Revocation of the Combined Plan and Disclosure Statement</u>.

The Debtors reserve the right to revoke and withdraw the Combined Plan and Disclosure Statement at any time on or before the Confirmation Date. If the Debtors revoke or withdraw the Combined Plan and Disclosure Statement, or if Confirmation or the Effective Date does not occur, then the Plan shall be deemed null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

19.2    <u>Severability of Plan Provisions</u>.

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, with the consent of the Debtors, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect

and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

19.3    Exhibits.

All exhibits attached to the Combined Plan and Disclosure Statement and the Plan Supplement are, by this reference, hereby incorporated herein.  The Debtors reserve the right to make non-substantive changes and corrections to such Exhibits in advance of the Confirmation Hearing.  If any Exhibits are changed or corrected, the replacement Exhibits will be filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing.

19.4    Notices.

All notices required or permitted to be made in accordance with the Plan shall be in writing and shall be delivered personally or by nationally recognized overnight or next-day courier service, first-class mail, electronic mail, or via facsimile with electronic confirmation of receipt as follows:

Counsel for Debtors:

Dentons US LLP
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Attn:   Samuel R. Maizel, Esq.
        Tania M. Moyron, Esq.
        samuel.maizel@dentons.com
        tania.moyron@dentons.com

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tel. 302-652-4100, Fax 302-652-4400
Attn:   Laura Davis Jones, Esq.
        ljones@pszjlaw.com

Liquidating Trustee:

_____
_____

19.5    Reservation of Rights.

Neither the filing of the Combined Plan and Disclosure Statement nor any statement or provision contained in the Combined Plan and Disclosure Statement, nor the taking by any party in interest of any action with respect to the Plan, shall: (a) be or be deemed to be an admission

against interest and (b) until the Effective Date, be or be deemed to be a waiver of any rights any party in interest may have (i) against any other party in interest, or (ii) in or to any of the assets of any other party in interest, and, until the Effective Date, all such rights are specifically reserved. In the event that the Plan is not confirmed or fails to become effective, neither the Combined Plan and Disclosure Statement nor any statement contained in the Combined Plan and Disclosure Statement may be used or relied upon in any manner in any suit, action, proceeding, or controversy within or without the Chapter 11 Cases involving the Debtors, except with respect to Confirmation of the Plan.

19.6    Defects, Omissions and Amendments.

The Debtors may, with the approval of the Bankruptcy Court and consent of the Cash Flow DIP Lender and without notice to all holders of Claims or Interests, insofar as it does not materially and adversely affect holders of Claims, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable to expedite the execution of the Plan.  The Plan may be altered or amended before or after Confirmation as provided in section 1127 of the Bankruptcy Code if, in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of holders of Claims, so long as the Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with section 1125 of the Bankruptcy Code.  The Plan may be altered or amended before or after the Confirmation Date but, prior to substantial Consummation, in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, so long as the Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code, the Debtors have complied with section 1125 of the Bankruptcy Code and, after notice and a hearing, the Bankruptcy Court confirms such Plan, as modified, under section 1129 of the Bankruptcy Code.

19.7    Filing of Additional Documents.

The Debtors shall file with the Bankruptcy Court such agreements, instruments, pleadings, orders, papers, or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

19.8    Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such Entity.

19.9    Setoffs and Recoupments.

The Debtors and the Liquidating Trust may, but shall not be required to, set off against or recoup from the payments to be made pursuant to the Plan in respect of a Claim, any claim of any nature whatsoever that the Debtors, the Liquidating Trust, or the Estates, as applicable, may have against the holder of such Claim, but neither the failure to do so or the allowance of any Claim hereunder shall constitute a waiver or release of any such claim by the Debtors, the Liquidating Trust, or the Estates, against such holder.

19.10    Tax Exemption.

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Plan, or the execution, delivery, or recording of an  instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including, without limitation, any transfers to or by the Debtors, if on the Effective Date, and the Liquidating Trustee, if after the Effective Date, of the Debtors' property in implementation of or as contemplated by the Plan (including, without limitation, any subsequent transfer of property by the Liquidating Trust) shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

19.11    Securities Exemption.

To the extent the Liquidating Trust Interests are deemed or asserted to constitute securities, the Liquidating Trust Interests and the issuance and distribution thereof shall be exempt from Section 5 of the Securities Act, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation, section 1145 of the Bankruptcy Code.

19.12    Implementation.

Upon Confirmation, the Debtors shall be authorized to take all steps and execute all documents necessary to effectuate the provisions contained in the Plan.

19.13    Record Date.

To the extent a "Record Date" is required for implementation of the Plan, the record date shall be the voting record date established by the Bankruptcy Court in the Conditional Approval and Procedures Order.

19.14    Certain Actions.

By reason of entry of the Confirmation Order, prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of members, managers or other interestholders of the Debtors under the Plan, including, without limitation, (i) the distributions of Cash pursuant to the Plan, (ii) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (iii) the adoption, execution, and implementation of other matters provided for under the Plan involving the company or organizational structure of the Debtors, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable corporation/limited liability company laws, without

any requirement of further action by the members, managers or other interestholders of the Debtors, irrespective of whether the Confirmation Order specifically authorizes any such action.

Effective upon the Effective Date, the Debtors' formation documents shall each be deemed amended to prohibit the issuance by the Debtors of nonvoting securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.

On or as soon as practicable following the Effective Date, the Liquidating Trustee shall be authorized to cancel, annul, and extinguish all Interests.

19.15   Substantial Consummation.

On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

19.16   Waiver of Fourteen-Day Stay.

The Debtors request as part of the Confirmation Order a waiver from the Bankruptcy Court of the 14-day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the 14-day stay of Bankruptcy Rule 6004(g).

19.17   Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

19.18   Entire Agreement.

On the Effective Date, the Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## SECTION 20
## RECOMMENDATION

The Debtors strongly recommend that all creditors receiving a Ballot vote in favor of the Plan.  The Debtors believe that the Plan is in the best interests of creditors.  The Plan as structured, among other things, allows creditors with Allowed Claims to participate in distributions believed to be in excess of those that would otherwise be available were the Chapter 11 Cases dismissed or converted under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to creditors.

FOR ALL THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE DEBTORS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES.   THE DEBTORS URGE ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH

ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY 4:00 P.M. EASTERN TIME ON _____, 2022.

Dated: September 6, 2022

Respectfully submitted,

FIRST GUARANTY MORTGAGE
CORPORATION

MAVERICK II HOLDINGS, LLC

*/s/ Aaron Samples*_____
Aaron Samples
Chief Executive Officer