**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FIRST GUARANTY MORTGAGE | ) | Case No. 22-10584 (CTG) |
| CORPORATION, *et al.,*[1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**MOTION OF THE DEBTORS FOR ENTRY**
**OF ORDERS: (I)(A) APPROVING BIDDING PROCEDURES FOR**
**ONE OR MORE SALES OR THE SALE OF SUBSTANTIALLY ALL OF THE**
**DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS TO ENTER INTO ONE OR**
**MORE STALKING HORSE AGREEMENTS AND TO PROVIDE BID PROTECTIONS**
**THEREUNDER, (C) SCHEDULING AN AUCTION AND APPROVING THE FORM**
**AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION AND**
**ASSIGNMENT PROCEDURES AND (E) SCHEDULING A SALE HEARING AND**
**APPROVING THE FORM AND MANNER OF NOTICE THEREOF; (II)(A)**
**APPROVING THE SALE OR SALES OF THE DEBTORS' ASSETS FREE AND CLEAR**
**OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (B) APPROVING**
**THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND**
**UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

The above captioned debtors and debtors in possession (the "Debtors"), hereby move (the

"Motion") the Court for the entry of: (i) an order substantially in the form attached hereto as

**Exhibit A**, (the "Bidding Procedures Order"), (a) approving bidding procedures, substantially in

the form attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures"), to be

used in connection with the sale or sales (collectively, the "Sale Transaction") of one or more

groups of the Debtors' assets or substantially all of the Debtors' assets (together, the "Assets") to

one or more bidders, (b) authorizing the Debtors to select a Stalking Horse Bidder and provide Bid

Protections in accordance with the Stalking Horse Designation Procedures, (c) scheduling an

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621). The Debtors' mailing address is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

auction of the Assets (the "Auction"), and scheduling the hearing to approve the Sale Transaction (the "Sale Hearing"), (d) approving the form and manner of notice of the proposed Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "Sale Notice"), (e) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "Contracts") in connection with any Sale (the "Assumption and Assignment Procedures"), (f) approving the form and manner of notice to each relevant non-debtor counterparty to a Contract (each, a "Counterparty") of (A) the Debtors' calculation of the amount necessary to cure any defaults under an applicable Contract (the "Cure Costs") and (B) certain other information regarding the potential assumption and assignment of Contracts in connection with the Sale, substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "Assumption and Assignment Notice"); (ii) an order or orders (each a "Sale Order"), (a) authorizing the sale or sales of the Assets free and clear of all liens, claims, interests, and encumbrances, except certain assumed liabilities and permitted encumbrances as determined by the Debtors and the Successful Bidder (as defined below), with liens to attach to the proceeds of the sale or sales, (ii) authorizing the assumption and assignment of certain Contracts; and (iii) granting related relief.  In support of this Motion, the Debtors rely upon and incorporates by reference the *Declaration of Aaron Samples in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 19] (the "First Day Declaration"). Concurrently with the filing of this Motion, the Debtors have filed a motion seeking shortened notice and an expedited hearing on the Motion.  In further support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      By this Motion, the Debtors seek to establish bidding procedures for the potential sale of all or substantially all of their assets or a sub-set thereof pursuant to the *Combined Disclosure Statement and Chapter 11 Plan of First Guaranty Mortgage Corporation and Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").

2.      The Debtors and their advisors have engaged in extensive discussions with the Cash Flow DIP Lender and DIP Repo Guarantor regarding the sale and liquidation of the Debtors' assets in these chapter 11 cases.  The parties have agreed on terms for conducting a sale or sales of substantially all of the Debtors' assets, or a sub-set thereof.  This agreement will allow the Debtors to proceed with their chapter 11 cases to enable the Debtors to engage in a postpetition marketing process and effectuate a sale or sales, by separate sale order(s) in parallel with the concurrent Plan solicitation and confirmation process. Accordingly, the Debtors propose a postpetition marketing process to pursue a potential sale or sales in accordance with the Bidding Procedures (defined below).

3.      The Debtors believe the Bidding Procedures will best facilitate a value maximizing sale or sales for the benefit of the Debtors' estates.  The Bidding Procedures provide for substantial flexibility with respect to the structure of any Sale.  For example, the Debtors may, in an exercise of their business judgment, select one or more Stalking Horse Bidder(s) (as defined below) and provide Bid Protections (as defined below) to the extent that doing so would maximize the value of the estates. The Bidding Procedures likewise will allow the Debtors sufficient time to fully market their assets, receive and evaluate bids, execute a stalking horse agreement and designate one or more Stalking Horse Bidder(s) (if any), and hold an auction (if necessary) to

determine the highest or otherwise best bid. In addition, the marketing process and the Bidding Procedures proposed herein are aligned with the parties' agreed milestones.

4.     The Debtors believe that their marketing efforts contemplated by the Bidding Procedures provide for an efficient marketing and sale process for the Debtors' Assets, and that approval of the Bidding Procedures and the related relief requested in this Motion are in the best interests of the Debtors' estates and their stakeholders. Accordingly, the Debtors respectfully request that the Court grant the relief requested herein.

<u>**JURISDICTION AND VENUE**</u>

5.     The district court has jurisdiction under 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.     The Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     The bases for the relief requested herein are sections 105(a), 363(b), 365, 503 and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Local Rules 2002-1, 6004-1, 9006-1 and 9013-1(m).

**INTRODUCTION**

9.      On June 30, 2022 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

10.      On July 14, 2022, the Office of the United States Trustee appointed an official committee of unsecured creditors in these chapter 11 cases (the "Committee").

11.      The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, is set forth in detail in the *Declaration of Aaron Samples in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 19] (the "First Day Declaration") filed on the Petition Date and fully incorporated herein by reference.

**RELIEF REQUESTED**

12.      Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Bankruptcy Rules and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules, the Debtors hereby seek:

(a) entry an order (the "Bidding Procedures Order"), substantially in the form attached hereto as Exhibit A, granting the following relief:

(i)      authorizing and approving the procedures, substantially in the form attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures"), to be used in connection with the sale of substantially all of the Debtors' assets, or a sub-set thereof, (collectively, the "Assets") through one or more Sale Transactions;

(ii)      establishing the following dates and deadlines in connection with the Bidding Procedures:

a. Stalking Horse Notice Deadline: October 7, 2022, at 4:00 p.m. (prevailing Eastern time), as the deadline by which the Debtors must file a Stalking Horse Notice (as defined below);

b. Bid Deadline: October 10, 2022, at 4:00 p.m. (prevailing Eastern time), as the deadline by which all binding bids must be actually received by the Debtors pursuant to the Bidding Procedures (the "Bid Deadline"); and

c. Auction: October 14, 2022, at 10:00 a.m. (prevailing Eastern time), as the date by which the Debtors will conduct an auction pursuant to the Bidding Procedures (the "Auction"), if necessary;

d. Sale Hearing: October 27, 2022 at TBD (prevailing Eastern time), as the date for the Court to consider approval of any Sale Transaction.

(iii)    authorizing the Debtors, in consultation with the Consultation Parties, and with the written consent of the Cash Flow DIP Lender, to (i) select one or more bidders to act as stalking horse bidders (each, a "Stalking Horse Bidder") and enter into a purchase agreement with any such Stalking Horse Bidder (each such agreement, a "Stalking Horse Agreement") and (ii) in connection with any Stalking Horse Agreement, provide (A) a break-up fee (the "Breakup Fee"), (B) an expense reimbursement (the "Expense Reimbursement"), and/or (C) other forms of bid protections (together with the Breakup Fee and the Expense Reimbursement, collectively, the "Bid Protections"), subject to Court approval;

(iv)    approving the form and manner of notice of the Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "Sale Notice");

(v)    approving procedures for the assumption and assignment of executory contracts and unexpired leases (collectively, the "Contracts") in connection with any Sale Transaction (the "Assumption and Assignment Procedures");

(vi)    approving the form and manner of notice to each relevant non-debtor counterparty to a Contract (each, a "Counterparty") of (A) the Debtors' calculation of the amount necessary to cure any prepetition defaults under an applicable Contract (the "Cure Costs") and (B) certain other information regarding the potential assumption and assignment of Contracts in connection with a Sale Transaction, substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "Assumption and Assignment Notice"); and

6

(b) following entry of, and compliance with, the Bidding Procedures Order, one or more orders (each, a "Sale Order")[2] at the Sale Hearing, authorizing and approving the following:

      (i)    the Sale of the Assets to each Stalking Horse Bidder or otherwise Successful Bidder(s) (as defined below), as applicable (each, a "Buyer") free and clear of all liens, claims, interests, and encumbrances to the extent set forth in the applicable Stalking Horse Agreement or asset purchase agreement(s) with the otherwise Successful Bidder(s), as applicable;

      (ii)    authorizing the assumption and assignment of certain Contracts in connection with such sale or sales; and

      (iii)    granting related relief.

## SALE TIMELINE

13.    In conjunction this Motion, the Debtors negotiated for a specific timeline that balances the Debtors' need to run a complete postpetition marketing and sale process to avoid creating undue risk of loss and unnecessary administrative expenses. The Bidding Procedures and the Debtors' proposed timeline for this process are a product of good-faith, arm's length negotiations and reflect the best option available for the Debtors to maximize the value of their Assets under the circumstances. Specifically, the Debtors have agreed to, among others, the following proposed key dates and deadlines (the "Milestones"):[3]

| SALE PROCESS KEY DATES AND DEADLINES | |
|---|---|
| **September 15, 2022, at 4:00 p.m. (prevailing Eastern Time)** | Bidding Procedures Objection Deadline |
| **September 20, 2022, at 3:00 p.m. (prevailing Eastern Time)** | Hearing to consider approval of Bidding Procedures and other relief requested herein (the "Bidding Procedures Hearing") |
| **The later of (i) September 23, 2022, and (ii) three business days after the** | Deadline for Debtors to file and serve Sale Notice |

---

[2] The Debtors will file any proposed Sale Order in advance of the Sale Hearing.

[3] Capitalized terms used in this chart but not previously defined herein shall have the respective meanings ascribed to such terms later in this Motion.

| | |
|---|---|
| **entry of the Bidding Procedures Order** | |
| **The later of (i) September 23, 2022, and (ii) three business days after the entry of the Bidding Procedures Order** | Deadline for Debtors to file and serve Assumption and Assignment Notice |
| **October 7, 2022, at 4:00 p.m. (prevailing Eastern Time)** | Stalking Horse Notice Deadline: Deadline by which the Debtors must file a Stalking Horse Notice |
| **October 14, 2022, at 4:00 p.m. (prevailing Eastern Time)** | Sale Objection Deadline |
| **October 14, 2022, at 4:00 p.m. (prevailing Eastern Time)** | Bid Deadline |
| **October 18, 2022, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for Debtors to Notify Bidders of Status as Qualified Bidders |
| **October 20, 2022, at 10:00 a.m. (prevailing Eastern Time)** | Auction |
| **The later of (i) October 21, 2022 at 4:00 p.m. (prevailing Eastern Time) and (ii) one business day after the conclusion of the Auction** | Deadline for Debtors to file Notice of Auction Results |
| **October 24, 2022, at 4:00 p.m. (prevailing Eastern Time)** | Post-Auction Objection Deadline |
| **October 31, 2022, at 10:00 a.m. (prevailing Eastern Time)** | Sale Hearing |

14.     The Debtors, with the assistance of their advisors, will market the Debtors' Assets to a range of potential strategic and financial buyers and will provide information regarding the Debtors' assets to prospective purchasers.  As such, the Debtors believe that prospective bidders will have sufficient time and information to conduct the necessary due diligence to submit binding bids in accordance with the timeline proposed herein.

15.     Completion of the sale process in a timely manner will also maximize the value of the Debtors' Assets obtained through the Sale.  The proposed dates governing the sale, marketing, and auction process are within the Milestones agreed to by the Consultation Parties. Failure to adhere to the Milestones could compromise the Debtors' chapter 11 strategy. Accordingly, it is in the Debtors' and their stakeholders' best interests to complete a robust sale process as swiftly as possible to consummate the Sale and confirm the Plan.  In view of the foregoing, the Debtors respectfully submit that the Court should grant the relief requested herein, in accordance with the proposed timeline for completing the sale, marketing, and auction process.

## STALKING HORSE BIDDER SELECTION PROCESS

16.     In the event the Debtors select a Stalking Horse Bidder after consulting with the Consultation Parties and obtaining the written consent of the Cash Flow DIP Lender, as soon as reasonably practicable following the selection of a Stalking Horse Bidder, **and by no later than 4:00 p.m. (prevailing Eastern time) on October 7, 2022** (the "Stalking Horse Notice Deadline"), the Debtors shall file a notice (a "Stalking Horse Notice") with detail regarding the Stalking Horse Bidder, attaching a copy of the proposed Stalking Horse Agreement, and detailing the proposed Bid Protections and serve such Stalking Horse Notice by overnight mail, email or facsimile on (i) all persons known or reasonably believed to have expressed interest in acquiring the Assets since the Petition Date, (ii) all non-Debtor parties to any executory contracts and/or unexpired leases proposed to be assumed and assigned pursuant to the Stalking Horse Agreement, and (iii) all parties that have requested notice in these chapter 11 cases as of the date of such  Stalking Horse Notice. Any objections to the Stalking Horse Notice shall be filed on or before **October 11, 2022 at 4:00 p.m. (prevailing Eastern Time)**.

17.     The Debtors propose that, subject to the procedures noted herein, they be authorized to provide a break-up fee to a Stalking Horse Bidder and reimbursement of expenses, in such amounts to be determined and subject to Court approval (together, the "<u>Bid Protections</u>").

18.     Having the flexibility to designate a Stalking Horse Bidder and provide Bid Protections will provide the Debtors with the ability to maximize the value of the Assets and therefore Plan recoveries.  Given the Debtors' need to maximize value for their estates through a timely and efficient marketing and sale process, the ability to designate a Stalking Horse Bidder and offer Bid Protections to such bidder (although the Debtors ultimately may, in the exercise of their business judgment, not designate a Stalking Horse Bidder at all) is a reasonable and sound exercise of the Debtors' business judgment and provides an actual benefit to the Debtors' estates.

## THE BIDDING PROCEDURES

### A.     Overview

19.     The Bidding Procedures are designed to promote a competitive and expedient sale process to consummate a Sale.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or best offer for one or more sales of the Assets on a schedule consistent with the Milestones and the Debtors' chapter 11 strategy.

20.     Importantly, the Bidding Procedures recognize the fiduciary obligations of the Debtors.  Specifically, the Bidding Procedures provide that nothing contained therein will require the board of directors, board of managers, or such similar governing body of a Debtor to take any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body reasonably determines in good faith, after consultation with their counsel, that taking such action, or refraining from taking such action, as applicable, would be inconsistent with applicable law or its fiduciary

10

obligations under applicable law.  As such, the Bidding Procedures do not impair the Debtors'

ability to consider all Qualified Bid proposals, and preserve the Debtors' right to modify the

Bidding Procedures as necessary or appropriate to maximize value for their estates.

21.    As the Bidding Procedures are attached to the Bidding Procedures Order,

they are not herein restated in their entirety.  Pursuant to Local Rule 6004-1(c), certain of the key

terms of the Bidding Procedures are highlighted in the chart below:

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
| --- | --- |
| **Provisions Governing Qualification of Bidders and Qualified Bids** Local Rule 6004-1(c)(i)(A)-(B) | **Qualified Bid and Qualified Bidder Requirements are set forth in Sections IV, V and VI of the Bidding Procedures.** <br><br> **A.  Due Diligence –** Execute confidentiality agreement with the Debtors and provide sufficient information (as reasonably determined by the Debtors) that access to information is for purpose consistent with the Bidding Procedures. <br><br> **B.  Bid Deadline –** Submit Qualified Bid **by October 14, 2022, at 4:00 p.m. (prevailing Eastern Time)**. <br><br> **C.  Qualified Bid Requirements** <br><br>     1.  <u>Identification of Bidder</u>.  A Qualified Bid must fully disclose the following:  (a) the legal identity of each person or entity bidding for the applicable Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such bid) or participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such bid) the Auction in connection with such bid and the complete terms of any such participation; and (b) any past or present connections or agreements with the Debtors or their non-debtor affiliates, any Stalking Horse Bidder(s), any other known Prospective Bidder or Qualified Bidder, the Cash Flow DIP Lenders, any Prepetition Lenders, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtors or their non-debtor affiliates). <br><br>     2.  <u>Purchase Assets</u>.  A Qualified Bid must identify the following: <br><br>         a.  the Assets or group of Assets to be purchased (including any then-known executory contracts and unexpired leases (collectively, the "<u>Contracts</u>")) such Prospective Bidder wishes to bid on.  For the avoidance of doubt, a  Bid may be a bid on the Assets in either (i) |

individual lots (by any combination), (ii) as a collective whole, or (iii) in any combination;

b. the liabilities (including applicable Cure Costs), if any, to be assumed by the Prospective Bidder in the Sale, including any debt to be assumed; and

c. if a bid is for more than one Asset, an allocation of the purchase price across the individual Assets.

3. <u>Form of Consideration</u>.

- *Credit Bidding*. The Cash Flow DIP Lender and DIP Repo Guarantor, each as defined in the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Providing Super-Priority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Granting Related Relief* [Docket No. 292] (the "<u>Cash Flow DIP Order</u>"), shall be entitled to credit bid (a "<u>Credit Bid</u>"), respectively, up to the full amount of the outstanding Cash Flow DIP Obligations (as defined in the Cash Flow DIP Order) and up to the full amount of amounts actually advanced by the DIP Repo Guarantor under the DIP Repo Guarantee (as defined in the Cash Flow DIP Order). No other party may credit bid.

- The Cash Flow DIP Lender and DIP Repo Guarantor will each be deemed to be a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a Prospective Bidder must satisfy to be a Qualified Bidder, and any Credit Bid submitted by the Cash Flow DIP or DIP Repo Guarantor will be deemed to be a Qualified Bid, for all purposes and requirements pursuant to these Bidding Procedures, notwithstanding the requirements that a Bid must satisfy to be a Qualified Bid, including the requirements, among others, that each Bid must be irrevocable and to deliver a confidentiality agreement and post a Good Faith Deposit.

- *Form of Consideration and Allocation*. A Bid must specify whether the Bid is an all cash offer (including confirmation that the cash component is in U.S. Dollars) or consists of certain non-cash components, such as a credit bid, assumption of liabilities, or other forms of consideration (and including a detailed analysis of the value of any non-cash component of the Bid) as well as the allocation of the Purchase Price among the Assets to be acquired and the liabilities to be assumed. Subject to Section VI.A.4 below, to be a Qualified Bid, a Bid (whether on an individual Asset, a package of Assets or all Assets) must include sufficient cash consideration to pay any applicable Bid Protections or similar payment payable to any Stalking Horse Bidder under the terms of

any Stalking Horse Agreement applicable to one or more of the Assets for which the Bid is submitted.

4. <u>Minimum Bid for Stalking Horse Assets</u>.  Each bid submitted in connection with Assets that are the subject of a particular Stalking Horse Bid (any such Assets, the "<u>Stalking Horse Assets</u>") must either (a) (i) be a bid for all of the Stalking Horse Assets in the Stalking Horse Bid and (ii) exceed the purchase price of such Stalking Horse Bid plus any applicable Bid Protections plus any applicable Initial Bid Increment or (b) propose an alternative transaction that, in the Debtors' business judgment, provides higher value or better terms than the applicable Stalking Horse Bid, including by exceeding the purchase price of such Stalking Horse Bid plus any applicable Bid Protections plus any applicable Initial Bid Increment, and after taking into account, among other things, in light of all the Bids submitted for the Assets or any combination of Assets, whether there is sufficient cash to pay (x) any applicable Bid Protections, and (y) the DIP Financing Amount, in each case, as applicable. For the avoidance of doubt, as to clause (b) in this Section VI.A.4, the Debtors may evaluate each Bid in light of each of the factors set forth therein, but a Bid is not required to meet each factor in order to be determined a Qualified Bid.

The Debtors may consider a bid for a portion of any applicable Stalking Horse Assets (each such bid, a "<u>Partial Bid</u>") if (a) the Debtors receive one or more other Partial Bids for the remaining applicable Stalking Horse Assets such that, when taken together, and after considering the risks associated with consummating several individual bids, the Partial Bids collectively constitute a higher or otherwise better bid than the Stalking Horse Bid (taking into account any Bid Protections, and the Initial Bid Increment) or (b) the Partial Bid proposes a purchase price for the applicable Stalking Horse Assets that, when taken together with the liquidation or alternative sale value of the remaining applicable Stalking Horse Assets, as determined by the Debtors in good faith with the advice of their legal and financial advisors, exceeds the purchase price in the Stalking Horse Bid *plus* any applicable Bid Protections *plus* any applicable Initial Bid Increment, and after taking into account, among other things, in light of all the Bids submitted for the Assets or any combination of Assets, whether there is sufficient cash to pay (x) any applicable Bid Protections, (y) and the DIP Financing Amount, in each case, as applicable.

If the value of a bid (whether such bid is for all of the applicable Stalking Horse Assets or is a Partial Bid) relative to the Stalking Horse Bid includes additional non-cash components (such as fewer contingencies than are in the Stalking Horse Agreement), the bidder should include an analysis or description of the value of any such additional non-cash components, including any supporting documentation, to assist the Debtors in better evaluating the competing bid.

5. <u>Proposed Asset Purchase Agreement</u>. A Qualified Bid must constitute a *binding and irrevocable* offer and be in the form of an asset purchase agreement reflecting the terms and conditions of the bid (each, a "<u>Proposed Asset Purchase Agreement</u>"). A Proposed Asset Purchase Agreement shall (a) be duly authorized and executed, (b) be based on, and marked against, (i) in the case of Assets subject to a Stalking Horse Agreement, the applicable Stalking Horse Agreement, and (ii) in the case of Assets not subject to a Stalking Horse Agreement, a form asset purchase agreement provided by the Debtors to Prospective Bidders to reflect the proposed Sale Transaction and to show any other proposed modifications to the form purchase agreement, (c) specify the proposed purchase price for the applicable Assets, and (d) identify any then-known Contracts proposed for or that may be proposed for assumption and assignment in connection with the proposed Sale Transaction.

6. <u>Financial Information</u>. A Qualified Bid must include the following: (a) a statement that the Prospective Bidder is financially capable of timely consummating the Sale Transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement; (b) sufficient evidence, as reasonably determined by the Debtors (in consultation with the Consultation Parties), to determine that the Prospective Bidder has, or can obtain, the financial wherewithal to timely consummate the Sale Transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement; and (c) Adequate Assurance Information (as defined in Section VI.A.8) with respect to any Contracts included or that may be included in the Prospective Bidder's bid.

7. <u>Good Faith Deposit</u>. Each Qualified Bid must be accompanied by a good faith deposit (each, a "<u>Good Faith Deposit</u>") in the form of cash (or other form acceptable to the Debtors in their sole discretion) in an amount equal to ten percent (10%) of the proposed purchase price for the applicable Assets (inclusive of any amount thereof comprising any applicable Credit Bid consideration); *provided*, that no Good Faith Deposit shall be required for any Qualified Bid that solely contains Credit Bid consideration.

Good Faith Deposits shall be deposited into a trust account maintained on behalf of the Debtors (and to be designated by Debtors) and handled in accordance with Section VII.E of these Bidding Procedures. To the extent a Qualified Bidder increases the purchase price before, during, or after the Auction, the Debtors reserve the right to require that such Qualified Bidder adjust its Good Faith Deposit so that it equals ten percent (10%) of the increased purchase price. The Debtors reserve the right to increase or decrease the Good Faith Deposit for one or more Qualified Bidders in their sole discretion except with respect to any Qualified Bid that solely contains Credit Bid consideration as set forth above; *provided*, the Debtors may not decrease or waive any Good Faith Deposit without consulting with the Consultation Parties.

8.  <u>Adequate Assurance</u>.  A Qualified Bid must include evidence of the Prospective Bidder's (or any other relevant assignee's) ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Prospective Bidder's (or any other relevant assignee's) ability to perform future obligations arising under any Contracts included in its bid. The Debtors may require the following information in connection with demonstrating adequate assurance of future performance: information evidencing the Prospective Bidder's (or any other relevant assignee's) financial wherewithal and willingness to perform under any Contracts included in the bid, which information may include (i) a corporate organizational chart or similar disclosure identifying corporate ownership and control, (ii) financial statements, (iii) tax returns and (iv) annual reports (the information described in Section VI.A.8, the "<u>Adequate Assurance Information</u>").  All Adequate Assurance Information must be in a form that will permit its immediate dissemination to the applicable Counterparties (as defined below).

9.  <u>Representations and Warranties</u>.  A Qualified Bid must include the following representations and warranties: (a) a statement that the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the applicable Assets prior to submitting its bid; (b) a statement that the Prospective Bidder has relied solely upon its own independent review, investigation and/or inspection of any relevant documents and the Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the applicable Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in a Stalking Horse Agreement; (c) a statement that all proof of financial ability to consummate the Sale in a timely manner and all information provided to support adequate assurance of future performance is true and correct; and (d) a statement that the Prospective Bidder agrees to be bound by the terms of the Bidding Procedures.

10. <u>Authorization</u>.  A Qualified Bid must (a) include evidence of authorization and approval from the Prospective Bidder's board of directors (or comparable governing body) with respect to the submission, execution and delivery of any bid for the Assets, participation in the Auction and closing of the Sale contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement or (b) if the Prospective Bidder is an entity formed for the purpose of effecting the proposed Sale Transaction, a Qualified Bid must provide written evidence acceptable to the Debtors of authorization and the approval by the equity holder(s) of such Prospective Bidder.

11. <u>Other Requirements</u>.  A Qualified Bid must satisfy, among others (as set forth in Section VI.A.11 of the Bidding Procedures), the following requirements:

- state that the Prospective Bidder agrees to serve as a backup bidder (a "<u>Backup Bidder</u>") if such bidder's Qualified Bid is selected at the Auction as the next highest or next best bid after the Successful Bid (as defined in Section VII.C.1 below) for the applicable Assets (each such bid, a "<u>Backup Bid</u>"); provided, that as to any Stalking Horse Bidder, the terms of any applicable Stalking Horse Agreement shall control as to any Backup Bidder and Backup Bid requirement;

- state that the bid, as may be modified before or during the Auction, represents a binding, irrevocable, good-faith and bona fide offer to purchase the applicable Assets and is not subject to or conditioned on any due diligence, financing, or other contingency (other than the conditions to closing under the applicable agreement), and is irrevocable until the later of (i) the applicable outside date for consummation of the Sale or (ii) the Backup Bid Expiration Date (as defined in Section VII.C.1);

- except as otherwise may be provided in a Stalking Horse Agreement, expressly state and acknowledge that the Prospective Bidder shall not be entitled to a break-up fee, termination fee, expense reimbursement or other "bidding protection" in connection with the submission of a bid for the Assets or otherwise participating in the Auction or the Sale process, unless otherwise granted by the Debtors and approved by an order of the Court;

- state that the Prospective Bidder is committed to closing the Sale contemplated in its bid as soon as practicable and in any case no later than the applicable deadline to consummate an approved Sale set forth herein;

- specify (i) whether the Qualified Bidder intends to hire any of the Debtors' employees and (ii) expressly proposes the treatment of the Debtors' prepetition compensation, incentive, retention, bonus or other compensatory arrangements, plans, or agreements, including offer letters, employment agreements, consulting agreements, retiree benefits, and any other employment related agreements (collectively, the "<u>Employee Obligations</u>");

- expressly waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code or the payment of any broker fees or costs in connection with bidding for any of the Assets and/or otherwise participating in the Auction or the Sale process;

|  | <ul><li>include a covenant to cooperate with the Debtors (i) to provide pertinent factual information regarding the Prospective Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and any other applicable regulatory requirements and (ii) to obtain Court approval of the Sale;</li><li>state or otherwise estimate the types of transition services, if any, the Prospective Bidder would require of and/or provide to the Debtors, including an estimate of the time any such transition services would be required of and/or provided to the Debtors, if the Prospective Bidder's bid were selected as the Successful Bid for the applicable Assets;</li><li>certify that the Prospective Bidder did not collude with any other bidders and is not otherwise a partnership, joint venture or other entity in which more than one bidder (or any affiliates of a bidder) has a direct or indirect interest, unless consented to in writing by the Debtors;</li><li>include a covenant to comply with the terms of these Bidding Procedures and the Bidding Procedures Order; and</li><li>include contact information for the specific person(s) the Debtors should contact in the event they have any questions about the Prospective Bidder's bid.</li></ul> |
|---|---|
| **Provisions Providing Bid Protections to Stalking Horse Bidder** Local Rule 6004- 1(c)(i)(C) | Sections II and VI.C of the Bidding Procedures set forth the proposed Stalking Horse Procedures and Bid Protections which, if approved, would govern the Debtors' provision of bidding protections to designated Stalking Horse Bidders. Because the Stalking Horse Procedures are discussed in detail in this Motion, they are not restated in this summary. |
| **Modification of Bidding Procedures** Local Rule 6004- 1(c)(i)(D) | The Debtors reserve the right to, in their business judgment, in a manner consistent with their fiduciary duties and applicable law, modify these Bidding Procedures, including to, among other things, (a) extend or waive deadlines or other terms and conditions set forth herein, (b) adopt new rules and procedures for conducting the bidding and Auction process, (c) if applicable, provide reasonable accommodations to a Stalking Horse Bidder, or (d) otherwise modify these Bidding Procedures to further promote competitive bidding for and maximizing the of value of the Asset; provided, that such extensions, waivers, new rules and procedures, accommodations and modifications (i) do not conflict with and are not inconsistent with the Bidding Procedures Order, these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court, (ii) are promptly communicated to each Qualified Bidder, (iii) do not extend the Bid Deadline the date of the Auction or the closing of the Auction, and (iv) do not allow the submission (or the Debtors' acceptance) of additional bids after, as applicable, the Bid Deadline or the close of Auction. |

| | |
|---|---|
| **Closing with Alternative Backup Bidders**<br>Local Rule 6004-1(c)(i)(E) | **Section VII.C.2 of the Bidding Procedures sets forth the primary requirements with respect to Backup Bids.**<br><br>Immediately prior to the conclusion of the Auction for an Auction Package, the Debtors will (a) determine, in a manner consistent with these Bidding Procedures, which Qualified Bid is the Backup Bid for the Auction Package and (b) notify all Qualified Bidders at the Auction for the Auction Package of the identity of the Backup Bidder for the Auction Package and the amount of the purchase price and other material terms of the Backup Bid.  Within two (2) business days after the Auction, the Backup Bidder shall submit to the Debtors execution versions of the documentation memorializing the terms of the Backup Bid(s).<br><br>A Backup Bid will remain binding on the applicable Backup Bidder until the earlier of (a) the first business day after the closing of a Sale with the Successful Bidder for the applicable Auction Package and (b) 30 days after the Sale Hearing (or such other date as may be set forth in a Stalking Horse Purchase Agreement, the "<u>Backup Bid Expiration Date</u>").  If the Sale to the applicable Successful Bidder is terminated prior to the Backup Bid Expiration Date, the Backup Bidder shall be deemed the new Successful Bidder for the applicable Auction Package and shall be obligated to consummate the Backup Bid as if it were the Successful Bid at the Auction; <u>provided</u>, that the Debtors may, in their business judgment and after providing notice to the Sale Notice Parties, elect not to pursue the Sale contemplated by the Backup Bid. |
| **Provisions Governing the Auction**<br>Local Rule 6004-1(c)(ii) | **Section VII of the Bidding Procedures sets forth the procedures governing the Auction.**<br><br>If the Debtors receive more than one Qualified Bid (including any Stalking Horse Bid) for an Asset, the Debtors will conduct an Auction for such Asset(s). With respect to any particular Asset for which the Debtors receive only one Qualified Bid by the Bid Deadline, the Debtors may, in their business judgment, determine to consummate a Sale with the applicable Qualified Bidder(s) without conducting an Auction.<br><br>In the event the Debtors determine not to hold an Auction for some or all of the Assets, the Debtors will file with the Court, serve on the Sale Notice Parties and cause to be published on the KCC Website at: https://www.kccllc.net/FGMC, a notice containing the following information, as applicable: (i) a statement that the Auction for the relevant Assets has been canceled, (ii) the identity of the Successful Bidder, (iii) a copy of the Successful Bid or a summary of the material terms of such bid, including any assumption and assignment of Contracts contemplated thereby, and (iv) the date, time and location of the applicable Sale Hearing.<br><br>The Auction, if required, will be conducted on **October 20, 2022, at 10:00 a.m. (prevailing Eastern Time)**, virtually through Zoom, or, if permitted, at the offices of Pachulski Stang Ziehl & Jones, LLP, 919 N. Market Street, 17th Floor, Wilmington, Delaware, 19801, or at such other time and location as designated |

by the Debtors, after providing notice to the Sale Notice Parties; <u>provided</u>, <u>however</u>, the Debtors shall have the right to hold the Auction remotely, including telephonically or by other electronic means (including, without limitation, video conferencing) as the Debtors may choose in their sole discretion so as to comply with all applicable federal, state and local laws, orders, ordinances, guidelines and guidance, including any COVID-19 related guidelines.  If held, the Auction proceedings will be transcribed and/or video recorded.

A.  <u>Participants and Attendees</u>.  Only Qualified Bidders are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bidding Procedures.  At least three (3) days prior to the Auction, each Qualified Bidder must inform the Debtors in writing whether it intends to participate in the Auction.  Qualified Bidders participating in the Auction must appear in person (or through video conferencing, if applicable) at the Auction or through a duly authorized representative.  Subject to the Auction procedures set forth in Section VII of the Bidding Procedures, all Qualified Bidders and the Consultation Parties are permitted to attend the Auction; <u>provided</u>, that the Debtors may, in their sole discretion, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder at the Auction.

B.  <u>Auction Packages</u>.  Prior to the commencement of the Auction, the Debtors will make a determination regarding the Assets for which the Debtors will conduct an Auction (an "<u>Auction Package</u>").

C.  <u>Baseline Bids</u>.  Prior to the commencement of the Auction, the Debtors will determine, in their business judgment, the highest and/or best Qualified Bid submitted for each Auction Package (each such Qualified Bid, a "<u>Baseline Bid</u>").  Bidding for each Auction Package at the Auction shall commence at the amount of the applicable Baseline Bid.

D.  <u>Minimum Overbids</u>.  Bidding at the Auction for an Auction Package that is subject to Qualified Bids will begin with the Baseline Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid (a "<u>Subsequent Bid</u>") is submitted by a Qualified Bidder that (i) improves on such Qualified Bidder's immediately prior Qualified Bid and (ii) the Debtors determine that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Baseline Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid.

The Debtors will announce at the outset of the Auction the minimum required increments for Successive Bids (each, such bid, a "<u>Minimum Overbid</u>").  The Debtors may, in their discretion, announce increases or reductions to Minimum Overbids at any time during the Auction.

Upon a Qualified Bidder's declaration of a bid at the Auction, the Qualified Bidder must state on the record its commitment to pay within two (2) business days following the Auction, if such bid were to be selected as the Successful Bid or as the Backup Bid for the applicable Auction Package,

the incremental amount of the Qualified Bidder's Good Faith Deposit calculated based on the increased purchase price of such bid (such Good Faith Deposit so increased, the "Incremental Deposit Amount") if applicable.

Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by any bid subsequent to a Baseline Bid, the Debtors will, at each round of bidding, consider and/or give effect to (a) any Bid Protections (only if such amount has not previously been paid) payable to any Stalking Horse Bidder under any applicable Stalking Horse Agreement, including the crediting of such amounts to the applicable Stalking Horse Bidder, (b) any additional liabilities to be assumed by a Qualified Bidder under the bid, including whether such liabilities are secured or unsecured, (c) any additional costs that may be imposed on the Debtors, and (d) the treatment of the DIP financing amount, as applicable.

E. Leading Bid. After the first round of bidding and between each subsequent round of bidding, the Debtors will announce the bid that they believe to be the highest or otherwise best offer for the applicable Auction Package (each such bid, a "Leading Bid") and describe the material terms thereof. Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the material terms of the Leading Bid, subject to the Debtors' authority to revise the Auction procedures to the extent permitted by the Bidding Procedures.

The Auction will be conducted by open bidding in the presence of all other Qualified Bidders and each Qualified Bidder shall have the right to be present for all rounds of open bidding and to submit additional bids and make modifications to its Proposed Asset Purchase Agreement at the Auction to improve its bid. The Debtors may, in their business judgment, engage in discussions and negotiate with any and all Qualified Bidders participating in the Auction outside the presence of other bidders before each round of bidding, including to improve or clarify the terms of bids made.

The Debtors shall have the right to determine, in their business judgment, which bid is the highest or otherwise best bid with respect to an applicable Auction Package (including, without limitation, with respect to an Auction Package that includes all or substantially all of the Debtors' Assets) and, in accordance with the terms of these Bidding Procedures, reject, at any time, without liability (except for any requirement to pay any bidding protections under a Stalking Horse Agreement, as applicable), any bid that the Debtors deem to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, these Bidding Procedures, any order of the Court, or the best interests of the Debtors and their estates, including, without limitation, the treatment of the DIP financing amount, as applicable.

G. Successful Bids. Immediately prior to the conclusion of the Auction for an Auction Package, the Debtors will (a) determine, consistent with these Bidding Procedures, which Qualified Bid constitutes the highest or

<table>
<tr><td></td><td>otherwise best bid(s) for the Auction Package (each such bid, a "<u>Successful Bid</u>") and (b) notify all Qualified Bidders at the Auction of the identity of the bidder that submitted the Successful Bid for the Auction Package (each such bidder, a "<u>Successful Bidder</u>") and the amount of the purchase price and other material terms of the Successful Bid.  As a condition to remaining the Successful Bidder, the Successful Bidder shall, within two (2) business days after the conclusion of the Auction, (i) if applicable, wire to the Debtors in immediately available funds the Incremental Deposit Amount, calculated based on the purchase price in the Successful Bid(s) and (ii) submit to the Debtors fully executed documentation memorializing the terms of the Successful Bid(s).</td></tr>
</table>

**B.**    **Sale Noticing and Objection Procedures**

22.    The below chart sets forth the noticing and objection procedures and requirements established by the Bidding Procedures (collectively, the "<u>Sale Noticing and Objection Procedures</u>"):

| SALE NOTICING AND OBJECTION PROCEDURES | |
|---|---|
| **Sale Notice** | By the later of (i) **September 23, 2022** and (ii) three (3) business days after entry of the Bidding Procedures Order, the Debtors will file with the Court, serve on the Sale Notice Parties and cause to be published on the KCC Website, at https://www.kccllc.net/FGMC, a notice (the "<u>Sale Notice</u>") setting forth (A) a description of the potential Sale in accordance with the Bidding Procedures, (B) the date, time and location of the Auction and Sale Hearing, (C) the Sale Objection Deadline and Post-Auction Objection Deadline (each as defined in Section X.D) and the procedures for filing such objections, and, if applicable, (D) a summary of the material terms of any Stalking Horse Agreement, including the terms and conditions of any bidding protections to be provided thereunder, as of the date of the Sale Notice. |
| **Sale Objections** | Objections to any Sale Transaction, including any objection to any sale of Assets free and clear of all liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code (each such objection, a "<u>Sale Objection</u>") shall, by no later than **October 14, 2022, at 4:00 p.m. (prevailing Eastern Time)]** (the "<u>Sale Objection Deadline</u>"), be filed with Court and served on the Objection Notice Parties. |
| **Publication Notice** | As soon as practicable after entry of the Bidding Procedures Order, the Debtors will cause the information contained in the Sale Notice to be published once in the national edition of *USA Today*. |
| **Qualified Bid Selections** | The Debtors will make a determination regarding the bids that qualify as Qualified Bids and as Baseline Bids (as defined in Section VII.B.2) and will notify bidders whether they have been selected as Qualified Bidders by no later than **October 18, 2022 at 4:00 p.m. (prevailing Eastern Time)**.  A Qualified |

|  | Bidder shall not (without the consent of the Debtors), modify, amend or withdraw its Qualified Bid, unless for the purposes of increasing the purchase price or otherwise improving the terms of the bid, as determined by the Debtors in their business judgment. |
|---|---|
| **Auction Results** | By the later of (a) **October 21, 2022** and (b) one day after the conclusion of the Auction, the Debtors will file with the Court, serve on the Sale Notice Parties and cause to be published on the KCC Website, at https://www.kccllc.net/FGMC, a notice setting forth the results of the Auction (the "Notice of Auction Results"), which will (a) identify each Successful Bidder and each Backup Bidder, (b) include a copy of each Successful Bid and each Backup Bid or a summary of the material terms of such bids, including any proposed assumption and assignment of Contracts contemplated thereby, and (c) set forth the Post-Auction Objection Deadline (as defined in Section X.D), the date, time and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Sale Notice Parties of the outcome of the Auction.<br><br>The Debtors' presentation to the Bankruptcy Court for approval of a selected Qualified Bid as a Successful Bid does not constitute the Debtors' acceptance of such Bid.  The Debtors will have accepted a Successful Bid only when such Successful Bid has been approved by the Bankruptcy Court at the Sale Hearing. |
| **Post-Auction Objections** | Following service of the Notice of Auction Results, Sale Notice Parties may object to the conduct of the Auction and/or the particular terms of any proposed Sale Transaction in a Successful Bid, other than with respect to a Stalking Horse Bid (each such objection, a "Post-Auction Objection") by no later than the later of (i) **October 24, 2022, at 4:00 p.m. (prevailing Eastern Time)** and (ii) three (3) days prior to the Sale Hearing. |

23.     The Debtors submit that the Sale Noticing and Objection Procedures, coupled with the Assumption and Assignment Procedures set forth below, constitute adequate and reasonable notice of the key dates and deadlines and other important information regarding the sale process, including the Objection Deadlines (as defined below), the Bid Deadline and the time and location of the Auction and Sale Hearing.  Accordingly, the Debtors request that the Court approve the form of Sale Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2, and find that the Sale Noticing and Objection Procedures comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

<u>**Assumption and Assignment Procedures**</u>

24.    In connection with any Sale Transaction, the Debtors may seek to assume and assign to a Successful Bidder one or more Contracts.  The Assumption and Assignment Procedures are designed to, among other things, govern the Debtors' provision of Adequate Assurance Information and the provision of notice to all Counterparties.  The below chart sets forth the Assumption and Assignment Procedures:

| ASSUMPTION AND ASSIGNMENT PROCEDURES | |
|---|---|
| **Assumption and Assignment Notice** | By the later of (i) **September 23, 2022** and (ii) three (3) business days after the entry of the Bidding Procedures Order, the Debtors will file with the Court and serve on each Counterparty to a Contract that may be assumed in connection with any Sale Transaction an Assumption and Assignment Notice, which will (i) identify the applicable Contracts, (ii) list the Debtors' good-faith calculation of Cure Costs with respect to each Contract, (iii) expressly state that assumption or assignment of a Contract is not guaranteed and is subject to Court approval, and (iv) prominently display the deadlines to file Contract Objections and Adequate Assurance Objections (each as defined below). |
| **Contract Objections** | <u>Contract Objection Deadline</u>.  Any Counterparty to a Contract that wishes to object to the Debtors' proposed Cure Costs (each such objection, a "<u>Contract Objection</u>") or assumption and assignment on any basis (except objections solely related to adequate assurance of future performance by a Successful Bidder other than a Stalking Horse Bidder) shall file with the Court and serve on the Objection Notice Parties its Contract Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by no later than **14 calendar days after service of the Cure Notice** (the "<u>Contract Objection Deadline</u>"). <br><br> <u>Resolution of Contract Objections</u>.  The Debtors and the objecting Counterparty shall first confer in good faith to attempt to resolve the Contract Objection without Court intervention.  If the parties are unable to consensually resolve the Contract Objection prior to the commencement of the Sale Hearing, the Court shall make all necessary determinations relating to the applicable Cure Costs or assumption and assignment and the Contract Objection at a hearing scheduled pursuant to the following paragraph.  If a Contract Objection is resolved in a manner that is not in the best interests of the Debtors and their estates, whether or not such resolution occurs prior to or after the closing of the applicable Sale (subject to the terms of the applicable Sale Transaction), the Debtors may determine that any Contract subject to such resolved Contract Objection will no longer be assumed and assigned pursuant to the applicable Sale (subject to the terms of the applicable Sale).  All other objections to the proposed assumption and assignment of the Debtors' right, title and interest in, to and under a Contract will be heard at the Sale Hearing. |

| | |
|---|---|
| | Adjourned Contract Objections.  If a timely filed Contract Objection cannot otherwise be resolved by the parties, the Contract Objection may be heard at the Sale Hearing, or, at the Debtors' option, be adjourned to a subsequent hearing (each such Contract Objection, an "Adjourned Contract Objection"); provided, that, the determination of whether a Contract Objection may be heard at the Sale Hearing is in the Debtors' and the Court's discretion.  An Adjourned Contract Objection may be resolved after the closing date of the applicable Sale.  Upon resolution of an Adjourned Contract Objection and the payment of the applicable cure amount or resolution of the assumption and assignment issue, if any, the applicable Contract that was the subject of such Adjourned Contract Objection shall, as applicable, be deemed assumed and assigned to the applicable Successful Bidder as of the closing date of the applicable Sale. |
| | Failure to Timely Object.  If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Contract Objection, the Counterparty forever shall be barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract and shall be deemed to have consented to the assumption and assignment of the Contract.  The Cure Costs set forth in the applicable Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Contract and satisfy the requirements of section 365(b) of the Bankruptcy Code, and the Counterparty to the Contract shall be bound by and deemed to have consented to the Cure Costs. |
| **Adequate Assurance Objections** | Adequate Assurance Objection Deadline.  Any Counterparty to a Contract that wishes to object to the proposed assumption and assignment of the Contract, other than with respect to a Stalking Horse Bidder, the subject of which objection is a Successful Bidder's (or any other relevant assignee's) proposed form of adequate assurance of future performance (each such objection, an "Adequate Assurance Objection"), shall file with the Court and serve on the Objection Notice Parties an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by no later than the Post-Auction Objection Deadline. |
| | Resolution of Adequate Assurance Objections.  The Debtors and the objecting Counterparty shall first confer in good faith to attempt to resolve the Adequate Assurance Objection without Court intervention.  If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, the Adequate Assurance Objection and all issues of adequate assurance of future performance of the applicable Successful Bidder (or any other relevant assignee) shall be determined by the Court at the Sale Hearing. |
| | Failure to Timely Object.  If a Counterparty fails to timely file with the Court and serve on the Objection Notice Parties a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any objection to the assumption and/or assignment of the applicable Contract with regard to adequate assurance of future performance.  The applicable Successful Bidder (or any other relevant assignee) shall be deemed to have provided adequate assurance of future performance with respect to the Contract in accordance with Bankruptcy Code |

24

| | |
|---|---|
| | section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or any other document. |
| **Designation Rights** | Successful Bidders (including any Stalking Horse Bidder or Backup Bidder ultimately named a Successful Bidder) may, pursuant to the terms of an applicable asset purchase agreement executed with the Debtors (including any applicable Stalking Horse Agreement), designate (a) for assumption and assignment Contracts that were not originally included in the Assets to be acquired in connection with the applicable Successful Bid and (b) Contracts that previously were included among the Assets to be acquired in connection with the applicable Successful Bid as "excluded assets" that will not be assigned to or otherwise acquired by the Successful Bidder. The Debtors shall use commercially reasonable efforts to, as soon as reasonably practicable after the Debtors receive notice of any such designation, file with the Court, serve on the applicable Counterparties and cause to be published on the KCC Website, a notice of such designation (a "<u>Designation Notice</u>") containing sufficient information to apprise Counterparties of the designation of their respective Contracts. |
| **Notice of Assumed Contracts** | As soon as reasonably practicable after the closing of a Sale, the Debtors will file with the Court, serve on the applicable Counterparties and cause to be published on the KCC Website, a notice containing the list of Contracts that the Debtors assumed and assigned pursuant to any asset purchase agreement with a Successful Bidder. |
| **Reservation of Rights** | The inclusion of a Contract or Cure Costs with respect to any Contract on any Assumption and Assignment Notice or any Notice of Auction Results, shall not constitute or be deemed a determination or admission by the Debtors, any Successful Bidder or any other party that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code, and shall not be a guarantee that such Contract ultimately will be assumed or assigned. The Debtors reserve all of their rights, claims and causes of action with respect to each Contract listed on the aforementioned notices. |

## <u>Argument</u>

**A.    The Bidding Procedures Are Fair, Appropriate and in the Best Interests of the Debtors and Their Stakeholders**

25.    The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of a debtor's property—maximizing the value of sale proceeds received by the estate. *See Burtch et al. v. Ganz, et al. (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (debtor has "fiduciary duty to maximize the value of

the bankruptcy estate"); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564- 65 (8th Cir. 1997) ("a primary objective of the Code [in asset sales is] to enhance the value of the estate at hand.") (citing *Metro. Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 494 (7th Cir. 1993) ("Section 365 . . . advances one of the Code's central purposes, the maximization of the value of the bankruptcy estate for the benefit of creditors.")).  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); I*n re Fin'l News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1992) ("[C]ourt-imposed rules for the disposition of assets . . .  [should] provide an adequate basis for comparison of offers, and [should] provide for fair and efficient resolution of bankrupt estates.").

26.     The Bidding Procedures provide for an orderly, uniform and appropriately competitive process through which interested parties may submit offers in connection with a Sale of one or more groups of the Debtors' Assets or substantially all of the Debtors' assets to one or more bidders.  The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Assets.

27.     Additionally, and as described in the First Day Declaration, given the decline in the Debtors' revenue, the nature of certain of the Debtors' Assets, and the pressure the Debtors face from operating in this current economic environment, the sale timeline was carefully negotiated as part of reaching an agreement with the Cash Flow DIP Lender and DIP Repo Guarantor.  The Bidding Procedures will allow the Debtors to conduct any Auction in a

fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely sale or sales.

28.    Courts in this District and other districts routinely approve procedures substantially similar to the proposed Bidding Procedures, including procedures providing for the designation of stalking horse bidders and sale timelines consistent with (or more accelerated) than the timeline proposed herein. *See*, *e.g.*, *In re Consolidated Infrastructure Group, Inc.*, No. 19-10165 (BLS) [Docket No. 151] (Bankr. D. Del. Apr. 24, 2019) (authorizing designation of stalking horse bidders and provision of bid protections without further hearing with consent of United States Trustee and consultation parties)**;** *In re Hobbico, Inc.*, No. 18-10055 (KG) [Docket No. 243] (Bankr. D. Del. Mar. 14, 2018) (same); *In re California Proton Treatment Center, LLC*, No. 17-10477 (LSS) [Docket No. 158] (Bankr. D. Del. Apr. 12, 2017) (same); *In re United Road Towing, Inc.*, No. 17-10249 (LSS) [Docket No. 131] (Bankr. D. Del. Mar. 6, 2017) (same); *In re Constellation Enterprises LLC*, No. 16-11213 (CSS) [Docket No. 260] (Bankr. D. Del. Jun. 15, 2016) (same); *See also, e.g.*, *In re Mabvax Therapeutics Holdings, Inc.*, No. 19-10603 (CSS) [Docket No. 78] (Bankr. D. Del. Apr. 8, 2019) (approving bidding procedures with a bid deadline 18 days after entry of bidding procedures order); *In re Things Remembered, Inc.*, No. 19-10248 (CSS) [Docket No. 100] (Bankr. D. Del. Mar. 13, 2019) (approving bidding procedures with bid deadline 7 days after entry of order and auction scheduled for 26 days after entry of order); *In re Charlotte Russe Holding, Inc.*, No. 19-10210 (LSS) [Docket No. 199] (Bankr. D. Del. Feb. 21, 2019) (approving bidding procedures with bid deadline 10 days after entry of order and auction scheduled for 29 days after entry of order); *In re Maurice Sporting Goods, Inc.*, No. 17-12481 (CSS) [Docket No. 125] (Bankr. D. Del. Dec. 12, 2017) (entering bidding procedures order 22 days after petition date, approving bid deadline 10 days after entry of order); *In re Golfsmith Int'l*

*Holdings, Inc.*, No. 16-12033 (LSS) [Docket No. 196] (Bankr. D. Del. Oct. 6, 2016) (approving bidding procedures with a bid deadline 11 days after entry of order and auction scheduled for 13 days after entry of order).

29.    Accordingly, the Bidding Procedures should be approved, not just because they are aligned with the circumstances of the Debtors' chapter 11 cases, but also because they are consistent with procedures approved by courts in this District in cases of similarly-situated debtors and are otherwise reasonable, appropriate, and in the best interests of the Debtors, their estates and all parties in interest.

**B.    Any Proposed Bid Protections Will Be Necessary, Reasonable and Appropriate**

30.    The Debtors believe that the potential to select Stalking Horse Bidders will set a floor for the value of the Assets and attract other potential buyers to bid for such Assets, thereby maximizing the realizable value of the Debtors' business for the benefit of the Debtors' estates, their creditors, and all other parties in interest.  In light of this, the Debtors submit that giving them the flexibility to offer Bid Protections, subject to Court approval, is reasonable in these circumstances.

31.    Providing a stalking horse bidder with certain bidding protections in connection with a sale of significant assets under section 363 of the Bankruptcy Code has become standard practice in chapter 11 cases.   In the Third Circuit, "break-up" fees and expense reimbursements are considered administrative expenses and must be necessary to preserve the value of a debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999).   In *O'Brien*, the Third Circuit provided two examples of a potential benefit accruing from the payment of a break-up fee.  *See id*.   First, a benefit to the estate may arise if, "assurance of a breakup fee promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without

28

which bidding would have been limited." *Id*. at 537.   Second, bidding protections encourage

potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that

the price at which the debtor is sold will reflect its true worth." *Id*.   Termination and similar fees

are effective mechanisms for protecting bidders in connection with an asset sale and can be

"important tools to encourage bidding and to maximize the value of the [d]ebtors' assets." *Official*

*Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R.

650, 659 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).   Put differently, these

bidding protections enable a debtor to assure a sale to a contractually committed bidder at a price

the debtor believes is fair and reasonable, while providing the debtor with the opportunity to

generate even greater value through an auction process. *See In re 995 Fifth Ave. Assocs., L.P.*, 96

B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to

convince a white knight to enter the bidding by providing some form of compensation for the risks

it is undertaking.") (citation omitted) (internal quotation marks omitted).

32.   In *O'Brien*, the Third Circuit reviewed the following nine factors set forth

by the lower court as relevant in deciding whether to award a break-up fee:

a.   the presence of self-dealing or manipulation in negotiating the break-up fee;

b.   whether the fee harms, rather than encourages, bidding;

c.   the reasonableness of the break-up fee relative to the purchase price;

d.   whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e.   the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.   the correlation of the fee to a maximum value of the debtor's estate;

g.    the support of the principal secured creditors and creditors' committees of the break-up fee;

h.    the benefits of the safeguards to the debtor's estate; and

i.    the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 536.

33.    As set forth above, the potential Bid Protections are necessary to preserve the value of the Debtors' estates because they will enable the Debtors to secure an adequate floor for the Assets and to therefore insist that competing bids be materially higher or otherwise better than a Stalking Horse Bid—a clear benefit to the Debtors' estates.

34.    The Debtors submit that any potential Bid Protections they offer would reflect market terms for a transaction of this nature. *See, e.g.*, *In re The Rockport Co., LLC*, (No. 18-11145) (LSS) [Docket No. 146] (Bankr. D. Del. June 5, 2018) (approving breakup fee and expense reimbursement equal to approximately 4.3% of the purchase price); *In re Orexigen Therapeutics, Inc.*, (No. 18-10518) (KG) [Docket No. 231] (Bankr. D. Del. April 23, 2018) (approving break-up fee and expense reimbursement equal to approximately 7.3% of the purchase price); *In re The Weinstein Company Holdings LLC*, (No. 18-10601) (MFW) [Docket No. 190] (Bankr. D. Del. Apr. 6, 2018) (approving break-up fee and expense reimbursement equal to approximately 5% of the purchase price); *In re ATopTech, Inc.*, (No. 17-10111) (MFW) [Docket No. 234] (Bankr. D. Del. Apr. 21, 2017) (approving break-up fee and expense reimbursement equal to approximately 5% of the purchase price); *In re Phoenix Brands LLC*, (No. 16-11242) (BLS) [Docket No. 136] (Bankr. D. Del. June 8, 2016) (approving break-up fee and expense reimbursement greater than 5% of the purchase price).

35.     Most importantly, absent the authority to offer Bid Protections, the Debtors may lose the opportunity to obtain the highest and otherwise best offers for the Assets through the Auction process.  The Bid Protections may be a pivotal component for any Stalking Horse Agreement, if one is selected, which will serve as a minimum or floor bid upon which the Debtors can rely at the Auction.  If the Court does not approve the Debtors' ability to offer the Bid Protections, the success of the sale process could be compromised, the competitive nature of the Auction (if one is held) could be undermined, and the estates could suffer accordingly.  The Bid Protections will be negotiated at arm's length and in good faith and, accordingly, the Debtors request that the Court authorize the Debtors' ability to provide Bid Protections, subject to the Court's later approval, as such bid protections will be in the best interest of the Debtors and their estates.

**C.     Approval of a Sale Transaction or Transactions Is Warranted Under Section 363 of the Bankruptcy Code**

36.     Section 363 of the Bankruptcy Code provides, in relevant part, that the debtor may, "after notice and a hearing . . . use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  While the Bankruptcy Code does not specify the appropriate standard for approving the sale of property under section 363, courts routinely authorize a sale if it is based upon the debtor's sound business judgment.  *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

37.     Courts typically consider the following factors in determining whether a sale under section 363 of the Bankruptcy Code passes muster under the business judgment

standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (adopting *Lionel* factors) (citing *Guilford Transp. Indus., Inc. v. Delaware & Hudson Ry. Co. (In re Delaware & Hudson Ry. Co.)*, 124 B.R. 169, 176 (D. Del. 1991) (listing non-exclusive factors that may be considered by a court in determining whether there is a sound business purpose for an asset sale)). As such, it follows that when a debtor demonstrates a valid business justification for a decision, the presumption is that the business decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

> *i.* **The Debtors Have Demonstrated a Sound Business Justification for a Sale Transaction or Transactions**

38.     A sound business justification exists where the sale of a debtor's assets are necessary to preserve the value of the debtor's estate for the benefit of creditors and interest holders. *See*, *e.g.*, *Cumberland Farms Diary, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Diaries of Penn., Inc.)*, 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. at 179 (approving the sale of the debtor as a going concern upon a showing of "a valid business purpose . . . ."); *In re Lionel Corp.*, 722 F.2d at 1071 (adopting a rule "requiring that a judge determining a § 363(b) application expressly find from the evidence presented before him . . . a good business reason to grant" the sale).

39.     As set forth above, a strong business justification exists for a sale of the Debtors' Assets. In light of the Debtors' financial condition, an orderly but expeditious sale ore

sales is critical to maximizing recoveries for all of the Debtors' stakeholders.  The Debtors' have determined that the most viable path toward a global resolution of the Debtors' financial and operational challenges is through consummating the Plan pursuant to which (a) the Debtors will liquidate their remaining assets, wind down their affairs, and be dissolved in a Wind-Down Transaction through a Liquidating Trust, and (b) prior to confirmation of the Plan, the Debtors will engage in a sale of one or more groups of the Debtors' Assets or substantially all of the Debtors' Assets to one or more bidders.    Moreover, a timely closing of any sale or sales is necessary under the Cash Flow DIP, without which Debtors would not have been able to execute an orderly and value-maximizing sale process or fund these chapter 11 cases.

> ii.     **The Sale Noticing and Objection Procedures Are Appropriate and Comply with Bankruptcy Rules 2002 and 6004**

40.     Bankruptcy Rules 2002 and 6004 require the Debtors to notify creditors of the proposed sale, provide a description of the Assets and disclose the time and place of the Auction, the terms and conditions of any proposed Sale and the Objection Deadlines.  *See* Fed. R. Bankr. P. 2002(a), 2002(c) and 6004(a).  The Sale Noticing and Objection Procedures set forth above are reasonably calculated to provide all of the Debtors' known creditors and other parties in interest with adequate and timely notice of all of the key dates, deadlines and other material information related to the sale process.  Further, publishing the Publication Notice in *USA Today* is designed to capture any creditors and parties in interest not currently known to the Debtors.  Accordingly, the Debtors request that the Court approve the Sale Noticing and Objection Procedures as set forth herein, including the Sale Notice, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u>, and find that no other or further notice of the Bidding Procedures, the Auction (excluding the Auction results) or the Sale Hearing is necessary or required.

*iii.*    **The Proposed Sale or Sales Will Yield a Fair and Reasonable Purchase Price for the Assets**

41.    As set forth above, the Debtors believe that any Sale governed by the Bidding Procedures will yield a fair and reasonable price for the Assets.  The Bidding Procedures were carefully designed to facilitate a robust and competitive bidding process and provide significant flexibility to do so.  The Debtors also constructed the Bidding Procedures to promote transparency, good faith and fairness throughout the entire sale process.  The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare one or more bids for the Assets and to engage with bidders on an arm's length basis to work to improve the quality of their bids for the benefit of all parties in interest.

42.    A sale or sales governed by the Bidding Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Assets, but also the highest or best value for the Assets.  This is a critical feature of the Bidding Procedures, which will inure to the benefit of all parties in interest in the chapter 11 cases.

*iv.*    **The Successful Bidder(s) Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code.**

43.    Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good-faith purchaser.  Specifically, section 363(m) provides the following:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) embodies the "policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely." *See Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.)*, No. 92

34

Civ. 7054 (PKL), 1993 U.S. Dist. LEXIS 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *Abbotts Dairies*, 788 F.2d at 147)); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

44.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Abbotts Diaries*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983)) (other citations omitted); *see also Kabro Assoc. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997).

45.     As set forth above, the Bidding Procedures were designed with the goal of producing a fair and transparent sale process that will yield the highest or otherwise best value for the Assets.  Any Stalking Horse Agreement or other asset purchase agreement executed by the Debtors will be negotiated at arm's length and in good faith at each stage of the negotiations.

46.     The Debtors submit that, if any Stalking Horse Bidder is selected, the Debtors will seek a finding that such Stalking Horse Bidder is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Assets.  Any purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's length and in good faith.

As such, the Debtors request a finding that any Successful Bidder (including any Stalking Horse

Bidder that is named a Successful Bidder) is a good-faith purchaser and is entitled to the full

protections afforded under section 363(m) of the Bankruptcy Code.

47.     In view of the foregoing, the Debtors have demonstrated that the proposed

sale of their Assets should be approved as a sound exercise of the Debtors' business judgment.

**D.     A Sale or Sales of the Assets Free and Clear of Liens, Claims, Interests and Encumbrances Is Appropriate under Section 363(f) of the Bankruptcy Code**

48.     In the interest of attracting the best offers, the Court should authorize the

Debtors to sell the Assets free and clear of any liens, claims, interests and other encumbrances, in

accordance with section 363(f) of the Bankruptcy Code.  Section 363(f) of the Bankruptcy Code

authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances of

an entity other than the estate if any one of the following conditions is met:

(a)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1) – (5); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D.

Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five

conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.");

*Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same);

*Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132,

1147 n.24 (6th Cir. 1991) (same); *In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D.Ill. 2005) (same);

*In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

49.     The Debtors anticipate that any Sale Transaction they elect to pursue will

satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code to permit a

"free and clear" sale of the applicable Assets.  As an initial matter, the Assets are subject to the

liens of the Debtors' lenders, each of whom has consented or will consent to such a sale or sales.

Additionally, any parties with junior liens on the Assets can be compelled to accept a money

satisfaction of their interests, but also would be adequately protected by such liens attaching to the

proceeds of the applicable Sale Transaction(s) in the order of their respective priority.

Accordingly, the Debtors request that the Court authorize the sale of any of the Assets free and

clear of any liens, claims, interests and encumbrances, to the fullest extent permitted by section

363(f) of the Bankruptcy Code.

**E.     The Debtors' Assumption and Assignment of Executory Contracts and Unexpired Leases Are Appropriate under Section 365 of the Bankruptcy Code**

50.     Section 365(a) of the Bankruptcy Code provides that a debtor "subject to

the court's approval, may assume or reject any executory contract or unexpired lease of the

debtor." 11 U.S.C. § 365(a).  Courts employ the business judgment standard in determining

whether to approve a debtor's decision to assume or reject an executory contract or an unexpired

lease.  *See*, *e.g.*, *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that

assumption or rejection of a lease "will be a matter of business judgment . . . ."); *In re HQ Global

Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding debtor's decision to assume or

reject executory contract is governed by business judgment standard and can only be overturned

if decision was product of bad faith, whim or caprice).  In this context, the business judgment test

only requires that a debtor demonstrate that assumption or rejection of an executory contract or

unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

51.     Any proposed sale or sales will provide a Successful Bidder with the opportunity to designate certain Contracts for assumption and assignment.  Assumption of any Contracts is an exercise of the Debtors' sound business judgment because the transfer of Contracts in connection with any Sale is an essential element in the Debtors' ability to maximize the value of the Assets—and, particularly so when a Contract is integral to the ownership or operation of the Assets to be acquired.  Further, the ability to assume and assign Contracts will increase the likelihood that the Debtors will be able to sell the Assets as part of an overall division sale or even as a going concern if an all-assets bidder emerges, thereby avoiding needless value-destruction through a liquidation of otherwise marketable operating assets and facilitating the preservation of as many jobs as possible.

52.     The consummation of any Sale involving the assignment of a Contract will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) requires that any outstanding defaults under the Contracts to be assumed be cured or that the Debtors provide adequate assurance that such defaults will be promptly cured.  *See* 11 U.S.C. § 365(b)(1).  The Debtors' assumption and assignment of any Contracts will be dependent upon payment of Cure Costs and effective only upon the closing of an applicable Sale.  As set forth above, subject to the Court's approval, the Debtors will file with the Court and serve on each Counterparty an Assumption and Assignment Notice setting forth the Debtors' good-faith calculation of the Cure Costs for each Contract that could be assumed in

Case 22-10584-CTG    Doc 406    Filed 09/07/22    Page 39 of 43

connection with a Sale. Counterparties will have an opportunity to raise any Contract Objections in advance of the Sale Hearing.

53.    Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any executory contract provide "adequate assurance of future performance ... whether or not there has been a default in such contract." 11 U.S.C. § 365(f)(2). While the Bankruptcy Code does not define "adequate assurance," courts have held that what constitutes "adequate assurance" should be determined by "a practical, pragmatic construction based upon the facts and circumstances of each case." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (quoting *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language ... from Section 2609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations."). While no single standard governs every case, adequate assurance "will fall considerably short of an absolute guarantee of performance." *In re Carlisle Homes, Inc.*, 103 B.R. at 538 (citations omitted); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

54.    Adequate assurance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business, and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

39

55.    The Bidding Procedures expressly specify that for a bid to qualify as a Qualified Bid a Prospective Bidder must include with its bid Adequate Assurance Information regarding the Prospective Bidder's (or any other relevant assignee's) ability to perform the applicable obligations under any Contracts that may be included in the bid.  The Debtors will furnish all available Adequate Assurance Information to Counterparties as soon as reasonably possible following their receipt of such information.  Finally, any Counterparty that is dissatisfied with the content or quality of any relevant Adequate Assurance Information will have an opportunity to request additional information from the Debtors and, if necessary, lodge an Adequate Assurance Objection in advance of the Sale Hearing.

56.    The Assumption and Assignment Procedures also require the Debtors to provide notice to Counterparties to any Contracts that are, after service of the Notice of Auction Results, designated by a Successful Bidder for assumption and assignment or as an excluded asset pursuant to the terms of any purchase agreement governing the applicable Successful Bid. Accordingly, the Assumption and Assignment Procedures are carefully designed to ensure that Counterparties receive timely and sufficient notice with respect to the disposition of their Contracts at each phase of the sale process.  In light of the foregoing, the Debtors' assumption and assignment of any Contracts in accordance with the Assumption and Assignment Procedures would satisfy the requirements of section 365 of the Bankruptcy Code and should be approved.

57.    Finally, in order to facilitate the assumption and assignment of Contracts in furtherance of maximizing the value of the Assets, the Debtors further request that the Court find that any anti-assignment provision included in any Contract, whether such provision expressly

prohibits, or has the effect of restricting or limiting assignment of a Contract, is unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[4]

## REQUESTS FOR IMMEDIATE RELIEF & WAIVER OF STAY

58.    Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtors seek a waiver of any stay of the effectiveness of the Bidding Procedures Order, any sale order (to the extent required), and any other order authorizing the assumption or assumption and assignment of a Contract in connection with a Sale Transaction.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

59.    As set forth above, the relief requested herein is necessary and appropriate to maximize the value of the Debtors' estates for the benefit of their economic stakeholders. Accordingly, the Debtors submit that ample cause to justify the waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), in each case, to the extent that such stay applies to the relief requested herein.

---

[4]  Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease .... " 11 U.S.C. § 365(f)(1). Further, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

## NOTICE

60.     Notice of this Motion will be given to the following parties, or their counsel, if known: (a) the U.S. Trustee; (b) counsel to the Debtors' prepetition and postpetition lenders; (c) the Committee; (d) any party asserting a lien on any of the Debtors' Assets; and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

61.     No prior request for the relief sought herein has been made to this Court or any other court in connection with the chapter 11 cases.

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, and grant such other and further relief to the Debtors as the Court may deem proper.

Dated: September 7, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Timothy P. Cairns*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Mary F. Caloway (DE Bar No. 3059)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
        tcairns@pszjlaw.com
        mcaloway@pszjlaw.com

-and -

**DENTONS US LLP**

Samuel R. Maizel
Tania M. Moyron
601 S. Figueroa Street, #2500
Los Angeles, CA  90017
Telephone:  (213) 623-9300
Email:  samuel.maizel@dentons.com
        tania.moyron@dentons.com

-and-

**DENTONS US LLP**

David F. Cook
1900 K Street, NW
Washington, DC  20006
Telephone:  (202) 496-7500
Email:  david.f.cook@dentons.com

*Counsel for Debtors and Debtors in Possession*