**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - o
                                                             :
In re:                                                       :      Chapter 11
                                                             :
                                                             :      Case No. 22-10584 (CTG)
FIRST GUARANTY MORTGAGE CORP.,                               :      Jointly Administered
*et al.*,                                                    :
                                                             :      Re: D.I. 405, 407 & 424
                                                             :
                     Debtors.                                :      **Hearing Date: Sept. 28, 2022 at 10:00 a.m.**
                                                             :      **Obj. Deadline: Sept. 26, 2022 at 4:00 p.m.**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - o

**OBJECTION OF THE UNITED STATES TRUSTEE
TO CONDITIONAL APPROVAL OF DEBTORS'
<u>COMBINED CHAPTER 11 PLAN AND DISCLOSURE STATEMENT</u>**

       Andrew R. Vara, United States Trustee for Region 3 (the "<u>U.S. Trustee</u>"), through

his undersigned counsel, files this objection to *Debtors' Motion for Entry of an Order (I)*

*Granting Interim Approval of the Adequacy of Disclosures in the Combined Disclosure*

*Statement and Plan; (II) Scheduling a Combined Confirmation Hearing and Setting Deadlines*

*Related Thereto; (III) Approving Solicitation Packages and Procedures; (IV) Approving the*

*Forms of Ballots; and (V) Granting Related Relief* (D.I. 407) (the "<u>Motion</u>"), and in support

thereof respectfully states as follows:

**<u>PRELIMINARY STATEMENT</u>**

       1.    The *Combined Disclosure Statement and Chapter 11 Plan of First Guaranty*

*Mortgage Corporation and Debtor Affiliate* (D.I. 405) (the "<u>Combined Plan</u>") does not contain

adequate information.  It does not describe with specificity what assets the Debtors have left to

liquidate.  It does not tell general unsecured creditors what recovery percentage they can expect

to receive, and when they can expect to receive it.  It does not describe the WARN Act adversary

proceeding that was filed against the Debtors on the petition date, or the risks it poses.  The

Debtors terminated about 471 of their 600 employees shortly before the petitions initiating the above-captioned cases were filed.  If the termination-related claims of those former employees are allowed under Section 507(a)(4)/(5), that could add $7 million to the estimated $1.5 million in priority non-tax claims in class 1.

2.     The WARN Act adversary proceeding may render the Combined Plan not feasible under Section 1129(a)(11).  Priority claims totaling $7 million would be massively consequential in cases that recently had about $23.1 million cash on hand, and where the insider cash-flow DIP lender is expected to receive a 10%-35% recovery.  Put differently, if the Combined Plan depends on the Debtors' successful future defense of the WARN Act adversary proceeding, then the Combined Plan is not feasible because its success is only possible, not reasonably likely.

3.     Finally, the Combined Plan has non-consensual third-party releases. Unimpaired creditors, creditors who abstain from voting, and creditors who vote to reject but do not opt out of the third-party releases would be deemed to give third-party releases.  Those releases are nonconsensual and should be denied.  They should be addressed now, because they may affect the forms of ballot.

## JURISDICTION

4.     Pursuant to 28 U.S.C. § 1334, applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and consider the Motion and this objection.

5.     Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with monitoring the federal bankruptcy system.  *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that 11 U.S.C. § 307 gives

the U.S. Trustee "public interest standing"); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog"); 28 U.S.C. § 586(a)(3)(B) (authorizing the U.S. Trustee to monitor chapter 11 plans and disclosure statements and to file comments about them).

6.      The U.S. Trustee has standing to be heard on the Combined Plan and Motion pursuant to 11 U.S.C. § 307.

## **BACKGROUND**

7.      On June 30, 2022, the above-captioned debtors (the "Debtors") filed chapter 11 petitions in this Court.

8.      Six days pre-petition, the Debtors laid off about 471 of their 600 employees. D.I. 19 ¶ 12.  On the petition date, a putative class action adversary proceeding was filed against the Debtors under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").  Adv. No. 22-50387 (CTG).  The Combined Plan has no discussion of the WARN Act suit.

9.      On July 14, 2022, the U.S. Trustee appointed an official committee of unsecured creditors.  D.I. 132.

10.     On September 7, 2022, the Debtors filed the Combined Plan and Motion. The Combined Plan states that "the Debtors will liquidate their remaining assets, wind down their affairs, and be dissolved through a Liquidating Trust."  Combined Plan § 1.  The Combined Plan does not describe what the Debtors' remaining assets are with specificity.[1]  Presently, the Debtors have a motion pending to sell substantially all of their remaining assets (on shortened

---

[1] The Combined Plan defines "Liquidating Trust Assets" to include causes of action that the Debtors hold as of the effective date (after giving effect to the Combined Plan's debtor releases), claims and rights under the Debtors' insurance policies, and any and all other non-cash assets of the Debtors or their estates.  *See* Combined Plan at 16.

notice).    D.I. 406 ("Sale Motion").    At a hearing on September 8, 2022, Debtors' counsel

represented to the Court that the sale is of remnant assets and would not be case-dispositive.

When the Sale Motion was filed, there was no stalking horse bidder.  Sale Mot. ¶ 16.

11.    The Debtors' August monthly operating report shows $23.1 million in cash

in the estates.  D.I. 464 at 2.

12.    The Combined Plan does not have an estimated percentage distribution for

class 6 general unsecured creditors.  *See* Combined Plan at 6-7.  Instead, it says "Recovery

Anticipated Pursuant to Section 14."  Section 14.2 provides for a distribution from a share of net

litigation proceeds, "if any," on commercial tort claims and avoidance actions.

## ARGUMENT

**A.  Combined Plan Does Not Contain Adequate Information**

13.    The Court should deny the Motion because the Combined Plan does not

contain adequate information.

14.    Section 1125 of the Bankruptcy Code provides that a disclosure statement

must contain "adequate information" describing a confirmable plan.  11 U.S.C. § 1125; *see also*

*In re Quigley Co., Inc.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).    The Bankruptcy Code

defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably
> practicable in light of the nature and history of the debtor and the
> condition of the debtor's books and records, including a discussion
> of the potential material Federal tax consequences of the plan to the
> debtor, any successor to the debtor, and a hypothetical investor
> typical of the holders of claims or interests in the case, *that would
> enable such a hypothetical reasonable investor of the relevant
> class to make an informed judgment about the plan* . . . .

11 U.S.C. § 1125(a)(1) (emphasis added); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin., Inc*., 233 B.R. 46, 54 (S.D.N.Y. 1999).

15.    The disclosure statement requirement of Section 1125 of the Bankruptcy Code is "crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (*citing Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.*), 848 F.2d 414 (3d Cir. 1988)).

16.    The "adequate information" requirement is designed to help creditors in their negotiations with debtors over the plan. *See Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94 (3d Cir. 1988).  Section 1129(a)(2) conditions confirmation upon compliance with applicable Bankruptcy Code provisions. The disclosure requirement of Section 1125 is one of those provisions. *See* 11 U.S.C. 1129(a)(2); *In re PWS Holding Corp*., 228 F.3d 224, 248 (3d Cir. 2000).

17.    To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan. *See In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan"); *In re Duratech Indus., Inc.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y. 1999), *aff'd,* 241 B.R. 283 (E.D.N.Y. 1999) (the purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan).

18.     Section 1125 of the Bankruptcy Code is geared towards more disclosure rather than less.  *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).  The "adequate information" requirement merely establishes a floor, and not a ceiling, for disclosure to voting creditors.  *See In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (*citing Century Glove*, 860 F.2d at 100).

19.     "Adequate information" under section 1125 is "determined by the facts and circumstances of each case."  *See Oneida*, 848 F.2d at 417 (*citing* H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)).

20.     A disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."  *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).  Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure should "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy] Code alternatives . . . ."  *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

21.     The Combined Plan does not contain adequate information because it does not discuss the WARN Act lawsuit (or the risks it poses to the Combined Plan), it does not describe with specificity what estate assets remain to be liquidated, and it does not tell general unsecured creditors in class 6 what distribution they can expect to receive and when.  The WARN Act lawsuit could have a major impact on the amount of priority non-tax claims the Debtors must pay in full in class 1.  The Combined Plan estimates class 1 claims will be about $1,534,196.  *See* Combined Plan at 4.  However, the WARN Act lawsuit could theoretically result in an allowed priority claim of over $7,000,000.  There is no showing that the Debtors could satisfy

such a liability.  The most recent monthly operating report (August) shows  $23,146,861 cash on hand.  D.I. 464 at 2.

22.    The Combined Plan does not contain adequate information about the amount or timing of class 6's distribution.  Essentially, the Debtors do not know the numerator or denominator of the class 6 distribution calculation.  The Debtors do not know the numerator because the source of any distribution -- causes of action -- have not been liquidated.  The Debtors have supplied a denominator ($51,700,781), but at present there is no telling what that number will ultimately be because the general bar date (October 14) has not yet passed.  D.I. 382 ¶ 2.  Without more information regarding the numerator or the denominator of the class 6 distribution calculation, soliciting votes on the Combined Plan is premature.

**B.  Debtors Have Not Shown Combined Plan Is Feasible**

23.    Additionally, soliciting votes on the Combined Plan is premature because the Debtors have not demonstrated the Combined Plan is feasible.

24.    The Court may address confirmation issues at the disclosure statement phase "where it is obvious . . . that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable.  A plan is patently unconfirmable where (1) confirmation 'defects [cannot] be overcome by creditor voting results' and (2) those defects 'concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing.'"  *In re American Cap. Equip., LLC*, 688 F.3d 145, 154-55 (3d Cir. 2012) (citation omitted).

25.    "The debtor has the burden of proving that a disclosure statement is adequate, including showing that the plan is confirmable or that defects might be cured or involve material facts in dispute."  *Id.* at 155.

7

26.    Section 1129(a)(11) of the Bankruptcy Code provides that a plan shall be confirmed only if confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

27.    Feasibility means that a plan must be "reasonably likely to succeed on its own terms without a need for further reorganization on the debtor's part." *American Cap. Equip.,* 688 F.3d at 156 (citations, brackets omitted).

28.    "The debtor has the burden of proving that a disclosure statement is adequate, including showing that the plan is confirmable or that defects might be cured or involve material facts in dispute." *Id.* at 155.  A plan proponent must show feasibility by a preponderance of the evidence. *See In re W.R. Grace & Co.*, 475 B.R. 34, 114 (D. Del. 2012) (citing cases).  A "debtor's own unsupported sincerity and belief that its plan is feasible is insufficient to satisfy the inquiry." *Id.* at 115.

29.    When considering a plan, the Court has "an affirmative obligation to scrutinize the plan and determine whether it is feasible." *In re Young Broadcasting Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010) (citing cases).  The Court has this duty "regardless of whether there is any objection raised by a party in interest." *In re Mid-State Raceway, Inc.*, 2006 WL 4050809 at *19 (Bankr. N.D.N.Y. Feb. 10, 2006).

30.    Similarly, the Court must determine a plan's feasibility even if the plan has received overwhelming creditor support. *See In re Las Vegas Monorail Co.*, 462 B.R. 795, 803-04 (Bankr. D. Nev. 2011).

31.    A plan—even a liquidating plan—is confirmable only if it is feasible under Section 1129(a)(11). *See American Cap. Equip.*, 688 F.3d at 155-56.  "A plan will not be feasible

if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely." *Id.* at 156 (citations omitted); *accord In re WR Grace & Co.*, 729 F.3d 332, 348-49 (3d Cir. 2013).

32.     The Debtors have not demonstrated feasibility, because they have not shown they can satisfy a potentially-significant priority (WARN Act) claim.  In other words, the Combined Plan's success may hinge on the Debtors' success in defending against the WARN Act adversary proceeding.  The Combined Plan anticipates $1,534,196 in priority non-tax claims in class 1.  *See* Combined Plan at 4.  But the WARN Act suit could result in an allowed priority claim several times that amount, perhaps approaching $7,000,000.  To the extent the Combined Plan hinges on a speculative litigation outcome, the Combined Plan's success is only possible -- not reasonably likely -- and therefore is not feasible under Section 1129(a)(11).  *See In re American Cap. Equip.*, 688 F.3d at 156.[2]

33.     The Debtors have scheduled substantially all employee priority claims as disputed.  D.I. 367.  Many of the claims are for less than $1,000.  The Court should require the Debtors to make a record of why they scheduled employee priority claims that way.  If the Debtors did so solely to force ex-employees to file proofs of claim as a way to reduce the payout to class 1 on the basis of employee attrition, the Combined Plan may not be proposed in good faith.

---

[2] Although the feasibility issue in *American Capital Equipment* centered on whether proceeds of litigation assets would be realized, and the feasibility issue in these cases involves determining the size of any allowed claim in the WARN Act litigation, they point to the same thing: whether a plan can make the distributions it needs to.

### C. Combined Plan Has Non-Consensual Third-Party Releases

33.    The Combined Plan contains nonconsensual third-party releases and, as such, is not confirmable.  Article 16.2(b) of the Combined Plan proposes to extract/impose third-party releases from/on "Releasing Parties."

34.    The Combined Plan defines "Releasing Parties" to mean:

> individually and collectively: (i) each holder of a Claim or Interest that: (a) votes to accept the Plan; (b) is conclusively deemed to have accepted the Plan or is otherwise being paid in full under the Plan; (c) abstains from voting on the Plan and does not opt out of the Third Party Release; (d) votes to reject the Plan and does not opt out of the Third Party Release; or (e) is conclusively deemed to have rejected the Plan and does not opt out of the Third Party Release; (ii) the Committee and each of its members in such capacity; and (iii) with respect to each of the foregoing Entities in clauses (i) and (ii), such Entities' or Persons' successors, assigns, transferees, and such Entities' or Persons' officers and directors, agents, members, financial and other advisors, attorneys, employees, partners, affiliates, and representatives (in each case in their capacity as such), and any and all other entities who may purport to assert any cause of action, by, through, for, or because of such Entities or Persons.

Combined Plan at 21.

35.    The unimpaired claimants from whom third-party releases would be extracted appear to include holders of administrative claims and priority tax claims insofar as Releasing Parties includes "each holder of a Claim that . . . (b) . . . is . . . being paid in full under the Plan[.]"  *Id.*  The claims to be released include direct claims that unimpaired parties hold against numerous non-debtors.  While unimpaired creditors would be paid in full on the claims they hold against the Debtors, the scope of the release of their direct claims against non-debtors is far broader than the claims upon which they would be paid.  The Combined Plan would release claims for "any . . . act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective Date" except for claims based on gross negligence, willful misconduct, actual fraud, or bad faith.  Combined Plan § 16.2(b).  The released claims would

apparently not need to have any nexus to the Debtors.  So, for example, a taxing authority whose

priority claim against the Debtors will be paid in full under the Combined Plan (as required by

the Bankruptcy Code) could later be subject to an argument by a Released Party that it has no

obligation to pay taxes in connection with revenue received from transactions with the Debtors

because, under the Plan, the taxing authority has been deemed to release the Released Party for

claims unrelated to the Debtors.

36.      Creditors who vote to reject the Combined Plan should not be required to

take the redundant step of opting out of the third-party releases.

> If (as prior cases have held) a creditor who votes in favor of a plan
> have implicitly endorsed and 'consented' to third party releases that
> are contained in that plan, then by that same logic a creditor who
> votes to reject a plan should also be presumed to have rejected the
> proposed third-party releases that are set forth in the plan.  ***The
> additional 'opt out' requirement, in the context of this case, would
> have been little more than a Court-endorsed trap for the careless
> or inattentive creditor***.

*In re Chassix Holdings*, 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

37.      Creditors in voting classes who abstain from voting on the Combined Plan

would also be stripped of their direct claims against non-debtors, regardless of the reason they

abstained.  Those reasons may include that such creditors (a) never received the solicitation

package, or received it late, due to mail errors or delays, or (b) received it timely, and completed

it and returned it to the balloting agent, but through no fault of their own, the ballot never reached

the balloting agent, or was received late.  Other creditors in voting classes may receive the

solicitation package, but not understand it.  Such creditors may not have the time or financial

resources to engage counsel and/or would never imagine that their rights against *non-debtors*

could be extinguished through the bankruptcy of these Debtors.

38.    The third-party releases would also be imposed on creditors' "successors, assigns, transferees, and such Entities' or Persons' officers and directors, agents, members, financial and other advisors, attorneys, employees, partners, affiliates, and representatives (in each case in their capacity as such), and any and all other entities who may purport to assert any cause of action, by, through, for, or because of such Entities or Persons."  Combined Plan at 21. There is no showing these entities related to Releasing Parties have affirmatively consented to give the releases, have any ability to opt out of the releases, and/or will receive notice of the releases.

39.    In sum, there will be no affirmative consent to the Combined Plan's third-party releases extracted from numerous persons and entities on whom such releases would be imposed.  Such releases are non-consensual.

40.    Some Courts in this District have determined that third-party releases of non-debtors should be allowed only to the extent the releasing parties have given affirmative consent.  *See In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011).  In *Washington Mutual*, this Court held that "any third party release is effective only with respect to those who *affirmatively consent* to it by voting in favor of the Plan and not opting out of the third party releases."  *Id.* at 355 (emphasis added).  Moreover, this Court clarified that merely having an opt-out mechanism is not enough, holding that an "opt[-]out mechanism is not sufficient to support the third party releases . . . particularly with respect to parties who do not return a ballot (*or are not entitled to vote in the first place*).  *Failing to return a ballot is not a sufficient manifestation of consent* to a third-party release." *Id.* (emphasis added; citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999)).

41.    In *Emerge Energy Services LP*, Case No. 19-11563, 2019 Bankr. LEXIS 3717 (Bankr. D. Del. Dec. 5, 2019), this Court ruled that consent to a third-party release "cannot be inferred by the failure of a creditor or equity holder to return a ballot or Opt-Out Form." *Id.* at *52. The Court reached this conclusion even though the Opt-Out Forms provided conspicuous notice of how to opt-out and the consequences of not doing so. The Court also rejected the debtor's argument that inferring consent from "silence" should be approved as typical, customary, and routine. *See id.* The Court held that it could not, "on the record before it find that the failure of a creditor or equity holder to return a ballot or Opt-Out Form manifested their intent to provide a release. Carelessness, inattentiveness, or mistake are three reasonable alternative explanations." *Id.* at *53.

42.    The Debtors may try to distinguish this case from *Emerge* based on the argument that *Emerge* dealt with creditors and shareholders who were receiving no distribution under the plan. However, the *Emerge* Court did not limit its ruling to "zero consideration" cases. To the contrary, this Court's recognition that failure to return a notice can be due to "carelessness, inattentiveness, or mistake," rather than constituting the manifestation of an intent to agree to a third-party release, would be applicable regardless of whether a creditor or interest holder was to receive a distribution under a plan. Similarly, the *Emerge* Court indicated that it "has concluded that a waiver cannot be discerned through a party's silence or inaction unless specific circumstances are present." *Id.* at *54-55. The Court clarified that, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not

qualify" as such circumstances.  *Id.* at *55.  Those statements appear to apply whether a creditor or shareholder is to receive a distribution under a plan or not. [3]

43.     Other decisions from Courts in this District are in accord with *Washington Mutual* and *Emerge.  See In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) (holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties," and that such release must be based on consent of the releasing party); *In re Exide Technologies*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (approving releases which were binding only on those creditors and equity holders who accepted the terms of the plan); *Zenith*, 241 B.R. at 111 (noting the release provision had to be modified to permit third parties' release of non-debtors only for those creditors who voted in favor of the plan).

44.     Not all decisions from this District have required affirmative consent for third-party releases.  In *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013), this Court reached a different conclusion than that of *Washington Mutual* and *Emerge*, and the other cases cited above, concerning the need for affirmative consent to third party releases.

45.     In *In re Spansion, Inc.*, 426 B.R. 114 (Bankr. D. Del. 2010), the Court held that affirmative consent was not required, but only as to releases being given by unimpaired classes who were "being paid in full." *Id.* at 144.  The Court determined that non-consensual releases being deemed to be given by parties who were not receiving any distribution under the

---

[3] Although not a reported decision, this Court's ruling in *In re Kettner Investments, LLC*, Case No. 20-12366 (KBO), on February 15, 2022 [transcript – D.I. 298] indicates that the *Emerge* ruling was not limited to situations in which the parties deemed to give releases are to receive nothing under the plan.  In *Kettner*, the Court denied confirmation of a proposed plan of reorganization because it deemed third-party releases to be given by creditors and interest holders in ***unimpaired*** classes, as well as by related parties to such creditors, without obtaining their affirmative consent.

plan "does not pass muster under *Continental*." *Id.* at 145.  The same will be true here as to the

lead Debtor's equity interests in class 7, which is deemed to reject the Combined Plan.[4]

46.    In *In re Mallinckrodt PLC*, 639 B.R. 837 (Bankr. D. Del. 2022), this Court

allowed third-party releases to be imposed on mass tort claimants without the opportunity to opt

out, as well as on certain other classes of creditors and equity holders who were provided the

ability to opt out, holding that the imposition of such releases were permissible under *In re

Continental Airlines*, 203 F.3d 203 (3d Cir. 2000) because of the mass tort context of the

case.  *See id.* at 873, 881.  In discussing "consensual releases obtained through an opt out

process," this Court explained that, "[a]lthough the Third Circuit has not explicitly commented

on the propriety of non-debtor releases in these circumstances, it has suggested that if they are

appropriate anywhere, it would be in a mass tort case like this one." *Id.* at 881 (*citing

Continental*, 203 F.3d at 214 n.11).  The Debtors' cases are not mass tort cases.

47.    Requiring affirmative consent from creditors to release their direct claims

against non-debtors is the only way to ensure there is true consent, rather than consent assumed

by silence, as silence could be caused by factors such as "carelessness, inattentiveness, or

mistake," as recognized by this Court in *Emerge,* 2019 Bankr. LEXIS 3717 at * 53.  Similarly,

silence in response to a written solicitation regarding a release could be caused by a package

being misdelivered, post-office failures, or other unforeseen issues.  In a recent decision, the

District Court for the Eastern District of Virginia vacated an order of the Bankruptcy Court

confirming a plan which deemed consent to third-party releases from parties who did not return

opt-out forms.  *See Joel Patterson v. Mahwah Bergen Retail Group, Inc.*, No. 3:21CV167 (DJN),

2022 WL 135398 (E.D. Va. Jan. 13, 2022).  The Court found that:

---

[4] First Guaranty Mortgage Corp. is 100% owned by B2 FIE IV, LLC, c/o PIMCO.  D.I. 1 at 21.

> [T]he Bankruptcy Court erred both factually and legally in finding the Third-Party Releases to be consensual. Failure to opt out, without more, cannot form the basis of consent to the release of a claim. Whether the Court labels these "nonconsensual" or based on "implied consent" matters not, because in either case ***there is a lack of sufficient affirmation of consent***.

*Id.* at *31 (emphasis added).

48.     Several decisions from the Bankruptcy Court for the Southern District of New York have reached the same conclusion.  In *Chassix Holdings*, the court held that third-party releases must be limited to those who voted to accept the plan or affirmatively elected to provide releases.  Creditors in voting classes who failed to return a ballot, as well as unimpaired creditors, would not be deemed to have consented to give third party releases.  *See In re Chassix Holdings, Inc.*, 533 B.R. at 79-80.  In *In re SunEdison, Inc.*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017), the court held that, under principles of New York contract law, a creditor could not be deemed to consent to third party releases merely by failing to object to the plan, even when the disclosure statement made it clear that such a consequence would result.

49.     Under the holding of *Emerge Energy*, *Washington Mutual*, and the other cases cited above, the third-party releases render the Combined Plan unconfirmable because they release direct claims against non-debtor parties held by (i) other non-debtor parties without their affirmative consent, including those who do not return a ballot, (ii) parties who are not entitled to vote and are not being provided with opt-in forms (or even opt-out forms), such as unimpaired classes, and (iii) various parties tangentially related to the Releasing Parties.  Releases from all such persons and entities are not consensual, and therefore should not be allowed.

**D. Combined Plan Does Not Meet the Requirements for Non-Consensual Releases**

50.     In *Continental*, the Third Circuit surveyed cases from various circuits as to when, if ever, a non-consensual third-party release is permissible.  The Court acknowledged that

some Circuits do not allow such non-consensual releases under any circumstances. *See In re Continental Airlines*, 203 F.3d at 212. Other Circuits, the Court found, "have adopted a more flexible approach, albeit in the context of extraordinary cases." *Id.* at 212-13 (citing Second Circuit cases where releases were upheld for "widespread claims against co-liable parties" and a Fourth Circuit mass tort case). "A central focus of these three reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties. Substantial debtor co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible." *Id.* at 213; *see also In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005) (noting a third-party release may be granted "only in rare cases").

51.    The Third Circuit in *Continental* ultimately determined that the proposed releases in that case, which enjoined shareholder lawsuits against debtors' directors and officers, did "not pass muster under even the most flexible test for the validity of non-debtor releases." 203 F.3d at 214. Therefore, the Court determined that it "need not speculate on whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration." *Id.* at 214 n.11. However, the Court did describe the "hallmarks of permissible non-consensual releases" to be "fairness, necessity to the reorganization, and special factual findings to support these conclusions." *Id.* at 214.

52.    The Third Circuit Court of Appeals referenced *Continental* in *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019), as one of the precedents, along with *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011), regarding non-consensual third-party releases. The Third Circuit indicated that these decisions "set forth *exacting*

*standards* that must be satisfied if such releases and injunctions are to be permitted." 945 F.3d at 139 (emphasis added).[5]

53.    In *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001), the Court held that a clause in the plan which released claims of any creditors or equity holders against the senior lenders for any act or omission in connection with the bankruptcy cases and reorganization process required factual showings under *Continental* – that the releases were necessary for the reorganization and were given in exchange for fair consideration. *See id.* at 607.    The Court elaborated that "necessity" under *Continental* requires a showing: (a) that the success of the debtors' reorganization bears a relationship to the release of the non-consensual non-debtor parties and (b) that the non-debtor parties being released from liability have provided "a critical financial contribution to the debtors' plan" in exchange for the receipt of the release. *See id.* at 607.    A financial contribution is considered "critical" if without the contribution, the debtors' plan would be infeasible. *See id.*    Fairness of a release is determined by examining whether non-consenting non-debtors are receiving reasonable consideration in exchange for the release. *See id.* at 608; *see also In re Spansion, Inc.*, 426 B.R. at 144.

54.    The *Genesis* Court found that the senior lenders had made a financial contribution to the plan, which allowed the debtors to make the 7.34% distribution to the unsecured creditors, who otherwise would be "out of the money." *Id.* at 608.    Ultimately, though, the Court found that such contribution was not enough, because "even if the threshold

---

[5] Although not directly addressed by the Third Circuit in *Continental*, *Millennium Lab,* or *Global Indus.*, the issue of whether the bankruptcy court has statutory authority to confirm a plan that includes non-consensual releases between non-debtors was recently addressed by the United States District Court for the Southern District of New York in *In re Purdue Pharma, L.P.*, No. 21 CV 7532 (CM), 2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021). That court held that no such statutory authority existed. 2021 WL 5979108 at * 69-70.

*Continental* criteria of fairness and necessity for approval of non-consensual third-party releases were marginally satisfied by these facts . . . [the] financial restructuring plan under consideration here would not present the *extraordinary circumstances* required to meet even the most flexible test for third party releases." *Id.* (emphasis added).

55.     Here, nothing in the record or the Combined Plan indicates "extraordinary circumstances" exist, or that that the high threshold necessary for approval of non-consensual third-party releases has been met with respect to each of the non-debtor parties that would be the recipients of these non-consensual releases.  As to the first *Continental* requirement, it is unclear what, if any, "necessity to the reorganization" such non-consensual releases have.  There is no reorganization, because the Debtors are liquidating.  *See*, *e.g.*, *In re Nickels Midway Pier, LLC*, No. 03-49462, 2010 WL 2034542 at *13 (Bankr. D.N.J. May 21, 2010) (rejecting non-consensual third-party releases in favor of creditor: "The Plan provides for liquidation, which can be successfully accomplished whether or not [the creditor] is released from third parties' claims.").  As to the second *Continental* requirement, that the releases be given "in exchange for fair consideration," the Debtors must establish what, if any, "critical financial contribution" was made by each and every recipient of the third-party releases, and how such contribution benefits those parties on whom the non-consensual releases are being imposed.  As to the non-consensual third-party releases being imposed on various parties tangentially related to the Releasing Parties, they cannot meet the fairness requirement of *Continental* because those various parties will receive no distribution under the Combined Plan (or any other consideration) in exchange for such releases.

56.     Thus, both the "exchange for fair consideration" and "necessity to the reorganization" elements specified in *Continental* appear to be absent here.  Therefore, the

Combined Plan cannot be confirmed with the inclusion of the nonconsensual third-party releases. *See Continental*, 203 F.3d at 214 n.11.

57.     As to the Debtors' current and former directors and officers, who are within the Combined Plan's definition of "Released Parties" and thus benefit from the Combined Plan's third-party releases, the Third Circuit Court of Appeals and this Court have already determined that they are not entitled to third-party releases. *See PWS Holding*, 228 F.3d at 245-46 ("§ 524(e) makes clear that a discharge in bankruptcy does not extinguish claims by third parties against guarantors or directors and officers of the debtor for the debt discharged in bankruptcy."); *Continental*, 203 F.3d at 215 ("[W]e have found no evidence that the non-debtor D & Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability"); *Washington Mutual*, 442 B.R. at 354 ("[T]here is no basis for granting third party releases of the Debtors' officers and directors, even if it is limited to their post-petition activity. The only 'contribution' made by them was in the negotiation of the Global Settlement and the Plan. Those activities are nothing more than what is required of directors and officers of debtors in possession (for which they have received compensation and will be exculpated); they are insufficient to warrant such broad releases of any claims third parties may have against them. . . ."); *see also Genesis*, 266 B.R. at 606–07 (in rejecting a *debtor*'s release of its directors, officers and employees, the Court held that, "the officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization.").

58.    The same logic is also applicable to third-party releases of the Debtors'
professionals who, like the Debtors' directors and officers, are eligible to receive exculpation.
*See Washington Mutual*, 442 B.R. at 354.

59.    The non-consensual third-party release in the Combined Plan also releases
all non-debtor affiliates of the Debtors.  *See* Combined Plan at 21 (definition of "Released
Parties" includes "(a) the Debtors . . . and (e) each such Entities' Related Persons."  Definition
of "Related Persons" means, subject to any express exclusions in the Combined Plan, with
respect to a specific person, "its current and former . . . affiliates, subsidiaries[.]").  The Court in
*Washington Mutual* disallowed releases in favor of non-debtor affiliates because no evidence
had been offered as to who the affiliates were, or why they should get a discharge without filing
their own bankruptcy cases.  442 B.R. at 354.   The same is true here.

60.    The Debtors have the burden of establishing whether any of the
*Continental*/*Genesis* factors have been met for each of the non-debtors who are the beneficiaries
of non-consensual third-party releases.  The Debtors should not be permitted to force creditors
and related entities who are not even parties to these cases to discharge nondebtors from liability,
because a permanent injunction limiting the liability of nondebtor parties is a rare thing that
should not be considered absent a showing of "extraordinary circumstances."  *See Continental*,
203 F.3d at 212; *Tribune*, 464 B.R. at 178 (interpreting *Continental* to allow non-consensual
releases only in "extraordinary cases."); *Genesis*, 266 B.R. at 608.

## CONCLUSION

The U.S. Trustee reserves any and all rights, remedies and obligations to, among
other things, complement, supplement, augment, alter or modify this objection, file an

appropriate motion, or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

WHEREFORE, the U.S. Trustee respectfully requests that this Court deny the Motion and grant such other relief as the Court deems fair and just.

Dated:        September 26, 2022
Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 & 9**

By: */s/ Benjamin Hackman*
Benjamin A. Hackman
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
(302) 573-6497 (Fax)
benjamin.a.hackman@usdoj.gov