**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRST GUARANTY MORTGAGE CORPORATION, *et al.*,[1] | Case No. 22-10584 (CTG) |
| Debtors. | (Jointly Administered) |

**MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF AMENDED
COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF
FIRST GUARANTY MORTGAGE CORPORATION AND DEBTOR AFFILIATE**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number are: First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621).  The location of the corporate headquarters and the service address for First Guaranty Mortgage Corporation is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

## Table of Contents

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ...................................................................... 3

ARGUMENT ........................................................................................ 3

I.    THE PLAN COMPLIES WITH THE CONFIRMATION STANDARDS
SET FORTH IN § 1129. ............................................................ 3

    A.    The Plan Complies with the Applicable Provisions of § 1129(a)(1). ........ 3

        1.    The Plan Complies with the Requirements of § 1122. .................. 4

        2.    The Plan Complies with the Requirements of § 1123(a). .............. 5

        3.    The Plan Complies with the Requirements of § 1123(b). .............. 8

        4.    Section 1123(d) and Bankruptcy Rule 3016(a) ............................ 9

    B.    The Debtors have Complied with § 1129(a)(2). ........................................ 9

        1.    The Debtors Have Complied with § 1125. ................................. 10

        2.    The Debtors Have Complied with § 1126. ................................. 11

    C.    Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and
Not by Any Means Forbidden by Law. ................................................... 12

    D.    Section 1129(a)(4): The Plan Provides that Professional Fees and
Expenses are Subject to Court Approval. ................................................ 13

    E.    Section 1129(a)(5): The Debtors Have Disclosed All Necessary
Information Regarding Directors and Officers. ........................................ 14

    F.    Section 1129(a)(6): The Plan Does Not Contain Rate Changes
Subject to the Jurisdiction of Any Governmental Regulatory
Commission. ......................................................................................... 14

    G.    Section 1129(a)(7): The Plan Is in the Best Interest of Creditors. ........... 15

    H.    Section 1129(a)(8): Not All Impaired Classes Have Accepted the
Plan. ..................................................................................................... 16

    I.    Section 1129(a)(9): The Plan Provides for Payment in Full of All
Allowed Administrative Claims, Priority Claims, Priority Tax
Claims, and Professional Fee Claims. ..................................................... 17

**J.**     Section 1129(a)(10): At Least One Impaired Class of Claims has Accepted the Plan. ................................................................. 19

**K.**     Section 1129(a)(11): The Plan is Feasible. ............................................ 20

**L.**     Section 1129(a)(12): All Statutory Fees Have Been or Will Be Paid. ................................................................................................ 21

**M.**     Sections 1129(a)(13) Through 1129(a)(16) Do Not Apply to the Plan. .................................................................................................. 21

**N.**     The Plan Satisfies the "Cram Down" Requirements of § 1129(b). ......... 21

        1.     The Plan Does Not Discriminate Unfairly. ................................... 22

        2.     The Plan Is Fair and Equitable. ................................................... 24

**O.**     Section 1129(c): The Plan Is the Only Plan Filed in the Chapter 11 Cases. ................................................................................................ 25

**P.**     Section 1129(d): The Principal Purpose of the Plan is Not to Avoid Taxes or Section 5 of the Securities Act. .................................................. 25

**Q.**     Section 1129(e): The Debtors are Not a Small Business. ........................ 26

**R.**     Executory Contracts ................................................................................ 26

**S.**     The Plan Releases, Exculpations, And Injunctions Are Appropriate And Consistent With Established Precedent. ........................................... 27

        1.     The Releases of the Estates' Claims ............................................ 27

        2.     Consensual Third-Party Releases ................................................. 31

        3.     Exculpation and Limitation of Liability ....................................... 33

        4.     Injunction ..................................................................................... 33

**T.**     Modifications of the Plan Do Not Adversely Change the Treatment of Any Creditor or Equity Interest Holder. ............................................... 34

**U.**     Waiver of Bankruptcy Rules Regarding Stay of Confirmation Order ................................................................................................................ 34

II.    REPLY TO OBJECTIONS TO CONFIRMATION ........................................... 35

**A.**     Kari Crutcher *Qui Tam* Plaintiff ............................................................. 35

        1.     Limited Objection to Plan ............................................................ 35

iii

2. Reply to Crutcher's Response to Debtors' Objection to Claim No. 124 Solely for Voting Purposes ................................. 36

**B.** Lynx Whole Loan Acquisition Objection ................................................ 36

**C.** Customer Bank's Limited Objection and Reservation of Rights ............. 37

**D.** Flagstar Bank, FSB's Joinder to Customer Bank's Limited Objection ................................................................................................ 41

**E.** U. S. Trustee's Objection ....................................................... 42

1. The Debtors Have Shown That the Plan Is Feasible, Despite the Contentions of the UST ........................................................ 42

2. The UST's Contention That the Releases Are Improper is Without Merit ............................................................................ 42

3. The Debtors Have Addressed the UST's Concern as to the Exculpation Provision. ............................................................. 45

4. The UST's Contention That Confirmation Should be Denied because the Plan is Cast as a Settlement Under Bankruptcy Rule 9019 is Without Merit. ....................................................... 45

5. The Plan Does Not Provide a Discharge in Contravention of 11 U.S.C. § 1141(d)(3). ............................................................... 46

6. The Debtors Have Addressed the UST's Concern as to Post Confirmation Reporting and Quarterly Fee Obligations. ............ 47

**F.** Fannie Mae's Limited Objection and Reservation of Rights ................... 47

III. Reply to WARN Act Objections ........................................................ 48

CONCLUSION .............................................................................................. 67

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Bus. Solutions, Inc.*,
   341 B.R. ...............................................................................................63, 64

*In re Adelphia Communs. Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...........................................................62

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court N.Y., N.Y. (In re Chateaugay Corp.)*,
   89 F.3d 942 (2d Cir. 1996) ................................................................................4

*In re AH Liquidation, Inc.*,
   No. 21-10883 (CTG) (Bankr. D. Del. Nov. 1, 2021) .......................................44

*In re Aleris Int'l, Inc.*,
   Case No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ....................28

*In re Alpha Entertainment LLC*,
   Case No. 20-10940 (LSS) (Bankr. D. Del. Dec. 11, 2020) ..............................32

*In re Am. Capital Equip., LLC*,
   688 F.3d 145 (3d Cir. 2012) .............................................................................66

*In re APA Transp. Corp. Consol. Litig.*,
   541 F.3d 233 (3d Cir. 2008) .............................................................................60

*In re Armstrong World Indus., Inc.*,
   432 F.3d 507 (3d Cir. 2005) .............................................................................22

*In re Avadim Health, Inc.*,
   Case No. 21-10883 (CTG) (Bankr. D. Del. Oct. 27, 2021) ............................32

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999) ...................................................................................15, 24

*In re Barney & Carey Co.*,
   170 B.R. 17 (Bankr. D. Mass 1994) ................................................................22

*In re Burns & Roe Enters., Inc.*,
   Case No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) ..............34

*In re Buttonwood Partners, Ltd.*,
  111 B.R. 57 (Bankr. S.D.N.Y. 1990) ..................................................................23

*In re Chemtura Corp.*,
  448 B.R. 635 (Bankr. S.D.N.Y. 2011) .................................................................65

*In re CL H Winddown LLC*,
  Case No. 21-10527 (JTD) (Bankr. D. Del. Sept. 7, 2021) ...................................32

*In re Cloud Peak Energy Inc.*,
  No. 19-11047 (KG) (Bankr. D. Del. Dec. 5, 2019) .............................................43

*Conn v. Dewey & Leboeuf LLP (In re Dewey & Leboeuf LLP)*,
  487 B.R. 169 (Bankr. S.D.N.Y. 2013) .................................................................55

*Czyewski v. Jevic Transp. Inc. (In re Jevic Holding Corp.)*,
  496 B.R. 151 (Bankr. D. Del. 2013) ............................................................ *passim*

*In re Dura Auto. Sys., Inc.*,
  379 B.R. 257 (Bankr. D. Del. 2007) ...................................................................22

*In re EveryWare Glob., Inc.*,
  No. 15-10743 (LSS) (Bankr. D. Del. May, 22, 2015) .........................................43

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) ......................................................................32

*In re Experient Corp.*,
  535 B.R. 386 (Bankr. D. Colo. 2015) ..................................................................36

*First Fid. Bank v. McAteer*,
  985 F.2d 114 (3d Cir. 1993).................................................................................32

*In re GBG USA Inc.*,
  Case No. 21-11369, Docket No. 672 (Bankr. S.D.N.Y. Aug. 2, 2022 ) .................61

*In re Gibson Brands*,
  No. 18-11025 (CSS) (Bankr. D. Del. Oct. 2018)................................................43

*In re Global Safety Textiles Holdings LLC*,
  Case No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009).....................34

*Gross v. Hale-Halsell Co.*,
  554 F.3d 870 (10th Cir. 2009) .................................................................... *passim*

*Hotel Emples. Int'l Union Local 54 v. Elsinore Shore Assocs.*,
  173 F.3d 175 (3d Cir.1999)........................................................................56, 58, 60

*In re Hydrox Chem. Co.*,
    194 B.R. 617 (Bankr. N.D. Ill. 1996) ..................................................................36

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) .......................................................30, 32, 43

*In re Insys Therapeutics, Inc.*,
    No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020) .............................................43

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987).................................................................................4

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986)...................................................4, 10, 23, 36

*In re Johns-Manville (Manville I)*,
    837 F.2d 89 (2d Cir. 1988)...................................................................................28

*In re Lambertson Truex, LLC*,
    No. 09-10747, 2009 Bankr. LEXIS 4812 (Bankr. D. Del. July 27, 2009) ........46, 47

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (D. Del. 2003)...........................................................................22, 23

*Lisanti Foods, Inc. v. Lubetkin (In re Lisanti Foods, Inc.)*,
    329 B.R. 491 (D.N.J. 2005) .................................................................................13

*In re MacDonald*,
    128 B.R. 161 (Bankr. W.D. Tex. 1991)................................................................67

*In re Mallinckrodt*,
    639 B.R. 837 (Bankr. D. Del. 2022) ....................................................................43

*In re Marvel Entm't Grp., Inc.*,
    273 B.R. 58 (D. Del. 2002)..................................................................................28

*In re Midway Gold US, Inc.*,
    575 B.R. 475 (Bankr. D. Colo. 2017) ..................................................................46

*In re NII Holdings, Inc.*,
    288 B.R. 356 (Bankr. D. Del. 2002) ....................................................................13

*In re One2One Commc'ns, LLC*,
    Case No. 12-27311, 2016 WL 3398580 (D. N.J. June 14, 2016) ........................30

*In re Pac Sunwear of Cal., Inc.*,
    2016 Bankr. LEXIS 2976 (Bankr. D. Del. Aug. 8, 2016) ....................................36

*In re Paragon Offshore PLC*,
No. 16-10386 (CSS) (Bankr. D. Del. June 7, 2017) ...............................................44

*In re Phil. Newspapers LLC*,
599 F.3d 298 (3rd Cir. 2010) ...............................................................................39

*In re PPI Enters. (U.S.), Inc.*,
228 B.R. 339 (Bankr. D. Del. 1998) ....................................................................13

*In re PQ New York, Inc.*,
Case No. 11266 (JTD) (Bankr. D. Del. Sept. 25, 2020) .......................................32

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000).......................................................................13, 28, 33

*In re Quiksilver Inc.*,
No. 15-11880 (BLS) (Bankr. D. Del. Jan. 29, 2016).............................................43

*In re Riverbed Technology, Inc.*,
Case No. 21-11503 (CTG) (Bankr. D. Del. Dec. 3, 2021) ...................................32

*In re Rubicon U.S. REIT, Inc.*,
434 B.R. 168 (Bankr. D. Del. 2010) ....................................................................23

*In re Seaside Eng'g & Surveying, Inc.*,
780 F.3d 1070 (11th Cir. 2015) ...........................................................................31

*In re Seventy Seven Fin. Inc.*,
No. 16-11409 (LSS) (Bankr. D. Del. July 14, 2016).............................................42

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*,
872 F.2d 36 (3d Cir. 1989)....................................................................................26

*Sherman v. Harbin (In re Harbin)*,
486 F.3d 510 (9th Cir. 2007) ...............................................................................61

*Stewart v. Art Van Furniture, LLC (In re Art Van Furniture, LLC)*,
638 B.R. 523 (Bankr. D. Del. 2022) .......................................................54, 55, 56

*In re Texaco, Inc.*,
84 B.R. 893 (Bankr. S.D.N.Y. 1988).....................................................................4

*In re Tonopah Solar Energy, LLC*,
No. 20-11844 (KBO), -- B.R. --, 2022 WL 982558 (D. Del. Mar. 31, 2022) .......61, 62, 63, 67

*In re Tonopah*,
Case No. 20-1184-KBO..........................................................................................62

*U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co.* (*In re Spansion, Inc.*),
    426 B.R. 114 (Bankr. D. Del. 2010) .................................................................28, 43, 61, 64

*In re United Healthcare Sys., Inc.*,
    200 F.3d 170 (3d Cir. 1999)..........................................................................................54

*In re Velocity Holding Company, Inc.*,
    Case No. 17-12442 (KJC) (Bankr. D. Del. March 29, 2018) .................................32

*In re Verity Health Sys. of California, Inc.*,
    No. CV 20-7632 DSF, 2021 WL 1102441 (C.D. Cal. Mar. 23, 2021)...................64

*In re Wash. Mut., Inc.*,
    442 B.R. .................................................................................................................30, 31

*In re Windsor Plumbing Supply Co.*,
    170 B.R. 503 (Bankr. E.D.N.Y. 1994).......................................................................63

*In re WorldCom, Inc.*,
    2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003) ...................................10

*In re WR Grace & Co.*,
    729 F.3d 332 (3d Cir. 2013)..........................................................................................66

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) .....................................................................29, 30, 31

**Statutes**

11 U.S.C. § 541 (a)(1)......................................................................................................28

11 U.S.C. § 1129(a)(9)........................................................................................17, 18, 19

11 U.S.C. § 1129(a)(11)............................................................................................. *passim*

11 U.S.C. § 1129(a)(14)....................................................................................................21

11 U.S.C. § 1129(a)(15)....................................................................................................21

11 U.S.C. § 1129(a)(16)....................................................................................................21

11 U.S.C. §1129(b)(1) ......................................................................................................22

11 U.S.C. § 1129(b)(2)(B)(ii) .....................................................................................24, 25

11 U.S.C. § 1129(b)(2)(C)(ii) ..........................................................................................24

11 U.S.C. § 1141(d)(3) .....................................................................................................46

28 U.S.C. § 1930 ................................................................................................21

29 U.S.C. § 2101, et seq. ....................................................................................48

United States Code Title 11 .................................................................................1

Bankruptcy Code amendments ............................................................................5

Bankruptcy Code § 507(a)(4) ..............................................................48, 52, 65

Bankruptcy Code section 1123 ......................................................................4, 28

Bankruptcy Code Section 1123(b)(3)(A) ..........................................................28

Bankruptcy Code sections 1125 and 1126 ...................................................10, 12

Bankruptcy Code § 1125 and § 1126 ...............................................................10

Bankruptcy Code § 1129(a) ....................................................................10, 22, 39

Code §§ 1122 and 1123 ............................................................................4, 9, 34

Priority WARN Act .............................................................................................54

Reply to WARN Act ...........................................................................................48

Second, WARN Act ............................................................................................49

Securities Act Section 5 ...............................................................................25, 26

WARN Act............................................................................................... *passim*

**Other Authorities**

Bankruptcy Rule 3007 ........................................................................................36

Bankruptcy Rule 3016 ........................................................................................33

Bankruptcy Rule 3016(a) .....................................................................................9

Bankruptcy Rule 3019 ........................................................................................34

Bankruptcy Rule 3020(e) ...............................................................................34, 35

Bankruptcy Rule 9019 .............................................................................28, 45, 46

Bankruptcy Rules 2002(b) and 3017(d)-(f) .......................................................11

7 *Collier on Bankruptcy* ¶ 1129.02[2] (16th ed. 2018) .................................10

Confirmation Order (i) ....................................................................................................68

*Crutcher Objection* at ¶ 9 ...........................................................................................35

Federal Rules of Bankruptcy Procedure Rule 3016(a) ................................................9

H.R. Rep. No. 95-595 (1977), reprinted in 1978 U.S.C.C.A.N. 5963 .........................10

Hearing Transcript, August 2, 2022, at 15 L.10-14 ....................................................38

Order (I) .......................................................................................................................43

Order Confirming the Fifth Joint Chapter 11 ..............................................................44

Rule 3018 ......................................................................................................................36

S. Rep. No. 95-989 (1978), reprinted in 1978 U.S.C.C.A.N. 5787 .............................10

The above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases") submit this memorandum of law (the "Memorandum") in support of confirmation of the *Amended Combined Disclosure Statement and Chapter 11 Plan of First Guaranty Mortgage Corporation and Debtor Affiliate*, dated October 7, 2022 (collectively with all exhibits thereto and as may be amended, modified, or supplemented from time to time, the "Plan"), pursuant to §[2] 1129 of Title 11 of the United States Code (the "Bankruptcy Code").[3]  In support of confirmation of the Plan, the Debtors rely upon (i) the *Declaration of Tanya Meerovich in Support of Confirmation of Amended Combined Disclosure Statement and Chapter 11 Plan of First Guaranty Mortgage Corporation and Debtor Affiliate* (the "Meerovich Declaration"); (ii) the *Declaration of Aaron Samples in Support of Confirmation of the Amended Combined Disclosure Statement and Chapter 11 Plan of First Guaranty Mortgage Corporation and Debtor Affiliate* (the "Samples Reply Declaration,"); and (iii) the *Declaration of Andres A. Estrada with Respect to the Tabulation of Votes on the Amended Combined Disclosure Statement and Chapter 11 Plan of First Guaranty Mortgage Corporation and Debtor Affiliate* (the "Voting Declaration," together with the Meerovich Declaration and Voting Declaration, the "Declarations"), filed contemporaneously herewith.  In further support of confirmation of the Plan, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.     The Debtors filed these Chapter 11 Cases on June 30, 2022, due to unforeseen historically adverse market conditions for the mortgage lending industry and after experiencing significant operating losses and cash flow challenges.  By mid-June 2022, as liquidity continued

---

[2]  All references to "§" or "section" herein are to sections of the Bankruptcy Code.

[3]  Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan.

to decline, Debtors' management concluded that they could no longer continue operations without a significant injection of new liquidity, as one or two days of significant margin calls could leave the Debtors without any cash. Despite their best efforts, the Debtors were unable to obtain financing or close a sale transaction that would allow them to continue ongoing business operations, and therefore, they commenced these Chapter 11 Cases.

2.      As a result, and as set forth in the *Declaration of Aaron Samples in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 19], the Debtors determined that, in order to continue to fund part of the current "pipeline" (loans not yet funded), they needed to suspend all new loan applications, suspend all correspondent lending, cease all hedging payments and significantly reduce their workforce. The Debtors further determined that filing these Chapter 11 Cases was the best way to preserve customer's ability to close on loans already in the pipeline.

3.      Over the course of these Chapter 11 Cases, the Debtors have overcome significant hurdles in achieving their goals and maximizing value for their stakeholders. Notwithstanding these obstacles, with funding provided by the Prepetition Bridge Loan Lender and Cash Flow DIP Lender, the Debtors' efforts culminated in funding the Debtors' existing pipeline of mortgages, the sale of the Debtors' assets to BSI Financial Services and complex settlements with Federal Home Loan Mortgage Corporation ("Freddie Mac") and Federal National Mortgage Association ("Fannie Mae") related thereto, as well as multiple material settlements, including the settlement with the Official Committee of Unsecured Creditors (the "Committee") and LVS II SPE XXXIV LLC (the "Cash Flow DIP Lender"), that are instrumental to the construct of the Plan.

4.      The Plan generates substantially more value for general unsecured creditors than would be available absent such settlements or if these Chapter 11 Cases were converted to chapter 7. The Plan further contemplates the formation of a Liquidating Trust to handle post-confirmation

2

matters, liquidate the Debtors' remaining assets (which are vested in the Liquidating Trust under the terms of the Plan), and make distributions to creditors in accordance with the Plan.

5.    Furthermore, and as more fully set forth below and in the Voting Declaration, Class 6 supports the Plan.  Accordingly, and for the reasons set forth below, the Debtors respectfully request the entry of the proposed order confirming the Plan (the "<u>Confirmation Order</u>").

## STATEMENT OF FACTS

6.    The facts relevant to confirmation of the Plan are set forth in the Plan, the Declarations, and any evidence presented or testimony that may be adduced at the hearing to consider confirmation of the Plan (the "<u>Confirmation Hearing</u>"), all of which are incorporated herein by this reference.

## ARGUMENT

## I.    THE PLAN COMPLIES WITH THE CONFIRMATION STANDARDS SET FORTH IN § 1129.

7.    Section 1129 sets forth the requirements that must be satisfied for a plan to be confirmed.  Through evidence to be presented at the Confirmation Hearing, as set forth in the Declarations, and as demonstrated herein, the Debtors will establish, by a preponderance of the evidence, that the Plan satisfies all confirmation requirements.

### A.    The Plan Complies with the Applicable Provisions of § 1129(a)(1).

8.    Pursuant to § 1129(a)(1), a plan may be confirmed only if it "complies with applicable provisions of [the Bankruptcy Code]."  It is well-established that the requirement in § 1129(a)(1) primarily focuses on compliance with § 1122 (governing classification of claims and interests) and § 1123 (governing necessary and permissible provisions).  *See In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986) (stating that "[o]bjections to confirmation raised under § 1129(a)(1) generally involve the failure of a plan to conform to the requirements of §

3

1122(a) or § 1123)"), *of'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987);

*In re Texaco, Inc.*, 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988) ("In determining whether a plan

complies with § 1129(a)(1), reference must be made to Code §§ 1122 and 1123 with respect to the

classification of claims and the contents of a plan of reorganization.") (citing *In re Toy & Sports

Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984)), *appeal dismissed*, 92 B.R. 38

(S.D.N.Y. 1988).   As demonstrated below, the Plan fully complies with all of the applicable

provisions of the Bankruptcy Code, as required by § 1129(a)(1), including, without limitation, §§

1122 and 1123.

### 1.    The Plan Complies with the Requirements of § 1122.

9.    Pursuant to § 1122, claims or interests within a given class must be "substantially

similar" to the other claims or interests in that class.  Section 1122, however, does not require that

all substantially similar claims or equity interest must be classified together.  Instead, courts have

recognized that similar claims may be classified separately, provided that there is a basis for doing

so. *See, e.g., Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court N.Y., N.Y. (In re Chateaugay

Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996).  Courts are also afforded broad discretion in approving a

plan proponent's classification structure and should consider the specific facts of each case when

making a determination regarding classification. *See, e.g., In re Jersey City Med. Ctr.*, 817 F.2d

1055, 1060–61 (3d Cir. 1987) (observing that "Congress intended to afford bankruptcy judges

broad discretion [under § 1122] to decide the propriety of plans in light of the facts of each case").

4

10.     Section 9 of the Plan provides for the separate classification of Claims and Interests into seven distinct Classes based upon (a) their secured status, if applicable, (b) their legal priority against the Debtors' assets, and (c) other relevant factors:[4]

| CLASS | CLAIM/ EQUITY INTEREST |
|-------|------------------------|
| 1 | Priority Non-Tax Claims |
| 2 | Other Secured Claims |
| 3 | Secured Prepetition Facility Claims |
| 4 | Loan Settlement Claims |
| 5 | Prepetition LVS II Offshore Guaranty Claim |
| 6 | General Unsecured Claims |
| 7 | Interests |

*See* Plan, at § 10, Meerovich Declaration ¶ 9.

11.     The Plan's classification scheme complies with § 1122 because each Class of Claims or Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within such Class.  Accordingly, the legal rights of each of the holders of Claims or Interests within a particular Class are substantially similar to other holders of Claims or Interests within that Class, and the Plan satisfies the requirements of § 1122.

**2.     The Plan Complies with the Requirements of § 1123(a).**

12.     As applicable, § 1123(a) sets forth seven (7) requirements for every chapter 11 plan.[5]  The Plan complies with each such requirement.

**i.     Section 1123(a)(1): Designation of Classes of Claims and Interests**

---

[4]     In accordance with 1123(a)(1), Administrative Claims, DIP Repo Loan Claims, Cash Flow DIP Claims and Priority Tax Claims have not been classified.  *See* Plan at § 2.1.

[5]     Section 1123(a)(8), added with the enactment of the 2005 Bankruptcy Code amendments, is only applicable to individual debtor cases and, therefore, not addressed herein.

13.    Section 1123(a)(1) requires that a chapter 11 plan designate classes of claims and equity interests subject to § 1122, other than the kinds specified in §§ 507(a)(2) (administrative expenses claims), 507(a)(3) (claims arising during the "gap" period in an involuntary case), and 507(a)(8) (unsecured tax claims).  As discussed above, and subject to § 1122, Section 9 of the Plan designates six Classes of Claims and one Class of Interests, not including the Claims of the kinds specified in §§ 507(a)(2), (3), and (8).  Thus, the Plan satisfies the requirements of § 1123(a)(2).

        **ii.**        **Section 1123(a)(2): Classes That Are Not Impaired by the Plan**

14.    Section 1123(a)(2) requires that a chapter 11 plan specify which classes of claims or equity interests are unimpaired under such plan.  The Plan specifies that Class 1 (Priority Non-Tax Claims) and Class 2 (Other Secured Claims) are Unimpaired.  *See* Plan at §§ 10.1 and 10.2.  Thus, the Plan satisfies the requirement of § 1123(a)(2).

        **iii.**        **Section 1123(a)(3): Treatment of Classes That Are Impaired by the Plan**

15.    Section 1123(a)(3) requires that a chapter 11 plan specify how the classes of claims or equity interests that are impaired under such plan will be treated.  The Plan designates Class 3 (Secured Prepetition Facility Claims), Class 4 (Loan Settlement Claims), Class 5 (Prepetition LVS II Offshore Guaranty Claims), and Class 6 (General Unsecured Claims) as Impaired and specifies the treatment of Claims and Interests in such Classes.  *See* Plan at §§ 10.3-10.6.  Thus, the Plan satisfies the requirement of § 1123(a)(3).

        **iv.**        **Section 1123(a)(4): Equal Treatment Within Each Class**

16.    Section 1123(a)(4) requires that a chapter 11 plan provide the same treatment for each claim or equity interest within a particular class, unless the holder of a claim or interest agrees to receive less favorable treatment.  Pursuant to the Plan, the treatment of each Claim against or Interest in the Debtors in each respective Class is the same as the treatment of each other Claim or

Interest in such Class, unless the holder has agreed to receive less favorable treatment.  *See* Plan at § 6.4.  Thus, the Plan satisfies the requirement of § 1123(a)(4).

**v.       Section 1123(a)(5): Adequate Means for Implementation**

17.       Section 1123(a)(5) requires that a chapter 11 plan provide "adequate means for the plan's implementation" and provide certain non-exclusive examples.  Sections 14 of the Plan, as well as the Liquidating Trust Agreement attached to the Plan Supplement as Exhibit 3 [Docket No. 551-3], provide a detailed description of, and framework for, the transactions, actions, and events that are contemplated by the Plan.  More specifically, the Plan provides adequate means for its implementation through, among other things, (i) procedures for voting on and confirming the Plan, (ii) the vesting of all of the Debtors' Property in the Liquidating Trust; (iii) the appointment of the Liquidating Trustee; and (iv) the making of Distributions by the Liquidating Trust in accordance with the terms and conditions of the Plan.  Thus, the Plan satisfies the requirement of § 1123(a)(5).

**vi.       Section 1123(a)(6): Prohibitions on Issuance of Non-Voting Securities**

18.       Section 1123(a)(6) requires that a plan provide that the debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities.  Here, the Plan provides that upon the Effective Date, the Debtors' formation documents shall be deemed amended to prohibit the issuance by the Debtors of nonvoting securities under § 1123(a)(6).  *See* Plan at § 19.14.  Thus, the Plan satisfies the requirements of § 1123(a)(6).

**vii.       Section 1123(a)(7): Provisions Regarding Directors and Officers**

19.       Section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such

7

officer, director, or trustee." Upon the Effective Date, the Liquidating Trustee will be the representative of the Estates, subject to the oversight of Oversight Committee, as set forth in the Plan and Liquidating Trust Agreement. *See* Plan at § 14.5. The Liquidating Trustee, Tanya Meerovich, Senior Managing Director of FTI Consulting, Inc., was selected by the Debtors, upon terms agreeable to the Committee and Cash Flow DIP Lender. *See* Plan at § 14.5(a); Meerovich Declaration, ¶ 13. The Oversight Committee will be comprised of the three members, with two members to be appointed by the Cash Flow DIP Lender and one member to be appointed by the Committee. *See* Plan at § 14.5(h); Meerovich Declaration, ¶ 16. The affiliations and compensation of the Liquidating Trustee and the Oversight Committee are described in the Plan and Liquidating Trust Agreement. *See* Plan at § 14.5(i); Liquidating Trust Agreement at §§ 2.9(c), 3.1. Prior to confirmation, the Debtors will file an amended Liquidating Trust Agreement and an Exhibit A attached thereto that will further describe compensation and reimbursement of expenses for the Liquidating Trustee. Thus, the Plan satisfies the requirements of § 1123(a)(7).

### 3.    The Plan Complies with the Requirements of § 1123(b).

20.    Section 1123(b) identifies various discretionary provisions that may be included in a chapter 11 plan. The Plan contains certain of these provisions specifically contemplated by § 1123(b), including provisions regarding: (a) impairment and unimpairment of Classes of Claims and Interests (Plan at § 9) as contemplated by § 1123(b)(1); (b) the assumption or rejection of executory contracts and unexpired leases (Plan at § 13) as contemplated by § 1123(b)(2); (c) settlement or retention of claims belonging to the Estates (Plan at § 12) as contemplated by § 1123(b)(3); and (d) modification of rights of holders of secured claims (Plan at § 10.2, 10.3, and 10.4) as contemplated by § 1123(b)(5).

21.     Moreover, the Plan contains other provisions that fall within the catch-all discretionary provision in § 1123(b)(6), which permits a plan to include other provisions not inconsistent with the applicable provisions of the Bankruptcy Code.  *See*, *e.g.*, Plan at Section 18 (providing for the Court's retention of jurisdiction on certain specified matters); and Plan at Section 11 (setting forth provisions regarding distributions under the Plan).[6]  Thus, the Plan complies with § 1123(b).

### 4.     Section 1123(d) and Bankruptcy Rule 3016(a)

22.     The Plan complies with § 1123(d),[7] which provides that if a plan proposes to cure a default, "the default shall be determined in accordance with the underlying agreement and applicable non-bankruptcy law."  The Plan does not provide otherwise.  Meerovich Declaration, ¶ 17.  Moreover, the Plan complies with Rule 3016(a) of the Federal Rules of Bankruptcy Procedure (the Bankruptcy Rules") because it is dated October 7, 2022 and identifies the Debtors as the Plan Proponents.

* * * * *

23.     Accordingly, the Plan complies with the requirements of §§ 1122 and 1123, as well as with other applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.  Thus, the Plan satisfies the requirements of § 1129(a)(1).

### B.     The Debtors have Complied with § 1129(a)(2).

24.     Section 1129(a)(2) requires that a plan proponent "compl[y] with the applicable provisions of the [Bankruptcy Code]."  Whereas § 1129(a)(1) focuses on the form and content of

---

[6]     The Plan's release and exculpation provisions are discussed in Section III, *infra*.

[7]     Because the Debtors are not individuals, § 1123(c) is inapplicable to the Plan.

a plan itself, § 1129(a)(2) is concerned with the activities of the plan proponent.[8]  That is, the inquiry under § 1129(a)(2) focuses on whether the plan proponent has complied with the disclosure and solicitation requirements of §§ 1125 and 1126.  *See* S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912 ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6368; *see also In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401 at *137 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that "[t]he legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code."); *In re Johns-Manville*, 68 B.R. at 630 ("Objections to confirmation raised under § 1129(a)(2 generally involve the alleged failure of the plan proponent to comply with § 1125 and § 1126 of the Bankruptcy Code").  Here, the Debtors have complied with the applicable provisions of the Bankruptcy Code, including, without limitation, §§ 1125 and 1126 and the applicable Bankruptcy Rules regarding plan disclosures and solicitation.

### 1. The Debtors Have Complied with § 1125.

25.    Section 1125(b) prohibits the solicitation of acceptance or rejections of a plan from holders of claims or equity interests "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved . . . by the court as containing adequate information."

26.    On October 7, 2022, the Court entered an order granting interim approval of the adequacy of the Disclosures in the Plan and approving the procedures for the transmittal of the

---

[8]    7 *Collier on Bankruptcy* ¶ 1129.02[2] (16th ed. 2018).

Plan and other solicitation materials [Docket No. 524] (the "<u>Disclosure Statement Order</u>").

Beginning on October 11, 2022, the Debtors, though KCC, transmitted Solicitation Packages (as

defined in the Solicitation Procedures Motion) to those holders of claims entitled to vote on the

Combined Plan and Disclosure Statement as of the September 28, 2022 record date, as well as

those creditors who filed proofs of claim in advance of the October 14, 2022 Bar Date.  *See*

Meerovich Declaration, ¶ 20; Voting Declaration, ¶ 5.  Specifically, KCC caused copies of the

Solicitation Packages to be served, via U.S. First Class Mail, on holders of Claims in Classes 3, 4,

5, and 6.  Voting Declaration, ¶ 5.  Additionally, KCC served holders of Claims and Interests in

Classes 7 with the Notice of Non-Voting Status Due to No Recovery and the Combined Hearing

Notice.  Voting Declaration, ¶ 5.  Holders of Class 1 and Class 2 Claims were served with the

Notice of Non-Voting Status Due to Non-Impairment.  Voting Declaration, ¶ 5.

27.     Because the holders of Claims and Interests in each Class received the same

materials in accordance with the terms of the Disclosure Statement Order, the Debtors have

complied with § 1125(c).  Furthermore, the Meerovich Declaration and the Voting Declaration

demonstrate that the Debtors served the solicitation materials in accordance with the requirements

of Bankruptcy Rules 2002(b) and 3017(d)-(f), as well as the Disclosure Statement Order.  As such,

the Debtors have complied with § 1125.

### 2.     The Debtors Have Complied with § 1126.

28.     Section 1126 specifies the requirements for acceptance of a plan and generally

provides that holders of claims or equity interests are entitled to vote on such plan; however, an

unimpaired class is conclusively deemed to accept the plan,[9] and a class that will not receive or retain any property under the plan is deemed to reject the plan.[10]

29.     The Debtors have complied with the requirements of § 1126.  Class 1 (Priority Non-Tax Claims) and Class 2 (Other Secured Claims) are unimpaired under the Plan and, pursuant to § 1126(f), these Classes are conclusively deemed to accept the Plan and have not been solicited to vote on the Plan.  Meerovich Declaration, ¶ 21; Voting Declaration, ¶ 5.  Holders of Claims in Class 7 (Interests) are not entitled to receive or retain any property under the Plan, and, pursuant to § 1126(g), Class 7 is deemed to reject the Plan and has not been solicited to vote on the Plan. Meerovich Declaration, ¶ 21; Voting Declaration, ¶ 5.  Class 3 (Secured Prepetition Facility Claims), Class 4 (Loan Settlement Claims), Class 5 (Prepetition LVS II Offshore Guaranty Claims), and Class 6 (General Unsecured Claims) are impaired under the Plan, and holders of Class 3, 4, 5, and 6 Claims are entitled to receive property under the Plan.  *See* Plan, § 9. Accordingly, holders of Class 3, 4, 5, and 6 Claims have been solicited to accept or reject the Plan. Meerovich Declaration, ¶ 21; Voting Declaration, ¶ 5.

30.     In this regard, the Debtors' solicitation of votes with respect to the Plan was undertaken in conformity with §§ 1125 and 1126 and the Disclosure Statement Order.  The Debtors, therefore, have complied with the applicable provisions of the Bankruptcy Code and have satisfied the requirements of § 1129(a)(2).

**C.      Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law.**

---

[9]   Section 1126(f) provides that "a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required."

[10]   Section 1126(g) provides that "a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests."

31.    Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law."  Good faith is generally interpreted to mean that there is a reasonable likelihood that the "plan will fairly achieve a result consistent with the objective and purposes of the Bankruptcy Code."  *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000).  Good faith is to be viewed in light of the particular facts and circumstances of the case.  *See, e.g., In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002); *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339 (Bankr. D. Del. 1998).

32.    The Debtors have proposed the Plan in good faith.  Throughout these Chapter 11 Cases, the Debtors have worked to build consensus among the various creditor constituencies.  The Plan and the process leading up to its formulation are the result of extensive arm's length negotiations among the Debtors, the Committee, the Cash Flow DIP Lender, and other parties in interest.  In this regard, the Plan has been proposed by the Debtors for legitimate and honest purposes and is in the best interests of the Debtors' stakeholders.  Meerovich Declaration, ¶ 22.  Accordingly, the requirement of § 1129(a)(3) has been satisfied.

### D.    Section 1129(a)(4): The Plan Provides that Professional Fees and Expenses are Subject to Court Approval.

33.    Section 1129(a)(4) requires that any payments by a debtor "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case," either be approved by the court as reasonable or subject to the approval of the court as reasonable.  Section 1129(a)(4) has been construed to require that all payment on account of professional fees and expenses from estate assets be subject to the Bankruptcy Court's review and approval.  *See, e.g., Lisanti Foods, Inc. v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 503 (D.N.J. 2005); *Resorts Int'l, Inc.*, 145 B.R. 412, 476 (Bankr. D.N.J. 1990).

13

34.     In accordance with § 1129(a)(4), no payment will be made from assets of the Estates on account of Professional Fee Claims other than payments that are authorized by order of the Bankruptcy Court.  Pursuant to Section 8.3 of the Plan, all applications for payment of Professional Fee Claims must be filed with the Bankruptcy Court within forty-five (45) days after the Effective Date.  Such Professional Fee Claims are only payable to the extent approved by the Bankruptcy Court. Accordingly, the requirement of § 1129(a)(4) has been satisfied.

### E.     Section 1129(a)(5): The Debtors Have Disclosed All Necessary Information Regarding Directors and Officers.

35.     Section 1129(a)(5) requires that (i) the plan proponents disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor, the identity of any insider to be employed or retained by the reorganized debtor, and the nature of any compensation proposed to be paid to such insider, and (ii) that appointment or continuance of such individual in such office be consistent with the interest of creditors, equity holders, and public policy.  Because the Plan provides for the liquidation and distribution of the Debtors' remaining assets by a Liquidating Trust, the requirements imposed by § 1129(a)(5) are largely inapplicable.  Based upon the foregoing, the Debtors have satisfied the requirements of § 1129(a)(5) to the extent applicable to the Plan.

### F.     Section 1129(a)(6): The Plan Does Not Contain Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission.

36.     Section 1129(a)(6) requires that any governmental regulatory commission having jurisdiction over the rates charged by the post-confirmation debtor in the operation of its business approve any rate change provided for in a plan.  Here, there is not any governmental regulatory commission having jurisdiction over the pricing of the services offered by the Debtors in the marketplace.  Further, this Plan does not propose any pricing or rate change, consequently § 1129(a)(6) does not apply to the Plan.  Meerovich Declaration, at ¶ 25.

14

G.    **Section 1129(a)(7): The Plan Is in the Best Interest of Creditors.**

37.    Section 1129(a)(7), often referred to the as the "best interest of the creditors test," requires that holders of impaired claims or interest which do not vote to accept the chapter 11 plan it issue "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date." The test focuses on individual creditors' claims rather than classes of claims. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

38.    The best interest test applies to the holders of Claims and Interest in Classes 3, 4, 5, and 6, all of which are impaired under the Plan. Consequently, each of those holders must either vote to accept the plan or must otherwise receive the requisite level of recovery under the Plan in order to satisfy the best interest of creditors test.

39.    The Debtors believe that the best interest test is satisfied as to each holder of an Impaired Claim or Interest, and no party in interest has argued otherwise or provided any evidence to the contrary. As an initial matter, the Plan is a plan of liquidation. As such, it is difficult to conceive how creditors in these Chapter 11 Cases would do better in a chapter 7, where there would be a negative impact on the ultimate proceeds available for distribution to creditors, including, without limitation, as a result of (i) the increased costs of liquidation under chapter 7, which would include, *inter alia*, the fees payable to a chapter 7 trustee and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, all of whom would need to get up to speed on the Debtors' affairs and the status of these Chapter 11 Cases, and (ii) the establishment of a new claims bar date, diluting any potential recoveries of holders of Class 6 Claims (General Unsecured Claims). Moreover, the addition of a chapter 7 trustee at this late stage in the Chapter 11 Cases would likely provide no benefit, as substantially all of the Debtors'

15

assets will be liquidated during these Chapter 11 Cases and the Plan provides for the vesting of all

of the assets of the Debtors in the Liquidating Trust under the direction of the Liquidating Trustee

to liquidate all remaining unliquidated assets and distribute the proceeds in accordance with the

Plan in a cost efficient manner.  Furthermore, given the magnitude of senior claims, certain priority

and general unsecured creditors are expected to receive no recovery if the Chapter 11 Cases were

converted to chapter 7 cases.  *See* Plan at <u>Exhibit A</u> (Liquidation Analysis).

      40.     Section 6.8 of the Plan as well as the Liquidation Analysis, attached to the Plan as

<u>Exhibit A</u>, further supports the satisfaction of the best interest of creditors test.  Impaired Classes

entitled to receive a distribution under the Plan, Classes 3, 4, 5, and 6, will receive greater

recoveries under the Plan than in a hypothetical chapter 7 liquidation.  *See* Plan at <u>Exhibit A</u>.

Holders of Claims and Interests in Class 7 (Interests) will not receive a distribution in either a

chapter 7 liquidation or under the Plan.  Meerovich Declaration, ¶ 25.  As a result, the Plan satisfies

the requirements of § 1129(a)(7).

      **H.**     **Section 1129(a)(8): Not All Impaired Classes Have Accepted the Plan.**

      41.     Section 1129(a)(8) requires either that each class of claims and interests under a

plan must either (a) accept the plan, or (b) be rendered unimpaired under the plan.

      42.     All unimpaired Classes of Claims under the Plan (*i.e.,* Classes 1 and 2) are

conclusively deemed to have accepted the Plan, pursuant to § 1126(f).  *See* Section I(B)(2), *supra*.

As set forth in the Voting Declaration, the following chart provides a summary of votes cast by

holders of Class 3 (Secured Prepetition Facility Claims), Class 4 (Loan Settlement Claims), Class

5 (Prepetition LVS II Offshore Guaranty Claims), and Class 6 (General Unsecured Claims), the

only Classes entitled to vote on the Plan:

| Class | Class Description | Not Tabulated | Members Voted | Members Accepted | Members Rejected | % Members Accepted | % Members Rejected | Total $ Voted | $ Accepted | $ Rejected | % $ Accepted | % $ Rejected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | Secured Prepetition Facility Claims | 1 | 3 | 1 | 2 | 33.33 | 66.67 | $152,511,248.32 | $144,219,127.98 | $8,292,120.34 | 94.56 | 5.44 |
| 5 | Prepetition LVS II Offshore Guaranty Claim | 0 | 1 | 1 | 0 | 100.00 | 0.00 | $25,717,263.14 | $25,717,263.14 | $0.00 | 100.00 | 0.00 |
| 6 | General Unsecured Claims | 9 | 51 | 41 | 10 | 80.77 | 19.23 | $39,005,358.01 | $32,490,294.36 | $6,515,063.65** | 83.00 | 17.00 |

\*\*Voting amount reduced per ballot #12 submitted by Kari Crutcher from $81,361,126.92 to $1.00 per filed objection.

Voting Declaration, at Exhibit A.  With respect to Class 6, as noted in the chart above, the Debtors'

vote tabulation has assigned $1.00 to Claim No. 124 filed by Kari Crutcher.  The Debtors objection

to that claim for voting purposes (Docket No. 561) is set for hearing at the Confirmation Hearing.

If the Court sustains the Debtors' objection,  Class 6 has accepted the Plan in amounts that far

exceed the required one-half in number and two-thirds in amount necessary for Class acceptance

under § 1126(f).

43.    As set forth in more detail below, the Holders of impaired Claims and Interests in

Class 3 and Class 7 (the "Rejecting Classes") will not receive or retain any property under the Plan

and, as such, such holders are deemed to reject the Plan, consistent with § 1126(g).  *See* Section

I(B)(2), *supra*.  Accordingly, the requirements of § 1129(a)(8) are not met with respect to the

Rejecting Classes.  The Plan, nonetheless, can be confirmed because the Rejecting Classes can be

crammed-down pursuant to § 1129(b).  *See* Section I(N), *infra*.[11]

**I.    Section 1129(a)(9): The Plan Provides for Payment in Full of All Allowed Administrative Claims, Priority Claims, Priority Tax Claims, and Professional Fee Claims.**

---

[11] As of right now, there are not any claimants in Class 4, but the Debtors are currently negotiating and finalizing settlement agreements with various claimants and anticipate that those claimants may solicited as part of Class 4.

44.     Section 1129(a)(9) requires that entities holding allowed claims entitled to priority under § 507(a)(1)-(8) receive specified cash payments under a plan.  Unless the holder of a particular claim agrees to a different treatment with respect to such claim, § 1129(a)(9) requires a plan to provide as follows:

> (A) with respect to a claim of the kind specified in section 507(a)(2) or 507(a)(3) of [the Bankruptcy Code], on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;
>
> (B) with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of [the Bankruptcy Code], each holder of claim of such class will receive—
>
>> (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>>
>> (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;
>
> (C) with respect to a claim of a kind specified in section 507(a)(8) of [the Bankruptcy Code], the holder of such claim will receive on account of such claim regular installment payments in cash—
>
>> (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;
>>
>> (ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and
>>
>> (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and
>
> (D) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

11 U.S.C. § 1129(a)(9).

45.     The Plan satisfies each of the requirements of § 1129(a)(9).  First, consistent with § 1129(a)(9)(A), the Plan provides for all Allowed Administrative Claims (*i.e.*, § 507(a)(2) claims) to be paid on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim.  *See* Plan at § 8.2.

46.     Second, with respect to § 1129(a)(9)(B), all Allowed Priority Non-Tax Claims, estimated in the Plan in the amount of $1,534,196, will be paid as soon as practicable following the later of: (a) the Effective Date or (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law).  *See* Plan at § 10.1.

47.     Third, with respect to § 1129(a)(9)(C), all Allowed Priority Tax Claims shall be paid the full unpaid amount of such Allowed Priority Tax Claim as follows: (a) Cash equal to the unpaid portion of the Allowed Priority Tax Claim on the later of the Effective Date or thirty (30) days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (b) such other treatment as to which the holder of an Allowed Priority Tax Claim and the Debtors shall have agreed upon in writing.  *See* Plan at § 8.5.

48.     With respect to § 1129(a)(9)(D), the Debtors do not believe they have any governmental secured claims, but in the event that there are, the Plan proposes to pay any such creditor faster than the five years permitted under § 1129(a)(9)(D).  *See* Plan at § 10.2.

49.     Accordingly, the Plan meets the requirements of § 1129(a)(9).

**J.      Section 1129(a)(10): At Least One Impaired Class of Claims has Accepted the Plan.**

50.     Section 1129(a)(10) requires that, if a class of claims is impaired under a plan, at least one class of impaired claims must have voted to accept the plan, as determined without including any acceptance of the plan by an insider.  As set forth in the Voting Declaration, the

holders of Claims in Class 6, an impaired class, as determined without including any acceptance by an insider in such Class, have voted to accept the Plan.[12]  Voting Declaration, at Exhibit A. Accordingly, the Plan meets the requirements of § 1129(a)(10).

**K.    Section 1129(a)(11): The Plan is Feasible.**

51.    Section 1129(a)(11) requires the Court to determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or such other successor to the debtor under the plan, unless liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).  The Plan provides for the vesting of all of the Debtors' remaining assets into the Liquidating Trust for the purpose of liquidation and distribution to creditors as trust beneficiaries under the Plan.  The Debtors have analyzed the ability for the Liquidating Trustee to meet its obligations under the Plan.  Meerovich Declaration, ¶¶ 31-32.  Based upon the Debtors' analysis, the Liquidating Trust will have sufficient assets to accomplish its tasks under the Plan. *See id.*; Plan at § 6.7.

52.    The Debtors and FTI also have analyzed the filed Administrative Claims and Priority Claims and have estimated the reserves necessary to satisfy such claims.  Meerovich Declaration, ¶¶ 31-32.  Administrative Claims have been asserted against the Debtors in the amount of approximately $3.4 million and the Debtors have a reserve commensurate with that amount.  *Id.*  As to Priority Claims, the Debtors paid all of the Priority Claims in the approximate amount of $1.4 million filed by former employees of the Debtors, pursuant to Court orders. Consequently, there are no remaining priority amounts owed to the former employees.  Further,

---

[12]  This calculation assumes that Claim No. 124 is allowed in the amount of $1.00 solely for purposes of voting on the Plan.  As discussed below, if the Court overrules the Debtors' objection to Claim No. 124 solely for voting purposes, the calculation would demonstrate that Class 6 is not an impaired consenting class.

one former employee filed a Priority Claim against the Debtors that is based on his employment agreement with the Debtors. The amount of that claim exceeds the Priority Claim amount threshold set forth in § 507(a), and, therefore, the Debtors do not need to reserve the full amount for such claim. Nonetheless, the Debtors will set aside a small reserve to account for any remaining unpaid Allowed Priority Non-Tax Claims. Further, the Debtors have also set aside reserves to pay for any Allowed Priority Tax Claims. Meerovich Declaration, ¶ 41.

53.     As discussed at length below, the Debtors also have set aside a reserve in the amount of $700,000.00 for any potential valid WARN Act claims, including with regard to the limited objection and reservation of rights filed by Lori Buckley and other plaintiffs in adversary proceeding number 22-50387-CTG. *See* Docket No. 604.

54.     Accordingly, the Plan is feasible and meets the requirements of § 1129(a)(11).

**L.     Section 1129(a)(12): All Statutory Fees Have Been or Will Be Paid.**

55.     Section 1129(a)(12) requires that fees payable under 28 U.S.C. § 1930 have been paid or will be paid on the effective date of the plan. The Plan provides that all fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date. *See* Plan, at § 8.2. Accordingly, the Plan complies with the requirements of § 1129(a)(12).

**M.     Sections 1129(a)(13) Through 1129(a)(16) Do Not Apply to the Plan.**

56.     Sections 1129(a)(14)-(16) are inapplicable to the Debtors and the Plan, as the Debtors (i) have no domestic support obligations (*see* 11 U.S.C. § 1129(a)(14)); (ii) are not individuals (*see* 11 U.S.C. § 1129(a)(15)); and (iii) are not non-profit corporations (*see* 11 U.S.C. § 1129(a)(16)).

**N.     The Plan Satisfies the "Cram Down" Requirements of § 1129(b).**

57.     Section 1129(b) provides a mechanism for confirmation of a chapter 11 plan in circumstances where not all impaired classes of claims and equity interest vote to accept that plan. This mechanism is known colloquially as "cram down."

58.     More specifically, § 1129(b)(1) provides:

> [I]f all the applicable requirements of [§ 1129(a) of the Bankruptcy Code] other than [the requirement contained in § 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on the request of the proponent of the plan, shall confirm the plan, notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interest that is impaired under, and has not accepted, the plan.

11 U.S.C. §1129(b)(1).

59.     Thus, under § 1129(b), the Bankruptcy Court may cram down a plan so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the impaired classes that did not vote to accept the plan.  *See, e.g., In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005); *In re Dura Auto. Sys., Inc.*, 379 B.R. 257, 271–72 (Bankr. D. Del. 2007); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (D. Del. 2003).

60.     Here, only Class 3 did not accept the Plan.  Accordingly, the Debtors invoke § 1129(b) to cram down the Plan with respect to Class 3.

### 1.     The Plan Does Not Discriminate Unfairly.

61.     The unfair discrimination standard of § 1129(b) requires that a chapter 11 plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to all other similarly-situated classes.  *See, e.g., In re Barney & Carey Co.*, 170 B.R. 17, 25 (Bankr. D. Mass 1994).  Generally, a plan unfairly discriminates in violation of § 1129(b) only if similar classes are treated differently without a reasonable basis for the disparate treatment.  *See, e.g., In re Rubicon U.S. REIT, Inc.*, 434 B.R.

168, 175 (Bankr. D. Del. 2010) (noting that courts generally look to whether "[v]alid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan"); *Lernout & Hauspie*, 301 B.R. at 660 ("The hallmarks of the various [unfair discrimination] tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination").  Accordingly, as between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment.  *See, e.g., In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds,* 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, In re Johns-Manville Corp., 843 F.2d 636* (2d Cir. 1988);  *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990).

62.    Here, the Plan does not discriminate unfairly with respect to Class 3 (Secured Prepetition Facility Claims), Class 4 (Loan Settlement Claims), Class 5 (Prepetition LVS II Offshore Guaranty Claim), Class 6 (General Unsecured Claims), and Class 7 (Interests).  A threshold inquiry to assessing whether a proposed plan unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to the class allegedly receiving more favorable treatment.  The holders of Claims in Class 3 (Secured Prepetition Facility Claims), Class 4 (Loan Settlement Claims), Class 5 (Prepetition LVS II Offshore Guaranty Claim), and Class 6 (General Unsecured Claims) are distinct from each other.

63.    Furthermore, with respect to Class 7 (Interests), there is only one Class of Interests, and there is no unfair discrimination because there are no other, similarly-situated Interests receiving different treatment under the Plan.  Because holders of Interests in Class 7 are deemed

23

to reject the Combined Plan and Disclosure Statement, the Debtors will seek confirmation of the Combined Plan and Disclosure Statement from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in § 1129(b). The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in the Impaired Classes is entitled to receive any property under the Combined Plan and Disclosure Statement.  Accordingly, the Plan does not "discriminate unfairly" with respect to any Impaired Classes of Claims or interest under the Plan that did not accept the Plan.

### 2.    The Plan Is Fair and Equitable.

64.    The holders of Class 3 Claims hold Secured Prepetition Facility Claims in unliquidated amounts.  The amount of each Class 3 Claim will be determined by whether the holder of such Class 3 Claim liquidates its collateral in an amount in excess of the obligations set forth in each Prepetition Repo Agreement.  If a holder of a Class 3 Claims liquidates its collateral in an amount that exceeds the obligations in its corresponding Prepetition Repo Agreement, such holder will have a $0 Claim.

65.    For a plan to be "fair and equitable" with respect to an impaired class of unsecured claims or interests that rejects a plan (or is deemed to reject a plan), the plan must follow the "absolute priority" rule and, if the impaired rejecting class consists of unsecured clams, satisfy one of the requirements of § 1129(b)(2)(B), or, if the impaired rejecting class consists of interest, satisfy one of the requirements of § 1129(b)(2)(C).  *See* 11 U.S.C. § 1129(b)(2)(B)(ii); 11 U.S.C. § 1129(b)(2)(C)(ii); *see also LaSalle*, 526 U.S. at 441-42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or

retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).

That latter condition is the core of what is known as the 'absolute priority rule.'").  Generally, this

requires that (a) no class of claims recover more than the amount of their allowed claims and (b)

the impaired rejecting class of claims or interests either be paid in full or that any class junior to

the impaired accepting class not receive any distribution under a plan on account of its junior claim

or interest.  *See id.*

66.    The Plan satisfies the requirements of §§ 1129(b)(2)(B) and 1129(b)(2)(C) for

Classes 3, 4, 5 and 6, respectively, because (a) there are no Claims or Interests junior to the Claims

and Interests in Classes 3, 4, 5, and 6, and accordingly no such junior Claims or Interests will

receive or retain any property under the Plan; and (b) no Classes will receive more than full

payment on account of their Claims.  *See* Meerovich Declaration, at ¶ 33.  Class 7 (Interests) will

not receive or retain any property under the Plan.  Accordingly, the requirements of § 1129(b) are

satisfied with respect to the Rejecting Classes.

**O.    Section 1129(c): The Plan Is the Only Plan Filed in the Chapter 11 Cases.**

67.    Section 1129(c) provides that, with a limited exception, a Bankruptcy Court may

only confirm one plan.  The Plan is the only plan that has been filed in the Chapter 11 Cases and

is the only plan that satisfies the requirements of subsections (a) and (b) of § 1129.  Accordingly,

the requirements of § 1129(c) are satisfied.

**P.    Section 1129(d): The Principal Purpose of the Plan is Not to Avoid Taxes or Section 5 of the Securities Act.**

68.    Section 1129(d) provides that on request of a party in interest, which is a governmental

unit, which holds the burden of proof on this issue, the Bankruptcy Court may not confirms a plan

if the principle purpose of the plan is the avoidance of taxes or the application of section 5 of the

Securities Act.  The Plan was not proposed to avoid taxes or section 5 of the Securities Act, and

no governmental unit has argued otherwise.  *See* Meerovich Declaration, ¶ 38.  Accordingly, the Plan satisfies the requirements of § 1129(d).

**Q.      Section 1129(e): The Debtors are Not a Small Business.**

69.      Section 1129(e) is inapplicable to the Plan because the Chapter 11 Cases are not small business chapter 11 cases.  *See* Meerovich Declaration, ¶ 39.

**R.      Executory Contracts**

70.      Section 1123(b)(2) allows a chapter 11 plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases.  Section 13.1 of the Plan provides that, on the Effective Date, all executory contracts and unexpired leases (excluding any Insurance Policies) except with respect to those (i) previously assumed or rejected by order of the Bankruptcy Court, (ii) that are the subject of a pending motion to assume or reject or (iii) scheduled by the Debtors and the Cash Flow DIP Lender to be assumed as of the Effective Date, shall be deemed rejected, pursuant to the Confirmation Order, as of the Effective Date.  *See* Plan at § 13.1.

71.      Assumption or rejection of an executory contract or unexpired lease of a debtor is subject to judicial review under the business judgment standard.  *See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989).  This standard is satisfied when a debtor determines that assumption or rejection will benefit the estate.  *See, e.g., id.*  The Debtors have reviewed and analyzed their portfolio of executory contracts and unexpired leases.  Given the Debtors' limited operational activity and that all of their remaining assets will be vested in the Liquidating Trust under the Plan for liquidation, the Debtors have concluded that all the Debtors' executory contracts and unexpired leases, to the extent not already rejected or assumed and assigned, should be rejected.  Meerovich Declaration, ¶ 43.  The Debtors have thus exercised their sound business judgment in their decision to reject all remaining executory contracts and unexpired

leases.   Accordingly, the proposed rejection of executory contracts should be approved in connection with confirmation.

**S.      The Plan Releases, Exculpations, And Injunctions Are Appropriate And Consistent With Established Precedent.**

72.      The Plan includes certain customary release, exculpation, and injunction provisions.  Plan at §§ 7.3 and 16.  These provisions are proper because, among other things, they are the product of arm's length negotiations, have been important to obtaining the support of various constituencies and parties in interest, are supported by both the Debtors, the Cash Flow DIP Lender, and the Committee.   Such release, exculpation, and injunction provisions are an appropriate exercise of the Debtors' business judgment, are fair and equitable, given for valuable consideration, and in the best interests of the Estates.   Meerovich Declaration, ¶ 44-48.   These provisions are consistent with the Bankruptcy Code and, thus, the requirements of § 1123(b) are satisfied.

**1.   The Releases of the Estates' Claims**

73.      Under the Plan, the Debtors propose the release of certain parties—the Released Parties[13]—from claims or causes of action that the Estates may possess.  *See* Plan at § 16.2.  Claims held by a debtor against third parties are property of the estate and may be released in exchange for settlement.  *See PWS Holding Corp.*, 228 F.3d at 242; *In re Johns-Manville* (*Manville I*), 837

---

[13]   "Released Parties" is defined in the Plan as "collectively, (a) the Debtors, (b) the DIP Lenders, (c) the Prepetition Bridge Lender, (d) the Committee, (e) Fannie Mae, (f) Freddie Mac, (g) each of the Related Persons of each of the Entities in the foregoing clauses (a)-(f) and (h) each Prepetition Warehouse Lender and Prepetition Repo Lender to the extent of the releases and stipulations set forth in the Final Cash Flow DIP Order, provided that as to this clause (h) only, nothing in this Plan shall expand such releases or stipulations or bind the Committee in the event of a Challenge; provided, however, that notwithstanding anything to the contrary herein, including the definition of "Related Persons," the following shall not be Released Parties: (i) the Debtors' accountants, and (ii) employees, directors, or officers who (a) were not employees, directors, or officers on the Petition Date, and (b) are not, and have never been, employed or indemnified by the Prepetition Bridge Lender, the Cash Flow DIP Lender, or any of the Related Persons of either the Prepetition Bridge Lender or Cash Flow DIP Lender."  Plan at § 3.

F.2d 89, 91-92 (2d Cir. 1988); *see also* 11 U.S.C. § 541 (a)(1).  Section 1123(b)(3)(A) of the

Bankruptcy Code allows a plan to provide for "the settlement or adjustment of any claim or interest

belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).

74.    When considering releases by a debtor of non-debtor third parties pursuant to

§ 1123(b)(3)(A), the appropriate standard is whether the release is a valid exercise of the debtor's

business judgment and is fair, reasonable, and in the best interests of the estate.  *U.S. Bank Nat'l*

*Assoc. v. Wilmington Tr. Co.* (*In re Spansion, Inc.*), 426 B.R. 114, 143 (Bankr. D. Del. 2010) ("[A]

debtor may release claims in a plan pursuant to Bankruptcy Code § 1123(b)(3)(A), if the release

is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests

of the estate."); *see also In re Aleris Int'l, Inc.*, Case No. 09-10478 (BLS), 2010 WL 3492664, at

*20 (Bankr. D. Del. May 13, 2010) (stating that where a debtor release is "an active part of the

plan negotiation and formulation process, it is a valid exercise of the debtor's business judgment

to include a settlement of any claims a debtor might own against third parties as a discretionary

provision of a plan"); *Coram Healthcare Corp.*, 315 B.R. at 334 (holding that standards for

approval of a settlement under section 1123 of the Bankruptcy Code generally are the same as

those under Bankruptcy Rule 9019).  As an exercise of its business judgment, a debtor's decision

to release claims against third parties under a plan is afforded deference.  *See, e.g., In re Spansion*,

426 B.R. at 140 ("It is not appropriate to substitute the judgment of the objecting creditors over

the business judgment of the [d]ebtors."); *In re Marvel Entm't Grp., Inc.*, 273 B.R. 58, 78 (D. Del.

2002) ("[U]nder the business judgment rule . . . a court will not interfere with the judgment of a

board of directors unless there is a showing of gross and palpable overreaching.  Thus, under the

business judgment rule, a board's decisions will not be disturbed if they can be attributed to any

rational purpose and a court will not substitute its own notions of what is or is not sound business judgment.") (internal quotation marks and citations omitted).

75.    Although the Debtors believe the appropriate standard to consider a debtor release is business judgment, in considering whether a debtor's release of claims is appropriate, some courts have applied the following list of non-exclusive and disjunctive factors (the "<u>Zenith Factors</u>" or individually, a "<u>Zenith Factor</u>"):

> (1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999).

76.    Applying either standard—business judgment or the *Zenith* Factors—this Court should approve the Debtor/Estate Release.  The Debtor/Estate Release is an essential component of the Plan and constitutes a sound exercise of the Debtors' business judgment.  Meerovich Declaration, ¶¶ 44-45.  Indeed, the Plan represents a fully-integrated resolution of these difficult cases that provides substantial benefit to the Debtors and their estates, creditors, and other stakeholders.  It is also the result of extensive negotiations with, and embodies a settlement reached by the Prepetition Bridge Lender, the Cash Flow DIP Lender, and the Committee.  Notably, despite the expectation that the Cash Flow DIP Lender will not be paid in full, it supports the Plan and, indeed, has agreed to provide additional funding so that the Plan can be confirmed, which agreement is conditioned on the releases set forth in the Plan.  Under these circumstances, it is a sound exercise of the Debtors' business judgement to release the Cash Flow DIP Lender and its Related Persons.

77.     In addition to being an integral component of the Plan and a sound exercise of the Debtors' business judgement, the Debtor/Estate Release, satisfies the *Zenith* Factors.

78.     First, an identity of interest exists between the Debtors and certain of the Released Parties. An identity of interest may be established where the non-debtor is entitled to indemnification from the debtor. *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release."). The Debtors owe indemnification obligations to their current and former officers, directors, agents, or employees. Thus, the Debtor/Estate Release satisfies the first *Zenith* Factor. *In re Indianapolis Downs, LLC*, 486 B.R. at 303; *see In re Wash. Mut., Inc.*, 442 B.R. at 349.

79.     Second, the Released Parties, including the Prepetition Bridge Lender, the Cash Flow DIP Lender, and the Debtors' current officers and directors have made a substantial contribution to the Chapter 11 Cases in exchange for the Debtor Release. Courts have emphasized that "[a]n analysis of 'substantial contribution' is necessarily fact specific'" and must be approached on a case-by-case basis. *In re One2One Commc'ns, LLC*, Case No. 12-27311, 2016 WL 3398580, at *8 (D. N.J. June 14, 2016) (surveying cases and noting that courts frequently reach different conclusions about whether similar types of contributions are substantial in the context of different cases). Specifically, the current officers and directors have (a) maximized value for the Debtors' Estates by proposing and implementing the Plan, which, among other things, provides potential recoveries to the unsecured creditors, (b) negotiated with the Debtors' key constituents to formulate and garner support for the Plan and the Committee Settlement, and (c) preserved value through the expeditious resolution of these Chapter 11 Cases. And as noted above, the Prepetition Bridge Lender and Cash Flow DIP Lender have provided the only funding available

30

to the Debtors, despite the fact that it is unlikely to be repaid.  All of this constitutes a substantial

contribution.  *See, e.g., In re Zenith*, 241 B.R. at 111 (finding substantial contribution by officers

and directors who, among other things, designed and implemented the operational restructuring

and negotiated the financial restructuring); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070,

1079–80 (11th Cir. 2015) (debtors' professionals provided substantial contribution in the form of

skilled labor and services).

81.    Third, the Debtor/Estate Release is integral.  As noted above, it is the result of

extensive negotiations with the key parties.  Without the release, the Cash Flow DIP Lender would

not be willing to fund the Plan.

81.    Fourth, as noted above, a substantial majority of the Debtors' major creditor

constituencies support the Debtor/Estate Release, as evidenced by the Committee Settlement and

voting results.

82.    As to the fifth *Zenith* Factor, the Plan does not provide for the payment of all or

substantially all Claims and Interests, and thus that factor is not satisfied.

83.    Importantly, the *Zenith* Factors "are neither exclusive nor conjunctive

requirements, but simply provide guidance in the Court's determination of fairness."  *In re Wash.

Mut., Inc.*, 442 B.R. at 346.  Indeed, the Debtors believe that pursuing claims against the Released

Parties would not be in the interest of the Debtors' various stakeholders because the costs involved

would likely outweigh any potential benefit derived from pursuing such claims.  Accordingly, as

set forth above, the Estates' release of the Released Parties represents a valid exercise of the

Debtors' business judgment, and the Debtors respectfully submit that these provisions should be

approved.

### 2.  Consensual Third-Party Releases

84.     Section 16.2 of the Plan also provides for certain third-party releases of each Released Party by the Creditors entitled to receive Distributions under the Plan.  In the Third Circuit, where releasing parties have consented to a provision in a plan of reorganization that releases claims against non-debtors, such releases will be approved on the basis of general principles of contract law.  *First Fid. Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993) (noting that a consensual third-party release is no different from any other settlement or contract and does not implicate section 524(e)); *Indianapolis Downs, LLC*, 486 B.R. at 303 (citing *In re Spansion*, 426 B.R. at 140) ("Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected."); *In re Exide Techs.*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) ("Because [the release] is consensual, there is no need to consider the Zenith factors.").

85.     These third-party releases are consensual, as they apply only to Creditors that do not opt out of the Third Party Release.  Courts in this district have regularly approved consensual third-party releases of similar scope.  *See, e.g., In re Avadim Health, Inc.*, Case No. 21-10883 (CTG) (Bankr. D. Del. Oct. 27, 2021); *In re Riverbed Technology, Inc.*, Case No. 21-11503 (CTG) (Bankr. D. Del. Dec. 3, 2021); *In re CL H Winddown LLC*, Case No. 21-10527 (JTD) (Bankr. D. Del. Sept. 7, 2021); *In re Alpha Entertainment LLC*, Case No. 20-10940 (LSS) (Bankr. D. Del. Dec. 11, 2020); *In re PQ New York, Inc.*, Case No. 11266 (JTD) (Bankr. D. Del. Sept. 25, 2020); *In re Velocity Holding Company, Inc.*, Case No. 17-12442 (KJC) (Bankr. D. Del. March 29, 2018). Furthermore, all Classes received sufficient, clear, and conspicuous notice of these third party releases and the process for opting out of or objecting to such releases.  Each Class Ballot (for Classes 3, 4, 5, and 6), Notice of Non-Voting Status (for Classes 1, 2), and Opt-Out Election Form (for Class 7) contained a large box and other emphasized disclosures highlighting the release and

the opt out provisions. Interested parties had ample time to raise any objections to these third-party releases and no such objections were filed.

86. Accordingly, the Court should approve the Plan's consensual third-party releases.

### 3. Exculpation and Limitation of Liability

87. The Plan provides for the exculpation of, and limitation of liability for, the Exculpated Parties.[14] *See* Plan at § 16.1. The exculpation and limitation of liability are subject to a standard carve-out for willful misconduct, fraud, bad faith, and gross negligence. Plan at § 16.1.

88. It is well established that exculpation is appropriate for fiduciaries of a bankruptcy estate, including the debtor, its directors, officers, and professionals, and the Committee, its members, and its professionals. *In re PWS Holding Corp.*, 228 F.3d 224, 245–47 (3d Cir. 2000). In the instant case, the Exculpated Parties have participated in good faith in formulating and negotiating the Plan, and they are entitled to protection from exposure to claims against them relating to their participation in these Chapter 11 Cases, consistent with § 1125(e). As a result, the exculpation provisions of section 16.1 of the Plan are appropriate and should be approved.

### 4. Injunction

89. Finally, section 16.3 of the Plan contains an injunction provision that the Debtors believe is necessary to enforce and preserve the release and exculpation provisions provided for in the Plan and should, therefore, be approved. Furthermore, in compliance with Bankruptcy Rule 3016, all acts to be enjoined by, and all entities that are subject to, such injunction are identified in

---

[14] "Exculpated Parties" is defined under the Plan as, "collectively (a) the Debtors, (b) the Debtors' respective officers, managers, and employees, (c) members of the Committee (solely in their capacities as Committee members), and (d) Bankruptcy Court-approved Estate and Committee professionals." *See* Plan at § 3.

"specific and conspicuous," bolded language in the Plan and the proposed Confirmation Order. The Plan's injunction provisions are therefore appropriate and should be approved.

**T.    Modifications of the Plan Do Not Adversely Change the Treatment of Any Creditor or Equity Interest Holder.**

90.    Section 1127(a) provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of §§ 1122 and 1123. Further, when the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.  *See, e.g., In re Global Safety Textiles Holdings LLC*, Case No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or re-solicitation); *In re Burns & Roe Enters., Inc.*, Case No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

91.    Any proposed modifications to the Plan incorporated in the proposed Confirmation Order will not adversely change the treatment of any Claim against the Debtors and should be approved.

**U.    Waiver of Bankruptcy Rules Regarding Stay of Confirmation Order**

92.    The Debtors respectfully request that, pursuant to Bankruptcy Rule 3020(e), the Bankruptcy Court waive the 14-day stay of the Confirmation Order.  *See* Plan at § 19.16.  Such a waiver is appropriate in these circumstances to allow the Liquidating Trustee to commence fulfilling its duties as quickly as practicable, to promote prompt distributions under the Plan and

Liquidating Trust Agreement for the benefit of creditors, and because a significant number of implementation activities are capable of being undertaken in short order. Accordingly, the Debtors respectfully submit that good cause exists to support the waiver of the stay imposed by Bankruptcy Rule 3020(e).

## II.   REPLY TO OBJECTIONS TO CONFIRMATION

### A.   Kari Crutcher *Qui Tam* Plaintiff

#### 1.   Limited Objection to Plan

The *Limited Objection of Kari Crutcher to Confirmation of the Combined Disclosure Statement and Chapter 11 Plan of Reorganization of First Guaranty Mortgage Corporation and its Debtor Affiliate* [Docket No. 600] (the "Crutcher Objection") should be overruled. In the Crutcher Objection, Kari Crutcher ("Crutcher") states that she "objects to confirmation of the Plan on the limited basis that the Third Party Release is overbroad and vague, and may be argued to release claims asserted against the Non-Bankrupt Defendants in the Litigation." *Crutcher Objection* at ¶ 9. Additionally, the Crutcher Objection seeks a finding from this Court that her rights to prosecute the *qui tam* litigation shall be unaffected by the confirmation of the Plan. Contrary to the Crutcher Objection, the Plan, including the Third Party Release contained therein, speaks for itself and the Third Party Release is clear and unambiguous. The Plan provides for a mechanism for claimants to opt-out of the Third Party Release, which Crutcher has utilized by submitting an opt-out form. Accordingly, the Crutcher Objection has been resolved with her submission of the opt-out form and should be overruled as moot. To grant the relief requested in the Crutcher Objection would render the opt-out provisions in the Plan superfluous and create further ambiguity and confusion regarding the Third Party Release that is both unnecessary and improper.

35

### 2.   Reply to Crutcher's Response to Debtors' Objection to Claim No. 124 Solely for Voting Purposes

93.     In the Crutcher opposition [Docket No. 596] (the "Opposition") to the Debtors'

Objection to Proof of Claim No. 124 Solely for Voting Purposes [Docket No. 561] (the "Rule 3018

Motion"), Crutcher repeatedly mischaracterizes the Debtors' request for relief as a either an

objection seeking disallowance of Proof of Claim No. 124 (the "*Qui Tam* Claim") or a motion to

estimate the *Qui Tam* Claim for purposes of distribution.  The Debtors are seeking neither option.

Rather the Rule 3018 Motion properly seeks to temporarily allow the *Qui Tam* Claim in the amount

of $1.00 solely for voting purposes.

94.     Bankruptcy Rule 3018 applies where a claim is being temporarily allowed or

disallowed for voting purposes.  A determination temporarily estimating a claim for purposes of

voting is a common practice in bankruptcy court.  *See In re Pac Sunwear of Cal., Inc.*, 2016 Bankr.

LEXIS 2976 (Bankr. D. Del. Aug. 8, 2016); *In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr.

M.D.N.C. 2005); *In re Hydrox Chem. Co.*, 194 B.R. 617 (Bankr. N.D. Ill. 1996).  Unlike traditional

claim objections considered under the procedures of Bankruptcy Rule 3007, neither Bankruptcy

Rule 3018 nor the Bankruptcy Code provide procedural requirements or guidelines about

temporarily allowing claims for voting purposes.  *In re Experient Corp.*, 535 B.R. 386, 405 (Bankr.

D. Colo. 2015) (internal citations omitted).  Accordingly, Crutcher's procedural complaints are

unfounded.  Further, the notice period did not prejudice Crutcher. Because she received adequate

notice of the Rule 3018 Motion, Crutcher filed a substantive Opposition.  In light of the foregoing,

the Rule 3018 Motion should be granted and the *Qui Tam* Claim should be temporarily allowed in

the amount of $1.00 solely for voting purposes.

### B.   Lynx Whole Loan Acquisition Objection

95.     Lynx Whole Loan Acquisition LLC ("LWLA") objects to confirmation of the Plan on the basis that the Debtors are allegedly holding partial claim payments that were erroneously sent to the Debtors instead of LWLA or its subservicer or agent.  To the extent the Debtors hold any asset that is not properly an asset of the Debtors, that asset will not transfer to the Liquidating Trust under the Plan.  *See* Plan, § 3 ("Liquidating Trust Assets means all assets of the Debtors [. . .]").  LWLA's rights will be preserved on this point.  As such, LWLA's objection should be overruled.

### C.      Customer Bank's Limited Objection and Reservation of Rights

96.     On October 26, 2022, Customers Bank ("Customers") filed the *Customers Bank Limited Objection and Reservation of Rights With Respect To Confirmation of Combined Disclosure Statement and Chapter 11 Plan of First Guaranty Mortgage Corporation and Debtor Affiliate* [Docket No. 603] (the "Customers Objection").  Customers is in every respect in an enviable position in these Chapter 11 Cases.  It is a counterparty to the Prepetition Customers Repo Agreement, which was automatically terminated on the Petition Date and for which Customers sought and obtained entry of the Customers Bank 559 Order.  The scope of the Customers Bank 559 Order is not limited to the Prepetition Customers Repo Agreement, but also covers the Prepetition Customers Loan Agreement.  As a result of the Customers Bank 559 Order, the Court lifted the automatic stay and, *inter alia*, permitted Customers to seize, liquidate and apply the proceeds of liquidation from assets of the Debtors serving as collateral that may or may not have been a Purchased Asset under the Prepetition Customers Repo Agreement as of the Petition Date, but none-the-less provided security for the Prepetition Customers Loan Agreement.

97.     As the Court may recall, on August 2, 2022, counsel for Customers advised: "But we do believe there will be some excess proceeds, at least from the pricing we tentatively have

looked at, net of our costs of liquidation, and so we'll comply with that 559 requirements." Hearing

Transcript, August 2, 2022, at 15 L.10-14.  Despite the clear direction of the Customers Bank 559

Order to remit excess proceeds,[15] Customers has neither yet remitted any excess proceeds to the

Debtors nor reported on the liquidation of Purchased Assets and the application of such proceeds

to Repurchase Amounts and expenses. The Debtors have complained directly and through counsel

regarding the glacial pace of certain asset sales and the significant cost to the Estates being incurred

as a result.[16]  It is in that context that Customers complains that: (1) the definition of Liquidating

Trust Assets may include the Debtors' residual interest in assets providing security for either or

both of the Prepetition Customers Repo Agreement and the Prepetition Customers Loan

Agreement as to which the automatic stay has been lifted pursuant to the Customers Bank 559

Order (Customers Objection at 13); (2) the proposed treatment of its Class 3 Allowed Claim

"delivery of the mortgage loans and other collateral purchased or securing the Claim or the net

proceeds of the liquidation of such mortgage loans and other collateral," (Plan §10.3.3(b)(i);

Customers Objection at 14) limits or modifies its rights under the Customers Bank 559 Order; and

(3) the mechanism for delivery of the collateral pursuant to the terms of Plan §14.6(iv) is somehow

not clear that the Plan does not displace or replace the meaning of the Customers Bank 559 Order.

(Customers Objection at 15).  Indeed, the Plan is very clear on this last point:  "For the avoidance

of doubt, nothing in subparagraphs (i) or (ii) shall be deemed to modify the terms of the Lift Stay

---

[15] "Customers Bank shall remit to the Debtors any proceeds related to the Purchased Assets in excess of the outstanding Obligations (as such term is defined in the Customers Bank Repurchase Agreement) due to Customers Bank." *See* § 4, Customers Bank 559 Order.

[16] The Customers Bank 559 Order precludes the surcharge of administrative claims pursuant to § 506(c).  "No costs or expenses of administration which have been or may be incurred in this Chapter 11 action or any successor action at any time shall be charges against Customers Bank or its claims or collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise […]."  *See* § 7, Customers Bank 559 Order.

Orders or the procedures for liquidation of collateral and payment of claims described therein." *See* Plan § 14.6(iv).

98.    The Customers' objections described above do not raise issues under § 1129(a) because the supposed ambiguities are not asserted to be good faith failures under § 1129(a)(3). Nor do the objections as to Class 3 raise issues of unfair discrimination with any other secured class or fair and equitable treatment with respect to an unsecured class of claims under § 1129(b)(2)(1).  Similarly, Customers does not assert that the treatment of its Class 3C claim violates § 1129(b)(2)(A), nor could it.  Being permitted or required to liquidate collateral and apply the same to the Debtors Repurchase Obligations as of the Petition Date. is clearly the "realization of the indubitable equivalent of such claims."  *In re Phil. Newspapers LLC,* 599 F.3d 298 (3rd Cir. 2010).

> Though broad, the phrase "indubitable equivalent" is not unclear. Indubitable means "not open to question or doubt," Webster's Third New Int'l Dictionary 1154 (1971), while equivalent means one that is "equal in force or amount" or "equal in value," *id.* at 769. The Code fixes the relevant "value" as that of the collateral. See 11 U.S.C. § 1129(b)(2)(A)(iii) (requiring the "indubitable equivalent" of the secured claim); *id.* § 506(a) (defining a secured claim as "the extent of the value of such creditor's interest in the estate's interest in such property").  Thus the "indubitable equivalent" under subsection (iii) is the unquestionable value of a lender's secured interest in the collateral.

*Id.,* at 310.  The unquestionable value of the collateral is receipt of the collateral and permission to liquidate it.  That is what the Plan does and what the Customers Bank 559 Order requires.

99.    The Customers Objection is an overt effort to prevent the Debtors and/or the Liquidating Trustee from ever challenging the commercial reasonableness of the process chosen by Customers to liquidate Purchased Assets and apply proceeds to Repurchase Obligations and expenses under the Prepetition Customers Repo Agreement.  The Plan is clear as is the Customers Bank 559 Order.  Customers is entitled to terminate, accelerate and liquidate Purchased Assets and

the Plan retains the excess for the benefit of the Estates.  The Debtors are entitled to excess assets

by virtue of the Bankruptcy Code.  The Debtors will not amend the Plan and should not be required

to amend the Plan in any manner that would foreclose the Debtors or the Liquidating Trustee from

challenging the manner in which Customers has liquidated its collateral and/or accounted for

proceeds thereof.

100.    Based on the foregoing, the Debtors respectfully submit that the Customers

Objection should be overruled and no changes are required excepted as stated in this paragraph

below.  Customers' request to clarify the Third Party Release language to except Customers'

alleged claims against the Customers Loan Agreement, is satisfied by the opt out mechanism under

the Plan.  However, the Debtors are willing to make the modification below, which is consistent

with the Court's prior orders on the Challenge Period and the Conditional Approval Order:

> "Released Parties" means, collectively, (a) the Debtors, (b) the DIP Lenders, (c)
> the Prepetition Bridge Lender, (d) the Committee, (e) Fannie Mae, (f) Freddie Mac,
> (g) each of the Related Persons of each of the Entities in the foregoing clauses (a)-
> (f) and (h) each Prepetition Warehouse Lender and Prepetition Repo Lender to the
> extent of the releases and stipulations set forth in the Final Cash Flow DIP Order,
> provided that as to this clause (h) only, nothing in this Plan shall ~~expand~~ modify
> such releases or stipulations or bind the Committee in the event of a Challenge;
> provided, however, that notwithstanding anything to the contrary herein, including
> the definition of "Related Persons," the following shall not be Released Parties: (i)
> the Debtors' accountants, and (ii) employees, directors, or officers who (a) were
> not employees, directors, or officers on the Petition Date, and (b) are not, and have
> never been, employed or indemnified by the Prepetition Bridge Lender, the Cash
> Flow DIP Lender, or any of the Related Persons of either the Prepetition Bridge
> Lender or Cash Flow DIP Lender.

101.    Finally, the Debtors decline to shape the terms of any litigation between Customers

and the LVS II Offshore Guarantor.  Specifically, assertions that the LVS II Offshore Guarantor

is subordinate to and must attorn to Customers' indefeasible payment of the Prepetition Customers

Loan Agreement do not benefit the Estates.  Further, nothing in the Plan overrides § 510(b)

permitting enforcement of contractual subordination or a creditor's right to enforce contractual subordination outside of the Bankruptcy Court for unreleased third party claims and defenses.

### D.  Flagstar Bank, FSB's Joinder to Customer Bank's Limited Objection

102.    On October 26, 2022,  Flagstar Bank, FSB ("Flagstar") filed *Flagstar Bank, FSB's Joinder to the Limited Objection of Customers Bank with Respect to Confirmation of Amended Combined Disclosure Statement and Chapter 11 Plan of First Guaranty Mortgage Corporation and Debtor Affiliate* [Docket No. 606] (the "Flagstar Objection").  Flagstar is a party to the Prepetition Flagstar Loan Agreement and is a Prepetition Warehouse Lender, as described in the Plan.  On August 11, 2022, this Court entered the Flagstar Lift Stay Order, which provided Flagstar with relief from the automatic stay to, among other things, sell the mortgage loans held as collateral under the Prepetition Flagstar Loan Agreement.  The Flagstar Lift Stay Order requires proceeds of such sales to be deposited into an account held by Flagstar.  Following the sale of all of the mortgage loans, Flagstar is then required to deliver to the Debtors the Sale Accounting (as such term is defined in the Flagstar Lift Stay Order), so the parties can review and agree on the amounts available to satisfy obligations under the Flagstar Loan Agreement, and the amounts to be remitted to the Debtors as surplus.

103.    The Flagstar Objection joins the arguments set forth in the Customers Objection.  Similar to the response set for above with respect to the Customers Objection, the Plan clearly preserves Flagstar's rights under the Flagstar Lift Stay Order.  No further modifications to the Plan, other than the modification addressed above with respect to the definition of "Released Parties," are needed to preserve Flagstar's rights.

104.    Flagstar has been free from the automatic stay's restrictions for more than 2.5 months and has somehow not completed the process of selling its collateral.  As such, Flagstar has

not, to date, provided the Debtors with any Sale Accounting.  The Debtors have concerns over the significant cost to the Estates being incurred as a result of this unexplained delay.[17]  The Debtors are entitled to remittance of any and all surplus available following the sale of Flagstar's collateral under the Prepetition Flagstar Loan Agreement by virtue of the Bankruptcy Code.  The Debtors will not amend the Plan and should not be required to amend the Plan in any manner that would foreclose the Debtors or the Liquidating Trustee from challenging the manner in which Flagstar has liquidated its collateral and/or accounted for proceeds thereof.

### E.  U. S. Trustee's Objection

#### 1.  The Debtors Have Shown That the Plan Is Feasible, Despite the Contentions of the UST.

105.    The U.S. Trustee ("UST") attacks the feasibility of the Plan because the adversary proceeding brought under the WARN Act may render the Plan not feasible under § 1129(a)(11).  *See* Docket No. 604, at 1 (the "UST Objection").  The Debtors have shown that the Plan is feasible, as fully explained below.  The objection of the UST should be overruled on this point.

#### 2.  The UST's Contention That the Releases Are Improper is Without Merit.

106.    The UST objects to confirmation of the Plan, arguing that the proposed release provisions (the "Releases") are, in fact, impermissible non-consensual third-party releases, rather than a mutual, bargained-for settlement.  This argument is misguided, and attempts to transform the bargained-for Releases into nonconsensual third-party releases.

107.    While the Plan does provide for third-party releases (the "Third-Party Releases"), third-party releases are permissible when they are consensual.  *See, e.g.*, *In re Seventy Seven Fin.*

---

[17] The Flagstar Lift Stay Order also waives the Debtors' rights to surcharge under section 506(c).  *See* Docket No. 317, ¶ 6.

*Inc.*, No. 16-11409 (LSS) (Bankr. D. Del. July 14, 2016) [Docket No. 192] (approving similar third-party releases); *In re Quiksilver Inc.*, No. 15-11880 (BLS) (Bankr. D. Del. Jan. 29, 2016) [Docket No. 740] (same); *In re EveryWare Glob., Inc.*, No. 15-10743 (LSS) (Bankr. D. Del. May, 22, 2015) [Docket No. 189] (same); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013) (collecting cases for the proposition that a plan may provide for a third-party release upon consent of the party affected); *In re Spansion*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (stating that "a third party release may be included in a plan if the release is consensual"). Courts in this District have approved third-party releases as consensual where holders of claims or interests failed to opt out of the releases, either by abstaining from voting or by voting against the plan but not otherwise opting out of the releases when such creditors were provided detailed instructions on how to opt out. *See, e.g., In re Mallinckrodt*, 639 B.R. 837, 880 (Bankr. D. Del. 2022) (finding "ample evidence in the record that the releasing parties were sent notices in a variety of ways that explained in no uncertain terms that action was required to preserve claims"); Confirmation Hr'g Tr. at 110:13-14, *In re Insys Therapeutics, Inc.,* No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020) [Docket No. 1121] ("There was clear notice of the opt-out requirement in both, mailed and published notice . . . ."); Findings of Fact, Concl. of Law, and Order (I) Approving the Debtors' Disclosure Statement and (II) Confirmation the Rev. First Am. Joint Ch. 11 Plan of Cloud Peak Energy Inc. and Certain of Its Debtor Affiliates, *In re Cloud Peak Energy Inc.*, No. 19-11047 (KG) (Bankr. D. Del. Dec. 5, 2019) [Docket No. 868] (finding plan's opt-out procedures, which required bondholders to affirmatively opt out of third-party releases in connection with completing their ballot, were consensual, specific, and integral to the plan and that, as such, bondholders would be bound by the releases unless they opted out in connection with submitting their ballot); Confirmation Hr'g Tr. 62:10-14, *In re Gibson Brands,* No. 18-11025 (CSS) (Bankr.

D. Del. Oct. 2018) [Docket No. 873] ("I have ruled numerous times that 'check the box' isn't required for a creditor to be deemed – to have been deemed to consent to something, that it's sufficient to say, here's your notice, this is what's going to happen and if you don't object, you'll have been deemed to consent"); Findings of Fact, Conclusions of Law, and Order Confirming the Fifth Joint Chapter 11 Plan of Paragon Offshore Plc and Its Affiliated Debtors at 26-27, *In re Paragon Offshore PLC,* No. 16-10386 (CSS) (Bankr. D. Del. June 7, 2017) [Docket No. 1614] (confirming plan and finding releases therein to be "consensual" because the releases were provided only by creditors who voted to accept the plan, creditors who did not timely object to the plan, and creditors that either abstained or voted to reject and did not opt out of the releases), *see also* Confirmation Hr'g Tr. at 76-80, *In re AH Liquidation, Inc.,* No. 21-10883 (CTG) (Bankr. D. Del. Nov. 1, 2021) [Docket No. 394] (approving third-party releases utilizing an opt-out mechanism and providing "I view this issue to be analytically the same as any other plan provision whose propriety is uncertain and that a party fails [to] raise an appropriate objection thus forfeits anu such objection the party might have."). Here, the Third-Party Releases are consensual and otherwise  reasonable, appropriate, and permissible under the Bankruptcy Code and applicable Third Circuit law.

108.    First, and most importantly, the Third-Party Releases are consensual.  The Debtors provided a clear opt out mechanism, and clear instructions, to parties entitled to vote on the Plan. Holders of Claims who opted out of the Releases, are not bound by the Third-Party Releases.

109.    Second, the Third-Party Releases are narrowly tailored, and are a product of extensive, arm's length negotiations and were a material inducement for the Releasing Parties' support of the Plan.  The Third-Party Releases are essential to the Plan and bringing finality to these Chapter 11 Cases.

110.    Third, the Third-Party Releases were granted in exchange for the concrete and substantial contributions of value by the Releasing Parties throughout these Chapter 11 Cases and are, therefore, supported by ample consideration.

111.    The UST further argues that the Releases should not be approved because the Plan does not contain adequate information with respect to claims of Class 6 General Unsecured Creditors.  The UST's argument ignores the carefully negotiated Committee Settlement, which is articulated with specificity throughout the Plan.  Tellingly, the Committee, the fiduciary body for all general unsecured creditors, has not objected to the Releases.

112.    The UST also posits that the Releases might somehow prejudice parties unimpaired under the Plan.  Any such argument or potential "prejudice" is far too speculative to carry weight sufficient to hold up confirmation on this point.  Tellingly again, no such party-in-interest unimpaired under the Plan has objected to the Releases, despite being on notice of all Plan issues.

113.    The Third-Party Releases are consensual under applicable law and consistent with the practices of this jurisdiction.  The Third-Party Releases, as well as the Releases as a whole, are reasonable, and in the best interests of the Estates and, therefore, should be approved. [18]

### 3. The Debtors Have Addressed the UST's Concern as to the Exculpation Provision.

114.    The Debtors have agreed to remove employees and the Liquidating Trustee from the Exculpation provision of the Plan.  As such, this concern of the UST should be resolved.

### 4. The UST's Contention That Confirmation Should be Denied because the Plan is Cast as a Settlement Under Bankruptcy Rule 9019 is Without Merit.

---

[18] The UST also posits that the Debtors' Release contain a non-consensual third-party release, citing an alleged lack of specificity in the Debtors' Release provision at § 16.2(a) of the Plan.  The Debtors submit that the provision is specific and clear as drafted, requires no clarification, is not a third-party release.  To the extent such provision is construed to be a third-party release, the Debtors submit that is permissible as a consensual third-party release, for the reasons set forth above.

115.     The UST erroneously posits that confirmation should be denied because the Plan itself is cast as a settlement pursuant to Bankruptcy Rule 9019.  In its objection the UST concedes that "a plan may incorporate one or more negotiated settlements. . . ."  UST Objection, ¶ 59.  This is precisely what the Plan does.  Section 14.1 of the Plan provides that "the *provisions* of the Plan shall constitute a good-faith compromise. . . ." Plan, § 14.1 (emphasis added).  For example, the Plan incorporates a settlement reached with the Committee, which is manifested throughout various provisions of the Plan.  These incorporated settlements should be approved under Bankruptcy Rule 9019.  The Debtors do not take the position that the Plan in its entirety constitutes a settlement under Bankruptcy Rule 9019.  The objection of the UST should be overruled on this point.

### 5.  The Plan Does Not Provide a Discharge in Contravention of 11 U.S.C. § 1141(d)(3).

116.     The UST takes the position that the injunctive provision of the Plan effects a discharge.  Plan, § 16.3.  However, the UST's position misunderstands the concept of the Liquidating Trust.  The Plan does not serve to discharge claims of creditors, rather it converts such claims to claims against the Liquidating Trust, thereby providing a mechanism for creditors to pursue a recovery on their respective claims.  Even though the Debtors are not receiving a discharge, it is entirely permissible to provide that assets transferred to the Liquidating Trust should be insulated from claims that might otherwise be asserted against the Debtors.  *See In re Midway Gold US, Inc.*, 575 B.R. 475, 515 (Bankr. D. Colo. 2017) (denying debtors a discharge but approving the following plan language as permissible: "Claimants may not seek payment or recourse against or otherwise be entitled to any Distribution from the Liquidating Trust Assets except as expressly provided in this Plan and the Liquidating Trust Agreement."); *see also In re Lambertson Truex, LLC*, No. 09-10747, 2009 Bankr. LEXIS 4812, at *14 (Bankr. D. Del. July 27,

2009) (confirming plan of liquidation with the following language: "the Debtor and the Estate shall

be deemed to have transferred and/or assigned any and all of their assets as of the Effective Date

[…] to the beneficiaries of the Liquidation Trust free and clear of all Claims, Liens and

contractually imposed restrictions, except for the rights to distribution afforded to holders of

Claims under the Plan; and immediately thereafter, such assets shall be deemed transferred by such

beneficiaries to the Liquidation Trustee in trust.").  The objection of the UST should be overruled

on this point.

> **6.  The Debtors Have Addressed the UST's Concern as to Post Confirmation Reporting and Quarterly Fee Obligations.**

117.    The Debtors have agreed to add language in the proposed confirmation order as

suggested by the UST as to this point.  As such, this concern of the UST should be resolved.

> **F.    Fannie Mae's Limited Objection and Reservation of Rights**

118.    Fannie Mae filed the *Limited Objection and Reservation of Rights of the Federal

National Mortgage Association to Debtors' Amended Combined Disclosure Statement and Plan

for First Guaranty Mortgage Corporation and Debtor Affiliate* [Docket No. 601] (the "FNMA

Limited Objection").  The FNMA Limited Objection is centered on its concern that the Debtors

may attempt to sell "license" rights related to Fannie Mae in connection with the sale of the

Debtors' remaining assets.  *Id.* at p. 2.  However, to be clear, the Debtors are not "selling" any

licenses or transferring any contracts, including the Fannie Mae Lender Contract, or any license

rights related to Fannie Mae in the sale of the Debtors' remaining assets.  As set forth in the

Debtors' *Notice of Successful Bidder and Cancellation of Auction* [Docket No. 598], the Debtors

cancelled the auction and deemed LVS II SPE XXXIV LLC and/or its designee the Successful

Bidder for the purchased assets, which only included the Debtors' intellectual property and interest

in FirstLine Holdings, LLC.  Accordingly, Fannie Mae's concerns raised in its Limited Objection are unfounded and the objection to confirmation should be overruled.

119.    Fannie Mae objects to confirmation of the Debtors' Plan as allegedly not feasible "because it fails to appropriately reserve for Administrative Claims, including potentially substantial claims held by Fannie Mae in respect of the Debtors' efforts to sell assets."  FNMA Limited Objection, ¶ 5.  In particular, Fannie Mae contends that "the Combined Plan does not require a sufficient amount of funding to pay Allowed Administrative Claims that aren't part of the DIP Budget Amount."  FNMA Limited Objection, ¶ 9.  The Limited Objection describes the "Fannie Mae Claims" as claims against the Estates based on any "attempt to sell alleged "license" rights related to Fannie Mae in connection with the sale of the Debtors' remaining assets."  FNMA Limited Objection, ¶ 2.  However, as discussed, the Debtors are not selling any license rights related to Fannie Mae.  Thus, the Debtors do not need to establish a reserve for Fannie Mae's nonexistent Administrative Claim resulting from the Debtors' efforts to sell their assets.

120.    In any event, the Plan provides for an appropriate reserve to pay allowed Administrative Claims, as set forth above in paragraph 52.

## III.    Reply to WARN Act Objections

121.    The Buckley Plaintiffs (as defined herein) and the UST (referred to collectively with the Buckley Plaintiffs as the "WARN Objectors") object to Plan confirmation on the basis that the Plan does not include a reserve to cover § 507(a)(4) priority level damages (the "WARN Claims") under the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. § 2101, et seq. (the "WARN Act").  The *Limited Objection and Reservation of Rights of Lori Buckley, Gayle Zech, Roberta Martinez, Jennifer Jackson and James Davies on Behalf of Themselves and Others Similarly Situated, to Confirmation of Debtors' Amended Combined*

48

*Disclosure State and Chapter 11 Plan and Notice of Election by the WARN Claimants to Opt-Out of Third-Party Releases Contained in the Plan* [Docket No. 604] (the "Buckley Objection"), together with the UST Objection (collectively the "WARN Objections"), go to Plan feasibility, and seek to condition confirmation on the creation of a reserve funded with at least $4.8 million (as asserted by the Buckley Plaintiffs) or $7.0 million (as asserted by the UST) to cover WARN Claims.  However, the Objectors' attempt to condition confirmation on the reserve of millions of dollars amounts to an improper and unreasoned "all or nothing" attempt to hold the Plan hostage. This Court, however, is not bound by the Objectors' demands; rather, it should estimate the value of the WARN Claims for Plan feasibility based upon the record and arguments of counsel. Moreover,  the operative facts and law demonstrate that the WARN Claims are without merit and hold little to no actual value.

122.    First, it should be noted that contemporaneously with the filing of this pleading, the Debtors will file an opposition to the Buckley Plaintiffs' motion for class certification in the Buckley Action (defined below).  In the opposition, the Debtors demonstrate why the Buckley Plaintiffs have failed to meet their burden of proof and persuasion, and, thus, why the certification request should be denied.  Denial of class certification alone significantly reduces risks the Buckley Action and the need for a reserve.

123.    Second, WARN Act liability is not warranted, because the Debtors' actions are defensible under all three traditional WARN Act exceptions: (1) at the subject time of reduction in force on June 24, 2022 (the "June 24 RIF"), the Debtors had ceased originating new loans and constituted a "liquidating fiduciary" exempt from liability under the WARN Act; (2) the Debtors are exempt from WARN Act liability because the June 24 RIF was in response to "unforeseen business circumstances," including efforts to sell the business that fell through in mid-June 2022;

and (3) the Debtors' failed efforts to refinance their debt justifies finding the faltering company exception to the WARN Act.

124.    Nevertheless, for purposes of addressing any legitimate potential risk raised by the WARN Claims and to demonstrate Plan feasibility, the Debtors have agreed to reserve $700,000 (the "WARN Reserve") for all potential priority WARN Claims, including any and all claims in connection the adversary proceeding captioned *Buckley, et al. v. First Guaranty Mortgage Corp., et al., Adv. Proc. No. 22-50387* (the "Buckley Action").   The WARN Reserve is more than sufficient to address Priority WARN Claims and, as such, the Court should (i) overrule the WARN Objections to the extent they seek a reserve in excess of $700,000 and (ii) find that the Plan is feasible under § 1129(a)(11).

### A.    Relevant Facts and WARN Litigation

#### 1.    Background

125.    By June 24, 2022—the date on which WARN notices were issued, the date of the June 24 RIF itself, and the date when the Debtors stopped originating loans—the Debtors had exhausted efforts to obtain financing to continue operations, sale efforts had failed, and the Debtors were in liquidation mode.  This conclusion is supported by the facts.  As testified in the *First Day Declaration of Aaron Samples, the Debtors' Chief Executive Officer* [Docket No. 19] (the "Samples First Day Declaration"):

> On June 24, 2022, as a result of its inability to procure additional financing to ease its liquidity crisis as well as the cessation of new loan origination activity, FGMC reduced its workforce by separating the employment of approximately 471 employees, including approximately 284 employees paid (at least in part) on a commission basis.

Samples First Day Declaration, ¶ 12. *See also id.*, ¶ 6.

Further, as set forth in the Samples First Day Declaration:

The Debtors' business included the origination, purchase, service, sale, and/or securitization of residential real estate mortgage loans. However, due to unforeseen historically adverse market conditions for the mortgage lending industry, including unanticipated market volatility, the Debtors have experienced significant operating losses and cash flow challenges. As a result of these challenges, they were forced to cease all of their origination activity and terminate the employment of nearly eighty percent (80%) of their workforce just prior to the Petition Date.

*Id.*, ¶ 6.

126.    As further stated by Mr. Samples: "on June 24, 2022, the Debtors ceased all new origination activity, and are now focused on funding and closing the committed mortgages remaining in the Debtors' pipeline." *Id.*, ¶ 9.

127.    The actions taken on June 24, 2022 were the culmination of the downward trajectory in the mortgage industry generally, and the inability of the Debtors to obtain additional funding or a purchaser. As Mr. Samples noted:

The combination of continued losses and volatile daily margin calls on hedge positions has led to drastic reductions in the Debtors' unrestricted cash creating a liquidity crisis. By mid-June 2022, as liquidity continued to decline, Debtors' management concluded that they could no longer continue operations without a significant injection of new liquidity, as one or two days of significant margin calls could leave the Debtors without any cash. Despite their best efforts, the Debtors were unable to obtain additional equity capital or financing. As a result, the Debtors determined that, in order to protect part of the current "pipeline" (loans not yet funded), they needed to suspend all new loan applications, suspend all correspondent lending, cease all hedging payments and significantly reduce their workforce. The Debtors further determined that filing these Chapter 11 Cases was the best way to preserve operational ability to help customers purchase and refinance their homes.

*Id.*, ¶ 29 (emphasis added); *See Supplemental Declaration of Tanya Meerovich in Support of Debtors' Motions for Debtor-In-Possession Repo and Cash Flow Financing* [Docket No. 259] at 14, Ex. A (Timeline) (showing the months-long negotiation with a potential buyer ended on June 9, 2022).

128.    With respect to employees, on June 24, 2022, the Debtors issued WARN Notices and severed approximately 470 employees from employment.  In an effort to treat employees as fairly as possible, on the June 24, 2022 date of termination, the Debtors paid all separated employees all wages and commissions then due and owing as well as all paid time off ("PTO") pursuant to company policy.  Samples First Day Declaration, ¶ 44.  Further, on June 29, FGMC paid severance to 203 employees, notwithstanding the absence of a formal severance policy.  Id.

### 2.    WARN Litigation

129.    On June 29, 2022 (prepetition), two separate lawsuits seeking WARN damages were filed against FGMC in US federal district courts: 1) by Jennifer Wolter in the United States District Court for Nevada (the "Wolter Action"), and 2) by Jennifer Jackson in the United States District Court for the Eastern District of Texas (the "Jackson Action").  Neither plaintiff in the Wolter Action or the Jackson Action sought relief from stay.  However, Ms. Wolter, through the same counsel who filed the Wolter Action, has filed a proof of claim seeking $44,250.50 as a general unsecured claim.  *See* Claim No. 254.  Ms. Jackson has not filed a proof of claim, and she appears to be a named plaintiff in the Buckley Action as described below.

130.    On the Petition Date, the Buckley Plaintiffs commenced the Buckley Action.  *See* Buckley Action Docket No. 1 (the "Buckley Complaint").  The Buckley Complaint seeks WARN damages on behalf of the Buckley Plaintiffs and "approximately 470" other persons they aver were terminated on June 24, 2022.  Buckley Complaint, ¶ 2.

131.    Notably, the Buckley Plaintiffs did not formally serve the Buckley Complaint immediately.  Rather, they waited until August 31, 2022 to issue a summons.  Buckley Action Docket No. 14.  Moreover, the Buckley Plaintiffs did not seek class certification until October 14,

2022 [Buckley Action Docket No. 16 (the "Buckley Class Certification Motion")], a date that was a little more than two weeks prior to the October 31, 2022 scheduled confirmation hearing.

132.    The Debtors filed an answer to the Buckley Complaint on September 30, 2022, and pled WARN Act exceptions and defenses, notably: 1) the liquidating fiduciary exception; 2) unforeseeable business circumstances exception; and 3) the faltering company exception (collectively, the "WARN Exceptions").  *See* Buckley Action Docket No. 15 at p. 10, ¶ 9-11, Further, the Debtors pled that WARN damages should be offset by the June 29, 2022 payments made to employees, that § 502(d) barred relief, and other defenses.  *Id.* at p. 10, ¶ 12-15.

133.    The Debtors' deadline to respond to the Buckley Class Certification Motion is October 28, 2022, and the Debtors are in the process of filing an objection by that date (the "Class Certification Objection").  As demonstrated in the Class Certification Objection, the Buckley Plaintiffs have failed to meet their burden on several critical requirements to justify class certification.  To the extent issues of class certification are relevant to the issue of the WARN Reserve, the arguments contained in the Debtors' pending objection are incorporated herein by reference.

134.    On October 26, 2022, the Buckley Plaintiffs filed the Buckley Objection, and the UST also filed the UST Objection.  The Buckley Plaintiffs "estimate that their asserted WARN Claim total is $6.2 million of which approximately $4.8 million" is priority, and the UST states that the Buckley Action could result in $7 million in WARN priority damages.  Buckley Objection ¶ 19; UST Objection ¶ 14.  However, neither of the WARN Objections proposed a reduced amount, with the Buckley Plaintiffs stating that the Debtors should be required to "reserve[e] at least $4.8 million as the Priority WARN Act Claim reserve."  Buckley Objection at ¶ 29.

**B.    There is no WARN Liability Under the Circumstances.**

135.    The WARN Objections did not address the Debtors' pled defenses.  Therefore, the

Debtors provide the following support for their defenses:

### 1.    Liquidating Fiduciary

136.    The first applicable defense is the "Liquidating Fiduciary" exception.  Under it, the

Debtors are not considered "employers" under the WARN Act, because, as of June 24, 2022, they

were not operating a business, but were liquidating.  This exception, which has been recognized

by the Court of Appeals of the Third Circuit in *In re United Healthcare Sys., Inc.*, 200 F.3d 170,

177 (3d Cir. 1999) and Delaware bankruptcy courts (as noted below), is the product of regulatory

interpretation and applies when an entity conducted a mass termination when it was liquidating its

business.  The Third Circuit has adopted this exception from Department of Labor guidelines, and

the following "language provides the basis for the 'liquidating fiduciary' exception to the WARN

Act:"

> [T]he Department does not think it appropriate to [exclude all bankrupt companies
> from the definition of "employer"].  Further, DOL agrees that a fiduciary whose
> sole function in the bankruptcy process is to liquidate a failed business for the
> benefit of creditors does not succeed to the notice obligations of the former
> employer because the fiduciary is not operating a 'business enterprise' in the
> normal commercial sense.  In other situations, where the fiduciary may continue to
> operate the business for the benefit of creditors, the fiduciary would succeed to the
> WARN obligations of the employer precisely because the fiduciary continues the
> business in operation.

*Id.* (quoting 54 Fed. Reg. 10642, 16045 (1989)) (explained by *Stewart v. Art Van Furniture, LLC*

*(In re Art Van Furniture, LLC)*, 638 B.R. 523, 533-34 (Bankr. D. Del. 2022)).  Regarding this

exception, "not all cases applying the principle involve post-petition terminations, and the petition

date is not determinative of the outcome in all cases."  *Conn v. Dewey & Leboeuf LLP (In re Dewey*

*& Leboeuf LLP)*, 487 B.R. 169, 175 (Bankr. S.D.N.Y. 2013).

137.   Here, since at least June 24, 2022, the Debtors have been in the process of liquidating.  As explained in the Samples First Day Declaration, at that time, FGMC ceased issuing any new loans and focused on winding down and placing existing loans with third parties.  These facts demonstrate that the Debtors were no longer acting as "employers" but rather, in the capacity of liquidating fiduciaries.

138.   The recent case of *In re Art Van Furniture, LLC* is instructive.  In that case, the Delaware Bankruptcy Court ultimately found that the debtors, a large retail chain, were not subject to WARN Act liability.  638 B.R. at 542.  As part of its analysis, the Delaware Bankruptcy Court considered, but ultimately denied a finding of a liquidating fiduciary exception, *albeit* on critically distinguishable facts.  More specifically, the Delaware Bankruptcy Court found that at the time of the mass layoff the debtors were operating in a "hybrid" capacity by continuing to sell goods while conducting going-out of business sales.  *Id.* at 536 ("In the case before the Court, the Debtors announced their intention to liquidate prior to the Chapter 11 filing, but the Debtors' orderly wind-down process contemplated continued postpetition operations. The Debtors' GOB Sales are a perfect example of a hybrid of engaging in business (i.e., continuing operations with its employees for the retail sales of goods) while liquidating at the same time.")  Here in contrast, at the time of the June 24 RIF, the Debtors had ceased to originate any new loans and its "sole function" was to liquidate its assets.  Given these facts, this Court can easily find that the risk of WARN Act liability exposure is $0.

### 2.   Unforeseen Business Circumstances

139.   The Debtors are also protected by the "unforeseen business circumstance" exception.  This exception has two elements: (1) business circumstances were unforeseeable at the time notice would have been required, and (2) the layoffs were caused by those circumstances.

*See In re Art Van Furniture, LLC*, 638 B.R. at 537; *Czywski v. Jevic Transp. Inc. (In re Jevic Holding Corp.)*, 496 B.R. 151, 164 (Bankr. D. Del. 2013) ("*Jevic*"). "Case law reveals that WARN Act defendants need not show that the circumstances which caused a plant closing or mass layoff arose from out of the blue to qualify for the exception," and the triggering of the necessity of layoffs need not just be foreseeable as possible, but should have been foreseen as probable. 496 B.R. at 161 (citing *Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 589 (7th Cir. 2005)); *see also Hotel Emples. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 187 (3d Cir.1999) ("*Hotel Employees*") (holding that the exception applied even though a casino owner knew that regulatory commission might revoke its license, forcing a shutdown). In contrast to the faltering company exception, "the Department of Labor has indicated that the exception ***should not be narrowly construed***, [and] that [courts should] apply an objective test to analyze the 'commercial reasonableness of the employer's actions,' and that '[e]ach claim of unforeseeable business circumstances must be examined on its own merits ... in terms of whether the employer reasonably ... could not foresee that the event would occur....'" *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 875–76 (10th Cir. 2009) ("*Gross*") (citations omitted) (emphasis added).

140.    Courts, including the Third Circuit, apply this exception so as not to discourage reasonable efforts to mitigate and restructure. *Jevic*, for instance, had the following timeline of events:

- 2007 – Debtors' business struggles under economic downturn
- End of 2007 – Debtors breach loan agreement with assets below required value
- January 8, 2008 – Forbearance agreement with lender, guarantee provided by affiliate
- February 2008 – Consulting service agreement with distressed company consultant who provides 13 week cashflow showing sufficient liquidity through May 9, 2008
- February 29, 2008 – Set expiration date of forbearance agreement
- February 29, 2008 – Forbearance agreement extended to April 2008
- **March 19, 2008 - Sixty Day Mark Before Eventual Mass Termination of Employees on May 19, 2008**

- March 27, 2008 – Lender ultimatum to parent guarantor for additional investment into debtor or 45 day forbearance for active sale process (sale process is chosen)
- Early April 2008, CRO engaged and reorganization plan announced with target implementation and effectiveness of June, 2008
- End of April, 2008 – Default of loan agreement
- May 13, 2008 – With struggling sale process, it becomes apparent that cash not available to fund business through close of possible sale and credit facility is terminated.
- May 16, 2008 – Bankruptcy authorized
- May 19, 2008 – Mass Termination
- May 20, 2008 – Bankruptcy Filing

*Jevic*, 496 B.R. at 155-56.

141.    The *Jevic* WARN plaintiffs argued that the debtors should have been able to foresee the need for layoffs in March, 2008.  However, Judge Shannon (granting summary judgment on the defense to the debtor) found otherwise:

> During April and into May, Jevic met with two potential buyers and sought capital … However, none of these options panned out. On May 13, 2008, CIT terminated the credit facility when Sun Cap refused to invest additional funds. Sun Cap also refused to fund a proposed sale to Pitt–Ohio. With no viable sale or funding available to Jevic, and with the forbearance agreement expired, Jevic's board formally authorized a bankruptcy filing and WARN notice was sent that day.  **These events are indicative of a company attempting to stave off layoffs, and attempting to save jobs and the company**. The Court does not doubt that CIT refusing to extend forbearance was a possibility. However, it was not necessarily the probable outcome at the time WARN notice was required.  **It would run counter to the WARN Act's policy of encouraging employers to take all reasonable actions to preserve the company and the jobs to impose liability upon the Debtors for not giving notice sooner than they did**.

*Id.* at 163 (emphasis added).  Further in *Gross*, which involved a wholesale grocery and distribution debtor:

- The debtor owned 50% of its largest customer, United Supermarkets, and the debtor and United had a thirty-year business relationship
- During 2002 and 2003, the debtor repeatedly fell short on United orders (with such shortages called "stockouts") and there were numerous conversations between United and the debtor regarding the stockouts
- November the debtor seeks a loan for working capital
- November 23, 2004 – Day that is sixty days before layoffs on January 22, 2004

- December, 2004 – Debtor continues to seek loan for working capital
- December 17, 2004, the debtor's possible lender placed auditors in their facilities, which continued to struggle to stock United stores
- January 2004, stockouts reached an "all-time high"
- January 8, 2004, United wrote debtor that United would "place orders with alternative suppliers," but also reiterated its willingness to continue doing business with debtor despite the stockouts
- January 9, 2004, the debtor wrote to United that the debtor was seeking working capital
- January 15, 2004, United wrote that it would use another company as its "primary" supplier, and would use the debtor as an "alternative supplier."
- January 20, 2002, the debtor met with its bank and its restructuring consultants, Alvarez & Marsal
- January 22, 2004, the debtor sent WARN notices, citing the unforeseen circumstance of the United contract termination, and terminated its employees

*Gross*, 554 F.3d at 873-74.

142.    The district court granted a complete summary judgment in favor of the debtor as to the WARN Claims on the unforeseeable business exception.   In affirming, the Tenth Circuit held:

> While [debtor] HHC was aware of United's dissatisfaction, that knowledge alone does not bar the application of the unforeseeable business circumstance exception. *See Loehrer*, 98 F.3d at 1062. Rather, an objective focus is required—whether a 'similarly situated employer in the exercise of commercially reasonable business judgment would have foreseen' United's withdrawal. *Elsinore Shore*, 173 F.3d at 186. In this evaluation, 'we consider the facts and circumstances that led to the [layoffs] in light of the history of the business and of the industry in which that business operated.' *Id*. While the situation leading up to United's eventual termination of the primary supplier relationship 'would undoubtedly raise the eyebrows of any prudent businessperson,' Loehrer, 98 F.3d at 1062, the evidence does not suggest that United's decision was reasonably foreseeable prior to HHC's receipt of the January 15 letter. For thirty-one years, United's relationship with HHC had flourished, and even when stockouts reached a new high in early 2004, United still confirmed its interest in doing business with HHC …
> Free enterprise always involves risk, yet most businesses operate as going concerns, notwithstanding those risks. Business downturns in a cyclical economy are not unusual, and we should not burden employers with the 'task of notifying employees of possible contract cancellation and concomitant lay-offs every time there is a cost overrun' or similar difficulty. *Halkias*, 137 F.3d at 336.

*Id.* at 876–77 (10th Cir. 2009) (affirming no WARN liability, including alternative argument that notice should have been given sometime during the sixty day period).

143.    Likewise, here, the Debtors on April 24, 2022 (the 60th day before the June 24 RIF that the Buckley Plaintiffs assert that notice should have been issues) could not reasonably foresee the probable occurrence of circumstances that led to the RIF and the need for the RIF itself—the "historically adverse market conditions for the mortgage lending industry, including unanticipated market volatility."  Samples First Day Declaration ¶ 6.  It was not until June 2022, "as liquidity continued to decline, that the Debtors retained restructuring professionals, and then "concluded that [the Debtors] could no longer continue operations."  Samples First Day Declaration, ¶ 29 (emphasis added).

144.    The Debtors' CRO has also testified that (i) the Debtors did not hire FTI Consulting until June 2022, (ii) the Debtors focused on a potential investor that had expressed interest, who then rescinded an offer, and then (iii) the Debtors, who drew on pre-petition facilities on June 9, June 22, and June 29, 2022, undertook a blitz solicitation process, but which was unsuccessful because of the terms demanded by counterparties and the "accelerating liquidity constraints" on the Debtors—with all this activity occurring well after April 24, 2022, in the month of June.  *Supplemental Declaration of Tanya Meerovich in Support of Debtors' Motions for Debtor-In-Possession Repo and Cash Flow Financing* [Docket No. 259] at 14, Exh. A.

145.    Like in *Jevic*, during a sharp downturn, on the "notice day," the *probability* of layoffs was not foreseeable, and like in *Gross*, though the debtor had severe business distress.  Like in *Jevic* and also in *Gross*, the Debtors engaged restructuring professionals to evaluate financial options, and expediently sought to save their business and save jobs before the layoff date, but were unable to do so.  Given these facts, the Debtors should not be held liable under the WARN Act for this effort, and like in *Jevic* and in *Gross* the Debtors would prevail on summary judgment for this defense.  This furthers public policy because finding employers like the Debtors liable

"would increase the chance that an employer will be forced to close and lay off its employees, harming precisely those persons WARN attempts to protect."  *Hotel Employees*, 173 F.3d 175, 185 n. 7 (3d Cir.1999).[19]

### 3.  Faltering Company

146.   In addition to liquidating fiduciary and unforeseen circumstances, the Debtors are protected by the faltering company exception.  As a threshold matter, a company seeking to qualify as a "faltering company" must demonstrate that it had inadequate capital to continue functioning and, as such, was in a "faltering" state.  Specifically, "an employer must prove:

    (i)    it was actively seeking capital at the time the 60–day notice would have been required,

    (ii)    it had a realistic opportunity to obtain the financing sought,

    (iii)    the financing would have been sufficient, if obtained, to enable the employer to avoid or postpone the shutdown, and

    (iv)    the employer reasonably and in good faith believed that sending the 60–day notice would have precluded it from obtaining the financing."

*In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 246-47 (3d Cir. 2008), as amended (Oct. 27, 2008) (citing 20 C.F.R. § 639.9(a)).

147.   Here, each of the elements have been met.  On April 24, 2022, sixty days before the June 24, 2022 RIF, the Debtors were seeking capital from their sponsor, which had a realistic opportunity of being achieved, which financing would have been sufficient to give the Debtors

---

[19] "Because plaintiffs' view [of a loose foreseeability requirement] might require an employer to provide frequent WARN notice, it could require an economically viable employer to provide notice of a possible-but-unlikely-closing. Once the employer's creditors learn of the notice, they may seek to enforce existing debts and become unwilling to extend the employer more credit. In addition, employees may overestimate the risk of closing and prematurely leave their employer, forfeiting (among other things) seniority and unvested benefits. Such behavior by creditors and employees would increase the chance that an employer will be forced to close and lay off its employees, harming precisely those persons WARN attempts to protect."

enough cushion to retain their employees, and the Debtors reasonably believed that sending WARN notices would preclude that financing.  Samples Reply Declaration, ¶ 10.  It was not until mid-June 2022 that the Debtors believed additional financing or a sale transaction to maintain an ongoing business operation was no longer a viable option.  *Id.* at ¶ 11.

### C.    The Court Should Exercise Its Wide Discretion to Evaluate and Estimate the WARN Claims in an Amount No More than $700,000

148.    In assessing the feasibility of a plan, a court is required to evaluate "the possibility that a potential creditor may, following confirmation, recover a large judgment against the debtor." *Sherman v. Harbin (In re Harbin)*, 486 F.3d 510, 517 (9th Cir. 2007).  Where, as here, the amount of priority claim exposure has not yet been determined, a court may estimate the amount of the claim for the purpose of determining plan feasibility under § 1129(a)(11).  *See In re Tonopah Solar Energy, LLC*, No. 20-11844 (KBO), -- B.R. --, 2022 WL 982558, at *14 (D. Del. Mar. 31, 2022) ("*Tonopah*").  A court may find the estimated value is $0 or some other amount significantly less that the facial claim amount.  *U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 146 (Bankr. D. Del. 2010) (estimating administrative claim at 4.2% of asserted value for plan confirmation purposes); *In re GBG USA Inc.*, Case No. 21-11369, Docket No. 672 (Bankr. S.D.N.Y. Aug. 2, 2022 ) (estimating priority amount of employee claims at $0 from alleged violation of labor law).

149.    In conducting this assessment, a court is free to "exercise its sound discretion in considering how such litigation may affect the feasibility of any specific plan." *In re Harbin*, 486 F.3d at 520.  As such, estimation may be sought by formal motion or, as here, in connection with the plan confirmation process and briefing when determining feasibility. For instance, in the recent bankruptcy case of *Tonopah* in front of Judge Owens, a creditor objected to the debtor's plan, which proposed to pay all unsecured claims in full, arguing that the plan was not feasible because

the creditor's $90 million litigation claim would not be able to be paid.  *See In re Tonopah*, Case No. 20-1184-KBO at Docket No. 168.  The debtor filed a brief in support of confirmation and in reply to objections and argued for estimation of the $90 million claim at zero dollars in defending the feasibility of the plan.  *Id.* at Docket No. 246.  The Court then held a confirmation hearing (taking place on November 20, 2020 and December 3, 2020), where the creditor argued that its claim should be considered and accounted for at face value, and which the debtor argued should be estimated at $0.  *Id.* at Docket Nos. 268; 287.  Still, during the interim, the debtor proposed a plan enhancement of a $6 million irrevocable letter of credit (6.67% of the claim) as a reserve to be drawn on in the event that the creditor obtained a judgment which was unpaid on the claim, and to increase its general working capital facility by $14 million.  *Id.* (explained by the District of Delaware in *Tonopah*, 2022 WL 982558, at *4).  At the hearing, Judge Owens found that "I think it is unreasonable for feasibility purposes to assume that [the objecting creditor] will ultimately have a $90 million dollar claim against the debtor's estate or anything close to that," *Id.* at Docket No. 287 at p. 96, before ultimately confirming the plan by written order.  *Id.* at Docket No. 291.

150.    "In estimating the value of [a] litigation claim for the purpose of assessing plan feasibility, the Bankruptcy Court is permitted to 'us[e] whatever method is best suited to the particular contingencies at issue'" so long as the procedure is consistent with the fundamental policy of Chapter 11 that a reorganization must be accomplished quickly and efficiently.  *Tonopah*, 2022 WL 982558, at *10 (citing *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982)); *In re Adelphia Communs. Corp.*, 368 B.R. 140, 278 (Bankr. S.D.N.Y. 2007).

151.    As an example of this wide discretion, in affirming Judge Owens' decision in *Tonopah*, the District of Delaware held:

> Indeed, the court may estimate the value through a simple review of the pleadings and oral argument. *See In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 520

(Bankr. E.D.N.Y. 1994) (citations omitted). The Bankruptcy Court [below] made its determination after receiving substantial motion to dismiss briefing from the parties concerning the claims alleged in the [complaint filed by the plaintiff]. The issue of the sufficiency of the [complaint] was addressed in the Claim Objection and Confirmation Brief, and was also the subject of oral argument at the Confirmation Hearing.

*  *  *

 The Court finds no error in the Bankruptcy Court's Valuation of the litigation claims as substantially less than $90 million and its determination that the Plan's cushion, as supplemented by the backstop, presented a workable provision for payment of Appellants' contingent litigation claims. Appellants' apparent insistence that the Plan set aside $90 million for their claims is based upon speculation that Debtor will be found liable for the full $90 million and unable to pay the full amount. Appellants' mere speculation of such an outcome is not enough to defeat confirmation on feasibility grounds because the mere 'possibility of failure is not fatal to confirmation.'

 *Tonopah,* 2022 WL 982558, at *14 (citations omitted).

152.    Similarly, in *In re Adelphia Bus. Sols., Inc.*, the court found that review of the pleadings in pending litigation to be an appropriate means of claims estimation for feasibility purposes).  341 B.R. 415, 422-23 (Bankr. S.D.N.Y. 2003).  In support for this approach, the *Aldelphia* court found that:

> . . . when estimating claims, Bankruptcy Courts may use whatever method is best suited to the contingencies of the case, so long as the procedure is consistent with the fundamental policy of Chapter 11 that a reorganization 'must be accomplished quickly and efficiently.' *Bittner v. Borne Chemical Co.*, 691 F.2d at 135–37; *see also*, *e.g., In re Brints Cotton Mktg.*, Inc., 737 F.2d 1338, 1341 (5th Cir.1984), citing 3 Collier on Bankruptcy ¶ 502.03, at 502–77 (15th ed.1983). Bankruptcy Courts have employed a wide variety of methods to estimate claims, including summary trial, *In re Baldwin– United Corp.*, 55 B.R. 885, 899 (Bankr. S.D. Ohio 1985), a full-blown evidentiary hearing, *In re Nova Real Estate Inv. Trust*, 23 B.R. 62, 65 (Bankr.E.D.Va.1982), and a review of pleadings and briefs followed by oral argument of counsel, *In re Lane*, 68 B.R. 609, 613 (Bankr.D.Haw.1986). In so doing, courts specifically have recognized that it is often 'inappropriate to hold time-consuming proceedings which would defeat the very purpose of 11 U.S.C. § 502(c)(1) to avoid undue delay.' *In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 520 (Bankr.E.D.N.Y.1994).

*Id.*

153.     Without the ability to estimate administrative or priority claims for the purposes of plan confirmation, "bankruptcy courts facing large asserted, but not yet allowed," priority claims would "have two basic choices at the time of plan confirmation. They can either put off plan confirmation for months or years … or they can set aside cash for the entire amount" of the priority claim "an amount that may or may not have any rational relationship to the amount likely to be ultimately allowed." *In re Verity Health Sys. of California, Inc.*, No. CV 20-7632 DSF, 2021 WL 1102441, at *2 (C.D. Cal. Mar. 23, 2021).

154.     Likewise, the Court here may utilize confirmation briefing, pleadings and briefings in the Buckley Action and arguments and evidence introduced at Plan confirmation hearing to rule on the WARN Reserve for feasibility and confirmation purposes (and, as explained infra the objectors made a strategic, consciences choice by simply ignoring the defenses and nuances of the WARN litigation and asking that their claim be estimated at full value)  Otherwise, the delay from a protracted hearing or other proceedings could push the estates into administrative insolvency.

**D.     The WARN Reserve Is More Than Sufficient To Demonstrate Plan Feasibility**

155.     As a part of the feasibility estimation process, a debtor may address potential exposure by setting aside "a reserve for a disputed … claim to 'go effective' under  [a proposed] plan [as] a reasonable compromise of the competing concerns [of the requirement of priority claims in full on the effective date and the time to finally resolve complex claims]." *In re Spansion, Inc.*, 426 B.R. at 146 (estimating administrative claim alleged to be $100 million at $4.2 million for plan confirmation purposes) (citing *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. at 419).  Here, as demonstrated by the facts and applicable law set forth above, the Debtors have little to no real WARN Act-related exposure.  However, to be conservative, the Debtors have created the WARN Reserve.

1.    **The WARN Reserve Is Well Reasoned, More Than Adequate To Address Any Risks, Justifies Overruling the Buckley Plan Objection, And Precludes Any Feasibility Argument**

156.    Taken together, the evidence demonstrates that the risks of priority liability arising from claims is minimal if not nonexistent, and that the Plan is feasible.

157.    However, in an effort to address whatever minimal risk may exist, the Debtors propose the WARN Reserve of $700,000.  *See generally*, *In re Chemtura Corp.*, 448 B.R. 635, 651 (Bankr. S.D.N.Y. 2011) (when setting a reserve amount, the "estimation analysis at the bankruptcy court level should, while still evaluating the parties positions for their correctness as a matter of governing law, also recognize the possibility (and try to estimate the probability ) of different conclusions in the appellate process") (citations omitted).

158.    This amount is reasonable.  The (broad) proposed Buckley Class consists of 470 employees.  While the Buckley Plaintiffs assert that "their WARN Claim total is $6.2 million of which approximately $4.8 million (not including litigation fees and expenses) constitutes a § 507(a)(4) wage priority amount" they provide no factual support for their estimate or make any attempt to assess the risks created by the WARN Act exceptions.  Buckley Objection, ¶ 19.

159.    Moreover, the "$4.8 million" estimate is itself grossly inflated as it does not reflect what could have been earned for the 60 day WARN Act period and fall within the limits of § 507(a)(4).  Rather, the maximum that could have been earned during the 60 day WARN Act period—without account for any defense risks—totals no more than $3,711,000, or $3,962,000 if fringe benefits are included.[20]  If one reduces these amount to account for severance payments, the maximum theoretical totals—without accounting for the other risks—shrink to $2,854,000 and

---

[20] In addition to these amounts, there would be general unsecured claims totaling $576,000, or $821,000 if fringe benefits are included.

$3,105,000.  However, those amounts do not take into account the WARN Act defenses, which this Court certainly should.

160.    In fact, the Court should discount (i) the high probability of achieving total success on the Debtors' affirmative defenses (like the summary judgment winning employer-debtors in *Jevic* and *Gross*), (ii) offsets of priority claims already paid, (iii) arguments against total certification, difficulties for the Plaintiffs in proving damages, and (iv) other defenses, and reserve no more than $700,000.[21]

### 2.    The WARN Objectors Have Waived Their Arguments As To The Reserve By Not Addressing The Debtors' Defenses And Seeking A Reserve Of The Full Amount Of Their Claims

161.    Notably, by failing to provide any rational basis for its assertion that $4.8 million should be reserved, the proposal should be summarily dismissed.  As Judge Leif Clark explained in a foundational feasibility estimation case:

> [T]he party with the strongest vested interest in an accurate estimate of … a claim [required to be paid under § 1129] is the claimant, so that party must bear primary responsibility for furnishing the court with the kind of information needed to make an accurate estimate— and must suffer the consequences if the estimate proves to be less than accurate. The burdens of both persuasion and of going forward with respect to the estimation of an administrative claim must therefore lie with the party asserting the claim.

*In re MacDonald*, 128 B.R. 161, 166 (Bankr. W.D. Tex. 1991).  Here, though it is not their burden, the Debtors have carefully considered the WARN Claims and have set a WARN Reserve to reasonably accommodate such claims.  If any WARN claimants disagree, to meet their burden,

---

[21] The UST Objection quotes *In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) to argue that "[a] plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely" and cites as in accord, *In re WR Grace & Co.*, 729 F.3d 332, 348-49 (3d Cir. 2013).  UST Objection at para. 25.  However, in *In re Am. Capital Equip., LLC*, the Third Circuit was considering the debtor's proposal to affirmatively fund the plan through offensive litigation, and in *In re WR Grace & Co*., the Third Circuit affirmed the bankruptcy court and district court decisions that provided for a claims reserve less than the claimants were asserting for litigation claims.

they should propose and explain a *reasonable* (i.e., not just maximum "estimated" amount) amount or "suffer the consequences" for not engaging appropriate in the § 1129 feasibility estimation process.

162.    The WARN claimants cannot rely on "face amounts" or a rough estimate  for a feasibility objection, because this allows these plaintiffs to dictate Plan terms without regard to the claim itself.  Such a result would preclude Debtors from ever confirming a Plan, and is inconsistent with the Bankruptcy Code and precedent.  *See Tonopah*, 2022 WL 982558, at *14 ("Appellants' apparent insistence that the Plan set aside $90 million for their claims is based upon speculation that Debtor will be found liable for the full $90 million and unable to pay the full amount. Appellants' mere speculation of such an outcome is not enough to defeat confirmation on feasibility grounds because the mere 'possibility of failure is not fatal to confirmation.'") (citing *In re W.R. Grace & Co.*, 475 B.R. 34, 120 (D. Del. 2012).  Consequently, and as addressed above, these WARN Claims do not render the Plan infeasible.  Accordingly, the Plan satisfies the feasibility requirement set forth in § 1129(a)(11).

163.    Further, even though the Plan itself is not required "to provide a mechanism for addressing the claims of creditors who may subsequently recover large judgments against the debtor," the Debtors have agreed to reserve $700,000 as set forth herein, which is a more than sufficient reserve under the circumstances.

164.    For these reasons, the Court should find that the WARN Reserve is sufficient and that confirmation of the Plan should be granted.  The Debtors reserve the right to raise additional arguments with respect to the Buckley Objection and the UST Objection prior to or at the hearing.

## CONCLUSION

**WHEREFORE**, based on the foregoing the Debtors respectfully request the entry of an order, substantially in the form in the form of the proposed Confirmation Order, (i) confirming the Plan, (ii) overruling any objections to the confirmation of the Plan to the extent such objections are not consensually resolved, and (iii) granting such other and further relief as may be just and proper under the circumstances.

Dated: October 28, 2022　　　　　**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/   Mary F. Caloway*　　　　　　
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Mary F. Caloway (DE Bar No. 3059)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
　　　　tcairns@pszjlaw.com
　　　　mcaloway@pszjlaw.com

　　　　-and -

**DENTONS US LLP**

Samuel R. Maizel (*Pro Hac Vice*)
Tania M. Moyron (*Pro Hac Vice*)
601 S. Figueroa Street, #2500
Los Angeles, CA  90017
Telephone:  (213) 623-9300
Email:  samuel.maizel@dentons.com
　　　　tania.moyron@dentons.com

　　　　-and-

**DENTONS US LLP**

David F. Cook (DE Bar No. 6352)
1900 K Street, NW
Washington, DC  20006
Telephone:  (202) 496-7500
Email:  david.f.cook@dentons.com

*Counsel for Debtors and Debtors in Possession*