# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | : Chapter 11 |
|  | : |
| FIRST GUARANTY MORTGAGE | : Case No. 22-10584 (CTG) |
| CORPORATION, *et al.*, | : |
|  | : Jointly Administered |
| Debtors.[1] | : |
|  | : **Docket Ref. No. 518** |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**
**(I) APPROVING DISCLOSURES ON A FINAL BASIS AND (II) CONFIRMING THE**
**AMENDED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF**
**FIRST GUARANTY MORTGAGE CORPORATION AND DEBTOR AFFILIATE**

Upon consideration of the (I) final approval of the disclosures contained in the *Amended Combined Disclosure Statement and Chapter 11 Plan of First Guaranty Mortgage Corporation and Debtor Affiliate* [Solicitation Version - Docket No. 525] which has been updated and restated and filed as Docket No. 652 and attached hereto as <u>Exhibit A</u> (together with all exhibits thereto, and as may be amended, modified, or supplemented[2], the "<u>Plan</u>") proposed by the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") and (II) confirmation of the Plan; the Disclosures having been approved on an interim basis pursuant to that certain *Order (I) Granting Interim Approval of the Disclosures, (II) Scheduling a Combined Hearing to Consider Final Approval of the Disclosures and Confirmation of the Combined Plan and Setting Deadlines Related Thereto; (III) Approving Solicitation Packages and Procedures; (IV) Approving the Forms of Ballot; and (V) Granting Related Relief* [Docket No. 524] (the "<u>Plan Procedures Order</u>")

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are: First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621). The Debtors' mailing address is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

[2] The Plan Supplement is filed at Docket No. 551 and the Amended Exhibit To Plan Supplement is filed at Docket No. 609 (collectively, the "<u>Plan Supplement</u>").

1

pursuant to the relief sought in *Debtors' Motion for Entry of an Order (I) Granting Interim Approval of the Adequacy of Disclosures in the Combined Disclosure Statement and Plan; (II) Scheduling a Combined Confirmation Hearing and Setting Deadlines Related Thereto; (III) Approving Solicitation Packages and Procedures; (IV) Approving the Form of Ballots; and (V) Granting Related Relief* [Docket No. 407]; upon the affidavits of service filed reflecting compliance with the notice and solicitation requirements of the Plan Procedures Order [Docket Nos. 574 and 610] (the "Notice Affidavits"); and as evidenced by the Notice Affidavits, the applicable notices having been sent to the applicable creditors and interest holders entitled to notice of the Confirmation Hearing and/or non-voting status [Docket Nos. 526, 527 and 528] (the "Confirmation Hearing Notices"); and the Debtors having filed *Debtors Objection to Proof of Claim No. 124 Solely for Voting Purposes* [Docket No. 561] (the "Voting Objection"); and upon the *Declaration of Andres A. Estrada Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Amended Combined Disclosure Statement and Chapter 11 Plan of First Guaranty Mortgage Corporation and Debtor Affiliate* [Docket No. 625] and the *Notice of Filing of Final Voting Declaration* [Docket No. 641]; (together, the "Voting Declaration"); and upon the *Declaration of Tanya Meerovich in Support of Confirmation of the Amended Combined Disclosure Statement and Chapter 11 Plan of First Guaranty Mortgage Corporation and Debtor Affiliate* [Docket No. 631] (the "Meerovich Declaration") and the *Declaration of Aaron Samples in Support of Confirmation of the Amended Combined Disclosure Statement and Chapter 11 Plan of First Guaranty Mortgage Corporation and Debtor Affiliate* [Docket No. 626] and the *Amended Declaration of Aaron Samples in Support of Confirmation of the Amended Combined Disclosure Statement and Chapter 11 Plan of First Guaranty Mortgage Corporation and Debtor Affiliate* [Docket No. 369] (together, the "Samples Declaration") (and together with the Meerovich

Declaration, collectively the "Confirmation Declaration"); and upon the *Order in Aid of Confirmation of Debtors' Plan (I) Approving First Amendment to Cash Flow DIP Credit Agreement Increasing Available Term Loan Commitments; (II) Providing for Additional Funding Contemplated by the Plan; Amending Approved DIP Budget; and (IV) Granting Related Relief* [Docket No. 665] (the "Order in Aid of Confirmation"); and upon the *Memorandum of Law in Support of Confirmation of the Amended Combined Disclosure Statement and Chapter 11 Plan of First Guaranty Mortgage Corporation and Debtor Affiliate* [Docket No. 628] (the "Confirmation Memorandum"); and any and all objections to the Plan[3] or related relief having been resolved and/or overruled by this Court pursuant to this Confirmation Order; and a hearing to consider Confirmation having been commenced on October 31, 2022 and concluded (the "Confirmation Hearing"); and upon the evidence adduced and proffered and the arguments of counsel made at the Confirmation Hearing; and this Court having reviewed all documents in connection with Confirmation and having heard all parties desiring to be heard; and upon the record of the chapter 11 cases; and after due deliberation and consideration of all of the foregoing; and sufficient cause appearing therefor; this Court hereby makes the following:

### Findings of Fact and Conclusions of Law

A.      **Findings of Fact and Conclusions of Law.** The findings and conclusions set forth herein and in the Plan Procedures Order, together with the findings of fact and conclusions of law

---

[3] The following objections to confirmation of the Plan were filed: (i) Limited Objection of Kari Crutcher [Docket No. 600], (ii) Limited Objection and Reservation of Rights of the Federal National Mortgage Association [Docket No. 601], (iii) Customer Bank's Limited Objection and Reservation of Rights [Docket No. 603] (the "Customers Bank Objection"), (iv) Limited Objection and Reservation of Rights of Lori Buckley, Gayle Zech, Roberta Martinez, Jennifer Jackson and James Davies on behalf of themselves and those similarly situated [Docket No. 604] (the "WARN Objection"), (v) Objection of the United States Trustee [Docket No. 605] (the "US Trustee Objection"), (vi) Flagstar Bank, FSB's Joinder to Customer Bank's Limited Objection [Docket No. 606] (the "Flagstar Objection") and (vii) Limited Objection and Reservation of Rights of Lynx Whole Loan Acquisition LLC [Docket No. 615] (the "Lynx Objection").

set forth in the record of the Confirmation Hearing, constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable to these proceedings pursuant to Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    **Capitalized Terms.** Capitalized terms used herein, but not defined herein, shall have the respective meanings attributed to such terms in the Plan.

C.    **Jurisdiction and Venue.** This Court has jurisdiction over the chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court may enter a final order consistent with Article III of the United States Constitution, and the Debtors consent to entry of this Confirmation Order under the Local Rules and Article III of the United States Constitution. Venue of these proceedings and the chapter 11 cases is proper in this district and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    **Chapter 11 Petitions.** On June 30, 2022 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b). No party has requested the appointment of a trustee or examiner in the chapter 11 cases. An Official Committee of Unsecured Creditors has been appointed. [Docket No. 132].

US_ACTIVE\122519033\V-18

E.    **Judicial Notice.** This Court takes judicial notice of the docket in the chapter 11 cases, including the dockets of any adversary proceedings initiated in the cases, maintained by the Clerk of this Court and/or its duly appointed agent, including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before this Court during the chapter 11 cases, including, without limitation, the Confirmation Hearing.

F.    **Disclosures.**  The Disclosures within the Plan provides holders of Claims entitled to vote on the Plan with adequate information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with Section 1125 of the Bankruptcy Code.

G.    **Plan Supplement.** Prior to the Confirmation Hearing, the Debtors filed the Plan Supplement. The Plan Supplement complies with the terms of the Plan, and the filing and notice of the Plan Supplement was appropriate and complied with the requirements of the Bankruptcy Code and the Bankruptcy Rules, and no other or further notice is or shall be required. The Debtors are authorized to modify the Plan Supplement documents following entry of this Confirmation Order in a manner consistent with this Confirmation Order and/or the Plan.

H.    **Mailing of Solicitation and Confirmation Materials.** As is evidenced by the Voting Declaration and the Notice Affidavits, the transmittal and service of the Plan, the Ballots and the Confirmation Hearing Notices were adequate and sufficient under the circumstances, and all parties required to be given notice of the Plan and the Confirmation Hearing (including the deadline for filing and serving objections to Confirmation of the Plan and final approval of the Disclosures) have been given due, proper, timely, and adequate notice thereof in accordance with the Plan Procedures Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to

appear and be heard with respect thereto. No other or further notice of the Plan and the Confirmation Hearing is required.

I.      **Voting.** The procedures by which the Ballots for acceptance or rejection of the Plan and Release Opt-Out Forms were distributed and tabulated under the circumstances of the chapter 11 cases were fair, properly conducted, and complied with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, applicable non-bankruptcy law and the Disclosure Statement Order.

J.      **Bankruptcy Rule 3016(a).** In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as the plan proponents.

K.      **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).** As set forth below, the Plan complies with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

L.      **Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).** The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code. In addition to Administrative Claims, Priority Tax Claims, DIP Claims, and Professional Fee Claims, which need not be classified, the Plan designates seven Classes of Claims and Interests. The Claims or Interests placed in each Class are substantially similar to other Claims or Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Interests. Thus, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

M.      **Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2)).** Section 10 of the Plan specifies that Class 1 (Priority Non-Tax Claims) and Class 2 (Other Secured Claims) are Unimpaired under the Plan. Thus, section 1123(a)(2) of the Bankruptcy Code is satisfied.

US_ACTIVE\122519033\V-18

N.      **Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).** Section 10 of the Plan designates Class 3 (Secured Prepetition Facility Claims including subclasses A to E thereof), Class 4 (Loan Settlement Claims), Class 5 (Prepetition LVS II Offshore Guaranty Claims), Class 6 (General Unsecured Claims) and Class 7 (Interests) as Impaired and specifies the treatment of Claims and Interests in such Classes. Thus, section 1123(a)(3) of the Bankruptcy Code is satisfied. There are no claims within Class 4 currently.

O.      **No Discrimination (11 U.S.C. § 1123(a)(4)).** The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest. Thus, section 1123(a)(4) of the Bankruptcy Code is satisfied.

P.      **Implementation of the Plan (11 U.S.C. § 1123(a)(5)).** The Plan and the Liquidating Trust Agreement provide adequate and proper means for the Plan's implementation. Thus, section 1123(a)(5) of the Bankruptcy Code is satisfied.

Q.      **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).** The Plan does not provide for the issuance of any securities, including non-voting securities, and the Debtors are being dissolved as soon as practicable after the Effective Date. Therefore, section 1123(a)(6) of the Bankruptcy Code is satisfied.

R.      **Selection of Officers and Directors (11 U.S.C. § 1123(a)(7)).** Section 14.5 of the Plan provides that the Liquidating Trust shall be governed by the Liquidating Trustee in consultation with the Oversight Committee. On the Effective Date, the Debtors have appointed FTI Consulting as the Liquidating Trustee, to oversee the Liquidating Trust and the wind-down of the Debtors' estates. In the event the Liquidating Trustee is removed by the Bankruptcy Court, resigns or is replaced pursuant to the Liquidating Trust Agreement, or otherwise vacates its

US_ACTIVE\122519033\V-18

position, a successor Liquidating Trustee shall be appointed as set forth in the Liquidating Trust Agreement.  Therefore, section 1123(a)(7) of the Bankruptcy Code is satisfied.

S.      **Additional Plan Provisions (11 U.S.C. § 1123(b)).** The Plan's provisions are appropriate, in the best interests of the Debtors and their Estates, and consistent with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

T.      **Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).** The Debtors have exercised reasonable business judgment in determining to either assume, assume and assign, or reject each of the Debtors' remaining Executory Contracts and Unexpired Leases as provided for in the Plan, the Plan Supplement, and this Confirmation Order, and any such assumptions and rejections are justified and appropriate in the chapter 11 cases. The Debtors' exercise of reasonable business judgment in determining to either assume, assume and assign, or reject each of the Debtors' remaining Executory Contracts and Unexpired Leases is justified and appropriate in the chapter 11 cases for the reasons set forth in the Disclosure Statement, the Confirmation Memorandum, and the Confirmation Declaration.

U.      **Compromises and Settlements Under and in Connection with the Plan (11 U.S.C. § 1123(b)(3)).** All of the settlements and compromises pursuant to and in connection with the Plan comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019. The Plan provides, for among other things, the Committee Settlement, the

US_ACTIVE\122519033\V-18

Debtor/Estate Release, and the Third Party Release. Accordingly, the Plan is consistent with section 1123(b) of the Bankruptcy Code.

a.      **Committee Settlement**. The Committee Settlement, as incorporated into the Plan, is in accordance with section 1123(b)(3)(A) of the Bankruptcy Code and represents a valid exercise of the Debtors' business judgment. The Committee Settlement was entered into in good faith and is: (a) the product of extensive arms'-length negotiations by and between the Debtors, the Committee, and the Cash Flow DIP Lender; (b) in the best interests of the Debtors, their Estates, and the holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) an integral element of the transactions incorporated into the Plan; and (e) consistent with sections 105, 1123, and 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, Bankruptcy Rule 9019, and other applicable law.

b.      **Debtor/Estate Release**.  The Debtor/Estate Release set forth in Section 16.2(a) of the Plan is in accordance with section 1123(b) of the Bankruptcy Code and represents a valid exercise of the Debtors' business judgment under Bankruptcy Rule 9019.  The Debtor/Estate Release is fair and equitable, is a key component of the Plan, and otherwise constitutes a settlement of Claims and Causes of Action under section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Releases of the Released Parties by the Debtors and the other Debtor/Estate Releasors are critically important to the success of the Plan, which embodies the settlement of certain claims with the Debtors' primary stakeholders, including the Cash Flow DIP Lender and its Related Persons and implements the concessions and compromises made by the parties to the restructuring transactions contemplated by the Plan.  Each of the Released Parties afforded value and provided consideration to the Debtors and Estates, aided in the reorganization process and played an integral role in the formulation and implementation of the Plan. The Plan reflects the settlement and resolution of several complex issues, and the Debtor/Estate Release is an integral part of the consideration to be provided in exchange for the compromises and resolutions embodied in the Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the Debtor/Estate Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor/Estate Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (b) a good faith settlement and compromise of the Claims and Causes of Action released by the Debtor/Estate Release; (c) in the best interests of the Debtors, the  Estates and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after

due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Liquidating Trust,

or the Debtors' respective Estates asserting any Claim or Cause of Action released pursuant to the

Debtor/Estate Release.

c.   **Third Party Release**.  The Third Party Release set forth in Section 16.2(b) of the Plan is an essential provision of the Plan.  The Confirmation Hearing Notices, Ballots, and Voting Instructions explicitly and conspicuously stated that potential Releasing Parties could opt out of the Third Party Release and included the language of the Third Party Release.   Thus, each Releasing Party was given due and adequate notice that they would be granting the Third Party Release by failing to opt out of the Third Party Release prior to the deadline to do so.  Accordingly, the Third Party Release is consensual.  The Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the Confirmation of the Plan, important to the overall objectives of the Plan and an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) materially beneficial to, and in the best interests of the Debtors and their respective Estates and stakeholders; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release; (i) within the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); and (j) consistent with sections 105, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code.

d.      **Exculpation**.  The exculpation provisions set forth in Section 16.1 of the Plan are essential to the Plan.  The record in these Chapter 11 Cases fully supports the exculpation provisions set forth in Section 16.1 of the Plan.

e.      **Injunction.**  The injunction provisions set forth in Section 16.3 of the Plan are essential to the Plan and are necessary to implement the Plan and to preserve and enforce the Debtor/Estate Release, the Third Party Release, and the exculpation provisions in  Section 16.1 of the Plan.

V.      **Debtors' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).** Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtors have complied with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1122, 1123, 1124, 1125, and 1126 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Plan Procedures Order governing notice, disclosure, and solicitation in connection with the Plan, the Plan Supplement, and all other matters considered by this Court in connection with the chapter 11 cases.

W.      **Plan Proposed in Good Faith and Not by Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).** The Debtors have proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, this Court has examined the totality of the circumstances surrounding the filing of the chapter 11 cases, the Plan itself, and the process leading to its formulation. The Plan is the result of extensive arm's length negotiations among the Debtors, the Committee and the Cash Flow DIP Lender. It is clear that the Plan promotes the objectives and purposes of the Bankruptcy Code.

X.      **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).** The procedures set forth in the Plan for this Court's approval of the fees, costs, and expenses to be paid

13

in connection with the chapter 11 cases, or in connection with the Plan and incident to the chapter 11 cases, satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

Y.    **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).** Upon the occurrence of the Effective Date, each of the Debtors' directors and officers shall be deemed to have resigned. The initial Liquidating Trustee is identified in the Section 14.5(a) of the Plan and shall be appointed as the sole remaining officer and director of both of the Debtors.  The initial Oversight Committee members shall be Eric Knight, Gerry Tywoniuk and David Galfus.  Thus, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

Z.    **No Rate Changes (11 U.S.C. § 1129(a)(6)).**  After the Confirmation Date, the Debtors will not have any businesses involving the establishment of rates over which any regulatory commission has or will have jurisdiction.   Therefore, the provisions of section 1128(a)(6) do not apply to the Plan.

AA.    **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).** The "best interests" test is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Interest in such Impaired Classes will receive or retain property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

BB.    **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).** Class 1 (Priority Non-Tax Claims) and Class 2 (Other Secured Claims) are left unimpaired under the Plan.  Each of Class 5 (Prepetition LVS II Offshore Guaranty Claims) and Class 6 (General Unsecured Claims) has voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes. Class 3 (Secured Prepetition Facility Claims) and Class 7

(Interests), is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, section 1129(a)(8) of the Bankruptcy Code has not and cannot be satisfied. The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

No claims were identified and assigned to Class 4 (Loan Settlement Claims). As such, Class 4 is not included the tabulation results.

CC.    **Treatment of Administrative Claims, Professional Fee Claims, Priority Tax Claims, and Other Priority Claims (11 U.S.C. § 1129(a)(9)).** The treatment of Administrative Claims, Priority Tax Claims and Professional Fee Claims, and other Priority Claims pursuant to Sections II and III of the Plan satisfies section 1129(a)(9) of the Bankruptcy Code.

DD.    **Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).** Class 6 (General Unsecured Claims) is an Impaired Class of Claims that voted to accept the Plan, determined without including any acceptance of the Plan by any insider. Therefore, section 1129(a)(10) of the Bankruptcy Code is satisfied.

EE.    **Feasibility (11 U.S.C. § 1129(a)(11)).** The Plan provides for the dissolution of the Debtors as soon as practicable after the Effective Date and the liquidation of the Debtors' property. Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied. The Debtors have ceased originating and servicing loans and have started the process of winding down their businesses prior to the Confirmation Hearing.

FF.    **Payment of Fees (11 U.S.C. § 1129(a)(12)).** All fees payable under 28 U.S.C. § 1930 have been paid or will be paid on or before the Effective Date pursuant to the Plan, thus satisfying section 1129(a)(12) of the Bankruptcy Code.

GG.    **Miscellaneous    Provisions    (11    U.S.C.    §§ 1129(a)(13)-(16)).**    Sections 1129(a)(13)-(16) of the Bankruptcy Code are inapplicable to Confirmation, as the Debtors (i) are not obligated to pay retiree benefits (as defined in section 1114(a) of the Bankruptcy Code) (section 1129(a)(13)), (ii) have no domestic support obligations (section 1129(a)(14)), (iii) are not individuals (section 1129(a)(15)), and (iv) are not nonprofit corporations (section 1129(a)(16)).

HH.    **No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C. § 1129(b)).** Class 3 voted against the Plan.  The holders of Class 3 Claims hold Secured Prepetition Facility Claims in unliquidated amounts.  The amount of each Class 3 Claim will be determined by whether the holder of such Class 3 Claim liquidates its collateral in an amount in excess of the obligations set forth in each Prepetition Repo Agreement.  If a holder of a Class 3 Claim liquidates its collateral in an amount that exceeds the obligations in its corresponding Prepetition Repo Agreement, such holder will have a $0 Claim.  The Plan is fair and equitable to the holders of Class 3 Claims because the Plan provides that Class 3 Claims will receive their collateral or the value of their collateral or the indubitable equivalent thereof.

The classification and treatment of Interests in Class 7 (Interests), which is deemed to have rejected the Plan, is proper pursuant to section 1122 of the Bankruptcy Code, does not discriminate unfairly, and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy Code. There is no Class of Claims or Interests junior to the Holders of Interests in Class 7 that will receive or retain property under the Plan on account of their Claims or Interests. Accordingly, the Plan does not violate the absolute priority rule, does not discriminate unfairly, and is fair and equitable with respect to each Class that is deemed to have rejected the Plan. Thus, the Plan satisfies section 1129(b) of the Bankruptcy Code with respect to Classes 3 and 7.

II.     **Only One Plan (11 U.S.C. § 1129(c)).** The Plan is the only chapter 11 plan currently proposed in the chapter 11 cases, and section 1129(c) of the Bankruptcy Code is therefore satisfied.

JJ.     **Principal Purpose (11 U.S.C. § 1129(d)).** The principal purpose of the Plan is neither the avoidance of taxes, nor the avoidance of the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to Confirmation on any such grounds. Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable.

KK.     **Satisfaction of Confirmation Requirements.** Based upon the foregoing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code, and should be confirmed.

LL.     **Good Faith Solicitation (11 U.S.C. § 1125(e)).** The Debtors and their officers, directors, employees, advisors, Professionals Persons, and agents have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code, and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order in connection with all of their respective activities relating to the solicitation of acceptances of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and they are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the injunction and exculpation provisions set forth in Article 16 of the Plan and in this Confirmation Order.

MM.     **Implementation**.   All documents and agreements necessary to implement transactions contemplated by the Plan, including those contained or summarized in the Plan Supplement (including, among others, the Liquidating Trust Agreement), have been negotiated in good faith and at arms'-length, are in the best interests of the Debtors and their Estates, and shall,

upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law. The Debtors and the Liquidating Trustee, as applicable, are authorized to take any action reasonably necessary or appropriate to consummate such agreements and the transactions contemplated thereby.

NN.    **Retention of Jurisdiction.** This Court may properly retain jurisdiction over the matters set forth in Section 18 of the Plan and/or section 1142 of the Bankruptcy Code.

OO.    **Sale.** On September 29, 2022, the Bankruptcy Court entered the Order: (A) Approving Bidding Procedures for One or More Sales or the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief (Docket No. 499) (the "Bidding Procedures Order and Sale Motion"). In accordance with the Bidding Procedures Order and Sale Motion, LVS II SPE XXXIV LLC and/or its designee (the "LVS Bidder") submitted a letter of intent dated October 20, 2022 for purposes of submitting a bid to take title to certain of the Debtors' intellectual property and other assets referred to in the Attachment 1 thereto (the "IP-Related Assets"). The hearing on the Bidding Procedures Order and Sale Motion has been adjourned until after the anticipated Effective Date of the Plan.

**Based upon the foregoing findings, and upon the record made before this Court at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby ORDERED, ADJUDGED AND DECREED THAT:**

## Confirmation of the Plan

1.    The Plan, as and to the extent modified by this Confirmation Order, is approved and confirmed pursuant to section 1129 of the Bankruptcy Code. Any objections to the Plan not otherwise withdrawn, resolved, or otherwise disposed of are overruled and denied.

2.    The terms of the Plan are incorporated by reference into (except to the extent modified by this Confirmation Order), and are an integral part of, this Confirmation Order.

## Final Approval of the Disclosures

3.    The Disclosures are approved as adequate on a final basis pursuant to Section 1125 of the Bankruptcy Code.

## Compromises and Settlements Under the Plan

4.    Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, upon the Effective Date, all settlements and compromises set forth in the Plan, including the Committee Settlement, or announced on the record at the Confirmation Hearing are approved in all respects, and constitute good faith compromises and settlements.

## Classification and Treatment

5.    The Plan's classification scheme is approved. The classifications set forth on the Ballots (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan, (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims under the Plan for distribution purposes, (c) may not be relied upon by any Holder as representing the actual classification of such Claim under the Plan

for distribution purposes, and (d) shall not be binding on the Debtors and the Liquidating Trustee except for Plan voting purposes.

### **Authorization to Implement the Plan**

6.      The Debtors and the Liquidating Trustee, as applicable, are authorized to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan, and to execute, enter into, or otherwise make effective all documents arising in connection therewith, including, without limitation, all Plan Documents, prior to, on, and after the Effective Date.

7.      On the Effective Date, the officers of the Debtors and the Liquidating Trustee are authorized to do all things and to execute and deliver all agreements, documents, instruments, notices, and certificates as are contemplated by the Plan and to take all necessary actions required in connection therewith, in the name of and on behalf of the Debtors.   In accordance with Bankruptcy Code section 1142(b), upon the entry of this Confirmation Order, the Debtors, and the Liquidating Trustee, each acting by and through its respective officers and agents, are authorized to take any and all actions necessary or appropriate to implement the Plan, including, without limitation, (i) consummating the Committee Settlement; (ii) forming the Liquidating Trust, entering into the Liquidating Trust Agreement (substantially in the form attached hereto as Exhibit B), and complying with, and satisfying the obligations set forth under, the Liquidating Trust Agreement; and (iii) complying with, and satisfying the obligations set forth under, the Plan, in each case, without any further order of the Court.  The Liquidating Trust shall be deemed for all purposes to have been created in connection with the Plan and this Confirmation Order.  On the Effective Date, each of the Debtors' then-current directors and officers shall be deemed to have resigned and the Liquidating Trustee shall automatically be the sole remaining officer and director of the Debtors, without the need for any meeting of or resolution by the Board of Directors.

Following the Effective Date, the Liquidating Trustee is given full power of attorney and has authority to execute and/or endorse any documentation on behalf of the Debtors in furtherance of the Plan and the Debtors' liquidation, including, but not limited to, authorizing the transfer of title to the IP-Related Assets pursuant to the Bidding Procedures Order and Sale Motion or to the Liquidating Trust.

8.    The approvals and authorizations specifically set forth in this Confirmation Order are not intended to limit the authority of the Liquidating Trustee, the Debtors, or any officer thereof to take any and all actions necessary or appropriate to implement, effectuate, and consummate any and all documents or transactions contemplated by the Plan or this Confirmation Order.

9.    For the avoidance of doubt, the Plan and this Confirmation Order in no way authorize or approve any incentive payments under sections 105 or 503 of the Bankruptcy Code.

### Enforceability of the Plan

10.    Pursuant to sections 1123(a), 1141(a) and 1142 of the Bankruptcy Code, the Plan and all Plan Documents (including, but not limited to, the Liquidating Trust Agreement) shall be, and hereby are, valid, binding and enforceable.  The current form of the Liquidating Trust Agreement is attached as Exhibit B to this Order.

11.    Except to the extent otherwise provided in this Confirmation Order and the Plan and pursuant to Section 15 of the Plan, on the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust all of their rights, title, and interest in and to all of the Liquidating Trust Assets, then held by the Debtors free and clear of all liens, claims, and encumbrances,  provided, however, that title to the IP-Related Assets shall remain with the Debtors until they are either sold pursuant to the Bidding Procedures Order and Sale Motion or transferred to the Liquidating Trust; provided, further, however, that notwithstanding anything to the contrary in the Plan or this Confirmation Order, so

21

long as title to any assets, including the IP-Related Assets, remain with the Debtors, the Cash Flow DIP Liens (as defined in the Final Cash Flow DIP Order) shall continue to attach to such assets, including the IP-Related Assets, to secure the Debtors' obligations under, and pursuant to the terms of, the Cash Flow DIP Documents.

### Preservation of Causes of Action and Litigation

12.    Except as otherwise provided in the Plan or this Confirmation Order (a) in accordance with Section 1123(b)(3) of the Bankruptcy Code and Sections 14.7 and 15 of the Plan, any retained Causes of Action or Litigation that the Debtors may hold against any Entity shall vest upon the Effective Date in the Liquidating Trust and (b) after the Effective Date, the Liquidating Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action and Litigation, in accordance with the terms of the Plan and the Liquidating Trust Agreement and without further order of this Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases.

### Reservation of Causes of Action and Litigation

13.    Unless a Cause of Action or Litigation against a holder or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including this Confirmation Order), including pursuant to the Debtor/Estate Release or the Third Party Release, the Debtors and the Liquidating Trustee expressly reserve such Cause of Action or Litigation  for later adjudication by the Liquidating Trustee, including, without limitation, Causes of Action or Litigation not specifically identified or described in the Plan Supplement or elsewhere or of which the Debtors may presently be unaware or which may arise or exist by reason of

additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist. No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action or Litigation upon, after, or as a consequence of the Confirmation or Consummation or after the entry of this Confirmation Order or Effective Date based on the Plan, or this Confirmation Order, except where such Causes of Action or Litigation have been released in the Plan or any other Final Order. The Debtors and Liquidating Trustee's rights to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

### **Wind-Up and Dissolution of the Debtors**

14.     The Debtors shall be dissolved as provided in the Plan and this Confirmation Order after title to the IP Related Assets are either sold pursuant to the Bidding Procedures Order and Sale Motion or transferred to the Liquidating Trust.  On the Effective Date and after title to the IP Related Assets are either sold pursuant to the Bidding Procedures Order and Sale Motion or transferred to the Liquidating Trust or as soon thereafter as is reasonably practicable, the Liquidating Trustee shall wind-up the affairs of the Debtors, if any, subject to the Plan, the Confirmation Order and the Liquidating Trust Agreement, and the Liquidating Trustee shall prepare and file (or cause to be prepared and filed) on behalf of the Debtors, all tax returns, reports, certificates, forms, or similar statements or documents (collectively, "Tax Returns") required to be filed or that the Liquidating Trustee otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds, for all taxable periods ending on, prior to, or after the Effective

23

Date. In connection therewith, the Debtors and the Liquidating Trustee are authorized to surrender to the applicable governmental authorities all licenses that the Debtors used to operate their business to the extent they have not already done so to date.

## Cancellation of Interests, Existing Securities, and Agreements

15.     On the Effective Date, except to the extent otherwise provided in the Plan or in this Confirmation Order, all notes, instruments, certificates, and other documents evidencing Claims or Interests, shall be deemed cancelled and surrendered without any need for a holder of a Claim or Interest (a "Holder") to take further action with respect thereto and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged; *provided*, *however*, that notwithstanding Confirmation or Consummation, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan; *provided further*, *however*, that on the Effective Date all Interests shall be deemed cancelled and extinguished. Holders of Interests shall not receive any distribution or retain any property pursuant to the Plan.

## Method of Distribution Under the Plan

16.     The Liquidating Trustee shall make all distributions required to be made to Holders of Allowed Claims pursuant to the Plan and the Liquidating Trust Agreement. The Liquidating Trust shall hold and distribute the Liquidating Trust Assets, the  Professional Fee Reserve and the Disputed Claim Reserve in accordance with the provisions of the Plan and the Liquidating Trust Agreement.

17.     The Liquidating Trustee shall make all distributions required to be made to such Holders of Allowed Claims pursuant to the Plan and the Liquidating Trust Agreement. The Liquidating Trustee shall not be required to give any bond or surety or other security for the performance of the Liquidating Trustee's duties as disbursing agent unless otherwise ordered by

this Court.  At the option of the Liquidating Trustee, any Cash payment to be made from the Liquidating Trust by any means deemed appropriate by the Liquidating Trustee, including by check or wire transfer or as otherwise required or provided in applicable agreements.

## The Liquidating Trust

18.    **Administration of the Liquidating Trust**.  The Liquidating Trust Agreement, substantially in the form attached hereto as Exhibit B, is hereby approved.  The appointment of FTI Consulting as the initial Liquidating Trustee and the retention of the professionals by the Liquidating Trust, on the terms set forth in the Plan and Liquidating Trust Agreement, is hereby approved.  The Liquidating Trustee shall be compensated in the manner set forth in and consistent with the Liquidating Trust Agreement. The Liquidating Trustee and the Oversight Committee shall both have all powers, rights, duties and protections afforded the Liquidating Trustee and the Oversight Committee, respectively, under the Plan, this Confirmation Order, and the Liquidating Trust Agreement.

19.    **Interests in the Liquidating Trust**. There shall be one class of interests in the Liquidating Trust. The Liquidating Trust shall issue the Liquidating Trust Interests to the Holders of Cash Flow DIP Claims and Class 6 Claims in accordance with Sections 8.4(b), 10.6 and 14.5 of the Plan. Liquidating Trust Interests shall be uncertificated. Beneficiaries of the Liquidating Trust Interests shall be bound by the Liquidating Trust Agreement.

20.    **Liquidating Trust Assets**.  The Liquidating Trust shall consist of the Liquidating Trust Assets. On the Effective Date, the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all liens, claims, and encumbrances, except to the extent otherwise provided in the Plan, including, without limitation, pursuant to Sections 14.5 and 15.3 of the Plan or in this Confirmation Order. The transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect any attorney-client privilege, the work-product privilege, and any other applicable

evidentiary privileges of the Debtors, which such privileges shall be expressly transferred and assumed by the Liquidating Trust.

21.     **Distribution of Liquidating Trust Assets.**  The Liquidating Trustee shall distribute the appropriate net proceeds of the Liquidating Trust Assets to the Beneficiaries pursuant to the terms of the Plan and the Liquidating Trust Agreement.

22.     The Liquidating Trustee shall utilize, in accordance with the Liquidating Trust Agreement and the Plan, Cash from the Liquidating Trust Assets Account in amounts sufficient to (i) fund costs and expenses of the Liquidating Trust, including, without limitation, the fees and expenses of the Liquidating Trustee, its professionals, and the professionals retained in these cases, (ii) compensate the Liquidating Trustee, and (iii) satisfy other liabilities incurred by the Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement (including any taxes imposed on the Liquidating Trust or in respect of the Liquidating Trust Assets).

## Executory Contracts and Unexpired Leases

23.     The assumption of the executory contracts or unexpired leases identified on the list filed with the Plan Supplement or separately (the "Assumed Executory Contract and Unexpired Leases List"), including, without limitation, any Insurance Policies being assumed, is approved.

24.     Except any executory contract or unexpired lease (a) identified on the Assumed Executory Contracts and Unexpired Leases List including without limitation, any assumed Insurance Policies, (b) which is the subject of a separate motion or notice to assume or reject filed by the Debtors and pending as of the Confirmation Hearing, (c) that previously expired or terminated pursuant to its own terms, or (d) that was previously assumed or rejected by any of the Debtors, each of the Debtors' other executory contracts and unexpired leases shall be deemed rejected as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code and such rejection is approved.

25.     Subject to paragraphs 46 and 47, each executory contract and unexpired lease assumed pursuant to the Plan or by Order of this Court, and not assigned to a third party on or prior to the Effective Date, shall be transferred to the Liquidating Trust and be deemed a Liquidating Trust Asset.

26.     **Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim arising from the rejection of executory contracts or unexpired leases ("Rejection Claims") pursuant to Confirmation of the Plan or otherwise must be Filed with the Claims and Balloting Agent no later than the later of 30 days after the Effective Date or 30 days after the effective date of rejection. Rejection Claims shall be classified as Class 6 General Unsecured Claims and shall be treated in accordance with Section 10.6 of the Plan, as applicable. Any Rejection Claims that are not timely filed pursuant to Section 13 of the Plan or this Confirmation Order shall be forever disallowed and barred**.

## Disputed Claims

27.     Except as otherwise provided in the Plan, the Liquidating Trustee shall have the right to object to all Claims on any basis.  Subject to further extension by the Bankruptcy Court with or without notice, the Liquidating Trustee may object to the allowance of all Claims on or before the Claim Objection Deadline. From and after the Effective Date, the Liquidating Trust shall succeed to all of the rights, defenses, offsets, and counterclaims of the Debtors and the Estates in respect of all Claims, and in that capacity shall have the exclusive power to prosecute, defend, compromise, settle, and otherwise deal with all such objections.

28.     **All objections to Claims shall be Filed by the Claims Objection Deadline;** *provided*, **that no such objection may be filed with respect to any Claim or Interest after a Final Order has been entered Allowing such Claim or Interest.**

**Administrative Claims**

29.     **All requests for payment of an Administrative Claim (other than a Professional Fee Claim) arising or deemed to have arisen after September 30, 2022 must be filed with this Court and served to the Debtors, the Liquidating Trustee and the Cash Flow DIP Lender on or before the date that is 60 days after the Effective Date.**  In the event of an objection to allowance of an Administrative Claim, this Court shall determine the Allowed amount of such Administrative Claim.  Nothing herein shall be deemed to extend existing deadlines established for filing certain Administrative Claims, including pursuant to the Bar Date Order.

**Professional Fee Claims Reserve Account and Professional Fee Claims**

30.     On or as soon as practicable after the Effective Date, Liquidating Trustee shall establish the Professional Fee Reserve and fund such reserve in an amount equal to the estimated Professional Fee Claims.  The Professional Fee Reserve shall be used solely for the payment of Allowed Professional Fee Claims in accordance with Section 8.3 of the Plan.

31.     **All final applications for payment of Professional Fee Claims must be Filed with this Court and served on the Debtors,  the Liquidating Trustee, and the U.S. Trustee on or before 45 days after the Effective Date or such later date as may be agreed to by the Liquidating Trustee.**   Upon approval of the fee applications by the Bankruptcy Court, the Liquidating Trustee shall pay Professionals from the Professional Fee Reserve all of their respective Allowed Professional Fee Claims.

32.     For the avoidance of doubt neither the amount of the Allowed Professional Fee Claims for any Professional, nor the amount included in the Professional Fee Reserve for such Professional, shall exceed the line-item amount for such Professional set forth in the Approved DIP Budget; *provided, however*, to the extent Allowed Professional Fee Claims of Professionals retained by the Committee exceed the amount(s) set forth in the Approved DIP Budget, such

Professional(s) shall be paid such additional amounts from the GUC Share of Net Liquidating Trust Proceeds subject to approval by the Bankruptcy Court.

33.    The Professional Fee Reserve shall be closed once all required payments have been made.  Any funds remaining in the Professional Fee Reserve after all required payments have been made shall be transferred to the Cash Flow DIP Lender.

**Release, Injunction, Exculpation and Related Provisions**

34.    The release, injunction, exculpation, and related provisions set forth in Article 16 of the Plan are hereby approved and authorized in their entirety, and such provisions are effective and binding on all Persons and Entities as and to the extent provided for therein.

35.    **Debtor Releases**. Notwithstanding anything in the Plan to the contrary, subject to paragraphs 45, 46 and 47 of this Order, and pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after and subject to the occurrence of the Effective Date, the Debtors and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action, by, through, for, or because of the foregoing entities (collectively, the "Debtor/Estate Releasors"), hereby release (the "Debtor/Estate Release") each Released Party, and each Released Party is deemed released by the Debtor/Estate Releasors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor/Estate Releasors, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor/Estate Releasors would have been legally entitled to assert in its own right, or on behalf of the holder of any Claim or Interest or other entity, based on

or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Debtors' liquidation, the Chapter 11 Cases, the purchase, sale, transfer of any security, asset, right, or interest of the Debtors and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party (including pursuant to the Prepetition Bridge Loan Agreement, the Cash Flow DIP Documents, the DIP Repo Facility Agreement, DIP BCI MSFTA, or DIP Netting Agreement), the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of, or solicitation of votes on, the Plan or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, actual fraud, bad faith, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction) but in all respects such Released Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; provided, that the foregoing Debtor/Estate Release shall not operate to waive or release any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan; and further provided that nothing herein shall act as a discharge of the Debtor.

Entry of this Confirmation Order shall constitute the Bankruptcy Court's approval, of the Debtor/Estate Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor/Estate Release is: (a) in exchange for the good and valuable consideration provided by the

Released Parties; (b) in the best interests of the Debtors, the Estates and all holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Debtor/Estate Releasors asserting any Claim or Cause of Action released pursuant to the Debtor/Estate Release.

36.    **Release by Holders of Claims and Interests**. Notwithstanding anything in the Plan to the contrary, subject to paragraphs 45, 46 and 47 of this Order , on and after and subject to the occurrence of the Effective Date, each of the Releasing Parties hereby release (the "Third Party Release") each Released Party, and each of the Debtors, the Estates, and the Released Parties is hereby deemed released from, any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of any of the Debtors or the Estates, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Debtors' liquidation, the Chapter 11 Cases, the purchase, sale, transfer of any security, asset, right, or interest of the Debtors and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Combined Plan and Disclosure Statement, the business or contractual arrangements between the Debtor and any Released Party (including pursuant to the Prepetition Bridge Loan Agreement, the Cash Flow DIP Documents, the DIP Repo Facility Agreement, DIP BCI MSFTA, or DIP Netting Agreement), the restructuring of Claims and Interests prior to or in

31

the Chapter 11 Cases, the negotiation, formulation, or preparation of, or solicitation of votes on,

the Plan or related agreements, instruments, or other documents or any other act or omission,

transaction, agreement, event, or other occurrence relating to the Debtors taking place on and

before the Effective Date, other than claims or liabilities arising out of or relating to any act or

omission of a Released Party that constitutes willful misconduct, actual fraud, bad faith, or gross

negligence (in each case subject to determination of such by final order of a court of competent

jurisdiction) but in all respects such Released Parties shall be entitled to reasonably rely upon the

advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

Notwithstanding anything to the contrary in the foregoing, the Third Party Release shall not release

any obligations of any party under the Plan or any other document, instrument, or agreement

executed to implement the Plan.

Entry of this Confirmation Order shall constitute the Bankruptcy Court's approval of the

Third Party Release, which includes by reference each of the related provisions and definitions

contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third

Party Release is: (a) in exchange for the good and valuable consideration provided by the Released

Parties; (b) in the best interests of the Debtors and all holders of Claims and Interests; (c) fair,

equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and

(e) a bar to any of the Releasing parties asserting any Claim or Cause of Action released pursuant

to the Third Party Release.

37.    **Release of Liens**. Except as otherwise provided in the Plan, this Confirmation

Order or in any contract, instrument, release, or other agreement or document created pursuant to

the Plan, and subject to paragraphs 45, 46 and 47 of this Order, on the Effective Date and transfer

to the Liquidating Trust, all mortgages, deeds of trust, Liens, pledges, or other security interests

against any property of the Debtors and their Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns, including the Liquidating Trust, in accordance with the Plan.

38.    **Exculpation**. The Exculpated Parties will neither have nor incur any liability (the "Exculpation") to any entity for any action in good faith taken or omitted to be taken between the Petition Date and Effective Date in connection with or related to the Chapter 11 Cases, the sale or other disposition of the Debtors' assets or the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Plan or any agreement created or entered into in connection with the Plan; provided, however, that this limitation will not affect or modify the obligations created under the Plan, or the rights of any holder of an Allowed Claim to enforce its rights under the Plan, and shall not release any action (or inaction) constituting willful misconduct, fraud, bad faith, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction); provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan, and such reasonable reliance may be asserted as a  form a defense to any such claim, Cause of Action, or liability.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes on the Plan and, therefore, are not, and will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or Distributions made pursuant to the Plan. The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability. Without limiting the generality of the foregoing,

each Debtor, each Estate, and each Exculpated Party shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code. Notwithstanding anything to the contrary in the foregoing, the releases and exculpations set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed or deemed executed to implement the Plan, or any executory contract or unexpired lease assumed during the Chapter 11 Cases or under the Plan.

Entry of this Confirmation Order shall constitute the Bankruptcy Court's approval of the Exculpation, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Exculpation is: (a) in exchange for the good and valuable consideration provided by the Exculpated Parties; (b) in the best interests of the Debtors and all holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any party from asserting any Claim or Cause of Action released pursuant to the Exculpation.  For the avoidance of doubt, the Exculpated Parties do not include employees of the Debtors.  Neither the Liquidating Trustee nor the Indemnified Parties will receive prospective exculpation for post-Effective Date acts or omissions.

39.    **Injunction**. In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtors, the Liquidating Trust, or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, the Estates, the Liquidating Trust, or any of the Liquidating Trust Assets with respect to

34

any such Claim or Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtors, the Estates, the Liquidating Trust, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; (c) creating, perfecting, or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Estates, the Liquidating Trust, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; and (d) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest, including, without limitation, the Debtor/Estate Release, the Third Party Release, or the Exculpation.  Nothing contained in this Section shall prohibit the holder of a timely filed Proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtors or the Liquidating Trust under the Plan.

## Resolution of Formal Objections to the Plan

40.    <u>United States Trustee</u>.  In order to resolve the US Trustee Objection, the Debtors have, among other things, revised Section 14.1 of the Plan and amended paragraph 38 above.

41.    <u>Customers Bank</u>.  The Customers Bank Objection has been resolved by adding or amending certain language in the Plan.  Notwithstanding anything to the contrary in the Plan or this Order, neither the Plan nor the Order shall in any way release, limit, modify, waive, or impede any and all rights, claims, causes of action, or defenses that Customers Bank, the LVS II Offshore Guarantor, or any other non-Debtor party may have against one another, including claims asserted in the action styled *Customers Bank v. LVS II Offshore, L.P.*, pending in the Court of Common Pleas of Berks County, Pennsylvania, Docket No. 22-13974.  Nothing contained in the Plan or this

Order shall or shall be deemed to limit or otherwise impair the rights of Customers Bank, or the Debtors or their Estates under the Customers Bank 559 Order.

42.     <u>Flagstar</u>.  The Flagstar Objection has also been resolved as a result of the changes that appear in this Order and in the Plan.  Nothing contained in the Plan or this Order shall or shall be deemed to limit or otherwise impair Flagstar's rights, or the Debtors or their Estates' rights, under the Flagstar Lift Stay Order.

43.     <u>WARN</u>.  The Debtors have resolved the WARN Objection through agreed revisions to the Plan.

44.     <u>Lynx</u>.  The Lynx Objection is hereby resolved.  Notwithstanding anything to the contrary in the Plan or this Order, Lynx Whole Loan Acquisition LLC's ("<u>Lynx</u>") rights, if any, to assert a claim against the Liquidating Trust or the Debtors, for constructive trust or otherwise, and to request that the Court order the Debtors or Liquidating Trust to segregate and hold in trust amounts required by the mortgage loan purchase and sale agreements between Lynx and FGMC are preserved, as are any and all of the Debtors', Liquidating Trusts' and the Cash Flow DIP Lenders' rights, if any, to assert defenses, including setoff or recoupment, by counterclaim or otherwise.

<b><u>Resolution of Informal Objections to the Plan</u></b>

45.     <u>United States of America</u>.  In resolution of an informal objection from the United States of America, the following language is hereby adopted and approved:

> Notwithstanding anything in the Plan, this Order, the Order in Aid of Confirmation or any Plan Supplement or other documents (collectively, "<u>Documents</u>"):

> As to the United States of America ("<u>United States</u>"), nothing in the Documents shall:

36

(1) discharge, release, enjoin, bar, impair or otherwise preclude (a) any obligation or liability owed to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code, (b) any claim of the United States arising after the Confirmation Date, (c) any obligation or liability of any entity or person under police or  regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee, licensee, or operator of property or rights to property that such entity or person owns, operates, licenses, or leases after the Confirmation Date; (d) any right, defense, claim, suit or cause of action of, or obligation or liability owed to, the United States on the part of any non-debtor; or (e) any claim, obligation, or liability preserved or established in the order authorizing the sale of mortgage servicing rights, Docket No. 390 (the "<u>Sale Order</u>");

(2) release, nullify, bar, enjoin or preclude the enforcement of any police or regulatory power;

(3) authorize the assumption, sale, assignment or other transfer of any federal or state (i) grants, (ii) grant funds, (iii) contracts, (iv) property, including but not limited to, intellectual property, data and patents, (v) leases, (vi) participation rights, (vii) agreements, (viii) applications, (ix) licenses, (x) permits, (xi) registrations, (xii) authorizations, (xiii) approvals, (xiv) any loans pooled for securitization with Ginnie Mae, (xv) any loans insured or guaranteed by the Federal Housing Administration ("<u>FHA</u>"), U.S. Department of Agriculture's Rural Housing Service ("<u>RHS</u>"), or U.S. Department of Veterans Affairs ("<u>VA</u>"), or (xvi) the discontinuation of any obligations thereunder (collectively, "<u>Federal Interests</u>"), without compliance by the Debtors and any purchaser with all terms of the Federal Interests, as applicable, and with all applicable non-bankruptcy law;

(4) be interpreted to set cure amounts or to require the United States to novate, approve or otherwise consent to the assumption, sale, assignment or transfer of any Federal Interests;

(5) confer exclusive jurisdiction to the Bankruptcy Court with respect to the Federal Interests, claims, rights, defenses, obligations, liabilities, and causes of action, except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code);

(6) waive, alter, or otherwise limit the United States' rights with respect to the Federal Interests, including but not limited to, licenses, permits, authorizations; loans insured or guaranteed by FHA, RHS or VA, and loans pooled for securitization for Ginnie Mae;

(7) affect any setoff or recoupment rights and defenses of the United States and such rights and defenses are preserved;

(8) constitute an approval or consent by the United States without compliance with all applicable legal requirements and approvals under non-bankruptcy law;

(9) be construed as a compromise or settlement of any claim, right, obligation, liability, cause of action, or interest of the United States;

(10) modify the scope of Bankruptcy Code Section 502 with respect to the claims of the United States;

(11) require the United States to file an administrative claim in order to receive payment for any liability described in Section 503(b)(1)(B) and (C) pursuant to Section 503(b)(1)(D) of the Bankruptcy Code;

(12) make prospective determinations as to the pre-petition nature of any Federal Interest;

(13) enjoin or estop the United States from asserting against the Debtors any claim, liability or obligation assumed by any purchaser that the United States would otherwise be entitled to assert against the Debtors and the Debtors' estates under applicable law; or

(14) require the United States to file any rejection damages claims, if any, earlier than December 27, 2022, the date by which Governmental Units must file unsecured proofs of claim [Dkt. 382] (the "Government Bar Date"), unless the order authorizing the rejection of an executory contract with a Governmental Unit, if any, establishes a date later than December 27, 2022, to file proofs of claim for rejection damages, or alter the treatment of rejection damages claims, if any, under the Bankruptcy Code.

Administrative expense claims of the United States allowed pursuant to the Plan or the Bankruptcy Code shall accrue interest and penalties as provided by non-bankruptcy law until paid in full; provided however, that nothing contained herein shall prohibit the Liquidating Trustee from objecting to or seeking a waiver of any penalties. Priority Tax Claims of the United States allowed pursuant to the Plan or the Bankruptcy Code will be paid in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. To the extent allowed Priority Tax Claims (including any penalties, interest or additions to tax entitled to priority under the Bankruptcy Code) are not paid in full in cash on the Effective Date, then such Priority Tax Claims shall accrue interest commencing on the Effective Date at the rate set forth in Section 511 of the Bankruptcy Code. Moreover, nothing shall affect a release, injunction or otherwise preclude any claim whatsoever against any Debtor or any of the Debtors' Estates by or on behalf of the United States for any liability arising a) out of pre-petition or post-petition tax periods for which a return has not been filed or b) as a result of a pending audit or audit that may be performed with respect to any pre-petition or post-petition tax period. Further, nothing shall enjoin the

United States from amending any claim against any Debtor or any of the Debtors' Estates with respect to any tax liability a) arising out of pre-petition or post-petition tax periods for which a tax return has not been filed or b) from a pending audit or audit that may be performed with respect to any pre-petition or post-petition tax period. Any liability arising a) out of pre-petition or post-petition tax periods for which a return has not been filed or b) as a result of a pending audit or audit which may be performed with respect to any pre-petition or post-petition tax period shall be paid in accordance with 1129(a)(9)(A) and (C) of the Bankruptcy Code. Without limiting the foregoing but for the avoidance of doubt, nothing contained in the Documents shall be deemed to bind the United States to any characterization of any transaction for tax purposes or to determine the tax liability of any person or entity, including, but not limited to, the Debtors and the Debtors' estates, nor shall the Documents be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Plan, nor shall anything in the Documents be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under Section 505 of the Bankruptcy Code. Nothing in these paragraphs impacts rights or obligations under previously entered Sale Order.

Notwithstanding anything in the Documents, the Debtors, Liquidating Trustee and any purchaser shall abide by and comply with all federal statutes, regulations, rules, policies and procedures, including, without limitation, (1) all applicable Ginnie Mae statutes, regulations, rules, policies and procedures, including, without limitation, 12 U.S.C. § 1721(g), 12 U.S.C. §§ 1716 et seq. and 24 C.F.R. parts 300 - 310; (2) the Ginnie Mae Guide, all Ginnie Mae guaranty agreements, MBS prospectus documents, escrow agreements, unilateral notification, notices of violation, supplements, addendums, amendments, and related documents or agreements, (collectively, the "Ginnie Mae Agreements"); (3) all applicable FHA statutes, regulations, rules, policies and procedures, including, without limitation, 12 U.S.C.§§ 1702 – 1715z-25 and 24 C.F.R. parts 201 – 203 and 206; (4) FHA handbooks, mortgagee letters,  indemnification agreements, and any other documents or agreements; (5) all RHS statutes, regulations, rules. Policies and procedures, including, without limitation,  42 U.S.C. §§ 1471 et seq. and 7 C.F.R. part 3555; (6) all RHS participation agreements, user agreements, guaranty agreements and other documents or agreements; (7) all VA statutes, regulations, rules, policies and procedures, including, without limitation, 38 U.S.C. §§ 3701 et seq., 38 C.F.R. part 36, and all administrative materials issued under such statutes or regulations; and (8) VA handbooks, user guides, circulars, audit letters, hold harmless agreements, and any other documents or agreements.

Further, the first paragraph of the Plan's Section 12.5 is deemed modified as follows with respect

to the United States:

Except as otherwise agreed or ordered by the Bankruptcy Court, any and all proofs of claim filed after the Government Bar Date shall not be treated as an Allowed Claim for purposes of Distribution without any further notice or action, and holders of such Claims may not receive any Distributions on account of such Claims, unless the Bankruptcy Court has entered an order deeming such Claim to be timely filed; provided, however, that this foregoing clause shall not apply to claims covered by 11 U.S.C. §503(b)(1)(D).

46.    <u>Federal Home Loan Mortgage Corporation</u>.  In resolution of an informal objection from the Federal Home Loan Mortgage Corporation ("<u>Freddie Mac</u>"), the following language is hereby adopted and approved:

Notwithstanding anything to the contrary in: (i) this Order; (ii) Plan; (iii) the Plan Supplement; (iv) the  Liquidating Trust Agreement; (v) any Order approving the sale or transfer of the Debtors' remaining assets and/or approving the assumption and assignment of executory contracts and/or unexpired leases; (vi) any Sale Transactions; (vii) any cure list filed in connection with the Plan, Plan Supplement or any Sale Transactions; (viii) any other Plan-related documents; (ix) the Order in Aid of Confirmation; and/or (x) in any exhibits, schedules or appendices to the foregoing (collectively, and as may be amended, the "<u>Plan/Sale-Related Documents</u>") – (A) FGMC's Servicing Contract (as defined in the Freddie Mac *Single-Family Seller/Servicer Guide*, the ("<u>Freddie Mac Guide</u>")[4] with the Federal Home Loan Mortgage Corporation ("<u>Freddie Mac</u>") has been assumed by FGMC as of September 15, 2022 pursuant to the *Order (I) Authorizing (A) Private Sale and (B) Transfer of Certain Servicing Rights to BSI Financial Services Free and Clear of Liens, Claims, Encumbrances, and Interests; (II) Approving the Terms of the Purchase and Sale Agreement; (III) Approving the Assumption and Assignment of Executory Contracts; and (IV) Granting Related Relief* (ECF No. 390) (the "<u>BSI Sale Order</u>") and, subject to Freddie Mac's consent and other applicable requirements under the Freddie Mac Agreements[5], shall be assigned to BSI as of November 1, 2022; (B) any and all Servicing Contract Rights held by FGMC for any loans that FGMC sold to, or serviced for, Freddie Mac (collectively,

---

[4] The Freddie Mac Guide is available on the AllRegs® website of ICE Mortgage Technology, Inc., which operates the AllRegs brand ("AllRegs") and which posts the Guide under license from and with the express permission of Freddie Mac at the following address:  https://www.allregs.com/tpl/public/fhlmc_freesite_tll.aspx).

Capitalized terms used, but not otherwise defined in this paragraph 46 of this Confirmation Order or in the Plan, shall have the meanings attributed to them in the Freddie Mac Guide.

[5] The "Freddie Mac Agreements" include, among other agreements, as applicable: the Freddie Mac Guide, the Freddie Mac *Single-Family Seller/Servicer Guide* Plus Additional Provisions, certain applicable Master Agreements, Purchase Contracts, Pricing Identifier Terms, supplements, addendums, Bulletins, directives, terms of business, Servicing Provisions, and any other agreements between the Debtors and Freddie Mac, as amended, restated or supplemented from time to time.

US_ACTIVE\122519033\V-18

the "Freddie Mac Loans") shall be transferred to BSI in accordance with the BSI Sale Order, subject to Freddie Mac's consent and other applicable Guide Requirements, on November 1, 2022 (except with respect to any Servicing Contract Rights relating to Freddie Mac Loans as to which Freddie Mac may otherwise have explicitly approved a different transfer date); and (C) other than with respect to rights and agreements set forth in (A) and (B) of this paragraph, no other actual or purported agreements with Freddie Mac, nor any other actual or purported rights or interests held or asserted by the Debtors with respect to Freddie Mac, shall be transferred, sold, assigned or otherwise conveyed to any other person or entity without Freddie Mac's explicit consent and without satisfying all requirements of all applicable Freddie Mac Agreements.

Notwithstanding anything to the contrary in the Plan/Sale-Related Documents, nothing shall limit, alter, impair, waive, discharge, release, enjoin or impact, in any way, the rights, payments, claims, indemnities, releases, and other protections provided to, or obligations owing to Freddie Mac under the: (1) *Order on Debtors' Motion for an Order (I) Approving a Settlement Agreement with Federal Home Loan Mortgage Corporation Pursuant to Fed. R. Bankr. P. 9019, (II) Authorizing the Sale of Certain Mortgage Loans, and (III) Granting Related Relief* (ECF No. 386) (the "Freddie Mac Settlement Order") and the Court-approved Settlement Agreement annexed to the Freddie Mac Settlement Order as Exhibit 1 (the "Freddie Mac Settlement Agreement"); (2) the BSI Sale Order; and/or (3) any other previous Order entered by this Court in these Chapter 11 Cases for which protections have been afforded to Freddie Mac (collectively, the Orders referenced in (1) through (3) of this paragraph, the "Freddie Mac Orders"), nor shall anything in the Plan/Sale-Related Documents limit, alter, impair, waive, discharge, release, exculpate, enjoin or impact, in any way, the obligations of (A) the Debtors under, or pursuant to, the Freddie Mac Orders and Freddie Mac Agreements (including, *without limitation*, the indemnification obligations provided to Freddie Mac pursuant to the Freddie Mac Settlement Order), (B) BSI under the BSI Sale Order and applicable Freddie Mac Agreements, or (C) any other person or entity subject to the Freddie Mac Agreements. For the avoidance of any doubt, except to the extent that Freddie Mac is satisfied that such obligation has been fulfilled in accordance with the terms of the Freddie Mac Settlement Agreement, Freddie Mac's rights, powers, prerogatives, remedies, payment or lien priorities, lien rights, security interests and claims against the Debtors or any other entity, including, without limitation,  in, under or with respect to, any Freddie Mac Loans or any Freddie Mac Agreements, or any rights to setoff or recoupment that Freddie Mac may have or assert, shall not be discharged, enjoined, impaired, released, modified, or limited in any respect and are all expressly preserved.

Each of the Debtors, the Liquidating Trust, and the Liquidating Trustee, as applicable, shall perform all remaining obligations under the Freddie Mac Orders and Freddie Mac Agreements whether arising prior to, or after, the Effective Date and are directed to maintain compliance with the Freddie Mac Orders and Freddie Mac Agreements. Freddie Mac shall not be required to take any other action to

41

preserve any of its rights, claims, or defenses against the Debtors, the estates or the Liquidating Trust, all of which are expressly preserved and shall survive entry of this Order, the Plan's discharge and injunction provisions, and the effectiveness of the Plan.  If the Debtors, the Liquidating Trust, or the Liquidating Trustee fail to satisfy all of the obligations owing to Freddie Mac, then Freddie Mac shall be permitted to seek recovery against the Debtors, or the Liquidating Trust (as applicable), and Freddie Mac shall reserve its rights, if any, to recovery against the Liquidating Trust.  Neither the automatic stay nor any post-confirmation injunction shall apply to Freddie Mac's exercise of any rights or remedies under the Freddie Mac Agreements, including, without limitation, with respect to Freddie Mac's rights to unilaterally terminate or transfer servicing of loans owned by Freddie Mac.

Immediately upon the entry of this Confirmation Order, the Debtors, the Liquidating Trust, and the Liquidating Trustee are authorized to enter into, and perform under, any agreements or settlements with Freddie Mac, including with respect to the resolution of claims, the termination of servicing rights, or the transfer of servicing rights, without further court approval or order.

Notwithstanding anything to the contrary in the Plan/Sale-Related Documents, Freddie Mac shall not be deemed a "Releasing Party" under the Third Party Releases granted pursuant to the Plan or this Confirmation Order, nor shall Freddie Mac be bound by any Third Party Releases granted in the Plan or this Confirmation Order; *provided, however*, that nothing shall limit, diminish, impair, waive or enjoin, in any way, the releases and indemnities provided to Freddie Mac under, or pursuant to, the Freddie Mac Settlement Order and the Freddie Mac Settlement Agreement.

To the extent that any conflict exists between paragraph 46 of this Confirmation Order and any other provision of the Confirmation Order or other Plan/Sale-Related Documents, the terms of this paragraph 46 shall explicitly supersede and control.

47.    <u>Federal National Mortgage Association.</u>  In resolution of an informal objection from the Federal National Mortgage Association ("<u>Fannie Mae</u>"), the following language is hereby adopted and approved:

<u>Fannie Mae</u>.  Notwithstanding anything to the contrary in: (i) this Confirmation Order; (ii) the Plan; (iii) the Plan Supplement; (iv) the Liquidating Trust Agreement; (v) any Order approving the sale or transfer of the Debtors' remaining assets and/or approving the assumption and assignment of executory contracts and/or unexpired leases; (vi) any Sale Transactions; (vii) any cure list filed in connection with the Plan, the Plan Supplement or any Sale Transactions; (viii) any other Plan-related documents; (ix) the Order in Aid of Confirmation; and/or (x) in any exhibits, schedules or appendices to the foregoing (collectively,

and as may be amended, the "Plan/Sale-Related Documents"), (A) pursuant to the Fannie Mae Settlement Agreement, (1) FGMC's responsibility for all Selling Representations and Warranties (as defined in the Fannie Mae Settlement Agreement) and all Servicing Obligations (as defined in the Fannie Mae Settlement Agreement) in each case associated with the Transfer Loans (as defined in the Fannie Mae Settlement Agreement) have been assumed by BSI as of September 15, 2022 pursuant to the Order (I) Authorizing (A) Private Sale and (B) Transfer of Certain Servicing Rights to BSI Financial Services Free and Clear of Liens, Claims, Encumbrances, and Interests; (II) Approving the Terms of the Purchase and Sale Agreement; (III) Approving the Assumption and Assignment of Executory Contracts; and (IV) Granting Related Relief (ECF No. 390) (the "BSI Sale Order"), (2) Fannie Mae has purchased from FGMC the Purchase Loans (as defined in the Fannie Mae Settlement Agreement), which were sold to Fannie Mae "servicing released" to BSI, and (3) upon completion of the Sale, Transfer and Loan Purchases (each as defined in the Fannie Mae Settlement Agreement), Fannie Mae will issue a letter confirming FGMC's voluntary termination of the Lender Contract (as defined the Fannie Mae Settlement Agreement, the "Fannie Mae Lender Contract"), including any rights to sell loans to, or service loans for, Fannie Mae; and (B) other than with respect to rights and agreements set forth in subclause (A) of this paragraph, no other actual or purported agreements with Fannie Mae, nor any other actual or purported rights or interests held or asserted by the Debtors with respect to Fannie Mae, shall exist or be transferred, sold, assigned or otherwise conveyed to any other person or entity.

Notwithstanding anything to the contrary in the Plan/Sale-Related Documents, nothing shall limit, alter, impair, waive, discharge, release, enjoin or impact, in any way, the rights, payments, claims, indemnities, releases, and other protections provided to, or obligations owing to Fannie Mae under the: (1) Order on Debtors' Motion for an Order (I) Approving a Settlement Agreement with Federal National Mortgage Association [sic] to Fed. R. Bankr. P. 9019, (II) Authorizing the Sale of Certain Mortgage Loans, and (III) Granting Related Relief (ECF No. 426) (the "Fannie Mae Settlement Order") and the Settlement Agreement (as defined in the Fannie Mae Settlement Order) (the "Fannie Mae Settlement Agreement"); (2) the BSI Sale Order; and/or (3) any other previous Order entered by this Court in these Chapter 11 Cases for which protections have been afforded to Fannie Mae (collectively, the Orders referenced in (1) through (3) of this paragraph, the "Fannie Mae Orders"), nor shall anything in the Plan/Sale-Related Documents limit, alter, impair, waive, discharge, release, exculpate, enjoin or impact, in any way, the obligations of (A) the Debtors under, or pursuant to, the Fannie Mae Orders and the Fannie Mae Lender Contract (including, without limitation, the indemnification obligations provided to Fannie Mae pursuant to the Fannie Mae Settlement Order) or (B) BSI under the BSI Sale Order and its contractual relationship with Fannie Mae.  For the avoidance of any doubt, except to the extent that Fannie Mae is satisfied that an obligation has been fulfilled in accordance with the terms of the Fannie Mae Settlement Agreement, Fannie Mae's rights, powers, prerogatives, remedies, payment or lien priorities, lien rights,

security interests and claims against the Debtors or any other entity, including, without limitation, in, under or with respect to, any loan sold or services by FGMC to or for Fannie Mae, including the Transfer Loans and the Purchase Loans, or any rights to setoff or recoupment that Fannie Mae may have or assert, shall not be discharged, enjoined, impaired, released, modified, or limited in any respect and all are expressly preserved.

Each of the Debtors, the Liquidating Trust, and the Liquidating Trustee, as applicable, shall perform all remaining obligations under the Fannie Mae Orders and, to the extent not terminated in accordance with their terms or the terms of the Fannie Mae Settlement Agreement, the Fannie Mae Lender Contract whether arising prior to, or after, the Effective Date and are directed to maintain compliance with the Fannie Mae Orders and the Fannie Mae Lender Contract.  Fannie Mae shall not be required to take any other action to preserve any of its rights, claims, or defenses against the Debtors, their estates or the Liquidating Trust, all of which are expressly preserved and shall survive entry of this Order, the Plan's discharge and injunction provisions, and the effectiveness of the Plan.  If the Debtors, the Liquidating Trust, or the Liquidating Trustee fail to satisfy all of the obligations owing to Fannie Mae, then Fannie Mae shall be permitted to seek recovery against the Debtors, or the Liquidating Trust (as applicable), and Fannie Mae shall reserve its rights, if any, to recovery against the Liquidating Trust.  Neither the automatic stay nor any post-confirmation injunction shall apply to Fannie Mae's exercise of any rights or remedies under the Fannie Mae Settlement Agreement or the Fannie Mae Lender Contract, including, without limitation, with respect to Fannie Mae's rights to unilaterally terminate servicing rights or cause the transfer of servicing rights on loans owned by Fannie Mae.

Immediately upon the entry of this Confirmation Order, the Debtors, the Liquidating Trust, and the Liquidating Trustee are authorized to enter into, and perform under, any agreements or settlements with Fannie Mae, including with respect to the resolution of claims, the termination of servicing rights, or the transfer of servicing rights, without further court approval or order.

Notwithstanding anything to the contrary in the Plan/Sale-Related Documents, Fannie Mae shall not be deemed a "Releasing Party" under the Third Party Releases granted pursuant to the Plan or this Confirmation Order, nor shall Fannie Mae be bound by any Third Party Releases granted in the Plan or this Confirmation Order; provided, however, that nothing shall limit, diminish, impair, waive or enjoin, in any way, the releases and indemnities provided to Fannie Mae under, or pursuant to, the Fannie Mae Settlement Order and the Fannie Mae Settlement Agreement.

To the extent that any conflict exists between this paragraph 47 and any other provision of the Confirmation Order or other Plan/Sale-Related Documents, the terms of this paragraph 47 shall explicitly supersede and control.

48.    <u>TIAA Bank FSB</u>.  In resolution of an informal objection from TIAA Bank, FSB (fka Everbank, FSB)("<u>TIAA</u>"), the following language is hereby adopted and approved:

Treatment of TIAA Servicing Remittances:

Upon entry of the Confirmation Order, the Debtors are hereby authorized and directed to reject each Servicing Agreement between the Debtors and TIAA Bank, FSB (fka Everbank, FSB) ("<u>TIAA</u>") relating to Residential Fixed Rate FHA-Insured Mortgage Loans dated October 1, 2015 and January 4, 2016 (the "<u>TIAA SAs</u>") and any related mortgage loan sale agreement to the extent of any remaining obligations imposed upon the Debtors or otherwise related to the mortgage loans subject to the TIAA SAs (the "<u>TIAA Mortgage Loans</u>"). Debtors and TIAA shall take reasonable steps to cooperate in the transition of the servicing obligations and servicing advances in accordance with applicable servicing laws, rules and regulations, provided however that such cooperation shall not require the unreasonable expenditure of funds by the Liquidating Trustee. Nothing herein shall constitute a waiver by TIAA or the Debtors of any rights of setoff or recoupment to the extent found to exist.

FGMC shall (i) account to TIAA for all monies that it has received prior to, on, and, following the Petition Date and that it receives, in each case, from Rushmore Loan Management Services, LLC ("<u>Rushmore</u>") pursuant to including, without limitation, all amounts that FGMC has paid to itself or its subservicer pursuant to the TIAA SAs since the Petition Date, and (ii) segregate, deposit, and hold in trust for the benefit of the parties all funds received by the Debtors from Rushmore pursuant to the subservicing agreement related to the TIAA SAs following the Petition Date (excluding any remittances actually paid to TIAA), without further offset, setoff, recoupment, payment of Servicing Fees, or recovery of Servicing Advances made on the TIAA Mortgage Loans, absent further order of this Court or the prior written consent of TIAA. TIAA's rights to pursue claims and administrative expenses against the estate, if any, are hereby preserved, as are the Debtors' and Liquidating Trustee's rights to pursue claims and defenses belonging to the estates, if any.

FGMC shall direct Rushmore to take direction from TIAA in respect of the Mortgage Loans and use its reasonable efforts to secure an acknowledgement from such subservicers of such direction no later than seven (7) days following the date on which the Bankruptcy Court enters the Confirmation Order. Provided however, any such direction shall not constitute a waiver of the Debtors' interest in property of the Debtors' estates on account of prepetition or postpetition Servicing Advances, Servicing Fees, Ancillary Income, FHA or other claims, which interest in property of the Debtors' estates, if any, is hereby preserved. Provided further, any such direction to Rushmore shall require Rushmore to remit to Debtors any

recovery of Serving Advances collected prior to entry of the Confirmation Order, which remittance shall be held in accordance with paragraph (2).

TIAA's Request for Allowance and Payment of Administrative Expense Claim [Doc. 548] is hereby held in abeyance pending further order of the Bankruptcy Court.

49.    <u>Carrington</u>.  The Debtors have filed a Notice of Settlement in connection with the

*Term Sheet for Proposed Settlement with Carrington Mortgage Services, LLC* [Docket No. 649]

the ("<u>Carrington Settlement</u>").  The Carrington Settlement is hereby approved by virtue of entry

of this Order and the Debtors are hereby authorized and directed to execute any documentation

reasonably necessary to implement the Carrington Settlement.

<b><u>Payment of Statutory Fees</u></b>

50.    All fees payable pursuant to 28 U.S.C. § 1930(a)(6) and any interest assessed

pursuant to 31 U.S.C. § 3717 ("<u>Quarterly Fees</u>") that are owed prior to the Effective Date shall be

paid by the Debtors in full in cash on the Effective Date. After the Effective Date, any and all

Quarterly Fees shall be paid in full in cash when due and payable. The Debtors shall file all

monthly operating reports due prior to the Effective Date when they become due, using UST Form

11-MOR. After the Effective Date, the Liquidating Trustee and each of the post-Effective Date

Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they

become due. Each and every one of the Debtors, whether existing pre- or post-Effective Date, and

Liquidating Trust shall remain obligated to pay Quarterly Fees until the earliest of that particular

Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy

Code. The U.S. Trustee shall not be treated as providing any release under the Plan. The U.S.

Trustee shall not be required to file any proof of claim or any request for administrative expense

for Quarterly Fees. The provisions of this paragraph shall control notwithstanding any other

provision(s) in the Combined Plan and Disclosure Statement to the contrary.

**Liquidating Trust Professionals**

51.     Dentons US LLP, Pachulski, Stang, Ziehl & Jones LLP and such other professionals as the Liquidating Trustee may retain hereinafter (the "Retained Liquidating Trust Professionals") may be retained as counsel to the Liquidating Trust, pursuant to the Liquidating Trust Agreement.  Any Retained Liquidating Trust Professional may be compensated pursuant to the terms of the Liquidating Trust Agreement and, for the avoidance of doubt, shall not be required to comply with sections 330 and 331 of the Bankruptcy Code solely with respect to such Retained Liquidating Trust Professional's retention and compensation or payment for work performed for the Liquidating Trust.

**Notice of Entry of Confirmation Order and Effective Date**

52.     Pursuant to Bankruptcy Rules 2002 and 3020(c), the Debtors are hereby authorized to serve a notice of entry of this Confirmation Order and the occurrence of the Effective Date, substantially in the form attached hereto as Exhibit C (the "Notice of Confirmation and Effective Date") on the Effective Date, on all Holders of Claims against or Interests in the Debtors and all other Persons on whom the Confirmation Hearing Notice was served. The form of the Notice of Confirmation and Effective Date is hereby approved in all respects. The Notice of Confirmation and Effective Date shall constitute good and sufficient notice of the entry of this Confirmation Order and of the relief granted herein, including, without limitation, any bar dates and deadlines established under the Plan and this Confirmation Order, and no other or further notice of the entry of this Confirmation Order, the occurrence of the Effective Date, and any such bar dates and deadlines need be given.

**Retention of Jurisdiction**

53.     Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of this Confirmation Order and the occurrence of the Effective Date, on and after the Effective

Date, this Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases, the Plan, and each of the Plan Documents, to the extent provided under applicable law, including, among other things, to take the actions specified in Article 18 of the Plan.

## References to Plan Provisions

54.    The failure to specifically include or to refer to any particular article, section, or provision of the Plan or any related document in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, and such article, section, or provision shall have the same validity, binding effect, and enforceability as every other article, section, or provision of the Plan, it being the intent of this Court that the Plan (as and to the extent modified by this Confirmation Order) be confirmed in its entirety.

## Rules Governing Conflicts Between Documents

55.    In the event that any provision of the Plan is inconsistent with the provisions of the Plan Supplement, and any other Order in the Chapter 11 Cases, or any other agreement to be executed by any Person pursuant to the Plan, the provisions of the Plan shall control and take precedence; *provided*, *however*, that this Confirmation Order shall control and take precedence in the event of any inconsistency between this Confirmation Order, any provision of the Plan, and any of the foregoing documents.

## Extension of Injunctions and Stays

56.    Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays provided for in the chapter 11 cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (including any injunctions or stays contained in or arising from the Plan or this Confirmation Order), shall remain in full force and effect.

**Section 1146 Exemption**

57.    Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan or the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, or the re-vesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated by the Plan, shall not be taxed under any state or local law imposing a stamp tax, transfer tax or any similar tax or fee.

**Headings**

58.    Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

**No Stay of Confirmation Order**

59.    Notwithstanding Bankruptcy Rules 3020(e) and 6004(h) and any other Bankruptcy Rule to the contrary, to the extent applicable, there is no reason for delay in the implementation of this Confirmation Order and, thus, this Confirmation Order shall be effective and enforceable immediately upon entry.

## EXHIBIT A

**Plan**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FIRST GUARANTY MORTGAGE CORPORATION, *et al.*, [1] | Case No. 22-10584 (CTG) |
| Debtors. | |

**AMENDED, MODIFIED AND RESTATED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF FIRST GUARANTY MORTGAGE CORPORATION AND DEBTOR AFFILIATE**

**DENTONS US LLP**
Samuel R. Maizel (*Pro Hac Vice*)
Tania M. Moyron (*Pro Hac Vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Email: samuel.maizel@dentons.com
tania.moyron@dentons.com

**DENTONS US LLP**
Claude D. Montgomery (*Pro Hac Vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 632-8390
Email: claude.montgomery@dentons.com

**DENTONS US LLP**
David F. Cook (DE Bar No. 6352)
1900 K Street, NW
Washington, DC 20006
Telephone: (202) 496-7301
Email: david.f.cook@dentons.com

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com

*Counsel for Debtors and Debtors in Possession*

Dated: November 2, 2022

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621). The Debtors' mailing address is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

# TABLE OF CONTENTS

**Page**

SECTION 1 INTRODUCTION ...............................................................................1

SECTION 2 SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER PLAN AND IMPORTANT SOLICITATION AND CONFIRMATION DATES AND DEADLINES.................................................2

    2.1    Summary of Classification and Treatment of Claims and Interests ......................2

    2.2    Important Dates and Deadlines..............................................................9

SECTION 3 DEFINED TERMS ............................................................................10

SECTION 4 BACKGROUND ...............................................................................28

    4.1    General Background ..........................................................................28

    4.2    Events Leading to Chapter 11 Filing .....................................................32

SECTION 5 THE CHAPTER 11 CASES ...............................................................33

    5.1    First Day Motions and Other Early Developments in the Chapter 11 Cases ........33

    5.2    DIP Financing and Related Matters.......................................................34

    5.3    Debtors' Retention of Professionals and Personnel...................................36

    5.4    Formation of the Committee; Retention of Professionals ...........................36

    5.5    Debtors' Schedules and Statement of Financial Affairs.............................36

    5.6    Claims Bar Dates .............................................................................36

    5.7    KEIP and KERP Motion.....................................................................36

    5.8    Ordinary Course Professionals ............................................................37

    5.9    Section 559 and Stay Relief Motions. ...................................................37

    5.10.    BSI Sale Motion .............................................................................37

    5.11.    Freddie Mac Settlement Motion and Adequate Assurances..................38

    5.12.    Fannie Mae Settlement Motion and Adequate Assurances ...................39

SECTION 6 CONFIRMATION AND VOTING PROCEDURES.................................40

6.1     Confirmation Hearing ...........................................................................40

6.2     Procedures for Objections ....................................................................40

6.3     Requirements for Confirmation ...........................................................40

6.4     Classification of Claims and Interests .................................................41

6.5     Impaired Claims or Interests ...............................................................42

6.6     Confirmation Without Necessary Acceptances; Cramdown ................43

6.7     Feasibility ...........................................................................................44

6.8     Best Interests Test and Liquidation Analysis ......................................45

6.9     Eligibility to Vote on the Combined Plan and Disclosure Statement ...46

6.10    Solicitation Package / Release Opt-Out Election Form .........................46

6.11    Voting Procedures, Voting Deadline, and Deadline to Submit the Release
        Opt-Out Election ...............................................................................46

6.12    Acceptance of the Combined Plan and Disclosure Statement ...............47

SECTION 7  CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER
DISCLOSURES ..............................................................................................48

7.1     Certain Risk Factors to be Considered .................................................48

7.2     Certain U.S. Federal Income Tax Consequences .................................51

7.3     Releases, Exculpations, and Injunctions ..............................................56

7.4     Alternatives to the Combined Plan and Disclosure Statement .............56

SECTION 8 UNCLASSIFIED CLAIMS ........................................................................57

8.1     Unclassified Claims ............................................................................57

8.2     Administrative Claims .........................................................................57

8.3     Professional Fees ................................................................................58

8.4     DIP Loan Claims .................................................................................58

8.5     Priority Tax Claims .............................................................................59

SECTION 9 CLASSIFICATION OF CLAIMS AND INTERESTS ...........................................59

9.1    Summary of Classification ...................................................................59

9.2    Special Provision Governing Unimpaired Claims...............................60

9.3    Vacant and Abstaining Classes ...........................................................60

SECTION 10 TREATMENT OF CLAIMS AND INTERESTS ...................................60

10.1    Class 1—Priority Non-Tax Claims .....................................................60

10.2    Class 2—Other Secured Claims .........................................................61

10.3    Class 3—Secured Prepetition Facility Claims ...................................61

10.4    Class 4— Loan Settlement Claims ......................................................63

10.5    Class 5—Prepetition LVS II Offshore Guaranty Claim .....................64

10.6    Class 6—General Unsecured Claims...................................................64

10.7    Class 7—Interests ...............................................................................64

SECTION 11 DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS ...........65

11.1    Distribution Dates ...............................................................................65

11.2    Subsequent Distributions ....................................................................65

11.3    Distribution Record Date .....................................................................65

11.4    Manner of Cash Payments Under the Plan or Liquidating Trust Agreement........65

11.5    Time Bar to Cash Payments by Check .................................................65

11.6    Liquidating Trust Assets Account .......................................................66

SECTION 12 PROCEDURES FOR RESOLVING DISPUTED CLAIMS................66

12.1    No Distributions Pending Allowance ..................................................66

12.2    Resolution of Disputed Claims............................................................66

12.3    Objection Deadline ..............................................................................66

12.4    Estimation of Claims ...........................................................................66

12.5    Disallowance of Claims .......................................................................67

12.6    Adjustment to Claims Register Without Objection .............................67

12.7     Reserve Provisions for Disputed Claims .................................................................67

12.8     Rounding...................................................................................................................68

12.9     No Cash Payments of Less Than $100 on Account of Allowed Claims ..............68

12.10    Delivery of Distributions and Unclaimed Property ...............................................68

12.11    Books and Records ..................................................................................................69

SECTION 13 TREATMENT OF EXECUTORY CONTRACTS  AND UNEXPIRED
         LEASES...................................................................................................................69

13.1     Rejection / Assumption...........................................................................................69

13.2     Rejection Claims......................................................................................................69

13.3     Insurance Policies ...................................................................................................70

SECTION 14 MEANS FOR IMPLEMENTATION OF THE PLAN.........................................70

14.1     General Settlement of Claims and Interests...........................................................70

14.2     DIP Repo Facility. ..................................................................................................70

14.3     Additional Funding. ................................................................................................70

14.4     Dissolution of Debtors............................................................................................71

14.5     Liquidating Trust. ...................................................................................................72

14.6     Disposition of Mortgage Loans ..............................................................................75

14.7     Litigation.................................................................................................................76

14.8     Dissolution of the Committee .................................................................................77

14.9     Sale Transaction(s) .................................................................................................77

14.10    Committee Representative Pursuit of Liquidating Trust Assets.............................77

14.11    WARN Act Claim Reserve......................................................................................77

SECTION 15 EFFECT OF CONFIRMATION ........................................................................78

15.1     Binding Effect of the Plan ......................................................................................78

15.2     Vesting of Property of Debtors on the Effective Date............................................78

15.3     Property Free and Clear ..........................................................................................78

SECTION 16 EXCULPATIONS, INJUNCTIONS, AND RELEASES .......................................79

    16.1   Exculpation ..............................................................................................................79

    16.2   Releases ...................................................................................................................79

    16.3   Injunction ................................................................................................................81

    16.4   Post-Confirmation Liability of Liquidating Trustee .............................................81

    16.5   Preservation of Rights of Action ..........................................................................82

    16.6   No Discharge ..........................................................................................................83

SECTION 17 CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............................................................................................83

    17.1   Conditions to Confirmation of the Plan ................................................................83

    17.2   Conditions to the Effective Date ...........................................................................84

    17.3   Waiver of Conditions Precedent ...........................................................................84

SECTION 18 RETENTION OF JURISDICTION ..............................................................85

SECTION 19 MISCELLANEOUS PROVISIONS .............................................................86

    19.1   Revocation of the Combined Plan and Disclosure Statement ..............................86

    19.2   Severability of Plan Provisions .............................................................................86

    19.3   Exhibits ...................................................................................................................86

    19.4   Notices ....................................................................................................................87

    19.5   Reservation of Rights .............................................................................................87

    19.6   Defects, Omissions and Amendments ...................................................................88

    19.7   Filing of Additional Documents ............................................................................88

    19.8   Successors and Assigns ..........................................................................................88

    19.9   Setoffs and Recoupments ......................................................................................88

    19.10  Tax Exemption .......................................................................................................88

    19.11  Securities Exemption .............................................................................................89

    19.12  Implementation ......................................................................................................89

19.13  Record Date ......................................................................................................89

19.14  Certain Actions ..................................................................................................89

19.15  Substantial Consummation .................................................................................90

19.16  Waiver of Fourteen-Day Stay.............................................................................90

19.17  Governing Law ...................................................................................................90

19.18  Entire Agreement................................................................................................90

SECTION 20 RECOMMENDATION .......................................................................................90

EXHIBIT A:  LIQUIDATION ANALYSIS

EXHIBIT B:  APPROVED DIP BUDGET

EXHIBIT C:  SPECIFIED ASSETS

EXHIBIT D: TRUST BUDGET

## DISCLAIMERS

EACH HOLDER OF A CLAIM AGAINST THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE.  IF YOU ARE ENTITLED TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.  <u>THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT.  PURSUANT TO THE TERMS OF THE COMMITTEE SETTLEMENT, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS SUPPORTS THE COMBINED PLAN AND DISCLOSURE STATEMENT AND, PURSUANT TO A LETTER SERVED HEREWITH, URGES CREDITORS IN CLASS 6 TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT.</u>

THE COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD EVALUATE THE COMBINED PLAN AND DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.  YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

THE COMBINED PLAN AND DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE TRUE AND ACCURATE, THEY ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTORY PROVISIONS. THE TERMS OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY

DISCREPANCY WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT. CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND THE DEBTORS DISCLAIM ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT.  THE DELIVERY OF THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTORS' CONTROL. ACCORDINGLY, THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS. SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT.  THE DEBTORS DO NOT INTEND TO UPDATE OR REVISE THEIR FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND THEIR ADVISORS.  ALTHOUGH THE DEBTORS AND THEIR ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE DEBTORS AND THEIR ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

IN CONNECTION WITH THE DEBTORS' SOLICITATION OF ACCEPTANCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT PURSUANT TO SECTION 1126(b) OF THE BANKRUPTCY CODE, THE DEBTORS ARE FURNISHING A SOLICITATION PACKAGE, CONSISTING OF THE COMBINED PLAN AND

**DISCLOSURE STATEMENT, THE EXHIBITS HERETO, CONFIRMATION NOTICE, AND A BALLOT OR RELEASE OPT-OUT ELECTION FORM, AS APPLICABLE, TO EACH RECORD HOLDER OF CLAIMS ELIGIBLE TO VOTE OR ITS COUNSEL. THE COMBINED PLAN AND DISCLOSURE STATEMENT IS TO BE USED BY EACH SUCH ELIGIBLE HOLDER SOLELY IN CONNECTION WITH ITS EVALUATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT; USE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. NOTHING STATED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY. THE COMBINED PLAN AND DISCLOSURE STATEMENT MAY NOT BE REPRODUCED OR PROVIDED TO ANYONE OTHER THAN ADVISORS TO THE RECIPIENT WITHOUT THE PRIOR WRITTEN CONSENT OF THE DEBTORS.**

# SECTION 1
# INTRODUCTION

First Guaranty Mortgage Corporation ("FGMC") and Maverick II Holdings, LLC ("Maverick" and together with FGMC, the "Debtors"), the debtors and debtors-in-possession in the above-captioned chapter 11 cases, hereby propose the following combined disclosure statement and plan pursuant to sections 1121(a) and 1125(b) of the Bankruptcy Code (the disclosure statement portion hereof, the "Disclosure Statement" and the chapter 11 plan portion hereof, the "Plan," as may be modified and/or amended from time to time, and collectively, the "Combined Plan and Disclosure Statement"). Capitalized terms used in the Combined Plan and Disclosure Statement and not otherwise defined have the meanings ascribed to such terms in Section 3.

Pursuant to the Plan, the Debtors will liquidate their remaining assets, wind down their affairs, and be dissolved through a Liquidating Trust. The Debtors, the Cash Flow DIP Lender, and the Committee were able to reach a settlement on the terms of the Plan. Under that settlement, among other things, after payment of senior claims as provided in the Plan, the proceeds of the Liquidating Trust Assets will be distributed to the holder of the Cash Flow DIP Claims and the holders of general unsecured claims as described more fully in the Combined Plan and Disclosure Statement.

The Debtors will distribute the Combined Plan and Disclosure Statement to all holders of Claims and Interests in accordance with section 1125(b) of the Bankruptcy Code; Rules 2002, 3016, and 3017 of the Bankruptcy Rules; and the Bankruptcy Court's order conditionally approving the Combined Plan and Disclosure Statement [Docket No. 524] (the "Conditional Approval and Procedures Order"). The Combined Plan and Disclosure Statement and the exhibits hereto include a discussion of: (i) the nature and history of the Debtors' business and liabilities; (ii) events during the Chapter 11 Cases; (iii) the requirements for confirmation of the Plan and procedures for voting to accept or reject the Plan; (iv) additional factors and disclosures to be considered, including risk factors and certain U.S. federal income tax consequences of the Plan; and (v) the terms of the Plan, including the treatment of holders of Claims and Interests under the Plan. The Disclosure Statement was prepared with the intent to provide "adequate information" (as defined in the Bankruptcy Code) to enable holders of Claims against and Interests in the Debtors to make informed judgments about the Plan.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Section 19.1 of the Combined Plan and Disclosure Statement, subject to the Cash Flow DIP Lender's consent, the Debtors expressly reserve the right to alter, amend, or modify the Combined Plan and Disclosure Statement, including the Plan Supplement, one or more times, before substantial consummation thereof.

***Please read the Combined Plan and Disclosure Statement, the exhibits, other supporting materials, and any appropriate ballot carefully and follow the instructions set forth below and on the appropriate ballot to vote on the Combined Plan and Disclosure Statement. The Debtors believe that the Combined Plan and Disclosure Statement provides the best method of maximizing the recoveries for the holders of Claims and Interests against the Debtors.***

***Therefore, the Debtors recommend that all creditors who are entitled to vote should vote in favor of the Combined Plan and Disclosure Statement.***

Unless otherwise specified, all section or exhibit references in the Combined Plan and Disclosure Statement are to the respective section in, or exhibit to, the Combined Plan and Disclosure Statement, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection, or clause contained herein. The headings in the Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; and (c) unless otherwise noted above, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

## SECTION 2
## SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER PLAN AND IMPORTANT SOLICITATION AND CONFIRMATION DATES AND DEADLINES

2.1    <u>Summary of Classification and Treatment of Claims and Interests</u>.

All Claims against or Interests in the Debtors, other than Administrative Claims, DIP Repo Loan Claims, Cash Flow DIP Claims and Priority Tax Claims, are classified for purposes of voting and distributions under the Combined Plan and Disclosure Statement. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor, and each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of the Debtors.

A summary of the classification of these Claims and Interests, the proposed treatment of each Class of Claims or Interests, and the voting status of each Class of Claims or Interests follows.

US_ACTIVE\122262256\V-5
DOCS_DE:241262.1 28311/001

| Class | Treatment | Status |
|-------|-----------|--------|
| Unclassified: Administrative Claims, estimated to total approx. $[•]<br><br>**Estimated Recovery: 100%** | Except to the extent that a holder of an Allowed Administrative Claim agrees to less favorable treatment, each holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the holder of such Claim and the Debtors or the Liquidating Trustee, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law. | Unclassified—not entitled to vote |
| Unclassified: DIP Repo Loan Claims, estimated to total approx. $53,655,159<br><br>**Estimated Recovery: 100%** | Unless otherwise agreed by the DIP Repo Parties, the holders of the DIP Repo Claims shall be paid in full, in Cash on or prior to the Effective Date. | Unclassified—not entitled to vote |

| Class | Treatment | Status |
|-------|-----------|--------|
| Unclassified: Cash Flow DIP Claims, estimated to total approx. $35,048,628 <br><br> **Estimated Recovery: 10% to 35%** | Pursuant to the terms of the Committee Settlement, the Cash Flow DIP Lender shall receive (a) any Excess Cash on the Effective Date, and (b) the Cash Flow DIP Lender Share of the Net Liquidating Trust Proceeds, until the Cash Flow DIP Claims and DIP Repo Guarantee Claims have been paid in full, in Cash. | Unclassified—not entitled to vote |
| Unclassified: Priority Tax Claims, estimated to total approx. $250,000 <br><br> **Estimated Recovery: 100%** | Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall be paid the full unpaid amount of such Allowed Priority Tax Claim as follows: (a) Cash equal to the unpaid portion of the Allowed Priority Tax Claim on the later of the Effective Date or thirty (30) days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (b) such other treatment as to which the holder of an Allowed Priority Tax Claim and the Debtors shall have agreed upon in writing. | Unclassified—not entitled to vote |
| Class 1: Priority Non-Tax Claims, estimated to total approx. $1,534,196 <br><br> **Estimated Recovery: 100%** | The Debtors or the Liquidating Trustee, as applicable, shall pay the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law). The Entity holding a Priority Non-Tax Claim will be paid in Cash in full in respect of such Allowed Claim without interest from the Petition Date; *provided, however*, that such Entity may be treated on such less favorable terms as may be | Unimpaired— deemed to accept the Plan |

| Class | Treatment | Status |
|-------|-----------|--------|
| | agreed to in writing by such Entity. | |
| Class 2: Other Secured Claims, estimated to total approx. $8,969<br><br>**Estimated Recovery: 100%** | Except to the extent previously paid in full, at the option of the Debtors or the Liquidating Trustee, subject to agreement by the Cash Flow DIP Lender, one of the following treatments shall be provided in full satisfaction and release of such Allowed Other Secured Claim: (i) the holder of such Claim shall retain its Lien on its collateral until such collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such holder; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, the holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim; (iii) the collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor; or (iv) treatment on such other terms as agreed between the Creditor, the Debtors or the Liquidating Trustee, as applicable, and the Cash Flow DIP Lender. | Unimpaired—deemed to accept the Plan |

US_ACTIVE\122262256\V-5
DOCS_DE:241262.1 28311/001

| Class | Treatment | Status |
|---|---|---|
| Class 3: Secured Prepetition Facility Claims, estimated to total approx. $557,617,115<br><br>**Estimated Recovery: 90% to 95%** | The holders of Secured Prepetition Facility Claims shall receive the following treatment:<br><br>(i) The holder of the Prepetition J.V.B. Repo Facility Secured Claims shall receive the following treatment on account of such Claim: (i) delivery of the Mortgage Loans and other collateral purchased or securing the Claim or the net proceeds of the liquidation of such mortgage loans and other collateral; or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Prepetition J.V.B. Repo Facility Secured Claim. Provisions regarding the process for transferring or otherwise monetizing the Mortgage Loans underlying the Prepetition J.V.B. Repo Facility Secured Claims and returning to the Debtors any amounts collected in excess of any repurchase amounts and expenses are set forth in Section 14.6.<br><br>(ii) The holder of the Prepetition TCB Repo Facility Secured Claim shall receive the following treatment on account of such Claim: (i) delivery of the Mortgage Loans and other collateral purchased or securing the Claim or the net proceeds of the liquidation of such mortgage loans and other collateral, or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Prepetition TCB Repo Facility Secured Claim. Provisions regarding the process for transferring or otherwise monetizing the mortgage loans underlying the Prepetition TCB Repo Facility Secured Claim and returning to the Debtors any amounts collected in excess of any | Impaired – entitled to vote |

| Class | Treatment | Status |
|-------|-----------|--------|
| | repurchase amounts and expenses are set forth in Section 14.6.<br><br>(iii) The holder of the Prepetition Customers Repo Facility Secured Claim shall receive the following treatment on account of such Claim: (i) pursuant to the terms of the Customers Bank 559 Order, the Prepetition Customers Repo Agreement and applicable law, the right to liquidate the Purchased Assets and apply the amount received to the Prepetition Customers Repo Facility Secured Claim, and the obligation to return any excess proceeds or Purchased Assets to the Debtors, or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Prepetition Customers Repo Facility Secured Claim.<br><br>(iv) The holder of the Prepetition Flagstar Warehouse Facility Secured Claim shall receive the following treatment on account of such Claim: (i) delivery of the mortgage loans and other collateral purchased or securing the Claim or the net proceeds of the liquidation of such mortgage loans and other collateral to the extent consistent with the Flagstar Lift Stay Order, or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Prepetition Flagstar Warehouse Facility Secured Claim. Provisions regarding the process for transferring or otherwise monetizing the mortgage loans underlying the Prepetition Flagstar Warehouse Facility Secured Claims and returning to the Debtors any amounts collected in excess of the amount of the Allowed Prepetition Flagstar Warehouse Facility Secured Claim shall be governed by the Flagstar | |

| Class | Treatment | Status |
|-------|-----------|--------|
| | Lift Stay Order, the Prepetition Flagstar Loan Agreement and applicable law.<br><br>(v) The holder of the Prepetition Customers Loan Obligation Secured Claim shall receive the following treatment on account of such Claim: (i) delivery of the collateral securing the Claim or the net proceeds of the liquidation of such collateral, or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Prepetition Customers Loan Obligation Secured Claim. The process for transferring, monetizing and returning the excess collateral underlying the Prepetition Customers Loan Obligation Secured Claim shall be governed by the Customers Bank 559 Order, the Prepetition Customers Repo Agreement, the Prepetition Customers Loan Agreement, and applicable law. | |
| Class 4: Loan Settlement Claims, estimated to total approx. TBD<br><br>**Estimated Recovery: TBD** | Each holder of a Loan Settlement Claim shall receive an Allowed Claim in amount of the cash in their possession and turnover to the Debtors any cash beyond such amount in accordance with any settlement agreement reached between such holder and the Debtors and approved by the entry of an Order pursuant to Bankruptcy Rule 9019. | Impaired – entitled to vote |
| Class 5: Prepetition LVS II Offshore Guaranty Claim, estimated to total approx. $25,000,000<br><br>**Estimated** | The holder of the Prepetition LVS II Offshore Guaranty Claim shall receive up to the amount of $6.59 million of any cash recovered by, or on account of assets turned over to or for the benefit of the Debtors, their Estates, or the Liquidating Trust on account of Customers Bank, pursuant to the Prepetition Customers Loan Agreement, | Impaired – entitled to vote |

-8-

| Class | Treatment | Status |
|-------|-----------|--------|
| **Recovery: 0%** | the Customers Bank 559 Order or otherwise. Pursuant to the terms of the Committee Settlement, the holder of the Prepetition LVS II Offshore Guaranty Claim shall not be entitled to a recovery from the GUC Share unless and until the Cash Flow DIP Claims and DIP Repo Guarantee Claims have been paid in full. | |
| Class 6: General Unsecured Claims, estimated to total approx. $51,700,781<br><br>**Estimated Recovery: Recovery Anticipated Pursuant to Section 14.** | Pursuant to the terms of the Committee Settlement, each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata share of the GUC Share of the Net Liquidating Trust Proceeds. | Impaired – entitled to vote |
| Class 7: Interests<br><br>**Estimated Recovery: 0%** | There shall be no Distribution on account of Interests.  Upon the Effective Date, all Interests will be deemed cancelled and will cease to exist. | Impaired – deemed to reject the Plan |

2.2    Important Dates and Deadlines

| Event | Proposed Date |
|-------|---------------|
| Voting Record Date | September 28, 2022 |
| Solicitation Commences | Later of (i) October 3, 2022, and (ii) three business days after the entry of this Order |
| Deadline for Creditors to File Rule 3018 Motions | October 14, 2022 |
| Deadline for Debtors to Respond to Rule 3018 Motions | October 21, 2022 |
| Deadline to file Plan Supplement | October 14, 2022 |
| Voting Deadline | October 26, 2022 |

US_ACTIVE\122262256\V-5<br>DOCS_DE:241262.1 28311/001

| Event | Proposed Date |
|---|---|
|  |  |
| Combined Plan and Disclosure Statement Objection Deadline | October 26, 2022 |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined Plan and Disclosure Statement | October 28, 2022 |
| Deadline to File Voting Tabulation Affidavit | October 28, 2022 |
| Confirmation Hearing | October 31, 2022 |

## SECTION 3
## DEFINED TERMS

As used in the Combined Plan and Disclosure Statement, capitalized terms not otherwise defined have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

"Adequate Protection Claim" means an Administrative Claim permitted under the Final Cash Flow DIP Order to the extent (i) agreed by the Debtors or (ii) Allowed by the Bankruptcy Court after notice and a hearing.

"Additional Administrative Claims Amount" means (i) the amount of $2,000,000 to fund the payment or reserve (including the Initial WARN Act Claim Reserve Amount) for Additional Administrative Claims, as the same may be increased pursuant to Section 14.3(d), and (ii) the portion of the WARN Act Claims Reserve that is not the Initial WARN Act Claim Reserve Amount. For the avoidance of doubt, an increase in the Additional Administrative Claims Amount pursuant to 14.3(d) and the amount set forth in clause (ii) of this definition are for Plan distribution purposes only, and neither shall require the Cash Flow DIP Lender to fund additional amounts to the Debtors or the Liquidating Trust.

"Additional Administrative Claims" means any Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims that are Allowed (either before or after the Effective Date) and not budgeted for in the Approved DIP Budget.

"Administrative Claim" means a Claim for an expense of administration of the Chapter 11 Cases arising under sections 503(b), 507(b), 503(b)(9) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates; (b) the value of any goods received by the Debtors within 20 days before the Petition Date to the extent that goods were sold to the Debtors in the ordinary course of the Debtors' business; (c) Professional Fee Claims; (d) all fees and charges assessed against the Estates under 28 U.S.C. §§ 1911-1930; (e) all obligations designated as Allowed Administrative Claims pursuant to an order of the Bankruptcy Court; (f) administrative claims that were timely filed prior to the Administrative Expense Bar Date; and (g) any Tax Claims incurred by the Debtors after the Petition Date or relating to a tax year or period which occurs after the Petition Date.

-10-

"<u>Administrative Expense Bar Date</u>" means the applicable last date, at 5:00 p.m. Eastern time, set by the Bankruptcy Court for a Claimant to file a request for payment of any Administrative Claim (excluding Professional Fee Claims) arising on or after the Petition Date, through and including the Effective Date. The Administrative Expense Bar Date shall be (i) October 14, 2022 for all Administrative Claims arising or deemed to be arisen on or prior to September 30, 2022 (Docket No. 382); or sixty (60) days after the Effective Date for all Administrative Claims arising or deemed to be after September 30, 2022, as applicable.

"<u>Additional Funding</u>" shall have the meaning provided in Section 14.3 hereof.

"<u>Affiliate</u>" means with respect to any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with") as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

"<u>Allowed</u>" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtors on the Schedules as other than disputed, contingent, or unliquidated and, as to which, the Debtors, the Liquidating Trustee or other party in interest has not filed an objection on or before the Claims Objection Deadline; (b) a Claim that is set forth in a timely filed Proof of Claim as to which no objection has been filed and which is not otherwise a Disputed Claim; (c) a Claim that has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtors prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Liquidating Trustee on or after the Effective Date; (iii) in any stipulation of amount and nature of any Administrative Claim, Priority Non-Tax Claim, or Priority Tax Claim executed by (y) the Debtors and approved by the Bankruptcy Court, or (z) the Liquidating Trustee; or (iv) in any contract, instrument, indenture or other agreement entered into or assumed by the Debtors in connection with and in accordance with the Plan; (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been timely filed by the Claimant before the applicable rejection Bar Date for such claim or has otherwise been deemed timely filed under applicable law; or (f) a Claim that is allowed pursuant to the terms of the Plan. For the purpose of determining distributions pursuant to the Plan, allowance under subsections (a) and (b) only is applicable once any of the following occur (1) before the Claims Objection Deadline, the Debtors or the Liquidating Trustee, as applicable, determine not to object to the Claim, (2) the Claims Objection Deadline passes without an objection being filed, or (3) after the Debtors or Liquidating Trustee timely objects to the Claim, the Claim is allowed as provided in subparagraphs (c), (d) or (e) above.

"<u>Allowed Claim</u>" or "<u>Allowed … Claim</u>" means a Claim that has been Allowed.

"<u>Approved DIP Budget</u>" shall have the meaning set forth in the Final Cash Flow DIP Order, as amended pursuant to the Committee Settlement.

"<u>Avoidance Actions</u>" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtors, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

"<u>Ballots</u>" mean the ballots upon which the holders of Impaired Claims shall indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions.

"<u>Bankruptcy Code</u>" means title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in sections 101 *et seq.* of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075.

"<u>Bar Date</u>" means, as applicable, the General Claims Bar Date, the Administrative Expense Bar Date, or any other applicable deadline to file Claims referenced in the Plan.

"<u>Bar Date Order</u>" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Setting a Bar Date for the Filing of Proofs of Claim By Governmental Units, (III) Setting a Bar Date for the Filing of Requests for Allowance of Administrative Expense Claims, (IV) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (V) Approving the Form of and Manner for Filing Proofs of Claim, (VI) Approving Notice of Bar Dates, and (VII) Granting Related Relief* [Docket No. 382].

"<u>Beneficiaries</u>" means holders of Allowed Claims entitled to receive Distributions from the Liquidating Trust under the Plan, whether or not such Claims were Allowed on the Effective Date.

"<u>Bidding Procedures Order</u>" means the *Order: (A) Approving Bidding Procedures for Equity Acquisition or One or More Sales or the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief* implementing procedures to solicit and, if applicable, select bids from interested parties to purchase some or all of the Debtors' assets under section 363 of the Bankruptcy Code.

"<u>Business Day</u>" means any day, other than a Saturday, Sunday or legal holiday as defined in Bankruptcy Rule 9006(a).

"<u>Cash</u>" means cash and cash equivalents, including, but not limited to, bank deposits, wire transfers, checks, and readily marketable securities, instruments, and legal tender of the United States of America or instrumentalities thereof.

-12-

"Cash Flow DIP Agreement" means that certain Senior Secured Superpriority Debtor-in-Possession Term Loan and Security Agreement, dated July 1, 2022, among FGMC, as borrower, Maverick, as "Holdings" (and a guarantor), and LVS II SPE XXXIV LLC, as lender, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Cash Flow DIP Claim(s)" means the Secured Claim(s) held by the Cash Flow DIP Lender pursuant to the Cash Flow DIP Documents.

"Cash Flow DIP Documents" means the Final Cash Flow DIP Order, the Cash Flow DIP Agreement, and other agreements and other documents entered into, or delivered, on connection with the Cash Flow DIP Facility.

" Cash Flow DIP Facility" means the financing facility pursuant to the Final Cash Flow DIP Order and the Cash Flow DIP Agreement.

"Cash Flow DIP Lender" means LVS II SPE XXXIV LLC, as lender under the Cash Flow DIP Agreement.

"Cash Flow DIP Lender Share" has the meaning ascribed to such term in Section 14.5.

"Causes of Action" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims, including, without limitation, all claims and any avoidance, preference, recovery, subordination or other actions of the Debtors and Estates (unless the context expressly states that such Causes of Action belong to another Entity) against Creditors, insiders, and/or any other Entities under the Bankruptcy Code, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the Effective Date. For the avoidance of doubt, Causes of Action does not include claims, challenges or other matters barred or otherwise released in the Final DIP Orders.

"Challenge" shall have the meaning provided in section 23(a) of the Final Cash Flow DIP Order.

"Challenge Period" shall have the meaning provided in section 23(a) of the Final Cash Flow DIP Order.

"Chapter 11 Cases" means the Chapter 11 cases commenced when the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on the Petition Date (each a "Chapter 11 Case") and with the following lead case number: 22-10584 (CTG).

"Claim" means a claim (as defined in section 101(5) of the Bankruptcy Code) against the Debtors, including, but not limited to: (a) any right to payment from the Debtors whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from the

-13-

Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Claimant" means the holder of a Claim.

"Claims Agent" means Kurtzman Carson Consultants LLC, which was appointed as the Debtors' claims, noticing, and balloting agent.

"Claims Objection Deadline" means, with respect to all Claims other than Professional Fee Claims, (a) 180 days after the Effective Date, or (b) such other period as may be fixed by an order of the Bankruptcy Court for objecting to Claims upon request of the Liquidating Trustee.

"Class" means a category of holders of Claims or Interests, as set forth in Section 9 of the Plan.

"Committee" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases on July 14, 2022.

"Committee Final DIP Settlement" means the settlement reached between the Debtors, the Committee, and the Cash Flow DIP Lender as set forth in the Final Cash Flow DIP Order.

"Committee Settlement" means the settlement reached between the Debtors, the Committee and the Cash Flow DIP Lender resolving the Committee's objections to the previous version of this Combined Plan and Disclosure Statement, which terms are incorporated into Section 14 hereof.

"Confirmation" means the entry of the Confirmation Order, subject to all conditions specified in Section 6 hereof having been (a) satisfied or (b) waived pursuant to Section 6.

"Confirmation Date" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Hearing" means the hearing at which the Bankruptcy Court will consider final approval of the disclosures contained in the Disclosure Statement and confirmation of the Plan.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"Consummation" or "Consummate" means the occurrence of the Effective Date.

"Contingent Claim" means any Claim for which a Proof of Claim has been filed with the Bankruptcy Court but was not filed in a sum certain and which Claim has not been estimated, fixed, or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date, or a Claim that has accrued but nonetheless remains dependent on the occurrence of a future event that may never occur.

"Customers Bank 559 Order" means the Order Confirming Applicability of 11 U.S.C. §559 and, In the Alternative, Granting Relief from the Automatic Stay and Related Relief dated August 2, 2022 [Docket No. 271].

"Creditor" means any holder of a Claim against any Debtor as specified in section 101(10) of the Bankruptcy Code.

"Debt" means liability on a Claim.

"Debtors" means First Guaranty Mortgage Corporation and Maverick II Holdings, LLC, debtors and debtors-in-possession in the Chapter 11 Cases.

"Debtor/Estate Release" has the meaning set forth in Section 16.2(a) hereof.

"Debtor/Estate Releasors" has the meaning set forth in Section 16.2(a) hereof.

"DIP BCI MSFTA" means that certain Master Securities Forward Transaction Agreement, dated August 25, 2022, between Barclays Capital Inc. and FGMC.

"DIP Budget Amount" means an amount of additional funding necessary to fund estimated ordinary course expenses that accrue prior to the Effective Date (including reserves established to pay such claims after the Effective Date) pursuant to an Approved DIP Budget, which additional funding amount is provided to the Debtors through an amendment to the Final Cash Flow DIP Order increasing the Commitments and the available Operating Amount under the DIP Facility prior to the Effective Date.  The Approved DIP Budget as of the Effective Date is attached hereto as **Exhibit B**.

"DIP Facilities" means the Cash Flow DIP Facility and the DIP Repo Facility.

"DIP Lenders" means the Cash Flow DIP Lender and the DIP Repo Parties.

"DIP Loan Claim(s)" means the DIP Repo Claims, the Cash Flow DIP Claims, and the DIP Repo Guarantee Claims.

"DIP Netting Agreement" means that certain Global Netting and Security Agreement, dated July 1, 2022, among Barclays Bank PLC, Barclays Capital Inc., and FGMC.

"DIP Repo Agent" means Barclays Bank PLC, as administrative agent under the DIP Repo Facility Agreement.

"DIP Repo Claim(s)" means the Secured Claim(s) held by the DIP Repo Parties under the Final DIP Repo Order, the DIP Repo Facility Agreement, the DIP BCI MSFTA, and the DIP Netting Agreement.

"DIP Repo Facility" means the financing facility pursuant to the Final DIP Repo Order and the DIP Repo Facility Agreement.

"DIP Repo Facility Agreement" means that certain Master Repurchase Agreement, dated July 1, 2022, among FGMC, as seller, and the DIP Repo Parties, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"DIP Repo Facility Purchasers" means the buyers from time to time party to the DIP Repo Facility Agreement.

"DIP Repo Guarantees" means (i) that certain Amended and Restated Guarantee of PIMCO BRAVO Fund II, L.P. dated August 25, 2022, by PIMCO BRAVO Fund II, L.P. in favor of the DIP Repo Guarantors, and (ii) that certain Amended and Restated Guarantee of Maverick II Holdings, LLC, dated August 25, 2022, by Maverick in favor of the DIP Repo Guarantors.

"DIP Repo Guarantee Claims" means any outstanding Claims and obligations of a DIP Repo Guarantor against the Debtors arising from a DIP Repo Guarantee or the Final Cash Flow DIP Order.

"DIP Repo Guarantors" means PIMCO BRAVO Fund II, L.P. and Maverick, each as guarantor under their respective DIP Repo Guarantee.

"DIP Repo Parties" means the DIP Repo Agent, the DIP Repo Facility Purchasers, and Barclays Capital Inc.

"DIP Repo Purchased Assets" has the meaning ascribed to the term "Purchased Assets" in the DIP Repo Facility Agreement.

"Disallowed Claim" means (i) a Claim, or any portion thereof, that has been disallowed by a Final Order or by other agreement of a Claimant; (ii) a Claim that has been listed in the Schedules at zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, a Final Order, or other applicable law; or (iii) a Claim that has not been listed in the Schedules and as to which no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, a Final Order, or other applicable law.

"Disputed" means, with respect to any Claim or Interest, any Claim or Interest: (a) listed on the Schedules as unliquidated, disputed, or contingent and as to which no Proof of Claim has been filed; or (b) as to which the Debtors, the Liquidating Trustee, or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or is otherwise disputed by the Debtors or the Liquidating Trustee, as applicable, in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

"Disputed Claim" means: (i) any Claim or portion of a Claim as to which an objection to the allowance thereof has been interposed as of any deadline fixed under the Plan or by order of the Bankruptcy Court, which objection has not been withdrawn or determined by Final Order; (ii) any Claim scheduled by the Debtors in the Schedules as disputed, contingent, or unliquidated and as to which no Proof of Claim has been timely filed; or (iii) a Claim that is not listed in the Schedules and as to which no Proof of Claim has been timely filed. To the extent an objection

-16-

relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the objection.

"Disputed Claim Reserve" has the meaning set forth in Section 12.7 hereof.

"Distribution Agent" means the Debtors and/or the Liquidating Trustee, or the designees or agents of the foregoing.

"Distribution Dates" means collectively the Initial Distribution Date, any Subsequent Distribution(s) Date, and the date of the Final Distribution.

"Distribution Record Date" means the close of business on the Business Day immediately preceding the Effective Date.

"Distributions" means the distributions of Cash to be made in accordance with the Plan and the Liquidating Trust Agreement, as applicable.

"Effective Date" means the date selected by the Debtors, subject to the Cash Flow DIP Lender's consent, which is a Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect, and (b) all conditions specified in Section 6 hereof have been satisfied, unless waived by the Debtors and the Cash Flow DIP Lender.  Within five (5) business days after the Effective Date, notice of the Effective Date shall be filed with the Bankruptcy Court by the Debtors or the Liquidating Trustee, as applicable.

"Effective Date Cash Transfers" has the meaning set forth in Section 14.5(k) hereof.

"Entity" means an entity as defined in section 101(15) of the Bankruptcy Code.

"Estates" means the estates of the Debtors in the Chapter 11 Cases created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

"Excess Cash" means the Debtors' Cash, if any, that is not necessary to make the Effective Date Cash Transfers.

"Exculpated Parties" means collectively (a) the Debtors, (b) the Debtors' respective officers and managers, (c) members of the Committee (solely in their capacities as Committee members), and (d) Bankruptcy Court-approved Estate and Committee professionals.

"Fannie Mae" means the Federal National Mortgage Association.

"Final Cash Flow DIP Order" means *the Final Order (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Providing Super-Priority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Granting Related Relief* [Docket No. 292].

"Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

"Final DIP Orders" means the Final Cash Flow DIP Order, together with the Final DIP Repo Order.

"Final DIP Repo Order" means the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 507, 546, 548, 555, 556, 559, 560 and 561 (I) Authorizing the Debtors to Enter Into Repurchase Agreement Facilities and Related Documents; (II) Authorizing Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business; (III) Granting Liens and Providing Superpriority Administrative Expense Status; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 288].

"Final Distribution" means the last payment to holders of Allowed Claims in accordance with the provisions of the Plan.

"Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction: (i) that has not been reversed, stayed, modified, or amended; (ii) as to which the time to or the right to appeal or seek reconsideration, review, rehearing, or certiorari has expired or been waived (without regard to whether the time to seek relief from a judgment under Bankruptcy Rule 9024 has expired); and (iii) as to which no appeal or petition for reconsideration, review, rehearing, or certiorari is pending.

"Flagstar" means Flagstar Bank, FSB.

"Flagstar Lift Stay Order" means the Order Granting Flagstar Bank, FSB's Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. §362(d) [Docket No. 298].

"Freddie Mac" means the Federal Home Loan Mortgage Corporation.

"General Claims Bar Date" means October 14, 2022, at 5:00 p.m. prevailing Eastern Time, which is the general deadline set pursuant to the Bar Date Order for filing proofs of claim for any Claims against the Debtors that arose prior to the Petition Date.

"General Unsecured Claim" means any unsecured Claim against the Debtors or the Estates that is not a Secured Claim, a DIP Loan Claim, an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, or a Loan Settlement Claim.  For avoidance of doubt, General Unsecured Claims include all Prepetition Facility Deficiency Claims.

"Ginnie Mae" means the Government National Mortgage Association.

"Governmental Unit" means the United States; State; Commonwealth, District, Territory, municipality, foreign state, department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under Chapter 11), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

"GUC Share" has the meaning set forth in Section 14.5 hereof.

"Impaired" means with respect to a Claim or Class of Claims, a Claim or Class of Claims that is impaired within the meaning of section 1124 of the Bankruptcy Code.

-18-

"Indemnified Parties" has the meaning set forth in Section 16.4 hereof.

"Initial Distribution Date" means the Effective Date, or as soon as practicable thereafter when the initial distribution of Cash shall be made to the holders of Allowed Claims, as determined by the Debtors or the Liquidating Trustee, as applicable.

"Initial Trust Cash" has the meaning set forth in section 14.5(k) hereof.

"Initial WARN Act Claim Reserve Amount" means $1,500,000 funded by the Cash Flow DIP Lender, as part of its funding of the Additional Administrative Claim Amount, to fund the WARN Act Claims Reserve.

"Insider" means an insider of the Debtors, as defined in section 101(31) of the Bankruptcy Code.

"Insurance Policies" means all insurance policies maintained by the Debtors as of the Petition Date, including but not limited to director and officer insurance policies.

"Interest" means any equity interest in the Debtors, including, but not limited to, all issued, unissued, authorized, or outstanding shares or stock, whether vested or non-vested, together with any warrants, options, or contract rights to purchase or acquire such interests at any time.

"Interim Cash Flow DIP Order" means *the Interim Order (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Scheduling a Final Hearing; (VI) Modifying the Automatic Stay; and (VII) Granting Related Relief* [Docket No. 67].

"Interim Fee Order" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 268], entered by the Bankruptcy Court in the Chapter 11 Cases.

"J.V.B." means J.V.B. Financial Group, LLC, as successor by merger to C&Co./PrinceRidge LLC.

"Lien" means any charge against or interest in property (including, but not limited to, any mortgage, lien, pledge, charge, security interest, encumbrance, or other security device of any kind) to secure payment of a debt or performance of an obligation.

"Lift Stay Order" means either or both, as the context shall require, of the Customers Bank 559 Order and the Flagstar Lift Stay Order.

"Liquidating Trust" means the grantor trust to be created upon the Effective Date for the benefit of the Beneficiaries pursuant to Section 14.5 hereof.

"Liquidating Trust Agreement" means the agreement, substantially in the form included in the Plan Supplement governing the Liquidating Trust, as it may be subsequently modified from time to time.

"<u>Liquidating Trust Assets</u>" means all assets of the Debtors that are not otherwise used by the Debtors to make distributions on the Effective Date to holders of Allowed Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims, or which secure Secured Prepetition Facility Claims, including Additional Funding funded by the Cash Flow DIP Lender as set forth in Section 14.3 and Effective Date Cash Transfers as set forth in Section 14.5(k). The Liquidating Trust Assets also include, but are not limited to: (i) the Trust Funding Amount; (ii) all Causes of Action the Debtors hold or may hold against any Person or Entity as of the Effective Date (after giving effect to the releases set forth in the Plan, including the Debtor/Estate Release); (iii) all Claims and rights of the Debtors under any Insurance Policies; (iv) any and all other non-Cash assets, interests, rights, claims and defenses of the Debtors or the Estates, including, without limitation, all rights under any order of the Bankruptcy Court; and (v) any and all proceeds of any of the foregoing.  For the avoidance of doubt, Liquidating Trust Assets shall not include (a) assets subject to any Sale Transaction, (b) Excess Cash, or (c) except to the extent of the Debtors' interests in any excess after payment in full of the Secured Prepetition Facility Claims, any mortgage loans, property, deposit accounts and other collateral purchased or securing the Secured Prepetition Facility Claims or the net proceeds of the liquidation of such mortgage loans, property, deposit accounts and other collateral.

"<u>Liquidating Trust Assets Account</u>" means an interest-bearing bank account or money-market account to be established and held in trust by the Liquidating Trustee on or after the Effective Date for the purpose of holding the Liquidating Trust Assets to be distributed pursuant to the Plan and any interest, dividends, or other income earned upon the investment of the Liquidating Trust Assets.

"<u>Liquidating Trust Interests</u>" means the non-transferable beneficial interests in the Liquidating Trust, record of which will be maintained by the Liquidating Trustee in accordance with the Liquidating Trust Agreement and Section 11 hereof.

"<u>Liquidating Trustee</u>" means the Person selected by the Cash Flow DIP Lender, acceptable to the Debtors, to act as trustee of the Liquidating Trust in accordance with the terms of the Plan, the Confirmation Order, and the Liquidating Trust Agreement, or such successor appointed as the trustee in accordance with the Liquidating Trust Agreement.

"<u>Liquidation Proceeds</u>" means any Cash or other consideration paid to or realized by the Debtors or the Liquidating Trustee, as applicable, upon the collection, sale, transfer, assignment, or other disposition of the Liquidating Trust Assets.

"<u>Litigation</u>" means the interest of the Estates, the Debtors, or the Liquidating Trust, as applicable, in any and all claims, rights, and Causes of Action that have been or may be commenced by the Debtors or the Liquidating Trust, as applicable, except to the extent concerning any Released Parties.  Litigation includes, without limitation not otherwise stated herein, any action: (i) to avoid and recover any transfers of property determined to be preferential, fraudulent, or avoidable pursuant to sections 544, 545, 547, 548, 549(a), and 550 of the Bankruptcy Code; (ii) for the turnover of property to the Debtors or the Liquidating Trust, as applicable; (iii) for the recovery of property or payment of money that belongs to or can be asserted by the Debtors or the Liquidating Trust, as applicable; (iv) for compensation for damages incurred by the Debtors; and (iv) equitable subordination actions against Creditors.

-20-

"<u>Litigation Recovery</u>" means any Cash or other property received by the Debtors or the Liquidating Trust, as applicable, from all or any portion of the Litigation, including, but not limited to, awards of damages, attorneys' fees and expenses, interest, and punitive damages, whether recovered by way of settlement, execution on judgment, or otherwise.  If any Litigation is pursued on a contingent-fee basis, the Litigation Recovery will be net of any contingent fee paid to legal counsel.

"<u>Loan Settlement Claims</u>" means any and all unsecured Claims of any purchasers, subservicers and other third parties in the possession of certain cash, including "holdback" or other amounts, owed to the Debtors with respect to purchase and sale agreements and loan subservicing agreements, that have been resolved by a settlement agreement reached between such claimants and the Debtors and approved by the entry of an Order pursuant to Rule 9019 prior to the confirmation of the Plan.

"<u>LVS II Offshore Guarantor</u>" means LVS II Offshore, L.P. solely in its capacity as guarantor under the LVS II Offshore Guaranty.

"<u>LVS II Offshore Guaranty</u>" means that certain Guaranty and Suretyship Agreement dated September 30, 2020, providing for the guarantee of prompt payment and performance of obligations arising from the Prepetition Customers Loan Agreement.

"<u>Mortgage Loans</u>" shall have the meaning provided in Section 14.6.

"<u>Net Liquidating Trust Proceeds</u>" means proceeds realized from the Liquidating Trust Assets (other than the Specified Assets) after the payment out of the Liquidating Trust Assets (other than the Specified Assets) of (i) Allowed Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims that are not paid by the Debtors on the Effective Date and (ii) expenses of the Liquidating Trust set forth in the Trust Budget.

"<u>Ordinary Course Professional Order</u>" means the *Order (I) Authorizing Employment and Payment of Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 281].

"<u>Oversight Committee</u>" has the meaning set forth in Section 14.5(h) hereof.

"<u>Person</u>" means any individual, corporation, limited liability company, general partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, Governmental Unit, or other Entity.

"<u>Petition Date</u>" means June 30, 2022, the date on which the Debtors filed their respective voluntary petitions for relief commencing the Chapter 11 Cases.

"<u>Plan Documents</u>" means the Plan, the Disclosure Statement, the Plan Supplement, the Liquidating Trust Agreement, any plan support letters, or other documents or pleadings filed by the Debtors relating to the Plan.

"<u>Plan Objection Deadline</u>" means the deadline established by the Bankruptcy Court for filing and serving objections to Confirmation of the Plan.

-21-

"Plan Supplement" means the pleading or pleadings identified in the Plan or Disclosure Statement for filing with the Bankruptcy Court not later than seven (7) calendar days prior to the Plan Objection Deadline, which shall include certain exhibits and schedules to the Plan, as well as documents, agreements, and instruments evidencing and effectuating the Plan.

"Prepetition Bridge Lender" means B2 FIE XI LLC and any successor thereto, in its capacity as lender under the Prepetition Bridge Loan Agreement.

"Prepetition Bridge Loan Agreement" means that certain Second Amended and Restated Secured Promissory Note, dated as of June 29, 2022, executed by FGMC, as borrower, and in favor of the Prepetition Bridge Lender, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Bridge Loan Claims" means any outstanding Claims and obligations under the Prepetition Bridge Loan Agreement and any other documents and agreements executed and delivered in connection with the Prepetition Bridge Loan Agreement. The Prepetition Bridge Loan Claims shall not include (a) any amounts refinanced with the proceeds of the DIP Repo Facility or (b) any amounts "rolled up" into the Cash Flow DIP Facility.

"Prepetition Customers Loan Agreement" means that certain Amended and Restated Loan Agreement, dated as of July 17, 2019, by and between FGMC and Customers Bank, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Customers Loan Obligation Deficiency Claims" means any outstanding deficiency Claims and obligations under the Prepetition Customers Loan Agreement and all other documents and agreements executed and delivered in connection with the Prepetition Customers Loan Agreement.

"Prepetition Customers Loan Obligation Claims" means any outstanding Secured Claims and obligations under the Prepetition Customers Loan Agreement and all other documents and agreements executed and delivered in connection with the Prepetition Customers Loan Agreement.

"Prepetition Customers Repo Agreement" means that certain Second Amended and Restated Master Repurchase Agreement, dated as of October 9, 2019, by and between FGMC and Customers Bank, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Customers Repo Facility Deficiency Claims" means any outstanding deficiency Claims and obligations under the Prepetition Customers Repo Agreement and all other documents and agreements executed and delivered in connection with the Prepetition Customers Repo Agreement.

"Prepetition Customers Repo Facility Secured Claims" means any outstanding Secured Claims and obligations under the Prepetition Customers Repo Agreement and all other documents and agreements executed and delivered in connection with the Prepetition Customers Repo Agreement.

"Prepetition Facility Deficiency Claims" means the Prepetition Customers Loan Obligation Deficiency Claims, the Prepetition Customers Repo Facility Deficiency Claims,

Prepetition Flagstar Warehouse Facility Deficiency Claims, Prepetition J.V.B. Repo Facility Deficiency Claims and the Prepetition TCB Repo Facility Deficiency Claims.

"<u>Prepetition Flagstar Loan Agreement</u>" means that certain Mortgage Warehouse Loan and Security Agreement, dated as of June 30, 2017, by and between FGMC and Flagstar, as amended, restated, supplemented or otherwise modified from time to time.

"<u>Prepetition Flagstar Warehouse Facility Deficiency Claims</u>" means any outstanding Claims and obligations under the Prepetition Flagstar Loan Agreement and all other documents and agreements executed and delivered in connection with the Prepetition Flagstar Loan Agreement that are not Allowed Prepetition Flagstar Warehouse Facility Secured Claims or Allowed Flagstar Adequate Protection Claims under the Final Cash Flow DIP Order.

"<u>Prepetition Flagstar Warehouse Facility Secured Claims</u>" means any outstanding Secured Claims and obligations under the Prepetition Flagstar Loan Agreement and all other documents and agreements executed and delivered in connection with the Prepetition Flagstar Loan Agreement.

"<u>Prepetition J.V.B. Repo Agreement</u>" means that certain Master Repurchase Agreement, dated as of October 25, 2012, by and between FGMC and J.V.B., as amended, restated, supplemented or otherwise modified from time to time.

"<u>Prepetition J.V.B. Repo Facility Deficiency Claims</u>" means any outstanding deficiency Claims and obligations under the Prepetition J.V.B Repo Agreement and all other documents and agreements executed and delivered in connection with the Prepetition J.V.B. Repo Agreement.

"<u>Prepetition J.V.B. Repo Facility Secured Claims</u>" means any outstanding Secured Claims and obligations under the Prepetition J.V.B. Repo Agreement and all other documents and agreements executed and delivered in connection with the Prepetition J.V.B. Repo Agreement.

"<u>Prepetition Loan Agreements</u>" means the Prepetition Customers Loan Agreement and the Prepetition Flagstar Loan Agreement.

"<u>Prepetition LVS II Guaranty Claims</u>" means any outstanding Claims and obligations against the Debtors arising from the LVS II Offshore Guaranty.

"<u>Prepetition Repo Agreements</u>" means the Prepetition Customers Repo Agreement, the Prepetition TCB Repo Agreement, and the Prepetition J.V.B. Repo Agreement.

"<u>Prepetition Repo Facility Claims</u>" means the Prepetition Customers Repo Facility Claims, the Prepetition J.V.B. Repo Facility Claims, and the Prepetition TCB Repo Facility Claims.

"<u>Prepetition Repo Lenders</u>" means Customers Bank, Texas Capital Bank, National Association, and J.V.B.

"<u>Prepetition TCB Repo Agreement</u>" means that certain Mortgage Warehouse Agreement, dated as of August 14, 2020, by and between FGMC and Texas Capital Bank, National Association, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition TCB Repo Facility Deficiency Claims" means any outstanding deficiency Claims and obligations under the Prepetition TCB Repo Agreement and all other documents and agreements executed and delivered in connection with the Prepetition TCB Repo Agreement.

"Prepetition TCB Repo Facility Secured Claims" means any outstanding Secured Claims and obligations under the Prepetition TCB Repo Agreement and all other documents and agreements executed and delivered in connection with the Prepetition TCB Repo Agreement.

"Prepetition Warehouse Lenders" means Customers Bank, solely in its capacity as a lender pursuant to the Prepetition Customers Loan Agreement and Flagstar.

"Priority Claim" means a Priority Non-Tax Claim or a Priority Tax Claim.

"Priority Non-Tax Claim" means any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under section 507(a) of the Bankruptcy Code, including a Priority WARN Act Claim.

"Priority Tax Claim" means a Claim of a Governmental Unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"Priority WARN Act Claim" means a Claim or any portion of a Claim that seeks damages under the WARN Act and that meets the requirements and falls within the limitations of section 507(a)(4) of the Bankruptcy Code.

"Pro Rata" means proportionately so that, with respect to a Claim, the ratio of: (a) (i) the amount of property distributed on account of a particular Claim to (ii) the Allowed amount of the Claim, is the same as the ratio of (b) (i) the amount of property distributed on account of all Allowed Claims in the Class or Classes entitled to share in the applicable distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

"Professional" means an Entity:  (a) employed pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"Professional Fee Claim" means those fees and expenses claimed by Professionals pursuant to sections 330, 331, or 503 of the Bankruptcy Code, and accrued and unpaid as of the Effective Date.

"Professional Fee Reserve" means a reserve fund established by the Debtors or the Liquidating Trustee, as applicable, on or as soon as practicable after the Effective Date, to pay any accrued and unpaid (a) Professional Fee Claims incurred by a Professional and which have not yet been approved by the Bankruptcy Court; (b) fees or expenses incurred by an entity or person retained under the Ordinary Court Professional Order; and (c) Professional Fee Claims approved by the Bankruptcy Court.  The amounts deposited into the Professional Fee Reserve shall be free and clear of all liens, claims and encumbrances of any Persons or Entities except to the extent that any excess amounts remain in the Professional Fee Reserve after payment of all Allowed

-24-

Professional Fee Claims, such excess amounts to be distributed to the Cash Flow DIP Lender in accordance with the Plan.

"Proof of Claim" means a proof of claim filed pursuant to section 501 of the Bankruptcy Code or any order of the Bankruptcy Court, together with supporting documents.

"Rejection Bar Date" means the last date for any Entity whose claims arise out of the Bankruptcy Court approved rejection of an executory contract or unexpired lease to file a proof of claim for damages related to such rejection. The Rejection Bar Date for such Claims will be, (i) with respect to executory contracts and unexpired leases rejected pursuant to a Bankruptcy Court order other than the Confirmation Order, the date provided by an order approving the rejection, and, (ii) with respect to executory contracts and unexpired leases rejected pursuant to the Confirmation Order, the date that is thirty (30) days after the Effective Date.

"Related Persons" means, subject to any exclusions expressly set forth in the Plan, with respect to a specific Person, said Person's successors and assigns, and as applicable, its current and former shareholders, Affiliates, subsidiaries, employees, agents, investment managers, subagents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, and consultants. For the avoidance of doubt, the Affiliates of the Prepetition Bridge Lender and Cash Flow DIP Lender include Pacific Investment Management Company LLC, B2 FIE IV LLC, LVS II Offshore, L.P., LVS II Holdings, LP, Bravo II Guarantor I LLC, and Bravo Fund II, L.P.

"Release Opt-Out Election Form" means a form for holders of Claims to opt out of being a Releasing Party in connection with the Third Party Release.

"Released Parties" means, collectively, (a) the Debtors, (b) the DIP Lenders, (c) the Prepetition Bridge Lender, (d) the Committee, (e) Fannie Mae, (f) Freddie Mac, (g) each of the Related Persons of each of the Entities in the foregoing clauses (a)-(f) and (h) each Prepetition Warehouse Lender and Prepetition Repo Lender to the extent of the releases and stipulations set forth in the Final Cash Flow DIP Order, provided that as to this clause (h) only, nothing in this Plan shall modify such releases or stipulations; provided, however, that notwithstanding anything to the contrary herein, including the definition of "Related Persons," the following shall not be Released Parties: (i) the Debtors' accountants, and (ii) employees, directors, or officers who (a) were not employees, directors, or officers on the Petition Date, and (b) are not, and have never been, employed or indemnified by the Prepetition Bridge Lender, the Cash Flow DIP Lender, or any of the Related Persons of either the Prepetition Bridge Lender or Cash Flow DIP Lender.

"Releasing Parties" means, individually and collectively: (i) each holder of a Claim or Interest that does not opt out of the Third Party Release; (ii) the Committee and each of its members in such capacity; and (iii) with respect to each of the foregoing Entities in clauses (i) and (ii), such Entities' or Persons' successors, assigns, transferees, and such Entities' or Persons' officers and directors, agents, members, financial and other advisors, attorneys, employees, partners, affiliates, and representatives (in each case in their capacity as such), and any and all other entities who may purport to assert any cause of action, by, through, for, or because of such Entities or Persons.

"Sale Transaction" means a sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, the procedures established under the terms of the Bidding Procedures Order, and an order of the Bankruptcy Court approving such sale.

"Schedules" means the schedules of assets and liabilities as the Bankruptcy Court required the Debtors to file pursuant to section 521 of the Bankruptcy Code, the Official Bankruptcy Forms, and the Bankruptcy Rules, as they may be amended and supplemented from time to time, and the Debtors' statements of financial affairs filed with the Bankruptcy Court, as the Bankruptcy Court required the Debtors to file pursuant to section 521 of the Bankruptcy Code, the Official Bankruptcy Forms, and the Bankruptcy Rules, as they may be amended and supplemented from time to time [Docket Nos. 365, 366].

"Secured Claim" means any Claim that is secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of such Lien or right of setoff as determined under sections 506(a) or 1129(b) of the Bankruptcy Code, as applicable.

"Secured Prepetition Customers Loan Obligation Claims" means the Prepetition Customers Loan Obligation Claims solely to the extent secured by the Debtors' prepetition deposit accounts at Customers Bank.

"Secured Prepetition Facility Claims" means the Prepetition Repo Facility Claims and the Secured Prepetition Warehouse Facility Claims.

"Secured Prepetition Warehouse Facility Claims" means the Secured Prepetition Customers Loan Obligation Claims and the Secured Prepetition Flagstar Warehouse Facility Claims.

"Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

"Specified Assets" means the assets set forth on the schedule attached hereto as **Exhibit C**.

"Subsequent Distribution Date" means any date after the Initial Distribution Date upon which the Liquidating Trust makes a distribution to any holders of Allowed Administrative, Secured, Priority, or General Unsecured Claims.

"Tax" means any tax, charge, fee, levy, impost, or other assessment by any federal, state, local, or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, *ad valorem*, estimated, severance, stamp, occupation, and withholding tax.

"Tax" shall include any interest or additions attributable to, imposed on, or with respect to such assessments.

"Tax Claim" means all or that portion of an Allowed Claim held by a Governmental Unit for a Tax assessed or assessable against the Debtors.

"Third Party Release" has the meaning set forth in Section 16.2(c) hereof.

"Trust Budget" means a budget for the payment by the Liquidating Trust of post-Effective Date costs and expenses of the Liquidating Trust.  The initial Trust Budget is attached hereto as **Exhibit D**.  The Liquidating Trustee may amend the Trust Budget only with the consent of the Oversight Committee.

"Trust Claims Reserve" has the meaning set forth in Section 7.2(b) hereof.

"Trust Funding Amount" means a one-time transfer, in the amount set forth in the initial Trust Budget attached hereto as **Exhibit D**, to the Liquidating Trust to fund estimated post-Effective Date costs and expenses of the Liquidating Trust.

"Unimpaired Claim" means an unimpaired Claim within the meaning of section 1124 of the Bankruptcy Code.

"U.S. Trustee" means the Office of the United States Trustee for the District of Delaware.

"Voting Classes" mean Classes 3, 4, 5 and 6.

"Voting Deadline" means October 26, 2022 at 4:00 p.m. (prevailing Eastern Time).

"Voting Instructions" means the instructions for voting on the Plan contained on the Ballots.

"Voting Record Date" means the date as of which the identity of holders of Claims is set by the Bankruptcy Court for purposes of determining the Entities entitled to receive and vote on the Plan.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, *et seq*.

"WARN Act Claim" means the Priority WARN Act Claim filed as *Lori Buckley, Gayle Zech, Roberta Martinez, Jennifer Jackson, and James Davies, on behalf of themselves and all others similarly situated v. First Guaranty Mortgage Corp., et. al*., Adv. Pro. No. 22-50387.

"WARN Act Claimants" means the plaintiffs and putative class members of the WARN Act Claim.

"WARN Act Claim Reserve" means the reserve related to the WARN Act Claim as set forth in Section 14.11 hereof.

## SECTION 4
## BACKGROUND

4.1    General Background.

(a)    Debtors' Prepetition Business and Operations.

Prior to the Petition Date, FGMC operated as a full service, non-bank mortgage lender offering a full suite of residential mortgage loan options tailored to borrowers' different financial situations.  FGMC was one of the leading independent mortgage companies in the United States that originated residential mortgages through a national platform.  As described further below, FGMC's business included the origination, purchase, service, sale, and/or securitization of residential real estate mortgage loans.  However, due to unforeseen historically adverse market conditions for the mortgage lending industry, including unanticipated market volatility, FGMC has experienced significant operating losses and cash flow challenges.  As a result of these challenges, FGMC was forced to cease all of its origination activity and terminate the employment of nearly eighty percent (80%) of its workforce just prior to the Petition Date.

There were three main components, or channels, to FGMC's mortgage loan business:  (a) wholesale loan originations;  (b) retail loan originations;  and (c) correspondent lending. Specifically:

Wholesale Loan Originations.  FGMC's wholesale loan origination channel produced Ginnie Mae, Fannie Mae, Freddie Mac, and Non-Agency loans but was focused primarily on non-qualified mortgage ("Non-QM") loans to consumer borrowers who do not meet the attributes, typically based on the traditional income verification, required for a "qualified mortgage" under federal lending regulations. FGMC offered Non-QM loans for borrowers based on alternative credit methods such as "bank statements" and 1099-only income.  In the wholesale mortgage loan business, FGMC worked with an independent network of mortgage brokers to identify borrowers eligible for a residential mortgage loan.

Retail Loan Originations.  Through a centralized call center located in Plano, Texas, and a series of branch offices in various locations, FGMC also originated residential mortgage loans directly to retail customers.  Potential borrowers could call and ascertain whether they were eligible for a mortgage loan.  FGMC's loan officers also called potential customers, realtors and builders.  FGMC's employees handled the approval and underwriting process, obtained all required documentation, and ensured compliance with all regulatory requirements through the loan closing.

Correspondent Lending.  Through its correspondent lending channel, FGMC purchased mortgage loans originated and closed by other lenders.  The correspondent lenders are typically unable to sell the loans on the secondary market themselves; as such, FGMC purchased the correspondent loans, which included Fannie Mae, Freddie Mac, Ginnie Mae, Non-Agency, and Non-QM loans, and sold them itself.

Once a wholesale, retail or correspondent loan was originated or purchased, FGMC had the option to sell them to a number of parties or agencies, including Fannie Mae, Freddie Mac, Ginnie Mae. Prior to the Petition Date, in the ordinary course of business, FGMC's wholesale and retail mortgage loan channels were replenished with additional new loan origination on a daily basis. On June 24, 2022, FGMC ceased most new origination activity.

In addition to loan origination and purchasing, prepetition, FGMC also engaged in hedging activities in an effort to reduce risk due to volatility in pricing for loans that are originated and sold in fluctuating market conditions. This was necessary because there is a gap in time between the date a customer or borrower receives an interest rate lock at the time a mortgage loan commitment is issued and the date of settlement of the loan, and FGMC is expected to support the value of the trade by posting margin (*i.e.*, cash or other eligible collateral) to the hedge counterparty. FGMC was subject to margin calls from hedge counterparties in the weeks leading up to the Petition Date, adversely affecting its cash position.

Though not a core part of the business, FGMC also owns loan servicing rights, which it fulfills through a sub-servicer.

As of June 1, 2022, FGMC employed approximately 600 full-time employees, of which approximately 292 were paid (either in whole or in part) on a commission basis for loans closed. On June 24, 2022, as a result of its inability to procure additional financing to ease its liquidity crisis as well as the cessation of new loan origination activity, FGMC reduced its workforce by terminating the employment of approximately 471 employees, including approximately 284 employees paid (at least in part) on a commission basis. On June 24, 2022, FGMC sent the separated employees notices of planned employee separation pursuant to WARN Act. The events of June 24, 2022 described in the preceding two sentences shall be referred to herein as the "June 24 RIF."

Maverick is a non-operating holding company with no employees.

      (b)    <u>Corporate Organizational Structure</u>.

FGMC is a Virginia corporation and, as Maverick's sole Member, owns 100% of the equity interests in Maverick, a Delaware LLC.

Maverick owns 50% of the equity interests of FirstLine Holdings, LLC ("<u>FirstLine</u>"). The party owning the other 50% interest in FirstLine is a non-affiliated entity. FirstLine, as the sole Member, owns 100% of the equity interests of non-debtor FirstLine Title, LLC.

      (c)    <u>Debtors' Debt Structure</u>.

      (i)    <u>Prepetition Repo Facilities</u>.

Pursuant to the terms of the Prepetition Repo Agreements, the Debtors sold newly originated mortgage loans to repo counterparties to finance the origination of such mortgage loans, and typically repurchased such mortgage loans from the related Prepetition Repo Lender after origination, with the proceeds from sales of such loans to direct investors, including Fannie Mae, Freddie Mac, Ginnie Mae, or through the issuance of mortgage backed securities ("<u>MBS</u>"),

-29-

indirectly to investors, including Fannie Mae, Freddie Mac, Ginnie Mae and other secondary market participants. Prior to the issuance of MBS, the Debtors generally obtained advances of less than 100% of the unpaid principal balance ("UPB") of such mortgage loans from the Prepetition Repo Lenders which required the Debtors to use working capital to fund the remaining equity portion of the UPB which is often referred to as the "haircut".

(ii)    Prepetition Loan Agreements.

Under the terms of the Prepetition Loan Agreements, the applicable Prepetition lender advanced funds to the Debtors to finance the origination and/or purchase of mortgages. The amounts advanced pursuant to the Prepetition Loan Agreements were wholly or partially secured by mortgage loans, deposit accounts, and related collateral. The Debtors' obligations to Customers Bank under the Customers Bank Loan Agreement are further secured by the LVS II Offshore Guaranty.

(iii)    Agency Loans.

Typically, loans that will be sold to, invested in or guaranteed by an entity such as Fannie Mae, Freddie Mac, or Ginnie Mae (collectively, the "Agency Loans") are financed at 100%. With respect to non-Agency Loans and Non-QM Loans, Warehouse Lenders will finance between 90% and 95% of the original principal amount of the loan, which requires the Debtors to use working capital to fund the remaining portion of the principal balance of the mortgage loans.

As of the Petition Date, the Debtors estimated that they collectively owed the Prepetition Repo Lenders, and the Prepetition Warehouse Lenders approximately $418 million.

(iv)    Bridge Loans.

Pursuant to the Prepetition Bridge Loan Agreement, executed by FGMC, as borrower, and in favor of the Prepetition Bridge Lender, as lender, the Prepetition Bridge Lender extended certain loans and other financial accommodations to the Debtors (the "Prepetition Bridge Loans"). The Prepetition Bridge Lender is an indirect subsidiary of a private investment firm managed by Pacific Investment Management Company LLC. B2FIE IV LLC, an affiliate of the Cash Flow DIP Lender (described below), owns 100% of the equity interests of FGMC.

As of the Petition Date, the total outstanding amount due under the Prepetition Bridge Loan Agreement is approximately $18.4 million, $7.3 million of which was used to finance the Prepetition Bridge Loans.

Pursuant to the Prepetition Bridge Loan Agreement, the Debtors granted the Prepetition Bridge Lender (a) a fully perfected, junior security interest in and lien on substantially all of its encumbered assets, and (b) a fully perfected, senior security interest in and lien on substantially all of its unencumbered assets, including all proceeds thereof, whether then owned and existing or thereafter acquired or arising.

The Prepetition Bridge Loan Claims do not include (a) any amounts refinanced with the proceeds of the DIP Repo Facility or (b) any amounts "rolled up" into the Cash Flow DIP Facility. As of the Effective Date, there will not be any unpaid Prepetition Bridge Loan Claims.

-30-

(v)    <u>Unsecured Debt</u>.

As of the Petition Date, the Debtors estimate they owe approximately $78 million of unsecured indebtedness, including trade debt and payables, amounts owed to former and current employees, and a $25 million fully-drawn line of credit with Customers Bank.

(d)    <u>Wolter, Jackson and Buckley Actions</u>

On or about June 29, 2022, an action styled *Jennifer Wolter, on behalf of herself and all others similarly situated, Plaintiff, v. First Guaranty Mortgage Corporation, a foreign corporation, Defendant*, was filed in the United States District Court for the District of Nevada, Case 22:22-cv-01030 (the "<u>Wolter Action</u>") under which Plaintiff seeks to certify a class and pursue damages arising out of the June 24 RIF.  Since its filing, no action has been taken on or in response to the Wolter Action by or against FGMC.

On or about June 29, 2022, an action styled as *Jennifer Jackson, on behalf of herself and all others similarly situated, Plaintiff, v. First Guaranty Mortgage Corporation and Pacific Investment Management Company, LLC, Defendants*, was filed in the United States District Court for the Eastern District of Texas, Case 4:22-cv-00545 (the "<u>Jackson Action</u>") under which Plaintiff seeks to certify a class and pursue damages arising out of the June 24 RIF.  Since its filing, no action has been taken on or in response to the Jackson Action by or against FGMC.

On or about June 30, 2022, an action styled as *Lori Buckley, Gayle Zech, Roberts Martinez, Jennifer Jackson and James Davies, on behalf of themselves and all others similarly situated, Plaintiffs, v. First Guaranty Mortgage Corporation, et al., Defendants*, was filed in the United States Bankruptcy Court for the District of Delaware, Adversary Case 22-50387 (the "<u>Buckley Action</u>") under which Plaintiffs seek to certify a class and pursue damages arising out of the June 24 RIF against Defendants.  In addition, the Buckley Action seeks to certify a class and pursue damages arising out of an alleged reduction in force that occurred on April 27, 2022.  On August 31, 2022, Plaintiffs filed a *Summons and Notice of Pretrial Conference in Adversary Proceeding*.

FGMC intends to file a timely answer to the Buckley Action. The Debtors believe there are complete defenses to the Buckley Action and to any other WARN Act Claim that has or may be filed including but not limited to defenses and exceptions under the WARN Act itself, including unforeseen business circumstances, faltering company and liquidating fiduciary exceptions, defenses based upon payments, setoff and/or recoupment, exhaustion of the statutory limitation of the section 507(a)(4) of the Bankruptcy Code cap ($15,150 per Priority Non Tax Claim or portion thereof), and under Bankruptcy Code § 502(d) for payments made to Holders of WARN Act Claims that constitute preferences and/or fraudulent conveyances and that are avoidable under sections 544, 547, 548 and 550 of the Bankruptcy Code.  Counsel to the Buckley Action estimates the Debtors' maximum liability in the Buckley Action is $7,000,000, exclusive of attorneys' fees and expenses.  The Debtors dispute the alleged estimate by counsel to the Buckley Action, and further assert that there is no liability based on its defenses and exceptions under the WARN Act.  Counsel to the Buckley Action asserts that payment in full of any Allowed Priority WARN Act Claim, as an Allowed Priority Non-Tax Claim is due on the effective date, unless the holder(s) of the Allowed Priority WARN Act Claim agree to accept less favorable treatment.

4.2     Events Leading to Chapter 11 Filing.

(a)     Mortgage Industry.

As of the Petition Date, the mortgage industry had seen an increase in market volatility as a result of the following issues: concerns about the availability and cost of credit, uncertainty with respect to Government-Sponsored Enterprises (including Fannie Mae and Freddie Mac) under the current and/or future administrations, volatility in certain United States real estate markets, worsening economic conditions in the United States and Europe, the systemic impact of inflation or deflation, rising energy costs, geopolitical issues (including the potential for increased tensions between the United States and Russia resulting from the current situation involving Russia's invasion of Ukraine), political gridlock in United States relating to federal budget matters (including full or partial government shutdowns), trade wars, the COVID-19 outbreak (and any future outbreaks of coronavirus or similar diseases) and potential military actions or threats. After many years of historically low inflation and interest rates for mortgage loans due in major part to the United States Federal Reserve lowering interest rates to near zero as a result of the COVID-19 pandemic, mortgage rates in the United States experienced steep increases as a result of the Federal Reserve's inflation-curbing strategy. For instance, mortgage rates increased from an average of 3.2% in January 2022 to 5.27% in May 2022. As a result, the refinance boom that reached its peak in 2020 and 2021 is now largely over.

Limited housing stock contributed to a reduction in demand for purchase money mortgages as home values continued to appreciate at near record levels despite the recent rise in mortgage loan interest rates.

The residential mortgage industry is also one of the most highly regulated industries in the United States. The creation of the federal Consumer Financial Protection Bureau under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and the additional authorities and responsibilities granted to it to administer and enforce various federal consumer protection statutes, including new requirements related to determining a borrower's ability to repay the loan and new servicing rules, as well as the increasing sophistication and coordination of various state banking and financial institution regulators, has led to unprecedented oversight and scrutiny of the residential mortgage industry, significantly increasing the legal, regulatory, and operational risks of operating a mortgage origination company.

(b)     Debtors' Liquidity Crisis.

The Debtors' business had been directly and severely impacted by the series of macroeconomic challenges described above. In 2021, intense competition for mortgage originations, in part due to the collapse of the refinancing market, resulted in a sharp decline in the Debtors' performance. The Debtors' margins on the sale of loans also declined dramatically.

Unfortunately, these trends continued into 2022. For the four months ending April 30, 2022, the Debtors generated a $23.3 million after-tax net loss. This was, in part, a result of lower origination volumes. In the first four months of 2022, the Debtors originated $1.7 billion in mortgages, an annual originations pace of only $5 to $6 billion. Moreover, gain on sale margins continued to be very weak. In an effort to increase profitability, in the first four months of 2022,

-32-

FGMC expanded its retail residential mortgage loan origination platform, increasing origination volumes in its most profitable business line. However, this expansion came at considerable additional expense in the form of additional labor costs, primarily salary and benefits.

The combination of continued losses and volatile daily margin calls on hedge positions has led to drastic reductions in the Debtors' unrestricted cash creating a liquidity crisis. By mid-June 2022, as liquidity continued to decline, Debtors' management concluded that they could no longer continue operations without a significant injection of new liquidity, as one or two days of significant margin calls could leave the Debtors without any cash. Despite their best efforts, the Debtors were unable to obtain additional equity capital. As a result, the Debtors determined that, in order to protect part of the current "pipeline" (loans not yet funded), they needed to suspend all new loan applications, suspend all correspondent lending, cease all hedging payments and significantly reduce their workforce. The Debtors further determined that filing these Chapter 11 Cases was the best way to preserve operational ability to enable customers to close on loans already in the pipeline.

## SECTION 5
## THE CHAPTER 11 CASES

The following is a brief description of certain material events that have occurred during the Chapter 11 Cases.

5.1     <u>First Day Motions and Other Early Developments in the Chapter 11 Cases.</u>

The Debtors filed a number of motions after the Petition Date to, among other things, help stabilize operations and establish procedures for the Chapter 11 Cases:

           (i)      joint administration motion [Docket No. 2] and order thereon [Docket No. 56];

           (ii)      applications to appoint Kurtzman Carson Consultants LLC as the Debtors' claims and noticing agent [Docket No. 4] and order thereon [Docket No. 58] and as the Debtors' administrative advisor [Docket No. 94] and order thereon [Docket No. 229];

           (iii)      motion for authorization to use certain cash management procedures, bank accounts, and certain payment methods, and to modify requirements imposed by section 345(b) of the Bankruptcy Code [Docket No. 5], interim order thereon [Docket No. 61] and final order thereon [Docket No. 273];

           (iv)      motion for authorization to continue insurance programs and prepetition surety bonds and pay obligations arising thereunder [Docket No. 6] and order thereon [Docket No. 206];

           (v)      motion to provide procedures to deal with utility providers [Docket No. 8] and order thereon [Docket No. 205];

           (vi)      motion to pay certain prepetition employee wages, salaries, commissions, other compensation, and reimbursable expenses, and to continue certain employee

-33-

benefits programs [Docket No. 9] and interim order thereon [Docket No. 64] and a final order with regard to Current Employees and continued order with regard to Former Employees thereon [Docket No. 288]; and

(vii)    motion for authorization to pay prepetition claims (which the Debtors estimate will not exceed $800,000 in total) of certain vendors and service providers critical to their businesses including vendors that are key to maintaining the Debtors' existing computer and operating systems, documenting and closing loans, and selling loans into the secondary market [Docket No. 7] and interim order thereon [Docket No. 65] and final order thereon [Docket No. 272].

5.2    DIP Financing and Related Matters.

a.    DIP Repo Motion

On June 30, 2022, the Debtors filed the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Enter into Repurchase Agreement Facilities; (II) Authorizing the Debtors to Sell and Repurchase Mortgage Loans in the Ordinary Course of Business; (III) Granting Liens and Providing Superpriority Administrative Expense Status; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing with Respect to the Relief Requested Herein; and (VI) Granting Related Relief* [Docket No. 20] (the "DIP Repo Motion"). The DIP Repo Motion sought, among other things, to obtain critical funding enabling the Debtors to fund loans to be originated to borrowers intending to close on their home purchase within 60-90 days.  Prior to the Petition Date, the Debtors had access to warehouse lines with the Prepetition Repo Lenders.  They used these lines to fund loans in their pipeline.  As a result of the filing of the Chapter 11 Cases, the Debtors could no longer access the Prepetition Repo Agreements to fund new loans.  As such, the DIP Repo Facility (providing for a maximum committed amount of up to $125 million) was necessary in order to prevent the harm that would result if those borrowers were unable to complete the purchase or refinance of their homes because the Debtors failed to fund their mortgage loans.  The DIP Repo Motion contemplated that the DIP Repo Agent would be granted first priority liens in the "Purchased Assets" (as defined in the DIP Repo Facility Agreement) under section 364(c)(2) of the Bankruptcy Code and superpriority administrative claims.

Further, prior to the Petition Date, in the ordinary course of business, FGMC entered into forward transactions for the purchase or sale of mortgage-backed and other securities, including pursuant to "when-issued," "to-be-announced," "dollar roll" and other transactions with various regulated broker dealers pursuant to the terms of various Master Securities Forward Transaction Agreements (the "MSFTAs").  FGMC used the prepetition MSFTAs to hedge certain risks inherent in its financing operations.  The counterparties to the Debtors' prepetition MSFTAs include BMO Capital Markets Corp., Goldman Sachs LLC, Mizuho Securities USA LLC, Morgan Stanley & Co. LLC, South Street Securities LLC, and Wells Fargo Securities LLC.  Such hedging arrangements are customary in the mortgage origination industry and afford mortgage originators and borrowers more advantageous borrowing rates and terms.  By the DIP Repo Motion, the Debtors requested authority to enter into and perform as necessary under that certain postpetition DIP BCI MSFTA between FGMC and the counterparties thereto, including Barclays Capital Inc. Pursuant to the DIP BCI MSFTA, from time to time, FGMC and the DIP BCI MSFTA

-34-

counterparties will enter into forward transactions for the purchase or sale of mortgage-backed and other asset-backed securities and such other securities as the parties thereto may determine.  By the DIP Repo Motion and the Final DIP Repo Order, the DIP BCI MSFTA counterparties were provided first priority liens pursuant to section 364(c)(2) of the Bankruptcy Code to secure FGMC's obligations under the DIP BCI MSFTA in all DIP BCI MSFTA Collateral (as defined in the Final DIP Repo Order).

Additionally, prior to the Petition Date, FGMC entered into a margin, setoff and netting agreement to allow FGMC and counterparties to the Prepetition Repo Agreements and prepetition MSFTs to net, setoff and margin their obligations to one another under certain prepetition netting agreements.  Such netting arrangements are customary in the mortgage origination industry and afford mortgage originators and borrowers more advantageous borrowing rates and terms.  Simultaneously with the Debtors' entry into the DIP Repo Facility and DIP MSFTAs, the Debtors entered into the DIP Netting Agreement.  Under the DIP Netting Agreement and as approved by the Court in the Final DIP Repo Order, the DIP Netting Agreement provided the DIP Repo Parties with first-priority liens, pursuant to section 364(c)(2) of the Bankruptcy Code, in the DIP Netting Collateral (as defined in the Final DIP Repo Order), to secure FGMC's obligations under the DIP Netting Agreement.

On July 1, 2022, the Bankruptcy Court entered an order granting the DIP Repo Motion, subject to the terms set forth in the order, on an interim basis [Docket No. 66].  The Bankruptcy Court entered the Final DIP Repo Order on August 4, 2022 [Docket No. 288].

b.    Cash Flow DIP Motion

On June 30, 2022, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Operational Cash Flow Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* [Docket No. 22] (the "Cash Flow DIP Motion").  The Debtors require operating liquidity utilized for payment of general operating expenses such as payroll, facilities rent, vendors and other day-to-day expenses.  By the Cash Flow DIP Motion, the Debtors sought, among other things, authorization and approval of the Cash Flow DIP Facility from the Cash Flow DIP Lender (including any permitted assignee or successor), with up to $22 million in new money borrowing capacity.  The Debtors entered these Chapter 11 Cases with minimal cash on hand, and thus access to the Cash Flow DIP Facility and the use of cash collateral was critical to ensure the Debtors' smooth entry into chapter 11.  The Cash Flow DIP Facility was market tested and evaluated by the Debtors and their professionals, and includes the roll-up of certain obligations under the Prepetition Bridge Loans. On July 1, 2022, the Bankruptcy Court entered the Interim Cash Flow DIP Order and on August 4, 2022, the Bankruptcy Court entered the Final Cash Flow DIP Order.

The Debtors' Approved DIP Budget approved by Cash Flow DIP Lender and this Court in connection with entry of the Final Cash Flow DIP Order makes certain assumptions as to the timing of receipts from excess purchased assets and financed mortgage loan collateral under the Prepetition Repo Agreements and the Prepetition Flagstar Loan Agreement and other receipts which have proven, in hindsight, to have been optimistic.  Disbursements continue to be in line

-35-

with the Approved DIP Budget demonstrating the collections variance means additional funds will be required prior to confirmation in order to achieve consummation of the Plan. The Cash Flow DIP Loan Agreement matures on November 28, 2022, and the Final Cash Flow DIP Order has a Milestone requiring consummation of an Acceptable Plan (as defined therein) on or before October 28, 2022. The Debtors assume the Cash Flow DIP Lender will advance (i) all currently remaining available amounts under the Cash Flow DIP Credit Agreement and (ii) the DIP Budget Amount. The Debtors have estimated the additional funds required to be received on or before the date the Court is asked to enter the Confirmation Order will approximate ten million dollars ($10,000,000.00).

5.3    Debtors' Retention of Professionals and Personnel.

The Debtors filed applications or motions, as applicable, to employ certain professionals, including (i) Dentons US, LLP and Pachulski Stang Ziehl & Jones LLP as bankruptcy co-counsel in the Chapter 11 Cases (approved by the Bankruptcy Court pursuant to orders entered on August 2, 2022 [Docket Nos. 267 and 277]; and (ii) FTI Consulting, Inc., a restructuring advisory firm, to provide Tanya Meerovich as the Debtors' Chief Restructuring Officer and additional personnel as of the Petition Date (approved by the Bankruptcy Court pursuant to an order entered on August 10, 2022 [Docket No. 311]).

5.4    Formation of the Committee; Retention of Professionals.

On or about July 14, 2022, the U.S. Trustee formed the Committee, comprised of (i) South Street Securities, (ii) Daiwa Capital Markets America Inc., (iii) Maxwell Lending Solutions, Inc., (iv) Sourcepoint, Inc., and (v) Lori Buckley, as WARN Act plaintiff [Docket No. 132]. The Committee retained Thompson Coburn Hahn & Hessen LLP as bankruptcy counsel and Blank Rome LLP as Delaware counsel to the Committee, and Berkeley Research Group, LLC as its financial advisor.

5.5    Debtors' Schedules and Statement of Financial Affairs.

Upon the Debtors' motion, pursuant to an order entered on July 28, 2022 [Docket No. 227], the Bankruptcy Court extended the Debtors' time to file the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs until August 29, 2022. On August 29, 2022, the Debtors filed their respective Schedules and Statements of Financial Affairs [Docket Nos. 365, 366].

5.6    Claims Bar Dates.

Upon the Debtors' motion [Docket No. 324], on August 31, 2022, the Bankruptcy Court entered an order [Docket No. 382] setting October 14, 2022 as the general claims bar date for the filing of proofs of claim; December 27, 2022 as the claims bar date for governmental units; and October 14, 2022 as the bar date for administrative claims arising on or prior to September 30, 2022.

5.7    KEIP and KERP Motion. On July 20, 2022, the Debtors filed the *Motion of Debtors for Entry of Order (I) Approving Key Employee Incentive Program, (II) Key Retention Employee Program and (III) Granting Related Relief* [Docket No. 163 (redacted)], under seal, seeking

-36-

approval of the Debtors' proposed key employee incentive plan (covering six members of the Debtors' senior leadership team) and retention plan (for certain non-insider employees). The Committee objected to the Debtors' motion [Docket No. 248]. The Bankruptcy Court entered an order approving the KERP on the terms set forth therein [Docket No. 290]. The Bankruptcy Court separately entered an order approving the KEIP on the terms set forth therein [Docket No. 322].

5.8    Ordinary Course Professionals. On July 14, 2022, the Debtors filed a motion [Docket No. 135] seeking entry of an order establishing the orderly and regular process for: (i) the retention of professionals including accountants, attorneys and other professionals on an "as needed" basis without the submission of separate, formal retention applications; and (ii) for the allowance and payment of compensation and reimbursement of expenses for such ordinary course professionals. On August 2, 2022, the Bankruptcy Court entered the Ordinary Course Professionals Order [Docket No. 281].

5.9    Section 559 and Stay Relief Motions. On July 21, 2022, Customers Bank filed a *Motion Seeking Confirmation of Applicability of 11 U.S.C. § 559 or, in the Alternative, Granting Relief from the Automatic Stay and Related Relief* [Docket No. 184]. On August 2, 2022, the Bankruptcy Court entered the *Order Confirming Applicability of 11 U.S.C. § 559 and, in the Alternative, Granting Relief from the Automatic Stay and Related Relief* [Docket. No. 271]. On August 5, 2022, Flagstar Bank filed the *Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [Docket No. 298]. On August 11, 2022, the Bankruptcy Court entered the *Order Granting Flagstar Bank, FSB's Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [Docket No. 317]. The Debtors did not oppose either motion, but the entered orders reflected language negotiated by the Debtors.

5.10.    BSI Sale Motion. On August 15, 2022, the Debtors filed the *Debtors' Motion for Entry of Order (I) Authorizing (A) Private Sale and (B) Transfer of Certain Servicing Rights and Obligations to BSI Financial Services Free and Clear of Liens, Claims, Encumbrances, and Interests; (II) Approving the Terms of the Purchase and Sale Agreement: (III) Approving the Assumption and Assignment of Certain Executory Contracts; and (IV) Granting Related Relief* [Docket No. 328] (the "BSI Sale Motion"). The BSI Sale Motion seeks authorization of a private sale of certain mortgage servicing rights and obligations to Servis One, Inc. d/b/a BSI Financial Services ("BSI") for an estimated gross purchase price of $4.8 million. Under the terms of the Services Rights Bulk Purchase and Sale Agreement ("BSI PSA"), 80% of the purchase price is payable on the Closing Date,[2] 10% is payable on the 90 day anniversary of the Transfer Date and 10% is payable on the 180 day anniversary of the Transfer Date. Fannie Mae filed a limited objection and reservation of rights with respect to the BSI Sale Motion [Docket No. 370]. Customers Bank filed a limited opposition and reservation of rights with respect to the BSI Sale Motion [Docket No. 372]. Freddie Mac filed a limited objection and reservation of rights with respect to the BSI Sale Motion [Docket No. 374]. Thereafter, the Debtors filed a certification of counsel with respect to the BSI Sale Motion, attaching a revised form of order reflecting terms resolving the issues raised by Fannie Mae, Customers Bank, and Freddie Mac in their respective pleadings [Docket No. 389]. On September 1, 2022, the Bankruptcy Court entered an Order approving the BSI Sale Motion on such terms [Docket No. 390] (the "BSI Sale Order"). The BSI

---

[2] Capitalized terms not otherwise defined in this paragraphs shall have the meaning afforded in the BSI Sale Motion.

Sale closed on September 15, 2022, with a total purchase price of $4,549,241.23. In accordance with adjustments permitted under the terms of the BSI PSA, BSI paid 80% of the purchase price, or $3,396,131.21, on the closing date. The Transfer Date is expected to occur on November 1, 2022. Subject to any further adjustments or reconciliation required by the BSI PSA, BSI is expected to  pay $454,924.12 to the Debtors on or before January 30, 2023 and an additional $454,924.12 to the Debtors on or before April 30, 2023. In addition, FGMC and BSI entered into that certain Interim Servicing Agreement, dated as of September 15, 2022, pursuant to which FGMC, as interim servicer, shall, or shall cause its subservicer to, service the related mortgage loans on behalf of BSI for the interim period between the Closing Date and the Transfer Date.

5.11.    <u>Freddie Mac Settlement Motion and Adequate Assurances</u>.  On August 17, 2022, the Debtors filed the *Debtors' Motion for an Order (I) Approving a Settlement Agreement with the Federal Home Loan Mortgage Corporation Pursuant to Fed. R. Bankr. P. 9019, (II) Authorizing the Sale of Certain Mortgage Loans, and (III) Granting Related Relief* [Docket No. 341] (the "Freddie Mac Settlement Motion"). The Freddie Mac Settlement Motion sought authorization of a sale of up to $25 million of Purchased Loans[3] from the Debtors to Freddie Mac. In return, the Debtors have acknowledged that (i) they owe Freddie Mac approximately $219,000 in Outstanding Accounts Receivable; (ii) Freddie Mac has exposure of approximately $335,000 for Bifurcated Liability; (iii) Freddie Mac has exposure of approximately $140,000 for Non-Bifurcated Liability; and (iv) the Debtors owe Freddie Mac approximately $2,500,000 for Pre-Petition Repurchase Obligations. The Debtors also agreed to provide Freddie Mac a $45,000 Purchased Loans R&W Credit to settle any modeled life of loan origination or sale representations or warranties for the Loan Purchases. Further, if the Servicing Contract Rights for all Freddie Mac Loans (including, without limitation, all Purchased Loans) are transferred to BSI pursuant to the BSI PSA by November 1, 2022, Freddie Mac agreed to reduce the Pre-Petition Repurchase Obligations to $75,000 and to retain ownership of the mortgage loans subject to the repurchase demands. Pursuant to the Terms of the Freddie Mac Settlement, Freddie Mac credited against the Purchase Price for the Purchased Loans the aggregate amounts of the Outstanding Accounts Receivable, the Bifurcated Liability the Compromised Repurchase Obligations and the Purchased Loans R&W Credit. Pursuant to the BSI Sale Order, BSI assumed the obligation to satisfy all ongoing origination and selling representation and warranty liability and servicing representation and warranty liability with respect to FGMC's non-bifurcated servicing portfolio of Freddie Mac Loans. Under the Freddie Mac Settlement, the Debtors also agreed to include Freddie Mac in any list of released parties in any chapter 11 plan filed by the Debtors and to broadly release Freddie Mac from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses and claims of every kind or character (including, without limitation, any avoidance actions that may be asserted against Freddie Mac under chapter 5 of the Bankruptcy Code). Separately, on August 17, 2022, the Debtors filed the *Debtors' Motion for Entry of Order Approving Stipulation Between Debtors and Freddie Mac for the Provision of Adequate Protection and Adequate Assurances Relating to the Servicing of Freddie Mac's Loans* [Docket No. 343] (the "Freddie Mac Stipulation Motion"). The Committee filed a reservation of rights with respect to the Freddie Mac Settlement Motion and the Freddie Mac Stipulation Motion [Docket No. 377]. On August 31, 2022, the Bankruptcy Court entered Orders approving the Freddie Mac Settlement

---

[3] Capitalized terms not otherwise defined in this paragraph shall have the meaning afforded in the Freddie Mac Settlement Motion.

Motion [Docket No. 386] and the Freddie Mac Stipulation Motion [Docket No. 387] (collectively, the "<u>Freddie Mac Orders</u>").  The sale of the Purchased Loans to Freddie Mac closed on September 15, 2022 after application of the previously described credits to the Purchase Price, the balance was paid to the Debtors on that same date.  The foregoing description of the Freddie Mac Settlement Agreement, the Freddie Mac Stipulation and the Freddie Mac Orders are for informational purposes and are qualified by the express terms thereof.  Nothing in this Combined Plan and Disclosure Statement alters the terms of the Freddie Mac Settlement Agreement, the Freddie Mac Stipulation or the Freddie Mac Orders, all of which remain in full force and effect.

     5.12.   <u>Fannie Mae Settlement Motion and Adequate Assurances</u>.  On September 1, 2022, the Debtors filed the *Debtors' Motion for an Order (I) Approving a Settlement Agreement with the Federal National Mortgage Association Pursuant to Fed. R. Bankr. P. 9019, (II) Authorizing the Sale of Certain Mortgage Loans, and (III) Granting Related Relief* [Docket No. 394] (the "<u>Fannie Mae Settlement Motion</u>").  The Fannie Mae Settlement Motion sought authorization of a sale of up to $15 million of originated, Fannie Mae-eligible loans, with delivery through the Cash Window,[4] as set forth in the Lender Contract, from the Debtors to Fannie Mae.  Pursuant to the terms of the Fannie Mae Settlement Agreement, the Debtors acknowledged that Fannie Mae's claims under the Lender Contract include (i) repurchase obligations of $888,596.91; (ii) post purchase adjustments of $11,322.50; (iii) whole loan extension fees of $151.35; (iv) whole loan pair-off fees of $4,827.59; (v) risk-based pricing obligations of $1,489,525.62 and (vi) MBSGF-single family buy down obligations of $185,512.44.  Under the Fannie Mae Settlement Agreement, Fannie Mae agrees to reduce the outstanding repurchase obligations to $183,270.83 and a total Cure Obligation of $1,874,610.33 to assign Servicing Rights under the Lender Contract to BSI under the BSI PSA.  Fannie Mae also agrees under the Settlement Agreement to permit the Debtors to use approximately $808,000 held in the Blocked Account to partially satisfy the Cure Obligation.  As part of the settlement, the Debtors also agreed to include Fannie Mae in any list of released parties in any chapter 11 plan filed by the Debtors.  Separately, on September 1, 2022, the Debtors filed the Debtors' Motion for Entry of Order Approving Stipulation Between Debtors and Fannie Mae for the Provision of Adequate Protection and Adequate Assurances Relating to the Servicing of Fannie Mae's Loans [Docket No. 393] (the "<u>Fannie Mae Stipulation Motion</u>").  No objections to either the Fannie Mae Settlement Motion or the Fannie Mae Stipulation Motion were filed.  On September 10, 2022, the Bankruptcy Court entered Orders approving the Fannie Mae Settlement Motion [Docket No. 426] and the Fannie Mae Stipulation Motion [Docket No. 425] (collectively, the "<u>Fannie Mae Orders</u>").  The Fannie Mae Settlement Agreement was executed on September 14, 2022.  The sale of the Purchased Loans to Fannie Mae is expected to close shortly thereafter.  The Debtors have paid the Cure Amount due to Fannie Mae under the Fannie Mae Settlement Agreement.  The Fannie Mae Orders and the Fannie Mae Settlement Agreement provide for the termination of the Lender Contract.  The foregoing description of the Fannie Mae Settlement Agreement, the Fannie Mae Stipulation and the Fannie Mae Orders are for informational purposes and are qualified by the express terms thereof.  Nothing in this Combined Plan and Disclosure Statement alters the terms of the Fannie Mae Settlement Agreement, the Fannie Mae Stipulation or the Fannie Mae Orders, all of which remain in full force and effect.

---

[4] Capitalized terms not otherwise defined in this paragraph shall have the meaning afforded in the Fannie Mae Settlement Motion.

## SECTION 6
## CONFIRMATION AND VOTING PROCEDURES

6.1    <u>Confirmation Hearing</u>.

On October 7, 2022, the Bankruptcy Court entered the Conditional Approval and Procedures Order.  The Confirmation Hearing has been scheduled for **October 31, 2022, at 10:00 a.m. (prevailing Eastern Time)** to consider (a) final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

6.2    <u>Procedures for Objections</u>.

Any objection to final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Combined Plan and Disclosure Statement must be made in writing and filed with the Bankruptcy Court by no later than **October 26, 2022, at 4:00 p.m. (prevailing Eastern Time)** and be served in accordance with the local rules of the Bankruptcy Court on the following parties: (i) the Debtors c/o FTI Consulting, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036, Attn: Tanya Meerovich (tanya.meerovich@fticonsulting.com); (ii) counsel for the Debtors, (1) Dentons US LLP, 601 S. Figueroa St., Suite 2500, Los Angeles, CA 90018, Attn: Samuel R. Maizel (samuel.maizel@dentons.com) and Tania Moyron (tania.moyron@dentons.com), and (2) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899-8705 (Courier 19801), Attn: Laura Davis Jones (ljones@pszjlaw.com); (iii) counsel for the Official Committee of Unsecured Creditors, (1) Thompson Coburn Hahn & Hessen LLP, 488 Madison Ave., New York, NY 10022, Attn: Mark S. Indelicato (mindelicato@thompsoncoburn.com) and Mark T. Power (mpower@thompsoncoburn.com), and (2) Bank Rome LLP, 1201 Market Street, Suite 800, Wilmington, DE 19801, Attn: Regina Stango Kelbon (regina.kelbon@blankrome.com), Victoria A. Guilfoyle (tori.guilfoyle@blankrome.com), and Lawrence R. Thomas III (lorenzo.thomas@blankrome.com); and (iv) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Benjamin Hackman (benjamin.a.hackman@usdoj.gov).  **Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.**

6.3    <u>Requirements for Confirmation</u>.

The Bankruptcy Court will confirm the Combined Plan and Disclosure Statement only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code.  Among the requirements for confirmation in the Chapter 11 Cases is that the Combined Plan and Disclosure Statement be:  (i) accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Combined Plan and Disclosure Statement "does not discriminate unfairly" against, and is "fair and equitable" with respect to, such Class; and (ii) feasible.  The Bankruptcy Court must also find that:

-40-

a.    the Combined Plan and Disclosure Statement has classified Claims and Interests in a permissible manner;

b.    the Combined Plan and Disclosure Statement complies with the requirements of Chapter 11 of the Bankruptcy Code; and

c.    the Combined Plan and Disclosure Statement has been proposed in good faith.

The Debtors believe that the Combined Plan and Disclosure Statement complies, or will comply, with all such requirements.

6.4    <u>Classification of Claims and Interests</u>.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Combined Plan and Disclosure Statement divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).

Section 1122 of the Bankruptcy Code requires the Combined Plan and Disclosure Statement to place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such class. The Combined Plan and Disclosure Statement creates separate Classes to deal respectively with Priority Non-Tax Claims, various Secured Claims, General Unsecured Claims, and Interests. The Debtors believe that the Combined Plan and Disclosure Statement's classifications place substantially similar Claims or Interests in the same Class and, thus, meet the requirements of section 1122 of the Bankruptcy Code.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Combined Plan and Disclosure Statement complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Combined Plan and Disclosure Statement if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Combined Plan and Disclosure Statement.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Combined Plan and Disclosure Statement only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Combined Plan and Disclosure Statement has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the

-41-

Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Combined Plan and Disclosure Statement to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of the Combined Plan and Disclosure Statement, to make such permissible modifications to the Combined Plan and Disclosure Statement as may be necessary to permit its confirmation.  Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Combined Plan and Disclosure Statement.

**EXCEPT AS SET FORTH IN THE COMBINED PLAN AND DISCLOSURE STATEMENT, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE COMBINED PLAN AND DISCLOSURE STATEMENT'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class.  Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein.  The Debtors believe that the consideration, if any, provided under the Combined Plan and Disclosure Statement to holders of Allowed Claims reflects an appropriate resolution of their Allowed Claims taking into account the differing nature and priority of such Claims and Interests.  The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Combined Plan and Disclosure Statement.  Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Combined Plan and Disclosure Statement, or do not vote to accept the Combined Plan and Disclosure Statement, but who will be bound by the provisions of the Combined Plan and Disclosure Statement if it is confirmed by the Bankruptcy Court.

6.5    Impaired Claims or Interests.

Pursuant to section 1126 of the Bankruptcy Code, only the holders of Claims in Classes Impaired by the Combined Plan and Disclosure Statement and receiving a payment or Distribution under the Combined Plan and Disclosure Statement may vote to accept or reject the Combined

-42-

Plan and Disclosure Statement. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be Impaired if the Combined Plan and Disclosure Statement alters the legal, equitable, or contractual rights of the holders of such Claims or Interests treated in such Class. The holders of Claims not Impaired by the Combined Plan and Disclosure Statement are deemed to accept the Combined Plan and Disclosure Statement and do not have the right to vote on the Combined Plan and Disclosure Statement. The holders of Claims or Interests in any Class which will not receive any payment or Distribution or retain any property pursuant to the Combined Plan and Disclosure Statement are deemed to reject the Combined Plan and Disclosure Statement and do not have the right to vote. Finally, the holders of Claims or Interests whose Claims or Interests are not classified under the Combined Plan and Disclosure Statement are not entitled to vote on the Combined Plan and Disclosure Statement.

Under the Combined Plan and Disclosure Statement, holders of Claims in the Voting Classes -- Class 3 (Secured Prepetition Facility Claims), Class 4 (Loan Settlement Claims), Class 5 (Prepetition Customers Bank Guaranty Claim) and Class 6 (General Unsecured Claims) -- are Impaired and are entitled to vote to accept or reject the Combined Plan and Disclosure Statement. Holders of Claims in Class 1 (Priority Non-Tax Claims) and Class 2 (Other Secured Claims) are Unimpaired and, therefore, not entitled to vote on the Combined Plan and Disclosure Statement and are deemed to accept the Combined Plan and Disclosure Statement. Holders of Interests in Class 7 are Impaired and will not receive any payment or Distribution or retain any property pursuant to the Combined Plan and Disclosure Statement and, therefore, are deemed to reject the Combined Plan and Disclosure Statement and do not have the right to vote.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN THE VOTING CLASSES.**

6.6     Confirmation Without Necessary Acceptances; Cramdown.

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because holders of Interests in Class 7 are deemed to reject the Combined Plan and Disclosure Statement, the Debtors will seek confirmation of the Combined Plan and Disclosure Statement from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in the Impaired Classes is entitled to receive any property under the Combined Plan and Disclosure Statement.

The concept of "unfair discrimination" is not defined in the Bankruptcy Code, but case law suggests it exists when a difference in a plan's treatment of two classes of equal priority results in

a materially lower percentage recovery for the non-accepting class. The Debtors do not believe that the Plan unfairly discriminates against any Class of Claims.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

      a.    <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

      b.    <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

      c.    <u>Interests</u>. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Combined Plan and Disclosure Statement satisfy the absolute priority rule, where required.

    6.7    <u>Feasibility</u>.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Combined Plan and Disclosure Statement). Based on the Debtors' analysis and subject to the financing contingency described below, the Liquidating Trustee will have sufficient assets to accomplish its tasks under the Combined Plan and Disclosure Statement. Therefore, the Debtors believe that the liquidation pursuant to the Combined Plan and Disclosure Statement will meet the feasibility requirements of the Bankruptcy Code.

The Debtors' Approved DIP Budget approved by Cash Flow DIP Lender and this Court in connection with entry of the Final Cash Flow DIP Order makes certain assumptions as to the timing of receipts from excess purchased assets and financed mortgage loan collateral under the Prepetition Repo Agreements and the Prepetition Flagstar Loan Agreement and other receipts which have proven, in hindsight, to have been optimistic. Disbursements continue to be in line with the Approved DIP Budget demonstrating the collections variance means additional funds will

be required prior to confirmation in order to achieve consummation of the Plan. The Cash Flow DIP Loan Agreement matures on November 28, 2022 and the Final Cash Flow DIP Order has a Milestone requiring consummation of an Acceptable Plan (as defined therein) on or before November 4, 2022. The Debtors assume the Cash Flow DIP Lender will advance (i) all currently remaining available amounts under the Cash Flow DIP Credit Agreement and (ii) the DIP Budget Amount. The Debtors have estimated the additional funds required to be received on or before the date the Court is asked to enter the Confirmation Order will approximate fourteen and a half million dollars ($14,500,000.00).

      6.8    <u>Best Interests Test and Liquidation Analysis</u>.

      Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

      To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

      The Debtors, with the assistance of their advisors, have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by holders of Claims if the Chapter 11 Cases were converted to cases under chapter 7 (the "<u>Liquidation Analysis</u>"), which is attached hereto as **Exhibit A**.

      Based upon the Debtors' current projections, holders of Allowed Administrative Claims, Priority Claims and Other Secured Claims will be paid in full under the Plan, while holders of Allowed General Unsecured Claims will receive a projected distribution to be determined based on various assumptions. *See* **Exhibit A** (Liquidation Analysis Supplement) attached hereto.

      Based upon **Exhibit A** (Liquidation Analysis Supplement) attached hereto, the Debtors believe that creditors will receive at least as much or more under the Plan than they would receive if the Chapter 11 Cases were converted to chapter 7 cases.

-45-

6.9     Eligibility to Vote on the Combined Plan and Disclosure Statement.

Unless otherwise ordered by the Bankruptcy Court, only holders of Allowed Claims in the Voting Classes may vote on the Combined Plan and Disclosure Statement.  Further, subject to the tabulation procedures that were approved by the Conditional Approval and Procedures Order, in order to vote on the Combined Plan and Disclosure Statement, you must hold an Allowed Claim in the Voting Classes, or be the holder of a Claim that has been temporarily Allowed for voting purposes only pursuant to the approved tabulation procedures or under Bankruptcy Rule 3018(a).

6.10     Solicitation Package / Release Opt-Out Election Form.

All holders of Allowed Claims in the Voting Classes will receive a solicitation package (the "Solicitation Package").  The Solicitation Packages will contain:  (i) the Combined Plan and Disclosure Statement; (ii) the Conditional Approval and Procedures Order; (iii) notice of the Confirmation Hearing; (iv) a form of Ballot, including voting instructions and a pre-addressed return envelope; (v) a Release Opt-Out Election Form; and (vi) such other materials as the Bankruptcy Court may direct or approve or that the Debtors deem appropriate.

All other Creditors and parties in interest not entitled to vote on the Combined Plan and Disclosure Statement will receive only a copy of the notice of Confirmation Hearing and a Release Opt-Out Election Form.

Copies of the Combined Plan and Disclosure Statement shall be available on the Claims and Balloting Agent's website at https://www.kccllc.net/fgmc.  Any creditor or party-in-interest can request a hard copy of the Combined Plan and Disclosure Statement be sent to them by regular mail by calling the Claims and Balloting Agent at (888) 647-1742  (U.S. & Canada) during regular business hours.

**IN ADDITION TO OTHER PARTIES WHO WILL BE CONSIDERED RELEASING PARTIES, ANY HOLDER OF A CLAIM OR INTEREST THAT DOES NOT AFFIRMATIVELY OPT-OUT OF THE THIRD PARTY RELEASE CONTAINED IN SECTION 16 HEREOF BY TIMELY AND PROPERLY COMPLETING AND RETURNING A RELEASE OPT-OUT ELECTION FORM WILL BE CONSIDERED A RELEASING PARTY IN RELATION TO THE THIRD PARTY RELEASE UNDER THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

6.11     Voting Procedures, Voting Deadline, and Deadline to Submit the Release Opt-Out Election.

The Voting Record Date for determining which holders of Claims in the Voting Classes may vote on the Combined Plan and Disclosure Statement is September 28, 2022.

In order for your Ballot to count, you must (1) complete, date, and properly execute the Ballot and (2) properly deliver the Ballot to the Claims and Balloting Agent by either (a) mailing the Ballot to the Claims and Balloting Agent at the following address:  FGMC Ballot Processing c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; and/or (b) uploading the  Ballot  on  the  Claims  and  Balloting  Agent's  online  balloting  platform  at

-46-

https://www.kccllc.net/fgmc.  Instructions for casting a Ballot will be available on the Claims and Balloting Agent's website.

Ballots must be submitted electronically, or the Claims and Balloting Agent must actually receive physical, original Ballots by mail or overnight delivery, on or before the Voting Deadline, which is **October 26, 2022 at 4:00 p.m. (prevailing Eastern Time)**.  Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, you may not change your vote once a Ballot is submitted electronically or the Claims and Balloting Agent receives your original paper Ballot.  Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, any Ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Combined Plan and Disclosure Statement.

In order to be effective, Release Opt-Out Election Form for holders of Claims or Interests entitled to opt out of being a Releasing Party in connection with the Third Party Release contained in Section 16.2(b) must be received by the Claims and Balloting Agent by the Voting Deadline. Each Release Opt-Out Election Form must be properly delivered to the Claims and Balloting Agent by either (a) mailing the Release Opt-Out Election Form to the Claims and Balloting Agent at the following address:  FGMC Ballot Processing c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (b) uploading the Release Opt-Out Election Form on the Claims and Balloting Agent's online opt-out portal at https://www.kccllc.net/fgmc.

**IF YOU ARE ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL OR UPLOAD THE BALLOT YOU RECEIVE.  PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT OR PROCEDURES FOR VOTING ON THE COMBINED PLAN AND DISCLOSURE STATEMENT, PLEASE CONTACT THE CLAIMS AND BALLOTING AGENT BY (I) TELEPHONE AT (888) 647-174 (U.S./CANADA) OR (II) EMAIL AT FGMCInfo@kccllc.com.  THE CLAIMS AND BALLOTING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

6.12    <u>Acceptance of the Combined Plan and Disclosure Statement</u>.

If you are a holder of a Claim in one of the Voting Classes, your acceptance of the Combined Plan and Disclosure Statement is important.  In order for the Combined Plan and Disclosure Statement to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Combined Plan and Disclosure Statement.  At least one Impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Combined Plan and Disclosure Statement.  The Debtors urge that you vote to accept the Combined Plan and Disclosure Statement.

-47-

## SECTION 7
## CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER DISCLOSURES

7.1     <u>Certain Risk Factors to be Considered</u>.

THE COMBINED PLAN AND DISCLOSURE STATEMENT AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW.  HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT.   THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT AND ITS IMPLEMENTATION.

(a)     <u>The Combined Plan and Disclosure Statement May Not Be Accepted</u>.

The Debtors can make no assurances that the requisite acceptances of the Combined Plan and Disclosure Statement will be received, and the Debtors may need to obtain acceptances of an alternative plan for the Debtors, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any alternative arrangement or plan would be similar to or as favorable to creditors as those proposed in the Combined Plan and Disclosure Statement.

(b)     <u>The Combined Plan and Disclosure Statement May Not Be Confirmed</u>.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Combined Plan and Disclosure Statement.  Even if the Bankruptcy Court determined that the Combined Plan and Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Combined Plan and Disclosure Statement if it finds that any of the statutory requirements for confirmation had not been met.  As is described in greater detail in Section 6.3, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan.  While, as more fully set forth Section 6, the Debtors believe that the Combined Plan and Disclosure Statement complies with or will comply with all such requirements, there can be no guarantee that the Bankruptcy Court will agree.

Moreover, there can be no assurance that modifications to the Combined Plan and Disclosure Statement will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.  If the Combined Plan and Disclosure Statement is not confirmed, it is unclear what distributions holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of liquidation.  If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case

-48-

it is likely that the holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Combined Plan and Disclosure Statement.

(c)     Distributions to Holders of Allowed Claims Under the Combined Plan and Disclosure Statement May be Inconsistent with Projections.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution.  There can be no assurance that the estimated Claim amounts set forth in the Combined Plan and Disclosure Statement are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

(d)     Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  As is described in greater detail in Section 6.4, the Debtors believe that the classification of Claims and Interests under the Combined Plan and Disclosure Statement complies with the requirements set forth in the Bankruptcy Code.  Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion.

To the extent that the Bankruptcy Court finds that a different classification is required for the Combined Plan and Disclosure Statement to be confirmed, the Debtors would seek to (i) modify the Combined Plan and Disclosure Statement to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Combined Plan and Disclosure Statement, by changing the composition of such Class and the vote required for approval of the Combined Plan and Disclosure Statement.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Combined Plan and Disclosure Statement based upon such reclassification.  Except to the extent that modification of classification in the Combined Plan and Disclosure Statement requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Combined Plan and Disclosure Statement by any holder of Claims pursuant to this solicitation will constitute a consent to the Combined Plan and Disclosure Statement's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member.  The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Combined Plan and Disclosure Statement only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Combined Plan and Disclosure Statement provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Combined Plan and Disclosure Statement complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Combined Plan and Disclosure Statement does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Combined Plan and Disclosure Statement. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Combined Plan and Disclosure Statement and could increase the risk that the Combined Plan and Disclosure Statement will not be consummated.

(e)    Failure to Consummate the Combined Plan and Disclosure Statement.

Although the Debtors believe that the Effective Date will occur and may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

(f)    The Releases May Not Be Approved.

There can be no assurance that the releases, as provided in Sections 16.2 and 16.3, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan that differs from the Combined Plan and Disclosure Statement or the Plan not being confirmed.

(g)    Reductions to Estimated Creditor Recoveries.

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of distributions to creditors in such Class to be reduced substantially. The amount of cash realized from the monetization of the Debtors' remaining assets could be less than anticipated, which could cause the amount of distributions to creditors to be reduced substantially.

(h)    Agency Risk

FGMC is subject to regulation by various federal agencies, including, without limitation, Ginnie Mae and the Federal Housing Administration, U.S. Department of Agriculture's Rural Housing Service, and U.S. Department of Veterans Affairs, and the government asserts that any failure by FGMC to abide by applicable non-bankruptcy law may lead to administrative actions or the accrual of administrative expense claims in favor of the government. In particular, Ginnie Mae has requested that FGMC withdraw voluntarily from the Ginnie Mae MBS program by November 1, 2022, and if it fails to do so, Ginnie Mae has asserted it may extinguish FGMC's participation rights pursuant to non-bankruptcy law. Any claims or expenses asserted by Ginnie Mae are subject to all of the Debtors' rights and defenses thereto, including rights and defenses arising under the Bankruptcy Code, the Bankruptcy Rules, and applicable non-bankruptcy law. All such rights and defenses of the Debtors are explicitly reserved.

-50-

7.2    Certain U.S. Federal Income Tax Consequences.

The following discussion is a summary of certain material U.S. federal income tax consequences of the Combined Plan and Disclosure Statement to the Debtors and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of Claims. The following summary does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote on the Combined Plan and Disclosure Statement. This summary is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Combined Plan and Disclosure Statement and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders of Claims in light of their individual circumstances, nor does the discussion deal with tax issues with respect to holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies; banks or other financial institutions; brokers, dealers, or traders in securities; real estate investment trusts; governmental authorities or agencies; tax-exempt organizations; retirement plans; individual retirement or other tax-deferred accounts; certain expatriates or former long-term residents of the United States; small business investment companies; regulated investment companies; S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes and their owners; persons whose functional currency is not the U.S. dollar; persons who use a mark-to-market method of accounting; persons required to report income on an applicable financial statement; persons holding Claims or Interests as part of a straddle, hedge, constructive sale, conversion transaction, or other integrated transaction; and persons who are not U.S. holders (as defined below)). Furthermore, this discussion assumes that a holder of a Claim holds such claim as a "capital asset" within the meaning of section 1221 of the Internal Revenue Code (generally property held for investment). This discussion does not address any U.S. federal non-income (including estate or gift), state, local, or foreign taxation, alternative minimum tax, or the Medicare tax on certain net investment income.

If a partnership (or other entity or arrangement classified as a partnership for U.S. federal income tax purposes) is a holder of Claims or Interests, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership. A holder of a Claim or Interest that is a partnership and the partners in such partnership should consult their tax advisors with regard to the U.S. federal income tax consequences of the Combined Plan and Disclosure Statement.

**THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO**

-51-

**CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

      (a)    <u>Tax Consequences for U.S. Holders of Certain Claims</u>.

      Generally, a holder of a Claim should in most, but not all, circumstances recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its Claim and such holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a holder's Claim. The tax basis of a holder in a Claim will generally be equal to the holder's cost therefor. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim for more than one year.

      A creditor who receives Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such creditor realizes an overall gain or loss as a result of surrendering its Claim. A creditor who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such creditor realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

      Under the Plan, the holders of certain Claims, including General Unsecured Claims in Class 6, will likely receive only a partial distribution of their Allowed Claims. Whether the applicable holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the holder and its Claims. Creditors should consult their own tax advisors.

      (b)    <u>Tax Consequences in Relation to Liquidating Trust</u>.

      As of the Effective Date, the Liquidating Trust will be established for the benefit of the holders of certain Allowed Claims. The tax consequences of the Plan in relation to the Liquidating Trust and the Beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law.

      Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to the Liquidating Trust's claims reserves) among holders of Claims will be determined by

reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its assets (valued at their tax book value) to the holders of the beneficial interests in the Liquidating Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining trust assets.

The tax book value of the trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Uncertainties with regard to federal income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee may (a) elect to treat any trust assets allocable to, or retained on account of, Disputed Claims (the "Trust Claims Reserve") as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Trust Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the trust assets in such reserves, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtor. All parties (including, without limitation, the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) will be required to report for tax purposes consistently with the foregoing.

The Liquidating Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994.28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan and Liquidating Trust Agreement, and in conformity with Revenue Procedure 94-45, *supra*, all parties (including the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) are required to treat for federal income tax purposes, the Liquidating Trust as a grantor trust of which the holders of the applicable Allowed Claims are the owners and grantors. While the following discussion assumes that the Liquidating Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and the Beneficiaries thereof could materially vary from those discussed herein.

-53-

In general, each creditor who is a Beneficiary of the Liquidating Trust will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Beneficiary in satisfaction of its applicable Allowed Claim, and (ii) such Beneficiary's adjusted tax basis in such Claim.  The "amount realized" by a Beneficiary will equal the sum of cash and the aggregate fair market value of the property received by such party pursuant to the Plan (such as a Beneficiary's undivided beneficial interest in the assets transferred to the Liquidating Trust). Where gain or loss is recognized by a Beneficiary in respect of its Allowed Claim, the character of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the party, whether the Claim constituted a capital asset in the hands of the party and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the party had previously claimed a bad debt deduction in respect of the Claim.

After the Effective Date, any amount that a creditor receives as a distribution from the Liquidating Trust in respect of its beneficial interest in the Liquidating Trust should not be included, for federal income tax purposes, in the party's amount realized in respect of its Allowed Claim, but should be separately treated as a distribution received in respect of such party's beneficial interest in the Liquidating Trust.

In general, a Beneficiary's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Liquidating Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the Beneficiary's holding period in such assets will begin the day following the Effective Date.  Distributions to any Beneficiary will be allocated first to the original principal portion of the Beneficiary's Allowed Claim as determined for federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim.  However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

For all federal income tax purposes, all parties (including the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) will treat the transfer of assets to the Liquidating Trust, in accordance with the terms of the Plan and Liquidating Trust Agreement, as a transfer of those assets directly to the holders of the applicable Allowed Claims followed by the transfer of such assets by such holders to the Liquidating Trust.  Consistent therewith, all parties will treat the Liquidating Trust as a grantor trust of which such holders are to be owners and grantors.  Thus, such holders (and any subsequent holders of interests in the Liquidating Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Liquidating Trust for all federal income tax purposes.  Accordingly, each holder of a beneficial interest in the Liquidating Trust will be required to report on its federal income tax return(s) the holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust.

The Liquidating Trust's taxable income will be allocated to the holders of beneficial interests in the Liquidating Trust in accordance with each such holder's pro rata share.  The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The federal income tax reporting obligation of a holder of a beneficial interest in the Liquidating Trust is not dependent upon the Liquidating Trust distributing any cash or other proceeds. Therefore, a holder of a beneficial interest in the Liquidating Trust may incur a federal income tax liability regardless of the fact that the Liquidating Trust has not made, or will not make, any concurrent or subsequent distributions to the holder. If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the Liquidating Trust it holds, the holder may be allowed a subsequent or offsetting loss.

The Liquidating Trustee will file with the IRS returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Liquidating Trust will also send to each holder of a beneficial interest in the Liquidating Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Plan and the transactions contemplated thereunder.

(c)    <u>Information Reporting and Withholding</u>.

In connection with the Combined Plan and Disclosure Statement, the Debtors will comply with all applicable withholding and information reporting requirements imposed by U.S. federal, state, local, and foreign taxing authorities, and all Distributions under the Combined Plan and Disclosure Statement will be subject to those withholding and information reporting requirements. Holders of Claims may be required to provide certain tax information as a condition to receiving Distributions pursuant to the Combined Plan and Disclosure Statement.

In general, information reporting requirements may apply to Distributions pursuant to the Combined Plan and Disclosure Statement. Additionally, under the backup withholding rules, a holder may be subject to backup withholding with respect to Distributions made pursuant to the Combined Plan and Disclosure Statement, unless a U.S. holder provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establish an exemption from backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against a U.S. holder's U.S. federal income tax liability, if any, hand may entitle a U.S. holder to a refund, provided the required information is timely furnished to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Combined Plan and Disclosure Statement would be subject to these regulations and require disclosure on the holder's tax returns.

-55-

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

       7.3     <u>Releases, Exculpations, and Injunctions</u>.

This Combined Plan and Disclosure Statement contains certain releases, exculpations, and injunction language. Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Plan will affect any Claim, interest, right, or action with regard to the Debtor and certain third parties.

**THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

       7.4     <u>Alternatives to the Combined Plan and Disclosure Statement</u>.

If the requisite acceptances are not received or the Combined Plan and Disclosure Statement is not confirmed and consummated, the theoretical alternatives to the Combined Plan and Disclosure Statement would be (a) formulation of an alternative chapter 11 plan, (b) conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (c) dismissal of the Chapter 11 Cases. As discussed below, the Debtors do not believe that any of these alternatives, even if viable, would afford holders of Claims or Interests a greater recovery than what is provided by the Combined Plan and Disclosure Statement.

If the Combined Plan and Disclosure Statement is not confirmed, then the Debtors or any other party in interest could attempt to formulate a different plan. The additional costs, including, among other amounts, additional professional fees, all of which would constitute Administrative Claims (subject to allowance thereof), however, may be so significant that one or more parties in interest could request that the Chapter 11 Cases be converted to chapter 7. At this time, the Debtors do not believe that there are viable alternative plans available to the Debtors.

If the Combined Plan and Disclosure Statement is not confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate and distribute the Debtors' remaining assets in accordance with the priorities established by the Bankruptcy Code. As discussed above and indicated in the Liquidation Analysis, the Debtors believe that the Combined Plan and Disclosure Statement provides a better outcome for holders of Claims than a chapter 7 liquidation would provide.

-56-

If the Combined Plan and Disclosure Statement is not confirmed, the Chapter 11 Cases also could be dismissed.  Among other effects, dismissal would result in the termination of the automatic stay, thus permitting creditors to assert state-law rights and remedies against the Debtors and their assets, likely to the detriment of other creditors.  While it is impossible to predict precisely what would happen in the event the Chapter 11 Cases are dismissed, it is unlikely that dismissal would result in a ratable distribution of the Debtors' assets among creditors as provided in the Combined Plan and Disclosure Statement.  Thus, the vast majority of creditors could expect to receive less in the dismissal scenario than they would receive under the Combined Plan and Disclosure Statement.

## SECTION 8
## UNCLASSIFIED CLAIMS

8.1   <u>Unclassified Claims</u>.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Loan Claims, and Priority Tax Claims have not been classified for purposes of voting or receiving Distributions.  Rather, all such Claims are treated separately as unclassified Claims as set forth in this Section, and the holders thereof are not entitled to vote on the Combined Plan and Disclosure Statement.

8.2   <u>Administrative Claims</u>.

(a)   Except to the extent that a holder of an Allowed Administrative Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive from Available Cash, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the holder of such Claim and the Debtors or the Liquidating Trustee, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law.

(b)   Holders of Administrative Claims (including, without limitation, Professionals requesting compensation or reimbursement of such expenses pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code and creditors asserting diminution of value claims authorized pursuant to the Final Cash Flow DIP Order) that do not file such requests by the applicable deadline provided herein may be subject to objection for untimeliness and may be prohibited by order of the Bankruptcy Court from asserting such claims against the Debtors, the Estates, the Liquidating Trust, or their successors or assigns, or their property.  Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

US_ACTIVE\122262256\V-5
DOCS_DE:241262.1 28311/001

(c)      All fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date.

8.3      Professional Fees.

(a)      Professionals requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code or required to file fee applications by order of the Bankruptcy Court for services rendered prior to the Effective Date must file and serve pursuant to the notice provisions of the Interim Fee Order, an application for final allowance of compensation and reimbursement of expenses no later than forty five (45) days after the Effective Date.   All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court.  For avoidance of doubt, the Liquidating Trustee is not authorized under the Plan to object to applications for final allowance of compensation and reimbursement of expenses.

(b)      On the Effective Date, or as soon as practicable thereafter, the Liquidating Trustee shall establish an appropriate Professional Fee Reserve based upon estimates of anticipated fees provided by Professionals for services rendered and expenses incurred prior to the Effective Date, including estimated fees for services rendered, and actual and necessary costs incurred, in connection with the filing, service and prosecution of any applications for allowance of Professional Fees pending on the Effective Date or filed and/or served after the Effective Date. The Liquidating Trustee shall supplement the Professional Fee Reserve if the amount originally established is insufficient to pay Allowed Professional Fee Claims.

(c)      Upon approval of the fee applications by the Bankruptcy Court, the Liquidating Trustee shall pay Professionals from the Professional Fee Reserve all of their respective Allowed Professional Fee Claims.

(d)      For the avoidance of doubt neither the amount of the Allowed Professional Fee Claims for any Professional, nor the amount included in the Professional Fee Reserve for such Professional, shall exceed the line-item amount for such Professional set forth in the Approved DIP Budget; *provided, however*, to the extent Allowed Professional Fee Claims of Professionals retained by the Committee exceed the amount(s) set forth in the Approved DIP Budget, such Professional(s) shall be paid such additional amounts from the GUC Share of Net Liquidating Trust Proceeds subject to approval by the Bankruptcy Court.

8.4      DIP Loan Claims.

(a)      DIP Repo Claims.

On or before the Effective Date, unless otherwise agreed by the DIP Repo Parties, the holders of the DIP Repo Claims shall be paid in full, in Cash.

(b)      Cash Flow DIP Claims.

Pursuant to the terms of the Committee Settlement, the Cash Flow DIP Lender shall receive (a) any Excess Cash on the Effective Date, and (b) the Cash Flow DIP Lender Share of the Net

-58-

Liquidating Trust Proceeds, until the Cash Flow DIP Claims and DIP Repo Guarantee Claims have been paid in full, in Cash.

    8.5    <u>Priority Tax Claims</u>.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall be paid the full unpaid amount of such Allowed Priority Tax Claim as follows: (a) Cash equal to the unpaid portion of the Allowed Priority Tax Claim on the later of the Effective Date or thirty (30) days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (b) such other treatment as to which the holder of an Allowed Priority Tax Claim and the Debtors shall have agreed upon in writing.

**SECTION 9**
**CLASSIFICATION OF CLAIMS AND INTERESTS**

    9.1    <u>Summary of Classification</u>.

The provisions of this Section 9 govern Claims against and Interests in the Debtors.  Any Class that is vacant will be treated in accordance with Section 9.3.

The following table designates the Classes of Claims against, and Interests in, the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Combined Plan and Disclosure Statement in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Combined Plan and Disclosure Statement.  A Claim or portion thereof is classified in a particular Class only to the extent that such Claim or portion thereof qualifies within the description of such Class and is classified in a different Class to the extent that the portion of such Claim qualifies within the description of such different Class.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 3 | Secured Prepetition Facility Claims | | |
| | A.   Prepetition J.V.B. Repo Facility Secured Claims | Impaired | Yes |
| | B.   Prepetition TCB Repo Facility Secured Claims | Impaired | Yes |
| | C.   Prepetition Customers Repo Facility Secured Claims | Impaired | Yes |

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| | D.   Prepetition Flagstar Warehouse Facility Secured Claims | Impaired | Yes |
| | E.   Prepetition Customers Loan Obligation Claims | Impaired | Yes |
| 4 | Loan Settlement Claims | Impaired | Yes |
| 5 | Prepetition LVS II Offshore Guaranty Claims | Impaired | Yes |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Interests | Impaired | No (presumed to reject) |

9.2    Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Combined Plan and Disclosure Statement, nothing under the Combined Plan and Disclosure Statement shall affect the rights of the Debtors or the Liquidating Trustee, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

9.3    Vacant and Abstaining Classes.

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Combined Plan and Disclosure Statement for purposes of voting to accept or reject the Combined Plan and Disclosure Statement and for purposes of determining acceptance or rejection of the Combined Plan and Disclosure Statement by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**SECTION 10**
**TREATMENT OF CLAIMS AND INTERESTS**

10.1    Class 1—Priority Non-Tax Claims.

(a)    Classification.  Class 1 consists of all Priority Non-Tax Claims.

(b)    Treatment.  The Debtors or the Liquidating Trustee, as applicable, shall pay the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law).  The Entity holding a Priority Non-Tax Claim will be paid in Cash in full in respect of such Allowed Claim without interest from the Petition Date; provided, however, that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity.

-60-

(c)    <u>Impairment and Voting</u>.  Class 1 is Unimpaired.  Holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

10.2    <u>Class 2—Other Secured Claims</u>.

(a)    <u>Classification</u>.  Class 2 consists of Other Secured Claims.

(b)    <u>Classification</u>.  Class 2 consists of all Other Secured Claims.  For purposes of distributions under the Plan, each holder of an Other Secured Claim in Class 2 is considered to be in its own separate subclass within Class 2 (*i.e.*, Class 2A, Class 2B, *etc.*), and each such subclass is deemed to be a separate Class for purposes of the Plan.

(c)    <u>Treatment</u>.  Except to the extent previously paid in full, to the extent any Other Secured Claims exist, at the option of the Debtors or the Liquidating Trustee, as applicable, one of the following treatments shall be provided: (i) the holder of such Claim shall retain its Lien on its collateral until such collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such holder in full satisfaction and release of such Allowed Other Secured Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the holder of such Claim and the Debtors or the Liquidating Trustee, as applicable, the holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim in full satisfaction and release of such Other Secured Claim; or (iii) the collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor, in full satisfaction, release, and discharge of such Other Secured Claim.

(d)    <u>Impairment and Voting</u>.  Class 2 is Unimpaired.  Holders of Other Secured Claims are conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

10.3    <u>Class 3—Secured Prepetition Facility Claims</u>.

10.3.1  <u>Class 3A—Prepetition J.V.B. Repo Facility Secured Claim</u>.

(a)    <u>Classification</u>.  Class 3A consists of the Prepetition J.V.B. Repo Facility Secured Claim.

(b)    <u>Treatment</u>.  The holder of the Prepetition J.V.B. Repo Facility Secured Claims shall receive the following treatment on account of such Claim: (i) delivery of the Mortgage Loans and other collateral purchased or securing the Claim or the net proceeds of the liquidation of such mortgage loans and other collateral; or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Prepetition J.V.B. Repo Facility Secured Claim.  Provisions regarding the process for transferring or otherwise monetizing the Mortgage Loans underlying the Prepetition J.V.B. Repo Facility Secured Claims and returning to

the Debtors any amounts collected in excess of any repurchase amounts and expenses are set forth below in Section 14.6.

(c)    <u>Impairment and Voting</u>.  Class 3A is Impaired, and the holder thereof is entitled to vote on the Plan.

10.3.2  <u>Class 3B— Prepetition TCB Repo Facility Secured Claim</u>.

(a)    <u>Classification</u>.  Class 3B consists of the Prepetition TCB Repo Facility Secured Claim.

(b)    <u>Treatment</u>.  The holder of the Prepetition TCB Repo Facility Secured Claim shall receive the following treatment on account of such Claim: (i) delivery of the Mortgage Loans and other collateral purchased or securing the Claim or the net proceeds of the liquidation of such mortgage loans and other collateral, or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Prepetition TCB Repo Facility Secured Claim.  Provisions regarding the process for transferring or otherwise monetizing the mortgage loans underlying the Prepetition TCB Repo Facility Secured Claim and returning to the Debtors any amounts collected in excess of any repurchase amounts and expenses are set forth below in Section 14.6.

(c)    <u>Impairment and Voting</u>.  Class 3B is Impaired and the holder thereof is entitled to vote on the Plan.

10.3.3  <u>Class 3C— Prepetition Customers Repo Facility Secured Claim</u>.

(a)    <u>Classification</u>.  Class 3C consists of the Prepetition Customers Repo Facility Secured Claim.

(b)    <u>Treatment</u>.  The holder of the Prepetition Customers Repo Facility Secured Claim shall receive the following treatment on account of such Claim: (i) pursuant to the terms of the Customers Bank 559 Order, the Prepetition Customers Repo Agreement and applicable law, the right to liquidate the Purchased Assets and apply the amount received to the Prepetition Customers Repo Facility Secured Claim, and the obligation to return any excess proceeds or Purchased Assets to the Debtors, or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Prepetition Customers Repo Facility Secured Claim.

(c)    <u>Impairment and Voting</u>.  Class 3C is Impaired and the holder thereof is entitled to vote on the Plan.

10.3.4  <u>Class 3D— Prepetition Flagstar Warehouse Facility Secured Claim</u>

(a)    <u>Classification</u>.  Class 3D consists of the Prepetition Flagstar Warehouse Facility Secured Claim.

(b)    <u>Treatment</u>.  The holder of the Prepetition Flagstar Warehouse Facility Secured Claim shall receive the following treatment on account of such Claim: (i) delivery of the

-62-

mortgage loans and other collateral purchased or securing the Claim or the net proceeds of the liquidation of such mortgage loans and other collateral to the extent consistent with the Flagstar Lift Stay Order, or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Prepetition Flagstar Warehouse Facility Secured Claim. Provisions regarding the process for transferring or otherwise monetizing the mortgage loans underlying the Prepetition Flagstar Warehouse Facility Secured Claims and returning to the Debtors any amounts collected in excess of the amount of the Allowed Prepetition Flagstar Warehouse Facility Secured Claim shall be governed by the Flagstar Lift Stay Order, the Prepetition Flagstar Loan Agreement and applicable law.

(c)    <u>Impairment and Voting</u>.  Class 3D is Impaired and the holder thereof is entitled to vote on the Plan.

### 10.3.5  <u>Class 3E— Prepetition Customers Loan Obligation Secured Claim</u>.

(a)    <u>Classification</u>.  Class 3E consists of the Prepetition Customers Loan Obligation Secured Claim.

(b)    <u>Treatment</u>.  The holder of the Prepetition Customers Loan Obligation Secured Claim shall receive the following treatment on account of such Claim: (i) delivery of the collateral securing the Claim or the net proceeds of the liquidation of such collateral, or (ii) treatment on such other terms as agreed between the Debtors, the Cash Flow DIP Lender, and the holder of the Prepetition Customers Loan Obligation Secured Claim. The process for transferring, monetizing and returning the excess collateral underlying the Prepetition Customers Loan Obligation Secured Claim shall be governed by the Customers Bank 559 Order, the Prepetition Customers Repo Agreement, the Prepetition Customers Loan Agreement, and applicable law.

(c)    <u>Impairment and Voting</u>.  Class 3E is Impaired and the holder thereof is entitled to vote on the Plan.

### 10.4   <u>Class 4— Loan Settlement Claims</u>.

(a)    <u>Classification</u>.  Class 4 consists of Loan Settlement Claims.  The Loan Settlement Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtors, the Estates, and pursuant to the Plan, the Liquidating Trustee, which subordination claims, rights, and grounds are fully enforceable prior to, on, and after the Effective Date.

(b)    <u>Treatment</u>. Each holder of a Loan Settlement Claim shall (i) receive an Allowed Claim in the amount of the cash in their possession, and (ii) (a) retain an amount of the cash in their possession and (b) turnover to the Debtors any cash beyond such amount in accordance with any settlement agreement reached between such holder and the Debtors and approved by the entry of an Order pursuant to Bankruptcy Rule 9019.

(c)    <u>Impairment and Voting</u>.  Class 4 is Impaired, and the holders of Class 4 Claims are entitled to vote on the Plan.

US_ACTIVE\122262256\V-5
DOCS_DE:241262.1 28311/001

10.5    Class 5—Prepetition LVS II Offshore Guaranty Claim.

(a)    Classification.  Class 5 consists of the Prepetition LVS II Offshore Guaranty Claim.

(b)    Treatment.  The holder of the Prepetition LVS II Offshore Guaranty Claim shall receive up to the amount of $6.59 million of any cash recovered by, or on account of assets turned over to or for the benefit of the Debtors, their Estates, or the Liquidating Trust on account of Customers Bank, pursuant to the Prepetition Customers Loan Agreement, the Customers Bank 559 Order or otherwise. Pursuant to the terms of the Committee Settlement, the holder of the Prepetition LVS II Offshore Guaranty Claim shall not be entitled to a recovery from the GUC Share unless and until the Cash Flow DIP Claims and DIP Repo Guarantee Claims have been paid in full.

(c)    Impairment and Voting.  Class 5 is Impaired, and the holder thereof is entitled to vote on the Plan.

10.6    Class 6—General Unsecured Claims.

(a)    Classification.  Class 6 consists of all General Unsecured Claims other than the unsecured claims described in Classes 4 and 5.  For avoidance of doubt, Class 6 includes all Prepetition Facility Deficiency Claims.  Class 6 Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtors, the Estates, and pursuant to the Plan, the Liquidating Trustee (as applicable), which subordination claims, rights, and grounds are fully enforceable prior to, on, and after the Effective Date.

(b)    Treatment.  Pursuant to the terms of the Committee Settlement, each Holder of an Allowed General Unsecured Claim shall receive in exchange for its Allowed General Unsecured Claim, a Pro Rata share of the GUC Share of the Net Liquidating Trust Proceeds.

(c)    Impairment and Voting.  Class 6 is Impaired, and the holders of Class 6 Claims are entitled to vote on the Plan.

10.7    Class 7—Interests.

(a)    Classification.  Class 7 consists of all Interests.

(b)    Treatment.  There shall be no Distribution on account of Class 7 Interests. Upon the Effective Date, all Interests will be deemed cancelled and will cease to exist; provided, however, for purposes of convenience, the Debtors and the Cash Flow DIP Lender may agree that Interests in Maverick shall continue to be held by FGMC as of the Effective Date.

(c)    Impairment and Voting.  Holders of Interests are deemed to have rejected the Plan, and are not entitled to vote.

-64-

## SECTION 11
## DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS

11.1    <u>Distribution Dates</u>.

The Debtors or the Liquidating Trustee, as applicable, shall make Distributions to holders of Claims, and with respect to General Unsecured Claims, may, in their discretion, make a full or partial Pro Rata Distribution to the holders of General Unsecured Claims on the Initial Distribution Date or a Subsequent Distribution Date.

11.2    <u>Subsequent Distributions</u>.

Any Distribution not made on the Initial Distribution Date or a Subsequent Distribution Date because the Claim relating to such Distribution had not been Allowed on that Distribution Date shall be held by the Distribution Agent on any Subsequent Distribution Date after such Claim is Allowed.  No interest shall accrue or be paid on the unpaid amount of any Distribution.

11.3    <u>Distribution Record Date</u>.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date.  The Distribution Agent shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date.  In making any Distribution with respect to any Claim, the Distribution Agent shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that is known to the Distribution Agent as of the Distribution Record Date.

11.4    <u>Manner of Cash Payments Under the Plan or Liquidating Trust Agreement</u>.

Cash payments made pursuant to the Plan or Liquidating Trust Agreement shall be in United States dollars by checks drawn on a domestic bank selected by the Distribution Agent, or by wire transfer from a domestic bank, at the option of the Distribution Agent.

11.5    <u>Time Bar to Cash Payments by Check</u>.

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof.  Requests for the reissuance of any check that becomes null and void pursuant to this Section shall be made directly to the Distribution Agent by the holder of the Allowed Claim to which the check was originally issued. Any Claim in respect of such voided check shall be made in writing on or before the later of six months from the Effective Date or 90 days after the date of issuance thereof.  After that date, all Claims in respect of voided checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become the property of the Liquidating Trust, as unclaimed property in accordance with section 347(b) of the Bankruptcy Code.

-65-

11.6    Liquidating Trust Assets Account.

Unless otherwise provided in the Confirmation Order, the Liquidating Trust Assets Account shall be invested by the Liquidating Trustee in a manner consistent with the objectives of section 345(a) of the Bankruptcy Code and in its reasonable and prudent exercise of discretion. The Liquidating Trustee shall have no obligation or liability to Beneficiaries in connection with such investments in the event of any unforeseeable insolvency of any financial institution where such funds are held.

## SECTION 12
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

12.1    No Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, the Debtors and the Liquidating Trustee, as applicable, shall not distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed.  Nothing contained herein, however, shall be construed to prohibit or require payment or Distribution on account of any undisputed portion of a Claim.

12.2    Resolution of Disputed Claims.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, subject to the Liquidating Trust Agreement, the Liquidating Trustee shall have the right to make, file, prosecute, settle, withdraw, or resolve objections to Claims.

The costs of pursuing the objections to Claims shall be borne by the Liquidating Trust. From and after the Confirmation Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to the extent, the Liquidating Trustee elects to withdraw any such objection or the Liquidating Trustee and the Claimant elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim or Disputed Interest without approval of the Bankruptcy Court.

12.3    Objection Deadline.

All objections to Claims shall be filed and served upon the Claimant not later than the Claims Objection Deadline, as such may be extended by order of the Bankruptcy Court.

12.4    Estimation of Claims.

At any time, (a) prior to the Effective Date, the Debtors, and (b) after the Effective Date, the Liquidating Trustee may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trust have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during Litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall

US_ACTIVE\122262256\V-5
DOCS_DE:241262.1 28311/001

constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Claim, the Debtors or the Liquidating Trust, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdraw, or resolved by any mechanism of the Bankruptcy Court.

12.5    Disallowance of Claims.

Except as otherwise agreed or ordered by the Bankruptcy Court, any and all proofs of claim filed after the Bar Date shall not be treated as an Allowed Claim for purposes of Distribution without any further notice or action, and holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed.

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or Entities that are transferees of transfers avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, provided that such Cause of Action is retained by the Liquidating Trust shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action the Debtors hold or may hold against any Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estates by that Entity have been turned over or paid to the Debtors or the Liquidating Trust.

12.6    Adjustment to Claims Register Without Objection.

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register at the direction of the Debtors or the Liquidating Trustee, as applicable, without an objection filed and without further notice to or action, order, or approval of the Bankruptcy Court.

12.7    Reserve Provisions for Disputed Claims.

On or by each Distribution Date, the Debtors or the Liquidating Trustee, as applicable, shall reserve Cash required for distribution on Disputed Claims as if such Claims were Allowed as filed with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Debtors or the Liquidating Trustee (the "Disputed Claim Reserve").

The property in the Disputed Claim Reserve shall be held in trust for the benefit of the holders of Disputed Claims that are ultimately determined to be Allowed.  Each Disputed Claim Reserve shall be closed and extinguished when all Distributions and other dispositions of Cash of other property required to be made hereunder will have been made in accordance with the terms of the Plan.

-67-

12.8    Rounding.

Whenever any payment of a fraction of a cent would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest cent.

12.9    No Cash Payments of Less Than $100 on Account of Allowed Claims.

Notwithstanding anything herein to the contrary, except with respect to Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims and Other Secured Claims, if a Distribution to be made to a holder of an Allowed Claim on the Initial Distribution Date or any Subsequent Distribution Date would be $100 or less in the aggregate, no such Distribution will be made to that holder unless a request therefor is made in writing to the Distribution Agent. If such request is made, such Cash shall be held for such holder until the earlier of (i) the next time an interim distribution is made to the holders of Allowed Claims (unless the distribution would still be less than $100, in which case this Section shall again apply), or (ii) the date on which Final Distributions are made to the holders of Allowed Claims.

12.10    Delivery of Distributions and Unclaimed Property.

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made at (a) the address of each Claimant as set forth in the Schedules, unless superseded by the address set forth on proof(s) of claim filed by such Claimant, or (b) the last known address of such Claimant if no proof of claim is filed or the Debtors or the Liquidating Trustee have been notified in writing of a change of address. If any Distribution is returned as undeliverable, the Distribution Agent may, in its discretion, make reasonable efforts to determine the current address of the holder of the Claim with respect to which the Distribution was made, but no Distribution to any such holder shall be made unless and until the Distribution Agent has determined the then-current address of such holder, at which time the Distribution to such holder shall be made without interest. Amounts in respect of any undeliverable Distributions shall be returned to, and held in trust by, the Distribution Agent, until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code. The Distribution Agent shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; *provided, however*, that its discretion may not be exercised in a manner inconsistent with any express requirements of the Plan or, if applicable, the Liquidating Trust Agreement. On or about the time that the Final Distribution is made, the Distribution Agent may make a charitable donation with undistributed funds if, in its reasonable judgment, the cost of calculating and making the Final Distribution of the remaining funds is excessive in relation to the benefits to the holders of Claims that would otherwise be entitled to such Distributions, and such charitable donation is provided to an entity not otherwise related to the Debtors or the Liquidating Trustee.

Except with respect to property not distributed because it is being held in a Disputed Reserve, Distributions that are not claimed by the later of the expiration of six (6) months from the Effective Date or (90) days after the date of a Distribution shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in the Liquidating Trust, and the Claims with respect to which those Distributions are made shall be automatically cancelled. After the expiration of that period, the claim of any Entity to those Distributions shall

-68-

be cancelled.  Nothing contained in the Plan shall require the Debtors or the Liquidating Trust to attempt to locate any holder of an Allowed Claim.  All funds or other property that vest or revest in the Liquidating Trust pursuant to this Section shall be distributed to the other holders of Allowed Claims in accordance with the provisions of the Plan or the Liquidating Trust Agreement, as applicable.

12.11  Books and Records.

The Debtors shall transfer dominion and control over all of their books and records, in whatever form, manner or media, to the Liquidating Trustee on or as soon as reasonably practicable after the Effective Date.

## SECTION 13
## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

13.1  Rejection / Assumption.

Except with respect to (i) executory contracts or unexpired leases that were previously assumed or rejected by order of the Bankruptcy Court, (ii) executory contracts or unexpired leases that are the subject of a pending motion to assume or reject, pursuant to section 365 of the Bankruptcy Code, or (iii) executory contracts or unexpired leases that are scheduled by the Debtors and the Cash Flow DIP Lender to be assumed as of the Effective Date, as set forth in the Plan Supplement, on the Effective Date, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to section 365 of the Bankruptcy Code; *provided, however,* that nothing in this Section shall cause the rejection, breach, or termination of any contract of insurance benefiting the Debtors and the Estates, the Debtors' officers, managers and directors and/or the Liquidating Trust.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions and rejections, as applicable, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  Nothing in this Section shall be construed as an acknowledgement that a particular contract or agreement is executory or is properly characterized as a lease.

The non-Debtor parties to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property that is the subject of such executory contracts and leases, and neither the Debtors nor the Liquidating Trust shall bear any liability for costs associated with such matters.

13.2  Rejection Claims.

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Confirmation of the Plan, if any, must be filed with the Claims Agent within thirty (30) days after the earlier of the Effective Date or an order of the Bankruptcy Court approving such rejection.  Any Claim arising from the rejection of an executory contract or unexpired lease pursuant to Confirmation of the Plan that is not filed within such times will be subject to objection.  All such Claims for which Proofs of Claim are timely and properly filed and ultimately Allowed will be treated as General Unsecured Claims.

-69-

13.3    Insurance Policies.

Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations of the Insurance Policies.  To the extent one or more of the Insurance Policies provide potential coverage related to one or more Causes of Action the Debtors hold or may hold against any Entity, the Debtors shall, to the extent permissible under each Insurance Policy, assign all of their rights thereunder with respect to such Causes of Action to the Liquidating Trust.  All net proceeds (including, for the avoidance of doubt, net of any deductibles or retentions) of Insurance Policies received by the Liquidating Trust shall be treated as proceeds of such Causes of Action for all purposes under the Plan.  The Debtors shall take no action to or otherwise impair the Insurance Policies.  Nothing herein shall diminish or impair the enforceability of the Insurance Policies and related agreements that may cover Claims and Causes of Action against the Debtors or any other Entity.

## SECTION 14
## MEANS FOR IMPLEMENTATION OF THE PLAN

14.1    General Settlement of Claims and Interests. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, settlements contained in the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the relevant Plan provisions. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlements and compromises are fair, equitable, reasonable, and in the best interests of the Debtors and the Estates. All Plan Distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final. For the avoidance of doubt, the Plan itself shall not be deemed to be a settlement.

14.2    DIP Repo Facility.  On or prior to the Effective Date, all DIP Repo Claims shall be paid in full in cash through, among other means: (a) sales of DIP Repo Purchased Assets; (b) by the DIP Repo Guarantors' purchase of the DIP Repo Purchased Assets from the DIP Repo Purchasers; (c) the liquidation of DIP Netting Collateral or DIP MSFTA Collateral; and/or (d) the payment in cash by the DIP Repo Guarantors of any Obligations (as defined in the DIP Repo Guarantees) that otherwise remain outstanding on the Effective Date.  On the Effective Date (or prior to the Effective Date upon the repayment in full of the DIP Repo Claims), the DIP Repo Facility Agreement, DIP BCI MSFTA, and DIP Netting Agreement, and all obligations of the DIP Repo Parties thereunder, shall terminate.

14.3    Additional Funding.

(a)    Pursuant to the terms of the Committee Settlement, the Cash Flow DIP Lender has or will provide additional funding to the Debtors and Liquidating Trust as follows: (i) prior to or on the Effective Date, the DIP Budget Amount; (ii) on the Effective Date, the Additional Administrative Claims Amount; and (iii) on the Effective Date, the Trust Funding Amount. If the

-70-

Debtors determine (i) on or prior to the Effective Date with respect to the DIP Budget Amount, and (ii) on the Effective Date with respect to the Additional Administrative Claims Amount and Trust Funding Amount, that the Debtors have sufficient Cash to satisfy some or all of the DIP Budget Amount, Additional Administrative Claims Amount, or Trust Funding Amount, then the Debtors shall use such Cash rather than request additional funding from the Cash Flow DIP Lender; *provided, however*, that if the Debtors use Cash to fund the Additional Administrative Claims Amount or Trust Funding Amount, the Cash Flow DIP Lender will nonetheless be entitled to reimbursement of such amounts out of Net Liquidating Trust Proceeds as set forth in Section 14.5(d).

(b)     To the extent not already reimbursed to the Cash Flow DIP Lender pursuant to Section 14.5(d), (A) the Liquidating Trustee shall return to the Cash Flow DIP Lender any portion of the DIP Budget Amount or Additional Administrative Claims Amount that relates to an Administrative Claim, Priority Tax Claim, or Priority Non-Tax Claim (or any portion thereof) that becomes reduced or disallowed, as soon as reasonably practical after such disallowance, and (B) if the Liquidating Trustee determines that any portion of the Trust Funding Amount will not be required to pay expenses of the Liquidating Trust, it shall return such portion to the Cash Flow DIP Lender.

(c)     Absent written consent of the Cash Flow DIP Lender or, with respect to the Trust Funding Amount and Trust Budget, agreement between the Oversight Committee and the Liquidating Trustee, the Liquidating Trustee shall (i) use the DIP Budget Amount only in accordance with the terms of the Cash Flow DIP Documents, including, but not limited to, the Approved DIP Budget, and such use shall be on an aggregate line-item basis (according to the line items included in the detail supporting the Approved DIP Budget attached hereto), without variances and without the ability to carry over excess in one line item to a different line item; (ii) use the Additional Administrative Claims Amount only to pay Additional Administrative Claims, and (iii) use the Trust Funding Amount only in accordance with the Trust Budget (according to the line items included in the detail supporting the Trust Budget attached hereto). For the avoidance of doubt, use of the DIP Budget Amount will be according to the Approved DIP Budget and use of the Trust Funding Amount will be according to the Trust Budget, which Trust Budget shall be subject to the direction of the Oversight Committee. If aggregate disbursements for any line item in the Approved DIP Budget exceed the aggregate budgeted amount for such line item after all known Administrative Claims budgeted for in that line item have been resolved, such additional amount shall be treated as an Additional Administrative Claims Amount for purposes of Plan distributions. If aggregate disbursements for any line item in the Approved DIP Budget is less than the aggregate budgeted amount for such line item after all known Administrative Claims budgeted for in that line item have been resolved, such additional amount of funding shall be returned to the Cash Flow DIP Lender.

14.4     <u>Dissolution of Debtors</u>.  As soon as practicable, the Debtors shall be dissolved, without any further action required on the part of the Debtors or the Debtors' members, managers, officers, directors, interest holders, and/or any other parties; provided, however, the Liquidating Trustee in his or her discretion shall be authorized to take any and all actions necessary or desirable in relation to dissolution of the Debtors.  On the Effective Date, the employment, retention, appointment and authority of all managers, officers, directors, employees and professionals of the Debtors shall be deemed to terminate: except for certain employees that may be necessary as

-71-

determined by the Liquidating Trustee and as otherwise set forth herein. Pending the Debtors' dissolution, Tanya Meerovich shall act as the Debtors' authorized representative (the "Authorized Representative"). The Authorized Representative shall work with the Liquidating Trustee to (i) liquidate any Trust Assets, the liquidation of which requires action by the Debtors or its employees and (ii) determine the date for the Debtors' dissolution.Liquidating Trust.

(a)     Appointment of the Liquidating Trustee. Upon terms agreeable to the Committee and the Cash Flow DIP Lender, the initial Liquidating Trustee shall be FTI Consulting (or an individual employed by FTI Consulting), which shall retain Dentons US LLP as counsel, unless otherwise agreed to the Cash Flow DIP Lender and the Committee. From and after the Effective Date, professionals may be retained by the Liquidating Trustee as set forth in the Liquidating Trust Agreement, without further need for documentation or Bankruptcy Court approval. All fees and expenses incurred by the professionals retained by the Liquidating Trustee following the Effective Date shall be paid by the Liquidating Trust from the Liquidating Trust Assets (after payment in full of all Allowed Administrative Claims) in accordance with the Liquidating Trust Agreement.

(b)     The Liquidating Trust. On the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of, *inter alia*, (i) administering the Liquidating Trust Assets, (ii) prosecuting and/or resolving all Disputed Claims, (iii) investigating and pursuing any Causes of Action (not released under the Plan) the Debtors hold or may hold against any Entity, and (iv) making all Distributions to the Beneficiaries provided for under the Plan. The Liquidating Trust is intended to qualify as a liquidating trust pursuant to Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of the trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidating Trustee shall, in an orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, and make timely Distributions to the Beneficiaries, and not unduly prolong the duration of the Liquidating Trust. Neither the Liquidating Trust nor the Liquidating Trustee shall be or shall be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.

(c)     Liquidating Trust Assets. On the Effective Date, the Liquidating Trust Assets shall vest automatically in the Liquidating Trust. The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief. The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be made for the benefit and on behalf of the Beneficiaries. The assets comprising the Liquidating Trust Assets will be treated for tax purposes as being transferred by the Debtors to the Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the Beneficiaries to the Liquidating Trust in exchange for the beneficial interests in the Liquidating Trust. The Beneficiaries shall be treated as the grantors and owners of the Liquidating Trust. Upon the transfer of the Liquidating Trust Assets, the Liquidating Trust shall succeed to all of the Debtors' rights, title and interest in the Liquidating Trust Assets, and the Debtors will have no further interest in or with respect to the Liquidating Trust Assets.

(d)     Net Liquidating Trust Proceeds. The Net Liquidating Trust Proceeds shall be distributed as follows: (i) first, subject to the terms of the Liquidating Trust Agreement, to

-72-

replenish any reserves required for paying the estimated expenses of the Liquidating Trust, provided, however, for the avoidance of doubt, that the Liquidating Trust Agreement shall provide that post-Effective Date receipts of the Liquidating Trust shall not be used to replenish reserves under this subpart (i) or to otherwise pay costs or expenses of the Liquidating Trust without the express written consent of the Cash Flow DIP Lender; (ii) second, to the Cash Flow DIP Lender to reimburse it for the (A) the Trust Funding Amount, plus (B) the Additional Administrative Claims Amount; and (iii) third, (A) seventy-five percent (75%) to the Cash Flow DIP Lender, and (B) twenty-five percent (25%) to the holders of Allowed General Unsecured Claims (other than any unsecured claims held by the Cash Flow DIP Lender or any of its Related Persons).  The portion of the Net Liquidating Trust Proceeds payable to the Cash Flow DIP Lender under the preceding clauses (ii) and (iii)(A) shall be referred to as the "Cash Flow DIP Lender Share" and the portion of the Net Liquidating Trust Proceeds payable to holders of Allowed Class 6 General Unsecured Claims under the preceding clause (iii)(B) shall be referred to as the "GUC Share".  Upon payment in full of all Cash Flow DIP Facility Claims and DIP Repo Guarantee Claims, all Net Liquidating Trust Proceeds shall be distributable to the GUC Share, *provided, however*, that in such scenario the holder of the Prepetition LVS II Offshore Guaranty Claim shall then be entitled to a pro rata share of the GUC Share.  Other than as set forth above, neither the Cash Flow DIP Lender nor any of its Related Persons shall be entitled to share in any distribution from the GUC Share on account of any Allowed Claims (including, but not limited to, subrogation claims).

(e)     Committee Final DIP Settlement.  To the extent of any inconsistency in the terms of this Plan, including the Committee Settlement, and the terms of the Committee Final DIP Settlement, the terms of this Plan, including the Committee Settlement, shall control.

(f)     Valuation.  Except to the extent definitive guidance from the IRS or a court of competent jurisdiction (including the issuance of applicable Treasury Regulations or the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one) indicates that such valuation is not necessary to maintain the treatment of the Liquidating Trust as a liquidating trust for purposes of the Internal Revenue Code and applicable Treasury Regulations, as soon as possible after the Effective Date, the Liquidating Trustee shall make a good-faith valuation of the Liquidating Trust Assets.  The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trust, the Beneficiaries) for all federal income tax purposes.

(g)     Rights and Powers of the Liquidating Trustee.  The Liquidating Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004 to act on behalf of the Liquidating Trust.  Without limiting the foregoing, the Liquidating Trustee will have the right to, among other things, (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement; (2) liquidate the Liquidating Trust Assets; (3) investigate, prosecute, settle, abandon or compromise any Causes of Action the Debtors hold or may hold against any Entity; (4) make all Distributions in accordance with the Plan and the Liquidating Trust Agreement; (5) administer the Liquidating Trust and pursue viable Causes of Action in accordance with the Plan and the Liquidating Trust Agreement; (6) establish and administer any necessary reserves for Disputed Claims that may be required; (7) object to the

US_ACTIVE\122262256\V-5
DOCS_DE:241262.1 28311/001

Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (8) assert or waive any attorney-client privilege on behalf of the Debtors and Estates with regard to acts or events during time periods prior to the Petition Date; and (9) employ and compensate professionals and other agents, including, without limitation, existing Professionals employed by the Debtors or the Committee in accordance with the Liquidating Trust Agreement or the Plan, *provided, however,* that any such compensation shall be made only out of the Liquidating Trust Assets, to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

(h)     Oversight Committee.  The Liquidating Trust shall have an oversight committee comprised of three members (the "Oversight Committee").  Two members of the Oversight Committee shall be appointed by the Cash Flow DIP Lender and one member shall be appointed by the Committee.  The Oversight Committee shall have approval rights over certain key decisions by the Liquidating Trustee including retention of professionals, proposed reserves and budgets for the Trust, proposed distributions by the Trust and settlements above a certain threshold amount, all as set forth in the Liquidating Trust Agreement.

(i)     Fees and Expenses of the Liquidating Trust.  Expenses incurred by the Liquidating Trust on or after the Effective Date shall be paid in accordance with the Liquidating Trust Agreement without further order of the Bankruptcy Court.

(j)     Transfer of Beneficial Interests in the Liquidating Trust.  Liquidating Trust Interests shall not be transferable except upon death of the interest holder or by operation of law. The Liquidating Trust shall not have any obligation to recognize any transfer of Claims or Interests occurring after the Distribution Record Date.

(k)     Effective Date Cash Transfers.  On or as soon after the Effective Date as is reasonably practical, the Debtors shall use any available Cash to (i) fund payments to be made pursuant to or otherwise consistent with the Plan and the Confirmation Order, including distributions to holders of Allowed Administrative Claims, Priority Tax Claim, and Priority Non-Tax Claims and (ii) transfer to the Liquidating Trust the (A) Trust Funding Amount and (B) an amount necessary to establish appropriate reserves (including the Professional Fee Reserve) to pay Administrative Claims, Priority Tax Claim, and Priority Non-Tax Claims that become Allowed after the Effective Date (collectively, the "Effective Date Cash Transfers").  To the extent the Debtors' available Cash is insufficient to fund the Effective Date Cash Transfers, such transfers will be made pursuant to the terms of Sections 14.3 and 14.5(d) above.  Notwithstanding any other provision of the Plan or the Liquidating Trust Agreement, Liquidating Trust Assets will be used in the first instance by the Liquidating Trustee to pay or reserve for all unpaid Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims (including any Disputed Claims until such Claims are resolved), prior to use of the available Cash for purposes of the Liquidating Trust. Subject to the restrictions set forth herein, the Liquidating Trust Assets (to the extent remaining after payment of or reserve for all Allowed Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims) will be used by the Liquidating Trustee to pay for the expenses of the Liquidating Trust in accordance with the Liquidating Trust Agreement.

On or as soon as practicable following the Effective Date, the Liquidating Trust Assets Account shall be opened by the Liquidating Trustee and funded with the amount set forth in clause (ii) of the first sentence of the preceding paragraph (the "Initial Trust Cash"), which shall constitute Liquidating Trust Assets.  Thereafter, from time to time, upon receipt of any Liquidation Proceeds or any Litigation Recovery, the Liquidating Trustee shall deposit such funds into the Liquidating Trust Assets Account, and such funds shall become part of the Liquidating Trust Assets.

(l)    Specified Assets.  The Specified Assets shall be held by the Debtors or the Liquidating Trustee, as the case may be, for the sole benefit of the Cash Flow DIP Lender.  The liquidation proceeds of the Specified Assets (i) shall be transferred to the Cash Flow DIP Lender, (ii) shall not be used by the Debtors or the Liquidating Trustee for any other purpose without the express written consent of the Cash Flow DIP Lender, and (iii) upon transfer to the Cash Flow DIP Lender shall reduce the outstanding amount of the Cash Flow DIP Claim but shall not reduce the Trust Funding Amount and Additional Claims Amount to be repaid to the Cash Flow DIP Lender pursuant to Section 14.5(d)(ii).  In lieu of the liquidation of the Specified Asset and distribution of the proceeds as set forth in the preceding sentence, at the direction of the Cash Flow DIP Lender, the Liquidating Trustee shall transfer one or more of the Specified Assets to the Cash Flow DIP Lender as a distribution in kind.

(m)    Bi-Weekly Distributions.  On the second Friday after the Effective Date, and on every second Friday thereafter until the Cash Flow DIP Lender is reimbursed in full for the Trust Funding Amount and Additional Claims Amount as set forth in Section 14.5(d)(ii) and the Specified Assets are liquidated or distributed in kind as set forth in Section 14.5(l) (each such date, a "DIP Lender Distribution Date"), the Liquidating Trust shall make a distribution to the Cash Flow DIP Lender that shall comprise the following: (i) any proceeds of Specified Assets then available; (ii) any amounts required to be returned to the Cash Flow DIP Lender pursuant to Section 14.2(b); and (iii) any Net Liquidating Trust Proceeds then available (taking into account reserves); provided, however, that if the amount to be distributed under this Section 14.5(m) is less than $500,000 on a DIP Lender Distribution Date, such amount can be carried over to, and held in trust until, the next DIP Lender Distribution Date.

(n)    Reporting.  On each DIP Lender Distribution Date, the Liquidating Trustee shall provide the following reporting to the Cash Flow DIP Lender: (i) budget to actual reports with respect to the Approved DIP Budget and the Trust Budget; (ii) status of collections and liquidation of Liquidating Trust Assets, by category; (iii) status of Additional Administrative Claims, including the payment, settlement, and disallowance of such claims, (iv) any information provided to the Oversight Committee; and (v) any additional information reasonably requested by the Cash Flow DIP Lender.

14.6    Disposition of Mortgage Loans.  The following provisions shall govern the disposition of the mortgage loans and related assets, including mortgage servicing rights constituting purchased assets or collateral (the "Mortgage Loans") underlying the Prepetition Repo Facility Claims and Prepetition Warehouse Facility Claims: The Mortgage Loans shall be sold or

US_ACTIVE\122262256\V-5
DOCS_DE:241262.1 28311/001

otherwise disposed of in a manner that maximizes the returns and minimizes the costs to the Debtors and Estates, including, without limitation:

i    With respect to any Mortgage Loans relating to the Prepetition Repo Agreements or Prepetition Warehouse Agreements, whose value is equal to or less than the Prepetition Repo Facility Claims or the Prepetition Warehouse Facility Claims, as applicable, the Prepetition Repo Lender or the Prepetition Warehouse Lender (y) shall sell all such loans (with the Debtors agreeing to relief from the automatic stay if necessary) or (z) may request the Debtors' assistance in selling such loans, provided that an agreement is reached by and between such Prepetition Repo Lender or Prepetition Warehouse Lender and the Debtors to compensate the Debtors for such assistance, with the terms and  conditions of such agreement in a form acceptable to the Cash Flow DIP Lender.

ii    With respect to any Mortgage Loans relating to the Prepetition Repo Agreements or Prepetition Warehouse Agreements, whose value exceeds the Prepetition Repo Facility Claims or the Prepetition Warehouse Facility Claims, as applicable, the Debtors, with the agreement of the Prepetition Repo Lender or the Prepetition Warehouse Lender, as applicable, and the Cash Flow DIP Lender, shall retain a broker to liquidate all such loans.

iii   With respect any Prepetition Repo Agreement not terminated immediately upon the Petition Date, or previously rejected by the Debtors pursuant to section 365(a) of the Bankruptcy Code, upon entry of the Confirmation Order such agreements shall be deemed cancelled, terminated and rejected as of the Petition Date.

iv    For the avoidance of doubt, nothing in this Section 14.6 shall be deemed to limit or otherwise impair the rights of the Prepetition Warehouse Lenders or the holders of Secured Prepetition Facility Claims under the Lift Stay Orders or the procedures for liquidation of collateral and payment of claims described therein.

14.7   Litigation.

Except as otherwise provided herein (including the Debtor/Estate Release), the Lift Stay Orders or the Final Cash Flow DIP Order, all Litigation is retained, vested in the Liquidating Trust, and preserved pursuant to section 1123(b) of the Bankruptcy Code.  From and after the Effective Date, all Litigation will be prosecuted or settled by the Liquidating Trustee.  To the extent any Litigation is already pending on the Effective Date, the Liquidating Trustee will continue the prosecution of such Litigation and shall be substituted as plaintiff, defendant, or in any other capacity for the Debtors or the Estates pursuant to the Plan and the Confirmation Order on the Effective Date, without need for any further motion practice or notice in any case, action, or matter. The Challenge Period expired for all parties other than as provided in the Conditional Approval

Procedures Order as follows: "The expiration of the Challenge Period, solely with respect to the Committee's right to bring a Challenge against the Cash Flow DIP Lender and the Prepetition Bridge Lender, and their respective Related Parties, or with respect to their Prepetition Loan Liens, Prepetition Loan Obligations, Prepetition Repo Obligations or Released Claims (all as defined in the Final Cash Flow DIP Order) is hereby modified to mean the earlier of (i) the Effective Date or (ii) November 18, 2022."

14.8    <u>Dissolution of the Committee</u>.

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Cases, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date. Nothing in the Plan shall prohibit or limit the ability of the Debtors' or Committee's Professionals to represent the Liquidating Trustee or to be compensated or reimbursed per the Plan and/or the Liquidating Trust Agreement in connection with such representation.

14.9    <u>Sale Transaction(s)</u>. The Debtors and, to the extent applicable, the Liquidating Trustee, are authorized and directed to implement the terms of any Sale Transaction.

14.10    <u>Committee Representative Pursuit of Liquidating Trust Assets</u>. To the extent the Liquidating Trustee, with the approval of the Oversight Committee, determines to abandon any Liquidating Trust Assets, the Liquidating Trustee shall have the authority, with the approval of the Oversight Committee on terms acceptable to the Liquidating Trustee and Oversight Committee, to allow the Committee Representative to continue the pursuit of such assets on behalf of the Liquidating Trust; *provided, however*, that any expenses incurred by the Committee Representative in liquidating or pursuing such assets or causes of action shall be deducted from any gross recoveries on account of such assets before any distributions are made with respect to such assets.

14.11    <u>WARN Act Claim Reserve</u>.

(a) <u>Funding of WARN Act Claim Reserve</u>. The WARN Act Claim Reserve shall be funded in the amount of $2,500,000, consisting of (i) the Initial WARN Act Claim Reserve Amount, and (ii) following the transfer of the Liquidating Trust Assets to the Liquidating Trust, the first $1,000,000 in net recoveries from the liquidation of Liquidating Trust Assets that are not the Specified Assets.

(b) <u>Unused WARN Act Claim Reserve Funds</u>. To the extent all or a portion of the funds in the WARN Act Claim Reserve are not used to pay the WARN Act Claim, such unused funds shall be returned to the Cash Flow DIP Lender up to the amount of the Initial WARN Act

Claim Reserve Amount.  All remaining unused funds thereafter shall constitute Net Liquidating Trust Proceeds and shall be distributed in accordance with Section 14.5(d).

(c)  Related Considerations.  The WARN Act Claim Reserve does not limit in any manner the potential allowed amount of the WARN Act Claim, to which the WARN Act Claimants and the Liquidating Trustee reserve all their respective rights.  The WARN Act Claim Reserve funds shall be maintained and not disbursed until the WARN Act Claim has been fully resolved or pursuant to a further order of the Bankruptcy Court.

(d)  Reservation of Rights.  Notwithstanding the foregoing, the Liquidating Trustee reserves the right to object to, estimate, or otherwise resolve the WARN Act Claim, and the WARN Act Claimants reserve their rights to oppose any relief sought by the Liquidating Trustee.

## SECTION 15
## EFFECT OF CONFIRMATION

15.1    Binding Effect of the Plan.

The provisions of the confirmed Plan shall bind the Debtors, the Liquidating Trust, the Liquidating Trustee, any Entity acquiring property under the Plan, any Beneficiary, and any Creditor or Interest holder, whether or not such Creditor or Interest holder has filed a Proof of Claim or Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or the Interest of such Interest holder is impaired under the Plan, and whether or not such Creditor or Interest holder has accepted or rejected the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to the Plan.  The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, or Governmental Unit or parish in which any instrument related to under the Plan or related to any transaction contemplated under the Plan is to be recorded with respect to any taxes of the kind specified in section 1146(a) of the Bankruptcy Code.

15.2    Vesting of Property of Debtors on the Effective Date.

Upon the Effective Date, title to all property constituting Liquidating Trust Assets (including, without limitation, all Causes of Action) of the Estates shall vest in the Liquidating Trust and shall be retained by the Liquidating Trust for the purposes contemplated under the Plan pursuant to the Liquidating Trust Agreement.

15.3    Property Free and Clear.

Except as otherwise provided in the Plan or the Confirmation Order, all property that shall vest in the Liquidating Trust shall be free and clear of all Claims, Interests, Liens, charges, or other encumbrances of Creditors or Interest holders, other than as set forth herein, in the Liquidating Trust Agreement, and in relevant documents, agreements, and instruments contained in the Plan Supplement.  Following the Effective Date, the Liquidating Trustee may transfer and dispose of any such property free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or the Confirmation Order.

## SECTION 16
## EXCULPATIONS, INJUNCTIONS, AND RELEASES

16.1    Exculpation.

The Exculpated Parties will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken between the Petition Date and Effective Date in connection with or related to the Chapter 11 Cases, the sale or other disposition of the Debtors' assets or the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan; *provided, however*, that this limitation will not affect or modify the obligations created under the Plan, or the rights of any holder of an Allowed Claim to enforce its rights under the Plan, and shall not release any action (or inaction) constituting willful misconduct, fraud, bad faith, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction); *provided that* any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan, and such reasonable reliance shall form a defense to any such claim, Cause of Action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of section 1125(e) of the Bankruptcy Code.

16.2    Releases.

(a)    **Debtor Releases**.

**Notwithstanding anything in the Combined Plan and Disclosure Statement to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after and subject to the occurrence of the Effective Date, the Debtors and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action, by, through, for, or because of the foregoing entities (collectively, the "Debtor/Estate Releasors"), shall release (the "Debtor/Estate Release") each Released Party, and each Released Party is deemed released by the Debtor/Estate Releasors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor/Estate Releasors, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor/Estate Releasors would have been legally entitled to assert in its own right, or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Debtors' liquidation, the Chapter 11 Cases, the purchase, sale, transfer of any security, asset, right, or interest of the Debtors and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party (including pursuant to the Prepetition Bridge Loan Agreement, the Cash Flow DIP Documents, the DIP Repo Facility Agreement, DIP BCI MSFTA, or DIP Netting**

-79-

Agreement), the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of, or solicitation of votes on, the Combined Plan and Disclosure Statement or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, actual fraud, bad faith, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction) but in all respects such Released Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; provided, that the foregoing Debtor/Estate Release shall not operate to waive or release any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan; and further provided that nothing herein shall act as a discharge of the Debtor.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, of the Debtor/Estate Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor/Estate Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) in the best interests of the Debtors and all holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Debtor/Estate Releasors asserting any Claim or Cause of Action released pursuant to the Debtor/Estate Release.

(b)     **Third Party Release**.

Notwithstanding anything in the Plan to the contrary, on and after and subject to the occurrence of the Effective Date, each of the Releasing Parties shall release (the "**Third Party Release**") each Released Party, and each of the Debtors, the Estates, and the Released Parties shall be deemed released from, any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of any of the Debtors or the Estates, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Debtors' liquidation, the Chapter 11 Cases, the purchase, sale, transfer of any security, asset, right, or interest of the Debtors and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Combined Plan and Disclosure Statement, the business or contractual arrangements between the Debtor and any Released Party (including pursuant to the Prepetition Bridge Loan Agreement, the Cash Flow DIP Documents, the DIP Repo Facility Agreement, DIP BCI MSFTA, or DIP Netting Agreement), the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of, or solicitation of votes on, the Combined Plan and Disclosure Statement or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other

-80-

occurrence taking place on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, actual fraud, bad faith, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction) but in all respects such Released Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Combined Plan and Disclosure Statement. Notwithstanding anything to the contrary in the foregoing, the Third Party Release shall not release any obligations of any party under the Combined Plan and Disclosure Statement or any other document, instrument, or agreement executed to implement the Combined Plan and Disclosure Statement.

16.3   **Injunction**.

In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtors, the Liquidating Trust, or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, the Estates, the Liquidating Trust, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtors, the Estates, the Liquidating Trust, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; (c) creating, perfecting, or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Estates, the Liquidating Trust, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; and (d) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest.  Nothing contained in this Section shall prohibit the holder of a timely filed Proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtors or the Liquidating Trust under the Plan.  Notwithstanding any other provision of this Plan, the Debtors shall not receive a discharge pursuant to Bankruptcy Code section 1141(d)(3).

16.4   Post-Confirmation Liability of Liquidating Trustee.

The Liquidating Trustee, together with its consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and the professionals engaged by the foregoing (collectively, the "Indemnified Parties") shall not be liable for any and all liabilities, losses, damages, claims, Causes of Action, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, to the holders of Claims or Interests for any action or inaction taken in good faith in connection with the performance or discharge of their duties under the Plan, except the Indemnified Parties will be liable for actions or inactions that constitute willful misconduct, fraud, bad faith, or gross negligence (in each case subject to determination of such by final order of a

-81-

court of competent jurisdiction). However, any act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute willful misconduct, fraud, bad faith, or gross negligence. In addition, the Liquidating Trust and the Estates shall, to the fullest extent permitted by the laws of the State of Delaware, indemnify and hold harmless the Indemnified Parties from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidating Trust and the Estates or the implementation or administration of the Plan if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interest of the Liquidating Trust and the Estates. To the extent the Liquidating Trust indemnifies and holds harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Liquidating Trustee in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be paid as Liquidating Trust Expenses. All rights of the Persons indemnified pursuant hereto shall survive confirmation of the Plan. For the avoidance of doubt, the Liquidating Trustee shall not be deemed an Exculpated Party under this Plan, nor shall this provision be read to grant the Liquidating Trustee an exculpation under this Plan.

16.5    <u>Preservation of Rights of Action</u>.

(a)    <u>Vesting of Causes of Action</u>.

Except as otherwise provided in the Plan or Confirmation Order, including any Cause of Action that is expressly waived, relinquished, exculpated, released, settled, or compromised under the Plan or Confirmation Order (including, without limitation, pursuant to the Debtor/Estate Release), (i) in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors hold or may hold against any Entity shall vest upon the Effective Date in the Liquidating Trust; (ii) after the Effective Date, the Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Causes of Action the Estates hold or may hold against any Entity constituting Liquidating Trust Assets, in accordance with the terms of the Plan and the Liquidating Trust Agreement, as applicable, and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases; and (iii) Causes of Action and recoveries therefrom shall remain the sole property of the Liquidating Trust, and holders of Claims shall have no direct right or interest in to any such Causes of Action or recoveries.

(b)    <u>Preservation of All Causes of Action Not Expressly Settled or Released</u>.

Unless a Cause of Action against a holder of a Claim or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan (including, without limitation, pursuant to the Debtor/Estate Release) and/or or any Final Order (including the Confirmation Order), the Debtors and the Liquidating Trustee expressly reserve such retained Cause of Action for later adjudication by the Debtors or the Liquidating Trustee, as applicable (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere, or of which the Debtors may be presently unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time, or facts or circumstances that may change or be different from those the Debtors now believe to exist) and,

-82-

therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan, or Confirmation Order, except where such Causes of Action have been released or otherwise resolved by a Final Order (including the Confirmation Order).  In addition, the Debtors and Liquidating Trustee expressly reserve the right to pursue or adopt claims alleged in any lawsuit in which a Debtor is a defendant or interested party against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to which the Debtors have incurred an obligation (whether on account of services, the purchase or sale of goods, or otherwise), or that has received services from the Debtors or a transfer of money or property of the Debtors, or that has received services from the Debtors or a transfer or money or property of the Debtors, or that has transacted business with the Debtors, or that has leased property from the Debtors, should assume and is hereby advised that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors or Liquidating Trustee have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors or Liquidating Trustee have objected to any such Entity's scheduled Claim; (v) any such Entity's scheduled Claim has been identified by the Debtors or Liquidating Trustee as disputed, contingent, or unliquidated; or (vi) the Debtors have identified any potential claim or Cause of Action against such Entity herein.

16.6     No Discharge.

Nothing contained in the Combined Plan and Disclosure Statement shall be deemed to constitute a discharge of the Debtors under section 1141(d)(3) of the Bankruptcy Code.

## SECTION 17
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

17.1     Conditions to Confirmation of the Plan.

Confirmation of the Combined Plan and Disclosure Statement is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtors, subject to the Cash Flow DIP Lender's consent and in consultation with the Committee: (i) the Bankruptcy Court shall have approved a disclosure statement to the Plan, which may be this Combined Plan and Disclosure Statement, in form and substance acceptable to the Debtors, the DIP Repo Agent, and the Cash Flow DIP Lender, (ii) the Debtors shall have determined that there will be sufficient Cash on the Effective Date to pay (or with respect to Disputed Claims to reserve for as required pursuant to the Plan) Allowed Administrative Claims, Priority Non-Tax Claims, and Priority Tax Claims in full (or in such lesser amount as may be agreed to by the Claimant), (iii) the Confirmation Order to be presented to the Bankruptcy Court at the Confirmation Hearing shall be acceptable to the Debtors, the DIP Repo Agent, and the Cash

-83-

Flow DIP Lender in form and substance, and (iv) the final version of the schedules, documents, and exhibits contained in the Plan Supplement, and all other schedules, documents, supplements and exhibits to the Combined Plan and Disclosure Statement, shall be in form and substance acceptable to the Debtors and the Cash Flow DIP Lender.

### 17.2    Conditions to the Effective Date.

The occurrence of the Effective Date is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtors, subject to the consent of the Cash Flow DIP Lender (provided, however, that unless the DIP Repo Claims have been indefeasibly paid in full prior to entry of the Confirmation Order and the DIP Repo Facility Agreement, DIP BCI MSFTA, and DIP Netting Agreement, and the obligations of the DIP Repo Parties thereunder, shall have been terminated, the Debtors and the Cash Flow DIP Lender shall have no authority to waive the conditions set forth in clause (i) or (ii) with respect to the DIP Repo Agent's approval of the Confirmation Order or with respect to the repayment in full of all DIP Repo Claims and the termination of the DIP Repo Facility Agreement, DIP BCI MSFTA, and DIP Netting Agreement) and in consultation with the Committee: (i) a Confirmation Order in form and substance acceptable to the Debtors, the DIP Repo Agent, and the Cash Flow DIP Lender shall have been entered by the Bankruptcy Court and become a Final Order which is not subject to any stay of effectiveness; (ii) the DIP Repo Claims shall have been paid in full in cash (or will be paid in full in cash concurrently with the occurrence of the Effective Date) and the DIP Repo Facility Agreement, DIP BCI MSFTA, and DIP Netting Agreement, and the obligations of the DIP Repo Parties thereunder, shall have been terminated; (iii) the Liquidating Trust shall have been created pursuant to the terms of the Plan, the Liquidating Trustee shall have been appointed by order of the Bankruptcy Court (which may be the Confirmation Order), and the Liquidating Trust Agreement shall have been executed by the Liquidating Trustee; (iv) the Initial Trust Cash shall have been fully funded and released to the Liquidating Trustee upon the Effective Date; (v) the Debtors shall not be in default under the Cash Flow DIP Documents (or, to the extent that the Debtors have been or are in default on the proposed Effective Date, such default shall have been waived by the Cash Flow DIP Lender or cured in a manner consistent with the Cash Flow DIP Documents, as applicable; (vi) in the case of one or more Sale Transactions, (a) each such Sale Transaction shall have closed and (b) all post-closing obligations of the Debtors related to each such Sale Transaction, including pursuant to any transition services, interim management, or similar agreements shall have terminated, unless the express terms of such Sale Transaction permit such obligations to be performed after the occurrence of the Effective Date; and (vii) all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto.

### 17.3    Waiver of Conditions Precedent.

To the fullest extent permitted by law, and except as otherwise expressly provided in Section 17.2 with respect to the conditions set forth in clause (i) or (ii) of Section 17.2 with respect to the DIP Repo Agent's approval of the Confirmation Order or with respect to the repayment in full of all DIP Repo Claims and the termination of the DIP Repo Facility Agreement, DIP BCI MSFTA, and DIP Netting Agreement, the conditions to the Effective Date set forth in Section 17.2 may be waived or modified in whole or in part at any time in writing by the Debtors, subject to the Cash Flow DIP Lender's consent, without leave from or an order of the Court.

**SECTION 18**
**RETENTION OF JURISDICTION**

From and after the Confirmation Date, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including, but not limited to, for the following purposes:

(a)    To hear and determine any and all objections to the allowance of a Claim, proceedings to estimate a Claim for any purpose, actions to equitably subordinate a Claim, proceedings seeking approval of any necessary claims reconciliation protocols, or any controversy as to the classification of a Claim in a particular Class under the Plan;

(b)    To administer the Plan, the Liquidating Trust, the Liquidating Trust Assets and the proceeds thereof;

(c)    To estimate or liquidate any Disputed Claims;

(d)    To hear and determine any and all adversary proceedings, contested matters or applications pending on the Effective Date or otherwise relating to, arising from, or in connection with the Litigation; provided, however, that the Liquidating Trustee shall reserve the right to commence actions in all appropriate jurisdictions;

(e)    To hear and determine any and all motions and/or objections to fix, estimate, allow and/or disallow any Claims arising therefrom;

(f)    To hear and determine any and all applications by Professionals for an award of Professional Fees;

(g)    To enable the Liquidating Trustee to commence and prosecute any Litigation which may be brought after the Effective Date;

(h)    To interpret and/or enforce the provisions of the Plan and the injunction provided for in the Plan and to determine any and all disputes arising under or regarding interpretation of the Plan or any agreement, document, or instrument contemplated by the Plan;

(i)    To enter and implement such orders as may be appropriate in the event Confirmation is for any reason stayed, reversed, revoked, modified, or vacated;

(j)    To modify any provision of the Plan to the extent permitted by the Bankruptcy Code and to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(k)    To enter such orders as may be necessary or appropriate in furtherance of Confirmation and the successful implementation of the Plan and to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code;

-85-

(l)     To enter any orders as required by Rule 23 of the Federal Rules of Civil Procedure, to the extent made applicable to any adversary proceeding pursuant or contested matter pursuant to Bankruptcy Rules 7023 and 9014(c), as applicable;

(m)     To enforce all orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

(n)     To enforce, and hear and determine all disputes involving, the injunction, release, and exculpation provisions provided in Section 16; and

(o)     To close the Chapter 11 Cases when administration of the Liquidating Trust and the Chapter 11 Cases has been completed.

## SECTION 19
## MISCELLANEOUS PROVISIONS

19.1     <u>Revocation of the Combined Plan and Disclosure Statement</u>.

The Debtors reserve the right to revoke and withdraw the Combined Plan and Disclosure Statement at any time on or before the Confirmation Date.  If the Debtors revoke or withdraw the Combined Plan and Disclosure Statement, or if Confirmation or the Effective Date does not occur, then the Plan shall be deemed null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

19.2     <u>Severability of Plan Provisions</u>.

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, with the consent of the Debtors, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

19.3     <u>Exhibits</u>.

All exhibits attached to the Combined Plan and Disclosure Statement and the Plan Supplement are, by this reference, hereby incorporated herein.  The Debtors reserve the right to make non-substantive changes and corrections to such exhibits in advance of the Confirmation Hearing.  If any exhibits are changed or corrected, the replacement exhibits will be filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing.

19.4    <u>Notices</u>.

All notices required or permitted to be made in accordance with the Plan shall be in writing and shall be delivered personally or by nationally recognized overnight or next-day courier service, first-class mail, electronic mail, or via facsimile with electronic confirmation of receipt as follows:

<u>Counsel for Debtors</u>:

Dentons US LLP
601 S. Figueroa Street, #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Attn:    Samuel R. Maizel, Esq.
       Tania M. Moyron, Esq.
       samuel.maizel@dentons.com
       tania.moyron@dentons.com

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tel. 302-652-4100, Fax 302-652-4400
Attn:    Laura Davis Jones, Esq.
       ljones@pszjlaw.com

<u>Liquidating Trustee</u>:

Tanya Meerovich
FTI Consulting
1166 Avenue of the Americas
15th Floor
New York, NY 10036
Tanya.meerovich@fticonsulting.com

19.5    <u>Reservation of Rights</u>.

Neither the filing of the Combined Plan and Disclosure Statement nor any statement or provision contained in the Combined Plan and Disclosure Statement, nor the taking by any party in interest of any action with respect to the Plan, shall: (a) be or be deemed to be an admission against interest and (b) until the Effective Date, be or be deemed to be a waiver of any rights any party in interest may have (i) against any other party in interest, or (ii) in or to any of the assets of any other party in interest, and, until the Effective Date, all such rights are specifically reserved. In the event that the Plan is not confirmed or fails to become effective, neither the Combined Plan and Disclosure Statement nor any statement contained in the Combined Plan and Disclosure Statement may be used or relied upon in any manner in any suit, action, proceeding, or controversy within or without the Chapter 11 Cases involving the Debtors, except with respect to Confirmation of the Plan.

-87-

19.6     Defects, Omissions and Amendments.

The Debtors may, with the approval of the Bankruptcy Court and consent of the Cash Flow DIP Lender and without notice to all holders of Claims or Interests, insofar as it does not materially and adversely affect holders of Claims, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable to expedite the execution of the Plan.  The Plan may be altered or amended before or after Confirmation as provided in section 1127 of the Bankruptcy Code if, in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of holders of Claims, so long as the Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with section 1125 of the Bankruptcy Code.  The Plan may be altered or amended before or after the Confirmation Date but, prior to substantial Consummation, in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, so long as the Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code, the Debtors have complied with section 1125 of the Bankruptcy Code and, after notice and a hearing, the Bankruptcy Court confirms such Plan, as modified, under section 1129 of the Bankruptcy Code.

19.7     Filing of Additional Documents.

The Debtors shall file with the Bankruptcy Court such agreements, instruments, pleadings, orders, papers, or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

19.8     Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such Entity.

19.9     Setoffs and Recoupments.

The Debtors and the Liquidating Trust may, but shall not be required to, set off against or recoup from the payments to be made pursuant to the Plan in respect of a Claim, any claim of any nature whatsoever that the Debtors, the Liquidating Trust, or the Estates, as applicable, may have against the holder of such Claim, but neither the failure to do so or the allowance of any Claim hereunder shall constitute a waiver or release of any such claim by the Debtors, the Liquidating Trust, or the Estates, against such holder.

19.10    Tax Exemption.

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Plan, or the execution, delivery, or recording of an  instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including, without limitation, any transfers to or by the Debtors, if on the Effective Date, and the Liquidating Trustee, if after the Effective Date, of the Debtors' property in implementation of or as contemplated by the Plan (including, without limitation, any subsequent transfer of property by the Liquidating Trust) shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or

-88-

Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

19.11    Securities Exemption.

To the extent the Liquidating Trust Interests are deemed or asserted to constitute securities, the Liquidating Trust Interests and the issuance and distribution thereof shall be exempt from Section 5 of the Securities Act, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation, section 1145 of the Bankruptcy Code.

19.12    Implementation.

Upon Confirmation, the Debtors shall be authorized to take all steps and execute all documents necessary to effectuate the provisions contained in the Plan.

19.13    Record Date.

To the extent a "Record Date" is required for implementation of the Plan, the record date shall be the voting record date established by the Bankruptcy Court in the Conditional Approval and Procedures Order.

19.14    Certain Actions.

By reason of entry of the Confirmation Order, prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of members, managers or other interestholders of the Debtors under the Plan, including, without limitation, (i) the distributions of Cash pursuant to the Plan, (ii) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (iii) the adoption, execution, and implementation of other matters provided for under the Plan involving the company or organizational structure of the Debtors, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable corporation/limited liability company laws, without any requirement of further action by the members, managers or other interestholders of the Debtors, irrespective of whether the Confirmation Order specifically authorizes any such action.

Effective upon the Effective Date, the Debtors' formation documents shall each be deemed amended to prohibit the issuance by the Debtors of nonvoting securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.

On or as soon as practicable following the Effective Date, the Liquidating Trustee shall be authorized to cancel, annul, and extinguish all Interests.

19.15   Substantial Consummation.

On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

19.16   Waiver of Fourteen-Day Stay.

The Debtors request as part of the Confirmation Order a waiver from the Bankruptcy Court of the 14-day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the 14-day stay of Bankruptcy Rule 6004(g).

19.17   Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

19.18   Entire Agreement.

On the Effective Date, the Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## SECTION 20
## RECOMMENDATION

The Debtors strongly recommend that all creditors receiving a Ballot vote in favor of the Plan.  The Debtors believe that the Plan is in the best interests of creditors.  The Plan as structured, among other things, allows creditors with Allowed Claims to participate in distributions believed to be in excess of those that would otherwise be available were the Chapter 11 Cases dismissed or converted under chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to creditors.

FOR ALL THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE DEBTORS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES.  THE DEBTORS URGE ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY 4:00 P.M. EASTERN TIME ON OCTOBER 26, 2022.

Dated: November 2, 2022                    Respectfully submitted,

                                      FIRST GUARANTY MORTGAGE
                                      CORPORATION

                                      MAVERICK II HOLDINGS, LLC

                                      */s/ Aaron Samples*_____
                                      Aaron Samples
                                      Chief Executive Officer

## EXHIBIT A

## (Liquidation Analysis)

As part of the chapter 11 process, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court determine that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan value that is not less than the amount that the holder would receive if the debtors had liquidated under chapter 7.

Prior to the Petition Date, the Debtors' business included the origination, purchase, service, sale, and/or securitization of residential real estate mortgage loans. However, due to adverse market conditions, the Debtors experienced significant operating losses and cash flow challenges, and ceased all origination activity. Further, the Cash Flow DIP Facility requires the Debtor to meet the following milestones: 1) the sale of all or substantially all of the Debtors' Mortgage Servicing Rights ("MSR") portfolio; 2) sale of all or substantially all of FGMC's pipeline of loans; 3) sale of loans funded pre-petition; and 4) substantial cessation of all loan operations.

Given the limited operational activity, upon conversion of the cases to chapter 7, it is anticipated that a chapter 7 trustee would primarily focus on liquidating remaining assets and effectuate the wind-down of the Estates. Remaining assets may include 1) excess proceeds from the sale of loans pledged to pre-petition warehouse and repo lenders; 2) holdbacks from the sale of mortgage servicing rights and servicing advances to BSI; 3) United States Department of Housing and Urban Development claims; 4) servicing advances, including advances associated with early buyout; 5) counterparty claims, including holdbacks from prepetition loan and MSR sales, correspondent lender claims and sub-servicer claims; and 6) property, plant & equipment and real estate owned properties.

A number of factors in a chapter 7 liquidation would affect the chapter 7 trustee's ability to sell the Debtors' remaining assets. Among other things, the primary risks are expected to include challenges associated with liquidating the assets in an expedited manner due to various operational and/or regulatory challenges, inability to collect accounts receivables given expected required negotiations with various parties some of whom may have the ability to set-off these amounts, and costs associated with the monetization of certain assets may exceed initial expectations. Additionally, there is a risk that the employee base necessary to effectuate a wind-down would deteriorate despite efforts to retain key individuals who are best positioned to maximize value for the creditors.  Absent these employees, the chapter 7 trustee is expected to be challenged to effectuate certain asset sales and collection of the Debtors' receivables, most of which require some level of institutional knowledge and legacy data.

If the Chapter 11 Cases were converted to chapter 7 cases, given the magnitude of senior claims, certain priority and general unsecured creditors are expected to receive no recovery.

Further, the Debtors' Estates would incur the costs of payment of a statutorily allowed commission to the chapter 7 trustee, as well as the costs of counsel and other professionals retained by the chapter 7 trustee. The Debtors believe that such amounts, over the same liquidation time period, would exceed the amount of expenses that will be incurred in implementing the Plan and winding up the affairs of the Debtors in the Chapter 11 Cases. Under the Plan, the Debtors contemplate an orderly administration and winding down of the Estates by certain parties that are familiar with the Debtors, their assets and affairs, and their creditors and liabilities. Such familiarity will allow the Liquidating Trust to complete liquidation of the remaining assets (including prosecution of Causes of Action), and distribute the net proceeds to creditors more efficiently and expeditiously than a chapter 7 trustee. Additionally, the Estates would suffer additional delays, as a chapter 7 trustee and his/her counsel took time to develop a necessary learning curve in order to complete the administration of the Estates (including the prosecution of Causes of Action). Also, a new time period for the filing of claims would commence under Bankruptcy Rule 1019(2), possibly resulting in the filing of additional Claims against the Estates.

US_ACTIVE\122262256\V-5
DOCS_DE:241262.1 28311/001

## EXHIBIT B

### (Approved DIP Budget)

*($ in millions)*

| | Actuals Through 23-Oct-22 | Forecast Through Effective Date | Post Effective Date Payments | Total |
|---|---|---|---|---|
| Operating Disbursements | $ (8.1) | $ (4.8) | $ (5.1) | **$ (18.0)** |
| Debtor Professional Fees | (1.9) | (3.1) | (10.6) | **(15.5)** |
| Lender Professional Fees | (1.3) | - | (0.5) | **(1.7)** |
| Committee Professional Fees | - | (0.1) | (1.4) | **(1.5)** |
| **Total Disbursements** | **$ (11.3)** | **$ (7.9)** | **$ (17.6)** | **$ (36.8)** |

US_ACTIVE\122262256\V-5
DOCS_DE:241262.1 28311/001

## EXHIBIT C

## (Specified Assets)

1.  All Intellectual Property owned by the Debtors, including but not limited to the Intellectual Property listed on the following portions of the *Schedules of Assets and Liabilities for First Guaranty Mortgage Corporation (Case No. 22-10584)*:

    a.  Schedule A/B 60 (patents, copyrights, trademarks, and trade secrets)

    b.  Schedule A/B 61 (internet domain names and websites)

    c.  Schedule A/B 64 (but only the "doing business as" name Goodmortgage.com)

    For purposes of this Exhibit, "Intellectual Property" means all (i) foreign and domestic patents and patent applications and inventions, (ii) trademarks, service marks, trade dress, trade names, logos and corporate or company names (both foreign and domestic) and registrations and applications for registration thereof together with all of the goodwill associated therewith, (iii) copyrights (registered or unregistered), works of authorship and copyrightable works (both foreign and domestic) and registrations and applications for registration thereof, (iv) Internet addresses, URL, domain names, websites and web page content, (v) computer software, data, data bases and documentation thereof, and (vi) trade secrets and other confidential information (including ideas, formulas, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), know how, business processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, financial and marketing plans and customer and vendor lists and information (including all account information, files, programs, plans, data and related business information).

2.  The Debtors' interest in FirstLine Holdings, LLC

3.  The proceeds of the loans and other "Purchased Assets" funded under the DIP Repo Facility

4.  Cash collateral backing the Debtors' surety bonds to the extent posted on or after the Petition Date

5.  Recovery of servicing advances to the extent funded on or after the Petition Date related to early buyout mortgage loans

US_ACTIVE\122262256\V-5
DOCS_DE:241262.1 28311/001

# EXHIBIT D

## (Trust Budget)

*($ in millions)*

|  | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May - On | Total |
|---|---|---|---|---|---|---|---|---|
| Total Payroll / Employee Costs | $ 0.3 | $ 0.5 | $ 0.1 | $ 0.2 | $ 0.1 | $ 0.2 | $ - | **$ 1.3** |
| Total Operating Costs & OCP | 0.6 | 0.3 | 0.3 | 0.2 | 0.1 | 0.1 | 0.3 | **2.0** |
| Total Professional Fee Costs | 0.6 | 0.5 | 0.4 | 0.2 | 0.2 | 0.3 | - | **2.2** |
| **Trust Funding Amount** | **$ 1.5** | **$ 1.3** | **$ 0.7** | **$ 0.6** | **$ 0.5** | **$ 0.6** | **$ 0.3** | **$ 5.5** |

US_ACTIVE\122262256\V-5
DOCS_DE:241262.1 28311/001

**EXHIBIT B**

**Final Form of Liquidating Trust Agreement**

# LIQUIDATING TRUST AGREEMENT

## PREAMBLE

This Liquidating Trust Agreement, dated as of November [●], 2022 (the "Agreement"), which pertains to the administration of the FGMC Liquidating Trust (the "Liquidating Trust"), is made effective as of the Effective Date[1] of the Plan, by and among First Guaranty Mortgage Corporation and Maverick II Holdings, LLC (together, the "Debtors")[2] and Tanya Meerovich of FTI Consulting, Inc., solely in her capacity as trustee of the Liquidating Trust (the "Liquidating Trustee" and together with the Debtors, the "Parties") in accordance with the Amended Combined Disclosure Statement and Chapter 11 Plan of First Guaranty Mortgage Corporation and Debtor Affiliate, dated October 6, 2022  which was subsequently amended and restated and attached to the Confirmation Order (as may be modified, supplemented and/or amended from time to time, the "Plan") filed by the Debtors, and such Plan having been confirmed pursuant to the entry of the Confirmation Order.

## RECITALS

A.      On June 30, 2022 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), thereby commencing their chapter 11 cases (together, the "Chapter 11 Cases").

B.      On October 6, 2022, the Debtors jointly filed their Chapter 11 plan which was subsequently amended and restated and attached to the Confirmation Order.

C.      On October 7, 2022, the Bankruptcy Court entered an order [D.I. 542] (the "Interim Approval Order") (i) granting interim approval of the Disclosures in the Plan and (ii) approving procedures for the Debtors' solicitation of votes on the Plan.

D.      On October [●], 2022, the Bankruptcy Court entered the Confirmation Order [D.I. ___].

E.      Among other things, the Plan provides for the creation of a post-confirmation Liquidating Trust on the Effective Date to hold and administer the Liquidating Trust Assets and distribute the proceeds therefrom to the Beneficiaries, in accordance with the terms of this Agreement and the Plan. This Agreement is executed to establish the Liquidating Trust and to facilitate the implementation of the Plan and the Liquidating Trust.

F.      The Liquidating Trust is created for the sole purpose of the administration of the Liquidating Trust Assets for the benefit of the Beneficiaries in accordance with Treasury

---

[1] A capitalized term used but not defined herein shall have the meaning ascribed to it in the Plan (as defined herein).

[2] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621). The Debtors' mailing address is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

1

Regulation Section 301.7701-4(d), with no objective or authority to continue or engage in the conduce of a trade or business except to the extent reasonably necessary to, and consistent with, the Liquidating Trust's purpose.

G.      The respective powers, authority, responsibilities, and duties of the Liquidating Trustee shall be governed by this Agreement, the Plan, the Confirmation Order, and, with respect to the Liquidating Trustee only, any obligations under Delaware law.

H.      This Agreement is intended to supplement, complement, and implement the Plan. If any of the terms and/or provisions of this Agreement are inconsistent with the terms and/or provisions of the Plan or the Confirmation Order, then the Plan or the Confirmation Order shall govern except for inconsistencies or clarifications in furtherance of the Liquidating Trust as a liquidating trust for federal income tax purposes, in which case the terms and/or provisions of this Liquidating Trust shall govern.

I.      The Liquidating Trust is intended to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), and as such is intended to be treated as a "grantor trust" for all federal income tax purposes pursuant to Section 671 of the Internal Revenue Code of 1986, as amended, with the Beneficiaries treated as the grantors and owners of the Liquidating Trust.

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements contained herein and in the Plan, the Parties agree as follows:

## **DEFINITIONS**

"Affiliates" means an "affiliate" as defined in Bankruptcy Code section 101(2).

"Agreement" has the meaning specified in the Preamble to this Agreement.

"Bankruptcy Court" has the meaning specified in the Preamble to this Agreement.

"Cash Flow DIP Lender Representative" means the two individuals designated by Cash Flow DIP Lender to serve on the Oversight Committee to represent the interests of the Cash Flow DIP Lender in Class 5 of the Plan..

"Causes of Action" means all Causes of Action (as defined in the Plan) that are Liquidating Trust Assets.

"Confidential Party" has the meaning specified in Article 14.3.

"Creditor Representative" means an individual designated by BRG Consulting LLP (and

initially the Creditors Committee) to serve on the Oversight Committee to represent the interests of the General Unsecured Creditors in Class 6 of the Plan.

"Debtors" has the meaning specified in the Preamble to this Agreement.

"IRS" means the Internal Revenue Service of the United States of America.

"Liquidating Trust" has the meaning specified in the Preamble to this Agreement.

"Liquidating Trustee" has the meaning specified in the Preamble to this Agreement and includes any successor Liquidating Trustee appointed pursuant to Article 9.1.

"Liquidating Trustee Non-Professionals" has the meaning specified in Article 11.1(b).

"Liquidating Trustee Professionals" has the meaning specified in Article 11.1(a).

"Parties" has the meaning specified in the Preamble to this Agreement.

"Permissible Investments" has the meaning specified in Article 2.8.

"Person" means any individual, corporation, partnership, joint venture, association, trust, unincorporated organization, or other legal entity, or any governmental authority, entity, or political subdivision thereof.

"Petition Date" has the meaning specified in the Preamble to this Agreement.

"Plan" has the meaning specified in the Preamble to this Agreement.

## ARTICLE 1
## ESTABLISHMENT, PURPOSE AND FUNDING OF TRUST

### 1.1    Creation and Name; Formation

Upon the Effective Date of the Plan, the Liquidating Trust as referred to in the Plan is hereby created. The Liquidating Trustee may conduct the affairs of the Liquidating Trust under the name of "FGMC Liquidating Trust," the Liquidating Trust, or such variation thereof as the Liquidating Trustee sees fit.

### 1.2    Appointment of Liquidating Trustee

Tanya Meerovich of FTI Consulting Inc. is hereby appointed to serve as the initial

Liquidating Trustee under the Plan, and hereby accepts this appointment and agrees to serve in such capacity effective upon the Effective Date of the Plan and pursuant to the terms of the Plan and this Agreement. To effectuate an orderly and efficient transition of the administration of the Liquidating Trust Assets from the Debtors to the Liquidating Trustee, the Liquidating Trustee may perform certain services in connection with its duties and obligations under this Agreement prior to the Effective Date, which are hereby ratified as of the Effective Date. A successor Liquidating Trustee shall be appointed as set forth in Article 9.1 in the event the Liquidating Trustee is removed or resigns pursuant to this Agreement, or if the Liquidating Trustee otherwise vacates the position.

### 1.3    Purpose of Trust

The Debtors and the Liquidating Trustee, pursuant to the Plan and the Confirmation Order and in accordance with the Bankruptcy Code, hereby establish the Liquidating Trust for the purpose of, inter alia, (i) administering the Liquidating Trust Assets, including investigating and, if appropriate, pursuing any Causes of Action not released under the Plan (ii) resolving all Disputed Claims, and (iii) making all Distributions to the Beneficiaries provided for under the Plan.   The Liquidating Trust is intended to qualify as a liquidating trust pursuant to Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of the trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  Accordingly, the Liquidating Trustee shall make commercially reasonable efforts to, in an orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, and make timely Distributions to the Beneficiaries, and not unduly prolong the duration of the Liquidating Trust. Neither the Liquidating Trust nor the Liquidating Trustee shall be or shall be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.

### 1.4    Liquidating Trust Assets

#### 1.4.1    Transfer of Liquidating Trust Assets; Assumption of Liabilities

Pursuant to the Plan, the Parties hereby establish the Liquidating Trust on behalf of the Beneficiaries, to be treated as the grantors and deemed owners of the Liquidating Trust Assets. The Debtors hereby transfer, assign, and deliver to the Liquidating Trust, on behalf of the Beneficiaries, all of their right, title, and interest in the Liquidating Trust Assets, including the Causes of Action not released under the Plan, free and clear of all Claims, Interests, Liens, charges, Causes of Action, and other encumbrances of Creditors or Interest holders subject to the rights of Holders of Allowed Claims under the Plan to obtain distributions provided for in the Plan, in accordance with the provisions of the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law. Such transfer includes, but is not limited to, all rights to assert, waive or otherwise exercise any attorney-client privilege, work product protection or other privilege, immunity, or confidentiality provision vested in, or controlled by, the Debtors. The Liquidating Trustee agrees to accept and hold the Liquidating Trust Assets in the Liquidating Trust for the benefit of the Beneficiaries, subject to the terms of the Confirmation Order, Plan and this Agreement.

### 1.4.2 Title to Assets

(a) On the Effective Date, the Debtors shall transfer the Liquidating Trust Assets to the Liquidating Trust free and clear of all Claims, Interests, Liens, charges, Causes of Action, and other encumbrances of Creditors or Interest holders for the benefit of the Beneficiaries. Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, all Liquidating Trust Assets shall vest in the Liquidating Trust in accordance with section 1141 of the Bankruptcy Code. Upon the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors shall have no interest in or with respect to such Liquidating Trust Assets or the Liquidating Trust.

(b) For all federal income tax purposes, all Parties and Beneficiaries shall treat the transfer of the Liquidating Trust Assets by the Debtors to the Liquidating Trust, as set forth in this Article 1 and in the Plan, as a transfer of such assets by the Debtors to the Beneficiaries entitled to distributions under this Agreement followed by a transfer by such Beneficiaries to the Liquidating Trust. Thus, the Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

### 1.4.3 Valuation of Assets

Except to the extent definitive guidance from the IRS or a court of competent jurisdiction (including the issuance of applicable Treasury Regulations or the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one) indicates that such valuation is not necessary to maintain the treatment of the Liquidating Trust as a liquidating trust for purposes of the Internal Revenue Code and applicable Treasury Regulations, as soon as possible after the Effective Date, the Liquidating Trustee shall make a good-faith valuation of the Liquidating Trust Assets. To the extent a valuation is completed, the Liquidating Trustee shall apprise the Beneficiaries of the value of the Liquidating Trust Assets. The valuation shall be used consistently by all Parties and the Beneficiaries for all federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidating Trust Assets.

### 1.5 Nature of Trust

The Liquidating Trust is irrevocable, but this Agreement is subject to amendment and waiver as provided in the Agreement, the Plan and the Confirmation Order. The Liquidating Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, limited liability partnership, joint venture, corporation, limited liability company, joint stock company or association, nor shall the Liquidating Trustee or the Beneficiaries for any purpose be, or be deemed to be, liable or responsible hereunder as partners or joint venturers. The relationship of the Beneficiaries, on the one hand, to the Liquidating Trust and the Liquidating Trustee, on the other hand, shall not be deemed a principal or agency relationship, and their rights shall be limited to those conferred upon them by this Agreement, the Plan, and the Confirmation Order.

### 1.6 Effectiveness

The effectiveness of this Agreement shall occur upon the Effective Date of the Plan.

## ARTICLE 2
## DUTIES AND POWERS OF THE LIQUIDATING TRUSTEE
## AND OVERSIGHT COMMITTEE

### 2.1    Generally

The Liquidating Trustee shall be responsible for liquidating and administering (or abandoning, as the case may be) the Liquidating Trust Assets, including the Causes of Action (subject to the provisions of this Agreement, the Plan and the Confirmation Order), and taking actions on behalf of, and representing, the Liquidating Trust, including to administer certain post-Effective Date responsibilities and wind-down the Debtors under the Plan.  The Liquidating Trustee shall have the authority to bind the Liquidating Trust within the limitations set forth herein but shall for all purposes hereunder be acting in the capacity of Liquidating Trustee and not individually.

### 2.2    Scope of Authority of Liquidating Trustee

The Liquidating Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules to act on behalf of the Liquidating Trust.  Without limiting the foregoing, the Liquidating Trustee will have the right, subject to any limitations set forth in this Agreement, the Plan or the Confirmation Order to, among other things, (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement, including establishing the Liquidating Trust Assets Account as soon as practicable after the Effective Date; (2) liquidate the Liquidating Trust Assets; (3) investigate, prosecute, settle, abandon or compromise any Causes of Action the Debtors hold or may hold against any Entity that are Liquidating Trust Assets; (4) make all Distributions in accordance with the Plan, Confirmation Order, and the Liquidating Trust Agreement; (5) administer the Liquidating Trust and pursue viable Causes of Action that are Liquidating Trust Assets in accordance with the Plan and the Liquidating Trust Agreement; (6) establish and administer any necessary reserves for Disputed Claims that may be required; (7) object to the Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (8) assert or waive any attorney-client privilege on behalf of the Debtors and Estates with regard to acts or events during time periods prior to the Petition Date; and (9) employ and compensate professionals and other agents, including, without limitation, existing Professionals employed by the Debtors or the Committee in accordance with the Liquidating Trust Agreement or the Plan, *provided, however*, that any such compensation shall be made only out of the Liquidating Trust Assets, to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

### 2.3    Obligations to Liquidating Trust and Beneficiaries

The Liquidating Trustee's actions as Liquidating Trustee will be held to standards applicable to liquidating trustees under Delaware law.

2.4    Additional Powers of Liquidating Trustee

In connection with the administration of the Liquidating Trust, subject to and except as otherwise set forth in this Agreement, the Plan or the Confirmation Order, the Liquidating Trustee is hereby authorized to perform those acts necessary to accomplish the purposes of the Liquidating Trust. Without limiting, but subject to, the foregoing, the Liquidating Trustee shall, unless otherwise provided in this Agreement and subject to the limitations contained herein and in the Plan and Confirmation Order (including with respect to restrictions on the Liquidating Trustee's use of the DIP Budget Amount, Additional Administrative Claims Amount, Trust Funding Amount, and Specified Assets):

(a)    be expressly authorized and required to hold legal title (on behalf of the Liquidating Trust as Liquidating Trustee, but not individually) to the Liquidating Trust Assets, including, but not limited to, the Causes of Action that are Liquidating Trust Assets, and be expressly authorized to vote any Claim held by the Liquidating Trust in any case or proceeding under the Bankruptcy Code or otherwise and to receive any distribution therein;

(b)    be expressly authorized and required to protect and enforce the rights to the Liquidating Trust Assets vested in the Liquidating Trust by the Plan or Confirmation Order by any method deemed appropriate in its discretion, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(c)    be expressly authorized to deposit funds, make distributions, and pay any other obligations owed by the Liquidating Trust from the Liquidating Trust Assets as provided herein and in the Plan and the Confirmation Order;

(d)    be expressly authorized and required to prosecute, defend, compromise, adjust, analyze, arbitrate, abandon, estimate, or otherwise deal with and settle, in accordance with the terms set forth in Article 5 hereof, Claims against the Liquidating Trust or the Liquidating Trust Assets;

(e)    be expressly authorized and required to pay expenses and make disbursements necessary to preserve and liquidate the Liquidating Trust Assets;

(f)    be expressly authorized and required to make the Distributions as contemplated in the Plan, Confirmation Order, and this Agreement;

(g)    be expressly authorized and required to file appropriate tax returns with respect to the Liquidating Trust and the Debtors, and pay taxes properly payable by the Liquidating Trust, if any, in the exercise of its fiduciary obligations;

(h)    be expressly authorized and required to take such actions as are necessary

7

and reasonable to carryout the purposes of the Liquidating Trust;

(i)    be expressly authorized to purchase insurance coverage as the Liquidating Trustee, in its sole discretion, deems necessary and appropriate with respect to the assets, liabilities, and obligations of the Liquidating Trust;

(j)    be expressly authorized to retain and pay, as applicable, the Liquidating Trustee Professionals and Liquidating Trustee Non-Professionals as provided in, and subject to the terms of, this Agreement, the Plan and the Confirmation Order;

(k)    be expressly authorized to incur any reasonable and necessary expenses in liquidating and converting the Liquidating Trust Assets to Cash, or otherwise administering the Liquidating Trust, as set forth in the Plan, Confirmation Order, or this Agreement;

(l)    be expressly authorized to terminate the Liquidating Trust and seek to close the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code;

(m)    be expressly authorized to open and maintain bank accounts, including the Liquidating Trust Assets Account;

(n)    be expressly authorized and required to assume such other powers as may be vested in or assumed by the Liquidating Trust pursuant to the Plan or Bankruptcy Court order (including the Confirmation Order), or as may be necessary and proper to carry out the provisions of the Plan or this Agreement;

(o)    be expressly authorized and required to implement the terms of any sale transaction; and

(p)    be expressly authorized to utilize employees, independent contractors, contracts, software licenses and other resources currently or formerly related to the Debtors.

2.5    General Authority of the Liquidating Trustee

Unless specifically stated otherwise herein, the Liquidating Trustee shall not be required to obtain Bankruptcy Court approval with respect to any proposed action or inaction: (a) authorized in this Agreement; or (b) contemplated in the Plan or Confirmation Order.  Notwithstanding the foregoing, the Liquidating Trustee, in its discretion, shall have the right to submit to the Bankruptcy Court any motion or application regarding actions for which the Liquidating Trustee may desire to have explicit approval of the Bankruptcy Court.

2.6    Limitation of Liquidating Trustee's Authority; No On-Going Business

(a)    The Liquidating Trustee shall not be authorized to engage in any trade or business with respect to the Liquidating Trust Assets or any proceeds therefrom except to the extent reasonably necessary to, and consistent with, the liquidation purpose of the Liquidating Trust as set forth in the Plan. The Liquidating Trustee shall take such actions consistent with the prompt

8

orderly liquidation of the Liquidating Trust Assets as required by applicable law and consistent with the treatment of the Liquidating Trust as a liquidating trust under Treasury Regulation section 301.7701-4(d), to the extent such actions are permitted by this Agreement.

(b)    Certain acts by the Liquidating Trustee are prohibited (including with respect to restrictions on the Liquidating Trustee's use of the DIP Budget Amount, Additional Administrative Claims Amount, Trust Funding Amount, and Specified Assets) and/or shall require approval of the Oversight Committee or the Cash Flow DIP Lender, as further set forth in Article 2.10 of this Agreement, the Plan, and the Confirmation Order.

2.7    Other Activities

The Liquidating Trustee shall be entitled to retain Liquidating Trustee Professionals and Liquidating Trustee Non-Professionals in accordance with the terms of this Agreement, and to assist with the administration of the Liquidating Trust including, but not limited to, former employees and Professionals retained by the Debtors, without the need for an order of the Bankruptcy Court. The provision of services by any Professional retained in the Chapter 11 Cases shall not disqualify such Professional from employment by the Liquidating Trustee and any conflict of interest with respect to such firm's prior representations in the Chapter 11 Cases shall be deemed waived upon entry of the Confirmation Order.  The Liquidating Trustee, the Liquidating Trustee Professionals, and the Liquidating Trustee Non-Professionals may be retained in matters that are unrelated to the Liquidating Trust by banks, bank groups or other institutional lenders or debt holders who are, or whose Affiliates are, Beneficiaries or its Affiliates, so long as such other retention does not involve holding or representing any interest adverse to the interests of the Liquidating Trust, or otherwise preclude or impair the Liquidating Trustee from performing its duties under this Agreement.

2.8    Safekeeping of Liquidating Trust Assets

All monies and other assets received by the Liquidating Trustee shall, until distributed or paid over as provided in the Plan and this Agreement, be segregated from all other monies and assets of the Liquidating Trustee, and further, shall be held in trust for the benefit of the Beneficiaries, but need not be segregated from other Liquidating Trust Assets, unless and to the extent required by the Plan and this Agreement. The Liquidating Trustee shall promptly deposit any such monies in the manner set forth in this Article 2.8 in an FDIC insured bank account or in any other manner approved by the Oversight Committee but shall otherwise be under no liability for interest or income on any monies received by the Liquidating Trust hereunder and held for distribution or payment to the Beneficiaries, except any interest that shall actually be received.

2.9    Establishment of Reserves

(a)    Subject to the terms of the Plan and Confirmation Order (including restrictions set forth therein on the Liquidating Trustee's use of the DIP Budget Amount, Additional Administrative Claims Amount, Trust Funding Amount, and Specified Assets), the Liquidating Trust Assets will be used in the first instance by the Liquidating Trustee to pay or reserve for all unpaid Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims (including any

Disputed Claims until such Claims are resolved), prior to use of the available Cash for purposes of the Liquidating Trust.  Subject to the restrictions set forth herein, the Plan and the Confirmation Order (including restrictions set forth therein on the Liquidating Trustee's use of the DIP Budget Amount, Additional Administrative Claims Amount, Trust Funding Amount, and Specified Assets), the Liquidating Trust Assets (to the extent remaining after payment of or reserve for all Allowed Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims) will be used by the Liquidating Trustee to pay for the expenses of the Liquidating Trust in accordance with the Trust Budget, Confirmation Order, Plan, and Liquidating Trust Agreement.

(b)      On or as soon as practicable following the Effective Date, subject to the terms of the Confirmation Order, Plan or the Liquidating Trust Agreement, the Liquidating Trust Assets Account shall be opened by the Liquidating Trustee and funded with the Initial Trust Cash, which shall constitute Liquidating Trust Assets.  Thereafter, from time to time, upon receipt of any Liquidation Proceeds or any Litigation Recovery, the Liquidating Trustee shall deposit such funds into the Liquidating Trust Assets Account, and such funds shall become part of the Liquidating Trust Assets, to be disbursed or used according to, and subject to restrictions set forth in, the Plan, the Confirmation Order, and this Agreement.

(c)      Subject to approval of the Oversight Committee (and subject to the terms of the Plan and Confirmation Order (including restrictions set forth therein on the Liquidating Trustee's use of the DIP Budget Amount, Additional Administrative Claims Amount, Trust Funding Amount, and Specified Assets), the Liquidating Trustee may: (i) establish and maintain additional reserves to satisfy current and projected expenses of the Liquidating Trust, and to satisfy Claims and contingent liabilities (including Disputed Claims); (ii) establish a separate Disputed Claims Reserve on account of Distributions of Cash or other property as necessary under the Plan; and (iii) establish a separate reserves as required under the Plan and may elect to treat any of the Liquidating Trust Assets allocable to, or on account of, Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9, if applicable, pursuant to the Plan. If a "disputed ownership fund" election is made, all parties (including the Debtors, holders of Claims, and the Liquidating Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

2.10    Oversight Committee

(a)      Membership.

(i)      The Oversight Committee and is hereby established as of the Effective Date pursuant to this Agreement.  The Oversight Committee shall have three (3) members consisting of: (i) two Cash Flow DIP Lender Representatives selected by the Cash Flow DIP Lender; and (ii) one Creditor Representative selected by the Committee.

(ii)      The initial members of the Oversight Committee shall be the Persons set forth on Schedule 1 attached hereto. No Beneficiary shall have any approval rights whatsoever in respect of management and operation of the Liquidating Trust; provided, however, that the Liquidating Trustee shall have the right to consult in good faith with Beneficiaries regarding any issues affecting the Liquidating Trust.

(iii)    The Oversight Committee shall have the rights and obligations set forth in this Agreement, the Plan and the Confirmation Order.

(b)    Tenure, Removal, and Replacement of the Members of the Oversight Committee

(i)    The authority of the members of the Oversight Committee will be effective as of the Effective Date and will remain and continue in full force and effect until the Liquidating Trust is terminated in accordance with Article 12.1 herein. The service of the members of the Oversight Committee will be subject to the following:

(A)    The members of the Oversight Committee will serve until disability, death, resignation pursuant to subsection (B) below, or removal pursuant to subsection (C) below.

(B)    A member of the Oversight Committee may resign at any time by providing a written notice of resignation to the Trustee and the remaining members of the Oversight Committee.  Such resignation will be effective upon the date delivered to the Liquidating Trustee and the Oversight Committee, in accordance with Article 14.6, or such later date specified in the written notice.

(C)    A member of the Oversight Committee may be removed by the unanimous vote of the other members of the Oversight Committee, a written resolution of which shall be delivered to the removed Oversight Committee member; *provided*, *however*, that such removal may only be made for cause.

(D)    In the event of a vacancy on the Oversight Committee (whether by removal, disability, death or resignation), a new member shall be appointed to fill such position by the Person(s) who initially designated the member whose seat has become vacant or by the designee of such Person(s); provided, however, that with respect to the Creditor Representative , any new member appointed to fill such position shall be designated by BRG Consulting.

(E)    Immediately upon the appointment of any successor member of the Oversight Committee, all rights, powers, duties, authority, and privileges of the predecessor member of the Oversight Committee hereunder will be vested in and undertaken by the successor member of the Oversight Committee without any further act; and the successor member of the Oversight Committee will not be liable personally for any act or omission of the predecessor member of the Oversight Committee and the predecessor member of the Oversight Committee will not be liable personally for any act or omission of the successor member of the Oversight Committee; and

(F)    Every successor member of the Oversight Committee appointed hereunder shall execute, acknowledge and deliver to the Liquidating Trustee and other members an instrument accepting the appointment under this Agreement and agreeing to be bound thereto, and thereupon the successor member of the Oversight Committee without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of the retiring member.

11

(c) Compensation and Reimbursement of Expenses of the Oversight Committee

(i) Members of the Oversight Committee shall not receive compensation directly from the Liquidating Trust for their services.  They shall be entitled to reimbursement of reasonable out-of-pocket expenses.

(ii) Notwithstanding the foregoing, the Creditor Representative shall be entitled to be compensated for his or her time incurred serving on the Oversight Committee at his or her standard hourly billing rates, which compensation shall be paid solely from the distributions allocated for distribution to the Class 6 General Unsecured Creditors.

(d) Special Provisions Regarding Oversight Committee Approval

(i) The Oversight Committee shall have approval rights by majority vote with a quorum present over the following key decisions by the Liquidating Trustee:

a. the Liquidating Trustee's retention of any Liquidating Trustee Professionals and Liquidating Trustee Non-Professionals including any Liquidating Trustee Professionals and Liquidating Trustee Non-Professionals not identified prior to the Effective Date;

b. the reserves and budgets for the Liquidating Trust;

c. any Distributions by the Liquidating Trust;

d. prosecution of objections to Claims, or the settling, compromising, or allowing any Disputed Claim in a liquidated amount in excess of $100,000 with respect to any Administrative or Priority Claims or in excess of $250,000 with respect to General Unsecured Claims (including any such Claims originally scheduled or filed in an unliquidated amount);

e. commencement, prosecution, settlement, compromise, withdrawal, or other resolution of any Cause of Action where the amount sought to be recovered in the complaint or other document initiating such Cause of Action exceeds $500,000;

f. the sale, transfer, assignment, or other disposition of any non-Cash Liquidating Trust Asset having a valuation in excess of $500,000; and

g. the borrowing of any funds by the Liquidating Trustee or Liquidating Trust or pledge of any portion of the Liquidating Trust Assets.

(ii) The Oversight Committee shall have approval rights by unanimous vote of all three Oversight Members over the following key decisions in connection with the Liquidating Trust:

a. Any modification or amendment to this Liquidating Trust Agreement or the terms of the Plan; and

b.   Any vote to remove or replace the Liquidating Trustee.

(iii)   The Liquidating Trustee shall notify the Oversight Committee for any matters over which the Oversight Committee has approval rights. Except as expressly provided herein, the affirmative vote of a majority of the members of the entire Oversight Committee then in office shall be the act of the Oversight Committee with respect to any matter that requires the determination, consent, approval or agreement of the Oversight Committee. Any or all of the members of the Oversight Committee may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof. Any member of the Oversight Committee participating in a meeting by this means is deemed to be present in person at the meeting. In all matters submitted to a vote of the Oversight Committee, each Oversight Committee member shall be entitled to cast one vote, which vote shall be cast personally by Oversight Committee member or by proxy.   The Liquidating Trustee may obtain the Oversight Committee's consent for any action by email, without a meeting, and such consent shall be deemed to have been provided pursuant to majority vote of the Oversight Committee upon the Liquidation Trustee's receipt of return emails from at least a majority of the Oversight Committee within three (3) Business Days unless the Liquidating Trustee requests an earlier response based on pressing circumstances.

(iv)   The Oversight Committee, and each of the members of the Oversight Committee, shall have standing and authority to seek relief from the Bankruptcy Court (and appellate courts) on actions or inactions of the Liquidating Trustee that the Oversight Committee, or such member, believes violates the terms of the Plan, the Confirmation Order, or this Agreement or is inconsistent with the Liquidating Trustee's fiduciary duties to all beneficiaries, which, in its, his or her business judgment, materially impacts the Liquidating Trust, the Beneficiaries as a whole, or the Class 6 General Unsecured Creditors (as a class) or the Cash Flow DIP Lender (individually).   The Oversight Committee and each of its members shall be authorized to retain counsel to represent and assist him or her in connection with the fulfillment of its, his or her duties, including filing pleadings in and appearing in court; provided, however, that any fees or expenses incurred by counsel to:

(x) Oversight Committee, retained by a unanimous vote of all three members, shall (A) be subject to approval of the Oversight Committee and (B) paid from the Liquidating Trust Assets,

(y) Creditors Representative shall (A) be subject to the approval of the Creditor Representative and (B) be paid solely from the distributions allocated for distribution to the Class 6 General Unsecured Creditors, and

(z) Cash Flow DIP Lender Representatives shall (A) be subject to the approval of the Cash Flow DIP Lender Representatives and (B) be paid solely from the distributions allocated for distribution to the Cash Flow DIP Lender.

(e)    Standard of Care; Business Judgment of the Oversight Committee

13

The Oversight Committee shall exercise its business judgment for the benefit of the Beneficiaries to maximize the value of the Liquidating Trust Assets, giving due regard to the costs, risk , and delay of any course of action.

(f)       Privileged Communications with Oversight Committee

Privileged communications may be shared among the Liquidating Trustee, the Liquidating Trustee Professionals, the Liquidating Trustee Non-Professionals, and the Oversight Committee without compromising the privileged nature of such communications in accordance with the "joint interest" doctrine.

## ARTICLE 3
## TERM AND COMPENSATION FOR LIQUIDATING TRUSTEE

3.1      <u>Compensation</u>

(a)       The Liquidating Trustee shall be entitled to receive compensation for services rendered on behalf of the Liquidating Trust and reimbursement of expenses as outlined in <u>Exhibit A</u> to this Agreement.

(b)       All compensation and other amounts payable to the Liquidating Trustee shall be paid out of the Liquidating Trust Assets.

3.2      <u>Termination</u>

The duties, responsibilities, and powers of the Liquidating Trustee will terminate on the date the Liquidating Trust is dissolved and terminated pursuant to Article 12.1, or by an order of the Bankruptcy Court.

3.3      <u>Bond</u>

The Liquidating Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. The cost of any bond shall be an expense of the Liquidating Trust and paid from the Liquidating Trust Assets.

3.4      <u>Removal</u>

The Liquidating Trustee may be removed (x) upon thirty (30) days' written notice from the Oversight Committee and (y) for cause by a Final Order of the Bankruptcy Court, after notice and a hearing; provided, however, that the Liquidating Trustee may not be removed until a successor Liquidating Trustee has been named or is capable of being named immediately upon such removal. For purposes of removing the Liquidating Trustee, "cause" shall mean gross negligence, breach of fiduciary duty, breach of trust, and reckless or willful mishandling of the Liquidating Trust Assets. Any fees and unreimbursed expenses that have been properly incurred by the Liquidating Trustee in accordance with the terms of this Agreement that are owing to the Liquidating Trustee as of the

date of the Liquidating Trustee's removal shall be paid to the Liquidating Trustee within seven (7) calendar days of the removal date.  The party removing the Liquidating Trustee shall in good faith proceed to appoint in an expeditious manner a successor Liquidating Trustee and the existing Liquidating Trustee may seek relief from the Bankruptcy Court if a successor Liquidating Trustee is not appointed within sixty (60) days of such Notice or Final Order.

3.5    Resignation

The Liquidating Trustee may resign by giving not less than sixty (60) calendar days' prior written notice thereof to the Bankruptcy Court and the Beneficiaries; provided that such resignation shall not be effective until a successor trustee is appointed pursuant to Section 9.1 of this Agreement. The Oversight Committee shall in good faith proceed to appoint in an expeditious manner a successor Liquidating Trustee and the existing Liquidating Trustee may seek relief from the Bankruptcy Court if a successor Liquidating Trustee is not appointed within sixty (60) days of the written notice of resignation from the existing Liquidating Trustee.

**ARTICLE 4**
**PROVISIONS REGARDING DISTRIBUTIONS**

4.1    Priority and Method of Distributions

(a)    Generally. The Liquidating Trustee, on behalf of the Liquidating Trust, or such other Person as may be designated in accordance with this Agreement, will make distributions to the Beneficiaries in accordance with this Agreement, the Plan, and the Confirmation Order and in accordance with the priorities set forth in, and the other provisions of, the Plan and Confirmation Order. Whenever any distribution to be made under the Plan or this Agreement is due on a day other than a Business Day, such distribution shall be made, without interest, on the immediately succeeding Business Day, but any such distribution will have been deemed to have been made on the date due.

(b)    Distribution of Liquidating Trust Assets and Proceeds Thereof.  All Liquidating Trust Assets and all Liquidating Trust Asset Proceeds shall be distributed in accordance with the terms of this Agreement, the Plan, and the Confirmation Order and from the Liquidating Trust Assets net of all other reserves established by the Liquidating Trustee, if any, and only to the extent that the Liquidating Trust has sufficient Liquidating Trust Assets to make such payments in accordance with and to the extent provided for in the Plan, the Confirmation Order and this Liquidating Trust Agreement, and the relevant provisions of the Plan are incorporated herein by reference.

(c)    Timing of Distributions.  Except as specifically set forth in the Plan, Confirmation Order, or Article 4.1(d) of this Agreement, the Liquidating Trustee may determine, in its discretion, the appropriate timing, amount, and cadence for distributions; provided, however, (i) without limiting the general requirement that distributions shall be in accordance with the Plan and Confirmation Order, nothing herein shall be deemed to alter the Liquidating Trustee's obligations to make distributions to the Cash Flow DIP Lender as required under the Plan; and (ii) the

Liquidating Trustee shall make continuing efforts to make timely distributions and not unduly prolong the duration of the Liquidating Trust.

(d)    <u>Periodic Distribution Requirement</u>.  Subject to the provisions of this Article 4, the Confirmation Order and the Plan, and to the extent required to maintain grantor trust tax status, the Liquidating Trustee may distribute within thirty (30) days after the end of each calendar quarter following the Effective Date, or upon such other interval as the Bankruptcy Court may order, but in no event less frequently than annually, to the Beneficiaries the Liquidating Trust's net income plus all net proceeds from the sale, realization, settlement, or liquidation of the Liquidating Trust Assets, except that the Liquidating Trustee may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the Liquidating Trust Assets, to satisfy current and projected expenses of the Liquidating Trust, and to satisfy Claims and contingent liabilities (including Disputed Claims).

(e)    <u>Withholding</u>.  The Liquidating Trustee may withhold from amounts distributable to any Person any and all amounts, to be determined in the Liquidating Trustee's reasonable sole discretion, required by any law, regulation, rule, ruling, directive or other government equivalent of the United States or of any political subdivision thereof. To the extent that amounts are so withheld and paid over to the appropriate governmental entity, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

(f)    <u>Tax Identification Numbers</u>. The Liquidating Trustee is authorized to request and obtain from the Beneficiaries or any other Person Forms W-8 and/or W-9 or such other forms or information relating to the Liquidating Trustee's obligations to withhold as the Liquidating Trustee may reasonably request, and the Liquidating Trustee may condition any distribution to any Beneficiary or other distributee upon receipt of such forms or information and the claim shall be deemed waived if the Beneficiary fails to provide a tax identification number after ninety (90) days of such form being solicited by the Liquidating Trustee and at least one follow up communication from the Liquidating Trustee to the Beneficiary who failed to provide the required Forms W-8 and/or W-9.

4.2    <u>Delivery of Distributions</u>

Subject to applicable Bankruptcy Rules, all Distributions to Holders shall be made by the Liquidating Trustee to the applicable Holders of Allowed Claims or their designees. Except as otherwise provided herein, Distributions to the Holders shall be made: (i) at the addresses set forth on the respective Proofs of Claim Filed by such Holders; (ii) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related Proof of Claim; or (iii) at the address reflected in the Schedules or the Debtors' books and records if no Proof of Claim is Filed and the Liquidating Trustee has not received a written notice of a change of address.

4.3    <u>Undeliverable Distributions</u>

In the event that any distribution to any Holder is returned as undeliverable, no distribution

to such Holder shall be made unless and until the Debtors or the Liquidating Trustee, as applicable, have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, that 90 days after the date such undeliverable distribution was initially made, all such unclaimed property or interests in property shall irrevocably revert to the Liquidating Trust automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

4.4    Final Distribution and Closure of the Chapter 11 Cases

If at any time the Liquidating Trustee determines that the expense of administering the Liquidating Trust so as to make a final distribution to the Beneficiaries is likely to exceed the value of the Liquidating Trust Assets remaining in the Liquidating Trust, the Liquidating Trustee shall apply to the Bankruptcy Court for authority to (i) distribute to each Beneficiary its Pro Rata share of Cash remaining in the Liquidating Trust Reserve Account (after reserving for administrative cost associated therewith) and (ii) close the Chapter 11 Cases in accordance with the Bankruptcy Code and Bankruptcy Rules. Notice of such application shall be given electronically, to the extent practicable, to those parties who have filed requests for notices and whose electronic addresses remain current and operating.

4.5    De Minimis Distributions

If any interim distribution under the Plan to the Holder of an Allowed Claim would be less than $100.00, the Liquidating Trustee may withhold such distribution until a final distribution is made to such Holder. If any final distribution under the Plan to the Holder of an Allowed Claim would be less than $50.00, the Liquidating Trustee may cancel such distribution which shall irrevocably revert to the Liquidating Trust automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

**ARTICLE 5**
**PROCEDURES FOR RESOLUTION OF DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS**

5.1    Objections to Claims; Prosecution of Disputed Claims

Except insofar as a Claim is Allowed under the Plan on and after the Effective Date, and subject to Section 2.10 of this Agreement, the Plan and the Confirmation Order, the Liquidating Trustee will have the authority, but not the obligation, to do any of the following with respect to any Claims or Interests: (1) file, withdraw, or litigate to judgment objections to and requests for estimation of Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by, the Bankruptcy Court. The Liquidating Trustee shall succeed to any pending

objections to Claims filed by the Debtors prior to the Effective Date and shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim. The Liquidating Trustee may, but shall not be obligated to, object to any Claim.

5.2     Estimation of Claims

The Liquidating Trustee may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trustee previously have objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Subject to the provisions of section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute the maximum allowed amount of such Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

5.3     Payments and Distributions on Disputed Claims

(a)     Notwithstanding anything herein to the contrary: (a) no distribution shall be made with respect to any Disputed Claim until such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Liquidating Trustee no distribution shall be made to any Person that holds both an Allowed Claim and a Disputed Claim until such Person's Disputed Claims have been resolved by settlement or Final Order.

(b)     Except as otherwise provided in a Final Order or as agreed by the relevant parties, distributions on account of Disputed Claims, if any, that become Allowed, shall be made by the Liquidating Trustee at such periodic intervals as the Liquidating Trustee determines to be reasonably prudent. No interest will be paid on Disputed Claims that later become Allowed or with respect to any distribution in satisfaction thereof to a Holder.

## ARTICLE 6
## LIABILITY PROVISIONS

6.1     Standard of Liability

In no event shall the Liquidating Trustee or the Liquidating Trustee Professionals, the Oversight Committee, the Liquidating Trustee Non-Professionals, Affiliates, representatives, employees, directors, officers or principals be held personally liable for any claim, expense, liability or other obligation asserted against the Liquidating Trust. The Liquidating Trustee and all of its Liquidating Trustee Professionals, Liquidating Trustee Non-Professionals, the Oversight

Committee, Affiliates, representatives, employees, directors, officers or principals shall not be liable for any negligence or any error of judgment made in good faith with respect to any action taken or omitted to be taken in good faith, except to the extent that the action taken or omitted to be taken by each of the same or their respective Liquidating Trustee Professionals, Liquidating Trustee Non-Professionals, the Oversight Committee, Affiliates, representatives, employees, directors, officers or principals is determined by a Final Order to be solely due to their own respective actual fraud or willful misconduct or, solely in the case of the Liquidating Trustee, breach of fiduciary duty. Any act or omission taken with the approval of the Bankruptcy Court will be conclusively deemed not to constitute gross negligence or willful misconduct

6.2     Reliance by Liquidating Trustee and Oversight Committee

Except as otherwise provided herein:

(a)     the Liquidating Trustee and Oversight Committee may rely, and shall be protected in acting upon, any resolution, certificate, statement, installment, opinion, report, notice, request, consent, order, or other paper or document reasonably believed to be genuine and to have been signed or presented by the proper party or parties;

(b)     the Liquidating Trustee and Oversight Committee shall not be liable for any action reasonably taken or not taken in accordance with the advice of a Liquidating Trustee Professional; and

(c)     persons dealing with the Liquidating Trustee or Oversight Committee shall look only to the Liquidating Trust Assets to satisfy any liability incurred by the Liquidating Trustee or Oversight Committee to such person in carrying out the terms of this Agreement, and the Liquidating Trustee and Oversight Committee shall not have any personal obligation to satisfy any such liability, except to the extent that actions taken or not taken after the Effective Date by the Liquidating Trustee or Oversight Committee are determined by a Final Order to be solely due to the Liquidating Trustee's or Oversight Committee's own gross negligence, willful misconduct, or fraud.

6.3     Exculpation; Indemnification

(a)     Exculpation.

(i)     The Liquidating Trustee, the Liquidating Trustee Professionals, the Oversight Committee (and its members and professionals), the Liquidating Trustee Non-Professionals, and each of their Affiliates, representatives, employees, directors, officers or principals (the "Protected Parties"), shall not be responsible and shall not have any liability whatsoever to any person (including, without limitation, any holder of a Claim) for any claims, causes of action, or other loss or liability arising out of the discharge of the powers and duties conferred upon said parties pursuant to or in furtherance of this Agreement, the Plan, applicable law, or otherwise, except for actions taken or not taken to the extent determined by a Final Order to be solely due to their own gross negligence, willful misconduct, or fraud.

(ii)     No Holder of a Claim or other party-in-interest will have or be permitted to pursue any claim or cause of action against the Protected Parties for making payments in accordance with the Plan or this Agreement or for implementing the provisions of the Plan or this Agreement. Any act taken or not taken, in the case of the Liquidation Trustee with the approval of the Bankruptcy Court, will be conclusively deemed not to constitute fraud, gross negligence, willful misconduct, or a breach of fiduciary duty.

(b)     <u>Indemnification</u>. The Liquidating Trust shall indemnify, defend and hold harmless the Protected Parties from and against any and all claims, causes of action, liabilities, obligations, losses, damages or expenses (including attorneys' fees and expenses) occurring after the Effective Date, other than to the extent determined by a Final Order to be solely due to their own respective actual fraud or willful misconduct or, solely in the case of the Liquidating Trustee, breach of fiduciary duty, to the fullest extent permitted by applicable law. Satisfaction of any obligation of the Liquidating Trust arising pursuant to the terms of this Article 6 shall be payable first, from any applicable insurance or similar policy, and only after the exhaustion of such insurance, second, from the Liquidating Trust Assets, and may be advanced from insurance prior to the conclusion of such matter, and such right to payment shall be prior and superior to any other rights to receive a distribution of the Liquidating Trust Assets, including, without limitation, the Beneficiaries.

(c)     In connection with the Liquidating Trust's request for closure of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code, the Liquidating Trustee shall be authorized to seek exculpation from and after the Effective Date for the Protected Parties by all Persons and Entities, including, without limitation, Holders of Claims and other parties in interest, from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon said parties pursuant to or in furtherance of this Agreement, the Plan, or any order of the Bankruptcy Court or applicable law or otherwise, except only for actions taken or not taken, from and after the Effective Date only to the extent determined by a Final Order to be solely due to their own respective actual fraud or willful misconduct or, solely in the case of the Liquidating Trustee, breach of fiduciary duty.

## ARTICLE 7
## <u>LIQUIDATING TRUST BENEFICIARIES</u>

7.1     <u>Identification of Liquidating Trust Beneficiaries</u>

In order to determine the actual names and addresses of the Beneficiaries, the Liquidating Trustee shall be entitled to conclusively rely on the names and addresses set forth in the Debtors' Schedules or filed proofs of claim, unless the Liquidating Trustee receives timely notice of a Beneficiary's change of address. Each Beneficiary's right to distribution from the Liquidating Trust, which is dependent upon such Beneficiary's classification under the Plan, shall be that accorded to such Beneficiary under the Plan.

7.2     <u>Beneficial Interest Only</u>

The ownership of a Liquidating Trust Interest shall not entitle any Beneficiary to any title in or to, possession of, management of or control of any of the Liquidating Trust Assets, or to

require an accounting, except as specifically provided herein.

7.3     Transferability of Liquidating Trust Beneficiaries' Interests

The beneficial interests that are owned by the Beneficiaries, which shall be reflected only on the records of the Liquidating Trust maintained by the Liquidating Trustee, shall be uncertificated but shall be voluntarily assignable or transferable upon written notice from such Beneficiary to the Liquidating Trustee. In the case of a deceased individual Beneficiary, its executor or administrator shall succeed to such decedent's beneficial interest upon notice to the Liquidating Trustee.

**ARTICLE 8**
**ADMINISTRATION**

8.1     Purpose of the Liquidating Trust

The Liquidating Trust shall be established for the primary purpose of liquidating its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidation purpose of the Liquidating Trust as set forth in the Plan. Accordingly, the Liquidating Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, make timely distributions to the Beneficiaries and not unduly prolong its duration, and shall take or refrain from taking such other actions as may be necessary, in the Liquidating Trustee's reasonable judgment, to preserve and maintain the status of the Liquidating Trust as a "liquidating trust" and as a "grantor trust" within the meaning of Treasury Regulation sections 301.7701-4(d) and 1.671-4(a). The Liquidating Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or this Agreement.

8.2     Books and Records

The Liquidating Trustee shall maintain books and records relating to the administration of the Liquidating Trust Assets and the distribution by the Liquidating Trustee of the proceeds therefrom in such detail and for such period of time as may be necessary to make full and proper accounting in respect thereof and to comply with applicable provisions of law. The Liquidating Trustee shall also maintain books and records relating to the administration of the Liquidating Trust Assets (including the Causes of Action), the income and expenses of the Liquidating Trust, and the payment of expenses of and liabilities of, claims against or assumed by, the Liquidating Trust in such detail and for such period of time as may be necessary to make full and proper accounting in respect thereof and to comply with applicable provisions of law. Except as otherwise provided herein or in the Plan, nothing in this Agreement requires the Liquidating Trustee to file any accounting or seek approval of any court with respect to the administration of the Liquidating Trust, or as a condition for making any payment or distribution out of the Liquidating Trust Assets.

8.3     Compliance with Laws

Any and all distributions of Liquidating Trust Assets shall comply with all applicable laws and regulations, including, but not limited to, applicable federal and state tax and securities laws.

## ARTICLE 9
## SUCCESSOR LIQUIDATING TRUSTEE

9.1    Successor Liquidating Trustee

In the event the Liquidating Trustee is removed by unanimous vote of the Oversight Committee, the Bankruptcy Court, resigns pursuant to this Agreement, or otherwise vacates its position, a successor Liquidating Trustee shall be appointed by the Oversight Committee by unanimous vote or, if an unanimous vote cannot be reached, by order of the Bankruptcy Court, after notice and a hearing. Any successor Liquidating Trustee appointed hereunder shall execute an instrument accepting such appointment. Thereupon, such successor Liquidating Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the Liquidating Trust with like effect as if originally named herein; provided, however, that a removed or resigning Liquidating Trustee shall, nevertheless, when requested in writing by the successor Liquidating Trustee, execute and deliver any reasonable instrument or instruments conveying and transferring to such successor Liquidating Trustee all the estates, properties, rights, powers, and trusts of such removed or resigning Liquidating Trustee.

## ARTICLE 10
## REPORTING

10.1    Quarterly and Final Reports

As soon as practicable but in no event later than forty-five (45) calendar days after the end of the first full quarter following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidating Trust has been distributed or otherwise paid out in accordance with the Plan and this Agreement, the Liquidating Trustee shall File a report with the Bankruptcy Court setting forth the amounts, recipients, and dates of all Distributions made by the Liquidating Trustee through each applicable reporting period.

10.2    Federal Income Tax

(a)    Grantor Trust Status. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee shall file tax returns for the Liquidating Trustee as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).

(b)    Allocations of Liquidating Trust Taxable Income. Subject to the provisions of Article 10.2(a) hereof, allocations of Liquidating Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately

prior to such deemed distribution, the Liquidating Trust had distributed all of its assets (valued for this purpose at their tax book value) to the Beneficiaries (treating any Holder of a Disputed Claim, for this purpose, as a current Beneficiary entitled to distributions), taking into account all prior and concurrent distributions from the Liquidating Trust (including any distributions held in reserve pending the resolution of Disputed Claims). Similarly, taxable losses of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for this purpose shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Liquidating Trust, adjusted in either case in accordance with tax accounting principles prescribed by the United States Internal Revenue Code, the Treasury Regulations and any other applicable administrative and judicial authorities and pronouncements.

(c)     Tax Reporting Duties of Liquidating Trustee. Within ninety (90) calendar days following the end of each taxable year, the Liquidating Trustee shall prepare and distribute a statement setting forth the information necessary for each Beneficiary to determine its share of items of income, gain, loss, deduction or credit for United States federal income tax purposes.

10.3    Other

The Liquidating Trustee shall file (or cause to be filed) any other statement, returns or disclosures relating to the Liquidating Trust or the Liquidating Trust Assets, that are required by the IRS or any other Governmental Unit.

## ARTICLE 11
## LIQUIDATING TRUSTEE PROFESSIONALS AND NON-PROFESSIONALS

11.1    Retention of Liquidating Trustee Professionals and Non-Professionals

(a)     Subject to approval of the Oversight Committee, the Liquidating Trustee may retain its own professionals, including, without limitation, claims, disbursing and transfer agents, legal counsel, accountants, experts and other agents or advisors, as the Liquidating Trustee deems appropriate (the  "Liquidating Trustee Professionals") and on such terms as the Liquidating Trustee deems appropriate. The Liquidating Trustee Professionals shall be compensated in accordance with Article 11.2 hereof. The Liquidating Trustee Professionals so retained need not be "disinterested" as that term is defined in the Bankruptcy Code and may include, without limitation, counsel and financial advisors of the Debtors.

(b)     Subject to approval of the Oversight Committee, the Liquidating Trustee shall have the right to retain non-professionals including, without limitation, employees, independent contractors or other agents as the Liquidating Trustee deems appropriate (the "Liquidating Trustee Non-Professionals") and on such terms as the Liquidating Trustee deems appropriate. Such Liquidating Trustee Non-Professionals shall be compensated in accordance with Article 11.2 hereof. The Liquidating Trustee Non-Professionals so retained need not be "disinterested" as that term is defined in the Bankruptcy Code.

11.2    Payment to Liquidating Trustee Professionals and Liquidating Trustee Non-Professionals

(a)    After the Effective Date, Liquidating Trustee Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the Liquidating Trustee, including in such invoices a description of the work performed, who performed such work, and if billing on an hourly basis, the hourly rate of each such person, plus an itemized statement of expenses. The Liquidating Trustee shall pay those invoices fourteen (14) calendar days after a copy of such invoices is provided to the Liquidating Trustee, without Bankruptcy Court approval, unless the Liquidating Trustee objects. If there is a dispute as to a part of an invoice, the Liquidating Trustee shall pay the undisputed portion and the Bankruptcy Court shall resolve any disputed amount.

(b)    After the Effective Date, Liquidating Trustee Non-Professionals shall be required to submit to the Liquidating Trustee periodic invoices containing information with sufficient detail to assess the reasonableness of the fees and charges. The Liquidating Trustee shall pay those invoices fourteen (14) calendar days after a copy of such invoices is provided to the Liquidating Trustee, without Bankruptcy Court approval, unless the Liquidating Trustee objects. If there is a dispute as to a part of an invoice, the Liquidating Trustee shall pay the undisputed portion and the Bankruptcy Court shall resolve any disputed amount.

(c)    All payments to Liquidating Trustee Professionals and Liquidating Trustee Non-Professionals shall be paid out of the Liquidating Trust reserve accounts.

## ARTICLE 12
## TERMINATION OF LIQUIDATING TRUST

12.1    Duration and Extension

Notwithstanding any provision of the Plan to the contrary, the Liquidating Trust shall dissolve upon the earlier of the distribution of all Liquidating Trust Assets to Beneficiaries required to be made by the Liquidating Trust under the Plan or the fifth anniversary of the creation of the Liquidating Trust, provided, however, that, notwithstanding the foregoing, the Liquidating Trust shall be dissolved no later than five (5) years from the Effective Date unless the Bankruptcy Court, upon a motion made at least 6 months prior to the fifth anniversary of the Effective Date or the end of any extension period approved by the Bankruptcy Court, determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets; provided, however, that adequate funding exists for such extension period as determined by the Bankruptcy Court; provided, further, that each request for an extension shall be approved by the Bankruptcy Court within six months prior to the conclusion of the extended term. After (a) the final Distribution of the balance of the assets or proceeds of the Liquidating Trust pursuant to the Plan, (b) the filing by or on behalf of the Liquidating Trust of a certification of dissolution with the Bankruptcy Court in accordance with the Plan, and (c) any other action deemed appropriate by the Liquidating Trustee, the Liquidating Trust shall be deemed dissolved for all purposes without the necessity for any other

or further actions.

12.2    Diligent Administration

The Liquidating Trustee shall, as applicable, (i) not unduly prolong the duration of the Liquidating Trust; (ii) at all times endeavor to resolve, settle or otherwise dispose of all claims that constitute Liquidating Trust Assets; (iii) effect the liquidation and distribution of the Liquidating Trust Assets to the Beneficiaries in accordance with the terms hereof; and endeavor to terminate the Liquidating Trust as soon as reasonably practicable.

## ARTICLE 13
## AMENDMENT AND WAIVER

13.1    Amendment and Waiver

This Agreement may not be amended, modified or supplemented, and no provision hereof or rights hereunder may be waived, except with the written consent of the Liquidating Trustee and the approval of the Oversight Committee. Any amendments to this Agreement shall not be inconsistent with the purpose and intention of the Liquidating Trust to administer and liquidate in an expeditious but orderly manner the Liquidating Trust Assets. Notwithstanding anything to the contrary herein, no amendment, modification, supplement or waiver shall be effective if it materially and adversely affects the liquidation and Distributions contemplated by the Plan, or if it would adversely affect the federal income tax status of the Liquidating Trust as a "grantor trust." The Liquidating Trustee shall promptly send a copy of each amendment, modification, supplement or waiver of this Agreement to the Oversight Committee after approval thereof.

## ARTICLE 14
## MISCELLANEOUS PROVISIONS

14.1    Intention of Parties to Establish Grantor Trust

This Agreement is intended to create a grantor trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as a grantor trust.

14.2    Preservation of Privilege

In connection with the vesting and transfer of the Liquidating Trust Assets pursuant to the Plan, including rights and Estate Causes of Action, any attorney-client privilege, work-product protection, or other privilege or immunity attaching or relating to any documents or communications (of any kind, whether written or oral, electronic or otherwise) held by the Debtors shall be transferred to the Liquidating Trust and shall vest in the Liquidating Trust. Accordingly, in connection with the prosecution and/or investigation of the Estate Causes of Action by the Liquidating Trustee, any and all directors, officers, employees, counsel, agents, or attorneys-in-fact, of the Debtors, cannot assert any attorney-client privilege, work product protection, or other privilege or immunity attaching or relating to any documents or communications (of any kind,

whether written or oral, electronic or otherwise) held by the Debtors or otherwise prevent, hinder, delay, or impede production or discussion of documents or communications requested by the Liquidating Trustee in discovery (whether formal or informal, and including without limitation, depositions, written discovery, and interviews). The Debtors and the Liquidating Trustee shall take all necessary actions to protect the transfer of such privileges, protections and immunities.

14.3    Confidentiality

The Liquidating Trustee, and each of its employees, members, agents, professionals and advisors, including the Liquidating Trustee Professionals, and Liquidating Trustee Non-Professionals, and the members of the Oversight Committee (each a "Confidential Party" and collectively the "Confidential Parties") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Entity to which any of the Liquidating Trust Assets relates; provided, however, that such information may be disclosed if (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties, or (b) such disclosure is required of the Confidential Parties pursuant to legal process including but not limited to subpoena or other court order or other applicable laws or regulations. In the event that any Confidential Party is requested to divulge confidential information pursuant to this subparagraph (b), such Confidential Party shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the Liquidating Trustee to allow it sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Liquidating Trustee in making any such objection, including but not limited to appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

14.4    Laws as to Construction; Retention of Jurisdiction

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of law. Notwithstanding anything else to the contrary herein, the Bankruptcy Court shall retain jurisdiction with respect to any conflict or issue arising out of the Liquidating Trust, the Liquidating Trust Assets, and this Agreement.

14.5    Severability

Except with respect to provisions herein that are contained in the Plan, if any provision of this Agreement or the application thereof to any Person, Entity or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to Persons, Entities or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and shall be valid and enforceable to the fullest extent permitted by law.

14.6    Notices

Any notice or other communication hereunder shall be in writing and shall be deemed to

have been sufficiently given, for all purposes, if delivered by email or facsimile (at the email addresses or numbers set forth below) and deposited, postage prepaid, in a post office or letter box addressed to the person (or their successors or replacements) for whom such notice is intended at such address as set forth below, or such other addresses as may be filed with the Bankruptcy Court:

Liquidating Trustee:

Tanya Meerovich
FTI Consulting
1166 Avenue of the Americas
15th Floor
New York, NY 10036
Tanya.meerovich@fticonsulting.com

With a copy to:

Office of the General Counsel
FTI Consulting, Inc.
555 12th Street, NW
Suite 700
Washington, DC 20004

The Liquidating Trustee shall deliver copies of any such notices to the members of the Oversight Committee promptly upon receipt.

    14.7   <u>Notices if to a Liquidating Trust Beneficiary</u>

    Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended to the name and address set forth on such Beneficiary's proof of claim or such other notice filed with the Bankruptcy Court, or if none of the above has been filed, to the address set forth in the Debtors' Schedules or provided to the Liquidating Trustee pursuant to Article 7.1.

    14.8   <u>Survivability</u>

    Notwithstanding any provision of the Plan to the contrary, the terms and provisions of this Agreement shall remain fully binding and enforceable notwithstanding any vacancy in the position of the Liquidating Trustee.

    14.5   <u>Headings</u>

    The section headings contained in this Agreement are solely for the convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

14.6    <u>Conflicts with Plan Provisions</u>

Except as otherwise expressly stated herein, if any of the terms and/or provisions of this Agreement conflict with the terms and/or provisions of the Plan or the Confirmation Order, then the Plan or the Confirmation Order, as applicable, shall govern.

IN WITNESS WHEREOF, the Parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

Tanya Meerovich of FTI Consulting, Inc., as Liquidating Trustee


By: _____
Name: _Tanya Meerovich_____



First Guaranty Mortgage Corporation

By: _____
Name: _____
Title: _____


Maverick II Holdings, LLC

By: _____
Name: _____
Title: _____

Schedule 1

<u>Initial Members of the Oversight Committee</u>

The initial members of the Oversight Committee shall be:

Eric Knight (Cash Flow DIP Lender Representative)
Gerry Tywoniuk (Cash Flow DIP Lender Representative)
David Galfus (Creditor Representative)

Exhibit A

Schedule of Compensation for Liquidating Trustee

See Attached

## Exhibit A

FTI will provide Tanya Meerovich to serve as the Liquidating Trustee to the Trust.  The Temporary Officer, as well as any additional Hourly Temporary Staff, (as defined below), shall have such duties as set forth in Agreement, subject to oversight by the Oversight Committee as provided in the Agreement.

In addition to providing the Liquidating Trustee, FTI may also provide the Trust with additional staff (the "Hourly Temporary Staff" and, together with the Liquidating Trustee, the "FTI Professionals").

Services rendered by the Liquidating Trustee or Hourly Temporary Staff will be billed at their current hourly rate.

The normal hourly billing rates, which are subject to periodic revision, are as follows:

|  | Per Hour (USD) |
|---|---|
| Senior Managing Directors | $1045 – 1,495 |
| Directors / Senior Directors / Managing Directors | 785 –  1,055 |
| Consultants/Senior Consultants | 435 –   750 |
| Administrative / Paraprofessionals | 175 –   325 |

In addition to the fees outlined above, FTI will bill the Trust for reasonable allocated and direct expenses incurred.  Direct expenses include reasonable and customary out-of-pocket expenses such as internet access, telephone, overnight mail, messenger, travel, meals, accommodations and other expenses specifically related to the Trust.  Further, if FTI and/or any of its employees are required to testify or provide evidence at or in connection with any judicial or administrative proceeding relating to this matter, FTI will be compensated at its regular hourly rates and reimbursed for reasonable allocated and direct expenses (including counsel fees) with respect thereto.

**EXHIBIT C**

**Notice of Confirmation and Effective Date**

US_ACTIVE\122519033\V-18

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | : Chapter 11 |
|  | : |
| FIRST GUARANTY MORTGAGE | : Case No. 22-10584 (CTG) |
| CORPORATION, *et al.*, | : |
|  | : Jointly Administered |
| Debtors.[1] | : |
|  | : |

## NOTICE OF (I) CONFIRMATION AND EFFECTIVE DATE OF THE AMENDED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF FIRST GUARANTY MORTGAGE CORPORATION AND DEBTOR AFFILIATE AND (II) DEADLINE UNDER THE PLAN AND CONFIRMATION ORDER TO FILE ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND REJECTION CLAIMS

## PLEASE TAKE NOTICE OF THE FOLLOWING:

1.    **Entry of Confirmation Order**. On _____ __, 2022, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered an order [Docket No. ___] (the "Confirmation Order") confirming the *Amended Combined Disclosure Statement and Chapter 11 Plan of First Guaranty Mortgage Corporation and Debtor Affiliate* [Docket No. ___] attached as Exhibit A to the Confirmation Order (together with all exhibits thereto, and as may be amended, modified or supplemented, the "Plan")[2] in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2.    **Effective Date of the Plan**. The Effective Date of the Plan was _____ __, 2022.

3.    **Administrative Claim Bar Date**. As provided for in Section 3 of the Plan (defined term Administrative Expense Bar Date) and in the Confirmation Order, all requests for payment of an Administrative Claim incurred after September 30, 2022 must be filed with this Court and served on counsel to the Liquidating Trustee, counsel to the Debtors, and counsel to the U.S. Trustee **no later than _____ __, 2022 (the date that is 60 days after the Effective Date);** *provided*, *however*, that Persons that asserted administrative claims with a timely filed Proof of Claim for prepetition Claims or Rejection Claims do not need to file additional requests for payment of such Administrative Claims. Nothing herein shall be deemed to extend existing deadlines established for filing certain Administrative Claims accrued as of September 30, 2022 pursuant to the previous Administrative Claims bar date established as to such Administrative Claims.  [Docket No. 324].

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are: First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621).  The Debtors' mailing address is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

[2] Unless otherwise defined in this notice, capitalized terms used in this notice shall have the meanings ascribed to them in the Plan.

4. **Deadline to File Professional Fee Claims**. As provided for in Section 8.4 of the Plan and in the Confirmation Order, all final applications for payment of the Professional Fee Claims must be filed with this Court and served on counsel to the Debtors, counsel for the Cash Flow DIP Lender, and the Liquidating Trustee **no later than 4:00 p.m. prevailing Eastern Time on _____ __, 2022 (the date that is 45 days after the Effective Date)**, unless otherwise ordered by this Court or such later date is agreed to by the Liquidating Trustee.

5. **Deadline to File Rejection Claims**.  As provided for in Section 13.2 of the Plan and in the Confirmation Order, unless otherwise provided by a Bankruptcy Court Order, any Proofs of Claim asserting Rejection Claims pursuant to the Plan or otherwise must be Filed with the Claims and Balloting Agent **no later than the later of _____ __, 2022 (the date that is 30 days after the Effective Date) or 30 days after the effective date of rejection. Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan, as applicable. Any Rejection Claims that are not timely Filed pursuant to Section 13.2 of the Plan shall be forever disallowed and barred.**

6. **Inquiries by Interested Parties**.  Copies of the Confirmation Order (to which the Plan is attached as Exhibit A) may be examined free of charge at http://www.kccllc.net/fgmc. The Confirmation Order is also on file with the Bankruptcy Court and may be viewed by accessing the Bankruptcy Court's website at www.deb.uscourts.gov. To access documents on the Bankruptcy Court's website, you will need a PACER password and login, which can be obtained at www.pacer.psc.uscourts.gov.

Dated: [  ], 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

_____

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Telephone: (302) 652-4100
Email:  ljones@pszjlaw.com
          tcairns@pszjlaw.com


-and-

**DENTONS US LLP**
Samuel R. Maizel (*Pro Hac Vice*)
Tania M. Moyron (*Pro Hac Vice*)
601 S. Figueroa Street #2500
Los Angeles, California 90017
Telephone: (213) 623-9300
Email:  samuel.maizel@dentons.com
          tania.moyron@dentons.com

*Counsel to the Debtors and Debtors in Possession*