**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 22-10584 (CTG) |
| FIRST GUARANTY MORTGAGE CORPORATION, *et al.*,[1] | (Jointly Administered) |
| Liquidating Debtors. | **Hearing Date: August 29, 2023 at 3:00 pm (ET)** <br> **Obj. Deadline: August 17, 2023 at 4:00 pm (ET)** |

**MOTION OF PACIFIC INVESTMENT MANAGEMENT COMPANY LLC AND
PIMCO INVESTMENTS LLC TO ENFORCE THE CHAPTER 11 PLAN AND
<u>CONFIRMATION ORDER</u>**

Pacific Investment Management Company LLC ("<u>PIMCO LLC</u>") and PIMCO Investments

LLC ("<u>PI</u>") (collectively, the "<u>PIMCO Parties</u>") hereby submit this motion (this "<u>Motion</u>") to

enforce the Plan and Confirmation Order (each as defined below). In support of this Motion, the

PIMCO Parties, by and through their undersigned counsel, respectfully represent as follows:

**<u>PRELIMINARY STATEMENT</u>**

1.     Pursuant to the Plan and Confirmation Order, the Debtors[2] and their Estates

released the PIMCO Parties from any and all claims, causes of action, remedies and liabilities

relating to the Debtors, including the management, operation, or ownership thereof. *Amended,*

*Modified, and Restated Combined Disclosure Statement and Chapter 11 Plan of First Guaranty*

*Mortgage Corporation and Debtor Affiliate* [D. I. 671-1] (the "<u>Plan</u>") § 16.2(a); *see also Findings*

*of Fact, Conclusions of Law and Order (I) Approving Disclosures on a Final Basis and*

*(II) Confirming the Amended Combined Disclosure Statement and Chapter 11 Plan of First*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction were: First Guaranty Mortgage Corporation ("<u>FGMC</u>") (9575); and Maverick II Holdings, LLC ("<u>Maverick</u>") (5621). The service address for FGMC is 13901 Midway Road, Ste. 102-334, Dallas, Texas 75244.
[2] All references herein to "Debtors" also include Liquidating Debtors, as applicable or as context may require.

*Guaranty Mortgage Corporation and Debtor Affiliate* [D. I. 671] (the "<u>Confirmation Order</u>")[3] ¶ 35.  The Plan and Confirmation Order also permanently enjoin Kari Crutcher ("<u>Relator</u>") from taking any action that fails to comply or conform with the Plan, including the Debtor/Estate Release.  Plan § 16.3; Confirmation Order ¶ 39.  The Plan, including the Debtor/Estate Release therein, is binding and enforceable against Relator.  Plan § 15.1; Confirmation Order ¶ 10.

2.      Relator, in violation of the express and binding terms of the Plan and Confirmation Order, is pursuing alter ego and veil piercing claims against the PIMCO Parties in connection with the Qui Tam Litigation (as defined below).  Under well-settled Third Circuit law, Relator's alter ego and veil piercing claims belonged to the Debtors' Estates because they (a) existed at the time these Chapter 11 Cases were commenced and (b) are general, not individualized, claims for which any recovery would inure to the benefit of all creditors.  *In re Emoral, Inc.*, 740 F.3d 875, 879-80 (3d Cir. 2014); *see also In re TPC Grp. Inc.*, No. 22-10493 (CTG), 2023 WL 2168045, at *5 (Bankr. D. Del. Feb. 22, 2023), *appeal filed*, No. 23-cv-0255-RGA (D. Del. Mar. 8, 2023) ("<u>TPC</u>"); *In re Maxus Energy Corp.*, 571 B.R. 650, 658 (Bankr. D. Del. 2017).  The Debtors released these claims under the Plan, and Relator is enjoined from pursuing them.  Plan §§ 16.2(a) & 16.3; Confirmation Order ¶¶ 35 & 39.

3.      Accordingly, the Court should enter an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Proposed Order</u>"): (a) enforcing the Plan and Confirmation Order; (b) finding that any and all claims, causes of action, liabilities, remedies, and/or theories relating to alter ego, veil piercing, and/or any form of vicarious liability, including those asserted in the Qui Tam Litigation, against any of the PIMCO Parties (collectively, the "<u>Released Claims</u>")

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or Confirmation Order, as applicable.

RLF1 29412703v.1

belonged to the Debtors' Estates and have been released; and (c) permanently enjoining Relator, and all other persons, from pursuing the Released Claims.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(b).  This Motion involves a core proceeding as it concerns, *inter alia*, a Chapter 11 plan confirmed by order of this Court and determination of what constitutes property of the Debtors' estates.  *See In re SemCrude L.P.*, 796 F.3d 310, 316 (3d Cir. 2015) ("Because [defendant's] motion to enjoin is related to the Chapter 11 reorganization plan and requires a determination that [plaintiffs'] claims are property of the Litigation Trust, the Bankruptcy Court had subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A).").

5.      In addition, pursuant to Paragraph 53 of the Confirmation Order and Section 18 of the Plan, this Court retained "exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases, the Plan, and each of the Plan Documents."  Confirmation Order ¶ 53; *see also* Plan § 18.  This Court plainly has jurisdiction to enforce its own orders.  *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *see also In re Resorts Int'l, Inc.*, 372 F.3d 154, 168-69 (3d Cir. 2004) ("[W]here there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of postconfirmation bankruptcy court jurisdiction is normally appropriate."); *In re Midstate Mortg. Inv., Inc.*, 105 F. App'x 420, 422-23 (3d Cir. 2004) (affirming bankruptcy court's decision to enjoin creditors of the debtor from prosecuting a state-court action or instituting any other action that might interfere with the plan or releases).

6.      In accordance with Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the PIMCO Parties

RLF1 29412703v.1

confirm their consent to the entry of a final order by this Court in connection with this Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## **BACKGROUND**

### I.  **PROCEDURAL BACKGROUND**

7.    In 2016, Relator filed a lawsuit, captioned *United States ex rel. Crutcher v. First Guaranty Mortgage Corporation*, No. 1:16-cv-03812 (N.D. Ga. Oct 13, 2016) (the "Qui Tam Litigation"), in the United States District Court for the Northern District of Georgia (the "Georgia District Court") (under seal) against Debtor FGMC, alleging that FGMC had violated the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"). *See* Qui Tam Dkt. 93 at 2.[4]

8.    On June 29, 2022, Relator first amended her complaint to add the PIMCO Parties (and several individuals formerly associated with FGMC) as additional defendants. *See* D. I. 600 ¶ 1. Beyond naming the PIMCO Parties as defendants in the Qui Tam Litigation, Relator's amended complaint made no factual allegations whatsoever regarding the PIMCO Parties. *See* Qui Tam Dkt. 19. The following day, on June 30, 2022, the Debtors commenced the Chapter 11 Cases.

9.    On August 17, 2022, the United States provided notice that, after completing nearly six years of investigation, the United States decided not to intervene in Relator's lawsuit or pursue her Qui Tam Litigation claims on behalf of the United States. Qui Tam Dkt. 28. More recently, the United States stated that the Qui Tam Litigation "*does not warrant the continued expenditure of government resources to pursue or monitor the action.*" Qui Tam Dkt. 87 at 2 (emphasis added).

---

[4] Citations to court filings refer to their ECF-generated page numbers for clarity. "D. I." indicates docket entries in these Chapter 11 Cases, while "Qui Tam Dkt." indicates docket entries in the Qui Tam Litigation.

RLF1 29412703v.1

10.     On September 20, 2022, Relator filed a proof of claim in the Chapter 11 Cases based on the same allegations and subject matter as the Qui Tam Litigation (the "Claim").  Proof of Claim #93 (Sept. 20, 2022), *as amended*, Proof of Claim #124 (Sept. 28, 2022).  By filing her Claim, Relator submitted to the exclusive jurisdiction of this Court with respect to her Claim.  28 U.S.C. § 1334; *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 362-64 (2006).

11.     On November 2, 2022, the Bankruptcy Court entered the Confirmation Order, which, among other things, permanently enjoined Relator from commencing or continuing any action or other proceeding against FGMC, its bankruptcy estate, or its assets, and from taking any act contrary to the Plan, including the releases granted by the Debtors and the Estates, or litigating the allowance of her Claim anywhere other than in this Court.  Confirmation Order ¶ 39, D. I. 671 at 34-35.  The Effective Date of the Plan occurred on November 6, 2022.  D. I. 678 ¶ 2.

12.     On November 28, 2022, the PIMCO Parties filed a motion to dismiss the amended complaint in the Qui Tam Litigation.  Qui Tam Dkt. 49.  Relator responded by, among other things, requesting authority to further amend her amended complaint.  Qui Tam Dkt. 71.  Thereafter, the Georgia District Court granted Relator's request to file her Supplemental Second Amended Complaint (Qui Tam Dkt. 94, attached hereto as Exhibit B (the "SSAC")) but reserved its ruling on the merits of the arguments raised in PIMCO Parties' prior motion to dismiss until after the briefing on an anticipated renewed motion to dismiss the SSAC.  Qui Tam Dkt. 93 at 10 n.1.  On June 29, 2023, the PIMCO Parties timely filed their motion to dismiss the SSAC.  Qui Tam Dkt. 99, 99-1.  Relator has not yet responded to the PIMCO Parties' motion to dismiss the SSAC.

## II.     THE PARTIES AND RELATOR'S CLAIMS

13.     Relator was employed by FGMC as a wholesale underwriter for approximately three months, from September 2014 to November 2014.  SSAC ¶ 34.  Relator never worked in any office or other FGMC facility, as she worked remotely throughout her three-month tenure with

FGMC. *See id.* Relator does not assert that she has personal knowledge of any events occurring at FGMC after her employment was terminated in November 2014. *See* SSAC ¶¶ 34, 122-156.

14. Prior to filing for Chapter 11 protection, FGMC, a Virginia corporation, operated as a full service, non-bank mortgage lender offering a wide range of residential mortgage loans that were tailored to individual borrowers based on their personal financial situations. D. I. 19 (Samples Decl.). FGMC was a "direct endorsement lender" that the U.S. Department of Housing and Urban Development ("HUD") authorized to underwrite and endorse residential home mortgage loans as eligible for an insurance program offered by the Federal Housing Administration ("FHA") for any loans in which the borrowers defaulted. SSAC ¶¶ 1-4, 46-48.

15. After FGMC originated a mortgage loan and endorsed it for FHA insurance, FGMC typically sold the mortgage to third parties. *See* D. I. 19, ¶¶ 7, 9; SSAC ¶¶ 10, 198. If the borrower later defaulted on the mortgage, the subsequent holder of the mortgage could submit a claim to the Government pursuant to the HUD's FHA mortgage insurance program. *See* D. I. 19, ¶¶ 7, 9; *cf. United States v. Carrington Mortg. Servs., LLC*, No. 1:16-cv-00920-RLY-MJD, 2022 WL 1059478, at *6 (S.D. Ind. Mar. 9, 2022), *aff'd*, 70 F.4th 968 (7th Cir. 2023) (citing *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 195 (2016)).

16. PIMCO LLC, a Delaware limited liability company with its principal place of business in California, serves as the investment manager or adviser to various investment funds and accounts, which are separate legal entities that pursue their own investment strategies. *See* PIMCO LLC Form ADV Part 2A Brochure, SEC (March 31, 2022). "Investment [managers and] advisers . . . provide advice and other discretionary services on an ongoing basis, for which they typically charge recurring fees based on a percentage of the assets they manage." *XY Plan. Network, LLC v. SEC*, 963 F.3d 244, 248 (2d Cir. 2020). An investment adviser is a "separate

6

legal entity" from each of its advisory clients. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 138 (2011). The investments the advisory clients make, even at the adviser's recommendation, belong to the clients and not to the investment adviser. *See id.* at 138-40. As relevant here, PIMCO LLC served as investment manager to certain private investment funds and accounts that extended loans to, or acquired the equity of, FGMC, but PIMCO LLC never lent to or held the equity of FGMC. *See infra*, ¶¶ 19-20.

17. PI, a Delaware limited liability company, is a limited purpose broker-dealer that does not invest in or operate portfolio businesses and has no relationship with FGMC. *See* PIMCO LLC Form ADV; PIMCO LLC, https://www.pimco.com (last visited June 29, 2023). In contrast to investment advisers, "[b]roker-dealers effect securities transactions for customers, for which they typically charge a commission or other transaction-based fee." *XY Plan. Network*, 963 F.3d at 248.

18. Neither of the PIMCO Parties has ever invested in, owned, or operated FGMC. *E.g.*, D. I. 844 at 2-3. Relator, in the SSAC, also acknowledges that neither of the PIMCO Parties (a) was ever a direct endorsement lender, (b) ever submitted any loan-level certifications to the government, or (c) ever made any statements or presented any claims for payment to the government in connection with HUD's FHA mortgage insurance program. *See* SSAC ¶¶ 189-207. Moreover, Relator does not assert that she ever had any dealings with any of the PIMCO Parties. SSAC ¶¶ 127-138, 210-216. Rather, Relator asserts that FGMC was the "alter ego" of the PIMCO Parties and "should not receive the protections of the corporate veil." SSAC ¶¶ 206-207. In her SSAC, Relator further alleges that "PIMCO" became FGMC's "new rich uncle," SSAC ¶ 192, when the PIMCO Parties "bought the majority of FGMC," and that the PIMCO Parties held "at

7

least two seats" on FGMC's board of directors, and ultimately obtained "100 percent of FGMC's equity." SSAC ¶¶ 189, 203-204.

19.     Additionally, Relator alleges that "PIMCO owns 100 percent of FGMC's equity" today.  SSAC ¶ 204.  As the record of the Chapter 11 Cases demonstrates, neither of the PIMCO Parties has ever owned the equity of FGMC.  Instead, B2 FIE IV LLC was the sole owner of FGMC, which was first disclosed on June 30, 2022 as part of FGMC's voluntary petition.  *See* D. I. 1 at 19; *see also* Plan § 4.1(c)(iv).

20.     The SSAC also asserts that "PIMCO provided the bridge loan to FGMC to help it through bankruptcy.  PIMCO provided a backstop to a $25 million warehouse line of credit of FGMC."  SSAC ¶ 204.  To the contrary, as the Court is aware, the Prepetition Bridge Lender and the Cash Flow DIP Lender—not the PIMCO Parties—provided prepetition and post-petition financing, respectively, to the Debtors.  Plan §§ 4.1(c)(iv), 5.2(b).[5]  Additionally, contrary to the SSAC's allegations, the PIMCO Parties never backstopped the "$25 million warehouse line of credit."  Plan § 4.1(c)(ii).

## III.     THE RELEVANT PLAN AND CONFIRMATION ORDER PROVISIONS

21.     The Plan and Confirmation Order provide for a comprehensive Debtor/Estate Release that is paired with a permanent injunction prohibiting acts that are contrary to the Plan.  Together, the plain terms of these provisions prohibit all parties in interest, including Relator, from commencing or continuing any action or other proceeding to prosecute released claims, including the derivative claims in the Qui Tam Litigation against the PIMCO Parties, or take any action in contravention of the Plan, including its Debtor/Estate Release.

---

[5] The PIMCO Parties dispute Relator's allegations in the Qui Tam Litigation and, as their motion to dismiss the SSAC demonstrates, the allegations fail to state a claim against the PIMCO Parties.

### A. The Debtor/Estate Release and Related Injunction

22. The Debtor/Estate Release is made by the Debtor/Estate Releasors, which include "the Debtors and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action, by, through, for, or because of the foregoing entities." Plan § 16.2(a); *see also* Confirmation Order ¶ 35.

23. The claims and causes of action released as part of the Debtor/Estate Release include:

> "***any and all claims***, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, ***including any derivative claims***, asserted or assertable on behalf of any of the Debtor/Estate Releasors, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, ***that the Debtor/Estate Releasors would have been legally entitled to assert in its own right, or on behalf of the holder of any Claim or Interest or other entity,*** based on or relating to, or in any manner arising from, in whole or in part, ***the Debtors*** (***including the management, ownership, or operation thereof***)"

Plan § 16.2(a) (emphasis added); *see also* Confirmation Order ¶ 35. The PIMCO Parties are Released Parties. *See* Plan § 3 (defining "Released Parties" to include the Cash Flow DIP Lender, the Prepetition Bridge Lender, and their Related Persons, which include the PIMCO Parties).

24. The Debtor/Estate Release is backed by an expansive injunction, which provides, in relevant part, that "all entities who have held, hold, or may hold Claims against or Interests in the Debtors, the Liquidating Trust, or the Estates that arose prior to the Effective Date are permanently enjoined from . . . any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim . . ., including, without limitation, the Debtor/Estate Release." *Id.* § 16.3; Confirmation Order ¶ 39. Thus, any

attempt to prosecute claims already released by the Debtor/Estate Release against the Released Parties, including the PIMCO Parties, is contrary to the Plan and, therefore, prohibited by the Plan injunction.

    **B.**     **Approval, Binding Effect, and Effectiveness of the Debtor/Estate Release and Related Injunction**

25.     This Court's entry of the Confirmation Order "constitute[ed] the Bankruptcy Court's approval, of the Debtor/Estate Release, which includes by reference each of the related provisions and definitions contained [t]herein." Plan § 16.2(a); *see also* Confirmation Order ¶ 35.

26.     Additionally, this Court's approval of the Debtor/Estate Release also constituted:

> "the Bankruptcy Court's finding that the Debtor/Estate Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) in the best interests of the Debtors and all holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) *a bar to any of the Debtor/Estate Releasors asserting any Claim or Cause of Action released pursuant to the Debtor/Estate Release*."

Plan § 16.2(a) (emphasis added); *see also* Confirmation Order ¶ 35.

27.     The Debtor/Estate Release and accompanying injunction are binding on all parties in interest, including, without limitation:

> "the Debtors, the Liquidating Trust, the Liquidating Trustee, any Entity acquiring property under the Plan, any Beneficiary, and *any Creditor or Interest holder*, whether or not such Creditor or Interest holder has filed a Proof of Claim or Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or the Interest of such Interest holder is impaired under the Plan, and *whether or not such Creditor or Interest holder has accepted or rejected the Plan*."

Plan § 15.1 (emphasis added). The Confirmation Order similarly provides that the "release, injunction, exculpation, and related provisions set forth in Article 16 of the Plan are hereby approved and authorized in their entirety, and such provisions are effective and binding on all

10

Persons and Entities as and to the extent provided for therein." Confirmation Order ¶ 34.[6] Thus, the Plan, including the Debtor/Estate Release and injunction provisions contained therein, is binding on Relator.

## RELIEF REQUESTED

28.     The PIMCO Parties respectfully request that this Court enter the Proposed Order enforcing the Plan and Confirmation Order by finding that (a) the Released Claims, which assert alter ego and veil piercing theories, belonged to the Debtors' Estates and were released under the Plan and (b) Relator, and all other persons, are enjoined from pursuing such Released Claims.

## BASIS FOR RELIEF

29.     The Debtors and their Estates released "***any and all claims***, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, ***including any derivative claims, asserted or assertable*** on behalf of any of the Debtor/Estate Releasors" against the Released Parties, which include the PIMCO Parties.    Plan § 16.2(a) (emphasis added); Confirmation Order ¶ 35.  Additionally, all entities who hold Claims against the Debtors or their Estates, including Relator, are permanently enjoined from taking any "act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim . . . including, without limitation, the Debtor/Estate Release."   Plan § 16.3; Confirmation Order ¶ 39.

30.     Under established Third Circuit precedent, all of the Released Claims constitute property of the Debtors' Estates because they are general claims that existed at the commencement of the Chapter 11 Cases that could have been asserted by the Debtors, and do not depend on facts particular to any specific creditor.  As such, Relator has no right or standing to pursue the Released

---

[6] Creditors who have properly completed and returned a Release Opt-Out Election Form may opt out of the Third Party Release, but they remain bound by the Debtor/Estate Release.  Plan § 6.10.

Claims.  These claims were released under the Plan and Confirmation Order as of the Effective Date, and Relator, and all other persons, are permanently enjoined from pursuing such claims.

## I.  THE RELEASED CLAIMS ARE PROPERTY OF THE DEBTORS' ESTATES

31.     The Bankruptcy Code defines property of the estate broadly to include "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  "After a company files for bankruptcy, 'creditors lack standing to assert claims that are property of the estate.'"  *Emoral*, 740 F.3d at 879 (quoting *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002)).  In other words, the "trustee in bankruptcy [has] exclusive authority to assert or resolve a cause of action that belonged to the debtor before the bankruptcy."  *TPC*, 2023 WL 2168045, at *5.

32.     A claim is the property of a debtor's estate if two criteria are met.  First, the claim must have existed upon commencement of the bankruptcy case and must be a claim that the debtor could have asserted on its own behalf under applicable state law.  *Emoral*, 740 F.3d at 879 (citing *Foodtown*, 296 F.3d at 169 n.5); *TPC*, 2023 WL 2168045, at *5; *Maxus*, 571 B.R. at 658 (collecting authority); *see* 11 U.S.C. § 541(a)(1) (the debtor's estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held").  Second, the claim must be "general" rather than particularized.  In conducting this inquiry, "the Third Circuit instructed that the *nature of the cause of action itself must be examined*."  *Maxus*, 571 B.R. at 656 (citing *Emoral*, 740 F.3d 879) (emphasis in original).  For example, "while the [personal injury plaintiffs] focus on the *individualized nature of their personal injury claims against Emoral*, they fail to demonstrate how any of the factual allegations that would establish their cause of action based on successor liability are unique to them as compared to other creditors."  *Id.* at 656 (quoting *Emoral*, 740 F.3d at 879-80) (emphasis in original); *see also TPC*, 2023 WL 2168045, at *6 (following *Maxus* to hold that *Emoral* focuses

12

"not on the underlying harm, itself, but on the theory of liability put forth by the party bringing such claims"). Those claims were the property of the bankruptcy estate even though "no other creditor could assert the specific claims stemming from successor liability alleged by the plaintiffs." *Maxus*, 571 B.R. at 657.

33. The Third Circuit's decision in *Emoral* rested on established law that alter ego and veil piercing claims belong to a debtor's estate. For example, the Third Circuit adopted the reasoning of the Second Circuit that "the trustee is the proper person to assert" "general" claims "that could be brought by any creditor of the debtor" such as "common claims against a debtor's alter ego." *Id.* at 879 (quoting *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989)). Such a cause of action "is properly pursued by the bankruptcy trustee because it inures to the benefit of all creditors." *Emoral*, 740 F.3d at 879.

34. The first prong of *Emoral* is easily satisfied here. The relevant Debtor here is FGMC, a Virginia corporation, whose corporate form would be disregarded if the Relator were allowed to pursue the Released Claims.[7] Accordingly, Virginia law governs whether FGMC could pierce its own corporate veil in order to assert alter ego and veil-piercing claims. Virginia law (like Delaware law) allows companies to pierce their own corporate veils and assert veil-piercing claims on their own behalf. *Borg v. Warren*, 545 F. Supp. 3d 291, 317-19 (E.D. Va. 2021) (quoting *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 136 (4th Cir. 1988) ("[I]n Virginia, a creditor may not bring alter ego claims, as under Virginia law, 'a corporation has an equitable interest in the assets of an alter ego because the corporation and the alter ego are 'one and the same.'")); *Maxus*, 571 B.R. at 658 ("under Delaware law, a wholly-owned corporate subsidiary

---

[7] From the two Debtors in the Chapter 11 Cases, only FGMC, and not Maverick (which is a Delaware limited liability company), is named as a defendant in the Qui Tam Litigation. Accordingly, the focus for analyzing the first prong of *Emoral* is Virginia law. Even if Delaware law were to apply, as stated herein, under Delaware law, a company can pierce its own corporate veil. *Maxus*, 571 B.R. at 658.

13

can, in fact, pierce its own corporate veil and hold liable a third-party non-debtor"); *TPC*, 2023 WL 2168045, at *6 (same). Thus, FGMC had the right to bring alter ego or veil piercing claims at the time of the filing of the Chapter 11 Cases under Virginia law (and would have the same right under Delaware law). *See TPC*, 2023 WL 2168045, at *6; *Maxus,* 571 B.R. at 660. When these Chapter 11 Cases were commenced, not only were the alter ego and veil piercing claims against the PIMCO Parties in existence, those claims were already pending in the Qui Tam Litigation as a result of Relator filing the amended complaint premised on alter ego and veil piercing theories against the PIMCO Parties one day prior to FGMC's Chapter 11 filing. *See* Qui Tam Dkt. 19.

35.     The second prong of *Emoral* is also satisfied with respect to the Released Claims because they are "general" rather than particularized claims. The facts necessary to establish the Released Claims, which are based on alter ego or veil piercing theories, do not depend on any particular creditor but instead are common to all creditors of the Debtors, and any recovery would inure to the Debtors' Estates as a whole.

36.     A claim satisfies the second prong of the *Emoral* framework if, like here, it is a "general" claim. *See Emoral*, 740 F.3d at 879. In *Emoral*, the Third Circuit held that successor liability claims were general claims that belonged exclusively to the bankruptcy estate because such claims were akin to other vicarious liability claims, like the alter ego and veil piercing claims at issue here. *See Emoral*, 740 F.3d at 880 ("***state law causes of action for successor liability, just as for alter ego and veil-piercing causes of action, are properly characterized as property of the estate***") (emphasis added). Applying this reasoning, Judge Sontchi in *Maxus* and this Court in *TPC* concluded that veil piercing claims belonged to the respective debtors' estates. *TPC*, 2023 WL 2168045, at *6; *Maxus*, 571 B.R. at 659-60.

14

37. In *TPC*, applying the test from *Emoral*, this Court held that the veil-piercing claims at issue were property of the estate and thus could not be asserted by any individual creditor. *Id.* at *1. There, the plaintiffs who had allegedly suffered property damage and personal injury, sued the debtors and their equity sponsors in state court in Texas, asserting certain veil piercing claims, among other theories, against the equity sponsors. *Id.* The equity sponsors argued that the veil piercing claims against them belonged to the bankruptcy estates and had been released under the debtors' confirmed plan of reorganization. *Id.* This Court held that, other than the negligent undertaking claim, the plaintiffs' other claims satisfied the *Emoral* standard because (a) Delaware law permitted the debtors to assert a veil piercing claim on their own behalf against the equity sponsors (satisfying the first prong) and (b) the plaintiffs' claims were general as they applied equally to all creditors because the "complaint [made] no suggestion that there were any 'personal dealings'" between the residents and the equity sponsors, let alone any facts unique to them that underlie their veil piercing claim (satisfying the second prong). *TPC*, 2023 WL 2168045, at *7. The *TPC* Court further found that "[n]o claim for veil piercing that [the tort plaintiffs] may assert has anything to do with any of the claimants' direct interactions with any of the Supporting Sponsors," but rather, "to the extent there is a basis for these plaintiffs to pierce the [debtors'] corporate veil, such a theory would also be available to any other creditor." *Id.*

38. Likewise, here, the Released Claims that Relator continues to pursue are general claims, based on alter ego or veil piercing theories, because, among other flaws, the SSAC fails to allege any "personal dealings" (and, in fact, makes it clear there were no "direct dealings") between Relator and the PIMCO Parties. *See TPC*, 2023 WL 2168045, at *7-8. To the extent there is a basis for Relator to pierce FGMC's corporate veil (which there is not), such a theory would not only be available to Relator but would be available to any other FGMC creditor. *E.g.*, SSAC ¶¶ 34,

189; *TPC*, 2023 WL 2168045, at \*7-8; *see also Maxus*, 571 B.R. at 659-60.  Accordingly, because the Released Claims are general claims that existed upon the commencement of these Chapter 11 Cases (and which the Debtors could have asserted on their own behalf under Virginia and Delaware law), they were property of the Debtors' Estates and were released.

39.    In particular, the SSAC's allegations against the PIMCO Parties pursue alter-ego and veil piercing claims based on the PIMCO Parties purported control over FGMC.  *See, e.g.*, SSAC ¶¶ 191, 205 (alleging the PIMCO Parties "quickly took control" and "exercised [their] control over FGMC").  The SSAC alleges that the PIMCO Parties became FGMC's "new rich uncle" by asserting that in "September 2015"—nearly *one year after* Relator's brief tenure at FGMC—the PIMCO Parties "bought the majority of [the equity of] FGMC and gained control over FGMC" and its Board of Directors by obtaining "at least two seats on the [FGMC] Board of Directors."  SSAC ¶¶ 189, 203.[8]  The SSAC alleges that the PIMCO Parties' purportedly controlled FGMC through:  (i) FGMC's personnel decisions (PIMCO Parties allegedly "handpicked [FGMC] senior executives" and "picked the new CEO" (SSAC ¶¶ 191, 201)); (ii) operational decisions (PIMCO Parties allegedly "directed the major actions of FGMC including the decisions on downsizing" and to "open[] a new operations center" (SSAC ¶¶ 201, 191)); and (iii) close-monitoring of FGMC (PIMCO Parties allegedly "received daily reports on FGMC's operations" and visited FGMC facilities "at least once to twice a year and at times monthly," during which visits the PIMCO Parties allegedly "had access to whatever they needed" (SSAC ¶¶ 189-204)).

40.    The SSAC alleges that, as a result of the foregoing alleged conduct and the PIMCO Parties' purported "extensive direction of and involvement in FGMC's day-to-day management,

---

[8] As noted above, the PIMCO Parties were never the equity owners of any of the Debtors.

. . . FGMC served as PIMCO's alter ego." SSAC ¶ 206. The SSAC asserts a "unity of interest and ownership . . . such that the separate personalities of FGMC and PIMCO ceased to exist." SSAC ¶ 206(b). Moreover, the SSAC alleges that the PIMCO Parties "disregarded that FGMC was a separate corporate entity and made [FGMC] a mere instrumentality for the transaction of [the PIMCO Parties'] own affairs." SSAC ¶ 206(a). Based on all of these alter ego allegations, the SSAC asserts that the PIMCO Parties should not "receive the protections of the corporate veil" and that recognizing those protections "would promote injustice." SSAC ¶¶ 206(c), 207.

41. The section of the SSAC containing these allegations, SSAC ¶¶ 189-207, "asserts no claim for a specific independent tort," let alone a direct FCA violation by, or liability of, the PIMCO Parties. *TPC*, 2023 WL 2168045, at *3. Putting aside the fact that the PIMCO Parties dispute these allegations, which in any event fail to state a claim against the PIMCO Parties, these allegations are entirely devoted to Relator's alter ego (SSAC ¶ 206) and veil piercing (SSAC ¶ 207) claims against the PIMCO Parties. The conclusion of that portion of the SSAC acknowledges Relator's narrow focus explicitly: Relator alleges that "[t]hrough the above actions, [the PIMCO Parties] exercised [their] control over FGMC and directly caused the false certifications and false claims of FGMC." SSAC ¶ 205. Relator thereby seeks to recover from the PIMCO Parties because of their alleged relationship to FGMC and not the PIMCO Parties' own actions (SAC ¶¶ 206-207)—a garden variety vicarious liability claim. In fact, in Relator's most recent motion to modify the Plan injunction filed in this Court, she explicitly admits the SSAC added "piercing the corporate veil and alter ego claims against PIMCO." D. I. 897, ¶ 8.

42. Remarkably, Relator presses these vicarious liability claims against the PIMCO Parties, neither of which is nor ever has been the parent company of FGMC. As Relator knows, and as the record of the Chapter 11 Cases demonstrates, neither of the PIMCO Parties has ever

17

invested in, owned, operated, or controlled FGMC.  D. I. 844 at 2-3.  In that regard, the alter ego and veil piercing claims in the SSAC are that much further removed from the facts of prior cases. *E.g.*, *O'Hazza v. Exec. Credit Corp.*, 431 S.E.2d 318, 320 (Va. 1993) (finding the trial court erred in holding the corporation was the alter ego and instrumentality of the appellant because the corporation "did not operate solely as a paper entity to pass money from parents to child."); *see Dana v. 313 Freemason*, 587 S.E.2d 548, 553 (Va. 2003) (finding it was appropriate to piece the corporate veil where there was evidence the subsidiary "was the . . . stooge, or dummy" of the parent).  Instead, as noted above, PIMCO LLC and PI are distinct from one another, and are separate legal entities from FGMC's corporate parent.  *See supra* ¶ 16-20.  Relator thus endeavors to confuse and conflate these separate legal entities to fabricate a claim of control where none exists.  Indeed, PIMCO LLC merely served as investment manager to a private investment fund, and a separate entity, that invested in FGMC's equity, and PI has no relationship to FGMC.  *Id.* Accordingly, Relator's alter ego and veil piercing claims, even if not released (which they have been), cannot properly reach the PIMCO Parties.

## II.     THE COURT SHOULD ENFORCE THE PLAN AND CONFIRMATION ORDER AND ENJOIN RELATOR FROM PURSUING THE RELEASED CLAIMS

43.     This Court has jurisdiction to enforce its own orders and expressly retained that authority in the Plan and Confirmation Order.  *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *In re Essar Steel Minn. LLC*, 47 F.4th 193, 200-02 (3d Cir. 2022).  Under the Plan and Confirmation Order, this Court "retain[ed] exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan," including the jurisdiction to (a) "enforce all orders previously entered by the [Court] in the Chapter 11 Cases [including] the Confirmation Order," (b) "interpret and/or enforce the provisions of the Plan and the injunction provided for in the Plan and to determine any and all disputes arising under or regarding interpretation of the Plan," and

18

(c) "enter such orders as may be necessary or appropriate in furtherance of Confirmation and the successful implementation of the Plan." Confirmation Order ¶ 53; Plan § 18.

44. Under governing Third Circuit law, Relator's alter ego and veil piercing claims against the PIMCO Parties (*i.e.*, the Released Claims) belonged exclusively to the Debtors' Estates and were released as part of the Debtor/Estate Release on the Effective Date. Those releases were an integral part of the consideration provided in exchange for the compromises and resolutions embodied in the Plan, made in "good faith," "in the best interests of the Debtors, the Estates, and all holders of Claims and Interests," and "fair, equitable, and reasonable." Confirmation Order at 10. And the injunctions in the Plan approved by the Confirmation Order enjoined all parties, including Relator, from taking any action in violation of the Plan, including the releases by the Debtors and their Estates granted thereunder.

45. As Released Parties, the PIMCO Parties are entitled to enforce the Debtor/Estate Release and the injunction provisions in the Plan and Confirmation Order. Accordingly, the PIMCO Parties respectfully request that this Court exercise its jurisdiction and enforce the Plan and Confirmation Order, including the Debtor/Estate Release and injunctions therein, and enjoin Relator from pursuing any further, in any manner, the Released Claims.

## **RESERVATION OF RIGHTS**

46. This Motion is submitted without prejudice to, and with a full reservation of, all of the PIMCO Parties' rights, claims, causes of action, defenses, and remedies, at law or in equity, under the Plan and the Confirmation Order and/or in connection with the Qui Tam Litigation.

47. Without limiting the generality of the foregoing, the filing of this Motion does not constitute: (i) a waiver of any of the PIMCO Parties' rights and remedies against any person or entity, including, but not limited to, Relator; (ii) a waiver of any obligation owed to the PIMCO Parties; (iii) an election of remedies (including, but not limited to, an election of remedies that

19

waives or otherwise affects any other remedies); or (iv) a waiver or limitation of any procedural or substantive rights, or any procedural or substantive defenses, to any claim that may be asserted against the PIMCO Parties.

48.     The PIMCO Parties further reserve the right to amend, modify, or supplement this Motion in writing or orally at any hearing, to respond to any pleadings filed by any other party, and to introduce evidence at or prior to any hearing relating to the Motion, in each case, without limiting any other rights of the PIMCO Parties.

### **NOTICE**

49.     Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to Relator: Stevens & Lee, P.C., 919 North Market Street, Suite 1300, Wilmington, DE 19801 (Attn. Joseph H. Huston, Jr.) and 1500 Market Street, East Tower, Suite 1800, Philadelphia, PA 19102 (Attn. Charles E. Leasure III); Thomas & Solomon LLP, 693 East Avenue, Rochester, NY 14607 (Attn. J. Nelson Thomas and Jonathan W. Ferris); Bracker & Marcus LLC, 3225 Shallowford Road, Suite 1120, Marietta, GA 30063 (Attn. Julie K. Bracker and Jason Marcus); and Black & Buffone PLLC, 1400 Eye Street NW, Suite 200, Washington, DC 20005 (Attn. Samuel John Buffone, Jr.); (c) counsel to the Liquidating Trust: Dentons US LLP, 601 S. Figueroa Street, Suite 2500, Los Angeles, CA 90017 (Attn. Samuel R. Maizel and Tania M. Moyron), 1221 Avenue of the Americas, New York, NY 10020 (Attn. Claude D. Montgomery) and 1900 K Street, NW, Washington, DC 20006 (Attn. David F. Cook); and Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899 (Attn. Laura Davis Jones, Timothy P. Cairns and Mary F. Caloway); (d) counsel to the Cash Flow DIP Lender and the Prepetition Bridge Lender, Greenberg Traurig, LLP, 222 Delaware Avenue, Suite 1600, Wilmington, DE 19801 (Attn. Dennis A. Meloro) and 77 West

20

Wacker Dr., Suite 3100, Chicago, IL 60601 (Attn. Nancy A. Peterman and Eric J. Howe); and (e) all parties who have requested notice pursuant to Bankruptcy Rule 2002.

50.     A copy of this Motion is available on this Court's website, at www.deb.uscourts.gov, and on the website managed by the Debtors' claims and noticing agent, KCC, at https://www.kccllc.net/fgmc.

## CONCLUSION

For the reasons set forth above, the PIMCO Parties respectfully request that this Court enter the Proposed Order enforcing the Plan and Confirmation Order by finding that the Released Claims belonged to the Debtors' Estates and were released under the Plan and Conformation Order, and Relator, and all other persons, are enjoined from pursuing such claims.

Dated:  August 3, 2023

*/s/ Robert J. Stearn, Jr.*
Robert J. Stearn, Jr. (No. 2915)
Sarah E. Silveira (No. 6580)
Zachary J. Javorsky (No. 7069)
RICHARDS, LAYTON & FINGER P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:  302-651-7700
Email:  stearn@rlf.com
            silveira@rlf.com
            javorsky@rlf.com

-and-

SCHULTE ROTH & ZABEL LLP
Peter H. White
Noah N. Gillespie
555 13th Street NW, Suite 6W
Washington, DC 20004
Telephone: 202.729.7476
Email:  pete.white@srz.com
            noah.gillespie@srz.com

(*Pro Hac Vice* applications pending)

21

-and-

Kristine Manoukian (No. 5509)
Kelly V. Knight (*Pro Hac Vice*
application pending)
Paulina Piasecki (*Pro Hac Vice*
application pending)
919 Third Avenue
New York, NY 10022
Telephone:  212.756.2466
Email: kristine.manoukian@srz.com
        kelly.knight@srz.com
        paulina.piasecki@srz.com

*Counsel for Pacific Investment
Management Company LLC and PIMCO
Investments LLC*