# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **KARI CRUTCHER,** | |
| *Plaintiff,* | **MOTION FOR LEAVE TO FILE A MOTION TO DISMISS CLAIMS PURSUANT TO RULE 41(a)(2) AND TO FILE A THIRD AMENDED COMPLAINT** |
| *v.* | |
| **FIRST GUARANTY MORTGAGE CORPORATION, PACIFIC INVESTMENT MANAGEMENT COMPANY, LLC, PIMCO INVESTMENTS, LLC, AARON SAMPLES, ANDREW PETERS, JILL WINTERS and SUZY LINDBLOM,** | **Civil Action No. 16-CV-03812-TWT** |
| *Defendants.* | |

<u>**PLAINTIFF'S MOTION FOR LEAVE TO FILE A MOTION TO DISMISS CLAIMS PURSUANT TO RULE 41(a)(2) and TO FILE A THIRD AMENDED COMPLAINT**</u>

Plaintiff-Relator Kari Crutcher, by and through undersigned counsel, respectfully submits its Motion for Leave to File a Motion to Dismiss Claims Pursuant to Rule 41(a)(2) and To File a Third Amended Complaint. Plaintiff-Relator's proposed Third Amended Complaint is attached to this motion.

Respectfully submitted,

*/s/* J. Nelson Thomas

J. Nelson Thomas, Esq. (Admitted *pro hac vice*)
Jonathan W. Ferris, Esq. (Admitted *pro hac vice*)
**THOMAS & SOLOMON LLP**
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
nthomas@theemploymentattorneys.com
jferris@theemploymentattorneys.com

-and-

Julie K. Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**BRACKER & MARCUS LLC**
3355 Lenox Road
Suite 660
Atlanta, GA 30326
Telephone: (770) 988-5035
Fax (678) 648-5544
Julie@FCAcounsel.com
Jason@FCAcounsel.com

*Attorneys for Plaintiff-Relator Kari Crutcher*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **KARI CRUTCHER,** *Plaintiff,* **v.** **FIRST GUARANTY MORTGAGE CORPORATION, PACIFIC INVESTMENT MANAGEMENT COMPANY, LLC, PIMCO INVESTMENTS, LLC, AARON SAMPLES, ANDREW PETERS, JILL WINTERS and SUZY LINDBLOM,** *Defendants.* | **Civil Action No. 16-CV-03812-TWT** |

## AFFIRMATION OF NELSON THOMAS IN SUPPORT OF MOTION FOR LEAVE TO FILE A MOTION TO DISMISS CLAIMS PURSUANT TO RULE 41(a)(2) AND TO FILE A THIRD AMENDED COMPLAINT

**Nelson Thomas**, under penalty of perjury deposes and states:

1. This case has a complex procedural history which, for the sake of judicial economy, will be omitted here, except where relevant.

2. As set forth in more detail in Docket Nos. 104-107, the defendants have moved this Court for the lift of the stay to allow for their complete dismissal from this action based on a decision from a bankruptcy judge in the United States District Court for the District of Delaware

("District of Delaware Bankruptcy Court"). For the reasons set forth in our response papers, the Relator does not believe that lifting the stay is warranted pending the appeal of the decision of the bankruptcy judge in the Delaware action.

3.    Moreover, the bankruptcy judge was clear in his decision that he rejected Defendants' arguments that the claims against them be dismissed "with prejudice" — "I don't think that's appropriate." Transcript of Bankruptcy Proceeding, September 5, 2023, Docket No. 104-2 at 67: 23-24.

4.    The bankruptcy judge held instead that:

> The determination that the complaint asserts claims that are barred by the plan injunction  is not an adjudication of those claims on the merits such that prejudice would attach, it's simply a determination that they cannot proceed, consistent with the injunction and, if a different claim were asserted in a way that did not violate the injunction, I don't think that the movants ought to be in any better position by virtue of this order to argue that the claim had already been adjudicated and, therefore, was within the scope of this injunction by virtue of this determination.

*Id.* at 68: 1-13.

5.    Therefore, defendants' motion for their entire dismissal from this action based on the decision of the bankruptcy court is without merit.

The decision of that Court held the reverse—that the claims against defendants were not dismissed with prejudice precisely so they could be replead.

6. Although the defendants initially moved this Court to dismiss this action, after the briefing was complete, they decided to then file a new motion in District of Delaware Bankruptcy Court to hold the Relator in contempt for not dismissing the claims against it in this Court. (Of course no such motion was possible given this Court's stay which remained in effect.) Although there were a number of options in terms of responding to the defendants' motion in the District of Delaware Bankruptcy Court, Relator concluded the most efficient was to ask this Court to lift its stay to allow plaintiff to file a motion to dismiss claims pursuant to Federal Rule of Civil Procedure 41(a)(2) and for leave to file a third amended complaint because repeated litigation of the issue was not warranted. As defendants appear to recognize in their papers before the District of Delaware Bankruptcy Court, the motion to dismiss the claims against the defendants must be done by leave of court both because an answer has been filed and because a party cannot partially dismiss a complaint under Rule 41(a)(1) as the defendants request. *Absolute Activist Value Master Fund Limited v.*

*Devine*, 998 F.3d 1258, 1265 (11ᵗʰ Cir. 2021) ("This Court has made abundantly clear that a Rule 41(a)(1) voluntary dismissal disposes of the *entire* action, not just some of the plaintiffs' claims.")

7. The proposed Third Amended Complaint attached to this motion both removes the form of the claims barred by the District of Delaware Bankruptcy Court and cures some claimed deficiencies defendants had with Relator's earlier proposed amended complaint. The proposed Third Amended Complaint also realigns the facts to assert claims that are allowed under the ruling of the District of Delaware Bankruptcy Court. Therefore, we respectfully request that this Court grant this motion for leave to file a motion to dismiss claims pursuant to Rule 41(a)(2) and for leave to amend the complaint. Because this case is in its earliest stages, and no discovery has been conducted, there is no prejudice to granting the amendment particularly as it is designed to meet the defendants' objections and comply with the ruling of the District of Delaware Bankruptcy Court.

8. Attached hereto as **Exhibit A** is a clean copy of Relator's proposed Third Amended Complaint.

9. Attached hereto as **Exhibit B** is a redlined version of Relator's proposed Third Amended Complaint.

I affirm under penalty of perjury that the foregoing is true and correct.

By: <u>/s/ J. Nelson Thomas</u>
J. Nelson Thomas, Esq. (*pro hac vice*)
Jonathan W. Ferris, Esq. (*pro hac vice*)
**THOMAS & SOLOMON LLP**
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
nthomas@theemploymentattorneys.com
jferris@theemploymentattorneys.com

Julie K. Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**BRACKER & MARCUS LLC**
3355 Lenox Road
Suite 660
Atlanta, GA 30326
Telephone: (770) 988-5035
Fax (678) 648-5544
Julie@FCAcounsel.com
Jason@FCAcounsel.com

*Attorneys for Relator*

## <u>CERTIFICATION</u>

Counsel for Plaintiff-Relator Kari Crutcher certifies, per N.D. Ga. L.
Civ. R. 7.1D, that the foregoing document was prepared with one of the fonts
and point selections (Book Antiqua, 14 point) approved by N.D. Ga. L. Civ.
R. 5.1B.

/ s/ J. Nelson Thomas

J. Nelson Thomas, Esq. (Admitted *pro hac vice*)
Jonathan W. Ferris, Esq. (Admitted *pro hac vice*)
**THOMAS & SOLOMON LLP**
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
nthomas@theemploymentattorneys.com
jferris@theemploymentattorneys.com

*Attorneys for Plaintiff-Relator Kari Crutcher*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on the indicated date, the undersigned filed and served the foregoing document, using the Court's CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

Dated: October 13, 2023          <u>/s/   J. Nelson Thomas</u>

J. Nelson Thomas, Esq. (Admitted *pro hac vice*)
Jonathan W. Ferris, Esq. (Admitted *pro hac vice*)
THOMAS & SOLOMON LLP
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
nthomas@theemploymentattorneys.com
jferris@theemploymentattorneys.com

***Attorneys for Plaintiff-Relator Kari Crutcher***

# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **KARI CRUTCHER,** | **THIRD AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL** |
| *Plaintiff,* | |
| *v.* | **Civil Action No.** |
| **FIRST GUARANTY MORTGAGE CORPORATION, ANDREW PETERS, PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, PIMCO INVESTMENTS LLC, B2 FIE IV LLC, V2 FIE TRUST, FIE IV HOLDCO LLC, and PIMCO BRAVO FUND II, L.P.** | **16-CV-03812-SCJ** |
| *Defendants.* | |

Relator Kari Crutcher brings this qui tam action in the name of the United States of America, by and through her undersigned attorneys Thomas & Solomon LLP, and alleges as follows:

## INTRODUCTION

1.    This is a civil fraud action by qui tam Kari Crutcher on behalf of the United States ("the Government"), against First Guaranty Mortgage Corporation, Andrew Peters, Pacific Investment Management Company LLC, (PIMCO LLC)

PIMCO Investments LLC, ("PI"), B2 FIE IV LLC, B2 FIE Trust, FIE IV Holdco LLC, PIMCO BRAVO Fund II, L.P. (collectively "FGMC" or "Defendants") to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, for damages sustained by the United States Department of Housing and Urban Development ("HUD") in connection with FGMC's origination of residential mortgage loans underwritten and approved by FGMC and endorsed for Federal Housing Administration ("FHA") insurance.

2.     FGMC, a lender approved by HUD to originate and underwrite single-family residential mortgages insured by HUD, knowingly approved loans that violated FHA rules while falsely certifying compliance with those rules. FGMC's conduct allowed it to profit from these loans, even if the borrowers defaulted on their mortgages.  As the risk was entirely on FHA, when the non-complaint loans inevitably defaulted, this materialized into millions of dollars in losses to HUD.

3.     The FHA program promotes American homeownership through its "Direct Endorsement Lender" program.  Under this program, the FHA insures loans so long as they satisfy certain requirements.   For these loans, the FHA guarantees that mortgage holders will suffer no loss if the borrower ultimately does not repay the loan.  This program encourages lenders to extend loans to

creditworthy low- and moderate-income families as well as first-time homebuyers.

4. Under this program, lenders known as Direct Endorsement Lenders are given the responsibility to determine whether the loans satisfy the requirements for FHA insurance. Because Direct Endorsement Lenders are permitted to endorse loans for FHA insurance without prior HUD review, HUD requires these lenders to conduct due diligence on loans before endorsing them for FHA insurance, and relies on the truthfulness of their loan-specific certifications in extending that insurance. As a result, the lender is expected and obligated to act with good faith, honesty, and fairness in its dealings with HUD.

5. FGMC annually certified to HUD that it was following all of HUD's guidelines, rules, and regulations, when in fact it knew it did not, and had no intention of providing such services.

6. FGMC's false statements in both individual loans as well as in its initial and annual certifications fraudulently induced (also known as promissory fraud) HUD to extend insurance coverage on home loans, as well as pay for losses on covered loans.

7. FGMC made these false certifications repeatedly in regards to its underwriting and quality control processes and each false certification

independently triggers FGMC's liability.

8.     FGMC failed to live up to its obligations under the FHA Direct Endorsement program.   FGMC's management instituted and encouraged practices that led underwriters to break HUD rules and to approve ineligible loans.

9.     These policies and practices included FGMC allowing exceptions to HUD's underwriting requirements, manipulating key data, waiving conditions and documentation requirements, pressuring underwriters to approve loans ineligible for FHA insurance, and encouraging underwriters to disregard risks that were evident in the loan files.

10.     FGMC established a culture that valued getting a loan approved and endorsed for FHA insurance over complying with HUD's rules.  FGMC's aim was to get loans insured by the United States and sold for a profit—even when FGMC could not truthfully certify to FHA that the loan qualified for FHA insurance.

11.     FGMC encouraged its underwriting staff to approve loans, no matter what the borrower's circumstances or documentation.  FGMC employees often joked that borrowers came to FGMC last because they had been declined everywhere else, but would be approved by FGMC because "we approve everything."

12.     In order to "fix" these initially ineligible loans, FGMC taught and

counseled employees on several mechanisms designed to falsely make loans eligible for FHA insurance. This included tactics such as intentionally miscalculating or misrepresenting borrowers' income or debt obligations, ignoring clear warning signs of fraud, and hiding adverse documentation.

13. As one of its most common fraudulent practices, FGMC abused the FHA's TOTAL Mortgage Scoreboard, a credit-rating algorithm maintained by the FHA that worked in conjunction with FGMC's internal automated underwriting system ("AUS"). TOTAL rates loans as either "accept/approve" or "refer" based on data points that FGMC enters into the AUS, including the borrowers' income, debt, and assets information. Loans that receive an "accept/approve" rating are subject to significantly fewer documentation requirements and less scrutiny than loans that receive a "refer" rating. To get around HUD rules, FGMC would initially run a loan through its AUS and if it did not receive an "accept/approve" rating, FGMC would then run the loan repeatedly through AUS/TOTAL in order to find income, debt, and asset information that would allow the loan to gain an "accept/approve" rating. Using the numbers obtained through this process, FGMC would have its underwriters work backwards from the known "accept/approve" data and would manipulate the borrowers' income, debts, and asset information in order to match up with the pre-determined acceptance

numbers.

14.     Although this "working backwards" technique is a serious violation of HUD's underwriting rules, FGMC would frequently run borrower scenarios in AUS/TOTAL multiple times in order to generate income and debt information that could then be manipulated.

15.     Employees that did not follow FGMC's methods to skirt the FHA rules and regulations were disciplined and/or terminated.  For example, if an underwriter did not subsequently follow the instructions of management to ignore or "waive" an underwriting condition, that employee could be subject to discipline including termination.

16.     FGMC also prioritized the mass approval of FHA loans by developing several strategies designed to generate as many approvals as possible.  For instance, although HUD requires an FHA lender to maintain a proper quality control system, FGMC failed to implement such a system and instead was only concerned with churning out loans.  Therefore, not only were there substantial errors in FGMC's underwriting process to begin with, but FGMC made no effort to use the required quality control process to identify and correct such deficiencies.

17.     Despite repeatedly underwriting loans that were ineligible for FHA insurance as they did not comply with HUD's rules and regulations, FGMC

further violated HUD's self-reporting requirements by failing to report loans that it knew were affected by fraud and other serious violations.  This self-reporting requirement is meant to enable HUD to identify issues with FHA loans, and to request reimbursement from lenders as appropriate.  Instead of making such self-disclosures, FGMC aimed to keep its deficient loans secretive.

18.    FGMC's conduct has caused improperly underwritten loans to be endorsed for FHA insurance where the loans did not satisfy HUD's requirements and where the borrowers ultimately did not repay the loans.

19.    Ineligible loans endorsed by FGMC have resulted in millions of dollars in existing losses to HUD and many additional loans are currently in default and will likely result in significant additional losses to the agency.

20.    HUD's underwriting requirements are designed not only to protect it and the taxpayers from improperly underwritten and unduly risky loans, but also to ensure that creditworthy borrowers are able to handle the monthly payments and to become lasting homeowners. FGMC's underwriting of ineligible loans and false certifications of compliance with applicable requirements undermined these objectives, harming homeowners and the housing market.

21.    In 2015, PIMCO bought FGMC. PIMCO used a series of funds to purchase FGMC, namely B2 FIE IV LLC, B2 FIE Trust, FIE IV Holdco LLC, and

PIMCO BRAVO Fund II, L.P. (collectively referred to as "PIMCO Purchasers").
PIMCO managed the PIMCO Purchasers through Pacific Investment Management
Company LLC, PIMCO Investments LLC (collectively referred to as "PIMCO
Managers"). The PIMCO Purchasers and PIMCO Managers are collectively
referred to as PIMCO.

22.     As described in more detail below, at the ongoing request of the
PIMCO Purchasers, among other things, PIMCO LLC and PI both actively
managed the PIMCO Purchasers complete investment of FGMC, and also
provided advice about FGMC to the PIMCO Purchasers.

23.     The stated goal in purchasing and managing FGMC was to originate
higher risk loans and more loans with the goal of increasing FGMC's profits. The
Defendants worked in concert to achieve that goal. However, on information and
belief, PIMCO, the Defendants, accomplished these goals by enabling and
encouraging all of FGMC's worst practices.

## JURISDICTION AND VENUE

24.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733.
This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§
1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

25.     This Court has personal jurisdiction over FGMC because FGMC

transacts business within the Northern District of Georgia.

26.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C.§ 1395, and 31 U.S.C. § 3732(a), because FGMC transacts business within this district.

27.     This suit is not based on prior public disclosure of allegations or transactions in a criminal, civil or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news media; or otherwise as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4), but rather upon information provided by Relator Crutcher.

28.     In the alternative, to the extent there has been a public disclosure unknown to Relator, Relator is an original source of these allegations, as defined by the FCA.  Relator has direct and independent knowledge of FGMC's fraudulent activities.  Relator has also voluntarily provided this information to the Government prior to filing this action as required under 31 U.S.C. § 3730(e)(4)(B).

29.     Relator shall serve on the United States a copy of the original Complaint and a written disclosure statement setting forth and enclosing all material evidence and information she possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

## THE PARTIES

30.     Defendant FGMC is a Virginia corporation.

31.     FGMC has a principal place of business located at 1900 Gallows Road, Suite 800, Tysons Corner, Virginia 22182.

32.     FGMC identifies its home office city to HUD as Tysons Corner, Virginia and is registered with HUD under Lender ID 75168.

33.     Defendant Andrew Peters is the former Chief Executive Officer of FGMC.

34.     Defendant Pacific Investment Management Company LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Newport Beach, California.

35.     Defendant PIMCO Investments LLC is a Delaware corporation that is headquartered in New York, New York. PIMCO Investments LLC is a wholly-owned subsidiary of PIMCO and an indirect subsidiary of Allianz SE.

36.     Defendant B2 FIE IV LLC, B2 FIE Trust, FIE IV Holdco LLC, and PIMCO BRAVO Fund II, L.P.

37.     Relator is a resident of Fenton, Missouri and worked remotely for FGMC as a Wholesale Underwriter from approximately September 2014 to November 2014.

38.     Through her past work experiences and education, Relator has extensive knowledge of the rules and regulations applicable to FHA loans.

## FACTUAL BACKGROUND

*Civil Statutes to Combat Mortgage Fraud*

39.     The False Claims Act provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(l) (2006); 31 U.S.C. § 3729(a)(l)(A) (2010).

40.     The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(l)(B) (2010). The prior version of the false statements provision made liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. §3729(a)(2) (2006).

41.     The Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(I)(A) (2010). The False

Claims Act provides that no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(l)(B) (2010).

42.    Before May 2009, the False Claims Act defined the term "claim" to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c)(2006).

43.    Effective May 20, 2009, the False Claims Act now defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that: (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C.

§ 3729(b)(2)(A) (2010).

44.    The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act. *See United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

45.    Any person who violates the False Claims Act is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(G).

***HUD's FHA Mortgage Insurance Program***

46.    HUD is a cabinet-level agency of the United States. Its mission is to create strong, sustainable, inclusive communities and quality affordable homes for all. HUD works to strengthen the housing market to bolster the economy and protect consumers, meet the need for quality affordable rental homes, utilize housing as a platform for improving quality of life, and build inclusive and sustainable communities free from discrimination.

47.     FHA is a part of HUD and is one of the largest mortgage insurers in the world. Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured more than 40 million home loans since FHA's inception. Through some of these mortgage insurance programs, FHA provides insurance against losses on mortgage loans to single family homebuyers originated and held by approved lenders, or mortgagees.

48.     If a homeowner defaults on an FHA-insured mortgage, the holder of the mortgage may submit a claim to HUD. HUD will then pay the mortgage holder the outstanding balance on the loan and other costs associated with the default. The mortgage holder therefore suffers no loss when a borrower is unable to repay an FHA-insured mortgage. This no-loss guarantee encourages lenders to make loans to creditworthy applicants who would otherwise have difficulty qualifying for conventionally available financing on favorable terms, including the ability to put little money down to make the purchase. FHA mortgage insurance programs therefore help many creditworthy low- and moderate-income families as well as first-time homebuyers become homeowners.

49.     A lender must apply to be a Direct Endorsement Lender and must be approved by HUD to underwrite FHA-insured mortgage loans on HUD's behalf. This is an important responsibility because HUD "does not review applications for

mortgage insurance before the mortgage is executed." 24 C.F.R. § 203.5(a). Instead, the Direct Endorsement Lender underwrites mortgage loans on HUD's behalf and determines whether a borrower presents an acceptable credit risk for HUD. In underwriting the mortgage loan, the lender must determine whether the borrower and the mortgage loan meet HUD's requirements for FHA insurance and whether the "proposed mortgage is eligible for insurance under the applicable program regulations." *Id.* The Direct Endorsement Lender must decide whether or not to approve the borrower for an FHA-insured mortgage loan.

50. After the Direct Endorsement Lender approves a borrower for an FHA-insured mortgage loan, the lender may submit the mortgage loan to HUD to "endorse" the mortgage loan for FHA insurance, meaning that the mortgage loan is fully insured by the FHA insurance fund in the event that the borrower cannot repay the loan. The Direct Endorsement Lender must certify that the loan meets all of HUD's requirements and HUD relies on this certification to endorse the loan for FHA insurance.

51. Certain Direct Endorsement Lenders apply to, and participate in, the Lender Insurance program in which the mortgagees themselves endorse the mortgage for FHA insurance and retain all documentation supporting the mortgage. 24 C.F.R. § 203.6. The lender retains the documents necessary to

approve the loan (the FHA "case binder") and remits the documents to HUD only at the Agency's request.

52.    A Direct Endorsement Lender is expected and obligated to act with the utmost good faith, honesty, and fairness in its dealings with HUD. "Under the . . . civil case law the mortgagee, knowing that the federal insurer is 'relying on its professional judgment in a business relationship' has an affirmative duty 'to use due care in providing information and advice' to the federal mortgage guarantor." As a result, in addition to the regulatory duties addressed below, the Direct Endorsement Lender owes both a fiduciary duty and a duty of reasonable care to HUD.

*HUD's Direct Endorsement Program*

53.    The success of the Direct Endorsement Program depends upon proper underwriting of loan files. Participating lenders have to determine the eligibility of borrowers and loans for FHA insurance, and ensure the integrity of the data relied upon to make such determinations.

54.    Under the Direct Endorsement Program, HUD relies on the expertise and knowledge of the lenders.

55.    HUD also relies on the truthfulness of the certification the lender completes on each loan certifying that the loan is eligible for FHA insurance. As

HUD has explained, these "certifications are important as HUD will rely upon them for purposes of endorsing the mortgage loan, thereby eliminating the necessity for a detailed HUD review of the loan prior to endorsement." Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11928, 11932 (March 22, 1983).

56.     To obtain and maintain its status as a Direct Endorsement Lender, a lender must have qualified underwriters on staff.

57.     To qualify as a Direct Endorsement underwriter or "DE underwriter," an underwriter must satisfy several requirements.  The DE underwriter "must have a minimum of three years full-time recent experience (or equivalent experience) reviewing both credit applications and property appraisals."  HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.3; *see also* HUD Handbook 4155.2 ch. 2.A.4.a.  The underwriter must also be a "reliable and responsible professional skilled in mortgage evaluation" and "must be able to demonstrate his or her knowledge and experience regarding the principles of mortgage underwriting." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.l; *see also* HUD Handbook 4155.2 ch. 2.A.4.a.

58.     A Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the

mortgage. That responsibility includes performing due diligence and ensuring accuracy.

### The FHA's Due Diligence Requirements

59. Proper due diligence is a critical component of the Direct Endorsement Program. It is required by federal regulation and HUD Handbooks. It is also required by virtue of the fiduciary duty and duty of reasonable care that the Direct Endorsement Lenders owe to HUD. *See* 48 Fed. Reg. at 11932 ("The duty of due diligence owed [HUD] by approved mortgagees is based not only on these regulatory requirements, but also on civil case law."). "The entire scheme of FHA mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found."

60. A lender's due diligence should (1) "determine a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties;" and (2) "examine a property offered as security for the loan to determine if it provides sufficient collateral." HUD Handbook 4155.1, REV-5, ch. 2-1. Proper due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral. Id.

61. In all cases, a Direct Endorsement Lender owes HUD the duty, as

prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R § 203.5(c).

62.     HUD has established specific rules for due diligence predicated on sound underwriting principles.  In particular, HUD requires Direct Endorsement Lenders to be familiar and to fully comply with governing HUD Handbooks and Mortgagee Letters, which provide detailed instructions and requirements for Direct Endorsement Lenders. These requirements set forth "the minimum standard of due diligence in underwriting mortgages" with which Direct Endorsement Lenders must comply. Id.

63.     HUD considers the Direct Endorsement underwriter to be "the focal point of the Direct Endorsement program." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C. The Direct Endorsement underwriter must assume the following responsibilities:

- compliance with HUD instructions, the coordination of all phases of underwriting, and the quality of decisions made under the program;

- the review of appraisal reports, compliance inspections and credit analyses performed by fee and staff personnel to ensure reasonable conclusions, sound reports and compliance with HUD requirements;

- the decisions relating to the acceptability of the appraisal, the inspections, the buyer[']s capacity to repay the mortgage and the overall acceptability of the mortgage loan for HUD insurance;

- the monitoring and evaluation of the performance of fee and staff personnel used for the Direct Endorsement program;

- and awareness of the warning signs that may indicate irregularities, and an ability to detect fraud, as well as the responsibility that underwriting decisions are performed with due diligence in a prudent manner.

*Id.*

64.     The underwriter must "evaluate the mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d).

65.     When ensuring that a borrower is creditworthy, a Direct Endorsement Lender must comply with governing HUD requirements, such as those set forth in HUD Handbook 4155.1 (Mortgage Credit Analysis for Mortgage Insurance on One- to Four-Unit Mortgage Loans).  The rules set forth in HUD Handbook 4155.1 exist to ensure that a Direct Endorsement Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the

mortgage debt. HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

66. Direct Endorsement Lenders can underwrite an FHA-insured loan in one of two ways. First, a DE underwriter can "manually underwrite" the loan, by making the credit decision whether to approve the borrower, in accordance with HUD underwriting rules. Second, the Direct Endorsement Lender can use a HUD-approved Automated Underwriting System (AUS), a software system that makes the credit recommendation whether to approve the borrower.

67. To "manually underwrite" an FHA-insured loan, there are numerous steps the DE underwriter must take. At a minimum, the underwriter must: (1) obtain and review the borrower's credit history; (2) obtain adequate explanations for major derogatory credit, including collections, judgments, and other recent credit problems; (3) analyze the borrower's debt obligations; (4) reject documentation transmitted by unknown or interested parties; (5) inspect documents for proof of authenticity; (6) verify the borrower's employment history; (7) establish the borrower's income stability and make income projections; (8) ensure that the borrower has invested a minimum required amount of his or her own funds in the transaction; (9) document the source of funds invested in the

transaction, including any gift funds; (10) calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and (11) consider and document any compensating factors permitting deviations from those fixed ratios. *See* HUD Handbook 4155.1.

***Underwriting of Loans with the FHA's TOTAL System***

68.     Beginning in July 2008, HUD required Direct Endorsement Lenders to electronically process eligible loan requests through an AUS.  The AUS is a software program that connects to a proprietary HUD algorithm known as Technology Open to Approved Lenders, or "TOTAL."  Using data the lender inputs, HUD's "TOTAL" algorithm makes a credit determination and either: (i) provides an "Accept/Approve" decision, approving the loan subject to certain conditions; or (ii) provides a "Refer" decision, referring the loan back to the lender for manual underwriting.  When TOTAL approves the loan, the approval is conditioned on the lender completing certain additional underwriting steps, called "conditions."  Many of these conditions relate to ensuring the data the lender entered is true, complete, and accurate.

69.     Numerous requirements promulgated by HUD explain how lenders must calculate each data point and what documentation they need to support each data point.

70.     For any loan approved through the use of an AUS, HUD requires the lender to certify to the integrity of the data it entered, which HUD defines as data that is true, complete, and accurate. FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2.  If the lender later receives or learns of information that materially differs from the information previously entered by the lender, the lender must re-submit a proposed loan to TOTAL through the AUS.

71.     The data entered into TOTAL is material to the endorsement of the loan because TOTAL is an algorithm that evaluates the overall creditworthiness of a mortgage applicant based on the data supplied by the lender.  Therefore, a loan receiving a TOTAL "Accept/Approve" decision is only eligible for FHA's insurance endorsement if "the data entered into the AUS are true, complete, properly documented, and accurate." *See* FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2.  It is the Direct Endorsement Lender's responsibility to ensure the integrity of the data relied upon by TOTAL.  *See* Mortgagee Letter 2004-1.

72.     Because TOTAL cannot analyze data that is not available to it, certain loans are not eligible for an AUS approval and must be manually underwritten. "A manual downgrade becomes necessary if additional information, not considered in the AUS decision, affects the overall insurability or eligibility of a

mortgage otherwise rated as an accept or approve." FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2. While a lender is not required to have a Direct Endorsement underwriter review the credit portion of an AUS approved loan, a lender must have qualified staff review AUS approvals to ensure a loan that receives an "Accept/Approve" decision is in fact eligible for an AUS approval. *See id.*

73. To ensure the integrity of TOTAL's decision, as well as the integrity of the data TOTAL relies upon, lenders are prohibited from "willfully manipulating ... application variables [in] TOTAL mortgage scorecard to obtain an accept/approve risk classification." *See* Mortgagee Letter 2005-15.

74. If TOTAL does not approve a loan with an "Accept/Approve" decision, it returns a "Refer" decision, meaning the loan is referred back to the lender for manual underwriting. Lenders must then have a DE underwriter perform a manual underwrite and determine if the loan is approvable under FHA's manual underwriting requirements. *See* 24 C.F.R § 203.255(b)(5)(i)(B).

**FHA's Requirements of a Quality Control Program and Mandatory Reporting**

75. A Direct Endorsement Lender is required to maintain a quality control program to ensure the quality of its FHA-insured mortgages. HUD requires that "[t]he Quality Control function must be independent of the [lender's]

origination and servicing functions."  HUD Handbook 4060.1, REV-2, ch. 7-3.B; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.A.

76.    The quality control program must be designed to meet the goals of assuring compliance with FHA's requirements, protecting FHA from unacceptable risk, guarding against errors, omissions and fraud, and assuring swift and appropriate corrective action.  HUD Handbook 4060.1, REV-2, ch. 7-2.  The quality control program also must review a sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines.  HUD Handbook 4060.l, REV-2, ch. 7-6.C; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.D.

77.    When a lender reviews a loan file for quality control, the lender must, among other things, review and confirm specific pieces of information. For instance,"[d]ocuments contained in the loan file should be checked for sufficiency and subjected to written reverification. Examples of items that must be reverified include, but are not limited to, the mortgagor[']s employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds."  HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.; *see also* HUD Handbook 4700.2 REV-1, ch. 6-3.A.2.

78.    If the lender finds discrepancies, it must explore them to ensure that there are no deficiencies.  "Any discrepancies must be explored to ensure that the

original documents . . . were completed before being signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed." HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.

79.     At the end of the quality control review, the lender is expected to assess the significance of any deficiencies.  The HUD Handbook recommends a "system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review. The system should enable a mortgagee to compare one month['s] sample to previous samples so the mortgagee may conduct trend analysis." HUD Handbook 4060.1, REV-2, ch. 7-4.

80.     HUD recommends four types of ratings. The ratings provided for this purpose are:

- "Low Risk", i.e., no problems or minor problems were identified with loan servicing or origination;
- "Acceptable Risk," i.e., the issues identified were not material to the "creditworthiness, collateral security or insurability of the loan";
- "Moderate Risk," i.e., a failure to address significant unresolved questions or missing documentation has created moderate risk for the mortgagee and the FHA; and
- "Material Risk," i.e. the issues identified were "material violations of FHA or mortgagee requirements and represent an unacceptable level of risk."

81.     Examples of "material risk" are violations that include a "significant miscalculation of the insurable mortgage amount or the applicant['s] capacity to

repay, failure to underwrite an assumption or protect abandoned property from damage, or fraud." HUD Handbook 4060.1, REV-2, ch. 7-4.D.

82.    These findings trigger mandatory reporting obligations. Mortgagees "must report [Material Risk] loans, in writing," to HUD.  *Id*.

83.    A lender is also required to report to HUD "[f]indings of fraud or other serious violations" that are discovered "during the normal course of business and by quality control staff during review/audits of FHA loans."  HUD Handbook 4060.1, REV-2., ch. 7-3.J.  The lender must report these findings, along with the supporting documentation, within 60 days of when the lender first discovers them. Id.; HUD Handbook 4060.1, REV-2, ch. 2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices."). Since November 2005, Direct Endorsement Lenders such as FGMC have been required to make such reports through HUD's online Neighborhood Watch Early Warning System.  *See* Mortgagee Letter 2005-26.

84.    Internal reporting of findings is also required. Quality control review findings must "be reported to the mortgagee[']s senior management within one month of completion of the initial report" HUD Handbook 4060.1, REV-2, ch. 7-3.I.

85.    In addition to appropriate reporting, lenders must act to address the problems they identify.   "Management must take prompt action to deal

appropriately with any material findings. The final report or an addendum must identify actions being taken, the timetable for their completion, and any planned follow-up activities." *Id.*; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.F.

***Certifications and Endorsements for FHA Insurance***

86.     HUD requires Direct Endorsement Lenders to certify their compliance with the foregoing due diligence, quality control, and reporting requirements.

87.     First, when a lender applies to participate in the Direct Endorsement Lender program and to endorse loans for FHA insurance on HUD's behalf, the lender must certify that it will fully comply with all HUD guidelines, regulations, and requirements:

> I certify that, upon the submission of this application, and with its submission of each loan for insurance or request for insurance benefits, the applicant has and will comply with the requirements of the Secretary of Housing and Urban Development, which include, but are not limited to, the National Housing Act (12 U.S.C. § 1702 et seq.) and HUD's regulations, FHA handbooks, mortgagee letters, and Title I letters and policies with regard to using and maintaining its FHA lender approval.

88.     If the lender is approved, the lender must re-certify, every year, that it is complying with the program's qualification requirements, including due diligence in underwriting and the implementation of a mandatory quality control

plan. As of 2010, lenders are required to certify:

> I certify that I know, or am in the position to know, whether the operations of above-named lender conform to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies; and that I am authorized to execute this report on behalf of the lender. I certify that the lender complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with [HUD]. I certify that to the best of my knowledge, the above-named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named lender is fully responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators, and all other employees conducting FHA business for the above-named lender . . . Each of my certifications is true and accurate to the best of my knowledge and belief. I understand that if I knowingly have made any false, fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law.

89.     Unless the lender submits a truthful initial certification and annual certifications, the lender is not entitled to obtain or maintain its status as a Direct Endorsement Lender or to endorse loans for FHA insurance.

90.     In addition, for each individual mortgage loan approved for FHA insurance, the lender must make a "loan-level" certification—i.e., a certification specific to an individual loan—that the individual mortgage complies with HUD

rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program."  Form HUD-92900-A.

91.    The "loan-level" certification differs depending on whether the lender used an AUS or manual underwriting.  For each loan that was underwritten with an AUS, the lender must certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *Id*.  For each loan that required manual underwriting, the lender must certify that the Direct Endorsement Underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage." Id.

92.    For every loan that was approved by an FHA lender, whether through manual underwriting or the use of an AUS, an employee is required to certify:

> I, the undersigned, as authorized representative of [the lender]
> at this time of closing of this mortgage loan, certify that I have
> personally reviewed the mortgage loan documents, closing
> statements, application for insurance endorsement, and all
> accompanying documents. I hereby make all certifications
> required for this mortgage as set forth in HUD Handbook 4000.4.

93.    Absent the applicable certifications for an individual loan as described in the above paragraphs, the Direct Endorsement Lender cannot

endorse that loan for FHA insurance.

94.     Each of the foregoing certifications is material to HUD's payment of any claim submitted under the Direct Endorsement Lender Program.  HUD does not review FHA loans for approval prior to the loan being endorsed for insurance or to paying claims in the event of a default; instead, it relies on its lenders to comply with HUD requirements and to ensure that every loan is in fact eligible for FHA insurance.  The certifications are required for each lender to enter and remain in the program. The certifications are critical to HUD's ability to ensure that only qualified and eligible loans are endorsed for HUD insurance. The certifications are essential for a claim on a loan to be submitted for FHA insurance.  And the certifications are needed to protect HUD and the FHA insurance fund from undue risk and loss.

*Defaulted Loans Result in Losses to HUD*

95.     Once a loan is endorsed by HUD or the Direct Endorsement Lender, it is insured by FHA on the basis that that the Direct Endorsement Lender has followed the HUD requirements and has submitted accurate certifications and that the loan is eligible for FHA insurance.  Without those requirements being met, the lender could not endorse the loan for FHA insurance.  It is only because a lender endorses a loan for FHA insurance that the holder of the mortgage is able to submit

a claim to HUD for any losses.

96.     If the borrower defaults, the holder of the mortgage can submit a claim to HUD for any loss from the default. The holder submits a claim for insurance by using HUD's electronic claim system. The claim must include certain information. Each loan that is endorsed for FHA insurance has a unique FHA case number, and the claim must include the FHA case number. If a valid FHA case number is not submitted with the claim, an insurance payment will not be processed on that claim. The claim also must include the identification number of the mortgagee inputting the claim, which must be either the holder of record or the servicer of record of the mortgage.

97.     FHA pays these insurance claims in two parts. First, the mortgage holder makes an initial claim for the unpaid principal on the loan, plus interest. Second, if applicable, the mortgage holder later makes a final claim for expenses and allowances (e.g., foreclosure costs), plus interest. HUD Handbook 4330.4, REV-I, ch. 2-4.

98.     These claims are submitted to HUD electronically, and HUD's electronic system processes them automatically. The system ensures that the FHA insurance is active with respect to the FHA case number provided and that there are no other impediments (such as a no-pay flag or indemnification agreement) to

paying the claim. After processing, the claim is approved for payment, and a disbursement request is sent to the United States Treasury to issue the funds via wire transfer to the holder of the mortgage note.

***Direct Endorsement Lenders Owe Duties to HUD By Virtue of Their Authority to Endorse Loans for FHA Insurance and Their Responsibility to Ensure Accuracy***

99.    HUD grants Direct Endorsement Lenders responsibility for determining which loans qualify for FHA insurance. In granting this control and responsibility to the Direct Endorsement Lenders, HUD must rely on and place trust and confidence in the lenders' knowledge, good faith, integrity, and candor. HUD therefore enters into a fiduciary relationship with the Direct Endorsement Lenders.

100.    As a result of this fiduciary relationship, the Direct Endorsement Lenders owe HUD a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in their dealings with HUD. These duties require, among other things, that the lenders exercise integrity, prudence, candor, and due diligence on behalf of HUD when endorsing loans for FHA insurance, reviewing the loans for quality control purposes, reporting defective loans, and submitting claims.

101.    To become and remain a HUD-approved Direct Endorsement Lender,

and to receive payment on claims for defaulted FHA-insured loans that it held,

FGMC was required to annually certify its compliance with HUD's requirements.

102.   Upon information and belief, one of FGMC's officers or executives

certified annually to HUD in sum or substance that:

> I know or am in the position to know, whether the operations
> of the above named mortgagee conform to HUD-FHA
> regulations, handbooks, and policies.  I certify that to the best
> of my knowledge, the above named mortgagee conforms to all
> HUD-FHA regulations necessary to maintain its HUD-FHA
> approval, and that the above-named mortgagee is fully
> responsible for all actions of its employees including those of
> its HUD-FHA approved branch offices.

103.   The foregoing certifications were knowingly false because, as

discussed below, FGMC knew, deliberately ignored, or recklessly disregarded that

it originated and underwrote loans that were not in compliance with HUD

requirements.

## FGMC'S SCHEME TO DEFRAUD HUD THROUGH DELIBERATELY AND RECKLESSLY APPROVING INELIGIBLE FHA LOANS

104.   During the relevant time period, FGMC underwrote loans it knew did

not comply with FHA loan requirements and knowingly and falsely certified to

HUD that it (1) used due diligence in underwriting the loans; or (2) that the data

it used to approve the loans for FHA insurance had integrity and that the loans

were eligible for FHA mortgage insurance.

105.     In order to approve ineligible loans, FGMC commonly utilized several tactics to approve ineligible loans.   As examples, FGMC instructed employees to "fix" loans by intentionally miscalculating or misrepresenting borrowers' income or debt obligations; manipulating the AUS/TOTAL system to predetermine the financial data points necessary to get an "Accept/Approve" rating; and hiding adverse documentation.

106.   As described below, FGMC knew, deliberately ignored, and recklessly disregarded the fact that many of its loans did not comply with FHA's underwriting requirements, and thus were not eligible for FHA mortgage insurance.

107.     Furthermore, FGMC established certain underwriting processes that it knew, deliberately ignored, or recklessly disregarded would result in FGMC endorsing materially defective loans for FHA mortgage insurance.

***FGMC's Pressure on Underwriters to Approve Ineligible Loans***

108.   As part of its scheme to approve as many FHA loans as possible, FGMC established a culture that valued getting a loan approved and endorsed for FHA insurance over compliance with FHA's rules.

109.   FGMC's goal was to approve the vast majority of loans that it was presented, even if those loans did not meet HUD's requirements to qualify for FHA

insurance.

110.    To do so, FGMC created a management exception process that allowed its underwriting staff to request management approval for an exception to underwriting requirements that could not be met. As part of this process, FGMC routinely granted management exceptions to allow violations of FHA underwriting requirements. FGMC certified that each loan complied with FHA requirements, even when FGMC knew these loans did not.

111.    Where underwriters raised issues or concerns with managers, the managers directed underwriters to overlook or ignore the HUD guidelines and rules, thus effectively training the underwriting staff to overlook or ignore the HUD guidelines and rules.

112.    FGMC's senior management was aware of the management exception process, and was often involved in the decision of whether to grant an exception requested by an underwriter.

113.    FGMC's formalized acceptance and approval of management exceptions, and the concurrent pressure by management on underwriters to approve loans, caused underwriters to view FHA's rules and requirements as mere suggestions that could be disregarded in order to close a loan and led underwriters to grant additional exceptions that were not formally tracked and did not receive

management approval.

114.    While FGMC normally wanted underwriters and processors to make notes on its internal computer system as to the conditions they approved, FGMC specifically told staff not to record information in the computer system that referenced FGMC's desire to not comply with the FHA guidelines.  In other words, FGMC only wanted employees to make notes on the computer system when it would make FGMC look like it was following the guidelines.

115.    FGMC required underwriters and processors to meet certain production goals.  Underwriters who did not keep up with FGMC's quotas were criticized and had their job status put into jeopardy.

116.    Under this system, FGMC's underwriters were expressly encouraged to push through as many loans as possible, with little regard for FHA requirements in order to keep their jobs. Thus, FGMC created a culture where loan quantity was valued over the quality of the loans.

*FGMC Manipulated the AUS/TOTAL System to Predetermine Values That It Knew Would Generate "Accept/Approve" Ratings*

117.    As part of its scheme to approve every FHA loan that it was presented, FGMC instructed employees to systemically manipulate the data that was entered into FGMC's AUS/TOTAL system to determine variables that would

lead to an "Accept/Approve" rating from TOTAL.

118. As discussed above, loans that receive an "Accept/Approve" rating in the AUS/TOTAL system are subject to significantly less documentation requirements and scrutiny than loans that receive a "Refer" rating and must be manually underwritten.

119. In order to avoid additional documentation and loan scrutiny that "Refer" ratings require, FGMC schemed to defraud HUD by predetermining data variables that would result in an "Accept/Approve" rating.

120. When an FGMC employee initially ran a loan through FGMC's AUS/TOTAL, he or she would enter variable amounts consistent with the borrower's representations and/or the documents in the loan file. However, if a loan received a "Refer" rating, FGMC's employees would isolate one or more variables, including most commonly the borrower's income or monthly debt obligations.

121. FGMC employees would then systematically increase or decrease the variable(s) during successive AUS/TOTAL runs over a short period of time to identify the variable amount(s) that would result in an "Accept/Approve" rating.

122. After identifying the qualifying variable amount(s), FGMC's employees would then use the lowest qualifying amount that they found

generated an "Accept/Approve" rating to determine how to underwrite the file.

123. Relator is aware that FGMC would manipulate the AUS/TOTAL system several times before determining financial variables that could be used to qualify a borrower for a loan on an "Accept/Approve" basis.

124. Relator is aware that FGMC would frequently run loans multiple times using these tactics.

***Examples of FGMC's Impermissible and Fraudulent Certification of Non-Compliant FHA Loans***

125. FGMC's false certifications, as well as its reckless, negligent, and grossly negligent conduct in violation of the FHA standards and requirements, violated FGMC's fiduciary obligations and duty of care to HUD.

126. As set forth above, the FHA program requires a lender to represent that the underwriting conditions are met for all loans processed through the lender's system.

127. As part of both the annual certifications and individual loan certifications, FGMC certified that they complied with the required level of quality control and duty of care. For example, FGMC underwrote mortgages using the AUS system, and verified that all of the AUS conditions were satisfied, the loans complied with all HUD requirements, and the loans were eligible for FHA

insurance.

128.    Contrary to these certifications, FGMC did not comply with the HUD requirements for approval of the loan.  FGMC ignored obvious red flags and signs of fraud in reviewing documentation and did not use its required due diligence in underwriting FHA loans.

129.    The following are just some examples of the ways in which FGMC failed to adhere to the FHA guidelines, rules, and regulations resulting in the approval of loans that should not have qualified for FHA insurance.

130.    FGMC's underwriting staff was repeatedly told by management to "make the files work" and to "fix" any variables that would prevent a loan from being approved by the AUS system.

131.    Relator was told by FGMC's management that documents should not be an obstacle to getting loans approved.  For instance, Relator Crutcher was instructed that when the tax returns provided by borrowers did not match the tax transcripts that came directly from the IRS, that she should not worry about it and instead just use whatever income source was higher.

132.    Relator was also frequently told by FGMC's management that she should "trash" the documents that raised concerns regarding fraud or improper underwriting practices.

133.   For instance, when Relator Crutcher mentioned that there were differences in the tax return documents, FGMC's management, including underwriting manager Terri Trzybinski instructed underwriters to "trash" the transcripts indicating a lower income to make sure that such adverse documents didn't not appear in the loan file.

134.   Relator Crutcher also observed that many of the W-2's submitted by borrowers had social security numbers that were different than the borrower's. Such a discrepancy is an obvious warning sign of fraud as a W-2 may be forged or may be for someone other than the borrower.

135.   Due to the likelihood of fraud in these circumstances, Relator Crutcher contacted her underwriting manager Terri Trzybinski on several occasions in approximately October and November 2014 to indicate that the loans could not be approved for FHA insurance due to the fact that there were strong indications of fraud.  Relator Crutcher also told FGMC that when she had worked for other banks such as Citigroup and Wells Fargo, issues related to conflicting income documents and social security numbers would automatically be flagged for follow up by the fraud departments of those lenders.

136.   In contrast, FGMC repeatedly instructed its underwriters to ignore these clear indications of fraud and appeared to pride itself on using fraudulent

documents to approve loans.  Whenever Relator Crutcher identified issues of fraud, she was told to look the other way and "trash" the adverse documentation because "that's the FGMC way."   Additionally, one of Relator Crutcher's supervisors, Jim, mentioned that FGMC  stood for "Finally Got my Mortgage Closed" as a play on FGMC's initials and the way that FGMC would approve ineligible loans in ways that other lenders would not due to the FHA rules and regulations.

137.   FGMC's management, including Terri Trzybinski, also instructed underwriting staff to miscalculate income using impermissible calculations related to bonuses and overtime.

138.   Under HUD Handbook 4155.1 4.D.2.b, overtime and bonuses can be used in calculating an individual's annual income if a borrower has received that income for the past two years and it is likely to continue.  Additionally, the lender must establish that the overtime and bonus income are likely to continue.  If either type of income shows a continual decline, lenders are required to document in writing the reasons for such a decline.

139.   Despite these requirements, FGMC routinely used impermissible income calculations related to bonuses and overtime.  For example, Relator recalls that Terri Trzybinski stated that underwriters should use bonuses and overtime as

a way to "make it work" and reach certain income requirements that FGMC had found the TOTAL system would rate as "Accept/Approve."

140.   However, the bonus and overtime of these borrowers would often be for less than a two-year period or would wildly fluctuate between years.  Despite this red flag, FGMC would exclude the income of the lower year and instead use two years of the higher income to make its calculation.

141.   In these instances, FGMC also failed to justify the reasons for using the income that it did, and management would instruct underwriters to perform the calculation incorrectly.

142.   The FHA guidelines also require that all sources of borrower income be documented per HUD requirements. Additionally, the FHA guidelines require Direct Endorsement lenders to ensure verification forms and documents not pass through the hands of third parties.  Contrary to these guidelines, FGMC routinely approved loans for which the income that was not properly verified (or not verified at all) and using documents that appeared to pass through the hands of a third party.

143.   FGMC's entry of a monthly debt obligations variable that lacked integrity into its AUS/TOTAL is another example of the multiple rules that FGMC violated in approving loans for FHA insurance.

144.    Under the applicable HUD rules, HUD Handbook 4155.1 4.C.3.c, the total debt-to-income ratio may not exceed 43% and the payment-to-income ratio may not exceed 31%.

145.    By lowering the monthly debt obligations to less than they actually were, FGMC approved loans where the debt-to-income ratios exceeded 43% and payment-to-income ratios exceeded 31%.

146.    Contrary to this clear requirement, FGMC failed to document adequate compensating factors even though borrowers' ratios exceeded the 31% and 41% limits.

147.    Additionally, under the FHA's program, borrowers are typically required to make a minimum down payment of 3.5% of the purchase price. However, borrowers with low credit scores may be required to make a down payment in excess of 3.5%.

148.    With respect to down payments, FGMC instructed its underwriting staff to ignore warning signs that a borrower's assets included funds that were not the borrower's.

149.    For example, borrowers would frequently claim that they had the required down payment funds in a checking or savings account. However, when FGMC's underwriters reviewed bank deposit information, it often revealed that

the requisite funds had recently been provided by a person other than the borrower (such as a family member). These are commonly referred to as "gift funds."

150. Specifically HUD Handbook 4155.1 5.B.5 requires that, in order to ensure that gift funds are not provided by a party to the sales transaction, FHA lenders must document gift funds with a gift letter, signed by the borrower, that specifies the amount of the gift, specifies that the funds are a gift requiring no repayment, and there must be documentation of the transfer of the funds from the donor to the borrower.

151. Additionally, HUD Handbook 4155.1 5.B.2.b requires that a verification of deposit, along with a recent bank statement be used to verify savings and checking accounts. If there is a large increase in the account, lenders are also required to obtain a credible explanation from the borrowers as to the source of the funds.

152. Despite these requirements, FGMC encouraged its underwriters to ignore instances in which borrowers had recent and significant deposits into their checking and savings accounts, and to instead treat the funds as if they had long existed in the borrowers' accounts. This is extremely problematic because if such funds were from an improper source (such as the seller) or if the funds were not

in fact a gift, this would substantially increase the likelihood that the buyer could not meet the loan's monthly mortgage payments and the loan would be declined.

153.  HUD Handbook 4155.1 also requires that lenders such as FGMC verify and analyze a borrower's payment history of housing obligations and to obtain written explanations as to past derogatory credit.  Despite this clear requirement, FGMC would instruct its underwriters and processors to ignore those requirements which could lead to loans being referred or declined.

154.  Similarly, FGMC also failed to properly develop credit histories for borrowers.  Under the relevant HUD rules, if a borrower does not have a credit score, HUD requires that the lender develop a credit history from alternative sources such as utility payment records, automobile insurance payments, or rental payment.

155.  Despite this requirement, underwriting manager Terri Trzybinski told Relator Crutcher and other underwriters that they could waive the requirements related to credit histories.

156.  FGMC also accepted information that was not permissible in reviewing a borrower's credit scores.  For example, FGMC frequently took credit references from unqualified credit entities such as rental companies that did not have actual credit scores.  FGMC frequently used similar credit sources to

determine a borrower's credit, despite the fact that such sources could not be used under the required due diligence standards.

157.   In the instances where FGMC did obtain additional documents, such as additional tax returns, FGMC intentionally did not review and scrutinize additional issues that those documents would raise, such as alimony or child support obligations that the borrower had failed to disclose.

158.   FGMC also encouraged underwriting staff to ignore or destroy adverse documentation that would cause a loan to be referred or declined.

159.   FGMC's management failed to take effective action to address deficiencies in its loan origination and underwriting practices.  Instead, FGMC reaped profits by certifying that the loans met FHA's standards and requirements and were therefore eligible for insurance.

*FGMC Failed to Maintain Quality Control Procedures as Required by HUD's Direct Endorsement Lender Program*

160.   Upon information and belief, FGMC further did not have a quality control department and did not review and audit loans as required by the FHA program.  As a result, many of FGMC's underwriting staff did not realize that there were serious deficiencies in the FHA loans because they did not know the FHA requirements and never received any feedback on the loans they processed.

161.     As a result of these deficiencies, FGMC's false certifications that loans complied with the FHA program's rules were material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

162.     FGMC also failed to comply with HUD's rules and regulations regarding required quality control procedures, even though those procedures were mandatory for FGMC's maintenance of its Direct Endorsement Lender status.  Instead, FGMC made false representations to HUD about FGMC's purported compliance with HUD's rules pertaining to quality control procedures.

163.     At all relevant times, FGMC was required to file annual certifications with HUD to maintain its Direct Endorsement Lender status.

164.     As part of those annual certifications, FGMC falsely certified that it had quality control procedures.

165.     In order to obtain and maintain Direct Endorsement Lender status, a lender is required to continuously implement a quality control program that is independent of its business operations.  Independence ensures that the quality control department brings its own judgment to bear in assessing the validity of loans previously made, without concern for meeting a targeted volume of business.

166.    Upon information and belief, no FGMC employees were exclusively assigned to quality control.  Even in the instances where FGMC may have had some loans reviewed or audited, FGMC did not consistently review loans nor did FGMC report to HUD findings of fraud and other serious violations, despite a HUD requirement that all such findings be reported within 60 days.

167.    FGMC deliberately avoided its quality control requirements because it viewed quality control as a detriment to loan production.   Instead of implementing quality control procedures, FGMC emphasized speed and volume and an overall focus on getting as many loans approved as possible.  FGMC sought to have virtually all employees perform underwriting and origination duties, while few, if any, employees were tasked with quality control.  This in turn resulted in loans that were likely to have significant errors.

168.    As part of its failure to maintain a proper quality control system, FGMC also ignored its obligation to provide underwriting staff with training and feedback on underwriting errors.

169.    In light of FGMC's serious and material defects in its quality control program, it would have been impossible for FGMC to truthfully complete the annual certification stating that it maintained a sufficient quality control program and thus falsely certified to HUD that it was able to participate in the Direct

Endorsement Lender program.

*FGMC's Improper Underwriting Practices Result in False Certifications and False Claims*

170. The examples discussed in this Complaint are representative examples of the systemic practices and procedures followed by FGMC that led to the submission of false statements and claims.

171. As a result of these systemic practices and procedures, FGMC made false certifications to HUD on individual loan-level, initial, and annual certifications to HUD.

172. Pursuant to the policies and practices described above, FGMC submitted the following loans to HUD that resulted in claims paid by HUD to FGMC.

a. FHA Case Number 045-7004717 for a claim submitted on approximately January 1, 2017 that was for a property located in Parlier, California that resulted in a claim to HUD in the amount of at least $131,775.52.

b. FHA Case Number 043-8253539 for a claim submitted on approximately February 29, 2016 that was for a property located in Los Molinos, California that resulted in a claim to HUD in the amount of at least $179,232.54.

c. FHA Case Number 197-3868121 for a claim submitted on approximately

October 21, 2013 that was for a property located in Monrovia, California that resulted in a claim to HUD in the amount of at least $378,571.22.

d. FHA Case Number 197-3859579 was a claim submitted on approximately September 11, 2013 for a property located in Palmdale, California that resulted in a claim to HUD in the amount of at least $280,127.42.

e. FHA Case Number 044-4339807 was a claim submitted on approximately November 12, 2010 for a property located in Fallbrook, California that resulted in a claim to HUD in the amount of at least $330,800.88.

f. FHA Case Number 045-8449590 was a claim submitted on approximately April 15, 2018 for a property located in Delano, California that resulted in a claim to HUD in the amount of at least $56,007.79.

173.   HUD paid all of the claims for loans that were falsely certified as eligible for FHA insurance.

174.   These claims were false because the loans were not eligible for FHA insurance because FGMC falsely certified that the loan was underwritten in accordance with HUD guidelines and/or FGMC falsely certified that it was in compliance with HUD's requirements when FGMC made its initial or annual certifications to HUD.

175.   The mortgages did not qualify for FHA insurance because they were

not underwritten in accordance with HUD guidelines, FGMC had not used due diligence in underwriting them, FGMC entered data into the AUS that lacked integrity, and FGMC failed to maintain a proper quality control program as required by HUD and FHA.

176.    FGMC violated HUD requirements and falsely certified to compliance with those requirements.   FGMC was therefore not authorized to endorse these mortgage loans for FHA insurance.   FGMC's false certifications and violations of HUD requirements bore upon the likelihood of whether the borrower would make mortgage payments.

177.    Upon information and belief, as a result of this conduct, FGMC submitted or caused the submission of hundreds of false claims.

## PETERS WAS RESPONSIBLE FOR FGMC AND ITS FRAUD

178.    Peters served as the Chief Executive Officer of FGMC from June 2011 to March 2018.

179.    He has served on FGMC's Board of Directors since 2015.

180.    He was responsible for FGMC's development of an Enterprise Risk Framework that failed to stop FGMC's fraud.

181.    FGMC had major issues with FHA underwriting while Peters was the CEO. This included failing to complete the FHA Form 92900, which contained the

individual loan level certification. Instead, FGMC falsely endorsed thousands of loans for FHA insurance without completing the FHA Form 92900 as required.

182.   This sloppy FHA underwriting process was ultimately driven by Peters and his management of FGMC. Peters and FGMC set unrealistic expectations that led to pressure on underwriters to close loans faster, and thus without proper and fulsome underwriting review.

183.   Peters drove FGMC's growth at the expense of compliance, increasing FGMC's volume from $25 million a month to $800 million a month.

184.   Peters drove this massive growth in an effort to make FGMC attractive to a buyer. In order to achieve this growth, Peters focused on providing the riskiest borrowers government insured loans. This included FHA loans to borrowers with troublesome credit and credit scores as low as 500. Peters made borrowers that other lenders viewed as too risky, including FHA borrowers, a niche market for FGMC.

185.   The unsustainable growth that Peters required increased pressure on underwriters and forced underwriters to complete their underwriting in an unreasonably short amount of time. This pressure and unrealistic expectations directly led to FGMC endorsing ineligible loans for FHA insurance.

186.   Peters also put pressure on FGMC's staff to grow. Prior to the sale to

PIMCO he reported to the entire company that FGMC was in financial trouble and would have difficulty staying afloat.

187.   Peters was a very hands-on CEO. He was responsible for FGMC's managers and ensuring (or failing to ensure) that FGMC's loans were in compliance with FHA rules. He signed off on any major decision surrounding quality control or underwriting.

188.   Peters personally approved exceptions on specific FHA loans, and upon information and belief, to FHA guidelines, as discussed in paragraphs 107-110 *supra*.

189.   As CEO, Peters was ultimately responsible for FGMC's deficient quality control process discussed in paragraphs 157-166 *supra*.

190.   Peters received FGMC's monthly quality control reports.

191.   Peters did not implement a pre-closing quality control process until right before the sale to PIMCO in an effort to make FGMC more saleable. The lack of pre-closing quality control meant that there was no check on the overworked underwriters. Peters specifically did not want to implement the pre-close quality control as it would slow down the underwriting process.

## PIMCO TOOK OVER FGMC AND ENCOURAGED THE FRAUD

192.   The PIMCO Defendants are liable because they conspired to

knowingly assist FGMC in both presenting the above-described false claims to the government, as well as falsely certifying both at an annual, and at a loan-by-loan basis, that FGMC as well as its fraudulent loan files met governmental requirements.

193.   The PIMCO Defendants' liability does not stem from an alter ego claim or veil piercing claim, but instead because of the direct actions of the PIMCO Defendants.

194.   In September 2015, the PIMCO Purchasers bought the majority of FGMC and gained control over FGMC.

195.   The PIMCO Purchasers conspired with PIMCO Managers to further increase FGMC's extension of highly risky loans, including loans that did not meet the government's legal requirements for insurance.

196.   Part of the purpose of the PIMCO Managers was to actively manage the PIMCO Purchasers complete investment in FGMC in accordance with the goal of extending riskier government insured loans.

197.   Before the PIMCO Purchasers ever bought FGMC, PIMCO engaged in extensive due diligence and knew or should have known of the extensive fraud under way at FGMC. This included placing 2 to 3 PIMCO employees at FGMC every day for a period, holding extensive meetings with senior executives,

reviewing internal FGMC documents and data, and gaining an in depth understanding of FGMC's operations.

198.   When PIMCO employees were at FGMC and engaged in the acts alleged here, they did not identify the specific entity they worked for and were employed by. Rather, they were simply known to be from PIMCO.

199.   After the sale, PIMCO quickly took control and knew what was occurring at FGMC. It handpicked the senior executives. It opened a new operations center in Plano, Texas and quickly began firing legacy staff, including 82 staff at the Fredrick Maryland location in 2018, and replacing the staff with new staff in Plano. For the core operations staff – underwriters, processors, and loan officers – this new staff was paid less and of a lower quality.

200.   It was made clear to FGMC staff that PIMCO was the one making the decisions. Employees were told that FGMC now had a "new rich uncle," PIMCO, backing them. Whenever PIMCO came onsite to FGMC's Plano office, which was at least once to twice a year and at time monthly, PIMCO was given the white glove treatment, with a dedicated IT staffer to ensure PIMCO had access to whatever they needed which allowed it to knowingly assist in the fraud.

201.   PIMCO had such close knowledge of FGMC that FGMC was required to transition to the communications systems used by PIMCO to ensure PIMCO

could direct FGMC's actions. Prior to the PIMCO Purchasers purchasing FGMC, FGMC used Microsoft Teams to communicate. However, PIMCO required FGMC to obtain and use Cisco's Web Ex. FGMC configured every conference room for Web Ex capability and purchased Web Ex licenses so that PIMCO could communicate and direct FGMC using PIMCO's preferred platform.

202.    PIMCO also required FGMC executives to fly to California to meet with PIMCO and inform them of what was occurring at FGMC.

203.    According to their agreed strategy, PIMCO was able to increase the originations by over 60 percent while increasing profit by 15-20 percent.

204.    PIMCO specifically built out the risk management systems. Risk management systems in part help management identify practices that could lead to scrutiny by regulators, such as the fraudulent practices outlined above.

205.    PIMCO was very involved in credit risk, i.e. the decision on what type of risk to take during underwriting. On multiple occasions, PIMCO employees met with FGMC's Director of Credit Risk, reviewed the analysis the Director of Credit Risk used to calculate credit risk, and asked questions in order to fully understand the responsibilities and work of credit risk.

206.    PIMCO received reports regarding buyback and indemnifications FGMC had to execute – i.e. specific loans where FGMC violated underwriting or

other requirements and had the repurchase or indemnify the purchaser of the loan.

207.   PIMCO was so involved that it received daily reports on FGMC's operations. PIMCO decided what software and other infrastructure to upgrade and what not to.

208.   PIMCO was specifically interested in mortgages that did not meet standard underwriting requirements and instead had an appetite for riskier mortgages that many lenders refused to originate. The delinquency and foreclosure rates for FHA loans that FGMC originated and underwrote were regularly higher than FHA averages. Higher delinquency and foreclosure rates indicate FGMC was underwriting and approving the exact riskier mortgages PIMCO desired.

209.   PIMCO continued to control the operations of FGMC. PIMCO picked the new CEO, an individual PIMCO used to conduct due diligence on its initial decision to purchase FGMC. PIMCO directed the major actions of FGMC including the decisions on downsizing.

210.   As one example of PIMCO's control, PIMCO directed FGMC to hire former PIMCO employee Brian Hale. Hale attended all executive meetings and provided executive coaching to FGMC's CEO. Hale helped select FGMC's new Chief Operations Officer, Lindblom, as well as executives Jordan Simons, Tracey

Fenton, and Darien Oien. FGMC executives recognized that the people Hale directed FGMC to hire were untouchable. Hale also oversaw the restructuring of all operations and sales compensation plans.

211.    PIMCO was fully aware of what FGMC's Board of Directors did and had at least two seats on the Board of Directors. The Board of Directors received a quarterly report that included Quality Control audits that would have identified the problems with underwriting that FGMC identified.

212.    PIMCO continues to control FGMC. PIMCO Purchasers owns 100 percent of FGMC's equity. PIMCO provided the bridge loan to FGMC to help it through bankruptcy. PIMCO, through related a special purpose entity, LVS II SPE XXXIV LLC, provided a backstop to a $25 million warehouse line of credit of FGMC, and B2 FIE XI LLC loaned money to FGMC on June 29, 2022 while PIMCO set up the special purpose entity.

213.    Through the above actions, PIMCO knowingly assisted the false certifications and false claims of FGMC.

214.

**FGMC IMPROPERLY RETALIATES AGAINST RELATOR CRUTCHER**

215.    As discussed further herein, during her employment with FGMC, Relator Crutcher discovered multiple instances of mortgage fraud that led her to

believe that FGMC was falsely certifying loans for FHA insurance that did not meet the HUD and FHA requirements for mortgage insurance.

216. Relator Crutcher attempted to raise her concerns internally with FGMC, but her complaints were repeatedly ignored by FGMC's management.

217. For example, in approximately October 2014, Relator Crutcher sent her underwriting manager, Terri Trzybinski several emails indicating that fraud was being committed due to the fact that FGMC was waiving conditions that were required for FHA insurance. Relator Crutcher also indicated that since many of the W-2s that FGMC used to approve loans had mismatching Social Security Numbers, FGMC had not performed the required due diligence to identify clear instances of fraud.

218. Relator Crutcher also indicated both in these emails and verbally that she would not approve these loans due to the fact that they did not meet the FHA guidelines and that FGMC was using improper documents and calculations in order to get the loans approved.

219. In her emails, Relator Crutcher also asked Ms. Trzybinski whether FGMC had a fraud department that could review the loans that were being approved by FGMC's process of waiving conditions.

220. Despite Relator Crutcher's complaints that FGMC was engaged in

FHA mortgage fraud, FGMC brushed off Relator Crutcher's complaints. Ms. Trzybinski merely responded that FGMC did not have a fraud department, and responded that Relator Crutcher should only worry about approving loans and not about compliance.

221. Shortly after making these internal complaints to Ms. Trzybinski, Relator Crutcher was terminated by FGMC on or about November 10, 2014.

222. Relator Crutcher's termination was in retaliation for her protected complaints about FGMC's fraud against the government and for her refusal to engage in further fraud against the government.

223. FGMC unlawfully discharged and discriminated against Relator Crutcher because of the lawful acts she had undertaken in further of the False Claims Act.

## FIRST CAUSE OF ACTION
### *For Damages and Penalties Under the False Claims Act*
**31 U.S.C. § 3729(a)(1)(A)**
**(As to All Defendants)**

224. Plaintiff-Relator repeats and realleges the allegations above as if fully set forth herein.

225. Defendants violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(l)(A) by: (i) knowingly presenting or causing to be presented claims for payment or approval; (ii) in order to get false or fraudulent claims paid; and (iii)

which claims the United States did pay.

226.    The United States paid the false or fraudulent claims because of Defendants' acts and incurred damages as a result.

## SECOND CAUSE OF ACTION
### *For Damages and Penalties Under the False Claims Act*
### 31 U.S.C. § 3729(a)(1)(B)
### (As to All Defendants)

227.    Plaintiff-Relator repeats and realleges the allegations above as if fully set forth herein.

228.    Defendants violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(l)(B) by knowingly making, using, or causing to be made or used, false records, or statements: (i) material to false or fraudulent claims for payment to HUD; and/or (ii) in order to get false or fraudulent claims paid; and (iii) which claims the United States did pay.

229.    The United States paid the false or fraudulent claims because of FGMC's acts and incurred damages as a result.

## THIRD CAUSE OF ACTION
### *For Damages and Penalties Under the False Claims Act*
### 31 U.S.C. § 3729(a)(1)(C)
### (As to All Defendants)

1.    Plaintiff-Relator repeats and realleges the allegations above as if fully set forth herein.

2.     Defendants violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(l)(C) by knowingly conspiring to make, use, or cause to be made or used, false records, or statements: (i) material to false or fraudulent claims for payment to HUD; and/or (ii) in order to get false or fraudulent claims paid; and (iii) which claims the United States did pay.

3.     The United States paid the false or fraudulent claims because of FGMC's acts and incurred damages as a result.

### FOURTH CAUSE OF ACTION
### Unlawful Retaliation Under the False Claims Act
### 31 U.S.C. § 3730(h)
### (As to FGMC)

4.     Plaintiff-Relator realleges the above paragraphs as if fully restated herein.

5.     This is a claim for back pay, interest on the back pay, front pay, compensation for special damages, and such other and further relief as the Court may deem proper for injuries Relator sustained as a result of retaliatory actions taken against Relator by Defendant, including litigation costs and reasonable attorneys' fees.

6.     31 U.S.C. § 3730(h) provides, in relevant part:

(h) Relief From Retaliatory Actions.

(1)     . . . Any employee, contractor, or agent shall be entitled to all

relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

(2)      . . . Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. . . .

7.      Through the acts described above, Relator repeatedly attempted to stop Defendant from committing violations of 31 U.S.C. § 3729.

8.      Relator's acts described above, undertaken to stop Defendants from committing countless violations of 31 U.S.C. § 3729(a), consisted of protected conduct under 31 U.S.C. § 3729 *et seq.*  Relator repeatedly raised concerns with Defendant's management that Defendant was engaging in fraud and submitting false claims to the Government.  Defendant was aware of Relator's protected conduct and acted in retaliation as a result of Relator's protected conduct under the False Claims Act.

9.      Through the acts described above, Defendant repeatedly ignored and/or refused to provide any meaningful response to Relator's lawful inquiries

and efforts to redress Defendant's intentional and knowing violations of HUD and the FHA's underwriting requirements and the submission of false claims for mortgage insurance by HUD.

10. As a direct result of Relator's lawful inquiries and efforts to stop intentional and knowing violations of HUD and the FHA's rules and regulations, Defendant unlawfully terminated Relator because of lawful acts done by Relator in furtherance of her efforts to stop Defendant from submitting false claims.

11. Defendant is liable under 31 U.S.C. § 3730(h) for (i) an award of double back pay; (ii) interest on back pay; (iii) an award of front pay; (iv) special damages; (v) litigation costs; (vi) attorneys' fees; and (vii) such other and further relief as the Court may deem proper.

**WHEREFORE, Relator, on behalf of herself and the United States Government, requests the following relief:**

a. A judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' violations of the False Claims Act;

b. A judgment against Defendants for civil penalties as described (and adjusted for inflation) under 31 U.S.C. § 3729(a) (1)(G) for each of Defendants' violations of the False Claims Act;

c. That Relator recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

    d.       That Relator be awarded all reasonable attorneys' fees in bringing this action;

    e.       That, because the United States Government did not proceed with this action, Relator be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

    f.       An award against FGMC to Relator on her retaliation claims including double back pay; interest on back pay; an award of front pay; litigation costs; attorneys' fees; special damages; an injunction restraining further retaliation; reinstatement of Relator's position; reinstate of full fringe benefits and seniority rights; compensation for lost wages, benefits, and seniority rights; and other remuneration.

    g.       That a trial by jury be held on all issues so triable;

    h.       An award of pre-judgment interest; and

    i.       Such other relief to Relator and/or the United States of America as this Court may deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Dated: October 13, 2023

By:    /s/    J. Nelson Thomas

J. Nelson Thomas, Esq. (admitted *pro hac vice*)

Jonathan W. Ferris, Esq. (admitted *pro hac vice*)

**THOMAS & SOLOMON LLP**

693 East Avenue

Rochester, New York 14607

Telephone: (585) 272-0540

nthomas@ theemploymentattorneys.com
jferris@theemploymentattorneys.com

Julie K. Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**BRACKER & MARCUS LLC**
3355 Lenox Road
Suite 660
Atlanta, GA 30326
Telephone: (770) 988-5035
Fax (678) 648-5544
Julie@FCAcounsel.com
Jason@FCAcounsel.com

*Attorneys for Relator*

# Exhibit B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **KARI CRUTCHER,** | ~~SUPPLEMENTAL SECOND~~ THIRD **AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL** |
| *Plaintiff,* | |
| *v.* | |
| **FIRST GUARANTY MORTGAGE CORPORATION, ANDREW PETERS, PACIFIC INVESTMENT MANAGEMENT COMPANY~~,~~ LLC, ~~and~~ PIMCO INVESTMENTS~~,~~ LLC, B2 FIE IV LLC, V2 FIE TRUST, FIE IV HOLDCO LLC, and PIMCO BRAVO FUND II, L.P.** | **Civil Action No. 16-CV-03812-SCJ** |
| *Defendants.* | |

Relator Kari Crutcher brings this qui tam action in the name of the United States of America, by and through her undersigned attorneys Thomas & Solomon LLP, and alleges as follows:

**INTRODUCTION**

1.     This is a civil fraud action by qui tam Kari Crutcher on behalf of the United States ("the Government"), against First Guaranty Mortgage Corporation, Andrew Peters, Pacific Investment Management Company~~,~~ LLC, (PIMCO LLC)

~~and~~ PIMCO Investments~~,~~ LLC, ("PI"), B2 FIE IV LLC, B2 FIE Trust, FIE IV Holdco LLC, PIMCO BRAVO Fund II, L.P. (collectively "FGMC" or "Defendants") to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, for damages sustained by the United States Department of Housing and Urban Development ("HUD") in connection with FGMC's origination of residential mortgage loans underwritten and approved by FGMC and endorsed for Federal Housing Administration ("FHA") insurance.

2.      FGMC, a lender approved by HUD to originate and underwrite single-family residential mortgages insured by HUD, knowingly approved loans that violated FHA rules while falsely certifying compliance with those rules. FGMC's conduct allowed it to profit from these loans, even if the borrowers defaulted on their mortgages.  As the risk was entirely on FHA, when the non-complaint loans inevitably defaulted, this materialized into millions of dollars in losses to HUD.

3.      The FHA program promotes American homeownership through its "Direct Endorsement Lender" program.  Under this program, the FHA insures loans so long as they satisfy certain requirements.   For these loans, the FHA guarantees that mortgage holders will suffer no loss if the borrower ultimately does not repay the loan.  This program encourages lenders to extend loans to

creditworthy low- and moderate-income families as well as first-time homebuyers.

4.      Under this program, lenders known as Direct Endorsement Lenders are given the responsibility to determine whether the loans satisfy the requirements for FHA insurance.  Because Direct Endorsement Lenders are permitted to endorse loans for FHA insurance without prior HUD review, HUD requires these lenders to conduct due diligence on loans before endorsing them for FHA insurance, and relies on the truthfulness of their loan-specific certifications in extending that insurance.  As a result, the lender is expected and obligated to act with good faith, honesty, and fairness in its dealings with HUD.

5.      FGMC annually certified to HUD that it was following all of HUD's guidelines, rules, and regulations, when in fact it knew it did not, and had no intention of providing such services.

6.      FGMC's false statements in both individual loans as well as in its initial and annual certifications fraudulently induced (also known as promissory fraud) HUD to extend insurance coverage on home loans, as well as pay for losses on covered loans.

7.      FGMC made these false certifications repeatedly in regards to its underwriting and quality control processes and each false certification

independently triggers FGMC's liability.

8.      FGMC failed to live up to its obligations under the FHA Direct Endorsement program.  FGMC's management instituted and encouraged practices that led underwriters to break HUD rules and to approve ineligible loans.

9.      These policies and practices included FGMC allowing exceptions to HUD's underwriting requirements, manipulating key data, waiving conditions and documentation requirements, pressuring underwriters to approve loans ineligible for FHA insurance, and encouraging underwriters to disregard risks that were evident in the loan files.

10.     FGMC established a culture that valued getting a loan approved and endorsed for FHA insurance over complying with HUD's rules.  FGMC's aim was to get loans insured by the United States and sold for a profit — even when FGMC could not truthfully certify to FHA that the loan qualified for FHA insurance.

11.     FGMC encouraged its underwriting staff to approve loans, no matter what the borrower's circumstances or documentation.  FGMC employees often joked that borrowers came to FGMC last because they had been declined everywhere else, but would be approved by FGMC because "we approve everything."

12.     In order to "fix" these initially ineligible loans, FGMC taught and

counseled employees on several mechanisms designed to falsely make loans eligible for FHA insurance. This included tactics such as intentionally miscalculating or misrepresenting borrowers' income or debt obligations, ignoring clear warning signs of fraud, and hiding adverse documentation.

13. As one of its most common fraudulent practices, FGMC abused the FHA's TOTAL Mortgage Scoreboard, a credit-rating algorithm maintained by the FHA that worked in conjunction with FGMC's internal automated underwriting system ("AUS"). TOTAL rates loans as either "accept/approve" or "refer" based on data points that FGMC enters into the AUS, including the borrowers' income, debt, and assets information. Loans that receive an "accept/approve" rating are subject to significantly fewer documentation requirements and less scrutiny than loans that receive a "refer" rating. To get around HUD rules, FGMC would initially run a loan through its AUS and if it did not receive an "accept/approve" rating, FGMC would then run the loan repeatedly through AUS/TOTAL in order to find income, debt, and asset information that would allow the loan to gain an "accept/approve" rating. Using the numbers obtained through this process, FGMC would have its underwriters work backwards from the known "accept/approve" data and would manipulate the borrowers' income, debts, and asset information in order to match up with the pre-determined acceptance

numbers.

14.     Although this "working backwards" technique is a serious violation of HUD's underwriting rules, FGMC would frequently run borrower scenarios in AUS/TOTAL multiple times in order to generate income and debt information that could then be manipulated.

15.     Employees that did not follow FGMC's methods to skirt the FHA rules and regulations were disciplined and/or terminated.  For example, if an underwriter did not subsequently follow the instructions of management to ignore or "waive" an underwriting condition, that employee could be subject to discipline including termination.

16.     FGMC also prioritized the mass approval of FHA loans by developing several strategies designed to generate as many approvals as possible.  For instance, although HUD requires an FHA lender to maintain a proper quality control system, FGMC failed to implement such a system and instead was only concerned with churning out loans.  Therefore, not only were there substantial errors in FGMC's underwriting process to begin with, but FGMC made no effort to use the required quality control process to identify and correct such deficiencies.

17.     Despite repeatedly underwriting loans that were ineligible for FHA insurance as they did not comply with HUD's rules and regulations, FGMC

further violated HUD's self-reporting requirements by failing to report loans that it knew were affected by fraud and other serious violations. This self-reporting requirement is meant to enable HUD to identify issues with FHA loans, and to request reimbursement from lenders as appropriate. Instead of making such self-disclosures, FGMC aimed to keep its deficient loans secretive.

18.    FGMC's conduct has caused improperly underwritten loans to be endorsed for FHA insurance where the loans did not satisfy HUD's requirements and where the borrowers ultimately did not repay the loans.

19.    Ineligible loans endorsed by FGMC have resulted in millions of dollars in existing losses to HUD and many additional loans are currently in default and will likely result in significant additional losses to the agency.

20.    HUD's underwriting requirements are designed not only to protect it and the taxpayers from improperly underwritten and unduly risky loans, but also to ensure that creditworthy borrowers are able to handle the monthly payments and to become lasting homeowners. FGMC's underwriting of ineligible loans and false certifications of compliance with applicable requirements undermined these objectives, harming homeowners and the housing market.

21.    In 2015, PIMCO bought FGMC. with the stated goal of originating higher-risk loans and more loans with the goal of increasing FGMC's profits.

- 7 -

PIMCO used a series of funds to purchase FGMC, namely B2 FIE IV LLC, B2 FIE Trust, FIE IV Holdco LLC, and PIMCO BRAVO Fund II, L.P. (collectively referred to as "PIMCO Purchasers"). PIMCO managed the PIMCO Purchasers through Pacific Investment Management Company LLC, PIMCO Investments LLC (collectively referred to as "PIMCO Managers"). The PIMCO Purchasers and PIMCO Managers are collectively referred to as PIMCO.

22.    As described in more detail below, at the ongoing request of the PIMCO Purchasers, among other things, PIMCO LLC and PI both actively managed the PIMCO Purchasers complete investment of FGMC, and also provided advice about FGMC to the PIMCO Purchasers.

21.23.  PIMCO's The stated goal in purchasing and managing FGMC was to originate higher risk loans and more loans with the goal of increasing FGMC's profits. The Defendants worked in concert to achieve that goal. PIMCO did just that. However, on information and belief, PIMCO, the Defendants, accomplished these goals by enabling and encouraging all of FGMC's worst practices.

## JURISDICTION AND VENUE

22.24.  This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

23. 25. This Court has personal jurisdiction over FGMC because FGMC transacts business within the Northern District of Georgia.

24. 26. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C.§ 1395, and 31 U.S.C. § 3732(a), because FGMC transacts business within this district.

25. 27. This suit is not based on prior public disclosure of allegations or transactions in a criminal, civil or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news media; or otherwise as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4), but rather upon information provided by Relator Crutcher.

26. 28. In the alternative, to the extent there has been a public disclosure unknown to Relator, Relator is an original source of these allegations, as defined by the FCA. Relator has direct and independent knowledge of FGMC's fraudulent activities. Relator has also voluntarily provided this information to the Government prior to filing this action as required under 31 U.S.C. § 3730(e)(4)(B).

27. 29. Relator shall serve on the United States a copy of the original Complaint and a written disclosure statement setting forth and enclosing all material evidence and information she possesses, pursuant to the requirements of

31 U.S.C. § 3730(b)(2).

## THE PARTIES

28.30. Defendant FGMC is a Virginia corporation.

29.31. FGMC has a principal place of business located at 1900 Gallows Road, Suite 800, Tysons Corner, Virginia 22182.

30.32. FGMC identifies its home office city to HUD as Tysons Corner, Virginia and is registered with HUD under Lender ID 75168.

31.33. Defendant Andrew Peters is the former Chief Executive Officer of FGMC.

32.34. Defendant Pacific Investment Management Company, LLC ("PIMCO") is a limited liability company organized under the laws of Delaware with its principal place of business in Newport Beach, California.

35. Defendant PIMCO Investments LLC is a Delaware corporation that is headquartered in New York, New York. PIMCO Investments LLC is a wholly-owned subsidiary of PIMCO and an indirect subsidiary of Allianz SE.

33.36. Defendant B2 FIE IV LLC, B2 FIE Trust, FIE IV Holdco LLC, and PIMCO BRAVO Fund II, L.P.

34.37. Relator is a resident of Fenton, Missouri and worked remotely for FGMC as a Wholesale Underwriter from approximately September 2014 to

November 2014.

35.38. Through her past work experiences and education, Relator has extensive knowledge of the rules and regulations applicable to FHA loans.

**FACTUAL BACKGROUND**

*Civil Statutes to Combat Mortgage Fraud*

36.39. The False Claims Act provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(l) (2006); 31 U.S.C. § 3729(a)(l)(A) (2010).

37.40. The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(l)(B) (2010). The prior version of the false statements provision made liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. §3729(a)(2) (2006).

38.41. The Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the

-11-

information." 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(I)(A) (2010). The False Claims Act provides that no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(l)(B) (2010).

39.42. Before May 2009, the False Claims Act defined the term "claim" to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c)(2006).

40.43. Effective May 20, 2009, the False Claims Act now defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that: (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for

any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2010).

~~41.~~44. The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act. *See United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

~~42.~~45. Any person who violates the False Claims Act is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(G).

***HUD's FHA Mortgage Insurance Program***

~~43.~~46. HUD is a cabinet-level agency of the United States. Its mission is to create strong, sustainable, inclusive communities and quality affordable homes for all. HUD works to strengthen the housing market to bolster the economy and protect consumers, meet the need for quality affordable rental homes, utilize housing as a platform for improving quality of life, and build inclusive and

-13-

sustainable communities free from discrimination.

44.47. FHA is a part of HUD and is one of the largest mortgage insurers in the world. Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured more than 40 million home loans since FHA's inception. Through some of these mortgage insurance programs, FHA provides insurance against losses on mortgage loans to single family homebuyers originated and held by approved lenders, or mortgagees.

45.48. If a homeowner defaults on an FHA-insured mortgage, the holder of the mortgage may submit a claim to HUD. HUD will then pay the mortgage holder the outstanding balance on the loan and other costs associated with the default. The mortgage holder therefore suffers no loss when a borrower is unable to repay an FHA-insured mortgage. This no-loss guarantee encourages lenders to make loans to creditworthy applicants who would otherwise have difficulty qualifying for conventionally available financing on favorable terms, including the ability to put little money down to make the purchase. FHA mortgage insurance programs therefore help many creditworthy low- and moderate-income families as well as first-time homebuyers become homeowners.

46.49. A lender must apply to be a Direct Endorsement Lender and must be approved by HUD to underwrite FHA-insured mortgage loans on HUD's behalf.

This is an important responsibility because HUD "does not review applications for mortgage insurance before the mortgage is executed." 24 C.F.R. § 203.5(a). Instead, the Direct Endorsement Lender underwrites mortgage loans on HUD's behalf and determines whether a borrower presents an acceptable credit risk for HUD. In underwriting the mortgage loan, the lender must determine whether the borrower and the mortgage loan meet HUD's requirements for FHA insurance and whether the "proposed mortgage is eligible for insurance under the applicable program regulations." *Id.* The Direct Endorsement Lender must decide whether or not to approve the borrower for an FHA-insured mortgage loan.

47.50. After the Direct Endorsement Lender approves a borrower for an FHA-insured mortgage loan, the lender may submit the mortgage loan to HUD to "endorse" the mortgage loan for FHA insurance, meaning that the mortgage loan is fully insured by the FHA insurance fund in the event that the borrower cannot repay the loan. The Direct Endorsement Lender must certify that the loan meets all of HUD's requirements and HUD relies on this certification to endorse the loan for FHA insurance.

48.51. Certain Direct Endorsement Lenders apply to, and participate in, the Lender Insurance program in which the mortgagees themselves endorse the mortgage for FHA insurance and retain all documentation supporting the

mortgage. 24 C.F.R. § 203.6. The lender retains the documents necessary to approve the loan (the FHA "case binder") and remits the documents to HUD only at the Agency's request.

49.52. A Direct Endorsement Lender is expected and obligated to act with the utmost good faith, honesty, and fairness in its dealings with HUD. "Under the . . . civil case law the mortgagee, knowing that the federal insurer is 'relying on its professional judgment in a business relationship' has an affirmative duty 'to use due care in providing information and advice' to the federal mortgage guarantor." As a result, in addition to the regulatory duties addressed below, the Direct Endorsement Lender owes both a fiduciary duty and a duty of reasonable care to HUD.

*HUD's Direct Endorsement Program*

50.53. The success of the Direct Endorsement Program depends upon proper underwriting of loan files. Participating lenders have to determine the eligibility of borrowers and loans for FHA insurance, and ensure the integrity of the data relied upon to make such determinations.

51.54. Under the Direct Endorsement Program, HUD relies on the expertise and knowledge of the lenders.

52.55. HUD also relies on the truthfulness of the certification the lender

completes on each loan certifying that the loan is eligible for FHA insurance. As HUD has explained, these "certifications are important as HUD will rely upon them for purposes of endorsing the mortgage loan, thereby eliminating the necessity for a detailed HUD review of the loan prior to endorsement." Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11928, 11932 (March 22, 1983).

53.56. To obtain and maintain its status as a Direct Endorsement Lender, a lender must have qualified underwriters on staff.

54.57. To qualify as a Direct Endorsement underwriter or "DE underwriter," an underwriter must satisfy several requirements.  The DE underwriter "must have a minimum of three years full-time recent experience (or equivalent experience) reviewing both credit applications and property appraisals."  HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.3; *see also* HUD Handbook 4155.2 ch. 2.A.4.a.  The underwriter must also be a "reliable and responsible professional skilled in mortgage evaluation" and "must be able to demonstrate his or her knowledge and experience regarding the principles of mortgage underwriting." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.l; *see also* HUD Handbook 4155.2 ch. 2.A.4.a.

55.58. A Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage. That responsibility includes performing due diligence and ensuring accuracy.

**The FHA's Due Diligence Requirements**

56.59. Proper due diligence is a critical component of the Direct Endorsement Program. It is required by federal regulation and HUD Handbooks. It is also required by virtue of the fiduciary duty and duty of reasonable care that the Direct Endorsement Lenders owe to HUD. *See* 48 Fed. Reg. at 11932 ("The duty of due diligence owed [HUD] by approved mortgagees is based not only on these regulatory requirements, but also on civil case law."). "The entire scheme of FHA mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found."

57.60. A lender's due diligence should (1) "determine a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties;" and (2) "examine a property offered as security for the loan to determine if it provides sufficient collateral." HUD Handbook 4155.1, REV-5, ch. 2-1. Proper due diligence thus requires an evaluation of, among other things,

a borrower's credit history, capacity to pay, cash to close, and collateral. Id.

58.61. In all cases, a Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R § 203.5(c).

59.62. HUD has established specific rules for due diligence predicated on sound underwriting principles.  In particular, HUD requires Direct Endorsement Lenders to be familiar and to fully comply with governing HUD Handbooks and Mortgagee Letters, which provide detailed instructions and requirements for Direct Endorsement Lenders. These requirements set forth "the minimum standard of due diligence in underwriting mortgages" with which Direct Endorsement Lenders must comply. Id.

60.63. HUD considers the Direct Endorsement underwriter to be "the focal point of the Direct Endorsement program." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C. The Direct Endorsement underwriter must assume the following responsibilities:

- compliance with HUD instructions, the coordination of all phases of underwriting, and the quality of decisions made under the program;

- the review of appraisal reports, compliance inspections and credit analyses performed by fee and staff personnel to ensure reasonable conclusions, sound reports and compliance with HUD requirements;

- the decisions relating to the acceptability of the appraisal, the inspections, the buyer[']s capacity to repay the mortgage and the overall acceptability of the mortgage loan for HUD insurance;

- the monitoring and evaluation of the performance of fee and staff personnel used for the Direct Endorsement program;

- and awareness of the warning signs that may indicate irregularities, and an ability to detect fraud, as well as the responsibility that underwriting decisions are performed with due diligence in a prudent manner.

*Id.*

61.64. The underwriter must "evaluate the mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d).

62.65. When ensuring that a borrower is creditworthy, a Direct Endorsement Lender must comply with governing HUD requirements, such as those set forth in HUD Handbook 4155.1 (Mortgage Credit Analysis for Mortgage Insurance on One- to Four-Unit Mortgage Loans).  The rules set forth in HUD

Handbook 4155.1 exist to ensure that a Direct Endorsement Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt. HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

63.66. Direct Endorsement Lenders can underwrite an FHA-insured loan in one of two ways. First, a DE underwriter can "manually underwrite" the loan, by making the credit decision whether to approve the borrower, in accordance with HUD underwriting rules. Second, the Direct Endorsement Lender can use a HUD-approved Automated Underwriting System (AUS), a software system that makes the credit recommendation whether to approve the borrower.

64.67. To "manually underwrite" an FHA-insured loan, there are numerous steps the DE underwriter must take. At a minimum, the underwriter must: (1) obtain and review the borrower's credit history; (2) obtain adequate explanations for major derogatory credit, including collections, judgments, and other recent credit problems; (3) analyze the borrower's debt obligations; (4) reject documentation transmitted by unknown or interested parties; (5) inspect documents for proof of authenticity; (6) verify the borrower's employment history; (7) establish the borrower's income stability and make income projections; (8)

ensure that the borrower has invested a minimum required amount of his or her own funds in the transaction; (9) document the source of funds invested in the transaction, including any gift funds; (10) calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and (11) consider and document any compensating factors permitting deviations from those fixed ratios. *See* HUD Handbook 4155.1.

***Underwriting of Loans with the FHA's TOTAL System***

65.68.  Beginning in July 2008, HUD required Direct Endorsement Lenders to electronically process eligible loan requests through an AUS.  The AUS is a software program that connects to a proprietary HUD algorithm known as Technology Open to Approved Lenders, or "TOTAL."  Using data the lender inputs, HUD's "TOTAL" algorithm makes a credit determination and either: (i) provides an "Accept/Approve" decision, approving the loan subject to certain conditions; or (ii) provides a "Refer" decision, referring the loan back to the lender for manual underwriting.  When TOTAL approves the loan, the approval is conditioned on the lender completing certain additional underwriting steps, called "conditions."  Many of these conditions relate to ensuring the data the lender entered is true, complete, and accurate.

66.69. Numerous requirements promulgated by HUD explain how lenders

must calculate each data point and what documentation they need to support each data point.

67. 70. For any loan approved through the use of an AUS, HUD requires the lender to certify to the integrity of the data it entered, which HUD defines as data that is true, complete, and accurate. FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2. If the lender later receives or learns of information that materially differs from the information previously entered by the lender, the lender must re-submit a proposed loan to TOTAL through the AUS.

68. 71. The data entered into TOTAL is material to the endorsement of the loan because TOTAL is an algorithm that evaluates the overall creditworthiness of a mortgage applicant based on the data supplied by the lender. Therefore, a loan receiving a TOTAL "Accept/Approve" decision is only eligible for FHA's insurance endorsement if "the data entered into the AUS are true, complete, properly documented, and accurate." *See* FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2. It is the Direct Endorsement Lender's responsibility to ensure the integrity of the data relied upon by TOTAL. *See* Mortgagee Letter 2004-1.

69. 72. Because TOTAL cannot analyze data that is not available to it, certain loans are not eligible for an AUS approval and must be manually underwritten.

-23-

"A manual downgrade becomes necessary if additional information, not considered in the AUS decision, affects the overall insurability or eligibility of a mortgage otherwise rated as an accept or approve." FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2. While a lender is not required to have a Direct Endorsement underwriter review the credit portion of an AUS approved loan, a lender must have qualified staff review AUS approvals to ensure a loan that receives an "Accept/Approve" decision is in fact eligible for an AUS approval. *See id.*

70.73. To ensure the integrity of TOTAL's decision, as well as the integrity of the data TOTAL relies upon, lenders are prohibited from "willfully manipulating ... application variables [in] TOTAL mortgage scorecard to obtain an accept/approve risk classification." *See* Mortgagee Letter 2005-15.

71.74. If TOTAL does not approve a loan with an "Accept/Approve" decision, it returns a "Refer" decision, meaning the loan is referred back to the lender for manual underwriting. Lenders must then have a DE underwriter perform a manual underwrite and determine if the loan is approvable under FHA's manual underwriting requirements. *See* 24 C.F.R § 203.255(b)(5)(i)(B).

*FHA's Requirements of a Quality Control Program and Mandatory Reporting*

72.75. A Direct Endorsement Lender is required to maintain a quality control program to ensure the quality of its FHA-insured mortgages. HUD requires that "[t]he Quality Control function must be independent of the [lender's] origination and servicing functions." HUD Handbook 4060.1, REV-2, ch. 7-3.B; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.A.

73.76. The quality control program must be designed to meet the goals of assuring compliance with FHA's requirements, protecting FHA from unacceptable risk, guarding against errors, omissions and fraud, and assuring swift and appropriate corrective action. HUD Handbook 4060.1, REV-2, ch. 7-2. The quality control program also must review a sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines. HUD Handbook 4060.l, REV-2, ch. 7-6.C; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.D.

74.77. When a lender reviews a loan file for quality control, the lender must, among other things, review and confirm specific pieces of information. For instance, "[d]ocuments contained in the loan file should be checked for sufficiency and subjected to written reverification. Examples of items that must be reverified include, but are not limited to, the mortgagor[']s employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds." HUD

Handbook 4060.1, REV-2, ch. 7-6.E.2.; *see also* HUD Handbook 4700.2 REV-1, ch. 6-3.A.2.

75. 78. If the lender finds discrepancies, it must explore them to ensure that there are no deficiencies. "Any discrepancies must be explored to ensure that the original documents . . . were completed before being signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed." HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.

76. 79. At the end of the quality control review, the lender is expected to assess the significance of any deficiencies. The HUD Handbook recommends a "system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review. The system should enable a mortgagee to compare one month[']s sample to previous samples so the mortgagee may conduct trend analysis." HUD Handbook 4060.1, REV-2, ch. 7-4.

77. 80. HUD recommends four types of ratings. The ratings provided for this purpose are:

- "Low Risk", i.e., no problems or minor problems were identified with loan servicing or origination;
- "Acceptable Risk," i.e., the issues identified were not material to the "creditworthiness, collateral security or insurability of the loan";
- "Moderate Risk," i.e., a failure to address significant unresolved questions or missing documentation has created moderate risk for the mortgagee and the FHA; and

- "Material Risk," i.e. the issues identified were "material violations of FHA or mortgagee requirements and represent an unacceptable level of risk."

78.81. Examples of "material risk" are violations that include a "significant miscalculation of the insurable mortgage amount or the applicant[']s capacity to repay, failure to underwrite an assumption or protect abandoned property from damage, or fraud." HUD Handbook 4060.1, REV-2, ch. 7-4.D.

79.82. These findings trigger mandatory reporting obligations. Mortgagees "must report [Material Risk] loans, in writing," to HUD. *Id.*

80.83. A lender is also required to report to HUD "[f]indings of fraud or other serious violations" that are discovered "during the normal course of business and by quality control staff during review/audits of FHA loans." HUD Handbook 4060.1, REV-2., ch. 7-3.J. The lender must report these findings, along with the supporting documentation, within 60 days of when the lender first discovers them. Id.; HUD Handbook 4060.1, REV-2, ch. 2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices."). Since November 2005, Direct Endorsement Lenders such as FGMC have been required to make such reports through HUD's online Neighborhood Watch Early Warning System. *See* Mortgagee Letter 2005-26.

81.84.  Internal reporting of findings is also required. Quality control review findings must "be reported to the mortgagee[']s senior management within one month of completion of the initial report" HUD Handbook 4060.1, REV-2, ch. 7-3.I.

82.85.  In addition to appropriate reporting, lenders must act to address the problems they identify.  "Management must take prompt action to deal appropriately with any material findings. The final report or an addendum must identify actions being taken, the timetable for their completion, and any planned follow-up activities." *Id.*; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.F.

***Certifications and Endorsements for FHA Insurance***

83.86.  HUD requires Direct Endorsement Lenders to certify their compliance with the foregoing due diligence, quality control, and reporting requirements.

84.87.  First, when a lender applies to participate in the Direct Endorsement Lender program and to endorse loans for FHA insurance on HUD's behalf, the lender must certify that it will fully comply with all HUD guidelines, regulations, and requirements:

> I certify that, upon the submission of this application, and with its submission of each loan for insurance or request for insurance benefits, the applicant has and will comply with the requirements of the Secretary of Housing and Urban Development, which include, but are not limited to, the

National Housing Act (12 U.S.C. § 1702 et seq.) and HUD's regulations, FHA handbooks, mortgagee letters, and Title I letters and policies with regard to using and maintaining its FHA lender approval.

85.88. If the lender is approved, the lender must re-certify, every year, that it is complying with the program's qualification requirements, including due diligence in underwriting and the implementation of a mandatory quality control plan. As of 2010, lenders are required to certify:

I certify that I know, or am in the position to know, whether the operations of above-named lender conform to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies; and that I am authorized to execute this report on behalf of the lender. I certify that the lender complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with [HUD]. I certify that to the best of my knowledge, the above-named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named lender is fully responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators, and all other employees conducting FHA business for the above-named lender . . . Each of my certifications is true and accurate to the best of my knowledge and belief. I understand that if I knowingly have made any false, fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law.

86.89. Unless the lender submits a truthful initial certification and annual certifications, the lender is not entitled to obtain or maintain its status as a Direct Endorsement Lender or to endorse loans for FHA insurance.

87.90. In addition, for each individual mortgage loan approved for FHA insurance, the lender must make a "loan-level" certification—i.e., a certification specific to an individual loan—that the individual mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD-92900-A.

88.91. The "loan-level" certification differs depending on whether the lender used an AUS or manual underwriting. For each loan that was underwritten with an AUS, the lender must certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *Id.* For each loan that required manual underwriting, the lender must certify that the Direct Endorsement Underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage." Id.

89.92. For every loan that was approved by an FHA lender, whether through manual underwriting or the use of an AUS, an employee is required to certify:

> I, the undersigned, as authorized representative of [the lender] at this time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents. I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4.

90.93. Absent the applicable certifications for an individual loan as described in the above paragraphs, the Direct Endorsement Lender cannot endorse that loan for FHA insurance.

91.94. Each of the foregoing certifications is material to HUD's payment of any claim submitted under the Direct Endorsement Lender Program. HUD does not review FHA loans for approval prior to the loan being endorsed for insurance or to paying claims in the event of a default; instead, it relies on its lenders to comply with HUD requirements and to ensure that every loan is in fact eligible for FHA insurance. The certifications are required for each lender to enter and remain in the program. The certifications are critical to HUD's ability to ensure that only qualified and eligible loans are endorsed for HUD insurance. The certifications are essential for a claim on a loan to be submitted for FHA insurance. And the certifications are needed to protect HUD and the FHA insurance fund from undue risk and loss.

*Defaulted Loans Result in Losses to HUD*

92.95. Once a loan is endorsed by HUD or the Direct Endorsement Lender, it is insured by FHA on the basis that that the Direct Endorsement Lender has followed the HUD requirements and has submitted accurate certifications and that the loan is eligible for FHA insurance. Without those requirements being met, the lender could not endorse the loan for FHA insurance. It is only because a lender endorses a loan for FHA insurance that the holder of the mortgage is able to submit a claim to HUD for any losses.

93.96. If the borrower defaults, the holder of the mortgage can submit a claim to HUD for any loss from the default. The holder submits a claim for insurance by using HUD's electronic claim system. The claim must include certain information. Each loan that is endorsed for FHA insurance has a unique FHA case number, and the claim must include the FHA case number. If a valid FHA case number is not submitted with the claim, an insurance payment will not be processed on that claim. The claim also must include the identification number of the mortgagee inputting the claim, which must be either the holder of record or the servicer of record of the mortgage.

94.97. FHA pays these insurance claims in two parts. First, the mortgage holder makes an initial claim for the unpaid principal on the loan, plus interest.

Second, if applicable, the mortgage holder later makes a final claim for expenses and allowances (e.g., foreclosure costs), plus interest. HUD Handbook 4330.4, REV-I, ch. 2-4.

95.98. These claims are submitted to HUD electronically, and HUD's electronic system processes them automatically. The system ensures that the FHA insurance is active with respect to the FHA case number provided and that there are no other impediments (such as a no-pay flag or indemnification agreement) to paying the claim. After processing, the claim is approved for payment, and a disbursement request is sent to the United States Treasury to issue the funds via wire transfer to the holder of the mortgage note.

***Direct Endorsement Lenders Owe Duties to HUD By Virtue of Their Authority to Endorse Loans for FHA Insurance and Their Responsibility to Ensure Accuracy***

96.99. HUD grants Direct Endorsement Lenders responsibility for determining which loans qualify for FHA insurance. In granting this control and responsibility to the Direct Endorsement Lenders, HUD must rely on and place trust and confidence in the lenders' knowledge, good faith, integrity, and candor. HUD therefore enters into a fiduciary relationship with the Direct Endorsement Lenders.

97 100.    As a result of this fiduciary relationship, the Direct Endorsement Lenders owe HUD a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in their dealings with HUD. These duties require, among other things, that the lenders exercise integrity, prudence, candor, and due diligence on behalf of HUD when endorsing loans for FHA insurance, reviewing the loans for quality control purposes, reporting defective loans, and submitting claims.

98 101.    To become and remain a HUD-approved Direct Endorsement Lender, and to receive payment on claims for defaulted FHA-insured loans that it held, FGMC was required to annually certify its compliance with HUD's requirements.

99 102.    Upon information and belief, one of FGMC's officers or executives certified annually to HUD in sum or substance that:

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies.  I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

100 103.    The foregoing certifications were knowingly false because, as discussed below, FGMC knew, deliberately ignored, or recklessly disregarded that

it originated and underwrote loans that were not in compliance with HUD requirements.

**FGMC'S SCHEME TO DEFRAUD HUD THROUGH DELIBERATELY AND RECKLESSLY APPROVING INELIGIBLE FHA LOANS**

101.104.    During the relevant time period, FGMC underwrote loans it knew did not comply with FHA loan requirements and knowingly and falsely certified to HUD that it (1) used due diligence in underwriting the loans; or (2) that the data it used to approve the loans for FHA insurance had integrity and that the loans were eligible for FHA mortgage insurance.

102.105.    In order to approve ineligible loans, FGMC commonly utilized several tactics to approve ineligible loans.   As examples, FGMC instructed employees to "fix" loans by intentionally miscalculating or misrepresenting borrowers' income or debt obligations; manipulating the AUS/TOTAL system to predetermine the financial data points necessary to get an "Accept/Approve" rating; and hiding adverse documentation.

103.106.    As described below, FGMC knew, deliberately ignored, and recklessly disregarded the fact that many of its loans did not comply with FHA's underwriting requirements, and thus were not eligible for FHA mortgage insurance.

104.107.    Furthermore, FGMC established certain underwriting processes that it knew, deliberately ignored, or recklessly disregarded would result in FGMC endorsing materially defective loans for FHA mortgage insurance.

***FGMC's Pressure on Underwriters to Approve Ineligible Loans***

105.108.    As part of its scheme to approve as many FHA loans as possible, FGMC established a culture that valued getting a loan approved and endorsed for FHA insurance over compliance with FHA's rules.

106.109.    FGMC's goal was to approve the vast majority of loans that it was presented, even if those loans did not meet HUD's requirements to qualify for FHA insurance.

107.110.    To do so, FGMC created a management exception process that allowed its underwriting staff to request management approval for an exception to underwriting requirements that could not be met. As part of this process, FGMC routinely granted management exceptions to allow violations of FHA underwriting requirements. FGMC certified that each loan complied with FHA requirements, even when FGMC knew these loans did not.

108.111.    Where underwriters raised issues or concerns with managers, the managers directed underwriters to overlook or ignore the HUD guidelines and

rules, thus effectively training the underwriting staff to overlook or ignore the HUD guidelines and rules.

109.112. FGMC's senior management was aware of the management exception process, and was often involved in the decision of whether to grant an exception requested by an underwriter.

110.113. FGMC's formalized acceptance and approval of management exceptions, and the concurrent pressure by management on underwriters to approve loans, caused underwriters to view FHA's rules and requirements as mere suggestions that could be disregarded in order to close a loan and led underwriters to grant additional exceptions that were not formally tracked and did not receive management approval.

111.114. While FGMC normally wanted underwriters and processors to make notes on its internal computer system as to the conditions they approved, FGMC specifically told staff not to record information in the computer system that referenced FGMC's desire to not comply with the FHA guidelines. In other words, FGMC only wanted employees to make notes on the computer system when it would make FGMC look like it was following the guidelines.

112.115.    FGMC required underwriters and processors to meet certain production goals.  Underwriters who did not keep up with FGMC's quotas were criticized and had their job status put into jeopardy.

113.116.    Under this system, FGMC's underwriters were expressly encouraged to push through as many loans as possible, with little regard for FHA requirements in order to keep their jobs. Thus, FGMC created a culture where loan quantity was valued over the quality of the loans.

*FGMC Manipulated the AUS/TOTAL System to Predetermine Values That It Knew Would Generate "Accept/Approve" Ratings*

114.117.    As part of its scheme to approve every FHA loan that it was presented, FGMC instructed employees to systemically manipulate the data that was entered into FGMC's AUS/TOTAL system to determine variables that would lead to an "Accept/Approve" rating from TOTAL.

115.118.    As discussed above, loans that receive an "Accept/Approve" rating in the AUS/TOTAL system are subject to significantly less documentation requirements and scrutiny than loans that receive a "Refer" rating and must be manually underwritten.

116.119.    In order to avoid additional documentation and loan scrutiny that "Refer" ratings require, FGMC schemed to defraud HUD by predetermining data variables that would result in an "Accept/Approve" rating.

117.120.    When an FGMC employee initially ran a loan through FGMC's AUS/TOTAL, he or she would enter variable amounts consistent with the borrower's representations and/or the documents in the loan file.  However, if a loan received a "Refer" rating, FGMC's employees would isolate one or more variables, including most commonly the borrower's income or monthly debt obligations.

118.121.    FGMC employees would then systematically increase or decrease the variable(s) during successive AUS/TOTAL runs over a short period of time to identify the variable amount(s) that would result in an "Accept/Approve" rating.

119.122.    After identifying the qualifying variable amount(s), FGMC's employees would then use the lowest qualifying amount that they found generated an "Accept/Approve" rating to determine how to underwrite the file.

120.123.    Relator is aware that FGMC would manipulate the AUS/TOTAL system several times before determining financial variables that could be used to qualify a borrower for a loan on an "Accept/Approve" basis.

121.124.    Relator is aware that FGMC would frequently run loans multiple times using these tactics.

***Examples of FGMC's Impermissible and Fraudulent Certification of Non-Compliant FHA Loans***

122.125.    FGMC's false certifications, as well as its reckless, negligent, and grossly negligent conduct in violation of the FHA standards and requirements, violated FGMC's fiduciary obligations and duty of care to HUD.

123.126.    As set forth above, the FHA program requires a lender to represent that the underwriting conditions are met for all loans processed through the lender's system.

124.127.    As part of both the annual certifications and individual loan certifications, FGMC certified that they complied with the required level of quality control and duty of care.  For example, FGMC underwrote mortgages using the AUS system, and verified that all of the AUS conditions were satisfied, the loans complied with all HUD requirements, and the loans were eligible for FHA insurance.

125.128.    Contrary to these certifications, FGMC did not comply with the HUD requirements for approval of the loan.  FGMC ignored obvious red flags and

signs of fraud in reviewing documentation and did not use its required due diligence in underwriting FHA loans.

126.129. The following are just some examples of the ways in which FGMC failed to adhere to the FHA guidelines, rules, and regulations resulting in the approval of loans that should not have qualified for FHA insurance.

127.130. FGMC's underwriting staff was repeatedly told by management to "make the files work" and to "fix" any variables that would prevent a loan from being approved by the AUS system.

128.131. Relator was told by FGMC's management that documents should not be an obstacle to getting loans approved. For instance, Relator Crutcher was instructed that when the tax returns provided by borrowers did not match the tax transcripts that came directly from the IRS, that she should not worry about it and instead just use whatever income source was higher.

129.132. Relator was also frequently told by FGMC's management that she should "trash" the documents that raised concerns regarding fraud or improper underwriting practices.

130.133. For instance, when Relator Crutcher mentioned that there were differences in the tax return documents, FGMC's management, including underwriting manager Terri Trzybinski instructed underwriters to "trash" the

transcripts indicating a lower income to make sure that such adverse documents didn't not appear in the loan file.

131.134.    Relator Crutcher also observed that many of the W-2's submitted by borrowers had social security numbers that were different than the borrower's.  Such a discrepancy is an obvious warning sign of fraud as a W-2 may be forged or may be for someone other than the borrower.

132.135.    Due to the likelihood of fraud in these circumstances, Relator Crutcher contacted her underwriting manager Terri Trzybinski on several occasions in approximately October and November 2014 to indicate that the loans could not be approved for FHA insurance due to the fact that there were strong indications of fraud.  Relator Crutcher also told FGMC that when she had worked for other banks such as Citigroup and Wells Fargo, issues related to conflicting income documents and social security numbers would automatically be flagged for follow up by the fraud departments of those lenders.

133.136.    In contrast, FGMC repeatedly instructed its underwriters to ignore these clear indications of fraud and appeared to pride itself on using fraudulent documents to approve loans.  Whenever Relator Crutcher identified issues of fraud, she was told to look the other way and "trash" the adverse documentation because "that's the FGMC way."  Additionally, one of Relator

-42-

Crutcher's supervisors, Jim, mentioned that FGMC stood for "Finally Got my Mortgage Closed" as a play on FGMC's initials and the way that FGMC would approve ineligible loans in ways that other lenders would not due to the FHA rules and regulations.

134.137.    FGMC's management, including Terri Trzybinski, also instructed underwriting staff to miscalculate income using impermissible calculations related to bonuses and overtime.

135.138.    Under HUD Handbook 4155.1 4.D.2.b, overtime and bonuses can be used in calculating an individual's annual income if a borrower has received that income for the past two years and it is likely to continue. Additionally, the lender must establish that the overtime and bonus income are likely to continue. If either type of income shows a continual decline, lenders are required to document in writing the reasons for such a decline.

136.139.    Despite these requirements, FGMC routinely used impermissible income calculations related to bonuses and overtime. For example, Relator recalls that Terri Trzybinski stated that underwriters should use bonuses and overtime as a way to "make it work" and reach certain income requirements that FGMC had found the TOTAL system would rate as "Accept/Approve."

137.140.    However, the bonus and overtime of these borrowers would often be for less than a two-year period or would wildly fluctuate between years.  Despite this red flag, FGMC would exclude the income of the lower year and instead use two years of the higher income to make its calculation.

138.141.    In these instances, FGMC also failed to justify the reasons for using the income that it did, and management would instruct underwriters to perform the calculation incorrectly.

139.142.    The FHA guidelines also require that all sources of borrower income be documented per HUD requirements. Additionally, the FHA guidelines require Direct Endorsement lenders to ensure verification forms and documents not pass through the hands of third parties.  Contrary to these guidelines, FGMC routinely approved loans for which the income that was not properly verified (or not verified at all) and using documents that appeared to pass through the hands of a third party.

140.143.    FGMC's entry of a monthly debt obligations variable that lacked integrity into its AUS/TOTAL is another example of the multiple rules that FGMC violated in approving loans for FHA insurance.

141.144.     Under the applicable HUD rules, HUD Handbook 4155.1 4.C.3.c, the total debt-to-income ratio may not exceed 43% and the payment-to-income ratio may not exceed 31%.

142.145.     By lowering the monthly debt obligations to less than they actually were, FGMC approved loans where the debt-to-income ratios exceeded 43% and payment-to-income ratios exceeded 31%.

143.146.     Contrary to this clear requirement, FGMC failed to document adequate compensating factors even though borrowers' ratios exceeded the 31% and 41% limits.

144.147.     Additionally, under the FHA's program, borrowers are typically required to make a minimum down payment of 3.5% of the purchase price.  However, borrowers with low credit scores may be required to make a down payment in excess of 3.5%.

145.148.     With respect to down payments, FGMC instructed its underwriting staff to ignore warning signs that a borrower's assets included funds that were not the borrower's.

146.149.     For example, borrowers would frequently claim that they had the required down payment funds in a checking or savings account.  However, when FGMC's underwriters reviewed bank deposit information, it often revealed

that the requisite funds had recently been provided by a person other than the borrower (such as a family member). These are commonly referred to as "gift funds."

147.150.    Specifically HUD Handbook 4155.1 5.B.5 requires that, in order to ensure that gift funds are not provided by a party to the sales transaction, FHA lenders must document gift funds with a gift letter, signed by the borrower, that specifies the amount of the gift, specifies that the funds are a gift requiring no repayment, and there must be documentation of the transfer of the funds from the donor to the borrower.

148.151.    Additionally, HUD Handbook 4155.1 5.B.2.b requires that a verification of deposit, along with a recent bank statement be used to verify savings and checking accounts. If there is a large increase in the account, lenders are also required to obtain a credible explanation from the borrowers as to the source of the funds.

149.152.    Despite these requirements, FGMC encouraged its underwriters to ignore instances in which borrowers had recent and significant deposits into their checking and savings accounts, and to instead treat the funds as if they had long existed in the borrowers' accounts. This is extremely problematic because if such funds were from an improper source (such as the

seller) or if the funds were not in fact a gift, this would substantially increase the likelihood that the buyer could not meet the loan's monthly mortgage payments and the loan would be declined.

150.153.    HUD Handbook 4155.1 also requires that lenders such as FGMC verify and analyze a borrower's payment history of housing obligations and to obtain written explanations as to past derogatory credit. Despite this clear requirement, FGMC would instruct its underwriters and processors to ignore those requirements which could lead to loans being referred or declined.

151.154.    Similarly, FGMC also failed to properly develop credit histories for borrowers. Under the relevant HUD rules, if a borrower does not have a credit score, HUD requires that the lender develop a credit history from alternative sources such as utility payment records, automobile insurance payments, or rental payment.

152.155.    Despite this requirement, underwriting manager Terri Trzybinski told Relator Crutcher and other underwriters that they could waive the requirements related to credit histories.

153.156.    FGMC also accepted information that was not permissible in reviewing a borrower's credit scores. For example, FGMC frequently took credit references from unqualified credit entities such as rental companies that did not

have actual credit scores. FGMC frequently used similar credit sources to determine a borrower's credit, despite the fact that such sources could not be used under the required due diligence standards.

154.157.    In the instances where FGMC did obtain additional documents, such as additional tax returns, FGMC intentionally did not review and scrutinize additional issues that those documents would raise, such as alimony or child support obligations that the borrower had failed to disclose.

155.158.    FGMC also encouraged underwriting staff to ignore or destroy adverse documentation that would cause a loan to be referred or declined.

156.159.    FGMC's management failed to take effective action to address deficiencies in its loan origination and underwriting practices. Instead, FGMC reaped profits by certifying that the loans met FHA's standards and requirements and were therefore eligible for insurance.

*FGMC Failed to Maintain Quality Control Procedures as Required by HUD's Direct Endorsement Lender Program*

157.160.    Upon information and belief, FGMC further did not have a quality control department and did not review and audit loans as required by the FHA program. As a result, many of FGMC's underwriting staff did not realize that there were serious deficiencies in the FHA loans because they did not know

the FHA requirements and never received any feedback on the loans they processed.

158.161.    As a result of these deficiencies, FGMC's false certifications that loans complied with the FHA program's rules were material and bore upon the loan's eligibility for FHA insurance and the likelihood that the borrower would make mortgage payments.

159.162.    FGMC also failed to comply with HUD's rules and regulations regarding required quality control procedures, even though those procedures were mandatory for FGMC's maintenance of its Direct Endorsement Lender status.  Instead, FGMC made false representations to HUD about FGMC's purported compliance with HUD's rules pertaining to quality control procedures.

160.163.    At all relevant times, FGMC was required to file annual certifications with HUD to maintain its Direct Endorsement Lender status.

161.164.    As part of those annual certifications, FGMC falsely certified that it had quality control procedures.

162.165.    In order to obtain and maintain Direct Endorsement Lender status, a lender is required to continuously implement a quality control program that is independent of its business operations.  Independence ensures that the quality control department brings its own judgment to bear in assessing the

validity of loans previously made, without concern for meeting a targeted volume of business.

163.166.    Upon information and belief, no FGMC employees were exclusively assigned to quality control.  Even in the instances where FGMC may have had some loans reviewed or audited, FGMC did not consistently review loans nor did FGMC report to HUD findings of fraud and other serious violations, despite a HUD requirement that all such findings be reported within 60 days.

164.167.    FGMC deliberately avoided its quality control requirements because it viewed quality control as a detriment to loan production.  Instead of implementing quality control procedures, FGMC emphasized speed and volume and an overall focus on getting as many loans approved as possible.  FGMC sought to have virtually all employees perform underwriting and origination duties, while few, if any, employees were tasked with quality control.  This in turn resulted in loans that were likely to have significant errors.

165.168.    As part of its failure to maintain a proper quality control system, FGMC also ignored its obligation to provide underwriting staff with training and feedback on underwriting errors.

166.169.    In light of FGMC's serious and material defects in its quality control program, it would have been impossible for FGMC to truthfully complete

the annual certification stating that it maintained a sufficient quality control program and thus falsely certified to HUD that it was able to participate in the Direct Endorsement Lender program.

***FGMC's Improper Underwriting Practices Result in False Certifications and False Claims***

167.170.    The examples discussed in this Complaint are representative examples of the systemic practices and procedures followed by FGMC that led to the submission of false statements and claims.

168.171.    As a result of these systemic practices and procedures, FGMC made false certifications to HUD on individual loan-level, initial, and annual certifications to HUD.

169.172.    Pursuant to the policies and practices described above, FGMC submitted the following loans to HUD that resulted in claims paid by HUD to FGMC.

a. FHA Case Number 045-7004717 for a claim submitted on approximately January 1, 2017 that was for a property located in Parlier, California that resulted in a claim to HUD in the amount of at least $131,775.52.

b. FHA Case Number 043-8253539 for a claim submitted on approximately February 29, 2016 that was for a property located in Los Molinos, California

that resulted in a claim to HUD in the amount of at least $179,232.54.

c. FHA Case Number 197-3868121 for a claim submitted on approximately October 21, 2013 that was for a property located in Monrovia, California that resulted in a claim to HUD in the amount of at least $378,571.22.

d. FHA Case Number 197-3859579 was a claim submitted on approximately September 11, 2013 for a property located in Palmdale, California that resulted in a claim to HUD in the amount of at least $280,127.42.

e. FHA Case Number 044-4339807 was a claim submitted on approximately November 12, 2010 for a property located in Fallbrook, California that resulted in a claim to HUD in the amount of at least $330,800.88.

f. FHA Case Number 045-8449590 was a claim submitted on approximately April 15, 2018 for a property located in Delano, California that resulted in a claim to HUD in the amount of at least $56,007.79.

170.173.      HUD paid all of the claims for loans that were falsely certified as eligible for FHA insurance.

171.174.      These claims were false because the loans were not eligible for FHA insurance because FGMC falsely certified that the loan was underwritten in accordance with HUD guidelines and/or FGMC falsely certified that it was in

compliance with HUD's requirements when FGMC made its initial or annual certifications to HUD.

172.175.   The mortgages did not qualify for FHA insurance because they were not underwritten in accordance with HUD guidelines, FGMC had not used due diligence in underwriting them, FGMC entered data into the AUS that lacked integrity, and FGMC failed to maintain a proper quality control program as required by HUD and FHA.

173.176.   FGMC violated HUD requirements and falsely certified to compliance with those requirements.  FGMC was therefore not authorized to endorse these mortgage loans for FHA insurance.  FGMC's false certifications and violations of HUD requirements bore upon the likelihood of whether the borrower would make mortgage payments.

174.177.   Upon information and belief, as a result of this conduct, FGMC submitted or caused the submission of hundreds of false claims.

**PETERS WAS RESPONSIBLE FOR FGMC AND ITS FRAUD**

175.178.   Peters served as the Chief Executive Officer of FGMC from June 2011 to March 2018.

176.179.   He has served on FGMC's Board of Directors since 2015.

177.180.   He was responsible for FGMC's development of an Enterprise

Risk Framework that failed to stop FGMC's fraud.

~~178.~~181.    FGMC had major issues with FHA underwriting while Peters was the CEO. This included failing to complete the FHA Form 92900, which contained the individual loan level certification. Instead, FGMC falsely endorsed thousands of loans for FHA insurance without completing the FHA Form 92900 as required.

~~179.~~182.    This sloppy FHA underwriting process was ultimately driven by Peters and his management of FGMC. Peters and FGMC set unrealistic expectations that led to pressure on underwriters to close loans faster, and thus without proper and fulsome underwriting review.

~~180.~~183.    Peters drove FGMC's growth at the expense of compliance, increasing FGMC's volume from $25 million a month to $800 million a month.

~~181.~~184.    Peters drove this massive growth in an effort to make FGMC attractive to a buyer. In order to achieve this growth, Peters focused on providing the riskiest borrowers government insured loans. This included FHA loans to borrowers with troublesome credit and credit scores as low as 500. Peters made borrowers that other lenders viewed as too risky, including FHA borrowers, a niche market for FGMC.

~~182.~~185.    The unsustainable growth that Peters required increased

pressure on underwriters and forced underwriters to complete their underwriting in an unreasonably short amount of time. This pressure and unrealistic expectations directly led to FGMC endorsing ineligible loans for FHA insurance.

~~183.~~186.     Peters also put pressure on FGMC's staff to grow. Prior to the sale to PIMCO he reported to the entire company that FGMC was in financial trouble and would have difficulty staying afloat.

~~184.~~187.     Peters was a very hands-on CEO. He was responsible for FGMC's managers and ensuring (or failing to ensure) that FGMC's loans were in compliance with FHA rules. He signed off on any major decision surrounding quality control or underwriting.

~~185.~~188.     Peters personally approved exceptions on specific FHA loans, and upon information and belief, to FHA guidelines, as discussed in paragraphs 107-110 *supra*.

~~186.~~189.     As CEO, Peters was ultimately responsible for FGMC's deficient quality control process discussed in paragraphs 157-166 *supra*.

~~187.~~190.     Peters received FGMC's monthly quality control reports.

~~188.~~191.     Peters did not implement a pre-closing quality control process until right before the sale to PIMCO in an effort to make FGMC more saleable. The lack of pre-closing quality control meant that there was no check on the

overworked underwriters. Peters specifically did not want to implement the pre-close quality control as it would slow down the underwriting process.

**PIMCO TOOK OVER FGMC AND ENCOURAGED THE FRAUD**

192. The PIMCO Defendants are liable because they conspired to knowingly assist the FGMC in both presenting the above-described false claims to the government, as well as falsely certifying both at an annual, and at a loan-by-loan basis, that FGMC as well as its fraudulent loan files met governmental requirements.

193. The PIMCO Defendants' liability does not stem from an alter ego claim or veil piercing claim, but instead because of the direct actions of the PIMCO Defendants.

194. In September 2015, PIMCO the PIMCO Purchasers bought the majority of FGMC and gained control over FGMC.

195. The PIMCO Purchasers conspired with PIMCO Managers to further increase FGMC's extension of highly risky loans, including loans that did not meet the government's legal requirements for insurance.

189.196. Part of the purpose of the PIMCO Managers was to both actively manage the PIMCO Purchasers their complete investment in FGMC in accordance with the goal of extending riskier government insured loans.

197.   Before ~~PIMCO~~ the PIMCO Purchasers ever bought FGMC, PIMCO engaged in extensive due diligence and knew or should have known of the extensive fraud under way at FGMC. This included placing 2 to 3 PIMCO employees at FGMC every day for a period, holding extensive meetings with senior executives, reviewing internal FGMC documents and data, and gaining an in depth understanding of FGMC's operations.

~~190.~~198.   When PIMCO employees were at FGMC and engaged in the acts alleged here, they did not identify the specific entity they worked for and were employed by. Rather, they were simply known to be from PIMCO.

~~191.~~199.   After the sale, PIMCO quickly took control and knew what was occurring at FGMC~~.~~. It handpicked the senior executives. It opened a new operations center in Plano, Texas and quickly began firing legacy staff, including 82 staff at the Fredrick Maryland location in 2018, and replacing the staff with new staff in Plano. For the core operations staff – underwriters, processors, and loan officers – this new staff was paid less and of a lower quality.

~~192.~~200.   It was made clear to FGMC staff that PIMCO was ~~in charge~~the one making the decisions. Employees were told that FGMC now had a "new rich uncle," PIMCO, backing them. Whenever PIMCO came onsite to FGMC's Plano office, which was at least once to twice a year and at time monthly, PIMCO was

given the white glove treatment, with a dedicated IT staffer to ensure PIMCO had access to whatever they needed which allowed it to knowingly assist in the fraud.

193.201.    PIMCO had such close control knowledge over of FGMC that FGMC was required to transition to the communications systems used by PIMCO to ensure PIMCO could direct FGMC's actions. Prior to the PIMCO Purchasers purchasing FGMC, FGMC used Microsoft Teams to communicate. However, PIMCO required FGMC to obtain and use Cisco's Web Ex. FGMC configured every conference room for Web Ex capability and purchased Web Ex licenses so that PIMCO could communicate and direct FGMC using PIMCO's preferred platform.

194.202.    PIMCO also required FGMC executives to fly to California to meet with PIMCO and inform them of what was occurring at FGMC.

195.203.    According to their agreed strategy, PIMCO was able to increase the originations by over 60 percent while increasing profit by 15-20 percent.

196.204.    PIMCO specifically built out the risk management systems. Risk management systems in part help management identify practices that could lead to scrutiny by regulators, such as the fraudulent practices outlined above.

197.205.    PIMCO was very involved in credit risk, i.e. the decision on what type of risk to take during underwriting. On multiple occasions, PIMCO

employees met with FGMC's Director of Credit Risk, reviewed the analysis the Director of Credit Risk used to calculate credit risk, and asked questions in order to fully understand the responsibilities and work of credit risk.

198.206.     PIMCO received reports regarding buyback and indemnifications FGMC had to execute – i.e. specific loans where FGMC violated underwriting or other requirements and had the repurchase or indemnify the purchaser of the loan.

199.207.     PIMCO was so involved that it received daily reports on FGMC's operations. PIMCO decided what software and other infrastructure to upgrade and what not to.

200.208.     PIMCO was specifically interested in mortgages that did not meet standard underwriting requirements and instead had an appetite for riskier mortgages that many lenders refused to originate. The delinquency and foreclosure rates for FHA loans that FGMC originated and underwrote were regularly higher than FHA averages. Higher delinquency and foreclosure rates indicate FGMC was underwriting and approving the exact riskier mortgages PIMCO desired.

201.209.     PIMCO continued to control the operations of FGMC. PIMCO picked the new CEO, an individual PIMCO used to conduct due diligence on its

initial decision to purchase FGMC. PIMCO directed the major actions of FGMC including the decisions on downsizing.

202.210.    As one example of PIMCO's control, PIMCO directed FGMC to hire former PIMCO employee Brian Hale. Hale attended all executive meetings and provided executive coaching to FGMC's CEO. Hale helped select FGMC's new Chief Operations Officer, Lindblom, as well as executives Jordan Simons, Tracey Fenton, and Darien Oien. FGMC executives recognized that the people Hale directed FGMC to hire were untouchable. Hale also oversaw the restructuring of all operations and sales compensation plans.

203.211.    PIMCO also controlledwas fully aware of what FGMC's Board of Directors did andand had at least two seats on the Board of Directors. The Board of Directors received a quarterly report that included Quality Control audits that would have identified the problems with underwriting that FGMC identified.

204.212.    PIMCO continues to control FGMC. PIMCO Purchasers owns 100 percent of FGMC's equity. PIMCO provided the bridge loan to FGMC to help it through bankruptcy. PIMCO, through related a special purpose entity, LVS II SPE XXXIV LLC, provided a backstop to a $25 million warehouse line of credit of FGMC, and B2 FIE XI LLC loaned money to FGMC on June 29, 2022 while PIMCO set up the special purpose entity.

205.213.    Through the above actions, PIMCO exercised its control over FGMC and directlyknowingly assisted caused the false certifications and false claims of FGMC.

206.    Additionally, PIMCO's extensive direction of and involvement in FGMC's day-to-day management meant that FGMC served as PIMCO's alter ego. *See Thermolife Int'l, LLC v. Hi-Tech Pharms., Inc.,* 2018 U.S. Dist. LEXIS 223732 at *8-9 (N.D. Ga. Oct. 30, 2018) (listing the factors that the Eleventh Circuit states a plaintiff must show to establish the alter ego doctrine).

> a. PIMCO disregarded that FGMC was a separate corporate entity and made it a mere instrumentality for the transaction of their own affairs;

> b. a unity of interest and ownership, through placement of PIMCO personnel on the board and control over FGMC's CEO, made it such that the separate personalities of FGMC and PIMCO ceased to exist;

> c. and, here, adhering to the doctrine of corporate entity would promote injustice and protect the fraud associated with PIMCO's direction of FGMC's scheme to defraud the United States.

207.214. Accordingly, PIMCO abused the corporate form by disregarding the separateness of FGMC and PIMCO through the commingling of funds on an interchangeable and/or joint basis, as well as by confusing the otherwise separate properties, records, and control of the two entities. Therefore, PIMCO should not receive the protections of the corporate veil. *See id.* at *9 (laying out factors that courts in the Eleventh Circuit look to in order to justify piercing the corporate veil).

**FGMC IMPROPERLY RETALIATES AGAINST RELATOR CRUTCHER**

208.215. As discussed further herein, during her employment with FGMC, Relator Crutcher discovered multiple instances of mortgage fraud that led her to believe that FGMC was falsely certifying loans for FHA insurance that did not meet the HUD and FHA requirements for mortgage insurance.

209.216. Relator Crutcher attempted to raise her concerns internally with FGMC, but her complaints were repeatedly ignored by FGMC's management.

210.217. For example, in approximately October 2014, Relator Crutcher sent her underwriting manager, Terri Trzybinski several emails indicating that fraud was being committed due to the fact that FGMC was waiving conditions that were required for FHA insurance. Relator Crutcher also indicated that since

many of the W-2s that FGMC used to approve loans had mismatching Social Security Numbers, FGMC had not performed the required due diligence to identify clear instances of fraud.

211.218.    Relator Crutcher also indicated both in these emails and verbally that she would not approve these loans due to the fact that they did not meet the FHA guidelines and that FGMC was using improper documents and calculations in order to get the loans approved.

212.219.    In her emails, Relator Crutcher also asked Ms. Trzybinski whether FGMC had a fraud department that could review the loans that were being approved by FGMC's process of waiving conditions.

213.220.    Despite Relator Crutcher's complaints that FGMC was engaged in FHA mortgage fraud, FGMC brushed off Relator Crutcher's complaints.  Ms. Trzybinski merely responded that FGMC did not have a fraud department, and responded that Relator Crutcher should only worry about approving loans and not about compliance.

214.221.    Shortly after making these internal complaints to Ms. Trzybinski, Relator Crutcher was terminated by FGMC on or about November 10, 2014.

215.222.    Relator Crutcher's termination was in retaliation for her

protected complaints about FGMC's fraud against the government and for her refusal to engage in further fraud against the government.

216.223.    FGMC unlawfully discharged and discriminated against Relator Crutcher because of the lawful acts she had undertaken in further of the False Claims Act.

**FIRST CAUSE OF ACTION**
*For Damages and Penalties Under the False Claims Act*
**31 U.S.C. § 3729(a)(1)(A)**
**(As to All Defendants)**

217.224.    Plaintiff-Relator repeats and realleges the allegations above as if fully set forth herein.

218.225.    Defendants violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(l)(A) by: (i) knowingly presenting or causing to be presented claims for payment or approval; (ii) in order to get false or fraudulent claims paid; and (iii) which claims the United States did pay.

219.226.    The United States paid the false or fraudulent claims because of Defendants' acts and incurred damages as a result.

**SECOND CAUSE OF ACTION**
*For Damages and Penalties Under the False Claims Act*
**31 U.S.C. § 3729(a)(1)(B)**
**(As to All Defendants)**

220.227.    Plaintiff-Relator repeats and realleges the allegations above as

if fully set forth herein.

221.228.    Defendants violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(l)(B) by knowingly making, using, or causing to be made or used, false records, or statements: (i) material to false or fraudulent claims for payment to HUD; and/or (ii) in order to get false or fraudulent claims paid; and (iii) which claims the United States did pay.

222.229.    The United States paid the false or fraudulent claims because of FGMC's acts and incurred damages as a result.

**THIRD CAUSE OF ACTION**

*For Damages and Penalties Under the False Claims Act*
*31 U.S.C. § 3729(a)(1)(C)*
**(As to All Defendants)**

1.    Plaintiff-Relator repeats and realleges the allegations above as if fully set forth herein.

2.    Defendants violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(l)(C) by knowingly conspiring to make, use, or cause to be made or used, false records, or statements: (i) material to false or fraudulent claims for payment to HUD; and/or (ii) in order to get false or fraudulent claims paid; and (iii) which claims the United States did pay.

3.    The United States paid the false or fraudulent claims because of

FGMC's acts and incurred damages as a result.

### FOURTH CAUSE OF ACTION
#### *Unlawful Retaliation Under the False Claims Act*
**31 U.S.C. § 3730(h)**
**(As to FGMC)**

~~1.~~4.    Plaintiff-Relator realleges the above paragraphs as if fully restated herein.

~~2.~~5.    This is a claim for back pay, interest on the back pay, front pay, compensation for special damages, and such other and further relief as the Court may deem proper for injuries Relator sustained as a result of retaliatory actions taken against Relator by Defendant, including litigation costs and reasonable attorneys' fees.

~~3.~~6.    31 U.S.C. § 3730(h) provides, in relevant part:

(h) Relief From Retaliatory Actions.

(1)    . . . Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

(2)    . . . Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay,

interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. . . .

4.7.   Through the acts described above, Relator repeatedly attempted to stop Defendant from committing violations of 31 U.S.C. § 3729.

5.8.   Relator's acts described above, undertaken to stop Defendants from committing countless violations of 31 U.S.C. § 3729(a), consisted of protected conduct under 31 U.S.C. § 3729 *et seq*.  Relator repeatedly raised concerns with Defendant's management that Defendant was engaging in fraud and submitting false claims to the Government.  Defendant was aware of Relator's protected conduct and acted in retaliation as a result of Relator's protected conduct under the False Claims Act.

6.9.   Through the acts described above, Defendant repeatedly ignored and/or refused to provide any meaningful response to Relator's lawful inquiries and efforts to redress Defendant's intentional and knowing violations of HUD and the FHA's underwriting requirements and the submission of false claims for mortgage insurance by HUD.

7.10.  As a direct result of Relator's lawful inquiries and efforts to stop intentional and knowing violations of HUD and the FHA's rules and regulations, Defendant unlawfully terminated Relator because of lawful acts done by Relator

in furtherance of her efforts to stop Defendant from submitting false claims.

8.11.    Defendant is liable under 31 U.S.C. § 3730(h) for (i) an award of double back pay; (ii) interest on back pay; (iii) an award of front pay; (iv) special damages; (v) litigation costs; (vi) attorneys' fees; and (vii) such other and further relief as the Court may deem proper.

**WHEREFORE, Relator, on behalf of herself and the United States Government, requests the following relief:**

a.    A judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' violations of the False Claims Act;

b.    A judgment against Defendants for civil penalties as described (and adjusted for inflation) under 31 U.S.C. § 3729(a) (1)(G) for each of Defendants' violations of the False Claims Act;

c.    That Relator recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

d.    That Relator be awarded all reasonable attorneys' fees in bringing this action;

e.    That, because the United States Government did not proceed with this action, Relator be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

f.    An award against FGMC to Relator on her retaliation claims including double back pay; interest on back pay; an award of front pay; litigation costs; attorneys' fees; special damages; an injunction restraining further retaliation; reinstatement of

Relator's position; reinstate of full fringe benefits and seniority rights; compensation for lost wages, benefits, and seniority rights; and other remuneration.

g.       That a trial by jury be held on all issues so triable;

h.       An award of pre-judgment interest; and

i.       Such other relief to Relator and/or the United States of America as this Court may deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Dated: March 3, August 16, 2023 October 13, 2023

By:       /DRAFT/    s/    J. Nelson Thomas_____

J. Nelson Thomas, Esq. (to be admitted *pro hac vice*)
Jonathan W. Ferris, Esq. (to be admitted *pro hac vice*)
**THOMAS & SOLOMON LLP**
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
nthomas@ theemploymenttattorneys.com
jferris@theemploymenttattorneys.com

Julie K. Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**BRACKER & MARCUS LLC**
3355 Lenox Road
Suite 660

Atlanta, GA 30326
Telephone: (770) 988-5035
Fax (678) 648-5544
Julie@FCAcounsel.com
Jason@FCAcounsel.com
Julie K. Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**BRACKER & MARCUS LLC**
3225 Shallowford Road
Suite 1120
Marietta, GA 30062
Telephone: (770) 988-5035
Fax (678) 648-5544
Julie@FCAcounsel.com
Jason@FCAcounsel.com

*Attorneys for Relator*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.*<br>**KARI CRUTCHER,**<br><br>         *Plaintiff,*<br><br>*v.*<br><br>**FIRST GUARANTY MORTGAGE CORPORATION, PACIFIC INVESTMENT MANAGEMENT COMPANY, LLC, PIMCO INVESTMENTS, LLC, AARON SAMPLES, ANDREW PETERS, JILL WINTERS and SUZY LINDBLOM,**<br><br>        *Defendants.* | **[PROPOSED] ORDER**<br><br>**Civil Action No.**<br>**16-CV-03812-SCJ** |

## ORDER

This matter having come before this Court and for good cause shown, this Court hereby GRANTS Plaintiff-Relator's Motion for Leave to File a Supplemental Third Amended Complaint. The Clerk of the Court is DIRECTED to file the Motion's attachment as Plaintiff-Relator's Third Amended Complaint.

SO ORDERED this _____ day of _____, 2023.

_____
Honorable Thomas W. Thrash, Jr.