## IN THE UNITED STATsES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FIRST GUARANTY MORTGAGE CORPORATION, *et al.*,[1]<br><br>Liquidating Debtors. | Chapter 11<br><br>Case No. 22-10584 (CTG)<br><br>(Jointly Administered)<br><br>**Re: D.I. 988 & 998** |

### REPLY OF THE PIMCO PARTIES FOR CONTEMPT FOR VIOLATIONS OF THE COURT'S ENFORCEMENT ORDER AND CONFIRMATION ORDER

The PIMCO Parties hereby submit this reply in support of their Motion for Contempt.[2]

1.      On September 5, 2023, this Court found that all claims asserted against the PIMCO Parties in the Qui Tam Litigation had been released and ordered Relator "to ***immediately*** cease and refrain from any further acts to commence or continue, in any manner or in any place, any action, or other proceeding, including the Qui Tam Litigation, to prosecute, assert, or enforce the Released Claims asserted against the PIMCO Parties."  D. I. 951, ¶ 4 (emphasis added).  Further, the Court ordered Relator "to take all actions necessary to dismiss the Released Claims from the Qui Tam Litigation, without prejudice to the rights of Relator with respect to any claim that may be asserted consistent with the terms of the Plan, Confirmation Order, and this Order."  *Id.* ¶ 5.

2.      Instead of immediately ceasing to prosecute the Released Claims and dismissing the action as ordered by this Court, Relator sought to compel discovery on September 22, 2023 to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction were:  First Guaranty Mortgage Corporation ("FGMC") (9575); and Maverick II Holdings, LLC ("Maverick") (5621).  The service address for FGMC is 13901 Midway Road, Ste. 102-334, Dallas, Texas 75424.

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the *Motion of the PIMCO Parties for Contempt for Violations of the Court's Enforcement Order and Confirmation Order* [D. I. 988] (the "Motion for Contempt").

continue to prosecute the barred claims.  Qui Tam Dkt. 105.  This motion was in direct violation of this Court's Enforcement Order.  Relator did not seek to dismiss the underlying action until October 13, 2023, more than a week after the PIMCO Parties filed the Motion for Contempt, despite this Court's order that she immediately dismiss them over a month earlier.  And now, Relator has compounded her contemptuous behavior toward this Court's rulings by seeking to file a proposed Third Amended Complaint [Qui Tam Dkt. 108-1] ("TAC") that reasserts the very claims that this Court has held are barred against the PIMCO Parties and also against several additional Released Parties.

3.      The proposed TAC violates this Court's rulings in at least two ways.  *First*, the cosmetic changes in the TAC continue to assert claims that require disregarding the corporate form of FGMC to hold others liable for actions taken "at FGMC."  TAC ¶¶ 197–199.  Bedrock principles of corporate law dictate that these claims seek to pierce the corporate veil and, as such, have been released and are barred.  As this Court predicted, striking two paragraphs of the Supplemental Second Amended Complaint ("SSAC") would overlook that the SSAC as a whole advanced solely Released Claims.  *See* Hr'g Tr. at 49:13–21.

4.      *Second*, the TAC seeks to assert Released Claims against additional Released Parties:  B2 FIE IV LLC, V2 FIE Trust, FIE IV Holdco LLC, and PIMCO Bravo Fund II, L.P. (collectively, the "BRAVO Entities").  The Enforcement Order, which held that the Confirmation Order "conclusively, absolutely, unconditionally, irrevocably, and forever released" the claims against the PIMCO Parties belonging to FGMC's bankruptcy estate, did not authorize Relator to assert the same Released Claims against other parties that FGMC also released.

2

5.      Although the TAC proposes to add a conspiracy cause of action, that does not alter the nature of Relator's allegations and does not create a direct claim.  The allegations of the TAC demonstrate that the facts relevant to a conspiracy claim are common to all creditors and do not depend on Relator's personal dealings, and the substance of that claim in the context of the TAC requires veil piercing.  State law regularly recognizes such "conspiracies" as derivative claims that FGMC had standing to pursue.  As such, the conspiracy claim is an estate claim FGMC released.

6.      Relator's procedural attack on the Motion for Contempt is a red herring.  Even though no meet and confer was required, the PIMCO Parties attempted to resolve this matter without the Court's intervention.  The PIMCO Parties sought Relator's agreement to dismiss the Released Claims on October 4, 2023.  D. I. 998-3.  Relator's only response was a cryptic email indicating only that counsel in the Georgia District Court would be "filing a motion next week which will address your concerns."  D. I. 988-4.  Relator did not state that she would dismiss the Released Claims as required by this Court, and her motion for leave to file the TAC demonstrates that she continues to pursue those claims in direct violation of this Court's orders.

7.      Relator contends that she complied because the Enforcement Order did not delineate a time frame for her compliance, and thus apparently Relator could comply at her leisure. That is simply not true.  The Enforcement Order required Relator "to ***immediately*** cease and refrain from any further acts to commence or continue, in any manner or in any place, any action, or other proceeding, including the Qui Tam Litigation, to prosecute, assert, or enforce the Released Claims asserted against the PIMCO Parties."  D. I. 951, ¶ 4 (emphasis added).  There can be no dispute that Relator's conduct between the entry of this Court's Enforcement Order and her filing of a motion to dismiss were in direct violation of this Court's directives.  All the while, the PIMCO

3

Parties have incurred and continue to incur costs that would not have been necessary if Relator had simply complied with this Court's orders. Relator should be held in contempt and face daily fines until she achieves full compliance, and she should be required to pay the attorney's fees and expenses the PIMCO Parties have incurred as a result of her violations.

## I.    Relator Is in Contempt.

8.    This Court's orders were clear. Relator was directed to take action "immediately" with the specific end of accomplishing "all actions necessary to dismiss the Released Claims from the Qui Tam Litigation." Bankr. Dkt. 951, ¶¶ 4–5; *see also Maness v. Meyers*, 419 U.S. 449, 458 (1975) ("We begin with the basic proposition that all orders and judgments of courts must be complied with promptly."). Relator's objection does not dispute that (1) the Confirmation Order and Enforcement Order are valid and binding, or that (2) Relator had knowledge of the orders. *Marshak v. Treadwell*, 595 F.3d 478, 485 (3d Cir. 2009). Relator disputes only that her conduct has disobeyed this Court's orders. *Id.*; D. I. 998, ¶¶ 1–2. However, Relator's conduct since the Enforcement Order was not "immediate[]" and is merely paying lip service towards ultimately "dismiss[ing] the Released Claims from the Qui Tam Litigation." Instead, Relator waited over a month to move to dismiss the Qui Tam Litigation and did so only ***after*** the PIMCO Parties incurred fees to move for contempt to secure her compliance with this Court's orders. Relator's actions demonstrate that she has repeatedly disregarded this Court's orders. Relator's arguments that the Federal Rules of Civil Procedure prevented her from complying with this Court's orders, because she "understood" that the PIMCO Parties would not consent to dismissal when she never even approached the PIMCO Parties regarding dismissal, or because she needed time to prepare the TAC, which simply re-asserts the Released Claims, are without merit. Relator should be held in

4

contempt for her continued violations of this Court's orders, including her attempt to assert Released Claims against the PIMCO Parties and additional Released Parties.

9.       As detailed in the Motion for Contempt, Relator opposed lifting the stay of briefing on the PIMCO Parties' Motion to Dismiss in direct contravention of this Court's orders, arguing that the Qui Tam Litigation as a whole "should remain stayed pending disposition of Plaintiff-Relator's cross-motion to transfer and Plaintiff Relator' [sic] appeal in the Bankruptcy Court." D. I. 988, ¶ 25 (quoting Qui Tam Dkt. 106 at 9).  Instead of dismissing the pending action, in further violation of this Court's orders, Relator moved to transfer the entire Qui Tam Litigation—including the Released Claims—to the District of Delaware and to compel the production of insurance policies to "continue," "prosecute," "assert," and "enforce" Released Claims.  *Id.* ¶¶ 5, 25 (citing Qui Tam Dkt. 106 at 16–22).  Even after the Motion for Contempt, Relator continued to press for transfer of the entire action and to compel discovery.  Qui Tam Dkt. 110 at 12–14.

10.      Relator's objection offers no explanation for these actions.  Because "an alleged contemnor's behavior need not be willful in order to contravene the applicable decree," the sole focus is whether Relator's conduct actually violates the orders.  *FTC v. Lane Labs-USA, Inc.*, 624 F.3d 575, 582 (3d Cir. 2010).  Relator does not assert that these violations were merely "technical" or "inadvertent" and resulted despite having "taken all reasonable steps to comply with the valid court order."  *Id.* at 591.  The PIMCO Parties brought the Motion for Contempt based on this conduct.  As there can be no reasonable dispute that this conduct violated this Court's orders, the PIMCO Parties have met their clear and convincing burden.  D. I. 988, ¶ 15; D. I. 998, ¶ 22.

11.      It was not until more than a week after the Motion for Contempt that Relator filed a *Motion for Leave to File a Motion to Dismiss Claims Pursuant to Rule 41(a)(2) and to File a*

*Third Amended Complaint* on October 13, 2023. Qui Tam Dkt. 108. Relator did not need to request leave in order to dismiss the Released Claims. She had been ordered to do so "immediately" and "to take all actions necessary" to achieve dismissal. D. I. 951, ¶ 4–5. Relator could have at least sought to arrange a stipulation signed by all parties that have appeared in the Qui Tam Litigation. Fed. R. Civ. P. 41(a)(1)(A)(ii). Relator also could have moved to dismiss "on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). But Relator did not do any of those things, and did not even try to do so. In short, in violation of this Court's order, Relator did not "to take all actions necessary to dismiss the Released Claims." *See* D. I. 998, ¶¶ 2, 26–27.

12.    By the time Relator took even a single step towards dismissing the Released Claims—a month and a half after the Enforcement Order and after extensive affirmative conduct to continue to prosecute and expand the Released Claims—the PIMCO Parties incurred the costs of the Motion to Enforce, resisting Relator's obstructive conduct in the Georgia District Court, and the Motion for Contempt. The Court should hold Relator in contempt.

## II.    Relator's Procedural Arguments Are Irrelevant and Incorrect.

13.    Relator complains that the Motion for Contempt "was not filed after a meaningful meet and confer." D. I. 998, ¶¶ 3, 19.[3] However, Relator cites no bankruptcy rule requiring a meet and confer in these circumstances, because there is no such rule.[4] Moreover, Relator's counsel's

---

[3] Relator also asserts that she "retained new counsel in this action and the District Court appeal." D. I. 998, ¶ 29 n.4. However, the counsel who signed her objection directly received the PIMCO Parties' letter, along with six other attorneys who have appeared for her in this action and/or the Georgia District Court. There has been no indication that any of the attorneys who received that communication have withdrawn from representation. Moreover, the fact that Relator retained new **Delaware** counsel, who are not involved in the Qui Tam Litigation, is irrelevant to her obligations to comply with this Court's orders by moving in the **Georgia District Court**, where Relator's counsel has not changed, to dismiss the Released Claims.

[4] The Bankruptcy Rules require a meet and confer in specific, identified circumstances, such as Rule 2004 motions (*see* Del. Bankr. L.R. 2004-1) and discovery motions (*see* Del. Bankr. L.R. 7026-1). The general rules regarding

cryptic response,  stating only that "it is our understanding that counsel for the Realtor [sic] in the N.D. Ga. action will be filing a motion next week which will address your concerns,"  D. I. 988-4, did not allay any concerns whatsoever.  Indeed, the email did not say whether Relator would dismiss anything.  *Id.*  And ultimately, Relator does not suggest that anything would have turned out differently if the parties discussed their positions in more detail.  Clearly, nothing would have changed.

14.    In short, the Motion for Contempt is procedurally proper and the Court can (and should) hold Relator in contempt and impose appropriate sanctions at the hearing on the motion. *Mine Workers v. Bagwell*, 512 U.S. 821, 827 (1994).

## III.    Relator Seeks to Assert Released Claims Against Additional Released Parties.

15.    Relator asserts that the Motion for Contempt is "now mooted" since "she has moved for leave to dismiss and amend the Complaint to remove the Released Claims."  D. I. 998, ¶ 2.  But the proposed TAC flouts the Enforcement Order and the Confirmation Order by continuing to assert Released Claims against the PIMCO Parties and seeking to commence an action to pursue Released Claims against the BRAVO Entities who were also released.

16.    The Enforcement Order re-affirmed that the PIMCO Parties, as Released Parties, were released by FGMC in the Debtor/Estate Release of the Plan and Confirmation Order.  D. I. 951, ¶ 2.  This ruling applies to the BRAVO Entities, which were also released by FGMC under the Debtor/Estate Release of the Plan and Confirmation Order.[5]

---

motions, pursuant to which the Motion for Contempt was filed, do not require a meet and confer (*see* Del. Bankr. L.R. 9006-1 and 9013-1).

[5] The Plan defines "Released Parties" to include, among others, the Cash Flow DIP Lender, the Prepetition Bridge Lender, and each of the Related Persons (as defined in the Plan) of the foregoing.  D. I. 671-1 at 24, 26, 33, 36.  Each of the BRAVO Entities are Related Persons of the Cash Flow DIP Lender and/or the Prepetition Bridge Lender and, as such, are Released Parties and have been released under the Debtor/Estate Release.

17.     Any claim against the BRAVO Entities that falls within the Debtor/Estate Release violates the Confirmation Order just as much as its assertion against the PIMCO Parties violates the Enforcement Order and Confirmation Order.  By proposing to pursue the BRAVO Entities as additional defendants, the TAC makes much more serious Relator's ongoing violations of this Court's orders.

## IV.    The TAC Continues to Assert Released Claims.

18.     The allegations of the proposed TAC, like the SSAC before it, make clear that any allegedly improper conduct occurred only "at FGMC," TAC ¶¶ 197–199, and that Relator seeks to hold the PIMCO Parties—and now also the BRAVO Entities—liable only because they allegedly engaged in the types of actions and made the types of decisions typical of business owners.  Relator's theory thus necessarily violates the basic precept that distinct corporate entities are separate persons, and that those who "own" or "control" them are liable for the actions of the entity only in exceptional circumstances.

19.     "The independent legal existence of a corporation is a basic component of corporate law and of the economic policy it supports." *O'Hazza v. Executive Credit Corp.*, 431 S.E.2d 318, 320 (Va. 1993) (citing *Cheatle v. Rudd's Swimming Pool Supply Co.*, 360 S.E.2d 828, 831 (Va. 1987)); *Perpetual Real Estate Servs., Inc. v. Michaelson Props., Inc.*, 974 F.2d 545, 547–48 (4th Cir. 1992) ("Virginia courts have long recognized the basic proposition that a corporation is a legal entity separate and distinct from its shareholders.").[6]

20.     "A fundamental purpose of incorporation is to 'enable a group of persons to limit their liability in a joint venture to the extent of their contributions to the capital stock.'" *Perpetual*,

---

[6] FGMC is a Virginia corporation.  SSAC ¶ 28; TAC ¶ 30.

974 F.2d at 548 (quoting *Beale v. Kappa Alpha Order*, 64 S.E.2d 789, 796 (Va. 1951)).  On this basis, "large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted." *Anderson v. Abbott*, 321 U.S. 349, 362 (1944).

21.    "Ignoring the separate existence of a corporation . . . is an extraordinary act to be taken 'only when necessary to promote justice.'" *O'Hazza*, 431 S.E.2d at 321 (quoting *Cheatle*, 360 S.E.2d at 831).  For this reason, Virginia courts are "very reluctant to permit corporate veil piercing." *Dana v. 313 Freemason*, 587 S.E.2d 548, 554 (Va. 2003).  The "burden of proof rest[s] upon the party seeking to pierce the veil." *Cheatle*, 360 S.E.2d at 831.

22.    "Each case is *sui generis* and requires examination of the particular factual circumstances surrounding the corporation and the acts in question." *O'Hazza*, 431 S.E.2d at 321.  The facts alleged in the TAC, like the SSAC, merely "set up" the "core veil piercing alter-ego claims that are estate causes of action." Hr'g Tr. at 49:13–21.

23.    The Enforcement Order applies to the TAC, which maintains most of the allegations from the SSAC unaltered.  Like the SSAC, the TAC acknowledges that none of the PIMCO Parties or BRAVO Entities (a) was ever a direct endorsement lender, (b) ever submitted any loan-level certifications to the government, or (c) ever made any statements or presented any claims for payment to the government in connection with HUD's FHA mortgage insurance program.  *See* TAC ¶¶ 192–213; SSAC ¶¶ 189–207.  Instead, any conduct that Relator argues allegedly violated the FCA occurred "at FGMC." TAC ¶¶ 197–199.

24.    Moreover, Relator does not assert that she ever had any dealings with any of the PIMCO Parties or BRAVO Entities.  TAC ¶¶ 130–141, 217–223; SSAC ¶¶ 127–138, 210–216.  Rather, as before, Relator alleges that "PIMCO" became FGMC's "new rich uncle," TAC ¶ 200,

9

SSAC ¶ 192, when the BRAVO Entities "bought the majority of FGMC," and that "PIMCO" held "at least two seats" on FGMC's board of directors, and ultimately obtained "100 percent of FGMC's equity."  TAC ¶¶ 194, 211–212; SSAC ¶¶ 189, 203–204; *see also* TAC ¶ 199 ("After the sale, PIMCO quickly took control"), ¶ 200 ("It was made clear to FGMC staff that PIMCO was the one making the decisions."), and ¶ 212 ("PIMCO continues to control FGMC.").

25.    The TAC adds that "PIMCO [LLC] used a series of funds to purchase FGMC," namely, the BRAVO Entities.  TAC ¶¶ 21, 36.  "PIMCO LLC and PI both actively managed the [BRAVO Entities'] complete investment of FGMC, and also provided advice about FGMC to [them]."  *Id.* ¶¶ 21–22.  The TAC repeats the SSAC's allegations that the PIMCO Parties "engaged in extensive due diligence" (adding that the diligence occurred before advising the BRAVO Entities to make investments in FGMC), including "holding extensive meetings with senior executives, reviewing internal FGMC documents and data, and gaining an in depth understanding of FGMC's operations."  TAC ¶ 197; SSAC ¶ 190.  The PIMCO Parties "handpicked senior executives" and opened a new office location in favor of a prior location.  TAC ¶ 199; SSAC ¶ 191.

26.    The TAC fails to specify any action by the PIMCO Parties or BRAVO Entities.  All of the factual allegations in the TAC would also be true of most business owners and managers.  The TAC expressly disavows alter ego and veil piercing claims, stating: "The PIMCO Defendants' liability does not stem from an alter ego claim or veil piercing claim, but instead because of the direct actions of the PIMCO Defendants."  TAC ¶ 193; *see also id.* at 62–63 (redline showing deletion of SSAC ¶¶ 206–207).  Yet the TAC, like the SSAC, fails to assert any direct FCA violations by the PIMCO Defendants or the BRAVO Entities, relying only on derivative claims.

10

Case 22-10584-CTG    Doc 1017    Filed 10/31/23    Page 11 of 20

27.    The TAC unsuccessfully attempts to distance from alter ego and veil piercing theories by revising some of the allegations about the PIMCO Parties' purported "control" to instead refer to their alleged "knowledge." *E.g.*, TAC ¶¶ 201, 211, 213.  For example, the TAC claims that the PIMCO Parties' access to visit FGMC office locations "allowed it to knowingly assist in the fraud."  TAC ¶ 200.  The TAC asserts, without support, that the "stated goal of purchasing and managing FGMC was to originate higher risk loans and more loans with the goal of increasing FGMC's profits."  TAC ¶¶ 23, 195–196.  FGMC's profits allegedly increased as a result of this purported "agreed strategy."  TAC ¶ 203.  These revisions fail to assert any direct claim against any of the PIMCO Parties (or the BRAVO Entities).

28.    As with the SSAC, Relator is attempting through the TAC to hold the PIMCO Parties and BRAVO Entities liable not for their own conduct but for the certifications and endorsements "at FGMC," which FGMC allegedly made in its capacity as a direct endorsement lender, erasing the distinct identities of seven separate entities.  The TAC thus "continue[s]" "pursuing" the same derivative, alter ego, and veil piercing claims this Court held were released and enjoined in the Confirmation Order.  D. I. 951, ¶¶ 2–4.  On that ground alone, the TAC violates the Enforcement Order and Confirmation Order.

## V.    The TAC's Conspiracy Cause of Action Is Also a Released Claim.

29.    In a proposed new cause of action, the TAC alleges in conclusory fashion only that "[all] Defendants . . . knowingly conspir[ed]" to make false records, and that the "United States paid the false or fraudulent claims ***because of FGMC's acts***."  TAC at Third Cause of Action (emphasis added).  In support of this claim, the TAC states only that the "PIMCO Defendants are liable because they conspired to knowingly assist FGMC in both presenting the above-described

11

false claims to the government, as well as falsely certifying both at an annual, and at a loan-by-loan basis, that FGMC as well as its fraudulent loan files met governmental requirements." TAC ¶ 192. The TAC provides no particularized allegations detailing the supposed conspiracy, which are required to state any type of claim under the FCA.

30. This claim belonged to FGMC and was released because (1) it is one that FGMC had the right to bring on its own behalf under state law and (2) the facts it depends upon are general to all of FGMC's creditors. *In re Emoral, Inc.*, 740 F.3d 875, 879–80 (3d Cir. 2014) (quoting *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 n.5 (3d Cir. 2002)). As a result, Relator lacked standing to pursue this claim since FGMC's chapter 11 filing and has been permanently enjoined from pursing it since the Confirmation Order. *See id.* at 879; D. I. 951, ¶ 2.

31. The FCA provides a cause of action against any person who conspires to violate any other provision of the FCA. 31 U.S.C. § 3729(a)(1)(C). Under this provision, "it is not enough for a plaintiff to show that the alleged conspirators agreed upon a fraud scheme that had the effect of causing a private entity to make payments using money obtained from the Government. Instead, it must be shown that the conspirators intended 'to defraud the Government.'" *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008) (quoting the statute). In particular, "it must be established that they agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim." *Id.*[7]

---

[7] Congress amended the FCA to overrule the Supreme Court's interpretation of the presentment and false record prongs of the FCA. *E.g.*, *United States ex rel. Electrical Workers IBEW Local 98 v. Farfield Co.*, 5 F.4th 315, 334 (3d Cir. 2021); *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 n.6 (11th Cir. 2015). However, the substance of the conspiracy prong was not affected by these amendments. *See United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 760–63 (3d Cir. 2017).

12

32.    The elements to establish an FCA conspiracy follow the elements for civil conspiracy under applicable state law.  *E.g.*, *United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 133 (D.D.C. 2014) (Jackson, J.).   Under Virginia law, "the gist of the civil action of conspiracy is the damage caused by the acts committed in pursuance of the formed conspiracy and not the mere combination of two or more persons to accomplish an unlawful purpose or use unlawful means."  *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 316 (Va. 2014) (quoting *Gallop v. Sharp*, 19 S.E.2d 84, 86 (Va. 1942)).   In other words, even evidence of an agreement or other coordinated conduct is not enough to establish a conspiracy. "No cause of action exists without the resulting injury, and the damage produced must arise as the effective result of the conspiracy."  *Id.* at 316–17.

33.    A conspiracy claim never stands alone.  "Civil conspiracy is merely a method of establishing joint liability for the underlying tort."  *Dunlap*, 754 S.E.2d at 318 (quoting *Selle v. Tozser*, 786 N.W.2d 748, 756 (S.D. 2010); *id.* at 317 (quoting *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983)) ("the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort").  The same is true under federal law.  Like any other form of vicarious liability, "[t]here can be no liability for conspiracy where there is no underlying violation of the FCA."  *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 507 n.53 (quoting *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014)); *United States ex rel. Petratos v. Genentech, Inc.*, 141 F. Supp. 3d 311, 317 n.3 (D.N.J. 2015), *aff'd*, 855 F.3d 481 (3d Cir. 2017) ("Thus, this count rises or falls with the others.")

34.    Further, "there can be no conspiracy to do an act that the law allows."  *Dunlap*, 754 S.E.2d at 317.  For example, it is not possible for a corporation to conspire with those who are

13

entitled to carry out its work. *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002). This includes the corporation's agents because "a principal and an agent are not separate persons for purposes of the conspiracy statute" and "a single entity cannot conspire with itself." *Charles E. Brauer Co. v. NationsBank of Va., N.A.*, 466 S.E.2d 382, 387 (Va. 1996) (citing *Fox v. Deese*, 362 S.E.2d 699, 708 (Va. 1987)) (bank's servicer was acting on behalf of the bank and could not conspire with the bank); *see also Stauffer v. Fredericksburg Ramada, Inc.*, 411 F. Supp. 1136, 1139 (E.D. Va. 1976) (parties to a contract cannot "conspire" to breach that contract, instead such a conspiracy must include a third party).

35.    Virginia courts regularly consider conspiracy claims to be derivative. *E.g.*, *Schrager v. Isquith*, No. CH05-272, 2005 WL 2546648, at *2 (Va. Cir. Ct. Aug. 19, 2005) ("Any claims that Plaintiff Schrager seeks recovery for personally cannot be pursued because any and all claims asserted are not his but the corporation's"); *see also Firestone v. Wiley*, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007) (dismissing personal civil conspiracy claims because of the "obvious defect" that they depended on duties owed to the corporation and not to the plaintiff personally). *Accord. Burton v. Dolph*, 89 Va. Cir. 101, 119 (Cir. Ct. 2014) (permitting civil conspiracy claim to proceed as a derivative claim); *Willard ex rel. Moneta Bldg. Supply, Inc. v. Moneta Bldg. Supply, Inc.*, 50 Va. Cir. 558, 590–91 (Cir. Ct. 1998), *aff'd*, 515 S.E.2d 277 (Va. 1999) (dismissing derivative conspiracy claim as insufficiently pled).    Accordingly, FGMC, as a Virginia corporation, had the right under Virginia law to bring the conspiracy claim Relator now seeks to assert in the TAC and could have brought that claim at the time of its chapter 11 filing.

36.    Further, all of the allegations made in support of the conspiracy claim are necessarily general, and are the same as they would be for any creditor of FGMC. *Emoral*, 740

F.3d at 879–80.  The TAC makes no reference to Relator's "personal dealings" with the PIMCO

Parties or BRAVO Entities.  *In re TPC Grp. Inc.*, No. 22-10493 (CTG), 2023 WL 2168045, at *7

(Bankr. D. Del. Feb. 22, 2023), *appeal filed*, No. 23-cv-0255-RGA (D. Del. Mar. 8, 2023) (quoting

*Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1349 (7th Cir. 1987)).

37.     Thus, the claims in the TAC, like the claims in the SSAC, satisfy all of the elements

of *Emoral*.  They are claims that the Debtors could have asserted on their own behalf under state

law at the time these chapter 11 cases were commenced.  *Emoral*, 740 F.3d at 879–80; *e.g.*, *Steyr-*

*Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 135–36 (4th Cir. 1988) (Virginia corporation

has an equitable interest in the assets of its alter ego).  Relator "lack[s] standing to assert claims

that are property of the estate."  *Emoral*, 740 F.3d at 879.  And FGMC "conclusively, absolutely,

unconditionally, irrevocably, and forever released" all such claims.  D. I. 951, ¶ 3.

38.     This Court was "satisfied from a review of the operative complaint that the claims

it asserts are claims that are under the rationale of *Emoral* and my decision in *TPC*, which simply

seeks to give effect to the rationale of *Emoral* estate causes of action" that belonged to FGMC,

and which were released and are now permanently enjoined by the Confirmation Order.  Hr'g Tr.

at 67:14–18.  While a direct claim might theoretically be possible under the FCA, *id.*, Relator has

not asserted any direct claim in the TAC any more than she did in the SSAC.  By persisting to seek

to pierce FGMC's corporate veil including through a new conspiracy claim that was also released,

Relator is violating this Court's order to "immediately cease and refrain" and "dismiss the

Released Claims from the Qui Tam Litigation."  D. I. 951, ¶ 4–5.

15

**VI.    Relator Should Be Fined Until She Complies And Should Pay the PIMCO Parties'
Reasonable Attorney's Fees.**

39.    Relator argues that the PIMCO Parties "cannot demonstrate any harm or prejudice."
D. I. 998, ¶ 42.  However, the PIMCO Parties have suffered and continue to suffer significant harm
as a result of Relator's contumacious behavior.  Relator continued to pursue the Released Claims
after the Confirmation Order, necessitating the Motion to Enforce.  Even after the Enforcement
Order, however, Relator actively obstructed the PIMCO Parties' Motion to Dismiss and inserted
numerous additional issues into the Qui Tam Litigation through her own motions, including a
motion to compel additional discovery into the Released Claims.  It was only after the PIMCO
Parties brought the Motion for Contempt that Relator took a single step (albeit not an
"immediate[]" one) toward "dismiss[ing] the Released Claims from the Qui Tam Litigation" and
even then, Relator did not seek a simple stipulation among the parties, but instead proposed to file
the TAC, which persists in prosecuting the Released Claims against the PIMCO Parties,
commences prosecution of the same Released Claims against the BRAVO Entities who were also
released, and adds a new Released Claim against all of them.  This has required the PIMCO Parties
to press forward with the Motion for Contempt and has required them—and the Liquidating
Trust—to prepare for and appear at the upcoming hearing on the Motion for Contempt.  None of
those costs would have been incurred if Relator had obeyed this Court's orders.

40.    In direct contravention of these orders, Relator (i) opposed the PIMCO Parties'
motion to lift the stay of briefing so that Relator could delay or perhaps avoid altogether ever
responding to their Motion to Dismiss filed in June 2023, (ii) moved to transfer the entire Qui Tam
Litigation—including Released Claims—to another venue without first moving to dismiss or even
referencing an intention to dismiss those claims, (iii) moved to compel discovery on the Released

16

Claims to obtain insurance information in an effort to recover on those Released Claims, and (iv) ultimately filed a motion for leave that appears designed to prosecute the TAC, which would assert Released Claims against even more Released Parties. These violations go to the "core substance" of the Enforcement Order's and Confirmation Order's obligations and "were not the result of oversight or neglect." *FTC v. Lane Labs-USA, Inc.*, No. 00-cv-3174 (DMC), 2011 WL 5828518, at *10–11 (D.N.J. Nov. 18, 2011).

41.    Relator argues that "the PIMCO Parties could have avoided [the] costs" of the motion to lift the stay of briefing but Relator fails to explain why that is so. Indeed, lifting the stay to set an orderly timetable for Relator to respond to the Motion to Dismiss would open up for Relator several avenues to more efficiently "take all actions necessary to dismiss the Released Claims." D. I. 951, ¶ 4. Relator opposed that motion. Qui Tam Dkt. 106.

42.    Relator disputes the costs for the Motion to Enforce because it was "filed before the Court entered the Enforcement Order" but as Relator concedes, "it was the basis for the order," D. I. 998, ¶ 44, and furthermore, it was a motion to enforce the Confirmation Order, which no party appealed, and which is final, binding, and conclusive. As Relator conceded in the District Court, the Enforcement Order "merely reaffirm[ed] the Bankruptcy Court's prior orders," including the Confirmation Order. Qui Tam Dkt. 105 at 8. It was the Confirmation Order that imposed the permanent injunction that Relator is continuing to violate. Hr'g Tr. at 67:19–20 (the Enforcement Order "gives effect to the Confirmation Order"). This Court has the power to enforce its Enforcement Order, which remains in effect notwithstanding Relator's appeal. D. I. 988, ¶ 28 (collecting authority); *see also Maness v. Meyers*, 419 U.S. 449, 458 (1975); *Gorgonzola v. Dir. U.S. OPM*, No. 22-1942, 2023 WL 1478999, at *7 n.13 (3d Cir. 2023).

17

43.    Relator cautions that this Court could find Relator in contempt but exercise discretion not to impose any sanction.  D. I. 998, ¶ 23 (citing *In re Mariner Post-Acute Network*, 329 B.R. 481, 489 (Bankr. D. Del. 2005)).   However, the court in *In re Mariner* found that the alleged contemnors had not violated its orders because they had already dismissed the action that could no longer be pursued following a discharge injunction.  *Id.*   That case therefore fails to support Relator's notion that this Court should decline to sanction Relator here.

44.    The sanctions the PIMCO Parties request are narrowly tailored to Relator's violations.  The PIMCO Parties request a daily fine until Relator comes into full compliance with the Enforcement Order and the Confirmation Order.  As soon as Relator does so, those fines will cease.  Such a fine is the prototypical contempt sanction, aiming "to compel future compliance with a court order, [which] are considered coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Bagwell*, 512 U.S. at 827.

45.    In addition, the PIMCO Parties seek their reasonable attorney's fees in preparing the motion practice necessitated by Relator's violations.  D. I. 988, ¶ 37.  "Under traditional principles of equity practice, courts have long imposed civil contempt sanctions to 'coerce the defendant into compliance' with an injunction or 'compensate the complainant for losses' stemming from . . . noncompliance with an injunction.'" *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (quoting *United States v. Mine Workers*, 330 U.S. 258, 303–04 (1947)).  That is precisely what the PIMCO Parties request here.  Relator has no answer to these costs and does not deny that they are the direct result of her contumacious behavior.  The Court should impose a daily fine and award the PIMCO Parties their reasonable attorney's fees.

18

## CONCLUSION

46.     For the reasons set forth above and in the Motion for Contempt, the PIMCO Parties

respectfully request that this Court hold Relator in contempt for violating the Enforcement Order

and Confirmation Order, order Relator to pay the PIMCO Parties' reasonable attorney's fees and

expenses resulting from Relator's noncompliance with those orders, and order Relator to pay a

daily fine for so long as her violations continue.

Dated:  October 31, 2023

/s/ Robert J. Stearn, Jr.
Robert J. Stearn, Jr. (No. 2915)
Sarah E. Silveira (No. 6580)
Zachary J. Javorsky (No. 7069)
RICHARDS, LAYTON & FINGER P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:  302-651-7700
Email:  stearn@rlf.com
         silveira@rlf.com
         javorsky@rlf.com

-and-

SCHULTE ROTH & ZABEL LLP
Peter H. White
Noah N. Gillespie
555 13th Street NW, Suite 6W
Washington, DC 20004
Telephone: 202.729.7476
Email:  pete.white@srz.com
         noah.gillespie@srz.com

(Admitted *Pro Hac Vice*)

-and-

Kristine Manoukian (No. 5509)
Kelly V. Knight (Admitted *Pro Hac Vice* )
Paulina Piasecki (Admitted *Pro Hac Vice*)
919 Third Avenue
New York, NY 10022
Telephone:  212.756.2466
Email: kristine.manoukian@srz.com
      kelly.knight@srz.com
      paulina.piasecki@srz.com

*Counsel for Pacific Investment*
*Management Company LLC and PIMCO*
*Investments LLC*

20