**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 22-10584 (CTG) |
| FIRST GUARANTY MORTGAGE CORPORATION, *et al.*,[1] | (Jointly Administered) |
| Liquidating Debtors. | **Re: D. I. 1017, 1032, 1060 & 1062** |

**REPLY OF THE PIMCO PARTIES IN FURTHER SUPPORT OF THEIR**
**MOTION TO ENFORCE THE CONFIRMATION ORDER AGAINST**
**THE PROPOSED THIRD AMENDED COMPLAINT IN THE QUI TAM LITIGATION**

The PIMCO Parties hereby submit this reply in support of their motion to enforce the

Confirmation Order [D. I. 671] against the proposed Third Amended Complaint (the "TAC").[2]

## PRELIMINARY STATEMENT

1.      Like the SSAC before it, the TAC asserts only derivative, alter ego or veil piercing

claims against the PIMCO Parties (and the BRAVO Entities).[3]  The TAC repeats virtually all of

the same claims and allegations contained in the SSAC, and the few non-material modifications

do not change the derivative or alter ego nature of the claims asserted against the PIMCO Parties

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number in the jurisdiction were:  First Guaranty Mortgage Corporation ("FGMC") (9575); and Maverick II Holdings, LLC (5621).

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the *Reply of the PIMCO Parties for Contempt for Violations of the Court's Enforcement Order and Confirmation Order* [D. I. 1017] (the "TAC Motion to Enforce").  The Court deemed the TAC Motion to Enforce a new motion in its *Order (I) Denying the PIMCO Parties' Motion for Contempt and (II) Setting Deadlines* [D. I. 1032].

[3] References in this reply to the "TAC," including the citations thereto, refer to Relator's most recent proposed complaint that was submitted with her objection to the TAC Motion to Enforce [D. I. 1062-1] (the "Objection").  The changes to this latest version of the TAC compared to the prior version that was the basis for the Motion for Contempt [D.I 988] are *de minimis*.  The primary change to Relator's latest version of the proposed TAC is to eliminate the "conspiracy" cause of action.  As the PIMCO Parties previously demonstrated, under Virginia law, conspiracy allegations assert derivative claims that FGMC released.  TAC Motion to Enforce, D. I. 1017, ¶¶ 5, 29-38.  By deleting the conspiracy claim, Relator implicitly concedes that claim has been released and is barred.  For the Court's convenience, attached hereto as Exhibit 1 is a redline comparing the latest version of the TAC to the SSAC, which highlights how similar the complaints are and that the TAC does not materially alter the complaint that this Court recognized asserts derivative and released claims.  *See* Exhibit 1.

(and the BRAVO Entities).  *See* Exhibit 1 hereto (comparing the TAC to the SSAC).  As with the SSAC, the theories the TAC advances would require disregarding the corporate form of FGMC to hold others liable for actions taken "at FGMC."  TAC ¶¶ 197-199.  The claims asserted in the TAC against the PIMCO Parties (and the BRAVO Entities) (*i*) existed when these bankruptcy proceedings began and (*ii*) are based on general allegations that are the same for all creditors rather than the personal dealings of any single creditor.  The TAC's claims are therefore property of FGMC's bankruptcy estate, and FGMC as debtor-in-possession had the right to compromise those claims.  The Debtor/Estate Release in the Plan released those claims, and the Confirmation Order permanently enjoins any effort to pursue them.  Accordingly, Relator is barred by the Confirmation Order from asserting these claims against the PIMCO Parties (and the BRAVO Entities).

2.       In the Enforcement Order, this Court re-affirmed that the claims asserted against the PIMCO Parties in the SSAC belonged to the Debtors' estates and were permanently released and barred by the Confirmation Order.  The Court therefore ordered Relator "to immediately cease and refrain" from pursuing those claims, and to take all necessary actions to release those claims from the Qui Tam Litigation.  D. I. 951, ¶¶ 4–5.  Despite this clear prohibition and directive, Relator failed to comply and the PIMCO Parties filed the Motion for Contempt.

3.       At the hearing on the Motion for Contempt, this Court directed the parties to brief whether "the [T]hird [A]mended [C]omplaint . . . violate[s] the original [P]lan injunction."  Nov. Hr'g Tr. 31:1–8.  It does.  Notwithstanding Relator's limited cosmetic changes, the TAC (Relator's *sixth* attempt to state a cognizable and unbarred claim) continues to assert the same released, derivative claims against the PIMCO Parties, as well as the BRAVO Entities it proposes to add as defendants, that have been released and permanently barred.

2

4.    Relator concedes that all derivative, alter ego and veil piercing claims were released and enjoined but contends that the TAC does not assert derivative claims, based in part on the TAC's legally inaccurate, self-serving disclaimer.  TAC ¶ 193.  No disclaimer can alter the fundamental essence of the underlying claims.  Like the SSAC, the TAC seeks to hold the PIMCO Parties (and BRAVO Entities) liable for alleged conduct that occurred "at FGMC" based solely on their purported control over or management of FGMC.  *Id*. ¶¶ 197–199.  These claims assert derivative theories of liability under governing Virginia law, which claims belonged to the Debtors under the law in this Circuit.

5.    Despite acknowledging that the only question for this Court is "whether the TAC asserts derivative, alter ego or veil piercing claims against the PIMCO Parties" [D. I. 1062, ¶ 14], Relator's entire Objection is devoted to defending the sufficiency of the TAC's allegations under the FCA rather than addressing the limited question before the Court.  As this Court has recognized, "whether under non-bankruptcy law [the PIMCO Parties] might, if the allegations are true, have liability under the FCA" is *not* the question for this Court.  Sept. Hr'g. Tr. 47:10-12.  Rather, this Court's role is to determine whether the TAC asserts claims that have been released and enjoined by the Plan and Confirmation Order.  By invoking cases that address whether the claims asserted are sufficient to state an FCA claim, the Objection fails to address this fundamental question.

6.    This Court previously recognized Relator's failure to "engag[e] with the premise of [*In re Emoral*, 740 F.3d 875, 879-80 (3d Cir. 2014)]." [4]  Nov. Hr'g. Tr. 54:15—55:4.

---

[4] As the Court noted at the hearing on the PIMCO Parties' motion to enforce the Confirmation Order with respect to the SSAC, "when you sue someone on an alter ego or a veil piercing cause of action, that the claim against the alter ego belongs in the first instance to the company that was taken over and, therefore, when a creditor directly brings an alter ego action, it's essentially commandeering the estate's claim and, in a world in which the estate has settled that claim, it's inconsistent with the plan to allow you to bring a claim that has been essentially fully resolved[,] would belong to the estate, was property of the estate, and that the estate released under the plan." *Id*.

Remarkably, the Objection does not cite *Emoral*, nor does it address the "premise" of *Emoral*'s binding framework.  It does not do so because the claims alleged in TAC are types of claims that *Emoral* held, and this Court already determined, were property of the estate (and therefore barred by the Confirmation Order).  As the Court did with the SSAC, the Court should, again, enforce the Confirmation Order against the TAC, enjoin Relator from pursuing the claims that have been released by the Plan, which include all of the claims asserted in the TAC, and require Relator to dismiss the PIMCO Parties and BRAVO Entities from the Qui Tam Litigation.

## ARGUMENT

### I.    Derivative Claims Are Property of the Debtor's Estate.

7.    The bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held." 11 U.S.C. § 541(a)(1); *City of Chicago v. Fulton*, 141 S. Ct. 585, 589 (2021); *Emoral*, 740 F.3d at 879.  While Relator contends that it is "inappropriate" for the Court to apply state law [D. I. 1062, at 2, n.4], the Bankruptcy Code recognizes that the debtor's "[p]roperty interests are created and defined by state law."  *Butner v. United States*, 440 U.S. 48, 55 (1979); *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 135 (4th Cir. 1988) (collecting authority); *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 821 F.2d 1339, 1343–44 (7th Cir. 1987) ("State law determines whether property is an asset of the debtor").

8.    A cause of action is the property of the bankruptcy estate if (*i*) the debtor had the right to bring the claim under state law at the time the bankruptcy case commenced, and (*ii*) the claim is "general," meaning that the facts necessary to establish it are the same for all creditors. *Emoral*, 740 F.3d at 879–81; *PHP Liquidating, LLC v. Robbins*, 128 F. App'x 839, 844–45 (3d Cir. 2005); *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown*, 296 F.3d 164, 169 n.5 (3d Cir. 2002); *Koch Refining*, 831 F.2d at 1345.  By contrast, "personal" claims depend on

4

"the specific nature of [the plaintiff's] relationship with the [debtor]," and "other creditors generally have no interest in that claim." *Emoral*, 740 F.3d at 879 (quoting *Foodtown*, 296 F.3d at 170); *Koch Refining*, 831 F.2d at 1348–49.

9.      Because the focus of the general/personal inquiry is "the nature of the cause of action itself," including the underlying theory of liability, the Court must examine each cause of action individually under applicable state law.  *See Emoral*, 740 F.3d at 879; *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700 (2d Cir. 1989) ("Whether the rights belong to the debtor or the individual creditors is a question of state law.").  To the extent the same facts support more than one claim, *Emoral* requires the Court to evaluate each claim independently.  *See* Nov. Hr'g Tr. 9:9–11.  As the Third Circuit recently explained:

> To distinguish general from personal claims, we focus not on the nature of the injury, but on the "theory of liability." *Emoral*, 740 F.3d at 879.  Claims alleging that "third parties . . . wrongfully deplete[d] the debtor's assets" are general or derivative because "[e]very creditor has a similar claim for the diversion of assets of the debtor's estate." *Tronox Inc. v. Kerr-McGee Corp. (In re Tronox Inc.)*, 855 F.3d 84, 103 (2d Cir. 2017); *accord Emoral*, 740 F.3d at 879–80.  The theory of recovery for those claims is "not tied to the harm done to the creditor by the debtor." *Tronox*, 855 F.3d at 103.  Rather, it is "based on an injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claim[s] against the debtor." *Id.* at 104.

*In re Wilton Armetale, Inc.*, 968 F.3d 273, 282–83 (3d Cir. 2020) (alterations in original).

10.      "If the theory of recovery 'would be based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors,' then the claim is general, not personal." *Id.* at 283 (quoting *Emoral*, 740 F.3d at 881).  "Only when a particular creditor suffers a direct, particularized injury that can be 'directly traced' to the

5

defendant's conduct is the claim personal to that creditor and not property of the estate." *Id.* (quoting *Tronox*, 855 F.3d at 100).[5]

11.     Applying these principles, courts around the country agree that *derivative* claims, including those alleging corporate malfeasance, paradigmatically belong to the bankruptcy estate. The Third Circuit has so held on at least four occasions.  In *Foodtown*, the Third Circuit accepted as well established that alter ego and veil piercing claims could be asserted by the debtor and were estate causes of action.  *Foodtown*, 296 F.3d at 171.  In *PHP Liquidating*, the Third Circuit held that a claim that a corporation issued dividends when it lacked sufficient capital was a derivative, general claim because the underlying cause of action "seeks to redress an injury common to all creditors."  *PHP Liquidating*, 128 F. App'x at 845–46.  In *Emoral*, the Third Circuit began by acknowledging that alter ego and veil piercing causes of action have long been "properly characterized as property of the bankruptcy estate."  *Emoral*, 740 F.3d at 880.  Examining plaintiffs' claims, the Third Circuit held that the "mere continuation" theory of liability belonged to the bankruptcy estate.  *Id*.  And most recently in *Wilton*, the Third Circuit held that a claim that insiders plundered the debtor's assets was "derivative" and belonged to the estate, despite the suing creditor's "assertions that the plundering targeted and disproportionately affected it."  *Wilton*, 968 F.3d at 283.

12.     Other Circuits agree.  "It has also long been held that rights of action against officers, directors and shareholders of a corporation for breaches of fiduciary duties, which can be enforced by either the corporation directly or the shareholders derivatively before bankruptcy, become property of the estate which the trustee alone has the right to pursue after the filing of a

---

[5] In contrast to the **general** FCA claims the TAC attempts to assert against the PIMCO Parties and the BRAVO Entities, Relator asserts a **direct** personal claim against FGMC for alleged retaliation. That is because the retaliation claim purports to be based on facts that are unique to Relator and do not apply to all creditors alike.

bankruptcy petition." *Koch Refining*, 831 F.2d at 1343 (collecting authority). The same goes for claims against "others who have misused the debtor's property in some fashion." *Emoral*, 740 F.3d at 879 (quoting *St. Paul*, 884 F.2d at 701); *see also Wilton*, 968 F.3d at 282. "If under governing state law the debtor could have asserted an alter ego claim to pierce its own corporate veil, that claim constitutes property of the bankrupt estate and can only be asserted by the trustee or debtor-in-possession." *Kalb, Voorhis & Co. v. American Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993).

13.     In applying these standards, the Seventh Circuit cited the example of a bankruptcy case that barred a creditor's claim because it was equivalent to assertions the trustee had raised but which had been settled and released. *Koch Refining*, 831 F.2d at 1347 n.10 (citing *In re Am. Hawk Enters., Ltd.*, 52 B.R. 395, 399 (E.D. Va. 1985)). That decision led to, and was affirmed by, the leading opinion governing the Fourth Circuit's standard for derivative claims. *Steyr-Daimler-Puch of Am. Corp.,* 852 F.2d at 134. There, the Fourth Circuit concluded that "an alter ego claim, under Virginia law, is property of the corporation so that it becomes property of the bankruptcy estate" and that because the bankruptcy trustee had previously settled that claim and extended a general release, that claim was barred. *Id.* at 135. "Under Virginia law, a corporation has an equitable interest in the assets of an alter ego because the corporation and the alter ego are 'one and the same.'" *Id.* (quoting *Pepper v. Dixie Splint Coal Co.*, 181 S.E. 406 (Va. 1935)). Accordingly, Bankruptcy Code "Section 541(a) brings the right of [the debtor] to proceed against its alter ego and claim its equitable interest in assets of the alter ego into the bankrupt estate." *Id.* Because the "trustee succeeded to that right and compromised it with the alter egos, Pappas and Hawk U.S.A.," that claim was barred. *Id.* Likewise, the estate claims in *Emoral* had already been released. *Emoral*, 740 F.3d at 882.

7

## II.    FGMC Had the Right to Bring the Claims Made in the Proposed TAC.

14.    This Court already held that the claims asserted in the SSAC belonged to FGMC's bankruptcy estate under Virginia law and *Emoral*'s binding precedent.  D. I. 951, ¶ 2; Sept. Hr'g Tr. 67:13–20.  The proposed TAC attempts to continue to pursue those same claims against Released Parties (as defined in the Plan), including the PIMCO Parties and the BRAVO Entities, in violation of the Confirmation Order and the Enforcement Order.  *See* D. I. 951, ¶¶ 4–5.

15.    In response, Relator contends she has now asserted a "direct claim."  Her *ipse dixit* does not make it so, however.  Fundamentally, Relator is attempting to hold corporate entities liable for acts that occurred at a separate corporate entity by virtue of their corporate relationship.  That is the very essence of a derivative claim.  Under Virginia law, alter ego and veil piercing claims are derivative, and Relator's own allegations confirm that is true of her claims here.

16.    *Emoral* recognized that to "determine whether" the claim "constitutes property of [the debtor's] bankruptcy estate, we must examine the nature of the cause of action itself." *Emoral*, 740 F.3d at 879.  For that reason, the purported disclaimer in the TAC—asserting that the claims do not assert alter ego or veil piercing theories—is irrelevant to the Court's analysis here.  As the Third Circuit recognizes, determining whether a claim is the property of the estate requires examination of the cause of action itself, not Relator's legally irrelevant labels.

17.    Although the *Emoral* plaintiffs framed their lawsuit as bringing "personal injury claims" arising out of the unique injuries each of them suffered, "their only theory of liability" against the successor corporation was that "as a matter of state law, [Emoral's successor] constitutes a 'mere continuation' of Emoral such that it has also succeeded to all of Emoral's liabilities."  *Id*.  The Third Circuit correctly held that plaintiffs asserted a derivative claim that belonged to the estate.  *Id.*

8

18.    Here Relator asserts that the PIMCO Parties (and BRAVO Entities) are liable for causing FGMC's alleged violation based on their control and management over FGMC, which the TAC now relabels as "knowing[] assist[ance]."  However, like the SSAC, the TAC alleges that "PIMCO" became FGMC's "new rich uncle," TAC ¶ 200; SSAC ¶ 192, when the BRAVO Entities "bought the majority of FGMC," and that "PIMCO" held "at least two seats" on FGMC's board of directors, and ultimately obtained "100 percent of FGMC's equity," TAC ¶¶194, 211-212; SSAC ¶¶ 189, 203-204; *see also* TAC ¶ 199 ("After the sale, PIMCO quickly took control"), ¶ 200 ("It was made clear to FGMC staff that PIMCO was the only making the decisions."), and ¶ 212 ("PIMCO continues to control FGMC.").  And as the TAC concedes, it is only through these alleged actions of domination and control over FGMC that the PIMCO Parties purportedly "knowingly assisted the false certifications and false claims of FGMC." TAC ¶ 213.

19.    As with the SSAC, the TAC's allegations that the PIMCO Parties exercised control over FGMC confirm that the Relator is attempting to hold the PIMCO Parties and the BRAVO Entities liable by erasing the identities of separate corporate entities.  By seeking to impose liability on the PIMCO Parties and the Bravo Entities for conduct "at FGMC," the TAC "continue[s]" "pursuing" the same derivative, alter ego, and veil piercing claims this Court held were released and enjoined in the Confirmation Order. D. I. 951, ¶¶ 2-4.  Relator's latest attempt to modify her claims to assert that the PIMCO Parties "knowingly assisted" FGMC and caused it to violate the FCA is simply an alternative phrasing of her derivative claims.  But inserting "knowingly assist" into derivative claims does not convert them into direct claims, especially when the alleged "knowing assistance" is premised on the purported failure to respect the corporate form of separate entities.  Indeed, Relator's "knowingly assist" allegations acknowledge that only FGMC

9

purportedly violated the FCA and that any alleged role the PIMCO Parties (and BRAVO Entities) played was secondary, at best.

20.    Relator's "knowingly assisted" allegations seek to eliminate the distinction between PIMCO and FGMC and to treat separate and distinct corporations as a single entity, jointly liable for each other's misconduct.  These assertions set forth quintessential alter ego/veil piercing claims that could have been brought by FGMC.  As such, FGMC had the power to, and did, release them.  Because Virginia law recognizes that the TAC's theories assert derivative claims that fundamentally belong to FGMC, the first prong of *Emoral* is satisfied.

## III.    Relator's Non-Bankruptcy, FCA Authorities Are Irrelevant to the Issue Before This Court

21.    As noted, Relator's Objection does not address *Emoral* or the test it established to determine whether a claim belongs to the bankruptcy estate.  Instead, Relator argues that allegations of "knowing assistance" can state a viable FCA claim.  Attempting to support her position, Relator invokes decisions that she contends held that the FCA claims in those cases stated viable claims against parties that "knowingly assisted" the party that actually presented the false claims.  *See* D.I. 1062, ¶¶ 17, 20-24.

22.    But none of the cases Relator cites addressed the issue this Court must decide—whether a claim of "knowingly assisting" another's FCA violation is a derivative claim that belongs to and was released by the debtor.  Rather, the caselaw on which Relator relies merely addresses whether the specific allegations in those cases, including allegations that a third party "knowingly assisted" another's FCA violation, are sufficient under the FCA to state a claim for "causing" another party to file false claims.

23.    For example, *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), recognized that allegations that local government sponsors and groups of electricians violated the FCA by

10

submitting collusive bids to obtain contracts paid with federal funds, could support a finding that the electricians "caused" the alleged false claims that were submitted by the local sponsors, even though the electricians did not themselves submit false claims. *Hess*, however, did not address and has no relevance to the question of whether an FCA claim belongs to a debtor's estate.

24.     Likewise, in *U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d at 243 (3d Cir. 2004), the court summarized the issue it decided as whether "it fairly [can] be said that Zimmer knowingly assisted in causing the government to pay claims which were grounded in fraud? Construing the facts alleged in the first amended complaint in a light most favorable to Schmidt, we conclude it can." *Id*. at 243-44. *Zimmer* acknowledges that the issue before it was whether the allegations were sufficient to state a claim under the FCA, *not* whether the allegations assert a derivative claim that belongs to a bankruptcy estate.

25.     Similarly, *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370 (5th Cir. 2004), held that allegations that defendants engaged in a scheme to file claims with the government for medically unnecessary services were sufficient to state FCA claims against all defendants, including those who did not actually file the claims. Like Relator's other authorities, *Riley* is irrelevant to the issue this Court must decide—whether an FCA claim belongs to a debtor because it asserts a derivative claim.

26.     Finally, *Massachusetts ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, 334 F.Supp. 3d 394 (D. Mass. 2018), recognized that liability for submitting false claims may be imposed against all parties that "participat[ed] in the claims process," thereby "causing" others to violate the Massachusetts false claims statute. However, *Martino-Fleming* does not address whether an FCA claim based on assertions that one corporation functioned as the alter ego of another belongs to a debtor because it asserts a derivative claim.

11

27.     As Relator concedes, whether the allegations in the TAC are sufficient to state a viable FCA claim against the PIMCO Parties is not the issue for this Court or the TAC Motion to Enforce.  Rather, as Relator observes, "[t]hat is a question for the Delaware District Court to decide."  D. I. 1062, ¶ 2.  Accordingly, none of the caselaw Relator cites regarding whether the allegations in those cases against third parties state a viable FCA cause of action has any relevance to the question before this Court—whether the TAC asserts derivative claims (based on alter ego and veil piercing theories) that belonged to and were released by FGMC.

## IV.    Relator's FCA Claim Against the PIMCO Parties Is a General Claim.

28.     As to *Emoral*'s second prong, there is no dispute that the TAC's FCA claim against the PIMCO Parties is a general claim.  Neither the allegations in the TAC nor the arguments in Relator's objection "demonstrate how any of the factual allegations that would establish [her] cause of action" are unique to Relator as compared to FGMC's other creditors.  *Emoral*, 740 F.3d at 880.  Rather than assert a personal claim, the TAC is "based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors." *Id.* at 881.  Here, the facts that would be necessary to demonstrate that the PIMCO Parties (and BRAVO Entities) allegedly violated the FCA are the same for all FGMC creditors.  *Koch Refining*, 831 F.2d at 1349 (a personal claim depends on the creditor's "personal dealings" with the debtor).[6] Indeed, neither Relator nor the United States Government on whose behalf Relator purports to sue had any personal dealings with the PIMCO Parties or the BRAVO Entities in connection with the derivative FCA claims the TAC asserts against the PIMCO Parties.  Accordingly, the TAC easily satisfies *Emoral*'s test for a general claim.

---

[6] The Seventh Circuit explained that derivative claims are general precisely because, outside of the bankruptcy context, alter ego and veil piercing are widely available claims that "any creditor" could assert "without regard to the specific nature of his relationship with the corporation and its alleged alter ego."  *Koch Refining*, 831 F.2d at 1345.

RLF1 30322831v.1

29.     None of Relator's allegations against the PIMCO Parties and the BRAVO Entities depends on "the specific nature of [Relator's] relationship with [FGMC]." *Emoral*, 740 F.3d at 879 (quoting *Foodtown*, 296 F.3d at 170); *Koch Refining*, 831 F.2d at 1348–49.  Such claims are "not tied to the harm done to the creditor by the debtor" but are true (or false) for all creditors. *Wilton*, 968 F.3d 282 (citing *Tronox*, 855 F.3d at 103).  Likewise, allegations that PIMCO Parties (or the BRAVO Entities) caused FGMC to violate the FCA are true (or not) for all creditors.  They are, therefore, general claims.

30.     Further, as this Court already determined with the Enforcement Order, any potential recovery based on Relator's derivative claims would inure to the bankruptcy estate and expand the assets available for distribution to all creditors, and that conclusion does not change based on Relator's non-material modifications to the SSAC in the TAC, or the inclusion of "knowing assistance" allegations.

31.     The TAC's claims are derivative claims under Virginia law because the facts alleged to support Relator's claims are the same for all creditors.  *Emoral's* binding precedent recognizes that such claims belong exclusively to FGMC and were released through FGMC's Debtor/Estate Release and this Court's permanent injunction.  Relator cannot continue to pursue any of the claims asserted in the TAC against Released Parties.  This Court should enforce the Confirmation Order and put an end to Relator's improper conduct.

**V.     The Court Should Enforce the Confirmation Order to Bar Further Pursuit of Released Claims Against the PIMCO Parties and BRAVO Entities.**

32.     The PIMCO Parties should not be forced to keep coming back to this Court to obtain the relief the Confirmation Order already granted in approving the Debtor/Estate Release and permanently enjoining all persons from taking actions contrary to the Confirmation Order's provisions.

RLF1 30322831v.1

33.     As the debtor-in-possession, FGMC had the right to compromise any cause of action that belonged to the bankruptcy estate.  This Court specifically found that the "Plan reflects the settlement and resolution of several complex issues, and the Debtor/Estate Release is an integral part of the consideration to be provided in exchange for the compromises and resolutions embodied in the Plan."  Confirmation Order, D. I. 671 at 10.  After careful review, this Court held that the Debtor/Estate Release was "fair, equitable, and reasonable," "given and made after due notice and hearing," and was "in the best interests of the Debtors, the Estates, and all holders of Claims and Interests," including Relator.  *Id.* at 10–11.  Consequently, all such derivative claims have been settled and forever released.  *Id.* ¶ 35, D. I. 671 at 29–31.

34.     This Court permanently enjoined all persons from taking any action contrary to the Plan and Confirmation Order.  *Id.* ¶ 39, D. I. 671 at 34–35; Plan § 16.3, D. I. 671-1 at 92. The Court enforced the Plan and Confirmation Order against Relator and the SSAC (D. I. 951), finding that it was "satisfied from the review of the operative complaint that the claims it asserts are claims that are under the rationale of Emoral and my decision in TPC, which simply gives effect to the rationale of Emoral estate causes of action."  Sept. Hr'g Tr. 67:14–20.  In other words, this Court concluded that all of the claims in the SSAC against the PIMCO Parties were estate causes of action that were released and permanently barred.[7]  As a result, the Court ordered Relator to "immediately cease and refrain from any further acts to commence or continue, in any manner or in any place, any action, or other proceeding, including the Qui Tam Litigation, to prosecute, assert, or enforce the Released Claims asserted against the PIMCO Parties" and directed Relator

[7] As this Court found, the theoretical possibility that there could be a claim that "PIMCO took independent action that violated the FCA in a way in which you could say a perfect stranger who wasn't a corporate affiliate might have taken such action" was "not how I read this complaint." Sept. Hr'g Tr. 49:13–50:1. As with the SSAC, the TAC makes no allegation of "independent action that violated the FCA in a way in which you could say a perfect stranger who wasn't a corporate affiliate might have taken such action." *Id.*

14

"to take all actions necessary to dismiss the Released Claims from the Qui Tam Litigation." D. I. 951, ¶¶ 4–5.

35.     Despite the Court's clear prohibition, Relator's TAC continues to assert Released Claims against Released Parties.  Accordingly, as with the SSAC, the Court should enforce the Confirmation Order with respect to the claims asserted in TAC because those claims are derivative claims that belonged to the Debtor and were released under the Plan.

## CONCLUSION

36.     For the reasons discussed above and in the PIMCO Parties' prior submissions, the PIMCO Parties respectfully request that this Court grant the relief requested in the TAC Motion to Enforce and enter the proposed order [D. I. 1060-1] the PIMCO Parties previously submitted.


Dated:  December 16, 2023          /s/ Robert J. Stearn, Jr.
                                   Robert J. Stearn, Jr. (No. 2915)
                                   Zachary J. Javorsky (No. 7069)
                                   RICHARDS, LAYTON & FINGER P.A.
                                   One Rodney Square
                                   920 N. King Street
                                   Wilmington, DE 19801
                                   Telephone:  302-651-7700
                                   Email:  stearn@rlf.com
                                           javorsky@rlf.com

                                   -and-

                                   SCHULTE ROTH & ZABEL LLP
                                   Peter H. White
                                   Noah N. Gillespie
                                   555 13th Street NW, Suite 6W
                                   Washington, DC 20004
                                   Telephone: 202.729.7476
                                   Email:  pete.white@srz.com
                                           noah.gillespie@srz.com

                                   (Admitted *Pro Hac Vice*)

                                   -and-

15

RLF1 30322831v.1

Kristine Manoukian (No. 5509)
Kelly V. Knight (Admitted *Pro Hac Vice*)
Paulina Piasecki (Admitted *Pro Hac Vice*)
919 Third Avenue
New York, NY 10022
Telephone:  212.756.2466
Email: kristine.manoukian@srz.com
   kelly.knight@srz.com
   paulina.piasecki@srz.com

*Counsel for Pacific Investment
Management Company LLC and PIMCO
Investments LLC*

RLF1 30322831v.1