**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>FIRST GUARANTY MORTGAGE CORPORATION, *et al.*,<br><br>Liquidating Debtors. | Chapter 11<br><br>Case No. 22-10584 (CTG)<br><br>(Jointly Administered)<br><br>**Related Docket No. 1032** |

## <u>MEMORANDUM OPINION</u>

The PIMCO Parties move this Court to hold Kari Crutcher, a relator who brought a prepetition False Claims Act lawsuit against debtor First Guaranty Mortgage Corporation and various related parties, in contempt for violation of the injunction issued in connection with this Court's confirmation of the debtors' plan of reorganization.[1]  The theory is that the action that Crutcher now seeks to assert against the PIMCO Parties is actually an estate cause of action, one that FGMC released in connection with the plan.  That plan release was backed by an injunction contained in this Court's confirmation order.

Crutcher previously sought to assert a veil piercing claim against the PIMCO Parties.  This Court, however, held that this claim was an estate cause of action that was released under the plan.  Crutcher now seeks to assert a claim for assisting in the making of a false statement.  She contends that unlike the claim for veil piercing, the claim for assisting in the making of a false statement is not an estate cause of

---

[1] Debtor First Guaranty Mortgage Corporation is referred to as "FGMC."  Movants Pacific Investment Management Company LLC and PIMCO Investments LLC are referred to as the "PIMCO Parties."

action, but rather one that she holds and may assert.  Or to be more precise, she contends that it is a claim held by the United States that the False Claims Act permits her to assert on the government's behalf as relator.  For the reasons described below, the Court concludes that Crutcher's position is correct.  The claim that she now seeks to assert is not an estate cause of action and thus falls outside the scope of the release the debtors gave.  Crutcher's assertion of that claim therefore does not violate the plan injunction.  The motion will be denied.

## Factual and Procedural Background

The debtors were a leading non-bank mortgage lender, whose business included originating, purchasing, servicing and securitizing mortgage loans.[2]  Rising interest rates and other unfavorable macroeconomic conditions put pressure on the debtors' business, ultimately leading to this bankruptcy case being filed in June 2022.[3]  Over the course of the bankruptcy case, the debtors sold their assets, reached various settlements with parties in interest, including Fannie Mae and Freddie Mac, and wound down their business affairs.

By order dated November 2, 2022, this Court confirmed the debtors' plan of reorganization.[4]  While the PIMCO Parties were the beneficiaries of a *consensual* third-party release, Crutcher opted out of that release and so is not bound by it.  The debtors, however, released any claim against that they might have held against the

---

[2] D.I. 19 ¶ 6.

[3] *Id.* ¶¶ 24-29.

[4] D.I. 671.

PIMCO Parties.[5]  And the plan thus operates to enjoin Crutcher (and all parties) from asserting a claim against the PIMCO Parties that is actually an estate claim that was released under the plan.[6]

Crutcher had filed a *qui tam* action against FGMC in 2016 in the United States District Court for the District of Georgia, alleging violations of the False Claims Act.[7] In June 2022, the day before the filing of this bankruptcy case, she amended her complaint to add the PIMCO Parties (among others) as defendants.

In August 2023, Crutcher filed a motion seeking relief from the plan injunction to permit her to proceed against FGMC, in name only, in the *qui tam* action, with any recoveries limited to any insurance that may be available.[8]  By order dated September 8, 2023, this Court granted that motion.[9]

Also in August 2023, the PIMCO Parties filed a motion seeking a determination that Crutcher's claims against them in the *qui tam* action violated the plan and confirmation order because the claims Crutcher was asserting were actually estate causes of action that had been released.[10]  Following an argument held on September 5, 2023, the Court determined that the then-operative complaint in the *qui tam* action sought to recover against the PIMCO Parties, who are corporate

---

[5] D.I. 671-1 § 16.2(a) (providing for release of any claim held by the estates); *id.* § 3 (definitions of "Released Party" and "Related Persons").

[6] *See* D.I. 671 ¶¶ 34, 35; D.I. 671-1 § 15.1.

[7] *See United States ex rel. Crutcher v. First Guaranty Mortgage Corporation*, N.D. Ga. No. 16-03812.

[8] D.I. 897.

[9] D.I. 960.

[10] D.I. 900.

affiliates of the debtors, on theories that were fundamentally claims for veil piercing or disregarding the corporate form.  The Third Circuit's decision in *In re Emoral* and this Court's decision in *In re TPC Group Inc.*, however, explain that a claim that a parent company's corporate veil may be pierced, such that the parent  is liable for its subsidiary's debt, is a claim that belongs to (and thus can be released by) the subsidiary.[11]  This Court accordingly entered an order on September 5, 2023 enforcing the Plan and directing Crutcher to dismiss that claim from the *qui tam* action.[12]

Crutcher's actions to come into compliance with that order were less than energetic.  As of October 5, 2023, a month after the order had entered, Crutcher had not taken any action to dismiss the claims as required by this Court's order. Accordingly, on that date, the PIMCO Parties moved to have Crutcher held in contempt.[13]

On October 13, 2023, Crutcher filed a motion in the U.S. District Court for the District of Georgia seeking leave to amend her complaint.[14]  Crutcher then contended in this Court that the proposed amended complaint would dismiss the claims that were ones for veil piercing and sought to impose liability on the PIMCO Parties only for claims that, she contended, fell outside the scope of the plan injunction, including

---

[11] *See In re Emoral*, 740 F.3d 875 (3d Cir. 2014); *In re TPC Group, Inc.*, 2023 WL 2168045, (Bankr. D. Del. Feb. 22, 2023).

[12] D.I. 951.

[13] D.I. 988.

[14] D.I. 998-1.  It appears that the parties raised in the district court, but the district court did not decide, whether Crutcher's proposed amendment was consistent with this Court's plan injunction.

claims alleging that the PIMCO Parties were liable for having conspired with FGMC to submit false claims to the government.[15]

In their reply brief in support of their contempt motion, the PIMCO Parties argued that the proposed amended complaint failed to solve the problem. They argued that the claims of conspiracy were, in substance, no different from veil piercing claims, and that the amended complaint thus continued to assert claims that belonged to FGMC that were released under the plan. In that reply, the PIMCO Parties asked that sanctions be awarded against Crutcher on that basis.[16]

This Court heard argument on the motion on November 2, 2023. At the hearing, the Court observed that although Crutcher might have brought greater energy to bear in coming into compliance with the Court's September 5, 2023 order, the Court did not believe that whatever foot dragging may have occurred rose to the level that would warrant the imposition of contempt sanctions.

As to the PIMCO Parties' claim that the amended complaint that Crutcher sought to file would still violate the plan injunction, because that argument was made for the first time in the PIMCO Parties' reply brief, the Court concluded that it would not be appropriate to rule without giving Crutcher the opportunity to respond in writing to the claim. The Court thus determined that it would treat the reply brief

---

[15] D.I. 998.

[16] D.I. 1017.

as a new motion, set deadlines for Crutcher to respond and for the PIMCO Parties to reply, and scheduled the matter for a hearing set for December 21.[17]

In its opposition, Crutcher again moved the goalpost, attaching a still further proposed revised complaint that would remove the claims of conspiracy.   Now, Crutcher's proposed complaint contends that the PIMCO Parties (as well as other affiliated entities who were also released by the debtor and are protected by the plan injunction) are liable for knowingly assisting in the making of false claims to the government.[18]

## Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). As a case within the district court's bankruptcy jurisdiction, it has been referred to this Court under 28 U.S.C. § 157(a) and the district court's standing order of reference.[19]  The PIMCO Parties' motion asks this Court to interpret the injunction contained in the plan of reorganization and this Court's confirmation order.  Because this Court plainly has jurisdiction to enforce its own orders, this is a core matter under § 157(b).[20]

---

[17] D.I. 1032.

[18] D.I. 1062.

[19] Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated Feb. 29, 2012.

[20] *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *In re Essar Steel Minnesota LLC*, 47 F.4th 193, 200-202 (3d Cir. 2022).

## Analysis

**Claims of "knowing assistance" are, for the purposes that are relevant here, direct rather than derivative claims that are not barred by the plan injunction.**

The question before the Court is whether the claims that Crutcher seeks to assert in the *qui tam* action against the PIMCO Parties for "knowingly assisting" in the making of a false claim are claims that actually belong to the debtor and were released under the plan.

As an initial matter, the Court emphasizes that the *merits* of the claim for "knowing assistance" is not before this Court. At argument, the PIMCO Parties emphasized that they vigorously dispute the suggestion that current law recognizes the existence of any such claim. But that question, the parties agree, is not for this Court to decide. Rather, the only question this Court should properly address is whether such a claim, if it is in fact recognized by the law, is one that is covered by the release contained in the confirmed plan. The Court engages this analysis assuming for argument's sake that the claim is a valid one. But to be clear, that is just an assumption, and one whose correctness (or not) is for another court to decide.

The Third Circuit's decision in *Wilton Armetale* explains the analytic framework for examining the relevant question.[21] A cause of action is a form of property that is not fundamentally different from any other. The test set forth in

---

[21] *In re Wilton Armetale, Inc.*, 968 F.3d 273 (3d Cir. 2020). See also *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) (citing *Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002) (in determining if a claim belongs to the estate, the test considers whether (1) "the claim existed at the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law," and (2) the claim is "a general one, with no particularized injury arising from it.").

7

*Wilton Armetale* addresses the question of who owns a particular cause of action. That question is not unique to bankruptcy. Outside of bankruptcy, this question may arise when a stakeholder in a corporate entity (whether a shareholder or creditor) asserts a claim, and there is a dispute about whether the claim is held by that plaintiff, or by the corporate entity itself. The state law of "direct" versus "derivative" actions is directed to answering that question. In bankruptcy, the fundamental question is essentially the same. Under § 541(a)(1) of the Bankruptcy Code, causes of action that belonged the debtor become property of the bankruptcy estate. Individual creditors are barred by § 362(a)(3) from asserting those claims, as such an effort would be an act to "exercise control" over property of the estate. In addition, those claims can be settled and resolved by the trustee in bankruptcy. On the other hand, if the claim is a "direct" one – meaning a claim held by a shareholder or a creditor, rather than the company – then (at least in the absence of a third-party release) nothing that happens in the bankruptcy case should interfere with the right of the owner of that claim to assert it against a non-debtor.

As *Wilton Armetale* explains, determining which claims belong to the estate as opposed to an individual creditor depends on the "theory of liability."[22] Where "every creditor has a similar claim" to the one that a particular creditor is seeking to assert, the claim likely belongs to the estate (rather than the creditor) because the "theory of recovery" for such a claim "is not tied to the harm done to the creditor by the debtor."[23]

---

[22] *Wilton Armetale*, 968 F.3d at 282.

[23] *Id.* (internal citations and quotations omitted).

Instead, such a claim "is based on an injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claims against the debtor."[24]

Where the theory of liability turns on a general injury to the estate, the law calls that claim a "derivative" claim. It is "derivative" in the sense that the injury to the creditor derives from the fact that the debtor suffered an injury for which the debtor itself has a claim to recover. In this sense, the term "derivative" is used similarly to how it is used in corporate law to describe the circumstances in which a shareholder that alleges that the shares it holds in a corporation have declined in value on account of the officer or director's breach of duty. There, the shareholder does not hold a *direct* claim against the corporation's officer or director, but instead holds a *derivative* claim that, if it may be asserted by the shareholder, can only be asserted on a "derivative" basis on behalf of the company.[25]

For example, if a company's CEO were grossly incompetent and ran the company into the ground, in violation of the CEO's duty of care, every shareholder would suffer the same injury, reflected in the depressed value of their shares of the company. An individual shareholder cannot assert a claim against the CEO that

---

[24] *Id.* at 283 (internal citations, quotations, and brackets omitted).

[25] *In re TPC Group, Inc.*, 2023 WL 2168045, at *9 (Bankr. D. Del. Feb. 22, 2023). Note also that *Wilton Armetale* makes clear that it is the theory of liability, not the nature of the factual allegations, that is the basis on which one determines whether a claim is direct or derivative. It may well be the case that similar factual allegations support both direct and derivative theories of liability. Accordingly, the fact that Crutcher's proposed complaint may contain many of the same (or similar) factual allegations as her prior veil piercing claim does not necessarily mean that her current proposed complaint is a disguised form of derivative claim.

seeks to recover for the decline in the value of his shares.  This is a claim that belongs to the company and can be asserted by an individual shareholder only on a derivative basis.

On the other hand, if the CEO persuaded a particular shareholder to purchase shares from the company at an inflated price by making knowingly false statements about the company's value in order to induce the shareholder to buy, then that claim of fraud is held by the individual shareholder, since only that shareholder (and not the shareholders in general) was harmed by the fraud.[26]

That may seem obvious enough.  But matters get complicated by the fact that in a different but somewhat related context, the law uses the word "derivative" in a way that has an entirely different meaning.  Under the first use of the term "derivative," the corporate-law usage described above, a derivative claim is one in which a shareholder's (or a creditor's) legal rights "derive" from the rights of the debtor.  There is also, however, a second – broader – use of the term in which a claim is "derivative" if a defendant's potential liability derives from the debtor's conduct and/or the defendant's relationship to the debtor.

The latter is how the term "derivative" is used in the law of third-party releases.[27]  The one area in which Congress has expressly authorized third-party

---

[26] These principles, as a matter of state corporate law, are set forth with greater precision in the Delaware Supreme Court's decisions in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004); and *In re Fairpoint Ins. Coverage Appeals*, 2023 WL 8658850 (Del. Dec. 15, 2023).

[27] *Id.* (explaining that the word "derivative" is one of "many, too many" meanings) (citation omitted).

releases is bankruptcy cases in which the debtor has asbestos-related liabilities. In exchange for a sufficient contribution to the trust that will pay present and future victims, the directors and officers (among others) may obtain a third-party release.

But how far may such a release extend? The directors and officers may not, for example, obtain a release that relieves them of their obligations to pay their home mortgages or their parking tickets. In describing the kinds of claims that may be the subject of a third-party release, the Third Circuit has explained that the release may extend only to "derivative" liability, which means liability that is imposed on the directors or officers by virtue of the third party having a particular kind of relationship with the debtor.[28]

The confusion arises from the fact that this second use of the term "derivative" is broad enough to include claims that would be "direct" claims under the first definition of the term. Consider, for example, a state law that made directors or officers personally liable to pay unpaid wages to a corporation's employees, or one that imposed personal liability on directors or officers for claims of consumer fraud against the company. Such claims may well be derivative in the second sense of the word. The liability of the directors and officers arises by reason of their relationship with the debtor. Their status as directors and officers is the reason they are named in these lawsuits. But these claims are not derivative in the first (corporate law)

---

[28] *See In re Combustion Engineering,* 391 F.3d 190, 233-235 (3d Cir. 2004); *In re W.R. Grace & Co.,* 900 F.3d 126, 135-138 (3d Cir. 2018). *See also* 11 U.S.C. § 524(g)(4)(A)(ii)(I) – (IV) (authorizing third party release "to the extent such alleged liability of such third party arises by reason of" one of four articulated relationships between the third party and the debtor).

sense.  The claim for back wages runs only to the benefit of the employees.  The company's vendors are not entitled to share in that recovery.  And the claim for consumer fraud is held only by the consumer victims of the fraud.  The company's bondholders may not recover on those claims.  Otherwise put, the first use of the term "derivative" (in the corporate law sense, and the one that determines whether a particular claim is owned by a company or by its shareholders/creditors) is narrower than the second (third-party release) sense in which a derivative claim is one that is asserted against a third party by virtue of the third-party's relationship with the debtor.

The difficulty with the PIMCO Parties' position is that it is the first, not the second, usage of "derivative" that is relevant to their argument.  But to the extent they contend that the "knowing assistance" claim is a "derivative" one, that is only true in the second sense.  For example, the PIMCO Parties emphasize that Crutcher's complaint seeks to hold them liable for conduct that took place "at FGMC," as a way of emphasizing that their potential liability for "knowingly assisting" in the making of a false claim derives from their relationship with FGMC.[29]  That is likely correct. If it is, it would be a sufficient basis to distinguish this liability from the director or officer's home mortgage or parking ticket.  If this case involved a non-consensual third-party release (which it does not), this argument would be a good response to an objection that the release is broader than is appropriate.

---

[29] D.I. 1070 at 9.

The PIMCO Parties' contention does not, however, support the argument that Crutcher's claim is "derivative" in the sense that it is actually FGMC's claim to pursue. *Wilton Armetale* emphasized that the distinction between direct and derivative claims depends on the nature of the claim. In determining the nature of a claim, one needs to look at the elements of the particular cause of action and ask whether a claim with those elements seeks to recover on an injury to the corporate entity, or an injury caused to a particular shareholder or creditor.

The elements of a claim for knowingly assisting the making of a false claim would seem to be, at least on first blush, similar to those of aiding and abetting the making of a false statement.[30] Under the definition set forth in the *Restatement (Second) of Torts*, "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he … knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."[31] Applying the *Wilton Armetale* framework to this (or any similar) theory of liability, it seems clear that this claim is a remedy that belongs to the victim of the tort (in the case of the False Claims Act, the government), not to the principal

---

[30] During the December 21, 2023 argument, counsel for the PIMCO Parties contested that assertion, arguing that it cannot be correct because the False Claims Act does not provide a cause of action for aiding and abetting the making of a false claim. If the PIMCO Parties are correct in their assertion, that may well be a strong argument against recognizing a claim for the "knowing assistance" of the making of a false claim. Those, however, are questions for another court to decide. All that matters for current purposes is that, the elements of a claim for knowing assistance (assuming the existence of such a claim) – which must be examined to determine whether the claim is direct or derivative – would appear to be similar to those for a claim of for aiding and abetting.

[31] *Restatement (Second) of Torts* § 876(b).

tortfeasor.  Indeed, to accept the PIMCO Parties' argument would be tantamount to saying that a claim for aiding and abetting the commission of an intentional tort belongs to the tortfeasor rather than the victim.

A claim for knowingly assisting the making of a false statement to the government thus is not one that is held by all of FGMC's creditors.  The party injured by that knowing assistance (again, assuming the claim is a valid one) is not the debtor itself.   Rather, it is the government, on whose behalf a relator asserts a claim.

The PIMCO Parties only response to this line of analysis is to argue that the specific factual allegations that Crutcher makes in support of her claim are, at bottom, the same kinds of allegations one would make if one were asserting a claim for veil piercing or alter ego.  That much is true.  Crutcher alleges that the PIMCO Parties dominated and controlled FGMC, effectively causing it to make the false statements.  But this is where the teaching of *Wilton Armetale* is critical.  Whether a claim is direct or derivative is not a function of whether the facts alleged in a particular complaint might *also* support a different cause of action that would be a derivative claim.  The analysis depends on the theory of liability, which directs one's focus to the elements of the cause of action asserted, rather than the facts alleged in a particular complaint.  For the reasons set forth above, this Court is satisfied that based on the theory of liability, a claim for the knowing assistance in the making of a false statement, if such a thing in fact exists, is one that would be held by the United States (and could be asserted by a relator under the False Claims Act), not by the entity alleged to have made the false statement.

14

Accordingly, the claim that Crutcher seeks to assert is not one that is foreclosed by the confirmed plan or the injunction set forth in this Court's confirmation order. The motion will be denied.  The Court will issue a separate order so providing.

Dated: December 27, 2023

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE